Desmond T. Barry, Jr.
CONDON & FORSYTH LLP
7 Times Square
New York, NY 10036
(212) 490-9100

Liaison Counsel for Plaintiffs/Aviation Parties

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| AMERICAN AIRLINES, INC.; AMR CORPORATION; UNITED AIRLINES, INC.; UAL CORP.; US AIRWAYS GROUP, INC.; US AIRWAYS, INC.; DELTA AIR LINES, INC.; CONTINENTAL AIRLINES, INC.; AIRTRAN AIRWAYS, INC.; COLGAN AIR, INC.; ARGENBRIGHT SECURITY, INC.; GLOBE AVIATION SERVICES CORPORATION; GLOBE AIRPORT SECURITY SERVICES, INC.; HUNTLEIGH USA CORP.; ICTS INTERNATIONAL NV; THE BOEING COMPANY; THE MASSACHUSETTS PORT AUTHORITY; AND THE METROPOLITAN WASHINGTON AIRPORT AUTHORITY | : : : : : : : : : : : : : : | 07 CV 7051<br><br>**COMPLAINT**<br><br>This Action relates to<br>In re September 11th Litigation,<br>No. 21 MC 97 (AKH) and<br>In re September 11th Property<br>Damage and Business Loss<br>Litigation, No. MC 101 (AKH) |
| Plaintiffs/Aviation Parties, | : : : | |
| -against- | : : : | |
| FEDERAL BUREAU OF INVESTIGATION and ROBERT S. MUELLER in his Official Capacity as Director of the Federal Bureau of Investigation | : : : : | |
| Defendants. | : : : : : : | |

------------------------------------------------------------- x

Plaintiffs American Airlines, Inc.; AMR Corporation; United Airlines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; and the Metropolitan Washington Airport Authority (collectively, "Aviation Parties") allege as follows:

## INTRODUCTION

This suit asks the Court to set aside the final agency action of the Federal Bureau of Investigation (the "FBI") refusing to permit the Aviation Parties to depose a limited number of former and current employees of the agency, who have first-hand knowledge of facts that are directly relevant to the Aviation Parties' defense in the personal injury, wrongful death, and property damage litigations arising out of the September 11, 2001 terrorist attacks, *In re September 11 Litigation*, 21 MC 97 (AKH) and *In re September 11 Property Damage and Business Loss Litigation.*, 21 MC 101 (AKH) (collectively, "September 11 Litigations").

The Aviation Parties seek to depose a limited number of former and current FBI employees: Scott Billings, Erik T. Rigler, Michael Rolince, Coleen M. Rowley, and Harry Samit. Each of these witnesses participated in FBI investigations of al-Qaeda and al-Qaeda operatives, both before and after September 11, 2001, and, as a result they have first-hand knowledge of al-Qaeda's operations and the means by which the terrorist group executed the September 11 attacks.

2

However, in a series of boilerplate letters, the FBI refused to permit the Aviation Parties to depose any of the five witnesses that they had proposed.  *See* Exhibit 1 attached.  The agency's blanket refusal to permit a single deposition to go forward is a decision which is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and it should not be permitted to stand.

The national importance of the information that the Aviation Parties seek concerning how the unprecedented terrorist attacks of September 11 were carried out is indisputable.  It is also of clear relevance and importance to the Aviation Parties' defense in the September 11 Litigations.  As one of the key intelligence agencies of the federal government responsible for gathering information on and investigating terrorist threats to the United States and its civil aviation system, the FBI was part of the multi-layered aviation security system in place on September 11.  The agency's current and former employees, therefore, have direct knowledge of facts that are relevant to at least two critical issues in the September 11 Litigations:  (1) whether the Aviation Parties' actions were the proximate cause of the injuries of the plaintiffs in the September 11 Litigations; and (2) whether the defendants' actions were reasonable in light of all of the circumstances, which is the standard the Court has suggested it may apply to some of the plaintiffs' claims.

Weighed against the importance of the factual, non-privileged evidence sought by the Aviation Parties, the minimal burden that the FBI may experience in connection with the proposed depositions is not a sufficient reason to block them from going forward.

## PARTIES

Plaintiffs – American Airlines, Inc.; AMR Corporation; United Airlines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; and the Metropolitan Washington Airport Authority (collectively, "Aviation Parties") – are all defendants in the September 11 Litigations, which are consolidated before this Court pursuant to the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (the "ATSSA"). Each of the Aviation Parties is either a commercial air carrier, airport authority, security company, or aircraft manufacturer.

Defendants – the Federal Bureau of Investigation, an agency of the United States Department of Justice, and Robert S. Mueller, in his official capacity as the Director of the Federal Bureau of Investigation – denied the Aviation Parties' request to depose a limited number of current and former FBI employees as fact witnesses in the September 11 Litigations.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, which authorizes the Court to hold unlawful and set aside final FBI actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, including the agency's unwarranted refusal to permit discovery that has been requested in accordance with the so-called "*Touhy* regulations" set forth at 28 C.F.R. §§ 16.21 *et seq.*

2.    Jurisdiction and venue are also proper in this Court pursuant to § 408(b)(3) of the ATSSSA, which vests the United States District Court for the Southern District of New York with original and exclusive jurisdiction over all actions brought for any claim resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001; including the refusal to permit third-party depositions of witnesses with first-hand knowledge of facts relevant to the September 11 Litigations. Pursuant to the ATSSSA, in the September 11 Litigations, "the general discovery process must be controlled by the very capable judges of the Southern District of New York, the only court with jurisdiction over the Civil Plaintiffs' causes of action." *U.S. v. Moussaoui*, 483 F.3d 220, 239 (4th Cir. 2007).

