# Exhibit 1



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

May 7, 2007

BY ELECTRONIC MAIL
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

      Re:  In Re September 11 Litigation
           21 MC 97, 21 MC 101 (AKH)

Dear Mr. Barry:

      This letter responds to your request of March 6, 2007, for authorization to depose Special Agent Scott Billings pursuant to 28 C.F.R. § 16.21 *et seq.* According to your request, you seek to depose Special Agent Billings regarding his participation in the investigation of Zacarias Moussaoui.

      The United States Department of Justice ("DOJ") has broad discretion to determine whether its employees shall be permitted to testify or produce documents in cases, such as this one, in which DOJ is not a party. *See* 28 C.F.R. § 16.21 *et seq.*; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989). This rule applies to both current and former DOJ employees. *See* 28 C.F.R. §§ 16.21(a), 16.22(a), 16.28(a). Department of Justice regulations prohibit any DOJ employee from producing documents or disclosing information "without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part." 28 C.F.R. § 16.22(a).

      We decline to authorize Special Agent Billings's testimony in the above-referenced litigation and raise the following objections to the proposed deposition.

      First, the affidavit accompanying your *Touhy* request fails to satisfy DOJ's *Touhy* regulations, *see* 28 C.F.R. § 16.22(c), in that it fails to explain adequately how much of the testimony sought is relevant to the above-captioned matter. For example, the affidavit fails to explain, *inter alia*, why "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" is relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants. Your affidavit is additionally deficient in that it fails to set forth the basis for your assertion that Special Agent Billings has

particular and personal knowledge with respect to the intelligence-related topics outlined in your request.

Second, a significant amount of the information that you have requested is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege. *See* 29 C.F.R. §§ 16.26(a)(2), (b)(3)-(5). Moreover, the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable.

Third, some of the information contained in the testimony that you seek may be protected from disclosure by the deliberative process, attorney-client, work product, or other applicable privileges. To the extent you seek to elicit testimony protected by these privileges, your request is denied. *See* 29 C.F.R. § 16.26(a)(2).

We reject your bald assertion that, by permitting Special Agent Billings to testify at the criminal prosecution of Zacarias Moussaoui, "the FBI has already concluded" that disclosure of the information requested in your *Touhy* request "would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets." To the contrary, your request on its face implicates a vast amount of classified and privileged information that was not disclosed or waived by virtue of Special Agent Billings's limited public testimony on certain of the requested topics.

Fourth, the testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI.

Fifth, your request for testimony is overbroad and unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). Given the breadth of the request and the privileges and exemptions that may apply, it would impose an undue burden on the FBI to segregate the information that may be disclosable and then to prepare Special Agent Billings to testify about these materials. *See, e.g., Linder v. NSA*, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden on agency and privileged nature of majority of responsive documents).

Sixth, your request runs afoul of Rule 26(b)(2) of the Federal Rules of Civil Procedure, which provides for limits on discovery that is cumulative, duplicative, or available through less burdensome channels. To the extent that you seek testimony concerning matters about which Special Agent Billings has previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources, such information is already in the public record. Asking Special Agent Billings to testify again concerning these matters not

only would yield duplicative information but also would impose a significant and unnecessary burden on the FBI and Special Agent Billings. Moreover, much of the requested information is also the subject of your November 3, 2006, and April 13, 2007, requests for the production of documents from the FBI, or, alternatively, is available through exhibits that were introduced into evidence in the Moussaoui trial. To the extent the FBI does release, or has released, documents on these topics, Special Agent Billings' testimony will be duplicative.

Seventh, the wide breadth of the topics to be covered in your proposed deposition exceeds the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure.

Please note that the objections noted in this letter are neither exclusive nor exhaustive. The FBI reserves the right to make further objections to the proposed deposition as necessary.

For all of the foregoing reasons, the FBI denies your request for the deposition of Special Agent Billings. Please contact me if you have any questions.

Very truly yours,

By: _____
MICHAEL J. GARCIA
United States Attorney

3



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

May 7, 2007

BY ELECTRONIC MAIL
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

      Re:  In Re September 11 Litigation
            21 MC 97, 21 MC 101 (AKH)

Dear Mr. Barry:

        This letter responds to your request of March 6, 2007, for authorization to depose former Special Agent Erik T. Rigler, pursuant to 28 C.F.R. § 16.21 *et seq.*

        The United States Department of Justice ("DOJ") has broad discretion to determine whether its employees shall be permitted to testify or produce documents in cases, such as this one, in which DOJ is not a party. *See* 28 C.F.R. § 16.21 *et seq.*; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989). This rule applies to both current and former DOJ employees. *See* 28 C.F.R. §§ 16.21(a), 16.22(a), 16.28(a). Department of Justice regulations prohibit any DOJ employee from producing documents or disclosing information "without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part." 28 C.F.R. § 16.22(a).

        We decline to authorize Special Agent Rigler's testimony in the above-referenced litigation and raise the following objections to the proposed deposition.

        First, the affidavit accompanying your *Touhy* request fails to satisfy DOJ's *Touhy* regulations, *see* 28 C.F.R. § 16.22(c), in that it fails to explain adequately how much of the testimony sought is relevant to the above-captioned matter. For example, the affidavit fails to explain, *inter alia*, why "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" is relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants. Your affidavit is additionally deficient in that it fails to set forth the basis for your assertion that Special Agent Rigler has particular and personal knowledge with respect to any of the topics outlined in your request.

Second, assuming *arguendo* that Special Agent Rigler did possess personal knowledge of the topics outlined in your request, a significant amount of the information that you seek is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege. *See* 29 C.F.R. §§ 16.26(a)(2), (b)(3)-(5). Moreover, the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable.

Third, some of the information contained in the testimony that you seek may be protected from disclosure by the deliberative process, attorney-client, work product, or other applicable privileges. To the extent you seek to elicit testimony protected by these privileges, your request is denied. *See* 29 C.F.R. § 16.26(a)(2).

We reject your bald assertion that, because Special Agent Rigler testified at the criminal prosecution of Zacarias Moussaoui, "the FBI has already concluded" that disclosure of the information requested in your *Touhy* request "would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets." Special Agent Rigler was not employed by the FBI at the time he provided testimony at the Moussaoui trial, nor did he testify as to information he obtained in his official capacity as an FBI Special Agent. Indeed, contrary to the assertion in your affidavit, Special Agent Rigler did not testify as an expert witness for the defense at the Moussaoui trial. Rather, as a summary witness pursuant to Fed. R. Evid. 1006, Special Agent Rigler's only role at the Moussaoui trial was to summarize for the jury information contained in a chapter of the Report of the Department of Justice's Office of Inspector General. Accordingly, your request on its face implicates a vast amount of classified and privileged information that was not disclosed or waived by virtue of Special Agent Rigler's limited public testimony at the Moussaoui trial.

