UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                       :

AMERICAN AIRLINES, INC., ET AL.      :  07 Civ. 7051 (AKH)
                                         :

        Plaintiffs,                 :  This Motion relates to:
                                         :  21 MC 101 (AKH)

               v.                  :

                                         :

FEDERAL BUREAU OF INVESTIGATION,  :
ET AL.                                    :
                                         :

        Defendants,               :
-------------------------------------------------------------- X


**AVIATION PARTIES' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1(a) of the United States District Court for the

Southern District of New York, American Airlines, Inc. ("American"); AMR

Corporation; United Air Lines, Inc. ("United"); UAL Corp.; US Airways Group, Inc.; US

Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.;

Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services, Inc.; Huntleigh

USA Corp.; Burns International Services Corp.; Burns International Security Services

Corp.; Pinkerton's Inc.; ICTS International NV; The Boeing Company; the

Massachusetts Port Authority; the Metropolitan Washington Airport Authority; and the

Port Authority of New York and New Jersey (collectively, "the Aviation Parties") state that the material facts[1] for which there is no genuine issue to be tried are as follows:

### The September 11 Terrorist Attacks

1.    On the morning of September 11, 2001, 19 al Qaeda terrorists launched suicide attacks against the United States by hijacking four commercial airliners with the intent of crashing them into selected ground targets ("the September 11 terrorist attacks"). National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 4 (2004) ("*9/11 Commission Report*").

2.    The terrorists crashed two of the hijacked flights, American Flight 11 and United Flight 175, into the World Trade Center in New York City. *9/11 Commission Report* at 7, 8. One group of terrorists drove American Flight 11 into One World Trade Center, and a separate group of terrorists crashed United Flight 175 into Two World Trade Center. *Id.* at 7, 8.

3.    A third group of terrorists crashed American Flight 77 into the Pentagon in Virginia. *9/11 Commission Report* at 10.

4.    A fourth group of terrorists crashed United Flight 93 into a field near Shanksville, Pennsylvania. *9/11 Commission Report* at 14.

5.    Five (5) terrorists hijacked American Flight 77. Khalid al Mihdhar and Majed Moqed were the first two terrorists to check in for Flight 77 at American's ticket

---

[1]    The inclusion of any item in this statement does not constitute, and should not be construed as, a concession or admission that the item is necessary to the Aviation Parties' motion for summary judgment.

counter at Dulles International Airport. National Commission on Terrorist Attacks Upon the United States, *Staff Monograph on the Four Flights and Civil Aviation Security* (2004) at 27. Approximately fifteen minutes later, the third and fourth terrorists on American Flight 77, brothers Nawaf al Hazmi and Salem al Hazmi, checked in together for the flight. *Id.* Hani Hanjour, the terrorist who piloted the plane into the Pentagon, checked in alone for Flight 77. *See id.* at 93 n.225.

### The September 11 Litigation

6.    The Aviation Parties are being sued by property damage, business loss, wrongful death, and personal injury plaintiffs for damages, under a theory of negligence, for injuries that they allegedly sustained in the September 11, 2001 terrorist attacks. Plaintiffs' Fourth Amended Flight 11 Master Liability Complaint ("Flight 11 Complaint"), 1-2, ¶¶ 8-47; Plaintiffs' Fourth Amended Flight 175 Master Liability Complaint ("Flight 175 Complaint"), 1-2, ¶¶ 8-40; Plaintiffs' Fourth Amended Flight 77 Master Liability Complaint ("Flight 77 Complaint"), 1-3, ¶¶ 6-30; Plaintiffs' Third Amended flight 93 Master Liability Complaint ("Flight 93 Complaint"), 1-2, ¶¶ 5-24; Sixth Amended Master Property Complaint Against Airline and Security Company Defendants ("Property Damage Complaint") 58-91, ¶¶ 2. These property damage, business loss, wrongful death, and personal injury actions have been consolidated in *In re September 11 Litigation,* No. 21 MC 101 (S.D.N.Y.) (AKH) ("September 11 Litigation").

7.    Plaintiffs in the September 11 Litigation include property damage and business loss claimants suing on account of destruction of real property and business interruption resulting from the September 11 terrorist attacks. Property Damage

Complaint at ¶ 1. Plaintiffs also include personal injury and wrongful death claimants suing on account of injuries and fatalities caused by the September 11 terrorist attacks. Flight 11 Complaint at 1; Flight 175 Complaint at 1; Flight 77 Complaint at 1; Flight 93 Complaint at 1.

### The Aviation Parties' Request to Depose Certain FBI Witnesses

8.      On March 6, 2007, the Aviation Parties served a letter request upon the United States Attorney for the Southern District of New York seeking to depose five current or former employees of the Federal Bureau of Investigation ("FBI"): Harry Samit; Coleen M. Rowley; Scott Billings; Erik T. Rigler; and Michael Rolince (the "FBI Witnesses"). *See* Declaration of Desmond T. Barry, Jr., dated April 28, 2008, Ex. 1.[2]

9.      The Aviation Parties included five affidavits with their March 6, 2007 letter request, explaining why the Aviation Parties believe the FBI Witnesses' testimony is relevant to their defense in the September 11 Litigation and identifying the topics about which they intend to question the FBI Witnesses. Exs. 2-6.

