# Exhibit 14

Page 672

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,    .         Criminal No. 1:01cr455
                             .
    vs.                      .         Alexandria, Virginia
                             .         March 9, 2006
ZACARIAS MOUSSAOUI,          .         9:30 a.m.
a/k/a Shaqil, a/k/a          .
Abu Khalid al Sahrawi,       .
                             .
            Defendant.       .
                             .
.  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
VOLUME IV

APPEARANCES:

FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                             DAVID J. NOVAK, AUSA
                             DAVID RASKIN, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             JOHN W. VAN LONKHUYZEN, ESQ.
                             U.S. Department of Justice
                             Counterterrorism Section
                             10th and Constitution Avenue, N.W.
                             Room 2736
                             Washington, D.C. 20530
FOR THE DEFENDANT:           GERALD THOMAS ZERKIN
                             KENNETH P. TROCCOLI
                             ANNE M. CHAPMAN
                             Assistant Federal Public Defenders
                             Office of the Federal Public
                             Defender
                             1650 King Street
                             Alexandria, VA 22314


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Page 792

```
 1    its certification, MN-514.1, I offer both of those.

 2              THE COURT:  All right, MN-514 and 514.1?

 3              MR. NOVAK:  Yes, Your Honor.

 4              THE COURT:  Both in.

 5              (Government's Exhibits Nos. MN-514 and MN-514.1 were

 6    received in evidence.)

 7              MR. NOVAK:  That stipulation reads:  On August 16 of

 8    2001, Mr. Moussaoui purchased a Microsoft PowerPoint 2002 program

 9    from CompUSA in Bloomington, Minnesota.

10              And then, Judge, finally, we would just offer business

11    records which are for a post office box that, they have been

12    marked MN-513, and it's a certificate of a business record of

13    MN-513.1.  I would offer those as well.

14              THE COURT:  There's no objection, correct?

15              MR. MAC MAHON:  No objection, Your Honor.

16              THE COURT:  513 and 513.1 are in.

17              MR. NOVAK:  Yes, Your Honor, thank you.

18              (Government's Exhibits Nos. MN-513 and MN-513.1 were

19    received in evidence.)

20              MR. NOVAK:  We would call Agent Samit, please.

21              THE COURT:  All right.  Ladies and Gentlemen, if you're

22    hearing a slight roar, I think we're losing our air conditioning,

23    and it may get warm in here.  Fortunately, it's the end of the

24    trial week, and we'll hopefully have it repaired over the weekend.

25    But I just don't want you to be surprised if it starts to warm up.
```

1    And that's what the noise is if any of you are hearing it.

2              HARRY SAMIT, GOVERNMENT'S WITNESS, AFFIRMED

3              MR. NOVAK:  May I proceed, Your Honor?

4              THE COURT:  Yes, sir.

5                        DIRECT EXAMINATION

6    BY MR. NOVAK

7    Q.    Sir, could you introduce yourself to the good jurors by

8    telling them your first and your last name, spelling both?

9    A.    Harry Samit, H-a-r-r-y S-a-m-i-t.

10   Q.    Mr. Samit, could you tell the folks by whom you're employed?

11   A.    The Federal Bureau of Investigation.

12   Q.    In what capacity?

13   A.    As a special agent.

14   Q.    And how long have you been a special agent with the FBI?

15   A.    Since January of 1999.

16   Q.    Is that when you left the FBI academy?

17   A.    No.  I left the FBI academy in May of 1999.

18   Q.    And when you left the academy in May of 1999, where did you

19   get assigned to?

20   A.    The Minneapolis field office.

21   Q.    And have you been assigned there since then?

22   A.    I have.

23   Q.    All right.  So you remain a special agent up there in

24   Minneapolis; is that right?

25   A.    That's correct.

Page 794

1   Q.   And could you tell the good folks on what -- what kind of

2   assignment do you have as a special agent with the FBI up there in

3   Minneapolis?

4   A.   I'm an investigator assigned to the Joint Terrorism Task

5   Force.

6   Q.   Tell the folks what the Joint Terrorism Task Force is.

7   A.   The Joint Terrorism Task Force is an organization of law

8   enforcement agents and officers who investigate international

9   terrorism under the framework set up by the FBI.  It's got

10  personnel from a variety of different law enforcement agencies.

11  Q.   Do you want to list some of the different agencies that work

12  with you on that Joint Terrorism Task Force?

13  A.   Immigration and Naturalization Service, United States Secret

14  Service, local police officers, sheriff's deputies, a variety of

15  different investigators.

16  Q.   And beyond your assignment on the, on the -- JTTF is the

17  acronym for the Joint Terrorism Task Force; is that right?

18  A.   Correct.

19  Q.   Beyond your assignment to the JTTF, can you tell us what else

20  you do there as a special agent up there in Minnesota?

21  A.   At the time in 1999, I was assigned as a pilot with the FBI

22  as well.

23  Q.   We're going to talk about your pilot training in a second,

24  but your squad that you're assigned to is squad what?

25  A.   Squad 5.

Page 795

1  Q.   And squad 5 up there includes the investigation of what types

2  of crime?

3  A.   In, in 2001, it included the investigation of international

4  terrorism, domestic terrorism, and foreign counterintelligence.

5  Q.   And would it be fair to say that since your inception into

6  the FBI, your initial assignment up there in Minneapolis, you've

7  basically been working full-time on terrorism investigations?

8  A.   Yes, sir.

9  Q.   Now, could you tell us, have you received any type of

10 specialized training in the world of terrorism?

11 A.   I have.  During the FBI academy, the new agent training,

12 there was a terrorism integrated case scenario which I

13 participated in along with my class.  I also attended a basic

14 international terrorism in-service after graduating the FBI

15 academy, and then later a double agent and recruitment in-service

16 as well.

17 Q.   Okay.  Now, in addition to that, you're a pilot as well; is

18 that right?

19 A.   That's correct.

20 Q.   And have you received any type of pilot training within the

21 FBI?

22 A.   I have.  I attended the FBI-sponsored Cessna Pilots

23 Association introduction to the Cessna 182 aircraft.

24 Q.   Those are little planes; is that right?

25 A.   That's correct.

Page 796

1   Q.   All right.

2   A.   As well as their air crew coordination seminar.

3   Q.   All right.  Do you want to tell the folks what you did before

4   you joined the FBI?

5   A.   I was an officer in the United States Navy.

6   Q.   And how long were you employed by the United States Navy?

7   A.   From May of 1990 until joining the FBI in January of 1999.

8   Q.   So for about nine years; is that right?

9   A.   Yes, sir.

10  Q.   And when you left the Navy after those nine years, what was

11  your rank?

12  A.   Lieutenant commander.

13  Q.   Okay.  So you were commissioned in what area?

14  A.   In intelligence.

15  Q.   All right.  And what exactly -- what was your duties there in

16  the Navy as an intelligence officer?

17  A.   During my time in intelligence, I spent the entire time

18  assigned to aviation commands.  I was first assigned to a

19  sea-going squadron, flying aircraft off of an aircraft carrier.  I

20  did an exchange tour with the Canadian Air Force at their

21  headquarters in Ottawa, and then I was an instructor at the Navy

22  Fighter Weapons School, a top gun.

23  Q.   And what is it that you were supposed to do?  What was your

24  job?

25  A.   As an intelligence officer with aviation units, it was my job

Page 797

1    primarily to evaluate threat air forces and air defense forces, to

2    look at their training, their capabilities, specifically with

3    regard to pilot training capabilities.  We'd evaluate -- I would

4    evaluate the number of hours, the types of training they did, and

5    determine what kind of pilots they would be.

6    Q.   Okay.  Now, you talked to us also about the fact that you

7    went to the top gun school; is that right?

8    A.   That's correct.  I was there as a student, and then I stayed

9    as an instructor.

10   Q.   Okay.  And you have training also as a navigator; is that

11   right?

12   A.   That's correct.

13   Q.   And for those of us who have watched the "Top Gun" movie,

14   were you sitting in the first seat or the second seat?`

15   A.   The back seat.

16   Q.   All right.  And how much training did you get as a navigator?

17   A.   Approximately six months.

18   Q.   All right.  And going back to your training in terms of what

19   you were supposed to analyze, how much time did you spend

20   analyzing the pilot trainings for other countries?

21   A.   When I was doing threat evaluations and looking at threat air

22   forces, probably 40 to 50 percent would be evaluating the pilot

23   capabilities.

24   Q.   Over what span of time?

25   A.   The entire time, from 1990 -- 1991 to 1999.

Page 798

```
 1   Q.   So during those nine years, you were -- I gather you were

 2   evaluating hostile countries to see what kind of pilot training

 3   that they were giving to, to members of their Air Force; is that

 4   right?

 5   A.   Yes, sir.

 6   Q.   All right.  Now -- so you're pretty familiar with flight

 7   training; is that correct?

 8   A.   Flight standards, absolutely, sir.

 9   Q.   All right.  Now, you yourself, separate from the Navy, became

10   a pilot; is that right?

11   A.   That's correct.

12   Q.   And when was it approximately that you became a pilot?

13   A.   1997.

14   Q.   And could you tell us, what's your license certification

15   level?

16   A.   I am a private pilot, single engine fixed wing land airplane,

17   and I have a complex and high-performance endorsement.

18   Q.   Okay.  And the private pilot license, is that known as a PPL?

19   A.   Correct.

20   Q.   And could you tell the folks how it is that you went about

21   getting your PPL?

22   A.   I had flown in the Navy and decided that I enjoyed that.  My

23   tour in Canada with the Canadian Air Force was a ground job.  I

24   didn't get to fly, so I went and decided I wanted a private

25   pilot's license so I could do that.  I went to a flying school.  I
```

U.S. v. MOUSSAOUI

1    asked, inquired about price and availability.  They were

2    welcoming.  They said:  Come on in, and we'll teach you to fly.

3    Q.   And what did you have to do before they started teaching you?

4    Did you have to take any type of physical?

5    A.   I did.  I had to take a medical to prove that I was medically

6    fit to be able to fly.

7    Q.   Does that happen with anybody?  Is that required by the FAA

8    that before you can get your PPL, that you have to take some basic

9    level of a physical of some sort?

10   A.   Yes, sir, that's correct.

11   Q.   And what's the purpose behind that?  What do they examine you

12   for?

13   A.   To make sure that vision, cardio, respiratory system, hearing

14   are all in accordance with my ability, with anyone's ability to

15   operate an aircraft safely.

16   Q.   Okay.  And did you do that?

17   A.   I did.

18   Q.   Okay.  And did you get your -- you were medically passed; is

19   that right?

20   A.   I was.

21   Q.   And then did you get your training there in Ottawa at that

22   flight school that you attended?

23   A.   That's correct.

24   Q.   All right.  And could you tell us, when you start your flight

25   school, what's the first thing that you do?

Page 800

1   A.   In my case, I went to ground school.

2   Q.   And can you tell the folks what flight school -- ground

3   school consists of?

4   A.   It's academic training.  Aircraft systems, navigation, rules

5   and regulations governing how you are allowed to fly an airplane.

6   Very similar to the types of aviation training that began my naval

7   aviation training.

8   Q.   Okay.  Thereafter, did you start taking flight training where

9   you actually flew in the plane?

10  A.   I did.

11  Q.   By the way, what kind of planes were you flying in at that

12  time?  The little Cessnas?

13  A.   Cessna 150s.

14  Q.   No kind of jets or anything like that, is that right?

15  A.   No.

16  Q.   All right.  Can you tell us, do you just jump in the Cessna

17  and start taking it up for a ride, or has somebody got to jump in

18  there with you?

19  A.   You're in there with a qualified instructor.

20  Q.   All right.  And how many hours did you spend with a qualified

21  instructor in dual-flight situations, where you're not flying

22  solo?

23  A.   Dual flight, where the instructor is with me in the airplane,

24  it took me about ten hours of dual flight before I was ready to

25  solo.

Page 801

1  Q.   Okay.  And did you indeed solo?

2  A.   I did.

3  Q.   All right.  And then ultimately, how many hours did it take

4  you until you were certified as a -- with your PPL license?

5  A.   Just under 50.

6  Q.   All right.  And you got -- you were certified; is that right?

7  A.   Yes, sir.

8  Q.   And approximately how many pilot hours do you have as you sit

9  here today as a private pilot?

10  A.   Approximately 250.

11  Q.   And approximately how many hours do you have sitting here

12  today as a navigator?

13  A.   About 350.

14  Q.   Now, despite those hours, I guess combined over 500 hours,

15  have you ever tried to go up to the next step of getting your

16  commercial license?

17  A.   I have not.

18  Q.   How many hours do you think that it normally takes before you

19  go up to that next step?

20         MR. MAC MAHON:  Objection, Your Honor.  He's an FBI

21  agent, not a commercial pilot.  That's irrelevant.

22         MR. NOVAK:  Well, no, he's a --

23         THE COURT:  He may be, but I think we've already heard a

24  great deal of this from the other witnesses, and I had assumed

25  Agent Samit was being called for other purposes.

Page 802

1          MR. NOVAK:  That's fine, Your Honor.  I'll move on.

2          THE COURT:  I think before you move on to a new topic,

3    this is a logical stopping point for the one-hour lunch break.

4    Agent Samit, you'll need to be back here at 1:30.  We'll recess

5    court until that time.

6          (Recess from 12:28 p.m., until 1:30 p.m.)

7

8                    CERTIFICATE OF THE REPORTERS

9          We certify that the foregoing is a correct transcript of the

10   record of proceedings in the above-entitled matter.

11

12

13

                              Anneliese J. Thomson

14

15

16                            Karen Brynteson

17

18

19

20

21

22

23

24

25

Page 803

1                                  I N D E X
2                           DIRECT   CROSS   REDIRECT   RECROSS
3    WITNESSES ON BEHALF OF
     THE GOVERNMENT:
4
     Shohaib Nazir Kassam         674     689      699      700
5
     Clarence E. Prevost         716     772      788      789
6
     Harry Samit                 793
7
8
                             EXHIBITS
9
                                  MARKED    RECEIVED
10
     GOVERNMENT'S:
11
     No. FO05521.11                            705
12       FO05521.12                            705
         FO05521.14                            705
13       FO05521.30                            705
         FO05521.29                            705
14
         FO05521.66                            705
15       FO05521.70                            705
         MN-151                                706
16       MN-617.1                              707
         MN-154                                708
17
         FO-5521.54                            708
18       FO-5521.55                            708
         ST-2                                  710
19       FO-5521.57                            710
         FO-5521.58                            710
20
         FO-5521.59                            711
21       FO-5521.60                            711
         FO-5521.61                            712
22       MN-617.2                              712
         FO-5521.75                            714
23
         FO-5521.76                            714
24       FO-5521.78                            715
         MN-150 through MN-156                 716
25       MN-515                                716

Page 804

```
 1                              EXHIBITS
 2                                        MARKED      RECEIVED
 3      GOVERNMENT'S:
 4      No. MN-111                                      721
            MN-112                                      721
 5          MN-113                                      721
            MN-105                                      724
 6          MN-101                                      726
 7          MN-102                                      727
            MN-103                                      727
 8          MN-144                                      732
            MN-128                                      732
 9          GX-2                                        740
10          MN-108                                      741
            MN-508.1                                    744
11          MN-508.2                                    744
            MN-617.3                                    788
12          MN-511                                      791
13          MN-611                                      791
            MN-512.1                                    791
14          MN-512.2                                    791
            MN-512.3                                    791
15          MN-514                                      792
16          MN-514.1                                    792
            MN-513                                      792
17          MN-513.1                                    792
18
19
20
21
22
23
24
25
```

Page 805

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          ALEXANDRIA DIVISION
 3    UNITED STATES OF AMERICA,     .       Criminal No. 1:01cr455
                                    .
 4        vs.                       .       Alexandria, Virginia
                                    .       March 9, 2006
 5    ZACARIAS MOUSSAOUI,           .       1:30 p.m.
      a/k/a Shaqil, a/k/a           .
 6    Abu Khalid al Sahrawi,        .
                                    .
 7               Defendant.         .
                                    .
 8    .   .   .   .   .   .   .   .   .   .   .   .
 9                   TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE LEONIE M. BRINKEMA
10                 UNITED STATES DISTRICT JUDGE
11                         VOLUME IV-A
12    APPEARANCES:
13    FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                                   DAVID J. NOVAK, AUSA
14                                 DAVID RASKIN, AUSA
                                   United States Attorney's Office
15                                 2100 Jamieson Avenue
                                   Alexandria, VA 22314
16                                    and
                                   JOHN W. VAN LONKHUYZEN, ESQ.
17                                 U.S. Department of Justice
                                   Counterterrorism Section
18                                 10th and Constitution Avenue, N.W.
                                   Room 2736
19                                 Washington, D.C. 20530
20    FOR THE DEFENDANT:           GERALD THOMAS ZERKIN
                                   KENNETH P. TROCCOLI
21                                 ANNE M. CHAPMAN
                                   Assistant Federal Public Defenders
22                                 Office of the Federal Public
                                   Defender
23                                 1650 King Street
                                   Alexandria, VA 22314
24
25         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Page 806

```
 1    APPEARANCES:  (Cont'd.)
 2    FOR THE DEFENDANT:              EDWARD B. MAC MAHON, JR., ESQ.
                                      P.O. Box 903
 3                                    107 East Washington Street
                                      Middleburg, VA 20118
 4                                       and
                                      ALAN H. YAMAMOTO, ESQ.
 5                                    643 South Washington Street
                                      Alexandria, VA 22314-3032
 6
      ALSO PRESENT:                   GERARD FRANCISCO
 7
 8    COURT REPORTERS:               ANNELIESE J. THOMSON, RDR, CRR
                                      U.S. District Court, Fifth Floor
 9                                    401 Courthouse Square
                                      Alexandria, VA 22314
10                                    (703)299-8595
                                         and
11                                    KAREN BRYNTESON, FAPR, RMR, CRR
                                      Brynteson Reporting, Inc.
12                                    2404 Belle Haven Meadows Court
                                      Alexandria, VA 22306
13                                    (703)768-8122
14
15
16
17
18
19
20
21
22
23
24
25
```

 1              A F T E R N O O N   S E S S I O N

 2                          (Defendant and jury in.)

 3          THE COURT:  All right.  Mr. Novak?

 4          MR. NOVAK:  May I proceed?

 5          THE COURT:  Yes, sir.

 6          MR. NOVAK:  Thank you, Judge.

 7          HARRY SAMIT, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED,

 8   RESUMED

 9                  DIRECT EXAMINATION - (continued)

10   BY MR. NOVAK:

11   Q.   Agent Samit, on August the 15th of 2001, were you assigned

12   still as the special agent to the FBI in Minneapolis?

13   A.   I was.

14   Q.   And at that time did you have an occasion to get assigned to

15   the investigation of Zacarias Moussaoui?

16   A.   Yes.

17   Q.   And at that time who was your supervisor?

18   A.   I had an acting supervisor, Gregory Jones.

19   Q.   And was there a fellow special agent by the name of Dave Rapp

20   that also worked with you?

21   A.   Yes, sir.

22   Q.   Was he relatively new?

23   A.   He was very new, yes, sir.

24   Q.   Do you want to tell us how it is that you -- how the

25   investigation into Zacarias Moussaoui began?

Page 808

1    A.    Special Agent Rapp had complaint duty that day.  It is a

2    rotating shift.  All the agents in the office have to answer phone

3    calls from the public and other law enforcement agencies.  Special

4    Agent Rapp had occasion to take a call from Pan Am, and the

5    person, the caller, Tim Nelson, provided some fairly significant

6    information.

7    Q.    What was the initial information that you-all received there

8    from Pan Am?

9    A.    That they had a student they were training at the flight

10   academy on simulators for 747-400 series aircraft who was very

11   unusual.

12   Q.    Okay.  Did they give you the student's name?

13   A.    They did.

14   Q.    And did they tell you why it is that the student was unusual?

15   A.    Yes, sir.  They said that he didn't have any ratings, any

16   aviation ratings or licenses.

17   Q.    What does that mean to you as a criminal investigator?

18   A.    It means that for a person to want to do expensive aviation

19   training, typically it is going to lead somewhere, to a job

20   opportunity or to a job enhancement.

21   Q.    And by not pursuing the ratings, that means they are just not

22   doing it for the -- to benefit themselves financially; is that

23   right?

24   A.    Yes, sir.

25   Q.    Not worth the investment, right?

U.S. v. MOUSSAOUI

1   A.   Yes, sir.

2   Q.   Did they tell you whether the student, Mr. Moussaoui, was

3   employed by an airline?

4   A.   They did.  They said he was not.  He had no affiliation with

5   any airline.

6   Q.   Was that unusual?

7   A.   It was.

8   Q.   Why was that unusual?

9   A.   Because the typical student, as was explained to us, is an

10  airline pilot or is seeking employment with an airline and is

11  already qualified to do so.

12  Q.   And was it also -- would it also be the norm that that's who

13  would pay for this expensive training?

14       MR. MAC MAHON:  Your Honor, this is an FBI agent.  We

15  don't need leading questions every time for him, Your Honor, if we

16  could get the testimony.

17       THE COURT:  Objection sustained.  You can't lead,

18  Mr. Novak.

19       MR. NOVAK:  Okay.

20  BY MR. NOVAK:

21  Q.   Why would that be unusual?

22  A.   Because the airlines typically would pay for the student, or

23  the student would be making an investment in their own training in

24  order to become eligible to be hired by an airline.

25  Q.   Okay.  Did they tell you how much the training for

 1    Mr. Moussaoui cost?

 2    A.    The caller didn't know for sure, but said it was between 8-

 3    and 9,000 dollars.

 4    Q.    Okay.  And what, if any, information did you get about the

 5    amount of hours or licensing that Mr. Moussaoui had?

 6    A.    It was low.  It was less than 60 hours of flight time.

 7    Q.    All right.  Did you receive information about what type of

 8    plane it was that Mr. Moussaoui was pursuing the training on?

 9    A.    Yes, sir.

10    Q.    What type of plane was that?

11    A.    747-400 series airliner.

12    Q.    All right.  And could you tell us, are you familiar with the

13    notion of a glass cockpit?

14    A.    Yes, sir.

15    Q.    Could you tell us what the glass cockpit means to you and the

16    investigatory significance of that?

17    A.    What it means to me as a pilot is the way the information is

18    displayed to the pilot in the cockpit is different.  Older

19    airplanes, as compared to glass cockpit airplanes, have individual

20    gauges that display the information, critical information that the

21    pilot needs.  When an airplane is said to have a glass cockpit, it

22    relies on a much smaller number of multi-function displays,

23    television screens in the cockpit.

24    Q.    What, if any, impact did that have in terms of you in terms

25    of your thinking about whether criminality was afoot?

1    A.   My initial thought was that it's a simpler interface for a

2    relative novice, so that if someone had illegitimate purposes in

3    mind for wanting to receive the flight training, that would be an

4    ideal type of aircraft, because they wouldn't need as much

5    training and experience if they were to try and fly it.

6    Q.   And what if any impact would the glass cockpit have on the

7    number of -- if there was criminality afoot, the number of

8    accomplices that would have to be involved?

9            MR. MAC MAHON:  Your Honor, that's an entirely

10   speculative question.  He is not an expert in hijackings with

11   glass cockpits or not or anything else.

12           MR. NOVAK:  This goes to why --

13           THE COURT:  I think, both being an experienced pilot and

14   an investigator, this witness can testify about what it was about

15   a glass cockpit that would give him concern.  And I believe that's

16   the way the question is phrased.

17           MR. NOVAK:  That's what the purpose of the question is,

18   yes.

19           THE COURT:  Overruled.

20           THE WITNESS:  The other issue would pertain to the

21   number of crew members in the cockpit.  Because the glass cockpit

22   airplanes typically have increased automation, they need fewer

23   people in the cockpit.  And so in order to take over an airplane,

24   it would be the difference between having to overwhelm one or two

25   people as opposed to three or four.

1   BY MR. NOVAK:

2   Q.   All right.  Now, in addition to that information, did you ask

3   for and receive any additional background information, identifiers

4   or anything like that from the defendant?

5   A.   We were able to get his name, his date of birth, and the fact

6   that he was, said he lived in England and was from France, at

7   least initially.

8   Q.   Now, once you got that information, did you open up a case,

9   an investigation?

10  A.   We did.

11  Q.   Could you explain to the ladies and gentlemen what kind of

12  case that you opened up?

13  A.   Within probably 30 minutes of receiving that telephone call

14  we opened an intelligence investigation.

15  Q.   As an agent that's assigned to investigate terrorism

16  organizations, could you tell us, is there more than one type of

17  case that you can open up as an investigator?

18          THE COURT:  I think -- wait, Mr. Novak.  The better form

19  of that question was in that time period, because you are looking

20  at the 2001 time period.

21          MR. NOVAK:  Yes, Your Honor, excuse me, you are right.

22  BY MR. NOVAK:

23  Q.   Back in August of 2001, could you tell us what type of

24  investigatory cases that you could open up?

25  A.   During that time we had the intelligence investigation, which

Page 813

1    we did actually open on Mr. Moussaoui, and we also had a criminal

2    investigation.

3    Q.    All right.  I want to ask you to explain the difference.

4    Starting with the criminal, what is -- criminal investigation,

5    what was your goal back in 2001 if you were to open up just a

6    standard criminal investigation?

7    A.    Like any other type of crime that the FBI investigates, the

8    goal of a criminal investigation pertaining to terrorism is to

9    collect evidence of a crime relating to international terrorism.

10   Q.    And would that -- with a mind-set towards what?

11   A.    Towards prosecution.

12   Q.    All right.  Now, contrast that with opening up an

13   intelligence investigation, what's, what do you do there?

14   A.    An intelligence investigation is designed to generate

15   intelligence, intelligence whose goal would be to safeguard

16   national security.

17   Q.    And by safeguarding national security, what does that mean?

18   What would you try to accomplish towards that goal?

19   A.    We would attempt to use any information derived from a case,

20   an intelligence investigation, to strengthen our ability to deal

21   with threats to national security, whether it be espionage or

22   terrorists, ways to implement countermeasures to deny them their

23   objectives, without necessarily prosecuting anybody, but we could

24   still take steps, countermeasures to prevent them from

25   accomplishing their goals.

 1   Q.   Explain to us, if you are not going to arrest somebody, how

 2   is it that you could end up protecting national security during

 3   your investigation?  What are the types of things you can do?

 4   A.   We can use that intelligence to deny personnel access to the

 5   United States, to certain classified information; we can use that

 6   intelligence to implement countermeasures, security

 7   countermeasures to make whole sectors safer.  Any time information

 8   comes of a threat, or intelligence comes regarding a threat, the

 9   government, without arresting anyone, could implement

10   countermeasures which would counter that.

11   Q.   Okay.  Now, what if during the course of an investigation, an

12   intelligence investigation, you decide that you have gathered

13   enough information to charge somebody criminally?  Are you allowed

14   to do that?

15        THE COURT:  Were you allowed to do that, in that time

16   period?

17        MR. MAC MAHON:  Time frame.

18   BY MR. NOVAK:

19   Q.   All my questions, I was going to say all my questions are

20   dedicated to that August of 2001 time period, okay?

21   A.   Yes, sir.  At the time we could, there was a mechanism by

22   which a criminal investigation and prosecution could occur, but

23   there were a number of steps that needed to be gone through before

24   that could happen.

25   Q.   Could you explain to us what those steps were?

U.S. v. MOUSSAOUI

1   A.   There was a term called the wall.  And the wall was supposed

2   to be a barrier between intelligence and criminal investigations

3   wherein information developed on the intelligence investigation

4   could not be supplied at the wall to those working the criminal

5   investigation.

6   Q.   And what was the purpose of the wall?

7   A.   To prevent abuse, to prevent people in the FBI and law

8   enforcement from utilizing information gathered under the auspices

9   of national security to be used to prosecute someone, without

10  safeguards and checks imposed on that.

11  Q.   Are there a difference -- back in August of 2001, was there a

12  difference in terms of the safeguards that were in place in terms

13  of what you needed to do for oversight purposes?

14       MR. MAC MAHON:  Can we have some kind of foundation

15  here, Your Honor?  We're just jumping right into a very complex

16  issue without establishing how he knows any of this, whether he

17  learned it before, whether it is something he has learned since or

18  anything else.

19       MR. NOVAK:  He was an active agent.

20       THE COURT:  Agent Samit, in the course of your being

21  trained to be an FBI agent, was this wall explained to you?

22       THE WITNESS:  Yes, Your Honor, it was.

23       THE COURT:  Were the reasons for the wall explained to

24  you?

25       THE WITNESS:  They were.

 1        THE COURT:  Was that part of the standard procedure at

 2   Quantico in training new agents?

 3        THE WITNESS:  It was not part of the procedure at

 4   Quantico but at the subsequent follow-on in-services, there were

 5   classes, extensive sessions, like a whole afternoon's worth given

 6   on the explanation of the wall and the separation of the two types

 7   of investigations.

 8        THE COURT:  And those special courses, were those for

 9   agents who were specializing in the kind of work you were doing;

10   that is, counterterrorism.

11        THE WITNESS:  They were not.

12        THE COURT:  That's more than an adequate foundation.

13        MR. NOVAK:  Thank you, Judge.

14   BY MR. NOVAK:

15   Q.   Now, we were talking about the wall there.  Again, could you

16   explain to us the amount of safeguards that you had to, or

17   oversight that you had to go through, if you were working on the

18   intelligence side versus the criminal side?

19   A.   We could -- the system was set up whereby there could be a

20   group of, separate group of agents within the same office who were

21   working criminal investigation against the same subject.  It was

22   important, especially for the people working the intelligence case

23   against that person, to be very cognizant that they not share

24   information that was derived directly.

25        Instead what we were required to do during that time

Page 817

1    period was apply to our headquarters, who would then apply to the

2    Department of Justice for authority to do that.

3    Q.    Okay.  And was there a particular unit within the Department

4    of Justice that you needed approval from in order to switch the

5    case from an intelligence to a criminal case?

6    A.    Not to switch, not to switch the cases.

7    Q.    Or share the information.

8    A.    It was the Office of Intelligence Policy Review, OIPR.

9    Q.    And could you tell us what impact the wall had upon you in

10   terms of going to -- well, strike that.  Let me step back.

11            In a criminal case, who are the attorneys that you would

12   normally deal with if you were to pursue a criminal investigation?

13   A.    Assistant United States attorneys in the District of

14   Minnesota.

15   Q.    And if you opened an intelligence case, were you able to deal

16   with the assistant United States attorneys that were located there

17   in Minneapolis?

18   A.    No, that would fall under the heading of our needing to go to

19   the Office of Intelligence Policy Review first for authority.

20   Q.    And they would have to approve that before you could share

21   information with them; is that correct?

22   A.    Yes, sir.

23   Q.    Now, let's go back to Mr. Moussaoui, and with the information

24   that you received from the Pan Am School, you had indicated you

25   had received a number of biographical information about him.  Did

Page 818

1    you share that with any of your fellow investigators assigned to

2    the JTTF?

3    A.    I did.  I shared it with Immigration and Naturalization

4    Service, Special Agent John Weess.

5    Q.    And he was assigned to your task force?

6    A.    Yes, sir.

7    Q.    And he is a member of the INS; is that right?

8    A.    That's correct.

9    Q.    Could you tell us why it is that you shared that information

10   with Agent Weess?

11   A.    We had indications that Mr. Moussaoui was, in fact, a foreign

12   national, and one of the initial checks we do is to determine

13   whether that person is legally in the United States, whether they

14   entered legally initially, and whether they remain in legal status

15   now.

16   Q.    Okay.  And did you determine his nationality?

17   A.    We did.

18   Q.    What was his nationality?

19   A.    His nationality -- he was carrying a French passport.

20   Q.    All right.  And as a result, could you tell us what a legat

21   is in the world of the FBI?

22   A.    A legat is an acronym that stands for legal attache.  They

23   are FBI agents who are assigned to a number of U.S. embassies

24   around the world, and they serve as the FBI's liaison to that

25   government.

Page 819

1    Q.    And back in August of 2001, did the FBI have a legat to the

2    country of France?

3    A.    We did.

4    Q.    And what was that person's name?

5    A.    The legat's name was Enrique Camente.

6    Q.    Well, who did -- did you deal with somebody in particular, an

7    assistant legat?

8    A.    I did.  I dealt with assistant legal attache, Jay Abbott.

9    Q.    And when you found out that Mr. Moussaoui was French, did you

10   initiate a request for information from Mr. Abbott?

11   A.    Yes.

12   Q.    You would get that sometime later; is that right?

13   A.    That's correct.

14   Q.    We will move on.

15         Now, in addition to finding out that he was French, did

16   Agent Weess determine, along with you, what Mr. Moussaoui's status

17   was in terms of being an immigrant into the United States?

18   A.    He did.  He was able to determine very quickly that

19   Mr. Moussaoui was out of status.

20   Q.    Well, out of status means what?

21   A.    Out of status means illegally in the United States.

22   Q.    Okay.  And how had he entered the United States?

23   A.    Special Agent Weess's checks indicated Mr. Moussaoui entered

24   the United States on the visa waiver program.

25   Q.    Could you tell us what the visa waiver program is?

Page 820

1    A.    It is -- the visa waiver program is open to citizens,

2    passport holders from a variety of countries considered friendly

3    to the United States.  If you are a passport holder from one of

4    those nations, you are --

5    Q.    France being one of those nations?

6    A.    France being one of those nations, you are eligible, in fact,

7    rather than having to go to a U.S. consular section and applying

8    for a visa to enter the United States, you can, with your passport

9    and round trip airline tickets, apply as you're on your flight for

10   the visa waiver program.  It is essentially filling out a single

11   form.

12   Q.    It is a convenience for those citizens of countries that are

13   friendly with us; is that right?

14   A.    Yes, sir.

15   Q.    Now, is there a limit on how long somebody can stay in the

16   United States who procures a visa pursuant to the visa waiver

17   program?

18   A.    90 days.

19   Q.    And could you tell us what is the consequence of somebody who

20   stays longer than 90 days?

21   A.    Subsequent to that 90-day period, they are subject to arrest

22   and deportation.

23   Q.    And when somebody violates the 90-day rule, are they able to

24   get bond or to pursue a change in the status or anything like

25   that?

Page 821

1   A.   They are not.

2   Q.   Now, when you did this check on Mr. Moussaoui, did you find

3   out when it was that he had entered the United States?

4   A.   I did.  Special Agent Weess's records indicated that he

5   entered on February 23rd of 2001.

6   Q.   So then his 90 days would have expired on what day?

7   A.   May 22nd, 2001.

8   Q.   So as of August the 15th he was well over the 90-day time; is

9   that right?

10  A.   Yes, sir.

11  Q.   So you were able to arrest him if you wanted to; is that

12  correct?

13  A.   Correct.

14  Q.   Now, by the way, when somebody is arrested for that

15  violation, what happens to them?  You told us they don't get bond,

16  but what's the ultimate result?  What occurs to them?

17  A.   They are deported to either their country of citizenship or

18  their country of origin.

19  Q.   Now, on August the 15th then did you have an occasion to

20  speak with Clancy Prevost?

21  A.   I did.  I spoke with him on the telephone.

22  Q.   All right.  And could you tell us why it is that you spoke

23  with Mr. Prevost?

24  A.   I spoke with Mr. Prevost because I had been directed to him.

25  I had been informed that he was Mr. Moussaoui 's ground school

1    instructor and, in fact, that he would be in a position to provide

2    me some additional background information that the initial callers

3    couldn't.

4    Q.   So you telephoned him?

5    A.   I did.

6    Q.   And could you tell us what it is that Mr. Prevost told you

7    about Mr. Moussaoui at that time?

8    A.   He told us, he told me that he considered Mr. Moussaoui to be

9    an unusual student.  He related that he did believe that

10   Mr. Moussaoui was from France, that he spoke English with a French

11   accent.  He explained that he had conducted two days of ground

12   school training with him and done one simulator session.

13            I decided that it would probably be the most efficient

14   to interview Mr. Prevost in person, and we agreed that we would

15   meet the next day for an interview.

16   Q.   Okay.  Before we do that, let me ask you a couple particular

17   questions, though, about your telephone contact with Mr. Prevost.

18   At any time did Mr. Prevost tell you anything about where it is

19   that he believed Mr. Moussaoui was staying?

20   A.   He did.  Mr. Prevost had information about Mr. Moussaoui's

21   hotel room.

22   Q.   And where was that?

23   A.   The Residence Inn in Eagan.

24   Q.   Okay.  And Eagan is where in relation to Minneapolis?

25   A.   Eagan is a southern suburb of the Twin Cities.

U.S. v. MOUSSAOUI

1    Q.   Did he give you any type of information about whether

2    Mr. Moussaoui was associated with any type of car?

3    A.   He did.  He was able to describe a sedan and give a partial

4    license plate and a color of the license.

5    Q.   All right.  Did he tell you the make of the car?

6    A.   He did.

7    Q.   What kind of car was that?

8    A.   Subaru.

9    Q.   All right.  And did you learn from Mr. Prevost if

10   Mr. Moussaoui was traveling alone or with somebody else?

11   A.   Mr. Prevost indicated that Mr. Moussaoui had a companion.

12   Q.   And did he give you any further information about that

13   companion at the time?

14   A.   He was able to describe him as a male, dark complected, with

15   dark hair.

16   Q.   All right.  And did you ask Mr. Prevost in terms of how long

17   Mr. Moussaoui was scheduled for training?

18   A.   Mr. Prevost, because he had completed his ground school

19   portion, was uncertain as to his exact schedule.  He was able to

20   refer me back to the school, but he said he had a number of

21   simulator sessions coming up in the next few days.

22   Q.   Who did Mr. Prevost refer you to at the Pan Am Academy for

23   the schedule?

24   A.   Alan McHale.

25   Q.   Now, directing your attention to the next day, August the

Page 824

1    16th of 2001, did your investigation continue with Agent Weess and

2    Agent Rapp going anywhere?

3    A.    It did.  Special Agents Weess and Rapp went to the Residence

4    Inn in Eagan and located the car that Mr. Prevost had described.

5    Q.    And what kind of license plates were on that car?

6    A.    Oklahoma.

7    Q.    And was it reported to you, the license plate, from their

8    surveillance of the car?

9    A.    It was.

10   Q.    And did you then run the license plates to figure out who the

11   registered owner was of the vehicle?

12   A.    I did.

13   Q.    And who was the registered owner of the vehicle?

14   A.    It came back with two registered owners, Abdullah and Hussein

15   al-Attas.

16   Q.    And before that time, before you had run the license plates,

17   had you heard the names Hussein al-Attas or Abdullah al-Attas?

18   A.    No, sir.

19   Q.    And did the information that you received from running the

20   license plate tell you where the car was registered?

21   A.    It did, to a post office box in Norman, Oklahoma.

22   Q.    And before the running of the plates, did you ever have any

23   information that pertained to Oklahoma before then?

24   A.    No, sir.

25   Q.    Now, after that, around noon on that day, the 16th, did you

1   have an occasion to go to the Pan Am Academy yourself?

2   A.   Yes, sir, I did.

3   Q.   Who did you speak with at the Pan Am Academy?

4   A.   I spoke with Alan McHale.

5   Q.   And at that time did he give you a schedule?

6   A.   He did.  He provided me a schedule for Mr. Moussaoui's

7   simulator training.

8          MR. NOVAK:  If we can put Exhibit MN-617.3 on the

9   screen, which has already been introduced, Your Honor.

10          THE COURT:  Yes.

11  BY MR. NOVAK:

12  Q.   I am showing you that exhibit, Agent Samit.  Do you recognize

13  that exhibit?

14  A.   Yes, sir.

15  Q.   What is that exhibit?

16  A.   That was what was provided by Mr. McHale.

17  Q.   All right.  And is there anything of import on that schedule

18  for you in terms of the way your investigation proceeded?

19  A.   I noted that there was a day off on Friday.

20  Q.   Okay.  What did that tell you?

21  A.   Well, that was the Muslim Sabbath, and it was just a possible

22  indicator that the person who had scheduled that was a very

23  religious Muslim.

24  Q.   Okay.  Was there any other, anything else of import on that

25  schedule for you in terms of how you were to proceed with the

Page 826

```
 1   investigation?

 2         MR. MAC MAHON:  Your Honor, if I may, in terms of forms

 3   of these questions, I assume these questions are asked as to what

 4   he assumed on the day that he saw this the first time.  Because

 5   the questions are a little broader than that.  If we have that

 6   time frame, I have no objection.

 7         MR. NOVAK:  I asked him when he got the schedule.

 8         THE COURT:  I assume that's what they meant.  But just

 9   so we're clear --

10         MR. NOVAK:  I asked him when he got the schedule, Judge.

11   I thought that was pretty clear.

12         THE COURT:  When he got the schedule.

13   BY MR. NOVAK:

14   Q.   When you got the schedule there, Agent Samit, what else of

15   import was on there?

16   A.   It also allowed me to predict fairly accurately when

17   Mr. Moussaoui would be traveling to and from his simulator

18   sessions.

19   Q.   Was there any indication to you when that training would end?

20   A.   Yes.  His last day, his last simulator day was August 20th.

21   Q.   Now, we can put that down.  Thank you, Gerard.

22         Now, thereafter you spoke to Mr. McHale.  By the way,

23   did you ask him how it was that Mr. Moussaoui paid for his

24   training?

25   A.   I did.
```

Page 827

```
 1   Q.   And what response did you get?

 2   A.   He told us that he paid in cash.

 3   Q.   Okay.  And thereafter you met with Mr. McHale.  Did you have

 4   an occasion to interview Mr. Prevost in person?

 5   A.   I did.  We responded to Mr. Prevost's hotel, as we had agreed

 6   the day before, and we conducted an interview.

 7   Q.   Can you tell us what it is that Mr. Prevost told you at that

 8   time?

 9   A.   Mr. Prevost was able to elaborate on his contact with

10   Mr. Moussaoui, to describe his interest in aviation but his utter

11   lack of experience and knowledge.  He discussed the fact that they

12   talked about Mr. Moussaoui was a resident of the U.K., originally

13   from France.

14        When we asked Mr. Prevost what sparked his suspicion,

15   what triggered his suspicion, that's when he related a story about

16   Mr. Moussaoui's interest in the aircraft doors, the fact that he

17   was surprised to learn that they couldn't be opened in flight, and

18   then that led into the discussion about Mr. Moussaoui's religion.

19   Q.   Okay.  Now, at that point also was there any indication to

20   you from Mr. Prevost whether or not Mr. Moussaoui was going to

21   seek additional training beyond the simulator training that was

22   scheduled?

23   A.   There was.  Mr. Prevost indicated that based on what

24   Mr. Moussaoui had observed the previous night in the simulator,

25   that he felt that more training might be required.
```

Page 828

1  Q.   All right.  And what if anything did that tell you in terms

2  of how long that you had to work with in terms of your

3  investigation, in terms of possible criminality here?

4  A.   Mr. Prevost related that it might be, he might require a week

5  or two more of training.  Dating that from August 20th when

6  Mr. Moussaoui's last scheduled simulator session was, we could

7  project ahead another 14 days or so to the end of the first week

8  of September.

9  Q.   Okay.  Now, after you interviewed Mr. Prevost, could you tell

10  us if you made any decisions about how to proceed with your

11  investigation?

12  A.   We did.  Special Agent Weess and I consulted and we decided

13  that on the basis of the suspicious behavior discussed, provided

14  to us by the school, that we were going to arrest Mr. Moussaoui.

15  Q.   Okay.  And why was that?  You were going to arrest him for

16  what?

17  A.   We were going to arrest him on his visa waiver overstay.

18  Q.   But were you focused upon that or were you focused on other

19  concerns?

20  A.   We were obviously focused on learning more about his plans.

21  And we saw that as a way of preventing him from getting any

22  simulator training, any meaningful aircraft training before we had

23  the opportunity to talk to him and sort things out.

24  Q.   Did you ever consider the fact that he could have just been a

25  rich guy, taking training?

1    A.    We did.  However, upon discussing that with Mr. Prevost,

2    Special Agent Weess and I concluded he really didn't fit any of

3    the categories.  He certainly didn't seem like just a rich guy.

4    He wasn't interested in logical things that just a vanity pilot

5    would be interested in.

6    Q.    And did you make any arrangements in case that, when you did

7    have contact with him, that if you had determined that he was a

8    legitimate person?

9    A.    We did.  We, Special Agent Weess and I discussed in advance,

10   and our plan was that if he was just a legitimate person and we

11   could find no further reason for suspicion, we were going to

12   intercede with the school and attempt to get some of his money

13   refunded for him, because we didn't want to spoil the training; if

14   it was no harm, no foul, we didn't want to interfere with his life

15   and cost him money.

16   Q.    Okay.  Now, after you made that decision to arrest

17   Mr. Moussaoui, could you tell us where it is that you went to

18   accomplish that?

19   A.    We went to his hotel.

20   Q.    What hotel was that?

21   A.    The Residence Inn in Eagan.

22   Q.    And could you tell us approximately what time on August the

23   16th you arrived there?

24   A.    Around 4 p.m.

25   Q.    And who arrived there with you?  Were you alone or with other

1  agents?

2  A.   No, we had two teams of two agents each.  It was myself,

3  Special Agent Steve Nordmann of Immigration and Naturalization,

4  and then Special Agents Weess and Rapp.

5  Q.   And when you arrived there, did you make any efforts to

6  determine which room it was that Mr. Moussaoui was staying in?

7  A.   We did.  We located the vehicle previously and we knew where

8  it was parked, but we didn't know what room he was staying in.  So

9  Special Agents Weess and Rapp interviewed the hotel clerk and

10 asked what room Mr. Moussaoui was staying in.

11 Q.   Which room did you determine that was?

12 A.   1414.

13 Q.   Now, if I could show the witness Exhibit Numbers MN-500.1

14 through MN-500.7.

15         THE COURT:  Any objection?

16         MR. MAC MAHON:  No objection, Your Honor.

17         THE COURT:  All right.  Those are all in.

18         (Government's Exhibit Nos. MN-500.1 through MN-500.7

19 were received in evidence.)

20 BY MR. NOVAK:

21 Q.   Maybe we can bring them up on the screen and we can take them

22 one at a time.  It is 500.1.

23         Do you want to tell us, Agent Samit, what it is that

24 Exhibit MN-500.1 is that we're looking at right there?

25 A.   That's the sign for the Residence Inn in Eagan.

Page 831

```
 1   Q.   And, by the way, I gather back in August of 2001 there was no

 2   snow?  You guys don't get snow in August there, do you?

 3   A.   No, sir, we don't.

 4              MR. MAC MAHON:  We will stipulate to that, Your Honor.

 5              (Laughter.)

 6   BY MR. NOVAK:

 7   Q.   Can we go to the next photo, MN-500.2.  What are we looking

 8   at there, Agent Samit?

 9   A.   That's the lobby, the office where the front desk is at the

10   motel.

11   Q.   500.3, please, what are we looking at there, Agent Samit?

12   A.   We're looking at the parking spot where Mr. al-Attas's

13   vehicle was located, right there (indicating), and we're looking

14   at the entrance to room 1414, right there (indicating).

15   Q.   Okay.  500.4, please.  What are we looking at there?

16   A.   That's just another view of the entrance to room 1414.

17   Q.   And 500.5?

18   A.   That's another angle, the sidewalk outside room 1414.

19   Q.   500.6?

20   A.   Closeup of the door.

21   Q.   500.7?

22   A.   Another view of the door.

23   Q.   Okay.  We can take those down.

24              Now, directing your attention to about 5:10 p.m. that

25   day, August 16th of 2001, could you tell us, had you set up a
```

Page 832

1  surveillance of where you depicted Mr. al-Attas's car being?

2  A.    We did.  We positioned both vehicles so that we could view

3  Mr. al-Attas's car and Special Agents Weess and Rapp could also

4  view room 1414.

5  Q.    Okay.  Could you tell us what happened at that time?  Who was

6  the first person that came out?

7  A.    Mr. al-Attas was the first person to leave the room.

8  Q.    Which -- what was his first name?

9  A.    Hussein al-Attas.

10  Q.    And could you tell us when Mr. al-Attas came out of the room,

11  where did he go?

12  A.    He proceeded directly to that 1991 Subaru and to the driver's

13  side.

14  Q.    And did anybody else come out after him?

15  A.    After a short delay, a second person came out that we

16  subsequently identified as Mr. Moussaoui.

17  Q.    And when Mr. Moussaoui -- when you talk about a short delay,

18  how much longer are we talking about?

19  A.    Probably 45 seconds.

20  Q.    The person that you identified as Mr. Moussaoui, is he here

21  in the courtroom today?

22  A.    He is.

23  Q.    Could you identify him, please?

24  A.    He is sitting right there (indicating).

25           MR. NOVAK:  For the record the witness has identified

Page 833

```
 1    the defendant, please.

 2              THE COURT:  Any objection?

 3              MR. MAC MAHON:  No objection, Your Honor.

 4              THE COURT:  All right.  The record will so reflect.

 5    BY MR. NOVAK:

 6    Q.   Now, when Mr. al-Attas came out of the room, can you tell us

 7    what it is that occurred?

 8    A.   Mr. al-Attas came out of the room, went to the driver's side

 9    of the vehicle and got in, at which point we moved in and blocked

10    his vehicle and asked him to step out of the vehicle.

11    Q.   All right.  And this is before Mr. Moussaoui had come out of

12    the room?

13    A.   Yes, sir.

14    Q.   And, by the way, what did you learn about Mr. al-Àttas in

15    terms of his nationality and such at that time?

16    A.   When we interviewed him subsequently we learned he was a

17    Yemeni citizen and a resident of Saudi Arabia.

18    Q.   And he had traveled to the United States on what kind of

19    visa?

20    A.   A student visa.

21    Q.   And that's different than the visa waiver program; is that

22    right?

23    A.   Yes, sir.

24    Q.   What's a student visa allow you to do?

25    A.   A student visa allows you to remain in the United States for
```

1    the duration of the time that you are studying at an accredited

2    university.

3    Q.    Now, at that time when you stopped Mr. al-Attas, did you

4    arrest him then?

5    A.    We did not.

6    Q.    Okay.  What did you do with him?

7    A.    We asked Mr. al-Attas to step out of the vehicle, which he

8    did.  We took him away from the vehicle and gave him a pat-down

9    search, quickly determined he did not have any weapons.

10   Q.    Could you tell us what is a pat-down search?

11   A.    A pat-down search is a law enforcement search that agents and

12   police officers under the law are allowed to conduct to ensure

13   that the person that they are dealing with cannot access any

14   dangerous items, weapons of any kind.

15   Q.    So you are patting down, are you patting down simply for

16   weapons or looking for other evidence at the same time?

17   A.    We're looking for weapons at that point.

18   Q.    It is just limited to that?

19   A.    Dangerous items, yes, sir.

20   Q.    Now, after you did the pat-down on Mr. al-Attas, how much

21   longer was it until Mr. Moussaoui came out?

22   A.    Probably within 15 seconds.

23   Q.    And I would like to show the witness Exhibit GX-2, please,

24   which is previously admitted.  I think it is on the screen there,

25   Agent Samit.  That's fine.  Do you recognize that photograph?

Page 835

1   A.   I do.

2   Q.   What does that photograph depict?

3   A.   That's Mr. Moussaoui's appearance on August 16th, 2001.

4   Q.   So he looked a little different then than he does today; is

5   that right?

6   A.   Yes.

7   Q.   What is the nature of the difference between then and now?

8        MR. MAC MAHON:  Your Honor, the jury can see the

9   difference between the two.

10       THE COURT:  I think it is cumulative too.  It has

11  already been asked of another witness.

12       MR. NOVAK:  That's fine.

13  BY MR. NOVAK:

14  Q.   Can you tell us, do you recall how Mr. Moussaoui was dressed

15  at that time?

16  A.   He was dressed casually, contemporary American clothes, he

17  had cargo pants on, a T-shirt, leather jacket, and a ball cap.

18  Q.   Could you tell us what happened?  Did you approach

19  Mr. Moussaoui?

20  A.   I did.  My first thought was he looks just like an American.

21  But having seen him come out of room 1414, we reasoned it was him.

22  And Special Agent Nordmann and myself approached Mr. Moussaoui.

23  Q.   Mr. Nordmann was the other INS agent; is that correct?

24  A.   That's correct.

25  Q.   When you and Agent Nordmann stopped or approached

Page 836

1    Mr. Moussaoui, can you tell us what happened next?

2    A.   We identified ourselves as federal agents and informed him

3    that he had an immigration issue and that we needed to discuss it

4    with him.

5    Q.   And what if any response did you receive from Mr. Moussaoui?

6    A.   Mr. Moussaoui immediately said he had some expensive flight

7    training he needed to get to and that he couldn't stop to talk.

8    Q.   And so what happened?

9    A.   We informed him that this was important and it was pressing

10   and that he needed to stay and talk to us.

11   Q.   All right.  What happened after that?

12   A.   I asked Mr. Moussaoui for identification and also that he

13   allow me to look in his bag, again, a search pursuant to the

14   pat-down just to ensure there were no weapons or dangerous items.

15   Q.   Okay.

16   A.   Mr. Moussaoui presented me with a passport case and his bag.

17   Q.   Okay.  Could we show the witness, first of all, Exhibit

18   MN-600.2, please.

19             THE COURT:  Any objection to that exhibit?

20             MR. MAC MAHON:  No objection, Your Honor.

21             THE COURT:  All right.  It is in.

22             (Government's Exhibit No. MN-600.2 was received in

23   evidence.)

24   BY MR. NOVAK:

25   Q.   We also have it on the screen.  Agent Samit, I am going to

1   ask you to hold up Exhibit MN-600.2.  Can you tell us what it is?

2   A.   Yes, sir.  It is the passport case that Mr. Moussaoui handed

3   me.

4   Q.   Now, was there anything inside the passport case?

5   A.   There was.  There was a French passport.

6   Q.   I am going to ask you, do you have Exhibit MN-600.1, which we

7   would offer?

8            THE COURT:  Any objection?

9            MR. MAC MAHON:  No.  I thought I already said no

10  objection.

11           THE COURT:  2 was the case.

12           MR. MAC MAHON:  No objection, Your Honor.

13           THE COURT:  1 is the passport.  It is in.

14           (Government's Exhibit No. MN-600.1 was received in

15  evidence.)

16  BY MR. NOVAK:

17  Q.   What is that?

18  A.   This is Mr. Moussaoui's French passport.

19  Q.   Is that what he showed to you?

20  A.   This was in the case, yes, sir, and I looked at it.

21  Q.   Other than the passport, did he show you anything else?

22  A.   Also in there was an I-94W form.

23  Q.   If we can show the witness Exhibit MN-635.

24           THE COURT:  Any objection?

25           MR. MAC MAHON:  No, Your Honor.

 1          THE COURT:  All right, it is in.

 2          (Government's Exhibit No. MN-635 was received in

 3  evidence.)

 4  BY MR. NOVAK:

 5  Q.   Do you have that there?  We will just bring it on the screen

 6  there and if you can just tell us, what is that?

 7  A.   That's Mr. Moussaoui's I-94W form.

 8  Q.   Okay.  Does that relate to that visa waiver program that you

 9  were talking about?

10  A.   It does.

11  Q.   And stamped -- first of all, do you see his name on there?

12  A.   I do.

13  Q.   And stamped on there, is there any indication when it was

14  that he entered the country?

15  A.   February 23rd, 2001.

16  Q.   And does it have the expiration date stamped on there, when

17  he has got to leave this country?

18  A.   It does.  The expiration date or the departure date is

19  actually larger than the entry, and it is May 2nd -- May 22, 2001.

20  Q.   We can put that aside.  In addition to those items.  Did

21  Mr. Moussaoui show you a driver's license from any country?

22  A.   There was a driver's license from the United Kingdom also in

23  that case.

24  Q.   If we can show the witness Exhibit MN-623, please.

25          THE COURT:  Any objection?

Page 839

```
 1              MR. MAC MAHON:  No objection.

 2              THE COURT:  It is in.

 3              (Government's Exhibit No. MN-623 was received in

 4    evidence.)

 5    BY MR. NOVAK:

 6    Q.   We can bring it on the screen then, if that's okay.  Do you

 7    recognize that item, Agent Samit?

 8    A.   Yes, sir.

 9    Q.   What is that item?

10    A.   That is a United Kingdom driver's license in Mr. Moussaoui's

11    name, and it bears his photo.

12    Q.   Does it reveal also his age on there, as well, his date of

13    birth?

14    A.   It does.  His date of birth, his address.

15    Q.   That date of birth being 5/30/68?

16    A.   Yes, sir.

17    Q.   And then what is the address that's provided on that driver's

18    license?

19    A.   23A Lambert Road in London.

20    Q.   If we can put that aside, please.  Additionally did

21    Mr. Moussaoui present you any type of financial document?

22    A.   Also in that passport case was a statement from Arvest Bank

23    in Norman, Oklahoma.

24    Q.   If we can show the witness Exhibit Number MN-639.4, which we

25    would offer.
```

Page 840

```
 1              THE COURT:  Any objection?

 2              MR. MAC MAHON:  No objection, Your Honor.

 3              THE COURT:  All right.  639.4 is in.

 4              (Government's Exhibit No. MN-639.4 was received in

 5    evidence.)

 6    BY MR. NOVAK:

 7    Q.   Perhaps if we can bring it on the screen then.

 8              Can you tell us what it is we're looking at there, Agent

 9    Samit?

10    A.   That's a deposit agreement, upon the opening of a bank

11    account in Mr. Moussaoui's name from Arvest Bank, Norman,

12    Oklahoma.

13    Q.   And can we zoom in there to the top there a little bit?

14              And does that, did that document indicate to you what

15    the initial opening deposit amount was?

16    A.   It does, sir, right here, in the amount of $32,000.

17    Q.   All right.  And did it also identify an address for

18    Mr. Moussaoui?

19    A.   It does.

20    Q.   What is the address, please?

21    A.   1950 Goddard Avenue in Norman, Oklahoma.

22    Q.   Thank you.  We can put that down.  By the way, those items,

23    the passport, the driver's license, the I-94 form and the bank

24    statement, where were they physically located when you received

25    those?
```

Page 841

1  A.   They were physically located within that passport case.

2  Q.   Okay.  Now, after Mr. Moussaoui showed you those items, what

3  is it -- what happened next?

4  A.   We informed him that on the basis of his immigration problem,

5  we believed that he was in the United States illegally, that he

6  had stayed past his departure date.

7  Q.   What was Mr. Moussaoui's response to that?

8  A.   His response was that was not true, that was not correct, and

9  that, in fact, he had received, he had applied for and received an

10  extension that would have allowed him to stay in the United States

11  for longer.

12  Q.   All right.  Any further discussions about his need to attend

13  flight training?

14  A.   He did.  He mentioned it again, that he wanted to clear

15  things up very quickly because he had to get to flight training.

16  Q.   All right.  Did he tell you where these papers were that he

17  had that could clear this up?

18  A.   He did.  He said he had the documents in his hotel room.

19  Q.   All right.  So what did you do?

20  A.   He invited us back to the hotel room to retrieve the

21  documents and Special Agent Nordmann and myself went with him.

22  Q.   Is that room 1414?

23  A.   Yes, sir.

24  Q.   Could you tell us who all went into 1414 other than

25  yourselves and Agent Nordmann?

Page 842

```
 1   A.   No one else.

 2   Q.   Well, how about Mr. Moussaoui?

 3   A.   Oh, right.  Mr. Moussaoui opened the door for us and then --

 4   Q.   Did he have a key?

 5   A.   He did.

 6   Q.   Can you tell us when you walked into the room what it is that

 7   you observed?

 8   A.   It was a larger hotel room suite with two beds, a

 9   kitchenette, and a seating area.

10   Q.   All right.  And could you tell us which side of the room it

11   was that Mr. Moussaoui headed to then?

12   A.   He headed to the left side of the room.

13   Q.   Could you tell us what happened when you went over to the

14   left -- did you do anything for your own safety's sake when you

15   went in there?

16   A.   We did.  As we moved through the room, we kept Mr. Moussaoui

17   in sight.  We stayed close to him, and we also ensured that any

18   areas he touched where he went, he wasn't attempting to access a

19   weapon.

20   Q.   Now, had he consented to your entry into the hotel room?

21   A.   Yes, sir, he did.

22   Q.   If he had not consented into the hotel room, would you have

23   been able to go in there?

24   A.   No.

25   Q.   And why is that?
```

Page 843

1   A.   Under the Fourth Amendment, we don't have the right to search

2   without a warrant or his consent.

3   Q.   Okay.  Now, in this instance, though, he did consent; is that

4   right?

5   A.   He did, yes.

6   Q.   Could you tell us what happened then?  You get in the room

7   and you said he headed to the left side.  What happened next?

8   A.   In the little kitchen area, the little kitchenette, there

9   were piled a number of documents.  Mr. Moussaoui began going

10  through the pile of documents and shortly retrieved one of those.

11  Q.   If we can show the witness Exhibit MN-636, please, which we

12  would offer into evidence.

13          THE COURT:  Any objection?

14          MR. MAC MAHON:  No objection, Your Honor.

15          THE COURT:  It is in.

16          (Government's Exhibit No. MN-636 was received in

17  evidence.)

18  BY MR. NOVAK:

19  Q.   Perhaps we can put it on the screen.  Maybe that would be the

20  easiest thing.  If we can zip in there a little closer, can you

21  tell us what it is there, Agent Samit?

22  A.   Yes, sir.  This is his request to adjust status form.  It is

23  an acknowledgment that Immigration had received a request to

24  adjust status from Mr. Moussaoui.

25  Q.   For his visa waiver program?

Page 844

```
 1    A.    Yes, sir, that's correct.

 2    Q.    Now, are you able to change that status?

 3    A.    No.

 4          MR. MAC MAHON:  Your Honor, we concede he was out of

 5    status, properly arrested for an immigration violation.

 6          MR. NOVAK:  That's not the point.

 7          THE COURT:  Well, I am going to overrule the objection

 8    at this point.  I assume this is going someplace.

 9          MR. NOVAK:  Right.

10    BY MR. NOVAK:

11    Q.    Did Mr. Moussaoui indicate to you whether that document

12    allowed him to stay in the country?

13    A.    He did.  In fact, he was very insistent that that document

14    allowed him to remain in the United States.

15    Q.    And was that correct?

16    A.    No.  It was not.

17    Q.    All right.  Now, as you went through these documents with

18    him, what else occurred then in the room?

19    A.    Special Agent Nordmann reviewed the document, made the final

20    decision that Mr. Moussaoui was not in status, he informed him of

21    that, and we placed Mr. Moussaoui under arrest.

22    Q.    Okay.  Now, at the time that you arrested him, did you notice

23    if Mr. Moussaoui had any other bags or any other items that were

24    in the hotel room on the left side?

25    A.    He did.  The room was full of household goods, of clothing,
```

Page 845

1    of bags, backpacks, suitcases, and I noticed a considerable

2    quantity of clothing and other materials like that on the left

3    side of the room.

4    Q.   Okay.  And at that time did you search those items?

5    A.   No, we did not.

6    Q.   Okay.  Why not?

7    A.   We asked Mr. Moussaoui for permission to search.  He became

8    very upset at being informed he was being placed under arrest.  He

9    again noted to us that he had expensive flight training, urgent

10   flight training he needed to attend.  And I suggested to him that

11   maybe there was a reply to that, that he had received --

12   Q.   Reply to what?

13   A.   To his request to adjust status.

14   Q.   Okay.

15   A.   That there might be other documents which would show that he

16   was, in fact, in status.

17   Q.   And what was his response to that?

18   A.   His response was no, you may not search my things, you can't

19   go through anything else.  He was very insistent that we not do

20   that.

21   Q.   Why didn't you search them anyhow?

22   A.   Because we're not allowed to do that under the law.

23   Mr. Moussaoui was in custody.  He had been patted down.  He was,

24   he was subsequently searched, his person was searched, but under

25   the Fourth Amendment we're not allowed to search his room.

Page 846

1    Q.    Okay.  Now, you said that you patted Mr. Moussaoui down.  And

2    what if anything did you find on his person?

3    A.    In his left pocket I found a dagger.

4    Q.    All right.  If we can show the Exhibit MN-501, please.

5              THE COURT:  Any objection?

6              MR. MAC MAHON:  No, Your Honor.

7              THE COURT:  All right.

8              MR. NOVAK:  I think we have a photograph, MN-501P, which

9    we can bring up while the agent is looking at the dagger.

10             THE COURT:  All right.  And do you want the photograph

11   made a part of the evidence in this case?

12             MR. NOVAK:  Please.

13             THE COURT:  501P is the photograph.  Any objection?

14             MR. MAC MAHON:  No, Your Honor.

15             THE COURT:  All right.

16             (Government's Exhibit Nos. MN-501 and MN-501P were

17   received in evidence.)

18   BY MR. NOVAK:

19   Q.    Can you hold up Exhibit MN-501 and tell the jury what it is

20   you have?

21   A.    This is the weapon I retrieved from the left front pocket of

22   Mr. Moussaoui.

23   Q.    Could you open that up?  Now, could you tell us, that's

24   obviously got a blade on it; is that right?

25   A.    It does, yes, sir.

U.S. v. MOUSSAOUI

 1              MR. NOVAK:  Judge, I think Mr. Wood has a ruler.  Can we

 2    measure what the length of that blade is, please?

 3              THE COURT:  Do you want that shown to the jury more

 4    closely?  I'm not sure I want to -- how sharp is that blade?

 5              THE WITNESS:  It's pretty sharp, Your Honor.

 6              MR. NOVAK:  May Agent Samit step down?

 7              THE COURT:  No, I will have Mr. Wood do that.  You can

 8    open it when you get to the jury.  I don't think I want you all

 9    handling that, unless you have to.

10              Thank you, Mr. Wood.

11              MR. NOVAK:  May I ask the agent to measure the length of

12    the blade then, Your Honor?

13              THE COURT:  Yes.

14              THE WITNESS:  The blade is two inches long.

15    BY MR. NOVAK:

16    Q.   Now, could you tell us, Agent Samit, is there any use for

17    pilots to have a dagger on their person?

18    A.   No.

19              MR. MAC MAHON:  Your Honor, I'd object to that.

20    Moussaoui's not a pilot anyway, and it's arguing with the

21    witness --

22              THE COURT:  That objection, without a long speech, I

23    will sustain I think at this point.  Let's move this along.

24    BY MR. NOVAK:

25    Q.   Now, in addition to that dagger, did you seize anything else

Page 848

1  off of Mr. Moussaoui's person?

2  A.   We did.

3  Q.   What was that?

4  A.   He was wearing a money belt.

5  Q.   Okay.  And did it have any money in it?

6  A.   It did.  It contained a little over $3,000 in cash.

7  Q.   Okay.  Did you seize that?

8  A.   We did.

9  Q.   After you seized the dagger and the $3,000 in cash, could you

10 tell us how did Mr. Moussaoui react?

11 A.   That's when he became upset and that's when we had the

12 discussion about -- the inquiry about perhaps the document was

13 elsewhere in the room.

14 Q.   Okay.  And that's when he denied you your ability to search;

15 is that right?

16 A.   Yes, sir.

17 Q.   Now, where was this pat-down with Mr. Moussaoui occurring at?

18 A.   It occurred in the kitchen, kitchenette area.

19 Q.   And then after you found those items, what did you do with

20 Mr. Moussaoui?

21 A.   We took him outside.

22 Q.   Okay.  Where did you take him to?

23 A.   We placed him in Special Agent Nordmann's INS vehicle.

24 Q.   Okay.  Now, where was Mr. al-Attas while this was going on?

25 A.   Mr. al-Attas was outside with Special Agent Weess and Rapp.

Page 849

1    Q.   Okay.  And when you exited the room with Mr. Moussaoui to put

2    him into the vehicle, did you have an occasion to see if Agent

3    Rapp was conducting a search of the Subaru?

4    A.   In fact, he was.  They were finishing up a search, consent

5    search of Mr. al-Attas's vehicle.

6    Q.   And what if anything did you observe then?

7    A.   Just as we brought Mr. Moussaoui out of the room, Special

8    Agent Rapp held up a knife that he had located on the passenger

9    side of that vehicle.

10   Q.   Could we show the witness Exhibit MN-502, which we would

11   offer, as well as a photo that we have of the same item, MN-502P.

12            THE COURT:  Any objection?

13            MR. MAC MAHON:  No objection, Your Honor.

14            THE COURT:  All right.

15            (Government's Exhibit Nos. MN-502 and MN-502P were

16   received in evidence.)

17   BY MR. NOVAK:

18   Q.   Agent Samit, I am asking you to look at 502 and then the

19   photograph, 502P.  Can you tell us what that item is?

20   A.   It is a Sheffield lock-blade knife.

21   Q.   And where do you recognize that item from?

22   A.   This is the knife that Special Agent Rapp held up.

23   Q.   Where was it that -- you observed him seize that; is that

24   correct?

25   A.   I did.  Special Agent Rapp reached in, pulled this up off the

Page 850

1    floor of the vehicle, turned to Mr. al-Attas and asked him if this

2    was his.  Mr. Moussaoui, who was with us, said "no, it is mine."

3    Q.    And what side of the vehicle was it that that came from?

4    A.    The passenger's side.

5              MR. NOVAK:  Okay.  Could we ask Mr. Wood to be kind

6    enough to do the same thing, Your Honor, and show it to the jury?

7              THE COURT:  Yeah.  Am I correct this is a retractable,

8    or a blade that --

9              THE WITNESS:  Yes, Your Honor, it is a folding blade

10   knife.

11             THE COURT:  Whereas the other did not fold?

12             THE WITNESS:  That's correct.

13             THE COURT:  Go ahead, Mr. Wood.

14   BY MR. NOVAK:

15   Q.    Agent Samit, I am also going to ask you to measure what the

16   length of that blade is for us, please.

17   A.    The blade on this knife is three inches long.

18   Q.    Thank you, Agent Samit.  You can put the ruler down.  You can

19   put the knife aside as well.

20             Now, could you tell us, after that item was seized,

21   could you tell us what it is that you all did with Mr. Moussaoui?

22   A.    We placed him in the back of Special Agent Nordmann's car and

23   we seat-belted him in.

24   Q.    What occurred at that time?

25   A.    He became very upset, visibly upset, again mentioning the

Page 851

1    need to get to flight training.

2    Q.    Okay.  And what did you do then?

3    A.    I attempted to talk to him at that point, just to kind of

4    reassure him, calm him down, tell him that we could talk about

5    this.  I informed him at that time that I was a pilot and tried to

6    engage him in a discussion of aviation.

7    Q.    At any point was there any interaction at that point between

8    Mr. Moussaoui and Mr. al-Attas?

9    A.    Mr. Moussaoui tried to say something to Mr. al-Attas, but we

10   asked him not to.

11   Q.    Okay.  And so nothing occurred then?

12   A.    So nothing, there was no communication.

13   Q.    What did you do with Mr. Moussaoui then?

14   A.    Special Agents Nordmann and Rapp transported Mr. Moussaoui to

15   Immigration, to their office.

16   Q.    Where is Immigration located?

17   A.    In Bloomington, Minnesota, another suburb, southern suburb.

18   Q.    Of Minneapolis?

19   A.    Of the Twin Cities, yes, sir.

20   Q.    And what did you and Agent Weess do?

21   A.    Special Agent Weess and I accompanied Mr. al-Attas back into

22   the room because Mr. al-Attas was going to produce some documents

23   for Agent Weess that would prove that he was in status, he was

24   legally in the United States.

25   Q.    And during this time is Mr. al-Attas in custody, is he

1    handcuffed or anything like that?

2    A.    He is not.

3    Q.    Can you tell us what occurred then?

4    A.    We went back into the room, Mr. al-Attas opened the door, we

5    went into the room with him and Special Agent Weess.  And I again,

6    taking precautions, stayed close by Mr. al-Attas.  We conducted a

7    quick review of anything that Mr. al-Attas -- a quick search of

8    anything Mr. al-Attas wanted to access for weapons and dangerous

9    items, until Mr. al-Attas was able to retrieve documents which

10   proved to Special Agent Weess that he was legally in the United

11   States.

12   Q.    And what side of the room was it that Mr. al-Attas directed

13   you to in that regard?

14   A.    To the right side.

15   Q.    Did he make any comment about whose items were on the left

16   side?

17   A.    He did.  He indicated Mr. Moussaoui's items were on the left.

18   Q.    So you all moved to the right side of the room then?

19   A.    We did.

20   Q.    Did you do anything with Mr. Moussaoui's stuff on the left

21   side?

22   A.    We did not.

23   Q.    Could you tell us what you did on the right side then with

24   Mr. al-Attas?

25   A.    Once he accessed the document that proved he was, in fact,

Page 853

 1   legally in the United States, to Special Agent Weess's

 2   satisfaction, we asked Mr. al-Attas if he would consent to a

 3   search of his belongings.

 4   Q.   Before we get to that search, what exactly was it that Mr.

 5   al-Attas showed you all that indicated that he was lawfully in the

 6   United States?

 7   A.   He showed us a transcript in his name that had indicated he

 8   was in classes through that year, and he informed us that he was

 9   planning on registering for classes for the coming semester as

10   well.

11   Q.   And did you all find that to be acceptable then or not?

12   A.   Special Agent Weess did, yes.

13   Q.   Would you later on find out that that was not an accurate

14   transcript?

15   A.   We would.  We would later learn he was lying and falsified

16   the transcript.

17   Q.   Now, after he showed you a transcript and you decided -- at

18   that point, though, you decided he was lawfully here; is that

19   right?

20   A.   Yes, sir.

21   Q.   So you didn't arrest him; is that right?

22   A.   That's correct.

23   Q.   So can you tell us what occurred then with Mr. al-Attas?

24   A.   Mr. al-Attas consented to be interviewed by myself.  And he

25   and I sat down and conducted an interview while Special Agent

Page 854

1    Weess executed the consent search of his belongings.

2    Q.   Consent search of what?

3    A.   Of Mr. al-Attas's belongings.

4    Q.   Did you ask Mr. al-Attas to consent search for

5    Mr. Moussaoui's items that were there?

6    A.   No.

7    Q.   Why is that?

8    A.   Because he indicated that they were Mr. Moussaoui's items.

9    Mr. Moussaoui had indicated they were Mr. Moussaoui's items.  And

10   he had denied us permission to search his items.

11   Q.   So Mr. al-Attas didn't have the lawful ability to do it?

12   A.   Yes, sir, that's correct.

13   Q.   And so could you tell us, did -- you began interviewing

14   Mr. Moussaoui, is that right?

15   A.   Mr. al-Attas.

16   Q.   Or Mr. al-Attas, excuse me, Mr. al-Attas?

17   A.   Yes, sir.

18   Q.   Can you tell us what it is Mr. al-Attas told you at that

19   time?

20   A.   Mr. al-Attas described his own background and described his

21   reasons for being in the United States.

22   Q.   Which were what?  Tell us what those were.

23   A.   He was a Yemeni citizen, born in Saudi Arabia to Yemeni

24   parents, he had older brothers who were engineers.  He indicated

25   that he had come to the United States for the purpose of getting

Page 855

1  his Bachelor's degree, attending university, and that he was

2  currently doing that at the University of Oklahoma.

3  Q.   Did he tell you, did he provide for you an address where he

4  was residing at that time?

5  A.   He did.

6  Q.   And what address was that?

7  A.   209A Wadsack in Norman, Oklahoma.

8  Q.   And that address of 209A Wadsack Drive in Norman, was that

9  the first time you had heard of that address?

10  A.   Yes, sir.

11  Q.   Did he also give you a telephone number for that address?

12  A.   He did.

13  Q.   Off the top of your head, do you remember it?

14  A.   I don't.  It was a 405 area code.

15  Q.   All right.  Did he tell you what his goal was at -- down at

16  the University of Oklahoma?

17  A.   He said that he eventually wanted to obtain at least his

18  Bachelor's degree in mathematics.

19  Q.   All right.  Did he indicate to you, did he describe himself

20  as an American or what?

21  A.   No.

22  Q.   Or any thoughts about that?

23  A.   No, he didn't.  In contrast, in my experience to a lot of

24  students, his future plans did not include remaining in the United

25  States.  In fact, he said that he wanted to finish his degree and

1    that he did not consider himself an American, and he did not mix

2    in American culture at all.

3    Q.    All right.  Did he tell you where it is that he had first

4    met, or when it was that he had first met Mr. Moussaoui?

5    A.    He said he met him a few months previous.

6    Q.    Did he tell you where he had met him at?

7    A.    He did, at the Anoor Mosque in Norman, Oklahoma.

8    Q.    Did he tell you if their relationship had changed in any way,

9    approximately one month before you arrested Mr. Moussaoui?

10   A.    He did, that a month prior they had become roommates.

11   Q.    And do you want to explain to the jurors how it is -- what it

12   is Mr. al-Attas told you about that?

13   A.    Mr. al-Attas stated that his previous roommate had gotten

14   married and asked him to move out because of that.  So he

15   approached a friend, Mukram Ali, another student at the University

16   of Oklahoma.  When he approached Mr. Ali with a request that he be

17   allowed to live with him, Mr. Ali told him that Mr. Moussaoui had

18   similarly made the same request and that it was okay, but all

19   three of them would be roommates.

20   Q.    Did he describe for you Mr. Moussaoui's religious practices?

21   A.    He did.

22   Q.    Could you tell us what those were?

23   A.    He characterized him as a religious Muslim.

24   Q.    Did he talk to you about any pronouncements that

25   Mr. Moussaoui had made about Israel or Palestine or anything about

1  that?

2  A.   He did.  He informed us Mr. Moussaoui did not like the

3  Israelis, he was very unhappy that -- what the Israelis were doing

4  and still receiving favorable press in the United States for it.

5  Q.   Did Mr. al-Attas repeat to you any discussions that, or any

6  statements that Mr. Moussaoui had said to him about the

7  mistreatments of Muslims around the world?

8  A.   He did.  In fact, Mr. al-Attas informed us that

9  Mr. Moussaoui, one of the things that was a constant theme in his

10  discussion with Mr. al-Attas and with others, was that it is the

11  duty of Muslims to understand the suffering of other Muslims all

12  over the world.

13  Q.   All right.  And were there any discussions that Mr. al-Attas

14  repeated to you about Mr. Moussaoui's views of -- about whether it

15  is okay to harm civilians?

16  A.   Yes.  He said that in defense of Muslims, it is okay to harm

17  civilians.

18  Q.   Did you ask Mr. al-Attas any further questions about whether

19  anybody could be harmed, according to Mr. Moussaoui's statements?

20  A.   We did.

21  Q.   Do you want to explain to us what it is that Mr. al-Attas

22  told you?

23  A.   He told us that in order -- that it would be perfectly

24  acceptable to harm civilians in a Jihad.  He said that if

25  Mr. Moussaoui believed that someone was an unbeliever, a

1    non-Muslim, was harming Muslims, that he would work against them.

2          He discussed Mr. Moussaoui's statements that it was the

3    duty of Muslims to train to fight and, in fact, he even quoted a

4    prophet.  He gave us the name of a prophet, Omar Ibn Khattab, the

5    companion prophet, who was a person who said that you should train

6    your children to swim, to ride, to fight the unbelievers.

7    Q.   All right.  Back in August of 2001, did you know what a

8    fatwah was?

9    A.   I did.

10   Q.   Do you want to tell us what you believed a fatwah to be?

11   A.   A fatwah is a religious pronouncement from a Muslim scholar,

12   a cleric.

13   Q.   And did you have any discussions with Mr. al-Attas about

14   fatwahs?

15   A.   We did.  We asked if there were any fatwahs that

16   Mr. Moussaoui subscribed to or had ever discussed.  And he said

17   that he couldn't name any specifically but that he knew that

18   Mr. Moussaoui did read fatwahs, that he accessed them on-line, in

19   fact.

20   Q.   Did you have any discussions with Mr. al-Attas about

21   Mr. Moussaoui's previous flight training?

22   A.   We did.

23   Q.   Could you tell the folks what that was?

24   A.   Mr. al-Attas told us that he was taking flight training in

25   Norman, Oklahoma, that he had been doing that for quite some time,

Page 859

1    and that he had come to Minnesota to gain additional flight

2    training.

3    Q.   Did he tell you when it is that they had arrived in

4    Minnesota?

5    A.   He did.

6    Q.   When was that?

7    A.   That previous weekend.

8    Q.   And which would have been what day?

9    A.   The 11th and 12th.

10   Q.   Okay.  And did he tell you when it is that he, Mr. al-Attas,

11   planned to go home?

12   A.   He said that Mr. Moussaoui had mentioned to him that there

13   would possibly be a requirement for additional flight training and

14   that they would need to stay later.

15   Q.   All right.  And did you have any discussions about who was

16   paying for this trip from Oklahoma up to Minnesota?

17   A.   We asked Mr. al-Attas that.  He said that originally they had

18   agreed to split the costs, but that after the trip began,

19   Mr. Moussaoui decided that he would pay for the lodging and the

20   fuel and that Mr. al-Attas would only have to pay for his own

21   food, his meals.

22   Q.   Now, did you question Mr. al-Attas about the source of

23   Mr. Moussaoui's money or how much money he had?

24   A.   We did.

25   Q.   What was that?

Page 860

1   A.   Mr. al-Attas told us that he had seen Mr. Moussaoui in

2   possession of over $10,000, and that he was aware he had received

3   it from overseas but that he had no additional details.

4   Q.   Did you try to get more details about that money?

5   A.   We did.  We asked Mr. al-Attas if he had received it, you

6   know, what mechanism by which he had received it, and Mr. al-Attas

7   did not know.

8   Q.   All right.  Did he tell you whether or not Mr. Moussaoui

9   discussed such things or not?

10  A.   He did.  Whenever we asked Mr. al-Attas questions, he was

11  unable to answer, he cited Mr. Moussaoui's extreme secretiveness

12  and, in fact, he told us that when we identified Mr. Moussaoui to

13  him by that name, that that was the first he had ever heard of it.

14  He didn't even know, claimed not to even know Mr. Moussaoui's

15  name.

16  Q.   What name did Mr. al-Attas tell you that he knew

17  Mr. Moussaoui by?

18  A.   He stated that he referred to him as Shaqil.

19  Q.   Okay.  Did he indicate to you how much longer he expected

20  Mr. Moussaoui to be in Minneapolis to get that flight training?

21  A.   He said that Mr. Moussaoui had told him that they were

22  probably going to have to stay another one to two weeks, but that

23  they were going to move to a cheaper hotel because of the

24  additional stay.

25  Q.   Did Mr. al-Attas tell you what their plans were after being

Page 861

1    in the Twin Cities up there?

2    A.    Mr. al-Attas said that they were looking to travel around the

3    United States.

4    Q.    Did he give you particular locations that he said they

5    intended to go to?

6    A.    He did, New York and Denver.

7    Q.    Okay.  Did he tell you why they were going to go to New York

8    and to Denver?

9    A.    New York to see the sights and Denver because Mr. Moussaoui

10   told him that there was some additional business with United

11   Airlines that he needed to take care of.

12   Q.    Now, while you were having this conversation with Mr.

13   al-Attas, did either you or Agent Weess come across a will?

14   A.    I came across a will.

15   Q.    Okay.  And where did you find that will?

16   A.    That was sitting on the table between Mr. al-Attas and

17   myself.

18   Q.    And whose will was that?

19   A.    Mr. al-Attas informed me that it was his.

20   Q.    And could you describe for us what the will looked like and

21   what it --

22   A.    It was in a brown mailing envelope, very new envelope, it

23   hadn't been worn.  Inside the envelope were two sheets -- was a

24   sheet of notebook paper.  Upon pulling the paper out of the

25   envelope, I asked Mr. al-Attas, is this yours?  He answered that

Page 862

1    it was.  Upon pulling the sheet out, I could see that there was

2    writing in Arabic on the sheet.

3    Q.   All right.  The prompting of that -- did that will prompt you

4    to have any further questions then with Mr. al-Attas?

5    A.   It did.  He informed me that it was his last will and

6    testament.  I asked him why he had such a document.  He told me it

7    was common for Muslims to make that up before going on a journey,

8    to carry a document like that.

9           I asked him then if he was planning on going on Jihad.

10   Q.   Do you want to explain to us what the word "Jihad" means?

11   A.   Jihad is a word that means holy war.  It is frequently what

12   terrorists and Muslim extremists will use to justify, to tell

13   people that they are going to embark on some campaign, some

14   fighting of some kind.

15   Q.   When you asked that question of Mr. al-Attas, what did he

16   respond to you about Jihad?

17   A.   He paused.  He said "Jihad," he repeated that.  And I:  Said

18   yes, it means holy war.  He laughed and said:  I know what it

19   means.  And he said:  Yes, yes, I would consider going on Jihad

20   some day, but right now, right now I have to finish school.

21   Q.   Okay.  Now, as a result of the information that you received

22   from Mr. al-Attas and the previous information that you had

23   received from the flight school, Mr. Prevost and such, do you have

24   any view of what Mr. Moussaoui's religious views were then?

25   A.   Yes, sir.

Page 863

1    Q.    And what was that?

2    A.    That he was at least an Islamic extremist who had espoused or

3    discussed violence.

4    Q.    And now -- by the way, excuse me, when you were going through

5    Mr. al-Attas's items or Agent Weess was, did you all find a

6    Pakistan visa?

7    A.    We found an application for a Pakistan visa.

8    Q.    Okay.  Do you want to tell us about that?

9    A.    We, Special Agent Weess located an application for a visa to

10   enter Pakistan among Mr. al-Attas's effects, he stated that that

11   was his and that he was planning on going to Pakistan in the near

12   future.

13   Q.    "He" being Mr. al-Attas?

14   A.    Correct.

15   Q.    Did he make any mention about whether the person that he knew

16   as Shaqil had helped him with that application?

17   A.    He did.  He told us that Shaqil, because he was experienced

18   and had traveled around the world, was assisting him in completing

19   that visa application.

20   Q.    Now, while you were in the room with Mr. al-Attas, did you

21   receive a phone call from somebody about what to do with

22   Mr. Moussaoui's bags, the seven, eight bags that were on the left

23   side of the room?

24   A.    Yes, sir, we did.

25   Q.    What happened?

Page 864

1  A.   Upon learning, Mr. Moussaoui's learning that he was not going

2  to be returning to the hotel in the next few days, that he was

3  going to be under arrest, he directed that his items, that he gave

4  permission for his items to be removed back to the Immigration

5  office.

6  Q.   Be removed, does that mean be searched or just to be

7  transported?

8  A.   No, it just means to be transported.

9  Q.   Okay.  Now -- and did you do that?

10  A.   We did, with Mr. al-Attas's help, we carried all of the items

11  which he identified as Mr. Moussaoui's out to the vehicle.

12  Q.   All right.  And were they ultimately then transported to the

13  INS building?

14  A.   Yes, sir.

15  Q.   And were they stored there?

16  A.   They were.

17  Q.   All right.  Now, when you were with Mr. al-Attas, as you

18  testified already, he had indicated to you that he lived with

19  Mukram Ali and Mr. Moussaoui would stay there as well.  Is that

20  right?

21  A.   Yes, sir.

22  Q.   And did you at any time ask Mr. al-Attas to consent to a

23  search of the address in Oklahoma, 209 Wadsack Road?

24  A.   No, sir, we didn't.

25  Q.   And can you tell us why it is that you did not do that?

Page 865

1    A.    Because it wasn't his apartment.

2    Q.    "His" being whose?

3    A.    It was not Mr. al-Attas's apartment.

4    Q.    Whose apartment was it?

5    A.    It was Mukram Ali's.

6    Q.    Was there any other reason why you decided not to do that?

7    A.    We didn't want to approach either Mr. al-Attas about it

8    because he had no standing, or Mr. Ali, for fear that if there

9    were items there, if there was evidence there, we didn't want it

10   to be destroyed.

11   Q.    Now, when you got all the -- after you got all the bags of

12   Mr. Moussaoui to transport back to INS, what did you do with Mr.

13   al-Attas?

14   A.    We left Mr. al-Attas in the hotel room.

15   Q.    He was free to go; is that right?

16   A.    Yes, sir.

17   Q.    Did you make any requests for him to report at a later date?

18   A.    We did.  We requested that he report at 9 a.m. the next day,

19   and he agreed to do that.

20   Q.    Okay.  And where was he to report to?

21   A.    To the Immigration and Naturalization Service office.

22   Q.    All right.  So did you leave the hotel then at that point?

23   A.    We did.

24   Q.    And where did you go to?

25   A.    We returned to the Immigration office.

Page 866

1  Q.  And who was at the Immigration office?  This is the one in

2  Bloomington; is that right?

3  A.  Yes, sir.

4  Q.  Who was at that office when you got there?

5  A.  Mr. Moussaoui was in custody there and had finished being

6  booked in.  Special Agents Weess and Rapp were there and they had

7  supplied Mr. Moussaoui with dinner.

8  Q.  Okay.  What time was this?  You are talking about dinner.

9  What time of the night now was it that you had come across

10  Mr. Moussaoui back at the INS office?

11  A.  Probably a little after 7 p.m.

12  Q.  Okay.  And directing your attention to about 9:30 then, did

13  you have an occasion then to commence an interview with him?

14  A.  We did.  We conducted a further review of the items.  We kind

15  of compared notes.  We spoke with Special Agents Nordmann and Rapp

16  and around 9:30 we commenced an interview with Mr. Moussaoui.

17  Q.  And before you started interviewing him, did you have an

18  occasion to give him what is commonly known as his Miranda rights?

19  A.  Yes, sir.

20  Q.  And were those rights in writing on a form or were they just

21  oral?

22  A.  They were -- no, they were both oral and in writing on a

23  form, which both Special Agent Weess and myself signed after

24  Mr. Moussaoui.

25  Q.  If we can show the witness Exhibit GX-2.1, please.

Page 867

1            THE COURT:  Any objection?

2            MR. MAC MAHON:  The waiver form, Your Honor?

3            THE COURT:  Yeah.

4            MR. MAC MAHON:  No objection.

5            THE COURT:  All right.

6            MR. NOVAK:  I offer it into evidence.

7            THE COURT:  2.1 is in.

8            (Government's Exhibit No. GX-2.1 was received in

9    evidence.)

10   BY MR. NOVAK:

11   Q.   Could you tell us what it is we're looking at there, the

12   Exhibit GX-2.1, please?

13   A.   This is the Immigration and Naturalization Service advice of

14   rights form.

15   Q.   Okay.  Is that signed by Mr. Moussaoui?

16   A.   It is.

17   Q.   And you have the date and the time as well; is that right?

18   A.   That's correct.

19   Q.   And it indicates to you that he was willing to make a

20   statement freely and voluntarily to you; is that right?

21   A.   It indicates, yes, sir, it indicates to me that he had

22   received all those Miranda warnings above, that we read them to

23   him, he read them and then signed.

24   Q.   Let me ask you this:  Before you all gave the Miranda rights

25   on that form, do you know if he was given any administrative INS

Page 868

1    warnings before then?

2    A.    He was.  As part of the booking process, Special Agent

3    Nordman supplied him with administrative advice of rights.

4    Q.    Is there any difference between the INS rights and the

5    Miranda rights?

6    A.    Under administrative proceedings for Immigration, although he

7    has a right to an attorney, Immigration doesn't pay for an

8    attorney in that case.

9    Q.    All right.  And in addition to the INS rights and the Miranda

10   warning rights -- which we can take down, by the way, thank you --

11   was there any discussion about his consular notification rights?

12   A.    There was.

13   Q.    Can you explain to the jurors what exactly, what are consular

14   notification rights?

15   A.    The consular section is obviously a country's representative

16   in foreign countries as part of an embassy.  When the FBI or

17   immigration arrests citizens of foreign countries, one of our

18   protocols is to give them the opportunity that their consular

19   section be notified, that the FBI or that Immigration has arrested

20   a citizen of your country, here is his name and his information.

21   Q.    And is there a benefit to somebody who is arrested to

22   exercise those rights?

23   A.    Absolutely.

24   Q.    What is the benefit to them?

25   A.    It allows them to receive any assistance that their country

Page 869

1    is willing to give.

2    Q.   And is there any downside for somebody to exercise those

3    rights?

4              MR. MAC MAHON:  Your Honor, it is consular rights.  His

5    opinion as to whether somebody might find them upsides or

6    downsides is not relevant.  He didn't take them.

7              THE COURT:  Well, I don't think that's a proper

8    objection.  And I'm going to overrule it.  Go ahead.

9    BY MR. NOVAK:

10   Q.   Is there a downside of somebody exercising their consular

11   rights?

12   A.   I can't think of a downside for a person who is not, who is

13   not known of by their, the host government as a criminal or

14   terrorist.

15             MR. MAC MAHON:  I move to strike that answer, Your

16   Honor.  He asked a broad question, whether it is an upside or

17   downside, and we get a conclusion instead of a yes or no.

18             THE COURT:  I think this is an explanation for the

19   answer.  I am going to overrule the objection.  Go ahead.

20   BY MR. NOVAK:

21   Q.   And if somebody -- well, strike that.  I will just move on.

22             Now, after he was given all those various rights, did

23   Mr. Moussaoui -- did you begin interviewing Mr. Moussaoui?

24   A.   We did.  After Mr. Moussaoui refused his consular

25   notification, we began the interview.

Page 870

1    Q.    Okay.  And who is the "we" that was interviewing him?

2    A.    Special Agent Weess and myself, the same two signatories to

3    the advice of rights form.

4    Q.    Before you started interviewing him, did you have any

5    discussions with him about the need to tell the truth?

6    A.    We did.  It was explained to Mr. Moussaoui that we were

7    federal agents, that we were discussing not just his immigration

8    status at this point but his reasons for being in the United

9    States and for asking for flight training, and we advised him of

10   the need to be able to tell the -- the need to tell the truth.

11   Q.    And was Mr. Moussaoui cooperative at that time?

12   A.    He was.

13   Q.    Did you have further discussions about his need to get back

14   to his training?

15   A.    He did.  In fact, we cited that as key to helping us be able

16   to understand his reasons for being in the United States and

17   wanting flight training.  He, again, repeated that he was very

18   eager to clear things up because of his flight training.

19   Q.    Now, you interviewed him from 9:23 p.m. to approximately what

20   time?

21   A.    A little bit after 11 p.m.

22   Q.    And could you tell us, first of all, how it is that the

23   interview started and what if anything Mr. Moussaoui told you

24   about his view of immigration people?

25   A.    Mr. Moussaoui explained some previous difficulty he had with

U.S. v. MOUSSAOUI

 1   immigration in the U.K. and indicated to us for this reason he did

 2   not trust immigration authorities.

 3   Q.   Now, could you tell us how it is that the interview then

 4   began?

 5   A.   It began with our requesting that he lay out his background.

 6   Q.   Okay.  And what did he tell you?

 7   A.   He told us that he was a French citizen, born in France, that

 8   he had been educated in the United Kingdom and that he had lived

 9   there for the last several years.

10   Q.   Did he tell you when it was he had come to the United States?

11   A.   He did.  He confirmed for us that it was in February of 2001.

12   Q.   Did he tell you why he had come to the United States?

13   A.   Yes, sir.

14   Q.   What did he say?

15   A.   He stated that he had come to the United States to take

16   flight training to become a pilot.

17   Q.   Did he tell you where he initially took that flight training?

18   A.   He did.

19   Q.   Where was that?

20   A.   Airman Flight School in Norman, Oklahoma.

21   Q.   Did he tell you the number of hours -- what type of training

22   that he had taken down in Norman, Oklahoma?

23   A.   Yes, sir, he did.

24   Q.   What kind of training was that?

25   A.   He had taken training pursuant to obtaining his private

1    pilot's license.

2    Q.    Okay.  On what type of plane?

3    A.    Cessna 150.

4    Q.    The kind of planes you used to fly?

5    A.    Yes, sir.

6    Q.    Did he report to you approximately how many hours he had had

7    down there?

8    A.    He did.

9    Q.    How many hours?

10   A.    A little bit more than 50, 55, 56.

11   Q.    Did he tell you if he had achieved getting his PPL license?

12   A.    He told us he had not.

13   Q.    Okay.  Did he tell you if he had taken any tests at all,

14   though?

15   A.    He told us that he took the written test but had failed it

16   and not gone back to take the practical test.

17   Q.    Did he tell you why he had not gone back to take the

18   practical test?

19   A.    He did not.  He just said he wasn't progressing and he didn't

20   feel ready.  But I also knew, in my experience, that you couldn't

21   take the practical test until you had passed the written test.

22   Q.    Okay.  Now, did he tell you why it was that he had gone to

23   Airman to take the flight training?

24   A.    He said that Airman specialized in training foreign students

25   and that he had chosen not to do it elsewhere, as in back home in

Page 873

1    the U.K., because of the cost associated with that.

2    Q.   Did he explain to you why it was that he had not completed

3    his training at Airman?

4    A.   He did.  He said that the instructors who were assigned to

5    fly with him were too young, too inexperienced, and that they

6    hadn't been able to teach him.

7    Q.   Okay.  Did he tell you why it was that he had contacted Pan

8    Am and paid that $8,300 to take this simulator training?

9    A.   He said he just wanted to enjoy the 747-400 series, that he

10   thought since he had been struggling with little airplanes, the

11   general aviation airplanes, that he might enjoy and have benefit

12   from flying larger airplanes.

13   Q.   All right.  For his personal enjoyment, basically?

14   A.   Yes, sir.

15   Q.   Did he tell you he was a terrorist at that time?

16   A.   No, sir.

17   Q.   Did he tell you he was taking the training for terroristic

18   purposes?

19   A.   No.

20   Q.   Could we bring on the screen Exhibit GX-1, which is a

21   Statement of Facts, paragraph 9.

22           MR. MAC MAHON:  Your Honor, I think with this witness

23   we're going to get the lies out, if he wants to.  I think he just

24   needs to ask him what Mr. Moussaoui said, not --

25           THE COURT:  That objection I am going to sustain.

Page 874

```
 1          MR. NOVAK:  But, Judge, the follow-up question, though,

 2   is what is the impact of him not telling that to the interviewer.

 3          THE COURT:  Let's confine the questioning to this

 4   witness, as to what this witness did with the defendant.

 5          MR. NOVAK:  Yes, Your Honor.

 6   BY MR. NOVAK:

 7   Q.   Now, at that point did Mr. Moussaoui also explain to you what

 8   his address -- where he resided before he came to the United

 9   States?

10   A.   He did.  He confirmed the address on his U.K. driver's

11   license, 23A Lambert Road in London as being his residence in the

12   U.K.

13   Q.   Did he tell you at any point whether he had resided at a

14   guesthouse in Kandahar?

15          MR. MAC MAHON:  Same objection, Your Honor.  The

16   question is what did this man tell this person when he was

17   interviewed, not what he withheld from him.  The lies are the

18   question he was asked and answered, not evidence that has been

19   withheld.  If he asked him did you go stay at a guesthouse in

20   Kandahar, then it would be a fair question.  Otherwise, it is not.

21          THE COURT:  I am going to continue to sustain that line

22   of objection.

23          MR. NOVAK:  All right, Your Honor.

24   BY MR. NOVAK:

25   Q.   Did you ask the defendant about his income?
```

Page 875

1    A.    Yes, sir, I did.

2    Q.    Could you tell us what it is that the defendant told you

3    about where he had gotten his money?

4    A.    He told us that he had worked here and there at various jobs

5    in the United Kingdom, that he had even before residing in the

6    United Kingdom, he had worked since the age of 14 and that he also

7    received some funding from family and associates.

8    Q.    All right.  At any point did he discuss with you working in

9    the world of marketing?

10   A.    He did.

11   Q.    Could you tell us what it is that he told you about that?

12   A.    He told us that he was employed at a company called NOP in

13   the United Kingdom.  He couldn't remember what NOP stood for, but

14   he remembered N was "national."  He said he had worked for them in

15   marketing.

16   Q.    Did you press him on any type of details about the NOP?

17   A.    We did.  We asked what his income had been, what his salary

18   had been, what his job description was.

19   Q.    And could you tell us why it is that you were -- first of

20   all, did you get a response to that?

21   A.    We did not.

22   Q.    And what did he tell you?

23   A.    He said he couldn't remember, that he hadn't paid taxes in

24   the year 2000, and that he couldn't remember the answer to those

25   questions.

Page 876

1    Q.    Could you tell us why it is that you pressed him on those

2    types of details?

3    A.    Because as a terrorism investigator, we're always very

4    interested in money.  It is a key element of any plan.

5    Q.    All right.  During the interview, were there any discussions

6    with Mr. Moussaoui about an Indonesian company?

7    A.    He told us, in fact, that he had been employed with an

8    Indonesian company attempting to do telephone cards.

9    Q.    Okay.  And did he tell you what happened with that?

10   A.    He just said that the business did not work out.

11   Q.    All right.  Now, did you ask him at any time how much money

12   he was making on a yearly basis or within the last year or two?

13   A.    We did.

14   Q.    And could you tell us what it is that he told you about that?

15   A.    Well, that's when he said he hadn't paid taxes in the year

16   2000 and that, in fact, he couldn't give us an estimate of how

17   much money he made.

18   Q.    And did you ask him at any point about this family business

19   or anything that he was associated with?

20   A.    We did.

21   Q.    Did you press him on trying to get more details or anything?

22   A.    We tried to get details out of it.  At length he told us in

23   fact, that it was an import/export business with relatives in

24   Saudi Arabia.

25   Q.    All right.  And were you able to get any more details other

Page 877

1    than that?

2    A.    Very few, just that it was eventually going to involve the

3    import of grape leaves into Saudi Arabia.

4    Q.    While you were pushing him for his information about his

5    income, what kind of -- at any point did Mr. Moussaoui become

6    angry with you?

7    A.    He did.

8    Q.    Can you tell us what happened?

9    A.    When we -- when I suggested to Mr. Moussaoui that it seemed

10   strange that he was unable to remember his, what he did for a

11   living, what his job duties involved, how much money he made, who

12   his relatives were who were supplying him these funds, he got very

13   agitated and began telling Special Agent Weess and myself about

14   his academic qualifications.

15   Q.    And what were those?

16   A.    That he had obtained a Master's degree from South Bank

17   University in the United Kingdom.

18   Q.    Okay.  And did he tell you if he had any advanced degrees as

19   well?

20   A.    He did.  He said he had a Master's degree as well.

21   Q.    All right.  Now, at any point did you show him the Arvest

22   Bank slip, which I think is Exhibit MN-639.4?  Could we bring that

23   up?  The one that he had showed you at the time of arrest, did you

24   show that back to Mr. Moussaoui.

25   A.    We did, yes, sir.

Page 878

1    Q.   And could you tell us, did you have questions about that?

2    A.   We did.  Special Agent Weess and myself noted that upon

3    arrival in the United States, he had $32,000 to deposit into an

4    account.  We informed him we considered that unusual.  And he

5    repeated that he had been working a lot and saved his money and

6    that that was the result.

7    Q.   And was he able -- could he give you any other explanation

8    other than that?

9    A.   He also said funds had been provided by friends and

10   associates.

11   Q.   Could he identify who those friends and associates were?

12   A.   He could not.  He gave us one name as one nickname as a

13   person that he was in contact with.

14   Q.   And what was that nickname?

15   A.   The nickname was Talil.

16   Q.   Why was it that you were so concerned about who his

17   associates were?

18   A.   Because the associates -- we had figured out, we had reasoned

19   that any kind of hijacked plot or any kind of plot involving

20   aircraft would of necessity involve more people; that associates

21   who were providing him money, money which he clearly had been

22   using to reside and operate in the United States, would have

23   probably been provided by those terrorist associates.

24   Q.   And could you tell us how is it that his answers affect your

25   interview in terms of how you are proceeding?

Page 879

1    A.    The answers dictate the logical course of the interview.    We

2    can't ask logical follow-up questions if we're led down different

3    alleys.    For example, if I ask about an associate who has provided

4    him money, supplied him with some of this $32,000, and he says the

5    person's name is Talil and he lives in the U.K., and he can't

6    remember the person's name, he can't remember their employment,

7    their source of income, it takes us down all sorts of alleys, wild

8    goose chases, essentially.

9    Q.    And do you investigate those things that Mr. Moussaoui tells

10   you?

11   A.    Absolutely.

12   Q.    And you did do that in this case, didn't you?

13   A.    That's right.

14   Q.    Now, in addition to that, did Mr. Moussaoui tell you where he

15   was born?

16   A.    He did.

17   Q.    And what did he tell you about that?

18   A.    He said he was born in Saint Jean De Luz, a city in France.

19   Q.    Okay.    Did he tell you what the ethnicity of his parents was?

20   A.    That they originated in Morocco.

21   Q.    Did he tell you about any other family members?

22   A.    He did.

23   Q.    What was that that he told you?

24   A.    He described a brother and his father.

25   Q.    Okay.    And any discussions about his sister at any point?

Page 880

1    A.    No.

2    Q.    All right.  What did he tell you about his father and his

3    brother in terms of their relationship that he has with them?

4    A.    He told us he was estranged from both, that his father was

5    employed as a builder and that his brother was a professor but

6    that he was estranged from both.

7    Q.    Did he indicate to you where his -- if he had contact at all

8    with his mother?

9    A.    He did not.

10   Q.    Okay.  Did he tell you where his family resided as of the

11   time that he was interviewed?

12   A.    He did, in Narbonne, France.

13   Q.    Did you ask him why it was that, since his family lived in

14   France, that he was living in England?

15   A.    We did.  He stated that it was because he had been educated

16   there and that he liked the qualities of the British people.

17   Q.    Now, did you ask him at all about his foreign travel?

18   A.    Yes, that was a very important interview item.

19   Q.    Why is that an important interview item?

20   A.    Because international terrorism by its nature involves plots,

21   operations, and funding that occur overseas that cross the borders

22   of countries.

23   Q.    All right.  And what is it that he had told you about his

24   travel around the world?

25   A.    He told us he had been to Saudi Arabia on one occasion, to

Page 881

1   Morocco.  Obviously we understood he had been born in France and

2   educated in the U.K.   He explained that.  We knew from examining

3   his French passport that he had traveled to Pakistan.  And then he

4   also informed us that he had been to Malaysia and Indonesia as

5   well.

6   Q.   Did he tell you how long he had been in Pakistan?

7   A.   He did.

8   Q.   And how long was he, did he report to you that he had been

9   there?

10  A.   Two months.

11  Q.   And did he tell you why it was that he -- first of all, when

12  was that two-month period that he reported to you that he had been

13  there?

14  A.   From December of 2000 to February of 2001.

15  Q.   Okay.  Did he tell you why it was that he had spent those

16  couple months in Pakistan in the early part of 2001?

17  A.   He told us that it was a combination of a business trip with

18  that telephone card company.

19  Q.   Okay.

20  A.   As well as an attempt to find a wife.

21  Q.   All right.  Did he tell you how long he had been in

22  Indonesia?

23  A.   He did.

24  Q.   How long?

25  A.   Just a week or two.

Page 882

1  Q.   Did he tell you why he had been in Indonesia?

2  A.   Also part of that telephone card business.

3  Q.   Did he tell you how long he had been in Malaysia?

4  A.   Just a week or two as well.

5  Q.   And did he tell you why he had gone to Malaysia?

6  A.   As part of that telephone card business.

7  Q.   All right.  At any point did Mr. Moussaoui tell you that he

8  was looking to get married at some point?

9  A.   He did, in Pakistan.

10  Q.   Could you tell us what he told you about that?

11  A.   He stated that in response to a question I had about why he

12  had stayed in Pakistan for longer than Indonesia and Malaysia, he

13  said in addition to his business with the telephone card company,

14  he was there looking for a wife and that he had been referred by

15  Talil to a brother, his friend Talil from the United Kingdom, to a

16  brother who lived in Pakistan and that that person was going to

17  help him find a wife.

18  Q.   Could this friend Talil, could he give you any more

19  information about Talil?

20  A.   He could not.

21  Q.   Did you ask him for it?

22  A.   We did.

23  Q.   Why did you want that additional information about his

24  associate?

25  A.   Because we were interested in identifying any associate he

1   could name, so that we could run checks on those people as well.

2   Q.   So with just a name Talil, you couldn't do that; is that

3   right?

4   A.   Correct.

5   Q.   What else did he tell you about his time in Pakistan in terms

6   of where he stayed and where he traveled?

7   A.   He told us that the entire time he was in Pakistan, he was

8   staying in hotels in the city of Karachi, that he never traveled

9   outside of Karachi at any time.

10   Q.   Okay.  And at that time -- during that time he is basically

11   staying with Talil's brother; is that right?

12   A.   He is associating with Talil's brother but he is staying in

13   hotels.

14   Q.   I'm sorry.  Okay.  And ultimately was he able to give you a

15   first name for Talil at some point?

16   A.   Yes.

17   Q.   And what was that first name?

18   A.   The following or later in that interview he gave us the first

19   name of Ahmed.

20   Q.   But without a last name at that point; is that correct?

21   A.   Correct, that's correct.

22   Q.   Now, had you asked Mr. Moussaoui during the time period that

23   he was in Pakistan, whether he had traveled to neighboring

24   countries or to other parts of Pakistan other than Karachi?

25   A.   Yes, sir, I did.

Page 884

1    Q.    What is it that he reported back to you?

2    A.    He became very, very agitated by that.  He didn't answer that

3    question directly.  Even though he previously had stated that he

4    was only in Karachi, when we phrased that question a different way

5    he got very angry and told us that he knew what we were trying to

6    do, and he wasn't going to stand for that.  He wasn't going to

7    stand for being treated that way.

8           I asked him what he meant by that, and he said, he knew,

9    he watched TV, and he knew what we were trying to do.

10    Q.    All right.  You had discussed earlier that you had reviewed

11    Mr. Moussaoui's passport with him; is that correct?

12    A.    Yes, sir.

13    Q.    If we can bring, give back to the witness Exhibit MN-600.2

14    and bring up page 2 and 3 on the screen.  Is that possible?  Do

15    you have the exhibit there, MN-600.2?

16    A.    Yes.

17    Q.    Directing your attention to page 2, does it have the name of

18    Mr. Moussaoui on there?

19    A.    It does.

20    Q.    Looking at the screen, by the way, are you looking at -- does

21    the screen depict exactly what you have in your hand there?

22    A.    It does.

23    Q.    So we have Mr. Moussaoui's name, we have got his picture; is

24    that right?

25    A.    Yes, sir.

Page 885

1   Q.   And does it have his date of birth on there as well?

2   A.   It does.

3   Q.   Now, does it indicate when it was that that passport was

4   issued?

5   A.   Yes, it does.

6   Q.   And what is that date?

7   A.   31 October 2000.

8   Q.   And on the top of the next page, does it indicate what his

9   address is?  I think it says domicile; is that right?

10  A.   It does, yes, sir.

11  Q.   What address is indicated on there?

12  A.   23A Lambert Road in London.

13  Q.   All right.  If we can turn forward to page 8 and 9 and ask

14  you if you can identify an entry stamp on there dated December the

15  9th.

16  A.   I can.  I can identify one for Karachi Airport in Pakistan

17  for December 9th.

18  Q.   Of what year?

19  A.   2000.

20  Q.   And is there a corresponding exit stamp for the Karachi

21  International Airport?

22  A.   There is, for 7 February 2001.

23  Q.   All right.  Now, on page 9 also is there a visa that's

24  indicated on there?

25  A.   There is.  There is a Pakistani, Islamic Republic of Pakistan

Page 886

1   visa.

2   Q.   And that's for entry into Pakistan; is that right?

3   A.   Yes, sir.

4   Q.   And that visa was issued in what country?

5   A.   That visa was issued at the Pakistani High Commission in

6   London, so the country would be England.

7   Q.   And what was the date that that visa was issued?

8   A.   December 4th of 2000.

9   Q.   All right.  In London they do it -- we see 4/12/2000.  They

10  invert the first two numbers there, right?

11  A.   Yes, sir, that's correct.

12  Q.   All right.  And does it indicate what kind of number of

13  visits that are allowed on that visa?

14  A.   It was a multiple-entry visa.

15  Q.   All right.  And how long was the duration of the stay

16  allowed?

17  A.   Up until, it looks like, good for journey until December 3rd

18  of 2001.

19  Q.   All right.  Does it also have duration of each stay; is that

20  right?

21  A.   It does, 90 days each.

22  Q.   Does it indicate what the purpose of the visit is on that

23  visa?

24  A.   Business.

25  Q.   All right.  Now, if you can turn to page 31, please, of the

1   passport and if we can put that up.  Is that possible?  All right.

2   Are you able to see an entry stamp there for the United States of

3   America?

4   A.   I can.

5   Q.   And what is the date that's indicated for the entry into this

6   country?

7   A.   February 23rd of 2001.

8   Q.   All right.  Now, had you gone through, as you leaf through

9   the entire passport, do you see any entrance or exit stamps for

10  either Indonesia or Malaysia?

11  A.   No, sir.

12  Q.   And did you ask Mr. Moussaoui why it is that since he had

13  traveled, he had indicated to you that he had traveled to those

14  countries, why it is that that travel was not indicated in his

15  passport?

16  A.   I did.

17  Q.   And what did he tell you about that?

18  A.   He informed me that that had been carried in a previously

19  issued passport, which had been destroyed by going through the

20  washing machine.

21  Q.   All right.

22  A.   Accidentally destroyed by going through the washing machine.

23  Q.   All right.  So this was a new a passport after he had ruined

24  the old one in the washing machine; is that right?

25  A.   Yes, sir.

Page 888

1    Q.    Now, could you tell us what the import of that is for you as

2    a terrorism investigator?

3    A.    I was aware that frequently terrorists to mask suspicious

4    travel or frequent travel, that couldn't be explained by their job

5    or by their nationality, would regularly destroy passports

6    accidentally or report them stolen in order to mask that travel,

7    so they weren't carrying incriminating entry and exit stamps.

8    Q.    And you had indicated earlier that Mr. Moussaoui told you he

9    had also traveled to Saudi Arabia; is that right?

10   A.    Yes, sir.

11   Q.    And was there any stamp in his passport for Saudi Arabia?

12   A.    There was not.

13   Q.    Now, did Mr. Moussaoui -- you can put the passport aside.

14          MR. NOVAK:  Thank you, Mr. Wood.

15   BY MR. NOVAK:

16   Q.    Now, Agent Samit, did you ask Mr. Moussaoui if he attended

17   any particular mosque when he was in London?

18   A.    Yes, sir.

19   Q.    And what is it that he reported to you?

20   A.    Regents Park Mosque.

21   Q.    Did he report to you whether he attended any mosque when he

22   was in Norman, Oklahoma?

23   A.    He did.  He said that he attended the Anoor Mosque there.

24   Q.    Did he report to you where it is that he had met Mr.

25   al-Attas?

Page 889

1    A.    He did.

2    Q.    And where was that?

3    A.    At the mosque.

4    Q.    Okay.

5    A.    The Anoor Mosque.

6    Q.    Now, did Mr. Moussaoui describe himself in terms of what his

7    religious views were to you?

8    A.    He did.  He said he considered himself a religious Muslim.

9    Q.    And did you ask him if he had followed any particular

10   religious scholars or leaders?

11   A.    We did.

12   Q.    And what is the import of that to you as an -- why did you

13   want to ask him something like that?

14   A.    Well, because frequently, especially -- frequently

15   extremists, Muslim extremists will have a leader, either of a

16   group or of a religious order that they follow and whose views and

17   beliefs they subscribe to.

18   Q.    Okay.  Did he report to you that he followed any particular

19   religious leader?

20   A.    He did not.  He said that he had no religious leader.  He had

21   no leader of any kind, that things were very clear for him, he

22   didn't need anyone to explain things.

23   Q.    Did he tell you how often he prayed?

24   A.    He did.

25   Q.    How often was that?

Page 890

1   A.   Five times daily.

2   Q.   Did he speak of helping his Muslim brothers?

3   A.   Yes, sir.

4   Q.   What did he tell you about that?

5   A.   He told us that he considered it his duty to help his Muslim

6   brothers in any way possible.

7   Q.   Did you ask him if he could read or speak or write Arabic?

8   A.   I did.

9   Q.   What did he tell you about that?

10  A.   He said he could speak it but that he could not read or write

11  it.

12  Q.   And did he have any discussions with you about how that

13  impacted his understanding of fatwahs?

14  A.   Yes, sir.

15  Q.   What did he tell you about that?

16  A.   He claimed to me that as a result of not being able to read

17  or write Arabic, he couldn't understand fatwahs.

18  Q.   Did you have any discussions with Mr. Moussaoui about the

19  plight of the Palestinians in relation to the country of Israel?

20  A.   Yes, sir.

21  Q.   And what is it that Mr. Moussaoui reported to you, his views

22  on that?

23  A.   He stated that that crisis, that confrontation made him very

24  sad.

25  Q.   Did you have any other follow-up discussions with that?

Page 891

1    A.    We continually talked about the theme of helping Muslims and

2    what he considered that help to be, yes.

3    Q.    Did you ask Mr. Moussaoui if he had been drafted into the

4    Army in France?

5    A.    Yes, sir.

6    Q.    Is there regular conscription in France?

7    A.    There is.

8    Q.    And what is it that Mr. Moussaoui reported to you about his

9    draft status in the country of France?

10   A.    He indicated that he had not served in the French military

11   due to some family and personal problems.

12   Q.    Did you ask him about his familiarity with weapons?

13   A.    Yes.

14   Q.    Why did you ask him about that?

15   A.    Because my understanding is, was that frequently

16   international terrorists train in camps.  During that training

17   they receive weapons training.

18   Q.    Okay.  What did he report to you about his familiarity with

19   weapons?

20   A.    He reported that he was unfamiliar with weapons, that he had

21   never been trained in them, that he had fired a handgun on one or

22   two occasions with some, owned by some friends in France.  He said

23   he was curious about weapons and would some day like to learn

24   about them but he denied unequivocally that he had ever been

25   trained in them or used them.

Page 892

1    Q.   Did you ask him particularly if he had been in terrorist

2    camps?

3    A.   No, not at that time.

4    Q.   Did you ask him about training with weapons, though, at all?

5    A.   Yes.  We asked him if he ever received any training with

6    weapons.

7    Q.   And he denied that; is that right?

8    A.   He did.

9    Q.   All right.  Now, did you ask him about what he intended to do

10   upon his completion of his training at Pan Am?

11   A.   He did -- we did ask him that, and he informed me that he

12   intended to return to Norman, Oklahoma and then eventually back to

13   the United Kingdom.

14   Q.   At any point did he indicate to you whether he and Mr.

15   al-Attas intended to take a sight-seeing trip in the United

16   States?

17   A.   He did.

18   Q.   What did he tell you about that?

19   A.   He told us that he was planning to go to New York and Denver

20   as well.

21   Q.   Did he tell you when that was going to occur?

22   A.   At the conclusion of his training in Minnesota.

23   Q.   Did he tell you where -- I'm sorry, where in particular he

24   was going to go?

25   A.   Well, when he said he was going to New York, he said he was

Page 893

1   going to go to see the Empire State and the White House.

2   Q.   Okay.  And now -- was there anything else that you discussed

3   during the interview on that evening?

4   A.   We just, we discussed leaving the interview open, that we

5   would talk again tomorrow after we did some checks.

6   Q.   Okay.  Basically, did the interview conclude then, after --

7   we basically captured the large part of the interview at that

8   time?

9   A.   Yes, sir.  Yes, sir.

10  Q.   And what did you do with Mr. Moussaoui at that point?

11  A.   Special Agent Weess and I transported him to Carver County

12  jail for the night.

13  Q.   Okay.  And during the drive, how far of a drive was that from

14  the INS offices?

15  A.   30 to 40 minutes.

16  Q.   And during that drive did you have any more conversations

17  with Mr. Moussaoui?

18  A.   We did.  Mr. Moussaoui informed us during that transport that

19  he again reminded us of the importance of his flight training.  He

20  told us that, in fact, if we would let him go, if we would release

21  him from INS custody, he would complete the flight training and

22  return so that we could deport him.

23  Q.   Okay.  He was pretty focused on that training; is that right?

24  A.   Extremely.  It was a constant theme during our interviews.

25  Q.   And what did you tell him in response to that request, to let

Page 894

1    him go so he could finish the training?

2    A.   Well, we told him we needed to clear up a few issues first,

3    we needed to continue discussing his background and the issues we

4    discussed that night before we could make a decision.

5    Q.   Okay.  And that was the last -- you took him to the jail; is

6    that right?

7    A.   Yes, sir.

8    Q.   Let's go to the next day, August the 17th of 2001.

9           About 9:00 a.m. -- now, you had previously testified

10   that Mr. al-Attas was asked to report to the INS on that day.  Did

11   he show up?

12   A.   Yes, sir, he did.

13   Q.   And did you and Agent Weess interview him at that time?

14   A.   We did.  We interviewed him again.

15   Q.   Again.  And how long approximately was it that that interview

16   occurred?

17   A.   About an hour.

18   Q.   Did you get a signed statement at that time?

19   A.   We did.

20   Q.   And now did you ask him -- this interview, was it basically

21   divided in two parts?

22   A.   It was.  It was a two-part interview.

23   Q.   And could you describe for us what it is that you mean, why

24   you described it as a two-part interview?

25   A.   Because the first part of the interview was about

Page 895

1    Mr. Moussaoui, was just a continuation of our discussion of

2    Mr. Moussaoui the night before.  The second part of the interview

3    by agreement was going to focus on Mr. al-Attas.

4    Q.   All right.  Let's talk about the first part then about

5    Mr. Moussaoui.

6          What additional details, if any, did he give you on the

7    August the 17th to supplement that which he had told you on the

8    previous day?

9    A.   He provided additional details about Mr. Moussaoui's belief

10   in defending Muslims, knowing of the plight of Muslims elsewhere.

11   He provided a little bit more on Mr. Moussaoui's philosophy of how

12   Muslims should prepare themselves to fight, should be ready to

13   fight, the approval of martyrs, that Mr. Moussaoui approved of

14   martyrs, which was consistent with Islamic radicals.

15   Q.   Okay.  Did you press him for any further personal details

16   about Mr. Moussaoui, about his name, beyond Shaqil or any things

17   like that?

18   A.   We did, and Mr. al-Attas stated that Shaqil was, he continued

19   to state Shaqil was all he knew him by.

20   Q.   Okay.  Now, did you ask Mr. al-Attas if Mr. Moussaoui

21   followed the teachings of any particular sheikh?

22   A.   We did.

23   Q.   And what was the response by Mr. al-Attas?

24   A.   Mr. al-Attas said that Mr. Moussaoui was, had told him he had

25   a sheikh that he followed but that he was unwilling to reveal the

Page 896

1    name to Mr. al-Attas because he feared Mr. al-Attas would not

2    approve of that sheikh because of the sheikh's nationality.

3    Q.    Okay.  And did you ask him if that sheikh was Usama Bin

4    Laden?

5    A.    We did.

6    Q.    And what was the response by Mr. al-Attas on that?

7    A.    Mr. al-Attas considered that possibility but he said he did

8    not think so.

9    Q.    Did you ask him, Mr. al-Attas, if Moussaoui had ever spoken

10   about Bin Laden?

11   A.    Yes.

12   Q.    And what did Mr. al-Attas report to you about that?

13   A.    Mr. al-Attas stated that he had on one occasion spoken about

14   Bin Laden, when the two of them were watching TV together, a news

15   clip, film clip came on of Mr. Bin Laden, and he said that

16   Mr. Moussaoui called his attention to that person and kind of gave

17   an indication that there was somebody important or there was

18   someone of significance.

19   Q.    All right.  Now, did you have -- did you ask Mr. al-Attas

20   about whether or not Mr. Moussaoui associated with others down in

21   Oklahoma?

22   A.    We did.

23   Q.    And what did Mr. al-Attas report to you?

24   A.    He gave us the names of a couple of people at the flight

25   school, who might have, might be associates of Mr. Moussaoui.

1    Q.    Anything else about Mr. Moussaoui during that interview of

2    consequence that he supplemented from the previous interview?

3    A.    No.

4    Q.    All right.  Now, in addition to asking questions of

5    Mr. al-Attas, as well as Moussaoui, did you ask him about,

6    questions about Mr. al-Attas?

7    A.    In the second part of the interview, when Mr. al-Attas

8    informed us that he had told us all that there was about

9    Mr. Moussaoui, we switched and started talking to Mr. al-Attas

10   about himself again.

11   Q.    And did you ask him about whether he was making any money

12   from employment in the United States?

13   A.    Special Agent Weess asked him if he was receiving money for

14   any work he was doing, yes.

15   Q.    Okay.  And what was Mr. al-Attas's response?

16   A.    Mr. al-Attas indicated that, in fact, he was being paid by

17   the mosque to teach the children, to teach the children in

18   religious studies there.

19   Q.    Okay.  And did that have any consequence upon Mr. al-Attas's

20   visa situation?

21   A.    It did.  It put him, absent permission to work on an F-1

22   visa, which he did not have, it put him in violation of that visa.

23   Q.    As a result of that, did you-all arrest Mr. al-Attas?

24   A.    Special Agent Weess placed Mr. al-Attas under arrest, yes.

25   Q.    Now, you told us the violation of the visa waiver program by

1  Mr. Moussaoui.  He could not get bond; is that right?

2  A.    That's correct.

3  Q.    But in contrast to Mr. al-Attas's situation, that violation

4  of the student visa, is somebody able to get bond?

5  A.    They are.

6  Q.    All right.

7  A.    They are.

8  Q.    And did he, indeed, ultimately post bond after that arrest?

9  A.    He did.

10  Q.    And when was it that he posted that bond?

11  A.    That arrest occurred on Friday, on the 17th, and he was, he

12  posted bond and was released on that Monday, the 20th.

13  Q.    Okay.  Now, how long was it that -- approximately when is it

14  that you stopped talking to Mr. al-Attas when he was arrested,

15  what time of day was it?

16  A.    Probably by the time we finished the interview and he was

17  handed over to the detention agents would have been between 10:30

18  and 11 a.m.

19  Q.    So you talked to him about maybe short of two hours?

20  A.    We talked to him for probably about an hour and then the

21  processing and reassuring him took probably another half an hour.

22  Q.    Now, where did you transport Mr. al-Attas to?

23  A.    Al-Attas was transported by immigration detention officials

24  to Carver County Jail.

25  Q.    The same jail Mr. Moussaoui had been in the night before?

Page 899

```
 1   A.   Previously, yes.  And he had been transported back up by then

 2   to the immigration office.

 3   Q.   And at any point did you put the two of them in the same jail

 4   together?

 5   A.   No, sir.

 6   Q.   We're going to talk about another interview of Mr. Moussaoui,

 7   but when you were done with that, did you send Mr. Moussaoui back

 8   to Carver or did you send him to a different jail?

 9   A.   At the conclusion of the interviews on the 17th,

10   Mr. Moussaoui was sent to a different jail.

11   Q.   And what jail was that?

12   A.   Sherburn County Jail.

13   Q.   All right.  Now, after you got done talking to Mr. al-Attas,

14   did you have an occasion to speak with Mr. Moussaoui?

15   A.   We did.  We, as we had agreed the night before, we

16   reinterviewed Mr. Moussaoui.

17   Q.   All right.  And at that time did you -- how long did you

18   interview him?

19   A.   Approximately two hours.

20   Q.   All right.

21   A.   One to two hours.

22   Q.   And at that time when you first started, did you readvise him

23   of his Miranda rights as you did the previous day?

24   A.   We did.  We reminded him that that was still in effect.

25   Q.   And at that time was Mr. Moussaoui interested in talking to
```

Page 900

1    you or not?

2    A.    He was.  He was very interested in talking to us that time.

3    Q.    And did he tell you why it was that he was eager to talk to

4    you?

5    A.    Again, he reminded us of the need to continue flight

6    training.  He was very under control.  He spoke in a controlled

7    manner.  He was -- he said he was anxious to clear things up.  He

8    informed us that he had never been arrested before, his words were

9    "my file is clear, and I would like to get this straightened out

10   so I can return to flight training."

11   Q.    All right.  By the way, at that time did he provide to you

12   any information about whether his father had been in trouble

13   before?

14   A.    He did.  He indicated his father had been arrested before.

15   Q.    For what?

16   A.    Issues relating to his construction business.  He undercut

17   some jobs or he otherwise didn't use materials that were up to

18   standard.

19   Q.    Did he tell you, did he give you the name of his brother at

20   that time?

21   A.    He did.

22   Q.    What was that?

23   A.    Abd Samad.

24   Q.    Did he tell you what his brother did in France?

25   A.    He indicated that he was professor in Montpelier, France.

Page 901

1    Q.    Okay.  Now, did you again during this second day of

2    interviews, did you ask him about the source of his funding again?

3    A.    Yes.

4    Q.    And could you tell us why it is that you did that again?

5    A.    The issue remained the same from the day before.  He had not

6    provided a wholly convincing explanation for where he was able to

7    come up with that amount of money.

8         Funding is very important to terrorism investigators

9    because, not just the source that allows us to identify

10   associates, but it also gives an indication of what the plan may

11   be.  It is a very important article of any criminality for us to

12   determine it.

13   Q.    And did he indicate to you any further discussions about

14   where he had gotten his money from?

15   A.    He did.

16   Q.    And what was that?

17   A.    He named, he indicated it was from friends and associates.

18   Q.    And did you press him again on details of who those friends

19   were?

20   A.    We did.  We pressed him on them, again, reminding him that it

21   seemed very strange that people who had provided him with such a

22   large sum of money, that he couldn't even name.

23   Q.    Okay.  And what names did he give you at that time?

24   A.    In the middle of his getting angry and shouting at us, he

25   gave us the name Ahmed Atif.

U.S. v. MOUSSAOUI

1   Q.   And Ahmed Atif, was that any relationship to the Ahmed who

2   was Talil the day before?

3   A.   It was.  He indicated that he had remembered the name, the

4   last name, and that Talil was, in fact, Ahmed Atef.

5   Q.   And what did you do with that information about that name?

6   Did you take any investigatory action about that?

7   A.   Yes, sir.

8   Q.   And what investigatory action was it that you took?

9   A.   We -- I sent an immediate lead to our legal attache in

10  London.

11  Q.   Okay.

12  A.   Asking for information about that person.

13  Q.   You are trying to follow that trail of money to see if it led

14  anywhere; is that right?

15  A.   We trailed the money and of any associates that he is naming.

16  Q.   Did it turn out to be fruitful in any fashion?

17  A.   It did not.

18  Q.   What did you find out about the fellow?

19  A.   That he was, in fact -- months later we were able to learn --

20       MR. MAC MAHON:  Objection to what he found out months

21  later, Your Honor, if that's the focus of this investigation.  If

22  he wants to open that up, we can do that.

23       MR. NOVAK:  Well, we're going to go there, but I think

24  that's a proper response.

25       THE COURT:  I am going to overrule the objection.  I

Page 903

1    think that gives a complete picture of what was going on.  Do you

2    have water?

3              THE WITNESS:  He is working on it, Your Honor.

4              THE COURT:  Thank you.

5              THE WITNESS:  We found out months later, in fact, that

6    Ahmed Atif was not related in any way to this investigation.

7    BY MR. NOVAK:

8    Q.   So that was a lie?

9    A.   Yes, sir.

10   Q.   All right.  And did he give you the name of anybody else

11   other than Ahmed Atif?

12   A.   He did.

13   Q.   And what other name did he gave you?

14   A.   He gave us a name Habib.

15   Q.   Did he give you a last name for Habib?

16   A.   He did not.

17   Q.   Did he tell you what country Habib was in?

18   A.   He indicated that Habib resided in Germany.

19   Q.   Did you do any investigation in Germany on Habib?

20   A.   No, because he was unable to give a last name, a telephone

21   number.  He told us he didn't even know what city or what part of

22   Germany Habib resided in.

23   Q.   Did you ask him for all these details?

24   A.   We did.

25   Q.   And were you continuing to ask for as much information as

1   possible about his financial sources?

2   A.   That's always the goal of investigators is to get every piece

3   of information that we can.  It was a constant theme of our

4   discussion with him.

5   Q.   So you were continuing to ask him those questions?

6   A.   Yes, sir.

7   Q.   All right.  And at any point did he mention the name of Ahad

8   Sabet?

9   A.   No.

10          MR. MAC MAHON:  Your Honor, same objection as before,

11  just waiting for a while to ask that question, never even asked

12  him if he knew anybody named Ahad Sabet.

13          MR. NOVAK:  It is a proper response --

14          THE COURT:  I am allowing a few but not the whole, we're

15  not going to go through the whole list of things.

16          MR. NOVAK:  That's fine, Judge.

17          THE COURT:  So that objection I am going to overrule.

18  BY MR. NOVAK:

19  Q.   Now, at that time did you ask him, again, as to any questions

20  about his flight training?

21  A.   Yes.

22  Q.   I'm sorry.  I don't think we ever got an answer on the Ahad

23  Sabet question.

24  A.   He never mentioned Ahad Sabet.  He did not.

25  Q.   Did you hear the name Ahad Sabet at all during that

Page 905

1    interview?

2    A.    No.

3    Q.    Other than the names of Talil and Habib, did he give you any

4    other names or any other sources of income, other than those two

5    names?

6    A.    No.

7    Q.    Now, I'm sorry, moving on to the flight training, did you ask

8    him any further questions about the flight training?

9    A.    Yes.

10   Q.    And what questions did you ask him?

11   A.    We again discussed his purpose, why he was taking the flight

12   training.  He gave us a similar answer for enjoyment, for his own

13   personal ego.

14   Q.    Okay.  Did you have any discussions about any other flight

15   schools that he was associated with?

16   A.    He did.  When we told him, Mr. Moussaoui, that it seemed

17   unlikely that he would spend that amount of money on what was not

18   going to gain him any ratings, was not going to advance his

19   aviation career in any way, he got agitated and he informed us

20   that there were plenty of other schools in the United States, that

21   he had made numerous inquiries of flight schools and he named a

22   couple.

23   Q.    Which couple did he name?

24   A.    Flight Safety International and he named the University of

25   Minnesota as well.

U.S. v. MOUSSAOUI

1   Q.   And did you check out whether, in fact, those places existed?

2   A.   Yes.  I did Internet searches for both.  I was familiar with

3   Flight Safety International anyway but I just verified that they

4   did offer training.  They did.

5   Q.   Did the University of Minnesota have any type of training,

6   flight training, are you aware?

7   A.   Not in specific flight training.  What it did have training

8   in was aerospace engineering as an academic pursuit.

9   Q.   Now, did you ask Mr. Moussaoui whether you could search his

10  computer at that time?

11  A.   We did.

12  Q.   What computer did he have?

13  A.   He had -- we noticed that the day before when we were

14  bringing his items, his goods to immigration, that he had a laptop

15  computer.

16  Q.   All right.  And what was his response when you asked him if

17  you could search his computer?

18  A.   He was very definite that it was no, the answer was no.

19  Q.   Did you ask him again whether you could search the baggage

20  that he had there in his room, the ones that had been transported

21  there to the INS office?

22  A.   We did not.

23  Q.   You did not or you did not ask him?

24  A.   We did not ask him.

25  Q.   Okay.  And now could you tell us why it is that you asked to

1    search his computer?

2    A.    He was -- he brought up the subject of the Internet.  He

3    brought up the Internet searches.  It was our, as the largest data

4    storage piece of equipment there, compared to a notebook or

5    compared to any other places where Mr. Moussaoui could have had

6    data stored, and through which he could have communicated, the

7    laptop was the most obvious.  It would have the most information

8    and it had the potential to log on to the Internet.

9    Q.    Now, could you tell us what else did you ask Mr. Moussaoui

10   then at that time?

11   A.    At that point we informed Mr. Moussaoui that, in fact, we did

12   not believe his story and, again, began asking him questions about

13   his source of funding, his associates, and his reasons for flight

14   training.

15   Q.    And you never got any more information other than what you

16   have reported to us; is that right?

17   A.    Yes, sir, that's correct.

18   Q.    All right.  Now, at some point did you confront Mr. Moussaoui

19   with what you believed that he was involved in?

20   A.    Yes, we did.

21   Q.    Could you tell us what it is that you told Mr. Moussaoui?

22   A.    We informed Mr. Moussaoui that his story hadn't added up,

23   that he had not given us a satisfactory explanation for his

24   reasons for being in the United States, his reasons for coming to

25   Minnesota to take flight training, the fact that he had so much

U.S. v. MOUSSAOUI

1    money, the fact that his flight training and the purpose and the

2    ends to that flight training did not make sense for any kind of

3    practical aviation rating, that we understood that he was an

4    Islamic extremist, that he talked about violence before, and we

5    asked him to identify his associates and what his plan was.

6    Q.   And what was his response to that?

7    A.   He denied that he was involved in terrorism.  He repeated

8    that he was training, his aviation training was for fun.  He

9    denied that he was a member of a terrorist group.  He denied that

10   he had any contact with terrorists and that he had any terrorist

11   purposes.

12   Q.   Did he provide to you the names of any associates?

13   A.   He did not.

14   Q.   Did he tell you the name of any religious scholar?

15   A.   He did not.

16          MR. MAC MAHON:  Your Honor, he's answered the question

17   as to what he said.  We can go through a list of things he didn't

18   say.

19          THE COURT:  I am going to allow a little leeway with

20   this witness.  I have been allowing a lot of leeway to the defense

21   in its cross, but -- so overruled.  That doesn't mean with every

22   witness we're going to ask a million questions, but that's all

23   right with this witness.

24          MR. NOVAK:  I understand.  Thank you, Judge.  I only

25   have a couple focus questions here anyhow.

U.S. v. MOUSSAOUI

 1    BY MR. NOVAK:

 2    Q.   Did he describe -- you asked him about a plan.  Did he give

 3    you any type of plan he was involved in?

 4    A.   No.

 5    Q.   And I think we were cut off but did he ever give you the name

 6    of a religious scholar that he followed?

 7    A.   He did not.

 8    Q.   Did he ever tell you if he was part of any type of particular

 9    type of terrorist group?

10    A.   He denied that.  He denied direct questions as to:  Please

11    tell us the name of your associates, the name of your group, who

12    the other people are.  Not only did he not tell us, he denied that

13    he was a member.

14    Q.   Now, after he made those denials about having any role in

15    terrorism, can you tell us what happened after that?

16    A.   We continued to press him to the point where he said that he

17    was not a member of a group, he didn't have any associates, and

18    then he asked to speak to an immigration lawyer.

19    Q.   All right.  And did you stop interviewing him at that time?

20    A.   Immediately.

21         MR. NOVAK:  Judge, I would ask for leave to be able to

22    show the Statement of Facts now to the witness and compare the

23    answers that he gave during the Statement of Facts to those that

24    he gave during the interview because if the agent has to describe

25    how the -- the lies that were told impacted his investigation, it

Page 910

1  is very material to this entire case about whether they had a

2  consequence or not, and what he would, what he could have done,

3  with the information that was in the Statement of Facts.

4          THE COURT:  Well, approach the bench for a second.

5          (Bench conference on the record.)

6          [--- Redacted

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 911

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 912

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 913

1

2

3

4

5

6

7

8

9    ---]

10              (End of bench conference.)

11              THE COURT:  We're going to go another five minutes and

12    take the afternoon recess.  All right?  Everybody okay on that?

13              MR. NOVAK:  That's fine, Judge, thank you.

14    BY MR. NOVAK:

15    Q.   If we can put Exhibit GX-1 on the stand, starting with

16    paragraph 4, please.

17              Now, I'm showing you paragraph 4 from the admissions

18    that Mr. Moussaoui made in his Statement of Facts, Agent Samit.

19    Can you read that?

20    A.   Yes, sir.

21    Q.   Now, could you tell us at any point during that interview did

22    Mr. Moussaoui tell you that he was a member of al Qaeda and he

23    pledged bayat to Bin Laden?

24    A.   No, sir.

25    Q.   Could you tell the jury what the impact upon that interview

1    that you had with Mr. Moussaoui was, had he told you this

2    information that he knew?

3    A.    It would have immediately sounded alarm bells.

4    Q.    I am just talking about the interview itself.  What would you

5    have done in terms of questions that you would have asked

6    Mr. Moussaoui?

7    A.    I would have asked additional questions to ascertain the full

8    extent of his role in al Qaeda, his association with Usama Bin

9    Laden, his role in any plot.  It would have opened a whole world

10   of questioning.

11   Q.    If we can show the witness statement number 5, please, or

12   paragraph number 5.  Could you tell us at any point did

13   Mr. Moussaoui tell you that he had trained in a terrorism camp in

14   Khalden, in Afghanistan?

15   A.    No, sir.

16   Q.    Could you tell us what impact upon the interview in terms of

17   the questions that you had with Mr. Moussaoui that you would have

18   asked had he told you the truth about his terrorist training?

19   A.    I would have asked the nature of the training, his

20   associates, again, a whole field of questioning, guesthouses

21   associated with that, with that installation, the types of

22   training he had received in terms of weapons.

23   Q.    Okay.  Well, talking about guesthouses, let's move on to

24   paragraph 6 of the Statement of Facts.  Can you see paragraph 6 up

25   there, Agent Samit?

Page 915

 1   A.   Yes, sir.

 2   Q.   And does that indicate -- well, strike that.

 3        Did Mr. Moussaoui ever tell you that he had managed a

 4   guesthouse for al Qaeda?

 5   A.   He did not.

 6   Q.   Did he ever tell you that he had a high position of respect

 7   within al Qaeda?

 8   A.   No, sir.

 9   Q.   Did he ever tell you that he spoke directly to Bin Laden and

10   Abu Hafs?

11        MR. MAC MAHON:  Your Honor, this is a little different

12   than just asking him about his interview techniques, using this as

13   an excuse to read the Statement of Facts back in the record.

14        THE COURT:  I have addressed this issue and I have

15   overruled the objection.  We're going to continue.  Go ahead.

16   BY MR. NOVAK:

17   Q.   Did he tell you that he had communicated directly with Bin

18   Laden and Abu Hafs?

19   A.   No, sir.  Obviously that would have been the most highly

20   significant information he could have given.

21   Q.   Try to explain to the ladies and gentlemen of the jury how it

22   is that an interview works and how you respond to the information

23   that they give you and how this would have affected that.

24   A.   An interview is a very dynamic thing, any type of law

25   enforcement interview.  It is not a scripted type of event.  In

1   fact, the course that the interview takes is highly dependent on

2   the responses that the person being interviewed gives.

3           If he denies any knowledge of the crime, any knowledge

4   of the activity being described, the interviewer of necessity has

5   to go into side channels which don't get directly at the problem.

6   As the person being interviewed, as the subject begins to make

7   admissions, that leads investigators to ask additional questions

8   which are designed to get more information.  If the admissions,

9   and in this case if the lies prevent that, the interview can't

10  continue logically.

11  Q.   All right.  Now, specifically about this information that is

12  in paragraph 6, where Mr. Moussaoui has admitted that he dealt

13  directly with Bin Laden and Abu Hafs, what kind of questions would

14  you have asked perhaps about Bin Laden and Abu Hafs and al Qaeda?

15  A.   I would have asked what his purpose for being in the United

16  States was, what they had asked him to do, who else they had asked

17  to do it, his means of communicating with them, the amount of

18  money they provided him.

19  Q.   Okay.  You talk about why he was in the United States.  Let's

20  move on to paragraph 7.  Can you read paragraph 7?

21  A.   Yes, sir.

22  Q.   Let's expand it a little bit.  Can we do that somehow?  Now,

23  can you read now paragraph 7?  You can take your time there if you

24  want.

25          Now, at any point during your interview with

1   Mr. Moussaoui, did he ever tell you that he was aware of a plan to

2   fly planes into buildings in the United States of America?

3   A.   No, sir.

4   Q.   And could you tell the ladies and gentlemen what the impact

5   on your interview would have been had he told you such a plan

6   existed?

7   A.   Yes, it would have obviously changed it dramatically.  I

8   would have begun asking the timing, the associates, the targets,

9   questions of that nature.

10  Q.   All right.  And moving on to paragraph 8, please.  Could you

11  take a second there and read paragraph 8, Agent Samit?

12  A.   Yes, sir.

13  Q.   Did you have a chance to read that?

14  A.   I did.

15  Q.   At any point did Mr. Moussaoui tell you that he was aware of

16  any type of, such operation or religious operation where people

17  were going to die?

18  A.   No, sir.

19  Q.   And could you tell us how that would have impacted your

20  interview?

21  A.   It would, again, have directed us to seek information on

22  associates, people he was aware of, by name, by nickname, by

23  location, telephone number, e-mail address, any way that we could

24  to locate those individuals.

25  Q.   Showing you paragraph number 9, if I could.  Do you want to

1    take a second to read that?

2           At any point did Mr. Moussaoui tell you he came to this

3    country to fly a plane into the White House?

4    A.   No, sir.

5    Q.   Could you tell us what the impact upon your interview would

6    have been had he told you he was here to do such a thing?

7    A.   Again, it would have triggered an immediate attempt to gather

8    as many details as possible about that operation, to include

9    people, timing, aircraft, everything we could possibly get about

10   that.

11   Q.   Did Mr. Moussaoui ever tell you he had a war name in

12   al Qaeda?

13   A.   No, sir.

14   Q.   Did you ever see that name there, which I am going to ask you

15   to say it, so I don't embarass myself, can you tell us what that

16   name is?

17   A.   Sahrawi.

18   Q.   Did you ever hear that name during that interview?

19   A.   No, sir.

20   Q.   If he had told you that he was here to do such a thing and he

21   bore a war name as part of al Qaeda, could you tell us how that

22   would have impacted your interview?

23   A.   It would have driven both Special Agent Weess and myself,

24   again, to gather every piece of information that we could about

25   the plan, associates, timing, targets.

Page 919

1    Q.    Showing you paragraph number 10, please.

2          THE COURT:  Actually, Mr. Novak, why don't we take the

3    break now, since you are having problems finding it and we will be

4    in recess for 20 minutes and reconvene at 10 of.

5          (Recess from 3:30 p.m., until 3:50 p.m.)

6                    (Defendant and Jury in.)

7          MR. NOVAK:  May I proceed, Your Honor?

8          THE COURT:  Yes, Mr. Novak.

9    BY MR. NOVAK:

10   Q.    I think I was trying to bring up paragraph 10, which is on

11   two different pages, so I'm going to ask you to take a look at No.

12   10 there, Agent Samit.  Take a look at that.

13   A.    Yes.

14   Q.    Can you tell us, had Mr. Moussaoui told you that as he did

15   when he admitted it before the Court, how would that have impacted

16   your interview on August the 16th and 17th?

17   A.    I would have asked him many questions aimed specifically at

18   gathering details of his plans to use his training in furtherance

19   of al Qaeda's plans.

20   Q.    By the way, would you have asked specifically about who the

21   al Qaeda associate was that gave him the flight school

22   information?

23   A.    I would.

24   Q.    And by the way, as of that day, had you ever heard the name

25   Mohamed Atta?

Page 920

1   A.    Mohamed Atta?  No.

2   Q.    Okay.  Now, if we can move to paragraph 13, please?  I'm

3   going to ask you to read that paragraph, sir.

4          Did -- did Mr. Moussaoui ever tell you that the reason

5   that he had those knives, including the dagger that you recovered

6   and the other knife, that it was to get past airport security?

7   A.    No.

8   Q.    Could you tell us what, if any, impact that had upon your

9   interview with Mr. Moussaoui at that time?

10  A.    I would have asked him -- I did not ask him because of that

11  additional follow-up questions about types of other weapons, the

12  reason for bringing those knives.  It just ended that there.

13  Q.    Would you have asked questions directed towards what kind of

14  countermeasures could have been put in place?

15  A.    No.

16          THE COURT:  Agent Samit, I may have missed it in your

17  earlier questioning.  Did you ask Mr. Moussaoui any questions at

18  all about the knives?

19          THE WITNESS:  Your Honor, we did.  We asked him why he

20  had them, and he said it was because there was crime in the United

21  States and they were to protect against that.

22  BY MR. NOVAK:

23  Q.    So that was not true; is that correct?

24  A.    No, that's not true.  And consistent with that statement,

25  it's not true.  He had the knives for another purpose.

Page 921

1    Q.   All right.  Could we show paragraph 14, please?

2         You've had a chance to take a look at that?

3    A.   Yes, sir.

4    Q.   Now, at any point, did Mr. Moussaoui ask you about any -- or

5    tell you about any receiving of money from a fellow by the name of

6    Ahad Sabet?

7    A.   No, sir.

8    Q.   Other than this fellow named Habib, the last name unknown,

9    did he mention anyone else from Germany?

10   A.   No.

11   Q.   Did he mention to you that he had received any of this money

12   via wire transfer?

13   A.   No.

14   Q.   And could you tell us how it is that this impacted your

15   interview with Mr. Moussaoui, his failure to disclose that

16   information that he ultimately told Judge Brinkema when he pled

17   guilty?

18   A.   We were unable to ask him any questions about Germany, about

19   Ahad Sabet, about any type of associate.  When we did ask him

20   questions about Germany, about this Habib individual, he claimed

21   he couldn't remember the city, Habib's last name, a telephone

22   number, any of those details, and that effectively ended that

23   questioning.

24   Q.   Now, could you tell us how it is that that interview ended?

25        You can put that down.  Thank you, Gerard.

Page 922

1          Can you tell us how it is the interview with

2    Mr. Moussaoui ended?

3    A.    Right before he, he invoked his right to counsel while we

4    were talking to him, we informed Mr. Moussaoui that we were aware

5    of his involvement in a plot, in a plot involving airliners.  We

6    reminded him that he was in custody and that if anything were to

7    happen to him, that, in fact, he would be held accountable before

8    the United States, before the American people.

9    Q.    And what did you do with that?

10   A.    What did we --

11   Q.    Did he respond to that?

12   A.    He did not.

13   Q.    All right.  And what did you do with Mr. Moussaoui then?

14   A.    Well, we continued the questioning until he invoked his right

15   to counsel, and then we turned him back over to the detention

16   personnel.

17   Q.    Okay.  Is that when you took him to the Sherburn jail?

18   A.    Yes, sir.

19   Q.    Now, after you took Mr. Moussaoui to the Sherburn jail, could

20   you tell us what it is -- what was your next step that you

21   intended to take in terms of the investigation here, or that you

22   did take, I should say?

23   A.    It was Special Agent Weess and my belief that we had

24   uncovered sufficient evidence of a crime, criminal conspiracy, and

25   our plan was to open a parallel criminal investigation and go to

Page 923

1    the United States Attorney's Office for appropriate search

2    warrants and subpoenas.

3    Q.   To do so, you had earlier told us you have to go through your

4    headquarters; is that right?

5    A.   Yes, sir, that's correct.  In fact, we do.

6    Q.   And had Mr. Moussaoui told you the things in those paragraphs

7    that we showed you on the screen here, would you have relayed that

8    information as well to your headquarters?

9    A.   Immediately.

10   Q.   All right.  Now, could you tell us on August 17 of 2001, did

11   you make some kind of notification to your headquarters?

12   A.   We did.

13   Q.   And could you tell us -- first of all, would you explain to

14   the ladies and gentlemen what ITOS is in the world of FBI?

15   A.   ITOS stands for the International Terrorism Operations

16   Section.  It's a group of supervisors and analysts at

17   headquarters, International Terrorism Operations Section, who are

18   assigned to oversee and support investigations in the field, like

19   in Minneapolis.

20   Q.   And within ITOS, are there various units dealing with

21   particular groups of terrorists?

22   A.   There are.

23   Q.   Could you just summarize what some of the units are there

24   that are within the ITOS division of the FBI?

25   A.   Two important ones for this are the Usama Bin Laden Unit that

Page 924

1    deals with al Qaeda, or UBLU is the acronym, and the Radical

2    Fundamentalist Unit, or RFU.

3    Q.   And what do they deal with?

4    A.   The Usama Bin Laden Unit deals with al Qaeda.  The Radical

5    Fundamentalist Unit at the time dealt with Sunni extremists who

6    are not al Qaeda, various other groups.

7    Q.   And as a field agent out there, are you supposed to go to

8    the, to the unit that deals with the particular terrorist that

9    you're looking at?

10   A.   Exactly.

11   Q.   And -- now, you believed that Mr. Moussaoui was a terrorist,

12   as you've -- you confronted him with, as you've testified; is that

13   right?

14   A.   Yes, sir.

15   Q.   Did you know which terrorist organization he was a member of?

16   A.   We did not.

17   Q.   And so how did you know which unit to go to in the ITOS?

18   A.   Well, we didn't originally, and the one that most logically

19   fitted it was the Radical Fundamentalist Unit.

20   Q.   Would that have been changed had he told you he was a member

21   of al Qaeda?

22   A.   It absolutely would have.  Any of those admissions that you

23   showed me on the screen would have triggered us going to the Usama

24   Bin Laden Unit, as opposed to Radical Fundamentalist Unit.

25            MR. MAC MAHON:  Your Honor, I want to renew my

Page 925

1    objection.  We've got questions about how it would have changed

2    the interview, and now we're getting questions about how it would

3    have changed any of the other things he did, which are purely

4    speculative.

5              THE COURT:  Well, I don't think for an on-the-ground

6    agent it's speculative for him to say if I had X, I would have

7    done Y.  That's what this agent is essentially saying, and I

8    therefore don't find this speculative.

9              Now, there may be down the road a legitimate basis to

10   make that objection.  I don't think this is it, so I'm overruling

11   it.

12             MR. MAC MAHON:  Thank you, Your Honor.

13   BY MR. NOVAK:

14   Q.   Okay.  So instead of going to the Usama Bin Laden Unit, you

15   said you went to the what unit?

16   A.   To the Radical Fundamentalist Unit.

17   Q.   And why is this that you went to the Radical Fundamentalist

18   Unit?

19   A.   We knew that Mr. Moussaoui was a Sunni Muslim, he was an

20   extremist, and we believed he was involved in an ongoing plot.

21   The Radical Fundamentalist Unit was the logical unit.

22   Q.   Okay.  And now could you tell us how is it that a field agent

23   communicates with the headquarters?  Do you just call them up on

24   the telephone, or do you do something else?

25   A.   Informal communications can be via telephone or e-mail, but

Page 926

1    in the FBI world, formalized communications were through a

2    document that we call an electronic communication.

3    Q.    Okay.

4    A.    Or an EC is how we abbreviate it.

5    Q.    This EC, did you send it then to the RFU unit?

6    A.    Initially it was sent to the Iran unit and then routed to the

7    RFU unit.

8    Q.    Why did you go to the Iran unit then?

9    A.    Because before speaking with Mr. Moussaoui, FBI database

10   checks indicated that his name might be connected to Iran.

11   Q.    Okay.  And what happened when your EC got to Iran?  Did you

12   get kicked over to the RFU unit?

13   A.    We did.  By then there had been enough of a delay, the

14   interviews had occurred, and we were well aware that it was not

15   under the purview of the Iran unit but in fact the Radical

16   Fundamentalist Unit.

17   Q.    So when -- so you never got kicked over to the UBL Unit,

18   though; is that right?

19   A.    That's correct.

20   Q.    Where you should have been in the first place, all right.

21           Now, could you tell us who was your contact in the RFU

22   unit?

23   A.    The supervisor who was assigned oversight and support

24   responsibilities for Minneapolis was Supervisory Special Agent

25   Mike Maltbie.

Page 927

1    Q.    Okay.  And when you sent that electronic communication to

2    Mr. Maltbie, what was it that your initial request was that you

3    wanted to do?

4    A.    My request to Mr. Maltbie was to apply to the Office of

5    Intelligence Policy Review, to OIPR --

6    Q.    That's in the Department of Justice.  You talked about them

7    before, right?

8    A.    Yes, sir, that's correct.

9    Q.    What did you want them -- what did you want to occur?

10   A.    I wanted them to grant permission to go to the United States

11   Attorney's Office in the District of Minnesota so that we could

12   pursue criminal charges.

13   Q.    Are you trying to overcome the wall, so to speak?

14   A.    Not overcome it.  I'm trying to get permission to release

15   selected information over it.  The wall will still exist, and that

16   will still be, certainly in August of 2001 will be a factor, but

17   what I'm trying to do is pass information to criminal

18   investigators so they can begin pursuing that type of

19   investigation.

20   Q.    Okay.  And were you given permission to do that?

21   A.    I was not.

22   Q.    Okay.  And why is it -- were you told why it is you were not

23   given permission?

24   A.    I was told that, that our headquarters, FBI headquarters,

25   Radical Fundamentalist Unit did not believe that sufficient

U.S. v. MOUSSAOUI

1    evidence of a crime existed, and also that there was a fear that

2    if we were to try and go for a criminal case, to pursue a criminal

3    search warrant initially, and then we had to go back and use

4    techniques under the intelligence world, that it might taint that.

5    Q.   Let's step back for a second and talk about the search

6    warrant.  What -- were you trying to get a search warrant?

7    A.   I was.

8    Q.   And -- now, we talked earlier when your testimony began about

9    the difference between a criminal investigation and a FISA, an

10   intelligence investigation.  Is there a difference in terms of the

11   types of, at least back then in -- all my questions are designed

12   for August of 2001.

13   A.   Yes, sir.

14   Q.   Is there any difference -- was there any difference between

15   getting search warrants via the criminal route versus the FISA

16   route?

17   A.   There was a large difference --

18   Q.   Okay.

19   A.   -- in those two.

20   Q.   I want you to explain to the jurors how it is that in a

21   normal criminal case, let's say a bank robbery case or something

22   like that, that you would procure a search warrant to search, for

23   example, Mr. Moussaoui's bags.

24   A.   Had it been a criminal search warrant, I would have applied

25   to the United States Attorney's Office, to an assistant United

Page 929

1    States attorney.  I would have presented them verbally and

2    probably in writing with the facts that we learned to date to give

3    probable cause to believe that a crime was being committed and

4    that the person, places, or items to be searched would yield

5    evidence of that crime.

6              I would prepare an affidavit which would be edited by an

7    assistant United States attorney, and then eventually that would

8    be taken, when the affidavit was in a condition agreeable to all,

9    that would be taken before a magistrate, sworn out, and then the

10   magistrate would either agree to sign it and grant the search

11   warrant, or not.

12   Q.   And if the answer was not, were you able to search the items?

13   A.   No.

14   Q.   Now, could you tell us what happened -- of course, and if you

15   would get a search warrant approved by the magistrate, I guess you

16   could search the items; is that right?

17   A.   Yes.

18   Q.   Now, could you tell us -- you've explained to us how that

19   worked back then in terms of the criminal world.  Can you explain

20   to the jurors how that process worked for a FISA search warrant?

21   A.   Under the, under the FISA law of 1978, which stands for

22   Foreign Intelligence Surveillance Act, that's a technique used to,

23   to grant searches under an intelligence investigation.  Under

24   FISA, we can apply for a search warrant, but instead of giving

25   evidence to a judge that there's a crime being committed, we need

U.S. v. MOUSSAOUI

Page 930

1    to give evidence to a judge that the person who is the subject of

2    that search is acting as an agent of a foreign power, acting as an

3    agent of a terrorist group or foreign government.

4    Q.   And is there a definition of what a foreign power or -- well,

5    obviously, we know what foreign governments are.  Does the -- is

6    there a definition under law as to what a foreign power would

7    include?

8              MR. MAC MAHON:  Excuse me, Your Honor.  If he's a legal

9    expert, if he's going to tell them what's in the statute, that's

10   fine, but he can't give his interpretation of FISA law.

11             MR. NOVAK:  Judge, it certainly is --

12             THE COURT:  Wait a minute.  Wait, excuse me.  In the

13   course of your career before August of 2001, had you applied for

14   any kind of FISA warrants yourself?

15             THE WITNESS:  Yes, Your Honor, I had.

16             THE COURT:  How many times had you done that?

17             THE WITNESS:  I'd applied three times prior to this

18   event.

19             THE COURT:  All right.  And had you received any

20   training by the FBI about the requirements to obtain a FISA

21   warrant?

22             THE WITNESS:  I had.

23             THE COURT:  This agent has adequate background to answer

24   those questions.

25             MR. NOVAK:  Thank you, Your Honor.

Page 931

```
 1              THE COURT:  Objection overruled.

 2   BY MR. NOVAK:

 3   Q.   And could you tell us then based upon your training and your

 4   knowledge at that time what -- what it is that you needed to prove

 5   to establish a foreign power?

 6   A.   We needed probable -- to establish that it was a foreign

 7   power?

 8   Q.   Yes.

 9   A.   That it was a group comprised not substantially of United

10   States persons, of citizens or legal permanent residents -- that

11   it was any type of group not comprised of that.  And typical

12   subjects of foreign power under the FISA that had been applied for

13   before were hostile foreign governments, terrorist groups.

14   Q.   Okay.  And does the -- in August of 2001, did the State

15   Department keep a list of groups that were designated as foreign

16   terrorist organizations?

17   A.   They did.

18   Q.   Was al Qaeda one of those groups?

19   A.   It was.

20   Q.   All right.  Now, therefore, in order for you to, to procure

21   this FISA warrant, would you have to prove an affiliation between

22   the defendant and a, a specified terrorist organization?

23   A.   Between the defendant and any terrorist group, yes.

24   Q.   Now, now, you've told us what you need to prove to get that.

25   Could you tell us logistically the hoops that you have to jump
```

Page 932

1    through --

2          THE COURT:  I'm sorry.  I think you need to be careful

3    in how you formulate the question.  I don't think it's proof.

4    Isn't it just establish probable cause?

5          MR. MAC MAHON:  As I was going to object, Your Honor.

6    That's a misleading question.

7          MR. NOVAK:  I'll withdraw the question.  That's fine.

8          THE COURT:  All right.

9    BY MR. NOVAK:

10   Q.   Could you tell us what the -- would you describe for us what

11   the process was then for you to go about procuring a FISA warrant

12   back in August of 2001?

13   A.   Once my investigation had convinced myself and supervisors,

14   other agents working the case with me, that probable cause existed

15   to believe that the subject of that warrant -- of that search was

16   acting as an agent of a foreign power, then I would prepare an

17   electronic communication, an EC, and supporting documentation that

18   would go to the Radical Fundamentalist Unit, or the FBI

19   headquarters unit that was overseeing that investigation.

20         They would, they would take that information, they would

21   add whatever type -- whatever information they could to amplify

22   their request, and then they would take it to a headquarters unit,

23   FBI headquarters unit called the National Security Law Unit,

24   comprised of lawyers whose expertise is in the area of national

25   security law.

Page 933

```
 1              They would review it to ensure that probable cause did,
 2    in fact, exist to establish that that person was acting as an
 3    agent of a foreign power.
 4              When that was in agreement and the FBI agreed that the
 5    application had merit, it would then go to the Department of
 6    Justice, OIPR, Office of Intelligence Policy Review, where it
 7    would again be reviewed by attorneys, this time in the Department
 8    of Justice outside the FBI, and again, when all parties agreed
 9    that probable cause existed, it would go forward to the FISA court
10    in the form of a declaration.
11    Q.   Okay.
12    A.   Which a judge would sign or not.
13    Q.   Is the FISA court a local judge then in Minnesota, or is that
14    somewhere else?
15    A.   It's somewhere else.
16    Q.   All right.  And is it generally headquartered somewhere in
17    the Washington area, with affiliates around the country?
18    A.   Yes, sir.
19    Q.   And, and even when the application goes to the FISA judge,
20    the FISA judge still has the decision whether to approve it or
21    disapprove it; is that right?
22    A.   That's correct.  There's many points along the way where it
23    can be forwarded and not forwarded.  The ultimate person who
24    decides is a FISA court judge.
25    Q.   All right.  And can you explain why it is that, you know,
```

1  based upon your knowledge and your training, that there is this

2  difference between all the different layers that are necessary for

3  the FISA warrant as opposed for the lesser scrutiny on a criminal

4  search warrant?

5  A.   Because of the -- it just precludes any even illusion that

6  there's a possibility that the FBI could abuse the intelligence

7  investigation process.

8  Q.   And when you talk about abuse, what do you mean by that?

9  A.   I mean if there's not enough information to, to establish a

10  criminal case, the Department of Justice and the Attorney General

11  have set up guidelines to prevent the FBI from applying for

12  intelligence techniques to circumvent that lack of evidence.

13  Q.   The idea being if you don't have enough for a criminal

14  warrant, you don't use the ruse of going to get a FISA warrant

15  when you couldn't have gotten a criminal warrant?

16  A.   Yes.

17  Q.   Could you tell us if you were to try the old -- go to the

18  criminal warrant first and you didn't receive it, or if it was

19  disapproved, I should say, do you have an obligation to tell that

20  to the FISA judge if you were to go back and try the FISA route?

21  A.   Yes, sir, absolutely.

22  Q.   Now, could you tell us -- now, you first made an application,

23  you had indicated, to go to the U.S. Attorney's Office to share

24  criminal information so you could procure a search warrant; is

25  that right?

Page 935

1    A.    That is correct.

2    Q.    And you told us that was denied; is that right?

3    A.    FBI headquarters advice --

4              MR. MAC MAHON:  Your Honor, I object.  If the

5    headquarters wants to come in and say what they did with this

6    warrant, they can, but he can't give hearsay answers as to what he

7    was told and done by those people.

8              THE COURT:  Well, he certainly can explain why he did

9    what he did or didn't do what he didn't do.

10             MR. MAC MAHON:  He can, but he can't do it in a way

11   where, you know, we're not going to hear from these other agents

12   as to exactly what happened.  To come in and say I was told this

13   or I was told that, he can say I did something after I was told

14   that, but we can't use this as a shadow witness, Your Honor.

15             THE COURT:  All right.

16             MR. NOVAK:  Judge, a couple responses on that.  No. 1,

17   he's testifying as to what he did and what happened on his

18   request.

19             THE COURT:  And you're not offering it for the truth of

20   its contents.

21             MR. NOVAK:  Not offered for the truth, and I remind the

22   Court, we're in a penalty phase.  The rules of evidence don't

23   apply, including hearsay rules.  Simply the confrontation clause

24   rules would apply.  That's certainly not, as they made in their

25   motion, as the Court is well aware --

1          THE COURT:  Well, I've already ruled that the standard

2     rules of evidence don't apply.  However, Crawford is a

3     different --

4          MR. NOVAK:  Right.  But there's nothing accusatory.

5     He's just establishing this is what happened on my efforts to try

6     to get a search warrant.

7          THE COURT:  This is a fairly arcane legal discussion.

8     It's important for the lawyers; the jurors may not understand it.

9     Basically, traditionally hearsay evidence doesn't come into a

10    court of law, because it's not considered reliable unless it falls

11    into an exception.

12          Hearsay is an out-of-court statement that's being made

13    by someone other than the person who's in court who can be

14    questioned directly about it, so it's not considered reliable.

15    However, sometimes a witness can talk about what somebody else

16    said, not to try to establish that what that person said is true

17    or not true, but to explain why that person, the speaker in court,

18    takes certain actions.  And I'm permitting the use of this

19    information in that non-hearsay way to explain why this agent then

20    did what he did or didn't do what he didn't do.

21          MR. NOVAK:  Thank you, Judge.  Thank you.

22    Q.   Now, I think I was asking, were you told then what the basis

23    was that the denial of the criminal search --

24          MR. MAC MAHON:  That's a different question entirely.

25    Were you told what the basis was is the hearsay, Crawford, however

1  you want to characterize it in the arcane, that's impermissible.

2          MR. NOVAK:  No, it's not.

3          THE COURT:  Agent, did you take certain steps after you

4  were given the explanation as to why the warrant request was

5  turned down?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Let's just go right there.

8          MR. NOVAK:  All right, that's fine, Judge.

9          MR. MAC MAHON:  Thank you, Your Honor.

10          MR. NOVAK:  We'll move on.

11  BY MR. NOVAK:

12  Q.   So after your request for the criminal search warrant, to go

13  with the criminal world, was denied, did you take steps to go in a

14  different direction in order to procure a search warrant for

15  Mr. Moussaoui's belongings?

16  A.   Yes, sir, we did.

17  Q.   And by the way, what is it that you specifically were trying

18  to search?

19  A.   We were trying to search the property that had been brought

20  to Immigration, to the Immigration office.

21  Q.   Those bags, those seven or eight bags that he had?

22  A.   Bags and -- yes, sir.  As well as the place where he was

23  staying in Norman, Oklahoma, the 209A Wadsack apartment.

24  Q.   And why is it that you wanted to search that location?

25  A.   Because we had reason to believe that he would have had other

Page 938

 1    items back there.

 2    Q.   All right.  Now, could you tell us after you were denied the

 3    search warrant, did you then -- the criminal search warrant, did

 4    you then take steps in order to try to procure a FISA warrant?

 5              MR. MAC MAHON:  Your Honor, I object to the form of the

 6    question.  There's no evidence he was denied a criminal search

 7    warrant.  He was denied the ability to ask for one.  It's a

 8    misleading question.

 9              THE COURT:  Rephrase the question, Mr. Novak.

10    BY MR. NOVAK:

11    Q.   After you were denied the authority to seek a criminal search

12    warrant, did you take steps to try to get a FISA warrant?

13    A.   Yes, sir.

14    Q.   Could you explain what it is that -- the steps that you took

15    in order to do so?

16    A.   We, we shifted -- I personally shifted gears slightly,

17    because now the nature of the information that I need is

18    different.  I no longer need to establish that, in fact, the

19    person is engaged in an ongoing crime, but rather that they're

20    doing any actions on behalf of a foreign power, that they are now

21    acting as an agent of a foreign power, and so the focus changed

22    slightly to that.

23              The substance of the interviews was still useful to some

24    extent and misleading to other extents, but the objective was the

25    same, was the search of those belongings.

Page 939

1   Q.   Well, and specifically factually, are you trying to connect

2   Mr. Moussaoui to a terrorist organization?

3   A.   Yes, absolutely.

4        MR. NOVAK:  And if we could put on the screen from GX-1

5   paragraph -- excuse me, Your Honor -- 4?

6   Q.   Do you recall seeing this before, Agent Samit?

7   A.   Yes, sir.

8   Q.   That being one of the statements that Mr. Moussaoui admitted

9   to during his statement of facts.

10       Had Mr. Moussaoui told you the truth as he admitted to

11  Judge Brinkema, could you have placed that information in a FISA

12  request?

13  A.   Yes, sir.  That would have been the centerpiece of a FISA

14  request.  That would have established exactly the connection to a

15  foreign power.

16  Q.   That you needed to get a FISA, is that correct?

17  A.   Yes, sir.

18  Q.   All right.  Now, did you -- since you did get that

19  information, did you set about to try to gather information to

20  somehow connect Mr. Moussaoui to a recognized foreign terrorist

21  organization?

22  A.   Yes, sir.

23  Q.   Now, directing your attention to August 23, earlier on in

24  your testimony, you had told us that you had made a request to

25  your -- to Jay Abbott, one of the French legats that the FBI has;

Page 940

1    is that correct?

2    A.   Yes, sir, the assistant legal attache in the Paris office.

3    Q.   All right.  And on August 23, did you get some information

4    back from your French legat?

5    A.   I did.

6    Q.   All right.  And did you get information from Mr. Abbott

7    connecting Mr. Moussaoui to a dead Chechen fighter?

8    A.   Yes, sir.

9    Q.   Could you tell the folks what a Chechen fighter is?

10   A.   Yes, sir.  There was a conflict then going on in the former

11   Soviet -- the former Soviet, now Russian, region of Chechnya.

12   They were seeking independence from the Russian Federation and, in

13   fact, had seen an influx in the late '90s of foreign fighters from

14   various Muslim countries.  A number of these soldiers were trained

15   in Afghanistan.  They reported into Chechnya and began engaging

16   the Russians in military combat.

17   Q.   They were rebels essentially; is that correct?

18   A.   Yes, sir, they were supporting --

19           MR. MAC MAHON:  Objection, Your Honor, to him

20   testifying.

21           THE COURT:  Sustained.

22   BY MR. NOVAK:

23   Q.   Well, let me ask you this:  You had told us that al Qaeda was

24   identified on a State Department list as a foreign terrorist

25   organization.  Were Chechen rebels identified as a foreign

3-9-06                          U.S. v. MOUSSAOUI                          Vol. IV-A

 1   terrorist organization?

 2   A.   No, sir, they weren't.

 3   Q.   Now, on August 30, did you get additional information back

 4   through your French legat?

 5   A.   Yes, sir.

 6   Q.   And did you get specific information about Mr. Moussaoui's

 7   fundamentalism?

 8   A.   Yes.

 9   Q.   Could you describe what the extent of the information was

10   about his religious views?

11   A.   That he was extreme, that he was -- had espoused violence,

12   that he attempted to recruit and convert others to both the

13   extreme view of Islam and to violence, and that he had followed

14   closely the Wahabi sect of Islam.

15   Q.   Now, moving forward then -- by the way, in addition to trying

16   to gather this information about his background, did you also

17   follow his -- the lies that he told you to make investigative

18   leads to England?

19   A.   Yes.  At the expense of some other investigative leads that

20   we could have sent, yes.

21   Q.   And on August 19, did you send a request to the English

22   government asking for them to do investigation on your behalf?

23   A.   To our legal attache in London, yes, sir.

24   Q.   Same type of thing you have in France, you've got one over

25   there in England?

Page 942

1   A.   Correct.

2   Q.   And what type of information was it that you were trying to

3   gather in England?

4   A.   The same type of information regarding associates, sources of

5   funding.  The one that was sent to London to our legal attache

6   carried particular weight and detail because those are the items

7   not only that Mr. Moussaoui had disclosed to the associate, Ahmed

8   Atif, but he had done so in such a way in the interview that made

9   me believe that that was a person of significance.

10  Q.   All right.  You were following out whatever lead you had

11  basically; is that right?

12  A.   Yes, sir.

13  Q.   Now, on August 22, did you have -- receive information from

14  the Central Intelligence Agency?

15  A.   I did.

16  Q.   Now, does the Central Intelligence Agency have a different

17  role in the world of the intelligence community than the FBI?

18  A.   It does.

19  Q.   And in a general sense, can you describe what the difference

20  in role is?

21  A.   The FBI is the domestic intelligence agency.  We are

22  designed -- one of our missions is to gather intelligence,

23  national security information relevant to people within the United

24  States.  The Central Intelligence Agency is assigned to do that

25  external to the United States.

1   Q.   Now, on August 22, did you receive information -- further

2   information about connecting Mr. Moussaoui to the Chechen rebels?

3   A.   Connecting Mr. Moussaoui to the Chechen rebels?

4   Q.   Well, what information did you get back from -- summarizing

5   what you got from the CIA at that time?

6   A.   I received information from them that Mr. Moussaoui's dead

7   associate was connected to the leader of the Chechen rebels by

8   name, and that that --

9   Q.   Who is the -- what name did you receive of the leader of the

10  Chechen rebels?

11  A.   Ibn Khattab.

12  Q.   Okay.  Do you want to spell that?

13  A.   I-b-n K-h-a-t-t-a-b.

14  Q.   Okay.  Did you receive any other information about Ibn

15  Khattab, the leader of the Chechen rebels?

16  A.   From the Central Intelligence Agency I learned that Ibn

17  Khattab and Usama Bin Laden had had a relationship based on their

18  past history.

19  Q.   Okay.  Did you receive any information about Mr. Moussaoui

20  being a member of al Qaeda?

21  A.   No.

22  Q.   At any point, did you ever receive any information about

23  Mr. Moussaoui being a member of al Qaeda?

24  A.   Prior to the, the attacks?  No.

25  Q.   Now, did you continue to try to accumulate the information

Page 944

1   that you had gotten through your French legat and from the Central

2   Intelligence Agency in terms of pursuing your FISA warrant?

3   A.   Yes.  It was, it was the obsession of our squad, of the Joint

4   Terrorism Task Force, was doing just that.

5   Q.   When you say obsession, could you tell us what do you mean by

6   that?

7   A.   I mean that on the basis of the interviews that Special Agent

8   Weess and myself had done on the 16th and the 17th, we were

9   convinced that Mr. Moussaoui was involved in some type of plot,

10  and so all of our energies were directed at accumulating whatever

11  was required, evidence or intelligence, to get into his belongings

12  and search them for information as to what was going to happen.

13  Q.   Now, at some point, your request to get a FISA search warrant

14  was denied by your headquarters; is that right?

15  A.   Yes, sir.

16  Q.   Okay.  Do you know approximately when that was?

17  A.   Approximately August 28.

18  Q.   All right.  At the time that your request for a search

19  warrant was denied, could you explain to us what was the extent of

20  the information that you had available that connected you to a

21  terrorist organization?

22  A.   Yes, sir.

23  Q.   Or Mr. Moussaoui, I'm sorry.

24  A.   Yes, sir.  We had information from our legat in Paris that

25  Mr. Moussaoui had recruited this fighter for the Chechens who had

Page 945

1    since been killed in Chechnya, that that fighter, in fact, was

2    connected to Ibn Khattab, who was the leader of the Chechen

3    fighters.

4              The CIA was able to confirm that information and also to

5    provide information that Ibn Khattab and Usama Bin Laden had a

6    relationship.

7    Q.    So to get to the proof of al Qaeda, you were trying to go

8    through Moussaoui's friend to the leader of the Chechens, from the

9    leader of the Chechens to al Qaeda; is that right?

10   A.    Yes.

11   Q.    If Mr. Moussaoui told you what was in paragraph 4 that we

12   showed you, would you have needed to do that?

13             MR. MAC MAHON:  Your Honor, I'm going to object.  It's a

14   misleading question, that anybody at the government ever even

15   looked at a warrant or even a warrant request along the lines that

16   Mr. Novak just described.

17             THE COURT:  Wait, wait, wait.  It's more appropriate --

18   I don't think that question got into that at all, but I think this

19   is areas for cross examination, but this question is not

20   objectionable.

21             MR. MAC MAHON:  Okay.

22             THE COURT:  Overruled.

23             MR. MAC MAHON:  All right.

24   BY MR. NOVAK:

25   Q.    So had Mr. Moussaoui said, as he did before this Court, that

1   he was a member of al Qaeda, would you have had to try that

2   circuitous route in order to try to get to al Qaeda?

3   A.   Absolutely not.

4   Q.   The designated organization?

5   A.   In fact, if he had answered our specific questions as to what

6   group he was a member of, who his associates were, it would have

7   met the foreign power standard immediately.

8   Q.   Now, after the FISA request was denied by your headquarters,

9   did they relay to you why it was that they were denying it?

10  A.   They did.

11  Q.   And what was that?

12  A.   They informed that --

13          MR. MAC MAHON:  Objection, Your Honor, as to why --

14  first of all, the question is misleading that a warrant was ever

15  presented to anybody.  If he wants to clarify that, he can, but

16  then to get the hearsay about what happened to it is

17  inappropriate.

18          THE COURT:  I'm not going to permit the government to

19  use hearsay in this case.

20          MR. NOVAK:  That's fine.  I'll move on.

21          THE COURT:  Sustained.

22          MR. NOVAK:  All right.

23  Q.   Let me ask you this:  At any point, were you able to satisfy

24  your headquarters' demands as to the proof as to what the foreign

25  power was?

Page 947

1   A.   No.

2   Q.   All right.  Now, after your headquarters denied your efforts

3   to try to get a FISA warrant, did you come up with a different

4   plan in order to try to get a search into Mr. Moussaoui's bags, at

5   least his bags that he had with him?

6   A.   Yes, sir.

7   Q.   And what was that plan?

8   A.   Through consultation with our legal attache's office in

9   Paris, we learned that the French government had an interest in

10  Mr. Moussaoui and, in fact, that they were willing to accept his

11  being deported there with the provision of French law that his

12  belongings could be searched upon his arrival.

13  Q.   Now, you could lawfully deport him already based upon his

14  overstay in the visa waiver program; is that right?

15  A.   Yes, sir, that's correct.

16  Q.   And through this series of days thereafter, did you set up

17  plans in order to do so?

18  A.   We did.  We worked -- that became the primary focus.  We kept

19  the other options, obviously mindful of the criminal and of the

20  intelligence, the FISA option as well, but our primary focus then

21  became the deportation of Mr. Moussaoui to France in order to

22  allow his goods to be -- his property to be -- property to be

23  searched.

24  Q.   And when was that finally approved by all parties, that that

25  was -- that that could occur?

Page 948

1    A.    On the afternoon of September 10, 2001.

2    Q.    And, and Mr. Moussaoui obviously as of September 11 had not

3    been sent back to France; is that right?

4    A.    That's correct.

5    Q.    When was that to occur, do you know?

6    A.    In the very near future.  We had received authority to begin

7    planning for that on the afternoon of September 10.  Obviously,

8    the time difference being what it was, the legal attache's office

9    in Paris was closed, so that next morning, we were going to set up

10   the logistics, but it was going to be a matter of days.

11   Q.    And the whole purpose of that plan was in order to allow you

12   to search his stuff; is that right?

13   A.    Yes, sir.

14   Q.    Now, in addition to taking those precautions, at any point

15   did you ask your headquarters to notify the FAA about the threat

16   that Mr. Moussaoui posed?

17   A.    Yes, sir.

18   Q.    And on August 31, did you send what is known as an LHM to

19   Mr. Maltbie in the RFU unit?

20   A.    I did.

21   Q.    Do you want to tell the folks what an LHM is in the jargon of

22   the FBI?

23   A.    An LHM stands for letterhead memorandum, and a letterhead

24   memorandum is a document authored by someone in the FBI that is

25   intended to be released outside of the FBI, whether it's to

Page 949

1    another law enforcement agency in the United States, to another

2    member of the intelligence community, or to a friendly foreign

3    government.

4    Q.   And why is it that you wanted your headquarters to notify FAA

5    about what was happening with Mr. Moussaoui?

6    A.   Because of the, our investigative theory that he was involved

7    in a plan to hijack a commercial airliner.

8    Q.   And on September 5 of 2001, do you know if your headquarters

9    did, in fact, make that notification?

10   A.   They did.  In fact, our headquarters issued a teletype, a

11   message to a number of other government agencies, to include the

12   FAA.

13   Q.   Now, in addition to what you requested your headquarters to

14   do, were you so concerned about the FAA being notified that you

15   took steps on your own as a local guy on the ground out in

16   Minnesota to make sure the FAA knew what was going on with

17   Mr. Moussaoui?

18   A.   Yes, sir.  Special Agent Weess and myself on September 5 went

19   to the FAA investigators in the Twin Cities, in Minneapolis-St.

20   Paul, and provided them a personal briefing on the contents of the

21   teletype, as well as case agent perspective on what we believed

22   was actually going on.

23   Q.   And did that include the lies that he had told you on August

24   16 and August 17?

25            MR. MAC MAHON:  Your Honor, that's argumentative.  If

Page 950

1    he's going to the statement of facts again, did it include what he

2    told them?  Did it include the lies?  It couldn't have included

3    the lies, Your Honor.

4            THE COURT:  I'm going to overrule the objection, but be

5    careful.  I don't want questions being argumentative or overly --

6            MR. NOVAK:  That's fine, Judge, yes.

7    Q.   Did you tell the FAA the things that Mr. Moussaoui told you

8    on August 16 --

9    A.   We did.  We were only able to report what he told us.

10   Q.   Had Mr. Moussaoui told you the things that in the statement

11   of facts he admitted in front of this Court, for example, that he

12   was part of a plot to fly planes into buildings, could you have

13   supplied that information to the FAA on September 5 as well?

14   A.   Absolutely.  It would have gone much sooner, obviously, but

15   yes, we would have been in a position to do that.

16   Q.   Well, why would it have been smoother?  What would you have

17   done?

18   A.   We would have notified them immediately, along with other

19   members of the intelligence community, FBI headquarters, FBI New

20   York.  Within minutes of Mr. Moussaoui disclosing any of those --

21   answering any of those questions truthfully, that information

22   would have been forwarded to, to every member of the intelligence

23   community, and especially the FAA.

24   Q.   And why especially the FAA?

25   A.   They're responsible for the safety of airplanes, commercial

Page 951

1   aviation.

2   Q.   Now, you never did get your search warrant to search

3   Mr. Moussaoui's belongings; is that right?

4   A.   That's correct.

5   Q.   Until September 11, is that correct?

6   A.   Correct.

7   Q.   You want to tell the ladies and gentlemen what happened on

8   September 11?

9   A.   The attacks, the terrorist attacks in Pennsylvania, New York,

10  and Washington, D.C.

11  Q.   And as a result of those attacks, those crimes occurring,

12  were you then authorized to go get a criminal search warrant?

13  A.   Yes, sir.

14  Q.   And did you go that very day, September 11, to the United

15  States Attorney's Office in Minneapolis and procure a search

16  warrant?

17  A.   Within minutes of our being granted permission, I was on my

18  way to the United States Attorney's Office at full speed, yes,

19  sir.

20  Q.   And did the U.S. Attorney's Office help you and your brother

21  agents to get a search warrant then signed by a United States

22  magistrate judge?

23  A.   Yes, sir.

24  Q.   And who authorized that search warrant?

25  A.   Who authorized --

Page 952

1   Q.   Who's the judge that --

2   A.   Oh, the Honorable J. Earl Cudd, U.S. Magistrate.

3   Q.   Now, after you got a search warrant, now you had the legal

4   ability to go in and search Mr. Moussaoui's items; is that right?

5   A.   Yes, sir.

6   Q.   And did you do so?

7   A.   Yes, sir.

8   Q.   Can you tell the folks what it is that you did finally with

9   those bags that he had stored in INS for those three weeks?

10  A.   Special Agent Weess went down to Immigration and was, was

11  responding lights and sirens to bring those bags to the FBI office

12  at full speed.  The warrant was signed, and I had an FBI

13  organization within our office called the evidence response team,

14  agents who are specially trained in evidence recovery, standing

15  by.

16         When the goods arrived, when the personal property

17  arrived and the warrant arrived, the evidence response team under

18  my direction immediately began executing the search warrant.

19  Q.   And let me ask you this:  During this time period where

20  you're making all these efforts to get the search warrant that

21  doesn't occur until September 11, where is Mr. Moussaoui at this

22  time?

23  A.   He's in Sherburn County jail.

24  Q.   And at any time from the time he spoke to you on August 17

25  until September 11, did he ever call you up or make any outreach

Page 953

1    to you to say, hey, I lied, let me fix this?

2              MR. MAC MAHON:  Your Honor, I object to that.  He

3    invoked the right to counsel.

4              THE COURT:  I'm sustaining that objection.  Mr. Novak,

5    that was not proper.

6              MR. NOVAK:  All right.

7              THE COURT:  The jury should disregard the question.

8    BY MR. NOVAK:

9    Q.   Now, let's go back to the search for a second, and let me ask

10   you, you seized a number of items from the search of his bags; is

11   that correct?

12   A.   Yes, sir.

13             MR. NOVAK:  If I could show the witness Exhibit No.

14   MN-503, please?  Which I would offer into evidence.

15             THE COURT:  Any objection to 503?

16             MR. MAC MAHON:  I think the knife -- no, no objection,

17   Your Honor.

18             THE COURT:  All right, it's in.

19             (Government's Exhibit No. MN-503 was received in

20   evidence.)

21             MR. NOVAK:  I think we have a photo of it as well, do

22   we?  Bad guess on my part.

23   Q.   Let's go back to MN-503 for a second.  Do you want to hold

24   that up?

25             Can you tell the ladies and gentlemen what that item is?

Page 954

1   A.   It's a knife.

2   Q.   Okay.  And does it unfold as well?

3   A.   It does, yes, sir.

4   Q.   And I gather that blade is less than 4 inches.  We don't have

5   to get the ruler out for that, do we?

6   A.   It is.

7   Q.   All right.  And where did you find that knife?

8   A.   In one of Mr. Moussaoui's bags.

9   Q.   Okay.  Do you want to put that down?

10          If we could move to item MN-504, please?

11          THE COURT:  Any objection?

12          MR. MAC MAHON:  No objection, Your Honor.

13          THE COURT:  All right, it's in.

14          MR. MAC MAHON:  Excuse me.

15          MR. NOVAK:  We have a picture of this one, too, Judge,

16  I'll show on the screen.

17          THE COURT:  Is that a 504P then?

18          MR. NOVAK:  Yes.  Could we introduce that as well,

19  MN-504P?

20          THE COURT:  Yes.

21          (Government's Exhibit Nos. MN-504 and MN-504P were

22  received in evidence.)

23  BY MR. NOVAK:

24  Q.   Now, could you tell the ladies and gentlemen what item MN-504

25  is?

Page 955

1   A.   It's two utility tools, like pliers and various tools, but

2   also having knife blades in them.

3   Q.   Could you open it up to show us what the knife blades are?

4   A.   (Indicating.)

5   Q.   And are those knife blades also under 4 inches?

6   A.   They are, yes, sir.

7   Q.   And where did you recover that item?

8   A.   These were also in a bag of Mr. Moussaoui's.

9   Q.   And how many are there?

10  A.   There's two.

11  Q.   Kind of a bigger one and a little one?

12  A.   Yes, sir.

13       MR. NOVAK:  Judge, could we have Mr. Wood just show it

14  to the jury a little closer?  Is that possible?

15       THE COURT:  Yeah.  Could you take both of them,

16  Mr. Wood?

17       (Indicating.)

18       MR. NOVAK:  If you could, put that aside, Mr. Wood.

19  Thank you for doing that for us.

20       Could we show the witness Exhibit MN-505, which I would

21  also offer into evidence?

22       THE COURT:  Any objection?

23       MR. MAC MAHON:  No objection, Your Honor.

24       THE COURT:  It's in.

25       (Government's Exhibit No. MN-505 was received in

Page 956

1    evidence.)

2            MR. NOVAK:  I think we have a photo there, so I would

3    offer MN-505P as well.

4            THE COURT:  All right, that's in as well.

5            (Government's Exhibit No. MN-505P was received in

6    evidence.)

7    BY MR. NOVAK:

8    Q.   Do you want to take those items out and tell the folks what

9    they are?

10   A.   These are boxing gloves, fighting gloves.

11   Q.   Okay.  And could you tell us where did you seize those from?

12   A.   These were in a bag of Mr. Moussaoui's.

13   Q.   Now, by the way, when you had gone into the hotel room, had

14   you ever seen anything like that laying out anywhere?  `

15   A.   I had, yes, sir.

16   Q.   This is when you first had contact with Mr. Moussaoui and

17   Mr. Al-Attas?

18   A.   It is that first evening on the evening of August 16.

19   Mr. Al-Attas had an identical set of gloves like this.

20   Q.   Thank you.  If we could show the witness MN-506, please,

21   which I would also offer?

22           THE COURT:  Any objection, Mr. MacMahon?

23           MR. MAC MAHON:  No, no objection to the shin guards.

24           MR. NOVAK:  I think we have a photo, so I'd offer

25   MN-506P as well, Your Honor.

Page 957

1            THE COURT:  All right, that's in as well.

2            (Government's Exhibits Nos. MN-506 and MN-506P were

3    received in evidence.)

4    BY MR. NOVAK:

5    Q.   Can you tell the folks what that is, Agent Samit?

6    A.   These are shin guards.

7    Q.   And for what?

8    A.   Well, they can be used for sports, but in this case,

9    Mr. Al-Attas informed me that they were being used for fighting

10   training.

11   Q.   Okay.  And where did you seize those items from?

12   A.   These were seized from the same bag that contained the boxing

13   gloves.

14   Q.   Okay.

15   A.   Mr. Al-Attas also had an identical set of these.

16            THE COURT:  Thank you, Agent Samit.

17            If we could show the witness MN-507, please?

18            THE COURT:  Any objection?

19            MR. NOVAK:  Which I would offer that as well.

20            MR. MAC MAHON:  The Court's indulgence, Your Honor?

21            No objection.

22            THE COURT:  All right, it's in.

23            (Government's Exhibit No. MN-507 was received in

24   evidence.)

25            THE COURT:  Is there a photograph also for that?

U.S. v. MOUSSAOUI

 1              MR. NOVAK:  I'd offer MN-507P in as well, Your Honor.

 2              THE COURT:  Yes, they're both in.

 3              (Government's Exhibit No. MN-507P was received in

 4      evidence.)

 5      BY MR. NOVAK:

 6      Q.    What have you got there, Agent Samit?

 7      A.    These are a set of 8-by-21 field binoculars.

 8      Q.    Okay.  And what relevance at all does that have to your

 9      terrorism investigation?

10      A.    It could be used by a pilot for target recognition.

11      Q.    Okay.  Put that aside.

12              Now, where did you find those?

13      A.    They were in a backpack.

14      Q.    Okay.  Showing you Exhibits MN-508.1 and 508.2, which we

15      referenced earlier, the red books?

16              THE COURT:  Those are already in, aren't they?

17              MR. NOVAK:  Yeah, they're in, Judge.

18      Q.    Did you seize those as well, Agent Samit?

19      A.    Yes, sir.

20      Q.    Those are the operating manual for a 747-400?

21      A.    They are the aircraft operating manual volumes 1 and 2.

22      Q.    Where did you seize those from?

23      A.    Those were in a bag in Mr. Moussaoui's room.

24      Q.    Okay.  Showing you Exhibit MN-509 -- which I would offer.

25              MR. MAC MAHON:  No objection to any of his belongings

Page 959

```
 1    that were searched and seized, Your Honor.

 2              THE COURT:  All right, that's fine.

 3              (Government's Exhibit No. MN-509 was received in

 4    evidence.)

 5              THE WITNESS:  This is the 747-400 cockpit operating

 6    manual.

 7              MR. NOVAK:  I think we have a photo of that as well, so

 8    I'd offer the P version of that, too.

 9              THE COURT:  That's fine.  They're both in.

10              (Government's Exhibit No. MN-509P was received in

11    evidence.)

12    BY MR. NOVAK:

13    Q.   Thank you, Agent Samit.

14              If you could show the witness MN-510?  Which we have a

15    photo of, so I'd offer that as well as the P exhibit.

16              THE COURT:  Any objection?

17              MR. MAC MAHON:  No objection.

18              THE COURT:  All right, 510 and P are both in.

19              (Government's Exhibit Nos. MN-510 and MN-510P were

20    received in evidence.)

21    BY MR. NOVAK:

22    Q.   Do you want to tell the folks what are these items?

23    A.   These were newly purchased hiking boots.

24    Q.   Okay.  Could you tell us in addition -- and where did you

25    find those particular boots?
```

Page 960

1  A.   These were in a bag among Mr. Moussaoui's belongings.

2  Q.   Did you notice if Mr. Al-Attas had bought similar types of

3  boots?

4  A.   He did, sir.

5  Q.   Okay.  And did you see that in the hotel that day that you

6  contacted him?

7  A.   I did.

8  Q.   All right.  Moving on to -- by the way, was either one of

9  them wearing these boots that they had just bought?

10 A.   No.

11 Q.   What kind of shoes was Mr. Moussaoui wearing at the time that

12 you had contact?

13 A.   Just casual loafer, slipper-type shoes.

14 Q.   Okay.  And by the way, he's up there in Minnesota in August;

15 is that right?

16 A.   Yes, sir.

17 Q.   We've already established the fact it's not snowing up there

18 in August; is that right?

19 A.   It's warm there, sir.

20      MR. MAC MAHON:  These questions are argumentative.  Do

21 you want us to move this along and to ask some questions?

22 Counsel is arguing to the jury.

23      MR. NOVAK:  I asked him if it was snowing.

24      THE COURT:  I don't think snowing in August is

25 argumentative, Mr. MacMahon.  I overrule the objection.

Page 961

1    BY MR. NOVAK:

2    Q.   Was it snowing in August in Minnesota?

3    A.   No, sir.

4              THE COURT:  Now, that now is cumulative, so let's move

5    on.

6              MR. NOVAK:  All right.  If we could show the witness

7    MN-551.1.

8              THE COURT:  555.1?

9              MR. NOVAK:  1.1.

10             THE COURT:  Is there a photograph of that, too, or not?

11             MR. NOVAK:  Judge, excuse me, can I talk to Gerard for

12   one second?

13             Judge, I'm told that, for Mr. Wood's benefit, that this

14   evidence is in that box on the floor under the table, to the

15   right.

16             THE COURT:  This is the laptop?

17             MR. NOVAK:  Yes.

18   Q.   Is that the laptop?

19   A.   Yes, sir.  This is the laptop case, with a laptop inside.

20   Q.   And is that the laptop that you had asked him consent for

21   that he had denied search?

22   A.   Yes, sir.

23             MR. NOVAK:  We'd offer that, 551.1, Your Honor.

24             THE COURT:  All right, it's in.

25             MR. MAC MAHON:  No objection, Your Honor.

 1          (Government's Exhibit No. MN-551.1 was received in

 2    evidence.)

 3    BY MR. NOVAK:

 4    Q.   And 551.2 is what?  The case, right?

 5          Agent Samit, you've got the laptop, the laptop case,

 6    computer cords, and software that have been marked 551.1, 551.2,

 7    551.3, and 551.4; is that right?

 8    A.   Yes, sir.

 9    Q.   I just move for all of those, Judge, instead of us rooting

10    through that box.  I think it's easier just -- I just move for the

11    admission.

12          MR. MAC MAHON:  And I still don't have an objection.

13          THE COURT:  That's fine.

14          (Government's Exhibit Nos. MN-551.2, MN-551.3, and

15    MN-551.4 were received in evidence.)

16          MR. NOVAK:  I'd like to show the witness Exhibit MN-601,

17    please.

18          THE COURT:  Is there an objection to 601?

19          MR. MAC MAHON:  No, Your Honor.

20          THE COURT:  All right, it's in.

21          (Government's Exhibit No. MN-601 was received in

22    evidence.)

23    BY MR. NOVAK:

24    Q.   Okay.  Could you tell the folks what that item is?  Well,

25    I'll ask you to get it out of there first.

Page 963

1          And I think we have a picture, so I'm going to move in

2    601P.

3          THE COURT:  All right, that's in as well.

4          (Government's Exhibit No. MN-601P was received in

5    evidence.)

6          THE WITNESS:  Yes, sir.  It's a small spiral-bound

7    notebook.

8    BY MR. NOVAK:

9    Q.   Now, within that small spiral-bound notebook, were you able

10   to look through to see if there were names and telephone numbers

11   in it?

12   A.   Yes, sir.

13   Q.   And I would like to show you Exhibit, specifically MN-601.1.

14   And I think that's been marked for a photograph that's within the

15   document.  Have you got that?

16   A.   Yes, sir, I have it right here.

17   Q.   Is that a piece of paper that was along with that notebook?

18   A.   Yes, sir.  It was contained within that notebook.

19   Q.   All right.  And could you tell us -- first of all, I'd move

20   for the admission of 601.1 and 601.1P, Your Honor.

21          THE COURT:  Any objection?

22          MR. MAC MAHON:  No.

23          THE COURT:  They're both in.

24          (Government's Exhibit Nos. MN-601.1 and MN-601.1P were

25   received in evidence.)

Page 964

 1   BY MR. NOVAK:

 2   Q.   All right.  Could you tell us, Agent Samit, what is it that

 3   is written on this piece of paper?

 4   A.   Two telephone numbers beginning with 49, which I understand

 5   to be the country code for Germany.

 6   Q.   Right.

 7   A.   The name "Ahad Sabet," and then the word "Germany."

 8        MR. NOVAK:  All right.  If we could show the witness,

 9   going back to exhibit, Government Exhibit No. 1, paragraph 14 from

10   the statement of facts.

11   Q.   And I will ask you as that is brought to the screen, at any

12   point during the interview, had Mr. Moussaoui discussed with you

13   any phone numbers for this fellow named Ahad Sabet?

14   A.   No.

15        MR. MAC MAHON:  Your Honor, that's asked and answered

16   now for the third time.  Ahad Sabet's name didn't come up, and he

17   wasn't told Ahad Sabet's name.

18        THE COURT:  I'm going to sustain that objection.

19        MR. NOVAK:  I'll withdraw it.

20        THE COURT:  That's cumulative.

21        MR. NOVAK:  All right.  If we could move on to MN-601.2,

22   please.

23        THE COURT:  Is there a P for this as well?

24        MR. NOVAK:  I guess there is, so I'm going to ask

25   that -- I offer 601.2 and P.

Page 965

1                THE COURT:  They're both in.

2                (Government's Exhibit Nos. MN-601.2 and MN-601.2P were

3       received in evidence.)

4       BY MR. NOVAK:

5       Q.   And can you tell us what that -- do you have it there?

6       A.   Yes, sir, I do.

7       Q.   Okay.  Do you want to hold that up and tell the folks what

8       that is?

9       A.   It's a page from that notebook, and it has a German telephone

10      number, a second German telephone number with the word "fax"

11      written next to it.

12      Q.   Okay.  If we could move on to MN-601.3, please?

13               THE COURT:  And there's a P for that one as well, and I

14      assume there's no objection.

15               MR. MAC MAHON:  No objection, Your Honor.

16               THE COURT:  Is this whole 601 series pages from the

17      notebook?

18               MR. MAC MAHON:  That's my understanding, Your Honor.

19               MR. NOVAK:  Right.  And I'm going to stop right now with

20      this.

21               THE COURT:  All right.

22               MR. NOVAK:  It's going to be the last 601.  After we

23      read this, Judge, I'm going to try to do it in a much more

24      economical fashion here.

25               (Government's Exhibit Nos. MN-601.3 and MN-601.3P were

Page 966

1    received in evidence.)

2    BY MR. NOVAK:

3    Q.    Can you tell the folks what this particular piece of paper

4    is?

5    A.    This contains specification serial numbers for what looks

6    like a Toshiba computer.

7    Q.    All right.  Moving on now to Exhibit No. 603, please.

8    A.    It's a scrap of paper with two telephone numbers on it.

9    Q.    Okay.  And do you -- first of all, I would move for the

10   admission of MN-603, please.

11            THE COURT:  Any objection to 603?

12            MR. MAC MAHON:  No objection, Your Honor.

13            THE COURT:  All right, it's in.

14            (Government's Exhibit No. MN-603 was received in

15   evidence.)

16   BY MR. NOVAK:

17   Q.    And are you able to tell from the numbers there, those

18   telephone numbers go to what country?

19   A.    The top one appears to be a U.K., United Kingdom, London

20   exchange.  I don't know about the bottom one.

21   Q.    All right.  Why is it that you say the top one is for United

22   Kingdom?

23   A.    207 I was familiar with as being a London exchange.

24   Q.    Okay.  Now, if we could move on to Exhibits MN-604.1 and

25   604.2.

Page 967

 1            THE COURT:  Any objection?

 2            MR. MAC MAHON:  No, Your Honor.

 3            THE COURT:  They're both in.

 4            (Government's Exhibit Nos. MN-604.1 and 604.2 were

 5    received in evidence.)

 6    BY MR. NOVAK:

 7    Q.   And I would just ask you, are those rent receipts that you

 8    found in the name of Zacarias Moussaoui?

 9    A.   Yes, sir.  The one, 604.2, just says "Moussaoui."

10    Q.   Okay.  And does it provide an address for those rent

11    receipts?

12    A.   Yes, sir.

13    Q.   And what was the address for those rent receipts?

14    A.   823 Monnett, South.

15    Q.   Okay.  And where was that located at?

16    A.   In Norman, Oklahoma.

17    Q.   All right.  If we could move to 605.1 and .2, please?

18            THE COURT:  Any objection?

19            MR. MAC MAHON:  No, Your Honor.

20            THE COURT:  All right, they're in as well.

21            (Government's Exhibit Nos. MN-605.1 and MN-605.2 were

22    received in evidence.)

23    BY MR. NOVAK:

24    Q.   Do you see those items, Agent Samit?

25    A.   Yes, sir.

Page 968

1    Q.   And are those electric service bills?

2    A.   They are utility bills for that --

3    Q.   That same address?

4    A.   For that same address.

5    Q.   Okay.  Were you aware that Mr. Moussaoui had any contact with

6    this address in Oklahoma, the Monnett, South?

7    A.   No, sir.

8            MR. NOVAK:  If we can move on to Exhibit MN-606, please.

9    And we'd offer that as well.

10           THE COURT:  Any objection?

11           MR. MAC MAHON:  No objection, Your Honor.

12           THE COURT:  All right, it's in.

13   BY MR. NOVAK:

14   Q.   Do you just want to tell the Court what that is?  `

15   A.   I don't think I have 606 here.

16   Q.   All right.

17           MR. MAC MAHON:  I may have an objection if he doesn't

18   have it, Your Honor.

19           (Laughter.)

20           MR. NOVAK:  I'll tell you what, Judge, I don't want to

21   slow down.  I'll just move on.  That's not the most important

22   document here, so we'll come back to it if he can't find it.

23   Q.   Let me ask you while he's looking, during your search, did

24   you come up with automobile insurance documents under

25   Mr. Moussaoui's name for a Ford Tempo?

Page 969

1    A.    For a Ford Tempo, yes, sir.

2    Q.    Yeah.  And would that have been the item that's marked 606?

3    A.    I don't, I don't know.  It's not here.

4    Q.    All right, we'll come back to that later on.

5          Showing the witness MN-607--

6          THE COURT:  At this point, 606 is not in evidence.

7          MR. NOVAK:  Yes, Judge.

8          THE COURT:  607, is there any objection to 607?

9          MR. MAC MAHON:  No, Your Honor.  No, Your Honor.

10         (Government's Exhibit No. MN-607 was received in

11   evidence.)

12   BY MR. NOVAK:

13   Q.    Do you find 607 there?

14   A.    Yes, sir, I have it here.

15   Q.    Can you tell the ladies and gentlemen what Exhibit MN-607 is?

16   A.    It is a Kinko's, receipt for Kinko's in Eagan, Minnesota.

17   Q.    Dated what date?

18   A.    Dated August 12, 2001.

19   Q.    Exhibit MN-608, which I would offer --

20   A.    I have it here.

21         THE COURT:  Any objection?

22         MR. MAC MAHON:  No, Your Honor.

23         THE COURT:  All right, it's in.

24         (Government's Exhibit No. MN-608 was received in

25   evidence.)

Page 970

 1  BY MR. NOVAK:

 2  Q.    Would you tell the ladies and gentlemen what MN-608 is,

 3  please?

 4  A.    It's a guest pass to the YMCA of greater St. Paul for the

 5  Residence Inn.

 6  Q.    And do you know if that YMCA has physical fitness training

 7  there?

 8  A.    It does.  It has a weight room and the ability to conduct

 9  that.

10  Q.    Okay.  Showing you MN-610, which I would offer.

11  A.    I have it.

12          THE COURT:  Any objection?

13          MR. MAC MAHON:  No, Judge.

14          THE COURT:  That's in.

15          (Government's Exhibit No. MN-610 was received in

16  evidence.)

17  BY MR. NOVAK:

18  Q.    Do you want to tell the folks what MN-610 is?

19  A.    That is a hotel bill for the Residence Inn at the -- in

20  Norman, Oklahoma.

21  Q.    All right.

22  A.    In the name of Zacarias Moussaoui for the dates -- for the

23  date 23 February '01.

24  Q.    Okay.  As I move on to MN-611, which I think you have there,

25  I would ask Mr. Wood, I am told that MN-606 might be in a box on

1    the floor, but I'll ask you, Agent Samit, to look for MN-611, if

2    you might.

3    A.   I don't think that's in here, either.

4    Q.   Okay.  We'll wait then for Mr. Wood.

5    A.   Here's 606, yes.

6    Q.   What's MN-606?

7    A.   This is insurance paperwork pertaining -- in the name of

8    Zacarias Moussaoui pertaining to a 1989 Ford Tempo.

9    Q.   Did you know before you searched that day that he had owned a

10   car before?

11   A.   He had told us that he had a Ford Tempo.  I didn't have the

12   specifics on it.

13   Q.   Okay.  Now, I think we're back to MN-611.

14        Judge, I'm sorry, I think I omitted to move in MN-606.

15        THE COURT:  There was no objection now that we've found

16   the exhibit, so 606 is in.

17        (Government's Exhibit No. MN-606 was received in

18   evidence.)

19        THE COURT:  We're up to 611.  Is there any objection to

20   611?

21        MR. MAC MAHON:  No, Judge, thank you.

22        THE COURT:  All right, that's in.

23        (Government's Exhibit No. MN-611 was received in

24   evidence.)

25   BY MR. NOVAK:

Page 972

1   Q.   Do you want to tell us what 611 is?

2   A.   We don't have it yet.

3   Q.   Oh, you don't have it?  Okay.

4        MR. NOVAK:  Judge, I think Mr. Francisco could aid

5   finding some of these items, if Mr. Wood would like the help.

6        THE COURT:  You know, I'm looking at a lot of these, and

7   I don't think we even need to take up the jury's time with this.

8   They're not objected to, and we could just move them in down the

9   road.  Why don't we continue --

10        MR. NOVAK:  That's fine if we could do it that way.  Can

11   I just collectively -- look, we've made all the exhibits available

12   to the defense.  They have the list.  If I could just collectively

13   move -- I'll just read off the numbers?

14        THE COURT:  Read it slowly, yeah.

15        And, Mr. MacMahon, unless you stand up and say --

16        MR. MAC MAHON:  There's been a trend to my objections,

17   Your Honor.

18        THE COURT:  I know.  I know.  And most of these are

19   just, as I can see from your list of them, they're confirming

20   residencies at hotels --

21        MR. NOVAK:  That's fine.

22        THE COURT:  -- rentals of post office boxes, that kind

23   of stuff, over which there apparently is no dispute.

24        MR. NOVAK:  That's fine.  We just want to make sure this

25   evidence is entered.  I'll just read off the numbers if I might,

Page 973

```
 1    Your Honor.  I'll try to do it slowly.

 2              THE COURT:  All right.  You stopped at 611.

 3              MR. NOVAK:  MN-611.

 4              THE COURT:  All right.  Go ahead.

 5              MR. NOVAK:  MN-612.1.

 6              THE COURT:  Go ahead.

 7              MR. NOVAK:  MN-612.2.

 8              THE COURT:  Go ahead.

 9              MR. NOVAK:  MN-613.

10              THE COURT:  Go ahead.

11              MR. NOVAK:  MN-614.

12              THE COURT:  And .1 and .2?

13              MR. NOVAK:  Yes, Your Honor.

14              THE COURT:  Go ahead.

15              MR. NOVAK:  MN-615; MN-616; MN-617 and 617.1, .2, .3,

16    and .4; 618.

17              THE COURT:  All right, go ahead.

18              MR. NOVAK:  619, 620.1 and .2.  And I'd like to ask some

19    questions of the witness on that if I might, Judge.  That is

20    something that I'd like to bring up.  May I do so now, or do you

21    want me to come back to that?

22              THE COURT:  Why don't you just finish them so then we

23    can just go to the questions.

24              MR. NOVAK:  Okay.  MN-621.

25              THE COURT:  All right.
```

Page 974

1          MR. NOVAK:  MN-622; MN-623; MN-624; MN-625.1, .2, .3;

2   MN-626.1 and .2; MN-627; MN-628; MN-629.1, .2, .3; MN-630.1, .2,

3   .3, and .4.

4          MN-633; MN-634; MN-637; MN-638; MN-639.1, .10, .11, .12,

5   .13, .14, .2, .3, .5, .6 --

6          THE COURT:  I'm sorry, not .4?

7          MR. NOVAK:  We already introduced that, Judge, earlier.

8          THE COURT:  Okay.  It's already in.

9          MR. NOVAK:  .6, .7, .8, .9.  MN-640; MN-641; MN-642.1,

10   .2, .3, .4, .5, .6, .7.  MN --

11          MR. MAC MAHON:  Hold on one second.

12          (Discussion between attorneys off the record.)

13          MR. NOVAK:  Judge, I'm representing to Mr. MacMahon that

14   all these items were found by Agent Samit in Mr. Moussaoui's

15   contents.

16          THE COURT:  In his bags?

17          MR. NOVAK:  In his bags.

18          MR. MAC MAHON:  Just being sure we're not dealing with

19   documents from another search.

20          MR. NOVAK:  I just want to put in the record, he's

21   whispering to me, I just want to make it clear what it is that I'm

22   responding to.

23          And now I lost my number.

24          THE COURT:  The last one was 642.7.

25          MR. NOVAK:  Okay.  6.3.01.

1          THE COURT:  No, no, 643.

2          MR. NOVAK:  Yeah, 643.01, 643.02, .03, 04, 05, 06, 07,

3   08, 09, and .10.

4          644; 645.1 and .2; 646; 647; 648; 649; 650; 651; 652;

5   653.1, .2; 654.1, .2; 655.1; 655.2; 656; 657; 658; 659.1, .2;

6   660.1 and .2; 661.1, .2, .3; 662.1 and .2 and .3; 663.1 and .2;

7   664; 666 --

8          THE COURT:  Because 665 is already in, right?

9          MR. NOVAK:  Right.  I think -- well, no, I think --

10         THE COURT:  Or did you miss that one?

11         MR. NOVAK:  I think I just did not introduce that one,

12  Judge.  667 --

13         THE COURT:  I'm sorry, are you trying to put in 665 as

14  well?

15         MR. NOVAK:  No, no.

16         THE COURT:  All right.

17         MR. NOVAK:  I'm sorry, 666, 667, 668, 669, 670, 671,

18  672, 674 --

19         THE COURT:  All right, not 673?

20         MR. NOVAK:  No.

21         THE COURT:  All right.

22         MR. NOVAK:  676.1 and .2.

23         Now, Judge, there are a couple of these items that we --

24  again, all those items were recovered from Mr. Moussaoui's bags,

25  and I'd like to go back and refer -- get some detailed testimony

Page 976

1    on a couple of the items if I might.

2              MR. MAC MAHON:  No objection to any of them.

3              THE COURT:  Just for the record, all the ones that were

4    just listed by Mr. Novak are in evidence.

5              MR. NOVAK:  Thank you, Judge.

6              MR. MAC MAHON:  All right.

7              (Government's Exhibits Nos. MN-612.1, MN-612.2, MN-613,

8    MN-614, MN-614.1, MN-614.2, MN-615, MN-616, MN-617, MN-617.1

9    through MN-617.4, MN-618, MN-619, MN-620.1, MN-620.2, MN-621,

10   MN-622, MN-623, MN-624, MN-625.1 through MN-625.3, MN-626.1,

11   MN-626.2, MN-627, MN-628, MN-629.1 through MN-629.3, MN-630.1

12   through MN-630.4, MN-633, MN-634, MN-637, MN-638, MN-639.1,

13   MN-639.10 through MN-639.14, MN-639.2, MN-639.3, MN-639.5 through

14   MN-639.9, MN-640, MN-641, MN-642.1 through MN-642.7, MN-643.01

15   through MN-643.10, MN-644, MN-645.1, MN-645.2, MN-646 through

16   MN-652, MN-653.1, MN-653.2, MN-654.1, MN-654.2, MN-655.1,

17   MN-655.2, MN-656, MN-657, MN-658, MN-659.1, MN-659.2, MN-660.1,

18   MN-660.2, MN-661.1 through MN-661.3, MN-662.1 through MN-662.3,

19   MN-663.1, MN-663.2, MN-664, MN-666 through MN-672, MN-674,

20   MN-676.1, and MN-676.2 were received in evidence.)

21   BY MR. NOVAK:

22   Q.   I'd ask you, Mr. Samit, to bring up MN -- to look at

23   MN-620.1, and could you tell the ladies and gentlemen what that

24   item is?

25   A.   It's a declaration for a replacement passport.

1    Q.    Now --

2    A.    In French.

3    Q.    Is that in French?

4    A.    It is.

5          MR. NOVAK:  Your Honor, with the agreement of counsel,

6    we have attached it at -- attached a translation from French into

7    English which we'd mark 620.1T, which we would offer as well

8    attendant to that exhibit.

9          THE COURT:  All right.  So 620.1T is also in evidence.

10          (Government's Exhibit No. MN-620.1T was received in

11    evidence.)

12    BY MR. NOVAK:

13    Q.    Now, based upon a translation, could you tell the folks what

14    is that item and -- I'm sorry, go ahead.

15    A.    Yes, sir.  This document is a declaration of the loss of a

16    passport, French passport in the name of Zacarias Moussaoui, date

17    of birth, 5-30-1968.

18    Q.    And what is the date that the declaration of loss was filed

19    on?

20    A.    This was filed on March 18 of 1999.

21    Q.    And does it -- does the -- that form by the French government

22    require the person making that request for a new identification

23    card to identify what happened to their old passport?

24    A.    It does.

25    Q.    And what does -- what is written in this section as for the

Page 978

1    explanation?

2    A.   Under circumstances, it says "information on the

3    disappearance of the documents."  Under circumstances, it

4    says "paper damaged."

5    Q.   Okay.  On Exhibit 620.2, is that a similar French

6    declaration?

7    A.   Yes, sir.

8         MR. NOVAK:  Judge, and there's also a similar

9    translation, which we would offer, 620.2T, by an agreement of

10   counsel.

11        THE COURT:  All right, that is also in evidence then.

12        (Government's Exhibit No. MN-620.2T was received in

13   evidence.)

14   BY MR. NOVAK:

15   Q.   Sorry.

16   A.   I'm caught up with you now.  Yes, sir, it is another

17   declaration.

18   Q.   And what is the date of that declaration?

19   A.   This one is dated March 30 of 1999.

20   Q.   So about two weeks after the other one you just looked at, is

21   that right?

22   A.   Yes, sir.

23   Q.   And is this also completed by Mr. Moussaoui?

24   A.   It is.

25   Q.   And what is he asking to replace this time instead of the

1   passport?  Is there something else?

2   A.   He is asking for a replacement of his national ID card.

3   Q.   And is there a statement by him as to what the reason for the

4   loss of his old national identification card was?

5   A.   Under "information on the disappearance of the documents," it

6   says "circumstances unknown."

7   Q.   Okay.  Could you move to MN-621 and 622 and tell us what

8   those two items are?

9   A.   621 is a, is a French national identity card.

10  Q.   In whose name?

11  A.   Zacarias Moussaoui.

12  Q.   And does it have his date of birth on there?

13  A.   It does.

14  Q.   What's his date of birth?

15  A.   30th of May, 1968.

16  Q.   So how old would he have been then when he had contact with

17  you on August 16 then?

18  A.   33.

19  Q.   All right.  And 622 is what?  MN-622, do you have that as

20  well?

21  A.   It is -- I do.  It is a French national identity card.

22  Q.   It's another identity card; is that right?

23  A.   Yes.

24  Q.   All right.  624, please, MN-624.  Could you tell us what that

25  is?

Page 980

```
 1   A.   This is an international student identity card.

 2   Q.   And in whose name?

 3   A.   Moussaoui, Z.

 4   Q.   Does it have his picture on there as well?

 5   A.   It does, it does bear his photograph.

 6   Q.   Are you familiar with international student cards?

 7   A.   Passingly familiar.

 8   Q.   Okay.  Do you know what they're for then?  Can you tell us?

 9   A.   They're for students traveling abroad that identifies them as

10   a student in a variety of languages.

11   Q.   Okay.  Did Mr. Moussaoui ever tell you why at the age of 33

12   he's got a student identification card?

13   A.   He did not.

14        MR. MAC MAHON:  Your Honor, that's not even in the

15   statement of facts.  Now we're getting into questions he didn't

16   ask him about things he found later that aren't in the statement

17   of facts.  It's just grossly irrelevant.

18        THE COURT:  Well, is it relevant to the issues in the

19   case?

20        MR. NOVAK:  Well, sure it's relevant, for all the use of

21   multiple identifications that this defendant has.  It's consistent

22   with Agent Anticev's testimony.

23        MR. MAC MAHON:  It's in his name.

24        THE COURT:  Usually multiple identifications are

25   relevant in a criminal case if they have distortions of name or
```

Page 981

1   birth date or have other false information that could be

2   misleading or trying to cover up their identity.  Does this have

3   that sort of information?

4        MR. NOVAK:  No, but what it does, it consists of

5   parallel conduct, is if we put forward evidence that the other

6   hijackers on September 19 (sic) did exactly the same thing, and

7   Mr. Raskin put that in, and this is parallel conduct, that he

8   acted the same as the other hijackers.

9        THE COURT:  All right.  Then I'll overrule the

10  objection.

11       MR. NOVAK:  Thank you, Judge.

12  Q.   So the answer was did he ever tell you why at the age of 33,

13  he had the international student identity card?

14  A.   No, sir.

15  Q.   630.1, .2, and .3, and .4.

16  A.   Yes, sir.

17  Q.   Do you want to tell the folks what those items are?

18  A.   These are small wallet size or passport size photographs of

19  Mr. Moussaoui.

20  Q.   And how many of those exist there?

21  A.   Six.

22  Q.   Six photos?  And they're all of Mr. Moussaoui?

23  A.   They are.

24  Q.   Okay.  You can put those aside.

25       Bring up MN-640.

Page 982

 1              And, Judge, I think we have MN-640 as a photo, which I'd

 2    also introduce MN-640P then.  If we can bring it up on the screen.

 3              THE COURT:  All right, 640P is also in.

 4              (Government's Exhibit No. MN-640P was received in

 5    evidence.)

 6    BY MR. NOVAK:

 7    Q.   Do you want to find 640 there while we have this on the

 8    screen?

 9    A.   I have it.

10    Q.   Okay.  Could you tell us what MN-640 is?

11    A.   This is a receipt -- customer receipt of a Western Union

12    money transfer.

13    Q.   And what is the date of that wire transfer?

14    A.   The date is August 4 of 2001.

15    Q.   And who is the receiver of the money that's identified on

16    that wire transfer?

17    A.   Zacarias Moussaoui.

18    Q.   And who is the sender as reported on that receipt?

19    A.   Ahad Sabet.

20    Q.   And can you tell us what are the amounts of money, the total

21    amount of money that was wire-transferred to Mr. Moussaoui from

22    Ahad Sabet on August 4?

23    A.   $4,063.25.

24    Q.   All right.  And does it indicate where it is that

25    Mr. Moussaoui collected the receipt -- I'm sorry, let me step back

1    and ask this question in English:  Does that document indicate

2    where the receipt is from, where Mr. Moussaoui was able to collect

3    that money?

4    A.   It does.  Pratt Foods No. 7, 1205 East Lindsey, P.O. Box 308,

5    Shawnee, Oklahoma.

6    Q.   Thank you.  You can put that aside.

7              Take a look at MN-644.

8              I think we have a picture of that, Judge.  I ask that

9    that be marked as MN-644P, and I'd offer that.

10             THE COURT:  All right, that's also in.

11             (Government's Exhibit No. MN-644P was received in

12    evidence.)

13             THE WITNESS:  I have it, sir.

14   BY MR. NOVAK:

15   Q.   Can you tell the folks what that item is?

16   A.   This is the, this is the applicant's copy of a medical

17   certificate for a student pilot.

18   Q.   Okay.  Can we scroll down a little bit further to the middle

19   section here?

20             And when you testified about back when you received your

21   PPL, you had to get a medical certificate; is that right?

22   A.   That's correct, sir.

23   Q.   And is this similar to the type of certificate that you

24   received?

25   A.   It is.

Page 984

1    Q.    And now on that -- and who is this medical certificate for

2    from the FAA?

3    A.    Zacarias Moussaoui.

4    Q.    And is there a date on that medical certificate?

5    A.    There is down at the bottom.  It looks like March 1 of 2001,

6    bottom right.

7    Q.    Okay.  I'm sorry, did you say you could read that?

8    A.    I can.  It says 03/01/2000, March 1.

9    Q.    Okay.  Now, I'm going to ask you to look at section M, when

10   it says yes or no.  What does it ask for whether there's any type

11   of symptom of?

12   A.    Frequent or severe headaches.

13   Q.    No, M, M as in Mary?

14   A.    I'm sorry, M.  Mental disorders of any sort, depression,

15   anxiety, etc.

16   Q.    And was there any indication of a mental disorder on that

17   certificate?

18   A.    No, sir.

19   Q.    Thank you, you can put that aside.  Moving on to 655.2,

20   please.

21         I'll tell you what, I'm going to withdraw that request.

22   It will make it easier on Mr. Wood, who I think I'm torturing over

23   there.  Could we show the witness MN-663.1 and .2?

24   A.    663.1 and .2?

25   Q.    Yes.

Page 985

```
 1              THE COURT:  Mr. Novak, I mean, the level of detail, I
 2    think, is becoming unnecessary.  These items speak for themselves.
 3    The jury will figure out what that is.
 4              MR. NOVAK:  Judge, there's a couple of items of physical
 5    evidence here -- these are hand-held exercises.  We think these
 6    are important --
 7              THE COURT:  But they don't need to have any discussion.
 8    They're already in evidence, and you can argue from them down the
 9    road.  Let's just start moving this along.
10              MR. NOVAK:  May I just have a moment to look at my notes
11    for a second?  Let me see if there's anything else.
12              Just a couple things.
13    Q.   MN-674.  This will actually be the last thing, Judge, I'll
14    ask about.
15              THE COURT:  All right.
16              MR. NOVAK:  It's a notebook.  It's in the box, I'm told.
17              THE COURT:  Is there something in this exhibit?
18              MR. NOVAK:  Yes, there's a particular page that I want
19    to bring out, Judge.
20              THE COURT:  That's fine.
21              MR. NOVAK:  Again, this will be the last item that I'll
22    talk about.
23              THE COURT:  It's a subject notebook, like a student's
24    notebook, Mr. Wood.
25              MR. NOVAK:  Similar to the one that's in Mr. Wood's hand
```

Page 986

1    right now, 674.

2              THE COURT SECURITY OFFICER:  72.

3              THE COURT:  There are several of them there, Mr. Wood,

4    but he wants one particular one, 674.  It should be blue.

5              THE COURT SECURITY OFFICER:  It's not in this bunch.

6              MR. NOVAK:  All right, Judge.  That's fine.  I'll just

7    move on.  We'll save it for argument.

8    Q.   Now, in addition, Agent Samit, in addition to the search

9    warrant that you procured of Mr. Moussaoui's personal items that

10   were held in the INS storage, did you also assist in other agents

11   in Oklahoma procuring a search warrant?

12   A.   Yes, sir.

13   Q.   And how does that work with the FBI in terms of other

14   locations within the country doing investigative work on your

15   behalf?

16   A.   When they're doing it on our behalf, we will communicate the

17   specifics to them.  In the case where we need a search warrant,

18   we'll provide them with similar facts to what we used in our

19   search warrant and transmit it to them so that they can go to

20   their judicial district, their district court and draw up a search

21   warrant that can be signed by a magistrate there.

22   Q.   And for what location did you ask your fellow colleagues down

23   in Oklahoma to search?

24   A.   The 209A Wadsack apartment.

25   Q.   And was that done then?

```
 1   A.    It was, yes, sir.

 2   Q.    Now, on September 14 of 2001, was Mr. Moussaoui transported

 3   to another location outside of Minnesota?

 4   A.    He was.

 5   Q.    And where was he transported to?

 6   A.    To the Southern District of New York.

 7   Q.    And before he was transported, did you-all take a picture of

 8   him?

 9   A.    We did.

10   Q.    And is that GX-3, we'd ask be shown.

11         I'd just offer GX-3.  It's a photograph.  We don't have

12   to bring it up on the screen?

13         THE COURT:  All right, it's in evidence.

14         (Government's Exhibit No. GX-3 was received in

15   evidence?)

16         MR. NOVAK:  Is there any objection from Mr. MacMahon?

17         MR. MAC MAHON:  No objection, Your Honor.

18         MR. NOVAK:  Judge, with that, I have no further

19   questions of Agent Samit.

20         THE COURT:  All right.

21         MR. MAC MAHON:  Your Honor, if we could have the jury

22   out of the room for a second?  We have a brief motion that

23   Mr. Zerkin and I would like to make.

24         THE COURT:  Well, I'll tell you what:  It's 5:10.  It's

25   been a long day and, I think, a long week, and I expect this cross
```

Page 988

1   examination will go more than 20 minutes.

2           MR. MAC MAHON:  It will, Your Honor.

3           THE COURT:  All right.  I think this is a logical time

4   then to end for today, and, ladies and gentlemen, as you know, you

5   have tomorrow off.

6           Now, you can go back to work and resume your normal

7   lives.  Just be sensitive to the fact that if people ask you about

8   what you've been doing, you are clearly under an order from this

9   Court that you cannot in any respect discuss this case or your

10  service as a juror, and you'll have to be careful over the long

11  weekend to avoid any media coverage about the case.

12          I am not able to get any kind of HOV passes for you-all.

13  We did check with the marshals.  That's just not something that's

14  very easily done.  You'd have to be driving a police car to get

15  one, and none of you is doing that.

16          Again, I suggest if some of you can carpool, that might

17  alleviate some of that problem, but we do appreciate the fact that

18  many of you are driving long distances and that you have been here

19  on time.  It's an excellent group of people.  So we thank you for

20  that, and we'll see you back here Monday morning at 9:30.

21          We will stay in session to address this issue.

22          (Jury out.)

23          MR. MAC MAHON:  He can be excused, Your Honor.

24          THE COURT:  Yes.  Agent, thank you.  We'll need you back

25  here, obviously, Monday at 9:30, and clearly, do not discuss your

Page 989

1    testimony with anyone.

2              THE WITNESS:  Yes, Your Honor.

3                        (Witness stood down.)

4              MR. MAC MAHON:  If it please the Court, this defense

5    team has been working, as you know, under extreme circumstances

6    trying to put this case together in a fair way, and this question,

7    everything's been -- every question and answer has been scripted

8    in this case.  Some of these witnesses are answering before

9    they're asked.  And this, this comment about Moussaoui's

10   invocation of his right is the most unprofessional and improper,

11   unconstitutional question I've ever heard of, much less coming in

12   the penalty phase of a death penalty case.

13             And Mr. Zerkin has prepared, since this is his

14   expertise -- I'd like to turn this over to him, Your Honor.

15             THE COURT:  We're not going to argue this case now.  I'm

16   fully --

17             MR. MAC MAHON:  Your Honor, he has a motion to make.

18             THE COURT:  Wait a minute, no.

19             MR. MAC MAHON:  And if the Court would listen for one

20   second, it's important.

21             THE COURT:  Well, let me hear the motion before I hear

22   the speech.

23             MR. MAC MAHON:  Thank you, Your Honor.

24             MR. ZERKIN:  The motion, Your Honor, is a motion for a

25   mistrial, and it is due to the premeditated, flagrant, intentional

Page 1029

1                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION
3   UNITED STATES OF AMERICA,        .      Criminal No. 1:01cr455
                                     .
4       vs.                          .      Alexandria, Virginia
                                     .      March 20, 2006
5   ZACARIAS MOUSSAOUI,              .      9:30 a.m.
    a/k/a Shaqil, a/k/a              .
6   Abu Khalid al Sahrawi,           .
                                     .
7               Defendant.           .
                                     .
8   .  .  .  .  .  .  .  .  .  .  .
9                    TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE LEONIE M. BRINKEMA
10               UNITED STATES DISTRICT JUDGE
11                         VOLUME VI
12  APPEARANCES:
13  FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                                 DAVID J. NOVAK, AUSA
14                               DAVID RASKIN, AUSA
                                 United States Attorney's Office
15                               2100 Jamieson Avenue
                                 Alexandria, VA 2231430
16
    FOR THE DEFENDANT:           GERALD THOMAS ZERKIN
17                               KENNETH P. TROCCOLI
                                 ANNE M. CHAPMAN
18                               Assistant Federal Public Defenders
                                 Office of the Federal Public
19                               Defender
                                 1650 King Street
20                               Alexandria, VA 22314
21
22
23
24
25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Page 1033

```
 1                         (No response.)

 2             THE COURT:  Oh, you have been wonderful, all right.  I

 3    had complete confidence that you would be able to abide by my

 4    instructions.  I'm very pleased that you have been able to.

 5             Now, the second thing is you had asked us for a glossary

 6    of terms.  We have that glossary ready at this point.  I would

 7    like to give each one of you that list.  Please keep it with your

 8    notebooks.  Obviously, don't take it home, but hopefully that will

 9    assist you at least in having some spellings.  And you can jot

10    notes on that sheet.  It is for your own information, but we want

11    you to leave it here when we're not in session, all right?

12             Then if there is nothing further -- now, I can tell from

13    the noise I'm hearing in chambers and the temperature in here that

14    we're again having some issues with our air-conditioning and

15    heating system.  If any of you are starting to get uncomfortable,

16    let me know.  We have already put a call in to the building folks,

17    so I'm aware that things are a bit chilly in here, but we will do

18    the best we can for you.  All right?

19             All right.  Mr. MacMahon, you were going to begin with

20    the cross-examination of Agent Samit, correct?  So he needs to be

21    brought back in.

22      HARRY SAMIT, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

23             THE COURT:  Agent Samit, you are still under your

24    affirmation from a week ago when you were last on the stand, or

25    ten days ago, whenever it was.  All right?
```

Page 1034

1          THE WITNESS:  Yes, Your Honor.

2          MR. MAC MAHON:  May I proceed, Your Honor?

3          THE COURT:  Yes, sir.

4                    CROSS-EXAMINATION

5    BY MR. MAC MAHON:

6    Q.   Agent Samit, you spent a lot of time with Mr. Novak preparing

7    your testimony in this case, didn't you?

8    A.   I spent some time with him, yes, sir.

9    Q.   How much time?

10   A.   Preparing testimony?

11   Q.   Yes, sir.

12   A.   Three visits to the Eastern District.

13   Q.   And did you go through how you were going to testify in the

14   case, questions and answers and --

15   A.   He asked questions, and I provided answers, yes, sir.

16   Q.   Did you hear any questions when we were in court last week

17   that you hadn't heard in preparation?

18   A.   Oh, yes, sir.

19   Q.   You did?

20   A.   (Nodding head.)

21   Q.   And you refused to talk to me about your testimony in this

22   case; is that right?

23   A.   Yes, sir.

24   Q.   Okay.  Now, your training as an FBI agent, tell us about what

25   training you got to become a member of the Joint Terrorism Task

Page 1035

1    Force in Minnesota.

2    A.    There was no training before becoming a member.  I was

3    assigned there.  Primarily based on my background with

4    intelligence in the military.  Once I reached the Joint Terrorism

5    Task Force, I attended numerous in-service trainings, anywhere

6    from a day to a week in international terrorism.

7    Q.    Did you study al Qaeda before you became an agent?

8    A.    I did.  Before I became an agent?

9    Q.    Well, before you became a member of the Joint Terrorism Task

10   Force, did you study al Qaeda?

11   A.    No, sir.

12   Q.    Did you have any classes in your course to become an agent --

13   to become a member of the task force to learn anything about

14   al Qaeda?

15   A.    Before I became a member of the task force, no, sir.

16   Q.    Okay.  Well, how about after you became a member of the task

17   force and before you actually encountered Mr. Moussaoui?

18   A.    Yes, sir.  I had -- I attended the IT and FCI basic course,

19   during which we discussed al Qaeda.

20   Q.    Okay.  And I don't know what those initials are.

21   A.    International terrorism and foreign counterintelligence, it

22   was a week-long in-service.  One class in that, during that

23   week-long training focused on terrorist groups, including

24   al Qaeda.

25   Q.    Okay.  And did you, did you learn or hear any speeches of

Page 1036

1    Usama Bin Laden or read translations of them?

2    A.    Did we hear of any speeches?  No, sir.

3    Q.    Did you read any materials, any propaganda materials from

4    al Qaeda?

5    A.    No, sir.

6    Q.    You learned that one way that al Qaeda members traveled to

7    Afghanistan in that time, you learned, was to go through Pakistan,

8    correct?

9    A.    Not through the in-service.  Through other case work before

10   meeting Mr. Moussaoui I learned that.

11   Q.    What case work was that?

12   A.    Well, I can't go into other investigations, sir.  Some of

13   those remain classified, the specific details.  What I will say is

14   that I had investigations of people who were connected to

15   Afghanistan and Pakistan who had traveled into Afghanistan through

16   Pakistan in a very similar fashion.

17   Q.    All right.  So you knew before you met Mr. Moussaoui that a

18   Muslim fundamentalist who had a passport with a Pakistani -- an

19   indication that recent travel had been to Pakistan was someone who

20   you ought to have a whole lot of interest in, right?

21   A.    Yes, sir.

22   Q.    And you knew that long before you met Moussaoui, right?

23   A.    Within a year or so before I met Moussaoui.

24   Q.    And you were trained to learn the difference between a

25   regular Muslim and a Muslim fundamentalist, too, weren't you?

Page 1037

1   A.    A radical, yes, sir.

2   Q.    Right.  And one of those, I think you testified, was that

3   they prayed five times a day?  That was one of the things you were

4   taught to look for?

5   A.    No, sir.  Even devout Muslims who are not radical pray five

6   times a day.

7   Q.    But when you found out that Mr. Moussaoui prayed five times a

8   day, you thought that meant he was a terrorist, right?

9   A.    No, sir.

10  Q.    You didn't testify to that last week?

11  A.    Certainly the five times a day would have increased the fact

12  that he was a religious Muslim.  What made me think he was a

13  radical were his statements and certainly Mr. al-Attas's

14  statements concerning the fact that he wanted to kill non-Muslims.

15  That was what made me think he was a terrorist.

16  Q.    And that was the first day, right?

17  A.    Yes, sir.

18  Q.    Now, let me just ask you a couple other questions about how

19  the FBI is organized.  As a field agent are you free to do, take

20  any action you want if headquarters tells you to do otherwise?

21  A.    No, sir.

22  Q.    And, in fact, you are supposed to call headquarters when you

23  get a significant investigation, correct?

24  A.    Notify them in some fashion quickly, calling or e-mailing.

25  Q.    Okay.  And then would you have direct access to somebody in

Page 1038

1    headquarters to call, for example, if you learned that someone

2    that fit Mr. Moussaoui's description was taking flight simulator

3    training in Minneapolis?

4    A.   Yes, sir.

5    Q.   Okay.  And you didn't tell the jury anything about those

6    kinds of phone calls in your testimony last week, did you?

7    A.   No, sir.

8    Q.   Okay.  And you did have those phone calls, didn't you?

9    A.   Yes, sir.

10   Q.   Right.  And you were told not to arrest Mr. Moussaoui.  You

11   were directly told that, weren't you?

12   A.   No, sir.

13   Q.   Joe Manarang told you not to arrest Mr. Moussaoui?

14   A.   Joe Manarang, sir, raised the point that maybe we should

15   consider not arresting Mr. Moussaoui and bringing surveillance

16   assets to Minneapolis in order to surveil him.  I persuaded him

17   otherwise.

18   Q.   Okay.  Now, you knew before you arrested Mr. Moussaoui that

19   Mr. Manarang thought the better course of action was not to arrest

20   him and surveil him and find out everywhere he went, right?

21   A.   Mr. Manarang wasn't advised of all the facts, sir, the

22   primary fact being that we had already notified the hotel clerk

23   that we were law enforcement and that we were interested in

24   Mr. Moussaoui.  Once he became aware of that fact and the

25   possibility then that Mr. Moussaoui could have been tipped off, he

Page 1039

1   revised his thinking.

2   Q.   Right.  And you also knew that if you hadn't arrested

3   Mr. Moussaoui, Mr. Manarang said because he was a foreign

4   national, you could have gone into his hotel room and searched it

5   while he was off at school, right?

6   A.   Not without an order, sir, either a FISA order or a search

7   warrant.

8   Q.   But you knew before you arrested Mr. Moussaoui that one of

9   the options you could have taken was to have waited while he went

10  to school and tried to get a warrant to go search his hotel room,

11  right?

12  A.   Yes, sir.

13  Q.   Right.  And if you had done that, you would have obtained

14  every item of information in the hotel room without alerting him

15  of a thing, right?

16  A.   If we had obtained the warrant, yes, sir, but that would have

17  been the key, the obtaining of the warrant.

18  Q.   Right.  But when you disobeyed -- you disregarded what

19  Mr. Manarang said, then that was no longer even a possibility, was

20  it?

21  A.   Sir, I didn't disregard what Mr. Manarang said.  We had a

22  conversation during which I persuaded him that the only tactical

23  course was to arrest him based on what had occurred.  Mr. Manarang

24  wasn't aware that we made contact with the hotel.  It is a basic

25  of any type of investigation where you are hunting a fugitive or

1    any person that once you make contact with someone who is in

2    contact with your subject, that the odds of them being notified go

3    up exponentially.

4    Q.   But you talked to Mr. Manarang before you went to the hotel,

5    didn't you?

6    A.   Yes, sir.

7    Q.   Right.  And he told you in that conversation that he wanted

8    you to be cautious, that there were other ways to deal with this,

9    that, for example, he could send you a surveillance team from

10   Chicago --

11   A.   No, sir, that conversation didn't occur until after we

12   notified the hotel clerk.

13   Q.   So you didn't wait to hear back from Mr. Manarang before you

14   made the decision -- Special Agent Samit decided on his own to go

15   ahead and arrest this guy, without getting full instructions from

16   headquarters, right?

17   A.   Sir, full instructions weren't required to arrest him.

18   Q.   You blew an opportunity to search Moussaoui's room even

19   without a warrant, didn't you, Agent?

20   A.   No, sir.

21   Q.   You know from your training that if someone is a foreign

22   national and suspected of being a terrorist, that you don't even

23   need a warrant to go into his room?

24   A.   Sir, that's, that's totally false.  That's not true at all.

25   Q.   You could -- doesn't FISA have an emergency provision in it,

Page 1041

1    Agent, didn't you learn in your training that you can get -- you

2    can actually enter a hotel room and do a search without a warrant?

3    A.    If we get emergency FISA authority, yes, sir.

4    Q.    You have -- they give the emergency FISA authority later,

5    right?

6    A.    We get the emergency FISA authority in advance of being able

7    to go in and search the room, and then within 72 hours, we need to

8    have an order signed by a FISA court judge.

9    Q.    And you didn't even try to do that, either, right?

10   A.    No, sir.

11   Q.    Right.  You were just -- you just wanted to arrest this guy

12   and collar him, right?

13   A.    No, sir.

14   Q.    Okay.  Didn't, didn't Manarang tell you he was going to send

15   surveillance teams to find Moussaoui?

16   A.    Again, sir, he told us that long after we had already

17   notified the hotel clerk and presented the possibility of tipping

18   Mr. Moussaoui off.  The surveillance would have been negated if at

19   breakfast the next morning the hotel clerk said to Mr. Moussaoui:

20   Hey, the FBI and Immigration was here asking about you, sir.

21         It wasn't a viable option.  Once I explained that to

22   Supervisory Special Agent Manarang, he saw the logic in that and

23   agreed immediately.

24   Q.    Okay.  But you didn't have full discussions with him and tell

25   him everything before you finally went ahead.  You said to the

Page 1042

1    jury last week that you and Agent Weess decided to arrest him,

2    right?

3    A.    Yes, sir.

4    Q.    And, in fact, what you told, you told Manarang was that it

5    was too late to implement his plan because you were going to

6    arrest him, right?

7    A.    For the reasons I explained to you, yes, sir.

8    Q.    And you serve on one of those surveillance squads, don't you?

9    A.    No, sir.

10   Q.    You don't -- you know that the FBI has special surveillance

11   squads, don't you?

12   A.    Yes, sir.

13   Q.    Including pilots, right?

14   A.    Yes, sir.

15   Q.    And there could have been ten -- how many agents just in

16   your, in the Minneapolis office could have been assigned to follow

17   Mr. Moussaoui around?

18   A.    At that time, sir, we didn't have a surveillance squad.  We

19   would have had to take members off of other squads.  The numbers

20   would have been subject to their caseload and their supervisor

21   availability.  I don't know how many we could have provided

22   ourselves.

23   Q.    And how many agents did Mr. Manarang tell you he was going to

24   send to Chicago --

25   A.    He didn't, sir.

Page 1043

1    Q.   Did he tell you that he was going to send a group from

2    Chicago?

3    A.   He said that he would make some calls and that there was a

4    possibility that Chicago could supply surveillance teams.

5    Q.   And he told you he could send people from New York as well,

6    right?

7    A.   He may have, sir.

8    Q.   And --

9    A.   I don't recall.

10   Q.   But it was too late by then, right?

11   A.   Yes, sir.

12   Q.   Now, did you receive -- look at Exhibit 901, if you would,

13   please, Agent Samit.

14        Your Honor, those are in chronological order `for you up

15   there, so it would be the first.

16        THE COURT:  Thank you, because they are not in numerical

17   order.  That's all right.

18        MR. MAC MAHON:  They are in CIPA designation.  It was

19   easiest for us to organize it this way.

20        THE COURT:  That's fine.  Are you going to be publishing

21   any of these?

22        MR. MAC MAHON:  Yes, we will be.

23        THE COURT:  All right.

24        THE WITNESS:  Yes, sir, okay.

25   BY MR. MAC MAHON:

Page 1044

1    Q.   Had you ever seen this exhibit before?

2    A.   I had not.

3    Q.   Did you learn in August of 2001 that the FBI had told the

4    President of the United States that there was suspicious

5    activities in the country consistent with preparations for

6    hijackings and other types of attacks?

7    A.   No, sir.

8    Q.   That information would have never filtered down to you,

9    right?

10   A.   I can't say that it never would have.  In this case it

11   didn't, sir.

12   Q.   Okay.  And you never received any information in August 2001

13   from headquarters that they had been concerned about hijackings in

14   the United States, right?

15   A.   No, sir, I didn't.

16   Q.   You weren't aware that there were preparations by Usama Bin

17   Laden to move his family?  You never heard that either, did you?

18   A.   No, sir.

19   Q.   In fact, as an agent on the street, you don't ever get any of

20   these warnings about what the head of the FBI thinks is going on,

21   right?

22   A.   That's not true, sir.  This one I didn't see.  We will

23   frequently see reporting on the FBI Internet, a web page, as to

24   what the director has told different members of the National

25   Command Authority.  In this case I didn't see this one, though.

Page 1045

1    Q.   But did you just say that you never received any information

2    in August of 2001 --

3    A.   That's correct.

4    Q.   -- or September of 2001 that the FBI and the United States

5    Government was concerned about al Qaeda trying to hijack planes in

6    the United States?

7    A.   Yes, sir, that's correct.  I did say that I did not see

8    anything like that.

9    Q.   Look, if you would, at Exhibit 628.

10   A.   Yes, sir.

11   Q.   Have you seen that before?

12   A.   I have.

13   Q.   Okay.  Could we put that up on the screen, please.

14         Now, before we go through this, in your direct you

15   didn't -- you didn't show the jury any of your work product in

16   this case, did you?

17         MR. NOVAK:  I object.  This has not been introduced in

18   evidence yet, and we're showing it on the screen?

19         THE COURT:  I'm sorry, it shouldn't be on the screen.

20   Is there an objection to this exhibit?

21         MR. NOVAK:  There has been no foundation at all as to

22   its admissibility at this point.

23         THE COURT:  Well, the witness said he had seen it.  I

24   thought I heard that testimony.

25         Agent Samit --

Page 1046

1              THE WITNESS:  Your Honor, I have seen it.

2              THE COURT:  When did you see it?

3              THE WITNESS:  Actually, I filled this out.  This is my

4    writing.

5              THE COURT:  Then there is no basis for the objection.

6              MR. MAC MAHON:  Move the admission of Exhibit 628, Your

7    Honor.

8              THE COURT:  628 is in.

9              (Defendant's Exhibit No. 628 was received in evidence.)

10   BY MR. MAC MAHON:

11   Q.   Okay.  Tell the jury what this is, Agent Samit.

12   A.   This is a memorandum that comprises a case opening form.

13   When the FBI initiates an investigation, we would fill out a form

14   like this so that they could be entered, the subject could be

15   entered into the computer system.

16   Q.   Okay.  And 199 you classified as what?

17              If I can show the jury?

18   A.   That's an international terrorism other case.

19   Q.   Okay.  So you knew as of August 15th that from even -- you

20   hadn't even talked to Mr. Moussaoui at this time, had you?

21   A.   No, sir.

22   Q.   And you knew it was an international terrorism case before

23   you even talked to him, right?

24   A.   I didn't know that for sure.  Because we were the

25   international terrorism squad, and because we had received

1    suspicious reporting, and because Mr. Moussaoui was not a United

2    States person, those three things allowed us to open an

3    international terrorism intelligence case.

4         I didn't know for sure that it would constitute

5    international terrorism.  On a lot of occasions, we will receive

6    reporting that on the face of it looks very suspicious, but once

7    we conduct some investigation and we begin looking into it, it has

8    an innocent explanation, and we very quickly close the case.

9    Q.   Now, did you -- when you talked to Mr. Manarang, did you tell

10   him that you would like not to open a case and just to investigate

11   Mr. Moussaoui?

12   A.   No, sir.  That would be a violation of attorney general

13   guidelines.  The FBI is not allowed to investigate people without

14   a case open.

15   Q.   Even -- even suspected terrorists, Agent?

16   A.   Anyone, sir.  We don't open -- we don't investigate people

17   without cases open.

18   Q.   Okay.  And there was no classified information or

19   FISA-generated information or anything about Mr. Moussaoui on

20   August 15, 2001, right?

21   A.   I don't understand your question.

22   Q.   This wasn't an intelligence investigation, you hadn't

23   received any intelligence on Mr. Moussaoui, was it?

24   A.   An intelligence investigation doesn't exist because

25   intelligence is received, sir.  An intelligence investigation is

1  opened and predicated for the purpose of collecting intelligence.

2  So it is not at all unusual for investigations to be opened absent

3  any intelligence but just some suspicious information.

4         It is called an intelligence case because the purpose is

5  to gather intelligence, not because intelligence previously

6  exists.

7  Q.   Right.  But once you opened it as a 199, you created yourself

8  problems with the wall, didn't you?

9  A.   Yes, sir.

10  Q.   And you knew that when you did it?

11  A.   Yes, sir, but I had no options.  I didn't have enough

12  criminal predication based on the information that I had received

13  from Pan Am.  All I had was suspicious information.

14         Although, yes, I did create myself problems, I had no

15  alternative.  The three options were a criminal case, which lacked

16  predication; to investigate Mr. Moussaoui without a case, which is

17  illegal; or to open an intelligence investigation.

18  Q.   Or you could have done what Mr. Manarang told you to do,

19  right?

20  A.   Sir, that -- those two aren't mutually opposed.

21  Q.   Did Mr. Manarang tell you you had to open a criminal case to

22  have Mr. Moussaoui tailed around and see who he went and talked

23  to, see who he met with, and see what was in his room?

24  A.   No, sir, that's, that's not correct.  He did not tell me

25  that.

Page 1049

1    Q.   If we can go down a little bit on this document.  Over here,

2    No. A on the right, Pam, please.

3              On August 15th, sir, you circled "counterterrorism"?

4    A.   Yes, sir.

5    Q.   Now, this was from a result of conversations that you heard

6    from somebody, correct?  You heard about Moussaoui from Clancy

7    Prevost, right?

8    A.   Not at the time this was opened, no, sir.  This was only on

9    the basis of Mr. Nelson's telephone call.

10   Q.   All right.  And we will get to that in your August 18th.  You

11   got substantial information from him about why they were concerned

12   about somebody who couldn't fly a plane at all paying cash and

13   trying to get on a flight simulator, right?

14   A.   Yes, sir.

15   Q.   And that information led you to circle "counterterrorism,"

16   right?

17   A.   No, sir.  The fact that we were the Joint Terrorism Task

18   Force, what you see under the heading NFIP, National Foreign

19   Intelligence Program, that's just how the FBI classifies the types

20   of investigations they have.

21             In this case I circled "counterterrorism" because that's

22   the squad I was on, and that's the description that this most

23   closely fit at the time.

24   Q.   But you knew that, you knew the minute you hung up the phone

25   with Mr. Nelson that you had a very substantial terrorism case on

Page 1050

1   your hands, didn't you?

2   A.   No, sir, not at all.  That's completely false.  I did not

3   know.

4   Q.   You didn't, you didn't know at that point in time that you

5   had -- that Mr. Moussaoui was the most dangerous man in the

6   history of the United States?

7   A.   Absolutely not, sir.

8   Q.   That came a couple days later?

9   A.   Yes, sir.  And even still, not the most dangerous man in the

10  United States.  A person of significance certainly, but the most

11  dangerous man in the United States, no, sir.

12  Q.   Well, your exact words were "gravest threat ever to national

13  security," weren't they?

14  A.   Where were those, sir?

15  Q.   You didn't use those words?

16  A.   I can't recall ever using those words, no, sir.

17  Q.   All right.  Let's go to Exhibit 949 if we could, please.

18  A.   Yes, sir.

19  Q.   Have you seen that before?

20  A.   It looks like Special Agent Weess's writing.  I have

21  certainly seen that information before.  As to this exact

22  document, I don't think so.

23  Q.   It is from your file, isn't it, from your investigative file

24  in Minneapolis?

25  A.   It may very well be, yes, sir.

1    Q.   Okay.  And that's your -- one of the immigration agents in

2    the case, right?

3    A.   Yes, sir.

4    Q.   Okay.  I'd move the admission of 949, Your Honor.

5            MR. NOVAK:  No objection.

6            THE COURT:  All right.  It is in.

7            (Defendant's Exhibit No. 949 was received in evidence.)

8    BY MR. MAC MAHON:

9    Q.   Okay.  What is -- if we can put that up on the screen,

10   Ms. Bishop, the first page, please?

11           Tell the jury what that is, Agent Samit.

12   A.   It is a document that says "French Passport."  It has

13   Mr. Moussaoui's date of birth and his name, as well as the date

14   and place he entered the United States.

15   Q.   All right.  And that's the correct spelling of his name and

16   the correct birthdate, and you had it on the 15th of August,

17   right?

18   A.   Yes, sir.

19   Q.   Can we show the next page, please?

20           Can you tell the jury what this is, Agent Samit?

21   A.   This is an Immigration and Naturalization Service entry

22   record.  It shows when a person enters the United States and the

23   circumstances under which they do so.

24   Q.   Okay.  And did you see this in August of 2001?

25   A.   Probably not.  The information was relayed to me by Special

Page 1052

1    Agent Weess.  Again, it looks like his writing.

2    Q.   But --

3    A.   I wouldn't have, I wouldn't have necessarily seen this

4    document.  I wouldn't need to.  The information that it contained

5    was relayed to me.

6    Q.   Okay.  And if we could, you learned that he had been, was a

7    student at Airman Flight School, right?

8    A.   Yes, sir.

9    Q.   You learned that day that he had been learning to fly since

10   2001, right?  On or about that day, you learned this information?

11   This is before you even arrested him, right?

12   A.   No, I would not have learned all that.  In fact, some of

13   these notes may have been made after the date of this printout.

14   This looks like Special Agent Joe Rivers, another agent on the

15   squad's, writing down here at the bottom.  This information may

16   have been obtained -- the written information, the text down here

17   that you circled, sir, may have been placed on this document after

18   the 15th.

19   Q.    Okay.  But let's go all the way to the bottom, if we could,

20   Ms. Bishop.

21        Why don't you show that to the jury, if you could.

22   A.   It says "Lead on Bin Laden, personal pilot."

23   Q.   So as of August 15th, someone in your investigative crew knew

24   that one of Bin Laden's, Usama Bin Laden's pilots had trained at

25   the Airman Flight School, right?

1   A.   Sir, I don't know when this -- as I told you, I don't know

2   when these, this writing was done on this document.  Understanding

3   that the documents are printed out, provided to us by Immigration,

4   and kept as a record over the long term, this writing could have

5   been added anytime subsequent to August 15th.

6   Q.   Whose handwriting is that?

7   A.   Special Agent -- I believe it is Special Agent Joe Rivers on

8   our squad.

9   Q.   Okay.  Did you know on August 15th that Usama Bin Laden

10  was -- had trained a personal pilot at Airman Flight School?

11  A.   No, sir.

12  Q.   Nobody told you that?

13  A.   No, sir.

14  Q.   Is this the first time you learned that?

15  A.   No, it is not.  This is the first time I have seen this

16  document.  It is not the first time that I learned that fact.

17  Subsequent to 9/11 I learned that a personal pilot of Bin Laden

18  had trained at Airman Flight School.

19  Q.   So whoever put this on here before 9/11 didn't tell you,

20  Agent, right?

21  A.   Again, sir, I don't know that this was put here before 9/11.

22  In fact, it is important to understand that Special Agent Joe

23  Rivers' role in this case, if this is his handwriting, came after

24  September 11th.  In fact, when a criminal case was opened after

25  September 11, that's when Special Agent Rivers was brought into

1   this investigation.

2          He was responsible for preparing an unclassified summary

3   of the investigative facts, and so it is very likely that this was

4   added after September 11th.

5   Q.   Agent Samit, you have no idea when Joe Rivers wrote this on

6   this piece of paper, do you?

7   A.   No, sir.

8   Q.   The visa number was something he would have written on August

9   15th on a piece of paper, right?

10  A.   Sir, I don't know.

11  Q.   So you have no idea?

12  A.   I don't, but I do know when Special Agent Rivers was involved

13  in the investigation, and it was after September 11th.

14  Q.   Nobody told you before 9/11 that there were al Qaeda members

15  training as pilots in the United States?

16  A.   No, sir.

17  Q.   Nobody sent you the Phoenix memorandum?

18  A.   No, sir.

19  Q.   Didn't search for it?

20  A.   No, sir.

21  Q.   Look at Exhibit 326, if you would, please.

22          THE COURT:  Any objection to 326?

23          MR. NOVAK:  Judge, may I get a copy?  I will say this,

24  the last objection, the copy that was given to us by defense

25  counsel was not what was put on the screen.  That's why it is

Page 1055

1    taking us a couple minutes to figure it out.

2            THE COURT:  All right.  Well, take a quick look at 326.

3    It appears to be an e-mail from Agent Samit -- to Agent Samit.

4            MR. NOVAK:  We have no objection.

5            THE COURT:  All right.  It is in.

6            (Defendant's Exhibit No. 326 was received in evidence.)

7    BY MR. MAC MAHON:

8    Q.    Have you seen this before, Agent Samit?

9    A.    Yes, sir.

10   Q.    Tell the jury what this is.

11   A.    This is an e-mail that I sent to our office in Paris, to the

12   assistant legal attache in Paris.

13   Q.    Okay.  And is this before you arrested Moussaoui, right?

14   A.    Yes, sir.

15   Q.    And if we could blow up at the bottom of the paragraph,

16   please?

17           Could you read that, the two sentences, the sentence

18   starting with "He paid" to the jury, please, Agent Samit?

19   A.    "He paid between 6,000 and 8,000 dollars to essentially learn

20   how to take off and land the 747-400.  His excuse is weak, he just

21   wants to learn how to do it.  That's pretty ominous and obviously

22   suggests some sort of hijacking plan."

23   Q.    All right.  That's before you even talked to him, right?

24   A.    Yes, sir.

25   Q.    Did you -- do you remember when your conversations were with

Page 1056

1    Mr. Manarang?

2    A.   I don't remember exactly, but on the 15th and then again on

3    the 16th.

4    Q.   And in no piece of paper that you prepared in the course of

5    your investigation did you ever reference any of your

6    conversations with Agent Manarang, did you?

7    A.   No, sir.

8    Q.   Okay.  And his role at the FBI was what?

9    A.   He was assigned to the Iran Unit.

10   Q.   How much experience did he have as a terrorist investigator

11   at that time?

12   A.   I don't know, sir.

13   Q.   Never asked him?

14   A.   No, sir.

15   Q.   A lot more than you did, right?

16   A.   I don't know, sir.

17   Q.   He was in the -- what section was he in?

18   A.   The Iran Unit.

19   Q.   Of what?

20   A.   FBI headquarters.

21   Q.   International Terrorism Operation Section?

22   A.   Yes, sir.

23   Q.   You don't have any idea what his experience level was, right?

24   A.   No, sir.

25   Q.   He was in charge of that section, wasn't he?

Page 1057

1   A.   No, sir, I believe he was a desk supervisor in that section.

2   The person in charge of that section would have been the

3   International Terrorism Operation Section person.

4   Q.   Did you ever call him to see whether it was wise to arrest

5   Moussaoui or not?

6   A.   No, sir.

7   Q.   Look at Exhibit 49, if you would, please.

8        THE COURT:  Any objection to 49?

9        MR. NOVAK:  No.

10       THE COURT:  All right, it is in.

11       (Defendant's Exhibit No. 49 was received in evidence.)

12  BY MR. MAC MAHON:

13  Q.   What is Exhibit 49, Agent?

14  A.   Sir, it is an electronic communication from our squad to the

15  State Department special agent assigned to the Chicago Joint

16  Terrorism Task Force.

17  Q.   Okay.  The precedence line here at the top, "immediate," what

18  does that mean?

19  A.   It means that the people who are receiving this are requested

20  to cover the lead, that is, to comply with the request in the

21  communication as quickly as possible.

22  Q.   And that's because after you, after you interviewed

23  Moussaoui, Mr. Moussaoui, you knew for a fact that you had a

24  terrorist on your hand who was getting flight training, isn't that

25  right, Agent Samit?

Page 1058

1   A.   Yes, sir.

2   Q.   Right.  And that's why you set about to get everybody in the

3   government to react immediately to your requests, correct?

4   A.   Yes, sir.

5   Q.   And Mr. Rivers actually read this, too, didn't he?

6   A.   Yes, sir.  Mr. Rivers was requested to send this lead because

7   he knew Special Agent Childs, the Department of State agent.  I

8   provided the information to Mr. Rivers, essentially the text to

9   Mr. Rivers.  He dropped it into an EC and sent it to Special Agent

10  Childs with the request.

11  Q.   Mr. Rivers was involved in your investigation of

12  Mr. Moussaoui before September 11th, wasn't he, Agent?

13  A.   No, sir, just to the point where he sent one communication

14  for us.  Doing administrative paperwork to facilitate leads does

15  not constitute investigation.  He was not involved in the

16  investigation.

17  Q.   And you weren't consulting with him at all about it?

18  A.   I'm sorry, what was the question?

19  Q.   Did you ever consult with him between the time of August 15th

20  and 9/11 about the investigation?

21  A.   No, sir.  I sent him, I sent him an e-mail.  He was copied on

22  the e-mail traffic.  We discussed the significance.  We discussed

23  ways to run leads, but in terms of consultation, it was Special

24  Agent Weess and myself before 9/11.

25  Q.   It was your case, right, Agent Samit?

Page 1059

1    A.    Yes, sir, although Special Agent Weess, it should be noted,

2    was the officially designated co-case agent.

3    Q.    So when we find e-mails and a lot of communications involving

4    Mr. Rivers, then that's just all administrative stuff, right?

5    A.    Yes, sir, that's correct.

6         MR. MAC MAHON:  Go to the third page, if you would,

7    please, Ms. Bishop, where it says "background."  Just back it off

8    a little bit, please.

9    BY MR. MAC MAHON:

10   Q.    Do you see where it says there that al-Attas was interviewed

11   and claimed that Moussaoui regularly speaks of jihad?

12   A.    Yes, sir.

13   Q.    Okay.  And "jihad" is a term that is frequently invoked by

14   Muslim fundamentalists and al Qaeda members; isn't that right?

15   A.    Yes, sir.

16   Q.    And you knew that then?

17   A.    Yes, sir.  But it is also a term that's frequently invoked by

18   radical Muslims who are not members of al Qaeda, who are members

19   of any Islamic fundamentalist-based group.  There's dozens of them

20   out there, sir, and so jihad does not equal al Qaeda.

21   Q.    Agent Samit, when you interviewed al-Attas, you said:

22   "Doesn't jihad mean holy war," didn't you?

23   A.    Yes, sir, but other groups other than al Qaeda have embarked

24   on holy wars, sir.

25   Q.    But when you say that al-Attas says that Moussaoui talks

Page 1060

1   about jihad, you were talking about holy war, not anything else,

2   right?

3   A.   And the same holy war that I was talking about is embarked on

4   by other groups as well, sir.

5   Q.   But you don't put "holy war" in any of your warnings to

6   everybody in Washington, right?

7   A.   No, sir.

8           MR. MAC MAHON:  Show him Exhibit 32 -- and move the

9   admission of --

10          THE COURT:  49 is in.

11          MR. MAC MAHON:  Thank you, Your Honor.

12          32, please?

13          THE COURT:  Is there any objection to 32?

14          MR. NOVAK:  No objection.

15          THE COURT:  All right.  It is in.

16          (Defendant's Exhibit No. 32 was received in evidence.)

17   BY MR. MAC MAHON:

18   Q.   Have you seen Exhibit 32 before, Agent?

19   A.   Yes, sir.

20   Q.   What is that?

21   A.   This is a sworn statement that Special Agent Weess and myself

22   took of Mr. al-Attas on August 17th.  In fact, that's my writing.

23   Q.   This is your handwriting?

24   A.   It is, yes, sir.

25          MR. MAC MAHON:  Can you pull that back a little bit,

Page 1061

1  please.

2  BY MR. MAC MAHON:

3  Q.   Now, this is the only written statement you have ever got

4  from al-Attas at all, right?

5  A.   Yes, sir.

6  Q.   Okay.  Did you ever get a written statement from Moussaoui?

7  A.   No, sir.

8  Q.   Did you ever ask him for one?

9  A.   No, sir.

10  Q.   And you didn't tape your interview with him, right?

11  A.   No, sir.

12  Q.   No video of it?

13  A.   Correct.

14  Q.   Is there some reason why you didn't ask Moussaoui for a

15  written statement?

16  A.   Yes, sir.

17  Q.   Didn't think he would sign one?

18  A.   He was providing us plenty of verbal statements.  It was

19  difficult to pin Mr. Moussaoui down.  We didn't think that there

20  would be any substance to a written statement from him.

21  Q.   Is that something you talked about with one of the agents

22  while you were there?

23  A.   No, sir.

24  Q.   So on the first day, August 17th, this man, Hussein al-Attas,

25  under oath tells you that Moussaoui uses a false name, right,

Page 1062

1   Shaqil?

2   A.   Yes, sir.

3   Q.   Was that his war name?  Did you ask him that?

4   A.   I did not, no, sir.

5   Q.   But you knew that Moussaoui was using a false name?

6   A.   Yes, sir.

7   Q.   But it wasn't a war name like Mr. Novak asked you; it was

8   just a false name, right?

9   A.   I later learned it was one of his war names, but at that time

10  I only knew it was a false name, a name not assigned to him, not

11  his own.

12  Q.   All right.  And Mr. al-Attas told you and signed under oath

13  that if Shaqil were to see a non-believer harming a Muslim in any

14  way, he would harm the non-believer secretly.  He has referred to

15  non-believers as Jews and Christians.

16        That's something you learned in the first day, right?

17  A.   Yes, sir, from Mr. al-Attas.

18  Q.   And that's pure Islamic fundamentalism, radical al Qaeda

19  rhetoric, isn't it?

20  A.   I'd stop you, sir, I would say it is pure Islamic

21  fundamentalism, yes, sir.  Al Qaeda, al Qaeda, they subscribe to

22  that, but there are many other terrorist groups which also do,

23  sir.

24  Q.   Let's just say it was pure -- it was very obvious to you

25  after hearing that rhetoric attributed to Shaqil that he was a

Page 1063

 1   terrorist, right?

 2   A.   That he was an Islamic fundamentalist.

 3   Q.   And --

 4   A.   The difference, sir, I should add, the difference between an

 5   Islamic fundamentalist and a terrorist is that an Islamic

 6   fundamentalist has a certain series of beliefs consistent with a

 7   very radical form of Islam.  A terrorist is someone who subscribes

 8   to those beliefs but will take steps to act upon that or to

 9   support people who are involved in that.

10   Q.   Right.  And you --

11   A.   And there is a big distinction between those two.

12   Q.   Thank you, Agent.  But you knew that day, you thought, had

13   reason to believe that that man was a terrorist, right?

14   A.   Yes, sir.

15   Q.   And you probably wrote at least 70 pieces of paper or

16   references to him as a terrorist before 9/11, right?

17   A.   70 individual pieces of paper?

18   Q.   70 references to Moussaoui as a terrorist you sent to your

19   superiors in government before 9/11, somewhere around there,

20   right?

21   A.   Probably, yes, sir.

22   Q.   And a Muslim fundamentalist, right?

23   A.   Yes, sir.  Radical fundamentalist would be more accurate.

24   Q.   And they ignored every one of them, didn't they?

25   A.   No, sir, that's not true.

Page 1064

1   Q.   They didn't even ask for a search warrant, right?

2   A.   That's correct.

3   Q.   And you learned that same day, on August 17th, that

4   Moussaoui -- and can we put that up again, please, Ms. Bishop?

5   Focus on the paragraph 2.

6           That Shaqil had stated that a true Muslim should know

7   about the pain of Muslims in various countries.  I can recall that

8   he discussed Palestine, Kashmir, Macedonia, Kosovo, Philippines,

9   and Chechnya, right?

10  A.   Yes, sir.

11  Q.   And that's more, that's more Bin Laden rhetoric, Muslim

12  fundamentalism as well, right?

13  A.   Again, it is a mischaracterization to say it is Bin Laden

14  rhetoric.  He is one of the people who subscribes to that, but

15  many other radical fundamentalists do as well.

16          And I should also add, sir, it is important to

17  distinguish between my investigative hunches, my suspicions, and

18  what I can prove legally.  Had Mr. Moussaoui told us these facts

19  on that date, it would have been a radically different story.

20  Q.   Well, that's what you think, right?

21  A.   Yes, sir, that is what I think.

22  Q.   If you'd done what Manarang told you, it might have been a

23  different story, too, right?

24  A.   No, sir.  If I had done what I was able to persuade

25  Mr. Manarang not to do, Mr. Moussaoui might have been tipped off

Page 1065

1    and radically altered his plans.

2    Q.   Agent, we will never know, will we?

3    A.   No, sir.

4    Q.   But this confirmed your suspicion that Moussaoui was a

5    terrorist, that he was running around talking about these same

6    kind of issues, right?

7    A.    It strengthened my suspicion.  The only thing that would have

8    confirmed my suspicion, sir, is if Mr. Moussaoui had admitted that

9    himself when asked.

10   Q.   Agent, are you going to tell this jury that the only way you

11   can get a search warrant is if somebody, if you were to ask him:

12   Are you a terrorist, if they said yes or no?

13   A.   No, sir.

14   Q.   All right.  And that's not how the FBI acts to defend this

15   country, either, is it?

16   A.   I'm sorry?

17   Q.   You don't wait for terrorists to say:  You know what?  I am a

18   terrorist?

19   A.   No, sir.

20   Q.   Right.  And your investigation here was to uncover the facts

21   that Moussaoui was, in fact, a terrorist, right?

22   A.   That's correct.

23   Q.   All right.  And you uncovered those facts, didn't you?

24   A.   I uncovered enough facts to generate suspicion in my mind

25   that he was a terrorist, but that's a far distance from being able

Page 1066

1    to prove it, sir.

2    Q.    Okay.  You knew before August 30th that Moussaoui had been to

3    Afghanistan to training camps, didn't you?

4    A.    No, sir.

5    Q.    Nobody ever told you that?

6    A.    No, sir.

7    Q.    That he'd been to Afghanistan, right?

8    A.    Correct.  Yes, sir.  No one had told me that.  I didn't learn

9    of that until after September 11.

10    Q.    Right.  But the FBI knew before -- on August 30th that

11    Moussaoui was a Bin Ladenite who had been to Afghanistan, and they

12    didn't do a thing with the information, did they?

13    A.    Sir, I have never seen that the FBI knew that before August

14    30th.  That's totally false.

15    Q.    Okay.  We will get to that document then, Agent.  We will get

16    there soon.

17            Now, on the next page, it says that Shaqil has refused

18    to reveal his sheikh for me.

19    A.    His sheikh.  "Shaqil has refused to reveal his sheikh to me

20    for fear that I would not like him (his sheikh) because of his

21    sheikh's beliefs or country of origin."

22    Q.    And did you ask, did you ask Mr. al-Attas who Moussaoui's

23    sheikh was?

24    A.    I did.

25    Q.    And what prompted you to ask that question?

Page 1067

1   A.   Because often it is important when dealing with a member of a

2   terrorist group to understand what religious leader they follow so

3   we can identify the group.  The purpose of that question was

4   precisely because we had not identified the group, and

5   Mr. al-Attas's inability to answer that question denied us the

6   ability to identify the group.

7   Q.   You also asked him about Moussaoui pointing out Usama Bin

8   Laden to him on a television, didn't you?

9   A.   Yes, sir.

10  Q.   So you needed him to confirm -- if Moussaoui is pointing

11  people out to Usama Bin Laden -- pointing Usama Bin Laden out to

12  people, there is nothing you as an agent can do with that

13  information if it is not confirmed; is that what you're telling

14  this jury?

15  A.   It is not there is nothing I can do as an agent, but

16  reasonable minds will differ as to the strength of our argument.

17  And, again, it is fairly certain that what I had was a reasonable

18  suspicion rather than the proof that your client could have

19  provided me, sir.

20  Q.   You never even asked a judge for a warrant, did you?

21  A.   I didn't?  No, sir, that's correct, I did not.

22  Q.   Look at Exhibit 948, if you would, please.

23           THE COURT:  Is there any objection to this exhibit?

24           MR. NOVAK:  Yes, Judge.  This is not his document that

25  he referred to.

Page 1068

1              MR. MAC MAHON:  I will ask him if he has seen it, Your

2     Honor.

3              THE COURT:  All right.

4     BY MR. MAC MAHON:

5     Q.   Have you ever seen this document before?

6     A.   No, sir.

7     Q.   Okay.  Isn't it a fact that -- don't put it up on the screen,

8     Ms. Bishop.

9              Isn't it a fact that on that same day that you

10    interviewed Hussein al-Attas, he also told you that Moussaoui used

11    the computer to access various websites related to the Islamic

12    jihad and other terror organizations?

13    A.   No, sir.  What Mr. al-Attas told us was he had looked at

14    fatwahs online.

15             I'm just trying to catch up to you, sir.  Does it say

16    that in this document?

17    Q.   Look at the second page and see if it refreshes your

18    recollection, of what Hussein al-Attas told you on August 16th,

19    2001.

20    A.   Yes, sir.  That's obviously a mistake by the person who wrote

21    this.  They were just amplifying, it looks like Bill Koch was

22    amplifying information he had received.  That's actually not what

23    we relayed to them.

24    Q.   Okay.  And he didn't -- al-Attas didn't tell you that

25    Moussaoui corresponded by e-mail with people connected to

Page 1069

1   terrorist organizations, either?

2   A.   No, sir.  It says -- in fact, this document doesn't say that.

3   It says various websites related to the Islamic jihad and other

4   terrorist organizations.

5          What Mr. al-Attas, in fact, told us was that

6   Mr. Moussaoui used the Internet to look at fatwahs online.

7   Q.   Why don't you finish -- since you want to read this to the

8   jury, why don't you finish the sentence then, Agent Samit?

9          MR. NOVAK:  Judge, I object.  He is trying to go the

10  back door way that he's not allowed to.

11         MR. MAC MAHON:  I was asking if it refreshed it.  Now

12  he's read it to the jury.  We might as well finish the sentence,

13  Your Honor.

14         THE COURT:  Well, I think the witness volunteered to

15  read a portion of the document.  I think to give the jury context,

16  he should read the surrounding language, and that's all.  He can

17  certainly cross-examine him about that.  Overruled.

18  BY MR. MAC MAHON:

19  Q.   Go ahead.  Finish reading the paragraph to the jury.

20  A.   "Furthermore, the Yemeni national stated that the suspect

21  also corresponded via e-mail with various individuals, believed

22  connected with terrorist organizations."

23  Q.   Okay.  And Bill Koch, is that how you pronounce his name?

24  A.   Yes, sir, that's correct.

25  Q.   And that's someone who works in the U.S. Attorney's Office in

Page 1070

1   Minneapolis, right?

2   A.   It is.

3   Q.   Okay.  Did you have any conversations with him after you

4   interrogated Moussaoui and Al-Attas about obtaining a search

5   warrant?

6   A.   No, sir.

7   Q.   Okay.  Mr. Jones did, though, right?

8   A.   Mr. Jones did.  I believe Mr. Jones did on the afternoon of

9   the 16th as the interviews were ongoing.

10  Q.   Okay.  And Peg Magill is another person, another lawyer in

11  the U.S. Attorney's Office who was consulted about getting a

12  search warrant, correct?

13  A.   She was not consulted to get a search warrant.  We did not

14  actually go to any attorneys in the U.S. Attorney's Office to get

15  a search warrant.

16  Q.   You asked them whether they could, you could get a search

17  warrant, correct?

18  A.   Supervisory Special Agent Jones gave them a heads-up of what

19  we had.  We were not able to formally request a search warrant of

20  the United States Attorney's Office.

21  Q.   And you were told that they would prepare the search warrant

22  affidavit for you and present it to a judge, and then you never

23  called them back; isn't that right?

24  A.   No, sir.

25  Q.   You never called them back at all, did you?

 1   A.    No, sir.  We were not permitted to.

 2   Q.    By -- the people in Washington didn't let you do it, right?

 3   A.    Yes, sir, that's correct.

 4         THE COURT:  I'm sorry, let me make sure I understand

 5   this.  In other words, you and the field agents in Minneapolis

 6   were prepared to ask the United States Attorney's Office to get a

 7   criminal search warrant; is that right?

 8         THE WITNESS:  Your Honor, it is correct.

 9         THE COURT:  Okay.  And field agents cannot on their own

10   go to the U.S. Attorney's Office when they believe there is

11   criminal activity afoot and get a search warrant without

12   permission from headquarters to do so?

13         THE WITNESS:  Your Honor, under the rules prevailing in

14   August 2001, with the wall in place between intelligence and

15   criminal investigations, that's correct.  We were not able to do

16   that.

17         THE COURT:  What if you had opened that case initially

18   as a criminal case?

19         THE WITNESS:  Then I would not have needed authority to

20   do that.

21         THE COURT:  So by having checked the intelligence box,

22   the wall went into effect?

23         THE WITNESS:  That's correct, Your Honor.  But, again,

24   predication of a crime didn't exist at the time we began

25   investigating Mr. Moussaoui.  It was only after the interviews had

Page 1072

```
 1   occurred that we were able to determine that there was evidence of

 2   a criminal conspiracy, so by then we were already down the road of

 3   the intelligence investigation, and we needed headquarters'

 4   authority either to go to the United States Attorney's Office for

 5   that search warrant, for criminal techniques at that point.

 6            THE COURT:  Isn't the -- wasn't the main reason for the

 7   wall, as you understood it, between intelligence and criminal

 8   matters the fact that in an intelligence matter, some techniques

 9   were permitted to be used by agents that would not fly in a

10   civilian court?

11            THE WITNESS:  Yes, Your Honor.  That would not fly in a

12   non-FISA court context, yes.

13            THE COURT:  Right.  Had any of those unusual techniques

14   been used up to that point in that case?

15            THE WITNESS:  They had not, Your Honor, but it was, it

16   was the concern about the appearance of abuse that we were trying

17   to get around, that we'd somehow used any criminal information or

18   any criminal techniques supported by information gathered under

19   intelligence auspices.  That was the concern.

20            The attorney general guidelines and the FBI manuals

21   clearly stated that Department of Justice had to provide authority

22   to contact the United States Attorney's Office, that we could

23   not -- once the criminal investigation -- or once the intelligence

24   investigation had been opened and once that investigation had

25   proceeded, in order to contact the U.S. Attorney's Office to use a
```

Page 1073

1   criminal technique, we needed to get their authority.

2           THE COURT:  Even though every technique you had used up

3   to that point are standard techniques you would use in a criminal

4   case?  I mean, you had gotten the tip from someone in the

5   community, right?

6           THE WITNESS:  Yes, Your Honor.

7           THE COURT:  You hadn't used a FISA warrant or some sort

8   of intelligence asset to get this information, just a walk-in off

9   the street?

10          THE WITNESS:  Correct.

11          THE COURT:  And then you interviewed the walk-in the way

12  you would in any kind of a criminal investigation, and then you

13  followed up on leads as a result of that?

14          THE WITNESS:  Yes, Your Honor.  Those were the rules

15  that prevailed pre-9/11, and they still exist for foreign

16  counterintelligence investigations today.

17          THE COURT:  All right.  Go ahead.

18  BY MR. MAC MAHON:

19  Q.   And you knew all of that when you opened this up as an

20  intelligence investigation, didn't you, Agent Samit?

21  A.   Yes, sir.

22  Q.   And to follow up on what the Judge said, you didn't have a

23  warrant, wiretap, you hadn't done a FISA mail cover or anything?

24  A.   The merest existence of the intelligence investigation was

25  sufficient to trigger the wall.

Page 1074

1   Q.   Look at Exhibit 631, if you could, please.  Have you seen

2   that before, Agent?

3   A.   Yes, sir.  Those are my notes.

4              THE COURT:  Any objection?

5              MR. NOVAK:  No objection.

6              THE COURT:  All right.  Do you want to move that one in?

7              MR. MAC MAHON:  Yes, please, Your Honor.

8              THE COURT:  All right.  631 is in.

9              (Defendant's Exhibit No. 631 was received in evidence.)

10  BY MR. MAC MAHON:

11  Q.   Exhibit 631 is a one-page document, right?

12  A.   Yes, sir.

13  Q.   Okay.  These are all -- pull that back, please, Ms. Bishop.

14              These are all the notes that you took when you

15  interrogated Mr. Moussaoui in Minneapolis, aren't they?

16  A.   During the August 17th interview, those are my notes, yes,

17  sir.

18  Q.   So all the testimony you gave about all the questions and the

19  answers and what happened, your only written record now, almost

20  four-and-a-half years ago, is contained on Exhibit 631?

21  A.   My only written record, yes, sir.  Special Agent Weess was

22  also taking notes that day.

23  Q.   Have you seen his notes?

24  A.   I saw them at the time, at the time we were doing the

25  write-up, yes, sir.

Page 1075

1   Q.   Have you seen them since?

2   A.   I have not.

3   Q.   And if we look at Exhibit -- just let's stay with that.  So

4   this is everything, huh, Agent?

5   A.   These are all the notes that I took, yes, sir.  You should

6   understand that that day on the 17th, I was the primary

7   interviewer, so I was doing most of the talking and very little of

8   the writing.

9   Q.   August 16th you took no notes, right?

10  A.   I took notes as well on that date, yes, sir.

11  Q.   What did you do with those notes?

12  A.   They were placed in the file as well.

13  Q.   Where are they?

14  A.   I don't know, sir.  The case file.

15  Q.   Did you look for them?

16  A.   I utilized them when I wrote the report and then placed them

17  in the case file.

18  Q.   Did you look for them to give to the defense lawyers in this

19  case in the last four years?

20  A.   No, sir.

21  Q.   Anybody ask you to?

22  A.   No, sir.

23  Q.   It says -- you testified that Mr. Moussaoui sent you on, I

24  believe, a bunch of wild goose chases.  Was that your testimony?

25  A.   Yes, sir.

Page 1076

1    Q.    Okay.  Did you send somebody to Germany to find Habib?

2    A.    No, sir.

3    Q.    Did you send anybody to Pakistan to find Ahmed Atif?

4    A.    No, sir.

5    Q.    Did you send anybody to Holland to find this Dutch company?

6    A.    No, sir.

7    Q.    Did you send anybody to France to find this senator that had

8    bailed him out of court?

9    A.    No, sir.

10   Q.    What you did was you sent information -- you sent requests

11   out to France that had his correct name, date of birth, and you

12   asked for information, correct?

13   A.    Yes, sir, and to the United Kingdom as well.  And that's

14   actually precisely the point of my wild goose chase argument.

15   Although he had been to --

16           MR. MAC MAHON:  Your Honor, there is no question

17   pending.

18           THE COURT:  Yes.

19           MR. NOVAK:  Give him a chance to answer the question.

20           THE COURT:  No, no, no.  Frankly, I was surprised that

21   we didn't pull an objection sooner.

22           Just answer the specific question, Agent.

23           THE WITNESS:  Yes, Your Honor.

24           MR. MAC MAHON:  Thank you, Your Honor.

25   BY MR. MAC MAHON:

Page 1077

```
 1   Q.   Look at, look at 629 if you would, please.

 2             THE COURT:  Any objection?

 3             MR. NOVAK:  One moment, Your Honor.

 4             No objection.

 5             THE COURT:  All right.  It is in.

 6             (Defendant's Exhibit No. 629 was received in evidence.)

 7   BY MR. MAC MAHON:

 8   Q.   Have you seen this before?

 9   A.   Yes, sir.

10   Q.   What is this?

11   A.   This is an e-mail I sent to different members of my squad as

12   well as an agent in Oklahoma City and an agent in our office in

13   Paris, just bringing them up to date on what the investigation had

14   revealed.

15   Q.   Okay.  And this is -- these two addresses, this information

16   from the French passport that you got from Moussaoui, that was

17   entirely correct, wasn't it?

18   A.   Yes, sir.

19   Q.   And that, within a matter of a couple days, led you to some

20   very important information, didn't it?

21   A.   Yes, sir, from the -- you are referring to the information

22   from the French?

23   Q.   Yes, sir.

24   A.   Yes.

25   Q.   And this U.K. driver's license that he gave you and the
```

Page 1078

1    address was absolutely correct, too, wasn't it?

2    A.    No, sir.

3    Q.    He didn't have an address of Lambert Road, London, England?

4    A.    He had an address of Lambert Road, but we subsequently

5    learned he never resided there.

6    Q.    But that was an address that he used when he was in London,

7    correct?

8    A.    It was an address that was on his driver's license.  The

9    results I have seen have showed that he never used that address,

10   the investigative results from the U.K.

11   Q.    And look on the bottom here.  It says Moussaoui told you that

12   his original passport had gone through the washing machine, right?

13   Do you see that?

14   A.    Yes, sir.

15   Q.    You didn't believe it when he said it, did you?

16   A.    I, I -- I didn't have any reason not to believe it.

17   Q.    Agent, your training, you know that terrorists and Muslim

18   fundamentalists are always altering documents, getting new

19   documents to hide their travel, right?

20   A.    Yes, sir.

21   Q.    And one way they do that is to claim they went through the

22   washing machine, right?

23   A.    Yes, sir.  And actually, sir, if I can answer your question,

24   one way to do that is actually to put it through the washing

25   machine.

Page 1079

1  Q.  I understand.  But you knew that before you met Moussaoui?

2  A.  Yes, sir.

3  Q.  Go to the next page, if you would, please.

4      Sorry, Judge, I keep forgetting to un-yellow.

5      Read that to the jury, if you would.

6  A.  "Interviews of the above individuals indicate radical Islamic

7  fundamentalist beliefs held at least by Moussaoui."

8  Q.  Okay.  And this is on August 17th, right?

9  A.  Yes, sir.

10  Q.  Okay.  Who were all the recipients on this e-mail?

11  A.  Members of my squad as well as an agent in Oklahoma City and

12  an agent at our office in Paris.

13  Q.  Okay.  And the people in Paris especially got back to you,

14  right?

15  A.  Yes, sir, they did.

16  Q.  But you didn't get anything back from England until after

17  9/11, did you?

18  A.  That's correct.

19  Q.  All right.  Let's look at Exhibit 472, if we could, please.

20      THE COURT:  Is there any objection to this?

21      MR. NOVAK:  No objection, Judge.

22      THE COURT:  All right.  It is in.

23      (Defendant's Exhibit No. 472 was received in evidence.)

24      THE WITNESS:  Yes, sir.

25  BY MR. MAC MAHON:

Page 1080

1    Q.    Okay.  What is this exhibit?

2    A.    This is my opening communication, my opening electronic

3    communication in the Moussaoui investigation.

4    Q.    Okay.  And the precedence on this is what?

5    A.    Immediate, sir.

6    Q.    And why was that?

7    A.    Because I felt based on the two days of interviews that had

8    been done, that we had some fairly urgent time-sensitive

9    investigation that needed to be done.

10   Q.    Right.  You thought you had a terrorist who was planning a

11   terrorist attack, right?

12   A.    Yes, sir.

13   Q.    And you wanted everybody in the whole government to know what

14   you had found, right?

15   A.    Yes, sir, that's correct.

16   Q.    That was the intent of this document, was to put everything

17   there to tell them what you had learned and what your conclusions

18   were, correct?

19   A.    Yes, sir.

20   Q.    Okay.  And when it says "To:  Counterterrorism," what is

21   that?  Do you see this here?

22   A.    Yes, sir.  Counterterrorism is a division within FBI

23   headquarters that is responsible for overseeing the field's

24   counterterrorism investigations.

25   Q.    And how many people is that?

Page 1081

1   A.   I don't know, sir.

2   Q.   More than ten?

3   A.   Yes, sir.

4   Q.   More than 50?

5   A.   Yes, sir.

6   Q.   Okay.  And when you send an EC to Counterterrorism -- and EC

7   is electronic communication?

8   A.   Correct.

9   Q.   When you send that to Counterterrorism marked "immediate,"

10   that means you expect everybody to read it, right?

11   A.   Yes, sir.

12   Q.   And on the right here is ITOS.  What is ITOS?

13   A.   International Terrorism Operation Section.

14   Q.   How many people are in ITOS?

15   A.   I don't know, sir.

16   Q.   More than 50?

17   A.   Probably 50 or less.

18   Q.   Okay.  And my questions, of course, mean on or about August

19   18th, 2001.

20   A.   Yes, sir.  It is much bigger now, obviously.

21   Q.   Right.  Much bigger now, obviously, right?

22   A.   Yes, sir.

23   Q.   Is that what you said?

24   A.   Yes, sir.

25   Q.   Thank you.

Page 1082

1          Okay.  Joe Manarang, who is that?

2    A.   He is a supervisor in the Iran Unit, sir.

3    Q.   And so the people in the Iran Unit all work for Mr. Manarang?

4    A.   No, sir.  No.  He is not the head of the Iran Unit.  He is

5    one of the supervisors in the Iran Unit.

6    Q.   Well, I am not an FBI agent.  Tell me what that means.

7    A.   There will be an Iran -- there will be different units

8    organized by terrorist group or by terrorist organization.  In

9    this case, because we initially thought Mr. Moussaoui was

10   connected to a group associated with Iran, at least before we

11   spoke with him and during the initial stages, it went to the Iran

12   Unit.

13          Within the Iran Unit there is a number of supervisors,

14   like Mr. Manarang, who are assigned different areas of

15   responsibility in the United States.  His area of responsibility

16   included Minneapolis.

17          The head of the Iran Unit would be the unit chief of the

18   Iran Unit, and Mr. Manarang would work for him.

19   Q.   Okay.  So he's the No. 2 guy there?

20   A.   No, sir, that's not accurate.  It is a unit chief and then a

21   number of desk supervisors who work for him.

22   Q.   Okay.  You don't know where he ranked in that at that time?

23   A.   No, sir.

24   Q.   Okay.  So how many -- between Counterterrorism and ITOS --

25   well, let me ask you what IRU 1 and 2 are as well?

1   A.   IRU 1 and 2 are international relations units.  They are

2   administrative recipients on any communications we send overseas.

3   Q.   Okay.  So they are not FBI investigative people.  That's just

4   paperwork; is that what you are telling me?

5   A.   Yes, sir.

6   Q.   Okay.  So between counterterrorism and the Iran Unit, how

7   many people did you expect to read this document?

8   A.   It would have gone to a fairly small number of people

9   initially within the Iran Unit, probably Special Agent Manarang

10  and any analysts he chose to share it with, and then it could

11  either move up his chain of command or laterally to another unit,

12  as it eventually did.

13  Q.   And when you drafted Exhibit 472, this was a very serious

14  matter to you, wasn't it, Agent Samit?

15  A.   The most serious, sir, yes.

16  Q.   And you wanted to make sure that everybody knew that you

17  thought you had a terrorist in your hands in Minneapolis, right?

18  A.   Yes, sir.

19  Q.   And if you look down -- go down a little bit, please,

20  Ms. Bishop -- I think this gets to some of what the judge was

21  asking you.

22          What is --

23  A.   It does.  That does perfectly answer what the judge was

24  asking.

25  Q.   Okay.  Go ahead and read that to the jury.

Page 1084

1    A.    "Request FBIHQ/CTD" -- which is counterterrorism division --

2    "ITOS," and then the "Iran Unit, obtain permission from the

3    Department of Justice Office of Intelligence Policy Review to

4    contact the United States Attorney's Office in the District of

5    Minnesota regarding captioned subject."

6    Q.    Go ahead.  I'm sorry.

7    A.    "Set leads at Paris, London, and Oklahoma City for additional

8    investigation."

9    Q.    Okay.  And all of this was immediate?

10   A.    Yes, sir.

11   Q.    Right.  And this, this in some way encapsulates the

12   bureaucratic bind that you found yourself in on or about August

13   18th, 2001, right?

14   A.    Yes, sir.

15   Q.    You couldn't, you couldn't call -- even though Mr. Jones had

16   made a contact with the U.S. Attorney's Office, you couldn't do it

17   again, right?  If you were going to follow the rules of the FBI,

18   you were as of August 18th unable to call back and ask for a

19   criminal search warrant?

20   A.    Yes, sir, that's correct.

21   Q.    And you needed the people in Washington to help you out,

22   right?

23   A.    Yes, sir.

24   Q.    And they didn't, did they?

25   A.    To help me out in terms of getting me permission, is that --

Page 1085

1    Q.    Yes.

2    A.    Yes, sir, they did not; that's correct.

3    Q.    In fact, they obstructed you is one of the words you like to

4    use, right?

5    A.    Yes, sir, I have used that term before.

6    Q.    Criminal negligence?

7    A.    Yes, sir.

8    Q.    Careerism?

9    A.    Yes, sir.

10          THE COURT:  Agent Samit, can you explain, at the very

11   bottom of that, the term "full field investigation instituted

12   8/15/01"?  What does that mean?

13          THE WITNESS:  Yes, Your Honor.  That's an administrative

14   requirement under the attorney general guidelines.  Under the

15   subset of that intelligence case, there are two types of

16   investigations.  There is a full field investigation, which is

17   what this was, and then there is a preliminary inquiry.

18          Under a preliminary inquiry, if we have a United States

19   person and we don't have a sufficient weight of probable cause to

20   believe that they are a member of a terrorist group, we can open

21   what we call a preliminary inquiry under which at that time we had

22   a 90-day period to investigate that and do one of three things.

23          We could close that, determine that the reporting we had

24   had no foundation, extend it as a preliminary inquiry, or open it

25   as a full field.  But if it was a United States person, that is, a

Page 1086

1   citizen or legal permanent resident, we had to have a pretty good

2   weight of information to prove that that person was acting on

3   behalf of a terrorist group.

4           And in Mr. Moussaoui's case, we were able to open a full

5   field investigation immediately, that is, using all -- that is,

6   giving us the capability of using all the techniques under an

7   intelligence investigation because he was a non-U.S. person,

8   because he was illegally in the United States on a visa waiver.

9           THE COURT:  All right, thank you.

10  BY MR. MAC MAHON:

11  Q.   All right.  And that included -- well, strike that question.

12          Let's move to the, to the second page, if you would,

13  please, Ms. Bishop.

14          I'm sorry, Your Honor, this is a long document.  This is

15  going to take us a little while.

16          THE COURT:  That's all right.

17  BY MR. MAC MAHON:

18  Q.   Thank you.  So then what you did in this document, Agent

19  Samit, was, was try to tell the people at headquarters what it was

20  that attracted you -- your office's suspicion to Mr. Moussaoui,

21  right?

22  A.   Yes, sir.

23  Q.   You wanted them to know that he was taking flight simulator

24  training when it really was totally inappropriate for him to be

25  doing it, right?

Page 1087

1   A.   Correct.

2   Q.   And you wanted them to know that he was paying cash for it?

3   A.   Correct.

4   Q.   You wanted them to know that he had no aviation background at

5   all and only wanted to learn how to take off and land a 747?

6   A.   Correct.

7   Q.   How long did it take you to write this document?

8   A.   About a day and a half.

9   Q.   Did you have that one note with you when you did it?

10  A.   I had my notes from both days, as well as Special Agent

11  Weess's notes.

12  Q.   Did Special Agent Weess help you write this?

13  A.   No, sir.

14  Q.   Then go to the next page, if you would, please.

15          And then you told them about your interviews with

16  Mr. Prevost, right?

17  A.   Yes, sir.

18  Q.   And you wanted them to know that -- all the information that

19  Mr. Prevost had given you about Moussaoui not claiming to even be

20  a Muslim, right?

21  A.   Yes, sir.

22  Q.   Okay.  And you knew that was a lie, right?

23  A.   Yes, sir.

24  Q.   And you knew that Prevost thought Moussaoui was unusual, and

25  you knew that was important to tell the people in headquarters,

Page 1088

1    right?

2    A.    I did.

3    Q.    Okay.  Next page, please.

4          And this is more information from Mr. Prevost, right?

5    A.    Yes, sir.

6    Q.    Can we go down to this -- excuse me, Your Honor.

7          And you wanted the people in headquarters to know about

8    the mode control panel, right?

9    A.    I did.

10   Q.    You wanted them to know that Moussaoui didn't even know that

11   the aircraft doors couldn't be opened while the plane was flying?

12   A.    Correct, yes, sir.

13   Q.    And you wanted them to know that because it made absolutely

14   no sense for him to be training on a 747 if he didn't even know

15   the doors couldn't open in flight, right?

16   A.    I'm not sure I understand it.

17   Q.    You were trying to tell the people at headquarters everything

18   you thought suspicious about Mr. Moussaoui; is that correct?

19   A.    Yes, sir, that's correct.

20   Q.    And that was one of the things.  A real pilot would know that

21   you couldn't open the door on a 747 while it was flying, right?

22   A.    A real airline pilot would.  I didn't know that at the time,

23   either, until Mr. Prevost told me.

24   Q.    Okay.  And you wanted him to know about the mode control

25   panel and how it gave the ability to fly, navigate, and sometimes

Page 1089

1   land in the fully automated manner?

2   A.   Yes, sir.

3   Q.   And you never passed on to them that Mr. Prevost told you

4   that Moussaoui could actually fly a 747 all by himself, right?

5   A.   I'm sorry?

6   Q.   You never -- nowhere in this communication does it say that

7   Moussaoui was capable of flying a 747, right?

8   A.   It didn't, because Mr. Moussaoui hadn't finished his

9   training, and so that wasn't true.

10  Q.   Right.  So at the time that you interviewed Mr. Moussaoui, he

11  had absolutely no capability of flying a plane, mode control panel

12  or not, right?

13  A.   He had, he had gone through some of the training.

14  Mr. Prevost's estimate at the time was if he had completed his

15  training, he would have been able to, which is one of the reasons

16  why we stopped him from completing his training.

17  Q.   All right.  But he didn't at the time you arrested him?

18  A.   That's correct.

19  Q.   Couldn't have flown a plane at all?

20  A.   I don't know.  I don't know what his level of capability to

21  fly a 747 would have been.

22  Q.   Well, by this date, you had the records from Airman Flight

23  School as well, that he had failed at Airman Flight School, right?

24  A.   No, sir.

25  Q.   You later found that out, before 9/11, right?

Page 1090

1   A.   We found it out from Mr. Moussaoui himself that he wasn't

2   progressing in his general aviation flight training for a private

3   pilot's license.

4   Q.   And that was true, wasn't it?

5   A.   Yes, sir.

6   Q.   And he never got a pilot's license, he told you that, right?

7   A.   Yes, sir.

8   Q.   And the license that you told the jury about last week was

9   really just a medical certificate, wasn't it?

10   A.   A student pilot's certificate, yes, sir.

11   Q.   Right.  And anybody could get one of those that could pass

12   the physical, right?

13   A.   Yes, sir.

14   Q.   And it doesn't mean a thing about somebody's ability to fly,

15   correct?

16   A.   Correct.

17   Q.   And you wanted the -- go to page 7, if you would, Ms. Bishop,

18   please.

19        You wanted the people in Washington to know that when

20   you searched Moussaoui, you found a knife, didn't you?

21   A.   Yes, sir.

22   Q.   You found two knives?

23   A.   Correct.

24   Q.   And you wanted the people in Washington to know that because

25   you thought somebody could use a knife to hijack an aircraft,

Page 1091

1   right?

2   A.   Yes, sir.

3   Q.   Okay.  And those are the two knives you held up last week?

4   A.   Yes, sir.

5   Q.   Same knives, right?

6   A.   Those knives, yes, sir.

7   Q.   Okay.  And you alerted the people in Washington to the fact

8   that Moussaoui had these knives?

9   A.   I did.

10  Q.   And you alerted them to the fact that Moussaoui had a

11  walkie-talkie, right, and other aviation study materials?

12  A.   Yes, sir.

13  Q.   Did anybody from Washington ever ask you what is Moussaoui

14  doing with all these aviation study materials before 9/11?

15  A.   No, sir.

16  Q.   Anybody ask you why he had all these knives?

17  A.   No, sir.

18        MR. MAC MAHON:  Go to page 8, if you would, please,

19  Ms. Bishop.  Go down to the bottom, please.

20  BY MR. MAC MAHON:

21  Q.   And you wanted the people in Washington to know what you had

22  learned about Moussaoui being an extremely religious Muslim who

23  often spoke against Israel and the United States and questioned

24  why the Israelis are killing Muslims, right?

25  A.   Yes, sir.

Page 1092

1  Q.   Okay.  Why did you include that in your communication?

2  A.   To illustrate to them the fact that he was an Islamic

3  fundamentalist, radical in his beliefs.

4  Q.   All right.  And as support for your belief that he was a

5  terrorist, too, right?

6  A.   Yes, sir.

7  Q.   Okay.  Let's go to the next page, if we could.

8       You wanted the people in Washington -- do you see that

9  there on the top page -- you wanted the people in Washington to

10 know that you had learned before August 18th, 2001 that Moussaoui

11 believed it was acceptable to kill civilians, right?

12 A.   Yes, sir.

13 Q.   And you wanted them to know that he approved of martyrs,

14 right?

15 A.   Yes, sir, that's correct.

16 Q.   Okay.  What is -- what did you know about the concept of

17 martyrdom in Islamic fundamentalism on or about August 18th, 2001?

18 A.   I knew that radicals considered that dying while fighting

19 infidels, while fighting non-Muslims, was considered martyrdom and

20 was considered a very honorable way to die in Islam.

21 Q.   All right.  And that's, that's another -- you can attribute

22 to whatever -- that's a Bin Laden-al Qaeda trademark to talk about

23 martyrdom as well, correct?

24 A.   It is one of -- they are one of the groups that talks about

25 martyrdom.  There is many other groups that speak about martyrdom

Page 1093

1   as well.  So to call it a trademark is not -- a Bin Laden

2   trademark is not accurate, no, sir.

3   Q.   You knew before this date, August 18th, 2001, that Bin Laden

4   had used martyrdom to recruit suicide -- people to commit suicide

5   while killing Americans, didn't you?

6   A.   Yes, sir.

7   Q.   And that's why you put this in there, right?  You wanted them

8   to know that that's what you were dealing with, somebody who talks

9   about martyrdom, right?

10  A.   Yes, sir, but not in the context of Bin Laden.  There had

11  been plenty of other terrorist groups who had used martyrs to kill

12  Americans as well.

13  Q.   Well, Bin Laden's name is in this 302, isn't it?

14  A.   This is an electronic communication, sir.

15  Q.   Bin Laden's name is in this, too, isn't it?

16  A.   It is, yes, sir.

17  Q.   So you were also telling Washington that there was a Bin

18  Laden, at least an interest in Mr. Moussaoui and Usama Bin Laden

19  as well, right?

20  A.   Yes, sir.

21  Q.   And it says, it says here that al-Attas was asked if he had

22  ever heard Moussaoui make a plan to kill those who harmed Muslims

23  and in doing so become a martyr, and that al-Attas admitted that

24  he may have heard that.

25  A.   Yes, sir.

Page 1094

1   Q.   That was pretty remarkable to you, wasn't it?

2   A.   It was.

3   Q.   And you wanted the people in Washington to know that as well,

4   too, right?

5   A.   I did.

6   Q.   And you wanted him to know -- the people in Washington to

7   know Moussaoui's opinions about Muslims preparing to fight, right?

8   A.   Yes, sir.

9   Q.   That Moussaoui had persuaded al-Attas to begin physical

10  exercise and martial arts training?

11  A.   That's correct, yes, sir.

12  Q.   And that they were, in fact -- Moussaoui was, in fact,

13  training in the martial arts before August 18th, 2001, right?

14  A.   Yes, sir.

15  Q.   And you later told the FBI that you thought he was doing that

16  to prepare to hijack an airplane and to disable the crew, right?

17  A.   Yes, sir, I did.

18  Q.   Go down a little further, please.

19       You asked al-Attas -- you wanted the people in

20  Washington to know that you had asked al-Attas about whether he

21  was interested in going to fight jihad, right?

22  A.   That's correct, yes, sir.

23  Q.   All right.  And that was holy war jihad, right?

24  A.   Correct.

25  Q.   And al-Attas had -- you wanted the people in Washington to

Page 1095

1    know, when it says that he reacted with surprise, he had a little

2    trouble answering that question, right?

3    A.   Yes, sir.

4    Q.   That's because you didn't believe him, you wrote that down to

5    say you didn't believe him and you thought he was preparing for

6    jihad?

7    A.   No, sir.  In fact, he reacted with surprise that I asked the

8    question.  I absolutely did believe him when he said he was

9    preparing to fight, when Mr. al-Attas said that.

10   Q.   Then I didn't ask you the question properly.

11         You knew at that time, regardless of what he answered to

12   your question, that he was preparing to go fight jihad, holy war,

13   right?

14   A.   Yes, sir.

15   Q.   And you wanted everyone in Washington to know that as well,

16   right?

17   A.   Correct.

18   Q.   Go to the next page, please.

19         You wanted the people in Washington to know that

20   Al-Attas said he was willing to fight if called, right?

21   A.   Yes, sir.

22   Q.   You wanted them to know that Al-Attas had told you that

23   Moussaoui had received $10,000 from overseas via a bank in Norman,

24   Oklahoma?

25   A.   Yes, sir.

Page 1096

1   Q.   Right?  And that was a sign to you of, of money coming from

2   overseas, as something of particular interest to you, right?

3   A.   Yes, sir.

4   Q.   And you wanted the people in Washington to know that, right?

5   A.   Correct.

6   Q.   Go to the next page, please.

7         And you then wanted the people in Washington to know

8   that al-Attas actually had a will in his possession, right?

9   A.   Yes, sir.

10  Q.   And why did you want to tell them that, Agent?

11  A.   Because a will might be, especially drawn up by a young,

12  healthy person, might be an indicator of somebody who is preparing

13  to die in the near future.

14  Q.   And you did a good job tricking Mr. al-Attas into telling you

15  that it was a will, didn't you?

16  A.   No, sir.  It wasn't intentional, the trick.

17  Q.   I am trying to give you credit, Agent.

18  A.   Thank you.  I appreciate that.

19  Q.   You picked up, you picked up an Arabic document, pretended

20  you could read it, and the guy blurted out "that's my will,"

21  right?

22  A.   No, sir, that's not correct.

23  Q.   What happened?  Tell the jury what happened.

24  A.   I picked up an Arabic document and looked at it.  I realized

25  later that Mr. al-Attas believed that I actually read it.  I

Page 1097

1   didn't pretend to read it.  I wouldn't pretend to read Arabic

2   because that would be an obvious -- that would be a facade that

3   could be seen through fairly obviously.

4   Q.   But whatever, whatever your intention was, the result of your

5   action was that he blurted out that he had a will?

6   A.   Yes, sir.

7   Q.   Right.  Let's go down, please.  And you wanted the people in

8   Washington to know that Moussaoui was looking for a GPS receiver?

9   A.   Correct, yes, sir.

10  Q.   Why did you want to tell them that?

11  A.   Because a GPS is something that allows a complete novice to

12  navigate very easily by air.

13  Q.   And that concerned you in terms of Moussaoui having some plan

14  to hijack an aircraft and use the GPS for navigation, right?

15  A.   Correct.

16  Q.   And that's exactly why you told that to the people in

17  Washington, right?

18  A.   Yes, sir.

19  Q.   And you found -- you wanted them to know that al-Attas was

20  actually -- had a visa application to go to Pakistan, right?

21  A.   Yes, sir.

22  Q.   And you wanted the people in Washington to know that because

23  that meant to you that he might be going to the camps in

24  Afghanistan, right?

25  A.   That's not why, sir.  It was another data point.  I didn't

Page 1098

1   know that he would be going to the camps.  I didn't know that -- I

2   still don't know that that was the plan.

3   Q.   Well, you know that, you knew as of this date -- well, you

4   believed as of this date that Moussaoui was recruiting al-Attas,

5   at the very least, to go to Pakistan for jihad, right?

6   A.   I knew as of this date that Mr. al-Attas was planning to go

7   to Pakistan, and that I didn't believe his story.  And I knew that

8   Mr. Moussaoui had assisted him at least in filling out his

9   application for a visa.

10  Q.   Right.  You found out that al-Attas told you that Moussaoui

11  actually filled out the application, right?

12  A.   Yes, sir.

13  Q.   And it was a bogus application, wasn't it?

14  A.   I didn't know that at the time, no, sir.

15  Q.   Go to the next page, please.  Go down to the bottom

16  paragraph, please.  Thank you.

17       This is what we were just talking about, right, you

18  wanted the people in Washington to know that Moussaoui was helping

19  him complete a visa application, right?

20  A.   Yes, sir.

21  Q.   And you knew in August of 2001 that it was against United

22  States law to recruit people to go overseas and become terrorists,

23  right?

24  A.   Yes, sir.

25  Q.   And you learned within a couple days of this that Moussaoui

U.S. v. Moussaoui

1    had a history of recruiting people to go, to fight as terrorists,

2    right?

3    A.    At the time the group that Mr. Moussaoui recruited a person

4    for, they were not terrorists, they were not a designated

5    terrorist group.

6    Q.    I will ask you this.  You knew, you knew within a couple of

7    days that Moussaoui had a history of recruiting Muslim

8    fundamentalists to go off and fight war in foreign lands, right?

9    A.    Yes, sir, that's correct.

10    Q.    And you never, never saw a predicate criminal act in

11    recruiting Hussein al-Attas to go do the same thing once you

12    learned that that's what he -- an act that he had already done

13    before?

14    A.    Mr. al-Attas never, never told us that Mr. Moussaoui

15    recruited him for that.  The only thing Mr. al-Attas told us was

16    that he helped him prepare the visa application.  Mr. al-Attas

17    stuck to his story, in fact, that he was going to assist his

18    uncle.

19    Q.    So if you learned that Moussaoui was recruiting Muslim

20    fundamentalists to go fight in far-off lands, it never occurred to

21    you that you had probable cause to believe that he was committing

22    a violation of American criminal law while recruiting Hussein

23    al-Attas as well, right?

24    A.    If I had understood that, it certainly would have occurred to

25    me that he was recruiting him.

Page 1100

1  Q.   So when you got the information about Moussaoui, the

2  recruiter, it didn't occur to you that that was a criminal act

3  that you could have tried to indict him for and get a search

4  warrant or anything else?

5  A.   Yes, sir, it would fall under the same heading of the other

6  criminal acts I suspected Mr. Moussaoui of.  We still required the

7  authority of the Department of Justice to go to the United States

8  Attorney.

9  Q.   But you never, you never went -- this information certainly

10  wasn't obtained by any kind of FISA, right, the information about

11  Pakistan and Hussein al-Attas?

12  A.   Yes, sir, it was not.  It was obtained by an interview.

13  Q.   Right.  But you could have learned from that in that time

14  frame that there was a separate crime that Moussaoui had committed

15  that you could have gone -- that had nothing to do with your 199

16  investigation, right?

17  A.   Sir, that would -- the other one I think you are referring to

18  did not occur in, through, or involving U.S. persons in the United

19  States, so that second recruitment at the time would not have been

20  a violation of U.S. federal law.

21  Q.   Recruiting Hussein al-Attas to go fight overseas would have

22  been a violation?

23  A.   Yes, sir.  And if I had known that, I certainly would have

24  included it.

25  Q.   It didn't show up in any of your documents?

Page 1101

1    A.   Correct, because I didn't know that, sir.

2    Q.   All right.  Go to page 13 if you would, please.

3         This is where in your communication you start to tell

4    the people in Washington what you have learned from Mr. Moussaoui,

5    right?

6    A.   Yes, sir, where I begin documenting the interview.

7    Q.   Right.  And you knew in that, before the interview started,

8    that Moussaoui was a liar, right?

9    A.   I'm not sure I understand, sir.

10   Q.   You said he was a bad liar, didn't you?

11   A.   He hadn't, at that point, he hadn't really been asked any

12   questions yet.

13   Q.   Let me ask you this.  It was a bad question.

14        By the time you filled this, you created this exhibit,

15   you knew that Moussaoui had lied to you, didn't you?

16   A.   Yes, sir.

17   Q.   And you said here that he was very -- he was very evasive in

18   many of his answers and that rather than giving answers to

19   seemingly innocuous questions directly, he would inquire -- he was

20   very talkative, right?

21   A.   Yes, sir.

22   Q.   Nowhere in here did you ever write that you told Moussaoui

23   how important it was that he be truthful to you, right?

24   A.   That's correct, I did not.

25   Q.   It is not written in here at all, right?

Page 1102

1   A.   No, sir.

2   Q.   And you have never given us any notes that say that you asked

3   him that?

4   A.   Correct.

5   Q.   But he got extremely agitated when he understood the line of

6   questioning to pertain to his religious beliefs, overseas travels

7   and associates, and the source of financial support, right?

8   A.   Yes, sir.

9   Q.   And from your training as an FBI agent, when he got agitated

10  and evasive about those issues, you knew you were on to something,

11  didn't you?

12  A.   Yes, sir.

13  Q.   And down here at the bottom where Moussaoui told you that he

14  got saved by a French senator at one point in time --

15  A.   Yes, sir.

16  Q.    -- you knew that was a lie, didn't you?

17  A.   I did not know that was a lie.

18  Q.   He was very insistent on completing his training, right?

19  A.   Yes, sir.

20  Q.   You wanted the people in Washington to know that because you

21  were concerned that Moussaoui was going to hijack a plane, right?

22  A.   Yes, sir.

23  Q.   Go to, if you would, page 16.  I'm sorry, hold on, just a

24  second, Your Honor, excuse me.

25       Yeah, page 16.  At the top of 16, we don't need to read

Page 1103

1    it, but Moussaoui told you a lot about his family, didn't he?

2    A.   Yes, sir.

3    Q.   Told you that he had an older brother named Ab Sumad?

4    A.   Yes, sir, he did.

5    Q.   That was true, wasn't it?

6    A.   It was.

7    Q.   And that he was a French citizen, that was true?

8    A.   Yes, sir.

9    Q.   And that he was born in St. Jean de Luz, France, right?

10   A.   Yes, sir.

11   Q.   His parents were Moroccan?

12   A.   Yes, sir.

13   Q.   All the information he gave you about his family was true,

14   wasn't it?

15   A.   Yes, sir.  Well, no, sir.  I want -- I should correct that.

16   Not all the information that he gave me about his family was true.

17   Q.   But you were --

18   A.   His reasons, his reasons for his split from them were not

19   true.  The fact that it was a personal matter, the fact that he

20   didn't see eye to eye --

21   Q.   We will get to that exhibit.

22   A.   Yes, sir.

23   Q.   We have to be -- we have got to be careful here with the

24   exhibits.

25   A.   Yes, sir.

1   Q.   So I am trying to -- looking on, it says here, that Moussaoui

2   volunteered to you that he just recently had visited Malaysia,

3   right?

4   A.   I'm sorry, sir, I am not with you.

5   Q.   Do you see on page 16?  I just circled it:  "Moussaoui was

6   asked about his foreign travel and answered that he had traveled

7   to Morocco and all over Europe.  He advised that in connection

8   with the Indonesian telephone card venture he visited Malaysia for

9   approximately three weeks."

10  A.   Yes, sir.

11  Q.   And he didn't have any passport stamps or anything to

12  indicate he had been to Malaysia, right?

13  A.   He did not.

14  Q.   He just volunteered that information to you?

15  A.   Yes, sir.

16  Q.   And it was true, wasn't it?

17  A.   Yes, sir, I found out later it was.

18  Q.   And nobody in the United States Government on or about August

19  18th or before 9/11 told you that there was -- the government had

20  information about Bin Ladenites traveling through Malaysia on

21  their way to the United States, right?

22  A.   Correct.

23  Q.   So this was a completely innocuous fact to you, that he had

24  been to Malaysia, right?

25  A.   It was, yes, sir.

Page 1105

1    Q.    Did anybody ever from the CIA or any agency ever call you and

2    ask you if you had information of whether Moussaoui had been in

3    Malaysia?

4    A.    No, sir.

5    Q.    Did they ever tell you that there were two Usama Bin Laden

6    known terrorists who had traveled from Malaysia to the United

7    States wandering around our country?

8    A.    Before 9/11?

9    Q.    Yes.

10   A.    No, sir.

11   Q.    Now, at the bottom, if we can go to the bottom, please,

12   Ms. Bishop -- could we read that, read the bottom paragraph, if

13   you would.

14   A.    "When asked if he traveled outside Pakistan to another

15   country during this trip or if he had visited any other cities in

16   Pakistan, Moussaoui did not answer directly, but instead claimed

17   that he was aware of what the interviewing agents were trying to

18   accuse him of as a result of his having watched television.  This

19   line of questioning caused him to become extremely agitated, and

20   he refused to discuss the matter further."

21   Q.    Okay.  You knew you hit gold again, didn't you, Agent?

22   A.    I'm not sure what, what you mean.

23   Q.    Agent, you asked him this question because you, you assumed

24   from everything you had learned in your investigation that

25   Moussaoui's trip to Pakistan included a trip to Afghanistan,

U.S. v. Moussaoui

1   didn't you?

2   A.   I assumed it, sir.  But if you look at the paragraph above,

3   he told me that he remained in Karachi, Pakistan, the whole time,

4   and he never, he never, again, in response to numerous direct

5   questions, he told me that he had only remained in Karachi and

6   so --

7   Q.   But you knew he was a liar, right?

8   A.   That's right.  I didn't know he was lying on this point.

9   Q.   Agent Samit, why did you ask him if he traveled outside of

10  Pakistan if you didn't believe he had gone to Afghanistan?

11  A.   What I believed and what I could prove were two different

12  things, sir.

13  Q.   So you needed Moussaoui to tell you that he had been to

14  Afghanistan for you to form a probable cause finding that he had

15  traveled to anywhere in Afghanistan; is that what you are saying?

16  A.   His admission would have been one way by which I could prove

17  it.  Investigation by our office in Pakistan would have been

18  another way.

19  Q.   Or information from France on August 30 that said he had

20  recently traveled to Afghanistan, that would have helped too,

21  wouldn't it?

22  A.   Yes, sir, but it wasn't August 30th when this document was

23  written.

24  Q.   Well, it was 12 days later that you learned that, right?

25  A.   I would have to see what document specifically you are, you

Page 1107

1    are referring to.

2    Q.    Are you saying you don't remember any documents that

3    confirmed that a somewhat reliable source had told you that

4    Moussaoui had been to Afghanistan?

5    A.    I'd have to see that document, sir, to refresh my memory.

6    Q.    But sitting here you don't recall it?

7    A.    I recall a document on August 30th, yes, sir, but I would

8    need to, I would need to review that.

9    Q.    Go to -- let me ask you this:  You never asked Moussaoui the

10   direct question of "have you ever been to Afghanistan," have you?

11   A.    That's correct.

12   Q.    Never asked him that?

13   A.    I did not.

14   Q.    Never asked him whether he had been to a terrorist training

15   camp?

16   A.    No.

17   Q.    Just kind of nibbled around the edges, right?

18   A.    Yes, sir.

19   Q.    Because you hoped over time to continue to interrogate him

20   and wear him down, right?

21   A.    No, sir, because I wanted to continue the interview,

22   certainly, but any time I nibbled around the edges, as you say, he

23   got very upset.  He got extremely agitated.

24   Q.    Right.  And the things that he got agitated about were the

25   things you knew he was lying about, right?

1  A.   No, sir.  I knew those were the things he was reluctant to

2  discuss.  That didn't equate automatically to a lie, no, sir.

3  Q.   In this, in this document you called Moussaoui very

4  deceptive, right?

5  A.   Yes, sir, he was.

6  Q.   And you never asked Moussaoui specifically whether he ever

7  had weapons training at a terrorist camp at all, right?

8  A.   Weapons training in general.

9  Q.   Just you said:  Did you ever have weapons training in

10  general?

11  A.   Yes, sir.

12  Q.   Do you remember that specific question?

13  A.   I do.

14  Q.   And nothing more, nothing less about that?

15  A.   Correct.  Have you ever received any training with weapons --

16  Q.   Okay.

17  A.   -- was the question.

18       MR. MAC MAHON:  Are we on page 18, Ms. Bishop?

19       MS. BISHOP:  17.

20       MR. MAC MAHON:  Oh, I'm sorry, put 17 up, if you would,

21  please.

22       Go down just a little bit, please, to the first

23  paragraph, can be shown.  No, the one on the top.

24  Q.   Agent Samit, you wanted the people in Washington -- oops, too

25  hard.  Sorry, Your Honor.  Thank you.  Excuse me, Judge.

Page 1109

1                    THE COURT:  All right.

2      BY MR. MAC MAHON:

3      Q.   This paragraph here, Agent Samit, right?

4      A.   Yes, sir.

5      Q.   You wanted the people in Washington to know all this

6      information about Moussaoui's travel, right, that you had

7      uncovered?

8      A.   Yes, sir, that's correct, I did.

9      Q.   Including the fact that he had been to Malaysia, correct?

10     A.   Correct.

11     Q.   And that he didn't have a passport that showed he went to

12     Malaysia?

13     A.   That's correct.

14     Q.   And you wanted them to know that Moussaoui claimed his prior

15     passport had gone through the washing machine, right, right here?

16     A.   Yes, sir, yes, sir.

17     Q.   And nobody ever called and asked you any questions about this

18     at all, did they?

19     A.   They did not.

20     Q.   Now, if you go down a little bit, please, Ms. Bishop, to this

21     paragraph.  You wanted the people in Washington to know that

22     Moussaoui in his spare time read fatwahs?

23     A.   Actually that paragraph said that he, his claim was he did

24     not study fatwahs.

25     Q.   Well, it says that he was, he studied fatwahs, but he just

Page 1110

```
 1   wasn't able to read them, right?

 2   A.   Correct, that's what it says.

 3   Q.   But did he tell you he listened to them on tape?

 4   A.   He didn't.

 5   Q.   Tell the people in the jury what a fatwah is.

 6   A.   Fatwah is a religious ruling issued by an Islamic scholar.

 7   Q.   Did you ask him what kind of fatwahs he was, he was

 8   interested in?

 9   A.   No.

10   Q.   And that's something in your training you learned could flesh

11   out somebody who was a fundamentalist, if you could find out what

12   fatwahs they were interested in, right?

13   A.   Yes.

14   Q.   Like Bin Laden's fatwah saying it was acceptable to kill

15   Americans wherever they could be found, right?

16   A.   Yes, sir.

17   Q.   Did you ever ask Moussaoui if he had read that fatwah?

18   A.   I did not, because he said he didn't read any fatwahs.

19   Q.   Did you ask him if he ever heard that fatwah?

20   A.   No, I did not.

21   Q.   Go to the next page, if you would, please.

22            And in that interview one of the things Moussaoui told

23   you he wanted to do in our country was to go see the Statue of

24   Liberty, the Empire State, or the White House, right?

25   A.   Yes, sir.
```

Page 1111

1   Q.   And you thought that was an important thing to tell the

2   people in Washington, didn't you?

3   A.   Yes, sir.

4   Q.   All right.  Especially the part about the White House, that

5   was of grave concern, wasn't it, to you, Agent?

6   A.   Sir, any part of the United States that Mr. Moussaoui was

7   interested in was of grave concern to me.  At that point because

8   he mentioned the White House, certainly being the most prominent

9   mark, it was, but every place was important to me.

10  Q.   I appreciate that, but what I meant to ask you or follow up

11  is that after knowing that Moussaoui was interested in what you

12  will say in this document in hijacking a plane, you wanted to tell

13  the United States Secret Service about him, didn't you?

14  A.   Yes, sir.

15  Q.   All right.  And that authority to do that was rejected, too,

16  as well, wasn't it?

17  A.   No, sir, the Secret Service was advised about this.

18  Q.   They were?

19  A.   That wasn't rejected.

20  Q.   Did this -- did this document go to the United States Secret

21  Service?

22  A.   The summary of the information contained in it did, yes, sir.

23  Q.   Including your conclusion that Moussaoui wanted to hijack an

24  airplane, disable the crew, and have -- and do his -- use the

25  plane for his own ends?

Page 1112

1   A.   Including my investigative speculation to that effect, no,

2   sir, it did not.

3   Q.   Just the e-mail that we will look at later, that's all that

4   went to them?

5   A.   No, sir, there was a cable sent from the FBI to them.

6   Q.   A cable from the FBI to the United States Secret Service?

7   A.   Yes, sir.

8   Q.   Have you seen that?

9   A.   Yes, sir.

10   Q.   What does it say?

11   A.   It contains much of the biographical information of

12   Mr. Moussaoui, as well as his flight training and the fact that he

13   was considered suspicious.

14   Q.   When was that sent?

15   A.   September 4th.

16   Q.   Did it mention that Moussaoui, that your investigative theory

17   was that Moussaoui wanted to hijack a plane, disable the crew, and

18   do as he wished with the plane?

19   A.   I would like to look at it, but it did not mention my

20   investigative conclusions, my investigative speculation.

21   Q.   I'd like to look at it too, Agent.

22        THE COURT:  No comments.

23        MR. MAC MAHON:  Thank you, Your Honor, I'm sorry.

24   BY MR. MAC MAHON:

25   Q.   And go to page 19, if you would.  You wanted the people in

1    Washington to know that part of your investigation uncovered

2    interest by Mr. Moussaoui in Usama Bin Laden, right?

3    A.   I wanted them to know that I was interested in trying to

4    uncover interest by Mr. Moussaoui in Usama Bin Laden, yes, sir.

5    Q.   Well, you did uncover that?  Hussein al-Attas said they were

6    watching TV and Moussaoui called his attention to it?

7    A.   Yes, sir, but Mr. al-Attas also said in that sentence above

8    the first circle of Bin Laden that he didn't believe that Bin

9    Laden was his sheikh.

10   Q.   So you needed someone to confirm that -- how many other ECs

11   or documents like this have you written that make three references

12   to Usama Bin Laden?

13   A.   Oh, many, numerous, yes, sir.

14   Q.   Really?

15   A.   Yes, sir.

16   Q.   What about this language here about teaching children to ride

17   a horse, know how to fight, all that language?  Why did you tell

18   the government that?

19   A.   Because it is something that Mr. al-Attas said.  Sir, maybe I

20   should, I should explain because it is the theme of your

21   questioning.  My job as an investigator is to take in all the

22   information I possibly can.

23        Anything anyone says about the subject, anything that I

24   am able to find about the subject, has to be included in my report

25   to headquarters, and so --

Page 1114

1  Q.   But this specifically, Agent Samit, is teach your children

2  how to swim, ride a horse, and know how to fight, something from

3  your training you know Usama Bin Laden says in his recruiting

4  videos?

5  A.   No, sir.

6  Q.   You have never seen any of those?

7  A.   No, I haven't.

8  Q.   Anybody in Washington ever call you back after they read this

9  and ask you questions about Usama Bin Laden?

10  A.   Relating to Mr. Moussaoui?

11  Q.   Yes.

12  A.   No, sir.

13  Q.   It says, "Moussaoui didn't like countries that don't adhere

14  to strict Islamic law."  You wanted the people in Washington to

15  know that as well, right?

16  A.   Yes, sir.

17  Q.   Can we go to page 21, if you would, please.

18        Now, you, last week when we were in court, you turned to

19  Mr. Moussaoui and said that you told him that he was going to have

20  to answer to the American people, words to that effect?

21  A.   Yes, sir.

22  Q.   Right.  And that's nowhere written in any of these documents,

23  is it?

24  A.   Yes, sir.  The purpose of these documents is --

25  Q.   Agent, the exact words --

1        MR. NOVAK:  Your Honor, I object.  Give him a chance to

2  answer the question, please.

3        THE COURT:  Well, if the answer is nonresponsive, it is

4  not appropriate.  So I am going to overrule the objection.  Reask

5  your question, Mr. MacMahon.

6  BY MR. MAC MAHON:

7  Q.  The statement that you made in court last week that you had

8  this dramatic moment where you turned to Moussaoui and said:  If

9  you don't tell me the truth, there is going to be consequences,

10  that isn't anywhere in any of these documents that you wrote, is

11  it?

12  A.  That's correct.

13  Q.  Thank you.

14        And you confronted him with the information that he was

15  known to be an extremist intent on using his past and future

16  aviation in furtherance of a terrorist goal, right?

17  A.  Yes, sir.

18        THE COURT:  All right, Mr. MacMahon, we're going to try

19  to stay very tight on schedule.

20        MR. MAC MAHON:  Thank you, Your Honor.

21        THE COURT:  So I will give the jury 15 minutes.  It will

22  be slightly after 20 after we'll reconvene.  Thank you.

23        (Recess from 11:05 a.m., until 11:25 a.m.)

24                 (Defendant and Jury in.)

25        THE COURT:  All right, sir.

1          MR. MAC MAHON:  May I proceed, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. MAC MAHON:  Thank you.

4    Q.   Page 21 of your document, sir.  It says here that Moussaoui

5    was asked to provide the name of his group, the religious scholars

6    they followed, and to describe his plan in detail.  Right?

7    A.   Yes, sir.

8    Q.   Okay.  You asked him what his plan was, right?

9    A.   Yes, sir.

10   Q.   You didn't ask him what other al Qaeda plans he knew about,

11   what other terrorist plans he knew about, or whatever else was

12   inside of his head?  You asked him what his plan was in detail,

13   right?

14   A.   Yes, sir.  We also asked what the plan was in general.

15   Q.   Where is that written down here?

16   A.   That's not.

17   Q.   Well, didn't you want the people in Washington to know you'd

18   asked that question, too?

19   A.   Well, sir, to get back to what I was answering earlier, these

20   reports contain what the person says, what the subject of the

21   interview says.  They're not intended to contain what I say.

22   Q.   All right.  So your questions are nowhere to be found in this

23   document, right?

24   A.   Yes, sir, that's correct.

25   Q.   And there's nowhere where you kept a list of the questions

Page 1117

1    you asked him or anything else?

2    A.    Correct.

3    Q.    All right.  And the piece of paper back at your office

4    doesn't list the questions, either, right?

5    A.    The piece of paper?

6    Q.    Your notes from this.  They don't --

7    A.    No, sir, I don't typically write down the questions and then

8    the answers.

9    Q.    But you did say that you -- in this document, you told

10   Washington that you asked him to describe his plan in detail?

11   A.    Yes, sir, I did.

12        MR. MAC MAHON:  All right.  Go down if you would,

13   please, Ms. Bishop.

14   Q.    Now, we go into this document where you're starting to tell

15   the people in Washington what you as the agent on the street with

16   the firsthand knowledge of what's going on is opining as to what's

17   happening, right?

18   A.    Yes, sir, my opinions.

19   Q.    Right.  And then you give your opinions to your superiors,

20   and then they're the ones that submit the warrant applications,

21   right?

22   A.    For -- I'm not sure what type of warrant.

23   Q.    In this situation, you needed help from the people in

24   Washington to, to, to move this case forward, right?

25   A.    Yes, sir, that's correct.

1    Q.    Okay.  And that's what your -- the purpose of what we're

2    about to read is for you to tell them what you have learned in

3    your investigation, what you think happened?

4    A.    My opinion is based on what I've learned, yes, sir.

5    Q.    Okay.  Well, why don't you read that on the bottom, please.

6    A.    The last paragraph?

7    Q.    Yeah?

8    A.    "Minneapolis believes that Moussaoui is an Islamic extremist

9    preparing for some future act in furtherance of radical

10   fundamentalist goals.  The numerous inconsistencies in his story,

11   his two-month long" --

12   Q.    Hold on a second.  Let Ms. Bishop get the document up again.

13   A.    "His two-month-long trip to Pakistan, which ended less than

14   three weeks before coming to the U.S., and his inability to

15   explain his source of financial support all give cause to believe

16   he is conspiring to commit a terrorist act, especially when this

17   information is combined with his extremist views as described by

18   al-Attas in his sworn statement."

19   Q.    Okay.  Now, when you wrote that to the people in Washington,

20   did they ever call and ask you why you believed it was that

21   Moussaoui was conspiring to commit a terrorist act?

22   A.    No, sir.

23   Q.    Okay.  Let's look at the next paragraph.

24   A.    "As Moussaoui was in the process of gathering the most

25   knowledge and skill possible in order to learn to fly the Boeing

Page 1119

1  747-400, Minneapolis believes that his plan involved an aircraft

2  of this type.  This is especially compelling when considering that

3  the 400 series of this aircraft has a smaller flight crew and is

4  more automated than other versions, lending itself to simpler

5  operation by relative novices.

6        "His request of Pan Am that he be permitted to fly a

7  simulated flight from London's Heathrow Airport to New York's JFK

8  Airport is suggestive and gives Minneapolis reason to believe that

9  he may have been attempting to simulate a flight under the

10  conditions which he would operate while putting his plan into

11  motion in the future."

12  Q.   Right.  And what you were trying to tell the people in

13  Washington here was that you thought that Moussaoui was going to

14  try to hijack a plane with the flight path being to New York City

15  or its environs, right?

16  A.   I told them that it was possible.

17  Q.   That was what your investigation had uncovered to date.  You

18  believed that Moussaoui was going to hijack a plane from Heathrow

19  Airport to New York, right?

20  A.   No, sir.  My investigation uncovered enough suspicious facts

21  to give me reason to opine that that may have been what he was

22  trying to do.

23  Q.   And you opined to the people in Washington, and you didn't

24  hear a thing back, did you?

25  A.   Sir, to say that I didn't hear a thing back is inaccurate.

Page 1120

1    There was a constant dialogue going back and forth between us and

2    our headquarters in Washington, as well as other members of the

3    intelligence community.

4    Q.    About your theory that there was a hijacking plan afoot?

5    A.    Yes, sir.

6    Q.    Keep reading, Agent.

7    A.    "Since it is reasonable to expect that some time might have

8    elapsed between Moussaoui's training at Pan Am and the execution

9    of his plan, Minneapolis believes that he may have intended to

10   amass a large supply of study aids, which would have allowed him

11   to maintain reasonable currency or at least familiarity with the

12   747-400 aircraft in the interim.  Minneapolis believes that this

13   is why he purchased the PowerPoint software in such a hurried

14   fashion after viewing the briefings provided him at Pan Am and why

15   he had in his possession several 747-400 flight manuals."

16   Q.    Okay.  Did anyone from Washington ever ask you for copies of

17   any of these flight manuals?

18   A.    No, sir, not before 9/11.

19   Q.    Right.  And you could have gotten exact replicas of what you

20   saw in the hotel room and given them to the people in Washington

21   had they asked, right?

22   A.    Yes, sir.

23   Q.    Keep reading.

24   A.    "Although al-Attas claimed to have no knowledge of

25   Moussaoui's actual plan, Minneapolis opines that he was being

U.S. v. Moussaoui

Page 1121

1  deceptive in trying to minimize both his understanding of and

2  involvement in whatever Moussaoui was planning to do.  In addition

3  to the numerous inconsistencies in his story regarding his reasons

4  for coming to Minneapolis, al-Attas's explanation for his planned

5  travel to Pakistan likewise is far-fetched.  Minneapolis believes

6  that al-Attas intends to travel to Pakistan to receive training or

7  indoctrination which will be used in furtherance of this plan."

8  Q.   Okay.  Keep going.

9  A.   "On the basis of investigation to date, Minneapolis has

10  reason to believe that Moussaoui, al-Attas, and others yet unknown

11  are conspiring to commit violations of the Federal Criminal Code

12  as set forth in Title 18, Section 2332(b), entitled 'Acts of

13  Terrorism Transcending National Boundaries,' in that they are

14  attempting or conspiring to destroy or damage any structure,

15  conveyance, or other real or personal property within the United

16  States.  Further, statements made by both Moussaoui and al-Attas

17  demonstrate that they have used interstate and foreign commerce in

18  furtherance of this offense."

19  Q.   All right.  Now, let's stop for a second.  2332(b) is one of

20  the counts in this indictment that Mr. Moussaoui pled guilty to,

21  isn't it?

22  A.   Yes, sir.

23  Q.   Okay.  And you came up with 2332(b) on or about August 18 by

24  consulting with the chief counsel of the FBI's office in

25  Minneapolis, right?

3-20-06                              U.S. v. Moussaoui                              Volume VI

Page 1122

 1   A.   No, sir.

 2   Q.   You didn't spend any time with Coleen Rowley at this time?

 3   A.   I did, but I didn't come up with -- prior to this document

 4   being authored, no, and I didn't come up with 2332(b) in

 5   consultation with her at any time.

 6   Q.   Okay.  Then how did you come up with -- it says here that you

 7   had reason to believe that Moussaoui was violating a crime known

 8   as "Acts of Terrorism Transcending National Boundaries."  Where

 9   did you find that in the code?

10   A.   Sir, as agents, we have access to the criminal code book as

11   well, and we review that all the time.

12   Q.   So you didn't need a lawyer to help you figure that out, did

13   you?

14   A.   No, sir.

15   Q.   Read the next paragraph.

16   A.   "In addition, information developed relating to Moussaoui's

17   training on the Boeing 747-400 aircraft gives reason to believe

18   that he is also conspiring to commit violations as specified under

19   Title 18, Section 32, entitled 'Destruction of Aircraft or

20   Aircraft Facilities', in that, on the basis of his possession of

21   weapons and his preparation through physical training for violent

22   confrontation, his plan is believed to involve the performance of

23   violence or incapacitation of individuals on aircraft in the

24   special aircraft jurisdiction of the United States or on any civil

25   aircraft employed in foreign air commerce, for the purpose of

Page 1123

1   seizing control of the aircraft for his own ends.  Investigation

2   has not yet shown what these ends are, but information pertaining

3   to this is expected to be developed through future investigation."

4   Q.   Okay.  And how did you find Title 18, Section 32?

5   A.   Same way, sir.

6   Q.   Without any help from a lawyer?

7   A.   Correct.

8   Q.   And that's one of the charges that Mr. Moussaoui has pled

9   guilty to as well, right?

10  A.   Yes, sir.

11  Q.   Can you -- when you told the people in Washington that

12  Moussaoui was in the possession of weapons that he was going to

13  use to seize control of a civil aircraft, what weapons were you

14  talking about?

15  A.   The knives, sir.

16  Q.   The knives you held up in court last week?

17  A.   Yes, sir.

18  Q.   You didn't tell the people in Washington that those were

19  knives?

20  A.   I told them earlier in the report, sir.

21  Q.   Did anybody from Washington ever call you after you sent this

22  up and before 9/11 to ask you what size the knives were or what

23  you thought he was going to do with them?

24  A.   No, sir.

25  Q.   Did anybody ever call and ask you why you believed that he

Page 1124

1    was preparing through physical confrontation to seize -- to

2    incapacitate individuals on an aircraft?

3    A.    No, sir.

4    Q.    Did anyone ask you what physical training you thought he was

5    engaged in to prepare to take over an aircraft?

6    A.    No, sir.

7    Q.    Now, you never -- you didn't, you didn't believe in this time

8    frame that Moussaoui could hijack a plane by himself, did you?

9    A.    No.

10   Q.    He needed people to help him, didn't he?

11   A.    Yes.

12   Q.    Even the 747, as simple as you told the jury, he still needed

13   people to help him hijack an airplane?

14   A.    Correct.

15   Q.    Because it was his plan, obviously from his training, you

16   believed, to fly the aircraft, right?

17   A.    Yes, sir.

18   Q.    And you never found anyone in your investigation that was

19   going to help Mr. Moussaoui take control of an aircraft or

20   anything else and fly it, did you?

21   A.    No, sir.

22   Q.    Okay.  Why don't you read the, the next paragraph, please.

23   A.    "Pursuant to MIOG" -- which, that's an acronym which stands

24   for Manual of Investigative and Operational Guidelines -- "Section

25   265-3, investigative policy and procedures, Minneapolis will open

Page 1125

1   an investigation under the 265 (criminal) classification, as

2   investigation under captioned pending 199 matter has developed

3   information indicating a terrorist or terrorist group is presently

4   engaged in the specific criminal acts described above."

5   Q.   Now, between August 18 and 2001, did anyone from Washington

6   call you and ask you what terror or terrorist group you were

7   talking about there?

8   A.   No, sir.

9   Q.   Didn't ask you what your suspicions were or anything else?

10  A.   No.

11  Q.   Okay.  Read the next paragraph if you would, please.

12  A.   "Minneapolis requests that FBI headquarters Counterterrorism

13  Division, International Terrorism Operation Section, Iran Unit,

14  expeditiously discusses this matter with the Office of `

15  Intelligence Policy Review at DOJ and secure authorization from

16  Minneapolis to contact the United States Attorney's Office in the

17  District of Minnesota pursuant to determining the full merit for

18  criminal prosecution and obtaining search warrants for Moussaoui's

19  effects, vehicles, and residence and subpoenas for his financial

20  and telephone toll records.  Minneapolis wishes to emphasize the

21  urgency of this matter in reminding recipients that it is as yet

22  unknown how far advanced the plan is or how many as yet

23  unidentified coconspirators exist.  The letterhead memorandum

24  enclosed for the Iran Unit is provided to facilitate this

25  process."

1    Q.   And you didn't get authority to go to the U.S. Attorney's

2    Office, did you?

3    A.   No, sir.

4    Q.   In fact, you were specifically told three days later by Agent

5    Frasca that you were not going to get a warrant, didn't you?

6    A.   Yes, sir, that I was not going to get a criminal search

7    warrant, yes, sir.

8    Q.   That was, that was very specific to him, right?

9    A.   His, his exact direction was that if we were to go the

10   criminal route and we were to fail in that endeavor, that it would

11   be difficult to go the FISA route later.  And so his

12   recommendation and, in fact, his direction was going to be that we

13   not go to the U.S. Attorney's Office.  He then told us he was not

14   going to go forward to the Office of Intelligence Policy Review.

15   Q.   No matter what you told him in the next, the ensuing time

16   between August 18th and 2001, no matter what you sent to him, no

17   matter what your investigation uncovered, he refused to budge,

18   didn't he?

19   A.   Oh, no, sir.  He didn't say that.

20   Q.   No, no, I'm asking you as a matter of fact, Agent, in this

21   conversation, he told you -- and he read this, didn't he?

22   A.   This communication?

23   Q.   Yes.

24   A.   I don't know.

25   Q.   You never had any specific conversations with him about the,

1   what you said that you had reason to believe was happening in this

2   communication?

3   A.   I don't know if he read this communication.  I certainly

4   conveyed the substance of it to him.  I can't testify as to

5   whether Unit Chief Frasca read this or not.

6   Q.   And what is the -- tell the jury what the unit chief is.

7   A.   He's the person who is in charge of the radical -- well, in

8   this case, the Radical Fundamentalist Unit at headquarters.

9   They're the ones, as I testified earlier, who oversee all

10  investigations of Sunni Muslim extremists in the FBI.

11  Q.   Okay.  And you sent this to him expecting him to read it,

12  correct?

13  A.   I sent this to the Iran Unit.  They walked it over to his

14  unit.  I don't know whether he read it or not.  I didn't have an

15  expectation one way or the other.  I knew that the supervisor

16  beneath him, Supervisory Special Agent Mike Maltbie, had received

17  it, and I certainly expected him to read it.

18  Q.   So as to the Unit Chief Frasca, you never had a conversation

19  with him where he discussed with you why you believe this, what

20  your investigation uncovered, or anything else?

21  A.   I did, yes, sir.  I did absolutely have a conversation to

22  that effect.

23  Q.   And in that conversation, he told you you were not to try to

24  get a search warrant, a criminal search warrant, right?

25  A.   He said on August 21, that on the basis of the information

Page 1128

1    we've developed thus far, that he is not going to go forward to

2    the Office of Intelligence Policy Review in order to allow me to

3    get a criminal search warrant.

4    Q.   Right.  And you've previously stated that the only negative

5    implications of doing both at the same time existed in Agent

6    Frasca's head, right?

7    A.   Yes, sir.

8    Q.   All right.  And you've accused him of criminal negligence in

9    this matter, haven't you?

10   A.   I accused the people at FBI headquarters in general, yes,

11   sir.

12   Q.   Of criminal negligence?

13   A.   Yes, sir.

14   Q.   And you thought they were doing all this -- you, you've said

15   that the reason that nobody walked your request any farther on,

16   because they were trying to protect their careers, right?

17   A.   Yes, sir, that's one of the reasons.

18   Q.   Right.  And the people in headquarters, you've said, took a

19   calculated risk to ignore what you had given them at the risk of

20   3,000 lives, correct?

21   A.   Not to ignore, but certainly not to advance, what the

22   information being developed by the Minneapolis JTTF, yes, sir.

23   Q.   But you have said it was a calculated risk on their part, and

24   the wager was a national tragedy, right?

25   A.   I said that it was a calculated risk on their part, yes, sir.

Page 1129

1    Q.    In order to protect their own careers, right?

2    A.    Yes, sir.

3    Q.    And you said that you didn't have any choice once Frasca told

4    you that you couldn't get a warrant, you were out of options,

5    right?  Because he was in charge.  You couldn't do anything else,

6    right?

7    A.    At my level?  No, sir, I could not do anything else.  I had

8    other options.  I could not further advance the criminal search

9    warrant path, but Frasca didn't just shut it down with -- while

10   providing no options.  In fact, he provided one that was very

11   viable at least at the time, which was to go the FISA route.

12   Q.    Well, even you've said, haven't you, that the FISA option

13   wasn't any good because there would have been restrictions in

14   using whatever you got anyway, right?

15   A.    At least to prosecute Mr. Moussaoui downstream, but in terms

16   of thwarting the plot, no.

17   Q.    Right.  But they also criminally obstructed your FISA

18   application, too, didn't they?

19   A.    Criminally obstructed -- they obstructed it, yes, sir.

20   Q.    Well, you've used the word "criminal negligence" to describe

21   Mr. Maltbie's efforts to try to get you a FISA, too, haven't you?

22   A.    I've used "criminal negligence" in a general term to,

23   referring to people in FBI headquarters.

24   Q.    And Mr. Maltbie was promoted after 9/11, wasn't he?

25   A.    He received the supervisor's spot of a Joint Terrorism Task

Page 1130

1   Force after 9/11.

2   Q.    After, after you talked to Mr. Frasca on the 21st, you never

3   once again raised the issue of getting a criminal search warrant,

4   did you?

5   A.    No, sir, not with Unit Chief Frasca.  To say that, that the

6   issue was never again raised is inaccurate.  We were always

7   mindful of the need throughout the continuance of that

8   investigation to collect both criminal evidence and intelligence.

9          We were pursuing both, both pipelines very aggressively.

10  Did we reraise the issue with the Radical Fundamentalist Unit?

11  No, but it was being pursued constantly.

12  Q.    You never once went back to the U.S. Attorney's Office in

13  Minneapolis and asked for one of them to prepare a search warrant,

14  correct?

15  A.    Yes, sir, that's correct.

16  Q.    And you never went back to Mr. Frasca after the 21st and

17  said, "I've got new information.  Do you want to hear my new

18  information?  Let's try again"?  You never did that, either, did

19  you?

20  A.    Yes, sir, that's correct.

21  Q.    Go to page 24 of this.  We're almost at the end of this

22  document.

23          Read the last paragraph, if you would, please, Agent.

24  A.    "Minneapolis believes that the preponderance of information

25  to be gained from future investigation will concern the specific

Page 1131

1    criminal acts set forth above.  However, as there is reason to

2    believe that Moussaoui and al-Attas are part of a larger

3    international radical fundamentalist group, captioned pending 199

4    matter will remain open and a classified sub-file to the 265

5    matter will be opened to serve as a repository for classified

6    information developed."

7             That's responsive to what I just said, the pursuit of

8    both intelligence and criminal investigations going on.

9    Q.   Right.  But you were shut down on the criminal investigation.

10   A.   I was shut down on the ability to contact the U.S. Attorney's

11   Office, and so that convinced the Minneapolis JTTF not to open a

12   parallel criminal investigation at the time.

13   Q.   You never opened a parallel criminal investigation, as you

14   wanted in this communication, sir, because you were told not to by

15   the people in Washington?

16   A.   No, sir, that's not correct.  That's not correct.  We did

17   open a 265, a parallel 265 on September 11.  Headquarters did not

18   direct us not to open the criminal investigation.  What

19   headquarters said is they were not going to go forward to get us

20   authority to contact the U.S. Attorney's Office.

21            We didn't need their permission to open a parallel

22   criminal investigation.  However, without authority to go to the

23   United States Attorney's Office, the criminal case is really of no

24   value.

25   Q.   Okay.  And you finally got a criminal warrant on September

U.S. v. Moussaoui

1    11, right?

2    A.    Yes, sir, that's correct.

3    Q.    But that was after a couple of planes crashed, right?

4    A.    Yes, sir.

5    Q.    And you told the -- you previously testified that, that Agent

6    Frasca didn't, didn't believe there was probable cause after the

7    two planes hit the World Trade Center and told your office it was

8    just a coincidence, right?

9    A.    Sir, what I said was I had heard from another person, from

10   Assistant Special Agent-in-Charge Briese, that that's what

11   Mr. Frasca had said, yes, sir.

12   Q.    And you've told the Inspector General that nothing short of

13   the disaster which befell the United States on September 11, 2001,

14   would have caused the Radical Fundamentalist Unit to give us the

15   authority we so desperately sought because we in Minneapolis

16   witnessed this ourselves?

17   A.    Yes, sir.  At the time I wrote that, I believed it.

18   Q.    Okay.  And that was a submission to the United States

19   government, wasn't it?  Right?  That's something you told the

20   United States government in an investigation, correct?

21   A.    Yes, sir.  As I said, at the time I submitted that, I

22   believed it.

23   Q.    And you were upset that someone in the Inspector General's

24   Office thought that you had just accepted the advice of the

25   Radical Fundamentalist Unit and not opened the investigation

Page 1133

1  anyway, correct?

2  A.   Yes, sir.

3  Q.   And you told them that the use of the word "advice" is

4  inaccurate.  "The FBI does not dispense advice to field offices.

5  And this characterization assigned there, including Special Mike

6  Rolince, does not portray what was then occurring.  This ignores

7  the fact that the Radical Fundamentalist Unit and the National

8  Security Law Unit were the first and second steps in the process

9  of obtaining a FISA or authority to go to the U.S. Attorney's

10  Office on a criminal case, and as stated above, Minneapolis wasn't

11  relying on the Fundamentalist Unit for advice.  We needed them to

12  take tangible steps in a prompt and aggressive manner, something

13  they were unwilling to do."  Right?

14  A.   Yes, sir.

15  Q.   Those are your exact words, aren't they?

16  A.   They are.

17        THE COURT:  Mr. MacMahon, I'm not sure the jury has yet

18  had explained for it what you mean by an Inspector General's

19  investigation.

20        MR. MAC MAHON:  Would you like for me to pull it out of

21  the witness, Your Honor?

22        THE COURT:  Yeah.

23  BY MR. MAC MAHON:

24  Q.   Tell the jury what the Office of the Inspector General is.

25  A.   The Office of the Inspector General is an organization within

Page 1134

1    the Department of Justice who is tasked with investigating

2    Department of Justice employees as to any misconduct or wrongdoing

3    in the performance of their duties.

4    Q.   Okay.  And after September -- can I lead a little bit, Your

5    Honor?  Excuse me?

6            THE COURT:  It depends on whether you draw an objection.

7            MR. MAC MAHON:  Well, I guess I'm on cross anyway so --

8            THE COURT:  Yeah, that's right.

9    BY MR. MAC MAHON:

10   Q.   But the -- after 9/11, the Office of the Inspector General

11   launched an investigation to determine the performance of certain

12   officials in the FBI, right?

13   A.   Yes, sir, that's correct.

14   Q.   And there was a report issued, correct?

15   A.   There was.

16   Q.   All right.  And you testified in that investigation?

17   A.   I did.

18   Q.   And then after the report came out, you, you generated a

19   document that has your comments in it about that investigation and

20   its conclusions, right?

21   A.   The comments were actually solicited by FBI headquarters,

22   yes, sir.

23   Q.   Okay.  But those are your -- what I was reading from are your

24   comments, correct?

25   A.   They were.

Page 1135

1  Q.   So when we talked about the IG, that's -- so the jury can

2  understand, when you say you told the IG or you testified, we're

3  talking about statements made by you under oath in the course of

4  that investigation, correct?

5  A.   What you were reading were not statements made by me under

6  oath, no, sir.

7  Q.   But you did give statements under oath?

8  A.   Yes, sir.  What you were reading were my administrative

9  comments in response -- they were internal to the FBI, and they

10 were not under oath.

11 Q.   Do you want to take them back?

12 A.   No, sir.

13 Q.   That also wasn't your first experience with Mike Maltbie, was

14 it?

15 A.   No, sir.

16 Q.   And you knew as soon as your FISA application for Moussaoui

17 was assigned to Mike Maltbie, it was going nowhere, right?

18 A.   No, sir.  Mr. Maltbie had actually advanced two previous

19 requests in other cases.  I knew it would be a difficult sell to

20 Mr. Maltbie, but to say that it was going nowhere is not accurate.

21 Q.   Okay.  And who is Mike Maltbie?

22 A.   He's the supervisory special agent in the Radical

23 Fundamentalist Unit, who is assigned oversight responsibility for

24 the Minneapolis Division.

25 Q.   You're not going to tell this jury that you thought

Page 1136

1  Mr. Maltbie was helpful to you in your obligations, are you?

2  A.   No, sir.  I'm also not going to say, sir, that, in fact, I

3  knew it was absolutely going nowhere beyond a shadow of a doubt.

4  Q.   Well, you were very concerned, weren't you?

5  A.   Yes, sir.

6  Q.   In fact, you told the IG that Mike Maltbie's actions

7  constitute misconduct of the most serious kind, right?

8  A.   Yes, sir.

9  Q.   You say that he thwarted your attempts to access Moussaoui's

10 belongings and meaningfully advance the investigation, right?

11 A.   Yes, sir.

12 Q.   And you told the IG that Maltbie's actions denied the FBI

13 what has been termed a significant opportunity to stop the 9/11

14 attacks, right?

15 A.   Actually, I think you're reading from my submission to the

16 FBI, to the internal FBI memo, to correct you on that first, and

17 second, yes, sir, I did, "an opportunity to stop 9/11" were my

18 exact words.

19 Q.   And you said that you had been dealing with Special Agent

20 Maltbie since 2000 and had seen firsthand how obstructionist he

21 could be when it came to FISA matters.  Those are your words,

22 right?

23 A.   Yes, sir.

24 Q.   "My first such encounter while working with Mr. Maltbie was a

25 FISA-covered intelligence investigation on a subject believed to

Page 1137

1    be going to Afghanistan to train terrorists," right?

2    A.    Yes, sir, that's correct.

3    Q.    Okay.  And when did that happen?

4    A.    Beginning in late 1999.

5    Q.    And you were pretty new to the -- a new agent at that time,

6    right?

7    A.    Yes, sir.

8    Q.    You had a very bad experience with Mr. Maltbie with that

9    application, right?

10   A.    I had a difficult experience, but one that was ultimately

11   forwarded by him and eventuallily signed by a FISA court judge.

12   Q.    Over what period of time, Agent?  Nine months?

13   A.    Yes, sir.

14   Q.    "Simply" -- these are your words -- "Simply obtaining the

15   FISA in this case has been an ordeal, as Maltbie raised a number

16   of objections and raised questions over a period of several

17   months, finally bowing to the pressure of the facts of the case,

18   he went forward with our request, which was approved," right?

19   A.    Yes, sir.

20   Q.    And tell the jury what you can about what that case involved.

21   A.    As you said, sir, as you read, it involved a person traveling

22   from Minnesota overseas to train terrorists.

23   Q.    Okay.  And what was going on in that person's family that

24   concerned you?

25   A.    That person had a relative who was attempting to enlist in

Page 1138

1    the Minnesota Army National Guard.

2    Q.    And that concerned you, didn't it?

3    A.    It did, yes, sir.

4    Q.    Okay.  And that information had been obtained somehow by a

5    FISA through -- it was intelligence information?

6    A.    Yes, sir, through a technique authorized under FISA.

7    Q.    Right.  And you had wanted to do what with that information?

8    A.    I wanted to share it with the military.

9    Q.    And in order to do that, you had to go, it turned out,

10   through Mr. Maltbie, right?

11   A.    Yes, sir, beginning with Mr. Maltbie all the way up through

12   the, the chain, the appropriate chain.

13   Q.    And one of the reasons even in 2000 you were concerned was

14   because this person, if he joined the National Guard, would have

15   access to the airports in Minneapolis, St. Paul, right?

16   A.    Yes, sir.

17   Q.    You were concerned about aviation security even then, right?

18   A.    Yes, sir.

19   Q.    And you immediately called -- when you learned that this

20   person was the relative of a Taliban terrorist trainer who was

21   planning to join the United States military, you immediately

22   called Special Agent Maltbie to obtain permission, right?

23   A.    To obtain permission?

24   Q.    To disseminate this information to the appropriate agencies.

25   A.    Yes, sir.

Page 1139

1    Q.    Okay.  And when you advised him of that, Special Agent

2    Maltbie became extremely agitated, right?

3    A.    Yes, sir.

4    Q.    And you wrote that he stated that there was no reason to

5    inform the military of this development?

6    A.    Yes, sir.

7    Q.    He went on to state that this was just the kind of thing

8    which would get FBI employees in trouble because of the

9    sensitivity of FISA information, right?

10   A.    Yes, sir, because of -- Mr. Maltbie's view was that FISA

11   information needed to be safeguarded because of some difficulty

12   the FBI had had with the FISA court.

13   Q.    And to protect his career, right?

14   A.    Yes, sir.

15   Q.    When I -- he went on to state -- excuse me, "When I insisted

16   that the Army needed to receive this information, Special Agent

17   Maltbie got angry."  Those are your words, right?

18   A.    Yes, sir.

19   Q.    He advised me that other supervisors at FBI headquarters had

20   recently gotten into trouble over FISA issues in the past, and he

21   was not about to let that happen to him.

22           That's what he told you, didn't he?

23   A.    That's correct.

24   Q.    "Maltbie advised me that he was trying to keep the two of us

25   from receiving a" -- and I quote -- "receiving a rectal with a

Page 1140

1    microscope", and his refusal to provide me what I considered to be

2    vital intelligence to the military was being done in the interest

3    of helping my career.

4             MR. NOVAK:  Judge, we object to this.  We're talking

5    about another case.  He's not denying at all his view of

6    Mr. Maltbie's conduct in relation to the case.

7             THE COURT:  This line of questioning is clearly relevant

8    to the defense's theory of the case.  The objection is overruled.

9    BY MR. MAC MAHON:

10   Q.   Those are your words, aren't they, sir?

11   A.   Could you repeat the question?

12   Q.   You told the FBI that Special Agent Maltbie advised me that

13   he was trying to keep the two of us from receiving a "rectal with

14   a microscope" and that his refusal to allow me to provide what I

15   considered to be vital intelligence to the military was being done

16   in the interest of helping my career.

17   A.   Yes, sir.

18   Q.   Those are your exact words, right?

19   A.   Yes, sir.

20   Q.   Then Maltbie went on to explain that a supervisor at FBI

21   headquarters had recently been subjected to scrutiny and

22   sanctioned as a result of his mishandling of a FISA matter.

23   A.   Yes, sir.

24   Q.   You remember these conversations very well, don't you?

25   A.   I do.

 1    Q.    "Agent Maltbie indicated to me that his caution" --

 2    quote-unquote, caution -- "in issues relating to FISA stem from a

 3    desire to avoid a similar fate and to preserve the integrity of

 4    his advancement potential in the FBI, and he also attempted to

 5    reassure me that my issue was not serious."  Right?

 6    A.    Yes, sir.

 7    Q.    That's exactly what he told you about the Moussaoui FISA

 8    request, too, didn't he?

 9    A.    No, sir.  That's, that's not accurate.

10    Q.    He told you you were getting spun up, didn't he?

11    A.    Yes, sir.  And he also told me that the information that we'd

12    surfaced on Mr. Moussaoui in that case had not met the foreign

13    power standard.  He never told me he didn't consider it serious.

14    He told me that it didn't meet the standard under FISA by which

15    we're required to connect Mr. Moussaoui to a foreign power.

16    Q.    Okay.  But you knew from your experience with Mr. Maltbie

17    this was going to be a serious problem, didn't you?

18    A.    That there was going to be a high standard, yes, sir.

19    Q.    Yes.  Protecting somebody's career, is that a high standard

20    on issuing a FISA?  Is that what you're saying, sir?

21    A.    No, sir.  What I'm saying is that Mr. Maltbie would have

22    required a high standard of information in order to go forward.

23    Q.    As of August 18, 2001, how many FISA requests to your

24    knowledge had ever been turned down?

25    A.    I don't know, sir.

Page 1142

1  Q.    A few?

2  A.    I don't know.

3  Q.    What did you learn in your training?

4  A.    We didn't get the track record of the FBI with regard to FISA

5  applications.

6  Q.    Out of thousands, Agent, you know that very few, in the hand

7  of a handful have ever been turned down, right?

8  A.    Yes, sir.  I know that the number is small.

9  Q.    And no one ever even submitted your application under any

10  circumstances?

11  A.    Submitted it to the FISA court?

12  Q.    Yes.

13  A.    Yes, sir, that's correct.

14  Q.    It just died on Mr. Maltbie's desk?

15  A.    No, sir, that's not accurate.

16  Q.    Died on somebody else's desk?

17  A.    Mr. Maltbie forwarded it to the National Security Law Unit at

18  FBI headquarters.

19  Q.    So you -- and going back to your IG response, "When I

20  persisted, Special Agent Maltbie again grew angry and advised me

21  that he would get a ruling from the National Security Law Unit on

22  the issue."

23  A.    Now we're speaking of the other case, correct?

24  Q.    We're back to the Taliban terrorist trainer planning to join

25  the United States military in the year 2000.

1  A.   If I could correct you, that's a relative of the Taliban

2  terrorist trainer.

3  Q.   Thank you, sir.

4       And you said, to him -- to you, "It seemed self-evident,

5  that the fact that a relative of a Taliban terrorist trainer was

6  attempting to join a part of the U.S. military constituted foreign

7  intelligence, so I was confident I would receive authority to

8  share this intelligence."  Those are your words, right?

9  A.   Yes, sir.

10  Q.   You were therefore -- it was therefore with surprise and

11  alarm a few days later that I received an e-mail from Agent

12  Maltbie informing, informing you that NSLU, National Security Law

13  Unit, attorneys had ruled that this did not constitute foreign

14  intelligence and advised me that you were not then allowed to

15  disseminate the information.

16  A.   Yes, sir.

17  Q.   That's what actually happened, right?

18  A.   Yes, sir.

19  Q.   And how much time period are we talking about this?

20  A.   A matter of a week or ten days.  I'm not sure exactly how

21  long the delay was.  It was reasonably short.

22  Q.   And you say that Maltbie told you that he feared -- made it

23  be known that he feared that any interaction with the FISA court

24  could be damaging to his reputation and his career, right?

25  A.   Any, any negative interaction with the FISA court.

Page 1144

1    Q.   Well, you don't use the word "negative" in your submission?

2    A.   Well, that's what I meant.

3    Q.   He was clear that he would only go to the FISA court when

4    absolutely necessary and he himself would be the final judge of

5    when it became absolutely necessary, right?

6    A.   Yes, sir.

7    Q.   That's what he told you, didn't he?

8    A.   Yes, sir.

9    Q.   "Therefore, when the Moussaoui matter was later handed to

10   Special Agent Maltbie, I realized that we would face significant

11   obstacles in advancing the investigation.  What I did not expect

12   is that when I asked for authority to go to the criminal route, in

13   part because I had no confidence in him or the other headquarters

14   supervisors, that he would deny this as well, with the assistance

15   of Agent Frasca."

16          Those are your words, too, aren't they?

17   A.   Yes, sir.

18   Q.   Go back to Exhibit 472, if you would, please, the last --

19   page 25.

20          All right, if you could, Agent, could you tell the jury

21   what these leads are?  You don't have to read them.  Just give

22   them an idea of what you're trying to do here as an agent.

23   A.   The lead portion of the electronic communication comes at the

24   back, and it's where we request other offices in the FBI to do

25   work for us, to take investigative action of some kind.

Page 1145

1   Q.   Okay.  So you're trying to -- and again, this immediate --

2   this is immediate, right?

3   A.   Yes, sir.

4   Q.   Okay.  And so you're asking these various offices to step up

5   and help you out?

6   A.   Cover it within the first 24 hours if possible.

7   Q.   And on the next page -- if you could, please, Ms. Bishop.

8          THE COURT:  Hold on one second.  You used the

9   term "letterhead memorandum."

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  You explained what an EC, electronic

12   communication, is.  Could you explain what an LHM is and the

13   difference between the two?

14         THE WITNESS:  An EC, or electronic communication, is an

15   internal FBI document.  It's intended to go from one office to

16   another, from one office to headquarters or vice versa, and it

17   contains, as you can see from my electronic communication, a lot

18   of information that's typically appropriate only within the FBI:

19   Investigative conclusions, opinions, investigative actions, things

20   of that nature.

21         A letterhead memorandum, or LHM, is a document that we

22   produced that's intended to go outside the FBI, most commonly to

23   another agency within the federal government or friendly foreign

24   government.

25         THE COURT:  Thank you.

Page 1146

1           MR. MAC MAHON:  Thank you, Your Honor.

2    Q.   Now, the, the other page we're looking at here, this is

3    something you wanted internally for the people in Oklahoma to look

4    into, correct?

5    A.   Yes, sir.

6           MR. MAC MAHON:  Okay.  I moved the admission of that

7    exhibit, didn't I, Your Honor?

8           THE COURT:  Yes, that's in.

9           MR. MAC MAHON:  Thank you.

10   Q.   Now, you, you told the IG that from the beginning of this --

11   after you sent the document we just read, that Mr. Maltbie had a

12   predetermined outcome in this case, right?

13   A.   After the document was provided to Mr. Maltbie by Supervisory

14   Special Agent Manarang, he took a number -- a day or two to review

15   it, but yes, sir, then I got the feeling that he had a

16   predetermined outcome for the case.

17   Q.   All right.  You told the inspector general that at the

18   substantive unit, Agent Frasca, possibly taking his clues -- cues,

19   excuse me, from his subordinate, Special Agent Maltbie, clearly

20   had a predetermined outcome in mind when dealing with the

21   Minneapolis field office, and this did not include FISA or

22   criminal search warrants for Moussaoui's belongings.

23           Those are your words, right?

24   A.   Yes, sir.  They had a third option in mind.

25   Q.   And having decided there was no urgency and no threat, he

Page 1147

1    slowed or denied the use of every tool at division's disposal for

2    further -- furthering our investigation, only relenting on

3    September 10, 2001, obviously too late in allowing us to exercise

4    our distant third choice option:  Travel to France so that their

5    service could search his belongings.

6    A.   Correct.

7    Q.   Those are your words, right?

8    A.   Yes, sir.

9    Q.   The only option they eventually gave you was for you to

10   actually get on the plane with Mr. Moussaoui and fly back to

11   France, right?

12   A.   It's the option that eventually we were pushed to, yes, sir.

13   Q.   All right.  And it was not the one that you wanted, right?

14   A.   It was not, no, sir.

15   Q.   You tried to move heaven and earth to get a search warrant to

16   get into this man's belongings, didn't you?

17   A.   Yes, sir.

18   Q.   And you were obstructed in Washington at every turn; isn't

19   that correct?

20   A.   In Washington?  I think it -- the statement "in Washington"

21   is inaccurate.

22   Q.   Well, I will be more specific.  From the people who you

23   needed help from, your supervisors in Washington, you were

24   obstructed in every way possible?

25   A.   From a particular individual in the Radical Fundamentalist

Page 1148

1    Unit, in RFU, yes, sir, I was obstructed.

2    Q.   All right, let's look at Exhibit 49, if we could, please.

3            49B?

4            THE COURT:  It's 49B is the one I have.

5            MR. MAC MAHON:  49B, I'm sorry, Your Honor.

6            THE COURT:  Is there an objection to 49B?

7            MR. NOVAK:  If we may just have a second?

8            THE COURT:  Yes, sir.

9            MR. NOVAK:  No objection, Judge.

10           THE COURT:  All right, it's in.

11           (Defendant's Exhibit No. 49B was received in evidence.)

12   BY MR. MAC MAHON:

13   Q.   Okay.  Tell the jury what this is, if you would, Agent.

14   A.   This is an e-mail internal from me to other members of my

15   squad who were assisting with the investigation, requesting

16   that -- or soliciting an opinion and seeing if anyone had a

17   contact with the Behavioral, Behavioral Assessment Unit.

18   Q.   And that's, that's who the -- I won't circle "quacks" for

19   you, Agent.  Islamic martyr?

20   A.   Yes, sir.

21   Q.   Why were you looking for a behavioral assessment of a profile

22   of an Islamic martyr?

23   A.   Because Mr. al-Attas had told us that day or the day before

24   that Mr. Moussaoui approved of martyrs, and so I wanted to

25   determine if Mr. Moussaoui himself fit that profile.

Page 1149

1  Q.   Did you ever hear back from these people?

2  A.   From the people on my squad?  I did.  No one had a current

3  contact, so I contacted the person I referred to.

4  Q.   Okay.  And did you hear back from the -- is that NFD,

5  behavioral assessments?

6  A.   Yes, sir.

7  Q.   Okay.  And did you ever hear back from them before September

8  11?

9  A.   I did.  I had an ongoing dialogue with the person -- you see

10 here, I refer to the field guy in Tampa?

11 Q.   Sure.

12 A.   I had an ongoing dialogue with him.

13 Q.   All right.  And you learned from him that Moussaoui did, in

14 fact, fit the profile, didn't you?

15 A.   I learned that there were reasons for concern.

16 Q.   Right.

17 A.   It's difficult for them to make an assessment just based on

18 what I tell them, but certainly that person pointed out some very

19 important points to me, but as far as him going -- being -- having

20 the capability based on my second-party information, for him to be

21 able to say definitively that Mr. Moussaoui met the martyr

22 threshold was impossible.  He couldn't do that.

23 Q.   But he didn't discourage you from your --

24 A.   No, sir.  He agreed with me, as a field agent, he agreed with

25 me that we had something very significant that needed to be

1    followed up.  That's the tendency of all FBI field agents is to

2    gather as much information as possible.  He just encouraged what's

3    for all of us a natural tendency.

4    Q.   Okay.  Go to Exhibit 668, if you would, please.

5              Did I move the last one, Your Honor?

6              THE COURT:  49B is in, yes, sir.

7              Does the government have an objection to 688?

8              MR. NOVAK:  No, Your Honor.

9              THE COURT:  All right, it's in.

10             (Defendant's Exhibit No. 688 was received in evidence.)

11             MR. MAC MAHON:  Thank you.

12   Q.   Agent Samit, could you tell us what Exhibit 688 is, please?

13   A.   This is the letterhead memorandum, one of the three

14   letterhead memoranda that were attached to that opening

15   communication.  This one in particular, as you can see, is the one

16   intended to go to the Department of Justice to get us authority to

17   go to the United States Attorney's Office.

18   Q.   Okay.  So this would have been an attachment to the document

19   we looked at before?

20   A.   It was one of three enclosures, yes, sir, one of three

21   enclosed LHMs.

22   Q.   Do you know where this would have been circulated to at

23   Justice?

24   A.   My request was for it to go to the Office of Intelligence

25   Policy Review.  Those are the people that needed to give me the

Page 1151

1   authority to go to the U.S. Attorney's Office.

2   Q.   Okay.  And who were the people at that office that you knew

3   were holding the yes-or-no answer to your question?

4   A.   I didn't, I didn't have any contact with those people.  The

5   people at FBI headquarters were interface with them.

6   Q.   Go to page 5 of this document, if you would, please.

7        All right.  You see the information in the bottom two

8   paragraphs there?

9   A.   Yes, sir.

10  Q.   Now, your intention here was to -- this is -- why did you

11  have to include this information in a separate document as opposed

12  to the communication you had already done?

13  A.   Because as I, I explained, the electronic communication is an

14  internal FBI document.  What I wanted the FBI to do in that lead

15  section as set forth there was go to the Office of Intelligence

16  Policy Review, Department of Justice, outside the FBI.  So in a

17  lot of cases, what you'll see is the letterhead memoranda that are

18  attached to electronic communications are very duplicative,

19  because they need to go outside the agency.

20  Q.   So who did this -- so is the Office of Intelligence Policy --

21  is that what it's called, OIPR?

22  A.   Yes, sir.

23  Q.   That's not part of the FBI?

24  A.   Correct.  That's part of Department of Justice.

25  Q.   And how many lawyers are there, to your knowledge?

1   A.   I don't know, sir.

2   Q.   Do you know how many lawyers of the Department of Justice

3   would have been forwarded this document?

4   A.   I don't know, sir.

5   Q.   And this document contains the same language about conspiracy

6   of acts of terrorism transcending national boundaries and

7   destruction of aircraft facilities, right?

8   A.   Yes, sir.

9   Q.   Same cites to Title 18, 2332, and 32 as well, right?

10  A.   Correct.

11  Q.   And you repeat your, your belief that Moussaoui's involved in

12  a plan to involve the performance of violence or incapacitation of

13  individuals on aircraft in the special aircraft jurisdiction of

14  the United States for the purpose of seizing control of the

15  aircraft for his own ends, right?

16  A.   Yes, sir.

17  Q.   And that was important, you wanted, you wanted the people at

18  Department of Justice to know that that was what your

19  investigation had uncovered at that time?

20  A.   That's correct.

21  Q.   Okay.  And no one from the Department of Justice ever called

22  you about this at all, did they?

23  A.   No, sir, not before 9/11.

24        MR. MAC MAHON:  Did I move the admission of --

25        THE COURT:  688 is in, yes.

Page 1153

1          MR. MAC MAHON:  692, please.

2          THE COURT:  Any objection to 692?

3          MR. NOVAK:  No objection.

4          THE COURT:  All right, it's in.

5          (Defendant's Exhibit No. 692 was received in evidence.)

6    BY MR. MAC MAHON:

7    Q.   What's Exhibit 692?

8    A.   This is the second of the three letterhead memoranda that was

9    enclosed with that electronic communication, this one, I believe,

10   going to our office in England for forwarding to the government of

11   the United Kingdom.

12          MR. MAC MAHON:  Okay.  Thank you.

13          Your Honor, I'm hearing that there's a declassified

14   version of this.  This may not be the last one, so I won't put it

15   up on the screen, and we'll just deal with that at the break.

16   Mr. Van Longhuyzen is -- I can hear him back there.

17          THE COURT:  Well, the one that's in my book indicates no

18   redaction.  Does that mean it should not be in my book in this

19   format?  All right.  We need to make sure we've checked into that.

20          MR. MAC MAHON:  I'm sorry about that, Judge.  There's so

21   many of them, we made a mistake.

22   Q.   Don't read any more from this document, but this is the LHM

23   to the office in London, right?

24   A.   Just if you could give me one second to review it.

25          MR. MAC MAHON:  Your Honor, we have a declassified one

Page 1154

1    we can put up on the screen with the Court's indulgence.

2            THE COURT:  Just make sure it's the one they want you

3    to --

4    BY MR. MAC MAHON:

5    Q.  I'll make it easier, Agent.  Sorry about that.  Have you seen

6    this before?

7    A.  I have.

8            THE COURT:  You need to substitute.

9            MR. MAC MAHON:  We will, Your Honor.  We'll do it at

10   lunchtime.

11           THE WITNESS:  I have seen it before.

12   BY MR. MAC MAHON:

13   Q.  Okay.  And the nature -- tell the jury about the relation

14   between what you do as an agent when you want to get some

15   information from the people in London, your ALAT is the word we

16   use.  Tell the jury that, if you would.

17   A.  Correct.  In the lead section of the electronic

18   communication, our offices all over the world are treated

19   essentially similarly.  In this case, I sent this letterhead

20   memorandum to our office in London, with the request that he go to

21   the British government.

22   Q.  Okay.  And you can't, you can't call the ALAT yourself,

23   right?  You have to go through Justice Department to do that?

24   A.  No, no, I can contact the ALAT.  He's an FBI employee.  In

25   fact, they're FBI agents.

Page 1155

```
 1   Q.   Okay.  So why do you use this method to go to them?

 2   A.   Well, I use both methods, both e-mail and this.  This method

 3   is the formal, formalized request.  In order for him to make a

 4   formalized request of the foreign government, he needs a

 5   formalized request from me, a formal request from me.

 6   Q.   So this is the formal request?

 7   A.   It is.

 8   Q.   Okay.  And you wanted the ALAT in London to know you had an

 9   international terrorism investigation?

10   A.   Yes, sir.

11   Q.   And you related a lot of the information in this document

12   about why you were suspicious about Moussaoui, that Moussaoui

13   thought it was acceptable to kill civilians and that other

14   information as well, correct?

15   A.   I'd have to review it to be sure, but yes, that would

16   certainly have been the kind of information that would have been

17   provided, absolutely.

18   Q.   All right.  But you didn't include in this LHM the language

19   about Moussaoui trying to take control of an aircraft, disable the

20   crew, and do -- for his own ends, did you?

21   A.   I'd have to review it.

22   Q.   Take your time, Agent.

23   A.   Okay.  I did not.

24        MR. MAC MAHON:  If you could pull up page 7?

25   Q.   Page 7 is -- no, that's -- excuse me, Your Honor.
```

Page 1156

1          You told them that Moussaoui was an Islamic

2   fundamentalist preparing for some future act in furtherance of

3   radical fundamentalist goals, correct?

4   A.   Yes, sir.

5   Q.   And that you believed he was conspiring to commit a terrorist

6   act, right?

7   A.   I did.

8   Q.   And you didn't hear anything back from London until after

9   9/11, right?

10  A.   That is correct.

11  Q.   And that lead was sent immediate, wasn't it?

12  A.   It was.  And it's important to note that our FBI

13  representative in London handled it in our fashion, handled it

14  immediately.  The response, the delay in response came `from the

15  people he was in contact with, not internal to his office.

16  Q.   The British authorities were the -- didn't get the work done

17  in time, right?

18  A.   I don't -- the British authorities didn't respond.

19  Q.   It didn't get done, right?

20  A.   The response didn't happen, yes, sir.

21  Q.   Thank you.

22          Exhibit 741, please.

23          THE COURT:  Any objection to 741?

24          MR. NOVAK:  No, Your Honor.

25          THE COURT:  All right, it's in.

Page 1157

1            (Defendant's Exhibit No. 741 was received in evidence.)

2    BY MR. MAC MAHON:

3    Q.   What's Exhibit 741 there, Agent Samit?

4    A.   That is an e-mail from me to a variety of people, including

5    our, our person in London, with that electronic communication and

6    the letterhead memoranda that we just looked at, that I'm

7    e-mailing that to all the recipients.  It's a way of making sure

8    they see it in the most timely fashion possible.

9    Q.   You're trying to get everybody's attention at this time,

10   aren't you, Agent?

11   A.   Yes, sir.

12   Q.   Right.  That's why you sent them an e-mail yourself.  And in

13   that e-mail, you again list two of the charges that Moussaoui has

14   pled guilty to, correct?

15   A.   Yes, sir.

16   Q.   And who -- tell the, tell the jury, if you would, who these

17   people are on the "To" line?

18   A.   G. Jones was my acting supervisor at the time, Joseph Hummell

19   was one of the ALATs in our London office, Joe Manarang was the

20   supervisor in the Iran Unit.  And it's cut off, but I'm guessing

21   that Joseph might be Joseph Rivers.

22   Q.   Joe Rivers from your office in Minneapolis?

23   A.   Yes, sir.

24   Q.   All right.  739, please.

25            THE COURT:  Any objection?

Page 1158

1            MR. NOVAK:  No objection, Your Honor.

2            THE COURT:  All right, it's in.

3            (Defendant's Exhibit No. 739 was received in evidence.)

4   BY MR. MAC MAHON:

5   Q.   Tell the jury what that is, Agent.

6   A.   This is the same type of e-mail being sent the next morning

7   to our legal attache's office in Paris.

8   Q.   And they responded quickly, didn't they?

9   A.   Yes, sir.

10           MR. MAC MAHON:  Move -- I already moved it.  I'm sorry,

11  Your Honor.

12           THE COURT:  It's in.

13  BY MR. MAC MAHON:

14  Q.   Exhibit 695, please.

15           THE COURT:  Any objection, Mr. Novak?

16           MR. NOVAK:  No objection, Your Honor.

17           THE COURT:  All right, it's in.

18           (Defendant's Exhibit No. 695 was received in evidence.)

19  BY MR. MAC MAHON:

20  Q.   Okay.  What's that, Agent?

21  A.   This is yet another e-mail to in this case Joe, the Joe there

22  is Joseph Manarang, asking them to take that letterhead memorandum

23  and get us permission from the Department of Justice to go to the

24  U.S. Attorney's Office.

25  Q.   And you were concerned on August 20, 2001, about the fact

Page 1159

1    that al-Attas had been bailed out, correct?

2    A.    Yes, sir.

3    Q.    And why were you concerned about that?

4    A.    As it says there, because he may be heading back to Oklahoma

5    City to destroy incriminating evidence.

6    Q.    Did you ask the people in Oklahoma City to make sure that

7    that didn't happen?

8    A.    I'm not sure how they could make sure that didn't happen.

9    Q.    Did you ask them to tail him?

10   A.    I asked them to conduct -- if you will recall from that EC, I

11   asked them to conduct as much investigation as they could to fully

12   identify him.  "Fully identify" is an FBI brevity term for conduct

13   an investigation of the person.  How they would go about doing

14   that, whether they would choose to do physical surveillance or

15   not, would be up to them.

16   Q.    Okay.  But you've written that they let you down, too,

17   haven't they?

18   A.    I've written that on one point they didn't pursue it as

19   vigorously as I would have liked.

20   Q.    And that had to do with this event, when al-Attas got back to

21   his apartment, correct?

22   A.    Yes, sir, it did, but they were directed to do that, so it's

23   probably more accurate to say that the people who were responsible

24   for that were at headquarters.

25   Q.    And nothing in your investigation ever revealed that Hussein

1   al-Attas was an al Qaeda member, did it?

2   A.   No.

3   Q.   Hussein al-Attas was somebody that Moussaoui had befriended

4   at the mosque and who drove him to Minneapolis, correct?

5   A.   Yes, sir.

6   Q.   And he pled guilty to and did time for giving you a false

7   statement, correct?

8   A.   Yes, sir.

9   Q.   How much time did he do?

10  A.   I don't know, sir.  He was prosecuted in another district.

11  I'm not familiar with the details of --

12  Q.   But nothing in your investigation revealed that Hussein

13  al-Attas was a terrorist, right?

14  A.   No, sir.

15  Q.   But you did, you did learn on or about August 20 that he was

16  on the telephone at the jail talking about going on jihad, right?

17  A.   Yes, sir.  He was certainly preparing to embark on a

18  terrorist career at the time that he was arrested.

19  Q.   It's because -- you learned that by listening to his

20  telephone call, right?

21  A.   Yes, sir, and interviewing him.

22  Q.   All right.  But the phone call from the jail, where was he in

23  jail?

24  A.   Carver County Jail.

25  Q.   And all the telephone calls that the inmates make at that

Page 1161

1    jail are recorded, right?

2    A.    Yes, sir.

3    Q.    And you recorded his phone call and learned that he told

4    somebody in Oklahoma City -- someone asked him if he was going on

5    jihad?

6    A.    Yes, sir, that's correct.

7    Q.    All right.

8    A.    In Norman, Oklahoma.

9    Q.    And what did he say?

10   A.    He said not to talk about that right now.

11   Q.    All right.  And that was, that was further confirming to you

12   that you had a pair of terrorists in your -- that you collared

13   here in Minnesota, didn't it?

14   A.    Yes, sir.

15   Q.    Okay.  Now, did -- where was Moussaoui in this time frame?

16   A.    He was in Sherburne County Jail.

17   Q.    All the, all the calls from Sherburne County Jail recorded,

18   too?

19   A.    Yes, sir.

20   Q.    And Moussaoui didn't make any phone calls from the jail, did

21   he?

22   A.    Not that we've ever been able to locate, no, sir.

23   Q.    Well, all of them -- all of the calls from the jail in the

24   time frame for when Moussaoui is arrested until September 11 were

25   recorded, weren't they?

Page 1162

1   A.   Yes, sir.

2   Q.   Calls into the jail and calls out of the jail?

3   A.   Correct.

4   Q.   Right.  And he didn't make any phone calls?

5   A.   Not that we've been able to detect, no, sir.

6   Q.   Well, have you listened to all of them?

7   A.   Yes, sir.

8   Q.   Couldn't hear his voice on there?

9   A.   Well, there were so many calls that it was spread out over a

10  number of agents in New York, sir.  And I know his voice, and I

11  can recognize it, but it would have been impossible for me to

12  listen to all of those calls.

13  Q.   Right.  But someone at the FBI did listen to all those calls,

14  right?

15  A.   Yes, sir.

16  Q.   And uncovered no evidence that Moussaoui ever placed a call

17  from the Sherburne County Jail or received one, correct?

18  A.   That's correct, yes, sir.

19  Q.   And he didn't get any mail while he was there, either, did

20  he?

21  A.   No, sir.

22  Q.   Didn't send any mail?

23  A.   No, sir.

24  Q.   Didn't have access to the Internet to send any e-mails or

25  otherwise, right?

Page 1163

1   A.   He did not.

2   Q.   So Moussaoui made and received no communications of any form

3   from the moment you arrested him in front of the Residence Inn

4   until 9/11, when he was -- after the attacks, right?

5   A.   None that we have been able to detect, no, sir.  To say that

6   he made no communications at all, inmates -- even inmates who are

7   in jail where their calls are monitored and they're strictly

8   supervised, which Sherburne County is not, that type of facility,

9   they can always get communications out.  They can have another

10  inmate make a call for them.  They can smuggle word-of-mouth words

11  out.  Certainly we have not detected any communications by

12  Mr. Moussaoui.

13  Q.   And you asked every inmate in the building, and you looked at

14  everything, and you found nothing, didn't you, Agent?

15  A.   Yes, sir.  Every inmate in the building is not accurate.

16  Inmates with whom we know Mr. Moussaoui had contact.

17  Q.   Well, after 9/11, you weren't short on resources.  You had

18  enough people to interview everybody in the jail that you wanted

19  to, didn't you?

20  A.   No, sir.  And to say that we were not short of resources is

21  inaccurate.  We were very busy.  Our resources grew, but so did

22  our workload.

23  Q.   But you found nothing in terms of a communication by

24  Moussaoui?

25  A.   That's correct, yes, sir.

Page 1164

 1   Q.   Look at Exhibit 632, please.

 2   A.   632.

 3              THE COURT:  Any objection to 632?

 4              MR. NOVAK:  Bear with me for a second, Your Honor?

 5              THE COURT:  Yes, sir.

 6              MR. NOVAK:  No objection, Your Honor.

 7              THE COURT:  All right, it's in.

 8              (Defendant's Exhibit No. 632 was received in evidence.)

 9              MR. MAC MAHON:  Thank you.

10   Q.   All right.  What's this, Agent?

11   A.   This is the criminal -- the opening to the criminal

12   investigation of Mr. Moussaoui.

13   Q.   Okay.  And that's a counterterrorism case?

14   A.   It is.  In this case, it's 265, it's a criminal

15   counterterrorism case.

16   Q.   And if we could scroll down a little bit?  Whose handwriting

17   is that?

18   A.   Mine.

19   Q.   Okay.  And read to the jury what this says.

20   A.   "8/21/2001, not open per instructions of SC Frasca."

21   Q.   And that's the conversation we talked about before about

22   Agent Frasca telling you not to open a criminal investigation?

23   A.   Right.  Again, the conversation was, Unit Chief Frasca asked

24   that I not -- or told me that he was not going to forward the

25   request to Department of Justice to contact the U.S. Attorney's

Page 1165

1    Office, so we did not open the criminal case, and that's what that

2    reflects.

3    Q.   All right.  What does the -- and I actually can't read it, so

4    I'm just asking it:  What is this language?

5    A.   That's actually my original -- the -- the one that you had me

6    read was a sticky that was placed on this document for one of the

7    inquiries that this went through.  The thing that's less easily

8    read is my writing also.  It says "(not open per tel call with

9    Unit Chief Frasca)."  Essentially, the substance of the

10   information is the same.

11   Q.   Without his approval, there was no way to open the criminal

12   case?

13   A.   No, sir, that's not accurate.  Without his approval, there

14   was no way to contact the U.S. Attorney's Office.

15   Q.   There wasn't any way to advance your investigation without

16   his approval through the U.S. Attorney's Office in Minneapolis,

17   correct?

18   A.   Correct.

19   Q.   Thank you.

20        All right, Exhibit 738, please.

21        THE COURT:  Any objection?

22        MR. NOVAK:  No objection, Your Honor.

23        THE COURT:  All right, it's in.

24        (Defendant's Exhibit No. 738 was received in evidence.)

25   BY MR. MAC MAHON:

Page 1166

1    Q.    Okay.  What's Exhibit 738, Agent?

2    A.    It's an e-mail from myself to Mike Maltbie, Supervisory

3    Special Agent Maltbie at headquarters, requesting that the U.S.

4    Secret Service, that's what USSS is, be notified.

5    Q.    Go ahead.

6    A.    Did you want me to read it?

7    Q.    Yes, please.

8    A.    "Mike, it's imperative that the USSS be apprised of this

9    threat potential indicated by the evidence contained in the EC.

10   If he seizes an aircraft flying from Heathrow to New York City, it

11   will have the fuel onboard to reach D.C."

12   Q.    You sent that to Mr. Maltbie on August 21, right?

13   A.    That's correct.

14   Q.    Did he call you back after you sent him that e-mail?

15   A.    I can't, I can't recall.  He may have.

16   Q.    Okay.

17   A.    I can't remember.

18   Q.    And Agent -- when Agent Frasca told you not to open a

19   criminal case, he didn't -- not to contact the U.S. Attorney's

20   Office, he didn't do that in writing, either, did he?

21   A.    No, sir.

22   Q.    Do you have any written response from Mr. Maltbie to this?

23   A.    Not this specific e-mail.  I've never seen a written

24   response.

25   Q.    It's a pretty extraordinary request from a street agent to

Page 1167

1   Washington, isn't it?

2   A.   No, sir, no.  In fact, again, as I discussed, our job is to

3   suck in as much evidence or as much intelligence as possible

4   regarding our investigations and to forward it to headquarters.

5   If we give it a little nudge in the direction it should go because

6   we're the first hand recipients of it, that's not -- that's not

7   unusual at all.  It's -- headquarters is our voice to the other

8   agencies.

9   Q.   Why did you send this e-mail?  You wanted a response, right?

10  A.   I wanted Mr. Maltbie to notify Secret Service headquarters.

11  Q.   On August 21st, 22nd, and 23rd, did he ever do that?

12  A.   Not that I know of.

13  Q.   In fact, he told you not to, right?

14  A.   He told me not to communicate directly with FAA.

15  Q.   Right.  You sent him a similar one that we'll get to later,

16  and his response was to tell you, remember, you're an agent.

17  That's not your job.  You stay out of this essentially, right?

18  A.   I think his exact, the exact substance of what he said was

19  things work better when we coordinate headquarters to

20  headquarters, and so in his role as a headquarters person, he is

21  going to send the communication from FBI headquarters in official

22  terms to in this case FAA headquarters.

23  Q.   And he threatened actually to write you up on administrative

24  charges for something else you did, right?  Going to the CIA

25  directly?

Page 1168

1   A.   No, that's not true.

2   Q.   But you never received any written response from anybody to

3   Exhibit 738, right?

4   A.   No.

5   Q.   You don't remember any verbal response from anybody?

6   A.   No.  Although the response did come in the form of a teletype

7   that was sent sometime later.

8   Q.   The 5th of September, right?

9   A.   I believe it was written on the 4th.

10  Q.   Well, we'll get to that document.

11  A.   Yes, sir.

12  Q.   Now, look at Exhibit 336.

13           THE COURT:  Any objection?

14           MR. NOVAK:  No objection, Your Honor.

15           THE COURT:  All right, it's in.

16           (Defendant's Exhibit No. 336 was received in evidence.)

17           MR. MAC MAHON:  Thank you.

18  Q.   What's Exhibit 336, Agent?

19  A.   It looks like a request of a foreign government from one of

20  our legal attache offices overseas, but I can't say for sure.

21  Q.   Why don't you go to the second page.  See if that helps.

22  A.   Yep, I can see there the fax header says, "Legat Paris," so

23  presumably it's provided by legat Paris to the French government.

24  Q.   Okay.  Let's have Ms. Bishop show you the second page.

25           Okay.  What is that, Agent?

Page 1169

1  A.   That is a fax copy or a scanned copy of Mr. Moussaoui's

2  French national identity card.

3  Q.   And that's something he gave you when he was arrested, right?

4  A.   Yes, sir.  That was something that was in his passport case.

5  Q.   All right.  And it said this is his birthday?

6  A.   Yes, sir.

7  Q.   That was correct, wasn't it?

8  A.   It was.

9  Q.   All right.  And same here, place of birth, right?

10  A.   It was.

11  Q.   As was this, too, right?

12  A.   The date he received it?  I assume it was.  I have no way of

13  checking that.

14  Q.   All right.  And what would be just, if you know, what would

15  have been included with the, the communication to the legat in

16  Paris?  Would they have gotten the full EC that we spent so much

17  time talking about this morning?

18  A.   Yes, sir.  Not only would they have gotten that through the

19  normal FBI system; they certainly got it because I e-mailed it to

20  them immediately.

21  Q.   And that would include the part about Moussaoui, you

22  believed, was going to use a weapon to disable the crew on a plane

23  and take it over, right?

24  A.   Yes, sir.

25  Q.   And it listed the statutes you thought he was conspiring to

1   violate?

2   A.   Correct.

3   Q.   And the, and the French legat sent you -- look at Exhibit

4   337, if you would, please.

5          Strike that half-question, please.

6          337.  My question before that, Your Honor, was --

7          THE COURT:  All right.  Do you want 337 moved in?

8          MR. MAC MAHON:  Yes, please.

9          THE COURT:  Any objection?

10          MR. NOVAK:  Judge, I think there needs to be a

11   foundation set for this document.  It's not his.

12          THE COURT:  All right, lay a foundation.

13   BY MR. MAC MAHON:

14   Q.   Agent, have you ever seen this exhibit, 337?

15   A.   I have.

16   Q.   Okay.  And when did you see it?

17   A.   I saw it first in Arabic within a short time after being

18   notified by our FBI office in Paris, and then I was able to pull

19   up the English translation after 9/11.

20          MR. NOVAK:  Judge, that's fine.  I have no objection.

21          THE COURT:  All right, it's in.

22          (Defendant's Exhibit No. 337 was received in evidence.)

23   BY MR. MAC MAHON:

24   Q.   Okay.  So when did you receive Exhibit 337?

25   A.   I don't know that I ever received this document.  What I did

Page 1171

1    was I pulled it up on the Internet after receiving the information

2    from our office in Paris.  So I viewed it on the Internet.  As far

3    as when I received the document, I can't say.  I don't know that I

4    have ever received the document.

5    Q.   You're not sure you ever received 337?

6    A.   Right, as a hard copy document.  I viewed it on the Internet.

7    Q.   Oh, I see.

8         And tell the jury why this was of interest to you.

9    A.   Because the information received from our legal attache's

10   office in Paris advised me that this person, this Shaheed Masood

11   Al-Benin, who was killed in Chechnya, was an associate of

12   Mr. Moussaoui's.

13   Q.   And that's why you pulled this document up to see what it

14   was, right?

15   A.   Right.

16   Q.   It was the result of information you received from Paris?

17   A.   Yes, sir.

18   Q.   Let's -- we'll get to that in a second.  Look at Exhibit 329,

19   if you would, please.

20        THE COURT:  Any objection to 329?

21        MR. NOVAK:  No objection, Judge.

22        THE COURT:  All right, it's in.

23        (Defendant's Exhibit No. 329 was received in evidence.)

24   BY MR. MAC MAHON:

25   Q.   Okay, what's this?

Page 1172

1   A.   I'm not sure.  This looks -- this might be Greg Jones's

2   notes.

3   Q.   They're not your notes?

4   A.   No, sir.

5   Q.   Okay.  Did you have any conversation with Mr. Maltbie that

6   you recall on the 22nd of August, 2001?

7   A.   I'm certain that I did, but this is -- these are clearly

8   someone else's notes.  Again, I'm going to -- although I can't

9   recognize the handwriting specifically, I'm going to say they're

10  Acting Supervisory Special Agent Jones's notes.

11  Q.   Okay.  Well, I won't ask you about someone else's notes,

12  Agent.

13           How about Exhibit 327?

14           THE COURT:  All right, 327?

15           MR. MAC MAHON:  Yeah, I'm going back one, Your Honor,

16  I'm sorry.

17           THE COURT:  All right.  Any objection to 327?

18           MR. NOVAK:  No objection, Judge.

19           THE COURT:  All right, it's in.

20           (Defendant's Exhibit No. 327 was received in evidence.)

21           THE WITNESS:  Yes, sir, this is mine.  I wrote this.

22  BY MR. MAC MAHON:

23  Q.   Okay.  What is -- this is the first one I've seen -- and

24  there could have been more, I might have missed them, but this

25  says "priority" on it.  What does that mean?

Page 1173

 1  A.   That's one level of precedence down from "immediate."  And

 2  the reason it was sent priority was on the basis of information

 3  learned about Mr. al-Attas.  I was requesting investigation

 4  primarily by Oklahoma City but also in Memphis Division regarding

 5  Mr. al-Attas and some of his associates.

 6  Q.   Okay.  And what -- again, if I -- this -- we've now got

 7  another group here.  Counterterrorism, is that the same as we

 8  testified to before?

 9  A.   Correct.

10  Q.   Okay.  Now, who's -- now, we have ITOS and RFU on the right.

11  Do you see that?

12  A.   I do.

13  Q.   Okay.  Tell the jury what the RFU is.

14  A.   By August 22, we knew that Mr. Moussaoui was not under the

15  purview of the Iran Unit, and as I testified earlier, it had been

16  hand-carried over to RFU, or the Radical Fundamentalist Unit,

17  where Unit Chief Frasca was in charge, and the person assigned to

18  Minneapolis was Supervisory Special Agent Maltbie.

19  Q.   Okay.  And the Iran Unit dealt with Hezbollah and other

20  Iranian-type-based terrorist organizations, where the RFU

21  essentially was dealing with the Sunni extremists, correct?

22  A.   Yes, sir.

23  Q.   So you would have thought that the Sunni extremists -- it was

24  your understanding at that time that the Sunni extremist group --

25  strike that question.

Page 1174

1          The people in the Radical Fundamentalist Unit at that

2    time, your understanding was they were the most knowledgeable

3    people about Sunni extremism, including Bin Laden, right?

4    A.    No, sir.  There was another unit that focused on Bin Laden.

5    Q.    And which unit was that?

6    A.    That was the Usama Bin Laden Unit, or UBLU.

7    Q.    Okay.  Where is that unit located?

8    A.    Under -- also at FBI headquarters, under ITOS.

9    Q.    So when you sent something to ITOS here and it went to RFU,

10   does that mean it would or would not go to the Bin Laden Unit to

11   your knowledge?

12   A.    Would not go to the Bin Laden Unit.

13   Q.    And even though Bin Laden is mentioned in your ECs, you

14   didn't feel the need to send it there?

15   A.    Yes, sir.  Mr. al-Attas said that Moussaoui, he didn't

16   believe Mr. Moussaoui had a connection to Bin Laden, and

17   Mr. Moussaoui himself answered my question that he didn't follow a

18   sheikh or anybody in particular.

19   Q.    So you just took his word that he didn't follow a sheikh, and

20   even though you had evidence that he was pointing out Usama Bin

21   Laden on a television, was conspiring in your mind to hijack an

22   aircraft, you didn't send it to the Bin Laden Unit, did you?

23   A.    No, sir.

24          MR. MAC MAHON:  All right, Exhibit 346, if we could,

25   please, Your Honor?

Page 1175

```
 1              THE COURT:  All right.  Any objection to 346?

 2              MR. NOVAK:  Just one moment, Your Honor.

 3              No objection, Your Honor.

 4              (Defendant's Exhibit No. 346 was received in evidence.)

 5              THE COURT:  Mr. MacMahon, I'm reminded that it's 12:30,

 6    which is our normal lunchtime, so we'll take our one-hour lunch

 7    break at this point and reconvene at 1:30.

 8              (Recess from 12:32 p.m., until 1:30 p.m.)

 9

10

11

12

13

14                                     `

15

16

17

18

19

20

21

22

23

24

25
```

Page 1176

```
 1                    A F T E R N O O N   S E S S I O N

 2                      (Defendant and Jury in.)

 3            THE COURT:  Mr. MacMahon?

 4            MR. NOVAK:  May I bring up one point before Mr. MacMahon

 5   begins?

 6            THE COURT:  Yes.

 7            MR. NOVAK:  The Exhibit No. 329, the item both

 8   Mr. MacMahon and I were both under the misimpression was Agent

 9   Samit's notes, and they were somebody else's notes, without

10   objection that went into evidence, I would move to strike that,

11   Your Honor.

12            MR. MAC MAHON:  No objection, Your Honor.

13            THE COURT:  All right.  Let's --

14            MR. NOVAK:  It is 329, Judge.  I apologize.

15            THE COURT:  I know it is.  Are you anticipating another

16   witness with whom that will be moved in down the road?

17            MR. MAC MAHON:  Not at this point, Your Honor.  We will

18   see.  But it is not -- I agree with Mr. Novak that it is not

19   properly in at this point.

20            THE COURT:  All right.  329 is out.

21            (Defendant's Exhibit No. 329 was withdrawn.)

22            MR. NOVAK:  Thank you, Your Honor.

23                      CROSS-EXAMINATION (Cont'd.)

24   BY MR. MAC MAHON:

25   Q.   Agent Samit, I think we were -- when we broke for lunch, I
```

Page 1177

1    think we were looking at Exhibit 346.

2              THE COURT:  Right.  Is there an objection to 346?

3              MR. NOVAK:  No, Your Honor.

4              THE COURT:  All right.  It is in.

5    BY MR. MAC MAHON:

6    Q.    Could you tell the people in the jury what Exhibit 346 is,

7    please?

8    A.    This is an electronic communication from our office in Paris

9    to a number of recipients, including me, and it summarizes

10   information provided by the French government about Mr. Moussaoui.

11   Q.    Okay.  And, again, when we look at these, these things mean

12   something to you as an FBI agent, right?  What does that one mean?

13   A.    "Routine" just means that it is handled as a routine matter.

14   It is being provided without an immediate precedence.  `Because

15   Mr. Abbott was primarily providing information, he didn't set it

16   as an immediate -- he ensured that I got it anyway by e-mailing it

17   to me and, in fact, by giving me a telephone call, but the

18   precedence of that, this communication, he just said is routine.

19   Q.    Okay.  And how about this, the, again, here, the

20   counterterrorism one that I have signed?

21   A.    That is as we talked about earlier, that's the unit, the

22   Radical Fundamentalist Unit with Supervisory Special Agent

23   Maltbie.

24   Q.    All right.  And to your knowledge, does it go to more people

25   than Maltbie?  You know, just -- on or about this date, August

1   22nd, 2000 -- would this go to Maltbie, or would it go to anybody

2   else?

3   A.   Well, it could go to anyone who was searching through the

4   case files, but it's specifically addressed to Mike Maltbie.

5   Anyone within the FBI who has access to our computer system and

6   specifically who has access to cases of this nature could pull it

7   up.

8          But it is going to these addressees at a minimum, and

9   then can be provided to others as needed.

10  Q.   All right.  But that actually would depend on whether it was

11  classified or not?

12  A.   That's correct.

13  Q.   So if this contained classified information, someone in this

14  time frame -- it is not always that they would have found it,

15  right?

16  A.   I'm not sure.

17  Q.   It is not -- you didn't have a searchable database that

18  included all of the classified information that the FBI had,

19  right?

20  A.   Oh, no, that would include all, no.  There was a searchable

21  database that included a great deal of the information, but by no

22  means all.

23  Q.   All right.  And certain information in 302s and letterhead

24  memorandums would go up, but not all of it?

25  A.   Right.  Where this would go would largely be dependent on who

Page 1179

1    it was addressed to, and then from there, those people choosing to

2    forward it elsewhere.

3    Q.   Okay.  So we can -- Mr. Maltbie would have received this,

4    correct?

5    A.   He would.

6              MR. MAC MAHON:  Let's go -- let's go to the bottom, if

7    you would, please, Ms. Bishop.  There you go.

8    BY MR. MAC MAHON:

9    Q.   So the reference lines in here, these are your phone calls,

10   right, Agent Samit?  You called on the 16th and the 17th?

11   A.   That's correct.

12   Q.   Because you wanted, you wanted information out of these

13   people, right?

14   A.   That's correct.

15   Q.   And you got it, didn't you?

16   A.   Yes, sir.

17   Q.   Turn to the next page, if you would.

18              Oh, I'm sorry, just, let's leave the bottom of the first

19   page, if we could, I'm sorry.

20              So "Legat Paris has been advised by the French that the

21   above-captioned Zacarias Moussaoui is known," right?

22   A.   Yes, sir.

23   Q.   And he is -- and then it is going to tell us how Moussaoui is

24   known, right?

25   A.   Yes, sir.

Page 1180

1   Q.   Okay.  Let's go to the next page.  Read to the jury what you

2   can -- what's still in there, if you could.

3   A.   "Date, place of birth" -- that's what DPOB stands for --

4   "1971 at Bazas, France (Department 33).  Is French and his father

5   is from Benin.  Died on April 12, 2000 in Chechnya fighting with

6   the Mujahideen.  While in Chechnya, that person was a computer

7   expert and worked for Emir Al-Khattab Ibn, a/k/a Al Soueilem

8   Samer, a Saudi known as the Black Arabian and a Mujahideen leader

9   in Chechnya."

10  Q.   Okay.  And keep reading, if you would.

11  A.   "After that person's death, someone was interviewed who

12  advised that that person was recruited to go to Chechnya by

13  Zacarias Moussaoui and stated that Moussaoui was the dangerous

14  one."

15  Q.   Okay.  And this information confirmed what you believed about

16  Mr. Moussaoui as someone affiliated with Islamic fundamentalism,

17  right?

18  A.   Yes, sir.

19  Q.   It had the right date of birth on it too, right?  You had the

20  right Mr. Moussaoui, didn't you?

21          If you can tell from this -- if you can't tell from

22  this, just tell me.

23  A.   I can't tell from this.

24  Q.   You didn't have any concern on August 23rd of 2001 that you

25  had the right Zacarias Moussaoui, did you?

Page 1181

1  A.    I did not.

2  Q.    Nothing in this report dissuaded you from that, did it?

3  A.    No.

4        THE COURT:  Mr. MacMahon, I wanted to stop for one

5  second.  Ladies and gentlemen, it is probably obvious to you, but

6  I wanted to make sure you understand.  This exhibit is an example

7  of what I had mentioned to you at the beginning of the trial, what

8  we call a redacted document.  This is not the form in which the

9  agent received this information.

10       All these black markings were not on the document when

11 you got it, correct?

12       THE WITNESS:  Correct, Your Honor.

13       THE COURT:  All right.  But we are not able to let

14 you-all see what's behind the black.  Remember, I indicated to you

15 earlier you are not to draw any inferences against either side

16 because of that, that's just the nature of the evidence in this

17 case, but I didn't want the jury to be confused about how these

18 documents are coming in.

19       MR. MAC MAHON:  Thank you, Your Honor.

20 BY MR. MAC MAHON:

21 Q.    Now, Agent Samit, in a prior question I asked you about 302s,

22 and as a lawyer, I know what I'm talking about.  Would you tell

23 the jury what a 302 is, please?

24 A.    An FD-302 is a standard FBI form that is a report of

25 investigation, an interview or a surveillance or any type of

Page 1182

1    investigation we do, and a criminal matter, primarily, goes on an

2    FD-302.

3    Q.   So if you interviewed a witness, if you interviewed a witness

4    as part of an investigation, you would create a document that's

5    called form FD-302?

6    A.   Yes, sir, that's correct.

7    Q.   That's where it has come from?

8    A.   It does.

9    Q.   Okay, thank you.

10            Now, what did you know in August 22 of 2001 about Ibn

11   Khattab?

12   A.   Not much, sir.  I hadn't previously heard of him.

13   Q.   Okay.  Did you, did you find anything out about Ibn Khattab

14   and his relationship to Usama Bin Laden?

15   A.   I was shortly thereafter notified by a contact in the CIA

16   that Mr. Khattab was affiliated in some form with Usama Bin Laden.

17   Q.   Okay.  When did you learn that?

18   A.   Probably within a -- within either that day, the 22nd, or a

19   day later, the 23rd.

20   Q.   Okay.  You learned that the United States intelligence

21   communities believed that Bin Laden and Ibn Khattab recruited

22   people together and trained fighters together and other things,

23   correct?

24   A.   No, sir.  No, sir.  What the information specifically was was

25   that Ibn Khattab and Usama Bin Laden had fought together in the

1    past and, therefore, had a relationship based on their fighting

2    together in the past.

3              The intelligence did not state that they recruited

4    people together or that they shared funding or, or anything like

5    that.

6              MR. MAC MAHON:  Your Honor, can we approach, please?

7              THE COURT:  Yes.  What machine?  C?

8              MR. MAC MAHON:  No.

9              THE COURT:  All right.

10             (Bench conference on the record.)

11             [--- Redacted

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1184

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1185

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1186

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    ---]

22                          (End of bench conference.)

23          MR. MAC MAHON:  Mr. Wood, would you show Exhibit 792 to

24    the witness, please.  I think this is the easiest way to do it, if

25    you would show him this one, please.

Page 1187

1          THE COURT:  That's not in your book, correct?

2          MR. MAC MAHON:  Ms. Bishop says it is in the book, Your

3    Honor.  It is one of the last ones.

4          THE COURT:  All right.

5    BY MR. MAC MAHON:

6    Q.   Have you ever seen that before?

7    A.   No, sir.

8    Q.   Okay, thank you.

9          Were you aware that there was any information in the FBI

10   database that linked Bin Laden to Ibn Khattab?

11   A.   I had not seen the information specifically.  What I was

12   aware, Supervisory Special Agent Maltbie told me in an e-mail that

13   he and his unit were well aware of Ibn Khattab, but in terms of

14   information in the FBI linking them, I had not seen that, no.

15   Q.   Okay.  Did you search the FBI database for information on Ibn

16   Khattab?

17   A.   I did.  I searched ACS indices for that name.

18   Q.   Did you come up with the Phoenix memo?

19   A.   I did not.

20   Q.   The Phoenix memo references Ibn Khattab, doesn't it?

21   A.   It does.

22   Q.   You didn't find that before 9/11, you already told us that,

23   right?

24   A.   Correct.

25          THE COURT:  It has been a while since we went through

1    that.  Maybe give -- remind the jury what you understand the

2    Phoenix memo to be.

3              THE WITNESS:  Your Honor, my understanding, it was a

4    memo prepared by Special Agent Ken Williams in the Phoenix

5    Division, of which I learned after 9/11, discussing that there

6    were Islamic extremists in large numbers engaged in flight

7    training throughout the United States.

8              THE COURT:  And it is your understanding there was a

9    reference to Chechnya in that memo?

10             THE WITNESS:  Upon recent review of it, yes, Your Honor,

11   there was a reference to Chechnya in there.

12   BY MR. MAC MAHON:

13   Q.   There is a reference to Ibn Khattab specifically, isn't

14   there?

15   A.   There was.

16   Q.   The reference is that one of the people that Mr. Williams was

17   interested in in Phoenix -- and I could be -- I believe had a

18   poster of Ibn Khattab in his room, right?

19             MR. NOVAK:  I am going to object.  I think Mr. MacMahon

20   is testifying now.  If there is a document, we will stipulate

21   there is a document.

22             THE COURT:  It is a leading question, so I think on

23   cross it is all right.  As long as the witness says yes or no,

24   then the jury has a factual issue.  If it is just a question and

25   the witness can't answer it, then that's not proper.

Page 1189

```
 1            THE WITNESS:  I do recall, yes, that that was discussed

 2   in there.  And I should, I should clarify that when I say I

 3   searched indices for Ibn Khattab, that means that I perform a type

 4   of search designed to bring up all documents which contain his

 5   name where he was indexed, where he was placed as this primary

 6   subject of the document or the subject of the investigation.

 7            I did not do a text search, which would have brought up

 8   every single document that contained his name.

 9   BY MR. MAC MAHON:

10   Q.   And that's because in August of 2001, your computer didn't

11   have the capacity to do a text search of all the information on

12   the database?

13   A.   It did.  It did at the time.

14   Q.   It did?  And you didn't type in "Ibn Khattab"?

15   A.   I typed in "Ibn Khattab" to gain as much background

16   information as I could.  I did it as again an indices search, an

17   index search, not as a text search.

18   Q.   All right.  So this information that you received from the

19   French, this was very important to you, wasn't it?

20   A.   Yes, sir.

21   Q.   Okay.  Why was this so important to you?

22   A.   It showed that he was known to another government to have

23   been affiliated with Islamic extremists.

24   Q.   And to be recruiting Islamic extremists to fight in far-off

25   lands?
```

Page 1190

1   A.   At least one, yes, sir.

2   Q.   All right.  Anybody from headquarters ever call and ask you

3   about that?

4   A.   No, sir.

5        MR. MAC MAHON:  Exhibit 633, please.

6        THE COURT:  Any objection to this?

7        MR. NOVAK:  No objection, Your Honor.

8        THE COURT:  All right.  It's in.

9        (Defendant's Exhibit No. 633 was received in evidence.)

10  BY MR. MAC MAHON:

11  Q.   And what is Exhibit 633, Mr. Samit?

12  A.   It's an e-mail from myself to my supervisor and to the FBI's

13  detailee to the CIA.

14  Q.   Okay.  And who is that?

15  A.   Chuck Frahm.

16  Q.   Okay.  What was the purpose of sending this to Chuck Frahm?

17  A.   To run all foreign overseas names that had surfaced in the

18  investigation of Mr. Moussaoui in order to determine if any of

19  those people were known to the CIA.

20  Q.   And you passed on to Mr. Frahm the information about Ibn

21  Khattab as well, right?

22  A.   Yes, sir.

23  Q.   Okay.  And you learned from Mr. Frahm that within the CIA,

24  the connection between Ibn Khattab and Moussaoui was considered

25  firmly established, right?

1   A.    Between Ibn Khattab and Moussaoui?

2   Q.    Excuse me, Ibn Khattab and Usama Bin Laden.  Thank you.

3   A.    What I learned from a representative at the CIA was that

4   there was a past association between Usama Bin Laden and Ibn

5   Khattab.

6   Q.    At the CIA you learned before 9/11 there was no question that

7   Ibn Khattab and Usama Bin Laden had worked together, right?

8   A.    In the past, yes, sir.

9   Q.    And you tried to tell that to Mr. Maltbie, too, didn't you?

10  A.    I told Mr. Maltbie that, yes, sir.

11  Q.    And he just disregarded it when you said it, correct?

12  A.    He didn't disregard it.  He said that they were well aware of

13  Ibn Khattab and that they were looking into that.

14  Q.    Okay.  And you testified last week that there was `-- that a

15  FISA had to have a list of organizations that were on a State

16  Department list?  Do you remember testifying to that?

17  A.    No, sir.  What I testified to was that there existed a State

18  Department list, that Mr. Maltbie in discussing that with me said

19  that it needed to be a recognized group, which is not the same as

20  that list, but in order to obtain a FISA, the designated terrorist

21  organization or the terrorist organization does not need to be on

22  the State Department list.

23  Q.    You didn't tell the jury that last time you testified; you

24  told them that there was a State Department list and Ibn Khattab

25  wasn't on it, right?

Page 1192

1   A.   That's correct.

2   Q.   All right.  And that has nothing to do with whether or not

3   you could get a FISA, does it?

4   A.   No.

5           MR. MAC MAHON:  737, please.

6           THE COURT:  Any objection to 737?

7           MR. NOVAK:  Just a moment, Your Honor.

8           THE COURT:  Yes, sir.

9           MR. NOVAK:  No objection, Your Honor.

10          THE COURT:  All right.  It's in.

11          (Defendant's Exhibit No. 737 was received in evidence.)

12  BY MR. MAC MAHON:

13  Q.   What's this document, Agent?

14  A.   This is a response from me to Jack Salata, who was the FAA's

15  detailee to the FBI.  Mr. Salata, it looked like, went through the

16  FAA registry and surfaced information about a pilot certificate

17  for Mr. Moussaoui.  I just clarified that it was the student pilot

18  certificate, as we discussed last week, that was not a pilot's

19  license but, in fact, just his medical clearance to fly, to begin

20  training.

21  Q.   Okay.  And you were looking for a little more than that,

22  weren't you there, Agent Samit?

23  A.   I'm not sure.

24  Q.   Why don't you look at what I just circled.

25  A.   Oh, right.  And that would have also -- Mr. Salata actually

Page 1193

1    came up with that himself, because that's his portion.  I think he

2    was looking at trying to find criminal charges that Mr. Moussaoui

3    had falsified his address.

4    Q.    Right.  You were looking for some way to make a false

5    statement charge against Mr. Moussaoui?

6    A.    No, sir, I wasn't; Mr. Salata was.  That portion down there,

7    to clarify, is his e-mail to me.

8    Q.    Okay.  But you knew that that's what this was about?

9    A.    I understood that.

10   Q.    Trying to figure out some way to find a predicate criminal

11   act so that you could get a search warrant and find out what was

12   in his hotel room, right?

13   A.    No, sir, that's not accurate.  This is Mr. Salata's e-mail to

14   me.  I understood that the Goddard Avenue address was Àirman

15   Flight School.  It didn't seem likely that Mr. Moussaoui would

16   falsify so obviously.  It was probably the only permanent address

17   he had at the time he took his medical, and that that 1001, that

18   that false statement charge wouldn't have stuck.

19   Q.    Well, you tried, didn't you?

20   A.    No, sir.  Again, that's Mr. Salata's e-mail to me, sir.

21   Q.    Well, you got the e-mail.  Did you talk to Jack Salata on or

22   about August 22nd about whether you could get a false statement

23   charge against Moussaoui?

24   A.    I did not.

25   Q.    Because you were looking for predication for criminal act,

Page 1194

1   right?

2   A.    I was.

3   Q.    Right.  And actually, you have testified that on August 21st,

4   when you received the information from the French, that that to

5   you was more than sufficient criminal predicate to get a search

6   warrant against Moussaoui, wasn't it?

7   A.    I testified that I believed that it was sufficient, yes, sir,

8   but in terms of trying to find a false statement charge here, that

9   was Mr. Salata's idea, and I didn't think that that would work,

10  that that would be a viable alternative.

11  Q.    You, you as a field agent in Minneapolis, when you read the

12  French information, there was no question in your mind that every

13  predicate act you needed to charge Moussaoui with a crime and get

14  a search warrant now was available for you, right?

15  A.    No, sir.  Those are -- that's comparing apples and oranges.

16  The information from the French was, again, underneath the

17  intelligence investigation, underneath the intelligence track.

18  When I read that, it provided additional evidence that

19  Mr. Moussaoui was linked to a foreign terrorist organization.

20          As of yet, it didn't constitute any additional evidence

21  of a crime being committed in the United States.

22  Q.    It confirmed your suspicion that he was a terrorist, didn't

23  it?

24  A.    Yes, sir.

25  Q.    And you could have put that in a search warrant at that time,

U.S. v. Moussaoui

1   right, that you had confirmed from a foreign government that he

2   had connections with terrorists?

3   A.    No, sir.

4   Q.    Because you needed to get that over the wall, right?

5   A.    Right.

6   Q.    So there was some bureaucratic impediment to using even the

7   French information that you got?

8   A.    No, sir, not a bureaucratic impediment.  It was the attorney

9   general guidelines designed to safeguard the citizens and people

10  under the protection of the law in the United States from abuse.

11  I wouldn't call that a bureaucratic impediment.

12  Q.    Well, how about a legal impediment?  Is that fair enough?

13  A.    Yes, sir.  Yes, sir.

14  Q.    So there was some legal impediment to you using the

15  information you received from the French to try to go get a

16  criminal search warrant against Moussaoui?

17  A.    Yes, sir.  There was a legal impediment to the use of the

18  information, one; and, two, it did not meaningfully contribute to

19  probable cause to believe that a crime was occurring.  The fact

20  that Mr. Moussaoui was involved with the Chechen Mujahideen did

21  not at the time add any weight to the criminal search warrant.

22  Q.    You didn't even try, did you, Agent?  You didn't even try?

23  A.    I'm sorry, what's your --

24  Q.    You never took this information from the French that said

25  Moussaoui was recruiting people connected to known terrorist

Page 1196

 1  organizations and resubmitted it to anybody, did you?

 2  A.   Yes, sir.  I, in fact, referenced it in my request for FISA

 3  two days later.

 4  Q.   For a criminal search warrant, you never again tried --

 5  A.   No, sir.

 6  Q.   -- to supplement a criminal search warrant for Moussaoui?

 7  A.   No, sir.

 8  Q.   And you never asked for permission to get this information

 9  over the wall and to try to get it to somebody, either, did you?

10  A.   No, sir.

11          MR. MAC MAHON:  Exhibit 56, please.

12          THE COURT:  Any objection?

13          MR. NOVAK:  Yes, Judge, we object.  This is not his

14  e-mail.

15          THE COURT:  Well, again, lay a foundation.  I see

16  there's a cc on it, so --

17  BY MR. MAC MAHON:

18  Q.   Agent Samit, have you ever seen Exhibit 56 before?

19  A.   I have.

20  Q.   That's because you received it on or about August 22nd, 2001?

21  A.   That's correct.

22          THE COURT:  I will overrule --

23          MR. NOVAK:  I will withdraw the objection.

24          THE COURT:  All right.  It's in.

25          (Defendant's Exhibit No. 56 was received in evidence.)

Page 1197

1    BY MR. MAC MAHON:

2    Q.    Have you seen that before, Agent?

3    A.    I have.  That's, that's Exhibit 56.  I have seen that.

4    Q.    Excuse me?

5    A.    Yes, I have seen it, yes, sir.

6    Q.    Who's Homer Pointer?

7    A.    He is an attorney in the National Security Law Unit at FBI

8    headquarters.

9    Q.    Who is Coleen Rowley?

10   A.    She was at the time the chief division counsel in the

11   Minneapolis Division.

12   Q.    And reading on the bottom, what is it -- did you receive both

13   of these e-mails or just the second one?  Do you remember?

14   A.    I don't recall.  I believe I saw the complete package.  I

15   believe it was Coleen that forwarded it to me, Ms. Rowley, so it

16   would have been the whole thing we see here.

17   Q.    Okay.  It says here that Mr. Pointer says:  Have your folks

18   asked you for your assessment of their chances of getting a

19   criminal warrant, right?

20   A.    Yes, sir.

21   Q.    Okay.  Did you respond to that?

22   A.    Did I respond to that?  No.  The e-mail wasn't to me, sir.

23   Q.    Well, did you respond to it when you got Ms. Rowley's

24   response?

25   A.    No.

Page 1198

1    Q.    You didn't chime in at all?

2    A.    No.

3    Q.    And Ms. Rowley said that the U.S. Attorney's Office had a

4    higher standard much of the time so they weren't going to risk it,

5    right?

6    A.    Yes, sir.

7    Q.    That was a discussion you had with her, wasn't it?

8    A.    It was.

9    Q.    You disagreed with her, right?

10   A.    I did.

11   Q.    You told her on or about August 22nd that it was more than

12   sufficient probable cause to get a search warrant if you could

13   just go to the U.S. Attorney's Office, right?

14   A.    The discussion I had with Ms. Rowley, I provided my

15   information to her and my arguments for why I thought that we

16   should have been able to get a search warrant.  She listened.  She

17   took it under advisement.  She said she would look into it.

18          And then when -- I guess by then she made her decision,

19   and she decided that that was what she was going to do.  She did

20   advise me probably -- either shortly before or shortly after she

21   sent this e-mail, she advised me that she'd advised that we would

22   go the FISA route.

23   Q.    Okay.  But you had -- in that conversation with Ms. Rowley,

24   you told her that you believed that there was more than sufficient

25   probable cause and reason to go to the U.S. Attorney's Office for

Page 1199

1   a search warrant for all of Moussaoui's belongings, right?

2   A.   Yes, sir.

3   Q.   And she referenced some -- she having some dispute with the

4   U.S. Attorney's Office at that time?

5   A.   I don't know.

6   Q.   And she is the -- who is she again?

7   A.   She was the Minneapolis Division's chief division counsel at

8   the time.

9   Q.   And so as a result of this exchange, no warrant application

10  was presented at all, right?  No criminal search warrant

11  application was presented to anyone?

12  A.   Correct.  Yes, sir.

13            MR. MAC MAHON:  And Exhibit 330D, please.

14            THE COURT:  330D?

15            MR. MAC MAHON:  Yes, Your Honor.  330, I'm told.

16            THE COURT:  All right.  Any objection to 330?

17            MR. NOVAK:  No objection from the government.

18            THE COURT:  All right.  It's in.

19            (Defendant's Exhibit No. 330 was received in evidence.)

20  BY MR. MAC MAHON:

21  Q.   By the way, looking at 330, Agent, did you know that on the

22  day before Exhibit 330 is dated, that the director of Central

23  Intelligence, George Tenet, was briefed about Moussaoui?

24  A.   I did not.

25  Q.   Did anybody ever ask you to provide any information for that

1   briefing?

2   A.    For the briefing directly, no, sir.  I was providing

3   everything I was getting to the FBI's detailee to the CIA, but no

4   one asked me specifically.  I was just providing everything I had

5   to him.

6   Q.    Did you know that Moussaoui had drawn the attention of the

7   director of the Central Intelligence Agency?

8   A.    No, sir.

9   Q.    Not at any time before 9/11 did you know there was a series

10  of briefings at the Central Intelligence Agency about Moussaoui,

11  did you?

12  A.    No, sir.

13  Q.    Never asked to provide any input to any of those briefings at

14  all?

15  A.    Except inasmuch as I was providing everything I had, I was

16  not asked specifically to provide information to briefings.

17  Q.    Nothing different than what you were already doing?

18  A.    Yes, sir.

19  Q.    All right.  What is Exhibit 330, please?

20  A.    This is my request per the direction of the Radical

21  Fundamentalist Unit, this is the EC requesting that we get a FISA

22  search warrant.

23  Q.    Okay.  And did you do the first draft of this?

24  A.    Yes, sir.  I did the first -- I'm not aware of any other

25  drafts of the electronic communication here.

Page 1201

1   Q.   All right.  Well, here, this is you, right, "drafted by"?

2   A.   Yes, sir, that's me.

3   Q.   And then you send this up to Mr. Maltbie again, right?

4   A.   Correct.

5   Q.   You know, you had had these prior problems with Mr. Maltbie

6   that we talked about before lunch.  Did you ever ask to have this

7   assigned to somebody else?

8   A.   No, sir.  He was the supervisor responsible for Minneapolis.

9   Q.   Did you discuss with anybody at the, at headquarters that

10  Mr. Maltbie and you had had -- you had a problem with Mr. Maltbie

11  before and didn't have any confidence in him?

12  A.   Did I discuss it with anyone where, sir?

13  Q.   Between August 16th and September 11 of 2001, did you tell

14  any of your superiors that you had had prior problems with

15  Mr. Maltbie and had no confidence that he would actually get a

16  FISA done?

17  A.   Yes, sir.

18  Q.   Who did you tell that to?

19  A.   I told my supervisor, Acting Supervisory Special Agent Greg

20  Jones.  I told my former supervisor, who was now the Special

21  Agent-in-Charge, Chris Briese, and told our Acting Special

22  Agent-in-Charge Ray Morrow.

23  Q.   And nobody got him off the case, right?

24  A.   No, sir.

25  Q.   Did you go to anybody at headquarters and ask to have him

Page 1202

1    removed from this?

2    A.   Did I go to anyone?  No, sir.

3    Q.   I mean, you knew this was -- this was very serious to you,

4    wasn't it, Mr. Samit?

5    A.   It was.

6    Q.   And it didn't occur to you to try to have him removed from

7    the case somehow?

8    A.   No, sir.

9    Q.   Even though you knew that you weren't going to get a FISA

10   once you started working with him?

11   A.   Again, to say that I wasn't going to get a FISA is a

12   misrepresentation.  My belief was that a FISA, because I had

13   gotten two other ones with Mr. Maltbie, was going to have a high

14   standard.  To say that I was certain I wasn't going to get a FISA

15   is not accurate.

16        But to answer your question, street agents don't call

17   FBI headquarters and request that supervisors be removed from

18   cases.

19   Q.   Who is Rita Flack?

20   A.   She is an investigative operations specialist who works for

21   Mike Maltbie.  She is an analyst, an intelligence analyst who

22   works for him.

23   Q.   And you told the inspector general you regret not having

24   tried to get Mr. Maltbie removed from this case, didn't you?

25   A.   I do.

1    Q.    Look at the second page, please.  Read the second paragraph.

2    A.    "As set forth in enclosure, Minneapolis is in possession of

3    intelligence indicating that Moussaoui is connected to a radical

4    fundamentalist group operating in Chechnya, whose leader has ties

5    to Usama Bin Laden.  For this reason, it is imperative that his

6    effects be searched in order to gather intelligence relating to

7    these connections and to any plans for terrorist attacks against

8    the United States or United States persons to which he may be a

9    party."

10   Q.    How many people did you send this communication to?

11   A.    Well, I sent it to Mike Maltbie and Rita Flack in the Radical

12   Fundamentalist Unit.

13   Q.    Did you hear back from anybody else at the FBI or Justice

14   about that?

15   A.    I heard back from them, from Ms. Flack or Mr. Maltbie.

16   Q.    Nobody else?

17   A.    No.

18         MR. MAC MAHON:  Just a second, Your Honor.

19   BY MR. MAC MAHON:

20   Q.    When -- when you were referencing Chechnya here, "connected

21   with a radical fundamentalist group operating in Chechnya," you

22   are referring to Ibn Khattab there, aren't you?

23   A.    I am.

24   Q.    And you are not referring to some civil war, are you?

25   A.    Well, it was then a civil war, yes, sir.

Page 1204

1    Q.   You are referring to a radical fundamentalist group operating

2    in Chechnya?

3    A.   Absolutely.  But they were operating in a civil war.

4    Q.   Where does it say that in here?

5    A.   It doesn't.

6    Q.   Go to Exhibit 35, please.

7              THE COURT:  Any objection to 35?

8              MR. NOVAK:  No objection, Your Honor.

9              THE COURT:  All right.  It is in.

10             (Defendant's Exhibit No. 35 was received in evidence.)

11   BY MR. MAC MAHON:

12   Q.   Tell the jury what this is.

13   A.   This is a communication from the Oklahoma City Division to me

14   documenting the results of their investigation.

15   Q.   Okay.  By this time now, you were beginning to get results

16   back even from Oklahoma, right?

17   A.   Correct.

18   Q.   And that's what this document is.  It gives you

19   Mr. Moussaoui's e-mail address, right?

20   A.   Yes, sir.

21   Q.   Zuluman Tangotango?

22   A.   Correct.

23   Q.   What did you do -- it gave you some of Mr. Moussaoui's

24   e-mails asking for flight training, right?

25   A.   It did.

Page 1205

1   Q.   It gave you his application?

2   A.   Yes, sir.

3   Q.   Look at the document marked -- the Bates stamp on it is 0049.

4   Put that up on the screen.

5           Do you remember seeing that e-mail, Agent?

6   A.   Yes, sir.

7   Q.   Okay.  Did you ask Moussaoui when it was that he first

8   started trying to get flight training when you arrested him?

9   A.   We did.

10   Q.   Did he tell you it was in October of 2000?

11   A.   He didn't.  He said sometime in the past, he decided.

12   Q.   So you knew now there was a specific amount of time that had

13   passed between when he decided to take flight training and when he

14   finally got to the United States, right?

15   A.   I knew there was some time that had passed, yes, sir.

16   Q.   But that's -- that time indicated to you that there was

17   preparation for a plan, right?

18   A.   Yes, sir.

19   Q.   And you knew that on August 24th of 2000, when you read these

20   e-mails, right?

21   A.   Yes, sir.

22           MR. MAC MAHON:  Exhibit 52, please.

23           THE COURT:  Any objection?

24           MR. NOVAK:  It is notes.  I would like to make sure they

25   are Mr. Samit's notes.

Page 1206

 1              THE WITNESS:  They are not.  They are not my notes.

 2              MR. NOVAK:  I object.

 3              THE COURT:  Have you ever seen them?

 4              THE WITNESS:  I have not.  Again, I am going to guess

 5      they are, from the content, they are Greg Jones's, but I can't say

 6      for sure.  They are not mine.

 7              THE COURT:  They can't go in then.

 8      BY MR. MAC MAHON:

 9      Q.   Were you -- without reference to the exhibit, were you aware

10      that Mr. Jones told Mr. Maltbie that they were -- you were trying

11      to get Mr. Moussaoui from flying a plane into the World Trade

12      Center?

13      A.   Yes, sir, I overheard that conversation.

14      Q.   When was that?

15      A.   Sometime around the time of the FISA application, sometime

16      after the 24th, I have this -- I know the circumstances of that

17      well.  I overheard Mr. Jones saying that.

18      Q.   Okay.  And that was before September 11th, right?

19      A.   Yes, sir.

20      Q.   And it was August 24th or so; is that what you are telling

21      us?

22      A.   It would have been sometime thereafter.

23      Q.   Okay.  Because Mr. Jones, you were nearby in the office,

24      right?

25      A.   Yes, sir, I was right close by.

Page 1207

1    Q.    And you could hear him on the phone essentially begging

2    Mr. Maltbie to help, right?

3    A.    "Begging" is strong.   He was requesting --

4    Q.    Pleading?

5    A.    I'm sorry.

6    Q.    Pleading for help?

7    A.    He was requesting his assistance very vigorously.

8    Q.    Insistently?

9    A.    Yes, sir.

10   Q.    Okay.   And one of the things he told Mr. Maltbie that you

11   overheard was that you were trying to make sure Moussaoui doesn't

12   get control of an airplane and crash it into the World Trade

13   Center, right?

14   A.    I asked him about that afterwards, yes, sir.

15   Q.    Okay.   And what did he tell you?

16   A.    He said it was a metaphor.   He was trying to get Mr. Maltbie

17   spooled up.

18          The reason I asked him was because we had no evidence

19   that the World Trade Center or any other target in New York was

20   part of Mr. Moussaoui's target.   Greg just said he pulled it out

21   of the air.   It was a lucky guess.

22   Q.    Okay.   And -- and Mr. Maltbie, he told you, said that you

23   people were trying to get everybody all spun up in Washington,

24   right?

25   A.    That's correct, yes, sir.

Page 1208

```
 1   Q.   It is the same thing essentially he told you about the Afghan

 2   terrorism, right?  Didn't he tell you --

 3   A.   About the Taliban case we were discussing?

 4   Q.   Yes, sir.

 5   A.   Yes, sir.

 6   Q.   The exact same words, right?

 7   A.   Well, no, the words regarding the Taliban terrorist were

 8   actually different.  It was more along the lines of what I

 9   intended to pass to the Department of Defense did not constitute

10   foreign intelligence.  It wasn't a spool-up issue or a spin-up

11   issue.  It was more that the substance of what I wanted to pass to

12   the military did not fall under the heading of foreign

13   intelligence.  That was that issue.

14   Q.   But he told you you were being, with respect to this Taliban

15   person, that you were being overly excited about what you were

16   learning, correct?

17   A.   Yes, sir.

18   Q.   And that's basically the way he treated you in this

19   investigation, too, didn't he?

20   A.   It is, yes, sir.

21   Q.   He disregarded your beliefs, didn't he?

22   A.   I'm certain that Mr. Maltbie believed what I had to say.  His

23   statements were more along the lines of the intelligence that we

24   were providing did not carry sufficient weight to win the day with

25   any of the other people that we would need to sell the case to.
```

Page 1209

1    Q.    Okay.

2    A.    It wasn't a question of him disregarding my beliefs.

3    Q.    But he never to your knowledge even submitted this thing to

4    anybody, did he?

5    A.    That's not true.  That's not true at all, sir.  He submitted

6    it to the National Security Law Unit.

7    Q.    With all of your -- most of the information you had put in it

8    redacted out of the document, right?

9    A.    One document that he proposed to us had that information

10   redacted, but my understanding is, and I don't know this directly,

11   but my understanding is when he went to that unit, he gave them a

12   verbal briefing.  So I have no way of knowing what he actually

13   said to them.

14   Q.    Mr. Maltbie never once took your package and walked it over

15   across the street, essentially, to the FISA court in Washington

16   and asked somebody, a judge, to say whether there was probable

17   cause in this case?

18   A.    That's correct.

19          MR. MAC MAHON:  All right.  Exhibit 693, please.

20          THE COURT:  Any objection?

21          MR. NOVAK:  Bear with me a second, Judge.

22          No objection.

23          THE COURT:  All right.  It is in.

24          (Defendant's Exhibit No. 693 was received in evidence.)

25          MR. MAC MAHON:  Thank you.

Page 1210

1    BY MR. MAC MAHON:

2    Q.    Have you seen this before?

3    A.    Yes, sir.  I wrote it.

4    Q.    What was the purpose of Exhibit 693?

5    A.    The purpose, this is another letterhead memorandum, the

6    purpose of which was to serve as a vehicle to go to the Department

7    of Justice substantiating our request for a FISA search warrant of

8    Mr. Moussaoui's belongings.  You can see there under the request

9    to Minneapolis, it spells it out.

10   Q.    All right.  And you wanted this to be as complete as you

11   could, right?

12   A.    Yes, sir.

13   Q.    Go to page 5 if you would, please.  Read the paragraph at the

14   top if you would, please.

15   A.    "Moussaoui was likewise unable to convincingly explain a trip

16   to Pakistan lasting from December 2000 until February 2001,

17   initially informing agents that this was for personal reasons.  He

18   later indicated that he was in Pakistan attempting to find a wife.

19   Recipients will note that Moussaoui arrived in the U.S. only 16

20   days after leaving Pakistan, a country determined through other

21   Minneapolis investigations to be a conduit for persons traveling

22   to Afghanistan in order to provide or receive terrorist training

23   and indoctrination."

24   Q.    And how did you know that?

25   A.    From my other investigations.

Page 1211

1   Q.   Okay.  And you knew, you knew that even before you arrested

2   Moussaoui, right?

3   A.   Yes, sir.

4   Q.   Did anybody from Washington call and ask you why it is you

5   think Moussaoui might have traveled to Afghanistan to receive or

6   provide terrorist training and indoctrination?

7   A.   No, sir.

8   Q.   And the next paragraph is the information that you received

9   from the French on August 21st, right?

10  A.   Yes, sir, I believe on the 22nd.

11  Q.   22nd, excuse me.

12       And what, what response did you get from filing this

13  document, Exhibit 693?

14  A.   Mr. Maltbie told us that the determination was that there was

15  insufficient connection between Mr. Moussaoui and a foreign power

16  to go forward to OIPR or the FISA court.

17  Q.   Well, he never provided you any written document saying that

18  your warrant application had been rejected by anybody, did he?

19  A.   No, sir.

20  Q.   You asked him for one, too, didn't you?

21  A.   Yes, sir.

22  Q.   And he refused to?

23  A.   Yes, sir.  He provided us -- I guess that's a

24  mischaracterization.  He did provide us e-mails to that effect, so

25  paper documents, no, but numerous e-mails spelling that out.

Page 1212

1   Q.   Okay.  Now, you have complained in many forums about what

2   Mike Maltbie took out of your -- out of this document, correct?

3   A.   Yes, sir.

4   Q.   Okay.  And tell the jury what it is that Mr. Maltbie took out

5   of this document and changed.

6   A.   He removed the discussion of Ibn Khattab and his relationship

7   to Usama Bin Laden.

8   Q.   Okay.  And how is somebody supposed to correct -- from your

9   training, how are you supposed to establish a connection to a

10  foreign power if it's deleted from the document?

11  A.   Well, sir, the connection can't be made.

12  Q.   That was something Mr. Maltbie did?  You tried, didn't you,

13  you tried to get it in there?

14  A.   Yes, sir.  But it should also be noted that I don't know

15  where that document went.  And after Minneapolis objected to it,

16  the document to my knowledge never went any further.

17  Q.   Right.  You have never seen a document in the course of this

18  investigation where Mr. Maltbie added back in the foreign power

19  information and tried to show it to a soul at the Department of

20  Justice; isn't that correct?

21  A.   No, sir, that's correct.

22  Q.   Okay.  And what else did he take out?

23  A.   That to my knowledge, that's the only, the only major fact.

24  Q.   Well, he changed some of the language, too, didn't he?

25  A.   Yes, sir.  I would have to do a side-by-side comparison to

Page 1213

1    recall it exactly.

2    Q.   Okay.  And you were appalled that he changed this language,

3    weren't you?

4    A.   Yes, sir.

5    Q.   And you said that he, him editing the letterhead memorandum

6    was a calculated risk that cost 3,000 lives, right?

7    A.   The calculated risk that cost us the opportunity to try and

8    stop the attacks.  Again, sir, emphasize an opportunity.  There

9    were several other points of failure beyond Mike Maltbie and

10   beyond OIPR.  It had to get past the FISA court judge as well.

11   Q.   Okay.  Go to Exhibit 347, please.

12            THE COURT:  Any objection?

13            MR. NOVAK:  No objection, Your Honor.

14            THE COURT:  All right.  It's in.

15            (Defendant's Exhibit No. 347 was received in evidence.)

16   BY MR. MAC MAHON:

17   Q.   What is this document, Agent?

18   A.   This is the cover EC -- I think it is a duplicate of the

19   cover EC in front of my FISA request.  This is just -- this is the

20   electronic communication under which I sent the letterhead

21   memorandum to headquarters, and I think we have already looked at

22   that.

23   Q.   Okay.  How about Exhibit 348?

24            THE COURT:  Any objection?

25            MR. NOVAK:  No objection.

Page 1214

 1              THE COURT:  All right.  348 is in.

 2              (Defendant's Exhibit No. 348 was received in evidence.)

 3              THE WITNESS:  This is an e-mail from myself to my

 4     supervisor; my co-case agent, John Weess; and to our

 5     representative in the London office.

 6     BY MR. MAC MAHON:

 7     Q.   Okay.  And you say -- you were trying to establish a

 8     connection.  Read this, the second paragraph.

 9     A.   "I just wanted to update you," is that it?

10     Q.   Right.

11     A.   "I just wanted to update you on where we stand.  It seems

12     that thus far ITOS/RFU has determined that we have neither

13     reasonable suspicion that a federal felony was in progress (as

14     needed to open a 265 and pursue search warrants for Moussaoui's

15     effects) or a connection to a foreign power (as necessary to apply

16     for a FISA-authorized search warrant for his effects).  I don't

17     agree, but they're in charge."

18     Q.   All right.  If you go down a little farther, you say:

19     "Therefore, this is a plea to you to see what the U.K. authorities

20     have on him that will either:  A, establish he is acting on behalf

21     of a foreign power," right?

22     A.   Yes, sir.

23     Q.   Or, help to establish that he is involved in the commission

24     of a federal offense, right?

25     A.   Yes, sir.

Page 1215

 1   Q.   And the reason you sent this is nobody in England had

 2   responded to anything, right?

 3   A.   That's correct.

 4   Q.   And you were desperate to get more information to try to get

 5   Mr. Maltbie to go ahead and push your warrant through, right?

 6   A.   Yes, sir.

 7   Q.   And you were desperate for more information to try to get a

 8   criminal search warrant as well, correct?

 9   A.   Yes, sir.  Either one.

10   Q.   Either one.

11        And in response to this, to the, the ALAT in London, you

12   received nothing, right?

13   A.   Nothing until after 9/11, yes, sir.

14        MR. MAC MAHON:  Exhibit 500, please.

15        THE COURT:  Any objection?

16        MR. NOVAK:  No objection, Judge.

17        THE COURT:  All right.  It's in.

18        (Defendant's Exhibit No. 500 was received in evidence.)

19   BY MR. MAC MAHON:

20   Q.   Okay.  What's this exhibit?

21   A.   This is an e-mail from me to the FBI's detailee assigned to

22   the CIA acknowledging that the connection between Ibn Khattab and

23   Usama Bin Laden and al Qaeda is tenuous and asking for additional

24   information that would link them that would strengthen the FISA

25   application.

Page 1216

1   Q.   All right.  And then what's below here is their response,

2   correct, "Many thanks for this information"?

3   A.   Actually, I think it is -- yes, sir, that looks like his

4   response.

5          THE COURT:  Whoa, whoa, whoa, whoa.  You have them in

6   reverse order.

7          MR. MAC MAHON:  Do I?  I think -- all right.  Let me see

8   if I can get this straight.

9   BY MR. MAC MAHON:

10  Q.   Chuck is the FBI detailee to the CIA, right?

11  A.   Yes, sir.

12  Q.   Okay.  And this is him -- at the bottom part, which we have

13  got up on the screen now, is that a note he sent to you?

14  A.   Actually, it is a note a CIO employee sent to me using his

15  FBI e-mail system.

16  Q.   Okay.  So now -- so which is the first one of these two, the

17  top or the bottom?

18  A.   The bottom is the first one.

19  Q.   Okay.

20  A.   You can see from the times, the 10:29 a.m. right there and

21  then if you scroll up, my response is at 11:45 a.m.

22  Q.   All right.  So this is information, "Harry:  Thanks for the

23  information," this is from the Central Intelligence Agency, right?

24  A.   Yes.  "Harry, Many thanks," that's from a representative at

25  the Central Intelligence Agency.

Page 1217

1    Q.   Okay.  Why don't you read that for us.

2    A.   "Many thanks for this information.  French info also was

3    highly interesting -- am not sure why this is not enough to firmly

4    link Moussaoui to a terrorist group -- Ibn al Khattab is well

5    known to be the leader of the Chechen Mujahideen movement and to

6    be a close buddy with Bin Laden from their earlier fighting days.

7    From a read of info, Moussaoui is a recruiter for Khattab.  I can

8    confirm from our own info that, in fact, the dead guy, in fact,

9    was a fighter for Khattab who perished in Chechnya in April 2000."

10   Q.   So the CIA is saying that this person that we looked at

11   before in the French information, they can confirm that, that that

12   was, in fact, the real story?

13   A.   Yes, sir.

14   Q.   And that also confirmed the thread of Mr. Moussaoui being the

15   person that had recruited him as well, right?

16   A.   Yes, sir.

17   Q.   And you sent this information on to Mr. Maltbie?

18   A.   Yes, sir.  It was actually included in -- this is -- as you

19   can see, this is just a regurgitation of what this CIA employee

20   had previously reported to me.  That was already in the LHM that

21   we just reviewed.

22   Q.   Okay.  But you sent this on again as well, right?

23   A.   Yes, sir.  We reiterated to the CIA or to Mr. Maltbie, in

24   fact, that the CIA was certain that, in fact, they were connected.

25   Q.   Okay.  And there was no response from Mr. Maltbie to that,

Page 1218

1    right?

2    A.    That was when he responded that they're well aware of Ibn

3    Khattab and they are looking into it.  He did respond.

4    Q.    What did you know that he ever did to look into it?

5    A.    I don't know, sir.

6    Q.    Did he ever tell you that he did anything to look into it?

7    A.    He did not detail the steps he took to look into it to me,

8    no, sir.

9              MR. MAC MAHON:  All right.  636, please.

10              THE COURT:  Any objection?

11              MR. NOVAK:  One second, Judge.

12              No objection, Judge.

13              THE COURT:  All right.  It's in.

14              (Defendant's Exhibit No. 636 was received in evidence.)

15    BY MR. MAC MAHON:

16    Q.    All right, what is this e-mail, Agent?

17    A.    This is an e-mail from myself to my acting supervisor, to

18    John Connelly, who was a detailee from Immigration to the Usama

19    Bin Laden Unit at FBI headquarters, and to my co-case agent.

20    Q.    Okay.  What were you trying to accomplish with this?

21    A.    I was giving him advance notice that we had a case where

22    there was some possible connections to Usama Bin Laden, and so I

23    wanted the Usama Bin Laden Unit to be aware of it as well.

24    Q.    Right.  And that case was the Moussaoui case, right?

25    A.    Yes, sir.

Page 1219

1    Q.    So as of August 24th, you were concerned enough about his Bin

2    Laden connections to try to get the UBL Unit involved?

3    A.    Sir, I think you can see there, I was concerned about his

4    possible Usama Bin Laden connections, yes, sir.

5    Q.    Enough to call the Usama Bin Laden Unit or send them an

6    e-mail, right?

7    A.    Yes, sir.

8    Q.    And did they get back to you?

9    A.    They did not.

10   Q.    They did not?  Is that what you said?

11   A.    Yes, sir.

12   Q.    Is that because it was a possible connection or otherwise?

13   A.    I don't know, sir.  That's -- that's certainly how I phrased

14   it in my e-mail, though, that it was a possible connection,

15   because that's the strongest thing that I could say based on the

16   information provided me.

17   Q.    How about Ibn Khattab?  You put that in here, too, right?

18   A.    Yes, sir.

19   Q.    And you said that Ibn Khattab is linked to UBL, right?

20   A.    Yes, sir.

21   Q.    Okay.  And am I right to say from August 24th, '01, to

22   September 11th, you never heard a word from the Usama Bin Laden

23   Unit, no matter what you sent them?

24   A.    Yes, sir, that's correct.

25          MR. MAC MAHON:  736, please.

Page 1220

 1          THE COURT:  Any objection?

 2          MR. NOVAK:  No objection, Your Honor.

 3          THE COURT:  All right.  736 is in.

 4          (Defendant's Exhibit No. 736 was received in evidence.)

 5          THE WITNESS:  This is a duplicate of the e-mail we

 6  previously looked at as well.

 7  BY MR. MAC MAHON:

 8  Q.   Oh, is it?

 9  A.   It is.

10  Q.   All right.  Well, thank you.  We have got a lot of paper,

11  Agent Samit.

12          637.

13          THE COURT:  Any objection?

14          MR. NOVAK:  No objection, Your Honor.

15          THE COURT:  All right.

16          (Defendant's Exhibit No. 637 was received in evidence.)

17          THE WITNESS:  This is an e-mail from me to another FBI

18  employee detailed to the intelligence community.

19  BY MR. MAC MAHON:

20  Q.   Okay.  And to the best that you can here in court, tell the

21  jury what you were trying to accomplish by sending this to Cathy,

22  as it says here.

23  A.   Cathy was assigned, as I said, to another member of the

24  intelligence community, another agency, and my desire was to get

25  additional information about Mr. Moussaoui.

Page 1221

1   Q.   Okay.  And did Cathy have access to information that other

2   agencies that you have referred to did not?

3   A.   She did.

4   Q.   Okay.  Where had you met Cathy?

5   A.   At an in-service, at in-service training.  And she had also

6   assisted Minneapolis on a previous investigation.

7   Q.   Okay.  Was it an appropriate thing for you to do to address

8   her directly --

9   A.   Yes.

10  Q.   -- with a request like this?

11  A.   Yes.

12  Q.   And what did -- the purpose of what you have in this document

13  was what?  You are telling her about flight manuals and

14  spiral-bound notebooks, things that you saw, right?

15  A.   Yes, that's correct.

16  Q.   And you are trying to find out whether she can help you find

17  out whether he is connected to a foreign power, correct?

18  A.   Exactly.  Because the information I had received as of this

19  date was attenuated.  It was not a direct connection.  I was

20  hoping that other members of the United States intelligence

21  community would be able to furnish me with that information.

22  Q.   It wasn't attenuated to you, was it, Agent?  It was

23  attenuated to Mr. Maltbie?

24  A.   It was.

25  Q.   But it wasn't attenuated to you?

Page 1222

1  A.   It was not.

2  Q.   Thank you.

3        Did you ever hear back from Cathy?

4  A.   I did.  I got some e-mails from her immediately prior to the

5  9/11 attacks.

6  Q.   Do you know whether Cathy actually responded to this e-mail

7  and provided information?

8  A.   I do.  And she did.

9        MR. MAC MAHON:  Your Honor, can we -- we're going to

10 have to use the silent witness rule for this.  We have --

11       THE WITNESS:  That's correct.

12       THE COURT:  Do you want to approach the bench?  We will

13 need the C machine for this.

14       (Bench Conference G not transcribed in this volume.)

15       THE COURT:  All right, ladies and gentlemen, in a

16 moment, each of you is going to see Defense Exhibit 506B-1.  You

17 may want to put that number in your notebook and add an asterisk

18 by it, but you cannot take notes about that exhibit in your

19 notebook.

20       This document is a classified document.  However, we

21 have received limited authorization authorizing what we call

22 partial disclosure, a limited disclosure.

23       We are allowing the jury to review this document, and

24 when you go to -- and then you will return all your copies to us.

25 When you go to deliberate, you may ask to have the document

Page 1223

1    brought back to you, all right?  That's why you want to keep track

2    of its number, and we may have a few others similar to that that

3    you will have to have reviewed.

4             Now, you are not ever to discuss the contents of that

5    document outside of what you do in the deliberation room.  In

6    other words, this is a classified document that cannot be publicly

7    disclosed.  You will have to talk about it among yourselves when

8    you go to deliberate, but other than that, never to be revealed.

9             I think that's sufficient.  Mr. Novak, do I need to --

10            MR. NOVAK:  I think it is fine.

11            THE COURT:  All right.  Then let's proceed.

12            MR. MAC MAHON:  If I may, Your Honor, the final version

13    that we got is 506B-2.  I think the Court was reading from the

14    cover.

15            THE COURT:  506B-2, that's correct.  That's the one that

16    I have.

17            Now, do we have the copies for the jury, 506B-2?  Does

18    everybody have one?  Yes?  All right.  Go ahead.

19            MR. MAC MAHON:  I'm still somewhat at a loss as to how

20    to proceed, Your Honor, but I will do my best.

21            THE COURT:  Well, why don't we do this:  Ladies and

22    gentlemen, it is not that long.  Why don't you read it for

23    yourselves.  Just let the jury read it so they understand the

24    content.

25                          (Jurors reading document.)

Page 1224

1              THE COURT:  It looks as though everybody has read.  All

2    right.

3              Mr. Wood, if you would collect those documents, please.

4              You can ask your question.

5    BY MR. MAC MAHON:

6    Q.   Okay.  Mr. Samit, the information in Exhibit 506B-2 is the

7    information that you requested on or about August 24th, 2001,

8    right?

9    A.   Correct.  You mean as referred to in this e-mail?

10   Q.   Yes.

11   A.   Yes.  This was the response to that, yes.

12   Q.   And before 9/11 you never received the response at all, did

13   you?

14   A.   That's correct.

15   Q.   Okay.  When did you get the response?

16   A.   Sometime in October.

17   Q.   Okay.  And it was -- to your knowledge, it was delivered to

18   FBI headquarters before September 11th, correct?

19   A.   That's correct.

20   Q.   And Mr. Frasca, Mr. Rolince, nor Mr. Maltbie, nor anyone else

21   involved from the FBI who was involved in the Moussaoui

22   investigation was provided this information before September 12th,

23   2001; isn't that correct?

24   A.   That's correct.

25   Q.   And this would have been important information to you,

Page 1225

1  wouldn't it?

2  A.   It would have generated some leads to additional locations,

3  which it did, subsequent to my seeing it, but those leads haven't

4  panned out, so the answer to that is no.

5  Q.   But you have previously testified that it refuted the story

6  that Moussaoui had told you when he was interrogated, right?

7  A.   It didn't completely refute it.  It gave us a new location,

8  and I can talk your eyes onto it by going line and word, by

9  telling you where.

10 Q.   Well, I don't think we need to do that.  I think we would get

11 somebody standing up from the back of the room.  But it didn't to

12 you provide information that would have shown that Moussaoui had

13 given you false information when you interrogated him?

14 A.   That he omitted discussing one location, it did, yes.

15 Q.   Did you consider charging him with a false statement?

16 A.   No.

17         MR. MAC MAHON:  Thank you, Your Honor.

18         THE WITNESS:  Again, that was subsequent to 9/11, so

19 there was no consideration of that.

20         MR. MAC MAHON:  Your Honor, we need to collect all of

21 them and get them back for Ms. Gunning.

22         THE COURT:  I know.  Mr. Wood should have 17, my copy

23 makes it 18, although we need to have one official one for the

24 record, so I'm going to have -- Katrina, did you hold on to yours?

25 We will collect it after the break.  But that needs to be -- to

Page 1226

1    stay in the record.  We will keep it separated.

2              MR. MAC MAHON:  We have got all of them, Your Honor.

3              THE COURT:  All right.

4    BY MR. MAC MAHON:

5    Q.   Look at Exhibit 53, if you would.  Is that your handwriting?

6    A.   No, sir.  I think these may be Greg Jones's notes again, not

7    mine.

8    Q.   Now, there is -- in this time frame, did you know that

9    Mr. Maltbie had tasked people to search the Paris phone book to

10   try to find out if it was the same Zacarias Moussaoui?

11   A.   Yes, sir.  And, in fact, what he did was he requested that we

12   do that.

13   Q.   Tell the jury what happened.

14   A.   Mr. Maltbie wasn't convinced that the Zacarias Moussaoui whom

15   we had arrested was the same person being referred to in

16   intelligence received either by the CIA or France, and so he

17   wanted an idea of how many Zacarias Moussaouis there would be in

18   France, and a way to search that would have been the phone book.

19   Q.   Okay.

20   A.   He suggested a way to search that would have been the phone

21   book.

22   Q.   When did that happen?

23   A.   On or about the 25th, 26th, shortly after the FISA

24   application was submitted.

25   Q.   Did he tell you this on the phone?

Page 1227

1    A.    Either telephonically or via e-mail.

2    Q.    Did you ask him why, what concern he had about whether you

3    had the right Zacarias Moussaoui?

4    A.    I believe the conversation occurred between Greg Jones and

5    himself, Mr. Jones, and I'm certain that Mr. Jones did ask him

6    why.  I'm not familiar with what Mr. Maltbie's response was.  Just

7    to make sure we had the right person.

8    Q.    And so did -- and at that time you had his passport, you had

9    information from the French, and you had a lot of other

10   information that confirmed that he was, in fact, Zacarias

11   Moussaoui and that he was a person who had recruited someone to go

12   fight in Chechnya, right?

13   A.    Yes, sir.

14   Q.    There wasn't any concern in your mind that you had the wrong

15   guy, was there?

16   A.    There was not.

17   Q.    Okay.  And did you tell Mr. Maltbie he was sending you on a

18   wild goose chase?

19   A.    I don't know what Special Agent, Supervisory Special Agent

20   Jones told him.

21   Q.    Okay.  Well, what did you do?

22   A.    We requested that the legat in Paris check and see if

23   Mr. Moussaoui appeared in telephone directories in Paris and how

24   many there were.

25   Q.    Did you ask Mr. Maltbie if there were more cities in France

Page 1228

1   than Paris?

2   A.   I didn't have a conversation with Mr. Maltbie, so...

3   Q.   You don't know why he -- someone said they lived in the south

4   of France, he was telling you to go look in the Paris phone book?

5   A.   I don't know why, sir.

6   Q.   Okay.  Did somebody actually do that?

7   A.   I don't believe that Mr. Abbott ever got that far.  I think

8   he just discussed the difficulty of the task with Mr. Maltbie.  I

9   don't know how that was resolved.

10   Q.   I mean, did anybody that you know talk to Mr. Maltbie and ask

11   him why are we looking in the Paris phone book?

12   A.   I'm certain that Acting Supervisory Special Agent Jones did,

13   and voiced our objections to it as well.

14   Q.   All right.  But Mr. Maltbie didn't give it up, did he?

15   A.   No, sir.

16   Q.   How many days in a row did he ask you to look in the phone

17   book or task you to do that?

18   A.   I don't know.  I don't know.

19   Q.   Up to about September 5th?

20   A.   Perhaps -- maybe.  He was communicating that with Supervisory

21   Special Agent Jones, and he -- Mr. Jones wasn't passing that on to

22   me.

23   Q.   Do you know how many people in the FBI office in Paris were

24   tasked to look through the phone book?

25   A.   I don't know.

Page 1229

1  Q.   Nobody has gotten back to you on that?

2  A.   No.

3  Q.   Did you tell him that Mr. Moussaoui lived in London, at least

4  from what he had told you?

5  A.   Did I tell Mr. Maltbie that?

6  Q.   Maltbie that Moussaoui said he lived in London.

7  A.   Yes, sir.

8  Q.   What did he say to that?

9  A.   He received that along with all the other information in the

10  communications.  We didn't bring up London in regard -- in that

11  context, because Mr. Maltbie's interest was the information

12  provided by the French.

13  Q.   Right.  Mr. Maltbie was fixated on the Paris phone book as

14  some way to confirm that the Moussaoui that you were getting

15  information on, who was a suspected terrorist recruiter was, in

16  fact, the same French guy, and his way of doing that was to look

17  in the phone book, right?

18  A.   One recommendation he had to determine how many Zacarias

19  Moussaouis in France, yes, sir.

20  Q.   And nobody ever figured that out, right?

21  A.   Not to my knowledge, no.

22  Q.   And the information you received on the 21st came from a

23  pretty reliable source, didn't it?

24  A.   It did.

25  Q.   From the French, the French information from the 21st was a

Page 1230

1    pretty reliable source about the right Zacarias Moussaoui, wasn't

2    it?

3    A.    From the 22nd, yes, sir.

4              MR. MAC MAHON:  All right.  How about Exhibit 641?

5              THE COURT:  Any objection?

6              THE WITNESS:  I don't have a 641 in here, I don't think.

7              MR. NOVAK:  No objection, Judge.

8              THE COURT:  It's after 352?

9              THE WITNESS:  Oh, I'm sorry, I do.

10             THE COURT:  They are out of order a little bit.

11             THE WITNESS:  This is an e-mail from myself to Greg

12   Jones; my co-case agent, John Weess; and to Mr. Maltbie.  It was

13   in response to a voice mail that Mr. Maltbie left me indicating he

14   wasn't clear as to whether or not I'd provided him all the

15   information on Mr. Moussaoui that we had received, and I just

16   wanted to reassure him that we had.

17   BY MR. MAC MAHON:

18   Q.    Okay.  And looking down at the second-to-the-bottom paragraph

19   here, you told him that Moussaoui made a call from the jail on

20   August 24th?

21   A.    Yes, sir.

22   Q.    Okay.  You had someone there monitoring all of his calls,

23   didn't you?

24   A.    No, sir.  We had someone there watching, so we requested that

25   anyone in the jail keep an eye on him and see if he made a call.

Page 1231

```
 1   Unfortunately, that was a mistaken identity issue, and it wasn't

 2   Mr. Moussaoui.

 3   Q.   Moussaoui -- we have been through this.  Moussaoui didn't

 4   make any calls?

 5   A.   Correct, yes, sir.

 6   Q.   So this is an error?

 7   A.   It is in error.

 8             MR. MAC MAHON:  331, please.

 9             THE COURT:  641 was in evidence, and 331, any objection

10   to 331?

11             (Defendant's Exhibit No. 641 was received in evidence.)

12             MR. NOVAK:  No objection, Judge.

13             THE COURT:  All right.  It's in.

14             (Defendant's Exhibit No. 331 was received in evidence.)

15   BY MR. MAC MAHON:

16   Q.   What is this document, sir?

17   A.   This is a document to Mike Maltbie saying that Minneapolis

18   was following up with legat Paris on the phone book lead.

19   Q.   Do you want to read the first page -- first line there?

20   A.   "Joe Rivers sent an e-mail to Jay Abbott requesting that

21   legat Paris attempt to determine how many Zacarias Moussaouis can

22   be found in France so that we can cover that base."

23   Q.   And to your mind as of August 27th, '01, this was an absolute

24   waste of time, wasn't it?

25   A.   As far as it being able to advance the investigation of
```

Page 1232

1    Mr. Moussaoui, yes, sir.  However, Mr. Maltbie seemed adamant that

2    we'd be able to say how many Mr. Moussaouis there were in France.

3    And while I may not have considered that the best use of legat

4    Paris's time, if Mr. Maltbie believed it would have bolstered our

5    FISA request, it was something worth doing.

6    Q.   And you said to the IG that this was part of his plan to run

7    out the clock, right?

8    A.   Yes, sir.

9    Q.   To give you worthless jobs to do, direct your attention to

10   other things, so that Moussaoui would just get deported, right?

11   A.   Well, in this case, it was this was a worthless job that

12   legat Paris would have had to pursue.

13   Q.   You said, you told the IG that he had a predetermined

14   outcome?

15   A.   Yes, sir.

16   Q.   And that the biggest mistake you made was ever telling him

17   that there was a chance that Moussaoui might be deported, right?

18   A.   Yes, sir.

19   Q.   All right.  That was the biggest mistake you made, because

20   that gave him a finish line.  If he gave you jobs that nobody

21   could do, didn't add at all to your investigation, eventually

22   Moussaoui as an INS detainee was going to be put on a plane and

23   sent home, right?

24   A.   Yes, sir.

25   Q.   And, in fact, he was complaining over which department's

Page 1233

1  budget the plane flight might come out of, right?

2  A.   Yes, sir.

3  Q.   All right.

4  A.   I don't know that "complaining" is the right word.  He was

5  inquiring.

6  Q.   Yeah.  Maltbie was more worried about which agency was going

7  to pay to send Moussaoui home than he was about investigating him,

8  wasn't he?

9  A.   No, sir, that's not true.

10 Q.   Well, he made a lot of requests to figure out who was going

11 to pay, right?

12 A.   It is an issue that FBI supervisors have to deal with with a

13 limited budget.

14 Q.   He wanted to send him back to London, because that way the

15 airline would have to pay for it, right?

16 A.   He considered that that would be a cheaper method, because as

17 part of the visa waiver program, if the person fails to depart on

18 time, the airline has to return him to his country of origin, yes,

19 sir, he pointed that out.

20 Q.   So with you filing these memorandums saying that you think

21 Moussaoui is going to hijack a plane with a weapon, seize control

22 of it for his own ends, Mr. Maltbie and other people in Washington

23 are arguing about who is going to pay for a plane ticket, right?

24 A.   Again, sir, it is a concern.  It is a very realistic concern.

25 Mr. Moussaoui isn't the only terrorist that the FBI investigates.

Page 1234

1    Budgets needs to be managed.

2            It was -- that to my mind was the least of our concerns.

3    Mr. Maltbie had a legitimate reason to at least examine who was

4    going to pay and where the funds were going to come from.

5    Q.   And who was going to go with him, right?  You wanted to go

6    with him, right?

7    A.   Yes, sir.

8    Q.   You were worried about Moussaoui -- Mr. Maltbie was worried

9    about Moussaoui claiming asylum at the airport, right?

10   A.   Yes, sir, that was a concern.

11   Q.   That Moussaoui was going to ask to stay in the United States

12   as a political prisoner?

13   A.   No, sir, as a political asylee, not a political prisoner.

14   Q.   Here, again, is another reference to a 48-minute phone call.

15   That's the one we talked about before?

16   A.   Yes, sir.

17   Q.   That wasn't Moussaoui; that's a mistake?

18   A.   It was a mistaken identity, yes, sir.

19   Q.   Thank you.

20            349, please.

21            THE COURT:  You need to lay a foundation for this.

22   BY MR. MAC MAHON:

23   Q.   Okay.  Have you ever seen this document before?

24   A.   Yes, sir.

25   Q.   When did you see this?

Page 1235

1    A.    Probably within, contemporaneous with when it was being

2    written by Mr. Jones.

3    Q.    Right.  And --

4          THE COURT:  Then I assume there is no objection?

5          MR. NOVAK:  There is no objection.

6          THE COURT:  All right.  It's in.

7          (Defendant's Exhibit No. 349 was received in evidence.)

8    BY MR. MAC MAHON:

9    Q.    What is -- tell the jury what this exhibit is, please,

10   Exhibit 349.

11   A.    This is Mr. Jones's response to Mr. Maltbie after viewing the

12   editorial changes to my letterhead memorandum requesting a FISA.

13   Mr. Jones was in this e-mail accurately reflecting our objections,

14   mine and his, to Mr. Maltbie's changes to the initial LHM.

15   Q.    Okay.  And you say you saw this before it went out or after

16   it went out?

17   A.    Either as he was typing it, before he sent it, he called me

18   over to view it, or immediately thereafter.

19   Q.    Okay.  What was your reaction when you saw what Mr. Maltbie

20   had done with your LHM?

21   A.    I was unhappy with that final product.

22   Q.    Okay.  And how unhappy?

23   A.    Extremely unhappy.

24   Q.    What did you do?

25   A.    I told Supervisory Special Agent Jones that we needed to do

U.S. v. Moussaoui

1    something to correct that, and this e-mail was the result.

2    Q.    And just, just walk through this with the jury.  Tell them

3    what things were changed and what you were concerned about.

4    A.    The biggest concern under paragraph 1 there was the removal

5    of the connection between Ibn Khattab and Usama Bin Laden.

6    Mr. Maltbie believed, as reasonable minds will differ on probable

7    cause issues, Mr. Maltbie believed this was not an adequate

8    foreign power connection.

9            So --

10   Q.    Agent Samit, he didn't even put it in, right?  He omitted it.

11   A.    Right.  His explanation was he omitted it and was reworking

12   it until such time as he could get someone to buy that this was an

13   adequate argument.

14   Q.    But you told the jury last week that if it wasn't `in the

15   application, it would be dead on arrival, right?

16   A.    That's correct.

17   Q.    So you didn't believe him when he said he was working it up

18   later, right?

19   A.    It didn't matter whether I believed that he was doing that or

20   not.  The fact that it wasn't in there was a problem, and that's

21   why Supervisory Special Agent Jones's e-mail was sent.

22   Q.    Right.  You told the inspector general that you know from

23   firsthand experience that details removed from LHMs to DOJ OIPR

24   can cost the lives of innocent Americans.  Those are your words,

25   right?

Anneliese J. Thomson
(703) 299-8595

Electronically signed by Anneliese Thomson (501-170-180-8434)

Karen Brynteson
(703) 768-8122

a76a2ab6-62e2-4a13-8536-82caa868bcf1

Page 1237

 1   A.   Yes, sir.

 2             MR. MAC MAHON:  Exhibit 332, please.

 3             THE COURT:  Any objection?

 4             MR. NOVAK:  Judge, I think we have the same

 5   authentication issue there.  Sorry, I don't see --

 6             THE COURT:  All right, see if you can lay a foundation.

 7             MR. MAC MAHON:  349 was admitted, wasn't it, Your Honor?

 8             THE COURT:  Yes.

 9             MR. MAC MAHON:  Thank you.

10   BY MR. MAC MAHON:

11   Q.   Have you seen 332 before?

12   A.   Yes, sir.

13   Q.   And when did you see that?

14   A.   Probably immediately after it was received from Paris.

15             THE COURT:  That's enough foundation.  It's in.

16             (Defendant's Exhibit No. 332 was received in evidence.)

17   BY MR. MAC MAHON:

18   Q.   We're on August 28th, 2001.

19   A.   Correct.

20   Q.   Read that sentence to the jury, please.

21   A.   "I have access to the white pages for Paris, but for all of

22   France may be too tall of an order."

23   Q.   Mr. -- they are still trying to confirm who Moussaoui's

24   identity is by looking in the phone books, right?

25   A.   That's correct.

Page 1238

1          MR. MAC MAHON:  Okay.  Exhibit 350, please.

2          THE COURT:  Again, lay your foundation on this.

3   BY MR. MAC MAHON:

4   Q.   Have you seen this before, sir?

5   A.   I have.

6   Q.   When did you see this?

7   A.   Right after, right after, Mr. Jones received it from

8   Mr. Maltbie, he forwarded it to me.

9          THE COURT:  All right.  Then there is no basis for

10  objection, right?

11         MR. NOVAK:  No.  We didn't have 350.

12         THE COURT:  All right, hold on a second.

13         MR. NOVAK:  That's fine.  No objection.

14         THE COURT:  All right.  It's in.

15         (Defendant's Exhibit No. 350 was received in evidence.)

16  BY MR. MAC MAHON:

17  Q.   Okay.  What is this document?

18  A.   This is Mr. Maltbie's response to Mr. Jones's objections.

19  Q.   Did you see this?

20  A.   I did.  Mr. Jones forwarded it to me almost immediately after

21  receiving it.

22  Q.   And did this make you angry when you saw this?

23  A.   Yes, sir.

24  Q.   Remind you of your prior experience with Mr. Maltbie?

25  A.   No, the experience wasn't exactly the same.  This wasn't

Page 1239

 1   reminiscent of that.

 2   Q.   Different obstruction?

 3   A.   Objections on different grounds.

 4   Q.   It says in here on line 2 that you didn't have verbatim

 5   answers to the interview questions.  Do you see that?

 6   A.   Yes, sir.  It says we don't need to provide verbatim answers

 7   to interview questions.

 8   Q.   But you don't have verbatim answers to any of your interview

 9   questions, do you?

10   A.   No, sir.

11   Q.   And Mr. Maltbie, from talking to all of you, said that he

12   agrees that this guy is a liar, right?

13   A.   I'm not following you.  Where?  Oh, yes, under 4?

14   Q.   Um-hum.

15   A.   Yes, sir.

16   Q.   And so as of August 28th, it was -- the fact that you

17   believed Moussaoui was a liar had gone all the way up to

18   Mr. Maltbie as well, right?

19   A.   Yes, sir.

20          MR. MAC MAHON:  Exhibit 351, please.

21          THE COURT:  Lay your foundation again.

22          MR. MAC MAHON:  Thank you, Your Honor.

23   BY MR. MAC MAHON:

24   Q.   Have you seen this before?

25   A.   I have.  These are a string of e-mails between first

Page 1240

1   Mr. Maltbie and Ray Morrow, our acting special agent-in-charge,

2   and Greg Jones, and then Ray Morrow's response to Mr. Maltbie.

3   Q.   And do you remember receiving this?

4   A.   Yes, sir.

5            MR. MAC MAHON:  Move its admission, Your Honor.

6            MR. NOVAK:  No objection.

7            THE COURT:  All right.  It's in.

8            (Defendant's Exhibit No. 351 was received in evidence.)

9   BY MR. MAC MAHON:

10  Q.   All right.  Who is Spike Bowman?

11  A.   He is a very senior person, an attorney in the National

12  Security Law Unit, NSLU you can see there.

13  Q.   He is another person you have accused of negligence?

14  A.   Yes, sir.

15  Q.   And that's because of this document, among other things,

16  right?

17  A.   Yes, sir.

18  Q.   It says here that Mr. Bowman is still trying to see -- why

19  don't you go ahead and read the second line.

20  A.   I'm sorry, say that again?

21  Q.   Go ahead and read from where it says "he says."

22  A.   "He says we have even less than I thought.  Apparently, even

23  if we could show that the ZM that recruited that person in France

24  is the one you have locked up in INS detection, we still don't

25  have a connection to a foreign power."

Page 1241

1    Q.    Okay.  And this had to drive you crazy, didn't it?

2    A.    Yes, sir, it did.  With the understanding that reasonable

3    minds will differ as to what constitutes probable cause.

4    Q.    Agent Samit, you had in the back -- you were obsessed, to use

5    your term from last week, you thought for sure that a terrorist

6    attack was coming and that something could be done to stop it,

7    right?

8    A.    Yes, sir.

9    Q.    And you just got obstructed by all of these people on the

10   most minor of points, even whether he is really Zacarias

11   Moussaoui, the whole way, right?

12   A.    That was certainly one issue that was raised, but to say that

13   the most minor points revolves around whether that foreign power

14   connection is attenuated or not is not -- that's not an accurate

15   representation of it at all.

16   Q.    But you couldn't get past the fact that you had the right

17   guy?  You couldn't get the people in Washington to even understand

18   that the Zacarias Moussaoui who gave you his passport and was

19   described in the information provided by the French was the same

20   guy?

21   A.    Yes, sir, we were there within a few days of that.  And

22   understanding, especially once Mr. Bowman became involved, that

23   people further up the chain had seen it, while it made me angry

24   that they said no, also showed me that it was being advanced in a

25   direction by headquarters.  It may not have been in the direction

Page 1242

1    that I wanted it to go, so it may not have been succeeding, but

2    other people were hearing about it.  Other people were receiving

3    the information we had.

4    Q.   Are you telling the jury that the actions taken by these

5    people that you have called criminal negligence in your own briefs

6    are now something you have accepted, you think is fine as to how

7    this was handled?

8    A.   No, sir, and I didn't say that they were fine.

9    Q.   Thank you.

10             CIPA 59, please.

11             THE COURT:  I'm sorry, CIPA?

12             MR. MAC MAHON:  59B, Your Honor.

13             THE COURT:  Exhibit?

14             MR. MAC MAHON:  Exhibit 59B.  We've got all these

15   numbers down here.

16             THE COURT:  Oh, I'm sorry.  I see what you mean.  All

17   right.

18             Any objection to 59B?

19             MR. NOVAK:  No objection, Your Honor.

20             THE COURT:  All right.  It's in.

21             (Defendant's Exhibit No. 59B was received in evidence.)

22   BY MR. MAC MAHON:

23   Q.   Have you seen this before, Agent Samit?

24   A.   I have.

25   Q.   Okay.  What is this?

Page 1243

1    A.   This is further information from our office in Paris about

2    Mr. Moussaoui.

3    Q.   And on the bottom of the first page here, the phone calls

4    referenced here on August 29, are those -- these phone calls here,

5    are they yours?

6    A.   No.  I believe it is Special Agent Abbott's phone calls.

7             Oh, I'm sorry.  I can't tell.  It is either between me

8    and Paris or between headquarters and Paris.  I can't tell from

9    that.

10   Q.   And this sticker down here, the 199 here in the right, that

11   means it is still an intelligence investigation, right?

12   A.   Yes, sir, that's correct.

13   Q.   Did you receive this -- the precedence here is "routine,"

14   right?

15   A.   Yes, sir.

16   Q.   Okay.  And go to the second page, if you would, please.

17   A.   Sir, the precedence notwithstanding, Special Agent Abbott

18   e-mailed it to me, so I received it nearly immediately.

19   Q.   And this information came from France, right?

20   A.   Yes, sir.

21   Q.   And it came from a reliable source, correct?

22   A.   It did.

23   Q.   Why don't you read to the jury what you learned on August

24   30th, 2001.

25   A.   "Learning of the death of a person" --

Page 1244

1    Q.   Start on the top, if you would.

2    A.   "Beginning of translation."

3    Q.   Right.

4    A.   "On September 28, 2000, our service had an interview with

5    someone regarding the Mujahideen person killed in Chechnya during

6    2000.

7            "Learning of the death of that person, the interview

8    source spontaneously accused Zacarias Moussaoui (date of birth:

9    May 30, 1968, at St. Jean De Luz) of being responsible for the

10   death of their common friend.  That person was apparently a friend

11   to both.

12           "He affirmed that it was well known that that person

13   Zacarias who had introduced to the doctrine of radical

14   fundamentalism while they worked together on a BTS at Perpignan,

15   France (Department 66).

16           "That person rejoined Zacarias Moussaoui in Great

17   Britain, where he obtained his diploma.

18           "The person described someone as an individual with

19   superior intelligence and that he brilliantly obtained his

20   Master's Degree at the University of Cambridge.

21           "It was in London that he (Zacarias) was taken in hand

22   and initiated by the fundamentalists of 'Backstreet' and 'Finsbury

23   Park.'  [Translator note, probably refers to radical mosques at

24   these locations, i.e. Baker Street and Finsbury Park].

25           "According to blank, this is the same group that also

Page 1245

1  recruited and converted blank to the extremist doctrine, when he

2  arrived in Great Britain.

3        "He noted that he had not seen blank since 1995, when

4  Zacarias returned to France to visit his family and friends.

5        "It was during the course of this visit that Zacarias

6  revealed that he had become completely enlightened on religious

7  matters.

8        "In spite of the force of the certain conviction

9  characterized by blank, himself schooled by the 'habachi' Imam

10  Khaled El Zahti, his intellectual guide, all his attempts to

11  orient blank towards an Islam of tolerance and of moderation,

12  which blank himself follows, were done in vain.  Zacarias

13  Moussaoui, wholly convinced of jihad, maintained his radical

14  convictions.

15        "According to blank, had been arrested by the Moroccan

16  police upon his arrival in Morocco, blank, in 1997.

17        "That same year, Zacarias went to Narbonne, France

18  (Department 11).  His ardent and emotional preaching in favor of

19  jihad agitated a large number of his childhood friends who he had

20  not seen since his departure to Great Britain.

21        "Blank informed of the trip by blank to the region of

22  Narbonne, himself blank being situated in Morocco, had advised

23  local Muslim community representatives of the moral danger that

24  Zacarias could represent for a number of young Muslims losing

25  their religious bearings and social placement.  In this regard,

1    Zacarias was driven from at risk urban areas by his coreligionists

2    for propagating his message of intolerance and hatred.

3          "Blank, who hasn't had any direct news from blank since

4    1997, knew only that he has traveled to Kuwait, Turkey, and

5    Afghanistan.

6          "Blank described Zacarias as an individual who is

7    extremely cynical, completely devoted to the Wahabite cause and

8    concerned with progressing that cause.

9          "He depicted him as a cold, stubborn man, capable of

10   nurturing a plan over several months, or even years, and of

11   committing himself to this task in all elements of his life.

12   Implacable, Zacarias is a strategist that blank qualified as being

13   potentially very dangerous and against who should be surveilled by

14   French authorities should he decide to return to France.

15         "Completely upset and unable to find any excuses for

16   blank, emphasized he would make sure to notify us of any

17   indication that Zacarias would return to France, stating that

18   wherever Zacarias is, Zacarias will try hard to put his

19   competencies and intelligence to the service of subversion.

20         "According to blank, Zacarias and blank were

21   inseparable, one was the head and the other was the armed hand of

22   the same monster."

23   Q.   Now, you didn't have any questions about Mr. Moussaoui after

24   you got that from France, did you?

25   A.   No, sir, that's correct.  The date of birth matched at this

Page 1247

1  point.

2  Q.   Okay.  And going back to the second page, it says that

3  Moussaoui was initiated by the fundamentalists at Finsbury Park.

4  Do you see that?

5  A.   Yes, sir.

6  Q.   He had never told you about Finsbury Park when you

7  interviewed him, did he?

8  A.   He had not.  In fact, he lied about the mosque that he was

9  involved at.

10  Q.   So why didn't you charge him with a false statement then?

11  A.   Because we still didn't have permission to go to the United

12  States Attorney's Office.

13  Q.   But you knew that was a false statement, right?  That's a

14  criminal offense, right?

15  A.   Yes, sir.  Criminal offense or not, we still need authority

16  to go to the United States Attorney's Office.  That's -- the wall

17  was still in place.  It was still an intelligence investigation.

18  Q.   But you could have gotten, if you -- you didn't even ask, did

19  you?

20  A.   No, sir.

21  Q.   But if you had been able to charge Mr. Moussaoui with a false

22  statement, you could have obtained a search warrant to look at his

23  belongings to find other evidence to support the false statement

24  charge, right?

25  A.   Yes, sir, the same as we could have to look at evidence to

Page 1248

1    support the act of terrorism or the destruction of commercial

2    aircraft.  The wall still existed.

3    Q.    At this point in time, Agent, you had a crime committed in

4    your presence, he had lied to you and now you could prove it,

5    correct?

6    A.    About which mosque he attended?

7    Q.    Yes.

8    A.    Yes, sir.

9    Q.    And that's a mosque that was well-known to you as a terrorism

10   investigator at that time, wasn't it?

11   A.    No, sir, I was not familiar with which mosques in the United

12   Kingdom at that time were frequented by Islamic fundamentalists.

13   Q.    On the next page it said Moussaoui was wholly convinced of

14   jihad and maintained to his radical convictions?

15   A.    Yes, sir.

16   Q.    Did the receipt of this document prompt anyone in the

17   Department of Justice to look again at whether there was probable

18   cause to search Moussaoui for a criminal act?

19   A.    Sir, to the best of my knowledge, with the exception of the

20   FBI portion of the Department of Justice, none of this information

21   was forwarded to OIPR or any other part of the Department of

22   Justice.  I don't know what it prompted on their, on headquarters'

23   end.

24   Q.    By headquarters, you mean FBI or Justice?

25   A.    FBI headquarters.

Page 1249

1  Q.   Did anybody at FBI headquarters call you and say:  Agent

2  Samit, you have been telling us that this guy is a terrorist all

3  along, now we know he had even just been to Afghanistan?

4  A.   Sir, I'm not sure where the Afghanistan representation is in

5  here.

6  Q.   Do you want to look on page 3 again?

7  A.   Yes, sir.  Oh, to Afghanistan as well, yes, sir.

8  Q.   And he didn't admit to you that he had been to Afghanistan

9  when you questioned him, did he?

10  A.   He did not.

11  Q.   Another false statement, right?

12  A.   Yes, sir.

13  Q.   In your knowledge what was a Muslim fundamentalist before

14  2001 doing in Afghanistan?

15  A.   Receiving training, direction.

16  Q.   And nobody in the FBI read this and said:  Agent Samit,

17  you're right, now you've got the confirmation of everything you've

18  been telling us, all of your good work is going to pay off, now we

19  have confirmation that he has been to training camps in

20  Afghanistan?

21  A.   No, sir, that's not what it said.  It didn't say training

22  camps.  It said Afghanistan.

23  Q.   It needed to say training camps, Agent, for you to move?

24  A.   Well, it's not for me to move, sir, but it is important to

25  understand the distinction that all along we had been applying for

Page 1250

1    an application for FISA based on Mr. Moussaoui's connection to Ibn

2    Khattab, and from there to Ibn Khattab's connection to Usama Bin

3    Laden.

4            It is an inaccurate thing to say, in fact, that

5    Mr. Moussaoui or anybody else who traveled to Afghanistan during

6    that time was automatically going there at the behest and

7    direction of al Qaeda.

8    Q.   Agent Samit -- are you telling us --

9    A.   In fact, there were many other editorials --

10           THE COURT:  One at a time.

11   BY MR. MAC MAHON:

12   Q.   Your editorial -- this information was critical to you when

13   you received it.  You didn't, you didn't say this information was

14   meaningless when you received it?

15   A.   No, sir, and it wasn't.

16   Q.   You knew it was critical and it proved exactly what you

17   thought about him?

18   A.   No, sir, that's inaccurate.

19   Q.   And you weren't making excuses like he could have been going

20   there to be a tourist in Afghanistan at that time, because you

21   didn't do anything with it, did you?

22   A.   Yes, sir, we forwarded it, we made sure headquarters had seen

23   it and were aware of it and wanted them to include it in our FISA

24   application.

25   Q.   But you didn't call anybody, there is no paperwork in here

Page 1251

1   where you said:  Oh, no, now we know Moussaoui has been to

2   Afghanistan, we know he is a Wahabite?

3   A.   Sir, as you can see the second recipient on there was

4   Supervisory Special Agent Maltbie.  We had ensured that he had

5   received the document and seen it and was aware of its contents.

6   Q.   Who is the -- in August of 2001, tell the jury who the Number

7   1 Wahabite in the world was.

8   A.   The Number 1?

9   Q.   Yeah, who is the most famous Wahabite in the world in August

10  30th, 2001.

11  A.   I think you want me to say Usama Bin Laden.  In terms of the

12  most famous or the most prominent, he would be it.

13  Q.   Right.  And you knew that then, didn't you?

14  A.   But Mr. Moussaoui being a member of the Wahabi sect, or

15  submitting to it, and even traveling to Afghanistan does not link

16  him legally to al Qaeda.

17  Q.   You didn't even ask for a warrant, did you?  When you got

18  this, you never made a single attempt again to say now we have got

19  everything we need to get a criminal search warrant, let's

20  resubmit our request, and see if these people will budge?  You

21  didn't do it, did you?

22  A.   Again, sir, that's a misrepresentation.  This was classified

23  information.  It was not evidence of a crime sufficient to get, to

24  ask the French government to --

25  Q.   Now, you might not have been able to do it because of the

Page 1252

1    wall, right?

2    A.   That's correct.

3    Q.   And you didn't even ask if you could go over the wall with

4    this information and try to get a criminal search warrant, did

5    you?

6    A.   No, sir.

7    Q.   About this same time you actually tried to insert somebody

8    into his cell to talk to him, didn't you?

9    A.   Yes, sir.

10   Q.   And what did you tell that person to do?

11   A.   We asked if that, if an Arabic-speaking officer would be

12   willing to go into jail and be alongside Mr. Moussaoui in the

13   hopes that he would make statements to him that would further

14   provide either a foreign intelligence connection or evidence of a

15   crime.

16   Q.   And you submitted this plan up the flagpole of headquarters

17   and what happened?

18   A.   Up the flagpole, sir?

19   Q.   You tried to get somebody at headquarters to approve your

20   plan to put an Arabic-speaking agent in the cell with

21   Mr. Moussaoui, right?

22   A.   To put an Arabic-speaking officer, yes, sir.

23   Q.   And it was denied?

24   A.   It was.

25   Q.   Did anybody from FBI headquarters ever call you and ask you

Page 1253

1    about the information contained in Exhibit 59B?

2    A.   No, sir.

3    Q.   Anyone from the Department of Justice ever call and ask you?

4    A.   No, sir.

5    Q.   Anyone from the Central Intelligence Agency?

6    A.   We had ongoing dialogue with them about that information.

7    Did anyone call me and ask me --

8    Q.   -- about the information in 59B.

9    A.   No, sir.  It was forwarded to them so they were aware of it.

10   And we had a continuing dialogue about it, so...

11   Q.   Do you know whether that information made it into briefings

12   to the director?

13   A.   I don't know.

14            MR. MAC MAHON:  642, please.

15            THE COURT:  Don't put it on the screen until we know if

16   it is in.

17            MR. NOVAK:  No objection.

18            THE COURT:  All right.  It is in then.

19            (Defendant's Exhibit No. 642 was received in evidence.)

20   BY MR. MAC MAHON:

21   Q.   Have you seen this before, sir?

22   A.   I have.

23   Q.   This is the e-mail you were talking about, where you wanted

24   to make sure that Mr. Maltbie saw this, right?

25   A.   No, sir.  This is an e-mail from Mr. Abbott in London.  And

Page 1254

1    it contained as the attachment the document we were just

2    reviewing, 59B.  And it was Jay Abbott ensuring that Mr. Maltbie

3    and I both received it.

4    Q.   Okay.  So this is what precedes the one you were talking

5    about?

6    A.   This document that we were just talking about was attached to

7    this e-mail seen under PS, attached EC is a draft.

8    Q.   Who is Joseph Hummell?

9    A.   He is our person in London.

10   Q.   Did you ever hear back from him in London after you received

11   this?

12   A.   No, sir.  As we discussed earlier, we didn't hear until after

13   September 11.

14   Q.   But this was pretty important information that you sent along

15   to him, wasn't it?

16   A.   This is from Jay Abbott sending it.

17   Q.   Agent Samit, you knew when you received this information on

18   August 30, 2001 that it was very significant to your

19   investigation?

20   A.   Yes, sir, absolutely.

21   Q.   All right.  Did you ever, after you received this, call

22   Mr. Hummell and tell him "we have got critical information here,

23   what are you doing?  What are you finding?"  Did you call him at

24   all?

25   A.   No, sir.

Page 1255

1   Q.   And Mr. Billings is in Oklahoma City, right?

2   A.   Correct.

3   Q.   And why is Joseph Rivers receiving this?

4   A.   Because he was helping with the administrative part of this

5   investigation.

6   Q.   All right.  644, please.  Excuse me, 643.

7              THE COURT:  I assume there is no objection?

8              MR. NOVAK:  No objection.

9              THE COURT:  All right.  It is in.

10             (Defendant's Exhibit No. 643 was received in evidence.)

11  BY MR. MAC MAHON:

12  Q.   Have you seen this before?

13  A.   Yes, sir.

14  Q.   Now, by August 30th the whole -- the people you were dealing

15  with, Mr. Maltbie, Frasca, and all them were all focused on

16  getting Moussaoui deported out of the country, right?

17  A.   Yes, sir.

18  Q.   And nobody, nobody ever again talked about, other than you,

19  talked about trying to get another search warrant, did they?

20  A.   Yes, sir, that's correct.

21  Q.   You were the only one?

22  A.   People in my office, yes, sir.

23  Q.   People in Minneapolis were continuing to try to get a search

24  warrant?

25  A.   That didn't end until -- that never ended.  It didn't end

Page 1256

1   until we got the search warrant on September 11th.

2   Q.   Well, you made a specific written request even on September

3   10th of headquarters, didn't you?

4   A.   Yes, sir.

5   Q.   So you never stopped trying?

6   A.   That's correct.

7   Q.   But Mr. Maltbie and Mr. Frasca, they gave up and were just

8   trying to send him home on a plane, that's correct, isn't it?

9   A.   In terms of giving up on the search warrant, I don't know

10  what they had done.  That wasn't plan A for them at that point.  I

11  don't know --

12  Q.   You never received any communication from them that said we

13  have received the information of August 30th or anything else that

14  Special Agent Samit has pulled together in this investigation or

15  are going to relook at this thing?

16  A.   Yes, sir, that's correct.

17  Q.   It never happened?

18  A.   We did not.

19  Q.   644, please.

20        MR. NOVAK:  No objection, Your Honor.

21        THE COURT:  All right.  It is in.

22        (Defendant's Exhibit No. 644 was received in evidence.)

23  BY MR. MAC MAHON:

24  Q.   You have seen this before, haven't you, Agent?

25  A.   Yes, sir, it is an e-mail that I wrote to Scott Billings in

Page 1257

1   Oklahoma City.

2   Q.   And this follows your receipt of a translation of al-Attas's

3   phone call to a man named Ndiaye, N-d-i-a-y-e, right?

4   A.   Yes.

5   Q.   And that's when you learned that al-Attas was, it said, I

6   heard -- "Question:  I heard you wanted to go on jihad?"  And then

7   al-Attas quickly squashed that line of discussion by saying "can't

8   talk about that now."  Right?

9   A.   By saying "don't talk about that now," yes, sir.

10  Q.   Okay.  And did you send this information up to Mr. Maltbie or

11  anybody else?

12  A.   Yes, sir.  I believe that was included either in an e-mail or

13  a phone call we sent, we had with him.

14  Q.   And no response from him about that either?

15  A.   I believe that Supervisory Special Agent Jones received that,

16  received a response from Unit Chief Frasca and that was a

17  discussion of the many forms of jihad, that jihad, while the most

18  common term certainly in use by terrorism investigators is holy

19  war, there are other meanings of that word.

20  Q.   And that's, Agent Frasca said:  Oh, he could have been

21  talking about losing weight, he could have been talking about

22  being nice to his mother, it could be a lot of things other than

23  holy war, right, something along those lines, right?

24  A.   About the weight and the mother, I don't know, but --

25  Q.   But those are two examples of other forms of jihad?

Page 1258

1  A.   He did say, he did say that it could be something other than

2  holy war.

3  Q.   Right.

4  A.   He raised that as a possibility.

5  Q.   But when you talked to al-Attas and said the word jihad, he

6  knew exactly what you meant, didn't he?

7  A.   Yes, sir.

8  Q.   It was another example of Maltbie just undercutting the work

9  you had done on this case, wasn't it?

10  A.   This was between Special Agent Jones and Special Agent Frasca

11  in this case.

12  Q.   Excuse me, Agent Frasca.  You are right.  But Frasca didn't

13  credit the work that you did finding these people talking about

14  jihad either, right?

15  A.   Credit?

16  Q.   I mean in terms of believing the quality of the work you had

17  done.  You have got two Muslims, one of whom you have got all

18  kinds of information on, and one of them says it might be going on

19  jihad, that's pretty important, isn't it?

20  A.   Yes, sir, but I don't think it comes down to an issue of

21  whether or not Frasca believed the work that I had done.  He was

22  just putting a different -- he was allowing the possibility of a

23  different interpretation of a word that has many meanings.

24  Whether or not I agreed with that, I didn't, but he wasn't -- he

25  didn't not believe what I said.

Page 1259

1   Q.   Is that one of the elements of criminal negligence that you

2   have lodged against Mr. Frasca?

3   A.   No.

4   Q.   His misuse of your word jihad?

5   A.   No.

6   Q.   Exhibit 810, please.

7              THE COURT:  Any objection?

8              MR. NOVAK:  One minute, Judge.  No objection.

9              THE COURT:  All right.  It is in.

10             (Defendant's Exhibit No. 810 was received in evidence.)

11  BY MR. MAC MAHON:

12  Q.   Have you seen this before, Agent?

13  A.   Yes, sir, I wrote it.

14  Q.   What is it?  Tell the jury.

15  A.   It is an August 31st, 2001 letterhead memorandum, in this

16  case from the Minneapolis office, intended to go to the Federal

17  Aviation Administration advising them of a threat to security of

18  aircraft.

19  Q.   And who did you forward this to?

20  A.   I didn't forward it to anyone.  It was never officially

21  released or uploaded.

22  Q.   And that's because Mike Maltbie told you not to do it, right?

23  A.   It is because Mike Maltbie told Greg Jones that, in fact, he

24  was authoring a cable to the FAA, among other agencies, and that

25  it would go headquarters to headquarters.

Page 1260

1    Q.    But you knew, you let it be known through Mr. Jones that you

2    had written a threat assessment about Moussaoui and that you

3    wanted it sent out to the FAA, correct?

4    A.    Yes, sir.

5    Q.    And he told you no?

6    A.    He told me that he was going to handle that.

7    Q.    You were told not to do it specifically, weren't you?

8    A.    Yes, sir.

9    Q.    So the document we're looking at as Exhibit 810 was never

10   seen by a decisionmaker in the United States before 9/11, was it?

11   A.    That's correct.

12   Q.    Why don't you read the purpose of the document, please.

13   A.    The purpose of this document:  "To advise the Federal

14   Aviation Administration of a potential threat to the security of

15   commercial aircraft."

16   Q.    Okay.  Go to page 3.

17         Just while Ms. Bishop is pulling that up, you were very

18   concerned about what you had found, enough to write this document,

19   right?

20   A.    Yes, sir.

21   Q.    At page 3.  Excuse me, Your Honor.

22         THE COURT:  We're on page 5.

23         MR. MAC MAHON:  She has got page 3 missing, Your Honor.

24         THE COURT:  All right.

25   BY MR. MAC MAHON:

Page 1261

1   Q.   All right.  Go up a little bit.

2        One of the things you wanted to tell the FAA and were

3   prohibited from doing, Agent Samit, was that when Moussaoui was

4   arrested, he was armed with a small sheath knife in his pocket and

5   admitted that a larger folding blade knife was found under the

6   seat of a car, right?

7   A.   Sir, I wasn't prohibited from telling the FAA that.

8   Q.   You didn't do it, did you?

9   A.   Yes, sir.

10  Q.   You told someone at the airport in Minneapolis?

11  A.   No, sir, I told someone in the FAA security office in

12  Minneapolis.

13  Q.   You never gave the FAA in Washington this document, right?

14  A.   That's correct, I didn't.

15  Q.   You told somebody in Minneapolis what your concerns were but

16  you didn't even give them this document, did you?

17  A.   No, sir, I provided them the teletype that Mr. Maltbie

18  provided.  It should be noted though --

19  Q.   Agent, I don't need you -- the thing that Mr. Maltbie

20  provided doesn't say anything about large folding blade knives

21  found on Moussaoui, does it?

22  A.   I'd have to review it, sir.  I can't recall.

23  Q.   And you wanted the FAA to know about Moussaoui thinking it

24  was acceptable to kill civilians, that's on page 4, right?  Right?

25  A.   I'm catching up to you, sir.  Hang on one second.  Yes.  Yep.

Page 1262

1  Q.   You wanted to tell the FAA that Moussaoui would harm

2  nonbelievers, who would be described as Christians and Jews,

3  right?

4  A.   Yes, sir.

5  Q.   You wanted them to know that Moussaoui was involved in

6  physical training, right?

7  A.   Yes, sir.

8  Q.   That he had no convincing explanation for his training or his

9  money?

10  A.   Yes, sir.  In fact, I did let them know all of those things.

11  Q.   You told somebody -- you did not tell the FAA in Washington

12  this, did you?

13  A.   No, sir, but I did tell the FAA.  Those were FAA special

14  agents like myself whose job it was to investigate these things.

15  To say that the FAA wasn't notified of all those facts is

16  inaccurate.

17  Q.   Well, then where did that meeting take place?

18  A.   At the FAA office in Minneapolis, their office.

19  Q.   What day was that?

20  A.   September 5th.

21  Q.   And what was the response from the FAA?

22  A.   I don't know.  They were very interested.  The agents I spoke

23  with were very interested.

24  Q.   Anybody ever get back to you?  Do you have any paperwork on

25  this?  Can we see the knives?  Anything like that?

Page 1263

1    A.    No, sir.

2    Q.    Nobody ever got back to you at all, right?

3    A.    Right.

4    Q.    Until after 9/11?

5    A.    Correct.

6    Q.    And you included on page 5 -- if Ms. Bishop could now put up

7    page 5 -- read this paragraph if you would that you wanted to give

8    to the FAA.

9    A.    "Information provided by blank, a reliable source with

10   excellent access to the information reported, indicated that

11   he/she is aware that Moussaoui had fully embraced the doctrine of

12   radical Islamic fundamentalism by 1995.  Despite attempts to

13   orient Moussaoui towards an Islam of tolerance and of moderation

14   by individuals close to him, he remained wholly convinced of the

15   need for jihad, holy war, maintained his radical convictions and

16   continued to spread his message of intolerance and hatred in

17   several different countries.  This source indicated that Moussaoui

18   has traveled to Kuwait, Turkey, and Afghanistan in connection with

19   this goal."

20   Q.    In connection with holy war, right, that's what you wanted to

21   tell the FAA?

22   A.    Yes, sir.  That's what I did tell the FAA.

23   Q.    No, that's what you told the person up in Minnesota?

24   A.    Well, sir, they are FAA employees.  When I tell that person,

25   just like when Mr. Moussaoui makes a statement to me, he is

Page 1264

1   telling the FBI.  When I make a statement to FAA employees, I'm

2   telling the FAA.

3   Q.   So you did everything -- you weren't obstructed at all in

4   getting your information to the FAA; is that what you are telling

5   this jury?

6   A.   The FAA locally?  No, sir.

7   Q.   Right.  But FAA nationally, which was your intent when you

8   drafted this, your intent was to give this to everybody at the FAA

9   so they could act, right?

10  A.   Yes, sir.

11  Q.   It wasn't your intent to go talk to somebody at the airport

12  in Minneapolis?

13  A.   No, sir.

14  Q.   Maltbie told you not to, right?

15  A.   To talk to those people?

16  Q.   Yes.

17  A.   No, sir.

18  Q.   He told you not to send anything to anybody in Washington

19  about this?

20  A.   That's correct, but that's different.  He did not direct me

21  not to speak to the people in Minneapolis.

22  Q.   You are not going to tell this jury that you talking to

23  somebody in Minneapolis is the functional equivalent of what you

24  were trying to accomplish when you drafted Exhibit 810, are you?

25  A.   No, sir, but it is certainly a good alternative.

Page 1265

1    Q.    And it was an alternative because you were stopped?

2    A.    Yes, sir, from sending it to the FBI or FAA in Washington,

3    yes, sir.

4    Q.    Why don't you go to page 6.  Read the first paragraph of your

5    threat assessment.

6    A.    "Minneapolis believes that Moussaoui, al-Attas, and others

7    not yet known were engaged in preparing to seize Boeing 747-400 in

8    commission of a terrorist act.  As Moussaoui denied requests for

9    consent to search his belongings and was arrested before

10   sufficient evidence of criminal activity was revealed, it is not

11   known how far advanced were his plans to do so."

12   Q.    Look at Exhibit 474, if you would, please.

13              THE COURT:  Any objection to 474?

14              MR. MAC MAHON:  We will have to voir dire him on this

15   one, Your Honor.

16              THE COURT:  All right.

17   BY MR. MAC MAHON:

18   Q.    Have you seen that before?

19   A.    Yes, sir.

20   Q.    When did you receive this?

21   A.    Probably within a few days of its being issued.

22              MR. MAC MAHON:  Move the admission of 474, Your Honor.

23              THE COURT:  Any objection?

24              MR. NOVAK:  No.

25              THE COURT:  All right.  It is in.

Page 1266

1              (Defendant's Exhibit No. 474 was received in evidence.)

2    BY MR. MAC MAHON:

3    Q.    Did you ever see an e-mail Mr. Maltbie wrote where he said

4    that there was no indication that Moussaoui or anyone else was

5    involved in any nefarious activities?

6    A.    Yes, sir, I recall that.

7    Q.    That's the e-mail that -- the threat assessment that

8    Mr. Maltbie came up with, after you drafted yours, right?

9    A.    I can't say.  I'd have to see it specifically before I could

10   comment on it.

11   Q.    All right.  Exhibit 474, tell the jury what that is.

12   A.    474 is a document, a letter from our office in London to the

13   British government, and it looks to contain the information that

14   had come from Paris on August 30th.

15   Q.    And this was an attempt to try to get information, to let the

16   people in London know where the investigation was going in France,

17   right?

18   A.    Correct.  This shows that information was certainly moving

19   among FBI offices overseas and between FBI offices overseas and

20   Minneapolis.

21   Q.    And, again, this didn't spur anything coming out of London,

22   right?

23   A.    Not that I saw, no, sir.

24   Q.    Okay.  Exhibit 40, please.

25              THE COURT:  I'm sorry?

Page 1267

1            MR. MAC MAHON:  Exhibit 40.

2            THE COURT:  40?

3            MR. MAC MAHON:  Yes, Your Honor.

4            MR. NOVAK:  No objection, Judge.

5            THE COURT:  How far down the road is that?  I am not

6    seeing it in my book.  Is that right after 474?

7            MR. MAC MAHON:  It is the fourth from the back, Your

8    Honor.

9            THE COURT:  Fourth from the back?

10           MR. MAC MAHON:  Well, I see a few more than that.

11           THE COURT:  Oh.  For some reason you have it -- got it.

12   Got it.

13           MR. MAC MAHON:  Sorry, Judge.

14           THE COURT:  There is no objection to 40?

15           MR. NOVAK:  There is no objection.

16           THE COURT:  All right.  It is in.

17           (Defendant's Exhibit No. 40 was received in evidence.)

18   BY MR. MAC MAHON:

19   Q.   What is this exhibit, Mr. Maltbie?

20   A.   This is an electronic communication from myself to --

21   Q.   Mr. Maltbie.  Excuse me.  Agent Samit.

22   A.   This is an electronic communication from myself to

23   headquarters to Mr. Maltbie and to Oklahoma City, to Special Agent

24   Billings.

25   Q.   As of the 6th, you still had a high priority on this

Page 1268

1    investigation, right?

2    A.    Yes, sir.  That never changed.

3    Q.    Right.  That never changed at all?

4    A.    No, sir.

5    Q.    And were you getting everything you wanted out of these folks

6    in Oklahoma City?

7    A.    Almost everything I wanted.

8    Q.    Okay.  And you got a translation of Mr. al-Attas's call,

9    right?

10   A.    Yes, sir.

11   Q.    And then a translation of the will?

12   A.    Yes, sir.

13   Q.    Is that the first time you had the translation of the will?

14   A.    It was.

15   Q.    And the will says that death is approaching, right, isn't

16   that the language in the will?

17   A.    Yes, sir, that's correct.

18   Q.    And that concerned you, didn't it?

19   A.    It does.

20   Q.    That a young man would have a will that said his death was

21   approaching?

22   A.    Yes, sir.

23   Q.    And you wanted to make sure that that information got up to

24   the Radical Fundamentalist Unit as well, didn't you?

25   A.    Correct.

Page 1269

1    Q.   And you didn't hear a word back from them, did you?

2    A.   No, sir.  That's where -- I believe that's where the

3    discussion from the translation of this phone call, I believe

4    that's where the discussion between Supervisory Special Agent

5    Jones and Special Agent Frasca about the meanings of jihad.

6    Q.   Many different meanings of jihad, right?

7    A.   Yes, sir.

8    Q.   How about Exhibit 731, please.

9              THE COURT:  Any objection?

10             MR. NOVAK:  No objection, Judge.

11             THE COURT:  All right.  It is in.

12             (Defendant's Exhibit No. 731 was received in evidence.)

13   BY MR. MAC MAHON:

14   Q.   Have you seen this before?

15   A.   Yes, sir.  It is an e-mail I sent to my supervisor.

16   Q.   Okay.  The first line here, read that to the jury.

17   A.   "Oklahoma continues to fall short of expectations."

18   Q.   What was the problem?

19   A.   There was some circumstantial evidence indicating that

20   Mr. NDI there, the person, may have been involved in some bank

21   robberies.  Oklahoma City investigated that at my request and

22   determined that it wasn't, in fact, the case.  I was disappointed

23   by the amount of investigation they did.

24             It seems in retrospect they were right.  Mr. NDI has

25   never been linked to those bank robberies, but at that time I was

Page 1270

1  frustrated that they didn't do more.  It is a real judgment call

2  there.  Oklahoma City were the people on the ground there, much as

3  I was the person on the ground in Minneapolis.  While I may not

4  have been happy with their decision at the time, they were right

5  and I was wrong.

6  Q.   And there were no documents created in this, in the Moussaoui

7  investigation over the long Labor Day holiday, were there?

8  A.   What were the dates of that, sir, do you know?

9  Q.   Well, it would have been -- the 3rd of September, I think,

10 was Monday.  Do you remember?  Did you go on vacation?

11 A.   No, sir.

12 Q.   You went on vacation at one point in time, didn't you, during

13 this?

14 A.   I took a day off, yes, sir.

15 Q.   You went to the fair?

16 A.   Yes, sir.

17 Q.   Okay.  Exhibit 729, please.

18          MR. NOVAK:  No objection.

19          THE COURT:  All right.  It is in.

20          (Defendant's Exhibit No. 729 was received in evidence.)

21          MR. MAC MAHON:  Just a second.

22          THE COURT:  Since it's 3:30, and we normally take the

23 afternoon break around this time, why don't we take a 20-minute

24 recess and we will continue at 10 of.

25          (Recess at 3:30 p.m., until 3:50 p.m.)

Page 1271

 1                    (Defendant in, Jury in.)

 2          THE COURT:  I think we were about to address Exhibit

 3    729; is that correct?

 4          MR. MAC MAHON:  Yes, Your Honor.  And we'll withdraw

 5    that exhibit and instead move to 334.

 6          THE COURT:  All right.

 7          MR. NOVAK:  No objection.

 8          THE COURT:  All right, 334 is in.

 9          (Defendant's Exhibit No. 334 was received in evidence.)

10    BY MR. MAC MAHON:

11    Q.   Tell the jury what Exhibit 334 is.

12    A.   It's an e-mail exchange between myself and Cathy regarding

13    any information that I'd received that she tried to get to me, and

14    her last, her last message on September 10.

15    Q.   And that's the information that we talked about -- and we

16    didn't talk about, right?

17    A.   Correct.

18          MR. MAC MAHON:  Okay.  Now, if we could scroll down a

19    little bit, Ms. Bishop, please.

20    Q.   Here, Agent Samit, this is an accurate characterization of

21    how you felt on September 10, 2001, isn't it?

22    A.   It is, yes, sir.

23    Q.   You were desperate?

24    A.   Yes, sir.

25    Q.   And the argument at this point in time was who was going to

Page 1272

1    go and who was going to be present for the search, the information

2    down there, right?

3    A.   Yes, sir.  A short time after I sent this e-mail, at the very

4    end of the day, and actually received Cathy's e-mail, at the very

5    end of the day, I learned that we had been approved to go.

6    Q.   Had been approved to go to France?

7    A.   Correct, yes, sir.

8    Q.   Okay.  And scroll back up, if you would, and read to the jury

9    Cathy's message on September 10, 2001.

10   A.   "Harry, thanks for the update.  Very sorry that this matter

11   was handled the way it was, but you fought the good fight.  God

12   help us all if the next terrorist incident involves the same type

13   of plane."

14             MR. MAC MAHON:  Exhibit 701, please.

15             THE COURT:  Any objection?

16             THE WITNESS:  I don't think -- I don't have 701.

17             THE COURT:  It's back before 334, Agent Samit.

18             THE WITNESS:  Oh, sorry, I do.  I have it.

19             MR. MAC MAHON:  Thank you, sir.

20             MR. NOVAK:  No objection.

21             THE COURT:  All right, it's in.

22             (Defendant's Exhibit No. 701 was received in evidence.)

23   BY MR. MAC MAHON:

24   Q.   Have you seen this before, Agent Samit?

25   A.   I have.  I wrote it.

Page 1273

1    Q.    And you wrote this on September 10, 2001?

2    A.    Yes, sir.

3    Q.    Okay.  Was this before or after you received that information

4    from -- that e-mail from Cathy?

5    A.    It was started before that.

6    Q.    Turn to the second page, if you would.

7          Read the writing on the second page, sir.

8    A.    "In the interest of advancing captioned investigation and

9    preventing rather than forestalling a terrorist attack by

10   Moussaoui, Minneapolis JTTF undertook to obtain criminal search

11   warrants."

12   Q.    Okay.  What is this document?

13   A.    This was an electronic communication, as you can see from the

14   first page, that was going from myself to the special agent in

15   charge of the Minneapolis Division.  I wrote it at Mr. Morrow's

16   request in order to document all of the investigative steps and

17   all of the requests that we'd made of FBI headquarters, so that he

18   would have a vehicle to make better arguments to advance any of

19   our requests.  It was just a summary for the head of my office,

20   essentially, as to everything that had gone on in the case so far.

21   Q.    Because you hadn't given up at all, had you, Agent?

22   A.    No, sir.

23   Q.    Did you get any response from Washington on this EC?

24   A.    This EC was never, was never sent.

25         MR. MAC MAHON:  If I could, Your Honor, it was not in

1    the book, is to show -- and I'm almost done, Your Honor.

2              THE COURT:  All right.

3              MR. MAC MAHON:  Exhibit 639.  And I have copies for

4    counsel and the Court.

5    Q.   Have you seen this before?

6    A.   I don't know that I've seen this exact e-mail, no, sir.

7    Q.   Did you learn in -- on or about August 24 of 2001 that

8    Mr. Maltbie was telling people that there was no indication that

9    Moussaoui and al-Attas --

10             MR. NOVAK:  Your Honor, I object.  He's trying to go the

11   back way when he can't get in through the exhibit.  That's totally

12   inappropriate.  He can't authenticate the document.  He can't

13   start reading the document --

14             MR. MAC MAHON:  Let me ask this way.  I'll start again.

15             THE COURT:  I'll sustain the objection.  You have to

16   rephrase your question.

17             MR. MAC MAHON:  Thank you.

18   Q.   Did you -- you told the OIG that Maltbie undercut your

19   efforts at literally every turn, right?

20   A.   I told him that he undercut my efforts to go to the U.S.

21   Attorney's Office and to obtain a FISA search warrant, yes, sir.

22   Q.   And one of the ways he did that was by telling people that

23   there was no indication and that you had generated no leads that

24   would show that Moussaoui was up to anything nefarious; is that

25   correct?

Page 1275

1  A.   One of the ways he did that was by not accepting the standard

2  of information I provided either establishing that there was

3  criminal activity or a link to a foreign power, yes, sir.

4  Q.   And he, he also interfered with your investigation in

5  Oklahoma City, didn't he?

6  A.   Yes, sir.

7  Q.   All right.  He went without even talking to you, he called

8  the people in Oklahoma City and ask them to go see Hussein

9  al-Attas and clear up a few matters, right?

10  A.   That's what I was told by Agent Billings, yes, sir.

11  Q.   And you thought that was totally inappropriate for him to do

12  that, right?

13  A.   Based on his position and the fact that it was my

14  investigation, yes, sir.

15  Q.   And you thought it was inappropriate for Mr. Manarang to have

16  told you not to arrest Moussaoui since he wasn't on the ground,

17  either, right?

18  A.   No, sir, that's not an accurate characterization.  I didn't

19  think it was inappropriate.  He just wasn't in possession of all

20  the facts at the time he raised that option with me.

21  Q.   You didn't think that he knew as much as you did at that

22  time?

23  A.   He didn't.  Once I supplied him with the additional facts, he

24  was up to speed, and we were in agreement.

25  Q.   That was after he was arrested, right?

Page 1276

1    A.    No, sir.  That was prior to his arrest.

2    Q.    You were on the phone with Mr. Manarang when Moussaoui was

3    arrested, weren't you?

4    A.    No, sir.

5    Q.    Did you testify -- do you remember testifying in front of the

6    IG, sir?

7    A.    Yes, sir.

8    Q.    Didn't you testify that you were on the telephone?

9    A.    That I was on the telephone when Mr. Moussaoui left his hotel

10   room and that I hung up with Mr. Manarang upon sighting him.

11   Q.    And in that conversation, he told you that he wanted to take

12   the cautious approach, right?

13   A.    Yes, sir, until I advised him, as we discussed this morning,

14   until I advised him that we already notified the hotel clerk in

15   order to ascertain what room Mr. Moussaoui was in.

16   Q.    Right.  You told Mr. Manarang and you told the IG that by

17   that time, it was too late?

18   A.    Yes, sir.

19   Q.    Right?

20   A.    Correct.

21   Q.    And on that phone call while you were in front of the

22   Residence Inn, he was still telling you not to arrest him?

23   A.    No, sir.  Once I explained that to him, he said he

24   understood.

25          MR. MAC MAHON:  Just a second, Your Honor.

Page 1277

1          THE WITNESS:  I also had to end the phone call because

2    Mr. Moussaoui came outside.

3          MR. MAC MAHON:  Okay.  Can we show the witness his IG

4    testimony?

5          MR. NOVAK:  Which exhibit?

6          MR. MAC MAHON:  Pages -- it's just the Inspector General

7    testimony that he gave.

8          MR. NOVAK:  Well, do you have an exhibit number?

9          MR. MAC MAHON:  It's in the testimony.  Pages 35 and 36.

10         Could we show it to the witness, Your Honor?

11         THE COURT:  All right.  Agent Samit, just to give us

12    some context, was there an actual evidentiary hearing as part of

13    the Inspector General's investigation?

14         THE WITNESS:  I'm not sure what would have constituted,

15    you mean a -- I was interviewed under oath, Your Honor, by agents

16    and attorneys from the Office of the Inspector General.  In terms

17    of an evidentiary hearing with a magistrate or someone present,

18    there wasn't.

19         THE COURT:  All right.  But was there a court reporter

20    present?

21         THE WITNESS:  No.  It was just tape-recorded.

22         THE COURT:  But it was tape-recorded.

23         THE WITNESS:  It was, yes, Your Honor.

24         THE COURT:  So it's verbatim?

25         THE WITNESS:  It is.

Page 1278

```
 1              THE COURT:  All right.

 2  BY MR. MAC MAHON:

 3  Q.   Okay.  When was the date of that interview, Mr. Samit?

 4  A.   I don't recall.  Sometime in June 2002.

 5  Q.   Okay.  June 20, 2002, right?

 6  A.   Yes, sir, if that's what the transcript says.

 7  Q.   And you were under oath that day, weren't you?

 8  A.   I was.

 9  Q.   Okay.  You testified starting on page 35, line 22, "Joe and I

10  had talked once or twice."

11              That's Joe Manarang, right?

12  A.   Yes, sir.

13              MR. NOVAK:  Judge, I object if Mr. MacMahon is going to

14  read this.  First of all, it's only admissible if it's an

15  inconsistent statement.  The passage is not inconsistent, and if

16  he believes it, he should point to certain passages.

17              THE COURT:  Well, I'll overrule the objection, but you

18  may lead the witness because this is cross-examination, but I

19  think it's -- you can either have the witness read his prior

20  statement in, or you can ask him questions about it, but I don't

21  want you reading it in.

22              MR. MAC MAHON:  Okay.

23  Q.   Let me ask you this:  You told the IG that Manarang called

24  you before Moussaoui came out of the hotel room, right?

25  A.   Yes, sir.
```

Page 1279

1   Q.   And Manarang called and said, "We don't want him arrested.

2   Let's take the cautious route."  Correct?

3   A.   Yes, sir.

4   Q.   That is before you arrested Moussaoui, right?

5   A.   That's correct.

6   Q.   He told you:  We'll get together a surveillance team from

7   Chicago or New York, and we'll follow him around, right?

8   A.   Yes, sir, that's what he said.

9        MR. MAC MAHON:  Nothing further, Your Honor, except for

10  I want to move Exhibit 697, please.

11       THE COURT:  Any objection?

12       MR. MAC MAHON:  Which I don't believe is in the book,

13  but it's his submission to the director's panel on the OIG

14  findings.

15       THE COURT:  Any objection?

16       MR. NOVAK:  Yes, we object to that, Judge.

17       THE COURT:  All right.  Let me take a look at it.

18       MR. NOVAK:  May I say why we object?

19       THE COURT:  Let me just have it first.

20       Go ahead.  You need to be at the lectern, remember.

21       MR. NOVAK:  Oh, I'm sorry, Judge.  Excuse me.

22       That submission to the director was far more than the

23  questioning that occurred here with Mr. MacMahon.  Mr. MacMahon

24  has asked Agent Samit about specific comments that he made in a

25  document.  Agent Samit has answered those questions and has

Page 1280

1  admitted to the relevant statements that are contained in the

2  document, and that's what should go into the record, not the

3  entire document.

4            THE COURT:  Mr. MacMahon?

5            MR. MAC MAHON:  Your Honor, there's a lot more

6  information -- a lot of the information is redacted out of that,

7  as the Court is well aware, but the information in there are

8  detailed historical answers to things that he did far in excess of

9  what I asked just in terms of impeachment or otherwise.  This

10  document is his explanation of many of the things that happened in

11  this case, and it is plainly relevant in this case even if it

12  wasn't offered for impeachment.

13            It's not hearsay.  It's a government report.  And it's

14  plainly admissible.  The jury can give whatever weight they want

15  to it, Your Honor.

16            MR. NOVAK:  Judge, it obviously is hearsay.  It's a

17  prior statement of the witness.  The only way it's admissible is

18  if it's --

19            THE COURT:  We can't hear you, Mr. Novak.  You've got to

20  be at the lectern.

21            MR. NOVAK:  Sorry.  Again, it is by definition hearsay.

22  It is a prior statement of the witness.  The only way that it is

23  admissible is if it is there to impeach the witness.  Mr. MacMahon

24  used the appropriate portions of that document to impeach Agent

25  Samit, and only those documents, which he acknowledged, he

Page 1281

1    answered those parts of the document, he admitted those, those

2    were -- those are already in the record.  They're in front of the

3    jury now.

4              The balance of the document is hearsay, and it's just

5    not an appropriate way to introduce this document.

6              THE COURT:  I'm going to sustain the objection.  The

7    entire document is, is way -- it's 44 pages.  I think that

8    traditionally the testimony of a witness is what the jury hears in

9    court.  We do have some exceptions to that in this particular

10   case, and it is certainly not the normal way in which things are

11   done, and this would be, in essence, allowing a particular

12   witness's testimony to be sitting in the jury room when other

13   witnesses' testimony is not, so I'll sustain the objection.

14             But obviously, Mr. MacMahon, if there's anything on

15   recross that you don't think has been adequately covered, you can

16   go into it.

17             MR. MAC MAHON:  Thank you, Your Honor.

18             MR. NOVAK:  Thank you.  I have a few questions on

19   redirect, if I might, Judge.

20             THE COURT:  All right.

21                       REDIRECT EXAMINATION

22   BY MR. NOVAK:

23   Q.  Agent Samit, you've been asked a lot of questions about the

24   law and the difference between an intel case and a criminal case.

25   Could you tell us why it is that you originally opened the case as

1  a criminal case, as opposed to an intel case?

2  A.   Yes, sir.  Because at the time I opened it and at the time I

3  was required to begin investigating, I didn't have evidence of a

4  crime being committed.  I had some suspicious information that

5  pointed to possible act of terrorism, and the policy then

6  prevailing dictated that you open an intelligence investigation or

7  we couldn't investigate.

8  Q.   At the time that you opened it, did you know that there was

9  this, this thing called the wall?

10  A.   Yes, sir.

11  Q.   Okay.  And could you describe for the jury what the

12  difference is under the law between your suspicions and probable

13  cause?

14  A.   Yes, sir.  It's, it's huge.  And, unfortunately, it was

15  decisive in this case.

16          MR. MAC MAHON:  Your Honor, that's couched in terms of

17  his training.  I don't think he can make a legal conclusion on

18  whether there was probable cause or not in this case.

19          MR. NOVAK:  Well, he can relate it to the facts of this

20  case.

21          THE COURT:  No, I think you can testify, Agent Samit,

22  based on your training and experience as an FBI agent whether you

23  believed you had probable cause, all right, and your understanding

24  of that doctrine, but Agent Samit cannot testify as a, as a legal

25  expert.

1          MR. NOVAK:  That's fine, Judge.  I wasn't trying to do

2     that.

3          THE WITNESS:  My understanding is that probable cause is

4     not a science, it's an art, and it's not an exact quantifiable

5     element in determining whether or not we can get a search warrant.

6     The definition, as I understand it, of probable cause is more

7     likely than not likely to be the case.

8          And I also understand that it's designed, the system of

9     law is designed to be flexible, to be a very variable system.  I

10    as an agent in the field, the person emotionally linked to the

11    investigation, can feel very strongly.  I can take other, other

12    factors into consideration in wanting to advance a FISA, in

13    wanting to advance a search warrant, that is, the potential

14    seriousness of it, but I also understand that probable cause, as

15    opposed to my investigative suspicions, has to be reviewed at

16    several other levels up my chain, up the legal chain, before it's

17    determined to be probable cause, the last being a judge.

18    BY MR. NOVAK:

19    Q.   And the probable cause, would that be based upon the evidence

20    that you've collected?

21    A.   It would.

22    Q.   And is that why the documents that you e-mail or the various

23    ECs, as you've described them here, electronic communications,

24    include only the information that you've gathered as opposed to

25    the questions that you've asked?

Page 1284

1    A.    Yes, sir.

2    Q.    All right.  Now, you talked about the wall for a second

3    earlier, and you've talked about that it's to prevent abuses, but

4    I don't think we've heard you describe what are the abuses that

5    the wall is designed to prevent?

6           MR. MAC MAHON:  Your Honor, this can't be of any

7    relevance, the abuses of the wall in this case.

8           THE COURT:  I think this is redirect.  That was

9    sufficiently within the scope of the cross.  I'm going to permit

10   it.

11          MR. MAC MAHON:  Thank you.

12          MR. NOVAK:  Thank you.

13          THE WITNESS:  Abuses could be, as I said at the outset

14   of this investigation, there was very little evidence of a crime

15   being committed, certainly when I opened the intelligence

16   investigation.

17          Again, myself and my fellow agents in Minneapolis who

18   were physically and emotionally closest to this investigation,

19   there can always be a tendency to overexaggerate or to attempt to

20   employ an intelligence technique, information gathered by that, to

21   bolster a criminal argument, and so the wall exists to prevent

22   intelligence techniques from being used to gather evidence of a

23   crime.

24   BY MR. NOVAK:

25   Q.    All right.

Page 1285

1    A.    It's, in essence, to prevent abuse of the defendant's rights.

2    Q.    Well, let me ask you as an example then -- if we could have

3    Defense Exhibit 59B put on the screen by Ms. Bishop, if I could,

4    please.

5          And while she's getting that exhibit, do you recall

6    Mr. MacMahon asking you a question of the violation of the Section

7    1001?  Do you recall that?

8    A.    Yes, sir, I do.

9    Q.    Do you want to explain to the jury what under the federal

10   code a violation of 1001 is?

11   A.    1001 is a false statement.  In my case, 1001 is a false

12   statement to a federal agent.  A person can make that either

13   verbally in writing, in essence, telling a lie or misleading story

14   constitutes a federal felony.

15   Q.    It's against the law?

16   A.    Yes.

17   Q.    They're not allowed to lie to you as an FBI agent?

18   A.    Yes, sir.

19   Q.    Now, to prove -- if you were to charge someone criminally

20   with 1001, do you have to have evidence to do that?

21   A.    Yes, sir, absolutely.

22   Q.    All right.  Now, this Exhibit 59B, do you recall this

23   exhibit?  Do you have it in front of you there?

24   A.    I have it now.  Yes, sir, I do.

25   Q.    All right.  Do you want to remind us again what that exhibit

Page 1286

1   was?

2   A.   This was the August 30, 2001 submission from the French

3   government providing additional intelligence information on

4   Mr. Moussaoui.

5   Q.   Back in August of 2001, had you charged Mr. Moussaoui with

6   1001, could you have used this intelligence in a criminal court?

7   A.   No, sir.

8   Q.   And why not?

9   A.   It would have required the authority of the French government

10  to do that first and foremost.

11  Q.   All right.  So did you have any evidence to charge

12  Mr. Moussaoui with 1001 back in August of --

13  A.   No, sir.

14  Q.   Now -- thank you, Ms. Bishop.

15       Mr. MacMahon has asked you why it is that you've

16  interviewed Mr. Moussaoui over two days and you have notes of

17  about one page.  I think it's -- I can't remember what exhibit he

18  marked it, but do you want to explain why it is that your notes

19  were only one page as to -- after you interviewed Mr. Moussaoui

20  for two days?

21  A.   Yes, sir.  Because when I'm interviewing a person, typically

22  my technique -- and they do vary among agents -- is not to write a

23  lot down.  It's distracting.  It distracts me as the interviewer,

24  it distracts certainly the person being interviewed, the subject

25  of the interview.  I try to be minimalist in my writing of notes

Page 1287

1    for those reasons.

2    Q.   All right.  Now, at some point, though, after your notes, do

3    you codify that into a written report?

4    A.   Absolutely, yes, sir.

5    Q.   And did you do that in this case?

6    A.   I did.

7    Q.   And is that the original electronic communication that you

8    wrote in this case?

9    A.   Yes, sir, the lengthy one.

10   Q.   I think that was Defense Exhibit 472, as I recall, if you

11   could take a look at that.  Ms. Bishop tells me I guessed right on

12   the number.  472, do you want to take a look at that?

13            THE COURT:  It's about the 9th or 10th in from the

14   beginning.

15            THE WITNESS:  That's correct.  That's the one.

16   BY MR. NOVAK:

17   Q.   Okay.  And in that document, do you describe the various

18   statements that Mr. Moussaoui told you?

19   A.   I do.

20   Q.   How many pages long is it that you write about the statements

21   about Mr. Moussaoui?

22   A.   Several.  Six, probably five or six.

23   Q.   Okay.  And are those the same statements you talked about

24   when I asked you on direct examination a week ago?

25   A.   Yes.

Page 1288

1         MR. MAC MAHON:  Your Honor, I object.  That's for the

2    jury to decide, whether what's in this document is what he

3    testified to.

4         THE COURT:  I'll sustain that objection.

5         MR. NOVAK:  All right.

6    Q.   Let me ask you this:  Within that document, though, 472, did

7    you write down everything you could recall as to what

8    Mr. Moussaoui said?

9    A.   I did.

10   Q.   All right.  Now, Mr. MacMahon was asking you some questions

11   about whether you went to Pakistan and whether you had indeed gone

12   on a wild goose chase as a result of Mr. Moussaoui's questions.  I

13   don't think you got to answer -- finish your answer.  Could you --

14   did you -- were you sent on a wild goose chase?

15   A.   Yes, sir, I was.

16   Q.   And could you explain to the jury factually what it is that

17   you mean by the "wild goose chase"?  What did you do?

18   A.   I can.  The wild goose chase can best be explained with this

19   Exhibit 472.

20   Q.   Okay.

21   A.   Mr. Moussaoui provided fairly detailed, for him, in the

22   context of interviewing him, fairly detailed information about his

23   contacts and associates in London.  He talked about places he'd

24   worked.  He provided an address, residential address and confirmed

25   that it was his.

Page 1289

1          He described an associate, Ahmed Atif, as a person who

2     provided him money.  And he did some of those things in a way that

3     made myself and made Special Agent Weese feel as though he gave

4     those up reluctantly.  None of those people -- and you can see

5     from my communication here that leads were sent to places like

6     London and Paris and not sent to Pakistan because he minimized the

7     importance of Pakistan, which is actually where his associates and

8     his sources of funding originated.

9          The wild goose chase comes in the leads that I sent to

10    London and the UK.  The fact that there was a long delay in the

11    British replying to us, the fact that I didn't set leads to

12    Pakistan, Mr. Moussaoui actively threw us off the trail of where

13    his real source of funding and where his associates were located.

14    Q.   And can you take a look at Defense Exhibit No. 692?  If

15    Ms. Bishop would be kind enough to go to page 5 then and then page

16    7.

17          Do you have 692, Agent?

18    A.   Yes, sir, I have page 5 up.

19    Q.   Well, while we're getting page 5 on the screen, could you

20    remind the folks what Exhibit 692 is?

21    A.   This was my letterhead memorandum that was attached to that,

22    enclosed with that original opening communication that went to our

23    office in London asking for investigation in London.

24    Q.   This is what you asked the Brits for help, as part of this

25    wild goose chase; is that right?

Page 1290

1    A.    Yes, sir.

2    Q.    And on page 5 -- if we could scroll down a little bit

3    farther?  That's fine.

4          Is the reference in there about the sources of

5    Mr. Moussaoui's income that you wanted verified, as you kept

6    asking about during the interview?

7    A.    Yes, sir.

8    Q.    Okay.  And where is that on that page?

9    A.    At the bottom there, that second line up, with NOP, that was

10   the company that Mr. Moussaoui identified.

11   Q.    Okay.  If you could go to page 7 then as well now,

12   Ms. Bishop, please?

13         If you could go to the bottom of that document, where it

14   indicates the request of Minneapolis?

15   A.    Yes, sir.

16   Q.    Do you see that?

17   A.    I do.

18   Q.    And is this what you're asking the people -- or the

19   government of the United Kingdom to help you out on?

20   A.    Yes, sir, it is.

21   Q.    And did you make a specific request for information about his

22   financial support and other things that he had told you about?

23   A.    I do.

24         MR. NOVAK:  All right.  Thank you, Ms. Bishop.  You can

25   take that down.

Page 1291

1    BY MR. NOVAK:

2    Q.   Now, the, the -- you obviously have a very poor opinion of

3    Mr. Maltbie; is that correct?

4    A.   Yes, sir.

5    Q.   And Mr. Frasca, is that right?

6    A.   That's correct.

7    Q.   And that's over this disagreement about whether you had

8    sufficient evidence to show the foreign power connection; is that

9    right?

10   A.   Sufficient probable cause, yes, sir.

11   Q.   Okay.  And you were, and you were trying to prove that

12   Mr. Moussaoui was connected to al Qaeda; is that right?

13   A.   I was.

14   Q.   All right.  Now, Mr. MacMahon kept asking you a number of

15   times about this comment about the television, viewing Usama Bin

16   Laden on the television that Mr. al-Attas had said to you.  Could

17   you tell us again what it was that Mr. al-Attas said to you about

18   that?

19   A.   Mr. al-Attas indicated that Mr. Moussaoui had mentioned

20   Mr. Bin Laden, Usama Bin Laden, one time.  They were watching

21   television, and Mr. Bin Laden's picture came on, and he said that

22   Mr. Moussaoui called his attention to it and said that that was

23   someone important, that was someone, a recognized figure.

24   Q.   Did you ask Mr. al-Attas if the, the sheikh that you were

25   questioning about was actually Bin Laden?

Page 1292

1    A.    Yes, sir.

2    Q.    And what did Mr. al-Attas say?

3    A.    Mr. al-Attas informed me that he didn't think so.  He didn't

4    think that was the case.

5    Q.    So that didn't help the link you do to Bin Laden then; is

6    that right?

7    A.    No, sir.  Remarking about a figure as significant and

8    controversial as Usama Bin Laden on television does not link a

9    person to al Qaeda.  I comment on Usama Bin Laden when I watch the

10   news, too.

11   Q.    If Mr. Moussaoui had told you himself that he was a member of

12   al Qaeda, would that have linked it?

13   A.    If Mr. Moussaoui had?  Absolutely.  That would have been a

14   slam dunk.

15   Q.    Could you tell us what the impact was on our investigation by

16   Mr. Moussaoui denying that he was a member of a terrorist

17   organization and failing to say that he was a member of al Qaeda?

18         MR. MAC MAHON:  Your Honor, this was all gone through on

19   direct.  I didn't ask him things that Mr. Moussaoui didn't ask

20   him.  That's for the jury to decide.

21         THE COURT:  I think this is a repeat of the direct, and

22   that's not proper redirect.  I'll sustain that objection.

23         MR. NOVAK:  All right.

24   Q.    Well, let me just ask you this then, Agent Samit:  Could you

25   use the information that you received from Mr. Moussaoui as part

Page 1293

1  of your efforts to get a FISA?

2  A.    The information I received in the course of my interview?

3  Q.    Yeah.  That information that you did get from Mr. Moussaoui

4  when you interviewed him over those two days, you relayed it to

5  your headquarters, right?

6  A.    I did.

7  Q.    And you tried to use that as part of getting the FISA; is

8  that right?

9  A.    Yes, sir.

10  Q.    And had he told you anything else, you could have used that

11  as well?

12  A.    Absolutely, yes, sir.

13  Q.    Including if he had told you whether he was part of an

14  organization?

15              MR. MAC MAHON:  Your Honor, that's --

16              THE COURT:  Sustained.

17              MR. MAC MAHON:  Thank you.

18              THE COURT:  That's the same question.

19              MR. NOVAK:  Judge, I have no further questions,

20  actually.

21              THE COURT:  All right.

22              MR. NOVAK:  Thank you.

23              THE COURT:  Now, recross is limited to redirect.

24              MR. MAC MAHON:  Yes, Your Honor.  Thank you.

25                      RECROSS EXAMINATION

Page 1294

1    BY MR. MAC MAHON:

2    Q.   Agent Samit, you don't have any idea what they were doing in

3    London, do you?

4    A.   I'm sorry, what who was doing?

5    Q.   Did you have any idea what was going on in London before you

6    sent out your LHM and when no information came back until after

7    9/11?

8    A.   If you're asking if I have no idea what our office was doing

9    in London?

10   Q.   You have no idea what the people in London that were supposed

11   to get information about this wild goose chase that Mr. Novak

12   asked you about, what any of them were doing?

13   A.   No, sir.  I know what the people at our embassy were doing,

14   what our agents there were doing.

15   Q.   And this reference to Usama Bin Laden as being meaningless

16   before -- you said when somebody points out to one of their

17   associates that they are -- that Usama Bin Laden is an important

18   person, that's just something you would disregard as an agent?

19   A.   No, sir, but it's something that doesn't carry a lot of legal

20   weight in a FISA argument.

21   Q.   What did you need, an affidavit from Bin Laden himself?

22   A.   I'm sorry, sir?  For what?  What purpose would I --

23   Q.   Well, you asked Moussaoui if he was a terrorist, and does how

24   you act to defend this country depend on whether he says yes or no

25   to that question?

Page 1295

1   A.   No, sir.

2   Q.   And you told the IG that it's irresponsible for anyone to say

3   that the FBI could have stopped 9/11.  Aren't those your exact

4   words?

5              MR. NOVAK:  Judge, I object.  This is now beyond

6   redirect.

7              THE COURT:  That's beyond the scope or redirect.

8   BY MR. MAC MAHON:

9   Q.   Hussein al-Attas was charged with a 1001 count, wasn't he?

10  A.   Yes, sir.  That's what I was told later.

11  Q.   And if you'd gotten information from Moussaoui, you would

12  have had to figure out how to throw that over the wall, too,

13  right?

14  A.   Yes, sir, but it would have been information collected -- as

15  the Court pointed out earlier, would have been collected in a very

16  straightforward, non-intelligence intensive technique.

17  Q.   Right.  And then no FISA -- no intelligence techniques were

18  ever employed on Moussaoui, were they?

19  A.   Prior to 9/11, no, sir.

20  Q.   Right.

21  A.   Well, actually, that's not accurate.  No, no -- none of the

22  FBI's intelligence techniques authorized under FISA were employed

23  prior to 9/11, but we enlisted the assistance of the intelligence

24  community, so it's not accurate to say no intelligence techniques

25  were provided.

1    Q.   At the time you arrested Moussaoui, no, no possible

2    intelligence techniques whatsoever had been employed against him.

3    You got a tip, right?

4    A.   Yes, sir.  We had -- we had -- at the time we arrested him,

5    he'd made a request of a foreign government.  That was an

6    intelligence technique.

7    Q.   Didn't have anything to do with arresting him, did it?

8    A.   No, sir.

9    Q.   All right.  And when you got information that Moussaoui had

10   been to Afghanistan and was a Wahabi, you didn't make any effort

11   to get that over the wall, either, did you?

12   A.   No, sir.  That was not information that was evidence of a

13   crime.  As we discussed before, it was further evidence of his

14   association with a foreign power, and that was provided to the

15   people who were helping us with a FISA, but that's not evidence of

16   a crime, sir.  That's intelligence information.

17   Q.   Agent Samit, how many times have you said under oath that as

18   of August 21, 2001, it was unequivocal, to use your words, that

19   there was sufficient probable cause to charge Moussaoui with a

20   crime?

21   A.   Many times.

22   Q.   Right.

23   A.   In my opinion, sir.

24   Q.   Have you ever --

25            THE COURT:  Let him finish.

Page 1297

1   BY MR. MAC MAHON:

2   Q.    Agent, you never once asked a single judge who's in charge of

3   determining probable cause to actually determine whether there was

4   probable cause to search Moussaoui?

5   A.    Yes, sir.  That's why I phrased it as in my opinion.

6           MR. MAC MAHON:  Nothing further, Your Honor.  Thank you.

7           THE COURT:  Agent Samit, thank you for your testimony.

8   Now, just wait one second.

9           Is there any possibility that Agent Samit might be

10  called again in the course of the proceedings.

11          MR. NOVAK:  There is.  For that reason, we don't want

12  him released, and I'd actually ask him to treat himself as

13  sequestered from this point forward just in case he's recalled.

14          THE COURT:  Agent Samit, that means you don't read

15  anything about this case.  You avoid any media coverage.  You're

16  free to go back to work.  They'll give you advance notice when

17  you're supposed to come back here.  And obviously, you're not to

18  discuss your testimony or anything you've seen or heard in the

19  courtroom with any witness who has not yet testified.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Thank you.  You're free to go at this point.

22                    (Witness stood down.)

23          THE COURT:  Call your next witness, Mr. Spencer.

24          MR. SPENCER:  Thank you, Your Honor.  The United States

25  calls Scott Billings.