# Exhibit 22



TIME | Nation | World | Business | Arts | Sci-Health | Photos | Current Issue | Search

## The Bombshell Memo



KENNETH LAMBERT/AP
**SENATORS** Announced a series of hearings on 9/11 and intelligence Friday in Washington

### MORE STORIES

How The FBI Blew the Case
The inside story of the FBI whistle-blower who accuses her bosses of ignoring warnings of 9/11

The Remaining Threat
Al-Qaeda operatives are still plotting against the U.S., but can we figure out what they'll do next, and how to stop them?

Decoding the Chatter
Parsing the latest terror warnings

The Memo
The explosive letter to the head of the FBI

The FBI's 'Phoenix Memo' Unmasked
From FORTUNE: The only journalist to see Ken Williams' prescient memo reveals its true nature

### GRAPHICS

The FBI
Rowley's Diagnosis—and Mueller's Rx

The Threat: Al-Qaeda
Tracking the terror at home...and the upsurge abroad

### NATION

# Coleen Rowley's Memo to FBI Director Robert Mueller
An edited version of the agent's 13-page letter

May 21, 2002

FBI Director Robert Mueller
FBI Headquarters Washington, D.C.

Dear Director Mueller:

I feel at this point that I have to put my concerns in writing concerning the important topic of the FBI's response to evidence of terrorist activity in the United States prior to September 11th. The issues are fundamentally ones of INTEGRITY and go to the heart of the FBI's law enforcement mission and mandate. Moreover, at this critical juncture in fashioning future policy to promote the most effective handling of ongoing and future threats to United States citizens' security, it is of absolute importance that an unbiased, completely accurate picture emerge of the FBI's current investigative and management strengths and failures.

To get to the point, I have deep concerns that a delicate and subtle shading/skewing of facts by you and others at the highest levels of FBI management has occurred and is occurring. The term "cover up" would be too strong a characterization which is why I am attempting to carefully (and perhaps over laboriously) choose my words here. I base my concerns on my relatively small, peripheral but unique role in the Moussaoui investigation in the Minneapolis Division prior to, during and after September 11th and my analysis of the comments I have heard both inside the FBI (originating, I believe, from you and other high levels of management) as well as your Congressional testimony and public comments.

I feel that certain facts, including the following, have, up to now, been omitted, downplayed, glossed over and/or mis-characterized in an effort to avoid or minimize personal and/or institutional embarrassment on the part of the FBI and/or perhaps even for improper political reasons:

1) The Minneapolis agents who responded to the call about Moussaoui's flight training identified him as a terrorist threat from a very early point. The decision to take him into custody on August 15, 2001, on the INS "overstay" charge was a deliberate one to counter that threat and was based on the agents' reasonable suspicions. While it can be said that Moussaoui's overstay status was fortuitous, because it allowed for him



[A TIME/CNN Poll](#)
9/11. Who's responsible and what about the warnings?

### QUICK VOTE

Did the FBI do all it could to foil the 9/11 plot?

○ Yes
○ No



### TIME ARCHIVE


[Did It Have to Happen?](#)
Did the FBI and the White House do enough to prevent Sept. 11?
5/27/2002


[Can We Stop the Next Attack?:](#)
Six months after 9/11, a TIME investigation shows how vulnerable we still are
3/11/2002

[Photo Essay](#): Digging Out Ground Zero

[Cover Collection](#): Browse every TIME cover related to September 11 and its aftermath

[America on Alert](#): From Ground Zero to the war in Afghanistan, a guide to our most compelling coverage

### LETTERS TO THE EDITOR

[E-mail](#) your letter to the editor

---

to be taken into immediate custody and prevented him receiving any more flight training, it was certainly not something the INS coincidentally undertook of their own volition. I base this on the conversation I had when the agents called me at home late on the evening Moussaoui was taken into custody to confer and ask for legal advice about their next course of action. The INS agent was assigned to the FBI's Joint Terrorism Task Force and was therefore working in tandem with FBI agents.

2) As the Minneapolis agents' reasonable suspicions quickly ripened into probable cause, which, at the latest, occurred within days of Moussaoui's arrest when the French Intelligence Service confirmed his affiliations with radical fundamentalist Islamic groups and activities connected to Osama Bin Laden, they became desperate to search the computer lap top that had been taken from Moussaoui as well as conduct a more thorough search of his personal effects. The agents in particular believed that Moussaoui signaled he had something to hide in the way he refused to allow them to search his computer.

