UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

AMERICAN AIRLINES, INC., ET AL.                :
          Plaintiffs,                          :   07 Civ. 7051 (AKH)
                              :
    -against-                                     :   This motion relates to
                              :   21 MC 101 (AKH)
                              :

FEDERAL BUREAU OF INVESTIGATION,     :
ET AL.                                                        :
                              :
          Defendants,                         :
                              :
                              :

------------------------------------------------------------ X

# MEMORANDUM OF LAW IN SUPPORT OF THE AVIATION PARTIES' MOTION FOR SUMMARY JUDGMENT SETTING ASIDE THE FEDERAL BUREAU OF INVESTIGATION'S REFUSAL TO ALLOW THE DEPOSITIONS OF CERTAIN WITNESSES

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square-18th Floor
New York, NY 10036
Tel: (212) 490-9100
Fax: (212) 370-4453

*Aviation Parties' Liaison Counsel*

*Of Counsel*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
Alison Mikkor

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 2

BACKGROUND ................................................................................................... 8

I.    Al Qaeda operatives executed unprecedented, coordinated terrorist attacks
      on the United States on September 11, 2001. ........................................... 8

II.   The witnesses investigated and analyzed information related to the terrorists'
      activities. .................................................................................................. 9

III.  The witnesses have publicly disclosed information concerning the
      September 11 terrorist attacks in various forums. .................................. 13

IV.   The FBI summarily refused the Aviation Parties' request to depose
      the witnesses in the September 11 Litigation. ....................................... 14

ARGUMENT ..................................................................................................... 15

I.    THE STANDARDS FOR REVIEW AND SUMMARY JUDGMENT ................ 15

II.   THE FBI'S MAY 7, 2007 REFUSAL LETTERS CONSTITUTE FINAL
      AGENCY ACTIONS THAT ARE PROPERLY SUBJECT TO REVIEW BY
      THIS COURT. ........................................................................................... 18

III.  THE REQUESTED TESTIMONY IS RELEVANT TO IMPORTANT
      ISSUES IN THE SEPTEMBER 11 LITIGATION. .......................................... 18

      A.  The requested testimony will help establish that the carefully-orchestrated
          acts of fanatical terrorists caused the attacks. .................................. 19

      B.  The requested testimony will tend to establish that the intelligence
          agencies' actions were also a causal factor in the attacks ................ 23

          1.  Disclosure of Moussaoui's plans could have thwarted the
              September 11 Conspiracy. ......................................................... 26

          2.  The hijacking of Flight 77 could have been prevented if the
              FBI or CIA had recommended that Hazmi and Mihdhar
              be placed on a "no-fly" list. ....................................................... 29

      C.  The requested testimony will help demonstrate that the Aviation Parties could
          not reasonably foresee the attacks .................................................. 31

      D.  The requested testimony is probative of whether the Aviation Parties have
          derivative immunity from liability .................................................... 35

IV.   THE FBI'S EXPLANATIONS FOR WHY IT WILL NOT PERMIT THE
      WITNESSES TO TESTIFY ARE UNSUPPORTED BY THE FACTS ............... 37

      A.  The Aviation Parties are not seeking protected information. ............ 39

      B.  The FBI's boilerplate objections are insufficient to sustain its refusal
          to allow the five depositions. .......................................................... 43

V.    THE FBI LACKS THE AUTHORITY TO BAR SPECIAL AGENT
      RIGLER FROM TESTIFYING ..................................................................... 48

CONCLUSION................................................................................................................ 49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ali v. Federal Bureau of Prisons*, 128 S. Ct. 831 (2008)......................................................36

*ACLU v. Dep't of Defense*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ..............................5, 43

*Association of American Physicians & Surgeons v. Clinton*,
    837 F. Supp. 454 (D.D.C. 1993) ...............................................................................17

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................18

*Cavanaugh v. Wainstein*, No. 05-123 (GK), 2007 U.S. Dist. LEXIS 40242
    (D.D.C. June 4, 2007) ..................................................................16, 17, 18, 44, 46

*Colaio v. Feinberg*, 262 F. Supp. 2d 273 (S.D.N.Y. 2003) .........................................15, 16

*Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991) ..........................38

*EPA v. General Elec. Co.*, 212 F.3d 689 (2d Cir. 2000)....................................................16

*F.A.C., Inc. v. Cooperativa De Seguros De Vida*, 188 F.R.D. 181 (D.P.R. 1999) ...........39

*Gaines-Tabb v. ICI Explosives USA, Inc.*, 995 F. Supp. 1304 (W.D. Okla. 1996) ..........19

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055,
    1061 (N.Y. 2001) .......................................................................................................33

*Hoppe v. G.D. Searle & Co.*, 779 F. Supp. 1413 (S.D.N.Y. 1991) .................................25

*In re Agent Orange Prod. Liab. Litig.*, 98 F.R.D. 522 (E.D.N.Y. 1983).........................48

*In re Kinsman Transit Co.*, 338 F.2d 708 (2d Cir. 1964) .................................................33

*In re SEC v. Glotzer*, 374 F.3d 184 (2d Cir. 2004) ...........................................................16

*In re Sept. 11 Litig.*, 280 F. Supp. 2d 279 (S.D.N.Y. 2003) .............................................20

*In re September 11 Litig.*, 280 F. Supp. 2d 279 (S.D.N.Y. 2003)...................................33

*In re Vioxx Products Liab. Litig.*, 235 F.R.D. 334
    (E.D. La. 2006)..................................................................16, 17, 42,43, 46, 47

*In re von Bulow,* 828 F.2d 94 (2d Cir. 1987) .................................................................39

*In re World Trade Ctr. Disaster Site Litig.,*
    No. 06-5324-cv, 2008 U.S. App. LEXIS 622 (2d Cir. Mar. 26, 2008) ...............6, 36, 37

*Kshel Realty Corp. v. City of New York,*
    No. 01 Civ. 9039, 2004 U.S. Dist. LEXIS 25791 (S.D.N.Y. Dec. 20, 2004) ...............40

*Mariani v. United Air Lines, Inc.,* No. 01 Civ. 11628 (AKH),
    2002 U.S. Dist. LEXIS 13369 (S.D.N.Y. July 24, 2002) ...............................................42

*McCarthy v. Sturm, Ruger & Co. Inc.,* 916 F. Supp. 366 (S.D.N.Y. 1996) ......................20

*Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.,* 122 F.R.D. 447
    (S.D.N.Y. 1988) ..............................................................................................................39

*Mudd v. Caldera,* 26 F. Supp. 2d 113 (D.D.C. 1998) .......................................................15

*National Lawyers Guild v. Attorney General,* 96 F.R.D. 390 (S.D.N.Y. 1982) ...............40

*OneBeacon Ins. Co. v. Forman Int'l, Ltd.,* No. 04 Civ. 2271,
    2006 U.S. Dist. LEXIS 90970 (S.D.N.Y. Dec. 15, 2006) ...............................................43

*Pelman v. McDonalds Corp.,* 237 F. Supp. 2d 512 (S.D.N.Y. 2003) ...............................25

*Petition of Kinsman Transit Co.,* 338 F.2d 708 (2d Cir. 1964) .........................................33

*Port Authority of N.Y. & N.J. v. Arcadian Corp.,* 991 F. Supp. 390
    (D.N.J. 1997) ............................................................................................................20, 21

*Sommer v. PMEC Assoc. & Co. Ltd.,* No. 88 Civ. 2537 (JFK),
    1993 U.S. Dist. LEXIS 20401 (S.D.N.Y. Mar. 31, 1993) ..................................17, 43, 47

*The Lusitania,* 251 F. 715 (S.D.N.Y. 1918) ......................................................................20

*Wilkins v. America Export Isbrandtsen Lines, Inc.,* 446 F.2d 480 (2d Cir. 1971) .............25

## STATE CASES

*Derderian v. Felix Contracting Corp.,* 414 N.E.2d 666 (N.Y.1980) ...................................5

*Eiseman v. State,* 70 N.Y.2d 175 (1987) ...........................................................................32

*Leonardi v. Loyola Univ.,* 658 N.E.2d 450 (N.Y.1995) ...................................................25

## FEDERAL STATUTES, REGULATIONS AND RULES

28 C.F.R. § 16.21 .........................................................................................14, 49

28 C.F.R. § 16.22 (2008) ...............................................................................39

28 C.F.R. § 16.26(c) (2008)......................................................................17, 38

49 U.S.C. § 44904(a) (2001)...........................................................................32

*Administrative Procedures Act,* 5 U.S.C. §§ 701-706 (2008) ................................1, 15, 16

*Federal Tort Claims Act, Pub. L. No.* 79-601, 60 Stat. 812 (1949), *codified* at 28
   U.S.C. § 1346(b) (2008) and 28 U.S.C. §§ 2671–2680 (2008),...............................35, 36

Federal Rule of Civil Procedure 26 ..................................................................38

Federal Rule of Civil Procedure 45 ...........................................................1, 15, 47

Federal Rule of Civil Procedure 56(c)..............................................................15

## SECONDARY AUTHORITY

*Restatement (Second) of Torts* § 448 (1965)........................................................5

*Restatement (Second) of Torts* § 433(a) (1965) ...................................................24

## MISCELLANOUS

Opening Remarks, *National Commission on Terrorist Acts Upon the United
   States, Public Hearing* (Mar. 31, 2003), *available at*
   http://govinfo.library.unt.edu/911/archive/hearing1/9-
   11Commission_Hearing_2003-03-31.pdf........................................................5

*The 9/11 Commission Report* (2004) .............8, 9, 11, 13, 21, 22, 24, 26, 28, 29, 30, 31, 32

By letters dated May 7, 2007, the Federal Bureau of Investigation ("FBI") denied the Aviation Parties'[1] March 6, 2007 request to depose five current and former agency employees ("the FBI Witnesses") who can each offer testimony probative of critical issues in the September 11 Litigation.   Regardless of whether this Court applies the "arbitrary and capricious" standard of the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (2008) or the "undue burden" standard of Federal Rule of Civil Procedure 45, the salient inquiry is whether the FBI provided specific and factually-supported justifications for its refusal to present the witnesses.  In this instance, the FBI did not.  Its denial was unsupported, particularly in view of the demonstrable importance of the evidence of the FBI witnesses, the minimal burden on the agency in producing them for depositions, and the fact that much of the information to which they are expected to testify has already been made public.   Therefore, this Court should enter summary judgment for the Aviation Parties and set aside the FBI's refusal to allow these five witnesses to be deposed in the property damage, business loss, wrongful death, and personal injury actions now consolidated in *In re September 11 Litigation*, No. 21 MC 101.

---

[1]  The "Aviation Parties" joining in this Motion and Memorandum of Law are plaintiffs American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services, Inc.; Huntleigh USA Corp.; Burns International Services Corp.; Burns International Security Services Corp.; Pinkerton's Inc.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; the Metropolitan Washington Airport Authority; and the Port Authority of New York and New Jersey.

