# Exhibit 13

Page 1352

```
 1                    UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION
 3   UNITED STATES OF AMERICA,      .      Criminal No. 1:01cr455
                                    .
 4      vs.                         .      Alexandria, Virginia
                                    .      March 21, 2006
 5   ZACARIAS MOUSSAOUI,            .      10:00 a.m.
     a/k/a Shaqil, a/k/a            .
 6   Abu Khalid al Sahrawi,         .
                                    .
 7               Defendant.         .
                                    .
 8   . . . . . . . . . . . .
 9                    TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE LEONIE M. BRINKEMA
10                  UNITED STATES DISTRICT JUDGE
11                           VOLUME VII
12   APPEARANCES:
13   FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                                  DAVID J. NOVAK, AUSA
14                                DAVID RASKIN, AUSA
                                  United States Attorney's Office
15                                2100 Jamieson Avenue
                                  Alexandria, VA 22314
16                                   and
                                  JOHN W. VAN LONKHUYZEN, ESQ.
17                                U.S. Department of Justice
                                  Counterterrorism Section
18                                10th and Constitution Avenue, N.W.
                                  Room 2736
19                                Washington, D.C. 20530
20   FOR THE DEFENDANT:           GERALD THOMAS ZERKIN
                                  KENNETH P. TROCCOLI
21                                ANNE M. CHAPMAN
                                  Assistant Federal Public Defenders
22                                Office of the Federal Public
                                  Defender
23                                1650 King Street
                                  Alexandria, VA 22314
24
25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

U.S. v. Moussaoui

 1          THE COURT:  I would rather stay on schedule because I

 2     think it makes the afternoon too long if we don't stay on the

 3     schedule.

 4          MR. RASKIN:  The government calls Michael Rolince.

 5          THE COURT:  All right.

 6          MICHAEL ROLINCE, GOVERNMENT'S WITNESS, AFFIRMED

 7                    DIRECT EXAMINATION

 8   BY MR. RASKIN:

 9   Q.   Good afternoon, sir.  Can you state your name and spell your

10     last name for the record, please.

11   A.   My name is Michael Rolince, R-o-l-i-n-c-e.

12   Q.   Now, sir, did you spend literally the entirety of your career

13     working for the FBI?

14   A.   31 years and change.

15   Q.   Were you working for the FBI on September 11th, 2001?

16   A.   I was.

17   Q.   Tell us what your title was, what your job was on that date.

18   A.   I was the section chief for the FBI's International Terrorism

19     Operations Section at FBI headquarters.

20   Q.   Tell us a little bit about your career at the FBI.  When did

21     you start, and tell us briefly what each of the jobs that you have

22     had with the FBI was.

23   A.   I started with the FBI right out of college in the fall,

24     September 9th, 1974, working at FBI headquarters as a -- actually,

25     headquarters wasn't built yet.  It was an old building down at 2nd

1    and D as a grade 2 clerk.

2         From there I was selected as one of ten to start up the

3    Special Surveillance Group out in San Francisco following mostly

4    Soviets attached to the embassy and other block countries,

5    intelligence officers.  From there I went to new agents class in

6    1981, in April of '81, spent 16 weeks at the Academy in Quantico,

7    Virginia, was assigned first office in New Orleans, Louisiana from

8    roughly the fall of '81 to the fall of '83.

9         In 1983 I was transferred to the Washington field office

10   of the FBI where I worked primarily counterintelligence and on

11   espionage matters.  In 1985 I was transferred to FBI headquarters

12   again in the Intelligence Division working primarily

13   counterintelligence and espionage matters.

14        In 1986 I was transferred -- I'm sorry, 1988 I was

15   transferred to the Boston Division of the FBI where I ran a

16   counterintelligence and counterterrorism squad that eventually

17   morphed into the Joint Terrorism Task Force.

18        I was promoted to the Number 2 position, assistant

19   special-agent-in-charge, with responsibility initially for

20   counterintelligence, counterterrorism, and had moved over into

21   organized crime, drugs, violent crime, when I received a call from

22   headquarters asking me to come back and be the chief of the

23   International Terrorism Operations Section.

24        I politely declined, and two years later they called and

25   said, "congratulations, you got the job," came down and arrived in

Page 1464

1    Washington, D.C. unfortunately, started the week of August 4th,

2    1998.  On Friday, when I was packing by bags to go home, I turned

3    on my television, like we all do when we travel, and saw the sites

4    at Dar-ul-Salam in Nairobi and the bombings of the East African

5    Embassies.

6            From that point for the next three and a half years, we

7    worked Nairobi, Kenya, the Kosovo grave digging operation at the

8    end of that civil war, that strife, the downing of Egypt Air 990

9    off the coast of Nantucket in the winter, followed by the

10   Millennium Conspiracy, and the arrest of Ahmed Ressam, followed

11   ten months later by the attack on the USS Cole where we lost 17

12   brave sailers, followed 11 months later by 9/11.

13           In January of 2002 I was promoted as

14   special-agent-in-charge of the Counterterrorism Division of the

15   Washington field office where I remained until I retired this past

16   October.

17   Q.   Tell us, again, what period of time were you the section

18   chief of the International Terrorist Operations Center at

19   headquarters, FBI headquarters?

20   A.   From August 4th, 1998 until the first part of January of

21   2002.

22   Q.   I am going to ask you a few questions about what FBI

23   headquarters is.  Tell us where it is, first.

24   A.   It is at the corner of 10th and Pennsylvania, Washington,

25   D.C., Northwest, across the street from the Main Justice building.

Page 1465

1  Q.   And we have referred a couple times to the International

2  Terrorist Operations Center.  Is that commonly referred to as

3  ITOS?

4  A.   It is.

5  Q.   And it is different today than it was before September 11; is

6  that right?

7  A.   It is significantly different.

8  Q.   Let's talk about ITOS before September 11.  Tell us, first,

9  what was the primary responsibility of the ITOS group at FBI

10  headquarters.

11  A.   The primary responsibility was to coordinate the

12  counterterrorism investigations being conducted throughout the

13  United States, within the 56 field offices and 400 smaller

14  resident agencies, to coordinate the deployment of FBI agents,

15  support persons, analysts, translators, linguists, et cetera, to

16  these various attack sites and to many other countries wherein

17  Americans were attacked or killed in the years prior to my arrival

18  at headquarters.

19       We managed five separate units, one of which was

20  assigned Iranian and Hizballah matters, Hizballah being a

21  terrorist organization that killed more Americans than any other

22  group combined prior to since September 11th, certainly worth our

23  time and effort and energy to figure out their presence in the

24  United States.

25       The second unit covered Middle Eastern terrorists,

Page 1466

1   Islamic Palestinian rejectionist groups, Palestinian Islamic

2   Jihad, for instance, and, again, serious concern on our part over

3   the support --

4              MR. MAC MAHON:  Your Honor, if I may, these are

5   speeches.  I can't object.  If we get questions and answers, it

6   might be more appropriate.

7              THE COURT:  I will sustain the objection, Mr. Raskin.

8   Ask your questions, Mr. Raskin, and, sir, just answer the specific

9   question.

10             THE WITNESS:  Yes, Your Honor.

11  BY MR. RASKIN:

12  Q.   Mr. Rolince, tell us how many, on September 11, 2001, how

13  many employees were there who were working for ITOS?

14  A.   Approximately 82.

15  Q.   82.  Now, let's talk about how ITOS was structured.  And you

16  began to tell us about the units that existed in ITOS on September

17  11th, 2001.  I believe you talked about two of them, Iran

18  Hizballah, Middle East.  Tell us what other units existed.

19  A.   The remaining units focused on Islamic radical

20  fundamentalists.  The next unit focused on Usama Bin Laden and

21  al Qaeda in particular, a unit that was formed in the immediate

22  aftermath of the bombings.  There was an administrative unit that

23  did the usual payroll, equipment, things of that nature.  And

24  there was an analytical unit comprised of the analysts who worked

25  in support of the aforementioned units.

Page 1467

1    Q.    Now, as section chief of ITOS, it was your responsibility to

2    oversee the units that existed?

3    A.    Yes, it was.

4    Q.    What positions existed underneath you in those various units?

5    A.    Alongside me in what is referred to as the front office was

6    an assistant special -- I'm sorry, an assistant section chief, a

7    position traditionally held by the FBI and the deputy section

8    chief traditionally held by a CIA officer.  The units were run by

9    unit chiefs, grade 15 positions, and within those units were grade

10   14 FBI agents, supervisors, analysts, secretaries and other

11   support personnel.

12   Q.    Okay.  And tell us what your job response -- as section

13   chief, what were your job responsibilities?  What was your day's

14   -- what were your days like?

15   A.    The days began roughly at 6:30 in the morning, going through

16   all the traffic that came in the night before, followed by a 7:00

17   a.m. meeting chaired by the Assistant Director Dale Watson, and

18   then that meeting would be followed by other meetings throughout

19   the units and throughout the section.

20          I spent a fair amount of time doing coordination

21   activities with my counterparts throughout the community at the

22   White House, the National Security Council, State Departments,

23   Office of Counterterrorism Coordination, spent a great deal of

24   time down at Langley, at CIA headquarters, interfacing with them,

25   at the Pentagon, interfacing with J-34, the force protection

Page 1468

1    people, special operations, low intensity conflict people, and at

2    meetings at the White House on a fairly regular basis, either

3    there or by way of secure video teleconference.

4             In addition to that, a fair amount of time taken up with

5    visitors from counterpart services throughout the world who would

6    come to the United States for the purpose of working on joint

7    operations or attending conferences or just building the liaison

8    necessary to be able to fight the war with them.

9             THE COURT:  All right, Mr. Raskin, it is 12:30.  We will

10   take the one hour lunch break and reconvene at 1:30.

11             (Recess from 12:30 p.m., until 1:30 p.m.)

12

13

14                                                    `

15

16

17

18

19

20

21

22

23

24

25

Page 1469

1              A F T E R N O O N   S E S S I O N

2                     (Defendant and Jury in.)

3              MR. RASKIN:  May I proceed, Your Honor?

4              THE COURT:  Yes, sir.

5              MR. RASKIN:  Thank you.

6   Q.   Mr. Rolince, before the break, we discussed some of the

7   people who worked underneath you in ITOS at FBI headquarters, this

8   again is in the pre-September 11 period.

9              Can you tell us what positions existed above you at FBI

10  headquarters at that time?

11  A.   Certainly.  Above the position of section chief, there's a

12  deputy assistant director, then an assistant director over the

13  entire Counterterrorism Division, as there is an assistant

14  director over each of the other divisions in the FBI.  That person

15  would have been Dale Watson at the time we're speaking of.

16              Above Dale would have been Tom Pickard, who was the

17  deputy director of the FBI, and then for most of my time there,

18  Mr. Louis Freeh was the director.  He retired in June of 2001.

19  And on September 11, Mr. Tom Pickard was the acting director of

20  the FBI.

21  Q.   Now, apart from headquarters, of course, the FBI has field

22  offices as well; is that correct?

23  A.   Yes.

24  Q.   How many field offices are there, and tell us what happens at

25  the field offices?

Page 1470

1  A.    There are 56 field offices throughout the United States.  And

2  belonging to those 56 field offices are 400 smaller what are

3  referred to as resident agencies.  In other words, the Tysons

4  Corner resident agency belongs to the Washington field office.

5          Within each field office, there are a number of

6  different programs, counterintelligence, counterterrorism, white

7  color crime, organized crime, violent crime, training, recruiting,

8  etc., broken down by squads.  And the squads are run by

9  supervisors who answer up to an assistant special agent in charge,

10  who answers to the special agent in charge.

11  Q.    Now, in terms of counterterrorism, what are the biggest or

12  the most significant field offices in, in conducting those types

13  of investigations?

14  A.    The New York field office would certainly be considered the

15  largest and most significant, followed in not really priority

16  order but in terms of numbers, Washington field office is the

17  second largest.  And there's a significant component within the

18  Los Angeles field office, the Miami field office, and Chicago are

19  the ones that really jump to mind.

20  Q.    Now, it was ITOS's responsibility at headquarters to

21  coordinate what was going on in these field offices at least from

22  the counterterrorism perspective.  Tell us very briefly how, how

23  that worked.

24  A.    Well, there are certain FBI rules and regulations that govern

25  the conduct of investigations, and there are a set of attorney

1    general guidelines that govern as well.  In addition, there are

2    other rules and regulations.  We'll probably talk a bit about

3    FISA; I know you probably already have.

4              Those packages come into headquarters, are coordinated

5    with headquarters from the field, and that's actually a

6    headquarters supervisor, unlike in a routine Title III, the agent

7    in the field goes and testifies.  At headquarters in the FISA

8    court, it's virtually always a headquarters supervisor that

9    testifies, so it has to be a lot of communication back and forth,

10   coordination, etc.

11             THE COURT:  Ladies and gentlemen, Title III is an

12   ordinary, old-fashioned wiretap done under court authorization.

13   That's why it's called a Title III.

14             MR. RASKIN:  Thank you, Your Honor.

15   Q.   Let's talk about information flow in terms of what's

16   happening out in the field.  How does information about the

17   investigations that are going on, whether they be intel

18   investigations or criminal investigations, how does that work its

19   way up the chain?  In fact, how does it work its way all the way

20   up to your desk as section chief of ITOS?

21   A.   It can make its way back in any number of ways.  If it's

22   routine information that's being gathered during the course of an

23   investigation, that would be chronicled on any number of different

24   forms, teletype, now in electronic communication, an FD-302, an

25   insert, just different FBI forms, and sent back that way.

1          Depending on the priority, it can be preceded with a

2    telephone call saying:  Hey, this is important, it's coming to you

3    via fax, or if it's important enough, get on a plane, come back to

4    headquarters, and talk about it.

5    Q.   And, and what is the -- what is the chain at headquarters in

6    terms of information coming to your desk?

7    A.   It would come into the, the units that we talked about

8    earlier, depending on what terrorist affiliation the individual in

9    question had.  It would come into that particular unit addressed

10   more likely than not to the intelligence operations specialist,

11   IOS, provide tactical support, and to the grade 14 supervisor,

12   perhaps to the attention of the unit chief.

13          And on some communications, based upon the importance of

14   the information contained therein, you would see the listing of

15   individuals all the way up through the section, through the

16   division, and it would usually stop at the assistant director,

17   although every communication that came in on the teletype system

18   and EC just by tradition says "to director FBI."  That doesn't

19   mean he gets anywhere near all those tens of thousands of

20   communications that are rolling in every day.

21   Q.   Now, what -- once information reaches you, you have to make a

22   decision about whether to pass it on to those above you, right?

23   A.   Correct.

24   Q.   And what informs that decision on your part?

25   A.   Probably first and foremost, time in the FBI.  You like to

Page 1473

