# Exhibit 16





DEFENDANT'S
EXHIBIT
472
U.S. v. Moussaoui
Cr. No. 01-455-A

 ~~SECRET~~

## FEDERAL BUREAU OF INVESTIGATION

Precedence: IMMEDIATE                                    Date:  08/18/2001

To:  Counterterrorism                          Attn:  ITOS/Iran Unit
                                                      SSA Joe Manarang
     Investigative Services
                                                      IRU#1
     London                                           IRU#2

     Paris                                             ALAT Joe Hummell

     Oklahoma City                                    ALAT Jay Abbott

From:  Minneapolis                                    SA Scott Billings
       Squad 5/JTTF
       Contact:  SA Harry M. Samit, ext (612) 376-3365

Approved By:  Morrow Ray A

Drafted By:  Samit Harry M:hms

Case ID #:  ▇▇▇  199M-MP-60130    (Pending) — 3

Title:  ▇▇▇
        <u>CHANGED</u>
        MOUSSAOUI, ZACARIAS,
        aka Shaqil;
        IT - OTHER

Synopsis:  ▇▇▇  Request FBIHQ/CTD/ITOS/IU obtain permission from
Department of Justice (DOJ) Office of Intelligence Policy Review
(OIPR) to contact the United States Attorney's Office in the
District of Minnesota regarding captioned subject.  Set leads at
Paris, London and Oklahoma City for additional investigation.

▇▇▇     ▇▇▇▇▇▇▇▇▇▇

Previous Title:  ▇▇▇  Title marked "Changed" to reflect an alias
used by captioned subject.  Title previously carried as
"MOUSSAOUI, ZACARIAS; IT - OTHER".

▇▇▇  Full Field Investigation Instituted:  08/15/2001 (NONUSPER)

Declassified by: UC CTRHII ~~SECRET~~
                 NSLB, OGC

Declassified on: 1/25/06

M-HQJ-88000001

SERIALIZED                INDEXED
                          FILED

AUG 2 1 2001

FBI MINNEAPOLIS



SECRET

To: Counterterrorism   From: Minneapolis
Re: ███   199M-MP-60130, 08/18/2001

Reference: ███  199M-MP-60130 Serial 2

**Administrative:** ███  This communication references telcals from
Paris ALAT Abbot to MP SA Samit on 08/17/2001 and from MP SA
Samit to London ALAT Hummel on the same date.

**Enclosure(s):** ███  Enclosed for all recipients is a signed sworn
statement by Hussein Ali Hassan Al-Attas regarding his knowledge
of the beliefs subscribed to by captioned subject.  Enclosed for
FBIHQ/CTD/ITOS/IU is a Letterhead Memorandum (LHM) as necessary
to complete the lead set forth in lead section.  Enclosed for
Paris is an unclassified LHM for dissemination ███ with a
request for information.  Enclosed for London is a Secret LHM
with a request for information.

**Details:** ███  Captioned investigation initiated on 08/15/2001
after Minneapolis received information from Timothy Nelson,
employed by Pan Am International Flight Academy, 2600 Lone Oak
Point, Eagan, Minnesota, telephone (651) 208-1253, that he and
co-workers were training a student they considered suspicious.

███  Pan Am International Flight Academy's Eagan
Facility is a fully accredited flight training center which uses
flight simulators to train airline pilots from all over the
world.  Training conducted there consists exclusively of initial
training for newly hired airline pilots, or update/refresher
training given to active airline pilots.  In both cases, the
typical student holds a Federal Aviation Administration (FAA)
Airline Transport Pilot (ATP) rating or foreign equivalent, is
employed by an airline, and has several thousand flight hours.

███  Nelson indicated that Zacarias Moussaoui, who met
none of the above criteria, had been in contact with his
company's headquarters in Miami, Florida and had paid $8,000-
$9,000 dollars in cash for training on the Boeing 747 Model 400
aircraft simulator.  Nelson indicated that Moussaoui was a
foreign national, who claimed that he grew up in France, although
he gave the opinion that Moussaoui appeared to be Middle Eastern.

███  What set Moussaoui apart from all other students
in Nelson's experience was that he had no aviation background,
and to Nelson's knowledge, no pilot's license.  Nelson also
considered it odd that Moussaoui indicated that all he wished to
learn was how to take off and land the 747 Model 400, giving the
reason that this was an "ego boosting thing".  At the time Nelson
called Minneapolis, Moussaoui had already received two days of



SECRET                      M-HQJ-88000002

2



SECRET

To: Counterterrorism  From: Minneapolis
Re: ███  199M-MP-60130, 08/18/2001

classroom training and had been scheduled for 4-5 upcoming
simulator sessions over the course of the next few days.

███ Following this call, Nelson's supervisor, Alan
McHale, Manager of Pilot Training in Minneapolis, was contacted
in order to determine Moussaoui's exact schedule. McHale
indicated that Moussaoui had received his ground school
instruction from a contract instructor named Clarence Prevost,
who had also indicated that he thought Moussaoui was unusual.

███ Clarence Worrel Prevost, DOB 10/02/1937, residing
at 47 Walnut Street, Wellsboro, Pennsylvania 16901, telephone
(570) 724-6064 was subsequently interviewed regarding Moussaoui.
Prevost is a retired airline pilot with more than 10,000 flight
hours in a wide variety of aircraft. He is a contract employee
of Pan Am who travels to Minneapolis in order to train students.
He has been doing so for several years and characterized
Moussaoui as unlike any other student with whom he has worked.

███ At the time Prevost was interviewed, Moussaoui had
completed the ground school portion and had done one flight in a
low fidelity simulator with him. Prevost was aware that he had
been scheduled for several more sessions in the higher-fidelity
simulators in the next few days.

███ Prevost described Moussaoui as a Middle Eastern
male, age 30-40, 5'9"-5'11" in height with a heavy build and a
trimmed beard. Prevost indicated that he spoke French-accented
English and advised that he was very amiable. Prevost noted that
Moussaoui was extremely reticent in discussing his background,
but did indicate that he had been born in the South of France,
but was now living in London, England. Moussaoui informed
Prevost that he worked in marketing and was involved with family
and friends in an import-export business, although he did not
describe the products involved.

███ As an example of this reluctance, Prevost related
a conversation they had regarding an aviation accident which
occurred some years before on an aircraft chartered to fly
Muslims to the Haj in Saudi Arabia. As Prevost was relating this
story, he casually asked Moussaoui if he himself was a Muslim.
Prevost described Moussaoui's reaction as being one of surprise
and caution. Prevost indicated that when he recovered, Moussaoui
informed him that he was not a Muslim.

