# Exhibit 20

Page 1947

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION
 3   UNITED STATES OF AMERICA,      .       Criminal No. 1:01cr455
                                    .
 4      vs.                         .       Alexandria, Virginia
                                    .       March 23, 2006
 5   ZACARIAS MOUSSAOUI,            .       9:30 a.m.
     a/k/a Shaqil, a/k/a            .
 6   Abu Khalid al Sahrawi,         .
                                    .
 7              Defendant.          .
                                    .
 8   .   .   .   .   .   .   .   .   .
 9                  TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE LEONIE M. BRINKEMA
10              UNITED STATES DISTRICT JUDGE
11                      VOLUME IX
12   APPEARANCES:
13   FOR THE GOVERNMENT:        ROBERT A. SPENCER, AUSA
                                DAVID J. NOVAK, AUSA
14                              DAVID RASKIN, AUSA
                                United States Attorney's Office
15                              2100 Jamieson Avenue
                                Alexandria, VA 22314
16
17   FOR THE DEFENDANT:         GERALD THOMAS ZERKIN
                                KENNETH P. TROCCOLI
18                              ANNE M. CHAPMAN
                                Assistant Federal Public Defenders
19                              Office of the Federal Public
                                Defender
20                              1650 King Street
                                Alexandria, VA 22314
21
22
23           (APPEARANCES CONT'D. ON FOLLOWING PAGE)
24
25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Page 2142

1    testifying.  But, look, at this point let's get the testimony in,

2    and we can address this issue of exhibits down the road.

3           MR. NOVAK:  We have no objection to the PowerPoint

4    except for the last page, which they have done in a separate

5    exhibit and which we will deal with at the end.

6           THE COURT:  All right.

7           MR. TROCCOLI:  That is correct.  That is marked, Your

8    Honor, as Defense Exhibit 950A.  And Mr. Rigler will not display

9    that to the jury until we get a ruling from the Court.

10          THE COURT:  All right.

11          MR. TROCCOLI:  We can address that at that time.

12          THE COURT:  Sir, for the record, would you please state

13   your full name and spell your last name.

14          THE WITNESS:  I am Erik Rigler, last name is spelled

15   R-i-g-l-e-r.

16          THE COURT:  Thank you.  Go ahead.

17          MR. TROCCOLI:  Thank you, Mr. Rigler.

18                        DIRECT EXAMINATION

19   BY MR. TROCCOLI:

20   Q.   Is your computer on?  Thank you, Mr. Rigler.  Can you please

21   tell the jury a little bit about your education?

22   A.   Wait just a second here.  I'm sorry.  We need to kill that

23   just a second so I can get it back to the start, Ms. Bishop.

24          I am ready now, please.

25   Q.   Very good.

Page 2143

1  A.   I apologize.

2  Q.   That's fine, Mr. Rigler.  Thank you.

3       Can you please tell the jury briefly what your

4  educational level is?

5  A.   I have a Bachelor's degree from North Texas State in Denton,

6  Texas.  I have a Master's degree in criminal justice from Sam

7  Houston State, that's in Huntsville, Texas.

8  Q.   And what has been your employment since you graduated from

9  college, briefly?

10  A.   During the Vietnam era, I was a pilot in the United States

11  Navy and flew both carrier and land-based aircraft.

12  Q.   And after that?

13  A.   I was recruited from the Navy by the Federal Bureau of

14  Investigation, where I served 23 years as a special agent.  Most

15  of my duties were in aviation.  I hold an airline transport pilot

16  rating.  I have about 5,000 hours flying FBI aircraft.

17  Q.   When you said special agent, is that special agent for the

18  FBI?

19  A.   Yes.

20  Q.   And are you currently retired from the FBI?

21  A.   I am.  Yes, I am.

22  Q.   What is your current employment?

23  A.   I have a small business called G Force.  G Force does

24  aviation accident and security investigations.

25  Q.   Are you also available for hire, like, by the Public

Page 2144

1    Defender's Office to act as a summary witness?

2    A.    Yes.

3    Q.    And are you being paid, in fact, by the public defender to

4    testify here as part of your summary witness responsibilities?

5    A.    Yes.

6    Q.    And approximately how much have you been paid by the Public

7    Defender's Office for your role as a summary witness in this case?

8    A.    I have billed 132 hours, just a little over $16,000 since the

9    first of the year.

10    Q.    Now, you are here to summarize a chapter in a report prepared

11    by the Department of Justice's Office of Inspector General; is

12    that correct?

13    A.    That's correct.

14    Q.    And that is what chapter of that report?

15    A.    Chapter 5.

16    Q.    And what does that chapter, just very briefly, deal with?

17    A.    It deals with the FBI's handling of the investigation

18    regarding two individuals involved in 9/11.

19    Q.    And who are those two individuals?

20    A.    Hazmi and Midhar.

21    Q.    And who are Hazmi and Midhar?

22    A.    These are two of the men that were aboard the aircraft that

23    crashed into the Pentagon.

24    Q.    Can you explain to the jury, please, why it was that the

25    Office of Inspector General was tasked with looking into the FBI's

1    handling of the information regarding Hazmi and Midhar?

2    A.    Yes.    In the days following 9/11, the Senate and the House of

3    Representatives had a select committee, it was a committee that

4    joined from both those elected bodies, they were

5    intelligence-related, to study 9/11.

6            At the conclusion of that, that committee is called the

7    Joint Investigative -- Joint Inquiry Investigative Committee or

8    the JIICI.    At the conclusion of that investigation, that

9    committee made a recommendation to various inspectors general that

10   they conduct further investigation of their respective

11   departments.    That would be the Department of Justice, Department

12   of State, the Central Intelligence Agency, and a review of items

13   at the FBI.

14   Q.    And did the -- you said JIICI recommended that the FBI --

15   that the Department of Justice Inspector General look into that?

16   A.    That's correct.

17   Q.    Did the FBI Director as well request a review?

18   A.    That's correct also.

19   Q.    What did the FBI Director request?

20   A.    He requested that the Inspector General from the Department

21   of Justice conduct an investigation of his agency, the FBI, with

22   regards to items stemming from 9/11 with the Phoenix memo, the

23   Moussaoui incident in Minnesota, and Hazmi and Midhar.

24   Q.    Now, before you summarize what the Inspector General found,

25   can you tell the jury, please, who was the Department of Justice

1    Inspector General?

2    A.    The Department of Justice Inspector General was a man at this

3    time by the name of Glenn Fine.  He was the overall director of

4    that agency or that department of about 450 personnel.

5    Q.    Can you tell the jury what is, not necessarily with respect

6    to Mr. Fine, but just what is the Office of Inspector General

7    within the Department of Justice?

8    A.    Following the Inspector General Act, several departments in

9    the government came underneath for investigative purposes in such

10   areas as fraud, waste, mismanagement, corruption, and Inspector

11   General is like an independent watchdog.  It is appointed by the

12   President.  The Inspector General responds to both, for the

13   Department of Justice, will respond by writing a letter or report

14   to the Attorney General and also to Congress.  And he reports to

15   two places.

16   Q.    And is the Office of Inspector General independent of the

17   Department of Justice itself?  Although it is a part of it, is it

18   independent, an independent body?

19   A.    Yes.

20   Q.    And does it exist pursuant to an act of Congress?

21   A.    That's correct.

22   Q.    Do you know if the -- the Inspector General is appointed by

23   the President; is that correct?

24   A.    Yes, sir.

25   Q.    Mr. Fine conducted an investigation concerning the FBI's

1    handling of the information that the FBI had prior to 9/11

2    concerning Khalid al-Midhar and Nawaf al-Hazmi.  That was the

3    scope of the investigation that he conducted in this case?

4    A.   That was a portion of it.  That is the chapter 5 portion.

5    Q.   There were other, other matters that the Inspector General

6    looked at as well?

7    A.   That's correct.

8    Q.   You are not here to talk about those?

9    A.   No.

10   Q.   Now, how did the Inspector General, Glenn Fine, go about

11   conducting his investigation generally?

12   A.   Well, there was a large document review, I think just over

13   14,000 pages of materials were reviewed, approximately 225

14   interviews of personnel associated mostly with the FBI and Central

15   Intelligence Agency.

16   Q.   Does the Inspector General have a staff or team of

17   individuals that he can call upon to help him with his

18   investigation?

19   A.   That's correct.  He has attorneys, he has investigators from

20   each agency that's assigned to him, he has support personnel,

21   other computer personnel, things like that.

22   Q.   And with respect to his investigators, what agencies can he

23   or did he draw from in this case, with this investigation?

24   A.   He had agents on his staff from the FBI detailed to the

25   Inspector General.

Page 2148

1   Q.   Do you know how many interviews, approximately, the Inspector

2   General conducted?

3   A.   225 interviews overall, 70 with regard to Hazmi and Midhar.

4   Q.   And you mentioned that he reviewed documents as well.  Do you

5   know how many, approximately?

6   A.   14,000 documents were reviewed.

7   Q.   And this is according to what's in his own report; is that

8   correct?

9   A.   That's correct.

10  Q.   You mentioned that the Inspector General's Office is

11  independent of the Department of Justice.  Is the Inspector

12  General also completely independent from the prosecution team

13  sitting here today?

14  A.   That's correct.  There's no way that he participates in this

15  prosecution, didn't authorize the indictment, doesn't follow or

16  pursue the investigation.

17  Q.   Not involved in the prosecution of Mr. Moussaoui at all?

18  A.   No.

19  Q.   Now, the chapter that you are summarizing, how long is that

20  chapter?

21  A.   I think about 140 pages.

22  Q.   And how was it that you -- can you give the jury a snapshot

23  on how it is that you are going to go about summarizing those 140

24  pages to them?

25  A.   The chapter 5, the Inspector General identified five areas of

Page 2149

1  opportunity, he called it, for the FBI to discover that Hazmi and

2  Midhar were in the United States and were associated with al Qaeda

3  and terrorism.  What I did was reviewed the book, the chapter,

4  reread the chapter 5, and then asked for and received the

5  underlying documents, those documents that were prepared by the

6  Inspector General's staff themself and the various communications

7  sometimes, and I prepared a PowerPoint slide that parallels the

8  Inspector General's report on chapter 5.

9  Q.   And you are going to first provide an overview of his

10 findings and then get into the details of each of those, you call

11 them -- the Inspector General referred to them as five

12 opportunities?

13 A.   That's what I will do.  And it starts from 1999 up to

14 September 2001.

15 Q.   Very good, Mr. Rigler.  Why don't you go ahead and start with

16 the first -- with the summary of the findings of the Inspector

17 General.

18 A.   Well, the report itself was published in November 2004.

19 Q.   Can I stop you there?  Do you have that with you?

20 A.   Yes, I do.

21 Q.   Can you just hold it up so the jury can see?  That's the

22 entire report, that includes chapter 5 and the other chapters as

23 well?

24 A.   That's correct.

25 Q.   Thank you.  You may continue.

Page 2150

1   A.    Among the findings that the Inspector found was that the FBI

2   had at least five opportunities to learn about the presence of

3   Hazmi and Midhar in the United States and to seek to find them

4   before September 11th, 2001.  I will be talking about the five

5   missed opportunities that comes from this report.

6          The first one the Inspector General places early in

7   September 2000.  That indicates Midhar travels to Kuala Lumpur,

8   Malaysia, where he meets with other al Qaeda operatives and

9   surveillance photographs --

10         MR. NOVAK:  I object.  Are we going to get question and

11  answer here or is it just going to be a speech?

12         THE COURT:  Well, the way it is presented, it is going

13  to be apparently a PowerPoint presentation.

14         MR. NOVAK:  That's what we did as well, and I remember

15  Mr. MacMahon screaming and yelling about the fact that we're not

16  asking questions and getting answers.  I think Mr. Troccoli should

17  ask questions and the witness should answer questions.

18         THE COURT:  I think that is appropriate as well.

19         MR. TROCCOLI:  I will ask questions, Your Honor.

20  BY MR. TROCCOLI:

21  Q.    What was the first missed opportunity, Mr. Rigler?

22  A.    The first one occurred early, January 2005.  It relates to

23  Midhar's travel to Kuala Lumpur, Malaysia, where he met with other

24  al Qaeda operatives and that surveillance photographs were taken.

25  We refer to these as the Malaysia photographs.  Sometimes we call

Page 2151

1   it the Malaysia meetings.

2   Q.   When you say "we," you mean the Inspector General?

3   A.   I'm sorry, the Inspector General does.  And when I reviewed

4   the book, I picked up his language, I apologize.

5   Q.   What else with respect to the first lost opportunity?

6   A.   The next point also in early January was Midhar was suspected

7   to be an al Qaeda operative and CIA learns that he had a multiple

8   entry U.S. visa.  And in March 2000, that Hazmi had traveled to

9   Los Angeles earlier that year, in January 2000.

10  Q.   Mr. Rigler, you mentioned here that Hazmi had traveled to Los

11  Angeles in January 2000.  Referring back to the first bullet on

12  this page, he came with Midhar.  Is that what the Inspector

13  General concluded?

14  A.   Yes.

15  Q.   In early January 2000?

16  A.   Yes.

17  Q.   And this is information according to the Inspector General

18  that the U.S. government had at that time?

19  A.   Let me clarify that, Mr. Troccoli.  I believe they only knew

20  that for sure one of them at the time had traveled.  Later on they

21  found out both of them had traveled.

22  Q.   Thank you.  What was -- is there anything else with respect

23  to the first opportunity?

24  A.   Yes, that the CIA did not disclose to the FBI the existence

25  of the visa held by Midhar and the surveillance photographs were

1  also not disclosed to the FBI.

2  Q.   You mentioned, Mr. Rigler, that Midhar's U.S. visa was a

3  multiple entry, multiple reentry or multiple entry U.S. visa?

4  A.   That's what it was, yes.

5  Q.   What is that?

6  A.   Well, it is a visa that's issued on his passport.  He held a

7  Saudi Arabian passport, and it granted him the opportunity to come

8  into this country with greater ease and more frequently.

9  Q.   Multiple means he can come on multiple occasions?

10  A.   Yes.

11  Q.   And what else with respect to the first lost opportunity?

12  A.   The CIA also did not share information that Hazmi had

13  traveled to the United States in January 2000.

