# Exhibit 28

```
                                                                   Page 1645
 1                    UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION
 3   UNITED STATES OF AMERICA,       .      Criminal No. 1:01cr455
                                     .
 4      vs.                          .      Alexandria, Virginia
                                     .      March 22, 2006
 5   ZACARIAS MOUSSAOUI,             .      9:30 a.m.
     a/k/a Shaqil, a/k/a             .
 6   Abu Khalid al Sahrawi,          .
                                     .
 7                  Defendant.       .
                                     .
 8    . . . . . . . . . . . .
 9                       TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE LEONIE M. BRINKEMA
10                   UNITED STATES DISTRICT JUDGE
11                           VOLUME VIII
12   APPEARANCES:
13   FOR THE GOVERNMENT:             ROBERT A. SPENCER, AUSA
                                     DAVID J. NOVAK, AUSA
14                                   DAVID RASKIN, AUSA
                                     United States Attorney's Office
15                                   2100 Jamieson Avenue
                                     Alexandria, VA 22314
16
     FOR THE DEFENDANT:              GERALD THOMAS ZERKIN
17                                   KENNETH P. TROCCOLI
                                     ANNE M. CHAPMAN
18                                   Assistant Federal Public Defenders
                                     Office of the Federal Public
19                                   Defender
                                     1650 King Street
20                                   Alexandria, VA 22314
21
22
              (Appearances Continued on Following Page)
23
24
25         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1   A.   No.
 2            MR. TROCCOLI:  Thank you, Your Honor.
 3            THE COURT:  Anything further?  Any redirect?
 4            MR. RASKIN:  No, Your Honor.
 5            THE COURT:  Ms. Irish, thank you for your testimony.
 6   You are excused as a witness, I assume.
 7            MR. RASKIN:  Yes.
 8            THE COURT:  That means you can leave now, but you are
 9   not to discuss your testimony with any witness who has not yet
10   testified.  Thank you.
11            THE WITNESS:  Thank you.
12                 (Witness excused.)
13            MR. NOVAK:  Robert Cammaroto, please.
14            THE COURT:  While the witness is coming in, counsel,
15   would you approach the bench for a second.
16            (Bench conference on the record.)
17            [--- Redacted
18
19
20
21
22
23
24
25
```

1  said the following: That a person had indicated they were a
2  member of al Qaeda, that they were arrested while they were
3  getting inappropriate flight training in Minnesota --
4         MR. ZERKIN: I am going to note the same objection to
5  the hypothetical, Your Honor, for the reasons stated.
6         THE COURT: This avoids, I think, that problem, so I
7  will overrule the objection at this point.
8         MR. NOVAK: Thank you, Judge.
9  BY MR. NOVAK:
10 Q.   If I can continue then and ask you what type of
11 countermeasures you could have employed if you received
12 intelligence information that indicated that a person had been
13 arrested at a flight school, taking inappropriate flight training,
14 indicating that they were a member of al Qaeda, that they were
15 part of a larger plot to fly commercial airliners into buildings
16 in the United States of America, and that that person, as well as
17 others, were going to overcome and take control of the airplane
18 through the use of short-blade knives.
19        Could you explain to us what type of countermeasures you
20 could, that were available to you that you could have employed as
21 you did in the past with, using perhaps Bojinka as an example to
22 counteract that threat?
23 A.   Yes. If we had that kind of information and especially if it
24 was provided in such a way that we felt the threat was exigent,
25 immediate, we certainly could have, we certainly could have placed

1  law enforcement officers at the checkpoint.  At that point in time
2  they were not stationed at the checkpoints.  They were allowed to
3  roam freely about their area of jurisdiction but had to provide a
4  presence at the checkpoint when called.
5  Q.  Why don't we take this in steps.  Why don't we start with
6  what if any countermeasures you could have employed on the plane
7  itself.  Was there any countermeasures that you could have
8  implemented?
9  A.  On the aircraft, as what we saw with Bojinka and some of the
10 later SDs, we certainly would have insisted upon the very thorough
11 search of the aircraft at some point before the passengers
12 boarded, to make sure there were no weapons secreted under the
13 seat or in a wall panel or in the paper towels in the bathroom,
14 common places that you might have access to.
15 Q.  What if anything could you have done in relation to federal
16 air marshals, FAMs?
17 A.  The federal air marshals could have, of course, been
18 redeployed.  And certainly it is conceivable that if, under the
19 circumstances you have described, the force at that time was
20 inadequate, we certainly could have called upon other agencies for
21 additional manpower but that's how the original FAM program was
22 done.
23       They were not FAA air marshals.  They were enlisted
24 persons from the military.  They were U.S. marshals.  They were
25 Customs agents.  We saw that again after September 11th where we

Page 1843

1  had to call upon other agencies to provide additional staff.
2  Q.  Could you tell us what if any impact upon the deployment of
3  FAMs would the information have, the fact that it is domestic, the
4  fact that the attack is going to occur here in the United States
5  of America as opposed to internationally?
6  A.  Well, just in terms of the operation of the FAM team itself,
7  there would be no impact, it is just that they would be doing
8  domestic deployments, as opposed to foreign.  The advantage there,
9  of course, is that you don't have quite the logistical problems in
10 moving around our own country as we would moving around in foreign
11 countries.
12 Q.  But are you saying you would have deployed, instead of
13 internationally, you would have deployed them domestically; is
14 that what you are saying?
15         MR. ZERKIN:  Objection.  The question was asked in terms
16 of what they would have done.
17         MR. NOVAK:  Strike that.  I misspoke.
18         THE COURT:  Could have.
19 BY MR. NOVAK:
20 Q.  What if any impact in terms of deployment, though, is what I
21 am asking, could have occurred in relation to the FAMs?
22 A.  We certainly could have redeployed the FAMs from a largely
23 overseas role to a largely, if not exclusively, domestic role.
24 Q.  Okay.  What if any impact could that information have had in
25 terms of the common strategy?

