# Exhibit 31

```
                                                              Page 1645
 1                  UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION
 3    UNITED STATES OF AMERICA,    .    Criminal No. 1:01cr455
                                   .
 4        vs.                      .    Alexandria, Virginia
                                   .    March 22, 2006
 5    ZACARIAS MOUSSAOUI,          .    9:30 a.m.
      a/k/a Shaqil, a/k/a          .
 6    Abu Khalid al Sahrawi,       .
                                   .
 7              Defendant.         .
                                   .
 8    . . . . . . . . . . . .
 9                    TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE LEONIE M. BRINKEMA
10                 UNITED STATES DISTRICT JUDGE
11                         VOLUME VIII
12    APPEARANCES:
13    FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                                   DAVID J. NOVAK, AUSA
14                                 DAVID RASKIN, AUSA
                                   United States Attorney's Office
15                                 2100 Jamieson Avenue
                                   Alexandria, VA 22314
16
      FOR THE DEFENDANT:           GERALD THOMAS ZERKIN
17                                 KENNETH P. TROCCOLI
                                   ANNE M. CHAPMAN
18                                 Assistant Federal Public Defenders
                                   Office of the Federal Public
19                                 Defender
                                   1650 King Street
20                                 Alexandria, VA 22314
21
22
              (Appearances Continued on Following Page)
23
24
25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Page 1678

1   They felt that it was English that was his problem, and that he
2   didn't comprehend a lot of the instruments and everything else
3   that he had to learn, so --
4   Q.  So what did you do in response to that?
5   A.  I called him into my office, and I told him that there were
6   some difficulties and that I didn't think that he would be able to
7   finish the course. He was very insistent that he could finish the
8   course, and so, you know, we tried to continue on.
9   Q.  All right. Was there some type of exercise that you set up
10  for him to help him get through the ground school portion?
11  A.  When it came time to do the oral exam with FAA, we knew he
12  was not ready, so what I did was I set up a mock oral exam for
13  him.
14  Q.  And how did he do on that exam?
15  A.  He did very poorly. Normally it is done in two hours, and it
16  took him almost eight to finish.
17  Q.  So what did you do after that exercise?
18  A.  I pretty much said that there was no way that we would be
19  able to finish.
20  Q.  What was his reaction to that?
21  A.  At that point in time, he requested that he just maybe spend
22  some time in the simulator.
23  Q.  Did you let him into the simulator?
24  A.  Yes, we did.
25  Q.  Why?

Page 1679

1  A.  I didn't have any idea of, you know, I thought that he was
2  just trying to learn, and so we in the pilot industry try to help
3  people to learn.
4  Q.  And he was a paying client, right?
5  A.  He was.
6  Q.  And how did he do when he got into the 737 simulator?
7  A.  He had a basic knowledge of flight but not that great.  He
8  didn't do well.
9        Again, I was approached by the instructors because he
10 just wanted to deviate from the program.  We have a set program,
11 which we do try to follow regardless, because as I stated, we want
12 them to learn, and so he wanted to deviate from that.  He didn't
13 want to do the takeoff or landing procedures.  He just wanted to
14 basically fly the simulator in the air.
15 Q.  And was he interested in getting as much time in the
16 simulator as he could?
17 A.  Yes, he was.
18 Q.  And now, based on your concerns and what had happened there
19 at Jet Tech with Hani Hanjour, what phone call did you make, if
20 any, to the FAA?
21 A.  I made a phone call to John Anthony, who oversaw our flight
22 training center.  He was with the FAA.  I contacted him with
23 concerns.  At first, the first time I had the conversation with
24 him was because I didn't feel that he was capable of flying an
25 aircraft.

1  Q.   You mean Hani Hanjour was incapable?

2  A.   Hani Hanjour was not capable; that's correct.

3  Q.   All right. And you said your first phone call. Was there

4  more than one phone call that you made to the FAA about

5  Mr. Hanjour?

6  A.   I don't remember the exact number of phone calls. I know

7  that I definitely had at least three conversations with John

8  Anthony regarding Hani Hanjour.

9  Q.   And what was your concern?

10 A.   My concern was -- well, there was two issues that I had.

11 First issue was that he didn't speak English well enough. He

12 couldn't get through an exam well enough, and he couldn't write

13 well enough to have a pilot's license. That was my initial

14 concern was how did he get his pilot's license.

15       My second concern in the second conversation was I was

16 worried that he was going to hurt himself or hurt somebody else

17 because his skills were -- he just didn't have the skills to fly,

18 I didn't feel.

19 Q.   Were you concerned that he was going to intentionally hurt

20 somebody or just because he couldn't fly very well?

21 A.   I was more concerned that he was going to hurt somebody

22 because of an accident, not because he intentionally meant to.

23 Q.   And what do you mean by you were concerned about how he got

24 his private pilot's license?

25 A.   FAA regulations state that you have to be able to read,

Page 1681

1   write, and speak English, and because he couldn't get through the

2   exams that we gave him, it was obvious that he didn't have the

3   requirements to get through the exams according to our FAA

4   regulations. So that was the concern of mine.

5   Q. All right. Can you take a look now, if you pick up

6   Government Exhibit PX-21.1, which should be a manila folder.

7            Excuse me, Mr. Wood, I think you have got it in your

8   left hand, there. Is the manila folder inside there? It is right

9   in your right hand now, Mr. Wood.

