UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                    :
AMERICAN AIRLINES, INC., ET AL.,                    :        07 Civ. 7051 (AKH)
            Plaintiffs,                             :
                                                    :
    -against-                                       :        This document relates to:
                                                    :        21 MC 101 (AKH)
FEDERAL BUREAU OF INVESTIGATION,                    :
ET AL.,                                             :
            Defendants.                             :
                                                    :
-------------------------------------------------------------X


# MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF THE AVIATION DEFENDANTS FOR SUMMARY JUDGMENT SETTING ASIDE THE FEDERAL BUREAU OF INVESTIGATION'S <u>REFUSAL TO ALLOW THE DEPOSITIONS OF CERTAIN WITNESSES</u>

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................iii

PRELIMINARY STATEMENT........................................................................................ 1

ARGUMENT ...................................................................................................................... 6

THE FBI'S DECISION TO DENY THE AVIATION
DEFENDANTS' REQUEST FOR THE DEPOSITIONS OF
FIVE FBI WITNESSES WAS PROPER AS A MATTER OF LAW .............................. 6

A.    The Standard of Review ...................................................................... 6

    1.    The Standard of Review For This Court Under The APA......................... 7

    2.    The Standard of Review For This Court Under
        The Federal Rules Of Civil Procedure........................................................ 7

    3.    The FBI's Decision Should Be Sustained Under Either
        The APA Or The Federal Rules Of Civil Procedure.................................. 8

B.    The FBI Properly Determined That Any Information That
      The FBI, CIA And/Or FAA Knew But Did Not Communicate
      To The Aviation Defendants Relates Only To The Irrelevant
      Issue Of The Government's Fault, If Any.............................................. 9

    1.    The FBI Properly Determined That Any Intelligence
        Information That The FBI, CIA And/Or FAA Did Not
        Communicate To The Aviation Defendants Is
        Irrelevant To The Issue Of Proximate Cause ......................................... 14

    2.    The FBI Properly Determined That Any Intelligence
        Information That The FBI, CIA And/Or FAA Did Not
        Communicate To The Aviation Defendants Is
        Irrelevant To The Issue Of Foreseeability ............................................... 17

    3.    The Aviation Defendants Are Not Entitled
        To Derivative Immunity............................................................................. 25

**TABLE OF CONTENTS (cont'd)**

**Page**

C.    The FBI Properly Determined That Information The
Aviation Defendants Seek To Discover About The Planning And
Execution Of The September 11th Attacks Is Either
Irrelevant Or Available From Other Sources ........................................................ 29

CONCLUSION ............................................................................................................... 36

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975,*
    635 F.2d 67 (2d Cir. 1980) ........................................................................................ 20

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
    419 U.S. 281 (1975) ...................................................................................................... 8

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988) .................................................................................................... 28

*Camp v. Pitts,*
    411 U.S. 138 (1973) ...................................................................................................... 3

*In re City of N.Y.,*
    475 F. Supp. 2d 235 (E.D.N.Y. 2007),
    *aff'd,* 522 F.3d 279 (2d Cir. 2008) ............................................................................ 16

*Derdiarian v. Felix Contracting Corp.,*
    51 N.Y.2d 308, 434 N.Y.S.2d 166 (1980)............................................. 14, 16, 18, 31

*DiBenedetto v. Pan Am World Serv.,*
    359 F.3d 627 (2d Cir. 2004) ...................................................................................... 19

*Eiseman v. State,*
    70 N.Y.2d 175, 518 N.Y.S.2d 608 (1987)................................................................. 25

*EPA v. General Elec. Co.,*
    212 F.3d 689 (2d Cir. 2000) ........................................................................................ 6

*Florence v. Goldberg,*
    44 N.Y.2d 189, 404 N.Y.S.2d 583 (1978).................................................................. 11

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ...................................................................................................... 8

*Gaines-Tabb v. ICI Explosives USA, Inc.,*
    995 F. Supp. 1304 (W.D. Okla. 1996) ...................................................................... 31

*Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co.,*
    45 N.Y.2d 551, 410 N.Y.S.2d 571 (1978)................................................................. 12

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Hoppe v. G.D. Searle & Co.,*
779 F. Supp. 1413 (S.D.N.Y. 1991) ................................................................. 17

*Japan Airlines Co. v. Port Auth. of N.Y. and N.J.,*
178 F.3d 103 (2d Cir. 1999) ............................................................................ 20

*Johnson v. Bryco Arms,*
226 F.R.D. 441 (E.D.N.Y. 2005) ............................................................... 6-7, 8, 9

*Johnson v. Folino,*
528 F. Supp. 2d 548 (E.D. Pa. 2007) ................................................................. 9

*In re Kinsman Transit Co.,*
338 F.2d 708 (2d Cir. 1964) ........................................................................... 18

*Kush v. City of Buffalo,*
59 N.Y.2d 26, 462 N.Y.S.2d 831 (1983) .......................................................... 30

*Leonardi v. Loyola Univ.,*
168 Ill.2d 83, 658 N.E.2d 450 (1995) ............................................................. 17

*Lozada ex rel. Lozada v. Arco Mgmt. Corp.,*
2005 WL 1651038 (Sup. Ct. N.Y. Co. 2005) ............................................... 15-16

*The Lusitania,*
251 F. 715 (S.D.N.Y. 1918) ........................................................................... 31

*McCarthy v. Sturm, Ruger & Co.,*
916 F. Supp. 366 (S.D.N.Y. 1996) .................................................................. 31

*Monroe v. Cessna Aircraft Co.,*
417 F. Supp. 2d 824 (E.D. Tex. 2006) ............................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................................ 7

*Nallan v. Helmsley-Spear, Inc.,*
50 N.Y.2d 507, 429 N.Y.S.2d 606 (1980) .................................................... 16, 30

*Nash v. Port Authority of N.Y. & N.J.,*
856 N.Y.S.2d 583 (1st Dep't 2008) ............................................................ 17, 32

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Pelman v. McDonald's Corp.*,
   237 F. Supp. 2d 512 (S.D.N.Y. 2003) ....................................................................... 17

*Port Authority of N.Y. & N.J. v. Arcadian Corp.*,
   991 F. Supp. 390 (D.N.J. 1997)................................................................................ 31

*Sanchez v. State*,
   99 N.Y.2d 247, 754 N.Y.S.2d 621 (2002)............................................................... 11

*In re SEC ex rel. Glotzer*,
   374 F.3d 184 (2d Cir. 2004) ................................................................................ 6, 7

*In re September 11 Litig.*,
   280 F. Supp. 2d 279 (S.D.N.Y. 2003) ....................................... 14, 18, 19, 25, 30, 31

*Sheehan v. City of N.Y.*,
   40 N.Y.2d 496, 387 N.Y.S.2d 92 (1976)................................................................ 14

*Stagl v. Delta Airlines, Inc.*,
   52 F.3d 463 (2d Cir. 1995) ................................................................................... 30

*Stanford v. Kuwait Airways Corp.*,
   89 F.3d 117 (2d Cir. 1996) ................................................................................... 19

*United States v. Albarado*,
   495 F.2d 799 (2d Cir. 1974). ............................................................................... 21

*United States v. Ozark Air Lines, Inc.*,
   419 F. Supp. 795 (E.D. Mo. 1976) ........................................................................ 19

*United States v. S.A. Empresa De Viacao (Varig Airlines)*,
   467 U.S. 797 (1984) ............................................................................................ 19

*Wilkins v. Am. Exp. Isbrandtsen Lines, Inc.*,
   446 F.2d 480 (2d Cir. 1971)................................................................................. 17

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Williams v. Trans World Airlines,*
  509 F.2d 942 (2d Cir. 1975) ................................................................... 19, 20

*In re World Trade Center Disaster Site Litig.,*
  521 F.3d 169 (2d Cir. 2008) .............................................................. 25, 27, 28

**Administrative Decisions**

*In re Trans World Airlines, Inc.,*
  FAA Order No. 1999-12, 1999 WL 1125387 (FAA Oct. 7, 1999) .......................................... 19

**Statutes**

28 C.F.R. § 16.21 .................................................................................... 1

28 C.F.R. § 16.26(a)(1) ............................................................................. 8

28 U.S.C. § 1346(b) ................................................................................ 11

32 C.F.R. § 1905 .................................................................................... 1

5 U.S.C. § 701 *et seq.* ............................................................................. 1

5 U.S.C. § 706(2)(A) ................................................................................ 7

49 U.S.C. § 44701(d) ............................................................................ 19, 26

49 U.S.C. § 44702(b)(1)(A) ...................................................................... 19, 26

N.Y. C.P.L.R. § 1401 .............................................................................. 11

N.Y. C.P.L.R. § 1402 .............................................................................. 11

N.Y. C.P.L.R. § 1601 .............................................................................. 11

Fed. R. Civ. P. 26(b) ............................................................................... 5

Fed. R. Civ. P. 26(b)(2)(C) ......................................................................... 8

**TABLE OF AUTHORITIES (cont'd)**

**Page**

Fed. R. Civ. P. 45 .................................................................................................. 7, 8

Fed. R. Civ. P. 45(c)(3) ............................................................................................ 7

Fed. R. Civ. P. 56(a) ................................................................................................ 1

Fed. R. Civ. P. 56(c) ................................................................................................ 6

Fed. R. Evid. 403 ................................................................................................... 13

Local Civil Rule 56.1(d) .......................................................................................... 3


**Treatises**

William L. Prosser & W. Page Keeton, <u>The Law of Torts</u> 240 (5th ed. 1984) ................ 11-12, 15

10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    <u>Federal Practice & Procedure</u> § 2733 (3d ed. 2008) .................................................. 6

Restatement (Second) of Torts § 441(1) .................................................................... 15


**Miscellaneous**

N.Y. PJI3d 2:70 (2005) ........................................................................................... 15

N.Y. PJI3d 2:71 (2005) ........................................................................................... 15

Richard Esposito & Jason Ryan, *CIA Chief: We Waterboarded;*
    *Gen. Hayden Confirms the Agency Waterboarded Three 'High-Value'*
    *Detainees*, ABC News, Feb. 5, 2008, *available at*
    http://abcnews.go.com/Blotter/TheLaw/story?id=4244423&page=1 ....................................... 2

Neil A. Lewis, "Moussaoui's Move to Recant Guilty Plea
    Is Denied," N.Y. Times, May 6, 2006 ................................................................... 30

## PRELIMINARY STATEMENT

On May 7, 2007, the Federal Bureau of Investigation (the "FBI"), pursuant to 28 C.F.R. §

16.21 *et seq.*, denied the request of the Aviation Defendants[1] to depose five FBI witnesses (the

"FBI Witnesses") in the case *In re September 11 Business Loss and Property Damage Litig.*, 21

MC 101 (AKH) (the "September 11 Litigation").    The Aviation Defendants thereafter

commenced this separate action, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et*

*seq.*, in which they allege that the FBI's decision should be set aside (the "APA Action").    The

FBI filed its answer in the APA Action on October 9, 2007.    After doing nothing with respect to

the APA Action for the next six months, on April 28, 2008, the Aviation Defendants moved for

summary judgment in the APA Action, pursuant to Fed. R. Civ. P. 56(a).[2]    Because any decision

in the APA Action will affect the rights and interests of the plaintiffs in the September 11

Litigation (collectively, the "Plaintiffs"), this Court authorized the Plaintiffs to appear in the APA

Action for the purposes of opposing the Aviation Defendants' motion. *See* Mar. 18, 2008 Tr.

