# EXHIBIT 3

# CONDON & FORSYTH LLP

NEW YORK
LOS ANGELES

Direct Dial: (212) 894-6770
Direct Fax: (212) 894-6771
dbarry@condonlaw.com

May 5, 2008

**VIA FEDERAL EXPRESS**

Beth E. Goldman, Esq.
Sarah S. Normand, Esq.
Jeannette A. Vargas, Esq.
Assistant United States Attorneys
Southern District of New York
U.S. Department of Justice
86 Chambers Street
New York, New York 10007

Re:    In re September 11 Litigation, 21 MC 101 (AKH)
       Request for Testimony of Government Employees
       C & F Ref: DTB/CRC/VAT/28507

Dear Counsel:

I write in my capacity as Aviation Defendants Liaison counsel in the above referenced litigation. Consistent with our past practice, I am writing to inform you that the Aviation Defendants wish to depose the following two current or former government employees:

- John Anthony, who as of 2001 was an inspector employed by the Federal Aviation Administration ("FAA"). The Aviation Defendants believe that Mr. Anthony investigated and met with September 11 terrorist Hani Hanjour.

- Kenneth Williams, who in 2001 was an FBI Special Agent based in Phoenix, Arizona who authored the so-called "Phoenix Memorandum" dated July 10, 2001 discussing his concern that al Qaeda was sending operatives to study at civil aviation schools in the United States.

In accordance with applicable agency regulations, I enclose affidavits setting forth the proposed topics to be covered at the depositions of these witnesses. Please forward the affidavits to the appropriate government agencies and their counsel.

CONDON & FORSYTH LLP

Beth E. Goldman, Esq.
Sarah S. Normand, Esq.
Jeannette A. Vargas, Esq.
May 5, 2008
Page 2

We look forward to your prompt response to this request.

Sincerely yours,

Desmond T. Barry, Jr.
Aviation Defendants Liaison Counsel

Enclosures

cc:    All Liaison Counsel
       Aviation Defendants' Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
                                    :
                                    :
IN RE SEPTEMBER 11 LITIGATION       :    21 MC 101 (AKH)
                                    :
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

1.      I am an attorney admitted to practice before this Court and a member of the law firm of Condon & Forsyth LLP. I serve as the Aviation Defendants Liaison Counsel in the September 11 Litigation pending before Judge Alvin K. Hellerstein in this Court. I submit this Affidavit pursuant to 49 C.F.R. §§ 9.1 *et seq.*, in connection with the Aviation Defendants' request to depose John Anthony, an inspector employed by the Federal Aviation Administration ("FAA") in Arizona in 2001.

2.      Plaintiffs in this litgation seek to impose billions of dollars in liability upon the Aviation Defendants for their alleged failure to detect and halt the terrorists who attacked the United States on September 11, 2001. Numerous property damage and business loss plaintiffs have brought claims against the Aviation Defendants for the destruction of real property and business interruption resulting from al Qaeda's attacks. The Aviation Defendants also are being sued by personal injury and wrongful death plaintiffs for injuries and fatalities caused by the terrorist attacks.

3.      As of September 11, 2001, the FAA, along with the Federal Bureau of Investigation ("FBI"), were responsible for evaluating potential terrorist threats to civil aviation pursuant to federal statute. *See* 49 U.S.C. § 44904(a) (1994). As part of its duties, the FAA was responsible for mandating specific security requirements that the Aviation Defendants were obligated to follow. When the FAA determined that it was appropriate to share intelligence information concerning the current threat environment with the Aviation Defendants, it did so by issuing Information Circulars to them. When the FAA determined that additional or different aviation security measures should be implemented immediately based on the intelligence information available to the agency, it instructed the Aviation Defendants to implement those measures by issuing Security Directives.

4.      Plaintiffs claim that the Aviation Defendants should have foreseen in 2001 that al Qaeda posed a significant threat to domestic civil aviation and might launch attacks against the United States in which they would hijack and crash commercial airliners into ground targets. Plaintiffs further allege that the Aviation Defendants should have employed countermeasures designed to prevent such attacks. Plaintiffs claim, in effect, that the Aviation Defendants should have "done more and done better" than the aviation security measures required by the FAA on September 11, 2001.

5.    The Aviation Defendants wish to depose John Anthony because he is believed to have investigated and met with terrorist Hani Hanjour, the hijacker-pilot who crashed American Airlines Flight 77 into the Pentagon.

6.    In 2001, Mr. Anthony was the FAA official responsible for overseeing Jet Tech Pan Am Flight Academy ("Jet Tech") in Phoenix, Arizona. The Aviation Defendants understand that in 2001 Hanjour was a student at Jet Tech learning how to fly a commercial jet and that Jet Tech's faculty was concerned because Hanjour had insufficient skills to pass a pilot exam and because Hanjour's flying skills were so poor that they feared he would injure himself and others in a flying accident. The Aviation Defendants further understand that a representative from Jet Tech contacted Mr. Anthony to express her concerns about Hanjour and asked Mr. Anthony to investigate Hanjour. The Aviation Defendants believe that in response to this request, Mr. Anthony investigated and met with Hanjour.

7.    The Aviation Defendants seek to depose Mr. Anthony in order to learn about his investigation of Hanjour and ascertain: 1) what Jet Tech told him about Hanjour; 2) what steps he took to investigate Hanjour; 3) the results of any investigation of Hanjour before September 11, 2001; 4) documentation of any such investigation of Hanjour; and 5) to whom the findings of any investigation into Hanjour were disseminated before September 11, 2001.

8.      The Aviation Defendants want to determine the extent to which Mr. Anthony's responsibilities before September 11, 2001 involved issues pertaining to aviation security. The Aviation Defendants plan to inquire if before September 11, 2001 Mr. Anthony had access to FAA Information Circulars discussing the threat posed by members of al Qaeda or other Islamic extremists to civil aviation or other documents containing similar intelligence information. Similarly, the Aviation Defendants want to question Mr. Anthony if before September 11, 2001 he even received a copy of the slide presentation by Pat McDonnell, Director of the Office of Civil Aviation Security Intelligence of the FAA (attached as Ex. A) or otherwise learned of its contents.

9.      The Aviation Defendants also want to determine the extent to which Mr. Anthony was involved with intelligence sharing with the FBI and plan to question if at any time before September 11, 2001 Mr. Anthony received the so-called "Phoenix Memorandum", authored by Kenneth Williams of the FBI's Phoenix office on July 10, 2001, or otherwise was informed that the Phoenix office of the FBI was concerned that persons suspected of being members of or affiliated with al Qaeda or Islamic extremist organizations were attending civil aviation schools in the United States, and that a significant number of individuals of investigative interest to the FBI were attending civil aviation schools in Phoenix, Arizona.

10.     Mr. Anthony's testimony will be pertinent to several important issues in this case including proximate cause (the extent to which actions by intelligence agencies

4

could have helped to prevent the September 11, 2001 terrorist attacks), the foreseeability of the September 11, 2001 attacks or the availability of a derivative immunity defense to the Aviation Defendants.

11.    For instance, evidence of Mr. Anthony's investigation of Hanjour and his knowledge, or lack thereof, about the terrorist threat posed by al Qaeda and/or other Islamic extremists to civil aviation before September 11, 2001 will help rebut any allegation that the Aviation Defendants should have foreseen the terrorist attacks based upon a general awareness of al Qaeda's hatred for the United States and implemented security measures designed to counteract those type of attacks on civil aviation. The Aviation Defendants intend to establish that before September 11, 2001 the FAA determined that the specific security measures plaintiffs are now advocating were not appropriate based on the intelligence information that was then available to the FAA. If the jury is permitted to consider that the FAA had no reason to foresee that al Qaeda would launch unprecedented suicide attacks involving civil aviation, the jury will be far more likely to conclude that the Aviation Defendants could not have foreseen the same threat.

12.    Additionally, the information known to the FAA before September 11, 2001 is relevant to determining whether the Aviation Defendants have derivative immunity from liability under the discretionary function exception of the Federal Tort Claims Act. The Court of Appeals for the Second Circuit has strongly suggested that this

5

is a defense available to the Aviation Defendants. *See In re World Trade Ctr. Disaster Site Litig.*, No. 06-5324, 2008 U.S. App. LEXIS 622 (2d Cir. Mar. 26, 2008). To establish their immunity to plaintiffs' claims for damages, the Aviation Defendants must show that they "were not aware of dangers about which [the federal agency was] unaware." *Id.* at *76. In effect, they must establish that they had no greater knowledge of the terrorist threat than the FAA. The Aviation Defendants cannot make such a comparison without being able to present evidence of the pre-September 11 intelligence information that the FAA had on the terrorist threat.

