# EXHIBIT 14



# Troubled Passage

The Federal Aviation Administration During the Nixon-Ford Term 1973-1977

U.S. Department of Transportation
Federal Aviation Administration

# TROUBLED PASSAGE

The Federal Aviation Administration
During the Nixon-Ford Term
1973-1977

by
Edmund Preston

U.S. DEPARTMENT OF TRANSPORTATION
Federal Aviation Administration
Washington, D.C.
1987

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

XC   050923

Library of Congress Cataloging-in-Publication Data

Preston, Edmund, 1941–
  Troubled passage.
  Bibliography: p. 267
  Includes index.
  1. United States. Federal Aviation Administration.
  2. Aeronautics, Commercial—Government policy—
United States—History.   I. Title.
HE9803.A35P74   1987   353.0087'77   87-25500

## Books in this Series

Nick A. Komons, *Bonfires to Beacons: Federal Civil Aviation Policy Under the Air Commerce Act, 1926-1938*

John R. M. Wilson, *Turbulence Aloft: The Civil Aeronautics Administration Amid Wars and Rumors of Wars, 1938-1953*

Stuart I. Rochester, *Takeoff at Mid-Century: Federal Civil Aviation Policy in the Eisenhower Years, 1953-1961*

Richard J. Kent, Jr., *Safe, Separated, and Soaring: A History of Federal Civil Aviation Policy, 1961-1972*

Edmund Preston, *Troubled Passage: The Federal Aviation Administration During the Nixon-Ford Term, 1973-1977*

## Foreword

In many ways the late 1960's were not kind to the Federal Aviation Administration. Budgets flagged, labor rebelled, hijackings occurred with disturbing regularity. By January 1973, however, when Richard M. Nixon took the presidential oath a second time, the men and women of the Federal Aviation Administration had every reason to believe that the travail of the previous eight years was behind them. Indeed, there was every expectation that better days lay ahead for the agency.

The Vietnam War was coming to an end and, as a Brookings study noted, was no longer a major factor either in the national or the defense budget. That meant precious resources that had previously been drained away by the conflict could now go to domestic programs. For FAA, the Airport and Airway Development and Revenue Acts of 1970 promised a steady stream of funds with which to finance overdue airport development and a technologically advanced third generation air traffic control system. A contentious labor union had been put to route in 1970; chastened and under new and more moderate leadership, it promised to turn over a new leaf. Even aerial hijacking, after resisting solution for nearly a decade, was giving signs of tractability.

To lead the FAA during his second term, the President chose Alexander P. Butterfield, a White House aide during the previous four years. That meant an unexpected and unwanted departure for John Shaffer, who had been a popular Administrator with FAA's rank and file. But many an agency member could see benefits in Butterfield's selection. Since becoming a part of the Department of Transportation, in 1967, FAA had keenly felt the loss of its independence. Its best interests, the agency believed, were being frustrated by the needless meddling of departmental officials obsessed

XC   050924

## 2. The Quest for Security

While Butterfield worked to restructure FAA, he also presided over a period of swift change in the agency's ongoing war against air piracy. He came on the scene just as two positive developments were reaching fruition: an antihijacking agreement with Cuba, and a profound shift in domestic policy toward the problem. Butterfield approved and supported this new strategy. In contrast to some other major agency concerns, however, he limited his personal involvement and delegated broad authority to his professional staff.[1]

The security issue nevertheless involved Butterfield in a sharp skirmish with the Office of the Secretary over his prerogatives as Administrator. Aside from this incident, FAA during this period worked in reasonable harmony with its parent organization and other agencies to implement a dramatic improvement in airport security. The new system entailed serious costs. It proved an overwhelming success, however, and the United States tried to bring other nations to adopt a similar approach. To understand the stakes at issue, it is necessary to review the origins and development of the hijacking phenomenon.

### II

The first sustained series of aerial hijackings on record began in 1947 as a means of flight from Soviet-dominated Eastern Europe. Another series occurred when Cubans opposed to Fidel Castro's revolution commandeered aircraft for escape, usually to the United States. In 1961, the flow was reversed with a flurry of Cuba-bound flights. After a lull of several years, hijacking in America reached its greatest intensity in late 1968 and early 1969. Though Havana

35

remained a favorite destination, persons of Latin origin were soon a minority among hijackers. Those attracted to air piracy fell generally into three overlapping categories: criminals, social-political malcontents, and the mentally disturbed. Outside the United States, terrorist groups adapted hijacking to their aims. In September 1970, Palestinians diverted four airliners to the Middle East, then evacuated and destroyed them. Two of the aircraft lost were American. At home, the crime entered a new phase in November 1971 when a man using the name of Cooper parachuted from a Boeing 727 with a large ransom gained by threatening to detonate a bomb. The exploit inspired an unsuccessful but highly dangerous series of extortion attempts.[2]

On the domestic level, official response to the hijacking problem included two sometimes conflicting modes: traditional law enforcement and an innovative multi-disciplinary approach. Passage of a Federal law providing tough penalties for the crime was an important factor in curbing the initial outbreak in 1961. In the longer term, however, the deterrent value of the law was limited by the fact that its sanctions had little effect upon the seriously deranged or those who succeeded in reaching asylum in Cuba. One result of the hijacking epidemic that peaked in early 1969 was the creation of an FAA Task Force of experts in psychology, medicine, security, law and other fields. Its chief contribution was the development of a system based upon the use of a behavioral profile to identify for special examination those passengers most likely to be potential hijackers. Airlines that voluntarily applied this technique found it very helpful in reducing the number of incidents. Following the dissolution of the Task Force in 1970, however, policy shifted for a time toward more conventional methods. In the wake of the Arab hijackings in September, the Nixon Administration implemented a new plan that placed Federal officers known as sky marshals aboard selected airline flights. Whether this highly publicized program had any deterrent effect is debatable, but its result was nil in terms of hijackers foiled or arrested. It became obvious that sky marshals could offer little protection because resistance aloft involved too great a hazard. By early 1972, emphasis was turning again toward preventive measures on the ground. FAA ordered airlines to screen all passengers by using the profile or other

means acceptable to the Administrator. On August 1, air carriers were required to deny boarding to any selectees not cleared by metal detectors or physical search. Sky marshals no longer rode airliners on a routine basis, but instead helped to support law enforcement at terminals. The force was gradually scaled down as more local officers assumed this duty.[3]

Paralleling the debate on the best means of deterring air piracy was the issue of response to hijackings in progress. While the aircraft remained on the ground, forceful intervention was sometimes possible. One of the earliest American hijackings was foiled when the Border Patrol disabled the aircraft with gunfire. Such procedures entailed great risks, however, especially when used against insane or ruthless hijackers. Fearful for their property and customers' lives, airlines were generally inclined to meet the perpetrator's demands. J. Edgar Hoover, redoubtable chief of the Federal Bureau of Investigation, preferred a hard-nosed approach. The issue received wide publicity in 1969 when a young Marine named Raffaele Minichiello forced a TWA jet to fly to Italy. When the captain complained that FBI actions had endangered his aircraft, Hoover allegedly retaliated by revealing data about the pilot's military record and ordering his agents not to ride on TWA flights.[4]

