# EXHIBIT 22

Confidential - Do Not Copy or Disclose                                   Subj. to Protect. Order 21MC97_101



| U.S. Department of Transportation | Office of Intelligence and Security |
|---|---|

*See p.6.*

# TRANSPORTATION SECURITY and TERRORISM REVIEW

## DEVELOPMENTS OF INTEREST TO SECURITY MANAGERS

*This report was prepared by the Department of Transportation's (DOT) Office of Intelligence and Security and is provided periodically for information purposes to assist the DOT, transportation security managers, and other persons responsible for protecting transportation industry personnel and assets. It is not meant to state or imply any new protection requirements and is based entirely on public sources. It is also provided to other selected government, law enforcement and security personnel. We request that recipients distribute this document to appropriate persons within their organization. Questions regarding any of the information contained in this report or requests to be added to the distribution list should be addressed to Jeff.Shumuker@ost.dot.gov or call (202) 366-7666.*

*Note: Special thanks to Aaron Danis of the Nuclear Regulatory Commission and Stephen Leder of Eagle Research for consenting DOT to use their research in this special edition the Transportation Security and Terrorism Review*

## Special Edition
## USA v. Usama bin Laden:
## Technical and Tactical Insights from the Trial

### INTRODUCTION

The New York trial of four defendants in the 1998 bombing of the U.S. Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania has provided revealing details on Usama bin Laden's network (known as Al-Qaeda), methods and thinking. This special issue brings together material from previous issues of *T&S* on the trial, as well as additional new material drawn from trial transcripts.

In this edition we examine 1) the defendants; 2) the terrorist operational cycle; 3) target selection criteria; 4) surveillance techniques; 5) training, including weapons and explosives; and 6) the use

AALTSA 017065
AAL 021009
XC134060

of vehicle bombs as well as other aspects of how the Al-Qaeda cell reportedly suicide bombed two U.S. embassies, despite the presence of common, basic preventive security measures (guards, gates, access controls, fences/walls).

It is based entirely on trial transcripts (through March 21, 2001) and press reports concerning trial testimony, with supporting information from the 1999 U.S. State Department Report of the Accountability Review Board (www.state.gov/www/regions/africa/accountability_report.html) and the 1998 Significant Incidents of Political Violence Against Americans (http://www.ds-osac.org/publications/documents/sig1998.pdf) also from the U.S. State Department. Complete day by day trial transcripts can be found on the WWW at: http://cryptome.org/usa-v-ubl-dt.htm. The FBI also maintains a web site concerning the bombings, with the original indictment and pictures of the perpetrators, at http://www.fbi.gov/majcases/eastafrica/summary.htm.

*Stefan Leader and Aaron Danis, Editors*

## THE DEFENDANTS

**Wadih El Hage:** Lebanese-American owner of a house in Nairobi allegedly used by the cell there, and until 1997, Nairobi cell leader. Also he was Bin Ladin's former secretary.

**Mohamed Rashed Daoud Al-'Owhali:** Saudi national and member of the Kenya cell who was a passenger in the truck carrying the bomb. His job was to scare the embassy gate guard into opening the gate so the truck could enter the compound. FBI Special Agent Stephen Gaudin debriefed Owhali and testified concerning his statements.

   

Wadih el Hage | Mohamed Rashed Daoud Al-'Owhali | Mohamed Sadeek Odeh | Khalfan Khamis Mohamed

**Mohamed Sadeek Odeh:** Jordanian national and admitted member of Al-Qaeda. While a member of the Kenya cell, he denies taking part in the embassy attacks. FBI Agent John Anticev debriefed Odeh and testified concerning his statements.

2

**Khalfan Khamis Mohamed:** Tanzanian national and member of the Tanzania cell accused of helping carry out the attack there. In opening statements, his lawyers admitted that Mohamed had ground TNT for the Tanzanian bomb, loaded it onto a truck and knew that he was helping to make an enormous explosive device. They added, however, that he was acting on the orders of "higher-ups" whose goals he did not know, and thus did not know the bomb's target. The FBI agent who questioned Mohamed, Agent Abigail Perkins, has testified that "based on his study of Islam, he felt he had an obligation and a duty to kill Americans."

