# EXHIBIT 30



Tuesday,
July 17, 2001

Part II

# Department of Transportation

Federal Aviation Administration

14 CFR Parts 107 and 139
Airport Security; Final Rule

costs upon the FAA; FAA representatives will have to review and approve airport incident threat response procedures and ensure coordination of such procedures with their counterparts in airport safety. Ten-year costs are estimated to be approximately $2.1 million (present value, $1.5 million).

Section 139.325 is amended to require each airport to ensure that the instructions for each airport emergency plan are consistent with its airport security program. This action will entail costs for each airport. The FAA assumes that the ASC and a clerk will each need to spend 2 hours in 2000 and 1 hour in each subsequent year to ensure consistency. Total costs over 10 years equal $270,000 (present value, $200,000).

The 10-year total cost of this rule is estimated to be $92.2 million (present value, $75.4 million).

The rules to amend parts 107 and 108 are intended to enhance aviation safety for U.S. airport operators and aircraft operators in ways that are not currently addressed. The benefits of the rules will be a strengthening of both airport and air carrier security by adding to their effectiveness. Security is achieved through an intricate set of interdependent requirements.

It would be extremely difficult to determine to what extent an averted terrorist incident can be credited to either airport or aircraft security. Accordingly, the benefits from the rules for parts 107 (airport operators) and 108 (aircraft operators) have been combined in this benefit-cost analysis. These benefits are comprised of the criminal and terrorist incidents that these rules are intended to prevent; hence, these benefits will be contrasted against the costs of the changes to parts 107 and 108. The combined costs of part 107 and 108 total $131.3 million (present value, $104.1 million) over 10 years.

Terrorism can occur anytime and anywhere in the United States. Members of foreign terrorist groups, representatives from state sponsors of terrorism, and radical fundamentalist elements from many nations are present in the United States. In addition, Americans are joining terrorist groups. The activities of some of these individuals and groups go beyond fund raising. These activities now include recruiting other persons (both foreign and U.S.) for terrorist activities and training them to use weapons and make bombs. These extremists operate in small groups and can act without guidance or support from state sponsors. This makes it difficult to identify them or to anticipate and counter their activities. The following discussion outlines some of the concrete evidence of the increasing terrorist threat within the United States and to domestic aviation.

Investigation into the February 1993, attack on the World Trade Center (WTC) uncovered a foreign terrorist threat in the United States that is more serious than previously known. The WTC investigation disclosed that Ramzi Yousef had arrived in the United States in September 1992, and had presented himself to immigration officials as an Iraqi dissident-seeking asylum. Yousef and a group of radicals in the United States then spent the next 5 months planning the bombing of the WTC and other acts of terrorism in the United States. Yousef returned to Pakistan on the evening of February 26, 1993, the same day that the WTC bombing took place. By August 1994, Yousef had conceived a plan to bomb as many as 12 U.S. airliners flying between East Asian cities and the United States.

Yousef and his co-conspirators tested the type of explosive devices to be used in the aircraft bombings and demonstrated the group's ability to assemble such a device in a public place, in the December 1994, bombing of a Manila theater. Later the same month, the capability to get an explosive device past airport screening procedures and detonate it aboard an aircraft also was successfully tested when a bomb was placed by Yousef aboard the first leg of Philippine Airlines Flight 424 from Manila to Tokyo. The device detonated during the second leg of the flight, after Yousef had deplaned at an intermediate stop in the Philippine city of Cebu.

Preparations for executing the plan were progressing rapidly. However, the airliner-bombing plot was discovered in January 1995, by chance after a fire led Philippine police to the Manila apartment where the explosive devices were being assembled. Homemade explosives, batteries, timers, electronic components, and a notebook full of instructions for building bombs were discovered. Subsequent investigations of computer files taken from the apartment revealed the plan, in which five terrorists were to have placed explosive devices aboard United, Northwest, and Delta airline flights. It is likely that thousands of passengers would have been killed if the plot had been successfully carried out.

Yousef and his co-conspirators were arrested and convicted in the bombing of Philippine Airlines flight 424 and in the conspiracy to bomb U.S. airliners. Yousef was sentenced to life imprisonment for his role in the Manila plot. Yousef also was convicted and sentenced to 240 years for the WTC bombing. However, there are continuing concerns about the possibility that other conspirators remain at large.

The fact that Ramzi Yousef was responsible for both the WTC bombing and the plot to bomb as many as 12 U.S. air carrier aircraft shows that: (1) Foreign terrorists are able to operate in the U.S. and (2) foreign terrorists are capable of building and artfully concealing improvised explosive devices that pose a serious challenge to aviation security. Civil aviation's prominence as a prospective target is clearly illustrated by the circumstances of the 1995 Yousef conspiracy.

The bombing of a Federal office building in Oklahoma City, Oklahoma, shows the potential for terrorism from domestic groups. While the specific motivation that led to the Oklahoma City bombing would not translate into a threat to civil aviation, the fact that domestic elements have shown a willingness to carry out attacks resulting in indiscriminate destruction is worrisome. At a minimum, the possibility that a future plot hatched by domestic elements could include civil aircraft among possible targets must be taken into consideration. Thus, an increasing threat to civil aviation from both foreign sources and potential domestic ones exists and needs to be prevented and/or countered.

That both the international and domestic threats have increased is undeniable. While it is extremely difficult to quantify this increase in threat, the overall threat can be roughly estimated by recognizing the following:

• U.S. aircraft and American passengers are representatives of the United States, and therefore, are targets;
• Up to 12 airplanes could have been destroyed and thousands of passengers killed in the actual plot described above;
• These plots came close to being carried out; it was only through a fortunate discovery and then extra tight security after the discovery of the plot that these incidents were thwarted;
• It is just as easy for international terrorists to operate within the United States as domestic terrorists, as evidenced by the World Trade Center bombing; therefore,
• Based on these facts, the increased threat to domestic aviation could be seen as equivalent to some portion of 12 Class I Explosions on U.S. airplanes. (The FAA defines Class I Explosions as incidents that involve the loss of an entire aircraft and incur a large number of fatalities.)

In 1996, both Congress and the White House Commission on Aviation Safety

XC    061413