UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

AMERICAN AIRLINES, INC. ET AL.,

                    Plaintiffs,

              v.

FEDERAL BUREAU OF INVESTIGATION, ET
AL.,

                  Defendants.

-------------------------------------------------------- x

07 Civ. 7051 (AKH)

This Motion relates to:
21 MC 101 (AKH)

**GOVERNMENT'S RESPONSE TO AVIATION PARTIES' STATEMENT OF
MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO
LOCAL RULE 56.1 IN SUPPORT OF THE GOVERNMENT'S MOTION FOR
SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1(b) of the Local Rules of the United States District

Courts for the Southern and Eastern Districts of New York, defendants the Federal Bureau of

Investigation and  Robert S. Mueller, Director of the FBI (collectively, the "Government"), by

their attorney, Michael J. Garcia, United States Attorney for the Southern District of New York,

respond to the Aviation Parties' Statement of Material Facts in Support of Motion for Summary

Judgment as follows:

        1.      This paragraph is admitted.

        2.      This paragraph is admitted.

        3.      This paragraph is admitted.

        4.      This paragraph is admitted.

5.      This paragraph is disputed to the extent that the cited authorities do not support the allegation that Hani Hanjour was the terrorist who piloted American Flight 77 into the Pentagon.

6.      This paragraph is admitted.

7.      This paragraph is admitted.

8.      This paragraph is admitted.

9.      This paragraph is disputed to the extent it suggests that the five affidavits included with the Aviation Defendants' March 6, 2007 letter request adequately explain the relevance of the requested testimony to the Aviation Defendants' defense in the *In re September 11 Litigation*. *See* Declaration of Desmond T. Barry, Jr., dated April 28, 2008 ("Barry Decl.") Exhs. 2-11.

10.     This paragraph is disputed to the extent it suggests that someone other than the United States Attorney for the Southern District of New York ("United States Attorney") issued the five letters dated May 7, 2007.  *See* Barry Decl., Exhs. 7-11.

11.     This paragraph is disputed to the extent it asserts that Harry Samit was assigned to the Minnesota Field Office.  *See* Barry Decl., Exh. 14 at 793-94.

12.     This paragraph is admitted.

13.     This paragraph is admitted.

14.     This paragraph is admitted.

15.     This paragraph is admitted.

16.     This paragraph is admitted.

17.     This paragraph is admitted.

18.     This paragraph is admitted.

19.     The first sentence of this paragraph is disputed to the extent it suggests that the only crimes Zacarias Moussaoui was charged with in Second Superseding Indictment were conspiracy to commit aircraft piracy and conspiracy to commit acts of terrorism. *See* Barry Decl., Exh. 24.  The second sentence of this paragraph is disputed to the extent it suggests that the only counts of the Second Superseding Indictment that Zacarias Moussaoui pled guilty to were conspiracy to commit aircraft piracy and conspiracy to commit acts of terrorism. *See* Barry Decl., Exh. 24.

20.     This paragraph is disputed to the extent it suggests that the jury imposed a sentence upon Zacarias Moussaoui.  *See* Barry Decl., Exh. 19.

21.     This paragraph is admitted.

22.     Admit that Special Agent Samit testified publicly at the Moussaoui trial. According to the 9/11 Commission Report, "at the request of the intelligence community agencies (including the FBI), we use the first name and last initial, only the first name, or in a few instances an alias or title when referring to working-level employees in those agencies." 9/11 Commission Report at 450.  Accordingly, the Government can neither confirm nor deny the identity of the individual cited as "Harry S." at page 540, footnotes 92 and 101, in the 9/11 Commission Report.

23.     This paragraph is admitted.

24.     This paragraph is admitted.

25.     This paragraph is admitted.

26.     This paragraph is disputed, except that it is admitted that the 9/11 Commission Report cites to a DOJ Inspector General interview of Coleen Rowley, dated July 16, 2002. *See* 9/11 Commission Report at 540 n.94.

27.     This paragraph is disputed to the extent it characterizes the substance of the letter Coleen Rowley sent to FBI Director Robert Mueller.  *See* Barry Decl., Exh. 21.

28.     This paragraph is disputed to the extent it characterizes the substance of the testimony Coleen Rowley gave to Senate Judiciary Committee on June 6, 2002.  *See* Oversight Hearing on Counterterrorism, Hearing Before the Senate Committee on the Judiciary, S. Hrg. 107-920 (2002).

