UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN AIRLINES, INC., ET AL.
    Plaintiffs,

v.

FEDERAL BUREAU OF
INVESTIGATION, ET AL.
    Defendants.

07 Civ. 7051 (AKH)

In relation to 21 MC 101 (AKH)

## DECLARATION OF MICHAEL J. HEIMBACH
## FEDERAL BUREAU OF INVESTIGATION

I, MICHAEL J. HEIMBACH, hereby declare and say:

1. I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation (FBI), United States Department of Justice, a component of an Executive Department of the United States Government. I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations. As Assistant Director, I have official supervision and control over the files and records of the Counterterrorism Division, FBI, Washington, DC.

2. The matters stated herein are based on my personal knowledge, my review and consideration of documents and information available to me in my official capacity, and information furnished by Special Agents and other employees of the FBI. My conclusions have been reached in accordance therewith.

3. As Assistant Director of the Counterterrorism Division, I have been delegated original classification authority by the Director of the FBI. *See* Executive Order 13292, Section

1.3(c). As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified information within the Counterterrorism Division of the FBI, including the sources and methods used by the FBI in the collection of information. I have been authorized by the Director of the FBI to execute declarations and other affidavits in order to protect such classified information.

4. I understand that the aviation parties, who are plaintiffs in the above-captioned case but are defendants in the *September 11 Litigation* (S.D.N.Y., 21 MC 101), seek the deposition testimony of five current and former FBI agents: Harry Samit, Coleen Rowley, Scott Billings, Michael Rolince, and Erik Rigler. The aviation parties claim that these witnesses have "unique knowledge of highly relevant facts concerning the September 11 plot and can provide some of the context that is vital to understanding what took place on September 11 and why."

5. I am submitting this declaration in opposition to the aviation parties' motion for summary judgment seeking to set aside the Department of Justice's final determinations denying their requests for depositions of the above-listed current and former FBI agents and in support of the government's cross-motion for summary judgment. This declaration explains more fully the bases for the Department of Justice's determination that these five depositions would impose significant and unwarranted burdens on the FBI and risk disclosures of classified and law enforcement sensitive information relating to the attacks of September 11, 2001. It further describes the harms that could reasonably be expected to flow from the unauthorized disclosure of this highly sensitive information.

2

## I. The PENTTBOM Investigation

6. The terrorist attacks of September 11, 2001 were the culmination of more than a decade of rhetoric, planning, coordination, and action by Usama bin Laden and his al-Qaeda network against the United States and its allies. In response to the attacks, the FBI initiated PENTTBOM (the acronym combines the roots of Pennsylvania, Pentagon, and Twin Towers), the largest and most complex investigation in its history. At the height of PENTTBOM, the FBI assigned 7,000 agents to assist full-time (the New York Division, after relocating to a garage on 26th Street, began a 24/7 operation utilizing 300 investigators from 37 agencies). By 2003, the FBI had received approximately 180,000 calls and 225,000 e-mails from the public regarding the September 11th investigation. Evidence response teams from throughout the country were dispatched to New York, Washington/Virginia, and Pennsylvania. Nationwide, the FBI covered over 500,000 investigative leads, conducted more than 167,000 interviews, and collected over 155,000 pieces of evidence which were submitted for analysis. The FBI helped process over 1.8 million tons of debris for investigative leads and victim identification and took more than 45,000 crime scene photographs.

7. The FBI has received multiple requests from the plaintiffs, aviation defendants, and cross-claim plaintiffs in the *September 11 Litigation* for production of documentary and other tangible materials (documents, photographs, videotapes, etc.) relating to the PENTTBOM investigation. The FBI has agreed to produce reasonably available materials that are relevant and material to the litigation so long as they are not classified,

law enforcement sensitive, or otherwise privileged. The FBI has devoted and continues to devote significant resources to gather, process, and produce responsive materials while assuring that no classified, law enforcement sensitive, or otherwise privileged materials are released. This discovery review process involves a multi-layered examination by highly-experienced paralegal specialists who have extensive experience handling voluminous and highly-sensitive FBI investigative files, in consultation with legal and operational personnel as necessary. As of today, the FBI unit responsible for the review and materials requested in the *September 11 Litigation* has logged approximately 3,650 hours and processed more than 50,000 pages of unclassified, non-privileged FBI material and other documents in response to the parties' voluminous requests.

