UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
                                          :
IN RE SEPTEMBER 11 LITIGATION             :    21 MC 101 (AKH)
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

     1.      I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP.  I serve as the Aviation Defendants Liaison

Counsel in the September 11 Litigation pending before Judge Alvin K. Hellerstein in this

Court.  I submit this Affidavit in accordance with 28 C.F.R. §§ 16.21 *et seq.*, in

connection with the Aviation Defendants' request to depose Kenneth Williams, a Special

Agent with the Federal Bureau of Investigation ("FBI") based in Phoenix, Arizona in

2001, who authored the so-called "Phoenix Memorandum" dated July 10, 2001

("Phoenix Memo") (attached as Ex. A) discussing his concern that al Qaeda was sending

operatives to study at civil aviation schools in the United States in order to create a cadre

of terrorists capable of attacking civil aviation.

2.       Plaintiffs in this litigation seek to impose billions of dollars in liability upon the Aviation Defendants for their alleged failure to detect and halt the terrorists who attacked the United States on September 11, 2001.  Numerous property damage and business loss plaintiffs have brought claims against the Aviation Defendants for the destruction of real property and business interruption resulting from al Qaeda's attacks. The Aviation Defendants also are being sued by personal injury and wrongful death plaintiffs for injuries and fatalities caused by the terrorist attacks.

3.       Plaintiffs claim that the Aviation Defendants should have foreseen that al Qaeda posed a significant threat to civil aviation in 2001 and that the terrorists would hijack commercial airliners for the purpose of crashing them into ground targets. Plaintiffs further allege that based upon the available intelligence information concerning al Qaeda and Usama Bin Laden, the Aviation Defendants should have employed countermeasures designed to prevent such attacks.  Plaintiffs claim, in effect, that the Aviation Defendants should have "done more and done better" than the aviation security measures required by the Federal Aviation Administration ("FAA") on September 11, 2001.

4.       The Aviation Defendants wish to depose Kenneth Williams because he investigated suspected al Qaeda supporters and Islamic extremists attending civil aviation schools in Phoenix, Arizona and authored the Phoenix Memo in July 2001.  In the Phoenix Memo, Mr. Williams alerted FBI Headquarters and agents working on

2

international terrorism issues at the FBI's New York Field Office that he suspected that Usama Bin Laden had developed a strategy of sending operatives to study civil aviation in the United States with the intention of creating a cadre of terrorists capable of attacking civil aviation. *See* Ex. A, Phoenix Memo at 1-2; National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (2004) ("*9/11 Commission* Report") at 272, 520, n. 56. Mr. Williams reported that that he had identified a significant number of individuals of investigative interest to the FBI who were attending civil aviation schools in Arizona and that he knew of many al Qaeda associates who were either living in or had lived in Arizona, including Wadih El-Hague, who was convicted for his participation in al Qaeda's 1998 bombings of U.S. embassies in Africa. *See 9/11 Commission Report at* 272; Ex. A at 1, 6.

5.     Mr. Williams recommended in the Phoenix Memo that the FBI (i) develop liaisons with flight schools throughout the country, (ii) consider obtaining visa information on foreigners seeking to attend flight school in the United States; and (iii) commence a discussion about suspected terrorists attending civil aviation school within the broader intelligence community. Ex. A at 2. The Aviation Defendants believe that neither FBI Headquarters nor the FBI's New York office acted upon his recommendations before September 11, 2001. *See* Ex. B, Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001 ("JIC Report") at 22-23.

3

6.    The Aviation Defendants want to depose Mr. Williams in order to determine if the FBI's Phoenix Field Office either disseminated the Phoenix memo or otherwise alerted constituencies involved in civil aviation that the FBI was in possession of intelligence indicating that members of al Qaeda and/or Islamic extremists from the Middle East, Africa and the Indian subcontinent were attending civil aviation schools in the United States. Specifically, the Aviation Defendants want to question Mr. Williams concerning whether the Phoenix Memo or the intelligence described in it were disseminated prior to September 11, 2001 to: 1) any flight school or flight simulator facility; 2) the FAA liaison to the FBI; 3) the FAA; 4) the FBI's civil aviation program manager 5) the FBI agents investigating Zacarias Moussaoui; or 6) any Aviation Defendant. Furthermore, the Aviation Defendants want to question Mr. Williams about what steps, if any, that the FBI took before September 11, 2001 to implement the recommendations listed in the Phoenix Memo.

