UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN AIRLINES, INC. et al.,

                              :

                Plaintiffs,

                              :      07 Civ. 7051 (AKH)

   v.

                              :      This case relates to

FEDERAL BUREAU OF INVESTIGATION et al.,     21 MC 101 (AKH)

                              :

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE AVIATION PARTIES' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT UPHOLDING THE DEPARTMENT OF JUSTICE'S FINAL DETERMINATIONS DECLINING TO AUTHORIZE THE TESTIMONY OF FIVE CURRENT AND FORMER FBI AGENTS IN THE SEPTEMBER 11 LITIGATION


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street
New York, New York 10007
Telephone:  (212) 637-2732
Facsimile:  (212) 637-2702


BETH E. GOLDMAN
SARAH S. NORMAND
JEANNETTE A. VARGAS
Assistant United States Attorneys

   - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    DOJ's Touhy Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The FBI's PENTTBOM Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Aviation Defendants' Touhy Requests for Documents Pertaining
        to the PENTTBOM Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.    The Aviation Defendants' Touhy Requests for the Testimony of
        Current and Former FBI Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.    The United States Attorney's Determinations Declining to
        Authorize the FBI Agents to Provide Deposition Testimony
        in the September 11 Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    F.    The Instant APA Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    DOJ's Final Determinations Declining to Authorize Testimony Under the
    Applicable Touhy Regulations Are Subject to an Arbitrary and Capricious
    Standard of Review in this Administrative Procedure Act Action. . . . . . . . . . . . . . . . 16

II.    DOJ Reasonably Declined to Authorize Deposition Testimony by the FBI
    Agents in Light of the Extraordinary Burdens Involved, Including Serious
    Concerns About Disclosure of Classified and Privileged Information. . . . . . . . . . . . . 22

    A.    The Aviation Defendants' Touhy Requests on Their Face Implicate
        Classified and Privileged Information, the Disclosure of Which Is
        Prohibited Under DOJ Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    The Protections Accorded Classified and Privileged Information Are
        Not Vitiated by the Limited Public Disclosures Cited by the Aviation
        Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        1.    Well-Established Precedent Rejects the Notion of Subject
            Matter Waiver of Government Privileges. . . . . . . . . . . . . . . . . . . . . . . 27

        2.    The Touhy Requests Seek Classified and Privileged Information
            Beyond the Scope of Any Prior Public Disclosures.. . . . . . . . . . . . . . . 30

　　　　3.　　The FBI Did Not Waive Any Privilege or Protection by Providing
　　　　　　　Information to the 9/11 Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

　　　　4.　　The FBI Did Not Waive Any Privilege or Protection by Permitting
　　　　　　　Limited Testimony at the Moussaoui Trial. . . . . . . . . . . . . . . . . . . . . . 35

　　C.　　The Aviation Defendants' Touhy Requests Are Unduly Burdensome
　　　　　in Light of the Substantial Risk of Unauthorized Disclosures of Classified
　　　　　and Privileged Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

　　　　1.　　Classified and Privileged Information Is Not Reasonably
　　　　　　　Segregable in the Context of Depositions in This Case. . . . . . . . . . . . . 40

　　　　2.　　Allowing Depositions of the FBI Agents Would Impose Unreasonable
　　　　　　　Burdens on the FBI and Open the Door to Further Deposition
　　　　　　　Requests and Related Litigation That Would Delay the
　　　　　　　September 11 Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

　　　　3.　　The Aviation Defendants' Analogy to the Depositions Already
　　　　　　　Taken in This Case Involving SSI Underscores the FBI's Concerns
　　　　　　　About Inadvertent Disclosures of Classified and Sensitive
　　　　　　　Information in Civil Depositions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

III.　　The Agency Did Not Act Arbitrarily or Capriciously in Denying the
　　　　Requests for Depositions Because the Burdens Far Outweigh Any
　　　　Minimal Relevance of Such Depositions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

　　A.　　The Aviation Defendants Seek Irrelevant Information From
　　　　　the FBI Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

　　　　1.　　Intelligence Information That Was Not Communicated to the
　　　　　　　Airlines or the FAA Is Immaterial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

　　　　2.　　New Arguments As to Relevance Not Presented to the Agency
　　　　　　　Should Be Rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

　　　　3.　　The Aviation Defendants Fail to Establish That the FBI Agents Can
　　　　　　　Offer Specific Relevant Evidence in Connection with
　　　　　　　Their Defenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

a.     The Aviation Defendants Have Not Established That They Need FBI Depositions to Make Their Legal Arguments. . . . . . . 56

b.     The Individual FBI Agents Cannot Provide the Evidence the Aviation Defendants Claim to Seek. . . . . . . . . . . . . . . . . . . . . 60

B.     Evidence Sought From the FBI Agents Is Readily Available From Other Less Burdensome Sources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

IV.     The Aviation Defendants' Argument Regarding Special Agent Rigler Is Unavailing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page**

Abdou v. Gurrieri, No. 05-CV-3946(JG), 2006 WL 2729247
    (E.D.N.Y. Sept. 25, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Afshar v. Dep't of State, 702 F.2d 1125 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . 29

Army Times Publ'g Co. v. Dep't of the Air Force, 998 F.2d 1067 (D.C. Cir. 1993). . . . . . . . . 28

Assassination Archives & Research Ctr. v. CIA, 334 F.3d 55 (D.C. Cir. 2003). . . . . . . . . . . . . 29

Beech Aircraft Corp. v. Rainey, 488 U.S. 153 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Boca Raton Cmty. Hosp. Inc. v. Tenet Healthcare Corp., No. 05-80183,
    2006 WL 1523234 (S.D. Fl. Apr. 24, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Borchers v. Comm'l Union Assurance Co., 874 F. Supp. 78 (S.D.N.Y. 1995).. . . . . . . . . . . . . 24

Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Burnett v. Al Baraka Inv. & Dev. Corp., 323 F. Supp. 2d 82 (D.D.C. 2004). . . . . . . . . . . . . . 32

Cavanaugh v. Wainstein, Civ. Action No. 05-123, 2007 U.S. Dist. LEXIS 40242,
    2007 WL 1601723 (D.D.C. June 4, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 69

Celerity, Inc. v. Ultra Clean Holding, Inc., No. C 05-4373, 2007 WL 205067
    (N.D. Cal. Jan. 25, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Certain  Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200 (4th Cir. 2000). . . . . . .  60

Coastal Delivery Corp. v. U.S. Customs Serv., 272 F. Supp. 2d 958 (C.D. Cal. 2003). . . . . . . 28

COMSAT Corp. v. Nat'l Science Found., 190 F.3d 269 (4th Cir. 1999). . . . . . . . . . 19, 20, 43, 69

Davis Enterprises v. U.S. Envtl. Prot. Agency, 877 F.2d 1181 (3d Cir. 1989). . . . . . . . . 18, 43, 69

Edmonds v. U.S. Dep't of Justice, 405 F. Supp. 2d 23 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . 29

Edwards v. U.S. Dep't of Justice, 43 F.3d 312 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 18

Eiseman v. State, 70 N.Y.2d 175, 518 N.Y.S.2d 608 (1987). . . . . . . . . . . . . . . . . . . . . . . . . 58

Exxon Shipping Co. v. U.S. Dep't of Interior, 34 F.3d 774 (9th Cir. 1994). . . . . . . . . . 16, 20, 21

F.A.C., Inc. v. Cooperativa De Seguros De Vida, 188 F.R.D. 181 (D.P.R. 1999). . . . . . . . . . . . 44

FDIC v. Meyer, 510 U.S. 471 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Florida House of Representatives v. U.S. Dep't of Commerce, 961 F.2d 941
    (11th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Forest Guardians v. U.S. Forest Serv., No. CIV 05-0372, 2006 WL 4109661
    (D.N.M. Aug. 22, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Gaines-Tabb v. ICI Explosives USA, Inc., 995 F. Supp. 1304 (W.D. Okla. 1996),
    aff'd, 160 F.3d 613 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

General Elec. Co. v. Johnson, No. Civ. A. 00-2855 (JDB), 2006 WL 2616187
    (D.D.C. Sept. 12, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Halpern v. FBI, 181 F.3d 279 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Hertzberg v. Veneman, 273 F. Supp. 2d 67 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Hoppe v. G.D. Searle, 779 F. Supp. 1413 (S.D.N.Y. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d 414 (2d Cir. 1989). . . . . . . . 29

In re "Agent Orange" Prod. Liability Litig., 98 F.R.D. 522 (E.D.N.Y. 1983). . . . . . . . . . . . . . . 44

In re Dep't of Investigation of the City of N.Y., 856 F.2d 481 (2d Cir. 1988). . . . . . . . . . . . . . . 24

In re IBM Corp. Sec. Litig., 163 F.3d 102 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

In re Korean Air Lines Disaster, 932 F.2d 1475 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 67

In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re SEC ex. rel. Glotzer, 374 F.3d 184 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 54

In re World Trade Center Disaster Site Litigation, 521 F.3d 169 (2d Cir. 2008). . . . . . . . . . . .  59

In re Vioxx Products Liability Litig., 235 F.R.D. 334 (E.D. La. 2006). . . . . . . . . . . . . .  20, 44, 68

Johnson v. Bryco Arms, 226 F.R.D. 441 (E.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Jones v. Goord, 95 Civ. 8026 (GEL), 2002 WL 1007614 (May 16, 2002). . . . . . . . 52, 62 - 64, 68

LaFleur v. Whitman, 300 F.3d 256 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Leonardi v. Loyola Univ., 658 N.E.2d 450 (Ill. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Linder v. Calero-Portocarrero, 251 F.3d 178 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 20

Linder v. NSA, 94 F.3d 693 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

McCarthy v. Sturm, Ruger and Co., 916 F. Supp. 366 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . 56

Mehl v. Blanas, 241 F.R.D. 653 (E.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Mobil Oil Corp. v. U.S. Envtl. Prot. Agency, 879 F.2d 698 (9th Cir. 1989). . . . . . . . . . . . . . 28

Moore v. Armour Pharm. Co., 927 F.2d 1194 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . 20, 51

Moran v. Pfizer, No. 99 Civ. 9969 (WHP)(HBP), 2000 WL 1099884
       (S.D.N.Y. Aug. 4, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 60, 71

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983). . . . . . . . . . 18

Nash v. Port Authority of N.Y. & N.J., 856 N.Y.S.2d 583 (1st Dep't 2008). . . . . . . . . . . . . . 57

Nat'l Council of La Raza v. Dep't of Justice, 411 F.3d 350 (2d Cir. 2005). . . . . . . . . . . . . . . 28

Pelman v. McDonalds Corp., 237 F. Supp. 2d 512 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . 57

Port Auth. of N.Y. & N.J. v. Arcadian Corp., 991 F. Supp. 390 (D.N.J. 1997). . . . . . . . . . . . 56

Presidential Gardens Assocs. v. United States, 175 F.3d 132 (2d Cir. 1999). . . . . . . . . . . . . . 16

Puerto Rico v. United States, 490 F.3d 50 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 18, 68

Robinson v. Overseas Military Sales Corp., 21 F.3d 502 (2d Cir. 1994). . . . . . . . . . . . . . . . . 16

Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Seafarers Int'l Union of North America v. U.S. Coast Guard, 736 F.2d 19
       (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sommer v. PMEC Assocs., 88 Civ. 2537, 1993 U.S. Dist. LEXIS 20401
       (S.D.N.Y. Mar. 31, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Starkey v. U.S. Dep't of Interior, 238 F. Supp. 2d 1188 (S.D. Cal. 2002). . . . . . . . . . . . . . . . . 29

Supreme Oil Co. v. Metropolitan Transp. Auth., 157 F.3d 148 (2d Cir. 1998).. . . . . . . . . . . . . 18

Trevino v. Gen. Dynamics Corp., 865 F.2d 1474 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . 59

Trunk v. City of San Diego, No. 06 CV 1597, 2007 WL 1110715
    (S.D. Cal. Apr. 2, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

United States v. Amodeo, 44 F.3d 141 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Dalm, 494 U.S. 596 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Duke Energy Corp., 214 F.R.D. 392 (M.D.N.C. 2003).. . . . . . . . . . . . . . . . . . 51

U.S. Envtl. Prot. Agency v. General Elec. Co., 197 F.3d 592 (2d Cir. 1999),
    modified on other grounds, 212 F.3d 689 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . passim

United States v. Mitchell, 463 U.S. 206 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Mottaz, 476 U.S. 834 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Sarkissian, 841 F.2d 959 (9th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States ex. rel. Touhy v. Regan, 340 U.S. 462 (1951).. . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Sherwood, 312 U.S. 584 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Williams, 170 F.3d 431 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Yonkers Contracting Co., 701 F. Supp. 431 (S.D.N.Y. 1998). . . . . . . . . . . . . 68

Watts v. SEC, 482 F.3d 501 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Wilkins v. Am. Export Isbrandtsen Lines, Inc., 446 F.2d 480 (2d Cir. 1971).. . . . . . . . . . . . . . 58

Williams v. United States, 947 F.2d 37 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Wilson v. McConnell, 501 F. Supp. 2d 545 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes**

5 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 552(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

5 U.S.C. § 552(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5 U.S.C. § 552(b)(7)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5 U.S.C. § 552(b)(7)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5 U.S.C. § 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

10 U.S.C. § 949d(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

10 U.S.C. § 949j(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. app. 3 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. app. 3 § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. app. 3 § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

18 U.S.C. app. 3 § 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

18 U.S.C. app. 3 § 5(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. app. 3 § 5(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

18 U.S.C. app. 3 § 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37

Pub L. No. 107-306, 116 Stat. 2383, § 5(c)(2) (Nov. 27, 2002). . . . . . . . . . . . . . . . . . . . . . . 33, 67

**Regulations and Rules**

28 C.F.R. § 16.21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6,8

28 C.F.R. § 16.21(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 72

28 C.F.R. § 16.22(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 16.22(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F. R. § 16.26(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 16.26(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 51

28 C.F.R. § 16.26(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27

28 C.F.R. § 16.26(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 C.F.R. § 16.26(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 C.F.R. § 16.26(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 51

28 C.F.R. § 16.26(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Fed. R. Civ. P. 26(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 26(b)(2)(C)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63- 64

Fed. R. Civ. P. 26(b)(2)(C)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Fed. R. Civ. P. 45. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 20 ,21

Fed. R. Civ. P. 45(c)(3)(A)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 50

Fed. R. Civ. P. 45(c)(3)(A)(iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 50

Fed. R. Civ. P. 45(c)(3)(B)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 803(8)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Fed. R. Evid. 807. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Miscellaneous**

Executive Order No. 13292, § 1.3(c), 68 Fed. Reg. 15315 (Mar. 25, 2003). . . . . . . . . . . . . . . . 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN AIRLINES, INC. et al.,

                                     :

                   Plaintiffs,

                                       :       07 Civ. 7051 (AKH)

  v.

                                       :       This case relates to

FEDERAL BUREAU OF INVESTIGATION et al.,     21 MC 101 (AKH)

                                       :

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE AVIATION PARTIES' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT UPHOLDING THE DEPARTMENT OF JUSTICE'S FINAL DETERMINATIONS DECLINING TO AUTHORIZE THE TESTIMONY OF FIVE CURRENT AND FORMER FBI AGENTS IN THE SEPTEMBER 11 LITIGATION

               Defendants the Federal Bureau of Investigation and Robert S. Mueller, Director of

the FBI (collectively, the "Government"), respectfully submit this memorandum of law in

opposition to the summary judgment motion of plaintiffs, a group of air carriers, airport security

companies, airport operators and other aviation parties who are defendants in the consolidated

litigation In re September 11 Litigation, 21 MC 101 (AKH) (S.D.N.Y.) ("September 11

Litigation") (collectively, the "Aviation Defendants"), seeking to set aside the Department of

Justice's ("DOJ's") final determinations declining to authorize the testimony of five current and

former agents of the Federal Bureau of Investigation ("FBI") in the September 11 Litigation, and

in support of the Government's cross-motion for summary judgment upholding DOJ's

determinations.

**Preliminary Statement**

The Government did not act arbitrarily or capriciously in denying the Aviation Defendants' requests for discovery that so obviously implicate classified information and the law enforcement privilege, especially in light of the absence of any demonstrated need for or relevance of the information requested.

At this late stage in the litigation, the Aviation Defendants seek to open up broad and burdensome discovery from the Government and to delve into highly sensitive intelligence information pertaining to the FBI's PENTTBOM investigation. They have requested depositions of five current and former FBI agents (and have stated their intention to pursue depositions of a variety of other similarly situated government witnesses) to testify on wide-ranging topics related to FBI and CIA intelligence gathering pre-9/11, inter-agency communications regarding intelligence pre-9/11, and information gathered regarding al Qaeda and Usama Bin Laden, among many other topics. The Government properly denied the requests: the requested depositions would impose extraordinary burdens on the Government because of the very real and serious concerns about potential disclosure of classified and otherwise privileged material at depositions, where such disclosure reasonably could be expected to cause serious damage to the national security and interfere with pending law enforcement proceedings.