## FACTUAL ALLEGATIONS

### THE UNPRECEDENTED TERRORIST ATTACKS OF SEPTEMBER 11, 2001

3.    On the morning of September 11, 2001, nineteen terrorists affiliated with the terrorist group al-Qaeda executed unprecedented suicide attacks on the United States. Divided into four groups, *the terrorists boarded and then hijacked four commercial flights*

with the objective of intentionally crashing the airplanes into targets on the ground. The terrorists crashed two of the airplanes, American Airlines Flight 11 and United Airlines Flight 175, into the North and South Towers of the World Trade Center in New York City. A short time later, American Airlines Flight 77 crashed into the Pentagon in Virginia and United Airlines Flight 93 crashed into an open field near Shanksville, Pennsylvania.

4.    In recognition of the American public's deeply-felt need to learn what happened on September 11 and understand the events that led up to the terrorist attacks, Congress and the President created the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"). The 9/11 Commission was given a sweeping mandate to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to commercial aviation, and to present its final report to the President, Congress and the American public. *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States*, xv (2004) ("*The 9/11 Commission Report*").

5.    Through the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, Congress also formed its own Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 (the "Joint Intelligence Inquiry"). The Joint Intelligence Inquiry specifically examined and reported on the activities of the U.S. intelligence community in connection with events leading up to the September 11 terrorist attacks.

6.    In the immediate aftermath of the terrorist attacks, Congress enacted the ATSSSA. Through the Act, Congress created an exclusive federal cause of action for all claims resulting from or relating to the September 11 terrorist attacks. The ATSSSA § 408(b)(3). Congress also designated the United States District Court for the Southern District of New York as the only court with jurisdiction to hear such actions. *Id.*

### THE SEPTEMBER 11 LITIGATIONS

7.    Multiple claimants filed negligence actions against the Aviation Parties, seeking to recover for injuries and fatalities, property damage, and business loss that resulted from the September 11 terrorist attacks. The individual Aviation Parties named in these suits are commercial air carriers, airport authorities, security companies, and an aircraft manufacturer. The claimants seek to impose billions of dollars in liability against the Aviation Parties for their alleged failure to detect and halt the terrorists who attacked the United States on September 11.

8.    Pursuant to the ATSSSA, the multiple litigations against the Aviation Parties were consolidated before the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York, *In re September 11 Litigation,* 21 MC 97 (AKH) and *In re September 11 Property Damage and Bus. Loss Litigation,* 21 MC 101 (AKH).

9.    Through their pleadings, discovery demands, and questions in deposition discovery, the plaintiffs in the consolidated September 11 Litigations have alleged that the Aviation Parties' conduct was deficient in certain respects and that because of these deficiencies the Aviation Parties negligently failed to prevent the terrorist attacks.

Specifically, the plaintiffs are claiming or have indicated that they are likely to claim that: (1) the Aviation Parties had primary responsibility to assess the threat posed by terrorists in general and al-Qaeda in particular to domestic civil aviation, and that the Aviation Parties could have prevented the September 11 terrorist attacks if they had properly carried out this responsibility; (2) the Aviation Parties should have identified and stopped the nineteen terrorists who carried out the attacks before they boarded the hijacked aircraft; (3) the Aviation Parties could have and should have detected whatever items the terrorists used as weapons on September 11; and (4) the Aviation Parties should have anticipated a suicide hijacking and implemented security procedures that would have provided an effective defense against such attacks.

### FBI WITNESSES ARE KNOWLEDGEABLE ABOUT THE SEPTEMBER 11 TERRORIST ATTACKS

10.    Together with the CIA, the FBI was one of the intelligence agencies of the federal government responsible for collecting information on and investigating terrorist threats to the United States at the time of the September 11 attacks. As the FBI itself explains, "the very heart" of its operations lies in its investigations. *See* Federal Bureau of Investigation, "What We Investigate," http://www.fbi.gov/hq.htm.

11.    One of the FBI's responsibilities, both before and since the September 11 terrorist attacks, was to collect intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden. Indeed, President Bush told the 9/11 Commission that the FBI was pursuing approximately 70 al-Qaeda-related investigations as of August 2001. *The 9/11 Commission Report* at 260.

12.   In September 2001, the FBI also had joint responsibility with the Federal Aviation Administration (the "FAA") for assessing the seriousness of potential terrorist threats to civil aviation, pursuant to 49 U.S.C. § 44904(a) (2000).   Section 44904(a) provides:

> The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.   The assessment shall include consideration of the extent to which there are individuals with the capability and intent to carry out terrorist or related unlawful acts against that system and the ways in which those individuals might carry out those acts.   The Administrator and the Director jointly shall decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system.