Fourth, the testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI.

Fifth, your request for testimony is overbroad and unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). Given the breadth of the request and the privileges and exemptions that may apply, it would impose an undue burden on the FBI to segregate the information that may be disclosable and then to prepare Special Agent Rigler to testify about these materials. *See, e.g., Linder v. NSA*, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden on agency and privileged nature of majority of responsive documents).

Sixth, your request runs afoul of Rule 26(b)(2) of the Federal Rules of Civil Procedure, which provides for limits on discovery that is cumulative, duplicative, or available

through less burdensome channels. To the extent that you seek testimony concerning matters about which Special Agent Rigler has previously publicly testified, or information that can be derived from the 9/11 Commission Report, the Report of the Department of Justice's Office of the Inspector General, or other public sources, such information is already in the public record. Asking Special Agent Rigler to testify again concerning these matters not only would yield duplicative information but also would impose a significant and unnecessary burden on the FBI and Special Agent Rigler. Moreover, much of the requested information is also the subject of your November 3, 2006, and April 13, 2007, requests for the production of documents from the FBI, or, alternatively, is available through exhibits that were introduced into evidence in the Moussaoui trial. To the extent the FBI does release, or has released, documents on these topics, Special Agent Rigler's testimony will be duplicative.

Seventh, the wide breadth of the topics to be covered in your proposed deposition exceeds the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure.

Please note that the objections noted in this letter are neither exclusive nor exhaustive. The FBI reserves the right to make further objections to the proposed deposition as necessary.

For all of the foregoing reasons, the FBI denies your request for the deposition of Special Agent Rigler. Please contact me if you have any questions.

Very truly yours,

By: _____
MICHAEL J. GARCIA
United States Attorney

3



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

May 7, 2007

BY ELECTRONIC MAIL
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

Re: In Re September 11 Litigation
21 MC 97, 21 MC 101 (AKH)

Dear Mr. Barry:

This letter responds to your request of March 6, 2007, for authorization to depose former Special Agent Michael Rolince, former Chief of the Federal Bureau of Investigation's International Terrorism Operations Section, pursuant to 28 C.F.R. § 16.21 *et seq.*

The United States Department of Justice ("DOJ") has broad discretion to determine whether its employees shall be permitted to testify or produce documents in cases, such as this one, in which DOJ is not a party. *See* 28 C.F.R. § 16.21 *et seq.*; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989). This rule applies to both current and former DOJ employees. *See* 28 C.F.R. §§ 16.21(a), 16.22(a), 16.28(a). Department of Justice regulations prohibit any DOJ employee from producing documents or disclosing information "without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part." 28 C.F.R. § 16.22(a).

We decline to authorize Special Agent Rolince's testimony in the above-referenced litigation and raise the following objections to the proposed deposition.

First, the affidavit accompanying your *Touhy* request fails to satisfy DOJ's *Touhy* regulations, *see* 28 C.F.R. § 16.22(c), in that it fails to explain adequately how the testimony is relevant to the above-captioned matter. For example, the affidavit fails to explain, *inter alia*, why "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" is relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants.

Second, a significant amount of the information that you have requested is

protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege. *See* 29 C.F.R. §§ 16.26(a)(2), (b)(3)-(5). Moreover, the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable.

Third, some of the information contained in the testimony that you seek may be protected from disclosure by the deliberative process, attorney-client, work product, or other applicable privileges. To the extent you seek to elicit testimony protected by these privileges, your request is denied. *See* 29 C.F.R. § 16.26(a)(2).

We reject your bald assertion that, by honoring the request of the National Commission on Terrorist Attacks Upon the United States ("Commission") for an interview of Special Agent Rolince, or by permitting Special Agent Rolince to testify at the criminal prosecution of Zacarias Moussaoui, "the FBI has already concluded" that disclosure of the information requested in your *Touhy* request "would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets." To the contrary, your request on its face implicates a vast amount of classified and privileged information that was not disclosed or waived by virtue of Special Agent Rolince's limited public testimony on certain of the requested topics, nor the FBI's provision of information to the Commission.

Fourth, the testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI.

Fifth, your request for testimony is overbroad and unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). Given the breadth of the request and the privileges and exemptions that may apply, it would impose an undue burden on the FBI to segregate the information that may be disclosable and then to prepare Special Agent Rolince to testify about these materials. *See, e.g., Linder v. NSA*, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden on agency and privileged nature of majority of responsive documents).

Sixth, your request runs afoul of Rule 26(b)(2) of the Federal Rules of Civil Procedure, which provides for limits on discovery that is cumulative, duplicative, or available through less burdensome channels. To the extent that you seek testimony concerning matters about which Special Agent Rolince has previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources, such information is already in the public record. Asking Special Agent Rolince to testify again concerning these matters not only would yield duplicative information but also would impose a significant and unnecessary burden on the FBI and Special Agent Rolince. Moreover, much of the requested information is

also the subject of your November 3, 2006, and April 13, 2007, requests for the production of documents from the FBI, or, alternatively, is available through exhibits that were introduced into evidence in the Moussaoui trial. To the extent the FBI does release, or has released, documents on these topics, Special Agent Rolince's testimony will be duplicative.

Seventh, the wide breadth of the topics to be covered in your proposed deposition exceeds the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure.

Please note that the objections noted in this letter are neither exclusive nor exhaustive. The FBI reserves the right to make further objections to the proposed deposition as necessary.

For all of the foregoing reasons, the FBI denies your request for the deposition of Special Agent Rolince. Please contact me if you have any questions.

Very truly yours,

By: _____
MICHAEL J. GARCIA
United States Attorney



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

May 7, 2007

BY ELECTRONIC MAIL
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

          Re: In Re September 11 Litigation
              21 MC 97, 21 MC 101 (AKH)

Dear Mr. Barry:

        This letter responds to your request of March 6, 2007, for authorization to depose former Special Agent and Minneapolis Chief Division Counsel Coleen M. Rowley, pursuant to 28 C.F.R. § 16.21 *et seq.* According to your request, you seek to depose Special Agent Rowley regarding her participation in the investigation of Zacarias Moussaoui.