10.     On May 7, 2007, the office of the United States Attorney for the Southern District of New York issued five separate letters that denied the Aviation Parties' request to depose the FBI Witnesses. Exs. 7-11.

---

[2]    All citations to "Ex." refer to the exhibits attached to the Declaration of Desmond T. Barry dated April 28, 2008.

**Harry Samit**

11.     In 2001, Harry Samit was a Special Agent assigned to the FBI's Minnesota Field Office and the Joint Terrorism Task Force. Ex. 14 at 793-94.

12.     In August 2001, Samit participated in the FBI's initial investigation of Zacarias Moussaoui. The FBI initiated this investigation after receiving a phone call about Moussaoui from the flight school where Moussaoui had been learning how to pilot commercial aircraft. Ex. 14 at 808-811.

13.     On August 16, 2001, Samit interviewed Moussaoui, observed the search of a car that Moussaoui had been using, and participated in Moussaoui's arrest for immigration and visa violations. Ex. 14 at 836, 841-45, 849.

14.     While conducting the search incident to the arrest, Samit found a two inch blade in Moussaoui's pocket. Ex. 14 at 846-47. Another FBI agent who was searching the vehicle of Moussaoui's associate, Hussein al Attas, found a three-inch folding Sheffield knife that Moussaoui claimed was his. *Id*. at 849-50.

15.     As part of Samit's investigation of Moussaoui, he interviewed Hussein al Attas on two occasions. Ex. 14 at 853, 895. During the first interview, al Attas told Samit that Moussaoui was a religious Muslim who was upset about American support for Israel and who believed that it was acceptable to kill civilians as part of a *Jihad*. *Id*. at 856-57. During the second interview, al Attas told Samit that Moussaoui believed that Muslims should be ready to fight and that Moussaoui approved of martyrs. *Id*. at 895.

16.     As part of his investigation of Moussaoui, Samit contacted several other branches of the federal intelligence community, including FBI legal attachés in Paris and

London, as well as the Central Intelligence Agency ("CIA") to determine if they had any information on Moussaoui. Ex. 14 at 902, 940, 942.

17.    As a result of his investigation of Moussaoui, Samit concluded that Moussaoui held radical Islamist beliefs and he was concerned that Moussaoui might pose a terrorist threat to domestic civil aviation. Ex. 14 at 863; Ex. 15. In fact, Samit wrote an FBI colleague that the information the FBI had gathered on Moussaoui was "pretty ominous and obviously suggests some sort of a hijacking plan." Ex. 15. Samit also consulted with several of his FBI colleagues regarding his concerns about Moussaoui. Ex. 14 at 1055-65, 1080; Ex. 16.

18.    On September 11, 2001, after the terrorist attacks had occurred, Samit participated in a search of Moussaoui's belongings and discovered:

        a.    a small knife with a blade of less than four inches;

        b.    two utility tools that contained blades of less than four inches;

        c.    a two-volume operating manual for a Boeing 747-400 aircraft;

        d.    boxing gloves;

        e.    shin guards; and

        f.    binoculars of the type that could be used by a pilot for target recognition.

Ex. 14 at 951-59.

19.    Moussaoui was charged with crimes relating to terrorism and conspiracy to commit air piracy after September 11, 2001. *See* Ex. 24. Moussaoui pled guilty to these charges, *see id.*, and a trial was held to determine if Moussaoui would be sentenced to death. *United States v. Moussaoui*, No. 01-445A (E.D. Va. Apr. 3, 2006) (the "Moussaoui trial").

20.     A jury ultimately found that Moussaoui was eligible for the death penalty for his participation in the September 11 plot, but sentenced him to a life term.  Ex. 19.

21.     Samit testified at the Moussaoui trial regarding his role in the Moussaoui investigation.  Ex. 14.

22.     In addition to testifying publicly at the Moussaoui trial, Samit also has been cited as an authority in the *9/11 Commission Report*.  *Id.* at 540 n.92, 540 n.101.

### Coleen M. Rowley

23.     In 2001, Coleen M. Rowley was an FBI Special Agent and Chief Counsel for the FBI's Minneapolis Division.  Ex. 14 at 1197.

24.     Before the September 11 terrorist attacks, Samit contacted Ms. Rowley about obtaining a search warrant for some of Moussaoui's belongings that Moussaoui would not allow the FBI to search.  Ex. 14 at 845, 1122, 1198-99.

25.     The FBI did not obtain a search warrant to investigate Moussaoui's belongings until after the September 11 terrorist attacks.  Ex. 14 at 951-52.