3) The Minneapolis agents' initial thought was to obtain a criminal search warrant, but in order to do so, they needed to get FBI Headquarters' (FBIHQ's) approval in order to ask for DOJ OIPR's approval to contact the United States Attorney's Office in Minnesota. Prior to and even after receipt of information provided by the French, FBIHQ personnel disputed with the Minneapolis agents the existence of probable cause to believe that a criminal violation had occurred/was occurring. As such, FBIHQ personnel refused to contact OIPR to attempt to get the authority. While reasonable minds may differ as to whether probable cause existed prior to receipt of the French intelligence information, it was certainly established after that point and became even greater with successive, more detailed information from the French and other intelligence sources. The two possible criminal violations initially identified by Minneapolis Agents were violations of Title 18 United States Code Section 2332b (Acts of terrorism transcending national boundaries, which, notably, includes "creating a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to destroy or damage any structure, conveyance, or other real or personal property within the United States") and Section 32 (Destruction of aircraft or aircraft facilities). It is important to note that the actual search warrant obtained on September 11th was based on probable cause of a violation of Section 32.[1] Notably also, the actual search warrant obtained on September 11th did not include the French intelligence information. Therefore, the only main difference between the information being submitted to FBIHQ from an early date which HQ personnel continued to deem insufficient and the actual criminal search warrant which a federal district judge signed and approved on September 11th, was the fact that, by the time the actual warrant was obtained, suspected terrorists were known to have highjacked planes which they then deliberately crashed into the World Trade Center and the Pentagon. To say then, as has been iterated numerous times, that probable cause did not exist until after the disastrous event occurred, is really to acknowledge that the missing piece of probable cause was only the FBI's (FBIHQ's) failure to appreciate that such an event could occur. The probable cause did not otherwise improve or change. When we went to the United States Attorney's Office that morning of September 11th, in the first hour after the attack, we used a disk containing the same information that had already been provided to FBIHQ; then we quickly added Paragraph 19 which was the little we knew from news reports of the actual attacks that morning. The problem with chalking this all up to the "20-20 hindsight is perfect" problem, (which I, as all attorneys who have been involved in deadly force training or the defense of various lawsuits are fully appreciative of), is that this is not a case of everyone in the FBI failing to appreciate the potential consequences. It is obvious, from my firsthand knowledge of the events and the detailed documentation that exists, that the agents in Minneapolis who were closest to the action and in the best position to gauge the situation locally, did fully appreciate the terrorist risk/danger posed by Moussaoui and his possible co-conspirators even prior to September 11th. Even without knowledge of the Phoenix communication (and any number of other additional intelligence

communications that FBIHQ personnel were privy to in their central coordination roles), the Minneapolis agents appreciated the risk. So I think it's very hard for the FBI to offer the "20-20 hindsight" justification for its failure to act! Also intertwined with my reluctance in this case to accept the "20-20 hindsight" rationale is first-hand knowledge that I have of statements made on September 11th, after the first attacks on the World Trade Center had already occurred, made telephonically by the FBI Supervisory Special Agent (SSA) who was the one most involved in the Moussaoui matter and who, up to that point, seemed to have been consistently, almost deliberately thwarting the Minneapolis FBI agents' efforts (see number 5). Even after the attacks had begun, the SSA in question was still attempting to block the search of Moussaoui's computer, characterizing the World Trade Center attacks as a mere coincidence with Misseapolis' prior suspicions about Moussaoui.**2**