## PRELIMINARY STATEMENT

The September 11 Litigation, although extraordinary in scope, must be grounded in the fundamental principles of tort law.   The evidence sought through the FBI Witnesses' depositions goes to basic, core issues such as causation and foreseeability, as well as to the affirmative defense of derivative immunity that was recently endorsed by the Second Circuit.   The FBI's denial of these depositions effectively prevents the Aviation Parties from fully and fairly defending themselves in lawsuits seeking to impose billions of dollars in liability.   Given the absence of specific and factually-supported justification for the FBI's actions, this Court should order the depositions to go forward.

Each FBI Witness has unique knowledge of highly relevant facts concerning the September 11 plot and can provide some of the context that is vital to understanding what took place on September 11 and why:

- **Special Agent Harry Samit** conducted the initial FBI investigation of confessed September 11 co-conspirator Zacarias Moussaoui and participated in his arrest in Minnesota in August 2001.
- **Former Special Agent Coleen Rowley** was Minneapolis Chief Division Counsel for the FBI; Special Agent Samit consulted her about Moussaoui before September 11.
- **Special Agent Scott Billings** searched Moussaoui's belongings after September 11 and uncovered several suspicious items, including flight simulator software.
- **Retired Special Agent Erik Rigler** conducted an extensive study of pre-9/11 intelligence regarding two of the September 11 hijackers, Khalid al Mihdhar and Nawaf al Hazmi, in connection with his testimony as a summary witness at Moussaoui's criminal trial.
- **Michael Rolince** was Chief of the FBI's International Terrorism Operations Section in the summer of 2001 and received and analyzed intelligence indicating that al Qaeda may launch terrorist attacks in the United States.

The evidence these witnesses can offer is important to the defenses in the September 11 Litigation in several respects.   First, the FBI Witnesses can provide

testimony that is probative of the strategies and tactics the hijackers employed to carry out the September 11 attacks. Their potential testimony as to Moussaoui's training and preparations for a suicide terrorist attack, his radical beliefs, and the weapons they found in his possession is highly probative of the conduct of Moussaoui's co-conspirators in the September 11 plot. Moussaoui, who was training to be a pilot when he was arrested, has admitted that he was planning to carry out an al Qaeda-sponsored suicide attack in which he would commandeer and fly a commercial airliner into a landmark in the United States. He confessed to being a part of the conspiracy to commit the September 11 attacks and is now serving a life sentence for his involvement. The Aviation Parties intend to use the FBI Witnesses' testimony, together with evidence from other sources such as *The 9/11 Commission Report* and the statements of the plot's mastermind, Khalid Sheikh Mohammed, to establish that the September 11 hijackers were fanatical, well-trained, and well-organized terrorists, who were committed to executing the attacks regardless of the checkpoint screening or aviation security measures that were in place.

Such evidence goes directly to the issue of causation. It strongly supports the Aviation Parties' position that the terrorists are responsible for the attacks and that the hijackers' intentional, criminal conduct was the supervening cause of plaintiffs' alleged damages – not any act or omission by the Aviation Parties. This type of evidence also demonstrates that the Aviation Parties' conduct was not a but-for cause of the terrorist attacks, because the terrorists had made preparations to ensure that the attacks would occur regardless of any steps the Aviation Parties took on or before September 11, 2001.

Second, the Aviation Parties anticipate that the FBI Witnesses' testimony will demonstrate that the FBI had information before September 11 indicating that al Qaeda may have been about to launch terrorist attacks on civil aviation, which it did not timely pass along to the Federal Aviation Administration ("FAA"). This evidence, like the witnesses' testimony as to Moussaoui's terrorist preparations, is relevant to the issue of causation. Specifically, the Aviation Parties expect that the FBI Witnesses' testimony will help establish that the FBI did not advise the FAA that Special Agent Samit and other field agents had identified Moussaoui as a likely terrorist, who professed that it was acceptable to harm civilians in a *jihad* and who had been learning to fly a commercial airliner in the United States for no apparent legitimate purpose. If the FAA had known this information, it could have amended aviation security measures to guard against the type of attack that Moussaoui was planning. Robert Cammarato, a Rule 30(b)(6) witness for the FAA and the former Chief of its Security Directive Working Group, has already testified that the FAA could have taken this step, if it had information on Moussaoui's intentions before September 11. Similarly, before the attacks, the FBI and the Central Intelligence Agency ("CIA") did not disclose to the FAA that they had identified Nawaf al Hazmi and Khalid al Mihdhar as al Qaeda operatives who posed a terrorist threat and were likely in the United States. If the intelligence agencies had shared this information, the FAA could have placed Hazmi and Mihdhar on a "no-fly list," which would have prevented them from boarding American Flight 77 on September 11. The Aviation Parties intend to show that the FBI's and CIA's decisions not to disclose the available intelligence information about Moussaoui, Hazmi, and Mihdhar was a causal factor in the

September 11 terrorist attacks. After weighing this evidence together with the criminal acts of the terrorists, the jury would be entitled to conclude that any act or omission by the Aviation Parties was so dwarfed by the other causal factors of the attacks that the Aviation Parties' conduct was not a substantial cause of plaintiffs' injuries.

Third, the FBI Witnesses' evidence as to the pre-9/11 intelligence information the FBI had about the terrorist threat posed by al Qaeda is relevant to the issue of foreseeability. The requested testimony is expected to rebut plaintiffs' allegations that the Aviation Parties should have foreseen the September 11 terrorist attacks and helps establish that the terrorist attacks were not a reasonably foreseeable consequence of the Aviation Parties' conduct. *See Derderian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y.1980) ("If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus."); *see* Restatement (Second) of Torts § 448 (1965).

The Aviation Parties share the view expressed by both the Chairman of the 9/11 Commission and this Court that the September 11 attacks were the first assault in "a war against the United States, declared by international terrorists."[2] The FBI and CIA were

---

[2]    Thomas H. Kean, Chairman of the 9/11 Commission, March 31, 2003, Opening Remarks, *National Commission on Terrorist Acts Upon the United States, Public Hearing* 8 (Mar. 31, 2003), *available at* http://govinfo.library.unt.edu/911/archive/hearing1/9-11Commission_Hearing_2003-03-31.pdf; *see also ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547, 552 (S.D.N.Y. 2005) ("Our nation has been at war with terrorists since their September 11, 2001 suicide crashes into the World Trade Center, the Pentagon, and a field in Shanksville, Pennsylvania, killing thousands and wounding our nation in ways that we still cannot fully recount-indeed, we were at war with the terrorists since well before that event.").

statutorily charged with conducting intelligence operations to assess terrorist threats to the United States. However, as the FBI Witnesses' testimony is expected to establish, the far more specific intelligence information that the FBI had on the terrorist threat did not cause the FBI to anticipate the attacks or even to recommend that the FAA implement the kind of special security measures that plaintiffs now claim in hindsight were appropriate on September 11. If the jury is permitted to consider that the intelligence agencies that were charged with countering the terrorist threat did not foresee that al Qaeda would launch unprecedented suicide attacks on September 11, they will be far more likely to conclude that the Aviation Parties could not have reasonably foreseen the same threat.

Finally, the intelligence information on the terrorist threat known to the FBI and the FAA before September 11 is relevant to determining whether the Aviation Parties have derivative immunity from liability under the discretionary function exception of the Federal Tort Claims Act. Recently, the Court of Appeals for the Second Circuit suggested rather strongly that this is a defense available to the Aviation Parties. *See In re World Trade Ctr. Disaster Site Litig.*, No. 06-5324-cv, 2008 U.S. App. LEXIS 622, at *71-77 (2d Cir. Mar. 26, 2008). To establish their immunity from plaintiffs' claims for property damage, the Aviation Parties must show, *inter alia*, that they "were not aware of dangers about which [the federal agencies were] unaware." *Id.* at *77. In effect, they must establish that they had no greater knowledge of the terrorist threat than the FBI and FAA, the agencies statutorily charged with threat assessment. The Aviation Parties cannot make such a comparison without being able to present the jury with evidence of

the pre-9/11 intelligence information that the FBI and FAA had concerning the terrorist threat.

To fairly and accurately evaluate whether the Aviation Parties should be held liable for the damages caused by the terrorist attacks, fundamental principles of tort law demand that the jury in the September 11 Litigation consider the type of evidence that the FBI Witnesses can provide. Plaintiffs in that action seek to portray the attacks as if they involved only the Aviation Parties, as the alleged tortfeasors, and plaintiffs, as the alleged victims of their supposed negligence. But that is an insupportably limited view of events: one that omits two critical players that the 9/11 Commission and every other objective observer has concluded had a role in the events of September 11, 2001 – the terrorists themselves and the federal intelligence agencies that were statutorily charged with taking countermeasures against terrorist threats to this country. The requested depositions will serve as a necessary corrective to this myopic view, providing relevant evidence that is probative of the actions of both the terrorists and the intelligence agencies.

Despite this, the FBI has refused to permit even a single deposition. Moreover, it has done so without offering any factually-supported justifications for blocking the requested testimony. The FBI does not deny that the five witnesses have already testified and made other public statements regarding the information about which the Aviation Parties seek to question them – including to the 9/11 Commission, the Moussaoui trial jury, and the media. Nor does it dispute that skilled counsel, well-versed in the issues in the September 11 Litigations from the office of the United States Attorney for the Southern District of New York, are available to represent the FBI Witnesses and to

instruct the witnesses not to reveal any privileged or classified information during their depositions. The FBI has also failed to establish that the depositions would cause any more than a minimal burden to the agency, particularly given that the Aviation Parties seek to question the witnesses regarding a limited set of facts about which they have first-hand knowledge – not as Rule 30(b)(6) witnesses whose testimony would bind the agency and might require more extensive preparation. In these circumstances, the FBI's refusal to permit their depositions is an arbitrary and capricious agency action that should be set aside.

## BACKGROUND

I.    **Al Qaeda operatives executed unprecedented, coordinated terrorist attacks on the United States on September 11, 2001.**

On the morning of September 11, 2001, terrorists affiliated with the Islamic extremist group al Qaeda divided themselves into four groups and carried out unprecedented, coordinated suicide attacks on the United States by hijacking commercial airliners with the express intention of crashing them into selected ground targets.