```
 1   figure you develop a sense of what's important, of what's urgent,

 2   what does the -- what do the people above me need to see right

 3   now, what can wait until the end of the day, what can wait until

 4   tomorrow, and what just isn't ready to go forward yet, because you

 5   learn to anticipate the questions that are going to come with this

 6   information, and oftentimes you say to yourself, I want to know a

 7   little bit more about this before I walk it upstairs, because I'm

 8   just going to have to be back up there with answers later on if I

 9   don't have them now.

10   Q.   Let's also talk a little bit about coordination between the

11   FBI and other agencies that are working on counterterrorism.  Tell

12   us what was the principal vehicle through which the FBI

13   coordinated with other agencies in the United States government?

14   A.   The principal vehicles, if you will, inside the building

15   would have been the detailees that were assigned to the various

16   units from throughout the intelligence and federal law enforcement

17   community.

18        The principal vehicle outside the building would have

19   been the counterterrorism security group, which is a policy body

20   coordinated out of the White House, run by at the time that I was

21   there an individual named Dick Clarke.

22   Q.   Now, let me just go back to detailees.  Just tell us in

23   layperson's terms, what's a detailee?

24   A.   It's an individual who is still formally assigned to his or

25   her home agency, that can be CIA, a Department of Defense entity,
```

1   the State Department, the Federal Aviation Administration, Secret

2   Service, etc.  Virtually the whole community is represented in

3   this exchange of detailees.

4           They then bring their communications system, their

5   expertise, and their questions into the FBI.  And in the event

6   that information relative to a particular threat, if it's on the

7   water, you'd give it to the Coast Guard; it's a threat against the

8   President, you'd get it to the Secret Service rep, etc., etc.  So

9   they occupy a full-time position within the Counterterrorism

10  Division, usually attached to a specific unit.

11  Q.   And you also mentioned the Counterterrorism Security Group,

12  or CSG, and you said that was run by an individual named Dick

13  Clarke?  Where did he work?

14  A.   He worked out of the West Wing of the White House.

15  Q.   And tell us who other than the FBI was represented on the

16  CSG?

17  A.   The traditional core representation would be the FBI, and

18  that could either be myself on international terrorism or a

19  counterpart from domestic terrorism or cyber crimes, etc., or

20  individuals from the Counterintelligence Division, if that was

21  what the particular issue being discussed was about.

22          Then you would have the Terrorism and Violent Crimes

23  Section of the Department of Justice, the Office of Intelligence

24  Policy Review that coordinated, shepherded, and makes decisions on

25  FISAs that do and do not go forward, the Office of

Page 1475

1    Counterterrorism Coordination at the State Department, the CIA,

2    and the other primary component in addition to the National

3    Security Council staff would be the Department of Defense, usually

4    SOLIC, Special Operations Low Intensity Conflict, and J-34, the

5    fourth protection people.

6          If an issue surrounded a topic outside of the purview of

7    those organizations, as I said, on the water, Dick had the

8    authority to bring in the Coast Guard.  If it was something to do

9    with aviation, he had the authority to bring in FAA, etc.

10   Q.   And were you the FBI's representive on the CSG?

11   A.   I was the day-to-day representative on the CSG.  If the issue

12   became so important that it needed a decision from higher-level

13   government, then they would convene what was referred to as the

14   deputies, which were generally the No. 2 persons within those

15   entities that I spoke of.

16          And then if a decision was needed by the President or by

17   the Secretary of Defense, State, etc., they would convene what

18   they call the principals, which would be those cabinet-level

19   individuals who ran those agencies.

20   Q.   Where did the CSG meet typically?

21   A.   In the situation room at the White House.

22   Q.   And how often did the CSG meet, let's, you know, in the years

23   2000 and 2001?

24   A.   At the White House, I would say at least once a week.

25   Depending on how busy we were, what was going on, it could be

Page 1476

1    three times a day.  If it was a 10-minute meeting, it was easier

2    to do by virtual video teleconference.  Every one of those

3    entities had a secured video teleconference room, and we could

4    conduct meetings in that forum as well.

5    Q.    Without getting into any of the details of sort of what the

6    issues were, tell us briefly how Dick Clarke ran these meetings.

7    A.    Dick was the chair, and he would put out an agenda of items

8    that we wanted to talk about, which it took us a while to get to

9    that point, but we streamlined the process.  That way everyone had

10   the opportunity to go back into their offices and retrieve the

11   information, if it was on a particular threat, let's say, you

12   would want to go back, pull the cable, read the cable, get some

13   analysis so you could go up to the White House and talk from an

14   informed position.

15           He was strident at times, he could be combative, but he

16   was focusd on the issue of counterterrorism.  It was important to

17   him.  It was important to all of us who sat at that table.

18   Resources were an issue, technology was an issue, funding was an

19   issue.  With that said --

20           MR. MAC MAHON:  Your Honor, we're getting into speeches

21   again.

22           THE COURT:  I'm going to sustain the objection.

23   BY MR. RASKIN:

24   Q.    Mr. Rolince, some questions about how the FBI reacted to

25   terrorist threats prior to September 2001.  And let's go back to

Page 1477

1   the 1990s, and give us a sense from, say, 1998 up until September

2   11, 2001, with what frequency did the FBI deal with threats,

3   terrorism threats of any kind?

4   A.   On a daily basis, there could be anywhere from 5 to 15 is

5   probably an average number of threats that would come in from any

6   different venue.  They could be by virtue of people walking into

7   the office to talk to you, writing it in, sending it in an e-mail,

8   phoning in.  It could be sent from intelligence or law enforcement

9   counterparts overseas.  So there were a number of different venues

10  from which this information came, but they came routinely and

11  regularly.

12  Q.   Now, is it fair to say some of these threats were considered

13  more serious than others?

14  A.   Yes, it is.

15  Q.   And is it also fair to say that the FBI couldn't devote all

16  of its resources to every one of these threats?

17  A.   That's correct.

18  Q.   Tell us by what criteria the FBI gauged its response to the

19  various threats.

20  A.   What you would be looking for is some specificity --  first

21  and foremost, you'd be looking for the credibility of the source

22  from which the information comes.  Is it a person who has an

23  established track record as opposed to the other end of the

24  spectrum, a person who's been a chronic liar in situations like

25  that?

Page 1478

1          You would look for timeliness of the information, is it

2   actionable?  Are they telling you about something that's going to

3   happen on a specific date, at a specific time?  You're looking for

4   location, what is the target, and you're looking for who are the

5   people that are going to carry out this threat if, in fact, it is

6   going to be carried out.

7          So the more specific the information, the more

8   actionable the intelligence, the more you can do with it.

9   Q.   Well, tell us what the word "actionable" means in this

10  context.

11  A.   There are three people whom I overheard in the front yard of

12  a building at 123 Porter Street last night talking about

13  kidnapping an individual at the 7-Eleven at the corner of Main and

14  First.  There are obviously a number of different things you can

15  do to ferret out that information, identify the people, validate

16  the information, and work the case.

17  Q.   And what are the range of options that the FBI has in terms

18  of dealing with threats from sort of the least actionable to the

19  most actionable?

20  A.   The range of investigative techniques?

21  Q.   Yeah.  Well, not necessarily techniques, but in terms of

22  responding as a, as an agency, manpower and resources, what are

23  the range of options that the FBI has?

24  A.   Okay.  The range before September 11 was, on average, the

25  grade 14 supervisor who received the information pretty much had

Page 1479

1    the authority to determine are we going to work this or aren't we

2    going to work this?

3            If it was a call, an anonymous phone call about the

4    potential hijacking of an El Al airliner next week, hung up the

5    phone, and you never heard back and you weren't able to trace