M-HQJ-88000003



SECRET

3

SECRET

To: Counterterrorism   From: Minneapolis
Re: ▮▮▮▮ 199M-MP-60130, 08/18/2001

▮▮ Prevost gave the opinion that Moussaoui did appear to have a genuine interest in aviation, although his knowledge is not extensive. Prevost observed that Moussaoui had been studying the Boeing 747-400 manuals with which he had been provided by Pan Am and had been able to demonstrate knowledge of some aircraft systems already.

▮▮ Prevost began the ground school with instruction in aircraft systems using Power Point presentations as he normally does with all students. He indicated that he considered this block of instruction useless as Moussaoui has no background in any type of sophisticated aircraft systems and to Prevost's knowledge only approximately 50 hours of flight training in light civil aircraft bearing no similarity to the 747-400. Prevost advised that Moussaoui was interested in the briefings he received and requested copies of the Power Point presentations, but was told that these particular presentations were copyrighted. Prevost did indicate to Moussaoui that similar materials were available elsewhere.

▮▮ Prevost did note that there were certain systems on the 747-400 in which Moussaoui was particularly interested. Although Prevost himself brought the subject up, he indicated Moussaoui was extremely interested in the aircraft doors and their operation. Prevost indicated that Moussaoui seemed surprised to learn that the doors cannot normally be opened in flight because of the pressurization of the cabin of the aircraft.

▮▮ The other system in which Moussaoui was interested was the Mode Control Panel (MCP). This is the portion of the aircraft's avionics suite which controls the aircraft when flying in an automated mode and what allows the 747-400 Series aircraft to have a two-person flight crew as opposed to earlier models which required additional pilots. Prevost indicated that at the time they did their one simulator session, Moussaoui already knew how to operate the MCP from previous study. For information, Prevost indicated that the level of automation provided by the MCP gives the 747-400 the ability to fly, navigate, and in some modes land in a fully automated manner.

▮▮ Prevost stated that for his upcoming high-fidelity simulator sessions, Moussaoui stated that he would "love" to fly a simulated flight from Heathrow Airport in England, to John F. Kennedy airport in New York, to include all navigation and communications. He offered no explanation as to why he wished to

SECRET

   M-HQJ-88000004

4

SE~~CRET~~

To: Counterterrorism  From: Minneapolis
Re: ███ 199M-MP-60130, 08/18/2001

do this. Prevost was also aware that Moussaoui was interested in booking additional simulator sessions after he finished his currently scheduled syllabus.

███ Prevost believed that Moussaoui does have a legitimate interest in aircraft as he asked for recommendations for schools able to provide subsequent aviation training. Prevost did ask Moussaoui why he did not attempt to get his aviation training in England and was told that the schools were not available in Europe. He also noted that flight training schools there were too severe in their training methods. Moussaoui informed Prevost that he intended to return to London in the fall as he claimed that he couldn't allow his family and friends running his business to make money for him forever.

███ Prevost advised that Moussaoui was staying at the Residence Inn Eagan, which address was subsequently determined to be 3040 Eagandale Place, Eagan, Minnesota. Prevost had seen Moussaoui arrive and depart in the company of a second male he described as Middle Eastern. Their vehicle he described as a 4 door Subaru sedan, gold in color, whose license plate he believed was white with green lettering and ended with the numbers 686.

███ This vehicle was subsequently located at the Residence Inn and was determined to be a 1991 Subaru 4 door sedan, Oklahoma license YPM 636, registered to Hussein Al-Attas, 01/23/1978 or Abdulla Al-Attas with an address of P.O Box 19208, Oklahoma City, Oklahoma 73144.

███ As Prevost was not certain of Moussaoui's exact schedule for simulator sessions, McHale was interviewed at his place of employment on 08/16/2001 and provided a computer-generated itinerary which showed that Moussaoui was scheduled for four sessions in "full flight simulator B744-7" from 6:00 p.m. to 9:00 p.m. on Thursday 08/16/2001, Saturday 08/18/2001, Sunday 08/19/2001 and Monday 08/20/2001. It is not known why Moussaoui was not scheduled for a simulator on Friday 08/17/2001, but this gap may have occurred at his request as a result of the Muslim Sabbath. This computer-generated schedule has been placed in a 1A envelope and made a part of captioned main file.

███ Investigation by Minneapolis Joint Terrorism Task Force (JTTF) Immigration and Naturalization Service (INS) SAs John Weess and Steve Nordman revealed the following information regarding Moussaoui and the individual believed to be his companion, Hussein Al-Attas:



SE~~CRET~~

5

M-HQJ-88000005

SECRET

To:  Counterterrorism  From:  Minneapolis
Re: ▮▮▮  199M-MP-60130, 08/18/2001

- Moussaoui, a resident of the United Kingdom, traveling on French passport # AE27016, entered the U.S. at Chicago, Illinois on 02/23/2001 on a visa waiver. Under the terms of the visa waiver program, citizens of certain countries may enter the U.S. without applying for a visa, however they are allowed to remain in the U.S. for no more than 90 days from the date of entry. According the INS records, Moussaoui was admitted to the U.S. only until 05/22/2001 and was therefore in an overstay status and subject to arrest any time after this date.

- Al-Attas, a resident of Saudi Arabia, traveling on Yemeni passport #0503683, is in the U.S. on an F1 (student) visa, first issued in 1995. Al-Attas indicated to INS that he is a student at the University of Oklahoma at Norman.

▮▮▮ As the vehicle had been located outside the Residence Inn on the afternoon of 08/16/2001 and Moussaoui was known to be scheduled for a simulator session beginning at 6:00 p.m. that evening, writer made the decision to request that INS arrest him on the overstay violation in order to delay his receiving any further training on the Boeing 747-400 aircraft until he could be interviewed and his true intentions determined.

▮▮▮ Pursuant to this, physical surveillance (FISUR) of the Subaru sedan was initiated and the clerk at Moussaoui's motel was interviewed to determine which room was his. The clerk indicated that Moussaoui was staying in room 1414 and that he had registered alone.

▮▮▮ A short time before 5 p.m. Moussaoui and Al-Attas were observed leaving room 1414. Al-Attas entered the driver's side of the Subaru while Moussaoui approached the vehicle. Both individuals were informed of the identity of INS Agents Weess and Nordman and detained temporarily pending a determination of their immigration status. Upon hearing that he was suspected of immigration violations, Moussaoui informed Agents that he was in possession of a valid extension document in his hotel room. He invited Agents to his room to view this document, which upon subsequent examination proved to be an extension request, not an actual visa waiver extension. Moussaoui was informed that this document was not proof of continued legal status in the U.S. and was asked for permission to search his room to discover additional documents. This request was refused.

M-HQJ-88000006



SECRET

SE̶CRET

To: Counterterrorism   From: Minneapolis
Re: ▆▆▆   199M-MP-60130, 08/18/2001

▆▆▆ Moussaoui was then placed under arrest without
incident. During a search of his person, Agents discovered a
short dagger with a scabbard in one of his pockets.
A subsequent consensual search of Al-Attas' vehicle revealed an
additional folding knife under the driver's seat which Moussaoui
admitted was his.