14  Q.   And I think you indicated on a previous slide that the CIA

15  learned that in March of 2000?

16  A.   Yes, that was when they became aware of the January 2000

17  events.

18  Q.   And what was the second lost opportunity?

19  A.   In February 2000 Midhar and Hazmi came to San Diego, they

20  first went to Los Angeles, then moved to San Diego, where they

21  lived with a long-time FBI informant or asset.

22  Q.   And what is an FBI asset?

23  A.   It is a phrase within the FBI, principally on the

24  intelligence or terrorist side, it is another word for informant,

25  a person that is contacted regularly by the FBI and gives

U.S. v. MOUSSAOUI

 1    information.

 2    Q.    Now, did the FBI learn about that, that Midhar and Hazmi

 3    were, had moved in with an FBI asset?

 4    A.    Yes.  The agent who controls this asset in San Diego, in

 5    visiting with his source, his asset, found out that the two men

 6    were there but only learned their first names.

 7    Q.    No, my question is, did the FBI -- and I guess I am referring

 8    to your next bullet, trying to keep Mr. Novak happy.

 9    A.    Yes, sir.

10          MR. NOVAK:  I would be happier if they weren't leading

11    questions, though.

12          THE COURT:  Well, I let you-all lead a little bit, too.

13    So let's just keep this moving, unless it is a bad leading

14    question, then you can object.  Go ahead.

15          MR. TROCCOLI:  Thank you, Your Honor.

16    BY MR. TROCCOLI:

17    Q.    It says here the FBI does not learn until after 9/11 that

18    Midhar and Hazmi had lived with one of the assets.  Is that

19    correct?

20    A.    That's correct.

21    Q.    And why -- what does the Inspector General say about why they

22    did not learn about that?

23    A.    I think that's what I had answered previously, is that the

24    agent didn't inquire and get the last names.  He only got first

25    names.

U.S. v. MOUSSAOUI

Page 2154

1  Q.   The FBI wasn't even informed, correct?

2  A.   That's correct.

3  Q.   That they had come into the country at that time?

4  A.   Yes.  It was a coincidence that the agent in San Diego had

5  visited his source while Hazmi and Midhar were living there.

6  Q.   And what was the third lost opportunity?

7  A.   The third one is identified by the Inspector General in late

8  2000, early 2001, and it deals with a source that's in a reliable

9  position to provide information to the FBI and the CIA.  He

10  provides information related to the FBI investigation of the USS

11  Cole attack.

12  Q.   What is a source?

13  A.   Again, it is a method to identify an informant.  It does not

14  identify it, whether it could be an electrical source or a human

15  intelligence source.  It is just identified as a source.

16  Q.   And when was the USS Cole attack?

17  A.   I believe that was October 12th, 2000.

18  Q.   What was that attack, very briefly?

19  A.   The attack was a suicide boat that rammed into the USS Cole,

20  killing 17 sailors and injuring 39 others in the Gulf of Aden.

21  Q.   Now, did the source provide information with respect to

22  Midhar and Hazmi?

23  A.   Yes, that's correct.  The source linked Midhar and Hazmi with

24  the mastermind of the attack, a man they called then as Khallad.

25  Q.   And turning to your next slide, was the FBI informed about

Page 2155

1    that?

2    A.    The FBI was not informed that Khallad had been identified in

3    the Malaysia photographs, the ones take at Kuala Lumpur.

4    Q.    And what did the Inspector General conclude with respect to

5    what the identification could have led the FBI to do?

6    A.    The Inspector General's report says that the identification

7    could have led the FBI to focus on who else was at the meeting

8    with Khallad in Malaysia, who could have led the FBI to identify

9    and locate al-Midhar and Hazmi.

10   Q.    Prior to 9/11?

11   A.    Yes, sir.

12   Q.    And Mr. Rigler, what was the fourth lost opportunity?

13   A.    The fourth picks up in the summer of 2001.  The Inspector

14   General identifies CIA and FBI as having interactions with each

15   other, which touch on the participants in the Malaysia meeting of

16   July of 2000.

17            THE COURT:  I think that's January.

18            THE WITNESS:  I'm sorry, it is January 2000.  Thank you.

19            The meetings and information developed by CIA regarding

20   these meetings.

21   BY MR. TROCCOLI:

22   Q.    And what did the Inspector General find with respect to these

23   interactions?

24   A.    Despite these interactions, in e-mails and in a June 11th

25   meeting at the New York FBI office, the New York field office, the

Page 2156

1    FBI is never informed of critical intelligence information that

2    Khallad is identified in Malaysia photographs with Midhar and

3    Hazmi, with Midhar, and that Hazmi has traveled to the United

4    States.

5    Q.    And did the Inspector General conclude anything with respect

6    to this lost opportunity?

7    A.    Again, in the summer of 2001, it was the Inspector General's

8    conclusion that in the summer of 2001, the information could have

9    led the FBI to initiate a search for Hazmi earlier than it did.

10   Q.    And you have just Hazmi here.  Did the Inspector General

11   conclude the same thing with respect to Khalid al-Midhar?

12   A.    I'm not certain on that as far as the source of this

13   information at this point, based upon the information that they

14   had.

15   Q.    Well, maybe that will come out further when we provide the

16   details --

17   A.    I think so.

18   Q.    -- of that opportunity.

19          And go on, please, to the fifth lost opportunity.

20   A.    The fifth one picks up in August 2001.  And it is when the

21   FBI learns Hazmi met with Khallad in Malaysia in 2000 and that

22   Midhar had reentered the United States on July 4th, 2001.

23   Q.    This is what the FBI learned at that time?

24   A.    That came up in August 2000.

25   Q.    And what happened next?

Page 2157

1  A.   In early September 2001, the FBI starts searching for Midhar

2  and Hazmi.  The Inspector General said it was without high

3  priority and the agency failed to locate them before the attacks

4  of 9/11.

5  Q.   Did it say, did the Inspector General give a reason?

6  A.   It said that the FBI assigned few resources and there was

7  little urgency placed on the investigation by the FBI.

8  Q.   What else did the Inspector General conclude with respect to

9  that lost opportunity?

10  A.   It said that the separation between the intelligence and the

11  criminal information within the FBI, what is known as the wall,

12  affects who can receive access to the information about them.

13  Q.   And what about this interpretation hampered, or did it hamper

14  the ability of the FBI to locate Midhar and Hazmi?

15  A.   The interpretation of the wall hampered the investigation,

16  the ability of the New York agent working the USS Cole

17  investigation to participate in the search for Midhar and Hazmi.

18  Q.   Did the Inspector General conclude anything else with respect

19  to the fifth lost opportunity?

20  A.   The Inspector General identified a clear predicate for a

21  criminal investigation that no one appeared to notice at the time.

22  Q.   A criminal predicate for who?

23  A.   For the FBI.

24  Q.   With respect to Midhar and Hazmi?

25  A.   Yes, that's correct.

Page 2158

1  Q.   What is a criminal predicate?

2  A.   In the FBI, we -- I'm sorry, the FBI, when I was in the FBI,

3  you had to have some evidence that a crime had occurred or was

4  about to occur in order to open a case or conduct an

5  investigation, so it would be referred to as the predicate, how

6  you open the case, how you start the case for a criminal case.

7  Q.   And what else did the Inspector General conclude?

8  A.   That neither the CIA nor the FBI watchlisted Midhar or Hazmi

9  until August 24, 2001.

10  Q.   And what is watchlisting?

11  A.   Watchlist is a system in this country where we place

12  individuals' names on various computer databases to prevent them

13  from entering the United States.  Ports of entries, airport

14  customs, places where people would be coming into the United

15  States or perhaps applying in advance for visas or other

16  documentation to enter the U.S.

17  Q.   Did the Inspector General conclude anything else with respect

18  to this opportunity?

19  A.   The fifth conclusion by the Inspector General was that the

20  FBI was not close to locating Midhar and Hazmi before the 9/11

21  attacks.

22  Q.   Mr. Rigler, can you please go to the next two slides.  Can

23  you just tell the jury and the Court what the next two slides are?

24  A.   These look similar as I look across the room here, but they

25  are different.

Page 2159

1          This one starts in late 1999.  It is a timeline that

2    runs across the page from left to right.  And it has bulleted

3    events.

4          This is from page 227 of the Inspector General's report.

5    The next one is part 2 of this, and it continues across to the

6    right to the September 11 attack.  This is page 228 from his

7    report.

8          MR. TROCCOLI:  Your Honor, these are hard to read.  We

9    would ask the Court for permission to pass out to the jury these

10   two pages so that they can use them to follow along with

11   Mr. Rigler's PowerPoint.

12         We also have, before Mr. Novak either agrees or objects,

13   we have the next three slides, slides which Mr. Rigler can also

14   turn to in a moment, provide a list of some of the names that will

15   come up during his summary of the report, and we would like to

16   give those three pages as well to the jury.

17         MR. NOVAK:  That's fine with us.

18         THE COURT:  That's fine.  Do you have those all set to

19   go?

20         MR. TROCCOLI:  Yes, Your Honor.

21         THE COURT:  All right.

22         MR. TROCCOLI:  May I proceed, Your Honor?

23         THE COURT:  Yes, sir.

24         MR. TROCCOLI:  Thank you.

25   BY MR. TROCCOLI:

Page 2160

1  Q.   Just so the jury can know what they have just received, the

2  timeline is in two parts, Mr. Rigler?

3  A.   That's correct; it is part 1 and part 2.

4  Q.   And it spans the time period, if you go back to part 1, it

5  spans the time period from late 1999, correct?

6  A.   That's correct.

7  Q.   All the way up to, if you can go to part 2, please, although

8  it doesn't come out here, on the hard copy it is September 15,

9  2001.  Correct?

10  A.   That's correct.  That's the final date at the bottom right.

11  Q.   Very good.  And who are some of the names that come up in

12  chapter 5 of the Inspector General's report that the jury should

13  be aware of?

14  A.   Are you referring to FBI and CIA personnel?

15  Q.   Yes.

16  A.   Okay.  There are nine individuals that were involved in this

17  chapter 5 that were identified by the Inspector General, Dina

18  Corsi at the FBI is an analyst here in Washington, D.C. at the

19  Usama Bin Laden Unit.  Rod Middleton is her supervisor.  At that

20  time he was the acting supervisor of that unit.

21        Doug Miller is an FBI agent who is a detailee to the

22  Central Intelligence Agency, Alec Station.

23  Q.   What is the Alec Station?

24  A.   It is apparently a squad or a unit at Central Intelligence

25  that dealt with a specific issue related to Usama Bin Laden.

Page 2161

1    Q.    And what is, you say he was a detailee.  Can you tell the

2    jury what a detailee is, please?

3    A.    Starting in about 1996, the FBI and the CIA began to exchange

4    employees.  That would be where a CIA employee would actually go

5    to work every day at FBI headquarters or at one of the FBI

6    offices.  And the same thing goes where an FBI employee would

7    report to Central Intelligence for an 8-to-5 job at CIA, although

8    they are an FBI employee.

9    Q.    And what other names will come up in your summary?

10   A.    We identify "Mary" as an FBI analyst.  Robert Fuller is the

11   special agent in New York who was on the Usama Bin Laden squad

12   there at the New York field office.  Steve Bongardt is also an FBI

13   agent in New York City on that same squad.

14   Q.    Anyone else?

15   A.    The last of the nine are "John," who is a CIA detailee to the

16   FBI's Terrorism Operations Section; "Patrick," who is an

17   Immigration agent assigned to the FBI office in New York; and

18   "Peter," who is a CIA agent assigned to the Counterterrorism

19   Center at CIA.

20   Q.    Now, Mr. Rigler, I notice some of these names are in first

21   names and they are in quotes.  Can you tell -- does the Inspector

22   General -- let me ask it in a leading question, leading way.  The

23   Inspector General did not want to reveal in his report some of the

24   names, the real names of some of the individuals that were

25   discussed in the report; is that correct?

Page 2162

1   A.   That's correct.

2   Q.   And that's why some of the names are given these first names

3   in quotes?

4   A.   Yes, sir.

5   Q.   All right.  Mr. Rigler, please turn to the timeline and

6   explain to the jury what the Inspector General found with respect

7   to the first lost opportunity starting in late 1999.

8   A.   This timeline has got three dates on it, late 1999 and early

9   2000.  The first one just is placed in by the Inspector General to

10  identify that there was a heightened concern by the intelligence

11  committee -- correction, intelligence community due to concerns

12  over the Millennium, the celebration of the new century.

13  Q.   And does the intelligence community include various agencies,

14  including the CIA?

15  A.   Yes.  It would be the FBI, NSA, some military intelligence

16  agencies, items such as that.

17  Q.   All right.  And what happened in late 1999?

18  A.   The National Security Agency or NSA obtains information that

19  persons named Khalid and Nawaf were planning to travel to

20  Malaysia.  And then in early 2000, the CIA determines links

21  between these two individuals and al Qaeda, and it further

22  identifies Khalid as Khalid al-Midhar.

23  Q.   What happened next?

24  A.   In January 5, 2000, the events are that Midhar arrives in

25  Kuala Lumpur, Malaysia.  His passport is presented at the airport

Page 2163

1    and it is copied.  And at that point, they realize that it

2    contains a United States endorsement visa, the multi-entry visa.

3    Several CIA cables discuss Midhar's travel and discuss also the

4    discovery of the visa on his Saudi passport.

5    Q.   And you say several CIA cables.  These are cables generated

6    at or around that time?

7    A.   That's correct.  A CIA cable is like what we might call an

8    e-mail or a teletype.  It is just their language for a

9    communication.

10   Q.   And what else happens on January 5?

11   A.   Midhar met with Hazmi and other Usama Bin Laden operatives in

12   Kuala Lumpur.  The meeting was surveiled.  Photographs were

13   obtained at the request of the U.S. government.

14   Q.   Is that what the Inspector General referred to in a prior

15   slide as the Malaysia photographs?

16   A.   Yes, sir.

17   Q.   What happens next?

18   A.   Again, on January 5, contemporaneously with that meeting, an

19   FBI agent or FBI employee who is detailed to the CIA

20   Counterterrorism Center, Doug Miller, reads the relevant CIA

21   cables and drafts a Central Intelligence Report or a CIR.