Page 1844

1  A.  Well, the common strategy, of course, was meant to deal with
2  the situation where the hijacker was truly not looking to injure
3  anybody.  It basically grew out of the original hijacking in the
4  late '60s, early '70s, where what we call the homesick Cuban
5  syndrome, they just wanted to go home and didn't want to hurt
6  anybody, but then as hostage situations grew and were studied by
7  the bureau and other folks, it still became clear that the longer
8  the situation went on without anybody getting hurt, the more
9  likely it was to resolve well.
10          In the situation that you described, we could have
11  revamped the common strategy or canceled it altogether in a sense,
12  if you will, to ensure that the crews were not merely going along
13  and cooperating with the expectation that this would have been a
14  long, drawn-out situation, given the idea that aircraft might have
15  been flown into buildings, the idea would have been to protect the
16  cockpit, the flight deck of the aircrafts so no one could breach
17  it and ensure the airplane was taken down as quickly as possible
18  on to the ground, have the flight crew be able to provide a
19  limitation on the access to the flight deck.
20  Q.  How would that occur?  How is it that you could have changed
21  the common strategy, mechanically?  How would that be implemented?
22  A.  That would be implemented very much through a situation like
23  you see within SD.  The security directive would say as of this
24  moment, the common strategy that's reflected in whatever the
25  citation of documents were at that time, is modified and the air

1  carrier under the following circumstances will follow these
2  procedures.
3         That would be disseminated to the air carriers. And
4  they would either take it verbatim or reword it sometimes to fit
5  their own corporate culture and share it, train the crews along
6  those lines as we saw with some of the material we have looked at
7  previously.
8  Q.  All right. Let's talk about what if any countermeasures you
9  could have used before somebody got on the plane. Specifically,
10 let's talk about the use of the short-blade knives.
11        What is it that you could have done in relation to
12 prohibiting the four-inch blades?
13 A.  We could have modified the requirement that the air carriers
14 had at that time in the SSP. There was an Appendix 1 that said
15 what items were prohibited from going onboard the aircraft, some
16 general categories, some very specific, but it did have the
17 exception that blades less than four inches were permitted,
18 basically.
19        And we could have said in a security directive -- and
20 that would have been the appropriate vehicle -- don't allow any
21 blades whatsoever. And that would have, of course, had to be
22 applied at the checkpoints.
23 Q.  And would you implement the barring of all knives in the same
24 way that you -- could you have barred all knives in the same way
25 you barred all liquid explosives or liquids, I'm sorry, at all in

```
 1   the Bojinka plot?
 2   A.   That would have been the template we would have used.
 3   Q.   Okay.  Now, could you similarly, as you did with the Bojinka
 4   plot in relation to liquids, could you have made a public
 5   announcement:  Hey, don't anybody bring any blades whatsoever,
 6   because you are not allowed to take them on the airplanes any
 7   more?
 8   A.   Yes, we could have done that.
 9   Q.   What would be the reason to do that?
10   A.   The reason to do that would be to limit the amount of effort
11   the screeners would have to go through with each and every bag, as
12   people in the general public take it seriously and say, okay, I'm
13   not going to bring my Swiss Army knife, that would limit the
14   amount of interaction the screeners would have giving them more
15   time to focus on the bags in front of them.
16           And I would draw an analogy to what we do at the
17   holidays.  And it is very common knowledge that we put out
18   announcements every Christmas, don't carry gift-wrapped boxes,
19   because if they have to get unwrapped, they are going to get
20   unwrapped, and you are not going to get them back gift-wrapped.
21   Q.   And why do you that, though?  Why do you tell folks don't
22   bring the gift-wrapped boxes at Christmastime on the airplanes?
23   A.   Because we don't want the screeners to have to deal with
24   irate passengers and have to go through that extra time-consuming
25   thing of trying to take apart the gift-wrapping, and to further
```

1   get through gift wrapping, which sometimes includes wires and
2   staples and stuff that would make their job as screeners harder.
3   Q.   Now, when you talk about the screeners, what if any
4   educational steps could you have taken in terms of teaching the
5   screeners not to allow knives to go through?
6   A.   Well, what we could have, and what was done, for instance, in
7   the Bojinka plot relative to liquids was in translating to the
8   carriers the meaning of the SD, and we would normally do this in
9   telecons with the corporate level and our local folks would
10  interact with their local counterparts at a given airport, we
11  would explain to them this is exactly what we're expecting you to
12  do, this is exactly how we expect you to do it.
13          Then, of course, we would be present at the checkpoints
14  during operations to ensure that they were in compliance.
15  Q.   Could it be possible to stop 100 percent of all knives from
16  going through a screening area?
17  A.   I don't believe that would be possible, no, sir.
18  Q.   And when you create these type of security directives like
19  barring liquids or barring knives or whatever it is, do you factor
20  in the fact that it is not 100 percent foolproof to stop these
21  type of items?
22  A.   Yes, sir, we have to accept that as an acceptable level of
23  risk.
24  Q.   And because of that, do you view the system in terms of
25  multi-layers of security that you implement?