10  A. Okay, that's PX-22.

11           MR. SPENCER: Mr. Wood? That's it right there. On the

12  inside. Thank you, sir.

13  BY MR. SPENCER:

14  Q. Now, do you recognize that manila file folder that's 21.1?

15  A. Yes, I do.

16  Q. Okay. What is that?

17  A. It is basically showing when he made payments in cash, basic,

18  his deposit. Also, what we were charging him for the cockpit

19  training was $200 for the four hours, and then the simulator was

20  250 an hour, and it also states a total, as well as a contact that

21  I made to John Anthony with my suspicions.

22  Q. So those are your notes on the bottom?

23  A. Correct.

24           MR. SPENCER: Mr. Francisco, can you put up the bottom

25  there?

Page 1682

```
 1   BY MR. SPENCER:
 2   Q.   So down on the bottom, is that your handwriting?
 3   A.   Yes, it is.
 4   Q.   And those are your notes of, saying that you called John
 5   Anthony at the FAA?
 6   A.   Yes.
 7   Q.   All right.  Suspicious of ratings, what did you mean by that?
 8   A.   I didn't believe he should have a pilot's license, period, so
 9   he shouldn't have been rated as a pilot.
10   Q.   Had you ever called the FAA before Mr. Hanjour to report
11   another student?
12   A.   Never.
13   Q.   All right.  Let me take you now, please, to September 11,
14   2001.  Did the FBI come to interview you on that day?
15   A.   On September 11?
16   Q.   Yes.
17   A.   No.
18   Q.   Did they come to interview you the next day?
19   A.   I believe they did.
20   Q.   All right.  Tell the jury what happened when the FBI came to
21   see you on September 12th, 2001.
22   A.   When they came to the office, I had already known in my heart
23   that Hani was a part of it, so when they came in and introduced
24   themselves, I pretty much initiated a conversation that stated to
25   them:  You are here because of Hani Hanjour.
```

Page 1686

1  English language skills?
2  A.  I was informed by the instructors that he was unable to
3  perform the skills necessary to fly.
4  Q.  And you contacted the FAA two or three times about this?
5  A.  I had conversations with them at least two or three times,
6  yes.
7  Q.  Did you call FAA headquarters, or was this a local
8  representative?
9  A.  I called John Anthony, who was our overseer for our flight
10 school.
11 Q.  Isn't, in fact, John Anthony a student?  Wasn't he a student
12 at the school?
13 A.  John Anthony was the FAA that oversaw our training center.
14 He is required to come and sit through ground school once a year
15 in order to maintain his credentials.
16 Q.  But he was there at the same time Mr. Hanjour was there,
17 correct?
18 A.  He was at one point, yes.
19 Q.  And he actually spoke with Mr. Hanjour, correct?
20 A.  Yes, he did.
21 Q.  You were so concerned -- you were concerned about his
22 language skills, correct, Mr. Hanjour's language skills?
23 A.  Initially I was concerned that he had a pilot's license and
24 how he got that without having the correct FAA requirement.
25 Q.  And you mentioned that it took him eight hours to complete an

Page 1687

```
 1  exam that typically takes about two?
 2  A.   That's correct.
 3  Q.   What did the FAA representatives say to you when you told
 4  them that he lacked the appropriate English language skills?
 5  A.   At that particular point, I asked him to verify his pilot
 6  license.
 7  Q.   Didn't, didn't the FAA say that you could get a translator
 8  for Mr. Hanjour?
 9       MR. SPENCER:  Your Honor, object to the hearsay.  They
10  can call Mr. Anthony if they want.
11       MR. TROCCOLI:  Your Honor, first of all, hearsay is not
12  an appropriate objection in the penalty phase, as the Court
13  previously ruled.
14       THE COURT:  We have relaxed the rules of evidence, as
15  the law permits, as long as the evidence is reliable.  I think in
16  this case that's sufficiently reliable.  I am going to overrule
17  the objection.
18       MR. SPENCER:  Thank you, Your Honor.
19       THE WITNESS:  I'm sorry, do I answer that question?
20  BY MR. TROCCOLI:
21  Q.   Didn't the FAA tell you, suggest to you that you could get a
22  translator to help Mr. Hanjour with his language skills?
23  A.   During a course that Hani was sitting through with John
24  Anthony, he did come in, and he did make a suggestion, which I
25  immediately reminded him of the regulation that it is a
```

1  requirement to be able to speak, read, and write English on your
2  own. You can't have an interpreter. You have to be able to do
3  what's required of the FAA, which is speak and read and write
4  English.
5  Q.  The FAA suggested that you bring in a translator, correct?
6  A.  That's correct.
7  Q.  And you reminded the FAA representative that this went
8  against the rules that require a pilot to read and write and speak
9  English fluently, correct?
10 A.  That's correct.
11 Q.  And at some point thereafter, are you aware that Mr. Anthony
12 actually spoke to Mr. Hanjour and got a sense of his language
13 skills?
14 A.  You know, I am not aware of the conversations that he had.
15 Q.  Do you know if the FAA did anything else other than suggest a
16 translator?
17 A.  Yes, they did. They contacted Washington to verify that his
18 pilot's license was legitimate.
19 Q.  And did they revoke his license, do you know?
20 A.  They checked to make sure that he made it through with his
21 initial pilot license, and that's the call that I got. That's all
22 I know. I got a call back stating that his pilot's license was a
23 legitimate license.
24 Q.  Do you know the name of that person?
25 A.  I do not.