---

[1]    The Aviation Defendants (referred to here as "Aviation Defendants" or "Defendants") include American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services, Inc.; Huntleigh USA Corp.; Burns International Services Corp.; Burns International Security Services Corp.; Pinkerton's Inc.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; the Metropolitan Washington Airport Authority; and the Port Authority of New York and New Jersey.

[2]    The Aviation Defendants also commenced a separate lawsuit on July 31, 2007, *American Airlines, Inc. v. Central Intelligence Agency*, Docket No. 07 CV 7050 (AKH), challenging the CIA's May 1, 2007 denial, pursuant to 32 C.F.R. § 1905, of their request to depose two anonymous undercover CIA agents. The Aviation Defendants have not moved for summary judgment in that case, notwithstanding the Court's direction to do so. *See* Mar. 18, 2008 Tr. (relevant excerpts annexed to the June 17, 2008 Declaration of Richard A. Williamson ("Williamson Decl.") as Exh. 1), at 27-28. Thus, although the Aviation Defendants claim (Defs' Br. at 14 n.6) that it is still their intention to pursue those CIA depositions, any right to those depositions in the September 11 Litigation should be deemed waived because of the Aviation Defendants' failure to move following the Court's instructions to do so and in light of the impending December 31, 2008 deadline for fact discovery, *see* Mar. 18, 2008 Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 1), at 63.

(relevant excerpts annexed to the Williamson Decl. as Exh. 1) at 29-30. Plaintiffs respectfully submit this memorandum of law in accordance with that ruling.

After sitting on their hands for months as discovery proceeded in the September 11 Litigation, the Aviation Defendants now ask the Court to overturn the FBI's decision and permit the depositions of the five FBI Witnesses – depositions that would further delay the resolution of Plaintiffs' claims in the September 11 Litigation, some of which were filed more than seven years ago, and likely make it impossible to complete fact discovery by the December 31, 2008 deadline in that litigation. However, the FBI properly found that the depositions requested by the Aviation Defendants relate to issues that are irrelevant and unnecessary to the September 11 Litigation. Because Defendants offer no legal basis for setting aside the FBI's decision, that decision should be affirmed, and the Aviation Defendants' motion for summary judgment should be denied.

The Aviation Defendants claim (Defs' Br. at 3-7, 9-13, 18-37) that in deciding this motion, the Court should consider the proposed testimony of the five FBI Witnesses along with *The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks Upon the United States* ("Commission Report") and statements made by Khalid Sheikh Mohammed (a member of al Qaeda subjected to "enhanced" interrogation techniques as a detainee in government custody).[3] The Aviation Defendants claim that the deposition testimony of the five FBI Witnesses, together with these other materials,[4] will show that (1) the government

---

[3] *See, e.g.*, Richard Esposito & Jason Ryan, *CIA Chief: We Waterboarded; Gen. Hayden Confirms the Agency Waterboarded Three 'High-Value' Detainees*, ABC News, Feb. 5, 2008, *available at* http://abcnews.go.com/Blotter/TheLaw/story?id=4244423&page=1).

[4] The Aviation Defendants' heavy reliance in their brief upon the Commission Report excerpts, the Staff Monograph and Statements, along with the statements of Khalid Sheikh Mohammed incorrectly (continued on next page)

2

had intelligence information that was never shared with the Aviation Defendants prior to September 11th; and (2) the September 11th hijackers "were fanatical, well-trained, and well-organized terrorists, who were committed to executing the attacks regardless of the checkpoint screening or aviation security measures that were in place."[5] As the FBI properly found, that testimony would be irrelevant and unnecessary in the September 11 Litigation.

First, the FBI properly determined that any testimony concerning intelligence information that may have been known to the government but not communicated to the Aviation Defendants is irrelevant and has no bearing on the liability of the Aviation Defendants in the September 11 Litigation, as we explain more fully in Section B below. The Aviation Defendants' liability turns on the knowledge and conduct of the Aviation Defendants, not on the knowledge and conduct of

---

assumes that those materials will be admissible in the September 11 Litigation. But, as the Aviation Defendants well know, the admissibility of these materials is the subject of separate motions currently pending before the Court. The Court should determine whether the FBI properly denied the Aviation Defendants' deposition requests without regard to these disputed materials, *cf.* Local Civil Rule 56.1(d) (each statement of material fact presented in connection with summary judgment motion must be followed by citation "to evidence which would be admissible"), particularly since the Commission Report excerpts, the Staff Monograph and Statements, and the statements of Khalid Sheikh Mohammed were not presented to the FBI by the Aviation Defendants when they requested the depositions of the five FBI Witnesses, *see* Declaration of Desmond T. Barry, Jr. ("Barry Decl."), Exhs. 1-6; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (when reviewing agency's decision, the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

[5] As evidence of the kind of information the Aviation Defendants hope to elicit from the five FBI Witnesses, the Aviation Defendants point to certain statements that were attributed to those witnesses in the Commission Report, and in the Staff Monograph and Statements, and to certain testimony that they gave at the trial in *United States v. Zacarias Moussaoui*, 01 cr 455 (E.D. Va.) (the "*Moussaoui* trial"). However, as with the Commission Report and the Staff Monograph and Statements, the question of whether any testimony from the *Moussaoui* trial will be admissible in the September 11 Litigation is the subject of a pending motion in this Court. Like the Commission Report and the Staff Monograph and Statements, the testimony from the *Moussaoui* trial also was not part of the administrative record before the FBI and, thus, should not be considered by the Court. In any event, these disputes are immaterial to this summary judgment motion. Even assuming that the FBI Witnesses would testify consistently with their testimony in the *Moussaoui* trial and with any statements attributed to them in the Commission Report, that testimony would be irrelevant for all the reasons discussed in this brief.

the government. Second, as we show in Section C below, the FBI properly determined that any testimony concerning the alleged "fanaticism" of the hijackers is also irrelevant or, at a minimum, unnecessary. The Aviation Defendants – all of whom had the duty to provide service with the highest possible degree of safety in the public interest – cannot as a matter of law excuse themselves from responsibility for the events of September 11th by speculating that the hijackers might have found alternative means to carry out their plot in the absence of the Aviation Defendants' negligence. Moreover, all of the facts that, according to the Aviation Defendants, demonstrate the alleged determination of the hijackers to carry out an attack on civil aviation already are available from other sources. Not only have the Plaintiffs offered to stipulate to many of those facts, but the FBI has produced tens of thousands of pages of documents from its own post-9/11 investigation of the terrorist attacks, including reports of interviews of airline and airport personnel and other witnesses, documents concerning the hijackers' weapons purchases, documents concerning communications with persons aboard the hijacked aircraft, and laboratory photographs and related information concerning physical evidence that was collected by the FBI in the course of its investigation. *See* March 14, 2008 letter from AUSA Sarah S. Normand to the Honorable Alvin K. Hellerstein (Exh. 2 to the Williamson Decl.), at 4-5. With all of this direct evidence available to the Aviation Defendants concerning how the 9/11 attacks were planned and executed, there is no reason to subject the parties and the government to the expense and burden of preparing for and taking the depositions of five FBI Witnesses when those depositions can yield only irrelevant or duplicative information.[6]

---

[6] If permitted to go forward, the depositions of the five FBI Witnesses will be only the tip of the government discovery iceberg. For example, on May 5, 2008, the Aviation Defendants requested the deposition of another FBI employee, Kenneth Williams, and of an FAA employee, John Anthony. The Aviation Defendants seek the depositions of these individuals, both of whom allegedly were involved in (continued on next page)

4

The FBI properly recognized that the testimony being sought was irrelevant and unnecessary when it denied the Aviation Defendants' deposition requests last year. The FBI refused to produce the five FBI Witnesses for deposition on the grounds, *inter alia*, that the Aviation Defendants had requested information that exceeded "the scope of permissible discovery under Rule 26(b) of the Federal Rules of Civil Procedure." May 7, 2007 letters from United States Attorney Michael J. Garcia to Desmond T. Barry, Jr., Esq. (annexed to the Barry Decl. as Exhs. 7-11), at 3. Specifically, the FBI noted that the Aviation Defendants had failed to explain how information that may have been available to the FBI prior to September 11, 2001 could be "relevant to the question of the Aviation Defendants' alleged negligence, at least in the absence of any showing that such information was communicated to the Aviation Defendants." *Id.* at 1.[7] The FBI also stated that much of the information requested by the Aviation Defendants was "cumulative, duplicative, or available through less burdensome channels," including, for example, through documents that had been produced by the FBI in response to the Aviation Defendants' requests for the production of documents. *Id.* at 2-3; *see also* Mar. 14, 2008 letter from AUSA Sarah S. Normand to the Honorable Alvin K. Hellerstein (Exh. 2 to the Williamson Decl.), at 4-5.

---

pre-9/11 investigations by the government, for the identical reasons that they seek the depositions of the five FBI Witnesses, *i.e.*, to show that the government had threat information that it did not share with the Aviation Defendants. *See* May 5, 2008 letter from Desmond T. Barry, Jr., Esq. to AUSA Beth Goldman (Exh. 3 to the Williamson Decl.).

[7] The government repeated this explanation for its decision in a March 14, 2008 letter to the Court. *See* March 14, 2008 letter from AUSA Sarah S. Normand to the Honorable Alvin K. Hellerstein (Exh. 2 to the Williamson Decl.), at 7-8. In that letter, the government reiterated that "[i]nformation known (or not known) to the Government that was not communicated to the aviation defendants [is] not relevant . . . This case is about the aviation defendants' conduct; the reasonableness of that conduct is properly judged by reference to the information they knew or should have known, not information they could not have known because it was not communicated to them." *Id.* at 7.

The FBI was well within its authority in denying the Aviation Defendants' deposition requests on these bases. This Court should deny the Aviation Defendants' motion because the Aviation Defendants have articulated no legal basis for overturning the FBI's determination.

## ARGUMENT

### THE FBI'S DECISION TO DENY THE AVIATION DEFENDANTS' REQUEST FOR THE DEPOSITIONS OF FIVE FBI WITNESSES WAS PROPER AS A MATTER OF LAW

**A.    The Standard Of Review**

The only question for the Court on this summary judgment motion is whether the FBI properly denied the Aviation Defendants' deposition requests as a matter of law. *See* Fed. R. Civ. P. 56(c) (summary judgment appropriate where movant establishes entitlement to judgment as a matter of law); *cf.* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2733 (3d ed. 2008) (noting that cases involving judicial review of federal agency decisions are particularly appropriate for summary judgment because function of court in such cases is to determine whether agency decision was consistent with the law and nothing more). Whether that legal determination should be made under the APA or under the Federal Rules of Civil Procedure remains an unsettled question in the Second Circuit. *See EPA v. General Elec. Co.*, 212 F.3d 689, 690 (2d Cir. 2000); *see also In re SEC ex rel. Glotzer*, 374 F.3d 184, 191 (2d Cir. 2004) (whether APA standard of review governs courts' review of agency non-compliance with discovery requests is question that is "far from settled"). But the Court need not resolve which standard of review applies here because under either the APA or the Federal Rules, the FBI's determination should not be disturbed. *See Johnson v. Bryco Arms*, 226 F.R.D. 441,

444-46 (E.D.N.Y. 2005) (declining to decide standard of review because ATF's refusal to produce three employees for deposition was proper under either APA or Federal Rules of Civil Procedure).