13.     The Aviation Defendants submit that Mr. Anthony's testimony is clearly appropriate when all the factors listed in 49 C.F.R. § 9.1 *et seq.* are taken into consideration. Because the scope of Mr. Anthony's pre-September 11, 2001 investigation of Hani Hanjour has been the subject both of newspaper articles and testimony in open court, his testimony is unlikely to implicate any privilege issues or protected information. *See, e.g.,* Testimony of Margaret Chevrette in *United States v. Moussaoui*, Cr. No. 01-445A (E.D.Va.) at 1679-80, 1686-87, *FAA Probed, Cleared Sept. 11 Hijacker in Early 2001*, AP, May 10, 2002 (available at http://www.foxnews.com/story/0,2933,52408,00.html); *see also* TSA, *The Phoenix Story* (June 3, 2002) (produced in this action at TSA0709). Additionally, the Aviation Defendants are not seeking classified national security information and expect that counsel for the FBI will instruct Mr. Williams not to answer any questions that threaten to elicit such information.

6

14.     By contrast, a refusal to permit Mr. Anthony's deposition would deprive the Aviation Defendants of evidence that is important to their defense of the serious allegations made against them in this litigation.  The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role consisted of implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI.  *See, e.g.*,  Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.").

DESMOND T. BARRY, JR.

Sworn to before me this
5th day of May 2008

Notary Public

TINA M. ZOCCALI
Notary Public, State of New York
No. 01ZO6059025
Qualified in Rockland County
Commission Expires May 21, 20 11

7

**Exhibit A**

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

54/

Slide 1
(music)

***

Slide 2
title - no narration

***

Slide 3

Hello.  My name is Pat McDonnell, Director of the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration.

***

Slide 4A

You are probably aware that civil aviation has long been a favored target of terrorist groups and state sponsors of terrorism.  An air carrier's flag establishes it as a symbol of the nation--or the government of the nation--that the terrorists want to strike.  In 1985, for example, Sikh terrorists were responsible for the bombing of an Air India flight from Canada, which crashed into the ocean off the coast of Ireland, killing 329 passengers and crew.  This incident remains the most lethal terrorist attack on civil aviation in history.  In 1987, North Korean agents disembarked from a South Korean airliner, leaving a bomb concealed in a radio in the cabin.  It exploded on the next leg, causing the aircraft to crash, resulting in 115 deaths.  The photo on the left depicts a radio similar to the one used to disguise the explosive device.  More recently, in April 1999, the Colombian terrorist group ELN, or National Liberation Army, hijacked an Avianca aircraft on a domestic route and did not release the last hostages until November 2000, making this by far the longest hijacking on record.

Although there have been no successful terrorist attacks against U.S. civil aviation since the bombing of Pan Am flight 103 in December 1988, it is only a matter of luck that there were not multiple catastrophes with thousands of fatalities in 1995--as you will hear later.  The purpose of this briefing is to give you a better understanding of the current threat to U.S. air carriers by focusing on the groups and state sponsors deemed likeliest to attack these symbols of the United States.

***

Slide 4B                                                    M-TSA-00000003

Unfortunately, there's been quite a bit of activity in the world of terrorism in the past year or so, including an international terrorist hijacking--the first since 1994--and an attempt

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

EXHIBIT
Tuohey-168
11-1-06

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

by foreign terrorists to smuggle bomb materials into the United States from Canada. This presentation will examine these events and their relevance to the overall threat to U.S. civil aviation, both in the United States and overseas.

Currently, the most significant threats to the United States are the country of Iran, a designated state sponsor of terrorism, and terrorist groups based in the area enclosed by the circle on the map. Of the groups, we're concerned about the Lebanese Hizballah, which is a surrogate of Iran, and the groups which are part of the International Islamic Front for Jihad against Crusaders and Jews formed by Usama bin Laden. These groups have representatives in most parts of the world, including North America.

\*\*\*

Slide 5

Iran remains the most active state sponsor of terrorism. The government departments most closely associated with terrorism are under the control of Supreme Leader Ali Khameini (pictured here on the left). Because it opposes the Middle East peace process, Iran actively supports the operations of groups intent on derailing the negotiations. Iran also objects to the continuing presence of U.S. and other Western military forces in the Persian Gulf and Saudi Arabia. There are, however, some positive signals coming from Tehran lately. President Mohammed Khatami (pictured here on the right) and other "reformists" have expressed interest in renewed relations with the United States. Moving in that direction, on March 17, 2000, Secretary of State Albright announced revisions of the U.S. sanctions against Iran, allowing the import of Iranian food products and carpets. The fate of this diplomacy, however, lies in the hands of Supreme Leader Khameini and the hard-line Guardian Council. The reformists will have to move carefully to avoid a conservative backlash. Pro-reform journalists and moderate religious leaders have been arrested for speaking out against the establishment. Because of this, we should not expect any immediate, drastic changes in Iran's attitude toward the United States or its support of terrorism.

\*\*\*

Slide 6

Hizballah is one of the most notorious terrorist groups in the world. Their goal is to create an Islamic Republic in Lebanon and remove all Western influences from the area. They have a worldwide presence with concentrations in the Middle East, Africa, Europe and the Americas. While they have very close ties to Iran, they have conducted operations in the past without its approval. They have a long record of lethal attacks, but are probably best remembered for their suicide bombing of the Marine barracks in Beirut in 1983. They were also involved in a number of hijackings and hostage operations in the 1980s--most notably the hijacking of TWA 847 in 1985. Hizballah remains one of the best organized, best trained and most sophisticated terrorist groups in the world today.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

The Hizballah presence in the United States was highlighted on July 22, 2000 when 19 individuals were arrested in North Carolina and Michigan for money laundering, racketeering and immigrations violations. A federal affidavit stated that the accused were part of an active group of Hizballah members who had sent funds obtained from criminal enterprises to Lebanon for Hizballah's use. They had also acquired technical equipment such as night vision goggles and global positioning systems for Hizballah.

\* \* \*

Slide 7

Currently, however, the organization that presents the greatest clear and present danger to U.S. interests is the International Islamic Front for the Jihad Against the Crusaders and Jews formed by Usama bin Laden. Bin Laden is the renegade Saudi Arabian businessman who is using his considerable wealth to sponsor terrorist activities against the United States to diminish our presence and influence in Arab and Muslim countries.

Bin Laden has been placed on the FBI's most wanted list for his involvement with the bombings of the U.S. embassies in Kenya and Tanzania. A $5,000,000 reward has been offered for his capture.

\* \* \*

Slide 8

As it turned out, there was more to worry about at the turn of the century than the Y2K bug. Terrorist plots targeting U.S. interests were uncovered overseas and at home.

Since December 1999, authorities in Jordan have arrested 16 members of a group planning to attack tourist sites frequented by Americans and Israelis during celebrations coinciding with the millennium. Those arrested include Khalil al-Deek and Raid Hyazi, who are citizens of both the Unites States and Jordan. Evidence indicates that the suspects received terrorist training in Afghanistan and have links to the bin Laden network.

In addition, the Jordanians believe at leas, another 12 people, all still at large, were involved in the plot. This is a huge number for a terrorist operation. This point will be emphasized in greater detail later in this presentation. The interrogations of the suspects and subsequent investigations resulted in the discovery by Jordanian authorities of large amounts of weapons, explosives and bomb-making equipment.

\* \* \*

Slide 9

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

For years now, there has been a growing concern on both sides of the border regarding the presence of terrorists in Canada who have an interest in infiltrating into the U.S. There have been 13 cases documented from 1995 to 1999 involving terrorists crossing the border. One of the 13 cases involved a man who was sentenced to life for plotting to bomb the New York subway system.

\*\*\*

Slide 10

At the end of 1999 there was a somewhat similar plot uncovered. On December 14, Ahmed Ressam attempted to enter the U.S. at Port Angeles, Washington. Customs officers thought that he was acting in a suspicious manner. When they approached him, he fled, but was quickly apprehended. A search of his car revealed explosives and bomb-making equipment..