Closely related to this question was that of operational jurisdiction over hijackings. Incidents were managed through informal cooperation between departments until a violent episode in June 1970 showed the need for a definite delineation of authority. Unable to meet the irrational demands of a hijacker at Dulles International Airport, FAA used its own airport police to shoot out the tires of a TWA 727. The FBI then subdued the hijacker. The Bureau's intervention was reportedly delayed by Director Hoover, who was still angry at the airline because of the Minichiello affair. The drama at Dulles led to a memorandum of understanding concluded on September 25 between the Departments of Justice and Transportation. The FBI was given control while the hijacked aircraft was on the ground. While in flight, the pilot retained command, and FAA's recommendations to him had precedence.[5] This arrangement was refined in December 1971, when another agreement assigned the pilot responsibility to signal that the aircraft should be disabled or stormed.[6]

In the international arena, the United States pressed for multilateral action against aerial crime. The main forum for this effort was the International Civil Aviation Organization (ICAO), an agency of the United Nations. By 1971, ICAO had adopted a series of conventions that obligated signatory states to assist hijacking victims and to extradite or punish the perpetrators. Not all ICAO members adhered to these pacts, however, and their weaknesses included a lack of enforcement provisions. A crucial problem was the tendency of hijackers to claim that their motive had been to flee oppression. After much soul-searching, policy makers in Washington concluded that the gravity of this modern offense outweighed the historic right of asylum. The United States therefore called for compulsory extradition. This position was rejected by the great majority of nations—including Cuba, the most popular destination for hijackers. Remembering that the yanquis had sheltered an earlier wave of Cuban hijackers, Castro may have viewed their campaign against havens as hypocritical. Nevertheless, his island's continuing reputation as a mecca for criminals was an obvious liability. In November 1969, Cuba announced its willingness to conclude a bilateral agreement on air piracy. Although the State Department believed that the Cubans' interest in such a pact faded during the next sixteen months, their treatment of hijackers was inhospitable during this period. At the suggestion of the FAA Task Force, the State Department reinforced the Castro regime's disillusionment by providing information on the criminals' often unsavory backgrounds.[7]

### III

In the autumn of 1972, two unusually violent incidents brought the hijacking problem to a head. In October, four men wanted for murder and bank robbery killed a ticket agent and made their way to Havana aboard an Eastern 727. This crime was soon overshadowed by an even more sensational event in the following month, when three fugitives seized a Southern Airways DC-9 and embarked on a harrowing journey. They made eight landings, collected ransom, and threatened to crash the aircraft into a nuclear facility. Security officials, meanwhile, became increasingly frustrated as

opportunities to stop the flight eluded them. After 28 hours, the FBI decided to shoot the tires, a surprisingly difficult method of immobilizing an airliner. The tactic enraged the hijackers, who reacted by wounding the copilot and forcing the damaged DC-9 into the air. Miraculously, the pilot managed to take off and land safely in Havana.[8]

These ugly episodes broke the diplomatic impasse. Castro embraced and congratulated the Southern pilot while jailing the hijackers. In reply to an American extradition request, Cuban authorities spoke of the need for an accord to attack the basic problem of air piracy. By mid-February 1973, the two nations had concluded an agreement. Under pressure from pilots and Congress to achieve a breakthrough, the State Department made certain concessions to Castro's point of view: the pact applied to those who commandeered vessels as well as aircraft, and included America's promise to enforce strictly its laws against armed expeditions aimed at Cuba. The key provision was a commitment to return or prosecute hijackers. Asked which option Cuba was likely to choose, a State Department spokesman predicted prosecution. This was the less desirable alternative, for extradition was believed to be a much stronger deterrent. Nevertheless, FAA officials judged that the pact gave a tremendous boost to their struggle against hijacking.[9]

The trend toward violence had an even more far-reaching effect on air transportation security at home. Following the Southern hijacking, President Nixon instructed Egil Krogh to coordinate development of a program to end such crimes. The result was an FAA Emergency Order issued on December 5, 1972. Airlines were given one month to implement electronic search of all passengers and inspection of their carry-on baggage. Operators of air carrier terminals were required to station armed guards at the boarding checkpoints within 60 days.[10] This measure carried the antihijacking campaign beyond the debate on behavioral versus traditional methods, and toward a broad preventive effort with little precedent in American life. On January 5, the onset of universal scrutiny by metal detectors caused some flight delays but no major disruption. The "magnetometers" were triggered by items ranging from coins to arch supports, old shrapnel wounds, and silverware filched from airport restaurants. Such incidents produced some complaints but

apparently no widespread resentment. "Today it is a novelty," commented the manager at O'Hare International. "A month from now the passengers are going to rebel at being treated like seals."[11]



*Airport searches traded convenience for security*

Airport operators put up a strong resistance to the second phase of the security program. The requirement to furnish armed guards was particularly onerous for small communities with limited law enforcement capabilities, and even large hubs had difficulty in finding enough qualified personnel. The problem was complicated by local jurisdictional disputes, and by the fact that the linear designs of many airports made them difficult to secure. Calling the regulation "unrealistic, uncoordinated, ill-conceived and probably illegal," the Airport Operators Council International petitioned FAA for a six-month extension and brought suit when this was rejected. After delaying the compliance deadline for a week, a Fed-

eral judge decided that the hijacking situation justified the emergency rulemaking. An appeals court upheld this view, but stipulated that the FAA Administrator keep Federal officers on duty where he determined airport authorities were not yet able to replace them.[12]

Both the airline and airport segments of the industry were united in their belief that providing antihijacking guards was a responsibility of the central government. The Senate had supported this thesis in September 1972, when it voted overwhelmingly for a new FAA force to back up electronic search of all passengers. The Nixon Administration, however, had managed to block this concept in the House. The Emergency Order itself was perhaps partly an attempt to preempt a revival of such legislation. While the Administration was concerned about the cost of the new force, it also had a philosophical objection. Unlike the earlier sky marshal program, this plan would mean a large scale—and possibly permanent—extension of the Federal role.[13]

In a Senate hearing, Secretary Volpe explained that localities were not being asked to pay for the additional police. The Administration was simply following the principle that the users of the air transportation system must shoulder its cost. Terminal operators should therefore cover their added security expenses by charging higher fees to carriers, who in turn could apply to the Civil Aeronautics Board for a fare increase. Although the Board permitted a special surcharge, its Chairman complained that a Federal burden was being foisted upon communities and airline customers. The Senate, too, was unimpressed with Volpe's arguments. On February 21, 1973, it passed by a count of eighty-nine to zero a new bill to establish an FAA airport guard service.[14]

The Administration's program faced a more fundamental challenge from those who believed that mass electronic search was illegal. This cause found a protagonist in Vance Hartke, a flamboyant Democratic Senator and frequent detractor of FAA. Beginning on January 15, Hartke refused to submit to the process, asserting both that it exceeded legal protection and that his office made him immune. FAA fined an airline that allowed the Senator to fly without being scanned. Hartke soon decided to limit himself to pro forma protests at boarding points, but brought his attack to the floor of Congress. Comparing the airport procedure to the abuses