### Others:

**L'Houssaine Kherchtou:** A former Al-Qaeda member turned U.S. government witness. While not a member of the Kenya cell, he housed three Al-Qaeda members, including Ali Mohamed (see below), while they conducted a surveillance mission against the U.S. embassy in Nairobi, Kenya, in 1994-95. He claimed to see Harun Fazul (see below) the day after the bombing in Kenya. He also testified about Al-Qaeda training techniques.



**Ali Mohamed:** Egyptian national who came to the United States in 1985 and served in the U.S. Army where he held the rank of sergeant. He spent three years at Ft. Bragg, North Carolina, where he trained U.S. military personnel on Middle Eastern cultures. He pleaded guilty last October to conspiring to bomb the U.S. Embassies in East Africa. He also admitted helping photograph the Nairobi embassy as part of a surveillance operation, and was a trainer in several Al-Qaeda Afghan camps and in the U.S.

**Abdullah Ahmed Abdullah, aka Saleh:** Kenya cell leader and allegedly the mastermind of the East Africa embassy bombings. Currently at large and wanted by the U.S.





**Harun Fazul, aka Fazul Abdullah Mohammed:** Nairobi cell coordinator. He is still at large and wanted by the U.S.

3



"**Azzam**": The alleged Nairobi suicide bomber who died in the attack. The picture at right is from his Saudi passport bearing the name "Gihad Ali."

## *TERRORIST OPERATIONAL CYCLE*

L'Houssaine Kherchtou testified that during his Afghan training, he was told that there are four groups involved in attacking a target. The first is *the surveillance group*, which collects information on the targets and sends it to the "bosses." The *"bosses,"* who comprise the second group, decide which target to attack and then send a third, *logistical group* to provide the weapons and explosives needed to attack the target. The fourth group then arrives and *carries out the attack.*

One FBI Agent stated that Mohamed Odeh told him that terrorist operations are broken down into two cells. One cell gets there before the operation, conducts all the logistics and planning, including the surveillance and building, and builds the bomb. The second cell consists of the people who carry out the attack. Mohamed Rashed Daoud Al-'Owhali stated to the FBI that the cell has four separate sections: the intelligence section, the administration (logistics) section, the planning and preparation section and the execution section.

**Comment:** Despite minor discrepancies over the number and name of the various groups/teams/cells/sections involved, the basic functions of the cell and the operational procedures taught in the training camps generally correlates with what was practiced during the attack on the embassies. From the trial transcripts, it appears that initial surveillance was done in 1994-95, 3-4 years before the attack was carried out.

## *TARGET SELECTION*

An FBI agent testified that Rashed Daoud Al-'Owhali told him that the Nairobi embassy was chosen as a target because 1) it was occupied by many Americans, including press and military attaches and intelligence officers; 2) it was *easy to hit*; and 3) it had a female Ambassador whose death would result in *more publicity*. 

Al-'Owhali also revealed that during his training in Afghanistan he had been taught that Al-Qaeda target priorities were 1) U.S. military bases; 2) U.S. diplomatic missions and posts and 3) kidnaping Ambassadors. But FBI agent Abigail Perkins reportedly testified that defendant Khalfan Khamis Mohamed told her that terrorists prefer to target embassies and civilians because *the military is too difficult to hit.* Another FBI agent also testified that Al-'Owhali told him that the organizer of the embassy bombing stated that many attacks on U.S. facilities abroad would *pave the way for attacks inside the U.S.* Reportedly, the time for the attack (between 10:30 and 11:00AM on Friday) was selected because this is the time that most Muslims are either in mosques at prayer or on their way to mosques. 

4

Case 1:07-cv-07051-AKH   Document 41-23   Filed 06/17/2008   Page 6 of 10

Confidential - Do Not Copy or Disclose                                      Subj. to Protect. Order 21MC97_101

Ali Mohamed was the first person to link Usama bin Laden directly to the attacks in Africa, saying in court that bin Laden once asked him to scout out the embassy in Kenya. "I took pictures, drew diagrams and wrote a report," Mohamed told the judge when he entered his guilty plea last October. "Bin Laden looked at the picture of the American Embassy and pointed to where a truck could go as a suicide bomber."

**Comment:** To rephrase terrorist expert Brian Jenkins' famous line, *they wanted a lot of people watching and a lot of people dead*. Analysts believe religiously motivated terrorists are more willing to carry out mass casualty attacks than politically motivated terrorists. The latter worry about alienating potential constituents while the former worry only about doing God's will. It is interesting to note that despite some security around the US Embassies (guards, walls, gates and access controls), the facilities apparently were considered easy targets, perhaps due to the lack of stand-off distance and the fact that host-nation guards were unarmed.