29.     This paragraph is admitted.

30.     This paragraph is admitted.

31.     This paragraph is admitted.

32.     This paragraph is admitted.

33.     This paragraph is admitted to the extent it describes the functions of the FBI's International Terrorism Operations Section as of September 11, 2001.

34.     This paragraph is admitted.

35.     This paragraph is admitted.

36.     This paragraph is disputed to the extent it characterizes the substance of the testimony Special Agent Rolince gave at the Moussaoui trial.  *See* Barry Decl., Exh. 13.

37.     Admit that Special Agent Rolince testified publicly at the Moussaoui trial and that he is cited in the 9/11 Commission Report.

38.     This paragraph is admitted.

39.    This paragraph is admitted.

40.    This paragraph is admitted.

41.    This paragraph is admitted.

## Government's Statement of Undisputed Material Facts

Pursuant to Local Civil Rule 56.1(a), the Government further states, in support of the

Government's cross-motion for summary judgment, that there is no genuine issue to be tried with

respect to the following material facts:

**The FBI's Response to Requests for Documents in Connection
with the *In re September 11 Litigation***

1.    In response to the terrorist attacks of September 11, 2001, by Usama bin Laden

and his al-Qaeda network, the FBI initiated PENTTBOM, the largest and most complex

investigation in the FBI's history.  *See* Declaration of Michael J. Heimbach, Assistant Director,

Counterterrorism Division, Federal Bureau of Investigation, dated June 16, 2008 ("Heimbach

Decl.") ¶ 6.

2.    PENTTBOM remains an active law enforcement investigation.  Heimbach Decl. ¶

9.

3.    Since October 16, 2006, both the plaintiffs (including cross-claim plaintiffs) and

the Aviation Defendants to the *In re September 11 Litigation* have submitted a number of

requests, pursuant to 28 C.F.R. §16.21 *et seq.*, for the production of FBI records pertaining to the

PENTTBOM investigation.  Declaration of Sarah S. Normand, dated June 17, 2008 ("Normand

Decl.") ¶ 3.

4.    The Aviation Defendants submitted a request for records from the FBI dated April 13, 2007, which sought 270 separate records and categories of records.  *See* Normand Decl. ¶ 4 & Exh. B; Heimbach Decl. ¶ 7

5.    By letter dated March 16, 2007, the FBI indicated that it would be willing to provide to the parties reasonably available, unclassified, non-privileged records that are relevant and material to the *In re September 11 Litigation*.  *See* Normand Decl. ¶ 3 & Exh. A; Heimbach Decl. ¶ 7.

6.    In response to document requests from all the parties to the *In re September 11 Litigation*, the FBI has processed more than 50,000 pages of unclassified, non-privileged materials.  Heimbach Decl. ¶ 7.

7.    In response to the parties' requests for documents in the *In re September 11 Litigation*, the FBI has produced more than 33,000 pages of documents and other materials, including, among other things, more than 10,000 pages of laboratory photographs and related information, reports of witness interviews, records related to the hijackers' weapon purchases and flights taken prior to September 11, 2001, investigative reports, documents describing communications with individuals on board the hijacked aircraft, and videotapes.  *See* Normand Decl. ¶ 5.

8.    The FBI unit responsible for processing these records has logged approximately 3,650 hours to date searching for, reviewing and processing records responsive to requests for documents from the parties to the *In re September 11 Litigation*.  Heimbach Decl. ¶ 7.

**The Aviation Defendants' Requests for Depositions of Additional Government Witnesses**

9.      On March 6, 2007, the Aviation Defendants submitted requests to the CIA seeking authorization to depose the witnesses identified as "John" and "Mary," respectively, during the trial of Zacarias Moussaoui. *See* Normand Decl. ¶ 8 & Exhs. D & E.

10.     On August 23, 2007, the Aviation Defendants submitted a request to the Department of Justice seeking authorization to depose Behrooz Sarshar, a former FBI translator who, according to the request, was assigned to the FBI's Washington Field Office in the spring of 2001. *See* Normand Decl. ¶ 11 & Exh. G.

11.     On May 5, 2008, the Aviation Defendants submitted requests for authorization to depose Kenneth Williams, an FBI Special Agent in Phoenix, Arizona, who authored the so-called "Phoenix memo," and John Anthony, a former Federal Aviation Administration ("FAA") inspector who had contact with 9/11 hijacker Hani Hanjour. *See* Normand Decl. ¶ 12 & Exhs. I, J.