## II. Protecting Classified and Law Enforcement Sensitive PENTTBOM-Related Information in Live Testimony

8. In addition to their requests for PENTTBOM documents and other materials, however, the aviation parties also seek deposition testimony regarding pre-September 11th intelligence from the five current and former FBI agents listed above. In contrast to the extensive document review process discussed above, the prospect of live testimony in civil discovery about intelligence and law enforcement investigatory matters raises significant national security and law enforcement concerns because it is extremely difficult -- if not impossible -- to protect against the unauthorized, even if inadvertent, disclosure of classified and law enforcement sensitive information relating to PENTTBOM.

9.  To begin, such testimony risks releasing classified and law enforcement sensitive information regarding PENTTBOM (and other related FBI investigations). Parties responsible for the September 11th attacks remain at large, and it is clear that al-Qaeda remains committed to future acts of terrorism. Accordingly, PENTTBOM remains an active investigation as the FBI works to bring to justice those responsible for the terrorist attacks and, together with our intelligence and law enforcement partners worldwide, to prevent future attacks. The FBI remains committed to following every lead, collecting every piece of intelligence, and analyzing every piece of evidence related to the September 11th attacks.

10. As a result of the ongoing PENTTBOM investigation, the FBI has been able to: assist in the disruption of terrorist operations around the world; identify al Qaeda operatives worldwide, many of whom have been or are being interviewed, arrested, and/or prosecuted (including the criminal prosecution of Zacarias Moussaoui, which is currently on appeal, as well as the upcoming military commission trials of other accused al Qaeda terrorists charged with September 11th-related crimes); develop valuable new intelligence, which is shared with our intelligence partners; better understand al Qaeda tradecraft; and develop new and better working relationships with our law enforcement colleagues overseas. Individually and collectively, these PENTTBOM-related efforts are -- even six-plus years after the September 11th attacks -- helping us arrest/prosecute terrorists, identify additional terrorists, cut off sources of financial support, and prevent future attacks.

11. For example, five co-conspirators were recently arraigned on charges related directly to the September 11th attacks: (a) Khalid Sheikh Mohammed, the self-proclaimed mastermind and alleged operational planner of the attacks; (b) Ramzi Binalshibh, who allegedly was selected at one time by Usama bin Laden to be a hijacker, assisted in finding flight schools for the hijackers, and engaged in numerous financial transactions in support of the plot; (c) Walid Muhammad Salih Mubarek Bin 'Attash, who allegedly administered an al Qaeda training camp where two of the hijackers were trained, and observed airport security by U.S. air carriers to assist in formulating the hijacking plan; (d) Ali Abdul Aziz Ali, who allegedly sent approximately $120,000 to the hijackers for their expenses and flight training as well as facilitated travel to the U.S. for nine of them; and (e) Mustafa Ahmed Adam al Hawsawi, who allegedly assisted and prepared the hijackers with money, western clothing, traveler's checks and credit cards, as well as facilitated the transfer of thousands of dollars between the hijackers and himself on September 11, 2001. Thus, classified and law enforcement information from PENTTBOM has direct relevance to ongoing enforcement proceeding against those allegedly responsible for the September 11th attacks.

12. Much of the information relating to PENTTBOM, including intelligence information in the FBI's possession prior to September 11, 2001, remains classified and/or law enforcement sensitive because it implicates specific intelligence sources, methods, and/or techniques utilized by the FBI (and the Intelligence Community) with respect to al Qaeda and those responsible for the September 11th attacks, as well as specific intelligence

obtained by the FBI, intra- or inter-agency communications regarding intelligence and law enforcement matters, and information obtained from foreign intelligence sources. Many of the proposed deposition topics call for the disclosure of classified and law enforcement sensitive information. *See, e.g.*, Aviation Parties request for deposition testimony on "[t]he information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Usama bin Laden." Disclosure of such classified and law enforcement sensitive information could reasonably be expected to harm the national security by compromising investigative sources, methods, and/or techniques and allowing our adversaries to better evade ongoing investigations and more easily formulate or revise their counter-surveillance efforts. Controlling the dissemination of such information is of paramount concern to the FBI.

13. These concerns are neither allayed nor undermined by the fact that much PENTTBOM-related information has already been publicly disclosed in such contexts as *The 9/11 Commission Report* and related hearings or the criminal trial of Zacarias Moussaoui. It is important to clarify and emphasize that the classified and law enforcement sensitive information I refer to above has <u>not</u> been publicly disclosed but rather remains protected as part of the ongoing PENTTBOM investigation. Moreover, in contrast to the depositions contemplated in this case, the prior public disclosures of PENTTBOM information were made through highly controlled and deliberative processes in which oral testimony and written language was thoroughly vetted in advance to ensure that classified

information was neither accessed by those without security clearances nor released in a manner that would harm the national security.