7.    The Aviation Defendants also want to inquire if before September 11, 2001 the FBI's Phoenix Field Office received or disseminated any information about Hani Hanjour, the hijacker-pilot of American Airlines Flight 77, whom the Aviation Defendants believe received flight training in Arizona. *See 9/11 Commission Report* at 225-26. The Aviation Defendants plan to question Mr. Williams concerning whether the FBI's Phoenix Field Office provided any intelligence information on Hani Hanjour to: 1) the FAA; 2) any flight school or flight simulator facility; or 3) any Aviation Defendant before September 11, 2001. The Aviation Defendants also want to ask Mr. Williams if

4

the FBI's Phoenix Field Office received any communications before September 11, 2001 regarding Hanjour from FBI inspector, John Anthony, any other FAA employee or official, or any representative of a flight school or flight simulator facility.

8.    Additionally, the Aviation Defendants want to question Mr. Williams concerning whether, before September 11, 2001, the staff of any flight school or flight simulator facility contacted the FBI's Phoenix Field Office to raise concerns about one of their students or patrons. Similarly, the Aviation Defendants also plan to ask Mr. Williams if, before September 11, 2001, any FAA employee or official contacted the FBI's Phoenix Field Office regarding information that the FAA had indicating that members of al Qaeda or other Islamic extremists were attending civil aviation schools in the United States.

9.    Mr. Williams' testimony is directly relevant to September 11 Litigation because it, together with evidence gathered from other sources, will shed light on the terrorists' intent, likely means of attack, and capabilities – as well as the extent to which the FBI shared this information with the FAA and the Aviation Defendants before September 11, 2001. This evidence is probative of the issues of causation, the foreseeability of the September 11 attacks, and the availability of a derivative immunity defense to the Aviation Defendants.

10.    For example, evidence of intelligence information possessed by the FBI regarding the threat posed by al Qaeda and Islamic extremists is relevant to the issue of

5

causation.  The Aviation Defendants intend to demonstrate that the terrorists' criminal

conduct was the supervening cause of the September 11 attacks and plaintiffs' alleged

damages.  The Aviation Defendants also intend to present evidence that the intelligence

information that the FBI had before September 11, 2001 regarding the threat posed by al

Qaeda or other Islamic extremists to domestic civil aviation was not shared with the FAA

or the Aviation Defendants.  Weighing this evidence together with the evidence of the

terrorists' intentional criminal acts, the jury in the September 11 Litigation would be

entitled to conclude that the Aviation Defendants should not be held liable because their

conduct was not a substantial cause of plaintiffs' alleged damages.  *See* Restatement

(Second) of Torts § 433(a) (explaining that the combination of multiple contributing

factors may "so dilute the effects of the actor's negligence as to prevent it from being a

substantial factor").


11.    Additionally, evidence of the pre-9/11 intelligence information the FBI

had on the terrorist threat will help rebut any allegation that the Aviation Defendants

should have foreseen the terrorist attacks based upon a general awareness of al Qaeda's

hatred for the United States.  The Aviation Defendants intend to establish that any

intelligence information that the FBI had regarding the terrorist threat to civil aviation

before September 11, 2001 did not result in the agency recommending that the FAA

implement the kind of specific security measures that plaintiffs now claim in hindsight

were appropriate on September 11, 2001.  The jury should be permitted to consider that if

the FBI did not foresee that al Qaeda would launch unprecedented suicide attacks on

6

September 11, 2001, despite having access to significantly more intelligence information than the Aviation Defendants, then the Aviation Defendants could not have been expected to foresee the same threat. *See Eiseman v. State*, 70 N.Y.2d 175, 191 (1987) (college not required to anticipate criminal behavior of student who was a parolee because that would unfairly "hold college to a higher degree than society's experts in making such predictions – the correction and parole officers").

12.     Furthermore, the information known to the federal intelligence agencies and the FAA before September 11, 2001 is relevant to determining whether the Aviation Defendants have derivative immunity from liability under the discretionary function exception of the Federal Tort Claims Act. The Court of Appeals for the Second Circuit has strongly suggested that this is a defense available to the Aviation Defendants. *See In re World Trade Ctr. Disaster Site Litig.*, No. 06-5324, 2008 U.S. App. LEXIS 622 (2d Cir. Mar. 26, 2008). To establish their immunity to plaintiffs' claims for damages, the Aviation Defendants must show that they "were not aware of dangers about which [the federal agencies were] unaware." *Id.* at *76. In effect, defendants must establish that they had no greater knowledge of the terrorist threat than the agencies statutorily charged with threat assessment, including the FBI. The Aviation Defendants cannot make such a comparison without being able to present the pre-September 11 intelligence that the FBI had on the terrorist threat.