The harm described is not hypothetical, and cannot lightly be dismissed. The PENTTBOM investigation is an active investigation. Investigators continue to seek out those parties responsible for the 9/11 attacks who remain at large. Moreover, various alleged co-conspirators have been charged with crimes related to 9/11 and will be tried. The Department of Justice cannot allow this criminal investigation to be compromised.

The Aviation Defendants are not realistic in suggesting that depositions can be limited to non-classified information or that government lawyers could prevent the inadvertent disclosure of classified or law enforcement privileged information. In fact, it is not possible to disentangle the classified from the unclassified information in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined. Nothing that has come before – neither the FBI agents' testimony in the Moussaoui trial nor the disclosures in the 9/11 Commission hearings and report, which occurred under very controlled and unique circumstances – suggests that classified and privileged information can be protected at depositions in a civil case, which lack all of the protections that existed in these other forums.

These burdens would be a sufficient reason for the Government to deny the requests. Indeed, under the governing Touhy regulations, the FBI is prohibited from producing information that is classified or privileged. Although we need not look at the other side of the ledger to consider the stated need for the requested discovery, in this case, the Aviation Defendants utterly failed to demonstrate that they actually need these depositions to obtain the information they seek. Much of the information requested is either irrelevant, because it consists of information held by the Government that was not communicated to the Aviation Defendants, or unnecessary, because the information is available from other sources. Among other things, the FBI has already produced tens of thousands of pages of material, including photographs and lab reports, that contain much of the factual information they seek (such as the type of knives used by the hijackers). There are also numerous other sources of information available to the Aviation Defendants, including The 9/11 Commission Report, prior testimony in the Moussaoui trial,

Moussaoui trial exhibits, and other Government reports, in which even certain non-classified intelligence information they seek can be found. And, significantly, plaintiffs have indicated a willingness to stipulate to many of the points for which the Aviation Defendants claim they need depositions.

Given that the Aviation Defendants could obtain the requested information through less burdensome means, and that these high-risk depositions would yield little, if any, relevant information, the Government properly denied the Aviation Defendants' Touhy requests. That decision was not arbitrary and capricious and should be upheld.

## BACKGROUND

A.    **DOJ's Touhy Regulations**

Consistent with the Federal Housekeeping Statute, 5 U.S.C. § 301, DOJ has enacted regulations setting forth the "procedures to be followed with respect to the production or disclosure of any material contained in the files of the [DOJ], any information relating to material contained in the files of the [DOJ], or any information acquired by any person while such person was an employee of the [DOJ] as a part of the performance of that person's official duties or because of that person's official status." 28 C.F.R. § 16.21. In United States ex. rel. Touhy v. Regan, the Supreme Court upheld the validity of a predecessor regulation, noting approvingly:

> When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious.

340 U.S. 462, 468 (1951).

DOJ's <u>Touhy</u> regulations prohibit agency employees from responding to discovery demands issued in connection with litigation to which the United States is not a party, unless the employee first receives authorization from, <u>inter alia</u>, the United States Attorney for the relevant district.  <u>See</u> 28 C.F.R. § 16.21 <u>et seq.</u>  The regulations set forth the procedures for requesting such authorization.  <u>See id.</u> at §§ 16.22(c)-(d).  Specifically, a party seeking oral testimony from a DOJ employee regarding information contained in DOJ files or information obtained in the course of that employee's official duties must submit an affidavit in support of their request "setting forth a summary of the testimony sought and its relevance to the proceeding."  <u>Id.</u> at § 16.22(c).  A party seeking records from DOJ files similarly must submit a "summary of the information sought and its relevance to the litigation."  <u>Id.</u> at § 16.22(d).

The DOJ's <u>Touhy</u> regulations further identify the factors to be considered by the United States Attorney in deciding whether to grant or deny a request for agency records or oral testimony.  Specifically, the United States Attorney considers whether the disclosure is appropriate under the applicable "rules of procedure" and the "relevant substantive law concerning privilege."  <u>Id.</u> § 16.26(a).  The United States Attorney is prohibited from authorizing the disclosure of information if, among other things, disclosure would reveal "classified information, unless appropriately declassified by the originating agency," or "investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."  <u>Id.</u> at § 16.26(b).

**B.    The FBI's PENTTBOM Investigation**

In response to the terrorist attacks of September 11, 2001, the FBI initiated

PENTTBOM, the largest and most complex investigation in the FBI's history.  See Declaration

of Michael J. Heimbach, Assistant Director, Counterterrorism Division, Federal Bureau of

Investigation, dated June 16, 2008 ("Heimbach Decl.") ¶ 6.  In the course of the investigation, the

FBI conducted more than 167,000 interviews, collected over 155,000 pieces of tangible evidence,

and followed up on more than 500,000 investigative leads.  Id.

Because parties responsible for the September 11 attacks remain at large, or are

the subject of ongoing prosecutions,[1] PENTTBOM remains an active investigation.  Id. ¶¶ 9-11.

Although substantial information about the PENTTBOM investigation has been publicly

disclosed, there is a great deal of information relating to PENTTBOM that remains classified

and/or law enforcement privileged because it implicates specific intelligence sources, methods,

and/or techniques utilized by the FBI (and the Intelligence Community) with respect to al Qaeda,

specific intelligence obtained by the FBI, intra- or inter-agency communications regarding

intelligence or law enforcement matters, and information obtained from foreign intelligence

sources.  Id. ¶¶ 12-13.

---

[1]    The conviction and life sentence of Zacarias Moussaoui are presently on appeal
before the Fourth Circuit, and five alleged co-conspirators in the terrorist attacks of September 11
have been charged in pending military commission proceedings.  Heimbach Decl. ¶¶ 10-11.

C.    **The Aviation Defendants' <u>Touhy</u> Requests for Documents Pertaining to the PENTTBOM Investigation**

Over the course of the past year, the FBI has expended an extraordinary amount of agency resources in order to produce to the parties in the September 11 Litigation a large volume of evidentiary material gathered in the course of the PENTTBOM investigation.

Since October 16, 2006, both the plaintiffs (including cross-claim plaintiffs) and the Aviation Defendants have submitted a number of requests, pursuant to 28 C.F.R. §16.21 <u>et seq.</u>, for the production of FBI records pertaining to the PENTTBOM investigation. Declaration of Sarah S. Normand dated June 17, 2008 ("Normand Decl.") ¶ 3. The most comprehensive of the requests received from the Aviation Defendants numbers more than 20 pages and seeks 270 separate records and categories of records. <u>See</u> Normand Decl. ¶ 4 & Exh. B. By letter dated March 16, 2007, the FBI explained that the task of gathering responsive documents, reviewing them for privilege and classified information, and making judgments about which information could or could not be produced is tremendously time-consuming and burdensome for the agency. <u>See</u> Normand Decl., Exh. A. The FBI nonetheless indicated that it would be willing to provide to the parties reasonably available, unclassified, non-privileged records that are relevant and material to the litigation. <u>Id</u>; Heimbach Decl. ¶ 7.

In response to document requests from all the parties to this litigation, the FBI to date has processed more than 50,000 pages of unclassified, non-privileged materials. Heimbach Decl. ¶ 7. The FBI has produced more than 33,000 pages of material to the parties, including, among other things, more than 10,000 pages of laboratory photographs and related information, reports of witness interviews, records related to the hijackers' weapon purchases and flights taken prior to September 11, 2001, investigative reports, documents describing communications

with individuals on board the hijacked aircraft, and videotapes.  Id.; Normand Decl. ¶ 5.  The FBI

unit responsible for processing these records has logged approximately 3,650 hours to date

searching for, reviewing and processing records responsive to the parties' Touhy requests for

documents.  Heimbach Decl. ¶ 7.

**D.    The Aviation Defendants' Touhy Requests for the Testimony of Current and Former FBI Employees**

In addition to the voluminous documentary evidence the Aviation Defendants

have sought and received from the FBI, on March 6, 2007, the Aviation Defendants submitted

requests, pursuant to 28 C.F.R. § 16.21 et seq., for authorization to depose, inter alia, five

current and former FBI employees in connection with the September 11 Litigation.  See Affidavit

of Desmond T. Barry, Jr., dated April 28, 2008 ("Barry Decl."), Exhs. 1-6 (collectively, the

"Touhy Requests" or the "Requests").  Specifically, the Touhy Requests seek the testimony of

Michael Rolince, the former Section Chief of the International Terrorism Operation Section of

the FBI; Coleen Rowley, the former Minneapolis Chief Division Counsel with the FBI; Harry

Samit, a Special Agent assigned to the FBI's Minneapolis Field Office and the Joint Terrorism

Task Force; Scott Billings, a Special Agent assigned to the Joint Terrorism Task Force in

Oklahoma City; and Eric Rigler, a former Special Agent who piloted FBI aircraft (collectively,

the "FBI agents").  Id.

In support of their Requests, the Aviation Defendants submitted an affidavit with

respect to each FBI agent from whom testimony was sought.  Id.  Each affidavit purports to set

forth the topics on which testimony is sought, and the relevance of such testimony to the

litigation.  Notwithstanding that the five FBI agents had very different roles and responsibilities

within the FBI, nine of each affidavit's thirteen to fourteen paragraphs are almost verbatim

identical, while the remaining paragraphs of each affidavit are substantially similar.  Id.

> According to the affidavits submitted in support of the Touhy Requests, the
Aviation Defendants sought testimony from each of the FBI agents "regarding the intelligence
available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the
terrorists' intent, likely means of attack, and capabilities, as well as the uses to which that
intelligence was put and with whom that intelligence was shared."  Barry Decl., Ex. 6 ("Barry
Aff.-Rigler") ¶ 4; accord Barry Decl., Ex. 5 ("Barry Aff.-Rolince") ¶ 4; Barry Decl., Ex. 2
("Barry Aff.-Samit") ¶ 4; Barry Decl., Ex. 3 ("Barry Aff.-Rowley") ¶ 4; Barry Decl., Ex. 4
("Barry Aff.-Billings") ¶ 4.  The Aviation Defendants claimed that this information was relevant
to the litigation because "[t]he intelligence that the FBI and the FAA communicated to the
airlines was the Aviation Defendants' primary source of information regarding the threat of
terrorist attacks on civil aviation."  Barry Aff.-Rigler ¶ 5; accord Barry Aff.-Rolince ¶ 5; Barry
Aff.-Samit ¶ 5; Barry Aff.-Rowley ¶ 5; Barry Aff.-Billings ¶ 5.  The Aviation Defendants further
submitted that "[t]he measures that the FBI determined that it should take in response to the
intelligence it had available to it, sheds [sic] light on whether the Aviation Defendants acted
reasonably in response to [the] more limited intelligence that they had available to them."  Barry
Aff.-Rigler ¶ 7; accord Barry Aff.-Rolince ¶ 7; Barry Aff.-Samit ¶ 7; Barry Aff.-Rowley ¶ 7;
Barry Aff.-Billings ¶ 7.

> The Touhy requests sought testimony from the FBI agents on more than thirty
separate topics related to intelligence gathered or received by the FBI, the actions the FBI took in
response to the intelligence it received, communications between the FBI and other governmental

agencies, and the FBI's investigation into Zacarias Moussaoui.  Barry Aff.-Rigler ¶ 11; <u>accord</u>

Barry Aff.-Rolince ¶ 12; Barry Aff.-Samit ¶ 11; Barry Aff.-Rowley ¶ 12; Barry Aff.-Billings

¶ 11.  For example, the Aviation Defendants sought testimony regarding:

- The information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Usama Bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by the FBI;

- The information available to the FBI before September 11, 2001, if any, indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets; and

- The communications between the FBI and the CIA and FAA regarding the possibility of an al Qaeda attack on civil aviation.

Barry Aff.-Rigler ¶ 11; <u>accord</u> Barry Aff.-Rolince ¶ 12; Barry Aff.-Samit ¶ 11; Barry Aff.-

Rowley ¶ 12; Barry Aff.-Billings ¶ 11.

   The Aviation Defendants assert that Special Agents Samit, Rowley and Billings are

"well-qualified" to testify as to these broad-ranging intelligence issues simply because each of

them participated, to some extent, "in the investigation into Zacarias Moussaoui, an al-Qaeda

operative who had trained as a pilot."  Barry Aff.-Billings at ¶ 8; Barry Aff.-Samit at ¶ 8; Barry

Aff.-Rowley at ¶ 8.

   According to the Aviation Defendants, Special Agent Rigler is also "well qualified"

to testify regarding the requested topics because he "served as a Special Agent with the FBI for

23 years and many of his duties pertained to aviation matters," and because he "holds an airline

transport pilot rating and has spent approximately 5,000 hours piloting FBI aircraft."  Barry Aff.-

Rigler ¶ 8.  The Aviation Defendants erroneously contend in their <u>Touhy</u> request that Special

Agent Rigler testified as "an expert witness for the defendant in <u>U.S. v. Moussaoui</u>, No. 01-455A

(LMD) (E.D.Va.)," regarding "the FBI's handling of intelligence before September 11." Id. In fact, Special Agent Rigler did not testify as an expert witness at the Moussaoui trial, nor did he testify as to any information he had obtained by virtue of his official duties with the FBI. See

Barry Decl., Exh. 20. Rather, Special Agent Rigler testified as a summary witness. Id. at 2144. His only role at the Moussaoui trial was to summarize for the jury information contained in a public, unclassified report published by the Department of Justice's Office of the Inspector General, entitled "A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks (November 2004)" ("OIG Report"). Id.; see also Normand Decl., Exh. P.

Finally, the Aviation Defendants contend that Special Agent Rolince is "well qualified" to testify as to these issues because he served as Chief of the FBI's International Terrorism Operations Section between 1998 and 2002. Barry Aff.-Rolince ¶ 8. The Aviation Defendants further allege that, "because his job involved considerable coordination and communication with the National Security Council, the State Department's Office of Counterterrorism Coordination, and the CIA, Mr. Rolince is qualified to testify as to the intelligence that was available to these agencies, as well as the FBI, before September 11." Id.

**E.    The United States Attorney's Determinations Declining to Authorize the FBI Agents to Provide Deposition Testimony in the September 11 Litigation**

By letters dated May 7, 2007, Michael J. Garcia, United States Attorney for the Southern District of New York, denied each of the five Touhy Requests for deposition testimony from the FBI agents. See Barry Decl., Exh. 7 ("Garcia Ltr.-Samit"); id. at Exh. 8 (Garcia Ltr.-Rowley"); id. at Exh. 9 ("Garcia Ltr.-Billings"); id. at Exh. 10 ("Garcia Ltr.-Rolince"); id. at Exh. 11 ("Garcia Ltr.-Rigler").

In denying the Requests, the United States Attorney gave careful and particularized consideration to the issues raised by the Aviation Defendants' Touhy requests, including the relevance of the requested testimony to the September 11 Litigation, the merits of the Aviation Defendants' contention that privileges or other protections had been waived by virtue of prior public disclosures of certain information relating to the PENTTBOM investigation, the classification issues raised by the specific topics requested by the Aviation Defendants, and the burdens that would be imposed upon the agency in authorizing testimony on the requested topics. Id. In their brief to this Court, the Aviation Defendants mischaracterize these decision letters as "boilerplate," implying that the United States Attorney issued a rote response that did not consider the merits of the Aviation Defendants' requests. Memorandum of Law in Support of the Aviation Parties' Motion for Summary Judgment ("Br.") at 15, 17. That each of the Touhy requests was denied on similar grounds does not reflect a lack of consideration by the United States Attorney, but rather is a function of the fact that the Aviation Defendants submitted nearly identical Touhy requests for each of the FBI agents, compare Barry Decl., Exhs. 2-6, and of the commonality of the issues presented by the five requests.

Specifically, the United States Attorney determined that it would be inappropriate to authorize the requested testimony because "a significant amount of the information [the Aviation Defendants requested] is protected from disclosure because it involves classified national security information or matters protected by the law enforcement investigative privilege." Garcia Ltr.-Samit at 2; accord Garcia Ltr.-Rowley at 2; Garcia Ltr.-Billings at 2; Garcia Ltr.-Rolince at 1-2; Garcia Ltr.-Rigler at 2. The disclosure of classified national security information and

information protected by the law enforcement privilege is explicitly prohibited under the DOJ's Touhy regulations.  See 29 C.F.R. §§ 16.26(b)(3)-(5).

The United States Attorney further found that, given the volume of protected information at issue, attempting to segregate such classified or privileged information during the course of a deposition, "where open-ended inquiries may elicit responses in which classified or privileged material is intertwined," would be an extremely burdensome, if not impossible, task, and posed an "unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed."  Garcia Ltr.-Samit at 2; accord Garcia Ltr.-Rowley at 2; Garcia Ltr.-Billings at 2; Garcia Ltr.-Rolince at 2; Garcia Ltr.-Rigler at 2.