13.   In September 2001, the FBI also contributed to the process by which the FAA determined whether new security countermeasures were necessary to protect civil aviation.  The FBI evaluated the intelligence it had collected and determined whether the threat of terrorist attacks had materially changed, such that the information should be shared with the FAA.   The FAA, in turn, would then direct commercial airlines and airport authorities to implement any amended security procedures that the FAA determined were an appropriate response to the intelligence that had been conveyed by the FBI.

14.   Following September 11, 2001, the FBI conducted an extensive investigation into the terrorist attacks and the steps that al-Qaeda operatives and Usama Bin Laden took to plan and execute the attacks.

15.   The FBI investigation into the September 11 terrorist attacks, code-named "PENTTBOM," was the largest investigation ever undertaken by the FBI.  At the peak of

the case, more than half of the FBI's agents were working on the investigation, in which the FBI followed more than half-a-million investigative leads, including several hundred thousand tips from the public. *See* Federal Bureau of Investigation, "9/11 Investigation – PENTTBOM," http://www.fbi.gov/pressrel/penttbom/penttbomb.htm.

16.    As part of the widespread PENTTBOM investigation, the FBI continued its on-going investigation into Zacarias Moussaoui, an al-Qaeda operative who had trained as a pilot in the United States.

17.    FBI special agents first began to investigate Moussaoui in August 2001.

18.    FBI special agents participated in the arrest of Moussaoui on or about August 16, 2001, at which time they suspected he had links to Islamic fundamentalists.

19.    Moussaoui has admitted that when he was arrested in August 2001, he had been planning to execute a terrorist attack involving civil aviation and that he had communicated with other al-Qaeda operatives, including some of the terrorists who carried out the September 11 terrorist attacks.

20.    Moussaoui pled guilty to six charges related to his participation in the plot to carry out the September 11 terrorist attacks, and following proceedings open to the public in the United States District Court for the Eastern District of Virginia, *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.), he was sentenced to life in prison in May 2006 for his participation.

21.    As a result of the investigations they carried out, both before and following the September 11 terrorist attacks, a large number of former and current FBI employees have first-hand knowledge of several factual topics that are relevant to the September 11

Litigations, including:  (1) the means and methods by which the terrorists planned and carried out the September 11 terrorist attacks, including steps the terrorists took to minimize the chance that they would be detected or stopped;  (2) al-Qaeda's means, methods, and motives for carrying out terrorist attacks similar to those perpetrated on September 11, including the training it provided to its operatives and al-Qaeda's resources;  (3) the information that was known to the FBI and the federal government before September 11 regarding the potential threat of terrorist attacks on commercial civil aviation by al-Qaeda or Usama Bin Laden;  (4) the specific information that was known to the FBI and the federal government before September 11, 2001 regarding the nineteen terrorists who carried out the September 11 terrorist attacks, including the likelihood that they were involved in terrorist activities;  and (5) the assessment that the FBI had made before September 11 regarding the intelligence it had collected concerning the terrorist threat posed by al-Qaeda, Usama Bin Laden, or any of the nineteen September 11 hijackers, including whether the intelligence was specific enough to be actionable or required the implementation of different or additional civil aviation security countermeasures.

### THE FBI WITNESSES HAVE FIRST-HAND KNOWLEDGE OF FACTS RELEVANT TO THE ISSUE OF PROXIMATE CAUSE

22.    The five former and current FBI employees that the Aviation Parties seek to depose – Scott Billings, Erik T. Rigler, Michael Rolince, Coleen M. Rowley and Harry Samit – are each likely to offer testimony relevant to the critical issue of whether the Aviation Parties' actions were the proximate cause of the injuries of the plaintiffs in the September 11 Litigations.

23. It is a basic tort law principle that the claimants in the September 11 Litigations must establish that the Aviation Parties' actions were the proximate cause of their alleged injuries in order to recover damages under a theory of negligence.

24. The proximate cause of a legal injury is often defined by the law as "a substantial factor in bringing about the harm." *See* Restatement (Second) of Torts § 431 (1965); *see also Derdiarian v. Feliz Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980); *Marchant v. Boddie-Noell Enters.*, 344 F. Supp. 2d 495, 497 (W.D. Va. 2004); *Hicks v. Metro Edison Co.*, 665 A.2d 529, 534 (Pa. Commw. Ct. 1995). The Aviation Parties are therefore entitled to present evidence indicating that the success of the September 11 terrorist attacks did not depend upon the negligence of any of the Aviation Parties and that there were other possible causes of the injuries of the plaintiffs in the September 11 Litigations beyond the actions of the Aviation Parties.

25. Evidence indicating that al-Qaeda and the specific terrorists who carried out the September 11 terrorist attacks were sophisticated, ideologically driven, and well-financed terrorists is precisely the type of relevant evidence regarding proximate cause that the Aviation Parties are entitled to present. Such evidence would establish or tend to establish that the terrorists would have succeeded in executing the September 11 attacks, irrespective of any alleged action or inaction by the Aviation Parties. For instance, if the terrorists invented around the aviation security procedures in place at the time of the September 11 attacks by using items to commit the hijackings that the FAA permitted passengers to carry aboard commercial flights – or if they were committed to proceeding with the suicide attacks regardless of whether or not they were able to carry on all of the

items they planned to use as weapons aboard the flights – the conduct of the Aviation Parties cannot be a substantial cause of the injuries allegedly caused by the terrorist attacks.