        The United States Department of Justice ("DOJ") has broad discretion to determine whether its employees shall be permitted to testify or produce documents in cases, such as this one, in which DOJ is not a party. *See* 28 C.F.R. § 16.21 *et seq.*; *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951); *Boron Oil Co. v. Downie,* 873 F.2d 67, 70 (4th Cir. 1989). This rule applies to both current and former DOJ employees. *See* 28 C.F.R. §§ 16.21(a), 16.22(a), 16.28(a). Department of Justice regulations prohibit any DOJ employee from producing documents or disclosing information "without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part." 28 C.F.R. § 16.22(a).

        We decline to authorize Special Agent Rowley's testimony in the above-referenced litigation and raise the following objections to the proposed deposition.

        First, the affidavit accompanying your *Touhy* request fails to satisfy DOJ's *Touhy* regulations, *see* 28 C.F.R. § 16.22(c), in that it fails to explain adequately how much of the testimony sought is relevant to the above-captioned matter. For example, the affidavit fails to explain, *inter alia,* why "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" is relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants. Your affidavit is additionally deficient in that it fails to set forth the basis for your assertion that Special Agent Rowley has

particular and personal knowledge with respect to the intelligence-related topics outlined in your request.

Second, a significant amount of the information that you have requested is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege. *See* 29 C.F.R. §§ 16.26(a)(2), (b)(3)-(5). Moreover, the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable.

Third, some of the information contained in the testimony that you seek may be protected from disclosure by the deliberative process, attorney-client, work product, or other applicable privileges. To the extent you seek to elicit testimony protected by these privileges, your request is denied. *See* 29 C.F.R. § 16.26(a)(2).

We reject your bald assertion that, because Special Agent Rowley has previously given testimony and made public statements regarding the Moussaoui investigation, "the FBI has already concluded" that disclosure of the information requested in your *Touhy* request "would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets." To the contrary, your request on its face implicates a vast amount of classified and privileged information that was not disclosed or waived by virtue of Special Agent Rowley's limited public statements on certain of the requested topics.

Fourth, the testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI.

Fifth, your request for testimony is overbroad and unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). Given the breadth of the request and the privileges and exemptions that may apply, it would impose an undue burden on the FBI to segregate the information that may be disclosable and then to prepare Special Agent Rowley to testify about these materials. *See, e.g.*, *Linder v. NSA*, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden on agency and privileged nature of majority of responsive documents).

Sixth, your request runs afoul of Rule 26(b)(2) of the Federal Rules of Civil Procedure, which provides for limits on discovery that is cumulative, duplicative, or available through less burdensome channels. To the extent that you seek testimony concerning matters about which Special Agent Rowley has previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources, such information is already in

the public record. Asking Special Agent Rowley to testify again concerning these matters not only would yield duplicative information but also would impose a significant and unnecessary burden on the FBI and Special Agent Rowley. Moreover, much of the requested information is also the subject of your November 3, 2006, and April 13, 2007, requests for the production of documents from the FBI, or, alternatively, is available through exhibits that were introduced into evidence in the Moussaoui trial. To the extent the FBI does release, or has released, documents on these topics, Special Agent Rowley's testimony will be duplicative.

Seventh, the wide breadth of the topics to be covered in your proposed deposition exceeds the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure.

Please note that the objections noted in this letter are neither exclusive nor exhaustive. The FBI reserves the right to make further objections to the proposed deposition as necessary.

For all of the foregoing reasons, the FBI denies your request for the deposition of Special Agent Rowley. Please contact me if you have any questions.

Very truly yours,

By: _____
MICHAEL J. GARCIA
United States Attorney



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

May 7, 2007

<u>BY ELECTRONIC MAIL</u>
Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
Times Square Tower
7 Times Square
New York, NY 10036

Re: In Re September 11 Litigation
<u>21 MC 97, 21 MC 101 (AKH)</u>

Dear Mr. Barry:

This letter responds to your request of March 6, 2007, for authorization to depose Special Agent Harry Samit, pursuant to 28 C.F.R. § 16.21 *et seq.* According to your request, you seek to depose Special Agent Samit regarding his participation in the investigation of Zacarias Moussaoui.

The United States Department of Justice ("DOJ") has broad discretion to determine whether its employees shall be permitted to testify or produce documents in cases, such as this one, in which DOJ is not a party. *See* 28 C.F.R. § 16.21 *et seq.*; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989). This rule applies to both current and former DOJ employees. *See* 28 C.F.R. §§ 16.21(a), 16.22(a), 16.28(a). Department of Justice regulations prohibit any DOJ employee from producing documents or disclosing information "without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part." 28 C.F.R. § 16.22(a).

We decline to authorize Special Agent Samit's testimony in the above-referenced litigation and raise the following objections to the proposed deposition.

First, the affidavit accompanying your *Touhy* request fails to satisfy DOJ's *Touhy* regulations, *see* 28 C.F.R. § 16.22(c), in that it fails to explain adequately how much of the testimony sought is relevant to the above-captioned matter. For example, the affidavit fails to explain, *inter alia*, why "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" is relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants. Your affidavit is additionally deficient in that it fails to set forth the basis for your assertion that Special Agent Samit has

particular and personal knowledge with respect to the intelligence-related topics outlined in your request.

Second, a significant amount of the information that you seek is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege. *See* 29 C.F.R. §§ 16.26(a)(2), (b)(3)-(5). Moreover, the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed. *See* Fed. R. Civ. P. 45(c)(3)(A)(i). This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable.

Third, some of the information contained in the testimony that you seek may be protected from disclosure by the deliberative process, attorney-client, work product, or other applicable privileges. To the extent you seek to elicit testimony protected by these privileges, your request is denied. *See* 29 C.F.R. § 16.26(a)(2).

We reject your bald assertion that, by permitting Special Agent Samit to testify at the criminal prosecution of Zacarias Moussaoui, "the FBI has already concluded" that disclosure of the information requested in your *Touhy* request "would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets." To the contrary, your request on its face implicates a vast amount of classified and privileged information that was not disclosed or waived by virtue of Special Agent Samit's limited public testimony on certain of the requested topics.

Fourth, the testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI.

Fifth, your request for testimony is overbroad and unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). Given the breadth of the request and the privileges and exemptions that may apply, it would impose an undue burden on the FBI to segregate the information that may be disclosable and then to prepare Special Agent Samit to testify about these materials. *See, e.g., Linder v. NSA*, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden on agency and privileged nature of majority of responsive documents).