26.     Ms. Rowley has been cited as an authority in the *9/11 Commission Report*. *Id.* at 540, n.94.

27.     After the September 11 terrorist attacks, Ms. Rowley sent a letter to FBI Director Robert Mueller detailing her concerns about how the FBI handled the Moussaoui investigation.  Ex. 21.  This letter is publicly available.  Exs. 21-22.

28.     Several weeks after sending her letter to Director Mueller, Ms. Rowley testified before the Senate Judiciary Committee regarding her concerns about the FBI's handling of counterterrorism investigations.    *See    Oversight    Hearing    on*

7

*Counterterrorism, Hearing Before the S. Comm. on the Judiciary*, S. Hrg. 107-920 (2002).

### Scott Billings

29.     In 2001, Scott Billings was an FBI Special Agent assigned to the FBI's Okalahoma City Division and the Joint Terrorism Task Force.  Ex. 18 at 1298-99.

30.     On September 15, 2001, Special Agent Billings led a search of Moussaoui's Oklahoma apartment and discovered:

    a.    flight simulator software and a joystick;

    b.    an invoice for a Boeing 747 flight deck video;

    c.    instructions pertaining to piloting commercial aircraft; and

    d.    a notebook pertaining to physical training.

Ex. 18 at 1300-10.

31.     Special Agent Billings testified at Moussaoui's trial regarding his role in the Moussaoui investigation.  Ex. 18.

### Michael Rolince

32.     In 2001, Michael Rolince was the Chief of the FBI's International Terrorism Operations Section ("International Terrorism Section").  Ex. 13 at 1462.

33.     The International Terrorism Section is responsible for coordinating counterterrorism investigations throughout the United States, and orchestrating the deployment of FBI agents and support personnel to locations where Americans have been killed or injured by terrorist attacks.  Ex. 13 at 1465.

34.     In the summer of 2001, the International Terrorism Section investigated and analyzed intelligence concerning the activities of al Qaeda, including information

suggesting that there were al Qaeda operatives present in the United States and that al Qaeda terrorists might attack the United States. Ex. 13 at 1484, 1488, 1508. Some of the al Qaeda threats analyzed by the International Terrorism Section related to attacks on civil aviation. *Id.* at 1485, 1510-11.

35.    Before the September 11 attacks, the Chief of the FBI's Radical Islamic Fundamentalist Unit told Mr. Rolince that the FBI's Minneapolis field office received a call about an individual from a flight school, that the individual had been interviewed, that his answers were unsatisfactory, and that he was arrested on immigration charges. Ex. 13 at 1493-94. Mr. Rolince also was told to expect a phone call from the FBI's Minneapolis office regarding application for a Foreign Intelligence Surveillance Act search warrant for this individual's computer and notebook. *Id.*

36.    Mr. Rolince testified at Moussaoui's trial regarding the Moussaoui investigation and the FBI's knowledge of other al Qaeda operatives prior to the September 11 attacks. Ex. 13.

37.    In addition to testifying publicly at the Moussaoui trial, Mr. Rolince has also been cited as an authority in the *9/11 Commission Report. See, e.g., 9/11 Commission Report* at 275, 536 n.54, 537 n.64, 538 n.79, 540 n.102.

### Erik T. Rigler

38.    Erik T. Rigler testified at Moussaoui's criminal trial, *United States v. Moussaoui*, No. 01-445A (E.D. *Va.* Apr. 3, 2006), as a summary witness for the defendant. Ex. 20; *see also* Ex. 11 at 2.

39.    Although Mr. Rigler previously had served as an FBI Special Agent, at the time of his testimony in the Moussaoui trial he no longer was an FBI employee and did not testify in an official capacity.  Ex. 20 at 2143-44; *see also* Ex. 11 at 2 ("Special Agent Rigler was not employed by the FBI at the time he provided testimony at the Moussaoui trial . . . . ").

40.    In his testimony at the Moussaoui trial, Mr. Rigler summarized the chapter of the report written by the Office of the Inspector General ("OIG") of the Justice Department regarding the FBI's handling of the pre-September 11, 2001 investigation of hijackers Nawaf al Hazmi and Khalid al Mihdhar.  Ex. 20 at 2144.  Mr. Rigler testified that OIG found that the FBI missed at least five opportunities to learn that Hazmi and Mihdhar were in the United States and to seek to locate them before September 11, 2001. *Id.* at 2150.

41.    Mr. Rigler's testimony at the Moussaoui trial was not based upon information that he gained in the course of his duties as an FBI agent.  Ex. 11 at 2 (Mr. Rigler did not "testify as to information he obtained in his official capacity as an FBI

Special Agent").

Dated:  April 28, 2008
        New York, New York

                            Respectfully submitted,

                            CONDON & FORSYTH LLP

                            By: _____

                            Desmond T. Barry, Jr. (DB 8066)
                            7 Times Square – 18th Floor
                            New York, NY 10036
                            Tel.: (212) 490-9100
                            Fax: (212) 370-4453
                            Email: dbarry@condonlaw.com

                            *Liaison Counsel for Aviation Parties*

11