4) In one of my peripheral roles on the Moussaoui matter, I answered an e-mail message on August 22, 2001, from an attorney at the National Security Law Unit (NSLU). Of course, with (ever important!) 20-20 hindsight, I now wish I had taken more time and care to compose my response. When asked by NSLU for my "assessment of (our) chances of getting a criminal warrant to search Moussaoui's computer", I answered, "Although I think there's a decent chance of being able to get a judge to sign a criminal search warrant, our USAO seems to have an even higher standard much of the time, so rather than risk it, I advised that they should try the other route." Leaked news accounts which said the Minneapolis Legal Counsel (referring to me) concurred with the FBIHQ that probable cause was lacking to search Moussaoui's computer are in error. (or possibly the leak was deliberately skewed in this fashion?) What I meant by this pithy e-mail response, was that although I thought probable cause existed ("probable cause" meaning that the proposition has to be more likely than not, or if quantified, a 51% likelihood), I thought our United States Attorney's Office, (for a lot of reasons including just to play it safe) in regularly requiring much more than probable cause before approving affidavits, (maybe, if quantified, 75%-80% probability and sometimes even higher), and depending on the actual AUSA who would be assigned, might turn us down. As a tactical choice, I therefore thought it would be better to pursue the "other route" (the FISA search warrant) first, the reason being that there is a common perception, which for lack of a better term, I'll call the "smell test" which has arisen that if the FBI can't do something through straight-up criminal methods, it will then resort to using less-demanding intelligence methods. Of course this isn't true, but I think the perception still exists. So, by this line of reasoning, I was afraid that if we first attempted to go criminal and failed to convince an AUSA, we wouldn't pass the "smell test" in subsequently seeking a FISA. I thought our best chances therefore lay in first seeking the FISA. Both of the factors that influenced my thinking are areas arguably in need of improvement: requiring an excessively high standard of probable cause in terrorism cases and getting rid of the "smell test" perception. It could even be argued that FBI agents, especially in terrorism cases where time is of the essence, should be allowed to go directly to federal judges to have their probable cause reviewed for arrests or searches without having to gain the USAO's approval.**4**

5) The fact is that key FBIHQ personnel whose job it was to assist and coordinate with field division agents on terrorism investigations and the obtaining and use of FISA searches (and who theoretically were privy to many more sources of intelligence information than field division agents), continued to, almost inexplicably,**5** throw up roadblocks and undermine Minneapolis' by-now desperate efforts to obtain a FISA search warrant, long after the French intelligence service provided its information and probable cause became clear. HQ personnel brought up almost ridiculous questions in their apparent efforts to undermine the probable cause.**6** In all of their conversations and correspondence, HQ personnel never disclosed to the Minneapolis agents that the Phoenix Division had, only approximately three weeks earlier, warned of Al Qaeda operatives in flight schools seeking flight training for terrorist purposes!

Nor did FBIHQ personnel do much to disseminate the information about Moussaoui to other appropriate intelligence/law enforcement authorities. When, in a desperate 11th hour measure to bypass the FBIHQ

roadblock, the Minneapolis Division undertook to directly notify the CIA's Counter Terrorist Center (CTC), FBIHQ personnel actually chastised the Minneapolis agents for making the direct notification without their approval!

6 ) Eventually on August 28, 2001, after a series of e-mails between Minneapolis and FBIHQ, which suggest that the FBIHQ SSA deliberately further undercut the FISA effort by not adding the further intelligence information which he had promised to add that supported Moussaoui's foreign power connection and making several changes in the wording of the information that had been provided by the Minneapolis Agent, the Minneapolis agents were notified that the NSLU Unit Chief did not think there was sufficient evidence of Moussaoui's connection to a foreign power. Minneapolis personnel are, to this date, unaware of the specifics of the verbal presentations by the FBIHQ SSA to NSLU or whether anyone in NSLU ever was afforded the opportunity to actually read for him/herself all of the information on Moussaoui that had been gathered by the Minneapolis Division and the French intelligence service. Obviously verbal presentations are far more susceptible to mis-characterization and error. The e-mail communications between Minneapolis and FBIHQ, however, speak for themselves and there are far better witnesses than me who can provide their first hand knowledge of these events characterized in one Minneapolis agent's e-mail as FBIHQ is "setting this up for failure." My only comment is that the process of allowing the FBI supervisors to make changes in affidavits is itself fundamentally wrong, just as, in the follow-up to FBI Laboratory Whistleblower Frederic Whitehurst's allegations, this process was revealed to be wrong in the context of writing up laboratory results. With the Whitehurst allegations, this process of allowing supervisors to re-write portions of laboratory reports, was found to provide opportunities for over-zealous supervisors to skew the results in favor of the prosecution. In the Moussaoui case, it was the opposite -- the process allowed the Headquarters Supervisor to downplay the significance of the information thus far collected in order to get out of the work of having to see the FISA application through or possibly to avoid taking what he may have perceived as an unnecessary career risk.**7** I understand that the failures of the FBIHQ personnel involved in the Moussaoui matter are also being officially excused because they were too busy with other investigations, the Cole bombing and other important terrorism matters, but the Supervisor's taking of the time to read each word of the information submitted by Minneapolis and then substitute his own choice of wording belies to some extent the notion that he was too busy. As an FBI division legal advisor for 12 years (and an FBI agent for over 21 years), I can state that an affidavit is better and will tend to be more accurate when the affiant has first hand information of all the information he/she must attest to. Of necessity, agents must continually rely upon information from confidential sources, third parties and other law enforcement officers in drafting affidavits, but the repeating of information from others greatly adds to the opportunities for factual discrepancies and errors to arise. To the extent that we can minimize the opportunity for this type of error to arise by simply not allowing unnecessary re-writes by supervisory staff, it ought to be done. (I'm not talking, of course, about mere grammatical corrections, but changes of some substance as apparently occurred with the Moussaoui information which had to be, for lack of a better term, "filtered" through FBIHQ before any action, whether to seek a criminal or a FISA warrant, could be taken.) Even after September 11th, the fear was great on the part of Minneapolis Division personnel that the same FBIHQ personnel would continue their "filtering" with respect to the Moussaoui investigation, and now with the added incentive of preventing their prior mistakes from coming to light. For this reason, for weeks, Minneapolis prefaced all outgoing communications (ECs) in the PENTTBOM investigation with a summary of the information about Moussaoui. We just wanted to make sure the information got to the proper prosecutive authorities and was not further suppressed! This fear was probably irrational but was nonetheless understandable in light of the Minneapolis agents' prior experiences and frustrations involving FBIHQ. (The redundant preface information regarding Moussaoui on otherwise unrelative PENTTBOM communications has ended up adding to criminal discovery issues, but this is the reason it was done.)