The hijackers who executed the attacks were part of an extensive terrorist conspiracy that involved several other al Qaeda operatives and years of careful planning. The plot was led by Usama Bin Ladin, Mohammed Atef, and Khalid Sheikh Mohammed, the self-proclaimed mastermind of the September 11 attacks. *The 9/11 Commission Report*,154 (2004) ("*9/11 Comm'n Report*"); Ex. 12, Substitution for the Testimony of Khalid Sheikh Mohammed at ¶ 6 ("KSM Substitute Testimony").[3] Another critical link

---

[3] All citations to "Ex. __" refer to the Exhibits to the accompanying Declaration of Desmond T. Barry, Jr., dated April 28, 2008 ("Barry Decl.").

in the terrorist network was Ramzi Binalshibh, who acted as a liaison between the hijackers and the plot's leadership. *9/11 Comm'n Report* at 225, 227, 243-45.[4]

The plot also included al Qaeda recruit Zacarias Moussaoui. Under orders from Sheikh Mohammed, Moussaoui came to the United States and enrolled in pilot training. *Id.* at 225; Ex. 12, KSM Substitute Testimony at ¶ 93. Sheikh Mohammed has explained that he intended Moussaoui to be a pilot in a second wave of terrorist attacks immediately after September 11. *See 9/11 Comm'n Report* at 247; Ex. 12, KSM Substitute Testimony at ¶ 3. There is also evidence that Moussaoui was being groomed as a back-up pilot in case one of the September 11 hijackers dropped out of the initial attacks. *See 9/11 Comm'n Report* at 246. As he was for the other hijackers, Binalshibh was Moussaoui's main al Qaeda contact while he was in the United States. *Id.* at 246-47.

## II.    The witnesses investigated and analyzed information related to the terrorists' activities.

The FBI had identified al Qaeda as a serious threat to the United States long before the attacks. As of August 2001, the agency was pursuing approximately 70 al Qaeda-related investigations. *9/11 Comm'n Report* at 262. FBI Witness Michael Rolince was intimately involved in these activities as the Section Chief of the FBI's International Terrorism Operations Section. Ex. 13, Moussaoui Tr. (Rolince) at 1462. According to Mr. Rolince, his section's "primary responsibility was to coordinate the

---

[4]  As the Court is aware, the Aviation Parties sought to depose both Sheikh Mohammed and Binalshibh, who are currently being detained as enemy combatants. The Government denied this request. Simultaneously with this motion, the Aviation Parties have filed a motion pursuant to Federal Rule of Evidence 807 seeking the admissibility of various prior statements by Sheikh Mohammed and Binalshibh as a substitute for their testimony.

counterterrorism investigations being conducted throughout the United States." *Id.* at 1465. In the summer of 2001, the section investigated and reviewed intelligence concerning the activities of al Qaeda, including information that suggested that there were al Qaeda operatives in the United States and that Bin Ladin might launch a terrorist attack. *See id.* at 1484, 1491, 1508.

One of the terrorism investigations coordinated by Mr. Rolince's section was the FBI's inquiry into Moussaoui. Three of the FBI Witnesses – Harry Samit, Scott Billings, and Coleen Rowley – directly participated in different phases of that investigation.

In August 2001, Special Agent Samit received a tip from Moussaoui's flight training school that he was a "very unusual" student with a suspicious interest in learning how to pilot Boeing aircraft. Ex. 14, Moussaoui Tr. (Samit) at 808-11. After conducting a preliminary investigation, Special Agent Samit interviewed Moussaoui, observed the search of a car he had been using, and participated in his arrest for visa violations on August 16, 2001. *Id.* at 836, 841-45, 849. Both a blade of two inches in length and a three-inch folding Sheffield knife were found in Moussaoui's possession. *Id.* at 846-47, 849-50. Special Agent Samit also interviewed Moussaoui's associate, Hussein al Attas, who reported that Moussaoui had expressed his view that it was acceptable for Muslims to harm civilians as part of *jihad* and had the duty to fight unbelievers. *Id.* at 853-65.

Special Agent Samit concluded that Moussaoui was an "an Islamic extremist who had espoused or discussed violence." *See* Ex. 14, Moussaoui Tr. (Samit) at 863. He viewed Moussaoui's explanation for why he wanted to learn to pilot a commercial aircraft as "weak" and "pretty ominous." Ex. 15, Email from Special Agent Samit to

W. Jay Abbott, dated August 15, 2001. He further determined that Moussaoui's activity "obviously suggests some sort of hijacking plan." *Id.*

Special Agent Samit conveyed his findings and concerns to several FBI colleagues, including agents in Mr. Rolince's terrorism section. *See* Ex. 14, Moussaoui Tr. (Samit) at 1055-60, 1080, 1117; Ex. 16, Electronic Communication from Samit, dated August 18, 2001. He also asked his colleagues to notify the FAA that Moussaoui was involved in a plan to hijack a commercial airliner, a recommendation that his superiors did not follow. *See* Ex. 14, Moussaoui Tr. (Samit) at 948-50; *9/11 Comm'n Report* at 274.[5]

At the end of August 2001, Special Agent Samit presented Coleen Rowley, Minneapolis Chief Division Counsel for the FBI, with the information he had gathered on Moussaoui and urged that it was sufficient to support a criminal search warrant for additional property of Moussaoui's. Ex. 14, Moussaoui Tr. (Samit) at 845, 1122, 1198-99. Former Special Agent Rowley indicated that it would be difficult to obtain a criminal search warrant. *Id.* at 1198; Ex. 17, Email chain between former Special Agent Rowley, Special Agent Samit and Homer Pointer, dated August 22, 2001. A search warrant was not obtained for Moussaoui's belongings until after the terrorist attacks of September 11. Later that day, Special Agent Samit found a number of suspicious items in his property, including:

---

[5] Instead, on September 4, 2001, the FBI included the FAA on a more neutral teletype that summarized the basic facts they had gathered on Moussaoui and contained the reassuring, but misleading, observation that Moussaoui's training was not necessarily unusual. FBI headquarters also instructed Special Agent Samit not to share a more complete report on Moussaoui with the FAA. *9/11 Comm'n Report* at 274-75.

- A small knife with a blade of less than four inches;
- Two utility tools that contained blades of less than four inches;
- A two-volume operating manual for a Boeing 747-400 aircraft and its cockpit;
- Boxing gloves;
- Shin guards; and
- Binoculars of the type that could be used by a pilot for target recognition.

Ex. 14, Moussaoui Tr. (Samit) at 951-59.

On September 15, 2001, Special Agent Billings led a search of Moussaoui's Oklahoma apartment, in which he uncovered additional items, including:

- Flight simulator software and a joystick;
- An invoice for a Boeing 747 flight deck video;
- Instructions pertaining to piloting commercial aircraft; and
- A notebook pertaining to physical training.

Ex. 18, Moussaoui Tr. (Billings) at 1303-10.

The FBI's investigation into Moussaoui culminated in a criminal trial against him at which a jury found he was eligible to receive the death penalty for multiple crimes related to his participation in the September 11 plot. *See* Ex. 19, *United States v. Moussaoui*, No. 01-445A (E.D. Va. Apr. 3, 2006) (Special Verdict Form).

The fifth FBI Witness, retired Special Agent Rigler, did not participate in the Moussaoui investigation. However, he conducted a study of the FBI's handling of pre-9/11 intelligence on the terrorist threat, including the agency's investigation of Hazmi and Mihdhar. Ex. 20, Moussaoui Tr. (Rigler) at 2144-45. Retired Special Agent Rigler identified at least five missed opportunities that the FBI had to confirm that Hazmi and

Mihdhar were in the United States and locate them before they hijacked American Flight 77 on September 11. *See id.* at 2148-50.

### III.    The witnesses have publicly disclosed information concerning the September 11 terrorist attacks in various forums.

Each of the five FBI Witnesses has publicly disclosed factual information related to al Qaeda's plot to carry out the September 11 terrorist attacks. Four of the witnesses – Mr. Rolince, Special Agents Billings and Samit, and retired Special Agent Rigler – testified in the Moussaoui trial. *See* Exs. 13-14, 18, 20.

Communications authored by the fifth witness, former Special Agent Rowley, were also introduced into evidence at the trial and remain publicly available at a Web site maintained by the United States Court of the Eastern District of Virginia. *See, e.g.,* Ex. 17.

The FBI Witnesses have also disclosed information to other public bodies such as the 9/11 Commission. The 9/11 Commission carried out the most well-known and comprehensive inquiry into the terrorist attacks, having been given the sweeping mandate to investigate the "facts and circumstances relating to the terrorist attacks of September 11, 2001" and to report its findings to the American public. *9/11 Comm'n Report* at xv. Mr. Rolince was interviewed by the staff of the Commission and is relied upon as an authority in its final report. *See id.* at 536 n.54, 537 n.64. Similarly, *The 9/11 Commission Report* discusses Special Agent Samit's investigation into Moussaoui at length and cites to an interview with former Special Agent Rowley in which she discussed the challenges the FBI faced in obtaining a search warrant for Moussaoui's belongings before September 11. *See id.* at 273-276, 540 n.94; *see also* Ex. 21, Open

Letter to FBI Director Robert Mueller, dated May 21, 2002; Ex. 22, Time Magazine, *Coleen Rowley's Memo to FBI Director Robert Mueller* (publishing excerpts of the letter).

**IV.    The FBI summarily refused the Aviation Parties' request to depose the witnesses in the September 11 Litigation.**

Plaintiffs in the September 11 Litigation claim under a negligence theory that the Aviation Parties are liable for billions of dollars in property damages because they did not stop the terrorist attacks.   Plaintiffs allege that the Aviation Parties should have foreseen suicide hijackings of the type carried out on September 11 and implemented security procedures that would have provided an effective defense against this kind of attack. Plaintiffs further allege that certain Aviation Parties should have identified and stopped the hijackers before they boarded the targeted aircraft and should have detected the items that the hijackers used to commit the attacks during passenger checkpoint screening.

Having determined that the FBI Witnesses can offer testimony that would help defend against the claims made in the September 11 Litigation, the Aviation Parties served letter requests for their testimony upon the office of the U.S. Attorney for the Southern District of New York, consistent with the FBI's *Touhy* regulations.   *See* 28 C.F.R. §§ 16.21-16.29 (2008); Ex. 1, Letter from Desmond T. Barry, Jr. to Beth E. Goldman, dated March 6, 2007 ("March 6 Letter").[6]   The Aviation Parties provided detailed supporting affidavits with their request. *See* Exs. 2-6, Affidavits of Desmond T. Barry, Jr. in support of requests to depose Special Agents Samit, and Billings, former

---

[6]   The Aviation Parties also seek to depose two witnesses who participated in the CIA's investigation of Hazmi and Mihdhar before September 11. *See* Ex. 1, March 6 Letter.

Special Agent Rowley, retired Special Agent Rigler and Mr. Rolince.   Each affidavit describes:

- The claims and defenses at issue in the September 11 Litigation;

- The relevance of the witness's testimony to the Aviation Parties' defense;

- The basis of the witness's knowledge of the relevant information; and

- The specific topics about which the Aviation Parties seek to question the witness.

In a series of boilerplate responses, all dated May 7, 2007, the FBI refused to allow any of the five witnesses to be deposed.  See Exs. 7-11.  The language of each of the FBI's letters is virtually identical, and they offer the same conclusory justifications for the refusals.