6    that, then about all you could really do is give that information

7    to the Israeli security officials.  On the other hand, if it were,

8    as I said before, more specific and credible --

9            MR. MAC MAHON:  Your Honor, if he's going to ask him

10   what "actionable" is, and we get a five-minute answer here, I

11   can't even object when he keeps coming up with hypotheticals and

12   suggestions.  It's not evidence, Your Honor.

13           MR. RASKIN:  This is a different question, Your Honor.

14           THE COURT:  I understand, but a witness's answers have

15   to be relatively succinct, and so I think either you need as the

16   questioner to -- you can't lead, but guide your witness a bit, but

17   the question has to be specific, and I want the answer specific to

18   the question.

19           THE WITNESS:  Yes, Your Honor.

20           MR. RASKIN:  Understood, Your Honor.

21   Q.   Mr. Rolince, going back to December of 1999 --

22           THE COURT:  Hold on a second.  You were asking for a

23   definition of "actionable."  Can you just give us a succinct

24   explanation of what the word "actionable" meant in the

25   pre-September 11 time frame?

1           THE WITNESS:  Certainly, Your Honor.  Actionable

2    intelligence is information that comes to you and you thereby

3    decide I can do something about this with this.  I can take

4    follow-on investigative steps.

5    BY MR. RASKIN:

6    Q.   Now, going back to December of 1999, was the FBI dealing with

7    a threat to national security in connection with the upcoming

8    millennium?

9    A.   We were.

10   Q.   And are you familiar with an individual named Ahmed Ressam?

11   A.   I am.

12   Q.   R-e-s-s-e-m.

13           Tell us who he is and what happened to him in December

14   of 2000 -- December of 1999.

15   A.   I'll try to be as succinct as I can.  Ahmed Ressam was an

16   Algerian who came across the border from Canada into Washington,

17   D.C., was stopped at the border by Deanna Dean, a customs

18   official.  His car was searched.  Explosive components were found

19   in it.

20   Q.   And was there -- what was found on his person?  Well,

21   withdrawn.

22           Was a telephone number found on his person?

23   A.   It was on a slip of paper with the name Ghani.

24   Q.   Ghanna, G-h-a-n-n-a?

25   A.   G-h-a-n-i, I believe.

Page 1481

1   Q.   And tell us what the FBI did in reaction to both the arrest

2   of Mr. Ressam and finding the piece of paper with the phone

3   number.

4   A.    Okay.  I think just a little bit of context, as a result of

5   the concern about the approaching millennium and attacks on the

6   U.S. and attacks on the cyber infrastructure, there were 22

7   agencies represented in our headquarters in SIOC ready to work

8   that event.

9          When Mr. Ressam came across the border and was arrested,

10  it caused enough concern within the entire intel and law

11  enforcement community that we stood up the operations section --

12  I'm sorry, the Operations Center, put every field office on

13  notice, canceled annual leave for Christmas and New Year's, and

14  brought back in dozens of individuals who had worked prior

15  attacks, because we knew that this was serious and something was

16  going to be attacked had he not been stopped.

17  Q.   All right.  When the FBI learned about the information on

18  Mr. Ressam's present possession -- in his possession, what did the

19  FBI do in the context you just described?

20  A.   The information was tracked back to a telephone number in the

21  New York City area.  The New York field office then stood up their

22  Operations Center, went on 24-a-day, seven-day-a-week surveillance

23  targeting that particular individual and ultimately several of his

24  associates.

25  Q.   Now, was the New York field office the only field office who

Page 1482

1    was working on the investigation that resulted from Mr. Ressam's

2    arrest?

3    A.    No.  All 56 field offices were on the daily conference calls

4    and were working whatever piece of the investigation they might

5    have as it unfolded.

6    Q.    Did the FBI ultimately make arrests apart from Mr. Ressam?

7    A.    Yes, we did.  Several arrests in a few different cities.

8    Q.    Okay.  Tell us in general terms what steps the FBI took in

9    terms of manpower and in terms of investigative techniques from

10   the time the investigation started to the time that arrests were

11   made.

12   A.    The investigative techniques would have included but not be

13   limited to physical surveillance, electronic surveillance.  I

14   believe that was the time frame in which we went up on `

15   approximately I want to say 30 wires in 20 days.  Again, leave was

16   canceled.  It was a 24/7 operation.  And from those wiretaps, we

17   branched out to identify other individuals in and around the

18   Seattle area, in Canada, Sacramento, New York City, Boston, and

19   ultimately the decision was made to arrest individuals, to conduct

20   searches of houses, because we were concerned that additional

21   explosives could be contained therein.

22   Q.    And was this still in the period of December of 1999, before

23   the actual millennium?

24   A.    Yes.

25   Q.    Are you familiar with the acronym BOLO, B-O-L-O?

1   A.   Yes.  It stands for be on the lookout.

2   Q.   And tell us what that is.

3   A.   It's a basic electronic teletype system whereby information

4   relative to a person or a vehicle of interest can be written out

5   and sent to each and every local, state, and federal law

6   enforcement and intelligence component in the United States.

7   Q.   And was that mechanism used during the millennium

8   investigation?

9   A.   Yes, it was.

10  Q.   Tell us how it was used.

11  A.   There was a suspicious vehicle which came to be known as the

12  blue van bought under suspicious circumstances in and around the

13  Dallas, Texas area.  A BOLO went out to locate that vehicle, and

14  it was next seen in a gas station in Washington, D.C. `

15        The assistant director made the decision to send every

16  single one of the 600 agents out on the street to look for this

17  van.  It was not found.

18        Move forward to the surveillance of Abdelghani Meskini

19  in New York City.  The surveillance team put him in a restaurant.

20  And John O'Neill, the special agent in charge at the time, God

21  rest his soul, called the director and said, that blue van just

22  pulled up in front of the restaurant where Meskini was having

23  dinner.  That's how the BOLO was used.

24  Q.   Now, did the FBI ultimately learn what the target of

25  Mr. Ressam's plot was?

Page 1484

1  A.   We did.  The Los Angeles International Airport.

2  Q.   And when the FBI learned that, did the FBI pass that

3  information to the Federal Aviation Administration?

4  A.   Yes, we did.

5  Q.   Now, we talked a little bit about threat reporting before.

6  Describe the nature of the terrorist threat reporting that the FBI

7  was receiving in the summer of 2001.

8  A.   In the late spring and early summer of 2001, just by virtue

9  of sheer numbers alone, Dick Clarke made the decision that we're

10  spending an inordinate amount of time having to get through each

11  and every one of these, so he decided to hold on Monday,

12  Wednesday, and Friday, in the afternoon, a video teleconference

13  SVTS, the secure system we talked about, just because the volume

14  was as significant as it was.

15  Q.   What does SVTS stand for?

16  A.   Secure --

17  Q.   Video teleconference?

18  A.   -- video teleconference system.

19  Q.   Now, was part of that threat reporting threats to attack

20  United States interests from Usama Bin Laden and al Qaeda?

21  A.   Yes, it was.

22  Q.   And just tell us generally what you remember about those

23  threats.

24  A.   Taken in sum total, the threats covered about every area that

25  one could possibly conceive, from the traditional truck bomb, to

Page 1485

```
 1   the use of chemical, radiological, biological, nuclear, to

 2   kidnappings, to assassinations, and on some occasions they

 3   surrounded the civil aviation industry.  I think that was on three

 4   occasions out of the thousand something.

 5          Generally speaking, the vast majority of the threats

 6   were targeted against U.S. persons or U.S. interests overseas.

 7   Q.   And going back to that period of time, what was the

 8   intelligence value of the information that constituted this threat

 9   reporting in the summer of 2001?

10          MR. MAC MAHON:  Objection, Your Honor.  That's an

11   awfully broad statement.  He said, I think, a thousand threats,

12   and it's awfully broad.

13          THE COURT:  Well, it's broad, but I think we need some

14   background.  And I'll certainly give you plenty of leeway to probe

15   it on cross, so I'll overrule that objection.

16          MR. RASKIN:  In fact, Your Honor, the parties have

17   entered into a stipulation regarding sort of the general nature of

18   the threat, and I would offer that stipulation now.

19          THE COURT:  All right, why don't you --

20          MR. RASKIN:  It's ST-3.

21          MR. MAC MAHON:  No objection, Your Honor.

22          THE COURT:  All right.  Do you want to publish it to the

23   jury?