▆▆▆ After Moussaoui was removed from the scene to the
INS District Office for processing, Al-Attas was accompanied back
to the room to retrieve documents proving he was still enrolled
as a student. It was subsequently determined that Al-Attas met
the minimum requirements for enrollment to remain in the U.S. on
an F1 visa.

▆▆▆ Al-Attas, who had a key to the room and advised
that he was staying there with Moussaoui, gave written consent to
search the room. This was done in the interest of Agent safety
and included searches for weapons of bags and cases within Al-
Attas' reach. Upon opening several bags and a small metal
suitcase which Al-Attas indicated were Moussaoui's, a laptop
computer, numerous aviation study materials, a cellular telephone
and one small "walkie-talkie" type radio were discovered. No
additional weapons were found and Moussaoui's effects were not
searched beyond the above-described check for weapons and other
dangerous items. Upon hearing that Moussaoui was subject to
deportation from the U.S. and consequently would not be
returning, Al-Attas gave permission and assistance in removing
Moussaoui's belongings to an INS vehicle. Moussaoui subsequently
gave verbal consent for the items to be brought to the INS
district office and placed in storage.

▆▆▆ Al-Attas was then interviewed by writer and INS SA
Weess for the first time in his hotel room on the evening of
08/16/2001. He voluntarily provided the following information:

▆▆▆ Al-Attas, whose full name is Hussein Ali Hassan Al
Attas, DPOB 01/23/1978 in Riyadh, Saudi Arabia, is a Yemeni
citizen whose family resides in Riyadh. Despite his Yemeni
citizenship, Al-Attas claims to have spent his entire life in
Saudi Arabia, and to have never been to Yemen. He indicated that
he holds Yemeni citizenship as a result of Saudi law which
stipulates that individuals born of foreign parents in Saudi
Arabia retain the citizenship of their parents. Al-Attas claims
that his foreign travel has been limited and that he has traveled
only to the U.S. and to Jordan one time in order to visit his
three cousins.

SE̶CRET

M-HQJ-88000007

SE~~CR~~ET

To: Counterterrorism  From: Minneapolis
Re: ▉▉▉  199M-MP-60130, 08/18/2001

▉▉▉ Al-Attas indicated that he is a Math Major at the University of Oklahoma in the University College and had in his possession transcripts which indicated he has been an undergraduate student there for several years. He gave his residential address as 209A Wadsack Drive, Norman, Oklahoma, 73072-7213, telephone (405) 325-9885. Al-Attas indicated that his father is employed by a furniture company in Riyadh and that he has four brothers and two sisters. Al-Attas advised that his other brothers are all engineers and that he is the fifth oldest in the family, all of whom reside in Riyadh. He indicated that he is not married and that his family is not religious.

▉▉▉ Al-Attas indicated that after he finishes his bachelor's degree, he will go on to get a master's degree. He stated that he does not consider the U.S. his home and that he confines his travels between his residence, his classes and the mosque because of an unwillingness to mix in U.S. culture.

▉▉▉ Al-Attas advised that it was at the Anur Mosque in Norman, Oklahoma that he first met Moussaoui, whom he claimed to know only by the name Shaqil, approximately six months ago. Al-Attas advised that he has always been drawn to the Mosque and has been the assistant to the Imam there for some time. Al-Attas identified the Imam at the Anur Mosque as Al Haj Achmed Indii, aka Abu Mustafa, from Senegal.

▉▉▉ In addition to his duties assisting the Imam, Al-Attas indicated that he enjoys helping new attendees. Therefore, when Moussaoui began attending, he offered his assistance. Al-Attas advised that the two were acquaintances until approximately one month ago when his current roommate got married, asking Al-Attas to move out. Al-Attas then advised that he approached a friend, Mukharan Ali, an Indian Muslim, to see if he could move in with him while looking for an apartment. Ali agreed to allow Al-Attas move in, but indicated that Moussaoui had made the same request of him nearly simultaneously so the three would be living together. ACS indices were negative for Ali.

▉▉▉ Al-Attas indicated that Moussaoui was an extremely religious Muslim who had gained a reputation at the Anur Mosque for being far too hard line and outspoken in his beliefs. Al-Attas advised that he has heard him speak out against Israel and its measures against the Palestinians on numerous occasions. Moussaoui also regularly questioned why the Israelis are killing Muslims and yet receiving favorable press in the U.S.

SE~~CR~~ET



M-HQJ-88000008

9

SECRET

To:    Counterterrorism   From:  Minneapolis
Re:    ███   199M-MP-60130, 08/18/2001

███   Al-Attas indicated that Moussaoui believes that it is acceptable to kill civilians who harm Muslims and that he approves of martyrs.  During this line of questioning, Al-Attas was then asked if he had ever heard Moussaoui make a plan to kill those who harm Muslims and in so doing become a martyr.  Al-Attas admitted that he may have heard him do so, but that because it is not in his own heart to carry out acts of this nature, he claimed that he kept himself from actually hearing and understanding.

███   Al-Attas related that in arguing his beliefs, Moussaoui has referred to Fatwas, or religious orders written by various Islamic scholars.  Al-Attas advised that he has seen him reading various Fatwas on the internet.  One such scholar whose name Al-Attas can recall is Abdulaziz Bin Baz, a Saudi who wrote a Fatwa in which Moussaoui was interested.  A check of ACS indices for Bin Baz revealed one entry which is believed to be identical in 265C-DE 79386 Serial 82, regarding an Abdul-Aziz Ibn Baz in Taef, Saudi Arabia.

███   Specifically, Al-Attas advised that Moussaoui holds the following opinions regarding Islam:

- True Muslims must prepare themselves to fight.  Pursuant to this, Moussaoui was able to persuade Al-Attas to begin physical exercise and martial arts training.  As an example of this preparation, both Moussaoui and Al-Attas had among their belongings padded gloves and shin guards for training in martial arts.

- Moussaoui believes that it is the highest-level duty of Muslims everywhere to know of the suffering of Muslims in lands where they are oppressed.  Al-Attas cited the specific examples of the Philippines, China, the Kashmir, Kosovo, Macedonia, Palestine and Bosnia as areas where Moussaoui stated this is occurring.

- Moussaoui considers the U.S. full of unbelievers, making it a place not fit for Muslims to reside.  He has made this argument to many people at the Anur Mosque, causing them to consider him very extreme.  He has urged Al-Attas to finish his studies and leave the U.S.