22   Q.   What is a CIR?

23   A.   It is just a communication.  Miller was preparing this

24   communication to travel that distance from CIA to FBI to provide

25   official notification of the events that were taking place in

Page 2164

1     Malaysia.

2     Q.    Does the Inspector General say whether Doug Miller, even

3     though an FBI employee, could just pass information to the FBI, or

4     did Doug Miller have to receive the approval of the CIA?

5     A.    By arrangements, our understanding between the two agencies,

6     only a CIA employee can release information from CIA files on an

7     official basis.  In other words, it is prepared by the FBI

8     employee because of the need for the FBI to get that information,

9     but it still has to be released by CIA.

10    Q.    And what did the Central Intelligence Report prepared by Doug

11    Miller include?

12    A.    It included that NSA information that Midhar had planned

13    travel to Kuala Lumpur, that photos of Midhar would be sent via

14    separate cover, and that details of Midhar's passport, multi-entry

15    visa, including New York as an intended destination on the visa,

16    with a planned three-month stay.

17    Q.    Does the Inspector General find that this Central

18    Intelligence Report with this information was ever passed to the

19    FBI?

20    A.    The report was not sent to the FBI per direction of CIA.

21    Q.    What was the next event, please, Mr. Rigler, that happened?

22    A.    Still on opportunity one, the timeline starts again at

23    January 8th, 2000.  Hazmi departs Malaysia for Bangkok, Thailand,

24    and on January 15, he traveled to and arrived at Los Angeles,

25    California.

Page 2165

1  Q.  Can I stop you there?  You just went to the next slide and

2  answered my question.

3          Go ahead, put up the next bullet.  I was going to ask

4  when did the CIA learn that Hazmi had, in fact, traveled to Los

5  Angeles?

6  A.  That would be March 5th, 2000.

7  Q.  And what else did the, what else did the CIA do at or around

8  March 5th, 2000?

9  A.  Well, it did not pass this information to the FBI until

10  August 2001.

11  Q.  Anything else?

12  A.  CIA also did not place either Midhar or Hazmi on anybody's

13  watchlist.  And Midhar and Hazmi, meanwhile, were placed on

14  watchlists of other countries, including the watchlist of

15  Thailand.

16  Q.  Mr. Rigler, what did the Inspector General conclude with

17  respect to the facts that you just presented?

18  A.  It was his conclusion that Hazmi was with al Qaeda operatives

19  who had traveled to Malaysia and were photographed with other

20  suspected operatives, that Hazmi traveled to Bangkok with a third

21  person, that Midhar had this multi-entry U.S. visa, Hazmi traveled

22  to Los Angeles in January 2000.

23  Q.  And did the Inspector General conclude whether any of this

24  information was passed to the FBI?

25  A.  It is indicated that significant pieces of information not

Page 2166

 1   provided to the FBI were Midhar's U.S. multiple-entry visa,

 2   Hazmi's travel to the United States, Khallad's identification in

 3   Malaysia, and the fact that CIA did not watchlist Midhar or Hazmi

 4   until August 24, 2001.

 5   Q.   And, again, Khallad was the person that you -- the Inspector

 6   General noted in a previous slide was the mastermind of the Cole

 7   bomb?

 8   A.   That's correct.

 9   Q.   All right, Mr. Rigler.  Can you please go to the second lost

10   opportunity.

11   A.   This one goes back to the timeline, the second opportunity

12   identified by the Inspector General in January 15th, 2000, Midhar

13   and Hazmi travel to Los Angeles.  The visa entitled him to stay

14   until July 14, 2000.

15            On February 8th, 2000, Midhar and Hazmi moved from Los

16   Angeles to San Diego, where they live in an apartment complex.

17   Q.   What happens next?

18   A.   In March 2000 the CIA learns now that Hazmi had traveled to

19   Los Angeles on January 15, but that fact was not shared with the

20   FBI until more than a year later, August 2001.

21   Q.   That's what was just discussed in the first lost opportunity?

22   A.   That's correct.

23   Q.   And what happens next?

24   A.   On May 31, 2000, Midhar and Hazmi were in a room in the

25   residence of an FBI asset, a man they had met at a local mosque.

Page 2167

1    Q.    How long did the Inspector General find that Midhar and Hazmi

2    lived with the FBI informant?

3    A.    Well, in June 2000 Midhar moved from the asset's residence

4    and departed the United States.  Hazmi continued to live there

5    until December 10th, at which time he moved from San Diego, from

6    the asset's residence, traveled to Phoenix, where he lived with

7    Hani Hanjour, also a terrorist aboard American Airlines 77, and he

8    lived there three months.

9    Q.    And you say Midhar departed the United States.  He flew out

10   of the United States; is that correct?

11   A.    That's correct.

12   Q.    Very well.  What did the FBI -- what did the Inspector

13   General find next?

14   A.    With regard to opportunity two, the findings of the Inspector

15   General were that the FBI did not obtain information about Midhar

16   and Hazmi in San Diego from their own source, who had been an

17   asset since 1994.  While living in San Diego, Midhar and Hazmi did

18   not hide their identities.

19   Q.    Mr. Rigler, again, with respect to the FBI did not obtain the

20   information, that was because they were not informed?

21   A.    Yes, they didn't get the lead-in information from CIA that

22   the men were in the country.

23   Q.    And what did the Inspector General say with respect to the

24   use of the real names of Midhar and Hazmi?

25   A.    He said with the real names, they rented an apartment,

Page 2168

1    obtained drivers' licenses in California, they opened bank

2    accounts under the real name, received credit cards with real

3    names, purchased a used car, obtained automobile insurance, they

4    took flight lessons at a local flying school, and they obtained

5    phone service which listed Midhar's name in the telephone

6    directory.

7    Q.   All right, Mr. Rigler, please go on to the third lost

8    opportunity.

9    A.   This is back on the timeline, and it is footnoted by the

10   Inspector General as starting in August 7th, 1998.  That's the

11   date that the East Africa bombings occurred on U.S. embassies in

12   Tanzania and Kenya.  The New York office of the FBI is assigned or

13   tasked with the duty to conduct the criminal investigation on

14   those two crimes.

15   Q.   What happens next?

16   A.   On May 1st, the CIA and the FBI begin interviewing or

17   questioning their source, the one they shared.  He provided

18   significant information about al Qaeda operations at the time.

19   The source gave them information about Khallad.  And the source

20   said Khallad was the person involved in the bombings of the

21   embassy and that Khallad was a trusted senior Usama Bin Laden

22   operative.

23   Q.   Mr. Rigler, what does it mean that it was a joint source?

24   A.   The two agencies shared the source.  It is sometimes they

25   interview them together, sometimes one or the other will interview

Page 2169

1   him.

2   Q.   And what happened next?

3   A.   October 12th, 2000, that's the attack on the USS Cole in

4   Yemen.  The New York field office is assigned to lead that

5   investigation.

6   Q.   The same, same office leading the investigation in the

7   embassy bombings?

8   A.   That's correct.  On December 16th, the source again

9   identifies Khallad as the mastermind on this event, this attack,

10  also, so the embassy bombings and the attack on the USS Cole are

11  both done by Khallad.

12  Q.   Or with his involvement?

13  A.   That's correct.

14  Q.   Does the source make any other identification?

15  A.   January 4th, the source identifies Khallad as being in those

16  photographs from Malaysia.

17  Q.   And those were the photographs -- those are the photographs

18  of the meetings in Malaysia attended by Khalid al-Midhar and Nawaf

19  al-Hazmi?

20  A.   That's correct.

21  Q.   What does the Inspector General say with respect to that?

22  A.   The Inspector General says that the source's identification

23  of Khallad in the photos in Malaysia raises question of whether

24  Midhar and Hazmi were also linked to the attack on the USS Cole.

25  Q.   And does the Inspector General make conclusions with respect

1   to these, these facts?

2   A.   These are the conclusions or the findings and the findings

3   that the FBI was not aware of the identification by this source of

4   Khallad in the meeting photographs, that the New York FBI office

5   was not aware even of the existence of the photographs from the

6   Malaysia meeting.

7   Q.   What does the Inspector General say with respect to that?

8   A.   Had the FBI known about identification of Khallad in the

9   Malaysia photographs, agents would have likely sought information

10  about other participants at the meeting, including Midhar and

11  Hazmi, which would have increased the FBI's chance to locate them

12  prior to the events of September 11th.

13  Q.   All right, Mr. Rigler.  Can you please go to the fourth lost

14  opportunity?

15  A.   Opportunity 4, again, is footnoted with the October 12, 2000

16  attack on the USS Cole, and, again, it identifies agents who lead

17  that investigation.  Steve Bongardt, a New York FBI agent, is

18  assisted by Dina Corsi, again, an analyst from the FBI office in

19  New York -- correction, in Washington, D.C.

20  Q.   She is the intelligence research specialist or intelligence

21  operations specialist, I think?

22  A.   That's correct, ITOS.  She is from the Usama Bin Laden Unit

23  at FBI headquarters.

24  Q.   And what happens next?

25  A.   In May 2001, "John," who is identified as a CIA deputy chief

Page 2171

1    of the Usama Bin Laden Unit, he is detailed to the FBI Terrorism

2    Operations Section.  He becomes interested in the Malaysia meeting

3    photographs and the relationship to the bombing of the USS Cole.

4    Q.   What does "John" do?

5    A.   "John" asks another CIA employee, "Peter," about the Malaysia

6    meeting.  "John" becomes aware at that time that Hazmi had

7    traveled to the United States in January 2000 and that Khallad was

8    at the meeting identified in the photographs at Kuala Lumpur,

9    Malaysia.

10   Q.   And again, "John" and "Peter" are FBI employees?

11   A.   No.  I believe, I believe they are both CIA employees.

12   Q.   CIA, I'm sorry, CIA employees?

13   A.   Right.

14   Q.   But "John" is detailed to the FBI?

15   A.   That's correct.

16   Q.   And what happens next?

17   A.   Near the end of May of 2001, Dina Corsi, who is the FBI

18   analyst, learns of the January 2000 Malaysia meeting photographs

19   when "John" gives some of them to her.  She knew Midhar was in the

20   photographs, but neither "John" nor "Peter" told Dina Corsi that

21   Khallad was in the photographs, that Midhar held a multiple-entry

22   visa, or of Hazmi's travel to the United States in January 2000.

23   Q.   She is given some information but not all?

24   A.   That's correct.

25   Q.   And what happens also at the end of May?

U.S. v. MOUSSAOUI

1    A.   Also at the end of May, Corsi plans at that time a meeting in

2    New York with the FBI agents there to discuss the USS Cole

3    investigation.  And the planned participants were New York agents

4    who were working the Cole, including Steve Bongardt; "Mary," who

5    is an FBI detailee to the CIA Counterterrorism Center, who had

6    recently been assigned and told to get up to speed about the

7    Malaysia meetings; and "Peter," the CIA employee.

8    Q.   What was the purpose of the meeting, generally?  Was it an

9    information-sharing meeting?

10   A.   Yes, it was to share information between CIA, FBI

11   headquarters, to assist the New York agents working the USS Cole

12   attack.

13   Q.   And what happened at that June 11 meeting?

14   A.   The June 11 meeting occurred.  Corsi meets with the New York

15   Agent Bongardt and others who were working the investigation.

16   CIA's "Peter" and "Mary" attend the meeting.  Corsi displays three

17   of the Malaysia photographs but does not tell the New York agents

18   their relationship to al Qaeda due to the restrictions of the

19   wall, as she understood them.

20   Q.   And the three, the three Malaysia photos, those were the ones

21   referenced in the other slides that "John" had given to her?

22   A.   That's correct.

23   Q.   And we have heard a lot about what the wall means, but that

24   was the reason that the Inspector General found that Ms. Corsi did

25   not pass all the information to the New York agents?

Page 2173

1    A.    That's correct.

2    Q.    What else were the New York agents not informed about?

3    A.    They also were not informed about Midhar's visa to the United

4    States or the fact that Khallad was in the Malaysia photographs.

5    Q.    And what else about that event?

6    A.    Corsi also did not leave the photographs with the New York

7    agents because she did not believe she was permitted to do so.

8    Q.    What happened next, Mr. Rigler?

9    A.    June to August 2001, the Inspector General found that there

10   was some limited follow-up by Corsi about the Malaysia photographs

11   or permission from NSA to pass Midhar intelligence to the New York

12   field office.

13   Q.    And that's because the Inspector General said the NSA, some

14   of the information came from the NSA?

15   A.    That's correct.

16   Q.    And what did the Inspector General conclude with respect to

17   the facts you have just summarized?

18   A.    In his findings with regard to opportunity four, he noted

19   that while there were several interactions between the FBI and CIA

20   in May and June that could have resulted in the FBI learning about

21   the Malaysia photographs and Midhar, the FBI personnel did not

22   become aware of significant intelligence about the Midhar

23   connection to Khallad.  What he is referring to is informal

24   intelligence that could be passed.

25   Q.    What was it that was not disclosed to the New York agents?

Page 2174

1  A.   Well, not disclosed to Corsi or FBI New York agents in May

2  and June, again, the visa, the multiple-entry visa on Midhar,

3  Hazmi's presence at that al Qaeda meeting in Malaysia, Hazmi's

4  travel to Los Angeles, Khallad's identification in Malaysia.

5  Q.   And Hazmi's travel to Los Angeles was on January 15th, 2000?

6  A.   I believe that's correct.

7  Q.   Does the Inspector General make any other findings?

8  A.   He noted that the June 11th meeting became very contentious

9  when agents in New York wanted more information about the Malaysia

10 meeting, and Corsi refused to provide that information because of

11 restrictions she felt about the wall.

12 Q.   What else did the Inspector General find?

13 A.   The Inspector General found that there was little follow-up

14 by either Corsi or the New York field agents regarding the

15 Malaysia photographs and that CIA and FBI interaction, again,

16 failed an opportunity for the FBI to obtain critical information.

17 Q.   Very good, Mr. Rigler.  Can you please turn to the fifth lost

18 opportunity?