### 1.    The Standard Of Review For This Court Under The APA

Under the APA standard of review, the FBI's decision may be set aside by this Court only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's review under this standard is "narrow." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency" but, rather, should "consider whether the [FBI's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted).

### 2.    The Standard Of Review For This Court Under The Federal Rules Of Civil Procedure

Under the Federal Rules of Civil Procedure, this Court may not set aside the FBI's decision as long as the FBI shows that the requested depositions require "disclosure of privileged or other protected matter" or "subject[] a person to undue burden." Fed. R. Civ. P. 45(c)(3); *Glotzer*, 374 F.3d at 190 n.5 ("If [Rule 45] applied to the case in which an agency refuses to comply with a subpoena, the burden would be on the agency to demonstrate that one of [the enumerated bases for quashing a subpoena] existed."). When conducting this analysis, the Court should preclude the depositions of the five FBI Witnesses as unduly burdensome, if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii)

7

the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P.

26(b)(2)(C); *Johnson*, 226 F.R.D. at 444-45 (when determining whether discovery request

imposes an "undue burden" on a government agency under Rule 45, the court should limit

discovery if it determines that any of the factors set forth in Rule 26(b)(2)(C) are satisfied).[8]

### 3.    The FBI's Decision Should Be Sustained Under Either The APA Or The Federal Rules Of Civil Procedure

Plaintiffs do not ask the Court to make an independent finding in the APA Action that the

testimony of the five FBI Witnesses is irrelevant or otherwise inadmissible in the September 11

Litigation.  Rather, as explained above, the Court's only role in the APA Action is to determine

whether it was arbitrary and capricious, or inconsistent with the Federal Rules of Civil

Procedure, for the FBI to have found that the proposed testimony is irrelevant and/or

unnecessary.  The FBI's decision was not arbitrary or capricious, or inconsistent with the Federal

Rules of Civil Procedure, and it should, therefore, be sustained.  The FBI's own regulations

authorized the Bureau to consider whether the depositions sought by the Aviation Defendants

were "appropriate under the rules of procedure governing the case," 28 C.F.R. § 16.26(a)(1), *i.e.*,

the Federal Rules of Civil Procedure.  In accordance with those regulations, the FBI found that

---

[8] The Aviation Defendants repeatedly characterize (*see* Defs' Br. 15, 17, 37) the reasons that the FBI gave for refusing to produce the five FBI Witnesses as "boilerplate."  To the extent the Aviation Defendants are suggesting that the Court should reverse on this basis without ever addressing the merits of the FBI's decision, that claim should be rejected.  The FBI's reasoning is thorough and clear in this case, and, indeed, the Aviation Defendants do not profess any confusion about why their deposition requests were denied.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1975) (court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").  But even if the Court were to accept the Aviation Defendants' assertion that the FBI's reasoning was insufficiently detailed to permit judicial review, the proper procedure would not be to reverse the agency's decision but, rather, to remand to the FBI for further explanation.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (if administrative record is inadequate to explain agency action taken, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

the Aviation Defendants' deposition requests were *not* appropriate under Rule 26 because the information sought from the five FBI Witnesses was irrelevant and, in any event, was unreasonably cumulative and duplicative and could be obtained from other, less burdensome sources. That decision reflects a proper application of the Federal Rules of Civil Procedure, and it was not arbitrary and capricious. *See Johnson*, 226 F.R.D. at 445-46 (finding that ATF's refusal to produce three agents for deposition was proper, under either APA or Federal Rules of Civil Procedure, because testimony of agents was "essentially hearsay;" what was relevant was evidence that agents relied upon, which was available to parties through other discovery); *see also Johnson v. Folino*, 528 F. Supp. 2d 548, 551-52 (E.D. Pa. 2007) (finding that FBI's refusal to produce requested information was proper, under either APA or Federal Rules of Civil Procedure, because information sought was "unlikely" to be relevant and FBI had legitimate interest in keeping information private).

**B.    The FBI Properly Determined That Any Information That The FBI, CIA And/Or FAA Knew But Did Not Communicate To The Aviation Defendants Relates Only To The Irrelevant Issue Of The Government's Fault, If Any**

The first category of information that the Aviation Defendants seek to elicit from the five FBI Witnesses consists of intelligence information, if any, that may have been known to the government prior to September 11th but that was not communicated to the Aviation Defendants. In particular, the Aviation Defendants seek information about the FBI's pre-September 11, 2001 investigation into the activities of al Qaeda, Zacarias Moussaoui, and two of the 9/11 hijackers, Khalid al Mihdhar and Nawaf al Hazmi.[9]  In an attempt to justify their request for this kind of

---

[9] The Aviation Defendants allege (Defs' Br. at 12) that one of the five FBI Witnesses, Retired Special Agent Erik Rigler, "conducted a study of the FBI's . . . investigation of Hazmi and Mihdhar." In fact, Retired Special Agent Rigler was paid more than $100,000 by Zacarias Moussaoui's defense team to summarize a chapter from a report that was prepared by the Department of Justice's Office of the (continued on next page)

9

discovery, the Aviation Defendants allege (Defs' Br. at 7) – incorrectly and without any citation

to the pleadings in the September 11 Litigation – that Plaintiffs intend to portray the Aviation

Defendants as the "only" cause of the September 11th attacks.  Having set up this straw man, the

Aviation Defendants then argue (Defs' Br. at 7, 23-31) that the testimony of the five FBI

Witnesses is necessary to correct Plaintiffs' allegedly "myopic view" of the evidence and to show

that the government played a "causal role" in the events of September 11th.

  The Aviation Defendants miss the point of what the Plaintiffs have alleged in the

September 11 Litigation and what the Plaintiffs have to prove to prevail in that case.  Plaintiffs

do *not* have to prove that the Aviation Defendants were the "only" cause of the 9/11 attacks.

Rather, all that Plaintiffs need and plan to prove at trial on their negligence claims is that the

Aviation Defendants were negligent.  That is, Plaintiffs will show that the Aviation Defendants

breached their duty to exercise reasonable care under the circumstances as well as their non-

delegable federal duty to provide service with the highest possible degree of safety in the public

interest, and that the breach of those duties was *a* substantial factor in causing Plaintiffs'

damages.  *See, e.g.*, WTCP Flight 11 Compl. (Exh. 4 to the Williamson Decl.), at ¶¶ 33-43, 45-

49, 61-65; WTCP Flight 175 Compl. (Exh. 5 to the Williamson Decl.), at ¶¶ 29-38, 40-44, 56-60;

*see also* Sixth Am. Master Prop. Compl. Against Airline and Sec. Co. Defs, at ¶¶ 118-23, 126-

31, 134-40, 143-49, 185-91; Pls' Fourth Am. Flight 11 Master Liab. Compl., at ¶¶ 103-10, 112-

21, 129-34, 141-45, 150-56; Pls' Fourth Am. Flight 175 Master Liab. Compl., at ¶¶ 94-101, 103-

---

Inspector General after September 11, 2001.  *See* Rigler Tr. (Barry Decl., Exh. 20), at 2144, 2195-96, 2265.  The Aviation Defendants present nothing to suggest that Retired Special Agent Rigler has any first-hand knowledge concerning Hazmi and Mihdhar or, for that matter, concerning any other matter relating to the September 11 Litigation.  Absent such a showing, it was not arbitrary and capricious, or inconsistent with the Federal Rules of Civil Procedure, for the FBI to deny the Aviation Defendants' request to depose Retired Special Agent Rigler.

12, 120-25, 132-36; Pls' Third Am. Flight 93 Master Liab. Compl., at ¶¶ 61-66, 68-73, 75-83,

94-99, 106-12; Pls' Fourth Am. Flight 77 Master Liab. Compl., at ¶¶ 60-65, 67-72, 74-82, 97-

102, 109-15 (relevant excerpts of each annexed to the Williamson Decl. as Exhs. 6, 7, 8, 9, 10).

What the government knew or did not know, and what actions the government took or

failed to take, is simply not at issue in the September 11 Litigation. The Plaintiffs do not plead

facts that bring these issues into play, and these issues do not have any bearing on any defense

that the Aviation Defendants may offer at trial.[10] More specifically, the liability of the Aviation

Defendants in the September 11 Litigation depends upon what the Aviation Defendants "knew or

had reason to know," and on whether the Aviation Defendants breached their duty to exercise

reasonable care or their duty to provide service with the highest possible degree of safety in the

public interest, not on the knowledge or conduct of the government. *Sanchez v. State*, 99 N.Y.2d

247, 255, 754 N.Y.S.2d 621, 626 (2002); *see also* William L. Prosser & W. Page Keeton, The

---

[10] No contribution claims may be made against the government under Article 14 of the CPLR because the government is immune from suit and, thus, not "subject to liability for damages." N.Y. C.P.L.R. § 1401 (contribution claim may be asserted only as against person "subject to liability for damages for the same personal injury, injury to property or wrongful death"); *see also* Aviation Defs' Br. in Support of Their Mot. for an Order that the Prior Moussaoui Trial Testimony of Certain FBI Witnesses is not Subject to Hearsay-Related Objections Under Fed. R. Evid. 807, at 18 (conceding government immunity). Nor will there be any apportionment of fault to the government under Article 16. The limited liability provisions of Article 16 do not apply to claims for property damage. *See* N.Y. C.P.L.R. § 1601 (limiting applicability of Article 16 to personal injury actions). Even with respect to personal injury claims, Article 16 only permits apportionment to those persons found liable for an "equitable share" of the judgment, N.Y. C.P.L.R. § 1601, and the only persons who may be found liable for an "equitable share" of the judgment are persons who are "liable for contribution," *see* N.Y. C.P.L.R. § 1402 ("equitable shares shall be determined in accordance with the relative culpability of each person liable for contribution"). Since the government cannot be "liable for contribution," no "equitable share" may be assessed against the government, and there can be no apportionment of fault to the government, under Article 16. Moreover, the government cannot be held liable for Plaintiffs' damages since the government owed no duty to Plaintiffs specifically but, rather, only to the public in general. *See* 28 U.S.C. § 1346(b) (government's liability governed by the law of "the place where the act or omission occurred"); *Florence v. Goldberg*, 44 N.Y.2d 189, 194-95, 404 N.Y.S.2d 583, 586 (1978) (for liability to lie, "the duty breached [by the governmental body] must be more than a duty owing to the general public.").

Law of Torts 184 (5th ed. 1984) ("individual will not be held to knowledge of risks which are not known or apparent to him"). If the Aviation Defendants breached their duties, then they are liable for Plaintiffs' economic damages, without regard for any alleged fault on the part of the government. *See Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co.*, 45 N.Y.2d 551, 557, 410 N.Y.S.2d 571, 574 (1978) ("It is elementary that injured claimants may still choose which joint tort-feasors to include as defendants . . . and, regardless of the concurrent negligence of others, recover the whole of their damages from any of the particular tort-feasors sued.") (internal citations omitted).