Canadian authorities announced that Ressam had undergone training at one of Usama bin Laden's Afghanistan camps in the early 1990's. In addition, they said that Ressam and a man named Abdel Dahoumane had recently shared a hotel room in Vancouver. Dahoumane was subsequently arrested in Algeria. So far, to our knowledge, he has not provided information regarding his role in the Millennium Plot or his connections to Usama bin Laden. Both Ressam and Dahoumane are believed to be connected to the Algerian Armed Islamic Group, or GIA, as it is known by its French acronym. They've been indicted on nine counts, including conspiracy to commit terrorism and several explosives-related violations.

\*\*\*

Slide 11

Ressam's specific plans or potential targets for terrorist activity are still unknown. Media speculation centered on attacks during the millennial celebrations in Seattle, New York and Washington, DC, but so far that has not been confirmed.

\*\*\*

Slide 12

A telephone number found in Ressam's possession led authorities to suspect Abdel Meskini, a Brooklyn, New York resident. The FBI placed a wiretap on his phone and intercepted a conversation between Meskini and Mukhtar Haouari of Montreal. Haouari instructed Meskini to get rid of his pager, cellular telephone and any evidence of his recent trip to Seattle. Just days later, authorities observed Meskini discarding several documents, including an airline ticket from Seattle, in a dumpster. He was subsequently arrested and told authorities that Haouari sent him to Seattle to drive and interpret for Ressam. He was waiting for Ressam to drive off the ferry at Port Angeles. When

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191. 1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Ressam didn't appear, he returned to New York, telephoned Haouari and learned of
Ressam's arrest. Haouari was arrested in Montreal on charges of aiding and directing
Ressam's activities. The U.S. government has requested his extradition. According to
Canadian authorities, Haouari probably also has ties to the GIA.

\*\*\*

Slide 13

On December 19, 1999, Immigration officers stopped Lucia Garofalo and Bouabide
Chamchi as they attempted to enter Vermont from Canada. INS records revealed that
they had attempted to cross the border at two other locations during December. Based on
telephone toll records, prosecutors filed court documents linking Garofalo and Ressam to
the same cell of the GIA. In late February she was deported to Canada. Investigation
also determined that her husband is a suspected member of the GIA who was deported to
Algeria from Italy in January of this year (2001). So far, he has not been connected to the
conspiracy.

The last arrest of an individual connected to Ressam was Abdel Tizegha, who was taken
into custody near Seattle on December 24th and charged with immigrations violations.
He has denied any ties to Ressam or Dahoumane, but the FBI stated that telephone
records revealed contact between him and Ressam.

\*\*\*

Slide 14

Additional leads in the investigation indicate the broad transnational nature of this
conspiracy. On December 21, 1999, Irish police detained Hammid Aich, who once
shared an apartment in Canada with Dahoumane. At the time of his arrest, police
discovered drawings for several devices, possibly bomb.

On January 27, Mohambedou Slahi, a Mauritanian, was taken into custody in Mauritania
pending the outcome of a U.S. extradition request. Press reporting linked Slahi with both
Ressam and a lieutenant of Usama bin Laden. The U.S. Attorney's office in Manhattan
was considering charges against Slahi because he allegedly was in regular
communication with Haouari in Canada. During interrogation by the FBI and
Mauritanian authorities, Slahi consistently denied that he had any connection to bin
Laden or to the individuals arrested in Canada and the United States. He was later
released by Mauritanian authorities.

\*\*\*

Slide 15

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191. 1et. seq. No part of this document may be released with ... 14 CFR 191. 1et.
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

It's quite possible that the bomb maker in this plot was trained in Afghanistan in a bin Laden camp. The timing mechanisms found among the bomb-making material in Seattle were Casio watches connected to nine-volt batteries, which is a method taught in those camps. The picture on the left is a modified Casio watch to be used as a timer in the 1995 plot by Ramzi Yousef to blow up a dozen U.S. airliners flying in Asia. The picture on the right is one of the timing mechanisms found in Seattle. However, the amount and type of explosives seized in Seattle indicates the bombs they were intending to build were larger than the type that would be used against an airliner.

\*\*\*

Slide 16

The most troubling aspect of this conspiracy is that it involved members of the GIA. They are literally a gang of vicious cutthroats. The GIA began its campaign of bloodshed in Algeria in mid-1992, as an effort to install a government based on Islamic law. They employ a variety of tactics, including vehicle bombings, abductions, kidnapping, torture and decapitation. They also intimidate civilians through massacres, often of entire villages. Their "signature" style of killing is cutting their victims' throats. So far, the unofficial death count in Algeria at the hands of the Armed Islamic Group is 80,000—and that's a low estimate! In terms of casualties, the GIA's fight with the Algerian government is considered one of the most serious ongoing conflict in the world.

\*\*\*

Slide 17A

The involvement of GIA members in the millennium plot is out of character for the group, because they haven't been much of a concern for the United States in the past. They've only targeted U.S. interests twice, and those attacks were directed at U.S. facilities in Algeria. Historically, their main targets have been the present Algerian government and France. So why are they now interested in the United States?

The answer may lie in statements made by Canadian and U.S. officials who said that Ressam's group had approached the bin Laden network for assistance, making it more likely that they were freelancing, rather than being actually directed by the GIA.

If this is the beginning of a trend, persons responsible for aviation security should be concerned. The GIA conducted the deadliest terrorist hijacking of the last decade. Four armed terrorists took control of an Air France flight in Algeria in 1994. Their demand was the release of blind Shaykh Omar Rahman, who is in jail in the United States, and four Islamic extremists imprisoned in Algeria. The ordeal ended 56 hours later in Marseilles, France, when the plane was assaulted by a French special forces unit.

\*\*\*

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administration of the Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. sec. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security of the Federal Aviation Administration, Washington, D.C. 20591.

Slide 17B
(Air France hijacking Video)

Three passengers were killed by the terrorists. The most troubling aspect of this hijacking was that it may have been a suicide mission. As the plane was en route to Marseilles, a terrorist told the passengers: "We are here to die." The hijackers were also observed examining dynamite, which had been placed under seats in the cockpit and in the center of the plane. When the aircraft landed in Marseilles, the terrorists requested 27 tons of fuel to fly to Paris. This request was unusual because only 10 tons were required. It was then suspected that they intended to fly the aircraft to a friendly Islamic country or blow it up over Paris. The possibility that the second course of action would be carried out was made only too real when an anonymous informant warned the French Consulate in Algeria that the plane was a "flying bomb that will explode over Paris." This hijacking marked the beginning of the GIA's terror campaign against the French outside Algeria. During 1995 and 1996, the GIA was the primary suspect in several attacks in France, including bombings of the Paris subway system in which seven passengers were killed and dozens were injured.

***

Slide 18

The second international terrorist hijacking of an airliner in the '90s occurred in December 1999. The major difference between it and Air France, is that this one was successful.

Five terrorists, armed with pistols, grenades and knives hijacked Indian Airlines flight 814 while it was en route to India from Nepal. Initially, the hijackers demanded the plane be flown to Lahore, Pakistan, but Pakistani officials denied it landing, forcing it to land instead in Amritsar, India. While in Amritsar, the hijackers demanded fuel for the aircraft, threatening to harm passengers if the demand wasn't met. During this time, one passenger, an Indian national, was killed, supposedly for failing to follow directions. The aircraft eventually took off for Lahore, where authorities closed the airport to discourage it from landing. After a plea from the pilot that they would crash if it they couldn't land, the plane made an emergency landing, and departed after taking on food and fuel. The flight was then diverted to Oman and Dubai, before arriving in Qandahar, Afghanistan on December 26.

***

Slide 19

The hijackers demanded the release of Maulana Mazood Azhar from an Indian jail.

Azhar is a Pakistani Muslim cleric and leader of the Kashmiri separatist group, Harakat-ul-Mujahidin. They also demanded the release of 35 other jailed militants and $200

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. sec. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

million. On December 29, during negotiations with Indian diplomats, the hijackers dropped their demands for ransom and the release of 35 prisoners; however, India did agree to exchange three jailed militants for the safe return of the aircraft and passengers.

The hijacking concluded on December 31st with the release of Azhar and two other prisoners. The passengers and crew were released and flown from Qandahar to New Delhi. Meanwhile, the Taliban, the controlling force in Afghanistan, had granted the hijackers ten hours to leave the country. The hijackers departed with a Taliban "hostage" to ensure their safe passage, and allegedly left Afghanistan.