XC 050928

42                           TROUBLED PASSAGE

of privacy revealed by the Watergate scandal, he urged Americans to "smite down a direct threat to the Constitution." Hartke's crusade stirred a largely negative response, however, perhaps because he seemed more a champion of privilege than popular rights. By April, his immunity claim had been disallowed in Federal court.[15]

Yet there was reason to believe that electronic inspection of all passengers might be vulnerable under the Fourth Amendment. Prior to the Emergency Order, judicial approval of airport screening programs had been based primarily on their selectivity. Persons were not normally searched unless a degree of suspicion had been established by the profile or other circumstances. Paradoxically, however, the new procedure was protected by the fact that it was routine and indiscriminate. In a key decision in June 1973, a judge ruled that the program was permissible as "part of a general regulatory scheme in furtherance of an administrative purpose . . . ." If conducted reasonably and on a consent basis, friskings that resulted from the system were acceptable because their basic object was to deter hijacking rather than to gather evidence against an individual.[16]

Some continuing doubts about the constitutionality of total magnatometer scanning focused on the question of whether it was truly necessary. One study of hijacking during 1972 concluded that in almost every case the profile system had been absent, imperfectly applied, or evaded by force. None of the incidents had been a clear-cut failure for the technique. Among the critics was Michael J. Fenello, an Eastern Airlines vice president who was concerned about the new procedure's effect on both personal liberty and efficient operations. Having helped to pioneer the use of the profile, he was able to cite his company's experience in arguing that it was an effective means of bringing hijacking under control. Since Eastern's zeal in implementing the profile was not matched throughout the industry, it was true that the technique had never been given a real test as a national policy. Legalists might therefore contend that the government should provide more evidence that the selective method was insufficient—but as month followed month without an airline hijacking, those who criticized universal electronic search were arguing with success.[17]

THE QUEST FOR SECURITY                        43

IV

One of Butterfield's first acts upon taking control at FAA was to review the new security program, then in its tenth week. Characteristically, he made an immediate bid to enhance industry cooperation. In a letter to airline and airport officials, the new Administrator thanked and complimented them for their response and urged continued diligence. From an airline point of view, total scanning did not prove to be the severe problem that some had feared, but was still a drag on operations. During the spring and summer of 1973, reports of passenger complaints were aired and pressure mounted to ease the regulations. This movement's adherents doubtless welcomed statements by Butterfield and FAA Security Director James T. Murphy that the agency was studying possible future modifications to the procedure. Behind these remarks was an attempt to take advantage of the fact that hijackings and related crimes were strikingly rare in some localities, particularly in certain areas of the Midwest. Murphy's office was working to identify city pairs that would be safe as sites for a test of less stringent regulations.[18]

Outside of the industry, reports that total scanning might be eased brought sharp opposition. To *The New York Times*, it was "incredible" that FAA should consider tampering with a system of proven effectiveness. On June 22, Butterfield reassured a concerned member of Congress that the agency had no intention of relaxing the current requirements. At the Aero Club a few days later, the Administrator further explained that he would consider modifications only after the respite from hijacking had lasted approximately one year. Even then, no changes would be made that would compromise the security standards. By August, Murphy had in any case concluded that the interconnected nature of air transportation made it impractical to relax procedures at selected sites. By this time, too, it was clear that no passenger revolt was developing. The agency had in fact received hundreds of letters supporting the total scanning system. Most air travelers evidently accepted the inconvenience and ticket surcharge as a fair price for protection.[19]

While implementation of the new program was primarily in industry hands, FAA worked to promote uniformity and efficiency.

The agency sponsored a security course for local airport officials at the Transportation Training Institute in Oklahoma City. Three weeks after attending the program, one of the earliest graduates foiled a violent hijacking attempt at Spokane. FAA also played a technical and logistical support role. It had encouraged the development of magnetometers for several years, and had conducted tests to ensure that they did not interfere with heart pacemakers. Even before the Emergency Order of December 1972, FAA had begun providing these metal detectors for airline use. The agency had also contracted for research on x-ray inspection of luggage. At one time, officials hoped that radiation discharge could be lowered to the point that this method could be used to search the passengers themselves. Though this goal was not achieved, dosage was greatly reduced through image enhancement techniques. Under the total scanning program, airlines purchased x-ray devices to help speed examination of carry-on baggage.[20]

The appearance of x-ray devices in airports triggered the involvement of the Aviation Consumer Action Project. This organization was one of many advocacy groups that Ralph Nader had set in motion since winning fame in the mid-1960s by his exposure of automobile safety defects. Established in 1971, ACAP operated in Washington with a professional staff of three. It worked against unfair practices in such matters as baggage handling and flight reservations, and also expressed views on a number of safety issues. In a letter to Butterfield in late August 1973, Nader protested that the airlines were "on the verge of making exposure to a potentially significant new source of radiation a condition of the right to travel for millions of passengers." He demanded that FAA halt deployment of the machines until the public could be assured that there was no risk of radiation leakage. The Administrator replied that certification of x-ray equipment was the responsibility of state authorities, who had agreed that their radiation standards would be at least as strict as guidelines recently issued by the Food and Drug Administration. He declined to deny the airlines the use of the machines without evidence that the state rules were being violated. In a personal postscript, Butterfield assured Nader that FAA intended to be "far more consumer-oriented than we may have been in the

past. And *this* means, of course, that we *should* be able to work in many areas *together*—your organization and ours."[21]

The adversarial relationship proved difficult to break. Following a meeting with the Administrator in late September, Nader wrote that he was still deeply troubled by FAA's "regulatory abdication." He charged that dangerous conditions existed that most states were unable or unwilling to control. Warning that the agency had no legal alternative but to suspend x-ray operations, he asked for an affirmative response within four days. Before that interval passed, Butterfield began receiving congressional letters echoing Nader's concern. The Administrator ignored the deadline but tried to avoid confrontation. He softened a draft reply that accused Nader of a "shot gun type approach" to the problem, and simply invited him to substantiate his charges. Butterfield continued to cite the issue in expounding on the need for FAA to listen to its critics—even those that lacked aviation expertise. He disliked Nader's tactics but recognized that ACAP shared FAA's goal of protecting the flying public. It was better to talk things out with such organizations than "fight these damn battles on the Hill and other places."[22]

In addition to Capitol Hill, Nader's chosen battlegrounds included the courts. In February 1974, ACAP obtained a judicial decision that FAA had acted illegally by allowing the x-rays to be used without regulatory hearings or an environmental impact study. While deciding whether to appeal, the agency removed about a quarter of the devices in use on the grounds that they did not meet the Food and Drug Administration's standards. An unnamed FAA official was quoted as saying that the banned machines had posed no real danger because FDA's specifications "lean way over on the safety side."[23] Nevertheless, the agency made its peace with ACAP by agreeing on April 24 to assume responsibility for regulating the devices. In announcing the proposed rule which eventually made the Federal guidelines mandatory, FAA noted that the radiation leakage standards would be the same as those for television sets. It also claimed that the airlines' machines used a very low dosage which was only about one tenth of that given off by a luminous watch dial.[24] Such statements make ACAP's concern seem highly exaggerated, but the controversy surrounding radiation's

long term effects makes final judgment difficult. Clearly, however, the organization had demonstrated the potential of consumer advocacy in the aviation field.