## SURVEILLANCE TECHNIQUES

L'Houssaine Kherchtou described what appeared to be a reconnaissance mission of the U.S. Embassy in Nairobi in 1994-95. Mr. Kherchtou said he often saw three Al-Qaeda members developing photographs in his apartment and had once spotted one of them with a camera around his neck strolling through downtown Nairobi near the embassy. Mr. Kherchtou said that one of the men who visited his home was Al-Qaeda operative, Ali Mohamed, who has pleaded guilty to participating in the conspiracy although he did not play a direct role in the bombing.

Kherchtou testified that in the 1980s he took a two-week surveillance seminar taught by Mohamed in a military training camp in Pakistan. He stated that he was trained to use different cameras, develop the pictures, and to take pictures holding the camera so that the surveillant is not looking through it (presumably while it is around his neck). The surveillant would then write a report that would include a target description, diagrams, maps, and photos.

Target descriptions included rooms; size, location and height of walls; location of lights and doors, and number of people present. The reports could be put on computer disks, making them easier to carry and conceal. Mohamed Odeh told the FBI that in difficult circumstances, the surveillants would set up a food stand or buy a nearby shop in order to observe the target and look for weaknesses. Another technique was to try to send a person inside the target to get a first-hand look, and to ask questions to assess the quality of the security. (These people are commonly known as "walk-ins.") Mohamed Rashed Daoud Al-'Owhali also stated that the leader of a terrorist cell was trained to do target site surveys, as well as still and video photography.

**Comments:** The descriptions given are consistent with long-standing terrorist surveillance practices. By using U.S. citizen and former U.S. Army Sergeant, Ali Mohamed to conduct the initial surveillance, the cell was able to exploit his knowledge of the U.S. mindset and approach to security.

## TRAINING, WEAPONS, & EXPLOSIVES

AALTSA 017069
AAL 021013
XC134064

Testimony by investigators and former bin Laden associates has also shed considerable light on the types of training given in Sudanese and Afghan camps run by bin Laden associates. Explosives training appears to be central.

At least seven types of training have been identified by witnesses in the bombing trial: 1) *Islamic law and jihad;* 2) *explosives and advanced explosives training;* 3) *small arms training;* 4) *assassination training (some involving the use of chemicals, poisons and toxins);* 5) *hand-to-hand combat training;* 6) *physical fitness training;* and 7) *training in operational principles, including collecting target intelligence and communications.* In addition, selected individuals were sent to specialized schools for training in electronics and flying aircraft. 

Details are incomplete, but explosives training appears to involve the identification, making and handling of various types of explosives (e.g., TNT, C-3, C-4, etc.), including the mixing of chemicals; modifying dynamite by grinding it into a powder; and familiarization with various military explosive devices such as grenades, mines (anti-personnel, anti-tank, anti-truck), and rockets. According to one witness, this was a 15 day course. Advanced and more advanced explosives courses were said to run for 45 and 60 days respectively.

Al-Qaeda also trained people in electronics, such as the use of off-the-shelf components (encoders, radios, watches) to make, for example, remote and other types of detonators. According to FBI testimony, one defendant stated that he knew how to build a directed charge, by putting "the metal around the TNT so when it goes off, all the force of the blast" can be aimed in one direction. This sounds similar to public descriptions of the bomb used in the USS Cole attack in Yemen last October.

Moreover, trial testimony has revealed that some members of Al-Qaeda went to Lebanon to train with Hizballah in *using explosives to destroy large buildings*. Direct explosives training appears to be supplemented by a detailed 1000 page *Encyclopedia of Jihad* contained on a computer disk made available to recruits. Another training manual, *Military Studies in the Jihad Against Tyrants*, which was introduced into evidence at the trial, points out that explosives are believed to be the safest weapon because they allow warriors to "get away from enemy personnel and to avoid being arrested," and they "strike the enemy with sheer terror and fright."

Small arms training involves the use of standard assault rifles, such as the AK-47 and its assorted variants, M-16, Uzi, pistols, and the use and firing of RPGs. Finally, assassination training has been described as "learning to kill people quietly." One chapter of the *Encyclopedia of Jihad* deals extensively with poisons suitable for use in assassinations. Training in operational principles is believed to include target surveillance (both people, and buildings, using various types of cameras), communications (writing reports and use of computers), use of forged documents, and cell organization and security.