12.     The Aviation Defendants have indicated an intent to seek the depositions of multiple intelligence specialists with the FAA and/or liaisons between the FAA and the Intelligence Community prior to September 11, 2001. *See* Normand Decl. ¶ 13 & Exh. K. Of the FAA employees identified by the Aviation Defendants, John Hawley, Jack Salata, Robert White, and James Padgett worked in or with FAA's Office of Intelligence. *Id.*

**Denial of the Aviation Defendants' Requests for Testimony from
Current and Former FBI Agents**

13.     In denying the Aviation Defendants' March 6, 2007, requests for testimony from current and former FBI agents (the "*Touhy* Requests"), the United States Attorney determined that it would be inappropriate to authorize the requested testimony because "a significant amount

of the information [the Aviation Defendants requested] is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege." *See* Barry Decl., Exhs. 7-11.

14.     The disclosure of classified national security information and information protected by the law enforcement privilege is explicitly prohibited under DOJ regulations. *See* 29 C.F.R. §§ 16.26(b)(3)-(5).

15.     In denying the *Touhy* Requests, the United States Attorney determined that it would be inappropriate to authorize the requested testimony because attempting to segregate classified or privileged information during the course of a deposition, "where open-ended inquiries may elicit responses in which classified or privileged material is intertwined," would be "an extremely difficult and burdensome task" and posed an "unacceptable risk that classified information or law enforcement matters [could] be inadvertently disclosed." *See* Barry Decl., Exhs. 7-11.

16.     The United States Attorney also denied the *Touhy* Requests to the extent the Aviation Defendants sought information protected by the deliberative process, attorney-client, work product or other applicable privilege. *See* Barry Decl., Exhs. 7-11.

17.     The United States Attorney also denied the *Touhy* Requests on the ground that some of the information sought by the Aviation Defendants originated with other Government departments and agencies, and the process of coordinating the FBI's responses with those other departments or agencies would place an undue burden on the FBI. *See* Barry Decl., Exhs. 7-11.

18.     In denying the *Touhy* Requests, the United States Attorney determined that the affidavits submitted in support of the *Touhy* Requests were deficient in that they did not

adequately explain the relevance of "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Osama bin Ladin" if such information was not communicated to the Aviation Defendants.  *See* Barry Decl., Exhs. 7-11.

19.    In denying the *Touhy* requests, the United States Attorney further determined that the affidavits submitted in support of the *Touhy* Requests were deficient in that they failed to set forth the basis for the Aviation Defendants' assertion that Special Agents Samit, Rowley, Billings or Rigler had particular and personal knowledge of many of the topics requested by the Aviation Defendants.  *See* Barry Decl., Exhs. 7-11.

20.    The Requests were also denied because the requested topics were overly broad and unduly burdensome, and therefore not permitted under either Rule 26(b) or Rule 45(c)(3)(A)(iv) of the Federal Rules of Civil Procedure.  *See* Barry Decl., Exhs. 7-11.

21.    The United States Attorney, citing Rule 26(b)(2) of the Federal Rules of Civil Procedure, denied the *Touhy* Requests on the additional ground that the requested information is cumulative, duplicative or available through less burdensome channels than the depositions of current or former FBI agents.  *See* Barry Decl., Exhs. 7-11.  The United States Attorney cited  to the public testimony and statements provided by the FBI agents, the records produced by the FBI to the parties in the *In re September 11 Litigation*, the exhibits that were introduced into evidence in the Moussaoui trial, the 9/11 Commission Report, and other public sources of the information requested by the Aviation Defendants.  *See* Barry Decl., Exhs. 7-11.

**Classified and Law Enforcement Sensitive Information Related to PENTTBOM**

22.    Much on the information relating to PENTTBOM, including intelligence information in the FBI's possession prior to September 11, 2001, remains classified and/or law

enforcement sensitive because it implicate specific intelligence sources, methods, and/or techniques utilized by the FBI and the Intelligence Community with respect to al Qaeda and those individuals responsible for the September 11th attacks,  as well as specific intelligence obtained by the FBI, intra- or inter-agency communications regarding intelligence and law enforcement matters, and information obtained from foreign intelligence sources.  *See* Heimbach Decl. ¶ 12.