14. For example, with respect to *The 9/11 Commission Report* and related hearings, all of the Commission members and their staff possessed security clearances.[1] Commission hearings and interviews in which classified information was discussed were closed to the public, and the Commission had a sensitive compartmented information facility (SCIF) in which it could store classified materials. During the Commission's public hearings, both the questioners and witnesses knew that classified topics could not be discussed, and precautionary steps were taken in advance to ensure that no classified topics would be raised during live testimony. During public hearings in which FBI witnesses testified, FBI personnel familiar with PENTTBOM and classification procedures were in attendance to lend advice and guidance regarding issues which implicated classified information.

15. Furthermore, the Commission's draft report was submitted to the FBI and other agencies within the Intelligence Community prior to its release to facilitate a "pre-publication review" for classified information. Indeed, prior to *The 9/11 Commission Report*'s publication in July 2004, numerous meetings among Commission staff and agency personnel (including from the FBI) were held in which the report's final language was collaboratively vetted to ensure that no classified information was disclosed.

---

[1] It should be noted that certain highly classified materials were not accessible to all Commission staffers, but rather were limited only to staffers with a demonstrable need to review those materials.

8

16. Not surprisingly, implementing all of these measures required a significant devotion of FBI resources. An FBI Headquarters task force of approximately 50 personnel was assembled in the summer of 2003, whose mission was to ensure the FBI's cooperation with the Commission and to protect against the unauthorized release of classified information.

17. Similar precautionary measures were taken in the criminal trial of *United States of America v. Zacarias Moussaoui* (E.D.Va., Crim. No. 01-455-A). The Classified Information Procedures Act (CIPA), 18 U.S.C. 3 §§ 1-16, provides a detailed framework for determining the discoverability and admissibility of classified information, often in *in camera* hearings, to prevent the inadvertent disclosure of such information in open criminal proceedings. While this mechanism is often initiated by the Government when classified information is potentially relevant to a prosecution, CIPA requires a defendant in a criminal case where classified information is at issue to disclose in advance any classified information that he "reasonably expects to disclose or to cause the disclosure of" at trial so a hearing may be held *in camera* to determine its use, relevance, and admissibility. *Id.* at § 5(a) and § 6(a).

18. CIPA was used extensively in the Moussaoui trial. Of critical relevance here, CIPA's discovery framework permitted Moussaoui's defense counsel (who had security clearances) to review of thousands of pages of classified PENTTBOM (and other) materials in a SCIF and identify several hundred documents for potential use in the trial.

       The prosecutors and defense counsel thereafter engaged in intense CIPA litigation, including multiple *in camera* proceedings and substantial negotiations among counsel.

19. As a result of this litigation, which proceeded under the CIPA framework, the prosecutors and defense counsel were able to resolve, through court rulings or negotiation, issues relating to the use of classified documents and information during the trial. For example, the prosecutors and defense counsel negotiated a set of factual stipulations regarding certain intelligence available to the Government before the September 11th attacks, as well as substitutes for the testimony of government employees "John" and "Mary," thereby obviating the need to introduce classified information on those subjects during the trial. *See* Attachments A, B, and C. These stipulations of facts and testimonial substitutes gave the FBI and prosecutors substantial comfort that defense counsel would not delve into classified areas during their examination of witnesses at trial.

20. Additional precautionary measures were put in place to protect against the inadvertent disclosure of classified information during live testimony during the Moussaoui trial. For example, representatives of the Intelligence Community briefed prosecutors, defense counsel, and witnesses in advance of their testimony regarding the classified boundaries of questioning. During courtroom proceedings in which witnesses with knowledge of classified information testified, several Intelligence Community representatives, including an original classification authority, were present in an attempt to prevent classified information from being disclosed. Even with these protective measures in place,

however, there were instances where questioning of witnesses could have revealed classified information.

21. CIPA-like precautionary measures are available and will be utilized to safeguard classified PENTTBOM-related information in ongoing and future military commission proceedings involving other alleged al Qaeda terrorists charged with involvement in the September 11th attacks. *See, e.g.*, 10 U.S.C. §§ 949d(f) and 949j(c).

22. These examples demonstrate the stark contrast between the handling of classified and law enforcement sensitive information in connection with the 9/11 Commission proceedings, the Moussaoui trial, or the upcoming military commissions, as compared with the requested depositions of five current and former FBI agents in this civil case. The parties' counsel do not possess security clearances to access classified PENTTBOM-related information. The CIPA framework does not apply to civil discovery involving classified information, and no comparable system is available in civil cases, particularly where the government is not a party. As a result, the parties' counsel (representing plaintiffs and cross-claim plaintiffs in addition to the aviation parties) could not determine in advance of the contemplated depositions which of the questions they wish to ask may intrude upon classified or law enforcement sensitive matters, nor could the FBI adequately prepare its witnesses or counsel to respond in a manner that fully protects against the disclosure of classified or sensitive information. The five current and former FBI agents whose deposition testimony has been requested themselves are not necessarily in a position to

know whether information they may be asked about at a deposition is or is not classified or law enforcement sensitive and therefore should not be discussed during the deposition.