13.    The Aviation Defendants submit that Mr. Williams' testimony is clearly appropriate when all the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Because Mr. Williams has been widely cited as an authority in *The 9/11 Commission Report* (2004) (which cites him by name) and the JIC Report (which describes him only as the author of the Phoenix Memo) concerning the topics about which the Aviation Defendants seek to depose him, his testimony is unlikely to implicate any privilege issues or protected information. The Aviation Defendants are not seeking classified national security information and expect that counsel for the FBI will instruct Mr. Williams not to answer any questions that threaten to elicit such information. Additionally, because Mr. Williams' testimony will be relevant to the parties' claims and defenses in this litigation, the testimony is appropriate under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. Rule 26(b)(1).

14.    By contrast, a refusal to permit Mr. Williams deposition would deprive the Aviation Defendants of evidence that is important to their defense of the serious allegations made against them in this litigation. The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role consisted of implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.,* Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of

the Federal Aviation Administration and the Director of the Federal Bureau of

Investigation jointly shall assess current and potential threats to the domestic air

transportation system.").

_____
DESMOND T. BARRY, JR.

Sworn to before me this
5th day of May 2008

_____
Notary Public

TINA M. ZOCCALI
Notary Public, State of New York
No. 01ZO6059025
Qualified in Rockland County
Commission Expires May 21, 20 ___

9

# Exhibit A

DEFENDANT'S
EXHIBIT
129
U.S. v. Moussaoui
Cr. No. 01-455-A

(Rev. 08-28-2000)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 07/10/2001

**To:** Counterterrorism          **Attn:**    RFU
                                               SSA David Frasca
                                               IRS Elizabeth Harvey Matson
                                               UBL Unit
                                               SSA Rodney Middelton
                                               IRS Jennifer Maitner
                                               IRS Mark Connor
                                               IRS Fred Stremmel
              New York                          I-46
                                               SSA Jack Cloonan
                                               SA Michael S. Butsch

**From:** Phoenix
          Squad16
          **Contact:**   SA Kenneth J. Williams ████████████

**Approved By:** Kurtz William A

**Drafted By:** Williams Kenneth J

**Case ID #:** ████████████████ (Pending)

**Title:** ███ ZAKARIA MUSTAPHA SOUBRA;
           IT-OTHER (ISLAMIC ARMY OF THE CAUCASUS)

**Synopsis:** ███ UBL and AL-MUHAJIROUN supporters attending civil
aviation universities/colleges in the State of Arizona.

███    ████████████████

███ **Full Field Investigation Instituted:** 04/17/2000 (NONUSPER)

**Details:** ███ The purpose of this communication is to advise the
Bureau and New York of the possibility of a coordinated effort by
USAMA BIN LADEN (UBL) to send students to the United States to attend
civil aviation universities and colleges. Phoenix has observed an
inordinate number of individuals of investigative interest who are
attending or who have attended civil aviation universities and
colleges in the State of Arizona. The inordinate number of these
individuals attending these type of schools and fatwas issued by AL-

███████

Declassified by: UC, CTLU 1, NSLB,
                 OGC, FBI
N: 02/8/06

██████

To: Counterterrorism  From: Phoenix
Re: ███████████████, 07/10/2001

MUHJIROUN spiritual leader SHEIKH OMAR BAKRI MOHAMMED FOSTOK, an
ardent supporter of UBL, gives reason to believe that a coordinated
effort is underway to establish a cadre of individuals who will one
day be working in the civil aviation community around the world.
These individuals will be in a position in the future to conduct
terror activity against civil aviation targets.

██  Phoenix believes that the FBI should accumulate a
listing of civil aviation universities/colleges around the country.
FBI field offices with these types of schools in their area should
establish appropriate liaison. FBIHQ should discuss this matter with
other elements of the U.S. intelligence community and task the
community for any information that supports Phoenix's suspicions.
FBIHQ should consider seeking the necessary authority to obtain visa
information from the USDOS on individuals obtaining visas to attend
these types of schools and notify the appropriate FBI field office
when these individuals are scheduled to arrive in their area of
responsibility.

██  Phoenix has drawn the above conclusion from  several
Phoenix investigations to include captioned investigation and the
following investigations: ████████████████, a Saudi
Arabian national and two Algerian Islamic extremists ██████████
████████ and ████████████████████.