In rendering his decisions on the Requests, the United States Attorney rejected the Aviation Defendants' argument that the FBI had somehow waived its claims of privilege over the whole subject matter of the requested topics by virtue of the fact the Special Agents Samit, Billings, Rolince and Rigler had provided limited public testimony regarding a few of the requested topics at the criminal trial of Zacarias Moussaoui or, in Special Agent Rolince's case, in statements to the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission").  The United States Attorney explained that the wide-ranging topics requested by the Aviation Defendants "implicate[] a vast amount of classified and privileged information that was not disclosed or waived by virtue of [any prior] limited public testimony on certain of the requested topics."  Garcia Ltr.-Samit at 2; accord Garcia Ltr.-Rowley at 2; Garcia Ltr.-Billings at 2; Garcia Ltr.-Rolince at 2; Garcia Ltr.-Rigler at 2.

The United States Attorney also declined to authorize the requested testimony on the ground that some of the information sought by the Aviation Defendants originated with other

Government departments and agencies.  Id.; cf. Barry Aff.-Rolince at ¶ 12(b) (requesting testimony regarding the communications between the FBI and the CIA); id. ¶ 8 (indicating that Special Agent Rolince could provide information he received from the National Security Council, the State Department and the CIA); Barry Aff.-Rigler at ¶ 11(b) (seeking testimony regarding information available to the CIA regarding the likelihood of an attack by al Qaeda and/or Usama Bin Laden); id. at ¶ 11(l) (seeking testimony regarding communications between the FBI and the CIA regarding the so-called "Phoenix memo").[2]  The United States Attorney noted that the FBI could not disclose such information without coordinating its responses with those other agencies, which would again place an undue burden on the FBI.  Garcia Ltr.-Samit at 2; accord Garcia Ltr.-Rowley at 2; Garcia Ltr.-Billings at 2; Garcia Ltr.-Rolince at 2; Garcia Ltr.-Rigler at 2.

In denying the Touhy requests, the United States Attorney determined that the affidavits submitted in support of the Touhy Requests were deficient in that they did not adequately explain the relevance of intelligence information that was not communicated to the Aviation Defendants to the question of the Aviation Defendants' alleged negligence.  Garcia Ltr.-Samit at 1; accord Garcia Ltr.-Rowley at 1; Garcia Ltr.-Billings at 1; Garcia Ltr.-Rolince at 1; Garcia Ltr.-Rigler at 1.  The affidavits in support of the Touhy Requests also failed to set forth the basis for the Aviation Defendants' assertion that Special Agents Samit, Rowley and Billings, by virtue of their participation in the Moussaoui investigation, or Special Agent Rigler, by virtue

---

[2]    The Aviation Defendants complain that the United States Attorney did not specify the agencies with which coordination would be required, Br. at 45, but the Requests on their face seek information from other agencies, and information about the FBI's intelligence sources and inter-agency communications remains classified.  Heimbach Decl. ¶ 12.

of having served as a summary witness at the Moussaoui trial, would have personal knowledge of the various intelligence-related topics requested by the Aviation Defendants.  Id.

The Requests were also denied because the requested topics were overly broad and unduly burdensome, and therefore not permitted under either Rule 26(b) or Rule 45(c)(3)(A)(iv) of the Federal Rules of Civil Procedure.  Garcia Ltr.-Samit at 2; accord Garcia Ltr.-Rowley at 2; Garcia Ltr.-Billings at 2; Garcia Ltr.-Rolince at 2; Garcia Ltr.-Rigler at 2.

Finally, the United States Attorney, citing Rule 26(b)(2) of the Federal Rules of Civil Procedure, denied the Touhy Requests on the ground that the requested discovery is cumulative, duplicative or available through less burdensome channels than the depositions of current or former FBI agents.  Id.  The United States Attorney noted that, in addition to public testimony and statements provided by the FBI agents, the FBI had already produced a large volume of records related to the requested topics in response to the Aviation Defendants Touhy requests for the production of documents.  Garcia Ltr.-Samit at 3; accord Garcia Ltr.-Rowley at 3; Garcia Ltr.-Billings at 3; Garcia Ltr.-Rolince at 3; Garcia Ltr.-Rigler at 3.  The United States Attorney also pointed to the exhibits that were introduced into evidence in the Moussaoui trial, see Garcia Ltr.-Samit at 3, the OIG Report, see Garcia Ltr.-Rigler at 3, and The 9/11 Commission Report, id., as other public sources of certain information requested by the Aviation Defendants.

## F.    The Instant APA Litigation

The Aviation Defendants filed the instant lawsuit on August 7, 2007, challenging the United States Attorney's final Touhy determinations under the Administrative Procedure Act.  Normand Decl. ¶ 9.  The FBI timely answered the complaint on October 9, 2007.  Id. ¶ 10.  The

Aviation Defendants, however, did not file their motion for summary judgment until April 28, 2008, more than six months later.  See id.

## ARGUMENT

I.   **DOJ's Final Determinations Declining to Authorize Testimony Under the Applicable Touhy Regulations Are Subject to an Arbitrary and Capricious Standard of Review in this Administrative Procedure Act Action**

"In any suit in which the United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity."  Presidential Gardens Assocs. v. United States, 175 F.3d 132, 139 (2d Cir. 1999).  With respect to the last element, well-established principles of sovereign immunity dictate that the United States cannot be sued without its consent.  See United States v. Mitchell, 463 U.S. 206, 212 (1983); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).  An action seeking to compel a federal agency or federal employee to provide discovery to a third party "is barred by sovereign immunity in the absence of a waiver."  U.S. Envtl. Prot. Agency v. General Elec. Co. ("EPA I"), 197 F.3d 592, 597 (2d Cir. 1999), modified on other grounds, 212 F.3d 689 (2d Cir. 2000) ("EPA II").

The Second Circuit has held that "the only identifiable waiver of sovereign immunity that would permit a court to require a response to a subpoena in an action in which the government is not a party is found in the [Administrative Procedure Act]."  EPA I, 197 F.3d at 598 (explicitly rejecting Ninth Circuit's contrary holding in Exxon Shipping Co. v. U.S. Dep't of Interior, 34 F.3d 774 (9th Cir. 1994)).  Specifically, section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., provides, in pertinent part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed

to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.[3]

Once a waiver of sovereign immunity has been established, "the second inquiry comes into play – that is, whether the source of substantive law upon which the claimant relies provides an avenue for relief." FDIC v. Meyer, 510 U.S. 471, 484 (1994). The Second Circuit recognized in EPA I that a party seeking review of an agency decision promulgated under the Touhy regulations has the choice of bringing a separate lawsuit pursuant to the cause of action established by the APA, or seeking "enforcement of a non-party subpoena duces tecum for discovery against the government through a motion to compel compliance" pursuant to Rule 45. EPA I, 197 F.3d at 599. In the instant case, as the parties previously agreed, the Aviation Defendants have filed a separate lawsuit alleging a cause of action under the APA. See Complaint ¶ 1.

The APA creates a separate cause of action for those adversely affected or aggrieved by a final agency action. See 5 U.S.C. §§ 702, 704; see also Seafarers Int'l Union of North

---

[3]    Although the Aviation Defendants also cite section 408(b)(3) of the Air Transportation Safety and System Stabilization Act. ("ATSSSA") as a source of jurisdiction over this action, see Complaint ¶ 2, nothing in the language of that section purports to waive the sovereign immunity of the United States. Congress can waive the United States' sovereign immunity only through unequivocal statutory language. See United States v. Dalm, 494 U.S. 596, 608 (1990); United States v. Mottaz, 476 U.S. 834, 841 (1986). Section 408(b)(3) of the ATSSSA merely vests "original and exclusive jurisdiction brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001" in the United States District Court for the Southern District of New York. Such language falls far short of the explicit waiver of sovereign immunity sufficient to confer subject matter jurisdiction over this action. See United States v. Sherwood, 312 U.S. 584, 586 (1941); Williams v. United States, 947 F.2d 37, 39 (2d Cir. 1991).

America v. U.S. Coast Guard, 736 F.2d 19, 25 (2d Cir. 1984).  Here, the United States Attorney

for the Southern District of New York rendered decisions under the governing Touhy regulations

with respect to the Aviation Defendants' five separate Touhy requests for testimony from the FBI

agents.  These Touhy decisions constitute final agency actions reviewable under the APA.  See,

e.g., EPA I, 197 F.3d at 597.

Section 706 dictates the scope of review that the district court shall apply in an APA

action.  Section 706 requires that "the reviewing court shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A); see also

Supreme Oil Co. v. Metropolitan Transp. Auth., 157 F.3d 148, 151 (2d Cir. 1998) ("Under the

APA, a federal court may set aside an agency's findings, conclusions or actions only if they are

'arbitrary, capricious, an abuse of discretion, [or] otherwise not in accordance with the law'

. . . .").  This standard of review is routinely applied in APA actions challenging an agency's

Touhy decision.  See, e.g., Puerto Rico v. United States, 490 F.3d 50, 60-61 (1st Cir. 2007);

United States v. Williams, 170 F.3d 431, 434 (4th Cir. 1999); Edwards v. U.S. Dep't of Justice,

43 F.3d 312, 315 (7th Cir. 1994); Davis Enters. v. U.S. Envtl. Prot. Agency, 877 F.2d 1181, 1186

(3d Cir. 1989).

The court's review of agency action under the APA is "narrow."  Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  An agency action is "arbitrary

and capricious" within the meaning of section 706(2)(A) if the agency "relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.; see also LaFleur v. Whitman, 300 F.3d 256, 267 (2d Cir. 2002).

In the Touhy context in particular, DOJ has discretion to determine whether its employees shall be permitted to testify in cases, such as this one, where the agency is not a party. See, e.g., Edwards, 43 F.3d at 317 ("It is clear from the Department of Justice regulations governing the disclosure of confidential information, as well as the common law doctrine in Touhy and the litany of succeeding case law, that the United States may restrict the release of its information."). As the Fourth Circuit has observed, "[w]hen an agency is not a party to an action, its choice of whether or not to comply" with a Touhy request "is essentially a policy decision about the best use of the agency's resources," and the decision to deny third-party discovery requests accordingly is "committed to agency discretion." COMSAT Corp. v. Nat'l Science Found., 190 F.3d 269, 278 (4th Cir. 1999). The "compromise between public and private interests" embodied by the Touhy process "is necessary to conserve agency resources and to prevent the agency from becoming embroiled in private litigation." Id.

Although the Aviation Defendants properly brought this action pursuant to the APA, they now suggest that the applicable standard of review is not that mandated by the explicit language of section 706(2)(A), but rather the standard that would be applied to a motion to compel enforcement of a subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure. See Br. at 16-17. The Aviation Defendants have cited no authority for the proposition that the standards applicable to the adjudication of a motion brought pursuant to Rule 45 should apply in an independent lawsuit asserting a cause of action under the APA. The notion that Rule 45

provides the appropriate standard of review is particularly inapt here, given that the Aviation Defendants have not served subpoenas upon the agencies or the requested witnesses.

The Aviation Defendants erroneously suggest that, in <u>EPA II</u>, the Second Circuit left open the question of whether a different standard of review – different from the section 706 standard applicable to all APA actions – would apply in a lawsuit brought pursuant to the APA seeking review of an agency's <u>Touhy</u> decision, and that federal courts have split on this issue. Br. at 16. The Aviation Defendants, however, misapprehend the issue presented to the Second Circuit in <u>EPA II</u>. In that case, the Second Circuit was confronted with the question of whether section 706's standard of review was applicable, not in a collateral action brought pursuant to the APA, but in a motion to compel agency compliance with a subpoena brought pursuant to Rule 45. <u>See</u> <u>EPA II</u>, 212 F.3d at 689; <u>cf. In re SEC ex rel. Glotzer</u>, 374 F.3d 184, 191 (2d Cir. 2004) (describing the issue reserved by the Court in <u>EPA II</u> as "whether the APA's standard of review . . . should govern the district court's evaluation of the EPA's refusal to comply with [a] subpoena," and noting that "some of our sister circuits have affirmatively held that APA § 706 does not apply <u>to motions to compel agency compliance with subpoenas</u>" (emphasis added)). Similarly, the "split" in authority described in the Aviation Defendants' brief concerns "whether the APA's arbitrary and capricious standard or Rule 45's undue burden standard should control motions to quash subpoenas compelling discovery from federal agencies and agents." <u>In re Vioxx Products Liability Litig.</u>, 235 F.R.D. 334, 344 (E.D. La. 2006), cited in Br. at 16.[4]

---

[4]    Although the Government takes the position that an arbitrary and capricious standard would govern review of a motion to enforce a subpoena seeking testimony from federal employees, <u>see</u> <u>COMSAT Corp.</u>, 190 F.3d at 277; <u>Moore v. Armour Pharm. Co.</u>, 927 F.2d 1194, 1197 (11th Cir. 1991); <u>see also</u> <u>Moran v. Pfizer</u>, No. 99 Civ. 9969 (WHP)(HBP), 2000 WL 1099884 (S.D.N.Y. Aug. 4, 2000); <u>but see</u> <u>Linder v. Calero-Portocarrero</u>, 251 F.3d 178 (D.C.

It is axiomatic that in a separate lawsuit asserting a cause of action under the APA, it is the APA standard of review that governs. Indeed, even the minority of courts that have held that the APA standard of review does not apply to a motion to compel brought pursuant to Rule 45 nonetheless acknowledge that section 706(2)(A)'s "arbitrary and capricious" standard governs where a party challenges a <u>Touhy</u> denial through a collateral proceeding brought pursuant to the APA. <u>See</u> <u>Watts v. SEC</u>, 482 F.3d 501, 509 n.* (D.C. Cir. 2007) (noting that, because state court litigants adversely affected by an agency's <u>Touhy</u> decision cannot bring a motion to compel under Rule 45, they must pursue a separate APA claim, which is "necessarily governed by the APA arbitrary and capricious standard"); <u>Exxon Shipping Co.</u>, 34 F.3d at 780 n.11 (acknowledging that parties wishing to challenge an agency's <u>Touhy</u> determination may also bring a "collateral APA proceeding," which proceeding would be governed by section 706(2)(A)'s standard of review). Accordingly, the standard of review set forth in section 706 of the APA governs this Court's review of the instant motion for summary judgment.

As set forth below, however, whether the Court applies the APA's arbitrary and capricious standard, or the standards of Rules 26 and 45 of the Federal Rules of Civil Procedure, the Government is entitled to summary judgment upholding its final <u>Touhy</u> determinations declining to authorize testimony by the FBI agents in the September 11 Litigation.

---

Cir. 2001); <u>Exxon Shipping Co. v. U.S. Dep't of the Interior</u>, 34 F.3d 774, 779 (9th Cir. 1994), the Court need not reach the issue in the present case, as no subpoenas have been served and no motion to compel is at issue.

II.    **DOJ Reasonably Declined to Authorize Deposition Testimony by the FBI Agents in Light of the Extraordinary Burdens Involved, Including Serious Concerns About Disclosure of Classified and Privileged Information**

A principal basis for DOJ's determinations not to authorize testimony by the FBI agents in the September 11 Litigation was the likelihood that the requested depositions would result in unauthorized disclosures, even if inadvertent, of classified or privileged information, and the extraordinary burdens that such depositions would impose on the FBI to protect against such unauthorized disclosures.  Although the Aviation Defendants are dismissive of these concerns, see Br. at 39-48, the record demonstrates beyond dispute that classified and law enforcement sensitive information could be disclosed inadvertently if the FBI agents are deposed, and such disclosures reasonably could be expected to cause serious damage to national security and interfere with pending law enforcement proceedings.  Heimbach Decl. ¶ 27.  DOJ thus reasonably applied its Touhy regulations and declined to authorized the FBI agents' testimony in the September 11 Litigation.

A.    **The Aviation Defendants' Touhy Requests on Their Face Implicate Classified and Privileged Information, the Disclosure of Which Is Prohibited Under DOJ Regulations**

The Aviation Defendants' claim that they do not seek protected information, Br. at 39, is belied by a even a cursory review of the Touhy requests they submitted to DOJ.  Each of the requests seeks testimony regarding, among many other things, "[t]he information available to the FBI before September 11, 2001 regarding the likelihood of attacks by al-Qaeda and/or Usama bin Laden, including any information regarding the anticipated form of such an attack, its likely location, and any countermeasures recommended by [the FBI or the National Security Council]."

See Barry Aff.-Billings ¶ 11(f); Barry Aff.-Rigler ¶ 11(b); Barry Aff.-Rolince ¶ 12(a); Barry Aff.-Rowley ¶ 12(k); Barry Aff.-Samit ¶ 11(g).