26.  Evidence of al-Qaeda's ideological motivation and *modus operandi* for committing terrorist attacks on civil aviation is, therefore, directly relevant to the important issue of proximate cause in the September 11 Litigations.

27.  It is also the type of evidence about which former and current FBI employees are likely to have extensive and direct knowledge because of their in-depth investigation into al-Qaeda, the September 11 terrorist attacks, and the nineteen hijackers.

28.  Former and current FBI employees who investigated al-Qaeda, Moussaoui, and any of the nineteen hijackers before September 11, 2001 are also likely to be able to provide direct testimony as to the facts and circumstances surrounding the inability of the federal intelligence agencies to specifically identify, uncover, and halt the plot to commit the September 11 terrorist attacks.

29.  Evidence of this sort is directly relevant to the issue of proximate cause in the September 11 Litigations because of the important role FBI intelligence operations had in uncovering and preventing terrorist attacks. The Aviation Parties are entitled to show that operations conducted by the federal intelligence agencies were the most effective way to uncover and stop the September 11 terrorist attacks and that the inability of the federal intelligence agencies to detect and stop the plot is a more significant causal circumstance of the terrorist attacks than any allegedly negligent conduct of the Aviation Parties.

### THE FBI WITNESSES HAVE FIRST-HAND KNOWLEDGE OF FACTS RELEVANT TO THE ISSUE OF THE REASONABLENESS OF THE AVIATION PARTIES' CONDUCT

30.    It is also a fundamental principle of tort law that a plaintiff cannot recover in a negligence action if the defendant's actions were reasonable in light of all of the circumstances.    Therefore, evidence that the Aviation Parties acted reasonably in September 2001 in taking precautions to guard against terrorist attacks on civil aviation is clearly relevant to the September 11 Litigations.

31.    As a matter of basic tort law, relevant evidence of whether a defendant acted reasonably includes evidence of the conduct of others under substantially similar circumstances. *See* 2 *Wigmore on Evidence* §§ 461, 442 (Chadbourne rev. 1970).

32.    Because the FBI and the Aviation Parties both participated in an integrated civil aviation security system at the time of the September 11 terrorist attacks, the FBI's response to and assessment of the potential terrorist threat to civil aviation posed by al-Qaeda or Usama Bin Laden is an appropriate consideration for the trier of fact to take into account in evaluating the reasonableness of the Aviation Parties' response to the same threat.

33.    Under the then existing civil aviation security system, the FBI had statutory responsibility for threat assessment and contributed to the FAA's determinations as to which countermeasures were an appropriate response to the threat.   The Aviation Parties, in turn, were responsible for implementing the countermeasures required by the federal government.   The FBI and the Aviation Parties were, thus, both participants in an aviation security system that was intended to prevent a terrorist attack against civil

14

aviation – the very thing that plaintiffs in the September 11 Litigations allege that the Aviation Parties negligently failed to do. It is therefore appropriate for the trier of fact to take into account the steps the FBI took to guard against the threat of a terrorist attack on civil aviation in evaluating whether the Aviation Parties took reasonable steps in response to the same threat.

34. Evidence regarding the intelligence the FBI had concerning the terrorist threat to civil aviation posed by al-Qaeda or Usama Bin Laden and the steps the FBI considered appropriate to take in response is also relevant because it helps to place the Aviation Parties' conduct in context. Precluding evidence of the FBI's role in assessing the terrorist threat would create the false impression that the Aviation Parties were independently responsible for evaluating threats to civil aviation and set a false baseline for the jury's determination of whether the Aviation Parties took reasonable steps to prevent the September 11 terrorist attacks.

35. As a government intelligence agency, the FBI also had access to far more intelligence information concerning the potential threat than the Aviation Parties, all of whom are private entities. It would be illogical and prejudicial to prevent the Aviation Parties from taking discovery that establishes or tends to establish that the FBI had access to superior information on the terrorist threat and that the FBI did not implement (or suggest that the FAA or the Aviation Parties implement) any additional security measures based on this information.

THE AVIATION PARTIES REQUESTED PERMISSION FROM
THE FBI TO DEPOSE A SMALL NUMBER OF
CURRENT AND FORMER AGENCY EMPLOYEES

36.    The Aviation Parties seek to depose a limited number of the many current and former FBI employees with first-hand knowledge of facts that are relevant to the September 11 Litigations.

37.    On March 6, 2007, the Aviation Parties advised the federal government of their intention to depose a select number of witnesses who were current or former FBI employees by a letter addressed to Beth E. Goldman, Esq. and Sarah S. Normand, Esq., Assistant United States Attorneys for the Southern District of New York (the "March 6 Letter").

38.    The March 6 Letter identifies seven fact witnesses, including five witnesses who work or worked for the FBI, namely:   Scott Billings, Erik T. Rigler, Michael Rolince, Coleen M. Rowley and Harry Samit.

39.    The March 6 Letter also sought the deposition testimony of a witness identified by the code-name "Mary" who upon information and belief was an FBI special agent detailed to the Usama Bin Laden Unit of the CIA's Counterterrorism Unit from 1998 to 2001.

40.    The seventh fact witness the March 6 Letter lists is identified by the code-name "John." Upon information and belief, John was the Deputy Chief of the CIA's Usama Bin Laden Unit and was detailed to FBI Headquarters in 2001.