Sixth, your request runs afoul of Rule 26(b)(2) of the Federal Rules of Civil Procedure, which provides for limits on discovery that is cumulative, duplicative, or available through less burdensome channels. To the extent that you seek testimony concerning matters about which Special Agent Samit has previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources, such information is already in the public record. Asking Special Agent Samit to testify again concerning these matters not only would yield duplicative information but also would impose a significant and unnecessary burden

2

on the FBI and Special Agent Samit.  Moreover, much of the requested information is also the subject of your November 3, 2006, and April 13, 2007, requests for the production of documents from the FBI, or, alternatively, is available through exhibits that were introduced into evidence in the Moussaoui trial.  To the extent the FBI does release, or has released, documents on these topics, Special Agent Samit's testimony will be duplicative.

Seventh, the wide breadth of the topics to be covered in your proposed deposition exceeds the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure.

Please note that the objections noted in this letter are neither exclusive nor exhaustive.  The FBI reserves the right to make further objections to the proposed deposition as necessary.

For all of the foregoing reasons, the FBI denies your request for the deposition of Special Agent Samit.  Please contact me if you have any questions.

Very truly yours,

By: _____
MICHAEL J. GARCIA
United States Attorney

3

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE          Civil No.
AND BUSINESS LOSS LITIGATION                  21 MC 101 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X

– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH LITIGATION               Civil No.
                                              21 MC 97 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

      1.     I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel

in the above-captioned actions. I make this Affidavit in connection with the Aviation

Defendants' request to depose Scott Billings, a Special Agent with the FBI who is

currently assigned to the Stillwater, Oklahoma resident agency of the Oklahoma City

Division of the FBI and who was assigned to the Joint Terrorist Task Force in Oklahoma

City in August and September of 2001, in accordance with 28 C.F.R. § 16.21 *et seq.*

      2.     The above-captioned lawsuits seek to impose billions of dollars in liability

against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being

sued by approximately six dozen personal injury and wrongful death claimants for injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.     Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.     In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which

2

that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

5. Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States. Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden. As part of its mandate, the FBI also decided which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants. The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation. Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6. The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA. The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the

heightened threat. The intelligence the FBI communicated to the FAA was thus an important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.    The measures that the FBI recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense. As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants. Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks. However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures. The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.    Mr. Billings is well qualified to testify to these material issues. As a FBI Special Agent assigned to the Joint Terrorism Task Force, he participated in the investigation into Zacarias Moussaoui, an al-Qaeda operative who had trained as a pilot.

4

Mr. Moussaoui has admitted that at the time that he was arrested in August 2001 he was planning to carry-out a terrorist attack against involving civil aviation and that he had communicated with some of the terrorists who attacked the United States on September 11. Mr. Moussaoui had in his possession a 3-inch folding knife, which was found at the time of his arrest, as well as several other short-bladed knives, which were discovered after September 11. Mr. Billings led a further search of Mr. Moussaoui's personal property on September 15, 2001, and Aviation Defendants' expect that Mr. Billings will testify that the FBI found flight simulator software, training materials and instructions pertaining to the piloting of commercial aircraft, and a notebook referring to physical training, among Mr. Moussaoui's belongings. By virtue of his investigation of Mr. Moussaoui, Mr. Billings has particularized knowledge of al-Qaeda's intent as of September 11 to carry out a terrorist attack against the United States, as well as the terrorists' capabilities and likely means of attack. Indeed, Mr. Billings previously testified to these issues in *U.S. v. Moussaoui,* Crim. No. 01-455A (LMB) (E.D.Va.), in a proceeding open to the public.

9.      One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. The Aviation Defendants believe that because of his investigation into Mr. Moussaoui, Mr. Billings has specific knowledge of the unique skills and planning that went into al-Qaeda's plot. Accordingly, he is particularly qualified to offer evidence as

to the manner in which the terrorists caused the injuries on which the plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of Mr. Billings will establish or tend to establish the following points in support of their defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place – for instance, by selecting items that were permitted inside the sterile areas of airports and airplane cabins to use in the attacks, like the short-bladed knives found in Mr. Moussaoui's possession. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10. The Aviation Defendants also anticipate that Mr. Billings's testimony will support or tend to support another of their defenses in these litigations: namely, that as private entities, they did not have the same access to intelligence information regarding the terrorist threat as the federal government. The Aviation Defendants anticipate that Mr. Billings will testify that the FBI had information before September 11, which indicated that potential terrorists who knew how to pilot commercial aircraft, such as Mr. Moussaoui, were present in the United States. The Aviation Defendants also expect that Mr. Billings will testify that the intelligence gathered during the investigation into Mr. Moussaoui before September 11 was not communicated to the FAA or the airlines. The

Aviation Defendants further expect that Mr. Billings will testify regarding what, if any, recommendations the FBI made to the FAA or the airlines, before September 11, based on its investigation into Mr. Moussaoui. Evidence as to all of these points is important to the determination of whether the Aviation Defendants acted negligently in failing to prevent the September 11 attacks.

11.    The topics upon which the Aviation Defendants would depose Mr. Billings include:

   a.    The training that Zacarias Moussaoui undertook with the intent of carrying out a terrorist attack on civil aviation, including any training on how to pilot a commercial aircraft and any physical conditioning.

   b.    The items that Zacarias Moussaoui had in his possession and/or purchased with the intent of using them to carry out a terrorist attack on civil aviation, including any items that Mr. Billings uncovered in his search of Mr. Moussaoui's property.

   c.    The communications, if any, between the FBI and the FAA before September 11, 2001, regarding the arrest of Zacarias Moussaoui.

   d.    The communications, if any, between the FBI and any defendant before September 11, 2001, regarding the arrest of Zacarias Moussaoui.

   e.    The training undertaken by any of the nineteen terrorists who attacked the United States on September 11, 20001 to prepare for the attacks, including any training on how to pilot a commercial aircraft and any physical conditioning.

   f.    The information available to the FBI before September 11, 2001 regarding the likelihood of attacks by al-Qaeda and/or Usama Bin Laden, including any information regarding the

anticipated form of such an attack, its likely location, and any countermeasures recommended by the FBI.

g.  The information available to the FBI before September 11, 2001, if any, indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

h.  The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

i.  The communications, if any, between the FBI and any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

j.  The changes in aviation security that the FBI recommended, if any, in response to information that it received before September 11, 2001 regarding the threat of an al-Qaeda attack, including to whom it made the recommendations and what those changes were.