7) Although the last thing the FBI or the country needs now is a witch hunt, I do find it odd that (to my knowledge) no inquiry whatsoever was launched of the relevant FBIHQ personnel's actions a long time ago. Despite FBI leaders' full knowledge of all the items mentioned herein (and probably more that I'm unaware of), the SSA, his unit chief, and other involved HQ personnel were allowed to stay in their positions and, what's worse, occupy critical positions in the FBI's SIOC Command Center post September 11th. (The SSA in question actually received a promotion some months afterward!) It's true we all make mistakes and I'm not suggesting that HQ personnel in question ought to be burned at the stake, but, we all need to be held accountable for serious mistakes. I'm relatively certain that if it appeared that a lowly field office agent had committed such errors of judgment, the FBI's OPR would have been notified to investigate and the agent would have, at the least, been quickly reassigned. I'm afraid the FBI's failure to submit this matter to OPR (and to the IOB) gives further impetus to the notion (raised previously by many in the FBI) of a double standard which results in those of lower rank being investigated more aggressively and dealt with more harshly for misconduct while the misconduct of those at the top is often overlooked or results in minor disciplinary action. From all appearances, this double standard may also apply between those at FBIHQ and those in the field.

8) The last official "fact" that I take issue with is not really a fact, but an opinion, and a completely unsupported opinion at that. In the day or two following September 11th, you, Director Mueller, made the statement to the effect that if the FBI had only had any advance warning of the attacks, we (meaning the FBI), may have been able to take some action to prevent the tragedy. Fearing that this statement could easily come back to haunt the FBI upon revelation of the information that had been developed pre-September 11th about Moussaoui, I and others in the Minneapolis Office, immediately sought to reach your office through an assortment of higher level FBIHQ contacts, in order to quickly make you aware of the background of the Moussaoui investigation and forewarn you so that your public statements could be accordingly modified. When such statements from you and other FBI officials continued, we thought that somehow you had not received the message and we made further efforts. Finally when similar comments were made weeks later, in Assistant Director Caruso's congressional testimony in response to the first public leaks about Moussaoui we faced the sad realization that the remarks indicated someone, possibly with your approval, had decided to circle the wagons at FBIHQ in an apparent effort to protect the FBI from embarrassment and the relevant FBI officials from scrutiny. Everything I have seen and heard about the FBI's official stance and the FBI's internal preparations in anticipation of further congressional inquiry, had, unfortunately, confirmed my worst suspicions in this regard. After the details began to emerge concerning the pre-September 11th investigation of Moussaoui, and subsequently with the recent release of the information about the Phoenix EC, your statement has changed. The official statement is now to the effect that even if the FBI had followed up on the Phoenix lead to conduct checks of flight schools and the Minneapolis request to search Moussaoui's personal effects and laptop, nothing would have changed and such actions certainly could not have prevented the terrorist attacks and resulting loss of life. With all due respect, this statement is as bad as the first! It is also quite at odds with the earlier statement (which I'm surprised has not already been pointed out by those in the media!) I don't know how you or anyone at FBI Headquarters, no matter how much genius or prescience you may possess, could so blithely make this affirmation without anything to back the opinion up than your stature as FBI Director. The truth is, as with most predictions into the future, no one will ever know what impact, if any, the FBI's following up on those requests, would have had. Although I agree that it's very doubtful that the full scope of the tragedy could have been prevented, it's at least possible we could have gotten lucky and uncovered one or two more of the terrorists in flight training prior to September 11th, just as Moussaoui was discovered, after making contact with his flight instructors. It is certainly not beyond the realm of imagination to hypothesize that Moussaoui's fortuitous arrest alone, even if he merely was the 20th hijacker, allowed the hero passengers of Flight 93 to overcome their terrorist hijackers and thus spare more lives on the ground. And even greater casualties, possibly of our Nation's highest government officials, may have been prevented if Al Qaeda intended for Moussaoui to pilot an entirely different aircraft. There is,