## ARGUMENT

The testimony the Aviation Parties seek from the FBI Witnesses is highly probative, not privileged, and important to their defense in the September 11 Litigation. In contrast, the reasons proffered by the FBI for blocking the depositions lack any substantial basis in fact.  The FBI's refusal constitutes an arbitrary and capricious agency action that should be set aside under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (2008) ("APA"), and Federal Rule of Civil Procedure 45.

## I.    THE STANDARDS FOR REVIEW AND SUMMARY JUDGMENT.

Summary judgment is a particularly appropriate means for resolving a suit of this kind where a trial would not serve to develop the factual record.  A court may grant summary judgment when there is no genuine issue as to any material fact.  *See* Fed. R.

Civ. P. 56(c); *Colaio v. Feinberg*, 262 F. Supp. 2d 273, 284 (S.D.N.Y. 2003) (deciding an APA action challenging the regulations governing the Victim Compensation Fund as a matter of law); *Mudd v. Caldera,* 26 F. Supp. 2d 113, 115 (D.D.C. 1998) (granting summary judgment after concluding that agency action was not supported by the record). Once the Aviation Parties establish a *prima facie* case supporting summary judgment by demonstrating that there are no material questions of fact, the burden shifts to the FBI "to come forward with 'specific facts showing that there is a genuine issue for trial.'" *Colaio,* 262 F. Supp. 2d at 284.

There is a split among the federal courts as to whether the FBI's refusal to grant a civil litigant's request for discovery should be reviewed under the "arbitrary and capricious" standard of Section 706 of the APA or the "undue burden" standard established by Rule 45. *See In re Vioxx Prods. Liab. Litig.,* 235 F.R.D. 334, 343-344 (E.D. La. 2006) (detailing contrasting holdings on the applicable standard of review). The appropriate standard of review remains an open question in the Second Circuit. *See In re SEC v. Glotzer,* 374 F.3d 184, 190-91 (2d Cir. 2004); *EPA v. Gen. Elec. Co.*, 212 F.3d 689, 690 (2d Cir. 2000). However, under either standard, the Court must overturn the FBI's refusal to authorize the requested depositions if it finds the agency failed to provide specific and factually-supported justifications for the refusal.

The APA instructs the Court to set aside the FBI's denial if that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision by the FBI to deny a *Touhy* request is arbitrary and capricious where, as here, the agency's decision is not supported by the record and the

agency has not provided a plausible, particularized explanation for its decision. *See Cavanaugh v. Wainstein,* No. 05-123 (GK), 2007 U.S. Dist. LEXIS 40242, at *15 (D.D.C. June 4, 2007) (setting aside the DOJ's refusal of a request for deposition testimony and noting that "where an agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action."); *In re Vioxx Prods. Liab. Litig.,* 235 F.R.D. at 345 (holding that an agency decision was arbitrary and capricious where the agency failed to "examine the relevant data and articulate a satisfactory explanation for [its] action including a rational connection between the facts found and the choice made"). Boilerplate justifications of the type offered here simply will not suffice. The FBI must show that its decision is reasonable and that it considered all the factors relevant to the litigant's request and to its proffered reasons for refusing the request. *See Cavanaugh,* 2007 U.S. Dist. LEXIS 40242, at *21-22. Indeed, far from encouraging the FBI to deny requests for discoverable and relevant information, the agency's *Touhy* regulations guide the Department of Justice to "authorize disclosure" if the discovery requested is "appropriate under the rules of procedure governing the case or matter in which the demand arose" and disclosure would not violate a specific statute or regulation or reveal privileged information. *See* 28 C.F.R. § 16.26(a), (c).

Similarly, the FBI's rationalizations for its refusal must be rejected under the "undue burden" standard of Rule 45 if they are boilerplate or not supported by specific facts. *See Sommer v. PMEC Assocs. & Co. Ltd.,* No. 88 Civ. 2537 (JFK), 1993 U.S. Dist. LEXIS 20401, at *11 (S.D.N.Y. Mar. 31, 1993) (holding that the Department of Labor

cannot resist a subpoena where "the factual record does not support the Department's argument . . ."); *Ass'n of Am. Physicians & Surgeons v. Clinton*, 837 F. Supp. 454, 458 n.2 (D.D.C. 1993).

## II. THE FBI'S MAY 7, 2007 REFUSAL LETTERS CONSTITUTE FINAL AGENCY ACTIONS THAT ARE PROPERLY SUBJECT TO REVIEW BY THIS COURT.

The FBI's refusals to allow the depositions of the FBI Witnesses constitute final agency actions that are subject to review by this Court. The refusals are clear determinations by which "rights or obligations have been determined" and from which "legal consequences will flow." *See Bennett v. Spear,* 520 U.S. 154, 178 (1997); Exs. 7-11, all at 1 ("[R]egulations prohibit any DOJ employee from producing documents or disclosing information without prior approval of the proper Department official"); *see also Cavanaugh,* 2007 U.S. Dist. LEXIS 40242, at *13 (noting that a subpoena *ad testificandum* cannot be obtained against an employee of a federal agency that has enacted a *Touhy* regulation). The FBI has also left no doubt as to the finality of the agency's decision. Each of the letters states definitively that "the FBI denies your request for the deposition," and offers no avenue for administrative appeal. *See* Exs. 7-11, all at 3 (emphasis added). The FBI's refusal to permit the depositions of the five witnesses is thus paradigmatic "final agency action" subject to review by this Court.

## III. THE REQUESTED TESTIMONY IS RELEVANT TO IMPORTANT ISSUES IN THE SEPTEMBER 11 LITIGATION.

The FBI Witnesses can provide context that is vital for the jury to understand what took place on September 11, 2001. First, by testifying as to their personal knowledge of the activities of Moussaoui, a confessed co-conspirator of the hijackers and

a trained pilot, the witnesses can offer evidence that is probative of the planning and tactics the hijackers used to commit the attacks. Second, their evidence about the information the FBI had before September 11 indicating that al Qaeda was about to launch terrorist attacks on civil aviation is probative of whether the intelligence agencies' decision not to disclose this information was a causal factor in the attacks. Third, their testimony will help establish that the Aviation Parties could not have reasonably foreseen the actions of the hijackers. Finally, the FBI Witnesses can provide some of the information necessary to establish that the Aviation Parties meet the Second Circuit's standard for derivative immunity under the Federal Tort Claims Act.

### A.    The requested testimony will help establish that the carefully-orchestrated acts of fanatical terrorists caused the attacks.

If the September 11 Litigation proceeds to trial, the Aviation Parties intend to argue that the primary and fundamental cause of the attacks was the terrorists' calculated, intentional conduct. If the jury agrees, they will be entitled to conclude that the Aviation Parties' alleged failure to stop the terrorists was either not a but-for cause of the attacks, or so pales in comparison to the terrorists' own criminal acts such that the Aviation Parties should not be held liable for the damages that plaintiffs have alleged.

Indeed, other negligence actions against third-parties arising out of earlier terrorist attacks have failed as a matter of law precisely because the terrorists' actions were determined to be the supervening cause of plaintiffs' damages. For example, in *Gaines-Tabb v. ICI Explosives USA, Inc.*, the court held that plaintiffs who were injured in the bombing of the Federal Building in Oklahoma City could not establish the liability of a manufacturer of fertilizer used in the bomb because "it was the criminal actions of

McVeigh and Nichols and/or others which directly caused the Plaintiffs' injuries as a matter of law." 995 F. Supp. 1304, 1315 (W.D. Okla. 1996). Claims for damages arising out of the 1993 World Trade Center bombing were also dismissed because under both New York and New Jersey law, "the terrorists' acts were clearly superseding and intervening events breaking the chain of causation" between the conducts of many of the non-terrorist defendants and plaintiffs' injuries. *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 991 F. Supp. 390, 408 (D.N.J. 1997); *see also McCarthy v. Sturm, Ruger & Co. Inc.*, 916 F. Supp. 366, 372 (S.D.N.Y. 1996) (dismissing plaintiffs' negligence claims against the manufacturer of the bullets used in a shooting spree because the gunman's "conduct was an extraordinary act which broke the chain of causation."), *aff'd*, 119 F.3d 148, 157 (2d. Cir. 1997) (holding manufacturer had no duty to prevent criminal misuse of its product); *The Lusitania*, 251 F. 715, 732 (S.D.N.Y. 1918) (holding the owner of passenger ship, which was torpedoed by a German submarine resulting in the loss of 1,195 lives, was not liable for the sea disaster and noting that "[t]here is [a] rule, settled by ample authority, *viz.* that, even if negligence is shown, it cannot be the proximate cause of the loss or damage, if an independent illegal act of a third party intervenes to cause the loss"). Indeed, this Court recognized in the September 11 Litigation that:

> The defendants may well be able to show at a later stage in this litigation that the conduct of the terrorists so attenuates defendants' negligence from the ultimate injury that responsibility for the injury may not reasonably be attributed to the defendants. Discovery will either supply evidence to substantiate or eviscerate the parties' divergent claims about foreseeability. At this point, however, both plaintiffs and defendants should be allowed to proceed to discovery on these issues of causation.

*In re Sept. 11 Litig.,* 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003) (emphasis added). The Aviation Parties now seek to pursue precisely this type of discovery from the FBI Witnesses, who can provide testimony that tends to establish that the plaintiffs' damages were "caused solely by the terrorists intent to cause harm." *Port Auth. of N.Y. & N.J.,* 991 F. Supp. at 408.

The FBI Witnesses can provide probative testimony of this kind because of their investigation into Moussaoui. Moussaoui shared the September 11 hijackers' fanatical intent, was trained by the same terrorist leaders in the same tactics, and was found to be sufficiently culpable of participating in al Qaeda's conspiracy to drive airliners into landmarks that a jury deemed him eligible for the death penalty. *See* Ex. 19, *United States v. Moussaoui,* No. 01-445A (E.D. Va. Apr. 3, 2006) (Special Verdict Form); Ex. 24, *United States v. Moussaoui,* No. 01-445A (E.D. Va. May 4, 2006) (Judgment in a Criminal Case); *see also* Ex. 25, BBC News, *"Supermax" Prison Awaits Moussaoui,* May 4, 2006 (Moussaoui was sentenced to a life term in a federal prison in almost-total solitary confinement for his role in the conspiracy). Moussaoui's terrorist training and his preparations are therefore highly probative of the tactics the hijackers employed on September 11.[7]

---

[7] The 9/11 Commission, which devoted substantial discussion to Moussaoui in its final report, shared the view that his activities were probative of the events of September 11. *See, e.g., 9/11 Comm'n Report* at 276. Plaintiffs have also acknowledged that evidence pertaining to Moussaoui is highly relevant, having moved the federal district court presiding over Moussaoui's criminal trial for access to the exhibits introduced as evidence in that trial for use in the September 11 Litigation. *See* Ex. 26, Motion for Access to Certain Portions of the Record, dated March 30, 2006.