24          MR. RASKIN:  And I think that's the best thing to do,

25   yes.
```

Page 1486

1           THE COURT:  That's in.

2           (Government Exhibit No. ST-3 was received in evidence.)

3           MR. RASKIN:  With the Court's permission, I'll read from

4    Government Exhibit ST-3.

5           "No. 1:  On February 6, 2001, a Senior Executive

6    Intelligence Brief, also known as an SEIB, indicated a heightened

7    threat of Sunni extremist terrorist attacks, particularly in the

8    Middle East and Europe, against United States facilities,

9    personnel, and other interests, and stated that this new reporting

10   on the planned Sunni attacks represented the most significant

11   spike in threat reporting concerning this group since the time of

12   the millennium.

13          "In March and April 2001, the Central Intelligence

14   Agency disseminated a series of reports warning that Abu Zubaydah

15   was planning an operation in the near future.  One report cited a

16   source indicating that Abu Zubaydah was planning an attack in a

17   country that CIA analysts thought might be Israel, or perhaps

18   Saudi Arabia or India.  Abu Zubaydah was an al Qaeda member and a

19   major figure in the millennium plots.

20          "On April 13, 2001, the Federal Bureau of Investigation

21   sent an all-office message summarizing the intelligence reporting

22   to date on the Sunni extremist threat.  The message did not

23   mention a domestic threat.

24          "On April 20, 2001, a SEIB indicated that Usama Bin

25   Laden was planning multiple operations.

1          "On May 3, 2001, a SEIB indicated that Usama Bin

2    Laden's 'public profile may pressage attack.'

3          "On May 23, 2001, a SEIB reported a possible hostage

4    plot against Americans abroad to force the release of prisoners,

5    including Sheikh Omar Abdel Rahman, otherwise known as the Blind

6    Sheikh, who was serving a life sentence for his role in the 1993

7    plot to blow up landmarks in New York City.  The reporting noted

8    that operatives might opt to hijack an aircraft or storm a United

9    States embassy abroad.

10          "On May 26, 2001, a SEIB indicated that Usama Bin

11    Laden's network's plans were advancing.

12          "Threat reports surged in June and July of 2001,

13    reaching an even higher peak of urgency.  The summer threats

14    seemed to be focused on Saudi Arabia, Israel, Bahrain, Kuwait,

15    Yemen, and possibly Rome, but the danger could be anywhere --

16    including a possible attack on the G-8 Summit in Genoa.

17          "On June 12, 2001, a CIA report passing along

18    biographical information on several terrorists mentioned, in

19    commenting on Khalid Sheikh Mohammed, that he was recruiting

20    people to travel to the United States to meet with colleagues

21    already there so that they might conduct terrorist attacks on

22    Usama Bin Laden's behalf.

23          "On June 21, 2001, United States Central Command raised

24    the force protection condition level for the United States troops

25    in six countries to the highest possible level, Delta.  The United

Page 1488

1    States Fifth Fleet moved out of its port in Bahrain, and a United

2    States Marine Corps exercise in Jordan was halted.  United States

3    embassies in the Persian Gulf conducted an emergency security

4    review, and the embassy in Yemen was closed.

5         "On June 22, 2001, the CIA notified all its station

6    chiefs around the world about intelligence, suggesting a possible

7    al Qaeda suicide attack on a United States target over the next

8    few days.  The same day, the State Department notified all

9    embassies of the terrorist threat and updated its worldwide public

10   warning.

11        "In late June 2001, a CIA terrorist threat advisory

12   indicated a high probability of near-term 'spectacular' terrorist

13   attacks resulting in numerous casualties.  On June 23, 2001, the

14   title of a SEIB warned, 'Bin Laden Attacks May Be Imminent.'  On

15   June 25, 2001, an SEIB titled 'Bin Laden and Associates Making

16   Near-Term Threats' reported that multiple attacks were being

17   planned by Bin Laden and his associates over the coming days,

18   including a 'severe blow' against United States and

19   Israeli 'interests,' during the next two weeks.  Also on June 25,

20   2001, an Arabic television station reported Bin Laden's pleasure

21   with al Qaeda leaders who were saying that the next few

22   weeks 'will witness important surprises,' and that United States

23   and Israeli interests will be targeted.  At the end of June 2001,

24   an al Qaeda intelligence report warned that something 'very, very,

25   very, very' big was about to happen, and most of Bin Laden's

Page 1489

1    network was reportedly anticipating the attack.

2            "On June 30, 2001, a SEIB titled 'Bin Laden Planning

3    High-Profile Attacks' reported that Bin Laden operatives expected

4    near-term attacks to have dramatic consequences of catastrophic

5    proportions.  The SEIB contained an article titled 'Bin Laden

6    Threats Are Real.'

7            "The intelligence reporting at the end of June

8    consistently described the upcoming attacks as occurring on a

9    calamitous level, indicating that they would cause the world to be

10   in turmoil and that they would consist possibly of multiple -- but

11   not necessarily simultaneous -- attacks.

12           "On July 2, 2001, a SEIB indicated that the planning for

13   Usama Bin Laden's attacks continued, despite delays.

14           "Also on June 2, 2001, the FBI issued a National Law

15   Enforcement Telecommunications, also known as NLETS, message

16   concerning potential anti-United States terrorist attacks.  The

17   message summarized the information regarding the threats from Bin

18   Laden and warned that there was an increased volume of threat

19   reporting.  The message indicated a potential for attacks against

20   the United States targets abroad from groups 'aligned or

21   sympathetic to Usama Bin Laden.'  The message further stated, 'The

22   FBI has no information indicating a credible threat of terrorist

23   attack in the United States.'  The message asked recipients

24   to 'exercise extreme vigilance' and 'report suspicious activities'

25   to the FBI.

U.S. v. Moussaoui

1          "On July 5, 2001, the CIA briefed the Attorney General

2    on the al Qaeda threat, warning that a significant attack was

3    imminent.  In addition, the Attorney General was told by the CIA

4    that preparations for multiple attacks were in late stages or

5    already complete and that little warning could be expected.  The

6    briefing addressed only threats outside United States.

7          "Also on July 5, 2001, the CIA briefed representatives

8    of the Immigration and Naturalization Service, the Federal

9    Aviation Administration, the Coast Guard, the Secret Service, and

10   Customs, on the current threat at a video teleconference convened

11   by the Counterterrorism Security Group.

12         "On July 13, 2001, a SEIB indicated that Usama Bin

13   Laden's plans had been delayed maybe for as long as two months,

14   but not abandoned.

15         "On July 19, 2001, one of the items mentioned by the

16   Acting FBI Director in a conference call with his special agents

17   in charge, was the need, in light of increased threat reporting,

18   to have evidence response teams ready to move at a moment's

19   notice, in case of an attack.  The Acting Director did not task

20   FBI field offices to try to determine whether any plots were being

21   considered within the United States or to take any action to

22   disrupt any such plots.

23         "On July 25, 2001, a SEIB stated that one Bin Laden

24   operation was delayed but that others were ongoing.

25         "On August 1, 2001, the FBI issued an advisory that in

Page 1491

1   light of the increased volume of threat reporting and the upcoming

2   anniversary of the bombings of the United States embassies in East

3   Africa, (which occurred on August 7, 1998), increased attention

4   should be paid to security planning.  The advisory noted that

5   while most of the reporting indicated that the potential for

6   attacks were on United States interests abroad, the possibility of

7   an attack in the United States could not be discounted.

8            "On August 3, 2001, the CIA issued an advisory

9   concluding that the threat of impending al Qaeda attacks would

10  likely continue indefinitely.  Citing threats in the Arabian

11  Peninsula, Jordan, Israel, and Europe, the advisory suggested that

12  al Qaeda was lying in wait and searching for gaps in security

13  before moving forward with the planned attacks.

14           "An article in the August 6, 2001 Presidential Daily

15  Brief, also known as a PDB, titled 'Bin Laden Determined to Strike

16  in U.S.,' and the 36th PDB item in 2001 relating to Bin Laden or

17  al Qaeda and the first devoted to the possibility of an attack in

18  the United States.

19           "On August 7, 2001, a SEIB indicated that Usama Bin

20  Laden was determined to strike in the United States.

21           "On August 23, 2001, Director of Central Intelligence

22  George Tenet received a briefing on Zacarias Moussaoui

23  titled 'Islamic Extremist Learns to Fly.'

24           And finally, "On August 24, 2001, a foreign intelligence

25  service reported that Abu Zubaydah was considering mounting

Page 1492

1   terrorist attacks in the United States to attack targets in the

2   United States."

3   Q.   Mr. Rolince, do you recall receiving threat reporting as

4   your -- in your position at ITOS in accord with what I just read?

5   A.   Yes, I do.

6   Q.   And tell us what was going on at the FBI and the CSG to deal

7   with the threat -- the reporting of threats that we just heard in

8   court.

9   A.   Again, the meetings were taking place now three times a week

10  instead of just at once a week, and those meetings surrounded just

11  the threat reporting.  The field offices were put on notice, even

12  though the vast majority of prior attacks and the vast majority of

13  threats dealt with overseas, we learned from the original World

14  Trade Center and Oklahoma City that we certainly were vulnerable

15  in the United States, which is one reason that at that time there

16  were approximately 3,000 international terrorism cases being

17  worked, so that we could get a handle on what the threat was and

18  was not.

19  Q.   Now, after September 11, you became familiar, as we all did,

20  with two individuals named Khalid al-Midhar and Nawaf al-Hazmi; is

21  that correct?

22  A.   Correct.

23  Q.   And after September 11, you learned that the FBI had received

24  information about these two individuals and their presence in the

25  United States?

1   A.   Yes.

2   Q.   Prior to September 11, 2001, what did you know personally

3   about those two individuals?

4   A.   I had no information prior to September 11 on either one.

5   Q.   Now, have you -- you, of course, have become familiar with

6   the defendant in this case, Mr. Moussaoui, have you not?

7   A.   I have.

8   Q.   Prior to -- well, withdrawn.

9        Did you become aware prior to September 11 that

10  Mr. Moussaoui was arrested in Minnesota in August of 2001?

11  A.   Yes.

12  Q.   How did you become aware of that?

13  A.   My unit chief, David Frasca, approached me on two different

14  occasions in what I've referred to as hallway conversations that

15  an individual had, in fact, been reported by a flight school.  The

16  FBI dispatched an agent and an Immigration and Naturalization

17  Service detailee from the office.  They went out and interviewed

18  Mr. Moussaoui, thought that the answers didn't add up, and

19  although the FBI did not possess sufficient information to levy a

20  charge, he was arrested on immigration charges.

21  Q.   All right.  Now, tell us what position David Frasca worked in

22  at the time.

23  A.   At the time, he was the unit chief in the Islamic Radical

24  Fundamentalist Unit.

25  Q.   Okay.  And tell us where you were when you had the first

Page 1494

1    conversation with Dave Frasca.

2    A.    Walking between my office and a SVTS, or another meeting in

3    the general direction of SIAC is what I remember.

4    Q.    How long was your conversation with Frasca, the first

5    conversation?

6    A.    20 seconds.

7    Q.    Tell us exactly what he said and exactly what you said to the

8    extent you can remember.