███   Although Al-Attas himself claimed that he does not share these beliefs, he indicated that he might fight in a Jihad himself in the future if called.  Al Attas reacted with surprise to the above question and delayed for several seconds before answering.  He indicated that he is currently involved in his

SECRET



9

M-HQJ-88000009

SECRET

To:    Counterterrorism   From:  Minneapolis
Re:    ███ 199M-MP-60130, 08/18/2001

studies, but that in the future he would be willing to fight if called.

███ Al-Attas indicated that he is accompanying Moussaoui on this trip as a friend. He stated that he is aware that Moussaoui has taken flight training with others in Oklahoma and that he wished to continue his studies in Minneapolis. Al-Attas advised that he and Moussaoui drove up from Oklahoma in his car, arriving on Saturday, 08/11/2001. Although he was aware that Moussaoui was scheduled for flight training through Monday, 08/20/2001, Al-Attas claims that he himself was planning to leave on Sunday, 08/19/2001 to be back in time to register at the University with his advisor during the following week.

███ Al-Attas indicated that originally the agreement for finances on the trip would be that he and Moussaoui would share expenses evenly. A short time after they discussed this, Moussaoui advised him that since he had asked Al-Attas to accompany him, he would pay for gas and lodging, leaving Al-Attas responsible only for his own food.

███ Al-Attas is aware that Moussaoui had more than $10,000 in his possession and that he received money from overseas via a bank in Norman, Oklahoma. He claimed to have no knowledge of the source of this income and indicated that Moussaoui was secretive in the extreme. As an example, he cited the fact that he himself knows Moussaoui only as Shaqil, and advised that he was extremely careful never to reveal his last name.

███ Al-Attas advised that as far as he knew, Moussaoui is simply in Minneapolis for flight training. He did admit that he was aware that Moussaoui was interested in staying in Minneapolis for an additional two weeks to "study". Moussaoui had informed him of this and indicated that they would be moving to a cheaper hotel which he found on the internet.

███ Following this study, Al-Attas indicated that Moussaoui intended that they drive to Denver, Colorado and then New York City, before returning to Oklahoma. Al-Attas stated that Moussaoui told him that they would "see America" and stated that he had no further information as to what Moussaoui was planning.

███ Al-Attas provided these explanations for the following items in his and Moussaoui's possession:

SECRET
10

M-HQJ-88000010



SECRET

To: Counterterrorism  From: Minneapolis
Re: (S)  199M-MP-60130, 08/18/2001

- Binoculars.  Al-Attas had no idea why Moussaoui had there and claimed he had not seen them in use.

- The fighting gloves and shin guards.  Al-Attas claimed that Moussaoui had purchased a set of each and convinced him to do the same for himself so they could train to protect themselves against crime in the U.S.

- Waterproof hiking boots.  Al-Attas advised that they were planning to hike and enjoy nature.

- Power Point 2002 computer program purchased that day for more than $300, in cash by Moussaoui.  Al-Attas claimed he did not know why Moussaoui purchased this software, but advised that he had informed him that he needed it immediately.

- A pamphlet containing guidelines in completing an Islamic will.  Al-Attas, who had in his possession several sheets of notebook paper with writing believed to be in the Arabic language, indicated that this was his Will.  He explained that it is standard practice for a Muslim to write out one's Will and that he had done so "long ago".

- In addition to these items, Agents discovered a list which indicated that Moussaoui intended to purchase a handheld Global Positioning System (GPS) receiver and to rent a camcorder for their subsequent travels.  Al-Attas indicated that Moussaoui claimed that he intended to videotape various scenes of natural beauty in the U.S. with the camcorder and to use the GPS to navigate during their cross country drive.  Moussaoui planned to rent the camcorder rather than buying one as he claimed those manufactured for the U.S. market were incompatible in Europe.

 Also among the documents discovered in Al-Attas' possession was an application for a Pakistani tourist visa which had been downloaded from the web site of the Pakistani Embassy in Washington, D.C. and partially completed by him.  Although he claimed he is scheduled to begin school at the University of Oklahoma in two weeks, Al-Attas advised that he is planning to go to Pakistan in order to research treatment options for liver cancer in order to assist an uncle suffering from this disease who resides in Saudi Arabia.

Al-Attas indicated that his uncle, Abubaker Al-Attas has been to the U.S. for treatment on several occasions at a hospital in Houston.  This treatment has to date not been

SECRET

11    M-HQJ-88000011

SECRET

To: Counterterrorism  From: Minneapolis
Re:  (S)  199M-MP-60130, 08/18/2001

successful, however it has been extremely costly since his uncle does not have health insurance in the U.S. As a result, Al-Attas stated that he had been tasked by his father with coming up with a less expensive treatment alternative for his uncle.

██████ Al-Attas indicated that he took ██████ laboratory results ██████ In order to obtain recommendations regarding alternative care. Al-Attas claimed that Dr. Mahmood recommended a hospital in Pakistan and had in his possession a letter from him confirming that Abubaker Al-Attas did have liver cancer and supporting Al-Attas' request for a Pakistani visa. Al-Attas indicated that the hospital Mahmood recommended was called the Inmol Cancer Institute in Lahore, Pakistan. He was instructed that, upon arrival in Lahore, he was to contact ██████ brother at 5 Zeenap Block, Allama Iqbal, Town Lahore, Pakistan for assistance.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

When asked why he had been selected to travel from the U.S. to Pakistan when he has school and when the rest of his family is in Saudi Arabia and therefore much closer, Al-Attas simply cited Arab morals in his being expected to do something to help his uncle. Al-Attas also indicated that he was only planning to go for one week and could complete the trip during a break in classes. He was then asked why one of his uncle's sons did not travel instead. Al-Attas indicated that this side of his family was unable to go because they are not experienced in matters of this nature.

██████ When asked, Al-Attas indicated that he was not planning to travel to Pakistan at the direction of Moussaoui or anyone outside his family. He did admit that Moussaoui has assisted him in completing the visa application, but only because he is experienced, having traveled to many countries.

██████ Al-Attas likewise had no explanation for how he was going to remain with Moussaoui for the duration of his additional simulator training in Minneapolis, then drive with him to New York and possibly Denver, while still arriving back in

SECRET



12

M-HQJ-88000012



SECRET

To: Counterterrorism    From: Minneapolis
Re: ███████    199M-MP-60130, 08/18/2001

Oklahoma in time to enroll for the Fall Semester at the
University of Oklahoma which begins in less than two weeks.

        An examination of Al-Attas' Yemeni passport and
the photograph attached, as well as the photographs carried by
the numerous U.S. F1 visas contained in that document show him
with a full and untrimmed beard. At the time he was interviewed,
Al-Attas had shaved and trimmed his beard down to a goatee. When
asked about this, he answered that he had done this a long time
ago, but did not indicate why.

        ███    At the conclusion of this interview, Al-Attas was
requested to visit the St. Paul Office of the INS at 9 a.m. the
next morning (08/17/2001) before leaving Minnesota. He agreed to
do so.