19 A.   The fifth one starts on July 13th, 2001.  This is where

20 "John," the CIA employee, writes a communication back to his

21 agency from the FBI in which he starts the lead sentence by

22 saying:  "Okay, this is important."  It is a cable and he is

23 asking information about the identification of Khallad in the

24 Malaysia photographs and wants to know if he can hand that over to

25 the FBI.

1  Q.   And the "this is important" is referring to the information?

2  A.   I'm sorry, say that again?

3  Q.   When he says "this is important," it is in reference to the

4  information referenced down here (indicating)?

5  A.   That's correct.

6  Q.   I am having a little bit of a problem clearing -- there we

7  go.  Thank you.

8          And what did the Inspector General conclude with respect

9  to or find with respect to the cable?

10 A.   In the cable "John" indicated that he called Khallad a

11 major-league killer who orchestrated the USS Cole attack and

12 possibly the Africa bombings.

13 Q.   Was there any evidence at all that the CIA acted on that

14 request?

15 A.   No evidence that CIA managers responded to John's "okay, this

16 is important" communication until August 30, 2001.

17 Q.   And what did "John" do after writing this cable?

18 A.   On July 23, having seen no action, "John," again,

19 communicated with CIA by writing them, inquiring about the status

20 of his request to pass this information on to the FBI.

21 Q.   And what did the Inspector General say about that e-mail?

22 A.   Well, in that e-mail "John" noted that when the next big op

23 is carried out by UBL or Usama Bin Laden hardcore cadre, Khallad

24 will be at or near the top of the command food chain -- and

25 probably nowhere near either the attack site or Afghanistan.  That

Page 2176

1    makes people who are available and people who have direct access

2    to him of very high interest.  Khalid al-Midhar should be of very

3    high interest anyway, given his connection.

4    Q.   And two individuals, according to previous slides, two

5    individuals who did have, were available and who had direct access

6    to Khallad were Khalid al-Midhar and Nawaf al-Hazmi?

7    A.   That's correct.

8    Q.   What happened next, Mr. Rigler?

9    A.   August 21, 2001, "Mary" locates a CIA communication regarding

10   Hazmi's travel to the United States on January 15, 2000.  She

11   checks with the U.S. Customs representative about Hazmi and

12   Midhar's travel and discovers that Hazmi -- correction, Midhar had

13   entered the United States on July 4, at JFK Airport in New York

14   but has not departed.

15   Q.   Now, "Mary" is at the CIA, but she is an FBI detailee?

16   A.   Yes, that's correct.

17   Q.   And what did "Mary" do with this information?

18   A.   "Mary" immediately leaves a voice mail message for Dina Corsi

19   at FBI headquarters.  Dina Corsi is on annual leave that day.

20   Q.   What happens the next day?

21   A.   There is a meeting that takes place on August 22nd in which

22   "Mary" met with Dina Corsi at the FBI headquarters and tells her

23   of information that she learned the prior day.  This information

24   Corsi confirms, that Midhar and Hazmi had entered the United

25   States on January 15th, 2000, stating their destination was a

Page 2177

1    Sheraton Hotel in Los Angeles, that Midhar departed the United

2    States on June 10, 2000; there was no departure record, however,

3    for Hazmi.  There was a record that Midhar had reentered the

4    United States July 4th, 2001, at JFK Airport in New York and

5    listed destination as the Marriott in New York City.

6         There was no record Midhar departed the United States.

7    Q.   Mr. Rigler, this is information that Ms. Corsi confirms once

8    she has her meeting with "Mary" and "Mary" passes the information

9    to her?

10   A.   That's correct.

11   Q.   And what did -- what did Ms. Corsi conclude with respect to

12   Hazmi?

13   A.   She incorrectly assumed that Hazmi had also left the United

14   States July 10, 2000, when Midhar left.

15   Q.   In fact, had he left?

16   A.   In fact, he remained in the United States.

17   Q.   What happened next, please?

18   A.   On August 22, 2001, "Mary" asks another CIA officer in the

19   Terrorism Center to draft notice to the Department of State,

20   Immigration, U.S. Customs, and the FBI requesting that Midhar and

21   Hazmi be placed on various agencies' respective watchlists.

22   Q.   And when was it that they were actually placed on a

23   watchlist?

24   A.   They were actually placed on the watchlist for the first time

25   August 24, 2001.

Page 2178

1   Q.   And can you please tell the jury what the Inspector

2   General -- how the Inspector General describes the various

3   watchlists that existed back then?

4   A.   The watchlist system in effect in 2001, according to the

5   Inspector General, was along the lines of department and state

6   that had a system that they called VISA/VIPER, also one called

7   TIPOFF.  These are computer databases for persons who are seeking

8   entry into the United States.  Immigration also made a system,

9   maintained a system called LOOKOUT, and Customs had one that they

10  called TECS, which is Treasury Enforcement Computer System.

11  Q.   And, again, these are primarily border searches, border

12  systems?

13  A.   Yes.  So if a person is entering this country or making

14  application in this country for entry, the name, date of birth,

15  passport number, and other identifying features are compared with

16  names in these database.

17  Q.   Mr. Rigler, what happened next with -- what did Ms. Corsi do

18  next?

19  A.   On August 23, Corsi contacted her supervisor, Rod Middleton,

20  regarding Midhar's travel to the United States, and tells him

21  Midhar entered the U.S. on July 4, 2001, and that there was no

22  indication that he had departed the country.

23  Q.   And what was Mr. Middleton's reaction?

24  A.   He recalled his reaction to the Inspector General as an "oh,

25  shit" moment.

Page 2179

1  Q.   And what did they agree to do?

2  A.   Middleton and Corsi agreed that an investigation should be

3  opened to locate Midhar.

4  Q.   What action does Ms. Corsi take next?

5  A.   On August 27 she requests permission through the NSA

6  representative at the FBI to pass to the FBI agents in New York

7  information about the USS Cole investigation that would assist

8  them in associating Midhar with a terrorist facility in the Middle

9  East that's linked to al Qaeda activities.

10  Q.   This is -- is this the same information that she did not pass

11  to the FBI New York office at the June 11 meeting?

12  A.   Yes, it is a portion of that information not passed.

13  Q.   What happens next, please?

14  A.   On August 28th, Corsi sent the New York field office an

15  electronic communication, in the FBI we call it an EC, it is like

16  an e-mail, it is a computer-generated communication, requesting

17  that a full field investigation be made to open, to locate Midhar.

18  Q.   Was it a full field criminal investigation or a full field

19  intelligence investigation?

20  A.   It is an intelligence investigation is what she has asked New

21  York to open.

22  Q.   And how does she mark her EC?

23  A.   Despite the urgency, the Inspector General noted that Corsi

24  marked her EC as routine, which is the lowest level of precedence

25  in the three levels within the FBI.

Page 2180

1  Q.   What are the three levels of precedence for an FBI EC at that

2  time?

3  A.   Routine, priority, and immediate.

4  Q.   And what does routine mean?

5  A.   Routine in the FBI is described as being within the normal

6  course of business.

7  Q.   What happens next, please.

8  A.   Still on the timeline for opportunity five, the day of August

9  28th, her EC is provided to various criminal agents in New York on

10  the Usama Bin Laden Squad, including Steve Bongardt.  Bongardt

11  argues that Midhar investigation should be opened as a 265 rather

12  than an intelligence, a criminal case rather than an intelligence

13  case.

14  Q.   What is a 265, and what is a 199?

15  A.   Well, the FBI categorizes things such as 91 would be a bank

16  robbery or 15 would be theft from interstate shipment.  It is a

17  method to file records.  A 199 is an intelligence investigation of

18  international terrorism, whereas a 265 is a criminal investigation

19  of international terrorism.

20  Q.   What happens next, please.

21  A.   Also on August 28th, Corsi asks Bongardt to delete the

22  communication in his computer because it contains NSA information

23  that he shouldn't have, since he is a criminal agent.

24  Q.   Was that information sent to him by mistake?

25  A.   It was shared among agents in New York.  In other words, it

Page 2181

1    went into the intelligence side of the house but was shared with

2    the agents working the criminal investigation on the USS Cole.

3    Q.   What happens next, please.

4    A.   On August 29, 2000, Corsi e-mails Bongardt telling him about

5    the decision of the National Security Law Unit, that's a unit here

6    in FBI headquarters, stating that no criminal agent should attend

7    any interview of Midhar if he is located.

8    Q.   What is the National Security Law Unit?

9    A.   It is a small unit in the FBI headquarters that receives and

10   evaluates policy and particularly with regards to legal issues

11   regarding intelligence matters.

12   Q.   Does the Inspector General say why Ms. Corsi sought a

13   decision from the NSLU?

14   A.   Because Bongardt had sought a secondary opinion. When Corsi

15   said that he had to delete the information and that New York had

16   to work the case as an intelligence case, not a criminal case, he

17   asked her to get a second opinion from the National Security Law

18   Unit.

19   Q.   And after Ms. Corsi e-mails Mr. Bongardt of the NSLU's

20   decision, what happens next?

21   A.   Bongardt responded in an e-mail back to Corsi in which he

22   says, "Some day, someone will die, and wall or not, the public

23   will not understand why we were not more effective and throwing

24   every resource we had at certain problems.  Let's hope the

25   National Security Law Unit will stand by their decisions then,

Page 2182

1    especially since the biggest threat to us now, Usama Bin Laden, is

2    getting the most protection."

3    Q.    Does the New York field office open an intelligence

4    investigation?

5    A.    They do, yes.

6    Q.    That happens -- when did that happen?

7    A.    August 29th the investigation was an opened as a full field

8    intelligence, 199 case, to locate Midhar.

9    Q.    And who was the case assigned to?

10   A.    It was assigned to Robert Fuller, who the Inspector General

11   identified as a fairly new agent, relatively inexperienced.

12   Q.    And I see you have here Fuller is also working another matter

13   at the time.

14   A.    That's correct.  So he did not turn to this immediately.  He

15   was working another case, and it was a few days before he turned

16   to this.

17   Q.    And was this Mr. Fuller's first intelligence investigation?

18   A.    That's correct.

19   Q.    Do you know, did the Inspector General say when he had joined

20   the Intelligence Squad there?

21   A.    He had just recently arrived.  He had had prior duties on

22   narcotics work and surveillance squad work in the New York office.

23   Q.    What happens next, please.

24   A.    Corsi e-mails Fuller, introducing herself and attaching

25   Midhar's U.S. visa application which she had received from the

Page 2183

1   consulate in Jeddah, Saudi Arabia.  On the application Midhar

2   falsely stated that he had never applied for a prior visa.  Corsi

3   and Fuller did not notice this discrepancy.

4   Q.   Is providing a false statement a crime?

5   A.   Yes, it could have been opened as a criminal case.

6   Q.   What else happens on August 30?

7   A.   The CIA sends the Central Intelligence report to the FBI

8   finally outlining the identification of Khallad at this Malaysia

9   meeting.  This is the first record showing information from the

10  January 2000 meeting was fully provided by CIA to FBI.

11  Q.   And when does Mr. Fuller actually begin work to locate Khalid

12  al-Midhar?

13  A.   On September 4, Fuller started working to locate Midhar.  It

14  doesn't start sooner due to his other assignment, and he completes

15  LOOKOUT form for Immigration and Naturalization.

16  Q.   Does he need any help with completing that form?

17  A.   He sought the assistance of "Patrick," the immigration agent

18  assigned to the FBI office in New York.

19  Q.   Why did he need the assistance of "Patrick"?

20  A.   He was new and was uncertain as to how to complete the form.

21  Q.   And how was the form ultimately completed?

22  A.   He checks a box on there identifying Midhar as a potential

23  witness, rather than a terrorist, to prevent overreaction.

24  Q.   Overreaction by who?

25  A.   By overzealous border checkpoint agent, customs agent, or

Page 2184

1   other person that is screening people entering the country.

2   Q.   What else does Fuller do?

3   A.   He requests local criminal history checks on Midhar through

4   the New York Police Department and performs checks for Hazmi after

5   going back and rereading Corsi's communication several times.

6   Q.   And let me stop you there and go back to this one here.  He

7   confirms that TECS LOOKOUT was, in fact, had been placed by that

8   time for Mr. Midhar?

9   A.   That's correct.

10   Q.   Now, what does the Inspector General say with respect to --

11   oops.  There you go.

12   A.   All right.

13   Q.   Explain this, after reading Corsi's EC several times.

14   A.   In FBI communications, generally the last of the `

15   communication sets forth a lead, such as New York will do the

16   following investigation.  It identified information with regards

17   to Midhar but didn't set a lead for Hazmi.  Fuller after rereading

18   it several times realized the FBI should also conduct a similar

19   investigation on Hazmi.

20   Q.   That related back to a previous slide in which the IG

21   concluded that Ms. Corsi had erroneously assumed that Hazmi had

22   left the country?

23   A.   That's correct.

24   Q.   And what happens on September 5, 2001?

25   A.   On September 5 the investigation by Fuller on Midhar and

Page 2185

1   Hazmi included NCIC criminal history checks, credit checks, motor

2   vehicle checks, an inquiry at the Security Department of the

3   Marriott Hotel chain, and ChoicePoint searches with assistance.

4   Q.   What is a ChoicePoint search?

5   A.   ChoicePoint is a private company in Atlanta.  They are known

6   as data miners.  They track applications for credit cards,

7   driver's license applications, new home purchases.  Anything that

8   results in a public record, this company will data mine it, and

9   then they sell it to the government or other investigative

10  agencies.

11  Q.   And why was it done with assistance?

12  A.   The Inspector General found that it was something new to

13  Fuller, so he sought assistance on how to do this check.

14  Q.   And what were the results of the ChoicePoint search?

15  A.   Negative.  They came up with no information on these

16  individuals.

17  Q.   And what did the Inspector General conclude with respect to

18  that?

19  A.   Well, they found after September 11, records on Hazmi were

20  actually located in the ChoicePoint files, database system.

21  Q.   What else happened on or about September 5?

22  A.   Fuller contacted Corsi concerning a request to have him

23  locate Khalid al-Midhar.  Fuller and Corsi discussed the potential

24  for obtaining additional information on Midhar, such as credit

25  card number from Saudi Arabian airlines.  That's the airline he

Page 2186

1    had flown into the country on.