The Court has made itself clear that the Aviation Defendants cannot obtain discovery as to the knowledge and conduct of other parties and non-parties regarding terrorism and threats to aviation security in order to demonstrate that others had superior knowledge. In particular, the Court denied the Aviation Defendants' attempt to obtain discovery from the WTCP Plaintiffs concerning pre-9/11 building security practices at the World Trade Center. Although the Aviation Defendants argued that evidence about the conduct of the WTCP Plaintiffs was somehow relevant to whether the Aviation Defendants had met their standard of care, the Court held that each party must be judged on the basis of its own actions: "[W]hat other parties did or did not do is not relevant." Feb. 26, 2007 Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 11), at 13. *See also id.* at 14 ("[W]hat some party did or did not do . . . is not relevant [in] my judgment to the situation of another party.").

Additionally, when addressing the Aviation Defendants' repeated requests over the past year for discovery from the government, the Court consistently stated that information known to the government but not communicated to the Aviation Defendants is irrelevant. *See* Mar. 22,

12

2007 Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 12), at 48 ("I anticipate that

I would rule that information not communicated is not relevant."); Mar. 18, 2008 Tr. (relevant

excerpts annexed to the Williamson Decl. as Exh. 1), at 30 ("no matter whether the government

is in a better position or not as good a position, I don't believe it affects your duty not to act

negligently if you have a duty.  And the duty is not going to be informed by what the government

did or didn't do.").[11]  So, too, here, the FBI properly found that what the government did or did

not do is not relevant to the Aviation Defendants' liability in the September 11 Litigation; the

negligence of the Aviation Defendants must be determined based on their own actions.

Notwithstanding the irrelevance of the government's fault in the September 11 Litigation,

the Aviation Defendants claim (Defs' Br. at 23-37) that they nonetheless need to discover threat

information, if any, that may have been known to the government but not communicated because

that information supposedly relates to the issues of proximate cause, foreseeability, and

derivative immunity.  None of those arguments provides any basis for reversing the FBI's

decision.

---

[11] One year ago, when the Aviation Defendants first requested discovery from the government concerning intelligence information, if any, that was not communicated to them, the Court indicated that it was inclined to find that any such evidence would be inadmissible in the September 11 Litigation under Federal Rule of Evidence 403 because the probative value of such evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and by considerations of delay.  The Court explained that the government discovery sought would "create a separate trial longer than this trial." "[W]hat you are asking me to authorize is another trial of the government . . . [a]nd I do not wish to do that." June 14, 2007 Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 13), at 117-21. If the government discovery sought is not admissible in the September 11 Litigation, the FBI's denial of the Aviation Defendants' deposition requests cannot be found to have been arbitrary and capricious, or inconsistent with the Federal Rules of Civil Procedure.

1.    **The FBI Properly Determined That Any Intelligence Information That The FBI, CIA And/Or FAA Did Not Communicate To The Aviation Defendants Is Irrelevant To The Issue Of Proximate Cause**

The Aviation Defendants claim (Defs' Br. at 4-5, 23-31) that testimony concerning the FBI's pre-9/11 investigation into Zacarias Moussaoui and two al Qaeda operatives, Khalid al Mihdhar and Nawaf al Hazmi, will establish that the government was negligent in failing to act when it had a number of "missed opportunities" to disrupt the September 11th plot, and that the government's alleged negligence "so overshadow[s] any causal role" of the Aviation Defendants that the Aviation Defendants could not have been a proximate cause of the 9/11 attacks. That argument rests on two fundamental misconceptions about the law of proximate cause and, thus, was properly rejected by the FBI.

First, the Aviation Defendants are incorrect as a matter of law in suggesting that the government was an intervening cause of the terrorist attacks because the government failed to communicate intelligence information about al Qaeda and Zacarias Moussaoui to the Aviation Defendants. A third party can be an intervening cause only if its negligence "interrupts" or severs the chain of causation between the original negligence of the defendant and the plaintiff's ultimate injury. *See In re September 11 Litig.*, 280 F. Supp. 2d 279, 301 (S.D.N.Y. 2003) ("when such an intervening cause 'interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result that could not have been reasonably anticipated,' it will prevent a recovery on account of the act or omission of the original wrongdoer.") (quoting *Sheehan v. City of N.Y.*, 40 N.Y.2d 496, 503, 387 N.Y.S.2d 92, 96 (1976)); *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 316, 434 N.Y.S.2d 166, 170 (1980) (intervening cause is one "which interrupt[s] the link between

14

[defendant's] negligence and plaintiff's injuries"); *see also* Restatement (Second) of Torts §
441(1) ("An intervening force is one which actively operates in producing harm to another after
the actor's negligent act or omission has been committed."). Here, of course, none of the "missed
opportunities" that the government supposedly had to prevent the 9/11 attacks by sharing
intelligence information about al Qaeda and Zacarias Moussaoui interrupted the Aviation
Defendants' negligence in permitting the terrorists to board and take control of the four aircraft
with dangerous weapons. As a result, the government could not have been an intervening cause,
and any discovery on this issue is unnecessary.

Second, the Aviation Defendants confuse proximate cause with apportionment of fault
when they claim (Defs' Br. at 5, 24) their actions could not have been a proximate cause of the
9/11 attacks because the government's alleged negligence "dwarfs" or "overshadow[s]" the
negligence of the Aviation Defendants. In order to establish that the Aviation Defendants were a
proximate cause of the 9/11 attacks, Plaintiffs need not prove that the Aviation Defendants were
the sole or even the primary cause of those events. Rather, as long as the Aviation Defendants'
negligence was not "slight or trivial," their conduct is a legal and proximate cause of Plaintiffs'
damages, regardless of whether there may have been other contributing causes. William L.
Prosser & W. Page Keeton, The Law of Torts 268 (5th ed. 1984) ("If the defendant's conduct
was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved
from liability merely because other causes have contributed to the result, since such causes,
innumerable, are always present."); *see also* N.Y. PJI3d 2:70 (2005) and PJI3d 2:71(2005)
(stating that each of several independent negligent acts can be regarded as the cause of an injury,
"provided that it was a substantial factor in bringing about that injury"); *Lozada ex rel. Lozada v.*

*Arco Mgmt. Corp.*, 2005 WL 1651038, at *3 (Sup. Ct. N.Y. Co. Apr. 6, 2005) ("in order to be a substantial factor, a cause cannot be slight or trivial; however, a cause may be a substantial factor even if a jury assigns a relatively small percentage of fault to it.") (citing N.Y. PJI 2:70 Proximate Cause – In General ("There may be more than one cause of an injury, but to be substantial, it cannot be slight or trivial")).

It is absurd for the Aviation Defendants to suggest that any of the proposed testimony of the FBI Witnesses would establish that the Aviation Defendants' negligence played a "slight or trivial" role in the September 11th attacks. The Aviation Defendants allowed 19 of the 19 hijackers to get through security checkpoints (that the hijackers previously had conducted surveillance over), board the four aircraft with knives, box cutters, mace, and other dangerous weapons, and then take control of the planes in direct contravention of the Aviation Defendants' duties to Plaintiffs, including the non-delegable federal duty to provide service with the highest possible degree of safety in the public interest. No reasonable juror could ever find such conduct to be so slight or trivial as to excuse the Aviation Defendants from liability. *See, e.g., In re City of N.Y.*, 475 F. Supp. 2d 235, 250 (E.D.N.Y. 2007), *aff'd*, 522 F.3d 279 (2d Cir. 2008) ("the City's failure to provide a second pilot or otherwise adopt a reasonable practice that addresses the issue of pilot incapacitation was plainly a substantial factor in causing" crash of Staten Island Ferry when pilot lost consciousness); *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520-21, 429 N.Y.S.2d 606, 614-15 (1980) (defendant's negligence, in failing to have attendant in lobby of its office building, was substantial factor in causing the shooting of plaintiff by an unidentified assailant); *Derdiarian*, 51 N.Y.2d at 316 434 N.Y.S.2d at 170 (contractor's negligence, in failing to safeguard excavation site, was substantial cause of plaintiff's injuries, which resulted after he

was struck by a "negligent, or even reckless" driver); *cf. Nash v. Port Authority of N.Y. & N.J.*, 856 N.Y.S.2d 583, 586-87, 592-94 (1st Dep't 2008) (affirming jury's verdict, finding Port Authority's negligence was a substantial factor in causing the 1993 bombing of the World Trade Center). Because the Aviation Defendants' causation arguments were groundless, the FBI properly found that the requested testimony was irrelevant.[12]

### 2. The FBI Properly Determined That Any Intelligence Information That The FBI, CIA And/Or FAA Did Not Communicate To The Aviation Defendants Is Irrelevant To The Issue Of Foreseeability

The Aviation Defendants also argue (Defs' Br. at 5-6, 31-35) that the discovery of any intelligence information that was known to the government but not communicated will show that the Aviation Defendants could not have reasonably foreseen the September 11th attacks. The Aviation Defendants claim (Defs' Br. at 6) the jury "will be far more likely to conclude that the [Aviation Defendants] could not have reasonably foreseen" the events of September 11 if the FBI, CIA and/or FAA, with their allegedly superior intelligence information, did not foresee them. The Aviation Defendants also argue (Defs' Br. at 33-34) that the FBI, CIA and/or FAA failed to communicate intelligence information without which they could not have foreseen the 9/11 attacks. According to the Aviation Defendants (Defs' Br. at 33-34), "the September 11th attacks were not reasonably foreseeable to them, in part, because they did not have access to any

---

[12] None of the cases that the Aviation Defendants cite on this issue (Defs' Br. at 25) are to the contrary. Neither *Leonardi v. Loyola Univ.*, 168 Ill.2d 83, 92-94, 658 N.E.2d 450, 455-56 (1995) – which was decided under Illinois law – nor *Hoppe v. G.D. Searle & Co.*, 779 F. Supp. 1413, 1423 (S.D.N.Y. 1991) – which was decided under Minnesota law – applied New York's law of proximate cause. In *Wilkins v. Am. Exp. Isbrandtsen Lines, Inc.*, 446 F.2d 480, 483 (2d Cir. 1971), the Second Circuit found that the trial court had improperly excluded evidence that *the plaintiff* had offered concerning the defendant's negligence, not, as here, evidence that the defendant sought to introduce concerning a non-party's fault. Finally, *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 537-40 (S.D.N.Y. 2003), had nothing to do with the discovery or admissibility of evidence of causation; it was a case dismissed at the pleadings stage because the plaintiffs had failed to allege with the requisite
(continued on next page)

specific intelligence that suggested that radical terrorists were planning imminent suicide attacks on domestic civil aviation." The FBI properly rejected both of these arguments.

The issue in the September 11 Litigation is not whether the Aviation Defendants or the FBI, CIA, FAA, or anyone else foresaw the hijackers' precise plot but, rather, whether the resulting harm was within the class of hazards generally foreseeable as a result of the Aviation Defendants' conduct. *See In re September 11 Litig.*, 280 F. Supp. 2d at 295 ("In order to be considered foreseeable, the precise manner in which the harm was inflicted need not be perfectly predicted"); *Derdiarian*, 51 N.Y.2d at 316-17, 434 N.Y.S.2d at 170 ("That defendant could not anticipate the precise manner of the accident or the exact extent of injuries, however, does not preclude liability as a matter of law where the general risk and character of injuries are foreseeable.").[13] As long as the Aviation Defendants reasonably could foresee that an aircraft might be subject to a cockpit intrusion or a hijacking that would put the plane, its passengers, and people and property on the ground at risk, then the harm that Plaintiffs suffered falls within the

---

specificity how their consumption of McDonalds' fast food was the proximate cause of their obesity.