The hijacking was professional, well-planned and, unfortunately, successful. According to one passenger, the hijackers had one man monitoring the cockpit at all times, while two others would watch the passengers, and the remaining two would rest. The hijackers wore ski masks and were always armed, they also carried radios to communicate with each other. The passengers were blindfolded and forced to keep their heads down, and the shutters on the aircraft windows were closed to make sure the passengers were unaware of their location.

\*\*\*

Slide 20

Speculation is that the hijackers were members of the Harakat-ul-Mujahedin, also known as the HUM, a militant group based in Pakistan. Their goal is to liberate Kashmir from what it sees as Indian occupation. HUM is part of the International Islamic Front for Jihad against Crusaders and Jews, and signed Usama bin Laden's proclamation calling for attacks on United States. Although their primary target is India, they've announced their intention to avenge the members of its group who were killed or wounded in the U.S. missile strikes on bin Laden's training camps in 1998. It's likely that the hijackers received their training in these camps.

On November 12, 1999, improvised rockets were fired at the U.S. Embassy, U.N. facilities, and the American Cultural Center in Islamabad. None of the rockets hit the Embassy, but there were injuries. The photo on the left is a picture of one of the launch vehicles that caught fire. The HUM is a primary suspect in this attack.

\*\*\*

Slide 21

What do the terrorist events of the past year tell us about the future? Let's first take a look at hijackings. Most international hijackings in the 1990's were perpetrated by individuals motivated by personal factors like escaping political or economic conditions in their homeland. They were largely unprofessional operations and rarely involved violence against passengers or crew. The hijacking of Ariana Airlines flight 305 in

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191.1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

February 2000 is considered to be in that category. The flight which originated in Afghanistan ended up in England, where 74 of the passengers requested political asylum.

During the 1990's, the conditions for terrorists' seizing a U.S. airliner were less favorable than in the previous two decades. Arrests of key members and cells, restraints placed by state sponsors, and the lack of safe haven airports--all may have contributed to the decline. However, in light of the successful Indian Airlines hijacking, we believe that the environment has changed and that the terrorist threat to U.S. airliners has increased. The emergence of Usama bin Laden and his relocation to Afghanistan may offer a new safe haven for future hijacked aircraft. The use of a safe haven is important for a sustained terrorist hijacking to be successful, because the plane can be held in a controlled environment. The hijacking of flight 814 was successful because of this. At no time did the hijackers appear to feel threatened while on the ground in Qandahar.

***

Slide 22

There's significant motivation for associates of bin Laden to conduct a terrorist hijacking. Successful intelligence and law enforcement operations around the world have led to the arrests and imprisonment of many individuals linked with his organization. Just in the United States alone we've jailed notable figures such as Ramzi Yousef and the Blind Sheik, as well as Mohammed al-Owahli and Mohammed Odeh for the Nairobi Embassy bombing. With the hijacking of Indian Airlines as a model, we're concerned that bin Laden's followers may look to duplicate that success by seizing a U.S. airliner to exchange hostages for the release of these prisoners and others.

***

Slide 23

This concern is not just based on idle speculation when viewed in light of events that began in Asia in the early part of 2000 and are continuing. In March, about 50 Filipino children and teachers were kidnapped on the island of Basilan in the Philippines y Islamic terrorists belonging to the Abu Sayyaf group, which is fighting to establish an independent homeland in the southern Philippines. In April, another faction of the group snatched 21 hostages, most of them foreign tourists, from a resort in Malaysia and took them to Jolo island in the Philippines. In May, the rebels on Basilan beheaded two of the hostages because their demands were not being met. The demands included the release of three terrorists, including Ramzi Yousef from jails in the United States. Some hostages are still being held and, on August 28, an American citizen was kidnapped by the group and threatened with death unless the United States frees Yousef.

A possible connection of Yousef to the Abu Sayyaf group goes back to 1994, when Yousef was in the Philippines plotting to bomb U.S. airliners. He tested one of his devices by placing it on Philippine Airlines flight 434 to Tokyo. It detonated en route,

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191.1 et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

killing one passenger and injuring six others. Curiously, an anonymous caller claimed that the Abu Sayyaf group was responsible for the attack. Although the group denied the claim, the current demand for Yousef's release in exchange for the hostages reinforces our concern about a future hijacking by other Islamic terrorists for the same purpose.

\*\*\*

Slide 24

Considering everything, we assess that a terrorist hijacking of a U.S. airliner is more likely to occur overseas than in the United States. A domestic hijacking would likely result in a greater number of American hostages, but would be operationally more difficult to accomplish. We don't rule it out, but two factors are not in the hijackers' favor. First, the terrorist support structure inside the United States is less developed than overseas, and second, if an aircraft is hijacked with the objective of flying it to a safe haven, it will probably need to be refueled. Planes flying in Europe, Africa and Asia could conceivably reach a safe haven without refueling.

If, however, the intent of the hijackers is not to exchange hostages for prisoners, but to commit suicide in a spectacular explosion, a domestic hijacking would probably be preferable. Fortunately, we have no indication that any group is currently thinking in that direction.

While FAA considers a suicide bombing of a U.S. airliner to be a low probability, a non-suicide bombing continues to be a major concern. For example, convicted members of the Manila plot to bomb U.S. airliners in Asia had links to bin Laden and members of that bombing conspiracy are still at large. Also, statements attributed to bin Laden following the U.S. missile attack on his camps specifically threatened to bring down and hijack U.S. and Israeli aircraft.

\*\*\*

Slide 25

The threats uncovered in connection with the millennium are troubling, especially the one in North America. The apparent alliance of members of the GIA with bin Laden is an unwelcome surprise. GIA members have never before targeted American interests outside Algeria and have never before attempted attacks in North America.

While the bin Laden network represents the most ominous terrorist threat we've ever faced, we've been fortunate so far that intensive law enforcement and intelligence efforts have interdicted or disrupted many operations. But personnel responsible for security can't become complacent. Bin Laden's recent lack of success is not the result of a lack of trying.

\*\*\*

FOR OFFICIAL USE ONLY                    1099551
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1st. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

Slide 26

One possible explanation for bin Laden's relative lack of success may lie in the structure of his network and his current method of operation. His organization, if you can call it that, is a loose affiliation of like-minded extremists held together by his money and the force of his personality. Although still deadly, it lacks the organizational structure, discipline and cohesiveness of the Middle Eastern terrorist groups of the 70's and 80's which were often trained by the intelligence services of state sponsors of terrorism. Those groups maintained a military-style hierarchy, with tight central control. Typically, the operational cells were small--usually averaging less than five members--and contact between cells was limited. Compartmentalization and secrecy were emphasized. In other words, they practiced operational security which made them difficult to detect.

In contrast, bin Laden's network is running terrorist operations in a much looser, less organized and less disciplined fashion. Just the sheer numbers involved in operations are unprecedented. In the plot in Jordan, there were 28 conspirators identified, and there may be more. In the East Africa bombings, 17 conspirators have been identified and indicted, and at least nine others have been named as having involvement in the crime. Including these suspects, more than 130 persons have been arrested worldwide since August of 1998. Involving that many people, especially some who may not be well-trained, leaves them vulnerable to identification and infiltration.

FAA believes that, sooner or later, the unwieldiness of the network he's created will become apparent to bin Laden, and he may seek help from some "experts" to bring order and security to his operations. Unfortunately there are already indications that this has happened. According to the Justice Department, bin Laden has forged alliances with representatives of the government of Iran and Hizballah with the goal of working together against the West.

\*\*\*

Slide 27
(Tenet video)

In February of this year (2001) CIA Director George Tenet summarized the current threat to U.S. interests in his testimony before Congress.

\*\*\*

Slide 28

In conclusion, it is the assessment of the FAA Office of Civil Aviation Security Intelligence that U.S. aviation targets could be selected by the terrorist organizations mentioned in this presentation. The recent counterterrorist successes against the bin Laden network probably saved many lives, but the tenacity displayed by his followers

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

leads us to believe that more attacks will be attempted. We cannot assume that intelligence and law enforcement efforts will intercept all of these attacks. A strong security posture must be maintained to deter or prevent them.

In closing, we would do well to keep in mind the words of a spokesman for the Irish Republican Army in 1984 following an unsuccessful attempt to assassinate Prime Minister Margaret Thatcher with a bomb: "Today we were unlucky. But remember, we only have to be lucky once--you will have to be lucky always."

\*\*\*

Slide 29

The preceding presentation was current as of September 2000. The following update reviews disturbing events that occurred in the Middle East in October.