V

To some, the only true solution to air piracy was to achieve an international agreement that would deprive hijackers of all possible sanctuaries. A few days after the January 1973 Emergency Order transformed America's internal approach to the problem, a meeting of ICAO's Legal Committee opened in Montreal. State Department officials expressed cautious optimism that the Committee might draw up a pact with effective penalties against uncooperative states. The International Federation of Air Line Pilots (IFALPA) threatened a worldwide strike if the meeting failed to produce strong measures. Many developing nations, however, feared binding agreements on sanctions as a device of powerful states to coerce weaker ones. The Committee shelved a treaty drafted by the United States and Canada which included mandatory suspension of air service to countries that failed to act against hijacking. Instead, it submitted four other proposals for consideration by the full ICAO assembly. Among these was a Scandinavian plan which included an expert commission to investigate incidents and make recommendations. This approach seemed to rely upon world opinion, a force that had already demonstrated its helplessness. Nevertheless, the United States supported it as the "only available new and immediate response" to the menace of sabotage and hijacking.[25]

By the time of the ICAO conference, unfortunately, the chance of any useful multilateral action on aerial crime had deteriorated. The problem was intimately connected to the Mid-East dispute in which America played a lonely role as champion of Israel, the nation most often the object of terrorist attack. In February 1973, however, Israeli fighters caused more than a hundred civilian fatalities by shooting down a Libyan 727 over occupied Sinai. On August 10, they forced another Arab airliner to land and undergo search. As ICAO representatives gathered in Rome on August 28, it was clear that the United States delegation would have its hands full trying to prevent Israel from being pilloried or even expelled.

The conference was poisoned by this issue and hampered by the requirement for a two-thirds majority to amend the existing convention. Dramatic evidence of the continuing threat to air travel appeared close at hand when police broke up a plot to launch missiles against Israeli airline flights at Rome's Fiumicino airport. IFALPA renewed warnings that pilots might take "drastic action" of their own. Despite this, the conference adjourned on September 21 with no more substantive result than a condemnation of the August 10 incident.[26]

On December 17, 1973, an American aircraft fell victim to a ruthless assault that began when five Palestinians opened fire in a crowded Rome airport. The terrorists then hurled incendiaries into a Pan American 707, killing thirty passengers. Shooting down a guard, they commandeered a Lufthansa jet and flew to Athens, where they threw the body of a murdered hostage onto the tarmac. Failing to win release of comrades imprisoned by the Greeks, they refueled in Syria and eventually surrendered in Kuwait. In the wake of this atrocity, President Nixon called on all peoples to renew the struggle against such acts, and pledged that his own nation would contribute more than its share to this effort.[27]

One official determined to give substance to the President's words was Benjamin O. Davis, Jr., a retired Air Force lieutenant general with a commanding personality. Davis had been appointed to head the Department of Transportation's "get tough" campaign following the multiple Arab hijackings of September 1970. Although the press sometimes gave the impression that he was the commander of the aviation security forces, the general's actual responsibility was coordination and policy development. When Davis was later given broader duties as an Assistant Secretary, Richard Lally became his security director. In later years, FAA security officials were asked about relations with their counterparts at the Office of the Secretary (OST) during this period. While one recalled fairly good rapport, another described a "constant battle." According to FAA security chief Murphy, however, the relationship worked because of the respect inspired by Davis' straightforward character. Lally, who later left OST to succeed Murphy, described the differences between the two organizations as more

XC 050931

theoretical than practical. He recalled Butterfield himself as generally cooperative.[28]

To a man of Benjamin Davis' temperament, the incident at Rome demanded a forceful response. In a memorandum submitted to Secretary Brinegar on December 19, 1973, he reported that intelligence sources indicated the likelihood of more terrorist attacks. The danger was heightened by current efforts to achieve a Middle East peace settlement. "Positive and visible actions" were therefore necessary to deter "attacks on U.S. air carriers, especially overseas." Davis made four recommendations: (1) FAA should issue an emergency rule that foreign airlines operating in the United States must conform to the total scanning procedures; (2) a well-publicized reactivation of the sky marshals, who would fly on selected international routes for at least the duration of the peace negotiations under way in Geneva; (3) America should make a strong appeal for world-wide adoption of its own aviation security procedures, and for elimination of terrorist havens; (4) the issue should be presented before a special session of the United Nations Security Council.[29]

In a memorandum on the following day, Davis informed Butterfield that the Secretary had rejected only his fourth suggestion. Brinegar had modified the plan for the sky marshals, however, doubting that flight duty was a cost effective use of the limited force available. He preferred to concentrate upon a preventive effort, perhaps by assigning the marshals to guard American airliners during stops on foreign soil. Davis would explore this concept with the State Department. Meanwhile, FAA should immediately prepare a list of high risk locations abroad, and begin work on the emergency regulation for foreign carriers serving airports in the United States. Davis now envisioned that this would require each of these airlines to implement FAA security rules throughout its entire route system. He also mentioned a number of other options, including use of American funds to help ICAO provide security expertise to requesting nations. In addition, his office would investigate the possibility of a special ICAO Council session. The Council had recently voted down a security annex to the convention under which ICAO operated; but Davis believed that the time was ripe to introduce a new and stronger draft.[30]

Butterfield found much to oppose in Davis' initiative. Writing to Secretary Brinegar, he complained that FAA had not been involved in formulating the recommendations. He also objected to the fact that Davis had taken it upon himself to present the Secretary's decisions to FAA. The resulting memo "made it somewhat difficult to determine precisely what you directed as opposed to what the Assistant Secretary deemed desirable." This was a typical protest for any manager to make about an assertive member of his supervisor's staff. In regard to the rule on foreign airlines, however, Butterfield based his objection on a special point of law. He was concerned "about being *directed to 'regulate'* elements of the air transportation system when, under the provisions of the Department of Transportation Act, such regulatory functions are specifically and exclusively reserved for the FAA Administrator." The Administrator was "a bit apprehensive that an OST *directive* to regulate *may* have the potential of subjecting certain future FAA regulatory actions to challenge." Butterfield's views on the authority of the Office of the Secretary had apparently evolved since the time of his nomination hearings. He was now ready to make a declaration of broad autonomy in the regulatory field.[31]