**Comment:** This reporting is consistent with previous open source reports concerning Al-Qaeda training techniques. There apparently is a heavy emphasis on explosives training.

## *VEHICLE BOMBS*

AALTSA 017070
AAL 021014
XC134065

**Kenya:** Mohamed Sadeek Odeh, who was part of the Kenya cell but denies taking part in the attack, said that the Nairobi attack was a "blunder" because so many civilians were killed, according to the agent who debriefed him. FBI Agent Anticev said that Odeh felt his colleagues made a mistake by putting the bomb in the back of a pickup truck. "He said the truck should have backed into the building closely." Instead the truck came in "nose first" and the force of the explosion ricocheted off the cab of the truck, causing many deaths in the vicinity. Odeh stated that, as a general matter, the best place to put explosives is inside the target building, but the best alternative is to get as close as possible.

Mohamed Rashed Daoud Al-Owhali's mission during the attack was to ride as a passenger in the bomb-laden vehicle, fire a gun and toss stun grenades to force guards to lift gates at the embassy so the truck could get close to the embassy walls, according to FBI Agent Gaudin. Al-'Owhali said the bomb consisted of TNT, aluminum nitrate, and aluminum powder packed in the back of the truck in wooden crates, the agent stated. He added that Al-'Owhali told him of a contingency plan: if the electrical detonator failed to work, it was Al-'Owhali's job to toss a grenade into the back of the truck to ensure that the bomb went off.

At the embassy, Agent Gaudin said, the suicide driver Azzam drove the truck to a parking lot in back. Al-'Owhali jumped out, ready to force the guard to lift the gate, but he suddenly realized that he had left his pistol in the truck. The guard refused to open the gate, so Al-'Owhali tossed a grenade at the guard, the agent testified, and people began to run, including Al-'Owhali. The gate was not raised so Azzam apparently pulled the truck forward as much as possible and detonated the bomb.

Agent Gaudin testified that Al-'Owhali claimed he originally had asked Kenya cell leader Saleh about trying to get the bomb into the underground parking garage at the embassy, where it could cause more damage. Saleh reportedly said no, that it would be too difficult to get past the second drop gate at the entrance to the parking garage ramp, so the plan was not changed.

**Tanzania:** The Kenya cell leader, Saleh, bragged to Al-'Owhali that he was able to get the second vehicle bomb ready in only 10 days. (Note: one cell planned and carried out both bombings.) That bomb also consisted of TNT, according to Al-'Owhali, but a number of oxygen tanks and gas canisters were added to increase fragmentation. The suicide driver for that attack, reportedly named Ahmed Abdallah, carried a cell phone in case Saleh needed to change the mission. The FBI agent who debriefed Khalfan Khamis Mohamed stated that Mohamed told him the vehicle bomb was built in a refrigeration truck. He said that the gas cylinders were placed down into the frame and then 20 boxes of TNT were placed among the tanks such that gas cylinders and boxes of TNT alternated -- gas cylinder, box of TNT, gas cylinder, etc., until the interior of the frame was full. This arrangement was used starting from the area closest to the cab all the way to the back of the truck. Three or four bags of fertilizer and some sandbags also were added to fill the gaps and stabilize the load. Khalfan also pointed out that they placed a partition of wood and metal in the very rear of the truck so that anyone opening the truck's two double doors would not see the bomb.

**Comment:** While the Kenya cell had a plan to get through the first embassy gate with the vehicle bomb, the plan apparently was not rehearsed. Lack of rehearsal, and subsequent poor

AALTSA 017071
AAL 021015
XC134066

execution of the plan, prevented the bombers from getting the bomb inside the compound and causing more damage. Meanwhile, at the U.S. embassy in Tanzania, the driver prematurely detonated the vehicle bomb while waiting in line behind a large water truck at the gate, approximately 35-50 feet from the embassy wall. The water truck probably absorbed some of the blast, also reducing damage to the building.



Parking area in rear of the embassy where the truck

Confidential - Do Not Copy or Disclose  Subj. to Protect. Order 21MC97_101



Front gate at the U.S. Embassy.

AALTSA 017073
AAL 021017
XC134068