23.    Classified and law enforcement sensitive information from the PENTTBOM investigation has direct relevance to the ongoing enforcement proceedings against Khalid Sheikh Mohammed, Ramzi Binalshibh, Walid Muhammad Salih Mubarek Bin Attash, Ali Abdul Aziz Ali and Mustafa Ahmed Adam al Hawsawi.  *See* Heimbach Decl. ¶ 11.

24.    Many of the proposed deposition topics contained in the Aviation Defendants' March 6, 2007 requests call for the disclosure of classified and law enforcement sensitive information.  *See* Heimbach Decl. ¶ 12.  Disclosure of such classified and law enforcement sensitive information could reasonably be expected to harm the national security by compromising investigative sources, methods, and/or techniques and allowing adversaries of the United States to better evade ongoing investigations and more easily formulate or revise their counter-surveillance efforts.  *Id.*

25.    Much of the classified and law enforcement sensitive information related to the deposition topics has not been publicly disclosed, including in such contexts as the hearings held by the the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission" or "Commission"), the 9/11 Commission Report, or the criminal trial of Zacarias Moussauoi.  *See* Heimbach Decl. ¶ 13.

26.     Attempts to elicit the foundation of prior public statements relating to the deposition topics, inquire into background facts or circumstances, or otherwise amplify the prior public statements likely would implicate classified or law enforcement sensitive information that has not been previously disclosed.  *See* Heimbach Decl. ¶ 23.

27.     The prior public disclosures of PENTTBOM information were made through highly controlled and deliberative processes in which oral testimony and written language was thoroughly vetted in advance to ensure that classified information was neither accessed by those without security clearances nor released in a manner that would harm the national security.  *See* Heimbach Decl. ¶ 13.

28.     All of the Commission members and their staff possessed security clearances.  *See* Heimbach Decl. ¶ 14.

29.     Commission hearings and interviews in which classified information was discussed were closed to the public.  *See* Heimbach Decl. ¶ 14.

30.     The Commission had a sensitive compartmented information facility ("SCIF") in which it could store classified materials.  *See* Heimbach Decl. ¶ 14.

31.     During the Commission's public hearings, precautionary steps were taken in advance of the hearings to ensure that no classified topics would be raised during live testimony. Moreover, during public hearings in which FBI witnesses testified, FBI personnel familiar with PENTTBOM and classification procedures were in attendance to lend advice and guidance regarding issues which implicated classified information.  *See* Heimbach Decl. ¶ 14.

32.    The 9/11 Commission's draft report was submitted to the FBI and other agencies within the Intelligence Community prior to release in order to ensure that no classified information was disclosed.  *See* Heimbach Decl. ¶ 15.

33.    The measures taken by the FBI to ensure that classified information was not disclosed during the Commission's inquiry required a significant devotion of FBI resources.  *See* Heimbach Decl. ¶ 16.  An FBI Headquarters task force of approximately 50 personnel was assembled in the summer of 2003, whose mission was to ensure the FBI's cooperation with the Commission and to protect against the unauthorized release of classified information.  *See* Heimbach Decl. ¶ 16.

34.    The Classified Information Procedures Act ("CIPA") provides a detailed framework for adjudicating the discoverability and admissibility of classified information in criminal proceedings, to prevent the public disclosure of such information.  *See* 18 U.S.C. app. 3; Heimbach Decl. ¶ 17.  The CIPA procedures were used extensively in connection with the Moussaoui trial.  *See* Heimbach Decl. ¶ 18.

35.    Under the CIPA framework, Moussaoui's defense counsel, who had security clearances, reviewed thousands of pages of classified materials in a SCIF to identify the subset of documents and information that would be potentially used at trial.  *See* Heimbach Decl. ¶ 18.

36.    In connection with the Moussaoui prosecution, prosecutors and defense counsel engaged in intense CIPA litigation, including multiple *in camera* proceedings and substantial negotiation.  *See* Heimbach Decl. ¶ 18.

37.     Through the CIPA framework, prosecutors and defense counsel were able to resolve issues relating to the use of classified documents and information in advance of the Moussaoui trial, both through court rulings and negotiations.  *See* Heimbach Decl. ¶ 19.

38.     Prosecutors and defense counsel in the Moussaoui case negotiated a set of factual stipulations regarding certain intelligence available to the Government before the September 11th attacks, thereby obviating the need to introduce classified information on those subjects during the trial.  *See* Heimbach Decl. ¶ 19.

39.     Prosecutors and defense counsel in the Moussaoui case negotiated to use substitutes for the testimony of government employees "John" and "Mary," thereby obviating the need to introduce classified testimony from those witnesses.  *See* Heimbach Decl. ¶ 19.