23. The risks of disclosing classified or law enforcement sensitive information are magnified in the context of a deposition, where open-ended inquiries may elicit responses in which such information is inextricably intertwined and not readily segregable, particularly given the breadth of the deposition topics proposed by the aviation parties here. Although the aviation parties have indicated that they wish to inquire only into information that has been made public previously, attempts to elicit the foundation of prior public statements, inquire into background facts or circumstances, or otherwise amplify the prior public statements likely would implicate classified or law enforcement sensitive information that has not previously been disclosed. Even if the aviation parties were willing to limit their examinations strictly to information that previously has been made public, the witnesses would be subject to cross-examination by counsel for plaintiffs and cross-claim plaintiffs, who likely would seek to probe the witnesses' testimony and inquire into matters beyond the scope of the information previously disclosed, thereby implicating information that remains classified and/or law enforcement sensitive.

24. Furthermore, the process of determining whether specific information is properly classified, or should be declassified, is based on a variety of factors and considerations that are weighed by officials, such as myself, who have been delegated original

classification authority.[2] In weighing these factors, some of which are subtle and complex, I must assess whether the disclosure of particular information, at a given time, would present an unacceptable risk of compromising the FBI's ongoing intelligence gathering process with respect to a particular investigation or investigations, and whether such disclosure would present an unacceptable risk of compromising certain investigative sources, methods, or techniques. In assessing the potential harms to the national security that reasonably could be expected to result in a given case at a particular point in time, I consider, among other things, the information that is already available from public sources, and whether the additional disclosure under consideration would contribute to a mosaic of information that could be pieced together by our adversaries, both individuals and groups, which would allow them to better evade ongoing investigations and more easily formulate or revise their counter-surveillance efforts.

25. As this description demonstrates, the determination of whether information is properly classified, or should be declassified and disclosed, is a painstaking and deliberate process, which requires careful analysis and measured judgment. It typically requires a great deal of time, energy, and collaboration among multiple FBI divisions and other government agencies, often including other agencies within the Intelligence Community, to trace information back to its source and determine the national security equities implicated by

---

[2] "Classified information" means information that has been determined pursuant to Executive Order to require protection against unauthorized disclosure. Information is classified at the "Secret" level, for example, if its unauthorized disclosure "could reasonably be expected to cause serious damage to the national security." *See* Executive Order 12958 (as amended by Executive Order 13292).

13

the potential disclosure of classified information. To the extent classified information originated with another agency or foreign government, such other agency or government must be consulted prior to release of the information.

26. Under all of these circumstances, it would be extremely difficult, if not impossible, and unduly burdensome for the FBI to monitor and protect against the inadvertent disclosure of classified and/or law enforcement sensitive information in depositions in this civil case. The 9/11 Commission and Moussaoui proceedings took place under tightly controlled circumstances, as described above, and with a substantial commitment of FBI and Intelligence Community resources to protect against unauthorized disclosures. To require the FBI (and the rest of the Intelligence Community) to commit similar resources to protect against unauthorized disclosures in civil litigation -- in a case in which the FBI is not even a party -- would be unduly burdensome and would deflect current FBI agents investigating PENTTBOM and other counterterrorism matters from their critically important operational duties.

### III. Conclusion

27. After a considered assessment of all of the facts and circumstances present in this case, and as the official charged with general supervisory responsibilities for the FBI's counterterrorism investigations (including the ongoing PENTTBOM case), I have concluded that classified and law enforcement sensitive information relating to the September 11, 2001 attacks could be disclosed inadvertently if the five designated current and former FBI employees are deposed in this civil litigation. I have further concluded

that the unauthorized disclosure of classified information in such depositions reasonably could be expected to cause serious damage to the national security of the United States, and that the unauthorized disclosure of law enforcement sensitive information in such depositions would reveal investigatory records compiled for law enforcement purposes and would interfere with enforcement proceedings and disclose investigative techniques and procedures the effectiveness of which would thereby be impaired. Such disclosures could reveal highly sensitive and classified information concerning the FBI's investigative sources, methods, and techniques that were used in PENTTBOM and other national security investigations, as well as the investigative capabilities of the U.S. Intelligence Community.

(U) Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 16, 2008

Michael J. Heimbach
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

15