██  Investigation of ZAKARIA MUSTAPHA SOUBRA was initiated
as the result of information provided by █████████ a source who has
provided reliable information in the past. The source reported during
April 2000 that SOUBRA was a supporter of UBL and the ████████
█████ AL-MUHJIROUN. SOUBRA arrived in Arizona from London, England
on 08/27/1999 on an F-1 student visa to attend EMBRY RIDDLE
UNIVERSITY (ERU), Prescott, Arizona. ERU only teaches courses related
to the field of aviation. SOUBRA is an Aeronautical Engineering
student at ERU and has been taking courses in "international
security" relating to aviation. SOUBRA, within weeks of his arrival
at Prescott, Arizona, ██████████████████████████,
supporting UBL, at Mosques located throughout Arizona. SOUBRA has
also organized anti United States and Israeli demonstrations in the
area of ARIZONA STATE UNIVERSITY (ASU), Tempe, Arizona. He has also
established and organized an Islamic student association on the ERU
campus organizing the Muslim student population on the ERU campus.

██  Phoenix has identified several associates of SOUBRA at
ERU who arrived at the university around the same time that he did.
These individuals are Sunni Muslims who have the same radical
fundamentalists views as SOUBRA. They come from Kenya, Pakistan,

██████

2

To: **Counterterrorism**  From: **Phoenix**
Re: ████████████████, 07/10/2001


United Arab Emirates, India, Saudi Arabia and Jordan. SOUBRA's
associates are:

████ ██████████████████, a Saudi Arabian national ████████
████████████████. ██████████ is enrolled in the ERU Pilot Training
program.

████ ████████████████, a Kenyan who traveled to the U.S. on
██████ passport ████████████████████████. ████ is
enrolled in the ERU Pilot Training program.

████ ████████████████, an Indian who traveled to the U.S. on
█████ passport ████████, ██████████████████████.
████████ is enrolled in the ERU Aeronautical Engineering program.

████ ████████████████, Saudi Arabian who traveled to the U.S.
on ████████ passport ████████, ██████████████.
██████ is enrolled in the ERU Pilot Training program.

████ ████████████████████, a Jordanian (possible Palestinian)
who traveled to the U.S. on ████████████████████, ████████
████████████. ████████████ is enrolled in the ERU Aeronautical
Engineering program.

████ ████████████████, a Pakistani who traveled to the U.S. on
████ passport ████████████████████. It is currently
unknown what ████████ field of study is.

████ ████████████████, it is unknown at the time of this
writing where ████████ is from, ██████████████████. ██████ is
enrolled in the ERU Aeronautical Engineering program.

████ The above individuals are involved with SOUBRA and
regularly participate in meetings with him in Prescott, Arizona.

████ FBIHQ, IRS Elizabeth Matson, RFU, wrote an analytical
paper on the AL-MUHAJIROUN, dated 11/09/1999, in support of FBINY
investigation captioned: ████████████████████████████████████
████████████████████████. IRS Matson's research paper
can be found in ████████████████████. The following information
was gleaned from IRS Matson's research paper.

████ The AL-MUHAJIROUN, which in English means THE
EMIGRANTS, is a Sunni Muslim fundamentalist organization based in the
United Kingdom. The organization's spiritual leader is SHEIKH OMAR
BAKRI MOHAMMED FOSTOK. The organization is dedicated to the overthrow

To: Counterterrorism  From: Phoenix
Re: ████████████████, 07/10/2001

of Western society. British officials have reported that FOSTOK first
came to their attention during the Gulf War after calling for the
assassination of British Prime Minister John Major. FOSTOK has
connections to UBL, JAMMAT AL-MUSLIMIAN (JM), HAMAS, HIZBALLAH and
the ALGERIAN SALVATION FRONT.

█ FOSTOK has made several controversial statements to
the press. For example, he stated in public interviews that the
bombings of the United States Embassies in Africa were "legitimate
targets."

█ FOSTOK, while representing the AL-MUHAJIROUN, signed a
fatwa (religious decree) during February 1998 which stated the
following:

█ " The Fatwa is jihad against the U.S. and British
government, armies, interests, airports (emphasis added by FBI
Phoenix), and instructions and it has been given because of the U.S.
and British aggression against Muslims and the Muslim land of
Iraq...we...confirm that the only Islamic Fatwa against this explicit
aggression is Jihad. Therefore the message for the British
governments or any other government of non-Muslim countries is to
stay away from Iraq, Palestine, Pakistan, Arabia, etc...or face full
scale war of Jihad which it is the responsibility and the duty of
every Muslim around the world to participate in...We...call
upon...Muslims around the world including Muslims in the USA and in
Britian to confront by all means whether verbally, financially,
politically or militarily the U.S. and British aggression and do
their Islamic duty in relieving the Iraqi people from the unjust
sanctions."