As set forth in DOJ's final Touhy determinations, however, information responsive to the Requests would include classified national security information.  See Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rolince at 1-2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2; see also Heimbach Decl. ¶ 12 (many of the proposed deposition topics call for the disclosure of classified information, including "the information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Usama bin Laden" (internal quotation marks omitted)).  Indeed, as set forth in the declaration of FBI Assistant Director Michael J. Heimbach, who directs the conduct of FBI counterterrorism investigations as head of the Counterterrorism Division, "[m]uch of the information relating to PENTTBOM, including intelligence information in the FBI's possession prior to September 11, 2001, remains classified and/or law enforcement sensitive because it implicates specific intelligence sources, methods, and/or techniques utilized by the FBI (and the Intelligence Community) with respect to al Qaeda and those responsible for the September 11th attacks, as well as specific intelligence obtained by the FBI, intra-or inter-agency communications regarding intelligence and law enforcement matters, and information obtained from foreign intelligence sources."  Heimbach Decl. ¶¶ 1, 12.[5]

---

[5]     Assistant Director Heimbach has been delegated original classification authority by the Director of the FBI, see Executive Order No. 13292, § 1.3(c), 68 Fed. Reg. 15315 (Mar. 25, 2003), and is responsible for the protection of classified information within the Counterterrorism Division of the FBI, including the sources and methods used by the FBI in the collection of information.  Heimbach Decl. ¶ 3.  His declaration is submitted herewith to further explain the bases for the FBI's position, expressed in DOJ's final Touhy determinations, that classified and law enforcement sensitive information relating to the September 11, 2001 attacks could be disclosed inadvertently if the five designated current and former FBI agents are deposed in this civil litigation, and to describe the harms that could reasonably be expected to flow from

In addition to being classified, much of the information requested by the Aviation

Defendants is protected by the law enforcement privilege.  PENTTBOM is an ongoing

investigation.  See Heimbach Decl. ¶¶ 6, 9-12.  The investigation has resulted in the prosecution

of Zacarias Moussaoui, whose conviction and life sentence are presently on appeal to the Fourth

Circuit.  Id. ¶ 10.  In addition, five alleged co-conspirators recently were arraigned in military

commission proceedings and charged with crimes related to 9/11 attacks.  See id. ¶ 11.  Other

parties responsible for the 9/11 attacks remain at large, and it is clear that al Qaeda remains

committed to future acts of terrorism.  Id. ¶ 9.  Accordingly, "PENTTBOM remains an active

investigation as the FBI works to bring to justice those responsible for the terrorist attacks and,

together with [its] intelligence and law enforcement partners worldwide, to prevent future

attacks."  Id. ("The FBI remains committed to following every lead, collecting every piece of

intelligence, and analyzing every piece of evidence related to the September 11th attacks.").

Because much of the information requested by the Aviation Defendants was compiled

in connection with an ongoing law enforcement investigation and prosecution, it is protected by

the law enforcement investigatory privilege.  See id. ¶ 27 (concluding that "the unauthorized

disclosure of law enforcement sensitive information in [the requested] depositions would reveal

investigatory records compiled for law enforcement purposes and would interfere with

---

the unauthorized disclosure of such information.  Heimbach Decl. ¶ 5; Garcia Ltr.-Billings at 2;
Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rolince at 1-2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at
2; see Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 82 (2d Cir. 2006) (although judicial
review of administrative action generally is confined to the administrative record, submission of
extra-record material may be appropriate to the extent it "illuminate[s] the original record" and
"explain[s] administrative action" (citations and quotation marks omitted)).  The Aviation
Defendants similarly have submitted extra-record materials in support of their motion.  See
exhibits attached Barry Decl.

enforcement proceedings and disclose investigative techniques and procedures"); see also In re Dep't of Investigation of the City of N.Y., 856 F.2d 481, 483-84 (2d Cir. 1988) (noting that law enforcement privilege intended "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation"), quoted in United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995); Borchers v. Comm'l Union Assurance Co., 874 F. Supp. 78, 80-81 (S.D.N.Y. 1995) (quashing subpoena served on fire department for testimony and documents concerning ongoing arson investigation).

Under DOJ's Touhy regulations, Department officials are expressly precluded from authorizing the release of classified information in response to a request for disclosure. The regulations provide that "disclosure will not be made by any Department official" where "[d]isclosure would reveal classified information, unless appropriately declassified by the originating agency."[6] 28 C.F.R. § 16.26(b)(3) (emphasis added); cf. also id. § 16.26(c) ("The Deputy or Associate Attorney General will not approve disclosure if the circumstances specified in paragraphs (b)(1) through (b)(3) of this section exist."). Similarly, the regulations prohibit disclosure of information protected by the law enforcement privilege, or other privileges. See id. § 16.26(b)(5) ("Among the demands in response to which disclosure will not be made by any Department official are those with respect to which . . . [d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement

---

[6]    As set forth infra Point II.C.3, declassification requires a painstaking and time-consuming process, which could not be accomplished in the context of a deposition. Heimbach Decl. ¶¶ 22-23.

proceedings or would disclose investigative techniques and procedures the effectiveness of which

would thereby be impaired."); id. § 16.26(a)(2) ("In deciding whether to make disclosures

pursuant to a demand, Department officials and attorneys should consider . . . [w]hether

disclosure is appropriate under the relevant substantive law concerning privilege.").

Given that the Aviation Defendants' Touhy Requests indisputably implicate classified

and privileged information, DOJ properly applied its regulations and denied the requests on those

grounds. See Garcia Ltr.-Rolince at 1-2 (declining to authorize testimony in part because "a

significant amount of the information that you have requested is protected from disclosure

because it involves classified national security information or matters protected by the law

enforcement investigative privilege"); accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2;

Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2; see also Heimbach Decl. ¶¶ 5, 26 (FBI's

conclusion that "classified and law enforcement sensitive information relating to the September

11, 2001 attacks could be disclosed inadvertently if the five designated current and former FBI

employees are deposed in this civil litigation").[7]  Far from acting arbitrarily or capriciously, the

Department followed the unambiguous dictates of its regulations in denying the requests for

testimony.

---

[7]    Because they seek testimony regarding inter- and intra-agency communications, including communications with counsel such as former Special Agent and Minneapolis Chief Division Counsel Rowley, the Requests also implicate information protected from disclosure by the deliberative process, attorney-client, and work product privileges.  The U.S. Attorney thus properly denied the requests to the extent they sought to elicit testimony protected by these privileges.  See Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rolince at 1-2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2.

**B. The Protections Accorded Classified and Privileged Information Are Not Vitiated by the Limited Public Disclosures Cited by the Aviation Defendants**

The Aviation Defendants wrongly contend that there is an "unsustainable contradiction" between the Department's assertion that the requested depositions implicate classified and privileged matters and its observation that certain information sought by the Aviation Defendants is available from public sources. Br. at 37-38. There is no contradiction. Contrary to the Aviation Defendants' suggestion, the United States Attorney did not state in his decisions that the same information sought by the Aviation Defendants was both classified and privileged, on one hand, and publicly available, on the other. Rather, the Department stated:

> To the extent that you seek testimony concerning matters about which [the FBI agents have] previously publicly testified, or information that can be derived from the 9/11 Commission Report or other public sources, such information is already in the public record. Asking [the FBI agents] to testify again concerning these matters not only would yield duplicative information but also would impose a significant and unnecessary burden on the FBI and [the FBI agents].

Garcia Ltr.-Rolince at 2 (emphasis supplied); accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2; see also Heimbach Decl. ¶ 13 ("It is important to clarify and emphasize that the classified and law enforcement sensitive information I refer to above [that would be implicated in the requested depositions] has not been publicly disclosed but rather remains protected as part of the ongoing PENTTBOM investigation." (emphasis in original)).

As set forth below, moreover, simply because certain information has been made public, such as in The 9/11 Commission Report or at the Moussaoui trial, does not mean that all information on that subject is now subject to public disclosure. See Heimbach Decl. ¶ 13 (FBI's concerns about disclosure of classified or law enforcement sensitive information in depositions

"are neither allayed nor undermined by the fact that much PENTTBOM-related information has already been publicly disclosed in such contexts as *The 9/11 Commission Report* and related hearings or the criminal trial of Zacarias Moussaoui").

> **1.    Well-Established Precedent Rejects the Notion of Subject Matter Waiver of Government Privileges**

In their <u>Touhy</u> Requests, the Aviation Defendants make the blanket assertion that, because the FBI agents had testified publicly or made public statements regarding certain matters relating to the September 11 attacks, "the FBI has already concluded that disclosure would not infringe an applicable privilege, . . . reveal classified information, . . . reveal investigative records or interfere with enforcement proceedings . . . ."  Barry Aff.-Rolince ¶ 13 (referring to considerations listed in 28 C.F.R. § 16.26(b)); <u>accord</u> Barry Aff.-Billings ¶ 12; Barry Aff.-Rigler ¶ 12; Barry Aff.-Rowley ¶ 13; Barry Aff.-Samit ¶ 12.  This argument, however, contravenes well-established authority that specific Government disclosures of classified or privileged information do not effect a waiver of privilege as to related information on the same general topic.

In the Freedom of Information Act ("FOIA") context, for example, courts have repeatedly held that the disclosure of particular information does not compromise the agency's ability to properly withhold the similar material in other documents.  <u>See</u> <u>Mobil Oil Corp. v. U.S. Envtl. Prot. Agency</u>, 879 F.2d 698, 702-03 (9th Cir. 1989) (FOIA exemptions 5 and 7(A)[8]

---

[8]    FOIA exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), and "encompass[es] traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges," <u>Nat'l Council of La Raza v. Dep't of Justice</u>, 411 F.3d 350, 356 (2d Cir. 2005).  FOIA exemption 7 protects "records or information compiled for law enforcement purposes," where, among other things, disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), or "would disclose techniques

properly asserted as to undisclosed attorney notes of enforcement conference sessions and civil

penalty calculations where agency released similar information to plaintiff contained in different

documents); Coastal Delivery Corp. v. U.S. Customs Serv., 272 F. Supp. 2d 958, 966 (C.D. Cal.

2003) (upholding redactions under exemption 7(E) where agency had previously disclosed "the

same category of information" sought by plaintiff); Hertzberg v. Veneman, 273 F. Supp. 2d 67,

81 (D.D.C. 2003) (no waiver of exemption 5 where agency disclosed certain information relating

to investigation of government's wildfire suppression efforts but withheld other similar

information); see also Army Times Publ'g Co. v. Dep't of the Air Force, 998 F.2d 1067, 1071

(D.C. Cir. 1993) (agency does not "'waive[]' its right to claim an exemption from disclosure

simply because it has released information similar to that requested"); Starkey v. U.S. Dep't of

Interior, 238 F. Supp. 2d 1188, 1193 (S.D. Cal. 2002) (agency properly withheld documents

containing information that overlapped with documents in public domain).

        In cases involving classified national security information, protected under FOIA

exemption 1, 5 U.S.C. § 552(b)(1), courts have been particularly careful not to compel

disclosure, unless there is "specific information in the public domain that appears to duplicate

that being withheld."  Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983); see also

Halpern v. FBI, 181 F.3d 279, 294 (2d Cir. 1999) (application of Exemption 1 "generally

unaffected by whether the information has entered the realm of public knowledge"; "[a] limited

exception is permitted only where the government has officially disclosed the specific

information the requester seeks"); accord Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,

---

and procedures for law enforcement investigations and prosecutions," id. § 552(b)(7)(E).

891 F.2d 414, 421 (2d Cir. 1989); <u>Assassination Archives & Research Ctr. v. CIA</u>, 334 F.3d 55,

60 (D.C. Cir. 2003); <u>Edmonds v. U.S. Dep't of Justice</u>, 405 F. Supp. 2d 23, 30 (D.D.C. 2005).

Outside the FOIA context as well, courts routinely have concluded that an agency's

disclosure of certain privileged documents does not waive its ability to protect other privileged

documents that address the same subject matter.  <u>See, e.g.</u>, <u>In re Sealed Case</u>, 121 F.3d 729, 741

(D.C. Cir. 1997) ("all-or-nothing approach" to subject matter waiver in attorney-client privilege

context "has not been adopted with regard to executive privileges generally, or to the deliberative

process privilege in particular;" "[i]nstead, courts have said that release of a document only

waives these privileges for the document or information specifically released, and not for related

materials"); <u>General Elec. Co. v. Johnson</u>, No. Civ. A. 00-2855 (JDB), 2006 WL 2616187, at *7

(D.D.C. Sept. 12, 2006) ("[D]isclosure of a deliberative document waives the privilege only as to

that document, not as to others dealing with the same subject matter."); <u>cf. also</u> <u>Wilson v.</u>

<u>McConnell</u>, 501 F. Supp. 2d 545 (S.D.N.Y. 2007) (CIA properly restricted publication in memoir

of classified information regarding plaintiff's employment with CIA, despite unauthorized

release by agency employee that resulted in public disclosure of the same information in the

Congressional Record).

Consistent with these principles, moreover, the parties executed a non-waiver

agreement with regard to documents or information produced by the FBI in response to the

parties' <u>Touhy</u> requests for documents, which the Court entered on May 1, 2007.  <u>See</u> Normand

Decl., Exh. C.  That agreement provides that "[a]ny disclosure of a document (or portion thereof)

or information by the Government shall not constitute a waiver by the Government of any

privilege or other protection that may be applicable to any document (or portion thereof) or

information not disclosed." Id. ¶ 1. This agreement comports with the well-recognized principle

that the Government, in disclosing certain documents or information, does not vitiate the

privileges and protections that may apply to other documents or information concerning the same

subject matter.

> **2.    The Touhy Requests Seek Classified and Privileged Information Beyond the Scope of Any Prior Public Disclosures**

In light of these authorities, DOJ, in declining to authorize the requested testimony,

reasonably rejected the Aviation Defendants' bald assertion that, by honoring the 9/11

Commission's requests for interviews of FBI employees or former employees, or by authorizing

such individuals to testify at the criminal prosecution of Zacarias Moussaoui or before Congress,

"'the FBI has already concluded' that disclosure of the information requested in [the Aviation

Defendants'] Touhy request[s] 'would not infringe an applicable privilege, violate a statute or

regulation, reveal classified information, reveal a confidential source or informant, reveal

investigative records or interfere with enforcement proceedings.'" Garcia Ltr.-Rolince at 2

(quoting Barry Aff.-Rolince ¶ 13); accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2;

Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2. "To the contrary," as DOJ's final determinations

concluded, and as demonstrated in Point II.A supra, the Aviation Defendants' "request[s] on

[their] face implicate[] a vast amount of classified and privileged information that was not

disclosed or waived" by virtue of the FBI agents' "limited public testimony [or statements] on

certain of the requested topics, nor the FBI's provision of information to the Commission."

Garcia Ltr.-Rolince at 2; accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-

Rowley at 2; Garcia Ltr.-Samit at 2; see also Heimbach Decl. ¶ 13.

The likelihood that the Aviation Defendants' requested depositions would call for disclosure of classified information is magnified by the enormous breadth of the requests. To give just one example, the Aviation Defendants sought to depose former Special Agent Rolince, among others, about "information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al Qaeda and/or Usama bin Laden," and "[t]he communications, if any, between the FBI and the CIA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation." Barry Aff.-Rolince ¶ 12a-b; see also id. ¶ 8 (noting that "Rolince is qualified to testify as to the intelligence that was available to" the NSC, State Department, and CIA). Former Special Agent Rolince, who served as Chief of the FBI's International Terrorism Operations Section from 1998 to 2002, id. ¶ 1, was privy to a tremendous volume of information regarding al Qaeda and Usama bin Laden during his tenure at the FBI. While former Special Agent Rolince provided limited testimony on the subject of al Qaeda at the Moussaoui trial, under tightly controlled conditions, see infra Point II.B.4, his testimony in one criminal trial obviously does not exhaust his knowledge of this extraordinarily broad topic.

Even as to the statements that former Special Agent Rolince made during his public testimony, if he were deposed in this case, the parties, including plaintiffs and cross-claim plaintiffs as well as the Aviation Defendants, undoubtedly would seek to cross-examine him and elicit additional information concerning his prior statements. See Heimbach Decl. ¶ 23. That process inevitably would reveal information beyond special Agent Rolince's prior public statements, and thus would raise substantial concerns about disclosure of classified or privileged information. See id. ("attempts to elicit the foundation of prior public statements, inquire into background facts or circumstances, or otherwise amplify the prior public statements likely would

-32-

implicate classified or law enforcement sensitive information that has not previously been

disclosed"); Burnett v. Al Baraka Inv. & Dev. Corp., 323 F. Supp. 2d 82, 83 (D.D.C. 2004)

(partially quashing subpoena seeking deposition of former FBI translator, and observing that,

"while some of [the] objectionable questions may seem innocuous, one of the many concerns to

the Court is that should the defendants desire to cross-examine the deponent on the veracity of

her claims, which undoubtedly would occur, the deponent would inevitably have to reveal

privileged information in order to establish the basis and source of her knowledge").

       DOJ thus reasonably concluded that the FBI agents' prior testimony or public

statements regarding certain matters relating to the September 11 attacks did not waive the

protections applicable to classified or privileged information on the same subject matters.

### 3. The FBI Did Not Waive Any Privilege or Protection by Providing Information to the 9/11 Commission

       The Aviation Defendants' suggestion that the FBI somehow waived its ability to

protect classified or otherwise privileged information by virtue of its cooperation with and

provision of information to the 9/11 Commission, see Br. at 13 (noting that the FBI agents had

disclosed information to "public bodies such as the 9/11 Commission"); see also, e.g., Barry

Aff.-Rolince ¶ 11 (noting that "Mr. Rolince . . . was previously interviewed about these issues by

the [9/11 Commission] and is frequently cited as an authority on these topics in the 9/11

Commission's Report"), is similarly unavailing.