41.    The Aviation Parties addressed the March 6 Letter to the offices of the United States Attorney for the Southern District of New York pursuant to an agreement

with that office, which has been longstanding counsel for the federal government as intervenor in the September 11 Litigations.

42.   Since July 2002, the office of the United States Attorney for the Southern District of New York has represented the federal government in the September 11 Litigations for the purpose of assuring the protection of information designated by the government as "sensitive security information." *See Mariani v. United Airlines, Inc.*, No. 01 Civ. 11628 (AKH) (S.D.N.Y. Jul. 24, 2002) (provisional order granting Government's motion to intervene and for consolidation).

43.   The Aviation Parties provided the March 6 Letter to the offices of the United States Attorney for the Southern District of New York with the understanding that the request would be forwarded to the appropriate FBI staff and officials for their consideration.

44.   In making the request for deposition testimony, the Aviation Parties complied with the applicable "*Touhy* regulations" set forth at 28 C.F.R. §§ 16.21 *et seq.*, which govern requests for discovery from FBI employees, by attaching detailed supporting affidavits that identify the reasons testimony sought is relevant to the September 11 Litigations and the proposed topics for each deposition.

45.   All of the fact witnesses who the Aviation Parties listed in the March 6 Letter have either testified in proceedings open to the public or are cited as an authority in publicly available secondary sources, such as *The 9/11 Commission Report*, regarding the topics about which the Aviation Parties seek their testimony.

46.  The first witness that the Aviation Parties listed in the March 6 Letter is Special Agent Scott Billings.  Upon information and belief, Special Agent Billings is currently assigned to the Stillwater, Oklahoma resident agency of the Oklahoma City Division of the FBI.

47.  Special Agent Billings was formerly assigned to the Joint Terrorism Task Force in Oklahoma City in August and September of 2001 during which time he participated in the investigation into Zacarias Moussaoui.

48.  Special Agent Billings participated in a search of Moussaoui's personal property following the September 11 attacks, in which the FBI uncovered flight simulator software, training materials, and instructions pertaining to how to pilot commercial aircraft, and a notebook referring to personal training.

49.  Special Agent Billings previously testified in proceedings open to the public regarding the facts, evidence, and information that he learned as a participant in the investigation into Moussaoui in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.).

50.  As described in the foregoing paragraphs, Special Agent Billings can offer factual testimony on a number of topics relevant to the September 11 Litigations, including al-Qaeda operatives' means, methods, and motives for carrying out terrorist attacks similar to those perpetrated on September 11, 2001.

51.  The affidavit setting forth the proposed topics for the deposition of Special Agent Billings and the relevance of his testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 2.

52.    Erik T. Rigler is a former Special Agent with the FBI, where he was employed for approximately 23 years and logged approximately 5,000 hours piloting FBI aircraft.

53.    Special Agent Rigler previously testified in proceedings open to the public as an expert witness for the defendant in *U.S. v. Moussaou* regarding the FBI's handling of pre-September 11 intelligence regarding al-Qaeda operatives and the threat they posed to civil aviation, including the agency's response to intelligence it collected regarding two of the September 11 hijackers, Khalid al-Mihdhar and Nawaf al-Hazmi.

54.    As described in the foregoing paragraphs, Special Agent Rigler can offer factual testimony on a number of topics relevant to the September 11 Litigations. For instance, Special Agent Rigler can offer relevant testimony regarding the intelligence the FBI had before September 11 concerning the potential threat of terrorist attacks on commercial civil aviation posed by al-Qaeda, Usama Bin Laden, Khalid al-Mihdhar, and Nawaf al-Hazmi. Special Agent Rigler can also provide relevant testimony as to the FBI's assessment of this intelligence.

55.    The affidavit setting forth the proposed topics for the deposition of Special Agent Rigler and the relevance of his testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 3.

56.    Michael Rolince was the FBI Section Chief, International Terrorism Operations Section from 1998 to 2002. Based on the evidence presented in *U.S. v. Moussaoui* and his position as Section Chief, in September 2001, Special Agent Rolince likely had extensive information concerning terrorist threats to the United States,

including the terrorist threat posed to civil aviation by al-Qaeda and Usama Bin Laden. The Aviation Parties also expect that, if deposed, Special Agent Rolince will testify that before the September 11 attacks, (1) the FBI knew that Khalid al-Mihdhar and Nawaf al-Hazmi were al-Qaeda operatives; (2) the FBI had suspicions that both men were present in the United States; and (3) the FBI did not communicate this information to the FAA or suggest that al-Mihdhar or al-Hazmi be placed on a "no-fly" list.

57.    Special Agent Rolince previously testified as a fact witness in proceedings open to the public in *U.S. v. Moussaoui*.    He was also interviewed by the 9/11 Commission and is cited as an authority in *The 9/11 Commission Report*, which is widely available to the public.