12.  The Aviation Defendants submit that Mr. Billings's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Given that Mr. Billings has already testified publicly regarding the matters at issue, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets. Moreover, the significance of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Mr. Billings's testimony.

8

13.    By contrast, a refusal to permit Mr. Billings's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation.    The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures.  The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.,*  Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.")

DESMOND T. BARRY, JR.

Sworn to before me this
___ day of March 2007

Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/__2010

9

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE                Civil No.
AND BUSINESS LOSS LITIGATION                        21 MC 101 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X

– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH LITIGATION                     Civil No.
                                                    21 MC 97 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X
STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

    1.      I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel

in the above-captioned actions. I make this Affidavit in connection with the Aviation

Defendants' request to depose Erik T. Rigler, former Special Agent with the FBI, in

accordance with 28 C.F.R. § 16.21 *et seq.*


    2.      The above-captioned lawsuits seek to impose billions of dollars in liability

against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being

sued by approximately six dozen personal injury and wrongful death claimants for

injuries and fatalities that resulted from the hijackings of four flights on that morning by

members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.      Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.      In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

2

5.      Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States.    Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden.    As part of its mandate, the FBI also decided which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants. The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation.    Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6.      The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA.    The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the heightened threat.    The intelligence the FBI communicated to the FAA was thus an

important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.      The measures that the FBI recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense. As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants. Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks. However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures. The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.      Mr. Rigler is well qualified to testify to these material issues. Before retiring, Mr. Rigler served as a Special Agent with the FBI for 23 years and many of his duties pertained to aviation maters. He holds an airline transport pilot rating and has spent approximately 5,000 hours piloting FBI aircraft. As a result, Mr. Rigler has expert

4

knowledge as to both the FBI and aviation. Indeed, he testified as an expert witness for the defendant in *U.S. v. Moussaoui,* No. 01-455A (LMB) (E.D.Va), in a proceeding open to the public. Mr. Rigler has testified regarding the FBI's handling of intelligence before September 11, including the agency's response to intelligence regarding two of the terrorists who carried out the attacks of September 11, Khalid al-Midhar and Nawaf al-Hazmi. As a result, Mr. Rigler has particularized knowledge of al-Qaeda's intent as of September 11 to carry out a terrorist attack against the United States, as well as the terrorists' capabilities and likely means of attack.

9.    One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. The Aviation Defendants expect that the deposition testimony of Mr. Rigler will establish or tend to establish the following points in support of their defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place – for instance, by selecting items that were permitted inside the sterile areas of airports and airplane cabins to use in the attacks. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

5

10.    The Aviation Defendants also anticipate that Mr. Rigler's testimony will support or tend to support another of their defenses in these litigations:  namely, that as private entities, they did not have the same access to intelligence information regarding the terrorist threat as the federal government.  The Aviation Defendants anticipate that Mr. Rigler will testify that the FBI had information before September 11, which indicated that potential terrorists, such as Khalid al-Midhar and Nawaf al-Hazmi, were present in the United States.  The Aviation Defendants also expect that Mr. Rigler will testify that the intelligence gathered during the investigation into Mr. Midhar and Mr. Hazmi before September 11 was not communicated to the FAA or the airlines.    The Aviation Defendants further expect that Mr. Rigler will testify regarding what, if any, recommendations the FBI made to the FAA or the airlines, before September 11, based on its investigation into the two men.  Evidence as to all of these points is important to the determination of whether the Aviation Defendants acted negligently in failing to prevent the September 11 attacks.

11.    The topics upon which the Aviation Defendants would depose Mr. Rigler include:

    a.    The respective roles and responsibilities of the CIA, the FBI, the FAA and the Aviation Defendants in assessing terrorist threats against civil aviation and devising countermeasures.

    b.    The information available to the FBI and the CIA before September 11, 2001 regarding the likelihood of an attack by al-Qaeda and/or Usama Bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by the FBI.

c.   Whether the FBI had information before September 11, 2001 indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

d.   Whether the intelligence the FBI had before September 11, 2001 was actionable, including any countermeasures that the FBI could have adopted in response to the intelligence.

e.   Whether the FBI recommended any changes in aviation security in response to information that it received before September 11, 2001 regarding the threat of an al-Qaeda attack and, if so, what those changes were.

f.   The communications, if any, between the FBI and the FAA and/or any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

g.   The information that the FBI had before September 11, 2001 regarding any of the 19 hijackers who took part in the September 11 terrorist attacks, including whether any of that information was actionable and whether any of that information was shared with the FAA and/or any Aviation Defendant.

h.   The information that the FBI had before September 11, 2001 regarding Khalid al-Midhar, including his contact with Nawaf al-Hazmi; any connection between Khalid al-Midhar and al-Qaeda; the likelihood that Khalid al-Midhar had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA and/or any Aviation Defendant.

i.   The information that the FBI had before September 11, 2001, regarding Khalid al-Midhar's entry into the United States in or around July 2001, including that there was no record of his departure and whether this information was shared with the FAA and/or any Aviation Defendant.

j.   The information that the FBI had before September 11, 2001 regarding Nawaf al-Hazmi, including his contact with Khalid al-Midhar; any connection between Nawaf al-Hazmi and al-

Qaeda; the likelihood that Nawaf al-Hazmi had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA and/or any Aviation Defendant.

k.      The FBI's role in designating individuals for a "no fly" list, the criteria for designating an individual as "no fly," the scope of any such list that existed on September 11, 2001 and whether and how such a list or any terrorist watch-list was communicated to the FAA and/or any Aviation Defendant.

l.      The communications, if any, between the FBI and the CIA before September 11, 2001 regarding the memo produced by the FBI's Phoenix field office regarding the presence of young Arab males in flight school.

m.      The communications, if any, between the FBI and the FAA and/or any defendant before September 11, 2001 regarding the memo produced by the FBI's Phoenix field office regarding the presence of young Arab males in flight school.

12.     The Aviation Defendants submit that Mr. Rigler's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Given that Mr. Rigler has already testified publicly regarding the matters at issue, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets. Moreover, the significance of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Mr. Rigler's testimony.

8

13.    By contrast, a refusal to permit Mr. Rigler's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation.    The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures.    The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.*,    Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.").

_____

DESMOND T. BARRY, JR.