therefore at least some chance that discovery of other terrorist pilots prior to September 11th may have limited the September 11th attacks and resulting loss of life. Although your conclusion otherwise has to be very reassuring for some in the FBI to hear being repeated so often (as if saying it's so may make it so), I think your statements demonstrate a rush to judgment to protect the FBI at all costs. I think the only fair response to this type of question would be that no one can pretend to know one way or another.

Mr. Director, I hope my observations can be taken in a constructive vein. They are from the heart and intended to be completely apolitical. Hopefully, with our nation's security on the line, you and our nation's other elected and appointed officials can rise above the petty politics that often plague other discussions and do the right thing. You do have some good ideas for change in the FBI but I think you have also not been completely honest about some of the true reasons for the FBI's pre-September 11th failures. Until we come clean and deal with the root causes, the Department of Justice will continue to experience problems fighting terrorism and fighting crime in general.

I have used the "we" term repeatedly herin to indicate facts about others in the Minneapolis Office at critical times, but none of the opinions expressed herin can be attributed to anyone but myself. I know that those who know me would probably describe me as, by nature, overly opinionated and sometimes not as discreet as I should be. Certainly some of the above remarks may be interpreted as falling into that category, but I really do not intend anything as a personal criticism of you or anyone else in the FBI, to include the FBIHQ personnel who I believe were remiss and mishandled their duties with regard to the Moussaoui investigation. Truly my only purpose is to try to provide the facts within my purview so that an accurate assessment can be obtained and we can learn from our mistakes. I have pointed out a few of the things that I think should be looked at but there are many, many more.**8** An honest acknowledgment of the FBI's mistakes in this and other cases should not lead to increasing the Headquarters bureaucracy and approval levels of investigative actions as the answer. Most often, field office agents and field office management on the scene will be better suited to the timely and effective solution of crimes and, in some lucky instances, to the effective prevention of crimes, including terrorism incidents. The relatively quick solving of the recent mailbox pipe-bombing incidents which resulted in no serious injuries to anyone are a good example of effective field office work (actually several field offices working together) and there are hundreds of other examples. Although FBIHQ personnel have, no doubt, been of immeasurable assistance to the field over the years, I'm hard pressed to think of any case which has been solved by FBIHQ personnel and I can name several that have been screwed up! Decision-making is inherently more effective and timely when decentralized instead of concentrated.

Your plans for an FBI Headquarters' "Super Squad" simply fly in the face of an honest appraisal of the FBI's pre-September 11th failures. The Phoenix, Minneapolis and Paris Legal Attache Offices reacted remarkably exhibiting keen perception and prioritization skills regarding the terrorist threats they uncovered or were made aware of pre-September 11th. The same cannot be said for the FBI Headquarters' bureaucracy and you want to expand that?! Should we put the counterterrorism unit chief and SSA who previously handled the Moussaoui matter in charge of the new "Super Squad"?! You are also apparently disregarding the fact the Joint Terrorism Task Forces (JTTFs), operating out of field divisions for years, (the first and chief one being New York City's JTTF), have successfully handled numerous terrorism investigations and, in some instances, successfully prevented acts of terrorism. There's no denying the need for more and better intelligence and intelligence management, but you should think carefully about how much gate keeping power should be entrusted with any HQ entity. If we are indeed in a "war", shouldn't the Generals be on the battlefield instead of sitting in a spot removed from the action while still attempting to call the shots?