The FBI Witnesses' testimony as to Moussaoui's activities will help to demonstrate that al Qaeda did not hazard the success of its long-planned, coordinated suicide attacks on the chance that employees of multiple Aviation Parties would act negligently on the morning of September 11. Rather, the Aviation Parties intend to show that the hijackers who carried out the attacks were ideologically driven terrorists who consciously took steps to avoid being detected and were intent on committing the attacks, irrespective of any act or omission by a checkpoint screener.

For example, the potential testimony of Special Agent Samit regarding the multiple knives and small blades that he found in Moussaoui's possession will tend to establish that the hijackers used short-bladed implements that were either permitted or not readily detectable by checkpoint screening on September 11. *See* Ex. 14, Moussaoui Tr. (Samit) at 849-50, 953-54. The blades Special Agent Samit uncovered are all so small as to be either permissible or difficult to detect by checkpoint security procedures that were designed to detect guns, large knives, and explosives. *See 9/11 Comm'n Report* at 2, 84 (on September 11, the FAA mandated that magnetometers at airport security checkpoints be calibrated to detect the metal in a .22 handgun, and knives under four inches in length were generally permitted items); Ex. 27, Cammaroto Tr. at 205, 209-10, 212-13, 245-46, 618-19 (knives under four inches in length were permitted past the security checkpoint); *see also id.* at 21-22, 80 (FAA security measures intended to allow screeners to focus on explosives in checked baggage).

Similarly, Special Agent Samit's testimony as to his assessment of Moussaoui's level of fanaticism and Special Agent Billings' testimony regarding Moussaoui's physical

training, will help establish that the hijackers were committed to following through with the September 11 terrorist attacks even if they were unable to take any items they planned to use as weapons past security checkpoints. *See, e.g.,* Ex. 14, Moussaoui Tr. (Samit) at 956-57, 1037; Ex. 18, Moussaoui Tr. (Billings) at 1306-07.  The Aviation Parties intend to use this type of evidence to show that even if checkpoint screeners detected and confiscated the blades and small knives the hijackers appear to have planned to use, the hijackers would have proceeded with the attacks, possibly after improvising weapons from inside the checkpoint or onboard the aircraft. *See* Ex. 27, Cammaroto Tr. at 234-39 (items such as glass wine bottles, which could be turned into dangerous weapons, were available inside the sterile area and the FAA was aware that terrorists could improvise "small cutting implements" once inside the sterile area).

The FBI Witnesses' testimony as to Moussaoui's preparations for a terrorist attack is particularly important to the Aviation Parties' defense, given that the terrorists who directly participated in the plot either died on September 11, are either at large or, like Moussaoui, are incarcerated and unavailable.

**B.    The requested testimony will tend to establish that the intelligence agencies' actions were also a causal factor in the attacks.**

The Aviation Parties intend to demonstrate that by the end of August 2001: (1) FBI agents had investigated Moussaoui and concluded that he was planning to hijack a commercial flight in an ideologically motivated terrorist attack in which he would pilot the commandeered aircraft and possibly drive it into the World Trade Center; and (2) the FBI and CIA had identified Hazmi and Mihdhar, two of the future hijackers of Flight 77, as al Qaeda operatives who were likely in the United States and posed a serious threat.

The Aviation Parties seek to establish that the intelligence agencies' failure to disclose this information to the FAA, to the Aviation Parties, or to the public represented a significant missed opportunity to disrupt the September 11 plot.[8]

The Aviation Parties do not seek to present this evidence on the theory that negligence by the government would somehow excuse any alleged negligence on the part of the Aviation Parties. Rather, the Aviation Parties intend to argue that the intelligence agencies' acts and omissions combined with the terrorists' intentional criminal acts so overshadow any causal role the Aviation Parties played in the attacks that the jury should find that the Aviation Parties' conduct was not a substantial cause of plaintiffs' alleged damages. As a matter of black-letter law, "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it" is relevant to a determination of whether a defendant's conduct was a substantial factor in causing plaintiffs' injuries. Restatement (Second) of Torts § 433(a). The Restatement of Torts acknowledges:

> Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although not one of the contributing factors may have such a

---

[8]  The Aviation Parties also intend to present evidence of similar missed opportunities, including the FBI's decision not to act on the recommendations made by Special Agent Kenneth Williams in the so-called Phoenix Memo in July 2001, in which he warned of the need to investigate the possibility that Usama Bin Ladin had launched a coordinated effort to send al Qaeda operatives to the United States to attend civil aviation schools. Special Agent Williams based this theory on the "inordinate number of individuals of investigative interest" attending aviation schools in Arizona. *See 9/11 Comm'n Report* at 272. The Aviation Parties will soon submit a *Touhy* request to depose Williams and question him about the Phoenix Memo, including his recommendation that the FBI obtain information on persons applying to flight schools. *Id.*

<u>predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor.</u>

*Id.* at § 433, cmt. d (emphasis added); *see also Pelman v. McDonald's Corp.,* 237 F. Supp. 2d 512, 537-38 (S.D.N.Y. 2003) (dismissing suit because proximate cause could not be established and finding that "the aggregate number of actors involved which contribute towards the harm and the effect which each has in producing it" is directly relevant to causation); *Leonardi v. Loyola Univ.,* 658 N.E.2d 450, 459 (N.Y.1995) (holding that a defendant always "has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries").

When the criminal acts of the hijackers *and* the missteps of the intelligence agencies are considered in tandem, it becomes far more apparent that the Aviation Parties' alleged conduct was not the proximate cause of the immense damages plaintiffs claim. The jury, therefore, should be allowed to consider evidence that tends to establish that the actions of the FBI and the CIA were causal factors in the September 11 attacks. *See Wilkins v. Am. Export Isbrandtsen Lines, Inc.,* 446 F.2d 480, 483 (2d Cir. 1971) (remanding case for a new trial where the court below precluded evidence related to alternate theories of causation and holding that "[t]he jury was entitled to have this broader basis for an evaluation of the cause"); *Hoppe v. G.D. Searle & Co.,* 779 F. Supp. 1413, 1419 (S.D.N.Y. 1991) (denying plaintiffs' request to exclude evidence that was probative of the possible cause of her injuries and holding "it would be inequitable to

permit plaintiff to select what evidence she wishes to be admitted, and deny defendant the right to present alternative theories of causation").

The FBI Witnesses can provide precisely this type of evidence by testifying about the pre-9/11 intelligence the FBI and CIA had concerning Moussaoui, Hazmi, and Mihdhar.

### 1. Disclosure of Moussaoui's plans could have thwarted the September 11 Conspiracy.

As the 9/11 Commission acknowledged, "publicity about Moussaoui's arrest and a possible hijacking threat might have derailed the plot." *9/11 Comm'n Report* at 276. Ramzi Binalshibh, the key liaison between the hijackers and the plot's leadership, has reported that had Usama Bin Ladin and Khalid Sheikh Mohammed "learned prior to 9/11 that Moussaoui had been detained, they might have cancelled the operation." *Id.* at 247. Disclosure of the FBI's intelligence on Moussaoui would also have provided the FAA with the opportunity to adjust aviation security measures to guard against the type of attack al Qaeda was planning. Robert Cammarato, the Chief of the FAA's Security Directive Working Group, testified in the Moussaoui trial and confirmed in his Rule 30(b)(6) deposition that the FAA could have made specific changes to aviation security measures if it had received intelligence information concerning Moussaoui before September 11. *See* Ex. 28, Moussaoui Tr. (Cammaroto) at 1841-47; Ex. 27, Cammaroto Tr. at 639-644.

The information the FBI learned in August 2001 provided the first real confirmation that Islamic terrorists were learning to fly commercial airliners in the United States. This information was significant because the hijackers' ability to pilot

commercial airliners was a key element in the September 11 attacks. It was only the ability to fly aircraft that allowed the terrorists to convert hijackings into suicide attacks that were carefully aimed at specific ground targets. Without knowing how to fly the aircraft, the hijackers would not have been able to drive American Flight 11 and United Flight 175 directly into the World Trade Center causing the billions of dollars of property damages plaintiffs seek. Simply put, if no trained hijacker pilots had participated in the attacks, plaintiffs would not have property damages claims.

The lead created by Moussaoui's arrest was particularly important, because, at the time, the FAA had been dutifully monitoring the available intelligence and had affirmatively concluded that there was little risk of a suicide attack on aviation within the United States. The FAA determined that "a suicide bombing of a U.S. airliner to be a low probability" and found instead that "a non-suicide bombing continues to be a major concern." Ex. 29, Slide presentation prepared by Pat McDonell, Director of the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration, at Slide 24. The FAA also concluded that "a terrorist hijacking of a U.S. airliner is more likely to occur overseas than in the U.S." *Id.* While the FAA mentioned the possibility that terrorists might carry out a hijacking to "commit suicide in a spectacular explosion," the agency followed that observation with the reassuring statement: "Fortunately, we have no indication that any group is thinking in that direction." *Id.*

The FAA would likely have changed this assessment if it had known that FBI agents had apprehended an Islamic radical who was fixated on learning to pilot a Boeing aircraft at a flight school in the United States – but who had no apparent interest in

learning how to land the aircraft safely. No doubt the FAA would have considered it important to know that at least one FBI agent had contemplated that Moussaoui was planning on "taking a plane and crashing into the World Trade Center." *See 9/11 Comm'n Report* at 275; *see also* Ex. 30, Warrant application prepared by Harry Samit, dated August 24, 2001 (the FBI was "in possession of intelligence that Moussaoui is an Islamic extremist and believes that his training in the U.S. represents preparation for some future act in furtherance [of] these goals").

The serious concerns that individual FBI agents had about Moussaoui were not shared with the FAA. While the FBI included the FAA on a September 4, 2001 teletype concerning Moussaoui, this report only summarized the basic facts the agency gathered and included the reassuring but misleading observation that Moussaoui's flight training was not necessarily unusual. *9/11 Comm'n Report* at 274. The FBI teletype "did not report the case agent's personal assessment that Moussaoui was planning to hijack an airplane." *Id.* Moreover, FBI headquarters explicitly directed that "the more complete report" prepared by Special Agent Samit not be shared with the FAA. *Id.* at 274-75.

If the FBI's findings had been shared with the FAA (and one of the purposes of the requested depositions is to determine the extent to which they were), it might well have led the FAA to reconsider the aviation security procedures it had in place, particularly the "Common Strategy" that directed crews to cooperate with hijackers. *See id.* at 85. Mr. Cammaroto testified that the FAA could have prohibited airline passengers from carrying "any blades whatsoever," if the FAA had known about Moussaoui's intentions. Ex. 28, Moussaoui Tr. (Cammaroto) at 1845; Ex. 27, Cammaroto Tr. at 206-

7. The jury should be allowed to weigh this type of evidence from the FAA with the testimony of FBI Witnesses such as Special Agent Samit who can describe the several small-blades found in Moussaoui's possession in August 2001. *See* Ex. 14, Moussaoui Tr. (Samit) at 849-50, 953-54.[9]

> ### 2. The hijacking of Flight 77 could have been prevented if the FBI or CIA had recommended that Hazmi and Mihdhar be placed on a "no-fly" list.