9    A.    That the Minneapolis field office, in conjunction with INS,

10   had interviewed an individual based on a call from a flight

11   school.  The answers he gave to questions did not add up.  He was

12   found to be in violation of his -- I think his visa was out of

13   order, if I recall correctly, and he was arrested on immigration

14   charges.

15   Q.    Now, did he say why he was bringing this information to your

16   attention?

17   A.    There was an ongoing debate and issue, they were trying -- at

18   that point in time, things weren't adding up, but at least the

19   immediate threat if there was one was neutralized in their eyes,

20   and Mr. Moussaoui had given authority to search some things but

21   not everything.  And the Minneapolis field office wanted to apply

22   for a FISA in order to be able to search what I believe was a

23   computer and a notebook.

24   Q.    And did he tell you whether the Minneapolis office was given

25   that authority?

Page 1495

1    A.    At that -- I think at the first conversation, a determination

2    had not been made, and some logical leads were going to be

3    covered, but ultimately it became an issue, and he was giving me

4    what's referred to as a heads-up.  We can't resolve it at the unit

5    level.  We have the appropriate Office of General Counsel

6    attorneys engaged in the conversation, and you'll be getting a

7    phone call from Minneapolis, which is not an unusual occurrence.

8    Q.   You said it's not an unusual occurrence.  What do you mean by

9    that?

10   A.    On any given day, there are probably dozens of FISAs,

11   applications, potential cases wherein the dialogue between the

12   field and headquarters, headquarters and the Department of

13   Justice, or all three of them in a conference call or a physical

14   visit are debating the merits of whether you are or aren't at the

15   threshold of having probable cause for a FISA.

16   Q.   All right.  You said that you also had another conversation

17   with Mr. Frasca, this again is before September 11, regarding the

18   defendant in this case.  Tell us what that conversation was.

19   A.    The last and final, it may have been broken into two halves.

20   Minneapolis requested authority to travel with the defendant when

21   he was being deported in hopes of soliciting either his authority

22   to do a search or just additional relevant information.  And there

23   was a concern over the merits of that travel, i.e., what were the

24   odds that it was going to be successful.  Ultimately, the decision

25   was taken that they could, in fact, travel.

Page 1496

1  Q.   All right.  And when you say "they," are you talking about

2  the agent in Minneapolis?

3  A.   Minneapolis agents, yes.

4  Q.   And who made that decision that gave them permission to do

5  that?

6  A.   I did.

7  Q.   Other than the two conversations that you just told us about

8  with Mr. Frasca, did you have any other conversations before

9  September 11 regarding Mr. Moussaoui with other employees of the

10  FBI at the ITOS section?

11  A.   The FBI detailee to the CIA at the time, in conjunction with

12  the unit and Minneapolis and a foreign counterpart service,

13  decided that it would be worthwhile to utilize that service

14  overseas in an attempt to secure the information contained in the

15  computer and the notebook upon the defendant's arrival in that

16  country.

17  Q.   Now, you had conversations about Mr. Moussaoui after

18  September 11, did you not?

19  A.   Yes.

20  Q.   And you participated in a meeting with some folks from

21  headquarters and the folks from out in Minneapolis on the search

22  warrant issue after September 11, did you not?

23  A.   I did.

24  Q.   And do you remember when that was?

25  A.   Either the last week of October or the first week of November

Page 1497

1   of 2001.

2   Q.   All right.  Is it fair to say that that meeting or the

3   subject of that meeting was whether or not a search warrant should

4   have been issued?

5   A.   Yes.

6        MR. MAC MAHON:  Your Honor, objection to what happened

7   after September 11 with relevance to Mr. Moussaoui's case.

8        THE COURT:  I'm going to sustain the objection.

9        MR. RASKIN:  That's fine.  I'll move on, Your Honor.

10  Q.   Mr. Rolince, are you familiar with a document called the --

11  called a Statement of Facts that the defendant adopted at his

12  guilty plea in this case?

13  A.   Yes, I am.

14       MR. RASKIN:  And if we could bring up -- well, hold on

15  one second.

16       MR. MAC MAHON:  Your Honor, I object if we're using the

17  Statement of Facts to a witness who wasn't even involved in the

18  investigation other than for 20 seconds.  It's just another

19  opportunity to put it up again.

20       THE COURT:  I'm going to sustain that objection.

21  BY MR. RASKIN:

22  Q.   Let me ask this:  Have you reviewed the Statement of Facts?

23  A.   I have.

24  Q.   Have you been asked to assess the Statement of Facts in terms

25  of its intelligence value?

Page 1498

1    A.   Yes.

2            MR. MAC MAHON:  Same objection, Your Honor.  It doesn't

3    matter what he assessed afterwards.

4            THE COURT:  I think this is the wrong witness to be

5    asking that questions of, since as I understand the previous

6    testimony, this witness had nothing to do with any of the decision

7    making that was subject to the earlier portions of the FBI

8    testimony.

9            MR. RASKIN:  Can we approach, Your Honor?

10           THE COURT:  Yes.

11           MR. RASKIN:  Thank you.

12           (Bench conference on the record.)

13           [--- Redacted

14

15

16

17

18

19

20

21

22

23

24

25

Page 1499

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1500

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    ---]

19              (End of bench conference.)

20              THE COURT:  I'm told we need to take a short break.

21    We'll be in a ten-minute recess.

22              (Recess from 2:20 p.m., until 2:28 p.m.)

23                    (Defendant and Jury in.)

24              MR. RASKIN:  May I, Your Honor?

25              THE COURT:  Yes, sir.

Page 1501

1   BY MR. RASKIN:

2   Q.   Mr. Rolince, you are familiar that the defendant,

3   Mr. Moussaoui, pleaded guilty in this case?

4   A.   I am.

5   Q.   Are you also familiar with the fact that in connection with

6   his guilty plea, he admitted that he was a member of al Qaeda?

7   A.   I am.

8   Q.   Going back to the threat environment in the summer of 2001,

9   what effect would it have had on the FBI and what could the FBI

10  have done from an investigative perspective if the FBI --

11           MR. MAC MAHON:  Objection to the form of the question,

12  Your Honor.

13           THE COURT:  All right.  Now, I have ruled that there is

14  a significant distinction between saying somebody would have done

15  something and could have.  I've limited the government in how it's

16  to approach this issue, so the question was not properly phrased.

17  I'll sustain the objection.

18  BY MR. RASKIN:

19  Q.   In the summer of 2001, or more specifically in August of

20  2001, what could the FBI have done with the information that

21  Mr. Moussaoui was an al Qaeda member arrested in a flight

22  simulator in Minnesota?

23  A.   It's just as background, unlike any information that I'm

24  aware receiving in that time frame --

25           MR. MAC MAHON:  Your Honor, objection.  It's not a

Page 1502

1      question that calls for background.

2              THE COURT:  Yeah.  Agent Rolince, you have to be able to

3      answer the specific question, but I think also -- are we having a

4      problem with the sound system?

5              THE REPORTER:  Yes.

6              THE COURT:  Let's try it now.

7              THE WITNESS:  Test.  Fine, Your Honor.

8              THE COURT:  Yeah?  Thank you.

9              MR. RASKIN:  I think there was a question pending, but

10     I'm going to withdraw it, and I'm going to ask actually a few

11     questions.

12     Q.   You're aware that the defendant admitted he was a member of

13     al Qaeda when he pled guilty in this case?

14     A.   I am.

15     Q.   You're also aware that he was a participant in a plot to fly

16     airplanes into prominent United States buildings in the United

17     States, are you not?

18     A.   I am.

19     Q.   And are you aware that he was arrested in a flight simulator?

20     A.   I am.

21     Q.   Are you aware that in connection with his guilty plea, he

22     said that the plot involved other individuals who were also taking

23     flight training similar to the defendant?

24     A.   Yes.

25     Q.   Taking that information as a whole, what could the FBI have

Page 1503

1   done in terms of investigatory steps if it had received that

2   information in August of 2001?

3   A.   I believe the first step would be, well, asking the field to

4   vet that information by virtue of follow-on interrogation,

5   interview, perhaps polygraph examination simultaneously in

6   Washington.  There would be a -- there could be a request for the

7   convening by Dick Clarke of the National Security Council CSG so

8   that that information in its totality could be spread to all those

9   partner agencies, in addition to FAA would certainly have been

10  brought in for that meeting.

11  Q.   What manpower options could have -- or what manpower options

12  could have been available to the FBI in response to that threat?

13  A.   Significant agent analysts, translator support, up to and

14  including the same numbers that were used for the millennium, the

15  USS Cole, the African Embassy bombings, virtually the limit would

16  have been 11,300 agents.

17  Q.   What -- apart from the facts that the defendant admitted in

18  his guilty plea, what steps could the FBI have taken to get more

19  information regarding this threat?

20  A.   A visit not only to that particular flight school but a

21  review of all information within the defendant's possession would

22  follow, those leads similar to a guy with a phone number on a

23  piece of paper would all be sent out to whatever field office

24  covered that particular area.  In addition, whatever funds were

25  utilized to purchase tickets, travel, hotels, motels, the bank

1    records would be asked for, subpoenaed.

2          MR. MAC MAHON:  Your Honor, I object to this.  He keeps

3    using the word "would" as if it was something they actually would

4    have done as opposed to could, which is in accordance with the

5    rules.

6          MR. RASKIN:  Object to Mr. MacMahon's speech.

7          THE COURT:  Look, this is a very difficult line.  I'll

8    make sure the jury has clear instructions on this.  But again,

9    Ladies and Gentlemen, as I told you even when we were doing the

10   voir dire process, juries cannot decide cases based on

11   speculation.  They have to have facts to support their conclusion.

12   And we're not going to get into speculating about what would have

13   happened.

14         But people who were on the ground working in the field

15   as professionals can talk about the types of investigative

16   techniques they had available and what they could have done with

17   certain information.  They can't say, because nobody knows, what

18   would have happened, all right?  Let's move on.

19   BY MR. RASKIN:

20   Q.   The threat that Mr. Moussaoui described or the facts that

21   Mr. Moussaoui described in pleading guilty, please compare that to

22   the threat reporting that the United States government was

23   receiving in the summer of 2001.

24         MR. MAC MAHON:  Your Honor, I don't know how he would be

25   able to compare a threat report.  We just read a stipulation.  The

Page 1505

1    jury's gotten the Statement of Facts.  It's just a chance to

2    regurgitate it.

3              THE COURT:  I'm going to sustain the question.  You may

4    rephrase the question.  I think there's a better way of getting

5    around that.

6    BY MR. RASKIN:

7    Q.   You talked to us before about specificity and actionability

8    of threat information that the FBI receives, correct?

9    A.   Yes.

10   Q.   And remind us why that is important.

11   A.   It's important because it gives you a first step to be

12   followed by logical investigative steps that could be taken.

13   Q.   With respect to facts admitted to by Mr. Moussaoui when he

14   pled guilty, tell us what -- assess that information in terms of

15   its specificity and in terms of its actionability.