        ███    After leaving Al-Attas, writer and SA Weess
interviewed Moussaoui at the INS Detention Facility in
Bloomington, Minnesota. As this was a custodial interview,
Moussaoui was provided Miranda warnings and acknowledged that he
understood them. He was then given the option of signing an INS
advice of rights and waiver form, which he did.

        ███    For information, Moussaoui was extremely evasive
in many of his answers given during the course of this and one
subsequent interview. Rather than answering numerous seemingly
innocuous questions directly, he inquired about the need for
interviewers to know or indicated that this was "a personal
matter". In addition, he became extremely agitated when he
understood the line of questioning to pertain to his religious
beliefs, overseas travel and associates, and the source of
financial support.

        ███    Moussaoui began the interview by stating he was
highly suspicious of immigration authorities in general because
of a problem he had in the UK in 1993 while traveling on his
identity card provided by the French Consulate in London.
Moussaoui indicated that he was questioned extensively by
immigration authorities who believed he was Algerian, despite his
possession of valid French documents. Moussaoui related that he
was saved from this difficulty only through a friend's
acquaintance with a French Senator who interceded on his behalf,
but whose name he could not recall.

        ███    Moussaoui also was extremely insistent that he be
allowed to complete his training at Pan Am. In addition to this



SECRET

M-HQJ-88000013

15



SEC̶R̶E̶T

To: Counterterrorism  From: Minneapolis
Re: ██████  199M-MP-60130, 08/18/2001

being one of the first issues he raised during this interview,
Moussaoui indicated his need to finish this training several
times while he was being arrested.  INS SA Nordman, who
transported Moussaoui to the INS Detention Facility reported that
he again stated several times that he needed to complete his
study and that he would voluntarily return to INS custody if he
was released temporarily in order to finish.

████  Moussaoui stated that he came to the U.S. to be a
pilot and has been a flight student at the Airman Flying School,
1950 Goddard Avenue, Norman, Oklahoma 73069 since he arrived in
February 2001.  Since arriving at Airman, he has logged
approximately 50 hours of flight time in Cessna 152 aircraft.  He
advised that he took the FAA written exam, but failed it and did
not wish to take the practical portion of the test.

████  Moussaoui indicated that he did not attempt to
obtain his pilot's license in the UK because of the expense.  He
explained that in order to fly in the UK as a student he would
have needed to hire an additional aircraft and pilot to follow
him, making the cost of obtaining a license there several times
what it would be in the U.S.  He cited the fact that the Airman
Flight School is full of foreign students as a result of the high
cost of comparable training overseas.

████  Moussaoui explained his failure to complete
training by stating that the instructors assigned to teach him to
fly were too youthful and that he was no longer making progress.
After being told that he was not cut out to be a pilot, he
resolved to follow his dream of flying a "big airplane".
Moussaoui claims that it is for this reason that he approached
Pan Am International Academy and paid $8,300 to fly the 747-400
simulator.  He further indicated that he was doing so purely for
enjoyment and that he eventually did intend to return to flying
real airplanes in order to obtain his pilot's license.

████  Moussaoui, whose address is listed on his UK
driving license as 23A Lambert Road, London SW2 5BB, indicated
that he works in the UK as a freelance marketing researcher.
When asked if this was his sole source of income, he indicated
that he also works "here and there".  When asked what that
involved, Moussaoui at length referred to a business initiative
with an Indonesian telephone card company, but stated that it did
not work out.  He was unable to give even an approximate figure
for his annual income, claiming that he did not pay taxes in the
UK in 2000.



SEC̶R̶E̶T
14

M-HQJ-88000014

NA-1704

S̶E̶C̶R̶E̶T̶

To: Counterterrorism   From: Minneapolis
Re: ▮▮▮  199M-MP-60130, 08/18/2001

▮ He also indicated that he earns some income from relatives in Saudi Arabia. When asked in what capacity this occurs, Moussaoui indicated that it is "absolutely legal, but private". When asked how a business venture could be private, Moussaoui began describing his family connections in Saudi Arabia, indicating that an aunt, who resides in Khobar, Saudi Arabia is married to a Saudi named Adil (phonetic), whose last name he could not recall. When pressed to describe the nature of the business, Moussaoui stated that he was trying to arrange the "import-export of some product". At length, Moussaoui indicated that the product was grape leaves which he wished to export from the South of France to Saudi Arabia, but that this venture had not panned out either.

▮ Moussaoui advised that his employment in connection with marketing research consisted of telephoning people to conduct customer satisfaction interviews on behalf of various corporations who contract with his employer for this service. Moussaoui indicated that the name of the company he worked for was NOP, located in London, but could not recall what this stood for, being able to state only that the "N" stood for National. When questioned about this, Moussaoui became angry and began listing his academic qualifications, including a Master's Degree in International Business from Southbank University and an advanced degree in Commerce and Technology from the "Institute of Export", both believed to be located in the UK.

▮ For information, among the documents Moussaoui presented to INS at the time of his arrest was a deposit agreement from Arvest Bank, 200 East Main Street, Norman, Oklahoma 73069, telephone (405) 321-7170 showing that on 02/26/2001, he opened a checking account (#12181933) in the amount of $32,000. At no time during this or one subsequent interview was Moussaoui able to give a convincing explanation for his source of income, especially considering that each of the business ventures he described, "did not work out". He did claim that he saves all of his money and that he has been working since the age of 14, but became angry when it was suggested to him that this did not seem adequate to account for the large sums of money in his possession.

 Moussaoui indicated that he is a French citizen, having been born in Saint-Jean-De-Luz, France to Moroccan parents. He advised that he is estranged from an older brother, a sister and his father for personal reasons. Moussaoui indicated that his father is a builder and his older brother is a

S̶E̶C̶R̶E̶T̶
15

M-HQJ-88000015

NA-1705

To: Counterterrorism  From: Minneapolis
Re: ███  199M-MP-60130, 08/18/2001

SECRET

professor of engineering. Moussaoui indicated that he remains in
contact with his mother and another sister and that all of his
immediate family members reside in France.

███  When asked why he resides in the UK, Moussaoui
indicated that he was educated there and likes the qualities of
the British people. He indicated that in his absence from the
UK, his flat is being sub-letted by friends. He was unable to
name any specifically, but indicated that most of his friends in
London are restaurant employees of Moroccan origin and that they
are on the lower end of the financial scale.

███  Moussaoui was also asked about his foreign travel,
answering that he has traveled to Morocco and all over Europe. He
also advised that in connection with the Indonesian telephone
card venture described above, he visited Malaysia for
approximately three weeks, Indonesia for approximately one week
and Pakistan for two months. He indicated that he was in
Pakistan approximately six months ago and at first claimed that
he was there in connection with the Indonesian telephone card
venture.