2            And according to Fuller, Corsi told him that that would

3    not be prudent to do so.

4    Q.    And at this point Mr. Fuller had Khalid al-Midhar's visa

5    application?

6    A.    Yes.

7    Q.    That had been sent to him by Ms. Corsi?

8    A.    That's correct.

9    Q.    And what happens next, please?

10   A.    On September 10, 2000, Fuller began to prepare a request to

11   go out to the FBI office in Los Angeles to check various Sheraton

12   Hotel records concerning Midhar and Hazmi.  This relates back to

13   the original entry at Los Angeles where they stated they were

14   going to stay at a Sheraton Hotel.

15   Q.    When was that request transmitted?

16   A.    Oops.  The request actually left the New York office on the

17   morning of September 11.

18   Q.    Mr. Rigler, can you please summarize for the jury what the

19   FBI concluded with respect to the facts you have summarized with

20   respect to the fifth lost opportunity.

21   A.    That would be the Inspector General's findings and

22   conclusions here.  He said that although the FBI and the CIA

23   personnel had many discussions throughout July and August 2001,

24   regarding the USS Cole attacks and the Malaysia meeting, the CIA

25   did not provide nor did the FBI become aware of significant

Page 2187

1    intelligence information regarding Midhar's U.S. visa, the

2    Malaysia meetings, and the identification of Khallad in the

3    photographs.

4    Q.   What else did the Inspector General conclude?

5    A.   He said that the CIA also did not provide to the FBI

6    information regarding Hazmi's travel in January 2000 to Los

7    Angeles, to the United States, they didn't provide this until

8    August 22nd, 2001.

9    Q.   And when the FBI received that information on August 22, what

10   did they do with it?

11   A.   The Inspector General said that when the FBI became aware of

12   this information on August 22 about Midhar, that he was in the

13   United States, the bureau took steps to open an intelligence

14   investigation to locate him but failed to pursue it as an urgent

15   matter or assign many resources to it.

16   Q.   I think you had said the EC was marked "routine"?

17   A.   That's correct.

18   Q.   And what else did the Inspector General conclude?

19   A.   I'm sorry.  It was, the Inspector General found that it was

20   given to a single inexperienced agent with no priority.

21   Q.   That was Agent Robert Fuller?

22   A.   Yes, sir.

23   Q.   Go on, please.

24   A.   It was also the Inspector General's finding that a dispute

25   existed in the FBI as to whether to open the case as a criminal or

Page 2188

1    an intelligence case and that demonstrated the wall between the

2    criminal and intelligence divisions.

3    Q.    And what did the Inspector General conclude with respect to

4    how close the FBI was to locating Midhar and Hazmi?

5    A.    On September 11th, the Inspector General said the FBI was not

6    close to locating Midhar and Hazmi when they participated in the

7    attacks on the Pentagon.

8    Q.    And what were the reasons the Inspector General found?

9    A.    He identified five areas here:  the criminal predicate, the

10   experience level of that agent in New York, the LOOKOUT forms,

11   ChoicePoint searches, and Saudi Arabian Airlines contacts.

12   Q.    The criminal predicate had to do with whether a criminal

13   predicate existed to open the case as a criminal case?

14   A.    Yes.

15   Q.    That Mr. Bongardt wanted?

16   A.    Yes.

17   Q.    The experience level of the agent is the agent of Mr. Fuller,

18   experience of Mr. Fuller?

19   A.    That's correct.

20   Q.    The LOOKOUT form is the assistance that Mr. Fuller needed to

21   prepare the LOOKOUT form and his indication on the form of Midhar

22   as a potential witness, correct?

23   A.    That's correct, a witness as opposed to a check in the box

24   for terrorist.

25   Q.    And the ChoicePoint search, I think you have indicated they

Page 2189

1    found no operation prior to 9/11 but some after 9/11?

2    A.    That's correct, on Hazmi.

3    Q.    And the Saudi Arabian contact concerned the conversation

4    between Agent Fuller and Ms. Corsi about whether to contact them

5    for additional information?

6    A.    Yes.  That was the one where the agent, Fuller, wanted to go

7    to the airline to get more information such as address, phone

8    number, credit card number that was used, items such as that that

9    would enhance the ability to do a full field investigation.  Corsi

10   turned him down due to it not being prudent.

11   Q.    And what was the -- can you summarize for the jury now the

12   items that the FBI missed?

13   A.    Well, in sum --

14   Q.    According to the Inspector General?

15   A.    In sum, according to the Inspector General, the FBI failed to

16   receive from the CIA the three critical pieces of information

17   about Midhar and Hazmi in a timely manner:  again, the possession

18   of the valid multiple-entry U.S. visa, Hazmi's travel to the

19   United States, identification of Khallad in the surveillance

20   photographs from Malaysia, attended by Midhar and Hazmi and other

21   al Qaeda operatives back in January of 2000.

22   Q.    And when did the CIA become aware of these items of

23   information?

24   A.    The CIA was aware of these pieces, three pieces of

25   intelligence in January 2000, March 2000, and January 2001, but

Page 2190

1    none of it was passed to the FBI until August 2001.

2    Q.    And were Hazmi and al-Midhar watchlisted before September 11?

3    A.    Yes.  They were not watchlisted, however, August 24, 2001, by

4    CIA.

5    Q.    And what else did the Inspector General conclude?

6    A.    The Inspector General said, moreover, there were several

7    opportunities for the FBI to have obtained this information in

8    other ways, but it failed to do so.

9    Q.    And what else?

10   A.    Some significant systemic problems hindered the flow of

11   information between the CIA and the FBI.

12   Q.    Any other reason?

13   A.    Employees at both FBI and CIA failed to provide or seek

14   important information about Midhar and Hazmi, despite numerous

15   interactions between them as these issues related to Hazmi from

16   January 2000 through August 2001.

17   Q.    Thank you, Mr. Rigler.

18         MR. TROCCOLI:  Your Honor, we are now at the point where

19   he has a final slide that the government has an objection to.  We

20   believe that it is an admissible slide because it is part of the

21   report.

22         THE COURT:  I think only if there is cross-examination

23   that might open the door to it would it be appropriate, so I am

24   going to sustain the objection at this point, Mr. Novak.

25         MR. TROCCOLI:  Thank you, Your Honor, that's all I have

Page 2191

 1   of Mr. Rigler.

 2                          CROSS-EXAMINATION

 3   BY MR. NOVAK:

 4   Q.   Mr. Rigler, how are you?

 5   A.   Fine, sir.  I think I am a little bit red.  I take a blood

 6   pressure medication, and shirt collars, I probably disappear into

 7   the background here.

 8   Q.   Well, I hope I don't make you any redder.  I will do my best

 9   here; how does that sound?

10   A.   Thank you.

11   Q.   Mr. Rigler, just to be clear, you were not part of the

12   investigation team with the Inspector General; is that right?

13   A.   That's correct.

14   Q.   You did not interview any of the FBI agents that were at

15   issue in the report; is that right?

16   A.   No.  I reviewed their work product but did not interview

17   them.

18   Q.   You have never met Dina Corsi, have you?

19   A.   No, sir.

20   Q.   Steve Bongardt or any of those people, is that right?

21   A.   That's correct.

22   Q.   And you didn't -- did you interview any of the CIA folks?

23   A.   No, sir.

24   Q.   Have you ever met any of them?

25   A.   I have met CIA agents all my life, but I didn't meet the ones

1    in this case.

2    Q.    The ones in this report?

3    A.    No, sir.

4    Q.    Have you ever been to the CIA?

5    A.    Not to my knowledge, no.

6    Q.    Now, you talked about, you know, "we" in the beginning of

7    this, of this examination.  Did you speak to Glenn Fine, the

8    Inspector General himself?

9    A.    No, sir.

10   Q.    Did you speak to any of his investigators?

11   A.    No, sir.

12   Q.    Did you speak to any of the agents that helped conduct the

13   investigation -- I'm sorry, strike that -- any of the attorneys

14   that helped write the report?

15   A.    No.

16   Q.    So as I understand it, your sole knowledge of this case is

17   reading chapter 5 in that book that you held up for all of us; is

18   that right?

19   A.    No, that's not correct.

20   Q.    All right.  What else have you done?  Have you done an

21   independent investigation at all?

22   A.    No.  While reading the book, I asked for and received

23   permission to review the underlying documents.  Those are the

24   reports prepared by the Inspector General.  Many of the

25   communications, much of this case rested in paper because many of

Page 2193

1   the witnesses either refused to talk to the Inspector General or

2   could not recall sufficient details, so the Inspector General's

3   report actually rested very heavily on the 14,000 pages that they

4   did.

5   Q.   Okay.  And so his report was based upon the paperwork of

6   whatever reports that the agents wrote, is that right, in large

7   part?

8   A.   Both the communications to and from the CIA and the New York

9   office, as well as the interviews prepared by the Inspector

10  General's investigators, when they were interviewing FBI

11  personnel.

12  Q.   That's the 70 witnesses that were interviewed; is that right?

13  A.   There were 225 total.  There were 70 with regard to chapter

14  5, and that's where I spent most of my time reviewing those

15  documents.

16  Q.   Okay.  Just, I mean, your presentation had nothing to do with

17  any other chapter, other than chapter 5; is that right?

18  A.   Well, some portion of it may be.  For instance, the

19  14,000-document quote and the 225 witness interviews comes from

20  chapter 1.

21  Q.   Well, let me ask you this, Mr. Rigler.  You were presented

22  here as a summary witness to summarize what is in chapter 5 of the

23  I G report.  Are you now saying that your PowerPoint presentation

24  deals with something other than what's in chapter 5?

25  A.   I'm saying those two items were the participation of the

Page 2194

1   agency necessary to understand what the Inspector General's total

2   report was and that my part was to summarize chapter 5.

3   Q.    Okay.  So you summarized chapter 5 of a report that the

4   Inspector General for the Department of Justice wrote based upon

5   written documents and interviews of 70 witnesses; is that right?

6   A.    That's correct.

7   Q.    And you didn't participate in any of the 70 interviews; is

8   that right?

9   A.    No, sir.

10  Q.    All right.  So now what you did was then you took the, that

11  chapter that you read and you turned it into a PowerPoint

12  presentation; is that right?

13  A.    That's correct.

14  Q.    And that's the item that you said you have been paid $16,000

15  since January; is that right?

16  A.    Well, I did other things besides that, as you know.

17  Q.    In addition to doing other things, you have been a little bit

18  modest about how much money you have been paid by these folks

19  sitting over here, haven't you?

20  A.    The question that he asked was with regard to the summary

21  work that I have done.  I have been on this case since four years

22  ago this month, March 11th, 2002.

23  Q.    And why don't you tell the folks how much money you have been

24  paid by Mr. Troccoli and his colleagues over here during the time

25  that you have been on this case?

Page 2195

1          MR. TROCCOLI:  Objection, Your Honor.

2          THE COURT:  To the form of the question?

3          MR. TROCCOLI:  Yes.

4          THE COURT:  Mr. Novak, rephrase that question.

5    Mr. Troccoli is not himself personally paying.

6          MR. NOVAK:  I'm sorry, excuse me.

7    BY MR. NOVAK:

8    Q.   Mr. Rigler, how much have you been paid during the time that

9    you have worked on this case then?

10   A.   Sure.

11   Q.   In terms of fees.

12   A.   To explain that, initially I was employed as the field

13   investigator to assist in the aviation interviews.  This case had

14   a lot of aviation database witnesses to interview.  So I traveled

15   the country for several weeks and several months over a four-year

16   period, and it averaged about, I think, a total of $82,000 in four

17   years.

18   Q.   Well, if your lawyers told us you received 86,000 plus in

19   fees, would that be appropriate?

20   A.   It probably would be, yes.

21   Q.   In addition to that you have received another almost $17,000

22   in expenses; is that right?

23   A.   I thought it would be closer to 13,000.  You mean the

24   airlines and hotels and rental cars?

25   Q.   I don't know.  They are your expenses.  What did you get the

Page 2196

1    17,000 for?

2    A.   Well, I'm sure that's what it is.  I don't know if it is

3    $17,000, but it is expenses relating to that, which would include

4    hotel, airline, coach class airlines, car rentals, gasoline

5    purchase.  We don't charge for meals.  It would be customary

6    business expenses associated with a government investigation.

7    Q.   Well, let me ask you this then:  I mean, would you accept the

8    fact that your lawyers told us as part of the discovery -- you

9    know what discovery is, right?

10   A.   I'm aware of that.

11   Q.   And what is discovery?

12   A.   It is a probing of the case by the two parties, in this case

13   the defense and the prosecution, where they exchange so that each

14   side can understand a little bit more about the case before we

15   come to court.

16   Q.   So if your lawyers told us in discovery that you have

17   received a total of $103,606.88, would that be accurate, do you

18   think?

19   A.   I could get the accurate number.  I'd say that's correct if

20   you want to talk four years of work and the travel expenses

21   involved.

22   Q.   All right.  Now, so getting down to exactly what the

23   Inspector General's report was about, that report was about the

24   sharing of or the lack of sharing of information between the CIA,

25   the FBI, and various branches within the FBI.  Is that right?

Page 2197

1   A.   On chapter 5?

2   Q.   On chapter 5.

3   A.   You are correct.  Much of chapter 5 dealt with sharing of

4   information between the two agencies.

5   Q.   And just to be clear, all my questions are going to be about

6   chapter 5.  Okay?

7   A.   Yes, sir.

8   Q.   Now, let's talk about exactly what the information was.  And

9   if you want, you can even turn to, I guess, your slide 15, which

10  is part of the timeline here if that will help you out there.

11          Now, what exactly happened here, Mr. Rigler, in terms of

12  the information, consisted of the CIA conducting a surveillance in

13  Malaysia in January of 2000.  Is that right?

14  A.   Just a second, please.  Would you give me the question again,

15  Mr. Novak?

16  Q.   I want to take you through what the actual information is

17  that wasn't shared here, okay?  It starts with the fact that the

18  CIA is conducting an investigation in January of 2000 in Malaysia.

19  Is that right?

20          THE COURT:  Hold on just one second.  Do we have a

21  problem?