[13] The one case relied upon by the Aviation Defendants (Defs' Br. at 33) on this issue, *In re Kinsman Transit Co.*, 338 F.2d 708 (2d Cir. 1964), actually supports *Plaintiffs'* position. In *Kinsman*, a ship that had been improperly moored at a dock on the Buffalo River broke loose and drifted along the river where it struck another ship, causing the second ship to break loose and drift along the river, where the second ship eventually crashed into a bridge, causing the two towers of the bridge to collapse. *Id.* at 712-13. The owner of the first ship and the operator of the dock argued that this specific series of events was unforeseeable. Judge Friendly rejected their argument, explaining that in order for the defendants to be held liable for the resulting damages, all that was necessary was that the general risk – the risk that a ship might break free and cause damage to people and property along the river – be foreseeable. "[W]here, as here, the damages resulted from the same physical forces whose existence required the exercise of greater care than was displayed and were of the same general sort that was expectable, unforeseen-ability of the exact developments and of the extent of the loss will not limit liability." *Id.* at 726. Likewise, here, the Aviation Defendants cannot avoid liability in the September 11 Litigation by claiming that they could not have foreseen the specific plot of the September 11th hijackers since, as is explained above, they certainly foresaw the general risk that a hijacking and crash of their aircraft might cause damage to passengers on the planes as well as to persons and property on the ground.

18

class of hazards that are generally foreseeable as a result of the Aviation Defendants' negligence.
The Aviation Defendants need not have known *any* of the information that they say they want to
elicit from the five FBI Witnesses. *See In re September 11 Litig.*, 280 F. Supp. 2d at 296 ("While
it may be true that terrorists had not before deliberately flown airplanes into buildings, the
airlines reasonably could foresee that crashes causing death and destruction on the ground was a
hazard that would arise should hijackers take control of a plane. The intrusion by terrorists into
the cockpit, coupled with the volatility of a hijacking situation, creates a foreseeable risk that
hijacked airplanes might crash, jeopardizing innocent lives on the ground as well as in the
airplane.").[14]

---

[14] The Aviation Defendants argue (Defs' Br. at 31) that Plaintiffs seek to hold the Aviation
Defendants liable "because they did not implement security measures that were different from and
additional to those required by the FAA at the time of the attacks." This again misstates Plaintiffs'
claims. In fact, Plaintiffs maintain that the Aviation Defendants breached their duty to the Plaintiffs
because they: (1) failed to comply with all FAA regulations; (2) failed to comply with their federal
statutory duty to provide service with the highest possible degree of safety in the public interest in a
manner that was reasonable under the circumstances, *see* 49 U.S.C. §§ 44701(d)(1)(A), 44702(b)(1)(A));
*see also* FAA Handbook 8300.10 CHG 9, at 6-5 – 6-6 (relevant excerpts annexed to the Williamson Decl.
as Exh. 58) ("private sector," which the FAA defines as including pilots, mechanics, air carriers, air
operators, air agencies, and manufacturers, has responsibility for providing service with the highest
possible degree of safety); FAA Handbook 8400.10 CHG 10, at 1-59 (relevant excerpts annexed to the
Williamson Decl. as Exh. 57) (same); *In re Trans World Airlines*, FAA Order No. 1999-12, 1999 WL
1125387, at *3-4 (FAA Oct. 7, 1999) (air carriers' duty to provide service with the highest possible
degree of safety in the public interest is non-delegable); *United States v. S.A. Empresa De Viacao (Varig
Airlines)*, 467 U.S. 797, 804 (1984) ("air carriers themselves retained certain responsibilities to promote
the public interest in air safety: the duty to perform their services with the highest possible degree of
safety"); *Williams v. Trans World Airlines*, 509 F.2d 942, 946 n.8 (2d Cir. 1975) ("TWA was and is
required to perform its services with the highest possible degree of safety in the public interest"); *United
States v. Ozark Air Lines, Inc.*, 419 F. Supp. 795, 798 (E.D. Mo. 1976) (the statutory duty of an air carrier
under the Federal Aviation Act is to "conduct searches of the carry-on baggage of boarding passengers
with the highest possible degree of care"); and/or (3) failed to take all steps needed to prevent or avoid
harm to passengers and to persons and property on the ground in a manner that a reasonably prudent air
carrier, security company, airport operator or aircraft designer/manufacturer/seller would have taken
under the circumstances, *see, e.g., DiBenedetto v. Pan Am World Serv.*, 359 F.3d 627, 630 (2d Cir. 2004)
(Pan Am, Pan Am's security company, and Aeroflot all had a duty of care to exercise "ordinary care
commensurate with the existing circumstances.") (citation omitted); *Stanford v. Kuwait Airways Corp.*,
89 F.3d 117, 123 (2d Cir. 1996) ("alleged tortfeasor must exercise such attention . . . of the circumstances
. . . [and] knowledge of other pertinent matters, intelligence, and judgment as a 'reasonable person'
(continued on next page)

19

The Aviation Defendants cannot argue that the hijacking and crash of aircraft was unforeseeable to them prior to September 11, 2001. Indeed, a primary purpose of airport security checkpoints was to prevent hijackings, and an overwhelming amount of information was available to the Aviation Defendants, from documents provided to them or from publicly available information, highlighting that hijackings could include possible suicide and/or terrorist hijackers, as the following examples illustrate:

- **The Aviation Defendants knew or should have known, based on prior hijackings dating back at least to the 1970s, that suicide hijackers might try to use aircraft as weapons in intentional crashes.** In 1972, three fugitives seized a Southern Airways DC-9 and threatened to crash the aircraft into a nuclear facility. *See* "Troubled Passage: The Federal Aviation Administration During the Nixon-Ford Term, 1973-1977" (1987) (relevant excerpts annexed to the Williamson Decl. as Exh. 14), at 38. On April 7, 1994, a FedEx flight engineer attempted the hijacking of a DC-10 freighter aircraft with the intent of crashing the plane into the company's package sorting center in Memphis, Tennessee. *See* Dave Hirschman, *Cockpit Security: Terrorist Techniques Looked Familiar to Ex-Pilot*, Atlanta J. & Const., Oct. 1, 2001 (Exh. 15 to the Williamson Decl.), at 1-2. In 1999, a disgruntled Air Botswana pilot stole an aircraft from the carrier and then threatened to crash the plane into buildings. *See Criminal Acts Against Civil Aviation* (1999) (relevant excerpts annexed to the Williamson Decl. as Exh. 16), at 39-40. Indeed, the use of aircraft as weapons had become such a familiar concept by the year 2000 that preparations for the 2000 Summer Olympics included plans by authorities to counteract the "use of 'biological, chemical, or radiological' weapons, the pirating of ocean liners, or *the intentional crash of a hijacked jet.*" *Summer Games Staff Alert to Terrorism*, Boston Globe, Sept. 14, 2000 (Exh. 17 to the Williamson Decl.) (emphasis added), at 1;[15]

would have") (internal quotations omitted); *In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67, 74-75 (2d Cir. 1980) (District Court "properly instructed the jury as to the duty . . . of the Eastern Crew to use all reasonable means and information to avoid a crash"); *Williams*, 509 F.2d at 948 ("The test of whether or not the airline properly exercised its power [under the Federal Aviation Act and FAA regulations] to refuse passage to an applicant" who might be a hijacker was whether "it was reasonable under the circumstances for [the air carrier] to refuse to transport" such person); *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 836 (E.D. Tex. 2006) (applied state standard of care in negligence and strict products liability claims against aircraft manufacturer); *Japan Airlines Co. v. Port Auth. of N.Y. and N.J.*, 178 F.3d 103, 109-10 (2d Cir. 1999) (airport operator required to maintain airport in reasonably safe manner for benefit of passengers).

[15] Indeed, in 1974, the Second Circuit recognized that hijackers "may literally turn the plane itself into a weapon, threatening not only those within it, but those on the ground as well . . . the plane
(continued on next page)

20

- **Based on prior hijackings, the Aviation Defendants also knew or should have known that suicide hijackers might target iconic structures.** In 1974, hijacker Samuel Byck forced his way onto a DC-9 aircraft with the intention of crashing the plane into the White House. *See* "Troubled Passage: The Federal Aviation Administration During the Nixon-Ford Term, 1973-1977" (1987) (relevant excerpts annexed to the Williamson Decl. as Exh. 14), at 52-53. That same year, a passenger hijacked a flight bound for Rome. He asked the crew to point out St. Peter's Basilica and then ordered the pilot to bring the aircraft to full speed and crash it into the city. *See* UPI, "Hijacker fails in try to force 747 to crash" (1974) (Exh. 18 to the Williamson Decl.). In 1994, four members of an Algerian terrorist group hijacked Air France Flight 8969. The hijackers forced the plane to land in Marseilles, where they claimed their intention was to continue on to Paris. But because the terrorists requested almost three times the amount of fuel that was needed for such a flight, French authorities concluded that the terrorists intended to use the plane as "a flying bomb" that would crash into the Eiffel Tower or explode over Paris. *See Omens of Terror*, L.A. Times, Oct. 7, 2001 (Exh. 19 to the Williamson Decl.), at 1-2;

- **The Aviation Defendants knew or should have known, based on numerous warnings that they admit receiving from the government, that terrorist groups, including al Qaeda, might target civil aviation.** In December 1997, the FAA warned that "the United States has become a more attractive target for terrorist attacks," that "radical Islamic terrorist groups have a presence in the United States," that civil aviation has been a prominent target of these groups, and that the FAA had information that terrorist groups had discussed targeting U.S. civil aviation. DOT/FAA Security Directive SD-96-03I (Dec. 15, 1997) (Exh. 20 to the Williamson Decl.), at 1-2. In 1998, the FAA issued an information circular warning about the "continuing concern that Osama bin-Laden and terrorist groups comprising the bin-Laden terrorist network are preparing to conduct further terrorist attacks against U.S. interests . . . *these attacks could possibly include the hijacking or the destruction of a United States aircraft*." DOT/FAA, Civil Aviation Security Information Circular IC-98-13 (Oct. 8, 1998) (Exh. 21 to the Williamson Decl.) (emphasis added), at 1. In 2001, the Department of Transportation made a presentation to the Aviation Defendants concerning al Qaeda's "methods and thinking." The presentation warned that within al Qaeda, "selected individuals were sent to specialized schools for training in electronics and flying aircraft." DOT, Office of Intelligence and Security, Transportation Security and Terrorism Review (2001) (Exh. 22 to the Williamson Decl.), at 1, 6;

---

may become a weapon of mass destruction that no ordinary person would have any way of obtaining except through a hijacking." *United States v. Albarado*, 495 F.2d 799, 805 (2d Cir. 1974).