On October 12th in Aden, Yemen, two men in a small boat executed a bombing attack against the USS Cole which was refueling there. The powerful explosion killed 17 sailors and injured 39 others. While no evidence linking bin Laden to this attack has been made public, Islamic extremists affiliated with him are high on the list of suspects.

Further raising the specter of additional terrorist attacks against U.S. interests are the events currently unfolding in Israel. On September 28th, Israeli Minister Ariel Sharon and a delegation of hard-line lawmakers visited a site in Jerusalem sacred to both Muslims and Jews. Sharon affirmed the Jewish claim to the site and his conviction that all of Jerusalem must remain under Israeli sovereignty. The next day violent clashes erupted between Palestinians and Israelis in Jerusalem and quickly spread to the West Bank and the Gaza Strip. Some Palestinian leaders have referred to the violence as an "intifada," the Arabic word for shaking, recalling the civil disorders which rocked the Occupied Territories from 1987 into the early 1990's. The impact of the violence on the Middle East peace process has been severe. The perception that the United States has always steadfastly supported Israel has been highlighted persistently throughout this crisis and could provide the motivation for a terrorist backlash against U.S. interests.

Additional updates to this presentation will be provided as appropriate.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191, et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

## WARNING

The following presentation is a product of the Office of Civil Aviation Security Intelligence of the Federal Aviation Administration. It is FOR OFFICIAL USE ONLY. It is exempt from public availability and is a record subject to the provisions of 14 CFR 191.1. Release of information contained herein is prohibited without the express written authority of the Associate Administrator for Civil Aviation Security.



### Federal Aviation Administration
#### Office of Civil Aviation Security Intelligence

*The Transnational Threat to Civil Aviation*



### Office of Civil Aviation Security Intelligence

*Note:*

Any adverse mention in the following presentation of individual members of any political, social, religious, or national group is not meant to imply that all members of that group are terrorists. Indeed, terrorists represent a small minority of dedicated, often fanatical, individuals in most such groups. It is those small groups - and their actions - that are the subject of the major points of this presentation.

### Office of Civil Aviation Security Intelligence



### Office of Civil Aviation Security



### Office of Civil Aviation Security Intelligence



- Iran...
  - Opposes Middle East Peace Process
  - Objects to US Military in Persian Gulf
  - Reformists vs. Hardliners

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191, et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released with the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.













FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released with the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



Office of Civil Aviation Security Intelligence

• U.S. Millennium Plot



Office of Civil Aviation Security Intelligence

• U.S. Millennium Plot



Office of Civil Aviation Security Intelligence

• U.S. Millennium Plot / International Ties
  • Hamid Aich
  • Mohambedou Ould Slahi



Office of Civil Aviation Security Intelligence



Office of Civil Aviation Security Intelligence

Armed Islamic Group



Office of Civil Aviation Security Intelligence

• Armed Islamic Group (GIA)
  • Primarily Targets Algerian/French Interests
  • Conspirators Were Freelancing for UBL

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191.1 et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
(ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



Office of Civil Aviation Security
Intelligence



Office of Civil Aviation Security
Intelligence
* Indian Airlines Flight 814
  * Nepal – India – Pakistan – United
    Arab Emirates – Afghanistan
  * One Passenger Killed



Office of Civil Aviation Security
Intelligence
* Indian Airlines Flight 814
  * Demanded Release of Prisoners
    and $200 million
  * India Capitulated
  * Hijackers Escaped



Office of Civil Aviation Security
Intelligence
* Harakat al-Mujaheddin (HUM)
  * Based in Pakistan
  * International Islamic Front
    for Jihad Against Crusaders
    and Jews



Office of Civil Aviation Security
Intelligence
* Terrorist Hijackings
  * Will There be More?
  * Will U.S. Airliners be Targeted?
  * New Safehavens



Office of Civil Aviation Security
Intelligence
* Hijacking Motivations
  * Free Incarcerated Terrorists
  * Overseas vs. Domestic

FOR OFFICIAL USE ONLY
WARNING NOTICE: This document contains sensitive information and is subject to the
provisions of 14 CFR 191.1 et. seq. No part of this document may be released without the
express written permission of the Associate Administrator for Civil Aviation Security
Washington, D.C.

FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

 Office of Civil Aviation Security
Intelligence

- Hostages in the Philippines
  - Abu Sayyaf Group Demands Yousef's Release
  - Philippine Airlines Bombing

  

Basilan    Jolo

 Office of Civil Aviation Security
Intelligence

- Hijacking Threat
  - Overseas vs. Domestic
  - Hostages vs. Flying Bomb

 

Indian Airliner - 1999    Air France - 1994

 Office of Civil Aviation Security
Intelligence

- Current Threat
  - Scope is Broadening
  - Failed Attempts Do Not Equate to Diminished Threat

  

 Office of Civil Aviation Security
Intelligence

- Future Threat
  - Learning From Mistakes
  - Dangerous Alliances

 

 Office of Civil Aviation Security
Intelligence

- CIA Director George Tenet:



Office of Civil Aviation
Security Intelligence of the
Federal Aviation Administration



Office of Civil Aviation Security
Intelligence

Deter and Prevent



FOR OFFICIAL USE ONLY

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

1940558

FOR OFFICIAL USE ONLY

**WARNING NOTICE:** This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.



### Continuing Conflict

- Intifada 2000
- USS Cole



Office of Civil Aviation Security
Intelligence

### *Note:*

Any adverse mention in the following presentation of individual members of any political, social, religious, or national group is not meant to imply that all members of that group are terrorists. Indeed, terrorists represent a small minority of dedicated, often fanatical, individuals in most such groups. It is those small groups - and their actions - that are the subject of the major points of this presentation.

Duplication Prohibited

Narration For McDonnell
Presentation Software Microsoft PowerPoint
Build 4.2
Date: March 22, 2001

FOR OFFICIAL USE ONLY                    1000559

WARNING NOTICE: This document contains sensitive information and is subject to the provisions of 14 CFR 191, 1et. seq. No part of this document may be released without the express written permission of the Associate Administrator for Civil Aviation Security (ACS-1), Federal Aviation Administration, Washington, D.C. 20591.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :

                                                  :

IN RE SEPTEMBER 11 LITIGATION      :    21 MC 101 (AKH)

                                                  :

                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

     1.     I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as the Aviation Defendants Liaison

Counsel in the September 11 Litigation pending before Judge Alvin K. Hellerstein in this

Court. I submit this Affidavit in accordance with 28 C.F.R. §§ 16.21 *et seq.*, in

connection with the Aviation Defendants' request to depose Kenneth Williams, a Special

Agent with the Federal Bureau of Investigation ("FBI") based in Phoenix, Arizona in

2001, who authored the so-called "Phoenix Memorandum" dated July 10, 2001

("Phoenix Memo") (attached as Ex. A) discussing his concern that al Qaeda was sending

operatives to study at civil aviation schools in the United States in order to create a cadre

of terrorists capable of attacking civil aviation.

2.      Plaintiffs in this litigation seek to impose billions of dollars in liability upon the Aviation Defendants for their alleged failure to detect and halt the terrorists who attacked the United States on September 11, 2001. Numerous property damage and business loss plaintiffs have brought claims against the Aviation Defendants for the destruction of real property and business interruption resulting from al Qaeda's attacks. The Aviation Defendants also are being sued by personal injury and wrongful death plaintiffs for injuries and fatalities caused by the terrorist attacks.

3.      Plaintiffs claim that the Aviation Defendants should have foreseen that al Qaeda posed a significant threat to civil aviation in 2001 and that the terrorists would hijack commercial airliners for the purpose of crashing them into ground targets. Plaintiffs further allege that based upon the available intelligence information concerning al Qaeda and Usama Bin Laden, the Aviation Defendants should have employed countermeasures designed to prevent such attacks. Plaintiffs claim, in effect, that the Aviation Defendants should have "done more and done better" than the aviation security measures required by the Federal Aviation Administration ("FAA") on September 11, 2001.