In addition to these legal and procedural objections, Butterfield also questioned the basic wisdom of several aspects of OST's plan. In regard to the sky marshals, the Administrator pointed out that many nations were reluctant to permit armed American guards at their airports and that the Rome episode itself showed how vulnerable such officers were to surprise attack. As to ICAO, a special Council session was impractical and unnecessary, as the next regular one would begin in less than a month. FAA was already conducting an extensive program of technical assistance in the security field, though ICAO experts would be welcome to supplement this. Although "personally in favor of our taking rather drastic actions," Butterfield pointed out that FAA had already issued and withdrawn a proposed rule on foreign airline security. Interested parties had argued convincingly that it was better to work for improved standards on a multilateral basis. The Administrator wished to avoid using emergency powers to reverse this outcome. FAA experience showed that such "no notice" methods caused acrimony and litigation. In this case, there was also a danger that governments

would retaliate by penalizing American flag carriers. He urged that the normal rulemaking process be followed, though with an abbreviated period for public response. The proposed regulation would not cover the foreign airlines' practices throughout their route systems, for FAA could not hope to enforce such a rule.[32]

Davis took note of Butterfield's comments in a second and more detailed set of recommendations that he presented to Secretary Brinegar in early January 1974. In an aside to this document, he rebutted the Administrator's criticism of his own role. Davis wrote that his clearly stated objective had been to develop "comprehensive and coordinated proposals for [the Secretary's] consideration,—a call for, rather than a bypass of, FAA authority and expertise." But the fact remained that Davis' December 20 memo assigned FAA a rather limited part in developing the plan, and gave the impression that Brinegar had already approved some of its aspects. The Assistant Secretary went on to state that "the issue of Presidential and Secretarial direction of FAA regulatory action was faced and resolved in connection with earlier aviation security regulatory actions." Davis was perhaps alluding to the total scanning rule itself, which had been the result of a White House initiative. The extension of this program to the foreign airlines might indeed have provided Butterfield with poor ground for a legal test of FAA prerogatives. It was true that the statute's wording seemed to reserve such regulation for the Administrator. In practical terms, however, the issue involved broad national policy as well as aviation safety. In any event, Butterfield pressed the point no further. To a staff member who called his attention to Davis' argument, the Administrator noted: "I read it. No problems".[33]

In the substance of his recommendations, Davis moved somewhat closer to Butterfield's viewpoint. He dropped the idea of sending guards abroad, and agreed that parliamentary action in ICAO could await its regular session. He made no mention of ICAO security assistance programs, but instead suggested that FAA expand its activities through an emergency order, Davis accepted FAA's contention that the rule should apply only to flights to and from the United States. Five days later, Brinegar approved most elements of the modified plan. In regulating the foreign

airlines, however, the Secretary chose the less abrupt approach urged by Butterfield and supported by his own General Counsel. He also softened Davis' recommendation that FAA "affirmatively consider" amending its rules to require American flag carriers to obtain local guards for their overseas landing points. Brinegar agreed only that this issue be discussed with the airlines' trade association.[34]

A key objective of Davis' plan had been to dramatize the need for greater security in order to stimulate international cooperation. The dramatization was no doubt also intended to satisfy public and congressional demands for action that many officials expected to be overwhelming. Richard Lally recalled that this anticipation may have helped to shape the Assistant Secretary's proposals. Lally was amazed at the mildness of the actual popular response to such a murderous attack. A partial explanation may be that less than half of those killed were American citizens.[35]

In the wake of the Rome tragedy, some governments in Europe and the Middle East took steps to strengthen airport defenses. The foreign carriers, however, protested vigorously against the proposal to impose total screening on their American flights. Many of the affected airlines objected that the abbreviated response period would not allow them to prepare their comments and coordinate them with their own governments. They also wanted to wait for a security committee meeting scheduled for early March by the International Air Transport Association (IATA). Considering these requests reasonable, FAA extended the response period for thirty days. Following the IATA committee meeting, the organization's Director General advised member airlines to take voluntary steps that would make FAA's proposed rule unnecessary. He urged them to adopt total screening to the extent permitted by the laws of their nations. Top priority in implementing this program should be given to flights bound for the United States. A few days later, the ICAO Council at last approved a security annex. Although this did not require total scanning, it contained standards and recommended practices that in many respects paralleled the American approach.[36]

Not unexpectedly, a majority of the comments on FAA's rulemaking notice proved negative. The affected carriers argued that

the American proposal ignored the existence of other nations' legal codes and special requirements. Some charged that an attempt to regulate the practices of foreign companies on their own soil was an illegal claim of extraterritorial authority. FAA tried to deal with these complaints by drafting a revised rule that simply listed certain objectives that security procedures for America-bound flights must be designed to meet. OST's security office refused to concur with this change, insisting that total screening be made mandatory. None of the members of FAA's Regulatory Council supported the OST view. Some wished to issue the revised draft as written, while others preferred to scrap the rule entirely. A. L. Butler, then acting as the agency's Director of Air Transportation Security, offered a persuasive analysis. In a memo to the Administrator, Butler pointed out that the rulemaking notice had "provided a powerful stimulant" to IATA and ICAO. Now that these international bodies had taken action, however, the agency should defer to them by withdrawing the notice. After all, the United States had been the prime mover in establishing ICAO, and had an interest in supporting the Council's authority.[37]

## VI

As Butterfield received advice on dealing with the foreign airlines, the question was one of several security issues being considered by Congress. Despite the Senate's example, the House had not passed an antihijacking bill during 1973. In early February 1974, however, its subcommittee on transportation and aeronautics approved a draft bill. Later that month, the legislators were given fresh incentive by a grim and bizarre incident at Baltimore. A flabby, middle-aged man entered the airport armed with a pistol and gasoline bomb. Firing without warning, he killed a guard at the passenger checkpoint, then forced his way aboard a DC-9 and ordered an immediate takeoff. The frenzied gunman became frustrated by a brief delay and shot both pilot and copilot. Wounded by a policeman, he committed suicide. The would-be hijacker was identified as Samuel J. Byck, an unemployed tire salesman and former mental patient whose resentments fastened on Richard Nixon. He had felt "rather flattered" when police arrived in three squad cars

to arrest him for picketing the President some months earlier. Shortly before his Baltimore foray, Byck tried to set the stage for posthumous fame by mailing out a tape recording describing his motives for "Operation Pandora's Box." He planned to excise the cancer of Watergate by a crash into the White House. Though Byck lacked the skill and self-control to reach his target, he had provided a chilling reminder of the potential of violence against civil aviation. Under a more relaxed security system, his suicidal rampage might have begun when the airliner was aloft.[38]

Following this episode, House committee members toughened their bill. As passed by the Representatives in March, however, the measure did not include the key provision of the Senate version, creation of an FAA airport security force. By now, however, the system of user funding and local enforcement had demonstrated its viability, and the upper house was willing to yield on this point. The question of foreign airlines using American airports was also resolved in conference. The House bill stipulated that FAA could exempt these carriers from security rules, while the Senate version required them to conform. In a letter to the conference committee, Undersecretary John Barnum explained that DOT intended to bring the foreign airlines into line with the antihijacking program, but needed flexibility to take into account existing agreements, ICAO practices, and the systems of individual nations. As enacted, however, the bill directed FAA to require total screening by domestic and foreign carriers alike. Accordingly, this rulemaking proposal remained alive, though it did not result in a regulation until nearly a year after the act became law. In issuing the final rule, FAA stated that foreign airlines boarding passengers for the United States did not have to use precisely the same procedures required in this country. Nevertheless, the wording clearly required total screening.[39]