40.     Representatives of the Intelligence Community briefed prosecutors, defense counsel, and witnesses regarding the classified boundaries of questioning in advance of testimony being given in the Moussaoui trial.  *See* Heimbach Decl. ¶ 20.

41.     Whenever witnesses with knowledge of classified information testified during the Moussaoui trial, several Intelligence Community representatives, including an original classification authority, were present in an attempt to prevent classified information from being disclosed.  *See* Heimbach Decl. ¶ 20.

42.     Precautionary procedures similar to those utilized pursuant to CIPA will be utilized to safeguard classified PENTTBOM-related information in ongoing and future military commission proceedings involving other alleged al Qaeda terrorists charged with involvement in the September 11th attacks.  *See* 10 U.S.C. §§ 949d(f) and 949j(c); Heimbach Decl. ¶ 21.

43.     The process of determining whether specific information is properly classified, or should be declassified, is based on a variety of factors and considerations that are weighed by officials who have been delegated original classifying authority.  *See* Heimbach Decl. ¶ 24.  In weighing those factors, an original classifying authority must assess whether the disclosure of particular information, at a given time, would present an unacceptable risk of compromising the FBI's ongoing intelligence gathering process with respect to particular investigation or investigations, or whether such disclosure would present an unacceptable risk of compromising certain investigative sources, methods, or techniques.  *Id.*

44.     The determination of whether information is properly classified, or should be declassified and disclosed, is a painstaking and deliberative process.  *See* Heimbach Decl. ¶ 25.  It requires a great deal of time, as well as collaboration among multiple FBI divisions and other governmental agencies in order to trace information back to its source and determine the national security equities implicated by the potential disclosure of classified information.  *Id.*  Moreover, to the extent classified information originated with another agency or foreign government, such other agency or government must be consulted prior to release of the information.  *Id.*

45.     In assessing the potential harms to the national security that could reasonably be expected to result from a disclosure, the classifying authority must consider the information already available from public sources and whether the additional disclosure of information would contribute to the mosaic of information that could be pieced together by adversaries of the United States.  *See* Heimbach Decl. ¶ 26.

46.     For the FBI and the Intelligence Community to ensure against the unauthorized disclosure of classified or law enforcement sensitive information in the civil depositions

-14-

requested by the Aviation Defendants would require a commitment of resources similar to that expended in connection with the 9/11 Commission inquiry and the Moussaoui trial. *See* Heimbach Decl. ¶ 26. The resource commitment would deflect current FBI agents investigating PENTTBOM and other counterterrorism matters from critically important operational duties. *Id.*

47.    Counsel in the *In re September 11 Litigation* do not possess clearances to access information classified national security information. *See* Heimbach Decl. ¶ 22.

**Depositions Implicating Sensitive Security Information**

48.    Each deposition in the *In re September 11 Litigation* potentially implicating Sensitive Security Information ("SSI") has been attended by a Transportation Security Administration ("TSA") security expert, as well as by counsel representing TSA. Normand Decl. ¶ 18. To identify SSI in deposition questions and answers, TSA's security expert relies heavily on the documents that TSA has previously reviewed and redacted in the *In re September 11 Litigation*, which documents are available in searchable electronic format during the deposition. *Id.* Only a very limited amount of SSI has been implicated in the depositions that have taken place to date. *Id.* Accordingly, TSA's security expert rarely has been called upon during the course of a deposition to make on-the-spot determinations as to what constitutes SSI. *Id.*

49.    Notwithstanding the presence of a TSA security expert and counsel, SSI has been disclosed inadvertently in more than twenty depositions in the *In re September 11 Litigation*. Normand Decl. ¶ 19.

By submitting this statement, the Government does not waive its right to contend that any

of the above-referenced facts are not material to the present action.

Dated: New York, New York
       June 17, 2008

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for Defendants


                        By:      /s/ JEANNETTE A. VARGAS
                                 JEANNETTE A. VARGAS
                                 SARAH S. NORMAND
                                 BETH E. GOLDMAN
                                 Assistant United States Attorneys
                                 86 Chambers Street, Third Floor
                                 New York, New York 10007
                                 Telephone: (212) 637-2709/2732/2678
                                 Facsimile: (212) 637-2702
                                 sarah.normand@usdoj.gov
                                 beth.goldman@usdoj.gov
                                 jeannette.vargas@usdoj.gov