█ SOUBRA was interviewed by FBI Phoenix on 04/07/2000
and 05/11/2000 at his residence. On 04/07/2000, interviewing Agents
observed photocopied photographs of UBL, IBN KHATTAB and wounded
Chechnyan Mujahadin tacked to his livingroom wall. SOUBRA admitted to
████████████████████████████ in the State of Arizona.
SOUBRA stated that he considers the United States Government and U.S.
Military forces in the Gulf as "legitimate military targets of
Islam." He also stated that the targeting of the U.S. Embassies in
Africa was "legitimate." SOUBRA denied having received any military
training. However, Phoenix believes that SOUBRA was being less than
truthful in this regard. SOUBRA was defiant towards interviewing
Agents and it was clear that he was not intimidated by the FBI
presence. It is obvious that he is a hardcore Islamic extremist who
views the U.S. as an enemy of Islam. Investigation of SOUBRA is
continuing.

4

M-HQI-88000177
4 OF 8

SECRET

To: Counterterrorism  From:  Phoenix
Re: ███████████████    07/10/2001



███  Phoenix investigation of ███████████████████████
          ████ was predicated upon information received during
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

███  According to ████████████, a ███████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

      On 06███/2001, ████████████████████████
████████████ arrested two individuals who admitted under
interrogation to being members of UBL's AL-QA'IDA organization.
Evidence was developed demonstrating that these individuals were
planning an operation to bomb the U.S. Embassy and U.S. Military
forces in Saudi Arabia. A ██████ passport ████████████ in the name of
████████

5

████

To: Counterterrorism  From: Phoenix
Re: ████████████████████, 07/10/2001


████████████████████████████████████████████
████ within their possession ████████████████
████████████████████████████████████████████
████████████████████████████████████████████

        Phoenix has not been able to show a direct association
between ████████ and ████████████████ had departed the U.S. prior
to ████████ arrival. However, both ██████████ and ██████ have
associated with the ████████████████
████████ Arizona and it is highly probable that they know people in
common.

        ████ Investigations of ████████████████████ and ██████
received from the ████████████████████████████ demonstrating that
both subjects were involved with ██████████████████
activity. Both subjects also have association(s) with individuals
associated with ██████████████████ who lived in Phoenix from
the mid 1990s - 1997 left the United States after graduating from
████████████████████████████████████████████████████████
has been identified as a friend of both ████████ and ████████
████████████████████████████████████████████
████████████ a known supporter of the ████
        Phoenix has not developed any information linking these
████████ with the other subjects referenced in this communication.

        ████ Phoenix believes that it is more than a coincidence
that subjects who are supporters of UBL are attending civil aviation
universities/colleges in the State of Arizona. As receiving offices
are aware, Phoenix has had significant UBL associates/operatives
living in the State of Arizona and conducting activity in support of
UBL. WADIH EL-HAGE, a UBL lieutenant recently convicted for his role
in the 1998 bombings of U.S. Embassies in Africa, lived in Tucson,
Arizona for several years during the 1980s. ESSAM AL-RIDI, a personal
pilot for UBL, traveled to Tucson, Arizona during 1993 at the
direction of AL-HAGE to procure a T-39 jet aircraft for UBL's
personal use. ████████████████████████████████████████████████
████████████

        Phoenix believes that it is highly probable that UBL has an
established support network in place in Arizona. This network was
most likely established during the time period that EL-HAGE lived in
Arizona.

████

6

To: Counterterrorism   From: Phoenix
Re: ███████████████, 07/10/2001

████  This information is being provided to receiving
offices for information , analysis and comments.

M-HQI-88000177
7 OF 8

To: Counterterrorism  From: Phoenix
Re: ████████████, 07/10/2001

**LEAD(s):**

**Set Lead 1:**

COUNTERTERRORISM

AT WASHINGTON, DC

██    The RFU/UBLU is requested to consider implementing the suggested actions put forth by Phoenix at the beginning of this communication.