       The statute creating the 9/11 Commission required that Federal agencies and

departments  "shall, to the extent authorized by law, furnish such information, suggestions,

estimates, and statistics" as the Commission requested, and directed that such "[i]nformation

shall only be received, handled, stored, and disseminated by members of the Commission and its

staff consistent with all applicable statutes, regulations, and Executive Orders."  Pub. L. No. 107-306, 116 Stat. 2383, 2411, § 5(c)(2) (Nov. 27, 2002).  The statute further provided that "the appropriate Federal agencies or departments shall cooperate with the Commission in expeditiously providing to the Commission members and staff appropriate security clearances to the extent possible pursuant to existing procedures and requirements," and specifically stated that "no person shall be provided with access to classified information under this title without the appropriate security clearances."  Id., 116 Stat. at 2413, § 609.

  These provisions make clear that Federal agencies and departments, including the FBI, were required to provide certain requested information to the Commission, and that the Commission was obliged to safeguard such information, including classified national security information, consistent with applicable law.  Under such circumstances, no inference can be drawn that in providing information to the Commission as mandated by statute, the FBI voluntarily waived any privilege or other protection that otherwise shielded the information from public disclosure.  See, e.g., Florida House of Representatives v. U.S. Dep't of Commerce, 961 F.2d 941, 946 (11th Cir. 1992) (involuntary disclosure of information to Congress did not support finding of waiver of Exemption 5 protection).

  The FBI, furthermore, took special precautions to ensure that classified and privileged information provided to the 9/11 Commission would not be publicly disclosed, in the Commission's report or otherwise.  See Heimbach Decl. ¶¶ 14-16.  As noted above, all of the Commission members and their staff possessed security clearances.  Id. ¶ 14.  All hearings and interviews in which classified information was discussed were closed to the public.  Id.  With respect to the Commission's public hearings, precautionary measures were taken in advance to

ensure that no classified information would be disclosed during live testimony, so that both the

questioners and the witnesses knew that specific classified matters could not be discussed

publicly.  Id.  During public hearings at which FBI agents testified, FBI personnel familiar with

PENTTBOM and classification procedures were in attendance to lend advice and guidance

regarding issues implicating classified information.  Id.

      With regard to information disclosed in the Commission's public report, the

Commission submitted a draft report to the FBI and other agencies within the Intelligence

Community prior to its public release, so that those agencies could conduct a "pre-publication

review" of the report for classified information.  Id. ¶ 15.  In fact, prior to publication of the final

report in July 2004, numerous meetings were held among Commission staff and agency

personnel (including the FBI), during which the report's final language was collaboratively

vetted to ensure that no classified was disclosed.  Id.

      Under all of these circumstances, the Aviation Defendants' contention that the FBI's

cooperation with the 9/11 Commission, and the publication of PENTTBOM-related information

in the Commission's final report, somehow declassified or otherwise waived privileges as to all

information relating to pre-9/11 intelligence or the PENTTBOM investigation, see Br. at 13-14,

does not withstand scrutiny.

### 4.  The FBI Did Not Waive Any Privilege or Protection by Permitting Limited Testimony at the Moussaoui Trial

      Equally meritless is the Aviation Defendants' argument that information relating to

pre-9/11 intelligence and the FBI's investigation of al Qaeda prior to September 11, 2001, is no

longer classified or privileged because four of the proposed FBI agents testified at the trial of

Zacarias Moussaoui.  See Br. at 39-41.  The Moussaoui trial was a criminal proceeding, and as

such, the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 (2000), governed all

matters relating to classified information that arose in connection with the prosecution.  18

U.S.C. app. 3 § 2; Heimbach Decl. ¶ 17.

        CIPA provides a framework for the use and handling of classified information in

criminal proceedings.  18 U.S.C. app. 3 §§ 2-8; Heimbach Decl. ¶ 16.[9]  It contains provisions

relating to the United States' use of classified documents or information in the course of its

prosecution, including through the use of non-classified summaries and stipulated facts.  See,

e.g., 18 U.S.C. app. 3 § 4 ("The court, upon a sufficient showing, may authorize the United

States to delete specified items of classified information from documents to be made available to

the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a

summary of the information for such classified documents, or to substitute a statement admitting

relevant facts that the classified information would tend to prove.  The court may permit the

United States to make a request for such authorization in the form of a written statement to be

inspected by the court alone.").  CIPA also requires a defendant to provide notice when he

"reasonably expects to disclose or to cause the disclosure of classified information in any manner

in connection with any trial or pretrial proceeding involving the criminal prosecution of such

---

        [9]        As explained infra Point II.C.1, CIPA does not apply to civil discovery involving
classified information, and no comparable system is available in civil cases, particularly where
the government is not a party.  Heimbach Decl. ¶ 22.  "Congress passed CIPA to prevent the
problem of 'graymail,' where defendants pressed for the release of classified information to force
the government to drop the prosecution.  CIPA permits 'the trial judge to rule on questions of
admissibility involving classified information before introduction of the evidence in open court.
This procedure … permit[s] the government to ascertain the potential damage to national security
of proceeding with a given prosecution before trial.'"  United States v. Sarkissian, 841 F.2d 959,
965 (9th Cir. 1988) (citing Senate Report).  It bears noting that in civil cases, especially when it
is not a party, the government does not have the option of foregoing a prosecution for purposes of
protecting classified information.

defendant."  18 U.S.C. app. 3 § 5.  In either event, CIPA specifies procedures for the court,

typically through in camera hearings, to make determinations concerning the use, relevance and

admissibility of classified information, or substitutions therefor.  18 U.S.C. app. 3 § 5(a), (c).

CIPA also provides procedures for the introduction of classified information into evidence in

criminal proceedings, including provisions to ensure against the unauthorized release of

classified information during testimony.  18 U.S.C. app. 3 § 8.

CIPA was used extensively in the Moussaoui trial.  See Heimbach Decl. ¶ 18.

CIPA's discovery framework allowed Moussaoui's defense counsel, who had been granted

security clearances, to review thousands of pages of classified PENTTBOM (and other) materials

in a secure facility and to identify several hundred documents for potential use in the trial.  Id.

Thereafter, prosecutors and defense counsel engaged in intense CIPA litigation, including

multiple in camera hearings, to resolve issues relating to the use of classified information during

the trial.  Id. ¶ 19.  This litigation resulted in court rulings and the negotiation of stipulations and

substitutes that obviated the need to introduce classified information on certain subjects at the

trial.  Id.  Of particular relevance here, prosecutors and defense counsel negotiated a set of factual

stipulations regarding certain intelligence information available to the Government before the

September 11 attacks, as well as substitutes for the testimony of government employees "John"

and "Mary," whose deposition testimony the Aviation Defendants have sought in this case, id. &

Exhs. A-C.  Those stipulations and testimonial substitutes gave the FBI and prosecutors

significant comfort that defense counsel would not delve inappropriately into classified material

in their questioning of witnesses.  Id. ¶ 19.

Additionally, precautionary measures were employed to protect against the inadvertent disclosure of classified information during live court testimony.  Id.  For example, representatives of the Intelligence Community briefed prosecutors, defense counsel and witnesses regarding the classified boundaries of questioning.  Id. ¶ 20.  During courtroom proceedings, when a witness who possessed classified information was on the stand, several Intelligence Community representatives, including an original classification authority, were present in an attempt to prevent classified information from being disclosed.  Id.[10]

The parties' extensive use of CIPA procedures – including the development of stipulated facts and other substitutes for live testimony and implementation of special precautions in advance of and during live trial testimony – make clear the oversimplification of the Aviation Defendants' claim that "[a]ny privilege or protection that may have once applied" to information revealed during the Moussaoui trial "no longer shields it from discovery."  Br. at 39.  While the Aviation Defendants are correct that the specific information revealed during the trial is not classified or privileged, any amplification of that testimony, including attempts to elicit the foundation of prior public statements or elicit background facts and circumstances, is likely to implicate classified and privileged matters.  Heimbach Decl. ¶ 23.  Even if the Aviation Defendants were willing to limit their examination strictly to information that previously has been made public, the witnesses would be subject to cross-examination by counsel for plaintiffs and cross-claim plaintiffs, who likely would seek to probe the witnesses' testimony and inquire

---

[10]    Similar CIPA-like precautionary measures are available and will be utilized to safeguard classified PENTTBOM-related information in ongoing and future military commission proceedings involving other alleged al Qaeda terrorists charged with involvement in the September 11 attacks.  Heimbach Decl. ¶ 21; see 10 U.S.C. §§ 949d(f), 949j(c).

into matters beyond the scope of the information previously disclosed, thereby implicating information that remains classified and/or law enforcement sensitive.  Id.

Another example from the Aviation Defendants' brief is illustrative.  Citing Mr. Rolince's testimony at the Moussaoui trial, the defendants explain that they wish to question him "regarding the information the [FBI] had about [9/11 hijackers] Hazmi and Mihdhar before September 11," and "how this intelligence fit into other information in the FBI's possession indicating that al Qaeda was planning to launch terrorist attacks in the United States."  Br. at 31. Former Special Agent Rolince, however, did not testify about Hazmi or Mihdhar at the Moussaoui trial.  See Barry Decl., Exh. 13 (Rolince Moussaoui testimony).  Therefore, contrary to their claim, Br. at 40-41, the Aviation Defendants seek to elicit in Mr. Rolince's deposition far more information than he provided at the Moussaoui trial.[11]

When evidence on the subject of Hazmi and Mihdhar was presented by the defense in the Moussaoui trial, moreover, it was through a summary witness, former Special Agent Rigler, who testified about unclassified portions of the OIG Report, and the substituted testimony of government employees "John" and "Mary."  See Barry Decl., Exh. 20 (Rigler testimony); Heimbach Decl. ¶ 19 & Exhs. B-C.  Thus, even in a death penalty case, the defense relied on the substituted testimony of two witnesses using pseudonyms, together with the OIG Report itself, rather than presenting live testimony that might have risked disclosure of classified information. See Heimbach Decl. ¶ 19.

---

[11]    Indeed, Mr. Rolince's testimony in the Moussaoui trial was quite general, and made use of the factual stipulations that had been negotiated during the extensive pretrial CIPA proceedings.  See Barry Decl., Exh. 13 at 1462-1533.  In light of those proceedings, the FBI and prosecutors were comfortable that defense counsel would not touch on classified matters in their cross-examination of Mr. Rolince.  Heimbach Decl. ¶ 19.

The Aviation Defendants' blithe assertion that they should be permitted to depose the former head of the FBI's International Terrorism Operations Section in this civil litigation – and inquire about the intelligence the FBI and other agencies had about certain 9/11 hijackers and how that intelligence fit into the mosaic of information in the FBI's possession, Br. at 31 – simply because he testified at the Moussaoui trial, is wholly unsupportable. The mere fact that a certain FBI agent may have testified at the Moussaoui trial does not vitiate the protections and privileges that attach to the larger body of information that was not publicly disclosed.

### C. The Aviation Defendants' Touhy Requests Are Unduly Burdensome in Light of the Substantial Risk of Unauthorized Disclosures of Classified and Privileged Information

Having reasonably concluded that the Touhy Requests implicate classified and privileged information, DOJ reasonably determined that "the process of separating the classified information from the non-classified information, and making a determination whether the information should be withheld pursuant to the law enforcement investigative privilege, both would be an extremely difficult and burdensome task and would pose an unacceptable risk that classified information or law enforcement matters may be inadvertently disclosed." Garcia Ltr.-Rolince at 2; accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2.

### 1. Classified and Privileged Information Is Not Reasonably Segregable in the Context of Depositions in This Case

The precautionary measures employed in connection with the 9/11 Commission proceedings and the Moussaoui trial demonstrate that the classified and privileged information implicated by the Aviation Defendants' Requests is not reasonably segregable in the deposition context. The 9/11 Commission members and their staff, and the attorneys representing

Moussaoui, were cleared for access to classified documents and information. Heimbach Decl. ¶¶ 14, 18. With the assistance of FBI and other agency personnel, who briefed the questioners and the witnesses in advance, questioners had knowledge of the boundaries of classified information, and thus could tailor their questions (and witnesses could tailor their responses) to avoid disclosure of classified information in proceedings open to the public. Id. ¶¶ 14, 20. Furthermore, in the case of the Moussaoui trial, issues or disputes relating to the use of specific classified information were resolved prior to trial through extensive CIPA litigation. Id. ¶ 18. Similarly, FBI and other Intelligence Community personnel worked with the 9/11 Commission and its staff to "collaboratively vet[]" the report's final language to ensure that no classified information was disclosed. Id. ¶ 15. It was only through these special precautions that it was possible to avoid disclosure of classified information in Commission proceedings and the Moussaoui trial. See id. ¶¶ 13, 26.

      The requested depositions of the FBI agents in this case stand in stark contrast to the 9/11 Commission and Moussaoui proceedings. Unlike the 9/11 Commission members and their staff and Moussaoui's defense counsel, the attorneys representing the diverse interests in this civil litigation do not have access to classified or privileged information relating to PENTTBOM. Heimbach Decl. ¶ 22; see 28 C.F.R. § 16.26(b)(3), (c) (prohibiting disclosure of classified information in response to Touhy requests). They could not review classified documents, or receive classified briefings by agency officials, prior to the requested depositions. Therefore, in questioning the FBI agents at deposition, unlike the 9/11 Commission members or staff, or the attorneys who examined witnesses in the Moussaoui trial, the questioners would not have knowledge of the limits of permissible questions. Heimbach Decl. ¶ 22 ("the parties' counsel

(representing plaintiffs and cross-claim plaintiffs in addition to the aviation parties) could not

determine in advance of the contemplated depositions which of the questions they wish to ask

may intrude upon classified or law enforcement sensitive matters, nor could the FBI adequately

prepare its witnesses or counsel to respond in a manner that fully protects against the disclosure

of classified or sensitive information").  Nor would the FBI agents necessarily be in a position to

know whether information they may be asked about at a deposition is or is not classified or

subject to the law enforcement privilege.  Id.

Thus, as Assistant Director Heimbach explains in his declaration, "it would be

extremely difficult, if not impossible," for the FBI to "monitor and protect against the inadvertent

disclosure of classified and/or law enforcement sensitive information in depositions in this civil

case." Id. ¶ 26.

### 2. Allowing Depositions of the FBI Agents Would Impose Unreasonable Burdens on the FBI and Open the Door to Further Deposition Requests and Related Litigation That Would Delay the September 11 Litigation

If the requested depositions of the FBI were permitted to proceed, the agency would

have to expend significant resources to protect against unauthorized disclosures of classified and

privileged information.  The FBI's efforts to protect against such disclosures in the 9/11

Commission and Moussaoui contexts involved a substantial commitment of FBI and Intelligence

Community resources.  Id. ¶¶ 13, 26.  In the 9/11 Commission context, for example, an FBI

Headquarters task force of approximately fifty personnel was assembled in the summer of 2003,

whose mission was to ensure FBI's cooperation with the Commission and to protect against the

unauthorized release of classified information.  Id. ¶ 16.  Similarly, FBI and other Intelligence

Community representatives were heavily involved in the pretrial and Moussaoui proceedings, for

-42-

purposes of guarding against inadvertent disclosures of protected information. See id. ¶¶ 19-20.

It would be extremely burdensome for the FBI (and the rest of the Intelligence Community) to

commit similar resources to protect against such disclosures in a civil case in which the FBI is

not a party. Id.; see also Garcia Ltr.-Rolince at 2 ("Given the breadth of the request and the

privileges and exemptions that may apply, it would impose an undue burden on the FBI to

segregate the information that may be disclosable and then to prepare Special Agent Rolince to

testify about these materials."); accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia

Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2.