58.    As described in the foregoing paragraphs, Special Agent Rolince can offer relevant factual testimony in the September 11 Litigations regarding a variety of topics, including al-Qaeda operatives' means, methods, and motives for carrying out terrorist attacks similar to those perpetrated on September 11, 2001; and the intelligence the FBI had before September 11 concerning the potential threat of terrorist attacks on commercial civil aviation posed by al-Qaeda, Usama Bin Laden, Khalid al-Mihdhar, and Nawaf al-Hazmi.    The Aviation Parties also expect Special Agent Rolince to offer testimony that will assist the Aviation Parties in establishing that if al-Mihdhar and al-Hazmi had been placed on the FAA "no-fly" list before September 11, the attempt by the terrorists to hijack American Airlines Flight 77 would in all probability have been prevented.

59.   The affidavit setting forth the proposed topics for the deposition of Special Agent Rolince and the relevance of his testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 4.

60.   Coleen M. Rowley was formerly a Special Agent and Minneapolis Chief Division Counsel with the FBI.   During August and September 2001, Ms. Rowley participated in the investigation of the Minneapolis Field Office of the FBI into Zacarias Moussaoui.

61.   Special Agent Rowley has testified and made numerous public statements about the systemic challenges that the FBI faced before September 11, 2001 as the agency investigated potential terrorist threats in general and Moussaoui in particular. Special Agent Rowley has testified before the Senate Judiciary Committee on these topics. She also provided a statement to the Inspector General of the Department of Justice, which was provided to the 9/11 Commission and is cited as an authority in *The 9/11 Commission Report*. In addition, Special Agent Rowley wrote an open-letter to FBI Director Robert S. Mueller in May 2002, regarding the FBI's investigation into Moussaoui and the manner in which the agency responded to the intelligence it gathered during the course of that investigation. Copies of her letter to Director Mueller were received by members of Congress, the Joint Intelligence Inquiry, and the media. The letter was widely disseminated and continues to be publicly available on the internet.

62.   As described in the foregoing paragraphs, Special Agent Rowley can offer relevant factual testimony in the September 11 Litigations regarding a variety of topics, including al-Qaeda operatives' means, methods, and motives for carrying out terrorist

attacks similar to those perpetrated on September 11, 2001; and the intelligence the FBI had before September 11 concerning the potential threat of terrorist attacks on commercial civil aviation posed by al-Qaeda, Usama Bin Laden and Zacarias Moussaoui.

63. The affidavit setting forth the proposed topics for the deposition of Special Agent Rowley and the relevance of her testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 5.

64. Harry Samit was a Special Agent with the FBI assigned to the Minneapolis Field Office and the Joint Terrorism Task Force in August and September 2001, and upon information and belief, Special Agent Samit currently continues to be assigned to the Minneapolis Field Office of the FBI.

65. Special Agent Samit was one of the principal investigators into the activities of Zacarias Moussaoui in August and September 2001. Special Agent Samit was one of the agents who interviewed and arrested Moussaoui in August 2001, uncovering a blade measuring 2 inches and Sheffield folding knife with a 3 inch blade in Moussaoui's possession.

66. Special Agent Samit previously testified in proceedings open to the public regarding the facts, evidence, and information that he learned as a participant in the investigation into Moussaoui in *U.S. v. Moussaoui*.

67. Special Agent Samit testified in *U.S. v. Moussaoui* that in August 2001, he formed the opinion that Moussaoui was an Islamic extremist who had espoused or discussed violence; and that following further investigation Special Agent Samit

suggested to his superiors that the FAA be notified that Moussaoui was involved in a plot to hijack a commercial airliner.

68.    As described in the foregoing paragraphs, Special Agent Samit can offer relevant factual testimony in the September 11 Litigations regarding a variety of topics, including al-Qaeda operatives' means, methods, and motives for carrying out terrorist attacks similar to those perpetrated on September 11, 2001; and the intelligence the FBI had before September 11 concerning the potential threat of terrorist attacks on commercial civil aviation posed by al-Qaeda, Usama Bin Laden, and Zacarias Moussaoui.

69.    The affidavit setting forth the proposed topics for the deposition of Special Agent Samit and the relevance of his testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 6.

### THE FBI'S REFUSAL TO GRANT THE AVIATION PARTIES' REQUEST WAS ARBITRARY AND CAPRICIOUS

70.    Through its counsel, the United States Attorney for the Southern District of New York, the FBI issued a series of boilerplate letters, all dated May 7, 2007, refusing the Aviation Parties' request to depose five of the witnesses identified in the March 6, 2007 letter (collectively, "the Refusal"). The Refusal denied the Aviation Parties' request to depose Scott Billings, Erik T. Rigler, Michael Rolince, Coleen M. Rowley, and Harry Samit.

71.    The language of each of the letters sent as part of the Refusal is virtually identical. In each of the letters, the FBI lists the same reasons for its decision to deny the Aviation Parties' requests to depose five separate witnesses. Beyond a general statement

that the deposition discovery sought is "overly broad and unduly burdensome," each of the letters states that the FBI is barring the requested depositions from going forward for four reasons: (1) the relevance of the testimony sought to the September 11 Litigations has not been sufficiently explained; (2) some of the information contained in the testimony sought may be protected by law enforcement investigative, deliberative process, attorney-client, work product, or other privilege; (3) some of the testimony sought "may contain information that originated with other Government departments or agencies," requiring the FBI to coordinate its response with these departments or agencies; (6) the testimony sought is duplicative to the extent that the information is available from publicly available secondary sources, such as *The 9/11 Commission Report* and the exhibits from the Moussaoui trial.