Sworn to before me this

____ day of March 2007

_____

Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/____ 2010

9

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE                    Civil No.
AND BUSINESS LOSS LITIGATION                            21 MC 101 (AKH)


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

IN RE SEPTEMBER 11TH LITIGATION                         Civil No.
                                                        21 MC 97 (AKH)


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NEW YORK    )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

      1.     I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel

in the above-captioned actions. I make this Affidavit in connection with the Aviation

Defendants' request to depose Michael Rolince, former FBI Section Chief, International

Terrorism Operations Section from 1998 to 2002, in accordance with 28 C.F.R. § 16.21

*et seq.*


      2.     The above-captioned lawsuits seek to impose billions of dollars in liability

against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being

sued by approximately six dozen personal injury and wrongful death claimants for

injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.    Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.    In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

2

5.    Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States. Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden. As part of its mandate, the FBI also decided which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants. The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation. Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6.    The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA. The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the heightened threat. The intelligence the FBI communicated to the FAA was thus an

important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.      The measures that the FBI considered appropriate to take in response to the intelligence it had in its possession are also important to the Aviation Defendants' defense.   As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants.   Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks.   However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures.   The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.      Mr. Rolince is well qualified to testify to these material issues.   As Chief of the FBI's International Terrorism Operations Section at the agency's headquarters between 1998 and 2002, Mr. Rolince gathered extensive information concerning terrorists threats to the United States, including those posed by al-Qaeda, Usama Bin

4

Laden, and their operatives.    By his own description, his Section's "primary responsibility was to coordinate the counterterrorism investigations being conducted throughout the United States." *U.S. v. Moussaoui*, Tr. at 1465.  As a result, Mr. Rolince has specialized knowledge of the terrorists' intent, likely means of attack, and capabilities.    Moreover, because his job involved considerable coordination and communication with the National Security Council, the State Department's Office of Counterterrorism Coordination, and the CIA, Mr. Rolince is qualified to testify as to the intelligence that was available to these agencies, as well as to the FBI, before September 11. Mr. Rolince is also knowledgeable as to which portions of the intelligence regarding the threat of a terrorist attack by al-Qaeda or Usama Bin Laden the FBI recommended that the FAA share with the airlines.  He is also qualified to offer evidence as to what, if any, recommendations the FBI made to the FAA regarding the countermeasures the airlines should take in response to the available intelligence.

9.    One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks.    The Aviation Defendants expect that, as the former Chief of the FBI's International Terrorism Operations Section, Mr. Rolince has specific information regarding the nineteen terrorists' unique skills and their training, as well as the planning and oversight with which al-Qaeda backed the September 11 plot.  Accordingly, he is particularly qualified to offer evidence as to the manner in which the terrorists caused the

5

injuries on which plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of Mr. Rolince will establish or tend to establish the following points in support of this defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10.    The Aviation Defendants also anticipate that Mr. Rolince will testify that, before September 11, the FBI and the CIA knew that Khalid al-Midhar and Nawaf al-Hazmi were al-Qaeda operatives and known threats to the United States. They also expect that Mr. Rolince will testify that the FBI knew or suspected that both men were present in the United States before September 11. The Aviation Defendants further believe that Mr. Rolince will testify that no communication was sent to the FAA requesting that the two men be placed on a "no-fly" list – even though such a list existed. The Aviation Defendants expect that Mr. Rolince's deposition testimony and other litigation discovery will help establish that if Khalid al-Midhar and Nawaf al-Hazmi had been placed on a no-fly list they would not have been permitted to board Flight 77 on September 11 and, at a minimum, its hijacking would have been prevented.

11.     Mr. Rolince has already testified to many of these material issues in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.), in a proceeding open to the public, and was previously interviewed about these issues by the National Commission on Terrorist Attacks Against the United States (more familiarly known as the "9/11 Commission") and is frequently cited as an authority on these topics in the Commission's Report, which is publicly available.

12.     The topics upon which the Aviation Defendants would depose Mr. Rolince include:

a.     The information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Usama bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by the NSC.

b.     The communications, if any, between the FBI and the CIA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

c.     The information that the FBI had before September 11, 2001 regarding any of the 19 hijackers who took part in the September 11 terrorist attacks and whether that information was shared with the FAA or any Aviation Defendant.

d.     Whether the FBI had information before September 11, 2001 indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

e.     Whether the FBI recommended any changes in aviation security in response to information that it received before September 11, 2001 regarding the threat of an al-Qaeda attack and, if so, what those changes were.

f.   The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

g.   The communications, if any, between the FBI and any Aviation Defendant before September 11, 2001 regarding the possibility of an al- Qaeda attack on civil aviation.

h.   The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the memo produced by the FBI's Phoenix field office regarding the presence of young Arab males in flight school.

i.   The communications, if any, between the FBI and any Aviation Defendant before September 11, 2001 regarding the memo produced by the Phoenix field office regarding the presence of young Arab males in flight school.

j.   The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the arrest of Zacarias Moussaoui.

k.   The communications, if any, between the FBI and any Aviation Defendant before September 11, 2001 regarding the arrest of Zacarias Moussaoui.

l.   The FBI's role in designating individuals for a "no fly" list, the criteria for designating an individual as "no fly," the scope of any such list that existed on September 11, 2001 and whether and how such a list or any terrorist watch-list was communicated to the FAA and/or any Aviation Defendant.

13.   The Aviation Defendants submit that Mr. Rolince's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Given that Mr. Rolince has already testified publicly regarding the matters at issue, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with

enforcement proceedings, or improperly reveal trade secrets. Moreover, the significance of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Mr. Rolince's testimony.

14.    By contrast, a refusal to permit Mr. Rolince's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation. The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.*, Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.").

_____
DESMOND T. BARRY, JR.

Sworn to before me this
_____ day of March 2007

_____
Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/____

9

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE          Civil No.
AND BUSINESS LOSS LITIGATION                           21 MC 101 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X

– – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH LITIGATION                       Civil No.
                                                                        21 MC 97 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – X
STATE OF NEW YORK      )
                                      ) ss.:
COUNTY OF NEW YORK   )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

    1.     I am an attorney admitted to practice before this Court and a member of
the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel
in the above-captioned actions. I make this Affidavit in connection with the Aviation
Defendants' request to depose Coleen M. Rowley, formerly a Special Agent and
Minneapolis Chief Division Counsel with the FBI, in accordance with 28 C.F.R. § 16.21
*et seq.*

    2.     The above-captioned lawsuits seek to impose billions of dollars in liability
against the Aviation Defendants for their alleged failure to detect and halt the terrorists
who attacked the United States on September 11. The Aviation Defendants are being
sued by approximately six dozen personal injury and wrongful death claimants for

injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.      Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.      In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

2

5.    Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States.    Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden.    As part of its mandate, the FBI also decided which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants. The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation.    Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6.    The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA.    The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the heightened threat.    The intelligence the FBI communicated to the FAA was thus an

important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.     The measures that the FBI recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense. As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants.  Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks.  However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures.  The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.     Ms. Rowley is well qualified to testify to these material issues.  Both in the weeks leading up to and following the attacks of September 11, Ms. Rowley participated in the investigation of the Minneapolis field office of the FBI ("Minneapolis Field Office") into Zacarias Moussaoui, an al-Qaeda operative who had trained as a pilot.