I have been an FBI agent for over 21 years and, for what it's worth, have never received any form of disciplinary action throughout my career.

From the 5th grade, when I first wrote the FBI and received the "100 Facts about the FBI" pamphlet, this job has been my dream. I feel that my career in the FBI has been somewhat exemplary, having entered on duty at a time when there was only a small percentage of female Special Agents. I have also been lucky to have had four children during my time in the FBI and am the sole breadwinner of a family of six. Due to the frankness with which I have expressed myself and my deep feelings on these issues, (which is only because I feel I have a somewhat unique, inside perspective of the Moussaoui matter, the gravity of the events of September 11th and the current seriousness of the FBI's and United States' ongoing efforts in the "war against terrorism"), I hope my continued employment with the FBI is not somehow placed in jeopardy. I have never written to an FBI Director in my life before on any topic. Although I would hope it is not necessary, I would therefore wish to take advantage of the federal "Whistleblower Protection" provisions by so characterizing my remarks.

Sincerely

Coleen M. Rowley
Special Agent and Minneapolis Chief Division Counsel

NOTES

1) And both of the violations originally cited in vain by the Minneapolis agents disputing the issue with FBIHQ personnel are among those on which Moussaoui is currently indicted.

2) Just minutes after I saw the first news of the World Trade Center attack(s), I was standing outside the office of Minneapolis ASAC M. Chris Briesse waiting for him to finish with a phone call, when he received a call on another line from this SSA. Since I figured I knew what the call may be about and wanted to ask, in light of the unfolding events and the apparent urgency of the situation, if we should now immediately attempt to obtain a criminal search warrant for Moussaoui's laptop and personal property, I took the call. I said something to the effect that, in light of what had just happened in New York, it would have to be the "hugest coincidence" at this point if Moussaoui was not involved with the terrorists. The SSA stated something to the effect that I had used the right term, "coincidence" and that this was probably all just a coincidence and we were to do nothing in Minneapolis until we got their (HQ's) permission because we might "screw up" something else going on elsewhere in the country.

4) Certainly Rule 41 of the Federal Rules of Criminal Procedure which begins, "Upon the request of a federal law enforcement officer *or* an attorney for the government" does not contain this requirement. Although the practice that has evolved is that FBI agents must secure prior approval for any search or arrest from the United States Attorneys Office, the Federal Rule governing Search and Seizure clearly envisions law enforcement officers applying, on their own, for search warrants.

5) During the early aftermath of September 11th, when I happened to be recounting the pre-September 11th events concerning the Moussaoui investigation to other FBI personnel in other divisions or in FBIHQ, almost everyone's first question was "Why?--Why would an FBI agent(s) deliberately sabotage a case? (I know I shouldn't be flippant about this, but jokes were actually made that the key FBIHQ personnel had to be spies or moles, like Robert Hansen, who were actually working for Osama Bin Laden to have so undercut Minneapolis' effort.) Our best real guess, however, is that, in most cases avoidance of all "unnecessary" actions/decisions by FBIHQ managers (and maybe to some extent field managers as well) has, in recent years, been seen as the safest FBI career course. Numerous high-ranking FBI officials who have made decisions or have taken actions which, in hindsight, turned out to be mistaken or just turned out badly (i.e. Ruby Ridge, Waco, etc.)

have seen their careers plummet and end. This has in turn resulted in a climate of fear which has chilled aggressive FBI law enforcement action/decisions. In a large hierarchal bureaucracy such as the FBI, with the requirement for numerous superiors approvals/oversight, the premium on career-enhancement, and interjecting a chilling factor brought on by recent extreme public and congressional criticism/oversight, and I think you will see at least the makings of the most likely explanation. Another factor not to be underestimated probably explains the SSA and other FBIHQ personnel's reluctance to act. And so far, I have heard no FBI official even allude to this problem-- which is that FBI Headquarters is staffed with a number of short term careerists* who, like the SSA in question, must only serve an 18 month-just-time-to-get-your-ticket-punched minimum. It's no wonder why very little expertise can be acquired by a Headquarters unit! (And no wonder why FBIHQ is mired in mediocrity! -- that maybe a little strong, but it would definitely be fair to say that there is unevenness in competency among Headquarters personnel.) (It's also a well known fact that the FBI Agents Association has complained for years about the disincentives facing those entering the FBI management career path which results in very few of the FBI's best and brightest choosing to go into management. Instead the ranks of FBI management are filled with many who were failures as street agents. Along these lines, let me ask the question, why has it suddenly become necessary for the Director to "handpick" the FBI management?) **It's quite conceivable that many of the HQ personnel who so vigorously disputed Moussaoui's ability/predisposition to fly a plane into a building were simply unaware of all the various incidents and reports worldwide of Al Qaeda terrorists attempting or plotting to do so.**

*By the way, just in the event you did not know, let me furnish you the Webster's definition of "careerism - - the policy or practice of advancing one's career often at the cost of one's integrity". Maybe that sums up the whole problem!