The FBI and CIA gathered substantial information on Nawaf al Hazmi and Khalid al Mihdhar before they hijacked American Flight 77. *See 9/11 Comm'n Report* at 266; Ex. 32, Substitute Testimony for John; Ex. 33, Substitute Testimony for Mary. By the end of August 2001, the intelligence agencies identified Hazmi and Mihdhar by their full names, marked them as suspected terrorists with ties to al Qaeda, and determined that they were likely in the United States. *9/11 Comm'n Report* at 270-72. Indeed, the

---

[9] For similar reasons, the Aviation Parties intend to depose John Anthony, an FAA flight inspector who is believed to have spoken to Hani Hanjour (the pilot-hijacker of Flight 77) after receiving multiple calls in early 2001 from the flight simulator center in Phoenix, Arizona where Hanjour was training at the time. Ex. 31, Moussaoui Tr. (Chevrette) at 1678-82, 1686-88. The staff at the center expressed concerns about Hanjour's lack of skill as a commercial pilot and his poor English. *Id.* The Aviation Parties anticipate that Anthony will testify that at the time of his contact with Hanjour, at worst, he thought of Hanjour as a poor pilot who posed a potential safety hazard, not as a terrorist. However, it would not be difficult for the jury to determine that Anthony would have revisited and revised this conclusion, if the FBI's Phoenix Memo had been made available to him and his colleagues at the FAA before September 11, 2001.

Similarly, the jury would be entitled to conclude that if Special Agent Williams had known about the flight simulator center's concerns about Hanjour, he would have initiated an investigation into Hanjour and his activities in Phoenix – perhaps uncovering that Hanjour had been living in Phoenix with fellow 9/11 hijacker Nawaf al Hazmi, who the intelligence agencies had already identified as a potential terrorist with links to al Qaeda. *See 9/11 Comm'n Report* at 226-27, 267-72.

intelligence agencies considered them to be sufficiently dangerous that they asked the U.S. Department of State to place both men on a watchlist. *Id.* at 270.

However, these suspicions were not conveyed to the FAA or to the Aviation Parties. *See* Ex. 34, Wansley Tr. at 418-419; Ex. 35, Security Directive 108-01-01. Nor did the intelligence agencies recommend that the FAA place Hazmi and Mihdhar on a no-fly list, even though such a list existed. *See 9/11 Comm'n Report* at 83.

Larry Wansley, American Airlines' Managing Director of Corporate Security on September 11 and a former FBI agent, testified at his deposition that if the airline had received notification that Hazmi and Mihdhar had been placed on a no-fly list, it could have immediately implemented procedures that would have prevented them from boarding any of its flights. Ex. 34, Wansley Tr. at 420-22. Mr. Wansley explained that Hazmi and Mihdhar's names would have been entered into American's computer system, so that when they attempted to obtain their boarding passes on September 11 the computer would have automatically instructed the ticket agents to alert law enforcement officials. *Id.* at 421-22. Mr. Wansley testified that he expected that law enforcement would have then detained not only Hazmi and Mihdhar, but the two other hijackers who checked-in with them for Flight 77. *Id.* at 423-425.

If four of the five terrorists who hijacked Flight 77 had been stopped before they received their boarding passes, it is highly unlikely, if not impossible, that the fifth hijacker would have proceeded with the attack on the Pentagon. The Aviation Parties, therefore, intend to argue that if the FBI and CIA had requested that the FAA place Hazmi and Mihdhar on a no-fly list, the hijacking and crash of Flight 77 would not have

occurred.  The Aviation Parties further intend to argue that if the FBI and CIA had successfully apprehended Hazmi and Mihdhar before September 11, they would have disrupted the September 11 plot and perhaps prevented all four attacks.  *Cf. 9/11 Comm'n Report* at 247, 276.

Both retired Special Agent Rigler and the former section chief of the FBI's international terrorism section, Michael Rolince, can offer testimony that is probative of this defense.  The entire focus of retired Special Agent Rigler's summary testimony in the Moussaoui trial was the FBI's failure to locate Hazmi and Mihdhar before September 11, and he detailed at least five missed opportunities the FBI and CIA had to find and stop the two terrorists.  Ex. 20, Moussaoui Tr. (Rigler) at 2148-50.  As the head of the FBI section dedicated to investigating potential terrorist threats, Mr. Rolince can testify regarding the information the agency had about Hazmi and Mihdhar before September 11.  *See* Ex. 13, Moussaoui Tr. (Rolince) at 1506.  He can also explain how this intelligence fit into the other information in the FBI's possession indicating that al Qaeda was planning to launch terrorist attacks in the United States.  *Id.* at 1484, 1491, 1508.

C.    **The requested testimony will help demonstrate that the Aviation Parties could not reasonably foresee the attacks.**

Plaintiffs contend that the Aviation Parties should be found liable because they did not implement security measures that were different from and additional to those required by the FAA at the time of the attacks.  *See* Pls.' Mem. of Law in Opp. to Defs.' Mots. to Determine the Applicable Standard of Care, dated May 25, 2007, 10 (claiming that "the procedures set forth in the FAA regulations . . . set bare minimum standards"); Ex. 36, Pls.' Resp. to Aviation Defs.' Second Set of Interrog. to Wrongful Death/Personal

Injury Pls., Resp. No. 5 ("Plaintiffs respond that the FAA set minimum standards, and the Defendants owed a duty to implement those protective measures they knew or should have known were required under the circumstances."). Plaintiffs argue, with the benefit of perfect hindsight, that the Aviation Parties should have foreseen the type of attacks that were launched on September 11 and put in place security measures of their own design to counteract the terrorist threat.

Yet, the FBI, which was statutorily charged with assessing the terrorist threat to civil aviation, apparently determined before September 11 that the additional security measures that plaintiffs are now advocating were not appropriate. *See* 49 U.S.C. § 44904(a) (2001) (the FAA and FBI are to "jointly . . . assess current and potential threats to the domestic air transportation system . . . [and] jointly . . . decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system"). As the FBI Witnesses' testimony is expected to demonstrate, the FBI did not recommend that the FAA revise aviation security procedures in light of the information the FBI had gathered on Moussaoui, Hazmi, and Mihdhar. To the contrary, the FBI did not even deem it necessary to *share* most of this intelligence with the FAA. *See 9/11 Comm'n Report* at 83, 274-75; Ex. 34, Wansley Tr. at 418-19; Ex. 35, Security Directive 108-01-01. Moreover, the FBI downplayed the significance of the information concerning Moussaoui that it did share. *See 9/11 Comm'n Report* at 274-75.

The jury should be permitted to weigh these facts when it evaluates plaintiffs' claim that the Aviation Parties, as private actors, should have reasonably foreseen the terrorist attacks. *See Eiseman v. State,* 70 N.Y.2d 175, 191 (1987) (holding it improper to

impose a higher duty on a college to predict the criminal behavior of a student who was a parolee than that borne by "society's experts in making such predictions – the correction and parole officers . . .");  *cf. In re Kinsman Transit Co.,* 338 F.2d 708, 723 (2d Cir. 1964) (Friendly, J.) ("With the aid of hindsight one can also say that a prudent man, carefully pondering the problem, would have realized . . . the danger . . . But such *post hoc* step by step analysis would render 'foreseeable' almost anything that has in fact occurred; if the argument relied upon has legal validity, it ought not be circumvented by characterizing as foreseeable what almost no one would in fact have foreseen at the time.").   The FBI Witnesses' testimony also will help establish that disrupting terrorist conspiracies is an extremely challenging and complex project – even for the FBI and CIA, which have the backing of the federal government and its resources.   This testimony could answer a "key" question with respect to the issue of duty in the September 11 litigation by demonstrating that the federal intelligence agencies – not the Aviation Parties – were in the best position to prevent the September 11 terrorist attacks.  *See In re September 11 Litig.,* 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003) (acknowledging that a plaintiff must show that "the defendant's relationship with either the tortfeasors or the plaintiff places the defendant in the best position to protect against the risk of harm") (citing *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1061 (2001)).

The FBI Witnesses' testimony as to the specific intelligence the FBI and CIA had concerning al Qaeda's intentions to commit a terrorist attack will also help rebut any claim by plaintiffs that the Aviation Parties had all the intelligence needed to foresee the terrorist attacks.  The Aviation Parties intend to argue that the September 11 attacks were

not reasonably foreseeable to them, in part, because they did not have access to any specific intelligence that suggested that radical terrorists were planning imminent suicide attacks on domestic civil aviation.    Plaintiffs are expected to claim in response that precise intelligence on the terrorist threat is never available, and that the Aviation Parties should have foreseen the attacks based on a general awareness that al Qaeda hated the United States.    *See, e.g.,* Ex. 27, Cammaroto Tr. at 374 - 375 (plaintiffs asking FAA witness whether the fact that "there was a known terrorist group capable of attacking and likely to do so was the context the airlines had to take into account in exercising good judgment in the whole screening process"); Ex. 37, Miller Tr. at 120 (plaintiffs asking a checkpoint screener "[d]id anyone from United Airlines or Argenbright ever tell that you [sic] there was a continuing concern that Osama Bin Ladin and terrorist groups in his network were preparing to conduct terrorist attacks against U.S. including U.S. Civil aviation?").

However, as the FBI Witnesses' testimony can establish, the intelligence agencies *did* have specific intelligence that indicated al Qaeda's plans.    Not only had they apprehended Moussaoui in the midst of his flight training and identified him as a likely terrorist, they had also identified two of the September 11 hijackers, Hazmi and Mihdhar, as dangerous al Qaeda associates who were likely in the United States.

As Mr. Cammaroto testified, if this intelligence had been made available to the FAA, the agency could have proscribed adjustments to aviation security countermeasures.    However, as the FBI Witnesses' testimony is expected to show, the intelligence agencies simply did not share the information with the FAA or the Aviation

Parties. Nor is it clear that the attacks would have been foreseeable to the Aviation Parties, even if they had this intelligence, given the FBI's and CIA's reaction to the information.

The jury is entitled to consider the Aviation Parties' conduct in the context of the total body of information that was known about the terrorist threat on September 11 – and in the context of who knew that information. Evidence of what intelligence the FBI and CIA had is particularly relevant to the Aviation Parties' defense, since plaintiffs have indicated their intention to proceed as if the Aviation Parties were privy to all of the information known to the intelligence agencies. *See* Ex. 26, Mem. in Support of Mot. for Access to Certain Portions of the Record, 2 (arguing that plaintiffs should have access to evidence supplied by the government to Moussaoui's defense counsel because it "illustrates the vast amount of information available to the aviation industry regarding the risk of terrorist attacks") (emphasis added); *see also* Ex. 27, Cammaroto Tr. at 360-64, 366-67 (property damage plaintiffs asking FAA witness whether the airlines could have implemented different security measures before September 11 based on the "specific intelligence" information provided by Moussaoui).