16   A.   It's specific in terms of subject, it's specific in terms of

17   target, it's specific in terms of methodology, and it's specific

18   in terms of other conspirators actually being in the United

19   States, so there are a number of areas that you could go down and

20   conduct very logical follow-on investigation to vet that and

21   hopefully thwart that.

22   Q.   Using that same criteria, Mr. Rolince, can you assess the

23   intelligence value of the threat reporting that the United States

24   government was receiving in the summer of 2001?

25   A.   That reporting, as articulated on the document we reviewed,

Page 1506

1   had some specificity in terms of possibly Israel, possibly Saudi

2   Arabia, possibly the next month, but I don't recall it being much

3   more than that.

4            MR. RASKIN:  If we could bring up Government Exhibit

5   OK-1011, please?  It's in evidence, Your Honor.

6            THE COURT:  Yes, sir.

7            MR. MAC MAHON:  Your Honor, before he shows this to this

8   witness, he can't start showing this witness exhibits that were

9   uncovered in the investigation.  We've got an agent who's going to

10  testify to that.

11           THE COURT:  Well, we're not going to hear it twice, that

12  is true, so you can choose which witness you want to use for that.

13           MR. RASKIN:  Thank you, Your Honor.

14           THE COURT:  All right.  I'll sustain the objection.

15           MR. RASKIN:  Nothing further at this time, Your Honor.

16           THE COURT:  All right.  Mr. MacMahon, are you ready?

17           MR. MAC MAHON:  Yes, Your Honor.

18                     CROSS-EXAMINATION

19  BY MR. MAC MAHON:

20  Q.   Mr. Rolince, you were in charge of the International

21  Terrorism Operating Section; is that right?

22  A.   Operations Section, yes.

23  Q.   And nobody in the summer of 2001 told you a thing about Nawaf

24  al-Hazmi or Khalid al-Midhar, right?

25  A.   That's correct.

1    Q.    Two known al Qaeda terrorists who were in our country, and

2    you as the head of it didn't hear a thing about it, right?

3              MR. RASKIN:  Objection to the oral argument.

4              THE COURT:  Well, it is cross-examination, so you can

5    lead, but I don't -- I agree that you should not argue the case.

6    So I'll sustain the objection.

7    BY MR. MAC MAHON:

8    Q.    Mr. Rolince, you -- you learned that the CIA had substantial

9    information on Nawaf al-Hazmi and Khalid al-Midhar and their

10   terrorist connections, right?

11   A.    I learned that there was information available to them.  I

12   would not characterize it as substantial.

13   Q.    How many cables?

14   A.    I don't know how many cables.

15   Q.    You don't have any idea, do you?

16   A.    How many cables from the CIA, from elsewhere, from the FBI?

17   Q.    Well, how many other al Qaeda members, known al Qaeda members

18   in the summer of 2001 did the government know were walking around

19   the United States unmolested?

20             MR. RASKIN:  Same objection.  Argumentative.

21             THE COURT:  I think "unmolested" is a slightly loaded

22   term.

23             MR. MAC MAHON:  Excuse me, Your Honor.

24             THE COURT:  I'll sustain the objection.

25                       (Laughter.)

1          MR. MAC MAHON:  Not being watched by the FBI.

2     BY MR. MAC MAHON:

3     Q.   How many other known al Qaeda members were walking around our

4     country not being watched by the FBI in that time frame?

5          MR. RASKIN:  Objection to the characterization or

6     mischaracterization, Your Honor.

7          THE COURT:  A little less editorializing, Mr. MacMahon.

8     But the question, the substance of the question is a legitimate

9     substance.

10         THE WITNESS:  There clearly were al Qaeda operatives in

11    the United States in the summer of 2001 about whom we were

12    unaware.

13    BY MR. MAC MAHON:

14    Q.   Were there al Qaeda operatives in the United States that you

15    were aware of?

16    A.   There are any number of classified investigations being

17    conducted on persons we believed to have some connection to

18    al Qaeda, yes.

19    Q.   In the summer of 2001, how many ongoing investigations were

20    there of known al Qaeda members in the United States of America?

21    A.   I don't have the exact number.

22    Q.   Were you involved in preparing the August 6 PDB?

23    A.   No, I was not.

24    Q.   Have you ever seen it?

25    A.   No, I don't believe I have.

Page 1509

1         MR. MAC MAHON:  Could we put up Exhibit 901, please?

2    This was mentioned in the stipulation that we just went through,

3    Your Honor.

4         THE COURT:  Is it a defense or a government exhibit?

5         MR. MAC MAHON:  It's a Defense Exhibit 901, but this is

6    the document that was referenced in the stipulation, paragraph No.

7    24.

8         MR. RASKIN:  Before the document is put up, could we

9    establish a foundation as to whether the witness is going to be

10   able to testify about it?

11        MR. MAC MAHON:  I think the document is in, Your Honor.

12        THE COURT:  It's not formally in evidence.  You're

13   saying it's referenced in the stipulation?

14        MR. MAC MAHON:  Yes, and I would move it in.`If it's

15   been stipulated that that was a document, it should come in.

16        MR. RASKIN:  That's not part of the stipulation.

17        MR. MAC MAHON:  Read paragraph 24, Your Honor.  "An

18   article in the August 6, 2001, Presidential Daily Briefing titled

19   'Bin Laden Determined to Strike in the United States.'"  That's

20   the exact document we're talking about right here.

21        MR. RASKIN:  We can talk about, we can talk about the

22   foundation, but this witness doesn't have anything --

23        THE COURT:  Whoa, let's show it to the witness first to

24   see whether he's seen it or not.

25        THE WITNESS:  Thank you.

Page 1510

1          Okay.

2    BY MR. MAC MAHON:

3    Q.    Have you seen that before?

4    A.    I've seen information contained in here before, but at the

5    section chief level, you do not get routine disseminations of

6    presidential daily briefs, no.

7    Q.    Did you get the senior executive intelligence briefs?

8    A.    No.

9    Q.    Did you know in early August of 2001 that the President

10   received a briefing titled "Bin Laden Determined to Strike in the

11   U.S."?

12   A.    No.

13   Q.    Did you know in that time frame that the President was being

14   told that Bin Laden wanted to hijack a U.S. aircraft to obtain the

15   release of the Blind Sheikh?

16   A.    That threat reporting sounds familiar, and I don't discount

17   that it's the kind of thing that would be brought to the

18   President's attention.

19   Q.    Okay.  You received a lot of information before 9/11 of plans

20   by al Qaeda to hijack American airplanes, didn't you?

21   A.    No.

22   Q.    No information at all?

23   A.    I didn't say "no information."

24   Q.    How much did you get?

25   A.    In the 1,000-plus threats that came in at the secret and

1    below level between January 1 and September 11, to the best of my

2    recollection, 3 percent had the words airport, airplane, or

3    airline in them; 97 percent spoke of traditional attacks.  The

4    three that spoke of airplanes, in hindsight, going back and

5    looking at them thoroughly after 9/11, had nothing to do with

6    9/11.

7    Q.   But you were receiving information about threats to hijack

8    aircraft, that's a fact, isn't it, by Muslim fundamentalists

9    affiliated with Usama Bin Laden?

10   A.   I can recall one or two instances relative to the southern

11   tip of Africa and the potential to hijack aircrafts.

12   Q.   Okay.  So you didn't, you didn't give -- prepare information

13   telling the President on August 6 that FBI information indicates

14   patterns of suspicious activity consistent with the preparations

15   for hijackings, right?

16        MR. RASKIN:  Objection.  Asked and answered.

17        THE COURT:  Well, this is a slightly different question.

18   This is about whether or not this witness was involved in

19   preparing information.  I'm going to permit that.  So overruled.

20        THE WITNESS:  I'm aware of a conversation between an

21   analyst who wrote that sentence and an analyst in FBI

22   headquarters.  And for the life of me, I don't know what activity

23   consistent with preparations for hijackings would be, based on

24   that conversation.

25   BY MR. MAC MAHON:

Page 1512

1    Q.    Did the FBI mislead the President of the United States in

2    August of 2001, Mr. Rolince?

3    A.    The FBI doesn't prepare the presidential daily brief.

4    Q.    Well, it says that the information comes from the FBI on the

5    brief, doesn't it?

6    A.    That is inaccurate information, that sentence.

7    Q.    So that was inaccurate.  Whoever did it made a mistake?

8    A.    Absolutely.

9    Q.    Okay.  And it also says in here that the FBI is conducting 70

10   full field investigations that are Usama Bin Laden-related?

11         MR. RASKIN:  Objection, Your Honor, to the "it says

12   here."

13         MR. MAC MAHON:  Well, I'm happy to publish it to the

14   jury, Your Honor.

15         MR. RASKIN:  He's reading to the jury.

16         THE COURT:  Well, we don't have a foundation for it yet

17   to go in.

18         MR. MAC MAHON:  It's mentioned in the stipulation.  I

19   can't get the President to come in and authenticate it, Your

20   Honor, and that's why we have a stipulation as to this.

21         MR. RASKIN:  We don't have a stipulation as to this

22   document.  If Mr. MacMahon would like to discuss that with us,

23   we'd be happy to.

24         THE COURT:  Let's move this examination along.  I'll

25   revisit this issue.

1              MR. MAC MAHON:  Thank you, Your Honor.

2    Q.    So, Mr. Rolince, were there 70 full field investigations that

3    were Bin Laden-related in the United States in August of 2001?

4    A.    I believe that's an accurate number.

5    Q.    Okay.  And in the stipulation that Mr. Raskin -- all of those

6    investigations were receiving all the proper attention that they

7    needed, right?

8    A.    That they should have been receiving the proper attention,

9    absolutely.

10   Q.    Okay.  And the, the stipulation that we looked at, that

11   Mr. Raskin read into evidence, there was an issue about a possible

12   attack on the G-8 Summit in Genoa, right?

13   A.    Yes, sir.

14   Q.    You remember that, don't you?

15   A.    I do.

16   Q.    And one of the threats that was against the Genoa Summit was

17   that Muslim fundamentalists would hijack a plane and fly it into

18   where all the leaders were meeting, correct?

19   A.    That was one of the dozens of threats to the Genoa Summit.

20   Q.    All right.  And in response to that threat, the air space

21   around Genoa, Italy, was closed to all aircraft while the

22   President was there; isn't that correct?

23   A.    I believe that's correct.

24   Q.    So the -- at least by June or July of 2001, you were well

25   aware, the FBI was well aware that Muslim fundamentalists might

Page 1514

1  use planes as weapons, right?

2  A.   I was aware that there were threats to hijack airplanes

3  throughout the world, and they had used planes in a number of

4  different instances or had talked about it, yes.

5  Q.   All right.  And you knew they were -- one of the plans was to

6  fly the plane into the building where the President was meeting

7  with the G-8 leaders in Genoa, right?

8  A.   I don't have it with that specificity.  I remember they

9  talked about attacking the summit.

10 Q.   Okay.  Why was the air space closed then?

11 A.   Out of an abundance of caution.

12 Q.   To prohibit someone from hijacking a plane and crashing it

13 into the building, right?

14 A.   Closing air space doesn't guarantee, as we've seen with the

15 Capitol, that planes won't get through that closure on a very

16 regular basis.

17 Q.   That was the idea, wasn't it, Mr. Rolince?

18 A.   I couldn't tell what their idea was.

19 Q.   And then in June of 2001, you learned that there was

20 reporting that Khalid Sheikh Mohammed was recruiting people to

21 travel to the United States, right?

22 A.   That piece of intelligence was out there.

23 Q.   Yeah.  You knew that, didn't you?  In June of 2001, you knew

24 that, didn't you?

25 A.   We assumed that al Qaeda and in particular, after the

Page 1515

1    original World Trade Center, would make a consistent effort to put