███  When asked why the Malaysian and Indonesian visits
were so much shorter than his trip to Pakistan, he explained that
his reasons for being there were both connected to the business
venture as well as Personal. After being pressed to provide a
reason, Moussaoui indicated that he was there attempting to get
married, but that this did not work out.

███  Moussaaoui stated that he traveled to Karachi,
Pakistan and that he stayed in hotels in that city the entire
time. When asked who he contacted in Pakistan, he indicated that
he was in touch with the brother of a close friend of Pakistani
origin who resided in London. Although he was unable to recall
the brother's name, he stated that his friend's nickname was
Talil. When asked for something more descriptive, Moussaoui
stated that he could not recall his friend's last name, but that
his first was Achmed.

███  When asked if he traveled outside Pakistan to
another county during this trip or if he had visited any other
cities in Pakistan, Moussaoui did not answer directly, but
instead claimed that he was aware of what the interviewing Agents
were trying to accuse him of as a result of his having watched
television. This line of questioning caused him to become
extremely agitated and he refused to discuss the matter further.

SECRET
16



M-HQJ-88000016

NA-1706



SECRET

To: Counterterrorism  From: Minneapolis
Re: ███  199M-MP-60130, 08/18/2001

███    A previous examination of Moussaoui's French
Passport showed that he entered Pakistan on 12/09/2000 and exited
on 02/07/2001 and that he had done so using Pakistani Visa
#VB086976 issued by the High Commission for Pakistan in London on
12/04/2000.  There were no entry or exit stamps for Indonesia or
Malaysia and no visas to enter these countries in Moussaoui's
passport, which was issued by the French Consulate in London on
10/31/2000.  When asked why these stamps did not appear, he
indicated that this document was a recently issued replacement
for one which had gone through the washing machine.

███    Later in the interview Moussaoui also disclosed
that he has traveled to Saudi Arabia in September 1996 for Ummah,
in order to fulfil a religious requirement.  Moussaoui indicated
that during this trip, foreign faithful are confined by the Saudi
authorities to the areas around Jeddah and Medina and that he was
unable to travel outside these cities.

███    Moussaoui indicated that he attended the Regent's
Park Mosque in London and a small mosque near the University of
Oklahoma while in Norman.  He stated that he met Al-Attas, who is
the "second Imam" in Norman, while attending mosque and that the
two became friends.  He advised that he considers himself a
religious Muslim and that Al-Attas is as well.

███    Moussaoui became very agitated when asked if, on
the basis of his religious beliefs, there are any particular
Islamic scholars he follows.  He claimed that "things are very
clear for him" and that he is able to think for himself.
Moussaoui indicated that he follows the Islamic practice of
praying five times per day and of helping his Muslim brothers.
He indicated that with regard to studying Fatwas, he is unable to
read Arabic, only to speak it, and that this precludes his
ability understand them.

███    When asked how he feels about the situation in
Israel regarding their treatment of the Palestinians, Moussaoui
indicated that this makes him sad.  He stated that "seeing a six
year old child shot in the head" makes him sad, and watching Israel "take Arab
land" makes him sad, but denied that any of this makes him angry.
When asked if he has ever been so sad that he spoke openly about
hurting people in retaliation, he stated that he must think about
the answer to this question, ultimately refusing to give one.

███    Moussaoui indicated that he had avoided being
drafted into the French Army as a result of unspecified family

SECRET
17

M-HQJ-88000017

NA-1707



SECRET

To: Counterterrorism  From: Minneapolis
Re: ████  199M-MP-60130, 08/18/2001

problems and the fact that he was studying for a degree at the
time. He indicated that he had no weapons training of any kind,
but that he had shot handguns once or twice in France with
friends whose names he could not recall. Moussaoui stated that
he would like to learn to use weapons as he is curious about
them, but repeated that he has never previously been taught to
use one. Minneapolis opines that Moussaoui was being deceptive
in stating that he has never been trained in the use of weapons
based on his reaction to the questions.

████  Moussaoui indicated that upon completion of his
training at Pan Am, he and Al-Attas planned to travel to New York
City to "see sites", including the Statue of Liberty, the "Empire
State" and the "White House". He also advised that he planned to
travel to Denver to do some unspecified business with United Air
Lines. Following this travel, Moussaoui indicated that he
planned to return to Oklahoma and fly back to the UK. This
concluded the 08/16/2001 interview.

████  As requested, Al-Attas voluntarily reported to the
INS office on the morning of 08/17/2001. He consented to being
interviewed a second time and also to giving two sworn statements
which were recorded on INS forms. One sworn statement
(enclosed), pertained to what he understands to be Moussaoui's
beliefs regarding Islam and the course to be followed by Muslims.

████  During this interview with writer and INS SA John
Weess, Al-Attas indicated that he had been paid for teaching
children by the directors of the Anur Mosque in Norman, Oklahoma.
He was therefore in violation of his immigration status as the
holder of an F1 visa, which prohibits employment in the U.S., and
was placed under arrest by INS at the conclusion of the
interview.

████  Al-Attas reiterated much of the same information
from the previous evening. He again indicated that he was aware
that Moussaoui has strong beliefs, but repeated that he was not
aware of any specific plan. He did indicate that Moussaoui does
not like anyone who is not a Muslim, and advised that he has
stated that he would work in any way possible to make the lives
of nonbelievers more difficult. Al-Attas added that if Moussaoui
were to perceive that a nonbeliever is harming a Muslim in any
way, he believes that Moussaoui would work to harm the
nonbeliever secretly. Al-Attas emphasized the secrecy aspect of
Moussaoui's general conduct, indicating that he was extremely
unwilling to reveal details about himself, or even give his last

SECRET
13

M-HQJ-88000018

NA-1708


SECRET

To:  Counterterrorism   From:  Minneapolis
Re:  ▇▇▇  199M-MP-60130, 08/18/2001

name to others.  Al-Attas cited as an example the fact that he himself only knew Moussaoui by his nickname, Shaqil.

In describing the source of Moussaoui's beliefs, Al-Attas indicated that he follows the teachings of a Sheikh, whose identity he has not revealed to Al-Attas.  Al-Attas indicated that Moussaoui explained his reason for keeping his Sheikh a secret is that Al-Attas would not approve of him because of his views and because of his national origin.  When asked if he was speaking about Usama Bin Laden, Al-Attas advised that he did not believe this was the case.  He indicated that the only reference he has seen Moussaoui make to Bin Laden occurred when the two were watching CNN on television and his picture appeared.  Al-Attas indicated that Moussaoui called his attention to Bin Laden, but did not comment further on him.