22          MR. SPENCER:  We might, Your Honor.  Let me talk to

23  Mr. Novak.  I don't know that we need to approach.

24          MR. NOVAK:  I am going to withdraw the question and ask

25  it differently if I might, okay?

Page 2198

1                    THE COURT:  Yes.

2       BY MR. NOVAK:

3       Q.   Mr. Rigler, there was a surveillance that occurred in

4       Malaysia in January of 2000.  Is that right?

5       A.   That's correct.

6       Q.   And during the surveillance there were pictures taken of

7       individuals.  Is that right?

8       A.   Yes, sir.

9       Q.   In the picture was Mr. al-Midhar and Mr. al-Hazmi; is that

10      correct?

11      A.   That's correct.

12      Q.   Also in some of these pictures were some people believed to

13      be al Qaeda members.  Is that right?

14      A.   That's correct.

15      Q.   And in the early part of 2000 the intelligence community made

16      a belief that there was perhaps some connection between

17      Mr. al-Midhar and Mr. Al-Hazmi to al Qaeda just because they are

18      at this meeting in Malaysia; is that right?

19      A.   I think that's correct, yes.

20      Q.   I am accurately summarizing it; is that right?  I want you to

21      correct me if I'm wrong about what I'm summarizing.

22      A.   I don't have the book memorized.  If you want to quote me a

23      page, and I'll -

24      Q.   You look any time you want, if you think I'm wrong about

25      something, but essentially what occurred was there was a

Page 2199

1    surveillance, pictures were taken, al-Hazmi, al-Midhar, and a

2    couple al Qaeda guys are in the picture.  Is that right?

3    A.    I don't know the total number.  I don't believe CIA released

4    the number total.

5    Q.    Okay.  Forget the couple.  Some al Qaeda guys in a picture

6    with al-Midhar and al-Hazmi; is that right?

7    A.    To my understanding, that's correct.

8    Q.    And a reasonable investigator -- and you were an investigator

9    for 20 some years; is that right?

10   A.    23 years, yes.

11   Q.    23 years at the FBI.  You have done surveillances, I guess;

12   is that right?

13             MR. TROCCOLI:  Your Honor, I object to any inquiry

14   involving his personal interest in this case.  He is here as a

15   summary witness summarizing Inspector General findings.  He has no

16   independent knowledge, as the Court is well aware, of those

17   findings.  He is here merely to summarize an independent body who

18   made findings.

19             MR. NOVAK:  Judge, he can explain what a surveillance

20   is.  Mr. Troccoli asked him things that -- based upon his

21   experience.

22             THE COURT:  I will allow a few questions to help define

23   terms that he might have used in his report.  But, ladies and

24   gentlemen, a summary witness is just what the English words mean.

25   He is summarizing a large body of documents.  The defense could

Page 2200

1    just as easily have moved in chapter 5 of the Inspector General's

2    report.

3           You would all have to sit there and read the whole

4    thing.  We have allowed this man instead to come in and present

5    you with a summary of the report.  And the proper

6    cross-examination would be whether the summary is inaccurate.  And

7    that's the scope, really, for a summary witness and to explain, to

8    the extent that he can, terms that are used in the summary so the

9    jury will understand it.

10          MR. NOVAK:  But I think, Your Honor, respectfully, I

11   believe it is also appropriate for me to point out exactly what

12   the facts are that are being summarized.  And there is two

13   components to this.

14          Component 1 is what is the information.  And component

15   number 2 is whether it was shared.  And that's what he has talked

16   about.  And I want to explore what is in the IG report about those

17   two components.  And I think that's appropriate.

18          THE COURT:  As long as the questions are just geared to

19   what you read in chapter 5 or the surrounding parts of the IG's

20   report, that's it.  All right?

21          THE WITNESS:  Yes, Your Honor.

22   BY MR. NOVAK:

23   Q.   You understand what a surveillance is; is that right?

24   A.   That's correct.

25   Q.   And a surveillance is people take pictures of people that are

Page 2201

1    meeting; is that right?

2    A.    Well, there are other things too that go on.

3    Q.    Okay.  But in this particular instance in chapter 5, there

4    were pictures taken of al-Hazmi and al-Midhar as well as these

5    other al Qaeda folks; is that right?

6    A.    And Khallad and others, yes.

7    Q.    Okay.  But at the time in the early part of 2000, nobody knew

8    who Khallad was.  Is that right?

9    A.    That's correct partially, yes.

10   Q.    Well, at the time, at the time -- why don't you tell us,

11   based upon your timeline in the book there that you are reading

12   when it was that al-Hazmi and al-Midhar entered the United States

13   for the first time?

14   A.    That would be January 15th, 2000.  Hazmi and Midhar traveled

15   to Los Angeles.  Let me clarify that.  I don't know that there was

16   not another occurrence, say, 1998 or '97, something outside of the

17   scope of this investigation.

18   Q.    Another occurrence of what?

19   A.    You said what was the first time these two men entered the

20   United States.

21   Q.    All right.  According to the report, the report references

22   them entering the United States in January, the date you said,

23   January of 2000; is that right?

24   A.    January 15th, yes, sir.

25   Q.    January 15.  And at the time that Mr. al-Midhar entered the

Page 2202

1    United States, he was legally -- the visa that he entered in was

2    legal; is that right?

3    A.    No, I have questions about that.

4    Q.    Well, the IG says the visa that he entered in was legal;

5    isn't that right?

6    A.    I believe he said it was a multi-entry visa.  And there has

7    been some other questions that some people maybe had missed that

8    some of the visas had been previously applied for.

9    Q.    Does not that report say that at the time that the Mr.

10   al-Midhar and Mr. al-Hazmi entered the United States on that visa,

11   that it was appropriate, legal visas, the issue about visas did

12   not come up until the year 2001; isn't that correct?

13           MR. TROCCOLI:  Your Honor, I would ask as a courtesy at

14   least, if he has got a specific page in a report that he would

15   like Mr. Rigler to summarize, that he refer him to it so that this

16   man does not have to be, what I see it as trying to embarrass him,

17   trying to memorize hundreds of pages.  If he has a page --

18           THE COURT:  You can lead on cross-examination,

19   Mr. Novak, so I think the proper thing would be, since I'm sure

20   you have got the report there, is to go to a page or a paragraph,

21   and the witness has access to the book and see if there is some

22   misinformation in the summary that is not accurate, in that it

23   doesn't accurately reflect what's in the report.

24           MR. NOVAK:  Judge, this is going to take me sometime.

25   We're obviously not going to finish here by 5:30.  May I look for

1    the page cites then so when we pick this back up on Monday -- I

2    don't want to delay it.  I will move on to something else.

3          THE COURT:  That's fine.

4    BY MR. NOVAK:

5    Q.   Let me ask you this then, Mr. Rigler.  At the time that Mr.

6    al-Midhar and Mr. al-Hazmi entered the United States in January of

7    2000, the only link that, according to the Inspector General, to

8    criminal activity was this photograph of these men with other

9    al Qaeda officials, is that right, or other al Qaeda members?

10   A.   There were other links, yes.  NSA had picked up that the two

11   men were going to this meeting in Malaysia, so it actually started

12   prior to January 5th, 2000 meeting in Malaysia.

13   Q.   Right.  NSA gave them information that there was going to be

14   a meeting in Malaysia, right?

15   A.   Yes.

16   Q.   The meeting occurred; is that right?

17   A.   That's correct.

18   Q.   There is a photograph of the meeting, of which these two are

19   in the photograph; is that right?

20   A.   Yes.  There were several photographs and other investigative

21   work product too.

22   Q.   They entered the United States January the 15th, as you

23   indicate; is that right?

24   A.   Yes, sir.

25   Q.   Now, while they are in the United States they engage -- from

Page 2204

1    January to June of 2000, they did not engage in any criminal

2    conduct; is that right?

3    A.   June of 2000?

4    Q.   Right.  From January of 2000 to June of 2000, they did not

5    engage in any criminal conduct; is that right?

6              MR. TROCCOLI:  Your Honor, again, if there is a page in

7    which --

8              THE COURT:  I will sustain the objection.  I am going to

9    sustain the objection.

10   BY MR. NOVAK:

11   Q.   Well, let me ask you this:  You read the section about the

12   FBI asset; is that right?

13   A.   Yes.

14   Q.   And in this section about the FBI asset, the Inspector

15   General interviewed the asset as well as the FBI agent; is that

16   right?

17   A.   I'm not certain, again.  You might want to refer me to the

18   page cite on that.  I don't know if it was the Inspector General

19   or a representative or an FBI agent that did the interview and

20   provided that information to the Inspector General.

21   Q.   Okay.  Somebody interviewed the agent and the asset; is that

22   right?

23   A.   The agent who controlled the asset retired and refused

24   further interviews.

25   Q.   But he was originally interviewed by FBI agents before he

Page 2205

1    retired; isn't that correct?

2    A.    Again, I would like to refer to the report for that, please.

3    Q.    All right, Judge.  May I get the report, Judge?  It is going

4    to take me a couple minutes to go through the reports.

5              THE COURT:  Since it is 5:30 and we're not going to

6    finish this cross-examination tonight, I think the time has come

7    to end for today.  And now you are on your three-day weekend,

8    ladies and gentlemen, so, again, be very cautious to avoid any

9    media coverage about this case and obviously not discuss it with

10   anyone, and let me know if you feel that in any respect you had a

11   problem complying with that.

12             Leave your notebooks here with the handouts that you

13   have gotten and we will get it all back on Monday.  And we will

14   see you back here 9:30 on Monday morning.

15             Unless there is anything with counsel, we will recess

16   court for the day, and I will see you back at 9:00 o'clock Monday

17   morning for an auxiliary hearing, correct?  We have not heard

18   anything about that?

19             MR. SPENCER:  Yes, Your Honor.

20             THE COURT:  We will recess court.

21             (Recess at 5:30.)

22

23

24

25

Page 2240

1                    UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION
3    UNITED STATES OF AMERICA,      .        Criminal No. 1:01cr455
                                    .
4       vs.                         .        Alexandria, Virginia
                                    .        March 27, 2006
5    ZACARIAS MOUSSAOUI,            .        9:30 a.m.
     a/k/a Shaqil, a/k/a            .
6    Abu Khalid al Sahrawi,         .
                                    .
7                  Defendant.       .        REDACTED
                                    .
8    . . . . . . . . . . .
9                     TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE LEONIE M. BRINKEMA
10                   UNITED STATES DISTRICT JUDGE
11                            VOLUME X
12   APPEARANCES:
13
14
     FOR THE GOVERNMENT:        ROBERT A. SPENCER, AUSA
15                              DAVID J. NOVAK, AUSA
                                DAVID RASKIN, AUSA
16                              United States Attorney's Office
                                2100 Jamieson Avenue
17                              Alexandria, VA 22314
18
19   FOR THE DEFENDANT:         GERALD THOMAS ZERKIN
                                KENNETH P. TROCCOLI
20                              ANNE M. CHAPMAN
                                Assistant Federal Public Defenders
21                              Office of the Federal Public
                                Defender
22                              1650 King Street
                                Alexandria, VA 22314
23
24
25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Page 2244

```
 1              THE COURT:  Good morning, Mr. Novak.

 2         (ERIK T. RIGLER, Defendant's witness, previously affirmed,

 3          resumed.)

 4              THE COURT:  Mr. Rigler, you are under the same

 5    affirmation that you took on Thursday.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  All right.

 8              MR. NOVAK:  Judge, may I proceed?

 9              THE COURT:  Yes, sir.

10                   CROSS-EXAMINATION (Cont'd.)

11    BY MR. NOVAK:

12    Q.   Good morning, Mr. Rigler.

13    A.   Good morning, sir.

14    Q.   Mr. Rigler, are you able to operate your computer slide show?

15    A.   If asked, I will, sir.

16    Q.   I am asking.  Can you, could you bring us to slide 24,

17    please.

18    A.   Would that be the correct one?

19    Q.   That's perfect.  I appreciate you doing that.

20              Mr. Rigler, on that slide you indicate that

21    Mr. Al-Midhar had a multiple-entry U.S. visa; isn't that right?

22    A.   That's correct.

23    Q.   You don't indicate on your slide show that the U.S. visa was,

24    in fact, a valid one; isn't that right?

25    A.   It's -- it's only indicated as a multi-entry U.S. visa on my
```

1   slide.

2   Q.   But actually the IG found that that was a legal, valid U.S.

3   visa that allowed him to come into the country; isn't that right?

4   A.   I think also the findings were that it was a false statement

5   had been used to obtain that.

6   Q.   Well, actually why don't you go to page 247.  You have the

7   report there; is that right?

8   A.   Yes, sir.

9   Q.   This slide is based upon the conclusions of the IG that are

10  indicated on that page.  Is that right?

11  A.   It will take me just a minute, sir.

12        THE COURT:  Just to remind everybody, IG is the

13  Inspector General for the Federal Bureau of Investigation.

14        MR. NOVAK:  Yes, Judge.  I'm sorry for using slang.

15        THE COURT:  It's all right.  It's just it's been a few

16  days, and I want to make sure that we're not losing our memory of

17  some of that stuff.

18        MR. NOVAK:  I'm becoming lazy after a couple of weeks.

19        THE WITNESS:  What page was that, Mr. Novak?

20  BY MR. NOVAK:

21  Q.   Page 247, sir.  If you want, I could read it to you if you

22  would like.  If you look at, under -- on page 247, under where it

23  says "O IG conclusions," the third bullet point, which corresponds

24  to your third bullet point, it says Midhar had a valid

25  multiple-entry U.S. visa.  Isn't that correct?

Page 2246

1    A.    Yes, sir.

2    Q.    Okay.  And you did not put in the fact that it was a valid

3    visa.  Is that right?

4    A.    That's correct.

5    Q.    In fact, nowhere in the conclusions is there any reference to

6    any type of false statement regarding that entry in January of

7    2000.  Is that right?

8    A.    No, I don't think I would agree with you on that.  I do

9    recall seeing somewhere where it was questioned regarding the

10   decision to open it as a 199 or 265, was hinged upon the false

11   statement.