- **In the years and months leading up to September 11, 2001, the government warned the Aviation Defendants that the threat to civil aviation was increasing.** Beginning in 1995, U.S. airports were at AVSEC Alert Level III, meaning that "[i]nformation indicates that a terrorist group or other hostile entity with a known capability of attacking civil aviation is likely to carry out attacks against U.S. targets; or civil disturbances with a direct impact on civil aviation have begun or are imminent." American Airlines' Air Carrier Standard Security Program, Appendix XV (excerpts annexed to the Williamson Decl. as Exh. 23), at 2; Tr. of Feb. 11-12, 2008 deposition of Robert Cammarato ("Cammaroto Tr.") (relevant excerpts of which are annexed to the Williamson Decl. as Exh. 24), at 124. In April 2000, the government warned that "the prospect for terrorist hijackings has increased and that U.S. airliners could be targeted." DOT/FAA, Civil Aviation Security Information Circular IC-2000-01 (Apr. 27, 2000) (Exh. 25 to the Williamson Decl.), at 1-2. In October 2000, the FAA similarly warned that "instruction in hijacking techniques is being provided in Bin Laden's Afghanistan training camps" and that "in August 1998, [Bin Laden] called on his militant followers to bring down or hijack a U.S. or Israeli aircraft." FAA, Memorandum: Worldwide Threat Questions and Answers (Oct. 30, 2000) (relevant excerpts annexed to the Williamson Decl. as Exh. 26), at XC036173. In April 2001, the FAA cautioned that "[i]t is our judgment that the potential for Middle Eastern militant groups or individuals to conduct terrorist operations against U.S. interests is high and will remain so for the next several months . . . *some of the currently active groups are known to plan and train for hijackings*." DOT/FAA, Civil Aviation Security Information Circular IC-2001-4 (Apr. 18, 2001) (Exh. 27 to the Williamson Decl.) (emphasis added), at 2. On July 31, 2001, less than two months before September 11, 2001, the FAA warned that there "have been a number of non-specific threats made against U.S. interests, to include U.S. civil aviation interests." DOT/FAA, Civil Aviation Security Information Circular IC-2001-4A (July 31, 2001) (Exh. 28 to the Williamson Decl.), at 2;

- **The Aviation Defendants also knew or should have known, based on warnings from the government, that terrorists were in the United States.** In February 2001, the Department of Transportation warned that "[f]oreign terrorist groups, primarily Middle Eastern, and Islamic extremists have been active in the United States . . . The Islamic extremist presence in the United States is growing and increases the potential domestic threat emanating from these elements. Information exists that several Middle Eastern terrorist groups have well developed terrorist support infrastructures here and are operating in over 66 cities throughout the United States." DOT, Terrorist Threat Overview for the United States (Feb. 12, 2001) (Exh. 29 to the Williamson Decl.), at 3. *In July 2001, the FAA similarly warned that Middle Eastern terrorist groups were in the United States, that these terrorists were willing to bring about major casualties, and that civil aviation was an attractive target for the terrorists.* See Final Rule on Airport Security for Department of Transportation and Federal Aviation Administration, 66 Fed. Reg. 37,313 (July 17, 2001) (Exh. 30 to the Williamson Decl.);

22

- **Based on their own operations and internal intelligence, the Aviation Defendants also knew or should have known that terrorists were conducting surveillance of U.S. airports and aircraft.** Sometime before September 11, 2001, James Miller, a former Globe duty manager at Logan Airport, observed one or more Muslim-appearing persons photographing the checkpoint setup. He reported their activities. Tr. of May 23, 2008 deposition of James Miller (relevant excerpts annexed to the Williamson Decl. as Exh. 31), at 86-90, 93-94, 96, 115-16. In May 2001, Stephen J. Wallace, an American Airlines facilities maintenance employee, caught Mohammed Atta and another of the 9/11 hijackers videotaping and photographing the main checkpoint at Logan Airport. Wallace notified two Massport employees and a checkpoint screener. *See* Tr. of July 17, 2007 deposition of Stephen J. Wallace (relevant excerpts annexed to the Williamson Decl. as Exh. 32), at 103-13, 118-21, 140-41. A checkpoint screener for Globe at Logan Airport likewise observed Mohammed Atta videotaping the main security checkpoint between October 4, 2000 and July 6, 2001. She reported the filming to her supervisor. *See* FBI Interview (Sept. 17, 2001) (Exh. 33 to the Williamson Decl.), at FBI0150. In the fall of 2000, an unidentified American Airlines flight attendant observed Mohammed Atta on an American Airlines flight exhibiting "strange behavior," including being "very observant of all activity." The flight attendant reported her observations to the Captain. The Captain "remarked that the airlines had just gotten a warning alert that day . . . [to] 'look out for Middle Eastern threats.'" AA Incident Report, Incident Number 0-0000005272 (Exh. 34 to the Williamson Decl.), at AAL004767. In August 2001, the actor James Woods noticed four Middle Eastern men traveling together on his flight. Woods believed the men were casing the plane and reported his impression to the flight attendant and the first officer. After September 11, 2001, the FBI showed Woods pictures of the 9/11 hijackers; Woods recognized two of them as part of the group that had been on his flight. *See* Transcript of the O'Reilly Factor (Feb. 14, 2002) (Exh. 35 to the Williamson Decl.), at XC088414-15;

- **The Aviation Defendants knew there were vulnerabilities in their own security systems.** In the spring of 2001, just months before September 11, 2001, the local Boston Fox News television station aired two exposés about the abysmal security at Logan Airport. In one of the two broadcasts, a reporter was able to breach checkpoints in each of Logan's terminals by carrying the same type of knife that is believed to have been carried by the 9/11 hijackers. The knife set off the alarms on each of the walk-through metal detectors, but, incredibly, the screeners never detected the weapon. *See* transcript of May 6, 2001 Fox 25 (Boston) broadcast on airport security (Exh. 36 to the Williamson Decl.); *see also* copy of the videotape of the May 6, 2001 broadcast (Exh. 37 to the Williamson Decl.). Joseph Lawless, Massport's public safety director, prepared a memo to Massport's executive director in which he voiced his concern about the "extremely poor job performance by the security checkpoint operators." Lawless opined that the "screening companies' job performance damages the entire

23

security environment at the airport." Apr. 27, 2001 memo from Joseph Lawless (Exh. 38 to the Williamson Decl.), at MP100701-02; *see also* Tr. of Mar. 30, 2007 deposition of Joseph Lawless (relevant excerpts of which are annexed to the Williamson Decl. as Exh. 39), at 64-65 (stating that checkpoint screening, which was the last and only line of defense prior to aircraft boarding, was the weakest link in the overall security program). Plaintiffs anticipate that documents to be produced by the FAA in the September 11 Litigation also will include a number of letters that the FAA sent in early 2001 to American Airlines and United Airlines regarding the deplorable checkpoint security at Logan Airport. Additionally, in the few years prior to September 11, 2001, passengers invaded flight decks and attempted to take control of the aircraft with increasing frequency. On July 23, 1999, for example, a hijacker brandished a knife at a flight attendant, forced her to knock on the flight deck door, and then pushed his way inside once the door was opened. When the pilot refused to hand over control of the Boeing 747, the hijacker fatally stabbed him in the neck. *See* FAA, Criminal Acts Against Civil Aviation (1999) (relevant excerpts annexed to the Williamson Decl. as Exh. 16), at 44. On March 16, 2000, a passenger on an Alaska Airlines flight broke through the locked flight deck door and tried to grab the throttles and fuel controls. *See* FAA, Criminal Acts Against Civil Aviation (2000) (relevant excerpts annexed to the Williamson Decl. as Exh. 40), at 34. And in a highly-publicized incident on August 11, 2000, a teenager kicked in the flight deck door on a Boeing 737 aircraft. *See* "Mother gropes for answers in death aboard jet," USA Today, Sept. 22, 2000 (Exh. 41 to the Williamson Decl.), at 2.

In short, prior to September 11, 2001, the Aviation Defendants had overwhelming information about the risk of a hijacking. Thus, even if the five FBI Witnesses were to testify that the government had *additional* threat information that was never communicated to the Aviation Defendants, any such testimony would be irrelevant to the Aviation Defendants' liability in the September 11 Litigation. It was not arbitrary and capricious, nor did it violate the Federal Rules of Civil Procedure, for the FBI to have denied the Aviation Defendants' deposition requests on this basis.[16]

---

[16] The Aviation Defendants also argue (Defs' Br. at 33) that the testimony of the five FBI Witnesses would relate "to the issue of duty in the September 11 litigation by demonstrating that the federal intelligence agencies – not the [Aviation Defendants] – were in the best position to prevent the September 11 terrorist attacks." However, this Court already has held that the Aviation Defendants owed a duty to passengers and to victims on the ground – a finding that was based in part on the Court's determination that the Aviation Defendants "could best control the boarding of airplanes, and were in the (continued on next page)

**3.    The Aviation Defendants Are Not Entitled To Derivative Immunity**

Finally, the Aviation Defendants argue (Defs' Br. at 6-7, 35-37) that the discovery of

intelligence information, if any, that may have been known to the government but not

communicated is relevant to the Aviation Defendants' belated assertion that they are entitled to

derivative immunity in the September 11 Litigation.  This argument – which the Aviation

Defendants never raised in their application before the FBI – is meritless and should be rejected

for two additional, separate reasons.  First, the Aviation Defendants are *not* entitled to derivative

immunity in the September 11 Litigation; their claim (Defs' Br. at 6) that the Second Circuit

"strongly" suggested otherwise in a case involving entirely different duties with respect to

workers' allegations of respiratory injuries during post-9/11 cleanup at the World Trade Center

site is wrong.[17]  Second, even if the doctrine of derivative immunity applied – and it does not –

---

best position to provide reasonable protection against hijackings and the dangers they presented." *In re September 11 Litig.*, 280 F. Supp. 2d at 292-95.  None of the anticipated testimony of the five FBI Witnesses would provide any basis for the Court to revisit that ruling.  *See* Mar. 18, 2008 Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 1), at 18 (evidence that the government was unable to prevent the September 11th attacks "wouldn't say anything about duty").

For similar reasons, *Eiseman v. State*, 70 N.Y.2d 175, 191, 518 N.Y.S.2d 608, 616 (1987) (cited in Defs' Br. at 32-33) is inapposite.  In that case, an ex-felon, released from State prison and admitted into a special State college program, committed a crime against a fellow student.  The court emphasized that the only question before it was "whether the College had a *legal duty*" to protect its students from the risk of admitting ex-felons into the school, not whether the particular harm in that case was foreseeable.  *Id.* at 192, 518 N.Y.S.2d 616 (emphasis in original).  Although the court held that the school did not have a legal duty, that holding has no relevance here.  The Court already has held, in accordance with the applicable statutes, case law, and FAA regulations, that the Aviation Defendants owed a duty to both passengers and persons on the ground.  *In re September 11 Litig.*, 280 F. Supp. 2d at 292-95.

[17] In *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169 (2d Cir. 2008), construction workers, firefighters, police officers, and others who were present during the clean-up of the World Trade Center site after the 9/11 attacks sued the City of New York, the Port Authority of New York and New Jersey, World Trade Center Properties, and various contractors and other defendants, claiming that they suffered respiratory injuries as a result of their alleged exposure to toxic fumes, gases, and other hazardous conditions at the site.  The Second Circuit held that if the City, the Port Authority, and the
(continued on next page)

the only intelligence information that might arguably be relevant to such a defense would be intelligence information that the Aviation Defendants withheld from the government, not intelligence information that the government withheld from the Aviation Defendants.