4.      The Aviation Defendants wish to depose Kenneth Williams because he investigated suspected al Qaeda supporters and Islamic extremists attending civil aviation schools in Phoenix, Arizona and authored the Phoenix Memo in July 2001. In the Phoenix Memo, Mr. Williams alerted FBI Headquarters and agents working on

2

international terrorism issues at the FBI's New York Field Office that he suspected that Usama Bin Laden had developed a strategy of sending operatives to study civil aviation in the United States with the intention of creating a cadre of terrorists capable of attacking civil aviation. *See* Ex. A, Phoenix Memo at 1-2; National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (2004) ("*9/11 Commission* Report") at 272, 520, n. 56. Mr. Williams reported that that he had identified a significant number of individuals of investigative interest to the FBI who were attending civil aviation schools in Arizona and that he knew of many al Qaeda associates who were either living in or had lived in Arizona, including Wadih El-Hague, who was convicted for his participation in al Qaeda's 1998 bombings of U.S. embassies in Africa. *See 9/11 Commission Report at* 272; Ex. A at 1, 6.

5.      Mr. Williams recommended in the Phoenix Memo that the FBI (i) develop liaisons with flight schools throughout the country, (ii) consider obtaining visa information on foreigners seeking to attend flight school in the United States; and (iii) commence a discussion about suspected terrorists attending civil aviation school within the broader intelligence community. Ex. A at 2. The Aviation Defendants believe that neither FBI Headquarters nor the FBI's New York office acted upon his recommendations before September 11, 2001. *See* Ex. B, Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001 ("JIC Report") at 22-23.

3

6.      The Aviation Defendants want to depose Mr. Williams in order to determine if the FBI's Phoenix Field Office either disseminated the Phoenix memo or otherwise alerted constituencies involved in civil aviation that the FBI was in possession of intelligence indicating that members of al Qaeda and/or Islamic extremists from the Middle East, Africa and the Indian subcontinent were attending civil aviation schools in the United States. Specifically, the Aviation Defendants want to question Mr. Williams concerning whether the Phoenix Memo or the intelligence described in it were disseminated prior to September 11, 2001 to: 1) any flight school or flight simulator facility; 2) the FAA liaison to the FBI; 3) the FAA; 4) the FBI's civil aviation program manager 5) the FBI agents investigating Zacarias Moussaoui; or 6) any Aviation Defendant. Furthermore, the Aviation Defendants want to question Mr. Williams about what steps, if any, that the FBI took before September 11, 2001 to implement the recommendations listed in the Phoenix Memo.

7.      The Aviation Defendants also want to inquire if before September 11, 2001 the FBI's Phoenix Field Office received or disseminated any information about Hani Hanjour, the hijacker-pilot of American Airlines Flight 77, whom the Aviation Defendants believe received flight training in Arizona. *See 9/11 Commission Report* at 225-26. The Aviation Defendants plan to question Mr. Williams concerning whether the FBI's Phoenix Field Office provided any intelligence information on Hani Hanjour to: 1) the FAA; 2) any flight school or flight simulator facility; or 3) any Aviation Defendant before September 11, 2001. The Aviation Defendants also want to ask Mr. Williams if

4

the FBI's Phoenix Field Office received any communications before September 11, 2001 regarding Hanjour from FBI inspector, John Anthony, any other FAA employee or official, or any representative of a flight school or flight simulator facility.

8.      Additionally, the Aviation Defendants want to question Mr. Williams concerning whether, before September 11, 2001, the staff of any flight school or flight simulator facility contacted the FBI's Phoenix Field Office to raise concerns about one of their students or patrons.  Similarly, the Aviation Defendants also plan to ask Mr. Williams if, before September 11, 2001, any FAA employee or official contacted the FBI's Phoenix Field Office regarding information that the FAA had indicating that members of al Qaeda or other Islamic extremists were attending civil aviation schools in the United States.

9.      Mr. Williams' testimony is directly relevant to September 11 Litigation because it, together with evidence gathered from other sources, will shed light on the terrorists' intent, likely means of attack, and capabilities – as well as the extent to which the FBI shared this information with the FAA and the Aviation Defendants before September 11, 2001.  This evidence is probative of the issues of causation, the foreseeability of the September 11 attacks, and the availability of a derivative immunity defense to the Aviation Defendants.

10.     For example, evidence of intelligence information possessed by the FBI regarding the threat posed by al Qaeda and Islamic extremists is relevant to the issue of

5

causation.  The Aviation Defendants intend to demonstrate that the terrorists' criminal

conduct was the supervening cause of the September 11 attacks and plaintiffs' alleged

damages.  The Aviation Defendants also intend to present evidence that the intelligence

information that the FBI had before September 11, 2001 regarding the threat posed by al

Qaeda or other Islamic extremists to domestic civil aviation was not shared with the FAA

or the Aviation Defendants.  Weighing this evidence together with the evidence of the

terrorists' intentional criminal acts, the jury in the September 11 Litigation would be

entitled to conclude that the Aviation Defendants should not be held liable because their

conduct was not a substantial cause of plaintiffs' alleged damages.  *See* Restatement

(Second) of Torts § 433(a) (explaining that the combination of multiple contributing

factors may "so dilute the effects of the actor's negligence as to prevent it from being a

substantial factor").

11.    Additionally, evidence of the pre-9/11 intelligence information the FBI

had on the terrorist threat will help rebut any allegation that the Aviation Defendants

should have foreseen the terrorist attacks based upon a general awareness of al Qaeda's

hatred for the United States.  The Aviation Defendants intend to establish that any

intelligence information that the FBI had regarding the terrorist threat to civil aviation

before September 11, 2001 did not result in the agency recommending that the FAA

implement the kind of specific security measures that plaintiffs now claim in hindsight

were appropriate on September 11, 2001.  The jury should be permitted to consider that if

the FBI did not foresee that al Qaeda would launch unprecedented suicide attacks on

September 11, 2001, despite having access to significantly more intelligence information

than the Aviation Defendants, then the Aviation Defendants could not have been

expected to foresee the same threat. *See Eiseman v. State*, 70 N.Y.2d 175, 191 (1987)

(college not required to anticipate criminal behavior of student who was a parolee

because that would unfairly "hold college to a higher degree than society's experts in

making such predictions – the correction and parole officers").

       12.      Furthermore, the information known to the federal intelligence agencies

and the FAA before September 11, 2001 is relevant to determining whether the Aviation

Defendants have derivative immunity from liability under the discretionary function

exception of the Federal Tort Claims Act. The Court of Appeals for the Second Circuit

has strongly suggested that this is a defense available to the Aviation Defendants. *See In

re World Trade Ctr. Disaster Site Litig.*, No. 06-5324, 2008 U.S. App. LEXIS 622 (2d

Cir. Mar. 26, 2008). To establish their immunity to plaintiffs' claims for damages, the

Aviation Defendants must show that they "were not aware of dangers about which [the

federal agencies were] unaware." *Id.* at *76. In effect, defendants must establish that

they had no greater knowledge of the terrorist threat than the agencies statutorily charged

with threat assessment, including the FBI. The Aviation Defendants cannot make such a

comparison without being able to present the pre-September 11 intelligence that the FBI

had on the terrorist threat.

13.    The Aviation Defendants submit that Mr. Williams' testimony is clearly
appropriate when all the factors listed in 28 C.F.R. § 16.26 are taken into consideration.
Because Mr. Williams has been widely cited as an authority in *The 9/11 Commission
Report* (2004) (which cites him by name) and the JIC Report (which describes him only
as the author of the Phoenix Memo) concerning the topics about which the Aviation
Defendants seek to depose him, his testimony is unlikely to implicate any privilege issues
or protected information.  The Aviation Defendants are not seeking classified national
security information and expect that counsel for the FBI will instruct Mr. Williams not to
answer any questions that threaten to elicit such information.  Additionally, because Mr.
Williams' testimony will be relevant to the parties' claims and defenses in this litigation,
the testimony is appropriate under the Federal Rules of Civil Procedure.  *See* Fed. R. Civ.
P. Rule 26(b)(1).

14.    By contrast, a refusal to permit Mr. Williams deposition would deprive the
Aviation Defendants of evidence that is important to their defense of the serious
allegations made against them in this litigation.  The Aviation Defendants are defending
against allegations that they were responsible for gathering and assessing information
regarding the threat of a terrorist attack and for designing appropriate countermeasures.
The Aviation Defendants contend that their role consisted of implementing the security
measures mandated by the FAA based on threat assessments made by the FAA and the
federal intelligence community, including the FBI.  *See, e.g.,*  Domestic Air
Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of

8

the Federal Aviation Administration and the Director of the Federal Bureau of

Investigation jointly shall assess current and potential threats to the domestic air

transportation system.").