Congress also addressed the issue of authority over hijackings in progress. The House voted to vest this responsibility exclusively in FAA, which it probably considered less prone than the FBI to overrule the wishes of the pilot. The Senate, however, preferred not to retire the chief Federal police bureau from the struggle against so spectacular a crime. While noting "some jurisdictional conflict leading to disastrous and near disastrous results," the

conference committee stated that the two agencies had worked together with "a high degree of success." The conferees believed this cooperation could be continued and improved. Their bill affirmed FBI jurisdiction while the aircraft was on the ground, yet expanded FAA's role by redefining "in flight" to include the period from the closing of the doors until their first opening for disembarkation. This legislative guideline was eventually reflected in a new interdepartmental memorandum of understanding. The FBI and FAA also agreed that any decision to intervene would be made only after full consideration of each other's views, as well as those of the pilot and airline.[40]

One of the most controversial aspects of the antihijacking bill was its provision on sentencing. Although no one had been executed for a Federal offense in the past decade, it seemed possible that the practice would be revived once its constitutionality was clarified. In early 1973, the press reported that Attorney General Richard G. Kleindienst favored requiring capital punishment for certain "premeditated, cold-blooded" crimes, including hijacking. A Justice Department spokesman soon assured Congress that Kleindienst's remarks had been misinterpreted. He pointed out that a mandatory death penalty might make it more difficult to obtain conviction or extradition of hijackers, and would also deprive them of incentive to spare their hostages. In the light of guidelines recently provided by the Supreme Court, the Nixon Administration believed that capital punishment for aircraft piracy should only be applied in certain well-defined situations. Congress followed the Administration's approach, prescribing the supreme penalty only for hijackers who caused loss of life in the absence of certain extenuating circumstances. Even in this limited form, however, the statute was open to attack by the Administration's own arguments. The prospect of execution might easily discourage the surrender of a hijacker who already had blood on his hands. In addition, the provision ignored evidence that some were drawn to the crime as a way to create a situation that would result in their own death.[41]

Other provisions of the act authorized sanctions for use against uncooperative governments. The President was empowered to suspend air links between the United States and any country that harbored or encouraged hijackers. With the approval of the State

Department, the Secretary of Transportation could limit or revoke the operating authority of foreign airlines whose nations failed to meet minimum ICAO standards of protection. At home, FAA was to set airport security practices, and was permitted to conduct research and offer training on the subject. In many respects, the law granted powers to the Executive Branch that it already possessed, and mandated procedures that were in effect before its passage. It was a legislative ratification of administrative initiatives. In the case of the total scanning system, the congressional conference committee granted this approval with extreme reluctance. In a passage that seemed to undermine their own recommendation, they reported that routine airport searches were necessary but nevertheless "in contradiction to our cherished constitutional freedom." This wording may have been the result of Senator Hartke's presence on the committee. Perhaps it was also a sop to another member, Representative John Dingell, whose hobby of arms collecting had placed him at odds with baggage inspectors.[42]

The Antihijacking Act of 1974 was signed into law on August 5. By that time, millions of American air travelers had submitted to electronic search backed by armed guards. Most of them appeared not to share the grave constitutional scruples expressed in the conference committee's report. Yet the program involved a small but undeniable reduction in personal liberty, as well as in the easy mobility that was air transportation's strength. A few days after the act became law, the president of the Air Line Pilots Association told Butterfield that the carriers were out to scuttle the total scanning program for economic reasons. "I suppose we knew this already," the Administrator noted. Though the program still had enemies, its practical value was now clearly proven. Not a single hijacker had succeeded in diverting the flight of an American airliner during its nineteen months of existence.[43]

International aviation security had also made some progress in this period, yet Americans could hardly hope for the same degree of achievement as on the domestic stage. Possessing the largest route system and number of air travelers, they simply had a greater stake in the issue than other peoples. The arrival of hijackers representing a popular cause could always place governments in a situation that made punishment difficult. In addition, sanctions against

states yielding to these pressures might easily undercut other important policy objectives. Both at home and abroad, aviation security was a matter of constant vigilance rather than permanent solutions. Sam Byck's troubled mind had groped toward an apt analogy for aerial crime: once opened, this Pandora's box could never be completely sealed.[44]

## 3. To Foster an Industry

In passing the Federal Aviation Act of 1958, Congress directed the Administrator of the new FAA to "encourage and foster" the development of civil air commerce and aeronautics. By the 1970s, it was less easy to interpret this mandate's application to a mature but somewhat unstable industry. Yet Alexander Butterfield was resolved to fulfill this mission, to be a champion as well as a regulator. He hoped to bring the members of the aviation community closer to FAA by giving them a larger share in the agency's planning. Butterfield was particularly sympathetic to small-scale airspace users, and tried to protect their interests. Despite this, their antagonistic spirit toward the agency remained strong. When a national energy crisis threatened all elements of the industry, FAA's response helped to lessen the impact of shortage and moderate the Nixon Administration's emergency measures. Like every Administrator before him, Butterfield confronted a deep-seated conflict between environmental concerns and airport expansion. He worked to preserve FAA's position as the leading Federal protagonist in this dispute by pressing for a prompt and noticeable degree of noise abatement. Overall, Butterfield tried to make FAA a more dynamic factor in the development of aviation.

### II

As 1972 came to an end, Americans could look back on a year in which recovery from the economic downturn at the end of the previous decade had gained momentum. This renewed prosperity had benefited the sections of the civil aviation industry, but in widely varying degrees. Production of commercial transports,

XC   050936

44. *Aviation Daily*, August 10, 1975; United Press International report, September 24, 1973; transcript of Butterfield press conference, New York, January 16, 1974, 15.

45. Leyden FAA interview, 20.

46. Memo, Dick Stafford to Churchville, October 9, 1973, as annotated by Butterfield. Final quotation from unsigned FAA public relations document, May 1973.

47. Department of Transportation Act, October 15, 1966, Sec. 6 (3) (c) (1), *U.S. Statutes at Large*, Vol. 80, 938; Archie Trammell, "Now Is the Time to Stop DOT/FAA Infighting," *Business and Commercial Aviation*, February 1975, 9; *Aviation Week & Space Technology*, May 8, 1972, 33.

48. First quotation from *Butterfield Confirmation Hearing*, 61; second quotation from Butterfield, remarks to the Womens Advisory Committee, Ft. Worth, Texas, May 1973, 3-6; *Air Line Pilot*, May 1973, 48; Butterfield 1983 FAA interview, 16l; *Aviation Daily*, June 4, 1973.

49. Brinegar FAA interview, 1984, 1-2, 5-8, 11, 21-24, quotations from 24, 22, 6.

50. Butterfield 1983 FAA interview, 21-28, 35-37; Churchville FAA interview, 1984, 3-6; Richard F. Cross, transcript of an interview with Preston, July 16, 1984, 4-6; Brinegar FAA interview, 1984, 7-10, quotation from 10.