**Set Lead 2:**

NEW YORK

AT NEW YORK, NEW YORK

██    Read and Clear

M-HQI-88000177
8
8 OF 8

**Exhibit B**

S. Rept. No. 107- 351    107TH Congress, 2d Session    H. Rept. No. 107-792

# JOINT INQUIRY INTO
# INTELLIGENCE COMMUNITY ACTIVITIES
# BEFORE AND AFTER THE TERRORIST ATTACKS OF
# SEPTEMBER 11, 2001

## REPORT

### OF THE

## U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

### AND

## U.S. HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

TOGETHER WITH ADDITIONAL VIEWS

DECEMBER 2002

TOP SECRET

Hanjour. [This individual] left the United States in April 2000 and returned in June 2001, remaining in the United States for approximately one month. The FBI now speculates that [the individual] may have returned to the United States either to evaluate Hanjour's flying skills, or to provide Hanjour with his final training on the flight simulator before the September 11 attacks. [The individual] was an experienced flight instructor who was certified to fly Boeing 737s.

The FBI also has determined since September 11, 2001 that another individual mentioned in the Phoenix communication – [————————————] -- is also connected to the al-Qa'ida network. [————————] was arrested at an al-Qa'ida safehouse in Pakistan in 2002 along with [————————], one of the most prominent al-Qa'ida facilitators.

### The FBI Investigation of Zacarias Moussaoui

**5.f. In August 2001, the FBI's Minneapolis field office, in conjunction with the INS, detained Zacarias Moussaoui, a French national who had enrolled in flight training in Minnesota. FBI agents there also suspected that Moussaoui was involved in a hijacking plot. FBI Headquarters attorneys determined that there was not probable cause to obtain a court order to search Moussaoui's belongings under the Foreign Intelligence Surveillance Act (FISA). However, personnel at FBI Headquarters, including the Radical Fundamentalist Unit and the National Security Law Unit, as well as agents in the Minneapolis field office, misunderstood the legal standard for obtaining an order under FISA. As a result, FBI Minneapolis field office personnel wasted valuable investigative resources trying to connect the Chechen rebels to al-Qa'ida. Finally, no one at the FBI apparently connected the Moussaoui investigation with the heightened threat environment [page 24] in the summer of 2001, the Phoenix communication, or the entry of al-Mihdhar and al-Hazmi into the United States.**

Discussion: On February 23, 2001, Moussaoui entered the United States at Chicago's O'Hare Airport, traveling on a French passport that allowed him to stay in the country without a visa for 90 days, until May 22, 2001. On August 11, 2001, Moussaoui and his roommate arrived in Eagan, Minnesota to begin classes at Pan Am, a flight school that offered training on a Boeing 747 flight simulator used by professional pilots.

---

TOP SECRET

According to FBI documents, on August 15, an employee at Pan Am called the FBI's Minneapolis field office because he and other employees were suspicious of Moussaoui, who met none of the usual qualifications for Pan Am students. The FBI's Minneapolis field office opened an international terrorism investigation and determined that, since Moussaoui had been authorized to stay in the United States only until May 22, 2001, he was no longer in proper legal status.

On the same day the Minneapolis field office learned about Moussaoui, it asked both the CIA and the FBI's legal attaché in Paris for any information about Moussaoui and informed FBI Headquarters of the investigation. The FBI Headquarters agent who was responsible for the contact suggested that the Minneapolis field office put Moussaoui under surveillance. However, a Minneapolis field office supervisory agent testified to the Joint Inquiry that:

> . . . .[m]y background in the criminal arena suggests that when a violation occurs and you can stop further or potential criminal activity, you act on that. So that is exactly what I instructed the agents to do. . . . Because I didn't want him to get any additional time on a flight simulator that would allow him to have the knowledge that we could no longer take back from him to operate an aircraft.

INS agents took Moussaoui into custody on August 16 because his authority to stay in the United States had expired. Moussaoui declined to consent to a search of his belongings. On Saturday, August 18, the Minneapolis field office sent a detailed memorandum to an agent in the Radical Fundamentalist Unit (RFU) at FBI Headquarters describing the investigation.

[Page 25]

The memorandum stated that Moussaoui had two knives, padded gloves and shin guards in his possession when he was arrested; had told his roommate that "true Muslims must prepare themselves to fight;" and had begun exercise and martial arts training. In addition, the memorandum stated that the Minneapolis field office believed that Moussaoui and his roommate were part of a larger international radical fundamentalist group. Based on Moussaoui's "possession of weapons and his preparation through physical training for violent confrontation," the Minneapolis filed office stated it had reason to believe that Moussaoui, his roommate, "and others yet unknown," were conspiring to seize control of an airplane.