    The burdens on the FBI, moreover, must be viewed in the context of its overall law

enforcement mission and its continuing PENTTBOM investigation. See COMSAT Corp., 190

F.3d at 278 (considering "potential cumulative burden upon the agency" of requested document

productions and depositions); Davis Enters., 877 F.2d at 1186-87 (same). To require the FBI to

mobilize its finite resources to protect against disclosure of classified and law enforcement

sensitive information the context of multiple depositions in this consolidated civil case would

divert current FBI agents investigating PENTTBOM and other counterterrorism matters from

their critically important operational duties. Heimbach Decl. ¶ 26; see COMSAT Corp., 190

F.3d at 278 (agency determination refusing to comply with subpoenas for documents and

testimony not arbitrary or capricious where compliance "would measurably strain agency

resources and divert [agency] personnel from their official duties"). These burdens are

compounded by the immense scope of the proposed deposition topics and their obvious nexus to

classified intelligence reporting. See supra Point II.A. Moreover, Special Agents Samit and

Billings, whose testimony has been requested, are active FBI agents. See Barry Aff.-Samit ¶ 1;

Barry Aff.-Billings ¶ 1.  The record thus easily rebuts the Aviation Defendants' flippant claim

that "the FBI would have to conduct the same preparation in advance of the FBI Witnesses'

depositions that any other non-party employer would undertake if five of its employees were

called to testify as fact witnesses in a civil litigation."  Br. at 47.[12]

And the Aviation Defendants' requests do not stop with the five FBI agents addressed

in this motion.  They have also submitted formal <u>Touhy</u> requests for the testimony of government

employees "John" and "Mary," whose substituted statements were admitted in the Moussaoui

trial, Normand Decl. ¶ 8 & Exhs. D-F; Heimbach Decl. Exhs. B-C, and Behrooz Sarshar, a

former FBI translator, Normand Decl. ¶ 11 & Exhs. G-H.[13]  Recently, the Aviation Defendants

---

[12]    Consistent with this myopic view, the Aviation Defendants rely on <u>Touhy</u> cases
that did not involve requests for depositions implicating classified national security information
or law enforcement sensitive information.  <u>See</u> Br. at 42-48 (citing <u>Cavanaugh v. Wainstein</u>, Civ.
Action No. 05-123, 2007 U.S. Dist. Lexis 40242, 2007 WL 1601723 (D.D.C. June 4, 2007)
(partially setting aside denial of requests for depositions of DOJ attorneys in action alleging
breach of fiduciary duty by members of Fiduciary Retirement Thrift Investment Board, where
defendant Board members had asserted an advice of counsel defense); <u>In re Vioxx Prods.
Liability Litig</u>, 235 F.R.D. 334 (E.D. La. 2006) (denying motion to quash deposition of Food and
Drug Administration doctor who, in addition to testifying before Congress, had appeared on
numerous television programs and had given interviews to multiple print and online publications
regarding the FDA's handling of Vioxx); <u>Sommer v. PMEC Assocs.</u>, 88 Civ. 2537, 1993 U.S.
Dist. Lexis 20401 (S.D.N.Y. Mar. 31, 1993) (Gershon, M.J.) (granting motion to compel
testimony of Department of Labor representative regarding alleged investigation of corporation,
where agency failed to make showing of "actual burden" and applicability of privileges could not
be determined in advance of deposition); <u>In re "Agent Orange" Prod. Liability Litig.</u>, 98 F.R.D.
522 (E.D.N.Y. 1983) (noting that government had produced documents and witnesses, apparently
voluntarily, in case in which government initially was sued)).  In <u>F.A.C., Inc. v. Cooperativa De
Seguros De Vida</u>, 188 F.R.D. 181 (D.P.R. 1999), cited in Br. at 39, the court declined to quash a
subpoena issued to the FBI and the U.S. Attorney's Office on purely procedural grounds, but
ordered an <u>in camera</u> hearing to assess the United States' claim of law enforcement privilege.

[13]    Notwithstanding the Court's expressed desire to resolve expeditiously the
outstanding government discovery and related evidentiary issues and bring fact discovery to a
close, <u>see</u> Hearing Tr. Mar. 18, 2008, at 19-20, 28, 65-66, the Aviation Defendants have not
challenged the CIA's denials of the requests to depose "John" or "Mary," or the FBI's denial of

submitted further <u>Touhy</u> requests to depose Kenneth Williams, an FBI Special Agent in Phoenix, Arizona, who authored the so-called "Phoenix memo," and John Anthony, a former FAA inspector who had contact with 9/11 hijacker Hani Hanjour.  Normand Decl. ¶ 12 & Exhs. I-J.

   In addition, although they have not yet submitted formal <u>Touhy</u> requests, the Aviation Defendants have indicated an intent to seek the depositions of multiple FAA employees who served as intelligence specialists and/or liaisons between the FAA and the Intelligence Community, prior to September 11, 2001.  <u>Id.</u> ¶ 13 & Exh. K (listing John Hawley, Jack Salata, Robert White, and James Padgett).  Further, in their motions seeking evidentiary rulings on the substituted statements of alleged 9/11 co-conspirators Khalid Sheikh Mohammed and Ramzi Binalshibh, the Aviation Defendants threaten to seek additional depositions of "law enforcement officers and intelligence agents," presumably including FBI witnesses, in the event that the Court denies their motion.  <u>See</u> Aviation Defendants' Memorandum of Law in Support of Motion for a Determination That Khalid Sheikh Mohammed's and Ramzi Binalshibh's Prior Out-of-Court Statements Are Not Subject to Any Hearsay-Related Objections to Their Admissibility, at 4 ("Absent a timely decision that Sheikh Mohammed's and Binalshibh's prior statements may be admissible as evidence, the Aviation Defendants will need to depose numerous other witnesses – such as the law enforcement officers and intelligence agents who investigated the terrorists – to establish the same factual information that is contained in their prior statements.").

   As their ever-increasing list of proposed government witnesses illustrates, and their brief makes clear, Br. at 29-35, the Aviation Defendants are seeking, at this late stage in the litigation, to turn the focus of this case to the government's conduct prior to September 11, 2001.

---

their request to depose Mr. Sarshar in their motion.

Allowing the Aviation Defendants to depose the five current and former FBI agents at issue in this case will only open the door to further requests, additional collateral litigation, and, ultimately, more delay.

> **3.    The Aviation Defendants' Analogy to the Depositions Already Taken in This Case Involving SSI Underscores the FBI's Concerns About Inadvertent Disclosures of Classified and Sensitive Information in Civil Depositions**

Defendants' contention that "skilled counsel, well-versed in the issues in the September 11 Litigations from the office of the United States Attorney for the Southern District of New York, are available to represent the FBI Witnesses and to instruct the witnesses not to reveal any privileged or classified information during their depositions," Br. at 7-8, fails to understand, much less resolve, the FBI's serious concerns about unauthorized disclosures in depositions.  As DOJ's final Touhy determinations state, and the Aviation Defendants nowhere address in their brief, the risk of disclosure of classified information or law enforcement matters "is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privilege material is intertwined and not readily segregable."  Garcia Ltr.-Rolince at 2; accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2; Heimbach Decl. ¶ 23.  This problem is further compounded by the fact that the questioners, who have not had access to classified documents or briefings, would not know and could not determine in advance which questions may implicate classified information, nor could the witness or counsel representing the witness determine in advance which questions or responsive testimony may reveal classified matters.  Heimbach Decl. ¶ 22.

The Aviation Defendants point out that "[c]ounsel from the U.S. Attorney's office regularly attend depositions to prevent protected information from being inadvertently

disclosed," and assert that "[t]here is no reason to believe they would not be similarly well-equipped to fulfill the same duties at the depositions of the FBI Witnesses."  Br. at 42-43.  The Aviation Defendants' analogy to the SSI depositions in the September 11 Litigation is both inapposite and incorrect.

The analogy is inapposite because there are substantial and material differences between the process of identifying SSI during a deposition of a checkpoint screener or other aviation employee, and the process of identifying classified or law enforcement privileged information during the deposition of an FBI special agent asked to testify about intelligence matters, such as "[t]he information available to the FBI before September 11, 2001 regarding the likelihood of an attack by al-Qaeda and/or Usama bin Laden."  The process of identifying whether a specific piece of information is properly classified, or may be disclosed, is based on a variety of factors and considerations that are weighed by officials who have been delegated original classification authority.  Heimbach Decl. ¶ 24.  In weighing those factors and considerations, which can be subtle and complex, the original classification authority must assess whether the disclosure of the information, at any given time, would present an unacceptable risk of compromising the FBI's ongoing intelligence gathering process with regard to a specific investigation or investigations, or compromising certain investigative sources, methods or techniques.  Id.  The original classification authority further considers whether a mosaic of information can be pieced together by our adversaries, both individuals and groups, which would allow them to better evade ongoing investigations and more easily formulate or revise their counter-surveillance efforts.  Id.

-47-

This process of determining when potentially classified information may be disclosed is a painstaking and deliberate process, which requires careful analysis and measured judgment. Id. ¶ 25. It often takes a great deal of time, energy, and collaboration among multiple FBI divisions and other government agencies, often including agencies within the Intelligence Community, to trace information back to its source and determine the equities implicated by the potential disclosure of classified information. Id.; see also Garcia Ltr.-Rolince at 2 ("[T]he testimony you seek may contain information that originated with other Government departments or agencies. Before the FBI can authorize testimony concerning such information, it must coordinate its responses with these other departments or agencies. This coordination process would place an undue burden on the FBI."); accord Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2.

The process of identifying SSI during depositions in this litigation, in contrast, is substantially less complex.[14] To identify SSI in deposition questions and answers, TSA's security expert relies heavily on the documents that TSA has previously reviewed and redacted, which documents are available in searchable electronic format during the deposition. Normand Decl. ¶ 18. Moreover, only a very limited amount of SSI has been implicated in the depositions that have taken place to date. Accordingly, TSA's security expert rarely has been called upon

---

[14]    Although the Court entered the Stipulated Protective Order Governing Access to, Handling of, and Disposition of Potential Sensitive Security Information on March 21, 2007, which permits the disclosure of SSI in certain limited circumstances, see Normand Decl., Exh. M ¶ 8, many of the depositions in this case occurred prior to that date. Even in depositions occurring after the Stipulated Protective Order was entered, SSI may not be disclosed in the presence of non-cleared counsel, and certain SSI is not subject to disclosure at all. See id. ¶¶ 8.2.1, 8.3.

during the course of a deposition to make on-the-spot determinations as to what constitutes SSI.
Id.

Even so, SSI has been disclosed inadvertently in more than twenty depositions in the
September 11 Litigation, notwithstanding the presence of a TSA security expert and counsel. Id.
¶ 19.  These inadvertent disclosures of SSI have occurred in a variety of contexts.  Sometimes the
witness blurts out SSI that does not appear to be responsive to the question, and thus could not
have been anticipated by TSA.  Other times it is not clear from the question whether or not the
answer will implicate SSI, and ultimately it does.  Sometimes the TSA security expert or counsel
fails to anticipate that the question calls for SSI, or the witness responds before TSA counsel has
had an opportunity to object.  Other times the sensitivity of the information becomes apparent
only after the question and answer are read in context, during TSA's post-deposition transcript
review.  SSI has also been revealed inadvertently by counsel taking the depositions.  Id.

All of these scenarios have occurred, resulting in the inadvertent disclosure of SSI to
the dozens of attorneys who attend depositions in this case.  Id.  Once released, the information is
at risk of further dissemination.  Id. ¶ 20.  There has been at least one occasion when attorneys
present during a deposition at which SSI was inadvertently revealed have made further
unauthorized disclosures of the information inadvertently revealed during the deposition.  Id.
While all of these disclosures have been inadvertent, they illustrate how difficult it is to fully
protect against unauthorized releases in the context of a deposition.

If the Aviation Defendants were permitted to conduct depositions of the designated
FBI agents, the risk of disclosure of classified information would be even greater, and the
consequences more dire.  See Heimbach Decl. ¶¶ 12, 27.  The painstaking, deliberative, and

consultative process required to segregate classified from non-classified information would be extremely difficult, if not impossible, to implement successfully in the context of a civil deposition.  See Garcia Ltr.-Billings at 2; Garcia Ltr.-Rigler at 2; Garcia Ltr.-Rolince at 2; Garcia Ltr.-Rowley at 2; Garcia Ltr.-Samit at 2; see also Heimbach Decl. ¶ 8 ("the prospect of live testimony in civil discovery about intelligence and law enforcement matters raises significant national security concerns because it is extremely difficult – if not impossible – to protect against the unauthorized, even if inadvertent, disclosure of classified and law enforcement sensitive information relating to PENTTBOM").

This problem is exacerbated by the tremendous breadth of the Aviation Defendants' deposition topics.  Unlike the depositions of air carrier and screening company personnel, which have implicated only small amounts of SSI, Normand Decl. ¶¶ 16, 18, the Aviation Defendants seek to inquire into all FBI's intelligence and communications regarding al Qaeda and Usama bin Laden prior to September 11, 2001.  See Barry Aff.-Billings ¶ 7(f), (h); Barry Aff.-Rigler ¶ 11(b), (f); Barry Aff.-Rolince ¶ 12(a), (b), (f); Barry Aff.-Rowley ¶ 12(k), (n); Barry Aff.-Samit ¶ 11(g), (j).  To protect against disclosure of classified or privileged information on these wide-ranging topics would require extraordinary efforts on the part of the FBI, with no assurance that those efforts ultimately would be successful.  Heimbach Decl. ¶¶ 5, 9, 21-26.

There is another significant distinction between the FBI agent testimony requested by the Aviation Defendants here, and the depositions that have taken place to date in the September 11 Litigation.  Although depositions of screening or airline personnel necessarily implicate SSI, there is no alternative but for those individuals – who are or work for parties to the litigation – to be deposed.  While great care has been taken to try to avoid inadvertent disclosures of SSI, there

was no possibility that those depositions would not proceed.  Clearly, their testimony is relevant,

and plaintiffs have a need to depose them.  Here, as set forth in Point III, infra, there is no

comparable need to depose FBI agents, as the specific facts that the Aviation Defendants seek to

establish, if relevant at all, are publicly available from other sources that are less burdensome and

do not present the same concerns about unauthorized disclosures of classified and privileged

information.

   Under all of these circumstances, DOJ's determination not to authorize testimony was

not arbitrary or capricious, but rather was faithful to the regulations, which prohibit Department

employees from producing information that is classified, privileged, or unduly burdensome to

provide.  28 C.F.R. §§ 16.26(a)(2), (b)(3),(5), (c); Fed. R. Civ. P. 45(c)(3)(A)(iii)-(iv); Linder v.

NSA, 94 F.3d 693, 697-98 (D.C. Cir. 1996) (quashing subpoena in its entirety in light of burden

on agency and privileged nature of majority of responsive documents); Moore, 927 F.2d at 1198

(affirming decision quashing subpoena based on burden to agency, and stating that "whether an

agency's denial is 'arbitrary or capricious' must include a determination of the burden that the

deposition would place on the agency"); Abdou v. Gurrieri, No. 05-CV-3946(JG), 2006 WL

2729247, at *4 (E.D.N.Y. Sept. 25, 2006) (subpoena for testimony of FBI detective quashed

where government's interest in protecting against disclosure of privileged matters outweighed

need for testimony).

## III. The Agency Did Not Act Arbitrarily or Capriciously in Denying the Requests for Depositions Because the Burdens Far Outweigh Any Minimal Relevance of Such Depositions

   The purported relevance of the discovery sought by the Aviation Defendants from the

FBI cannot be addressed in a vacuum.  The Court must weigh the relevance of the discovery

sought against the burdens such discovery will impose.  See In re IBM Corp. Sec. Litig., 163

F.3d 102, 111 (2d Cir. 1998) ("'weak showing' of potential relevance in its extensive discovery

request was insufficient to outweigh the burden and expense of" further discovery); United States

v. Duke Energy Corp., 214 F.R.D. 392, 393 (M.D.N.C. 2003) (weighing burdens of requested

discovery on the Government against its relevance, court found that "the likely relevance and

benefit of any of the discovery requested is far outweighed by the burden"); Jones v. Goord, 95

Civ. 8026 (GEL), 2002 WL 1007614, at *6 (May 16, 2002) (even where requested material is

relevant and not privileged "the Court still has considerable discretion to evaluate the practical

realities of discovery, balancing the importance of the information against the burdens of

production to decide whether fairness does or does not require production, and if so, on what

terms").  Given that the limited relevance of the discovery requested from the Government is so

heavily outweighed by the burdens it imposes, the Government did not act arbitrarily or

capriciously in denying the requests.

### A.  The Aviation Defendants Seek Irrelevant Information From the FBI Agents

#### 1.  Intelligence Information That Was Not Communicated to the Airlines or the FAA Is Immaterial

The scope of the testimony the Aviation Defendants seek from the FBI agents is

broad, and much more extensive than the description in the Aviation Defendants' brief would

suggest.  These broad requests, properly rejected by the Government, seek vast amounts of

patently irrelevant information from the FBI about threat and intelligence information not

communicated to the Aviation Defendants or the FAA.

For example, the Aviation Defendants seek testimony that the FBI had information

before September 11 that potential terrorists knew how to pilot commercial aircraft, which was

not communicated to the FAA.  Barry Aff.-Billings ¶¶ 10, 11(e), (f), (g); Barry Aff.-Rolince ¶ 12; Barry Aff.-Rowley ¶ 10; Barry Aff.-Samit ¶ 10.

Similarly, they seek testimony that "the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place."  Barry Aff.-Billings ¶ 7;Barry Aff.-Rolince ¶ 7; Barry Aff.-Rowley ¶ 7; Barry Aff.-Samit ¶ 7.  In addition, they seek information generally available to the FBI indicating that a terrorist attack would likely target civil aviation.  Barry Aff.-Billings ¶ 11(g); Barry Aff.-Rolince ¶ 12(d); Barry Aff.-Rowley ¶ 12(l); Barry Aff.-Samit ¶ 11(h).  They also seek information regarding communications between the FBI and the CIA regarding the possibility of an al Qaeda attack on civil aviation.  Barry Aff.-Rolince ¶ 12(b).