72. The FBI's blanket refusal to permit the Aviation Parties to take a limited number of depositions regarding facts that are of central importance both to the September 11 Litigations and to the public at large is an arbitrary and capricious final agency action that should not be permitted to stand.

73. The Aviation Parties are seeking relevant testimony regarding information that Congress has recognized that the national public has a commonly shared need to know and understand: what happened during the shocking terrorist attacks of September 11 and what events made it possible for the terrorists to execute the attacks. Congress has clearly evidenced its intention that the full-story of the September 11 terrorist attacks, including the role of the FBI in investigating and preventing such threats to the United States, be told. The 9/11 Commission and the Joint Intelligence Inquiry were initiated

precisely to report to the American public on these issues. Congress also recently revised the statute governing "sensitive security information" to liberalize access to information held by agencies such as the FBI, including information concerning the September 11 terrorist attacks. *See* Section 525 of the Department of Homeland Security Appropriations Act, 2007, 109 Pub. L. No. 295, § 525, 120 Stat. 1355 (2006).

74.    Congress also demonstrated the national importance of the September 11 Litigations by creating – only days after the terrorist attacks – an exclusive federal cause of action for all claims arising out of the terrorist attacks, which can only be heard in a single federal forum, the United States District Court for the Southern District of New York. *See* The ATSSSA, § 408.

75.    In light of the importance of the testimony sought by the Aviation Parties to both the public as a whole and the September 11 Litigations, the objections proferred by the FBI are not sufficient to prevent the limited number of depositions requested by the Aviation Parties from going forward.

76.    First, the FBI's contention that the Aviation Parties could seek the information about which it seeks to depose a limited number of FBI witnesses from other sources overlooks the fact that secondary sources are not satisfactory substitutes for evidence taken directly from witnesses with first-hand knowledge of the underlying facts. Direct testimony is less likely to raise issues regarding the admissibility of the information as evidence at trial and is more likely to prove persuasive to the trier of fact. Deposition discovery also would permit all parties in the September 11 Litigations to ask specific questions targeted to elicit information directly relevant to the issues at stake in

those litigations, such as proximate cause and the reasonableness of the Aviation Parties' conduct.

77.    Second, the FBI's objection that the requested testimony may implicate privileged information is directly inconsistent with its assertion that the same information is available from secondary sources.    As the FBI concedes, much of the information about which the Aviation Parties seek to depose the five FBI witnesses has already been widely publicly disclosed.    The agency, therefore, overstates the extent to which privileged information may be implicated in the requested depositions.

78.    The requested depositions are also unlikely to raise privileged information because the Aviation Parties are primarily seeking factual discovery about the events of September 11 and the actions of the terrorists.    The Aviation Parties are seeking virtually no information concerning the FBI's deliberative process or investigative techniques that might be protected by an applicable privilege.

79.    To the extent that individual questions posed to the deponents might brush up against the boundaries of a privileged area of inquiry, counsel for the FBI is not precluded from attending the depositions with minimal inconvenience and issuing instructions to the witnesses on how to answer those specific questions without revealing privileged information.    Certainly the alternative should not be to permit the FBI to block a limited set of depositions from taking place in their entirety because *some specific* questions *might* implicate potentially privileged information.

80.    Third, the FBI overstates the burden that the limited number of depositions that the Aviation Parties have requested would pose on the agency.    Counsel for the FBI

is very familiar with the September 11 Litigations and the issues pertaining to sensitive security or privileged information that they implicate. Indeed, the office of the United States Attorney General for the Southern District of New York has been an active participant in the litigations and discovery for almost five years. Given counsel's familiarity with the September 11 Litigations, the inconvenience involved in preparing for and attending five depositions is insufficient to warrant denial of the deposition requests.

81. Finally, any coordination that the FBI might need to do with other government departments or agencies to permit the depositions to go forward is likely to be negligible and not unduly burdensome, given the specific witnesses the Aviation Parties have requested to depose and the topics about which they seek to depose the witnesses. The Aviation Parties are seeking discovery from the FBI witnesses regarding factual information about which, in large measure, the witnesses have first-hand knowledge. To the extent that their testimony may implicate information learned from other government agencies, many of those facts and the sources through which those facts were learned have already been publicly disclosed in *The 9/11 Commission Report*, the Moussaoui trial, and other public sources.

## FIRST CAUSE OF ACTION

(Review and Reversal Under The Administrative Procedure Act)

82.    The Aviation Parties incorporate by reference all allegations set forth in paragraphs 1 to 81 above.

83.    The FBI's blanket refusal to permit the Aviation Parties to depose a limited number of former and current FBI employees, namely Scott Billings, Erik T. Rigler, Michael Rolince, Coleen M. Rowley and Harry Samit in the September 11 Litigations constitutes a final agency action for the purposes of the Administrative Procedure Act.

84.    The FBI's blanket refusal to permit any deposition to go forward at all is an agency action or failure to act in an official capacity.

85.    The FBI's refusal to permit the depositions requested by the Aviation Parties to go forward in the September 11 Litigations should be set aside, because that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and because it is an action that deprives the Aviation Parties of evidence that is important to their defense of very serious allegations that have been made against them in litigation of national importance.