4

Mr. Moussaoui has admitted that at the time he was arrested he had been planning to carry-out a terrorist attack against civil aviation and that he had communicated with some of the nineteen terrorists who attacked the United States on September 11. Ms. Rowley is expected to testify that Mr. Moussaoui had in his possession a 3-inch folding knife, which was found at the time of his arrest, as well as several other short-bladed knives, which were discovered after September 11. The Aviation Defendants also anticipate that Ms. Rowley will testify that a further search of Mr. Moussaoui's personal property on September 15, 2001 revealed flight simulator software, training materials and instructions pertaining to the piloting of commercial aircraft, and a notebook referring to physical training. By virtue of her investigation of Mr. Moussaoui, Ms. Rowley has particularized knowledge of al-Qaeda's intent as of September 11 to carry out a terrorist attack against the United States, as well as the terrorists' capabilities and likely means of attack.

9. One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. The Aviation Defendants believe that because of her investigation into Mr. Moussaoui, Ms. Rowley has specific knowledge of the unique skills and planning that went into al-Qaeda's plot. Accordingly, she is particularly qualified to offer evidence as to the manner in which the terrorists caused the injuries on which the plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of Ms. Rowley will establish or tend to establish the following points in support of their defense. First,

5

with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place – for instance, by selecting items that were permitted inside the sterile areas of airports and airplane cabins to use in the attacks, like the short-bladed knives found in Mr. Moussaoui's possession. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10.     The Aviation Defendants also anticipate that Ms. Rowley's testimony will support or tend to support another of their defenses in these litigations: namely, that as private entities, they did not have the same access to intelligence information regarding the terrorist threat as the federal government. The Aviation Defendants anticipate that Ms. Rowley will testify that the FBI had information before September 11, which indicated that potential terrorists who knew how to pilot commercial aircraft, such as Mr. Moussaoui, were present in the United States. The Aviation Defendants also expect that Ms. Rowley will testify that the intelligence gathered during the investigation into Mr. Moussaoui before September 11 was not communicated to the FAA or the airlines. In addition, it is expected that Ms. Rowley will testify that the FBI did not connect the intelligence that had been gathered by its Minneapolis Field Office regarding Mr. Moussaoui to the information its Phoenix Field Office had uncovered regarding the

6

presence of young Arab males in flight school. The Aviation Defendants further expect that Ms. Rowley will testify regarding what, if any, recommendations the FBI made to the FAA or the airlines, before September 11, based on its investigation into Mr. Moussaoui. Evidence as to all of these points is important to the determination of whether the Aviation Defendants acted negligently in failing to prevent the September 11 attacks.

11.    Ms. Rowley previously provided a statement to the Inspector General of the Department of Justice concerning many of the matters upon which the Aviation Defendants seek to depose her, including the FBI's investigation into Zacarias Moussaoui. Ms. Rowley's statement to the Inspector General was provided to the National Commission on Terrorist Attacks Against the United States (more familiarly known as the "9/11 Commission") and is cited as an authority on these topics in the Commission's Report, which is publicly available. Ms. Rowley has also testified to the Senate Judiciary Committee about some of the systemic challenges faced by the FBI and the intelligence community. In addition, Ms. Rowley wrote an open-letter to FBI Director Robert Mueller in May 2002, regarding the FBI's investigation into Zacarias Moussaoui and the manner in which the agency responded to the intelligence it gathered during the course of that investigation. Copies of her letter to Mr. Mueller were received by members of Congress, the Joint Intelligence Committee of Congress, and the media. The letter was widely disseminated, and it continues to be publicly available on the

internet. *See, e.g.,* Website of <u>Time Magazine,</u> <u>available</u> <u>at</u>
<u>http://www.time.com/time/nation/article/0,8599,249997,00.html</u>.

    12.    The topics upon which the Aviation Defendants would depose Ms.
Rowley include:

        a.   The communications, if any, between the Minneapolis Field Office of the
FBI and any other division, section or office before September 11, 2001
regarding the arrest of Zacarias Moussaoui.

        b.   The communications, if any, between the FBI and the FAA before
September 11, 2001 regarding the arrest of Zacarias Moussaoui.

        c.   The communications, if any, between the FBI and any defendant before
September 11, 2001 regarding the arrest of Zacarias Moussaoui.

        d.   The confirmation that the Minneapolis Field Office received from the
French Intelligence Service that Zacarias Moussaoui was affiliated with
radical fundamentalist Islamic groups and activities connected to Usama
Bin Laden, including when this information was received and whether this
information was communicated to the FAA and/or any Aviation
Defendant.

        e.   Ms. Rowley's statement that "The Minneapolis [FBI] agents who
responded to the call about Moussaoui's flight training identified him as a
terrorist threat from a very early point," including the basis for this
statement and the identity of the agents to whom she refers.

        f.   Ms. Rowley's statement that "It is obvious, from my firsthand knowledge
of the events and the detailed documentation that exists, that the agents in
Minneapolis who were closest to the action and in the best position to
gauge the situation locally, did fully appreciate the terrorist risk/danger
posed by Moussaoui and his possible co-conspirators even before
September 11[th]," including the basis for this statement, the identity of the
agents to whom she is referring, and whether the Minneapolis Field Office
conveyed the terrorist risk posed by Mr. Moussaoui to the FAA and/or any
Aviation Defendant.

g. The communications, if any, between any division, section or office of the FBI and the Minneapolis Field Office before September 11, 2001 regarding the arrest of Zacarias Moussaoui.

h. The communications, if any, between the FBI and any defendant before September 11, 2001, regarding the presence of young Arab males in flight school.

i. The communications, if any, between the FBI and the FAA before September 11, 2001, regarding the presence of young Arab males in flight school.

j. The changes in aviation security that the FBI recommended, if any, in response to information that it received before September 11, 2001 regarding the presence of young Arab males in flight school.

k. The information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al-Qaeda and/or Usama Bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by the FBI.

l. The information available to the FBI before September 11, 2001, if any, indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

m. The communications, if any, between the FBI and any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

n. The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

o. The changes in aviation security that the FBI recommended, if any, in response to information that it received before September 11, 2001 regarding the threat of an al-Qaeda attack, including to whom it made the recommendations and what those changes were.