6) For example, at one point, the Supervisory Special Agent at FBIHQ posited that the French information could be worthless because it only identified Zacarias Moussaoui by name and he, the SSA, didn't know how many people by that name existed in France. A Minneapolis agent attempted to surmount that problem by quickly phoning the FBI's legal Attache (Legat) in Paris, France, so that a check could be made of the French telephone directories. Although the Legat in France did not have access to all of the French telephone directories, he was able to quickly ascertain that there was only one listed in the Paris directory. It is not known if this sufficiently answered the question, for the SSA continued to find new reasons to stall.

7) Another factor that cannot be underestimated as to the HQ Supervisor's apparent reluctance to do anything was/is the ever present risk of being "written up" for an Intelligence Oversight Board (IOB) "error." In the year(s) preceding the September 11th acts of terrorism, numerous alleged IOB violations on the part of FBI personnel had to be submitted to the FBI's Office of Professional Responsibility (OPR) as well as the IOB. I believe the chilling effect upon all levels of FBI agents assigned to intelligence matters and their manager hampered us from aggressive investigation of terrorists. Since one generally only runs the risk of IOB violations when one does something, the safer course is to do nothing. Ironically, in this case, a potentially huge IOB violation arguably occurred due to FBIHQ's failure to act, that is, FBIHQ's failure to inform the Department of Justice Criminal Division of Moussaoui's potential criminal violations (which, as I've already said, were quickly identified in Minneapolis as violations of Title 18 United States Code Section 2332b [Acts of terrorism transcending national boundaries] and Section 32 [Destruction of aircraft or aircraft facilities]). This failure would seem to run clearly afoul of the Attorney General directive contained in the "1995 Procedures for Contacts Between the FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence Investigations" which mandatorily require the FBI to notify the Criminal Division when "facts or circumstances are developed" in an FI or FCI investigation "that reasonably indicate that a significant federal crime has been, is being, or may be committed." I believe that Minneapolis agents actually brought this point to FBIHQ's attention on August 22, 2001, but HQ personnel apparently ignored the directive,

ostensibly due to their opinion of the lack of probable cause. But the issue of whether HQ personnel deliberately undercut the probable cause can be sidestepped at this point because the Directive does not require probable cause. It requires only a "reasonable indication" which is defined as "substantially lower than probable cause." Given that the Minneapolis Division had accumulated far more than "a mere hunch" (which the directive would deem as insufficient), the information ought to have, at least, been passed on to the "Core Group" created to assess whether the information needed to be further disseminated to the Criminal Division. However, (and I don't know for sure), but to date, I have never heard that any potential violation of this directive has been submitted to the IOB or to the FBI's OPR. It should also be noted that when making determinations of whether items need to be submitted to the IOB, it is my understanding that NSLU normally used/uses a broad approach, erring, when in doubt, on the side of submitting potential violations.

8) For starters, if prevention rather than prosecution is to be our new main goal, (an objective I totally agree with), we need more guidance on when we can apply the Quarles "public safety" exception to Miranda's 5th Amendment requirements. **We were prevented from even attempting to question Moussaoui on the day of the attacks when, in theory, he could have possessed further information about other co-conspirators.}** (Apparently no government attorney believes there is a "public safety" exception in a situation like this?!)

**Get the Magazine - Try 4 Issues Risk-Free!** | **Search the Archive**

---

**QUICK LINKS:** Cover Story **|** The Memo **|** How to Fix the FBI **|** Graphic: The Threats **|** Back to TIME.com Main

FROM THE JUNE 3, 2002 ISSUE OF TIME MAGAZINE; POSTED SUNDAY, MAY 26, 2002
© 2002 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.
FAQ | Site Map | Privacy Policy | Terms of Use

[an error occurred while processing this directive]