**D.** **The requested testimony is probative of whether the Aviation Parties have derivative immunity from liability.**

The information that was known to the federal government concerning the terrorist threat to civil aviation posed by al Qaeda before September 11 is also of central relevance to the question of whether the Aviation Parties have derivative immunity from liability, pursuant to the Federal Tort Claims Act ("FTCA"), Pub. L. No. 79-601, 60 Stat. 812 (1949), *codified at* 28 U.S.C. § 1346(b) (2008) and 28 U.S.C. §§ 2671–2680 (2008).

Plaintiffs in the September 11 Litigation are prevented by the FTCA from asserting claims against the FAA based upon the agency's assessment of the terrorist threat and its decisions regarding the appropriate countermeasures. The FTCA provides that the government and its agents shall not be held liable "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . . .". 28 U.S.C. § 2680(a) (2008); *cf. Ali v. Fed. Bureau of Prisons,* 128 S. Ct. 831, 834 (2008) ("28 U.S.C. § 2680 . . . carves out certain exceptions to the United States' waiver of sovereign immunity for torts committed by federal employees.").

The Second Circuit recently issued a decision indicating that the Aviation Parties may be entitled to share in the FAA's immunity under the FTCA. Interpreting a "practically identical" discretionary function clause in the Robert T. Stafford Disaster Relief and Emergency Assistance Act and after explicitly "consider[ing] the policies for the FTCA discretionary function exception, and prior interpretations of that exception, for guidance," the Court held that a defendant acting under federal direction could establish that it was entitled to derivative immunity by showing:

> (1) a federal agency made certain discretionary policy judgments that resulted in reasonably precise specifications that were based on the purposes that the regulatory regime in question seeks to accomplish;
>
> (2) the agency supervised and controlled defendants' implementation of these reasonably precise specifications; and
>
> (3) defendants were not aware of dangers about which the agency was unaware.

*In re World Trade Ctr. Disaster Site Litig.*, 2008 U.S. App. LEXIS 6222, at *48-49, *76-77.

The Second Circuit's decision strongly indicates that the Aviation Parties should be deemed immune from liability under the FTCA, if they are able to make an analogous showing. The Aviation Parties can meet the first two prongs of the test for immunity by demonstrating that the FAA established specific aviation security measures that the Aviation Parties implemented and that the FAA monitored the Aviation Parties' compliance. However, to satisfy the third prong of the test announced by the Court of Appeals, the Aviation Parties must be able to present evidence establishing what intelligence information the FAA had (and did not have) regarding the terrorist threat before September 11. *Id.* at *76-77. In effect, the Aviation Parties must establish that they had no greater knowledge of the terrorist threat than the FAA. The Aviation Parties, however, cannot make such a comparison without being able to present the jury with evidence of the pre-9/11 intelligence information held by the agency. The FBI Witnesses can provide an important piece of this evidence by testifying as to what information the FBI – the FAA's partner in assessing the threat to civil aviation – had regarding Moussaoui, Mihdhar, and Hazmi before September 11 and by explaining how much, if any, of this information the FBI shared with the FAA.

## IV.    THE FBI'S EXPLANATIONS FOR WHY IT WILL NOT PERMIT THE WITNESSES TO TESTIFY ARE UNSUPPORTED BY THE FACTS.

The FBI's explanations for its denial of the Aviation Parties' requests to depose the five witnesses are jumbled and contradictory boilerplate. On the one hand, the FBI generically objects that the Aviation Parties seek testimony "concerning matters about

which [the witnesses have] previously publicly testified" and that this evidence "is already in the public record." Exs. 7 - 10, all at 2; Ex. 11 at 3. On the other hand, the FBI makes the conclusory assertions that none of the witnesses may testify because some of the information about which they may be questioned "involves classified national security information" and is protected by a laundry list of privileges, including the deliberative process, attorney-client, and work product privileges. Exs. 7 – 11, all at 2. There is an unsustainable contradiction in these two explanations that demonstrates the extent to which the FBI's refusal to permit the depositions is an arbitrary and capricious decision.

The FBI's blunderbuss denial of the Aviation Parties' request is also not reconcilable with the agency's own *Touhy* regulations. The regulations instruct the agency to "authorize disclosure" if the requested discovery is "appropriate under the rules of procedure governing the case or matter in which the demand arose . . . .". *See* 28 C.F.R. § 16.26(c) (2008). The highly probative testimony the Aviation Parties seek from the witnesses fits easily within the broad range of evidence that is discoverable in the September 11 Litigation. Federal Rule of Civil Procedure 26 casts a wide net and directs that it is appropriate for the parties to take discovery of "any . . . matter that is relevant to any party's claim or defense . . . .". *See* Fed. R. Civ. P. 26(b)(1). Moreover, "the court may order discovery of any matter relevant to the subject matter involved in the action." *Id*; *see also Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (stating that what is discoverable in federal litigation is to be liberally construed and acknowledging that the phrase "reasonably calculated" in Rule 26(b)(1) means "<u>any</u>

possibility that the information sought may be relevant to the subject matter of the action") (emphasis in original); *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.,* 122 F.R.D. 447, 449 (S.D.N.Y. 1988). Moreover, the Aviation Parties' detailed supporting affidavits fully satisfy the regulation's requirement that they provide "a summary of the testimony sought and its relevance to the proceedings . . . .". *See* 28 C.F.R. § 16.22 (2008); *F.A.C., Inc. v. Cooperativa De Seguros De Vida,* 188 F.R.D. 181, 185 (D.P.R. 1999).

The Aviation Parties must be free to determine which evidence is relevant to their defense, and it is the Court – not the FBI – that is the ultimate arbiter of whether that evidence is discoverable. The Court should not accord any deference on questions of relevance to the views of a non-party, particularly when its rationale for refusing discovery are as generic as those offered here by the FBI.

A.     **The Aviation Parties are not seeking protected information.**

As the FBI concedes, much of the information about which the FBI Witnesses would testify in the September 11 Litigation has already been publicly disclosed by those very same witnesses in sworn testimony or in other public forums. Any privilege or protection that may have once applied to this information therefore no longer shields it from discovery. The Second Circuit has held, "[m]atters actually disclosed in public lose their privileged status because they obviously are no longer confidential. The cat is let out of the bag, so to speak." *In re von Bulow*, 828 F.2d 94, 102-03 (2d Cir. 1987).

This principle applies equally to the deliberative process and state secret privileges, as it does to more common protections such as the attorney-client privilege or

the work product doctrine. As this Court has held, "principles of waiver apply to the law enforcement privilege, so that a document otherwise properly withheld may be subject to disclosure if the privilege has been forfeited." *Kshel Realty Corp. v. City of New York*, No. 01 Civ. 9039, 2004 U.S. Dist. LEXIS 25791, *7-8 (S.D.N.Y. Dec. 20, 2004). Similarly, there is no merit to the FBI's position that the state secret privilege precludes the depositions from going forward. The Aviation Parties seek testimony from the FBI Witnesses on the same topics about which they have already testified with the authorization of the FBI – the Aviation Parties are not seeking any state secrets because any "secrets" have already been publicly confirmed. *See Nat'l Lawyers Guild v. Att'y Gen.*, 96 F.R.D. 390, 402 (S.D.N.Y. 1982) (the fundamental principle that disclosure negates a privilege protection applies to the state secret privilege). For instance:

| | |
|---|---|
| The Aviation Parties seek to ask Samit and Billings about the items they uncovered in their searches of Moussaoui's possessions, both before and after September 11. Ex. 2, Touhy Aff. for Samit ¶ 11(d); Ex. 4, Touhy Aff. for Billings ¶ 11(b). | ➢ Both agents publicly testified at Moussaoui's trial as to what they found in their respective searches. Ex. 14, Moussaoui Tr. (Samit) at 844-50; Ex. 18, Moussaoui Tr. (Billings) at 1302-10. |
| The Aviation Parties seek to ask Rolince whether the FBI had information before September 11 indicating that al Qaeda was planning terrorist attacks in the United States. Ex. 5, Touhy Aff. for Rolince ¶ 12(d). | ➢ Rolince publicly testified at Moussaoui's trial as to the threat information the FBI received in summer 2001 and the extent to which it suggested al Qaeda was targeting civil aviation. Ex. 13, Moussaoui Tr. (Rolince) at 1484-85, 1510-11. |
| The Aviation Parties seek to ask Rigler about the information the FBI had before September 11 on Hazmi and Mihdhar. | ➢ Rigler publicly testified at Moussaoui's trial as to the information available to the FBI and the extent to which it was actionable. Ex. 20, Moussaoui Tr. |

Ex. 6, Touhy Aff. for Rigler ¶¶11(h)-(j).        (Rigler).

Given the symmetries between the information the FBI Witnesses have already disclosed and the testimony the Aviation Parties seek, there is little risk that they would reveal privileged information during their depositions. Indeed, the FBI does not even appear to claim that all of the discovery requested by the Aviation Parties is privileged. Rather, its position seems to be that "some of the information" is protected and that it would be too much trouble for the agency to determine which information is privileged and which is not. *See* Exs. 7-11, all at 2 ("[T]he process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege . . . would be an extremely difficult and burdensome task."). But the mere possibility that a handful of questions may raise privileged information should not permit the FBI to erect a barrier preventing the depositions from going forward at all. To the extent that the answer to a particular question may touch on protected information, counsel for the FBI can object and instruct the witness not to reveal that information in his answer, just as counsel for a third-party witness would at any other deposition and just as government counsel did at Mr. Cammaroto's deposition.

This can be done with little burden to the agency. The Aviation Parties are only seeking the witnesses' testimony as to factual information that they know first-hand. The scope of information that will be covered at the depositions will be bounded by the limits of the witnesses' personal knowledge. The Aviation Parties have called each of the witnesses to speak only for themselves about the specific topics identified in the Aviation

Parties' requests, not as Rule 30(b)(6) witnesses whose testimony would bind the agency and might require more extensive preparation. The preparations for the FBI Witnesses' depositions are also likely to be modest given their prior public disclosures. *See In re Vioxx Prods. Liab. Litig.*, 235 F.R.D. at 345-46 (noting that the agency employee can limit the potential ramifications of his testimony for the employer-agency by specifying that he is testifying in his individual capacity and asking "[h]ow can it be that the [agency] and [the witness] had enough resources and time for him to appear in all these varied venues yet neither can afford to have him appear for a federal court subpoenaed deposition at the time and place of their choosing?").