2    people in the United States, sure.  It wasn't June of 2001.  It

3    was probably post the first World Trade Center attack.

4    Q.   And so the FBI after that made every effort to keep out

5    al Qaeda members, right?

6    A.   Within the law, absolutely.

7    Q.   All right.  And President Clinton issued an order saying that

8    they would be not allowed to come to the United States, right?

9    A.   I don't recall that.

10   Q.   Then on June 22, you learned there were possible al Qaeda

11   suicide attacks, and the State Department issued a warning on all

12   embassies, correct?

13   A.   Yes.

14   Q.   You've heard the phrase that Director Tenet's hair was on

15   fire at this time, right?

16   A.   Right.

17   Q.   And that was correct, wasn't it?

18   A.   There was a concern throughout the community, as it had been

19   since October of the prior year when the Cole was attacked, that

20   we had not been attacked, and we certainly anticipated a follow-on

21   attack, yes.

22   Q.   Okay.  And one of the targets that you knew was on the list

23   for al Qaeda was the World Trade Center, right?

24   A.   I don't recall ever seeing the World Trade Center

25   specifically mentioned in any of the threats.

Page 1516

1    Q.    No, as a general threat, you knew one place that al Qaeda

2    wanted to destroy was the World Trade Center in New York; isn't

3    that correct?

4    A.    I can't say that's correct.  I can name 100 logical targets

5    in and around Washington, D.C., and New York.  It was a prior

6    target, yes.

7    Q.    You knew that Ramzi Yousef had said that he just didn't have

8    enough money, and that somebody would come back and finish the

9    job, right?

10   A.    The first part of that quote is accurate.  The second part

11   isn't.

12   Q.    You knew that they were still interested in the World Trade

13   Center as of when Mr. Yousef said that, correct?

14   A.    I think you can draw that conclusion.

15   Q.    Okay.  And when was that?

16   A.    When did he say that?

17   Q.    Yeah.

18   A.    When he was in an airplane being flown back from his arrest

19   in Pakistan to the embassy in New York.

20   Q.    Yeah.  And what year was that?

21   A.    I don't recall.  It was when Bill Gavin was the head of the

22   New York office.  That's five generations ago.  '95-'96 time

23   frame.

24   Q.    Who's Ramzi Yousef's nephew?

25   A.    Ramzi Yousef is Khalid Sheikh Mohammed's nephew.

Page 1517

1    Q.    They're relatives, right?

2    A.    That would make them relatives.

3    Q.    Yes.  And you knew that then, didn't you?

4    A.    Yes.

5    Q.    And then you learned on June 30, 2001, that Bin Laden was

6    planning high-profile attacks, right?  That information made it up

7    to your desk, didn't it?

8    A.    We knew from before our embassies were attacked that Bin

9    Laden was consistently planning attacks.

10   Q.    Now, the millennium attack that you talked about before,

11   you're not telling this jury that anything that happened at

12   headquarters in Washington resulted in the arrest of Ahmed Ressam,

13   are you?

14   A.    No.  Ahmed Ressam was arrested based upon not luck and not

15   happenstance but the exceptional training that Deanna Dean

16   received as a customs officer that she put into effect.  That's

17   what stopped Ahmed Ressam.

18   Q.    You didn't issue any "be on the lookout" or any notice to

19   her.  It was just that she was doing her job.  It had nothing to

20   do with what you did in Washington, did it?

21   A.    That is exactly right.

22   Q.    Now, another thing I want to show you, did you have a, a

23   string of reporting in your office called "Bin Laden/Ibn Khattab

24   threat reporting"?

25   A.    Not that I recall.

Page 1518

1              MR. MAC MAHON:  Show the witness Exhibit 792, please.

2    It's in our file.  There's another one.

3    Q.  Have you seen this before?  And just to be -- sir, this

4    document has been gone through the declassification process, so it

5    may not look exactly like the original.

6    A.  I don't recall seeing it prior to my preparation for today,

7    no.

8              MR. MAC MAHON:  I move the admission of 792, Your Honor.

9    It has his name as one of the copies on it.

10             THE COURT:  Any objection?

11             MR. RASKIN:  Object.  It does have Mr. Rolince's name as

12   a cc, but I don't believe a foundation has been established to ask

13   the witness questions about it.

14             THE COURT:  Let me see a copy of the document.

15             MR. MAC MAHON:  Your Honor, I tried to put this in

16   through somebody else, and they said, "Wait until Mr. Rolince

17   comes on the stand," and now he's here.

18             MR. RASKIN:  We don't have any objection to the document

19   coming in evidence, but I think we will have a question to -- an

20   objection to asking the witness questions about it.

21             THE COURT:  Would you routinely get copies of

22   communications between Dale Watson and Director Freeh?

23             THE WITNESS:  Not necessarily.

24             THE COURT:  The question was routinely.  On a routine

25   basis, would you normally, normally see what Watson was

Page 1519

1    communicating to Director Freeh?

2              THE WITNESS:  Yes.

3              THE COURT:  And if the distribution included Pickard,

4    Bucknam, Turchie, Jennings, Stafford, and Middleton, I assume you

5    know all those names.

6              THE WITNESS:  Yes.

7              THE COURT:  Would you normally be in that kind of a

8    distribution list, if they were all getting the same document?

9              THE WITNESS:  Yes, Your Honor.  It's traditional from

10   the analyst who wrote the document or supervisor, if he's asked

11   for a note to the director, just as a courtesy, they would put

12   everybody in the chain in between the writer and the director.

13             THE COURT:  And was it your normal policy to read these

14   types of documents if you were copied on them?

15             THE WITNESS:  If I could get to the 400 pages roughly

16   that came in every day, and occasionally not.

17             THE COURT:  I think that's enough foundation to

18   certainly be questioned about the document.

19             MR. MAC MAHON:  Thank you, Your Honor.

20             Could we put the first page of Exhibit 792 on the

21   screen, please?

22             THE COURT:  You're moving it into evidence as well?

23             MR. MAC MAHON:  Yes, Your Honor.

24             THE COURT:  I'm letting it in.  That's enough

25   foundation.

Page 1520

1              (Defendant's Exhibit No. 792 was received in evidence.)

2    BY MR. MAC MAHON:

3    Q.   Have you seen this document before, Mr. Rolince, if you're

4    done reading?  If you're not --

5    A.   I am.

6    Q.   Have you seen this before, now after you've had a chance to

7    read it?

8    A.   I don't recall seeing this document before the day before

9    yesterday.

10   Q.   Do you recall seeing any documents when you were head of ITOS

11   that were captioned as this one is, "Bin Laden/Ibn Khattab Threat

12   Reporting"?

13   A.   No, I don't.

14   Q.   Do you -- whose name is on the bottom of this?  Who's that?

15   A.   Dale Watson, he was my assistant director.

16   Q.   Yeah.  Who's this?

17   A.   That's me.

18   Q.   Did you know who Ibn Khattab was in April of 2001?

19   A.   Ibn Khattab was a Chechen rebel.

20   Q.   Okay.  Was it brought up in your preparation for preparing

21   for your testimony today to answer questions about Ibn Khattab,

22   sir?

23   A.   Ibn Khattab is fairly well-known throughout the

24   counterterrorism circles.

25   Q.   He was known as someone who helped, helped Usama Bin Laden

1    with volunteers in training, correct?

2    A.    Yes.

3    Q.    That was well known within the FBI in the summer of 2001,

4    wasn't it?

5    A.    I would say it was known within the Islamic Radical

6    Fundamentalist Unit and by certain other people following Bin

7    Laden, yes.

8    Q.    Okay.  So this kind of reporting doesn't surprise you that

9    Bin Laden and Ibn Khattab would be grouped as essentially

10   interconnected organizations, right?

11   A.    I don't know that I'd go so far as to call them

12   interconnected.  I think the reporting would indicate that there's

13   some connectivity, whether it's funds or training, but I don't

14   know that I would interconnect the Chechen rebels with al Qaeda.

15   Q.    Well, you knew that Chechen rebels were training in al Qaeda

16   training camps in the summer of 2001, didn't you?

17   A.    I think we came to the conclusion that just about everyone

18   was training there.

19   Q.    Including people affiliated with Ibn Khattab, right?

20   A.    Possibly.

21   Q.    And this, this document here indicates that they're

22   training -- Ibn Khattab is -- has -- is preparing some kind of

23   attacks with Usama Bin Laden, correct?

24   A.    Yes.

25   Q.    Now, how, how would someone in the FBI have found this

3-21-06                                U.S. v. Moussaoui                            Volume VII

Page 1522

1    document if they were looking for -- in the summer of 2001 if they

2    were looking for information on a link between Ibn Khattab and

3    Usama Bin Laden?

4    A.   If the document was uploaded into the system, which is the

5    technical term to get it off a piece of paper and into the screen,

6    they would go in and using any number of search capabilities,

7    either one of the names or both, and hopefully the response would

8    be those documents containing those names.

9    Q.   Okay.  And if the document was scrubbed of certain

10   information, it would just get lost in the system, right?

11   A.   Scrubbed?

12   Q.   Let me show you -- look at Exhibit 428, if you would.

13          MR. RASKIN:  Is that in?

14          MR. MAC MAHON:  I'm going to move it in in a second.

15   With Mr. Wood's assistance, please?

16   Q.   Have you seen this document before, sir?

17   A.   I could have seen this document before.  It's four years old.

18   Q.   Who is it approved by?

19   A.   Normally it's approved by the person on the top line, Tom

20   Pickard, the deputy director.

21   Q.   Well, that's your name there, isn't it?

22   A.   I'm in that chain.  I was in that chain.

23          MR. MAC MAHON:  Just a second, Your Honor.  We're

24   having -- we're having a CIPA question here.

25          Your Honor, I'd move the admission of Exhibit 428,

Page 1523

 1   please.

 2             THE COURT:  Is there an objection?  No?  Mr. Raskin?

 3             MR. RASKIN:  Well, yes.  I don't believe an adequate

 4   foundation has been laid to ask the witness questions about it.

 5   He says he doesn't remember seeing it.

 6             MR. MAC MAHON:  Your Honor, it says it was approved by

 7   him right on it.

 8             THE COURT:  Is it possible that a document would

 9   indicate you'd approved something without your having approved it?

10             THE WITNESS:  Absolutely.

11                       (Laughter.)

12             THE COURT:  What's the -- how can that be proper

13   conduct?

14             THE WITNESS:  The way it comes up through the system is

15   to each individual, but if I'm out of the country, then they would

16   try to find either the assistant or the deputy in the front office

17   to sign it, but if it's a communication that needs to go out,

18   ultimately the only person that needs to see it is the person on

19   the top line, Tom Pickard.

20   BY MR. MAC MAHON:

21   Q.    And at that time, Mr. Pickard was the head of the FBI?

22   A.    He was the acting director.

23   Q.    Okay.  And this document, 428, is the follow-up to the "all

24   field offices" from 792, isn't it?

25   A.    I'm sorry, repeat, 792?

Page 1524

1   Q.   Look at 792.

2        THE COURT:  Exhibit 792.

3        THE WITNESS:  Oh, I'm sorry.  Got it.

4   BY MR. MAC MAHON:

5   Q.   Exhibit 792 is a letter to people, including you, from

6   Director Freeh, right?

7   A.   Yes.

8   Q.   Okay.  And that gives you information about Bin Laden and Ibn

9   Khattab?

10  A.   Yes.

11  Q.   Okay.  Let's go to the second page of 792.  Maybe this will

12  help.

13       And this is a direction from the head of the FBI telling

14  the Bin Laden Unit to prepare an EC for all the field offices and

15  legats advising of the heightened threat environment, correct?  Do

16  you see that?

17  A.   Yes.