In addition to the unidentified Sheikh, Al-Attas gave several other examples of quotations from Islamic prophets which Moussaoui draws upon as justification for his beliefs and actions.  Al-Attas stated that Moussaoui quoted Omar Ibn Al Khattar, referred to as the companion prophet, "teach your children how to swim, ride a horse and to know how to fight".  He indicated that Moussaoui used this as justification for his physical training and preparation for fighting.  In referring to Moussaoui's dislike of living in any country which doesn't follow strict Islamic law, he quoted the prophet Mohammed in saying, "If he does something good in Islam, love him that much.  If he does something bad in Islam, hate him that much."  Al-Attas indicated that Moussaoui's dislike of countries not adhering to Islamic law extends to secular Muslim states.

Although he had earlier stated that Moussaoui did not have any friends or associates in Norman, Al-Attas later admitted that Moussaoui did associate with other students from Muslim countries at Airman Flight School.  He was also aware that Moussaoui was friendly with two instructors there of Pakistani origin, although he was unable to provide their names.  He was aware of two flight students with whom Moussaoui associated, a Saudi named Mohamed Al-Bahalaqi (phonetic) and his roommate, Abuda LNU, from Bahrain.  Al-Attas could add no further detail on these two, except to state that they did not attend mosque.  ACS indices were negative for Al-Bahalaqi and Abuda.

Upon being informed that he was being arrested for immigration violations, Al-Attas requested that he be allowed to return to Norman, Oklahoma to deal with the charges.  He



SECRET

19

M-HQJ-88000019

NA-1709

002905



SECRET

To: Counterterrorism   From: Minneapolis
Re: ███    199M-MP-60130, 08/18/2001

expressed a desire to return there several times giving the
reason that this would make things much easier for him.

███ Moussaoui was again questioned on the afternoon of
08/17/2001. He indicated that he has no criminal record in
France, and that his "file is clear". Moussaoui stated that he
has never been in jail in France or questioned by any security or
police authorities. He stated that he is aware that his father
has been in trouble with the law, and indicated that he is a
builder who undercut projects and built buildings "not to
standard". Although he gave the name of his brother, Abdsamed
Moussaoui (phonetic), who is an engineering professor in
Montpelier, France, he would not explain why they are estranged,
stating that it is a personal matter. ACS indices were negative
for Abdsamed Moussaoui.

███ Although Moussaoui began this second interview in
a very subdued manner, in an attempt to appear cooperative, as
the questions began to touch on the gaps in his financial
support, his reasons for training at Pan Am and his religious
beliefs, he became increasingly angry. He was again unable to
convincingly explain his source of income, now indicating that
the money came from friends in the UK. When asked their names,
he indicated that Talil, whose true name he had been unable to
recall the day before, had provided him money. He added that
Talil's full name was Ahmed Atif (phonetic) and that he worked as
an executive for a large Dutch Company whose name he could not
recall. ACS indices were negative for Atif. When pressed for
other names of people who have provided him financial support, he
indicated that there was a Habib LNU in Germany as well.
Moussaoui was unable to name the city where Habib lives, his
place of employment, a telephone number or even a means by which
they met or contact one another.

███ In continuing to attempt to explain his presence
in the U.S. and at Minneapolis, Moussaoui repeated that he was
simply interested in learning to fly. He gave as an example of
this the names of several other flight training facilities in the
U.S., including Flight Safety International and the University of
Minnesota flying program. He indicated that Pan Am International
Flight Academy, which he contacted after seeing their web site,
offered to train foreign students just like him. He indicated
that he dealt with a Matt Tierny at Pan Am headquarters in Miami
and had been told that this training was open to him. He further
stated that as all of these schools advertised on the internet,
he could show interviewing agents if allowed access to a



SECRET

20

M-HQJ-88000020



SECRET

To: Counterterrorism   From: Minneapolis
Re: ████ 199M-MP-60130, 08/18/2001

computer.  He was then asked if such materials were on his laptop
computer, to which he quickly replied in the negative.  In
writer's opinion the suggestion that his laptop might be accessed
by the FBI clearly provoked an extremely strong emotional
reaction.

████  For information, a subsequent internet check of
Minnesota Aviation Educational Institutions provided by the
Minnesota Department of Transportation revealed that the
University of Minnesota Twin Cities campus does not have a flight
training program.  The only aviation-related training offered
there are degree programs in Aerospace Engineering.

████  Moussaoui also disclosed for the first time that
he was the owner of a beige Ford Taurus registered in the state
of Oklahoma which is parked in front of his apartment building.
When asked why he did not drive this car to Minneapolis, he gave
no answer.

████  Moussaoui was then confronted with the information
that he was known to be an extremist intent on using his past and
future aviation training in furtherance of a terrorist goal.  He
was asked to provide the name of his group, the religious
scholars whom they followed, and to describe his plan in detail.
Moussaoui was visibly surprised at the mention that he was a
member of a group and that the FBI/INS were aware that he
subscribed to fundamentalist beliefs.  He began repeating his
earlier claims that he was here to enjoy the 747-400 simulator
and that this was all that interested him.  A short time after
this, he invoked his right to "an immigration lawyer" and
questioning was halted.

████  For information, since his arrest Moussaoui has
contended that he did not violate any immigration laws and that
he has been detained unlawfully.  He continually referred to the
visa waiver extension request as a valid document which would
allow him to legally remain in the U.S.  He stated several times
that if he had known this would happen, he would have left the
U.S. and returned on a second visa waiver.  In addition, he
advised that when deported, he will simply go to the U.S. Embassy
in London and obtain a visa to travel to the U.S. in order to
complete his training.

████  Minneapolis believes that Moussaoui is an Islamic
extremist preparing for some future act in furtherance of radical
fundamentalist goals.  The numerous inconsistencies in his story,

SECRET
21

M-HQJ-88000021



SECRET

To: Counterterrorism    From: Minneapolis
Re: ████ 199M-MP-60130, 08/18/2001

his two month long trip to Pakistan which ended less than three
weeks before coming to the U.S., and his inability to explain his
source of financial support all give cause to believe he is
conspiring to commit a terrorist act, especially when this
information is combined with his extremist views as described by
Al-Attas in his sworn statement.

████ As Moussaoui was in the process of gathering the
most knowledge and skill possible in order to learn to fly the
Boeing 747-400, Minneapolis believes that his plan involved an
aircraft of this type.  This is especially compelling when
considering that the 400 series of this aircraft has a smaller
flight crew and is more automated than other versions, lending
itself to simpler operation by relative novices.  His request of
Pan Am that he be permitted to fly a simulated flight from
London's Heathrow Airport to New York's JFK Airport is suggestive
and gives Minneapolis reason to believe that he may have been
attempting to simulate a flight under the conditions which he
would operate while putting his plan into motion in the future.