12   Q.    Well, I will just let you then take a look.  You show me,

13   this is your testimony, you show me where in those conclusions

14   regarding the January 2000 entry that there is any indication of

15   any illegality about his entry into the country.

16   A.    I think the issue in the report was that the existence of the

17   visa, multiple-entry visa was not disclosed to the FBI.  That's

18   the triggering point --

19   Q.    Sure.

20   A.    -- of communication failures between CIA and the FBI.

21   Q.    Well, I completely agree with you.  I think what -- you are

22   saying something different.  You are telling -- you have just

23   testified that you think that there is something in error,

24   something false or illegal about the nature of his entry into the

25   United States, and, in fact, according to the IG, when he came in

Page 2247

1   in January of 2000, there was nothing illegal about that entry.

2   Isn't that right?

3   A.   No, I won't agree with that.  If I may have a few minutes

4   to --

5   Q.   Sure, take all the time you need.

6   A.   -- take another look.

7   Q.   Mr. Rigler, if you want, I can help you and point you again

8   to page 247, that's the summary of all the conclusions as it

9   relates to the January 2000 entry.  If you want to take some time

10  and read the entirety of page 247, I would encourage you to do so

11  and ask us -- and indicate where it is that you think it says that

12  there was something illegal about that entry.

13  A.   I don't find it now, Mr. Novak, but I do recall there was a

14  question about the false statement on acquiring the multiple-entry

15  visa by Midhar.

16  Q.   All right.  Well, I'm going to ask you then to look at 247,

17  this summary page of all the conclusions about what you described

18  as Opportunity No. 1.  And I am asking you to tell us where in the

19  IG's conclusions is there any reference to a false statement about

20  the entry in January of 2000.

21  A.   The page I'm referring to, Mr. Novak, is page 301, where it

22  says Midhar falsely claimed that he had not previously applied for

23  a nonimmigrant visa or had been in the United States.  It's a

24  footnote on page 301, about in the middle of the page.

25  Q.   Sure.  That has nothing to do with the January 2000 entry.

Page 2248

1   That's about the 2001 entry in July; isn't that correct?  Do you

2   want to take a look at that a little bit closer?

3   A.   That's correct.  That's what I'm talking about.

4   Q.   Okay.  But that's not what my question was.  My question was

5   on this slide that you're talking about, Opportunity No. 1 talks

6   about his entry in January of 2000.  Isn't that right?

7   A.   Yes.

8   Q.   Okay.  And there was nothing, there was nothing improper or

9   illegal about his entry into the United States in January of 2000.

10  Isn't that right?

11          MR. TROCCOLI:  Your Honor, I think that has been asked

12  and answered.

13          THE COURT:  Sustained.

14  BY MR. NOVAK:

15  Q.   Your four bullet points that you have essentially track

16  almost identically the language that's in the four bullet points

17  on page 247.  Isn't that right?

18  A.   Let me take a look at 247 here.

19  Q.   Sure.

20  A.   They are similar, yes, sir.

21  Q.   Okay.  They are basically identical except for one missing

22  word on the third bullet point.  Isn't that right?

23  A.   There are other ones that were cut for space, size.

24  Q.   Okay.  Well, can you tell us, the missing word in the third

25  bullet point was the word "valid."  Isn't that right?

1    A.   That's correct.

2    Q.   And who made the decision to eliminate the word "valid"

3    before "multiple-entry U.S. visa"?

4    A.   That was probably me.  I prepared the PowerPoint.

5    Q.   All right.  Any particular reason why you decided to

6    eliminate the word "valid" in front of "multiple-entry visa"?

7    A.   Space, and also it was, the issue was whether or not the FBI

8    failed in this Opportunity 1 of 5.  It's not an issue of whether

9    the visa was valid or not.  The issue was the CIA had the

10   information that he had the multiple-entry visa.  They had that

11   from the meeting in Kuala Lumpur, but yet they didn't pass the

12   existence -- at the point that the FBI would take over as if the

13   person was coming into the country or could have traveled to this

14   country, that's the bell ringer right there.

15   Q.   Sure.  And my point is what exactly the information was that

16   wasn't passed.  You understand there's two parts to that, right?

17   You understand there is whether it was passed and what the

18   information was that was passed, right?

19   A.   I understand that, yes.

20   Q.   Okay.  And the information was, that wasn't passed, was they

21   had their pictures taken with other al Qaeda operatives and they

22   entered on a valid multi-entry visa.  Isn't that right?  That's

23   the information, right?

24   A.   There was other pieces of the information also, that they had

25   just come from the meeting in Kuala Lumpur where al Qaeda people

Page 2250

1    were present.

2    Q.    Where they were photographed, right?

3    A.    Yes.

4    Q.    Okay.  That's your first bullet point, right?

5    A.    Yes, sir.

6    Q.    The second bullet point is that they have gone to Bangkok

7    with a third person.  Isn't that right?

8    A.    Yes.

9    Q.    Nothing illegal about that.  Isn't that right?

10   A.    Well, I don't know whether it is legal or not.  I'm only

11   quoting what was in the Inspector General's report.  I don't want

12   to give an endorsement of legality, because the report, the

13   purpose of the report was to examine what the FBI knew and when

14   the FBI knew it.

15   Q.    Sure.  And there is nothing that the IG found that indicated

16   any type of -- there is no reference to illegality in your bullet

17   point that you took -- that, in fact, that's a verbatim quote,

18   basically.  Well, actually instead of "al-Hazmi," it says "they"

19   traveled to Bangkok with a third person.  Is that right?  That's

20   what's in the 247; is that right?

21   A.    Yes.

22   Q.    Okay.  So there is nothing in there about anything being

23   illegal about those, the fellows that went to Bangkok; is that

24   right?

25   A.    There is, there is no reference provided by the Inspector

Page 2251

1   General for legality about travel to Bangkok.

2   Q.   Okay.  And then of course then we have what we have already

3   discussed, a valid multiple-entry U.S. visa, and then you have

4   them actually coming into the United States in January of 2000.

5   That's it; is that right?

6   A.   That's correct.

7   Q.   That's the bullet points for Opportunity No. 1 that you have

8   described.  Is that right?

9   A.   On page, slide 24.

10  Q.   Okay.  If we can go to slide 28, please.

11       Okay.  Slide 28 references what was described as

12  Opportunity No. 2 regarding the fact that they resided in a

13  residence as boarders for an FBI asset, an informant.  Is that

14  right?

15  A.   That's correct.

16  Q.   Okay.  And the point that I think that you made was that

17  the -- the question is whether the informant could have supplied

18  any information about these fellows.  Isn't that right?

19  A.   I'm sorry, say that again?

20  Q.   The point of missed Opportunity No. 2 that you are indicating

21  from the IG's report is that the informant was not questioned

22  about these two fellows, al-Midhar and al-Hazmi; is that right?

23  A.   He provided some information, but he was not questioned in

24  detail regarding those two individuals.

25  Q.   Well, actually it says on page 253 what actually the

Page 2252

1    informant did say about these two gentlemen when he was asked by

2    the FBI.  Isn't that right?  Do you see the last full paragraph on

3    page 253?

4    A.   The last paragraph, you mean, where it starts --

5    Q.   The last full paragraph, where it starts off, "The asset was

6    asked what information he provided to Stan" -- referring to the

7    FBI agent handler -- "about al-Hazmi and al-Midhar before

8    September 11."  Do you see that paragraph?

9    A.   Yes, sir.

10   Q.   Okay.  And in that, when he was interviewed, the informant

11   indicated that al-Hazmi and al-Midhar were quiet tenants who paid

12   the rent and were good Muslims who prayed a lot at the mosque,

13   basically; is that right?

14   A.   I can read the paragraph for you if you like.

15   Q.   Sure.  Go ahead.  Why don't you go ahead and do that.

16   A.   The last paragraph on page 253 that starts, "The asset was

17   asked what information he provided to Stan about Hazmi and Midhar

18   before September 11th.  In these interviews the asset provided

19   conflicting accounts regarding the information on Hazmi and Midhar

20   that he had disclosed to Stan."

21   Q.   I'm sorry, I directed you to the wrong paragraph.  The

22   paragraph above that, I'm sorry.  "After the September 11th

23   attacks."

24   A.   "After the September 11th attacks, the FBI interviewed the

25   asset and asked about the conduct and activities of Hazmi and

1   Midhar while they were living with the asset.  In these

2   interviews, the asset described them as quiet tenants who paid

3   their rent.  He said they were good Muslims who regularly prayed

4   at the mosque.  The asset said that Hazmi and Midhar often would

5   go outside when using their cell phone -- cellular telephones.

6   The asset insisted that he noted no indicators of nefarious

7   activity by Hazmi or Midhar that should have resulted in his

8   reporting their identities to the FBI."

9   Q.   So the asset, the informant, had no information about any

10  illegality committed by al-Hazmi and al-Midhar; is that correct?

11  A.   I can just see that, like you, in that paragraph.

12  Q.   And that's what it said, it said no indicators of nefarious

13  activity; is that right?

14  A.   That's correct.

15  Q.   And you didn't indicate that in your slide, did you?

16  A.   No, sir.

17       MR. TROCCOLI:  Object, Your Honor.  The point was the

18  FBI didn't even know they were here.

19       THE COURT:  All right, look.  I think rather than this

20  type of examination, a summary witness, and that's all that

21  Mr. Rigler is, he has no independent knowledge other than what he

22  got from reading this report, the most appropriate thing to do is

23  to move the report into evidence.  The jury can evaluate the

24  adequacy of the summary by looking at the actual thing that was

25  summarized.  Does anyone have any objection to proceeding that

Page 2254

1  way?

2          MR. NOVAK:  No objection at all, Judge.  We prefer to do

3  that.

4          MR. TROCCOLI:  I have no objection to moving in chapter

5  5.  We have actually marked it as Defense Exhibit 952, and

6  attached to chapter 5 we also are moving in Defense Exhibit 952 --

7  it is 952A, and 952B is a name key, because chapter 5 uses

8  pseudonyms throughout, and I have been provided an unclassified

9  list of who the pseudonyms match up with in terms of their real

10  names, and that's 952B.

11          THE COURT:  All right.  Any objection?

12          MR. NOVAK:  Well, I don't have 952B.  Can I see it?

13          MR. TROCCOLI:  With that, Your Honor, we would withdraw

14  our request to have the slides be sent back to the jury, because

15  now they would have the chapter itself.

16          MR. NOVAK:  May I just show this to --

17          THE COURT:  Yes.

18          MR. NOVAK:  Judge, may I just have a moment to confer?

19          THE COURT:  Yes.

20          MR. NOVAK:  While we're reviewing that, may I just

21  proceed with my examination, Judge?  I still think I have the

22  ability to point out, I mean, they have put on what they thought

23  were the bullet points that they thought were relevant, and I

24  think I have the right to ask -- there are other bullet points

25  that he did not bring out, and I think I have the right to examine

1    him on the point, to make those points to the jury.

2           THE COURT:  I'm going to allow -- this is

3    cross-examination, and leeway is allowed on cross-examination, but

4    what I'm suggesting is let's not overdo it, because, again,

5    ultimately the jury will have the ability to evaluate the accuracy

6    of the summary by reading the actual material that was summarized.

7           MR. NOVAK:  Sure.  And I just want to be able to point

8    out to the jury through this exam what the relevant ones, points

9    are that were missed, Judge.

10          THE COURT:  All right.  Let's move on.

11          MR. NOVAK:  I'm also told we have no objection to that

12   exhibit, Judge.

13          THE COURT:  All right.  Well, now, 952, which is chapter

14   5, that's the chapter in the Inspector General for the Federal

15   Bureau of Investigation's report, will go into full evidence, so

16   you can read the entire chapter for yourselves if you wish to.

17          952B is a key that will explain to you who "John" and

18   "Mary" and these various people are, to the extent that is

19   possible.  There had been an objection to 952A.  However, I find

20   that that area was opened up on cross, and so 952A will also go in

21   as that one-page exhibit that had been tendered on Thursday to

22   which an objection had been noted.

23          (Defendant's Exhibit Nos. 952A and 952B were received in

24   evidence.)

25          THE COURT:  All right, let's proceed with the

Page 2256

1    cross-examination.

2              MR. TROCCOLI:  Thank you, Your Honor.

3              MR. NOVAK:  Judge, may I be heard on that point?

4              THE COURT:  No.  You opened the door, so it is in.  Go

5    ahead.

6    BY MR. NOVAK:

7    Q.   Mr. Rigler, directing your attention then to the top of page

8    254, the report also indicated that the FBI agent also was

9    interviewed about what the informant had told him about those two

10   gentlemen.  Isn't that right?

11   A.   At the top of page 254?

12   Q.   Yes.

13   A.   It says that he refused or declined, he declined to be

14   interviewed by the Inspector General.  He retired.        `

15   Q.   Right.  But it also indicates, it also says his FBI

16   supervisors had interviewed him about the asset in the past.

17   Isn't that right?

18   A.   Yes.

19   Q.   Okay.  And what he had told his supervisors in the past was

20   that the informant did tell him that there were two Saudi

21   nationals that were renting rooms off of him; isn't that right?

22   A.   May I take a minute to read?

23   Q.   Sure.  Take your time.

24             THE COURT:  While that is being done, Mr. Troccoli,

25   Exhibit 950A, is that the same as 952A?  I think my clerk tells me

1   it was 950A to which the objection was made.

2            MR. TROCCOLI:  That's correct.  950A was the last slide

3   of Mr. Rigler's PowerPoint --

4            THE COURT:  All right.

5            MR. TROCCOLI:  -- which we will, we will show the jury

6   on redirect.

7            THE COURT:  What is 952A?

8            MR. TROCCOLI:  952A is chapter 5 of the Inspector

9   General's report, which the Court, I believe, has admitted

10  already.  952B is the name key for chapter 5.

11           THE COURT:  What was 952 by itself?

12           MR. TROCCOLI:  There is no 952.  It is 952A.

13           THE COURT:  Sorry, it is A and B that are in, okay.  And

14  950A would also be in then.

15           MR. TROCCOLI:  Thank you, Your Honor.

16           THE WITNESS:  Mr. Novak, I have read the paragraph at

17  the top of page 254.  What was the question again?