The Aviation Defendants' claim that they are entitled to derivative immunity rests on the faulty assumption that the Aviation Defendants' only obligation on 9/11 was to comply with FAA regulations. But the Federal Aviation Act expressly imposes a non-delegable duty upon the Aviation Defendants – independent of any FAA regulation or action – "to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. §§ 44701(d)(1)(A), 44702(b)(1)(A); FAA Handbook 8300.10 CHG 9, at 6-5 – 6-6 (relevant excerpts annexed to the Williamson Decl. as Exh. 58); FAA Handbook 8400.10 CHG 10, at 1-59 (relevant excerpts annexed to the Williamson Decl. as Exh. 57). Thus, Plaintiffs allege in the September 11 Litigation that, apart from the issue of the Aviation Defendants' failure to comply with federal regulations, the Aviation Defendants would, in any event, be liable for failing to do what a reasonable air carrier, airport operator, security company, and aircraft designer should have done under the circumstances, given what they actually knew or should have known, to fulfill their independent, non-delegable federal duty to provide the services they have undertaken with the highest possible degree of safety in the public interest. Any decisions that the Aviation Defendants made in an effort to comply with this non-delegable federal duty are not entitled to

---

contractor defendants had merely enforced OSHA's requirements concerning the distribution of respirators, fitting, and training, those defendants *might* be entitled to derivative immunity, although the court ultimately found that there were factual issues that precluded summary judgment on the issue. *Id.* at 196-98. The Second Circuit never addressed whether the Aviation Defendants would be entitled to derivative immunity, and if anything, the decision implies that the Aviation Defendants could *not* assert such a defense since, as explained above, the Aviation Defendants were not charged merely with complying with regulations; rather, they had an independent duty to provide service with the highest possible degree of safety in the public interest.

immunity because those decisions were neither specifically directed nor controlled by the federal government. *See In re World Trade Center Disaster Site Litig.*, 521 F.3d at 197 (recognizing viability of derivative immunity defense where federal agency directed and controlled contractor's actions but not where contractor could have fulfilled its duty of care to the plaintiff while simultaneously complying with agency's specifications).

Indeed, the Aviation Defendants proposed the security policies that the FAA ultimately approved as the Air Carrier Standard Security Program ("ACSSP"). Cammaroto Tr. (relevant excerpts annexed to the Williamson Decl. as Exh. 24), at 303. The ACSSP only established "guidelines" for the Aviation Defendants to follow; the Aviation Defendants were expected to exercise "common sense" and "good judgment" in the context of daily circumstances in carrying out those "guidelines." *See id.* at 138-40, 142, 173-74 (air carriers and/or their contractors are permitted to develop specific screening procedures not inconsistent with the ACSSP; ACSSP is a "guideline;"); *id.* at 314 (airlines can seek modifications to the ACSSP); *id.* at 316-20, 330-31, 333-36, 374-75, 445 (ACSSP requires airlines to use "common sense" and "good judgment" in the context of daily circumstances); *id.* at 338-47, 351-53 (ACSSP contemplates that airlines would develop and adopt implementing procedures to carry out ACSSP guidelines); *id.* at 355, 357-60, 498-500 (it would not be inconsistent with ACSSP for airlines to intensify security procedures based on FAA Information Circulars or the airlines' own intelligence information); *id.* at 403-04 (air carrier security personnel had "flexibility to apply judgment and discretion in determining whether an article carried by a passenger might be adverse to the safety and security of the flight."); *id.* at 406-07 ("while the security programs issued by the FAA established the minimum standards that airlines and airports must follow, the airlines and airports may

27

implement more stringent security requirements."); *id.* at 416 (while "airlines are required to meet certain standards, they possess the final decision to impose more stringent restrictions for carry-on items"). As the FAA's Mr. Cammaroto, testified, "The air carriers as private entities, not government operations[,] certainly had rights to determine who could or couldn't fly on their aircraft." *Id.* at 633.

Even if the Aviation Defendants could overcome this hurdle and establish their entitlement to assert a derivative immunity defense, intelligence information that may have been known to the government but not communicated to them would be irrelevant. Entitlement to derivative immunity requires those claiming immunity to show, among other things, that they warned the government of any risks of which they were aware but the government was not. *See In re World Trade Center Disaster Site Litig.*, 521 F.3d at 196 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). The purpose of that requirement is to eliminate any incentive to withhold from the government knowledge of risks in order to take advantage of the defense of derivative immunity. *See In re World Trade Center Disaster Site Litig.*, 521 F.3d at 196; *see also Boyle*, 487 U.S. at 512-13 (unless defendant is required to show it warned government about dangers known to it but not to the government, defendant would have an incentive "to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability;" this requirement ensures that the protection of discretionary functions will not "perversely impede them by cutting off information highly relevant to the discretionary decision.").

The Aviation Defendants' claim (Defs' Br. at 37) that they need to compare the intelligence information that the government had prior to September 11th with the intelligence

28

information that was available to the Aviation Defendants in order to satisfy this requirement is wrong. The requirement is intended to ensure that the party seeking derivative immunity has not concealed information and deceived the government and, thus, forfeited, as a policy matter, any right to derivative immunity. If the Aviation Defendants did not conceal information about al Qaeda, Zacarias Moussaoui, Khalid al Mihdhar, and Nawaf al Hazmi – and they make no such claim – it is irrelevant what the government knew. Indeed, Defendants admit that they want the five FBI Witnesses' testimony to show that the FBI, CIA and/or FAA failed to communicate all information about the risk of a terrorist threat to them. In short, the Aviation Defendants have the derivative immunity requirement backwards. This is just another improper effort by the Aviation Defendants to blame the government.

**C.     The FBI Properly Determined That Information The Aviation Defendants Seek To Discover About The Planning And Execution Of The <u>September 11th Attacks Is Either Irrelevant Or Available From Other Sources</u>**

The second category of information that the Aviation Defendants seek to discover from the five FBI Witnesses is information about the FBI's investigation into Zacarias Moussaoui's pre-9/11 activities from which the Aviation Defendants say conclusions can be drawn about the September 11th hijackers. Specifically, the Aviation Defendants claim that information about Moussaoui will "tend to establish" that the 9/11 hijackers were so "fanatical" that the Aviation Defendants could not have been a "but-for cause" of the attacks. *See* Defs' Br. at 3, 19-23 (Moussaoui's activities will show that the 9/11 hijackers were "ideologically driven" and that they "consciously took steps to avoid being detected and were intent on committing the attacks, irrespective of any act or omission by a checkpoint screener.");[18] *see also id.* at 19, 23 (because

---

[18] Since Moussaoui was not one of the 9/11 hijackers, the Aviation Defendants' claim that his activities shed any light on the events of September 11th appears to rest primarily upon Moussaoui's
(continued on next page)

the hijackers were allegedly so "fanatical," "even if checkpoint screeners detected and confiscated the blades and small knives the hijackers appear to have planned to use, the hijackers would have proceeded with the attacks, possibly after improvising weapons from inside the checkpoint or onboard the aircraft.").

There is no need for further discovery from the FBI to establish that the hijackers were an intervening cause of the September 11th attacks. As a matter of law, the hijackers could not have been an intervening cause because the hijackers were the "foreseeable hazard" giving rise to the Aviation Defendants' duty to exercise reasonable care and their duty to provide service with the highest possible degree of safety in the public interest. *Nallan*, 50 N.Y.2d at 520-21, 429 N.Y.S.2d at 614 ("Of course, the fact that the 'instrumentality' which produced the injury was the criminal conduct of a third person would not preclude a finding of 'proximate cause' if the intervening agency was itself a foreseeable hazard"); *see also In re September 11 Litig.*, 280 F. Supp. 2d at 302 (citing *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835 (1983)); *see also Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 (2d Cir. 1995) ("The governing rule in New York has long been settled and is perfectly clear: an intervenor's actions will not break the necessary chain of causation where they are 'a normal or foreseeable consequence of

---

confession to being a co-conspirator of the 9/11 hijackers (*see* Defs' Br. at 3). But Moussaoui later recanted his confession, *see, e.g.*, Neil A. Lewis, "Moussaoui's Move to Recant Guilty Plea Is Denied," N.Y. Times, May 6, 2006, when he failed to receive the death sentence he sought in order to become an ideological martyr. Moussaoui's naked disclosure of the purpose of his confession makes his original confession highly suspect and, thus, inherently unreliable. It is also misleading for the Aviation Defendants to argue (Defs' Br. at 21 n.7) that by applying for access to a portion of the record in the *Moussaoui* trial, Plaintiffs have "acknowledged that evidence pertaining to Moussaoui is highly relevant." As the Plaintiffs' memorandum in support of that application makes clear, the evidence sought in *Moussaoui* was sought not because it was probative of the tactics of the 9/11 hijackers but, rather, because it illustrates "the vast amount of information available to the aviation industry regarding the risk of terrorist attacks and is relevant to the duties owed by the industry to their passengers and to those injured on the ground." Barry Decl., Exh. 26, at 2.

the situation created by the defendant's negligence.") (quoting *Derdiarian*, 51 N.Y.2d at 315, 434

N.Y.S.2d at 169).  Indeed, one of the purposes of the Aviation Defendants' duty to exercise

reasonable care and their duty to provide service with the highest possible degree of safety in the

public interest was to prevent hijackings of aircraft by terrorists.  Under these circumstances,

"where the risk of the intervening act occurring is the very same risk which renders [the Aviation

Defendants] negligent," the doctrine of intervening cause simply does not apply, *Derdiarian*, 51

N.Y.2d at 316, 434 N.Y.S.2d at 170.[19]

The Aviation Defendants' claim (Defs' Br. at 21-22) that testimony from the FBI

Witnesses about Moussaoui's activities would establish that the 9/11 hijackers were "fanatical"

and, thus, would have found alternative means to carry out their attacks even in the absence of

---

[19]  The cases that the Aviation Defendants cite (Defs' Br. at 19-20) as examples of cases where
terrorists' actions were determined to be an intervening cause are all easily distinguishable.  In all of
those cases, the terrorists' crimes were not reasonably foreseeable and the defendants had no duty to
protect against them.  For example, *Gaines-Tabb v. ICI Explosives USA, Inc.*, 995 F. Supp. 1304 (W.D.
Okla. 1996), and *Port Authority of N.Y. & N.J. v. Arcadian Corp.*, 991 F. Supp. 390 (D.N.J. 1997), were
both cases brought against manufacturers and distributors of the ammonium nitrate that was used in the
Oklahoma City bombing and the 1993 bombing of the World Trade Center.  The courts in those cases
found that the manufacturer and distributor defendants did not owe any duty to the plaintiffs to prevent
the use of their fertilizer product as a terrorist device, and also that the terrorists' actions were an
intervening cause, because the manufacturers and distributors of the ammonium nitrate could not have
reasonably foreseen that the terrorists would have altered their product to convert it into an explosive
material.  As this Court explained when it held that those cases were inapplicable here, "To require
manufacturers to prevent the appropriation of their products for an unintended purpose when
manufacturers have no control over who purchases and alters the fertilizer would be an undue burden.
Unlike the manufacturers, however, the Aviation Defendants controlled who came onto the planes and
what was carried aboard.  They had the obligation to take reasonable care in screening precisely because
of the risk of terrorist hijackings, and the dangerous consequences that would inevitably follow.  The
consequences that in fact followed were within the scope of the duty that the Aviation Defendants
undertook to carry out." *In re September 11 Litig.*, 280 F. Supp. 2d at 296; *see also McCarthy v. Sturm,
Ruger & Co.*, 916 F. Supp. 366, 369 (S.D.N.Y. 1996) (manufacturer of bullets used by Colin Ferguson
during shooting spree on the Long Island Rail Road owed no duty to plaintiffs to protect them from
criminal misuse of its ammunition); *The Lusitania*, 251 F. 715, 736 (S.D.N.Y. 1918) (unforeseeable that
German submarine would torpedo an unarmed British passenger vessel in violation of international law
without making any provision for the safety of persons on board).