_____
DESMOND T. BARRY, JR.

Sworn to before me this
5th day of May 2008

_____
Notary Public

TINA M. ZOCCALI
Notary Public, State of New York
No. 01ZO6059025
Qualified in Rockland County
Commission Expires May 21, 20 __11__

9

# Exhibit A

(Rev. 08-28-2000)



# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 07/10/2001

**To:** Counterterrorism          **Attn:** RFU
                                          SSA David Frasca
                                          IRS Elizabeth Harvey Matson
                                          UBL Unit
                                          SSA Rodney Middelton
                                          IRS Jennifer Maitner
                                          IRS Mark Connor
                                          IRS Fred Stremmel
            New York                      I-46
                                          SSA Jack Cloonan
                                          SA Michael S. Butsch

**From:** Phoenix
          Squad16
          **Contact:** SA Kenneth J. Williams ▓▓▓▓▓▓▓▓▓▓▓

**Approved By:** Kurtz William A

**Drafted By:** Williams Kenneth J

**Case ID #:** ▓▓▓▓▓▓▓▓▓▓▓▓▓ (Pending)

**Title:** ▓▓ ZAKARIA MUSTAPHA SOUBRA;
           IT-OTHER (ISLAMIC ARMY OF THE CAUCASUS)

**Synopsis:** ▓▓ UBL and AL-MUHAJIROUN supporters attending civil
aviation universities/colleges in the State of Arizona.

▓▓  ▓▓▓▓▓▓▓▓▓▓

▓▓ **Full Field Investigation Instituted:** 04/17/2000 (NONUSPER)

**Details:** ▓▓ The purpose of this communication is to advise the
Bureau and New York of the possibility of a coordinated effort by
USAMA BIN LADEN (UBL) to send students to the United States to attend
civil aviation universities and colleges. Phoenix has observed an
inordinate number of individuals of investigative interest who are
attending or who have attended civil aviation universities and
colleges in the State of Arizona. The inordinate number of these
individuals attending these type of schools and fatwas issued by AL-

Declassified by: UC, CTLU 1, NSLB,
OGC, FBI

rw: 02/0/06

To: Counterterrorism  From: Phoenix
Re: ██████████████, 07/10/2001

MUHJIROUN spiritual leader SHEIKH OMAR BAKRI MOHAMMED FOSTOK, an ardent supporter of UBL, gives reason to believe that a coordinated effort is underway to establish a cadre of individuals who will one day be working in the civil aviation community around the world. These individuals will be in a position in the future to conduct terror activity against civil aviation targets.

██ Phoenix believes that the FBI should accumulate a listing of civil aviation universities/colleges around the country. FBI field offices with these types of schools in their area should establish appropriate liaison. FBIHQ should discuss this matter with other elements of the U.S. intelligence community and task the community for any information that supports Phoenix's suspicions. FBIHQ should consider seeking the necessary authority to obtain visa information from the USDOS on individuals obtaining visas to attend these types of schools and notify the appropriate FBI field office when these individuals are scheduled to arrive in their area of responsibility.

██ Phoenix has drawn the above conclusion from several Phoenix investigations to include captioned investigation and the following investigations: ████████████████, a Saudi Arabian national and two Algerian Islamic extremists ██████████ ██████ and ██████

██ Investigation of ZAKARIA MUSTAPHA SOUBRA was initiated as the result of information provided by ███████ a source who has provided reliable information in the past. The source reported during April 2000 that SOUBRA was a supporter of UBL and the ████████ ████ AL-MUHJIROUN. SOUBRA arrived in Arizona from London, England on 08/27/1999 on an F-1 student visa to attend EMBRY RIDDLE UNIVERSITY (ERU), Prescott, Arizona. ERU only teaches courses related to the field of aviation. SOUBRA is an Aeronautical Engineering student at ERU and has been taking courses in "International security" relating to aviation. SOUBRA, within weeks of his arrival at Prescott, Arizona, ████████████████████ supporting UBL, at Mosques located throughout Arizona. SOUBRA has also organized anti United States and Israeli demonstrations in the area of ARIZONA STATE UNIVERSITY (ASU), Tempe, Arizona. He has also established and organized an Islamic student association on the ERU campus organizing the Muslim student population on the ERU campus.

██ Phoenix has identified several associates of SOUBRA at ERU who arrived at the university around the same time that he did. These individuals are Sunni Muslims who have the same radical fundamentalists views as SOUBRA. They come from Kenya, Pakistan,

2    M-HQI-88000177
2 OF 8

▬▬▬

To: Counterterrorism  From: Phoenix
Re: ▬▬▬▬▬▬▬, 07/10/2001

United Arab Emirates, India, Saudi Arabia and Jordan. SOUBRA's
associates are:

▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬, a Saudi Arabian national ▬▬▬▬▬▬▬
▬▬▬▬▬. ▬▬▬▬▬ is enrolled in the ERU Pilot Training
program.

▬▬ ▬▬▬▬▬▬, a Kenyan who traveled to the U.S. on
▬▬▬▬▬ passport ▬▬▬▬▬, ▬▬▬▬▬▬▬▬▬. ▬▬▬ is
enrolled in the ERU Pilot Training program.

▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬, an Indian who traveled to the U.S. on
▬▬▬▬▬ passport ▬▬▬▬▬▬
▬▬▬▬ is enrolled in the ERU Aeronautical Engineering program.

▬▬▬▬▬▬ ▬▬▬▬▬▬▬, Saudi Arabian who traveled to the U.S.
on ▬▬▬▬▬ passport ▬▬▬▬▬▬, ▬▬▬▬▬▬▬▬.
▬▬▬▬▬ is enrolled in the ERU Pilot Training program.

▬▬▬▬▬▬▬▬▬▬, a Jordanian (possible Palestinian)
who traveled to the U.S. on ▬▬▬▬▬▬▬▬, ▬▬▬▬▬▬
▬▬▬▬. ▬▬▬▬▬▬ is enrolled in the ERU Aeronautical
Engineering program.

▬▬▬ ▬▬▬▬▬▬▬, a Pakistani who traveled to the U.S. on
▬▬ passport ▬▬▬▬▬▬▬. It is currently
unknown what ▬▬▬▬▬ field of study is.

▬▬▬▬▬▬, it is unknown at the time of this
writing where ▬▬▬▬ is from, ▬▬▬▬▬▬. ▬▬▬ is
enrolled in the ERU Aeronautical Engineering program.

▬▬ The above individuals are involved with SOUBRA and
regularly participate in meetings with him in Prescott, Arizona.

▬▬ FBIHQ, IRS Elizabeth Matson, RFU, wrote an analytical
paper on the AL-MUHAJIROUN, dated 11/09/1999, in support of FBINY
investigation captioned; ▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬. IRS Matson's research paper
can be found in ▬▬▬▬▬▬▬▬▬. The following information
was gleaned from IRS Matson's research paper.

▬▬ The AL-MUHAJIROUN, which in English means THE
EMIGRANTS, is a Sunni Muslim fundamentalist organization based in the
United Kingdom. The organization's spiritual leader is SHEIKH OMAR
BAKRI MOHAMMED FOSTOK. The organization is dedicated to the overthrow

▬▬▬▬

To:  Counterterrorism  From:  Phoenix
Re:  ███████████████, 07/10/2001

of Western society. British officials have reported that FOSTOK first
came to their attention during the Gulf War after calling for the
assassination of British Prime Minister John Major. FOSTOK has
connections to UBL, JAMMAT AL-MUSLIMIAN (JM), HAMAS, HIZBALLAH and
the ALGERIAN SALVATION FRONT.

███ FOSTOK has made several controversial statements to
the press. For example, he stated in public interviews that the
bombings of the United States Embassies in Africa were "legitimate
targets."

███ FOSTOK, while representing the AL-MUHAJIROUN, signed a
fatwa (religious decree) during February 1998 which stated the
following:

" The Fatwa is jihad against the U.S. and British
government, armies, interests, airports (emphasis added by FBI
Phoenix), and instructions and it has been given because of the U.S.
and British aggression against Muslims and the Muslim land of
Iraq...we...confirm that the only Islamic Fatwa against this explicit
aggression is Jihad. Therefore the message for the British
governments or any other government of non-Muslim countries is to
stay away from Iraq, Palestine, Pakistan, Arabia, etc...or face full
scale war of Jihad which it is the responsibility and the duty of
every Muslim around the world to participate in...We...call
upon...Muslims around the world including Muslims in the USA and in
Britian to confront by all means whether verbally, financially,
politically or militarily the U.S. and British aggression and do
their Islamic duty in relieving the Iraqi people from the unjust
sanctions."