51. *Aviation Daily*, March 8, 1973; *Butterfield Confirmation Hearing*, 62-63; Butterfield FAA 1983 interview, 6-8; Bill Henzey's *Airline Reports*, August 22, 1973 (quoted); *Government Executive*, September 1973, 59 (quoted); *Business Aviation*, October 8, 1973; *Business and Commercial Aviation*, November 1973, 21; *Washington Post*, June 12, 1973; Brinegar FAA interview, 1984, 5-6.

52. Butterfield 1983 FAA interview, 8-9, 15, 36; Brinegar FAA interview, 1984, 5-8, 11, quotations from 5, 8.

53. Brinegar FAA interview, 1984, 10-11, quotation from 11; Butterfield quoted from a transcript of his remarks to the National Airport Committee, Washington, D.C., February 13, 1974, 6; *Aviation Daily*, February 14, 1974.

54. Butterfield 1983 FAA interview, 73.

## Chapter 2

1. James T. Murphy, transcript of an interview with Edmund Preston, February 6, 1984, 10 (hereinafter cited as Murphy FAA interview).

2. FAA, *Task Force on Deterrence of Air Piracy—Final Report*, Rpt. No. FAA-AM-78-35, November 1978, H. L. Reighard and John T. Dailey, 35-38, 41-43, 48-50; FAA, *Aircraft Hijackings and Other Criminal Acts against Civil Aviation Statistical and Narrative Reports*, May 1983, Section B, 1-2, 25-26; Betsy Gidwitz, *The Politics of International Air Transport* (Lexington, Mass: D.C. Heath and Company, 1980), 219; FAA News Release, unnumbered, July 17 1972, updated August 29 1972; *New York Times*, February 13, 22 1980.

3. FAA, *Task Force Report*, 1, 19, 47, 85-86; H. L. Reighard, transcript of interview with Nick A. Komons, Edmund Preston, and Charles Spence, August 30, 31, and September 21, 1984, 10 (hereinafter cited as Reighard FAA interview); Richard I. Kent, Jr., *Safe, Separated and Soaring* (Washington: DOT, 1980), 343-46; Amendment 121-83 to FAR Part 121, January 31, 1973, *Federal Register*, February 2, 1973, 2500-501; FAA News Release No. 72-26, February 6, 1973; U.S. Congress, Senate, *Second Supplemental Appropriations for Fiscal Year 1973, Hearings before the Committee on Appropriations*, 93rd Congress, 1st sess., 1973, 1766 (hereinafter cited as *Supplemental Appropriations FY73*); DOT News Release No. 72-72, August 1, 1972.

4. Document, December 16, 1970, "Development of a Behavioral Profile for Hijackers; FAA, *Task Force Report*, 70; *New York Times*, November 2, 1969; *Washington Post*, May 11, 1971; Neil J. Welch and David W. Marston, *Inside Hoover's FBI: The Top Field Chief Reports* (Garden City, N.Y.: Doubleday & Company, 1984), 166-67.

5. Document, James T. Murphy, June 9, 1970; "TWA Hijacking on June 4, 1970;" *Washington Post*, June 5, 1970; Murphy FAA interview, 7; FAA, *Task Force Report*, 71; Memorandum of Understanding, John A. Volpe and John Mitchell, September 25, 1970.

6. This document is quoted in *Supplemental Appropriations FY 1973*, 1774, and described by Capt. Thomas M. Ashwood in the transcript of an interview with Edmund Preston, October 19, 1984, 1-2. The original cannot be located.

XC    050937

276                                                                                           NOTES

7. Gidwitz, *The Politics of International Air Transport*, 229; U. S. Congress, House, *Anti-Hijacking Act of 1973*, Hearings before a subcommittee of the Committee on Interstate and Foreign Commerce, Part 1, 359-61, and *Hijacking Accord between the United States and Cuba*, Hearings before a subcommittee of the Committee on Foreign Affairs, 93d Cong., 1st sess., 1973, 6, 9 (hereinafter cited as *Hijacking Accord Hearings*); FAA, *Task Force Report*, 24-26.

8. U.S. Congress, Senate, *The Administration's Emergency Anti-Hijacking Regulations*, Hearings before a subcommittee of the Committee on Commerce, 93d Cong., 1st sess., 1973, 21-33, 179-82 (hereinafter cited as *Anti-Hijacking Hearings*); *Supplemental Appropriations FY73*, 1774-1784; C. V. Glines, "Pilot Unity and the Cuban Agreement," *Air Line Pilot*, April 1973, 7-8; *Aviation Week & Space Technology*, November 20, 1972, 14-15; Ed Blair with William R. Haas, *Odyssey of Terror* (Nashville: Broadman Press, 1977), 265-70; Murphy FAA interview, 11-12.

9. Blair with Haas, *Odyssey of Terror*, 267-268; *Hijacking Accord Hearings*, 1-9, 14-16; *Washington Post*, February 12, 1973; *Sunday Star and Daily News* [Washington, D.C.], February 18, 1973; U.S. Congress, House, *Department of Transportation and Related Agencies Appropriations for 1974*, Hearings before a subcommittee of the Committee on Appropriations, 93d Cong., 1st sess., 1973, 75.

10. Krogh FAA interview, 1984, 2, 4-5; Murphy FAA interview, February 6, 1984, 1-2; DOT News Release No. 103-72, December 5, 1972.

11. *Washington Post*, January 6, 1973; quotation from *New York Times*, January 6, 1973.

12. Murphy FAA interview, January 22, 1973, 23; *Aviation Daily*, February 13, 20, 22, 1973; ltr, Claude S. Brinegar to Jennings Randolph, February 16, 1973.

13. *Anti-Hijacking Hearings*, 1, 34, 74-76, 160; *Cong. Rec.*, 92d Cong., 2d sess., September 21, 1972, 31756-58; Krogh FAA interview, 1984, 1.

14. *Anti-Hijacking Hearing*, 76; *Aviation Daily*, January 22, 1973; *Washington Post*, February 9, 1973; *Cong. Rec.*, 93d Cong., 1st sess., February 21, 1973, 4923-25.

NOTES                                                                                         277

15. *Washington Post*, February 2, 1973; *Phoenix Republican*, January 27, 1973; Associated Press report, February 9, 1973; Quotation: *Cong. Rec.*, 93d Cong., 1st sess., February 7, 1973, 3852; *Air Line Pilot*, April, 1974, 34; Descriptions of the unfavorable response to Hartke's stand include: *Pioneer Press* [St. Paul, Minn.], February 3, 1973; *Aviation Daily*, February 5, 1973; *Journal of Commerce*, February 6, 1973; Michael J. Fenello, "Individual Rights v. Skyjack Deterrence: An Airline Man's View," *Villanova Law Review*, June, 1973, 1000.

16. Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* (St. Paul: West Publishing Co., 1978), Vol. 3, 330-44; quotation from *U.S. v. Davis*, June 29, 1973, *Federal Reporter*, Vol. 482 F.2d (St. Paul, 1974), 908.