These examples demonstrate that the Aviation Defendants are seeking intelligence and other threat information not communicated to the Aviation Defendants that is irrelevant to the question of the Aviation Defendants' liability to plaintiffs.  This case is about the aviation defendants' conduct; the reasonableness of that conduct is properly judged by reference to the information they knew or should have known, not information they could not have known because it was not communicated to them.

The Aviation Defendants contend that the "measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds [sic] light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them."  Barry Aff.-Billings ¶ 7; Barry Aff.-Rolince ¶ 7; Barry Aff.-Rowley ¶ 7; Barry Aff.-Samit ¶ 7.  This Court rejected a similar argument in connection with the World Trade Center Properties' ("WTCP") motion for a protective order.  In that case, the Aviation

Defendants sought discovery from the WTCP regarding conversations its security personnel had regarding the foreseeability of the attacks, because "[i]f they are claiming these attacks were unforeseeable and they hired the head of the FBI terrorist center," their discussions are relevant to the Aviation Defendants' defense of unforeseeability.  See Hearing Tr. Feb. 26, 2007, at 7.  The Court rejected the claim that those internal conversations were relevant, id. at 9, and held that "the security practices of the World Trade Center Properties parties, whatever they were, have no relevance to the measures that were taken by the aviation defendants," id. at 11; see also id. at 13 ("What other parties did nor did not do is not relevant").

What the Government knew on these subjects that was not communicated to the Aviation Defendants is similarly irrelevant.  Even if the discovery were to demonstrate exactly what the aviation defendants say it would - that the FBI had far greater information about al Qaeda and the threat of terrorist attacks on the civil aviation system than did any of the Aviation Defendants - the question of the Aviation Defendants' knowledge and use of that knowledge would not be any further elucidated.  The Government's asserted superior knowledge has no bearing on what the Aviation Defendants knew or should have known, or what they did with the information they already had.

It is similarly irrelevant that notwithstanding their "far more detailed information" regarding al Qaeda, the Government "made the decision not to change the countermeasures it had in place – nor did it recommend or require that the airlines adjust their security procedures." Barry Aff.-Billings ¶ 7; Barry Aff.-Rolince ¶ 7; Barry Aff.-Rowley ¶ 7; Barry Aff.-Samit ¶ 7.  If the Government did not share the information, it is not relevant to the question of whether the Aviation Defendants acted reasonably.

### 2.   New Arguments As to Relevance Not Presented to the Agency Should Be Rejected

The Aviation Defendants offer two new arguments as to the relevance of the requested depositions – that the requested testimony "will tend to establish that the intelligence agencies' actions were also a causal factor in the attacks," Br. at 23-31, and "is probative of whether the Aviation Parties have derivative immunity from liability," Br. at 35-37. These claims, which were never presented to the Government as a basis for the Touhy requests, should be rejected by the Court. See Barry Decl., Exhs. 2-6.

Failure to exhaust their claims before the agency precludes the Aviation Defendants from raising the arguments before the Court on this APA challenge to the agency's Touhy decision. See Glotzer, 374 F.3d at 192 (party challenging agency's Touhy decision must first exhaust administrative remedies pursuant to APA); Boca Raton Cmty. Hosp. Inc. v. Tenet Healthcare Corp., No. 05-80183, 2006 WL 1523234, at *2 (S.D. Fl. Apr. 24, 2006) (exhaustion of administrative remedies is a prerequisite to obtaining judicial review of an agency's Touhy determination); Forest Guardians v. U.S. Forest Serv., No. CIV 05-0372, 2006 WL 4109661, at *31 (D.N.M. Aug. 22, 2006) (failure to exhaust argument before agency precludes court from considering it). Accordingly, the Court should decline to consider any claims not previously presented to the agency.

### 3.   The Aviation Defendants Fail to Establish That the FBI Agents Can Offer Specific Relevant Evidence in Connection with Their Defenses

Even if the Court were to consider the Aviation Defendants' unexhausted arguments, none of their various theories as to the relevance of the FBI agents' testimony – causation, foreseeability, and the newly minted claim of "derivative immunity" – justifies subjecting the

FBI and its agents to the burdens of deposition.  The flaws in the Aviation Defendants' argument

cut across all of their theories of relevance:  the Aviation Defendants repeatedly confuse

argument and evidence, they seek opinion evidence properly sought from experts rather than

from individual FBI agents, and they seek information from these agents about which they lack

personal knowledge.

> ### a. The Aviation Defendants Have Not Established That They Need FBI Depositions to Make Their Legal Arguments

To the extent the Aviation Defendants seek to obtain evidence from the FBI agents

regarding facts within their knowledge – such as what knives were found in Moussaoui's

possession or the nature of Moussaoui's physical training – as set forth below, these facts have

already been disclosed and are available to the Aviation Defendants through alternative channels.

It appears, however, that the Aviation Defendants seek to depose the FBI agents not to develop

facts, but to attempt to make arguments through them.  For example, they claim to seek to

establish through the FBI agents that the hijackers were "ideologically driven terrorists who

consciously took steps to avoid being detected and were intent on committing the attacks,

irrespective of any act or omission by a checkpoint screener."  Br. at 22.  The Aviation

Defendants claim that such testimony is relevant to their arguments regarding causation.  But

these points are arguments they may wish to make to the jury, not discoverable facts.

The Aviation Defendants' cases demonstrate this very point.  In support of their claim

that they need discovery to establish their causation defense, they cite numerous cases in which

courts have dismissed tort actions against manufacturers of materials used in crimes because an

intervening criminal act broke the chain of causation.  See Br. at 20-21, citing McCarthy v.

Sturm, Ruger and Co., 916 F. Supp. 366, 372 (S.D.N.Y. 1996) (dismissing action against

ammunition manufacturer who made bullets used by man involved in shooting spree on passenger train); Port Auth. of N.Y. & N.J. v. Arcadian Corp., 991 F. Supp. 390, 408 (D.N.J. 1997) (dismissing action against fertilizer product manufacturer sued in connection with World Trade Center bombing where terrorists' acts were "clearly superseding and intervening events breaking the chain of causation"); Gaines-Tabb v. ICI Explosives USA, Inc., 995 F. Supp. 1304, 1314-15 (W.D. Okla. 1996) (dismissing action against manufacturer of ammonium nitrate used in Oklahoma City bombing because intervening criminal acts of McVeigh and Nichols were independent as a matter of law), aff'd, 160 F.3d 613 (10th Cir. 1998).  But all of these cases were decided on motions to dismiss.  Thus, none stands for the proposition that discovery is necessary for the Aviation Defendants to make the arguments they wish to make here.[15]

Similarly, the Aviation Defendants can make their other arguments without discovery, including their new argument that the U.S. Intelligence Community was a proximate cause of the attacks, and that other causes "overshadow any causal role the Aviation Parties played in the attacks."  Br. at 24.  For example, the Aviation Defendants rely on Pelman v. McDonalds Corp., 237 F. Supp. 2d 512 (S.D.N.Y. 2003), for their proximate cause argument (Br. at 25), but in that

---

[15]     It is questionable whether these cases provide the relevant framework for decision here.  The question here, unlike in those cases, is whether the conduct of the Aviation Defendants, who were responsible for security screening, was a substantial cause of the attacks, notwithstanding the intervening criminal conduct of the terrorists.  See Nash v. Port Authority of N.Y. & N.J., 856 N.Y.S.2d 583, 593 (1st Dep't 2008) (affirming decision denying motion to set aside jury verdict assigning 68 percent of fault to Port Authority for 1993 World Trade Center bombing).  Nothing prevents the Aviation Defendants from arguing, as the Port Authority did in Nash, that the bombers were "exceedingly determined and clever malefactors, whose success was attributable, not in the main to [defendant's] negligence, but to their own 'finely tuned' plan," id. at 597, but the Aviation Defendants have utterly failed to demonstrate that the FBI agents have any relevant evidence that is not duplicative, cumulative or available from other less burdensome sources – such as documents, prior testimony and expert testimony.

case the court held as a matter of law that no reasonable person could find that McDonalds'
conduct was a proximate cause of children's obesity problems. 237 F. Supp. at 538. The case
was decided on a motion to dismiss without the benefit of discovery. So too, the Aviation
Defendants can argue foreseeability, or the lack thereof (Br. at 31-35), without discovery. In
their lead case, Eiseman v. State, 70 N.Y.2d 175, 518 N.Y.S.2d 608 (1987), the Court of Appeals
decided as a matter of law that the college did not have a duty to restrict parolees' activities on
campus. 70 N.Y. 2d at 189, 518 N.Y.S.2d at 615. Discovery played no role in the decision.

      Even the cases that were not decided as a matter of law do not support the Aviation
Defendants' contention that they are entitled to discovery. The cases are entirely
distinguishable. For example, none of the cases cited to support the alternative theories of
causation argument, Br. at 25, address the availability of discovery or the propriety of putting
before the jury counterfactual evidence – evidence that seeks to establish that history might have
played out differently had any number of other things happened instead of what actually
happened. Rather, in all of the cases cited, there is an alternative theory of causation that would
render the defendant without any liability. See Hoppe v. G.D. Searle, 779 F. Supp. 1413, 1419
(S.D.N.Y. 1991) (in action alleging infertility caused by manufacturer of IUD, error to exclude
evidence of plaintiff's sexual history, which was "directly relevant" to cause of infertility);
Wilkins v. Am. Export Isbrandtsen Lines, Inc., 446 F.2d 480, 483 (2d Cir. 1971) (where plaintiff
claimed death resulted from work required by defendant in violation of statute, error to exclude
evidence of prior work that may have caused death); Leonardi v. Loyola Univ., 658 N.E.2d 450,
455 (Ill. 1995) (evidence that nonparty physician was "sole proximate cause" of harm to patient
should not have been excluded). Here, however, plaintiffs could stipulate to all of the Aviation

Defendants' claims – <u>e.g.</u>, that disclosures about Moussaoui might have altered or thwarted the attacks, or that the hijacking of flight 77 might not have occurred had Hazmi and Mihdhar been placed on the no-fly list – and it need not affect the jury's decision as to whether the Aviation Defendants' conduct was a substantial cause of what actually occurred on 9/11.

The Aviation Defendants' newfound reliance on the theory of "derivative immunity" similarly fails to justify the discovery they seek. Even if the defense were applicable here, which we will leave to the parties to contest, discovery of the kind sought is not relevant. Citing <u>In re World Trade Center Disaster Site Litigation</u>, 521 F.3d 169, 198 (2d Cir. 2008), the Aviation Defendants contend that they need FBI discovery to establish the third element of the defense: that defendants were not aware of dangers about which the FAA was unaware. Br. at 36-37. But as the standard they cite makes clear on its face, the only relevant inquiry is whether the Aviation Defendants had information that the FAA did not. Indeed, "[t]he third element of the [derivative immunity] defense requires that the government contractor warn the government when the contractor has information which the government lacks." <u>Trevino v. Gen. Dynamics Corp.</u>, 865 F.2d 1474, 1481 (5th Cir. 1989).

Thus, it appears that the relevant inquiry pertains to the flow of information from the contractor to the government and not vice versa. <u>See</u> <u>In re World Trade Center Disaster Site Litigation</u>, 521 F.3d at 197 (third element for derivative immunity described as whether "entity warned the agency about any dangers known to it but not to the agency"); <u>Trevino</u>, 865 F.2d at 1480 (contractor may not be liable under state law where "(3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to

-59-

the United States").  Accordingly, whether the FBI or the FAA had information that they did not

share with the Aviation Defendants is entirely irrelevant to the derivative immunity analysis.

### b.    The Individual FBI Agents Cannot Provide the Evidence the Aviation Defendants Claim to Seek

Much of what the Aviation Defendants claim they need from the FBI agents is

actually opinion evidence more appropriately put forward by expert witnesses.  Thus, for

example, to the extent that the Aviation Defendants are seeking opinion evidence regarding the

terrorists' ideology and commitment to their cause, Br. at 22, the challenge of disrupting terrorist

conspiracies, Br. at 33, or the likelihood of other possible outcomes had the intelligence agencies

acted differently, Br. at 26-31, the FBI agents are not proper witnesses for that purpose.  See Fed.

R. Civ. P. 45(c)(3)(B)(ii) (court may disallow the taking of testimony of a non-retained expert's

opinion).  As lay witnesses, they may not answer hypothetical questions.  See Certain

Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000).  It is certainly

reasonable and appropriate for the Government to refuse to allow its agents to testify where the

litigant seeks the agent's testimony "for his expert knowledge rather than for a recitation of

agency records."  Boron Oil Co. v. Downie, 873 F.2d 67, 70 (4th Cir. 1989); see also Moran,

2000 WL 1099884, at *2-3 (FDA's decision to deny request for depositions not arbitrary and

capricious where party was attempting to use FDA witnesses as a free source of expert testimony

that is available elsewhere).  Such opinions are the province of expert witnesses, whom we

expect both sides in the litigation will be enlisting.[16]

---

[16]    In fact, former Special Agent Rigler, as set forth more fully in Point IV, infra, previously testified in the Moussaoui trial as a summary witness on behalf of the defense – on some of the very topics the Aviation Defendants now seek fact discovery from him in this proceeding.

Nor do the individual FBI agents have personal knowledge of much of the information defendants seek.  The Aviation Defendants point out that they do not seek Rule 30(b)(6) testimony from the FBI agents.  Br. at 8, 41-42.  Thus, many of the areas of inquiry are inappropriate.  For example, the Aviation Defendants seek testimony from Agent Billings, who executed the search warrant of Moussaoui's personal property, on a variety of intelligence topics including the information available to the FBI as a whole before September 11, 2001, regarding the likelihood of attacks by al Qaeda and Usama Bin Laden, and the likelihood that an attack would target civil aviation.  See Barry Aff.-Billings ¶ 11(f), (g).  They also seek information from Billings as to whether anyone at the FBI had communications with the FAA and any defendant regarding Moussaoui's arrest.  See id. ¶ 11(c), (d).  Special Agent Billings clearly is not competent to provide this evidence.

Similarly, Agent Samit, a field agent assigned to the Minneapolis Field Office – who may have personal knowledge of the Moussaoui investigation –  is not competent to testify regarding the universe of FBI communications with the defendants or the FAA.  See Barry Aff.-Samit ¶ 11(i), (j).  Nor can he speak for the FBI as a whole as to the intelligence information available to the FBI before September 11, 2001 regarding the likelihood of attacks by al Qaeda and Usama Bin Laden, and the likelihood that an attack would target civil aviation.  See id. ¶ 11(g), (h).  Nor does he have knowledge of changes in aviation security recommended by the FBI.  See id. ¶ 11(k).

The same holds true for other witnesses.  Agent Rowley may have knowledge of the Minneapolis Field Office's investigation of Moussaoui and communications between the Minneapolis office and the rest of the FBI, but there is no basis for inquiring of her regarding the

FBI's communications with defendants or the FAA, Barry Aff.-Rowley ¶ 12(m), (n); nor any changes in aviation security that the FBI recommended in response to information concerning the threat of an al Qaeda attack or the presence of Arab males in flight school, id. ¶ 12(o), (j).  The FBI agents thus cannot provide competent evidence to establish the contentions that the Aviation Defendants claim justify subjecting them to depositions.

### B. Evidence Sought From the FBI Agents Is Readily Available From Other Less Burdensome Sources

Under Rule 26(b)(2)(c)(i) of the Federal Rules of Civil Procedure, the court *must* limit the extent of discovery otherwise allowed where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Where, as here, there are alternative means of obtaining the information sought by the Aviation Defendants, which do not intrude on the significant governmental privileges at play here or substantially burden non-party Government agencies, discovery should be denied.  See, e.g., Trunk v. City of San Diego, No. 06 CV 1597, 2007 WL 1110715, at *6-7 (S.D. Cal. Apr. 2, 2007) (denying motion to compel depositions of Congressman and Mayor regarding purpose of legislation because of availability of significant amount of source material on issue including letters, legislative materials, transcripts of recorded council meetings and quotation-filled press releases); Mehl v. Blanas, 241 F.R.D. 653, 659 (E.D. Cal. 2007) (issuing protective order governing sensitive material in applications to carry concealed weapons where "[p]laintiffs' interest is adequately served by other exhaustive discovery in this litigation which does not intrude upon the privacy and security interests of non-litigants as severely as disclosure of this information would").

Judge Lynch's analysis in <u>Jones v. Goord</u> is instructive here.  In an action challenging New York State's administration of a program for "double celling" inmates, plaintiffs sought production from the State of six electronic databases.  2002 WL 1007614, at *2-3.  For purposes of deciding the motion, the court assumed that at least a substantial part of the information sought was relevant and not privileged.  Nevertheless, applying the balancing test set forth in Rule 26(b)(2), the court denied the discovery because "[a]ll three of the reasons set forth in Rule 26(b)(2) as rationales for limiting disclosure of otherwise-discoverable information apply."  <u>Id.</u> at *10.  First, the court found that the State had demonstrated that "the burden of the proposed discovery is extremely serious."  <u>Id.</u>  Specifically, the court noted that the data in question were "highly sensitive" and thus the burden would not be limited to financial costs or business disruption, but would also include substantial security risks.  <u>Id.</u> at *11; <u>see also</u> <u>id.</u> at *12 (disclosure of databases would provide "highly confidential" information on techniques for data storage).