## SECOND CAUSE OF ACTION
(Writ of Mandamus)

86.    The Aviation Parties incorporate by reference all allegations set forth in paragraphs 1 to 85 above.

87.    The Aviation Parties' claim for permission to proceed with the requested depositions of a limited number of current and former FBI employees is clear and certain.

88.    The FBI has ignored and/or violated the standards delimiting the manner in which their discretion to permit the requested third party depositions to go forward in the September 11 Litigations can be exercised by issuing boiler plate refusals, barring any of the requested depositions to go forward.

89.    No adequate remedy is available other than the issuance of a writ of mandamus directing that the FBI grant permission for the requested depositions to go forward.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court set aside the final agency action of the FBI refusing to permit any of the depositions sought by the Aviation Parties to proceed or, in the alternative, that the Court issue a writ of mandamus ordering the FBI to permit the requested depositions to go forward, and to award such other and further relief as the Court deems proper.

Dated:  New York, New York
       July 31, 2007

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
    Desmond T. Barry, Jr. (DB 8066)
    7 Times Square
    New York, New York 10036
    (212) 894-6770

- and -

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Counsel for American Airlines Inc.
and AMR Corporation*

*Counsel for United Airlines, Inc. and UAL Corp.*
QUIRK & BAKALOR, P.C.
Jeffrey Ellis
845 Third Avenue, 15th Floor
New York, New York 10022
Telephone: 212-319-1000
Facsimile: 212-319-1065

MAYER, BROWN, ROWE & MAW
Michael R. Feagley
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone: 312-782-0600
Facsimile: 312- 701-7711

*Counsel for US Airways Group, Inc. and US Airways, Inc.*
CAMPBELL, CAMPBELL, EDWARDS &
  CONROY, PROFESSIONAL CORPORATION
Richard P. Campbell
One Constitution Plaza, Third Floor
Boston, Massachusetts 02129
Telephone: 617-241-3000
Facsimile: 617-241-5115

*Counsel for Delta Airlines*
GALLAGHER GOSSEEN FALLER & CROWLEY
Michael J. Crowley
1010 Franklin Avenue, Suite 400
Garden City, New York 11530-2927
Telephone: 516-742-2500
Facsimile: 516-742-2516

*Counsel for Continental Airlines*
ST. JOHN & WAYNE, L.L.C.
Peter B. Van Deventer, Jr.
Two Penn Plaza East
Newark, New Jersey 07105-2249
Telephone: 973-491-3600
Facsimile: 973-491-3555

*Counsel for AirTran Airways*
SATTERLEE STEPHENS BURKE & BURKE
James Rittinger
230 Park Avenue
New York, New York 10169-0079
Telephone:  (212) 818-9200
Facsimile:  (212) 818-9606

*Counsel for Colgan Air, Inc.*
CONNELL FOLEY, LLP
Jeffrey W. Moryan, Esq.
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973-535-0500
Facsimile:  973-535-1685

*Counsel for Argenbright Security, Inc.*
SIMPSON THACHER & BARTLETT LLP
Joseph F. Wayland
425 Lexington Avenue
New York, New York 10017-3954
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Counsel for Huntleigh USA Corp.*
SUSMAN GODFREY L.L.P.
H. Lee Godfrey
Charles Eskridge
Suite 5100
1000 Louisiana Street
Houston, Texas 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666

MENDES & MOUNT, LLP
Edward J. McMurrer
750 Seventh Avenue
New York, New York 10019-6829
Telephone: 212-261-8000
Facsimile: 212-261-8750

*Counsel for Globe Aviation Services Corporation and
Globe Airport Security Services, Inc.*
JONES HIRSCH CONNORS & BULL P.C.
James P. Connors
One Battery Park Plaza
New York, New York 10004
Telephone: 212-527-1000
Facsimile: 212-527-1680

KELLY, LIBBY & HOOPES, P.C.
Paul V. Kelly
175 Federal Street
Boston, Massachusetts 02110
Telephone: 617-338-9300
Facsimile: 617-338-9911

LORD, BISSELL & BROOK
Gary W. Westerberg
111 South Wacker Drive
Chicago, Illinois 60606-4410
Telephone: 312-443-0700
Facsimile: 312-443-0336

*Counsel for ICTS International NV*
MCLAUGHLIN & STERN LLP
David Sass
260 Madison Avenue - 18th Floor
New York, NY 10016
Telephone: 212-448-1100
Facsimile: 212-448-0066

*Counsel for The Boeing Company*
PERKINS COIE LLP
Thomas J. McLaughlin
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Telephone: 206-583-8888
Facsimile: 206-583-8500

RICHARDS KIBBE & ORBE LLP
Brian S. Fraser
One World Financial Center
New York, New York 10281-1003
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

*Counsel for Massachusetts Port Authority*
O'MELVENY & MYERS LLP
Mark Wood
400 South Hope Street
Los Angeles, California 90071
Telephone: 213-430-6220
Facsimile: 213-430-6675

GOODWIN PROCTER LLP
Christopher D. Moore
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Counsel for Metropolitan Washington Airport Authority*
DOMBROFF & GILMORE
Mark Dombroff
Michael Kerns
1676 International Drive, Penthouse
McLean, VA 22102
Telephone: 703-336-8800
Telephone: 703-336-8700 (Dombroff)
Facsimile: 703-336-8750