13.    The Aviation Defendants submit that Ms. Rowley's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration.   Given that Ms. Rowley has already testified and provided a lengthy, publicly available statement regarding the matters at issue, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets.   Moreover, the significance of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Ms. Rowley's testimony.

14.    By contrast, a refusal to permit Ms. Rowley's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation.   The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.*, Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of

10

the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.").

_____
DESMOND T. BARRY, JR.

Sworn to before me this
6th day of March 2007

_____
Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/___2010

11

# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE          Civil No.
AND BUSINESS LOSS LITIGATION                            21 MC 101 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – – X

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH LITIGATION                      Civil No.
                                                                            21 MC 97 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – – X

STATE OF NEW YORK     )
                                         )  ss.:
COUNTY OF NEW YORK  )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

     1.    I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel

in the above-captioned actions. I make this Affidavit in connection with the Aviation

Defendants' request to depose Harry Samit, a Special Agent with the FBI assigned to the

Minneapolis Field Office and the Joint Terrorism Task Force, in accordance with 28

C.F.R. § 16.21 *et seq.*

     2.    The above-captioned lawsuits seek to impose billions of dollars in liability

against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being

sued by approximately six dozen personal injury and wrongful death claimants for

injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.     Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.     In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

2

5.     Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States. Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden. As part of its mandate, the FBI also decided which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants. The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation. Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6.     The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA. The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the heightened threat. The intelligence the FBI communicated to the FAA was thus an

important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.      The measures that the FBI recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense. As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants.  Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks.  However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures.  The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.      Mr. Samit is well qualified to testify to these material issues.  As a FBI Special Agent assigned to the Joint Terrorism Task Force, beginning in August 2001, he led the initial investigation into Zacarias Moussaoui, an al-Qaeda operative who had trained as a pilot.  Mr. Moussaoui has admitted that at the time he was arrested he had

4

been planning to carry-out a terrorist attack involving civil aviation and that he had communicated with some of the nineteen terrorists who attacked the United States on September 11. Mr. Samit is expected to testify that Mr. Moussaoui had in his possession a 3-inch folding knife, which was found at the time of his arrest, as well as several other short-bladed knives, which were discovered after September 11. The Aviation Defendants also anticipate that Mr. Samit will testify that a further search of Mr. Moussaoui's personal property on September 15, 2001 revealed flight simulator software, training materials and instructions pertaining to the piloting of commercial aircraft, and a notebook referring to physical training. By virtue of his investigation of Mr. Moussaoui, Mr. Samit has particularized knowledge of al-Qaeda's intent as of September 11 to carry out a terrorist attack against the United States, as well as the terrorists' capabilities and likely means of attack. Indeed, Mr. Samit previously testified to these issues in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.), in a proceeding open to the public.

9.    One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. The Aviation Defendants believe that because of his investigation into Mr. Moussaoui, Mr. Samit has specific knowledge of the unique skills and planning that went into al-Qaeda's plot. Accordingly, he is particularly qualified to offer evidence as to the manner in which the terrorists caused the injuries on which the plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of Mr. Samit will

establish or tend to establish the following points in support of their defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place – for instance, by selecting items that were permitted inside the sterile areas of airports and airplane cabins to use in the attacks, like the short-bladed knives found in Mr. Moussaoui's possession. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10.    The Aviation Defendants also anticipate that Mr. Samit's testimony will support or tend to support another of their defenses in these litigations: namely, that as private entities, they did not have the same access to intelligence information regarding the terrorist threat as the federal government. The Aviation Defendants anticipate that Mr. Samit will testify that the FBI had information before September 11, which indicated that potential terrorists who knew how to pilot commercial aircraft, such as Mr. Moussaoui, were present in the United States. The Aviation Defendants also expect that Mr. Samit will testify that the intelligence gathered during the investigation into Mr. Moussaoui before September 11 was not communicated to the FAA or the airlines. The Aviation Defendants further expect that Mr. Samit will testify regarding what, if any, recommendations the FBI made to the FAA or the airlines, before September 11, based

on its investigation into Mr. Moussaoui. Evidence as to all of these points is important to

the determination of whether the Aviation Defendants acted negligently in failing to

prevent the September 11 attacks.

      11.     The topics upon which the Aviation Defendants would depose Mr. Samit

include:

    a.  The communications, if any, between the FBI and any defendant before September 11, 2001, regarding the arrest of Zacarias Moussaoui, including any communications that identified Mr. Moussaoui's known associates and possible accomplices.

    b.  The communications, if any, between the FBI and the FAA before September 11, 2001, regarding the arrest of Zacarias Moussaoui, including any communications that identified Mr. Moussaoui's known associates and possible accomplices.

    c.  The training that Zacarias Moussaoui undertook with the intent of carrying out a terrorist attack on civil aviation, including any training on how to pilot a commercial aircraft and any physical conditioning.

    d.  The items found in the possession of Zacarias Moussaoui at the time of his arrest, including any items found at his residence and in his automobile and any items he is believed to have acquired with the intent of carrying out a terrorist attack on civil aviation.

    e.  The changes in aviation security that the FBI recommended, if any, in response to information that it received before September 11, 2001 regarding Zacarias Moussaoui's intention to carry out a terrorist attack on civil aviation, including to whom it made the recommendations and what those changes were.

    f.  The training undertaken by any of the nineteen terrorists who attacked the United States on September 11, 2001 to prepare

7

for the attacks, including any training on how to pilot a commercial aircraft and any physical conditioning.

g.  The information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al-Qaeda and/or Usama Bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by the FBI.

h.  The information available to the FBI before September 11, 2001, if any, indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

i.  The communications, if any, between the FBI and any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

j.  The communications, if any, between the FBI and the FAA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

k.  The changes in aviation security that the FBI recommended, if any, in response to information that it received before September 11, 2001 regarding the threat of an al-Qaeda attack, including to whom it made the recommendations and what those changes were.

12.    The Aviation Defendants submit that Mr. Samit's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Given that Mr. Samit has already testified publicly regarding the matters at issue, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets. Moreover, the significance

8

of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Mr. Samit's testimony.

13.    By contrast, a refusal to permit Mr. Samit's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation. The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.,* Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.").

DESMOND T. BARRY, JR.

Sworn to before me this
___ day of March 2007

_____
Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/___

9