Furthermore, any potential burden to the FBI in preparing for the depositions is minimized by the fact that its counsel from the office of the U.S. Attorney for the Southern District of New York is already familiar with the September 11 Litigation. The FBI's refusal to permit the depositions to go forward was issued by the U.S. Attorney for the Southern District of New York, which is representing the FBI in these proceedings as well. *See* Exs. 7-11. That office has been an active participant in the September 11 Litigation and discovery for more than five years. *See Mariani v. United Air Lines, Inc.*, No. 01 Civ. 11628 (AKH), 2002 U.S. Dist. LEXIS 13369 (S.D.N.Y. July 24, 2002) (provisional order granting government's motion to intervene). While discovery in the September 11 Litigation was long-delayed to address the government's concerns over the potential disclosure of "sensitive security information," since the Court ordered discovery to go forward, it has proceeded without incident. Counsel from the U.S. Attorney's office regularly attend depositions to prevent protected information from being

inadvertently disclosed – including the recent deposition of Mr. Cammaroto. There is no reason to believe they would not be similarly well-equipped to fulfill the same duties at the depositions of the FBI Witnesses.

**B.      The FBI's boilerplate objections are insufficient to sustain its refusal to allow the five depositions.**

The law requires that the FBI provide a particularized, well-reasoned explanation for precluding the five witnesses from testifying. This requirement applies equally to its privilege objections and to its concerns over potential burden. *See In re Vioxx Prod. Liab. Litig.*, 235 F.R.D. at 345 (A federal agency "must examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made"); *Sommer*, 1993 U.S. Dist. LEXIS 20401, at *13-14 (holding that agency's claim that governmental privileges will apply to the requested testimony was not a reason to preclude the testimony because "in the absence of specific questions and specific assertions of privilege, the applicability of these privileges cannot be determined" and that a "showing of actual undue burden" is required to sustain a motion to quash pursuant to Fed. R. Civ. P. 45); *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271, 2006 U.S. Dist. LEXIS 90970, at *18-19 (S.D.N.Y. Dec. 15, 2006) (granting motion to compel and holding that "[w]hen a claim of privilege is asserted in response to any means of discovery, Federal Rule of Civil Procedure 26(b)(5) and Local Rule 26.2 require that specific information be provided that will enable other parties to assess the applicability of the privilege or protection"); *cf. ACLU*, 389 F. Supp. 2d at 552 (noting in the context of a FOIA request on the CIA that "[a]n agency's burden, although high, is not impractical" and that the agency must show "by

affidavits or declarations supplying facts, that the agency has conducted a thorough search for responsive documents, and has given reasonably detailed explanations why any withheld documents fall within an exemption").

The FBI provides no detailed basis for its objections and, as a result, they fail to meet this standard. The FBI's refusal letters are so similar that they read as if they were prepared using a standardized template into which the FBI merely inserted each witness's name. In all five letters, the FBI parrots the same language, claiming in each that "some of the information contained in the testimony that you seek <u>may</u> be protected from disclosure by the deliberative process, attorney client, work product or other applicable privileges." *See* Exs. 7-11, all at 2 (emphasis added). The FBI continues to echo itself asserting that "a significant amount of the information that you seek is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege." Exs. 7, 11, all at 2 (using this exact phrase); *see also* Exs. 8 -10 (using virtually identical language).

The FBI has presented the Court with a situation very similar to the one recently addressed in *Cavanaugh v. Wainstein*, in which the requesting party had sought the Department of Justice's permission to depose a handful of Department attorneys under the same *Touhy* regulations that apply to FBI employees. The Department refused to authorize some of the depositions, claiming that the proposed testimony topics "<u>appear covered</u>, in large part, . . . by the deliberative process privilege." *Cavanaugh*, 2007 U.S. Dist. LEXIS 40242, at *25 (emphasis added). The reviewing court found that "[t]his unsubstantiated comment constitutes a failure to examine the relevant data and articulate

a satisfactory explanation for the action." *Id.* at *25-26. The court also held that the Department's invocation of the work product protection to prevent the testimony of other witnesses was arbitrary and capricious because the Department's "failure to justify invoking work product protection . . . constitutes a significant failure to consider the 'relevant factors.'" *Id.* at *31.

The other rationalizations proffered by the FBI for barring the depositions are equally boilerplate and, therefore, inadequate. The FBI claims in all five refusal letters that the requested testimony "may contain information that originated with other Government departments or agencies." The agency argues that therefore it "must coordinate its responses with these other departments or agencies" which "would place an undue burden on the FBI." *See* Exs. 7-11, all at 2. As an initial matter, this justification must be rejected because the "need to consult" is not a recognized protection that shields otherwise discoverable information from production. Furthermore, it is unclear how information regarding what the FBI Witnesses personally know or directly observed could have possibly "originated with other Government departments or agencies." *Id.* It is also unclear from the FBI's refusals *which* agencies or departments it might have to consult with, because it does not identify them. The FBI's lack of specificity is particularly puzzling given that the agency took more than *sixty days* to respond to the Aviation Parties' request, in which time it certainly had an opportunity to identify, if not consult with, any entities that may have had an interest in the first-hand testimony of the FBI Witnesses.

The FBI also raises the generic objection that the requested testimony is "cumulative, duplicative, or available through less burdensome channels." *See* Exs. 7-11, all at 2. The FBI explains that the Aviation Parties "seek testimony concerning matters about which [the FBI Witnesses have] previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources." Exs. 7-10, all at 2; *see also* Ex. 11 at 3 (using virtually identical language). Putting aside for a moment that these assertions run directly counter to the FBI's protestations that the requested testimony is privileged, the FBI's claim that evidence obtained from secondary sources is a satisfactory substitute for the direct testimony is misguided.

Secondary sources cannot replace evidence taken directly from witnesses with direct knowledge of the underlying facts. As this Court itself has recognized, it is best to "go to the source" and "[s]tay . . . away from secondary stuff." June 14, 2007 Hearing Tr. at 59; *see also Cavanaugh*, 2007 U.S. Dist. LEXIS 40242, at *21 ("A declaration is simply not an adequate substitute for live testimony, such as a deposition."). This is particularly the case in the September 11 Litigation, where the extent to which secondary sources such as *The 9/11 Commission Report* will be admissible evidence at trial remains undecided.

Not only is direct testimony far less likely to raise issues regarding the ultimate admissibility of the information as evidence at trial, a jury evaluating the Aviation Parties' defense is likely to find direct testimony more persuasive than evidence given in another proceeding and for another purpose. *See In re Vioxx Prods. Liab. Litig.*, 235 F.R.D. at 346 ("None of the documents provided by the FDA can express the [witness's]

opinion with the clarity and tone as he personally can in his deposition."). The Aviation Parties are entitled to put on the best defense possible. For this reason, the Aviation Parties should be permitted to elicit their own direct testimony from the FBI Witnesses.

The FBI cannot refuse to authorize the testimony of the FBI Witnesses merely because the agency might have to expend some effort in connection with their depositions – otherwise <u>every</u> request to authorize discovery made to any federal agency could be rejected on these grounds. Under the federal discovery regime, the FBI must establish not only that it would be burdened by the depositions, but that the burden is in some way exceptional or "undue." *See* Fed. R. Civ. P. 45(c). The courts have expressly held that an agency cannot properly rebuff a *Touhy* request where it "merely relies on the general proposition that its time should not be spent on responding to civil discovery." *Sommer*, 1993 U.S. Dist. LEXIS 20401, at *13 (setting aside a refusal to permit testimony, where "the Department has made no effort to establish an actual burden"); *see also In re Vioxx Product Liab. Litig.*, 235 F.R.D. at 345 (refusing to make the "unsound ruling" advocated by the FDA because doing so would allow the agency "to implement a practice of denying all deposition requests under the guise of possible, although presently nonexistent consequences" and stating "[m]uch as this Court will not write litigants a blank check, it will not deal the [agency] a trump card").

Here, the FBI would have to conduct the same preparation in advance of the FBI Witnesses' depositions that any other non-party employer would undertake if five of its employees were called to testify as fact witnesses in a civil litigation. This is far from an extraordinary effort. Indeed, the government is often faced with far more burdensome

discovery demands. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 98 F.R.D. 522, 523 (E.D.N.Y. 1983) (after being dismissed from the case, the government produced "[t]housands of documents" and "numerous government employees, present and former, have appeared for depositions").

## V.    THE FBI LACKS THE AUTHORITY TO BAR SPECIAL AGENT RIGLER FROM TESTIFYING.

The Aviation Parties note that retired Special Agent Rigler represents a special case among the FBI Witnesses, and that the FBI's assertion that he cannot be deposed in the September 11 Litigation should be given no deference because the agency's *Touhy* regulations do not apply to the request for his testimony.

The Aviation Parties seek to question retired Special Agent Rigler concerning his knowledge of Hazmi and Mihdhar's activities, and the intelligence information the FBI had on these two hijackers before September 11. *See* Ex. 6, ¶ 11. He learned this information not in the course of his duties as an active agent, but when he was asked to testify on behalf of Moussaoui as a summary witness at his criminal trial. As the FBI itself explains:

> Special Agent Rigler was <u>not employed by the FBI</u> at the time he provided testimony at the Moussaoui trial, <u>nor did he testify as to information he obtained in his official capacity as an FBI Special Agent</u>.

Ex. 11, at 2 (emphasis added). Under these circumstances, and the plain meaning of the FBI's *Touhy* regulations, the regulations simply do not apply to the Aviation Parties' request to depose retired Special Agent Rigler. The regulations expressly state that they apply solely to requests for the:

production or disclosure of any material contained in the files of
the Department, any information relating to material contained in
the files of the Department, or any <u>information acquired</u> by any
person <u>while such person was an employee of the Department as
part of the performance of that person's official duties</u> or because
of that person's official status.

28 C.F.R. § 16.21(a) (2008) (emphasis added).

The agency's *Touhy* regulations do not permit the FBI to prevent retired Special
Agent Rigler from being deposed.  Nor should the FBI be allowed to block his testimony
from going forward.  He can provide evidence that tends to establish that the FBI and
CIA missed a significant opportunity to disrupt the terrorist attacks.  In his testimony at
the Moussaoui trial, retired Special Agent Rigler detailed at least five missed chances the
intelligence agencies had to apprehend Hazmi and Mihdhar before they hijacked
American Flight 77 on September 11.  The jury in the September 11 Litigation should
have the opportunity to weigh this same important evidence.

## CONCLUSION

For all of the reasons set forth above, the Court should set aside the final agency
action of the Federal Bureau of Investigation refusing to permit the Aviation Parties to
depose Scott Billings, Erik Rigler, Michael Rolince, Coleen Rowley, and Harry Samit in
the September 11 Litigation, as a decision which is arbitrary, capricious, an abuse of

discretion, and not in accordance with law.

Dated:  New York, New York
        April 28, 2008

                          Respectfully submitted,

                          CONDON & FORSYTH LLP


                          By: _____
                             Desmond T. Barry, Jr. (DB-8066)

                          7 Times Square-18th Floor
                          New York, NY 10036
                          Tel: (212) 490-9100
                          Fax: (212) 370-4453

                          *Aviation Parties' Liaison Counsel*



*Of Counsel*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
Alison Mikkor