18  Q.   Okay.  And then if you look at Exhibit 428, that's what that

19  is, isn't it?  That's your office doing what it was told, right?

20  A.   Yes.

21       MR. MAC MAHON:  Move the admission.

22       THE COURT:  I'm allowing it in.  That's an adequate

23  foundation.  428 is in.

24       (Defendant's Exhibit No. 428 was received in evidence.)

25       MR. MAC MAHON:  All right.  If you'd put the first page

Page 1525

1   of Exhibit 428 up, please, Ms. Bishop?

2          We need your copy back, I'm sorry, Mr. Rolince.  We gave

3   you the wrong one.

4          The one that's up on the screen is right.  Can we

5   proceed that way and then clear it up?

6   Q.   Okay.  Tell the jury what Exhibit 428 is.

7   A.   428 is an electronic communication going out to all field

8   offices, to the attention of the special agent in charge of those

9   offices, authored by an analyst in the Usama Bin Laden Unit, sent

10  up through the chain, the synopsis of which is to advise them of

11  continued aggressive and proactive efforts to counter UBL-related

12  threats in the United States.

13  Q.   And if you read through this document, Mr. Pickard --

14  Mr. Pickard, excuse me, Mr. Rolince -- the Ibn Khattab connection

15  in the document that's been sent out to all the field offices is

16  missing, isn't it?

17  A.   Unless it's contained in the eight or so lines that are

18  blacked out on page 3, it's not on the prior pages.

19  Q.   If you can accept my representation --

20          MR. RASKIN:  We stipulate that Ibn Khattab is not

21  mentioned.

22          THE COURT:  All right.

23  BY MR. MAC MAHON:

24  Q.   How would that happen, Mr. Rolince?  Why would the

25  information about Ibn Khattab and his connections to Usama Bin

Page 1526

1    Laden be deleted from this document when it was sent out?

2            MR. RASKIN:  Well, objection to deletion, Your Honor.

3    BY MR. MAC MAHON:

4    Q.   Well, however it -- it's in one and it's not in the other.

5    Whatever the word is that you prefer, how come it's not there?

6    A.   The person who authored the communication took all relevant

7    and existing information and crafted a document that he or she

8    felt told the field what it was that headquarters wanted them to

9    do, so there's probably other information that's available in that

10   assessment, in that compilation that's not in here, either.  It's

11   a judgment call made by the person that wrote it, essentially.

12   Q.   Okay.  So is it normal practice to delete the UBL/Ibn Khattab

13   connection from documents to your knowledge?

14   A.   It's normal practice when compiling a document to make a

15   decision as to what information will, in fact, go into that

16   document.

17   Q.   And that would cause problems if people were searching your

18   computer trying to find a connection between Bin Laden and Ibn

19   Khattab, wouldn't it?

20   A.   No, because they'd find this exhibit.

21   Q.   So it would have been easy to find?

22   A.   As easy as any other document, same process.

23   Q.   Okay.  Did you know in the -- in August of 2001 that, that

24   the director of Central Intelligence was being briefed about

25   Zacarias Moussaoui?

Page 1527

1   A.   Yes.

2   Q.   You did know that?

3   A.   Yes.

4   Q.   Okay.  And when did you learn that?

5   A.   In my conversations with the FBI deputy who attended the 5:00

6   briefings and provided that information to him.

7   Q.   Were you aware of this before September 11?

8   A.   Yes.

9   Q.   Okay.  And what did you learn about the briefings that the

10  director of Central Intelligence was getting about Moussaoui?

11  A.   They were critical to our ability to conduct the follow-on

12  plan upon arrival overseas to access the information that he did

13  not authorize us to access here in the United States.

14  Q.   When was -- what meeting are you aware of that the first time

15  was the director of Central Intelligence got a briefing?

16  A.   I don't have a date.

17  Q.   The stipulation we read is it was August 23, 2001, sir.  Does

18  that refresh your recollection?

19  A.   No.

20  Q.   Do you know whether the briefing that the director of the

21  Central Intelligence Agency got about Moussaoui was before or

22  after it was decided that no one would even try to get a search

23  warrant?

24  A.   I would have to compare the dates.  I'm not sure exactly when

25  those conversations between and among the attorneys and the people

Page 1528

1    in the unit took place versus the briefings relative to the

2    follow-on plan.

3              MR. MAC MAHON:  Your Honor, can we put up -- and this

4    has been stipulated, it says it can be admitted without further

5    authentication -- what's stipulated in 29A?  It's Defendant's

6    Exhibit 660, please.

7              THE COURT:  All right, Defendant's 660 is in.

8              (Defendant's Exhibit No. 660 was received in evidence.)

9    BY MR. MAC MAHON:

10   Q.   Have you seen this before, sir?

11   A.   I don't believe so, no.

12   Q.   Okay.  Does this refresh your recollection as to when you

13   learned that the director of Central Intelligence was being

14   briefed about Moussaoui?

15   A.   Well, it would make sense that --

16             MR. RASKIN:  Objection.

17             THE COURT:  Well, wait, there's an objection.

18             MR. MAC MAHON:  It's in evidence.  It's in evidence,

19   Your Honor.

20             THE COURT:  I understand that, but if he hasn't seen it,

21   the only proper question is whether he -- whether this witness's

22   memory is refreshed as to the date, and if it's not then --

23             MR. MAC MAHON:  I thought I asked him that, Your Honor.

24   I'm sorry.

25             THE COURT:  Try it again.

Page 1529

1    BY MR. MAC MAHON:

2    Q.   Does seeing that document refresh your recollection --

3              MR. RASKIN:  We stipulate that this is the date the DCI

4    was briefed.

5              THE COURT:  All right, that's fine.

6              THE WITNESS:  I think I have a logical progression.  It

7    would make sense that if the FBI is considering an investigative

8    technique that is going to get us that information in the United

9    States, you're not at the point that you're using a follow-on plan

10   because there won't be a need for that plan, so, yes, the

11   conversation should have taken place in headquarters.

12             The decision would have been made probable cause does

13   not exist.  Plan B then becomes the follow-on plan, which the DCI

14   is briefed on.  That would be a logical progression in my mind.

15   BY MR. MAC MAHON:

16   Q.   So you had more conversation about Mr. Moussaoui than the

17   20-second heads-up, sir?

18   A.   No, that was how many conversations I had with Dave Frasca.

19   Dave Frasca is not part of the conversation that I'm talking

20   about.

21   Q.   So you had more conversations about Mr. Moussaoui than that.

22   Who did you talk to about Moussaoui's briefing at the Central

23   Intelligence Agency?

24             THE WITNESS:  Your Honor, I need a determination as to

25   whether that's classified.

Page 1530

1          MR. RASKIN:  Maybe the witness can just refer to the

2    individual's title as opposed to his name.  Is that permissible?

3          MR. MAC MAHON:  That's fine, Your Honor.

4          THE COURT:  Yeah, all right.

5          THE WITNESS:  He would have been the FBI detailee, and

6    the title would have been the deputy chief of Counterterrorism

7    Center.

8    BY MR. MAC MAHON:

9    Q.   And it's your understanding those conversations only had to

10   do with deporting Moussaoui from the United States, correct?

11   A.   They had to do with the planning of the operation that we

12   hoped to engage in with an overseas intelligence partner, and that

13   planning really couldn't go forward just between the FBI and that

14   component.  It would be a role for the agency to play in that.

15   Q.   Okay.  Why didn't you brief the attorney general of the

16   United States about Moussaoui if you knew that the director of

17   Central Intelligence was being briefed about him?

18   A.   Zacarias Moussaoui was arrested on immigration charges in the

19   United States.  He was not arrested by the FBI.  And the case was

20   not anywhere near fully developed.  There was a plan to get access

21   to the information that we could not legally get in the United

22   States.

23          So as that plan went along further, the briefings would

24   have gone up, but I determined that the operation being worked was

25   not of sufficient progress to brief.

Page 1531

1  Q.   So the -- your understanding is that he was not arrested in

2  an FBI operation, sir?

3  A.   The charges levied against him were immigration charges.  He

4  was arrested by immigration.

5  Q.   He was arrested as part of an FBI operation, wasn't he, sir?

6  A.   He was arrested by immigration on immigration charges

7  following an interview by the FBI and Immigration and

8  Naturalization Service.

9  Q.   All right.

10  A.   I wouldn't call it an operation.  It was a routine interview.

11  Q.   Well, the FBI got a tip about Mr. Moussaoui in the middle of

12  August 2001, didn't they?

13  A.   Yes.

14  Q.   And were you told about that on or about August 15, 2001?

15  A.   The first conversation I had with Dave Frasca would have been

16  when I was told about that, sure.

17  Q.   Okay.  So you were never told about what Agent Samit was

18  doing and what he was finding in Minnesota until you talked to

19  Mr. Frasca, and that conversation was about the plan to deport

20  Moussaoui, correct?

21  A.   No.  The first conversation was about the fact that they had

22  an individual arrested on immigration charges brought to their

23  attention by the flight school whose answers were not matching up

24  with the questions.

25  Q.   You had a Muslim fundamentalist in the United States who was

1   learning how to fly on jet simulators.  That's what you were told,

2   right?

3   A.   No.

4   Q.   You were never told that?

5   A.   No.

6   Q.   Were you told that Agent Samit, the FBI agent, had determined

7   on August 18, 2001, that there was sufficient evidence that

8   Moussaoui was conspiring with others to commit acts of terrorism

9   transcending national boundaries?

10  A.   I think what Agent Samit's suppositions and hunches and

11  suspicions were are one thing.  What we actually knew at the time

12  of the arrest were clearly something else.

13  Q.   Agent, on August 18, 2001, or before you talked to

14  Mr. Frasca, were you ever told that the agent on the field who had

15  conducted the investigation had written a very long document in

16  which he concluded there was sufficient evidence that Moussaoui

17  was a terrorist who was going to try to hijack a plane?

18  A.   No.

19  Q.   And nobody told you that the agent on the ground who was

20  doing the investigation had determined that Moussaoui was

21  possessing weapons and preparing through physical violence or

22  training for violent confrontation to incapacitate individuals on

23  aircraft and seize control of the aircraft for his own ends,

24  right?  You were never told that, either, were you?

25  A.   No.  Can I ask what document that's coming from?

Page 1533

1    Q.   Sure.  That's Mr. Samit's communication to your office dated

2    August 18, 2001.  And it's Exhibit No. 472, if you'd like to see

3    it.

4    A.   I'm just curious as to what document it was.

5            MR. MAC MAHON:  I don't have any further questions, Your

6    Honor.

7            THE COURT:  Any redirect?

8            MR. RASKIN:  No, Your Honor.

9            THE COURT:  All right.  Does anybody expect to call

10   Mr. Rolince again during the course of the trial?

11           MR. RASKIN:  No, Your Honor.

12           THE COURT:  How about from the defense?

13           MR. MAC MAHON:  I don't think so, Your Honor.

14           THE COURT:  Well, this is --

15           MR. MAC MAHON:  No.

16           THE COURT:  All right.  Then, sir, you're excused as a

17   witness.  You're free to go.  We thank you for your testimony.  Do

18   not discuss anything that you've said in court with any witness

19   who has not yet testified.

20           THE WITNESS:  Thank you, Your Honor.

21                          (Witness excused.)

22           THE COURT:  All right.  Your next witness, Mr. Novak?

23           MR. NOVAK:  Pascal Schreier, please.

24    GUIDO ALEXANDER PASCAL SCHREIER, GOVERNMENT'S WITNESS, AFFIRMED

25           MR. NOVAK:  Judge, may I proceed?