████ Since it is reasonable to expect that some time
might have elapsed between Moussaoui's training at Pan Am and the
execution of his plan, Minneapolis believes that he may have
intended to amass a large supply of study aids which would have
allowed him to maintain reasonable currency or at least
familiarity with the 747-400 aircraft in the interim.
Minneapolis believes that this is why he purchased the Power
Point software in such a hurried fashion after viewing the
briefings provided him at Pan Am and why he had in his possession
several 747-400 flight manuals.

████ Although Al-Attas claimed to have no knowledge of
Moussaoui's actual plan, Minneapolis opines that he was being
deceptive in trying to minimize both his understanding of and
involvement in whatever Moussaoui was planning to do.  In
addition to the numerous inconsistencies in his story regarding
his reason for coming to Minneapolis, Al-Attas' explanation for
his planned travel to Pakistan likewise is farfetched.
Minneapolis believes that Al-Attas intends to travel to Pakistan
to receive training or indoctrination which will be used in
furtherance of this plan.

████ On the basis of investigation to date, Minneapolis
has reason to believe that Moussaoui, Al-Attas, and others yet
unknown are conspiring to commit violations of federal criminal
code as set forth in Title 18 Section 2332b, entitled Acts of



SECRET

M-HQJ-88000022

 SECRET

To: Counterterrorism  From: Minneapolis
Re: ███  199M-MP-60130, 08/18/2001

terrorism transcending national boundaries, in that they are
"attempting or conspiring to destroy or damage any structure,
conveyance, or other real or personal property within the United
States". Further, statements made by both Moussaoui and Al-Attas
demonstrate that they have used interstate and foreign commerce
in furtherance of the offense.

███ In addition, information developed relating to
Moussaoui's training on the Boeing 747-400 aircraft gives reason
to believe that he is also conspiring to commit violations as
specified under Title 18 Section 32, entitled Destruction of
aircraft or aircraft facilities, in that, on the basis of his
possession of weapons and his preparation through physical
training for violent confrontation, his plan is believed to
involve the performance of violence or incapacitation of
individuals on aircraft in the special aircraft jurisdiction of
the United States or on any civil aircraft employed in foreign
air commerce, for the purpose of seizing control of the aircraft
for his own ends. Investigation has not yet shown what these
ends are, but information pertaining to this is expected to be
developed through future investigation.

███ Pursuant to MIOG Section 265-3, Investigative
Policy and Procedures, Minneapolis will open an investigation
under the 265 (criminal) classification as investigation under
captioned pending 199 matter has developed information indicating
a terrorist or terrorist group is presently engaged in the
specific criminal acts described above.

███ Minneapolis requests that FBIHQ/CTD/ITOS/IU
expeditiously discusses this matter with the Office of
Intelligence Policy and Review (OIPR) at DOJ and secure
authorization for Minneapolis to contact the United States
Attorney's Office in the District of Minnesota pursuant to
determining the full merit for criminal prosecution and obtaining
search warrants for Moussaoui's effects, vehicles and residence
and subpoenas for his financial and telephone toll records.
Minneapolis wishes to emphasize the urgency of this matter in
reminding recipients that it is as yet unknown how far advanced
the plan is or how many as yet unidentified co-conspirators
exist. The LHM enclosed for the Iran Unit is provided to
facilitate this process.

 Minneapolis request that London and Paris provided
enclosed LHMs to host government security and law enforcement
authorities as appropriate in order to request their assistance

SECRET
22

M-HQJ-88000023

NA-1713



SECRET

To: Counterterrorism  From: Minneapolis
Re: ▮▮▮ 199M-MP-60130, 08/18/2001

in fully identifying captioned subject and any associates yet unknown. Minneapolis has yet to identify contacts locally, leading to the conclusion that the majority of Moussaoui's and Al-Attas' support originates in Oklahoma or overseas. This is supported by Moussaoui's residency in London and Al-Attas' admission that he is aware that Moussaoui receives funds from overseas via his bank in Norman, Oklahoma.

▮▮▮ Minneapolis believes that the preponderance of information to be gained from future investigation will concern the specific criminal acts set forth above. However, as there is reason to believe that Moussaoui and Al-Attas are part of a larger international radical fundamentalist group, captioned pending 199 matter will remain open and a classified subfile to the 265 matter will be opened to serve as a repository for classified information developed.

SECRET
24

M-HQJ-88000024

NA-1714



SECRET

To: Counterterrorism   From: Minneapolis
Re: ▮▮▮ 199M-MP-60130, 08/18/2001

LEAD(s):

Set Lead 1:

COUNTERTERRORISM

AT ITOS/IRAN UNIT

▮▮▮ FBIHQ/CTD/ITOS/IU is requested to expeditiously contact Office of Intelligence Policy and Review (OIPR) at DOJ in order to secure authorization for Minneapolis to contact the United States Attorney's Office in the District of Minnesota pursuant to criminal prosecution in a parallel 265A matter. The LHM enclosed for the Iran Unit is provided to facilitate this process.

Set Lead 2:

INVESTIGATIVE SERVICES

AT IRU1/IRU2

▮▮▮ For information.  Read and clear.

Set Lead 3:

PARIS

AT PARIS, FRANCE

▮▮▮ Provide enclosed Letterhead Memorandum to host government security services as appropriate.  Forward to Minneapolis any information developed relating to captioned subjects or associates.

Set Lead 4:

LONDON

AT LONDON, ENGLAND

▮▮▮ Provide enclosed Letterhead Memorandum to host government security services as appropriate.  Forward to Minneapolis any information provided by them relating to captioned subjects or associates.



SECRET

M-HQJ-88000025



To:  Counterterrorism  From:  Minneapolis
le: ▓▓▓▓ 199M-MP-60130, 08/18/2001

Set Lead 5:

<u>OKLAHOMA CITY</u>

<u>AT NORMAN, OKLAHOMA</u>

▓▓▓ Oklahoma City is requested to initiate
investigations as necessary to fully identify the following
individuals who have surfaced in connection with captioned
matter:

Hussein Ali Hassan Al-Attas, DOB 01/23/1978, residing at 209A
Wadsack Drive, Norman, Oklahoma 73072, telephone (405) 325-9885,
Yemeni passport #0503683, is in the U.S. on an F1 (student) visa
and claims he is a student at the University of Oklahoma.
Abdulla Al-Attas, listed as an alternate registered owner on
Hussein's vehicle.

Mukharan Ali, an Indian Muslim, believed to be a student at the
University of Oklahoma.

Dr. Tariq Mahmood, 2828 N. Glenhaven Dr., Midwest City, Oklahoma,
73110

Mohamed Al-Bahalagi (phonetic) believed to be from Saudi Arabia
and his roommate, Abuda LNU, from Bahrain.  Both individuals are
believed to have been acquaintances of captioned subject at
Airman Flight Academy, 1950 Goddard Avenue, Norman, Oklahoma
73069.

✦✦



SECRET
16

M-HQJ-88000026