18  BY MR. NOVAK:

19  Q.   Well, essentially the handling FBI agent who was, who they

20  refer to as "Stan" in this report, he reports to his supervisors

21  the same information that the asset had earlier said, what you

22  summarize in that last paragraph that I had you read, that they

23  were good Muslims, that they prayed a lot, their names were Nawaf

24  and Khalid, that they were here on a valid visitor's visa, and

25  that there was nothing suspicious or otherwise worthy of further

1  scrutiny.  Isn't that right?

2  A.   Well, I have to point out again to clarify here, he was -- he

3  refused to be interviewed by the Inspector General, and he retired

4  on the spot and has not been interviewed subsequent to this.

5  Q.   Well, I understand that.  I think my question to you,

6  Mr. Rigler, though, what it was that he had told his FBI

7  supervisors in the past about the asset.

8  A.   Yes.  And he also told them that he never conducted any

9  investigation regarding these two individuals.

10 Q.   He said that he had -- why don't you read that paragraph.

11         Actually, you know, I will strike that, Judge.  Since we

12 have entered in the report, I think I am going to exhaust your

13 patience if I do that.

14         I think I will move on to slide 32.  Now, in slide 32,

15 this talks about Opportunity No. 3, and you indicate that there is

16 a source that identified Khallad as being present in one of the

17 Malaysia photographs.  Is that right?

18 A.   That's correct, yes.

19 Q.   I want to direct your attention to page 255, footnote 195,

20 please.  Do you have that, sir?

21 A.   Yes.

22 Q.   And in that footnote, it actually indicates that what the IG

23 found was that it later turned out that the informant who, the

24 source who identified the photograph of Khallad actually did a

25 misidentification, that the person that was identified in the

Page 2259

1   photograph was actually Nawaf al-Hazmi.  Isn't that right?

2   A.    Again, I am going to need a minute to review this, Mr. Novak.

3   Q.    Sure, take your time.  It is actually three different

4   footnotes.  We will start with that one.

5          Judge, actually, this is one sentence.  May I ask the

6   witness just to read that one sentence?

7          THE COURT:  Go ahead.

8   BY MR. NOVAK:

9   Q.    Do you just want to read the first sentence there in footnote

10  195?

11  A.    "Information developed after September 11th, 2001 revealed

12  this was a misidentification and the person identified as Khallad

13  was actually al-Hazmi."

14  Q.    And on page 263, footnote 204, the Inspector General again

15  said that that was a misidentification.  Isn't that correct?

16  A.    Well, this is the part in the report where they were

17  identifying photos as photo No. 1, photo No. 2, and so on, and

18  they are referring, the corresponding note 3 -- correction, 204,

19  refers to the individual found in photograph No. 1.  There was

20  initially some confusion, but Khallad was subsequently identified

21  in the photographs by sources shared by CIA and FBI.

22  Q.    Well, Mr. Rigler, isn't it true that the Inspector General in

23  three different footnotes indicates that this January the 4th

24  identification was wrong?  It was an identification, the person

25  that the source said was Khallad was actually Nawaf al-Hazmi?

Page 2260

1    A.    In the January initially, yes, there was confusion, and I

2    think it hinged on the first names, "Khallad" being similar to

3    "Khalid."

4    Q.    Okay.  But it was actually a misidentification -- it wasn't

5    confusion; it was a misidentification; isn't that right?

6    A.    Which was later corrected to be Khallad actually being at

7    that meeting.

8    Q.    Well, that's not what my question is.  My question to you was

9    whether, in fact, the identification of Khallad was a

10   misidentification.

11   A.    There is some indication of a misidentification early in the

12   January 2000 time frame related to that meeting.

13   Q.    And at no point did you reference that in your summary; is

14   that correct?

15   A.    No, sir.

16   Q.    All right.  Now, if we could go to page -- or slide 51,

17   please.

18          THE COURT:  We can't fast-forward this any better than

19   this, without going through the whole thing technologically?  No?

20   All right.

21          THE WITNESS:  I will go faster.

22          MR. NOVAK:  I will ask the question, Judge.  I think we

23   can achieve the same thing just as fast.

24   BY MR. NOVAK:

25   Q.    On slide 51, you indicate that there were watchlist versions

Page 2261

1    for the State Department, Immigration, and Customs.  You indicate

2    for the State Department VISA/VIPER and TIPOFF, for Immigration

3    you indicate LOOKOUT, and you also indicate for Customs TECS.  Is

4    that correct?

5    A.   That's correct.

6    Q.   And there was no mention of any FAA no-fly list; is that

7    correct?

8    A.   Not at this point in August 22 on the slide that I prepared.

9    Q.   Sure.  And the reason for that, of course, is that there is

10   no indication in the IG report of any information about any

11   connection of these gentlemen to an aviation plot.  Is that right?

12   A.   Well, chapter 5 dealt largely with the information transfer

13   from CIA to FBI, and then the development of sufficient

14   information to place names on a watch list.  The OIG found that

15   they had the information all along but didn't put them on the

16   watch list until the August 22nd-23rd time frame, 2001.

17   Q.   So your answer is that there is no information about a

18   connection between the two of them with a civil aviation threat,

19   is that right, which is what my question was?

20   A.   I'm not sure exactly what you mean, as far as placing them on

21   a watch list to prohibit their travel or to track these

22   individuals, is that your question, or was there information --

23   Q.   Simple question:  There is no information within that chapter

24   5 connecting Khalid al-Midhar and Nawaf al-Hazmi to a civil

25   aviation threat; is that correct?

Page 2262

1   A.   No, I don't agree with that.  Chapter 5 deals heavily with

2   why they were here.  They came to this country to hijack planes

3   and murder people.  They didn't come for Disney.

4   Q.   Where does that say that, sir?

5   A.   That's what the chapter 5 is about.

6   Q.   Where does that say that in chapter 5, that they were here

7   for doing that?

8   A.   Well, they came to San Diego, they took flying lessons, one

9   of them went on to Phoenix and lived with Hani Hanjour.  I don't

10  know what else to, how to explain the chapter 5.

11  Q.   Mr. Rigler, Mr. Rigler, could you tell me on what page in the

12  IG report is there any information that connected those gentlemen

13  to a hijacking mission?  Where in chapter 5 does it say that, sir?

14  A.   The OIG's report is to examine the handling by the FBI and

15  the CIA of these two individuals.  These men were both killed in

16  the crash at the Pentagon, so the thrust of the investigation was

17  no longer on investigating them.  The chapter 51 is investigating

18  CIA and FBI.

19          MR. NOVAK:  Judge, I move to strike his answer.  He is

20  not being responsive to the question, which was he said that there

21  is, there is information --

22          THE COURT:  All right.  Mr. Rigler, the question that

23  you are being asked is a specific question, and that is whether or

24  not you found in reading chapter 5 any specific reference, not an

25  inference, but a specific reference that linked those two

Page 2263

1    individuals with an aviation plot.  That is the question.

2              THE WITNESS:  Yes, ma'am.

3              And you're correct, Mr. Novak, no, I don't recall seeing

4    that in there.

5    BY MR. NOVAK:

6    Q.   Thank you.

7              Now, if we can go to -- on slide 54, I don't know if

8    we're able to bring that up or not, but you indicate on there that

9    the woman indicated as "Donna" had marked her lead as being

10   routine, isn't that correct, her electronic communication?

11   A.   Yes, that's correct.

12   Q.   At the same time, however, you know from reading page 295

13   that she also called the fellow "Chad" in the UBL Unit to indicate

14   that he should deal with it with a sense of urgency.  Isn't that

15   right?

16   A.   May I take a minute for that?

17   Q.   Sure, page 295.  I will actually read the page to you if you

18   don't mind, Mr. Rigler.  Halfway -- the last full paragraph near

19   the end, it says, "Donna told the IG that she did not normally

20   telephonically contact the field on these types of issues, but

21   there was some urgency to her request because the FBI did not want

22   to lose the opportunity to locate Midhar before he left the United

23   States."

24             Isn't that what it says?

25   A.   That's what it says, yes.

Page 2264

1    Q.   All right.  Now, also, by the way, you indicated that you

2    reviewed the underlying documents in this case; isn't that right?

3    A.   In sum.  There are a lot of documents here.

4    Q.   So you didn't review all the documents; is that right?

5    A.   No.

6    Q.   All right.  Did you review Defense Exhibit 469, which I would

7    ask -- do we have 469?

8              May we show this to the witness, please, Your Honor?

9              THE COURT:  Yes.

10             THE WITNESS:  Thank you, Mr. Wood.

11   BY MR. NOVAK:

12   Q.   Did you review that document, Mr. Rigler?

13   A.   I'll take just a minute, sir.

14   Q.   Oh, I'm sorry.  Excuse me.

15   A.   I believe I have seen this before, Mr. Novak.

16   Q.   Okay.  If we could go to the bottom of page 3, please.  And

17   that's the document that's already been introduced into evidence,

18   that being an August 28 electronic communication by Dina Corsi.

19   Isn't that right?

20   A.   Yes, the routine one that was sent August 28th.

21   Q.   Sure.  And on the bottom of page 3, Ms. Corsi indicates that

22   the goal of the investigation is to locate al-Midhar, determine

23   his contacts and the reasons for his being in the United States,

24   and potentially conducting an interview of him; is that right?

25   A.   Yes, an interview.

Page 2265

1    Q.   That's the reason they were looking for him, just to

2    interview him; isn't that right?

3    A.   That's what this communication says.

4    Q.   Okay.  And above that it indicates that the reason that they

5    are pursuing him is his association with individuals related to

6    the attack on the USS Cole.  Isn't that right?

7    A.   That's correct.

8              MR. NOVAK:  Thank you.

9              Judge, I have no further questions of the witness.

10             THE COURT:  All right.  Any redirect?

11             MR. TROCCOLI:  Just very briefly, Your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. TROCCOLI:

14   Q.   Good morning, Mr. Rigler.

15   A.   Good morning, sir.

16   Q.   Let me just ask you this, first:  Were you hired to read this

17   report to the jury or summarize it?

18   A.   To summarize it, sir.

19   Q.   Were you hired to do an independent investigation, or had the

20   Inspector General already done that?

21   A.   No, I was not hired to do the investigation.

22   Q.   Mr. Novak asked you about Khalid al-Midhar's valid

23   multi-entry U.S. visa in January of 1999.  Was the point that the

24   Inspector General was making that they just weren't watch listed,

25   not that the valid -- the visa itself was valid?

Page 2266

1          MR. NOVAK:  Objection.  Leading.

2          THE COURT:  You are leading the witness.  Objection

3    sustained.

4          MR. TROCCOLI:  Thank you, I will move on.

5    BY MR. TROCCOLI:

6    Q.   Mr. Novak also asked you about "Donna" and the urgency of her

7    request to the New York field office.  Could you please turn to

8    page 297 of the Inspector General's report, please.

9    A.   I have 297, sir.

10   Q.   Can you please read the second full paragraph on 297 to the

11   jury, in which the Inspector General speaks about that.

12   A.   "While 'Donna' had relayed urgency to opening the

13   investigation in her telephone conversation with 'Chad' and in her

14   cover e-mail, she designated the EC precedent as routine, the

15   lowest precedence level.  She explained this by saying this case

16   was no bigger than any other intelligence case.  She also told us,

17   however, that there was a time consideration because Midhar could

18   be leaving the United States at any time, and that is why she had

19   personally contacted 'Chad.'"

20         MR. TROCCOLI:  Your Honor, may I have a moment?

21         THE COURT:  Yes, sir.

22         MR. TROCCOLI:  Your Honor, I'd ask Mr. Rigler now to

23   publish his final exhibit, and I have a question before he does

24   so.

25         THE COURT:  250A?

Page 2267

1           MR. TROCCOLI:  It would be 250A, correct.

2           THE COURT:  All right.

3           THE WITNESS:  May I ask that you cover the screen until

4    I get to that slide, please?

5    BY MR. TROCCOLI:

6    Q.   When you are at that slide, Mr. Rigler, let me ask you a

7    question before you display it to the jury, please.

8    A.   Yes, sir, I'm there now.

9    Q.   Did there come a point when the Inspector General provided

10   the FBI with a review or a draft or a final, some product of its,

11   of its Inspector General report?

12   A.   Yes.  The FBI participated in the report preparation and had

13   input throughout the stage, and, in fact, agents who --

14   Q.   Well, my question, Mr. Rigler, not to cut you off, but did

15   the FBI have an opportunity to review the findings of the

16   Inspector General?

17   A.   It did, yes, sir.

18   Q.   All right.  Can you please display the final slide and tell

19   us what the FBI itself said.

20   A.   In a letter to the Inspector General from the FBI dated June

21   2004, "On behalf of the director, I want to thank you and your

22   staff for this report.  The FBI values the Office of the Inspector

23   General's input as a comprehensive independent assessment of our

24   operations and as a means of identifying weaknesses that require

25   corrective actions to strengthen our operations.

Page 2268

 1            "Your findings and recommendations are consistent with

 2    the FBI's internal reviews and with those of other oversight

 3    entities."

 4            MR. TROCCOLI:  Thank you, Your Honor.  No further

 5    questions.

 6            THE COURT:  All right.  Any recross?

 7            MR. NOVAK:  Nothing else, Judge.

 8            THE COURT:  All right.  Is anyone going to call

 9    Mr. Rigler again during the course of this phase of the

10    proceedings?

11            MR. NOVAK:  Not the government.

12            MR. TROCCOLI:  No, Your Honor.

13            THE COURT:  All right.  Mr. Rigler, then you may be

14    excused as a witness.  Please don't discuss your testimony with

15    any person who has not yet testified.

16            THE WITNESS:  Thank you, Your Honor.

17                        (Witness excused.)

18            THE COURT:  All right.  Is your next witness going to be

19    one of the summary witnesses, or one of the --

20            MR. TROCCOLI:  Not yet, Your Honor.  I would move into

21    evidence, please, Defense Exhibit 448, which is not objected to by

22    the government.

23            THE COURT:  I'm sorry?

24            MR. TROCCOLI:  448.

25            THE COURT:  448, okay.  And what is 448?