31

any negligence on the part of the Aviation Defendants, is similarly unavailing. The Aviation

Defendants cannot absolve themselves of responsibility for their negligence on September 11th

by resorting to this kind of speculation, as was made clear by the Appellate Division, First

Department, in a recent decision affirming a judgment against the Port Authority of NY and NJ

in civil litigation arising out of the 1993 bombing of the World Trade Center. *See Nash v. Port*

*Authority of N.Y. & N.J.*, 856 N.Y.S.2d 583, 592-94 (1st Dep't 2008). Just as the Aviation

Defendants now speculate that the 9/11 hijackers might have found a way to cause harm even if

they had been stopped from boarding, their weapons had been confiscated at security

checkpoints, and/or the aircraft they were allowed to board were more secure, the Port Authority

in *Nash* speculated that "even if the recommended precautions had been taken, the terrorists

would have been undeterred from causing an explosion of similar character and extent, although

perhaps at a different date, time and location." *Id.* at 592. The Appellate Division found no error

in the trial court's decision to preclude the Port Authority from presenting this theory to the jury.

As the Appellate Division explained,

> We would have thought it clear that a plaintiff may not be deprived
> of a remedy for negligence by proof of the possibility of a
> nominally similar, although necessarily different, tortious occasion
> in which, in distinction to the matter sued upon, the alleged
> negligence is shown not to have been causally connected to the
> harmful event. It will nearly always be possible to hypothesize the
> circumvention of security precautions . . . but the fact remains that
> such precautions must be supposed to provide some margin of
> security . . . That there may be another scenario under which
> similar harm might be caused notwithstanding the performance of
> the [defendant's] duty, cannot defeat a plaintiff's showing that the
> margin of security that he or she would have been afforded had the
> [defendant's] duty been met would have been sufficient under the
> circumstances actually obtaining to deter the injurious conduct.
> Indeed, research discloses no case in which a plaintiff's proof of
> causation has been rebutted by a defendant's hypothecation of a
> merely 'similar' tortious event in which the intentional tortfeasor

32

would have and could have done what he or she demonstrably did
not and was not prepared to do on the occasion of the actual wrong.

*Id.* at 592-93. The Aviation Defendants' "hypothecation of a merely 'similar' tortious event" in

which the 9/11 hijackers could have caused similar harm even if the Aviation Defendants' had

fulfilled their duties is equally unavailing here.

The FBI was, therefore, totally justified in declining to subject the five FBI Witnesses to

deposition because evidence of the 9/11 hijackers' "fanaticism" was irrelevant. But the agency's

decision can be sustained for a separate and independent reason: All of the information that the

Aviation Defendants say they need to demonstrate the hijackers' alleged commitment to follow

through with the 9/11 attacks is already available elsewhere in the record:

- The Aviation Defendants argue (Defs' Br. at 22) that Moussaoui's terrorist
  training, including his physical training and his training to pilot commercial
  aircraft, will show that the 9/11 hijackers "did not hazard the success of [their]
  long-planned, coordinated suicide attacks" on the negligence of the Aviation
  Defendants. But, of course, Plaintiffs have offered to stipulate to the fact that
  many of the 9/11 hijackers had obtained commercial pilot's licenses, practiced on
  flight simulator programs, enrolled in flight training courses, and trained at the
  gym in the years and months leading up to September 11, 2001. *See* Proposed
  Stipulation of Facts (Exh. 42 to the Williamson Decl.), at ¶¶ 315-23, 330-31, 333-
  34.

- The Aviation Defendants also claim (Defs' Br. at 22-23) that evidence concerning
  the knives and blades that the FBI found in Moussaoui's possession will "tend to
  establish" that the 9/11 hijackers "used short-bladed implements that were either
  permitted or not readily detectable by checkpoint screening on September 11."
  Even setting aside the Aviation Defendants' unsupported assertion that the
  weapons used by the 9/11 hijackers "were either permitted or not readily
  detectable,"[20] the Aviation Defendants have overwhelming, direct evidence that

---

[20] Contrary to the Aviation Defendants' claim (Defs' Br. at 22), knives with blades less than four
inches in length *were* prohibited if (1) illegal under local law or (2) menacing to a reasonable person
using common sense, good judgment, and caution. *See, e.g.*, Cammaroto Tr. (relevant excerpts annexed
to the Williamson Decl. as Exh. 24), at 209-10; American Airlines' Checkpoint Operations Guide
(relevant excerpts annexed to the Williamson Decl. as Exh. 43), at 5-7; American Airlines' Air Carrier
Standard Security Program, Appendix I (relevant excerpts annexed to the Williamson Decl. as Exh. 44),
at AAL060204. Moreover, when shown the knives, box cutters, mace and pepper spray that were used
(continued on next page)

33

shows precisely the weapons that were possessed by the actual hijackers on September 11th. The FBI already has produced sales receipts and credit card settlement statements for the knives, blades and box cutters that the hijackers purchased prior to September 11th. *See, e.g.*, sales receipts and credit card settlement statements (Exh. 51 to the Williamson Decl.). The FBI also has produced photographs and descriptions of some of the actual weapons and prohibited items that were recovered from the Flight 93 and World Trade Center crash sites, including homemade knives, serrated blades, menacing pocket utility knives, box cutters, and wiring used to bind the wrists of an unidentified female victim. *See, e.g.*, FBI description and photographs of knives found at the UA Flight 93 crash site (Exh. 52 to the Williamson Decl.); FBI laboratory photographs (Exh. 53 to the Williamson Decl.).[21] Plaintiffs also have offered to stipulate to these facts, including the fact that the hijackers' "primary weapons of choice were knives with a blade less than 4 inches long." *See* Proposed Stipulation of Facts (Exh. 42 to the Williamson Decl.), at ¶¶ 1-3, 16, 107, 189, 301-02, 305, 307, 333.

---

by the 9/11 hijackers, virtually every screener who has been deposed in the September 11 Litigation has testified that those objects were not only prohibited but that they were readily detectible by x-ray, walk-through metal detector, hand wand, pat down, and bag search. *See, e.g.*, Tr. of Dec. 14, 2006 deposition of Trandafile Bala (relevant excerpts annexed to the Williamson Decl. as Exh. 45), at 71, 96-105; Tr. of Nov. 6, 2007 deposition of Hemsley Myles (relevant excerpts annexed to the Williamson Decl. as Exh. 46), at 16-17, 60-61, 63-69, 72-73; Tr. of Sept. 13, 2006 deposition of Rosarita Rivera (relevant excerpts annexed to the Williamson Decl. as Exh. 47), at 134; Tr. of Oct. 18, 2007 deposition of Yosmaris (Santa) Guerrero (relevant excerpts annexed to the Williamson Decl. as Exh. 48), at 80-83; Tr. of July 26, 2007 deposition of Camille M. Summa (relevant excerpts annexed to the Williamson Decl. as Exh. 49), at 41-43; Tr. of Jan. 16, 2007 deposition of William T. Thomas (relevant excerpts annexed to the Williamson Decl. as Exh. 50), at 113, 123. Indeed, as explained above at page 24, one type of knife that was used by the hijackers – a "Leatherman Wave" – triggered the metal detectors when it was carried by a Fox News reporter who was doing an exposé on security at Logan Airport during the spring of 2001; the checkpoint screener nonetheless failed to identify the weapon.

[21] Additionally, several individuals who received telephone calls from passengers and crew aboard the four flights have described the use of knives, box cutters, pepper spray, mace and bombs by the 9/11 hijackers. *See, e.g.*, Tr. of Mar. 1, 2007 deposition of Nydia Gonzalez (relevant excerpts annexed to the Williamson Decl. as Exh. 54), at 35-38, 134, 136 (describing telephone call from Betty Ong, one of the flight attendants aboard American Flight 11, in which Ong reported that two people had been stabbed and that mace had been sprayed); FBI interview of United Airlines employee (Exh. 55 to the Williamson Decl.) (stating that a flight attendant on board Flight 93 had telephoned him and reported that one of the hijackers was wielding a knife), Tr. of Oct. 12, 2007 deposition of Theodore B. Olson (relevant excerpts of which are annexed to the Williamson Decl. as Exh. 56), at 22-23 (describing phone call from his wife, who was a passenger on Flight 77, in which she reported that the hijackers wielded box cutters and knives); *see also* Proposed Stipulation of Facts (Exh. 42 to the Williamson Decl.), at ¶¶ 37-40, 53, 55, 58, 92, 96-97, 144, 173, 223, 240, 244-45, 254, 258, 263-64, 266, 270, 300, 303-04, 306, 308.

With all of this evidence available to the Aviation Defendants concerning the training actually undertaken and the weapons actually used by the 9/11 hijackers, there is simply no need for the Aviation Defendants to depose the five FBI Witnesses about the training and weapons of Zacarias Moussaoui. Under these circumstances, it was entirely proper for the FBI to have concluded that the testimony of the five FBI Witnesses would be irrelevant or duplicative, unduly burdensome, and/or unnecessary.[22] That decision should now be affirmed.

---

[22] Even if the testimony sought were relevant and material to the issues in this litigation, the facts contained in the testimony can be admitted by a much less burdensome stipulation. Plaintiffs already have proposed an extensive factual stipulation with respect to facts contained in the Commission Report, the Staff Monograph and Staff Statements. *See* Plaintiffs' Proposed Stipulation of Facts (Exh. 42 to the Williamson Decl.). If there are additional issues that the Court finds relevant and material, Plaintiffs are willing to propose factual stipulations related to those issues, as well.

## **CONCLUSION**

The FBI's decision to refuse to produce the five FBI Witnesses for depositions was

neither arbitrary and capricious, nor did it violate the Federal Rules of Civil Procedure.  The

Aviation Defendants' rationale for seeking the five FBI Witnesses' testimony – in their

continuous effort to blame the government and deflect attention from their own negligence – has

no basis in law.  The FBI's decision should, therefore, be affirmed, and the Aviation Defendants'

motion for summary judgment should be denied.

Date:   June 17, 2008
        New York, New York


FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

By: _____/s/_____
        Richard A. Williamson, Esq. (RW-3033)

One Liberty Plaza
New York, New York  10006
(212) 412-9500

*Liaison Counsel for Property Damage Plaintiffs*
*World Trade Center Properties LLC*
*1 World Trade Center LLC*
*2 World Trade Center LLC*
*3 World Trade Center LLC,*
*   formerly known as 5 World Trade Center LLC*
*4 World Trade Center LLC*
*7 World Trade Company, L.P.*
*Port Authority of New York and New Jersey*
*        -and-*
*Liaison Counsel for the Ground Defendants*

36

MOTLEY RICE LLC

By: _____ /s/ _____
        Donald A. Migliori, Esq.

28 Bridgeside Boulevard
Mount Pleasant, SC 29465
(843) 216-9000

*Liaison Counsel for the Wrongful Death and Bodily Injury Plaintiffs*