███ SOUBRA was interviewed by FBI Phoenix on 04/07/2000
and 05/11/2000 at his residence. On 04/07/2000, interviewing Agents
observed photocopied photographs of UBL, IBN KHATTAB and wounded
Chechnyan Mujahadin tacked to his livingroom wall. SOUBRA admitted to
███████████████████████████ in the State of Arizona.
SOUBRA stated that he considers the United States Government and U.S.
Military forces in the Gulf as "legitimate military targets of
Islam." He also stated that the targeting of the U.S. Embassies in
Africa was "legitimate." SOUBRA denied having received any military
training. However, Phoenix believes that SOUBRA was being less than
truthful in this regard. SOUBRA was defiant towards interviewing
Agents and it was clear that he was not intimidated by the FBI
presence. It is obvious that he is a hardcore Islamic extremist who
views the U.S. as an enemy of Islam. Investigation of SOUBRA is
continuing.

SECRET

TO:  **Counterterrorism**  From:  Phoenix
Re:  ███████████████  07/10/2001



██  Phoenix investigation of ████████████████████
was predicated upon information received during

██  According to ███████████, a

On 06███/2001, ████████████████
████████ arrested two individuals who admitted under
interrogation to being members of UBL's AL-QA'IDA organization.
Evidence was developed demonstrating that these individuals were
planning an operation to bomb the U.S. Embassy and U.S. Military
forces in Saudi Arabia. A ████████ passport ███████████ in the name of

To: Counterterrorism From: Phoenix
Re: ███████████████, 07/10/2001

███ within their possession ███

      ███ Phoenix has not been able to show a direct association
between ███ and ███ had departed the U.S. prior
to ███ arrival. However, both ███ and ███ have
associated with the ███████████████████
███ Arizona and it is highly probable that they know people in
common.

      ███ Investigations of ███████████████ and
███████████ were predicated on information
received from the ███████████ demonstrating that
both subjects were involved with ███████████
activity. Both individuals also have association(s) with individuals
associated with ███████████ who lived in Phoenix from
the mid 1990s - 1997 left the United States after graduating from
███████████
has been identified as a friend of both ███ and ███ .
███████████ a known supporter of the ███
███ Phoenix has not developed any information linking these
███ with the other subjects referenced in this communication.

      ███ Phoenix believes that it is more than a coincidence
that subjects who are supporters of UBL are attending civil aviation
universities/colleges in the State of Arizona. As receiving offices
are aware, Phoenix has had significant UBL associates/operatives
living in the State of Arizona and conducting activity in support of
UBL. WADIH EL-HAGE, a UBL lieutenant recently convicted for his role
in the 1998 bombings of U.S. Embassies in Africa, lived in Tucson,
Arizona for several years during the 1980s. ESSAM AL-RIDI, a personal
pilot for UBL, traveled to Tucson, Arizona during 1993 at the
direction of AL-HAGE to procure a T-39 jet aircraft for UBL's
personal use. ███████████

      ███ Phoenix believes that it is highly probable that UBL has an
established support network in place in Arizona. This network was
most likely established during the time period that EL-HAGE lived in
Arizona.

To:  Counterterrorism  From:  Phoenix
Re:  ██████████████, 07/10/2001


███  This information is being provided to receiving
offices for information , analysis and comments.

To: Counterterrorism  From: Phoenix
Re: ███████████████, 07/10/2001

LEAD(s):

Set Lead 1:

   COUNTERTERRORISM

      AT WASHINGTON, DC

         ██ The RFU/UBLU is requested to consider implementing
the suggested actions put forth by Phoenix at the beginning of this
communication.

Set Lead 2:

   NEW YORK

      AT NEW YORK, NEW YORK

         ██  Read and Clear

M-HQI-88000177
8 OF 8

# Exhibit B

S. Rept. No. 107- 351        107TH Congress, 2d Session        H. Rept. No. 107-792

## JOINT INQUIRY INTO
## INTELLIGENCE COMMUNITY ACTIVITIES
## BEFORE AND AFTER THE TERRORIST ATTACKS OF
## SEPTEMBER 11, 2001

# REPORT

### OF THE

## U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

### AND

## U.S. HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

TOGETHER WITH ADDITIONAL VIEWS

DECEMBER 2002

TOP SECRET

Hanjour. [This individual] left the United States in April 2000 and returned in June 2001, remaining in the United States for approximately one month. The FBI now speculates that [the individual] may have returned to the United States either to evaluate Hanjour's flying skills, or to provide Hanjour with his final training on the flight simulator before the September 11 attacks. [The individual] was an experienced flight instructor who was certified to fly Boeing 737s.

The FBI also has determined since September 11, 2001 that another individual mentioned in the Phoenix communication – [————————————] -- is also connected to the al-Qa'ida network. [————————] was arrested at an al-Qa'ida safehouse in Pakistan in 2002 along with [————————], one of the most prominent al-Qa'ida facilitators.

### The FBI Investigation of Zacarias Moussaoui

**5.f. In August 2001, the FBI's Minneapolis field office, in conjunction with the INS, detained Zacarias Moussaoui, a French national who had enrolled in flight training in Minnesota. FBI agents there also suspected that Moussaoui was involved in a hijacking plot. FBI Headquarters attorneys determined that there was not probable cause to obtain a court order to search Moussaoui's belongings under the Foreign Intelligence Surveillance Act (FISA). However, personnel at FBI Headquarters, including the Radical Fundamentalist Unit and the National Security Law Unit, as well as agents in the Minneapolis field office, misunderstood the legal standard for obtaining an order under FISA. As a result, FBI Minneapolis field office personnel wasted valuable investigative resources trying to connect the Chechen rebels to al-Qa'ida. Finally, no one at the FBI apparently connected the Moussaoui investigation with the heightened threat environment [page 24] in the summer of 2001, the Phoenix communication, or the entry of al-Mihdhar and al-Hazmi into the United States.**

<u>Discussion</u>: On February 23, 2001, Moussaoui entered the United States at Chicago's O'Hare Airport, traveling on a French passport that allowed him to stay in the country without a visa for 90 days, until May 22, 2001. On August 11, 2001, Moussaoui and his roommate arrived in Eagan, Minnesota to begin classes at Pan Am, a flight school that offered training on a Boeing 747 flight simulator used by professional pilots.

TOP SECRET

According to FBI documents, on August 15, an employee at Pan Am called the FBI's Minneapolis field office because he and other employees were suspicious of Moussaoui, who met none of the usual qualifications for Pan Am students. The FBI's Minneapolis field office opened an international terrorism investigation and determined that, since Moussaoui had been authorized to stay in the United States only until May 22, 2001, he was no longer in proper legal status.

On the same day the Minneapolis field office learned about Moussaoui, it asked both the CIA and the FBI's legal attaché in Paris for any information about Moussaoui and informed FBI Headquarters of the investigation. The FBI Headquarters agent who was responsible for the contact suggested that the Minneapolis field office put Moussaoui under surveillance. However, a Minneapolis field office supervisory agent testified to the Joint Inquiry that:

> . . . .[m]y background in the criminal arena suggests that when a violation occurs and you can stop further or potential criminal activity, you act on that. So that is exactly what I instructed the agents to do. . . . Because I didn't want him to get any additional time on a flight simulator that would allow him to have the knowledge that we could no longer take back from him to operate an aircraft.

INS agents took Moussaoui into custody on August 16 because his authority to stay in the United States had expired. Moussaoui declined to consent to a search of his belongings. On Saturday, August 18, the Minneapolis field office sent a detailed memorandum to an agent in the Radical Fundamentalist Unit (RFU) at FBI Headquarters describing the investigation.

[Page 25]

The memorandum stated that Moussaoui had two knives, padded gloves and shin guards in his possession when he was arrested; had told his roommate that "true Muslims must prepare themselves to fight;" and had begun exercise and martial arts training. In addition, the memorandum stated that the Minneapolis field office believed that Moussaoui and his roommate were part of a larger international radical fundamentalist group. Based on Moussaoui's "possession of weapons and his preparation through physical training for violent confrontation," the Minneapolis filed office stated it had reason to believe that Moussaoui, his roommate, "and others yet unknown," were conspiring to seize control of an airplane.

TOP SECRET