17. LaFave, *Search and Seizure*, Vol. 3, 346-47; Fenello, "Individual Rights v. Skyjack Deterrence," 997-99; Fenello, transcript of an interview with Nick A. Komons and Edmund Preston, April 16, 1984, 20-21 (hereinafter cited as Fenello FAA interview).

18. Ltr, Alexander P. Butterfield to multiple addressees, March 21, 1973; *Air Transport World*, April, 1973, 27; Fenello FAA interview, 1984, 24; *Aviation Week & Space Technology*, May 7, 1973, 16; *New York Times*, June 5, 1973; *Wall Street Journal*, June 6, 1973; *Christian Science Monitor*, June 7, 1973; *Aviation Daily*, May 25, 31, 1973; Murphy FAA interview, 1984, 5-6.

19. *New York Times*, June 10, 1973; ltr, Butterfield to John D. Dingell, June 22, 1973; Butterfield, remarks to the Aero Club, Washington, D. C., June 26, 1973; Murphy FAA interview, 1984, 5-6; Edward E. Carlson, "Airline Security: Is the Cost Too High?," *Mainliner*, August, 1973.

20. FAA, *First Semi-annual Report to Congress on the Effectiveness of Passenger Screening Procedures*, April 17, 1975, 4; ltr, Butterfield to L. A. Bafalis, April 4, 1973; Associated Press report, March 7, 1973; DOT News Release No. 103-72, December 5, 1972; Reighard FAA interview, 2-4; FAA, *Task Force Report*, 60; Reighard FAA interview, 17; FAA New Release No. 72-199, October 20, 1972.

21. *Aviation Daily*, July 25, 1974; ltrs quoted: Ralph Nader to Butterfield, August 30, 1973; Butterfield to Nader, September 14, 1973.

22. Ltrs: Nader and Reuben B. Robertson III to Butterfield, October 1, 1973 (quoted); Edward Mezvinsky to Butterfield, October 3, 1973; Philip A. Hart to Butterfield, October 4, 1973; Butterfield to Nader, October 25, 1973, and undated draft of this ltr (quoted); Butterfield remarks to FAA professional employees, Washington, D.C., October 3, 1973, 20; and to the Airport Operators Council International, Dallas, Texas, October 16, 1973, quotation from 11.

278  NOTES

23. *Aviation Daily*, March 1, 1973; quotation from *Wall Street Journal*, April 15, 1973.

24. *Aviation Daily*, April 29, 1974, March 6, 1975; FAA News Release No. 74-97, June 21, 1974.

25. Associated Press report, January 4, 1973; *Air Line Pilot*, January, 1973, 3; *New York Times*, January 14, 1973; *Washington Post*, January 19, 1973; *FAA Intercom*, February 5, 1973; *ICAO Bulletin*, March, 1973, 13; Charles N. Brower quoted in *Aviation Daily*, June 5, 1973; see also *Aviation Week & Space Technology*, May 14, 1973, 7.

26. *New York Times*, February 21, 23, March 12, August 29, 1973; *Washington Post*, September 22, 1973; International Civil Aviation Organization, *Annual Report to the Council—1973* (New York: Basic Books, 1978), 98; J. Bowyer Bell, *A Time of Terror* (New York: Basic Books, 1978), 156; *ICAO Bulletin*, November 1973, 36-37; James O'Grady quoted in Baltimore Sun, September 22, 1973.

27. FAA, *Aircraft Hijackings*, Section D, 43; *Air Line Pilot*, February 1974, 12; memo, Benjamin O. Davis, Jr., to Claude Brinegar, December 19, 1973.

28. *Washington Post* and *New York Times*, September 22, 1970; transcripts of Edmund Preston's interviews with the following: Richard Lally, February 9, 1984, 1-2, 4-5; Virgil L. Krohn, February 8, 1984, 2; Alan Read, February 6, 1984, 2-3 (quoted); James T. Murphy, February 6, 1984, 9-10 (hereinafter cited as Lally FAA interview, Krohn interview, etc.).

29. Memo, Davis to Brinegar, December 19, 1973.

30. Memo, Davis to Butterfield, December 20, 1973.

31. Memo, Butterfield to Brinegar, December 27, 1973.

32. *Ibid*.

33. Davis quoted from his memo to Brinegar, January 4, 1974; in regard to the issue of the Administrator's prerogatives, see *U.S. Statutes at Large*, Vol. 80, 938, and Vol. 75, 467-68; Butterfield quoted from his annotation to a January 9, 1974, memo from James M. Yohe.

34. Memo, Davis to Brinegar, January 4, 1974, as annotated by Brinegar January 9.

35. Memo, Butterfield to Brinegar, December 27, 1973; Lally FAA interview, 3-4; *U.S. News & World Report*, December 31, 1973, 16.

NOTES  279

36. Memos, Yohe to Butterfield, January 9 and February 15, 1974; "Executive Briefing Summary" attached to memo, Garland Castleberry to Regulatory Council, June 17, 1974; telegram, Knut Hammarskjold to airline officials, circa March 15, 1974.

37. "Executive Briefing Summary," June 17, 1974; memos: R. R. Cybulski to James E. Dow, June 27, 1974; A. L. Butler to Butterfield, June 21, 1974, (quoted).

38. *Congressional Quarterly, Inc., Congress and the Nation*, Vol. IV (Washington, D.C., 1977), 568; *Aviation Daily*, February 6, 1974; *Washington Post*, February 23, 1974 (quotes Byck from a November 30, 1973, interview in the *Philadelphia Inquirer*), and February 28, 1974.

39. *Aviation Daily*, March 1, 29, April 30, 1974; *Washington Post*, February 28, 1974; *Wall Street Journal*, March 1, 1974; U.S. Congress, House, *Antihijacking Act of 1974, Conference Report*, Hs. Rpt. No. 93-1194, 93d Cong., 2d sess., 1974, 22, 25-26; Public Law 93-366, *U.S. Statutes at Large*, Vol. 88, 415; *Federal Register*, July 11, 1975, 29273-74.

40. U.S. Congress, House, *Antihijacking Act of 1974*, Hs. Rpt. 93-885, 93d Cong., 2d sess., 1974, 22-23; Hs. Rpt. 93-1194, 23-25; Memorandum of Understanding, Butterfield and Clarence M. Kelley, February 26, 1975; *U.S. Statutes at Large*, Vol 88, 417.

41. *Washington Post*, January 6, 1973 (quoted); *Anti-Hijacking Hearings*, 102-103, 107-108; Murphy FAA interview, 12; *U.S. Statutes at Large*, Vol. 88, 411-13.

42. Public Law 93-366, *U.S. Statutes at Large*, Vol. 88, 409-419; Hs. Rpt. 93-1194, *passim*, quotation from 27; *Washington Post*, March 22, 1973.

43. Memo, Butterfield to James F. Rudolph, August 12, 1974 (quoted); FAA, *Aircraft Hijackings*, Section B, 30-32.

44. FAA interviews: Murphy, 15; Krohn, 6-7; Lally, 10.

XC  050939