The court next analyzed whether the burden of discovery "outweighs its likely benefit," Fed. R. Civ. P. 26(b)(2)(C)(iii), and concluded that the "suggested benefits . . . prove elusive."  <u>Id.</u> at *13.  Plaintiffs' speculative claim that an expert could manipulate the data to obtain relevant evidence was insufficient to demonstrate "the importance of the proposed discovery in resolving the issues" as set forth in Rule 26(b)(2)(C)(iii).  <u>Id.</u> ("plaintiffs can only be characterized as demanding a huge volume of sensitive data, in a form that may or may not be usable for any productive purpose, on the vague hope that it will prove useful when subjected to future massage by unspecified experts").

Finally, and of particular significance to this case, as an element of the court's burden/benefit analysis, the court assessed the discovery requests in light of whether the discovery was cumulative, duplicative or obtainable from some other source.  See Fed. R. Civ. P. 26(b)(2)(C)(i).  The court concluded that although the form of the databases could provide some non-cumulative value, the "actual data" or "concrete facts" in the databases were available in another "less burdensome" and "less expensive" form, i.e., 700,000 pages of written material. 2002 WL 1007614, at *14.  Because the "security burdens on the State will be massively increased by production" of the databases, and because the "expense of additional production has to be weighed in the context of the extraordinarily burdensome and expensive process already undertaken in this case," id. at *14-15, the court declined to order discovery of the databases, id. at *15-16.

Application of the Rule 26(b)(2) analysis used in Jones v. Goord to this case yields a similar result.  The Aviation Defendants seek to obtain deposition testimony from the FBI that implicates highly sensitive classified and law enforcement information, and imposes substantial security risks and thus significant burdens on the Government.  See Jones v. Goord, 2002 WL 1007614, at *11.  These burdens outweigh any potential incremental benefit from the depositions because the specific facts that the Aviation Defendants seek to elicit from the witnesses are readily available from various other sources that do not pose comparable burdens on the Government or implicate serious security concerns.  Those sources include documents already produced by the FBI in the September 11 Litigation, The 9/11 Commission Report, the OIG Report, and exhibits and testimony admitted in the Moussaoui trial, including the testimony of these same witnesses, among other things.

By way of example, the Aviation Defendants claim that they seek testimony from Special Agent Samit, based on his investigation of Moussaoui, that the terrorists used short-bladed knives. But evidence regarding the knives used by the terrorists is available from myriad other sources, including documents produced in the September 11 Litigation by the FBI (which include photographs, reports describing conversations with persons aboard the hijacked aircraft, investigatory reports and records related to the hijackers' weapons purchases), various exhibits used in the Moussaoui trial, Samit's testimony in Moussaoui, The 9/11 Commission Report, and the agreed Statement of Facts in Moussaoui (attached to Normand Decl. as Exh. T). Moreover, plaintiffs have proposed to stipulate to various facts pertaining to the knives (Nos. 301, 303, 305), and we would expect the parties could agree to further stipulations as to other such undisputed facts.

Similarly, the Aviation Defendants claim to need testimony from Special Agents Samit and Billings as to Moussaoui's level of fanaticism and his physical training, but that information is also available elsewhere. In addition to the agents' Moussaoui testimony and The 9/11 Commission Report, the Aviation Defendants have access to exhibits introduced by the Government in the Moussaoui trial, including descriptions of the items seized in the search of Moussaoui's personal effects, a declassified FBI memorandum dated August 31, 2001 regarding Moussaoui's extremist views (attached to Normand Decl. as Exh. U), and a document found in hijacker Atta's luggage at Logan Airport (attached to Normand Decl. as Exh. V), among other things.

Or, if relevant at all, pre-9/11 intelligence information regarding an imminent attack, which the Aviation Defendants seek from many of the witnesses, is available elsewhere. In

addition to <u>The 9/11 Commission Report</u>, a stipulation entered in the Moussaoui case (attached to Heimbach Decl. as Exh. A) provides an unclassified outline of the threat information available prior to 9/11.  The OIG Report also provides extensive information about the government's handling of various intelligence reports, including information that the Aviation Defendants ostensibly seek regarding hijackers al-Mihdhar and al-Hazmi (attached to Normand Decl. as Exh. P) and the so-called "Phoenix memo" (attached to Normand Decl. as Exhs. N and O).  Br. at 12-13, 23-24 & n.8.  In addition, TSA and FAA have authorized deposition testimony with regard to unclassified information communicated by the FAA to the Aviation Defendants prior to September 11, 2001, including any information regarding the arrest and terrorist-related plans of Zacarias Moussaoui, and any information concerning whether al Qaeda or any other terrorist group was planning to use trained pilots to hijack commercial airplanes.  Normand Decl. ¶ 15 & Exh. L at 14-15, 33.     These are but a few examples of the information the Aviation Defendants seek in depositions of FBI agents that is available from other sources.  Attached hereto at Tab A is a chart that reviews, witness by witness, the specific areas of inquiry identified in the Aviation Defendants' brief for which they seek depositions, and a non-exhaustive list of alternative sources from which the Aviation Defendants can obtain the same information.

Any evidentiary hurdles regarding the use of such materials can be overcome.  For example, to the extent there are questions as to authenticity of documents or items obtained by the FBI and used in the Moussaoui trial, the Government is prepared to take steps to authenticate such materials.  Further, we understand that if the Court deems specific facts identified by the Aviation Defendants to be relevant and material to the issues in dispute in the September 11

Litigation, plaintiffs are prepared to discuss factual stipulations that would obviate the need for

any FBI agent testimony.

Similarly, hearsay objections with respect relevant sections of The 9/11 Commission

Report may be resolved on the motion made by the Aviation Defendants now pending before the

Court.  See Memorandum of Law in Support of the Aviation Defendants' Motion for an Order

that The 9/11 Commission Report, Aviation Monograph and Selected Staff Statements Contain

Relevant Evidence Not Excluded by the Hearsay Rule.  Although the Government takes no

position on the Aviation Defendants' motion as to the admissibility of The 9/11 Commission

Report and Staff Reports in their entirety, with respect to the specific facts identified by the

Aviation Defendants in the instant motion that derive from The 9/11 Commission Report, which

are largely if not entirely undisputed, the Government believes that the Commission's Report is

entitled to a presumption of reliability.  The Commission was charged by Congress to investigate

the "facts and circumstances relating to the terrorist attacks" and to "make a full and complete

accounting of the circumstances surrounding the attacks."  Pub. L. No. 107-306, 116 Stat. at

2408, § 602.  The Commission had full authority to subpoena documents, compel testimony and

swear witnesses.  Id., 116 Stat. at 2410-11, § 605.

Thus, at least with respect to the particular factual matters identified in the Aviation

Defendants' motion seeking FBI testimony, such as what knives were found in Moussaoui's

possession, the Commission's findings should be accorded a presumption of reliability.  See Fed.

R. Evid. 803(8)(c); Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988).  There is no need

for the litigants here to recreate and repeat the work of the Commission, particularly with respect

to facts that are undisputed.  The burden should be on the party who seeks to exclude the

particular fact found by the Commission by establishing that it is not trustworthy.  Id. at 167; In re Korean Air Lines Disaster, 932 F.2d 1475, 1483 (D.C. Cir. 1991) ("The burden is on the party disputing admissibility to prove the factual finding to be untrustworthy." (citation and quotation marks omitted)).

A similar motion is pending in connection with these same FBI agents' prior testimony in the Moussaoui trial.  See Aviation Defendants' Memorandum of Law in Support of Their Motion for an Order that the Prior Moussaoui Trial Testimony of Certain FBI Witnesses Is Not Subject to Hearsay-Related Objections Under Federal Rule of Evidence 807.  The Government urges the Court to grant the Aviation Defendants' motion in connection with the FBI agents' prior testimony, at least with respect to their factual assertions, which are incontrovertible.  A decision allowing the use of their prior testimony could obviate the need for the Court to decide this motion and for burdensome depositions to go forward.  By their own admission, the bulk of the facts sought by the Aviation Defendants from these witnesses are to be found in the prior testimony.  In any event, the prior testimony has indicia of reliability:  they testified under oath, based on personal knowledge, in their capacity as federal law enforcement officers charged with upholding the law – and much of the testimony is corroborated by various other means.  See United States v. Yonkers Contracting Co., 701 F. Supp. 431, 437 (S.D.N.Y. 1998).

The Aviation Defendants contend that secondary sources are an inadequate substitute for deposition evidence and that they are entitled to elicit testimony directly from the witnesses. Br. at 46-47.  Secondary sources, however, may be sufficient where the alternative is to risk disclosure of classified and privileged material.  See Jones v. Goord, 2002 WL 1007614, at *14

-68-

(denying access to databases that posed security risks where documents provided alternative source for much of relevant information); Puerto Rico, 490 F.3d at 68-69 (holding that FBI did not act arbitrarily in providing substitute, however "imperfect," where requested information was subject to law enforcement privilege); Johnson v. Bryco Arms, 226 F.R.D. 441, 443-44, 446 (E.D.N.Y. 2005) (where ATF produced documents from investigation, absent a compelling need for depositions of investigators, magistrate judge's decision to quash subpoenas upheld).  None of the Aviation Defendants' citations are to the contrary.  Neither Cavanaugh, 2007 WL 1601723, at *10, nor In re Vioxx Prods. Liab. Litig., 235 F.R.D. at 346, involved the potential disclosure of classified or highly sensitive information.  Nor did the Court render an opinion on this issue in lightheartedly chiding counsel to cite the statute rather than his own brief.  Jan. 14, 2007 Tr. at 59 ("I learned in law school that you go to the source.  Stay away from secondary stuff.").

        Particularly where, as here, there are numerous less intrusive means for the Aviation Defendants to obtain the relevant facts they seek, DOJ's Touhy decision denying burdensome depositions was not arbitrary or capricious.  See COMSAT Corp., 190 F.3d at 277-78 (agency determination refusing to comply with subpoenas for documents and testimony not arbitrary or capricious where most, if not all, of the documents were available from other sources, and compliance with the subpoenas would be unnecessarily duplicative and costly); Davis Enters., 877 F.2d at 1186-87 (EPA's denial of deposition testimony not arbitrary or capricious where EPA had not withheld the relevant underlying test results and offered to provide an affidavit, and the potential cumulative impact of granting deposition testimony would constitute a drain on agency resources); see also Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (district court

properly exercised discretion to deny deposition where, among other things, plaintiff had

testimony of same witness given to a Senate committee, which contained substantially the same

information plaintiff sought to obtain from witness at deposition); Celerity, Inc. v. Ultra Clean

Holding, Inc., No. C 05-4373, 2007 WL 205067, at *5 (N.D. Cal. Jan. 25, 2007) (protective order

granted to bar depositions of high-level employees where information sought in depositions

could be obtained through less intrusive discovery channels).

**IV.    The Aviation Defendants' Argument Regarding Special Agent Rigler Is Unavailing**

Finally, the Aviation Defendants erroneously contend that the FBI lacks authority to

bar former Special Agent Rigler from testifying in the September 11 Litigation, because his

testimony at the Moussaoui trial was not based on information obtained in his official capacity as

an FBI special agent.  Br. at 48-49.  The Aviation Defendants' Touhy Request is not as limited as

they now suggest.  Nowhere in their Request did the Aviation Defendants indicate that they seek

to depose Mr. Rigler solely with regard to information obtained outside of his employment with

the FBI.  See Barry Aff.-Rigler ¶¶ 1-13.  To the contrary, their request was submitted "in

accordance with 28 C.F.R. § 16.21 et seq.," id. ¶ 1, regulations that apply only to "the production

or disclosure of any material contained in the files of the Department, or any information

acquired by any person while such person was an employee of the Department as part of the

performance of that person's official duties or because of that person's official status." 28 C.F.R.

§ 16.21(a).

Further, the Aviation Defendants assert in their Request that "Mr. Rigler is well

qualified to testify" in this case because, "[b]efore retiring, [he] served as a Special Agent with

the FBI for 23 years and many of his duties pertained to aviation matters."  Barry Aff.-Rigler ¶ 8.

"As a result" of his experience as a Special Agent, the Aviation Defendants' maintain, "Mr. Rigler has expert knowledge as to both the FBI and aviation."  Id.  The Touhy request thus strongly suggests that the Aviation Defendants seek to elicit information from Mr. Rigler that was obtained in this course of his employment with the FBI.  The Aviation Defendants cannot have it both ways – they cannot seek to obtain Mr. Rigler's testimony as a former FBI agent, while disclaiming any intent to obtain information obtained by Mr. Rigler in his official capacity.  See Moran, 2000 WL 1099884, at *2 (holding that FDA's denial of Touhy requests for employee depositions was not arbitrary and capricious, where "plaintiff [was] attempting to cloak the personal opinion of an individual physician with the aura of authority that results from the physician's employment with the FDA," which the court deemed "misleading").

Even accepting the Aviation Defendants' argument that they seek to depose former Special Agent Rigler regarding information learned "not in the course of his duties as an active agent, but when he was asked to testify on behalf of Moussaoui as a summary witness at his criminal trial," Br. at 48, his deposition nevertheless would raise substantial concerns about unauthorized disclosures of classified FBI and other Intelligence Community information that he learned in his capacity as a summary witness.  As the Aviation Defendants correctly note, Mr. Rigler testified at the Moussaoui trial for the limited purpose of "summariz[ing] a chapter in a report prepared by [DOJ's] Office of Inspector General" regarding "the FBI's handling of the investigation regarding two individuals involved in 9/11," Hazmi and Mihdhar.  Barry Decl., Exh. 20 at 2144.  In the course of his participation in the Moussaoui defense, however, Mr. Rigler was granted access to a host of classified documents and information, including "the underlying documents" on which the OIG Report was based.  Id. at 2149; see also Normand

Decl. Exhs. Q-R (orders entered in Moussaoui case regarding Rigler's access to classified information).

Pursuant to the terms of the Memorandum of Understanding governing his access to such classified information and documents, which "will remain forever binding on [him]," Mr. Rigler agreed that he "shall never divulge, publish, or reveal either by word, conduct or other means, such classified documents and information unless specifically authorized in writing to do so by an authorized representative of the United States Government; or as expressly authorized by the Court pursuant to [CIPA] and the Protective Order entered in the [Moussaoui case]." Normand Decl., Exh. S ¶¶ 1-2.  Mr. Rigler has not been "specifically authorized in writing" to reveal classified information that he received as a summary defense witness; to the contrary, the United States Attorney has declined to authorize his testimony precisely because, among other things, "a significant amount of the information that [the Aviation Defendants] seek is protected from disclosure because it involves classified national security information."  Garcia Ltr.-Rigler, at 2; see also 28 C.F.R. § 16.21(a) (DOJ Touhy regulations apply to "production or disclosure of any information contained in the files of the Department").

As they concede in their brief, the Aviation Defendants seek to "question Special Agent Rigler concerning his knowledge of Hazmi and Mihdhar's activities, and the intelligence information the FBI had on these two hijackers before September 11."  Br. at 48; see also Barry Aff.-Rigler ¶ 8 (seeking deposition testimony regarding a wide range of intelligence information and inter-agency communications).  The proposed testimony directly implicates the classified documents or information that Mr. Rigler was provided as a summary witness, including the intelligence "communications" examined in the OIG Report.  Barry Decl., Exh. 20 at 2149.

Consistent with its Touhy regulations, DOJ reasonably prohibited Mr. Rigler from testifying about such matters.  Garcia Ltr.-Rigler at 1-3; see Heimbach Decl. ¶¶ 5, 22-27; 28 C.F.R. § 16.26(b)(3).

We note, in closing, that Mr. Rigler's role as a summary witness in the Moussaoui trial, illustrates the fallacy of the Aviation Defendants' premise that they need FBI agent testimony to establish the facts of what took place during the months leading up to September 11, 2001.  Just as the Moussaoui team used a well-credentialed summary witness to present unclassified, publicly available information to the jury in an interesting fashion, so too could the Aviation Defendants retain an expert or summary witness to present the relevant facts supporting their theories of foreseeability and causation to the jury in the September 11 Litigation.

## CONCLUSION

For the foregoing reasons, the Court should deny the Aviation Defendants' motion for summary judgment, grant the Government's cross-motion for summary judgment upholding DOJ's final Touhy determinations, and dismiss the complaint in this action.

Dated:    New York, New York
          June 17, 2008

                                        Respectfully submitted,

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for Defendants

                                  By:    s/ Sarah S. Normand
                                        SARAH S. NORMAND
                                        BETH E. GOLDMAN
                                        JEANNETTE A. VARGAS
                                        Assistant United States Attorneys
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2709/2732/2678
                                        Facsimile: (212) 637-2702
                                        sarah.normand@usdoj.gov
                                        beth.goldman@usdoj.gov
                                        jeannette.vargas@usdoj.gov