# CHAPTER THREE
# THE FBI'S HANDLING OF THE PHOENIX ELECTRONIC COMMUNICATION AND OTHER INFORMATION RELATING TO USE OF AIRPLANES IN TERRORISTS ATTACKS

## I.    Introduction

In this chapter of the report, we examine allegations that the FBI failed to act prior to September 11, 2001, on intelligence information that warned of potential terrorists training in aviation-related fields of study in the United States. The focus of these allegations concerned an Electronic Communication (EC) dated July 10, 2001, that was written by Kenneth Williams, a special agent in the FBI's Phoenix Division. In his EC, Williams wrote that he believed that there was a coordinated effort by Usama Bin Laden to send students to the United States to attend civil aviation universities and colleges. He suggested that the purpose of these students would be to one day work in the civil aviation industry around the world to conduct terrorist activity against civil aviation targets. Williams wrote that he was providing the information in the EC for analysis and comments. Williams addressed the EC to several people in FBI Headquarters and in the FBI's New York Division.[56]

After September 11, 2001, the FBI has acknowledged several problems in how the Phoenix EC was handled. The FBI stated that the information raised in the EC should have been analyzed by the FBI, but that such analysis did not occur before September 11. In addition, the FBI acknowledged that the Phoenix EC should have been disseminated to other intelligence agencies and to the FBI's field offices for their consideration, but it was not disseminated before September 11.[57]

---

[56] A redacted copy of this document is attached in the Appendix.

[57] Director Mueller's written statement for his October 17, 2002, testimony before the Joint Intelligence Committee Inquiry (JICI) stated: "We have heard, and we acknowledge, the valid criticisms, many of which have been reiterated by this Committee. For example, the Phoenix memo should have been disseminated to all field offices and to our sister agencies." Former ITOS Section Chief Michael Rolince testified before Congress that the (continued)

In this chapter we analyze the FBI's handling of the Phoenix EC. We first provide background on how leads were communicated and assigned in the FBI before September 11, 2001. We then summarize the contents of the EC. Next, we describe in detail how the Phoenix EC was handled within the FBI before September 11. In the analysis section, we examine problems in how the Phoenix EC was handled, first focusing on the systemic problems that affected the way the FBI treated the EC and then on the performance of the individuals involved with the EC. Finally, at the end of the chapter we discuss several other pieces of information in the possession of the FBI before September 11 that also noted connections of potential terrorists to flight schools or the use of airplanes.

## II.  The Phoenix EC

### A.  Background

In this section, we first provide the key terminology and a description of FBI processes that are relevant to the handling of the Phoenix EC.

#### 1.  Assigning leads in the FBI

When an FBI field office needs assistance or information from another office or from FBI Headquarters, it "sets a lead" for the assistance. Leads are initially written out in ECs, hard copies of which are mailed to the appropriate offices. In addition, when the EC is "uploaded" to the FBI's Automated Case Support (ACS) system, leads associated with the EC are "set" electronically in ACS system. We describe both processes below.

##### a.  The manual process

The specific action requested in an EC is stated in the lead section, which is at the end of the document. In the "To:" section of the EC, the author specifies the offices to which the EC is addressed. In the "Attention:" section,

---

(continued)
Phoenix EC should have been provided to the personnel assigned to FBI Headquarters from other agencies, such as the INS, the CIA, the FAA, and others, for their assessment.

56

the author specifies the persons who the author believes should receive a copy of the EC.

ECs have a line marked "Precedence." There are three options on the precedence line: "Immediate," "Priority," and "Routine." The FBI's investigative manual states that "immediate" precedence should be used "when the addressee(s) must take prompt action or have an urgent need for the information." The manual states that "priority" precedence should be used when information is needed within 24 hours, and "routine" precedence should be used when information is needed within the normal course of business. The time frame for responding to "routine" requests is not specified.

The office preparing an EC that sets a lead normally sends a hard copy of the EC to the offices with leads mentioned in the EC. The paper EC is normally sent through "Bureau mail," which is the FBI's interoffice mail delivery system.

The distribution of the hard copy EC in the receiving office varies from office to office. In most offices, the EC is routed to an administrative employee assigned to the substantive program that is the subject of the EC, such as the squad secretary for the counterterrorism squad if counterterrorism is discussed in the EC. The administrative employee decides who should receive the hard copy EC, whether copies will be made, and for whom. All individuals listed on the attention line of a hardcopy EC do not necessarily receive a copy of the EC through the manual distribution process.

### b.    The electronic process

Leads contained in ECs also are set electronically in ACS when the EC is completed and is "uploaded" to ACS. The office requesting the lead can enter in ACS a deadline for handling the lead. If no deadline is set, the default deadline in ACS for action is 60 days.

ACS contains an "electronic routing table" for each office that receives leads electronically through ACS. FBI offices set up the electronic routing table to assign leads to a particular person's "lead bucket" based on the case number provided in the "Case ID #" field of the EC. For example, a field office may program its electronic routing table to direct all leads associated with cases having international terrorism identifiers to the secretary for the international terrorism squad. The secretary would then be responsible for

checking the "lead bucket" and determining to whom to assign the lead electronically.

FBI employees are responsible for checking ACS periodically and accessing their lead bucket to see if any leads have been assigned to them. ACS does not notify users when leads are assigned to them. Only persons who are assigned a lead will see a notification of an EC associated with the lead when they check their lead buckets. All other persons listed on the attention line of the EC must search ACS for their names by conducting text searches and other kinds of searches to determine if there are any ECs containing their names.

In ACS, leads may be "reassigned" or may be "closed." When leads are closed, the person closing the lead fills in the field labeled "disposition" to indicate what action was taken with respect to the lead. However, ACS does not require this field to be completed in order to close the lead.

### c.    Persons responsible for assigning leads

At FBI Headquarters, the Radical Fundamentalist Unit (RFU) and the Usama Bin Laden Unit (UBLU) were the two units in the International Terrorism Operations Section (ITOS) involved in the handling of the Phoenix EC. Within the RFU and UBLU, Intelligence Assistants, called IAs, were responsible for many duties, including distributing hard copy ECs to the appropriate persons in the units, assigning leads in ACS, conducting name checks in ACS, and preparing ECs. In addition, before September 11, 2001, an IA assigned to an administrative unit in ITOS was responsible as a collateral duty for assigning leads that had been routed to ITOS' general lead bucket in ACS. During the time period relevant to our investigation, this IA could assign leads from ACS directly to analysts in the section, called Intelligence Operations Specialists (IOSs). The IA also could route ECs directly to IOSs without any supervisor's input or knowledge.

IAs within the RFU and the UBLU normally determined to whom to assign a lead based on the case identifier, which is one of the required fields on an EC. For example, 199M matters, called "IT-Other," were investigations related to terrorist groups that were not associated with one of the FBI's 17 other specific case identifiers. 199M or IT-Other matters normally were

assigned to the RFU. The case identifier associated with the Phoenix EC was 199M, which fell under the RFU.

Within a particular unit, the specific case number would also be used to determine whether an IOS or Supervisory Special Agent (SSA) was working on the designated case and therefore would be responsible for the lead.

### d.    "Read and clear"

A common type of lead is a "read and clear" lead. According to FBI procedures, "read and clear" leads are for informational purposes and do not require any action, other than "clearing" the lead in ACS by closing the lead. Witnesses told the OIG that setting a "read and clear" lead is similar to sending a "cc:" copy of a document to someone to read for their information.

### e.    Persons responsible for conducting analysis in the FBI

As discussed in Chapter Two, analysis of counterterrorism information normally was conducted in two places in the FBI. Operational or case-related analysis was performed primarily by IOSs who worked in ITOS, located in the Counterterrorism Division. Broader, strategic analysis was performed by Intelligence Research Specialists (IRSs) who at the time worked in the FBI's Investigative Services Division (ISD), a separate division from the Counterterrorism Division.[58]

As discussed in more detail below, the Phoenix EC was addressed to several SSAs and IOSs in ITOS. It was not addressed to any IRSs or anyone in the Investigative Services Division.

---

[58] ISD was created in November 1999 and housed the FBI's analytical resources, such as the IRSs who handled counterintelligence matters, organized crime and white-collar crime matters, and domestic and international terrorism matters. In addition, ISD included an Intelligence and Operations Support Section that was responsible for administering the field's analytical program and training and automation requirements. ISD was eliminated in the beginning of 2002.

## B.    The Phoenix EC

Kenneth Williams, the special agent who wrote the Phoenix EC, joined the FBI in 1990, and was assigned to the Phoenix Division. He worked his first year and a half on white-collar matters. Since then, he was assigned to work on international terrorism matters. Williams told the OIG that while working on international terrorism matters, he spent almost all of his time on a terrorist organization that was not connected to Al Qaeda or Bin Laden. At FBI Headquarters, responsibility for this terrorist organization fell under the jurisdiction of a unit in ITOS other than the Usama Bin Laden Unit (UBLU). Williams said that he had not had any contact with the UBL unit. At the time of the EC, Williams reported to an SSA who we call "Bob," who was responsible for the Phoenix counterterrorism squad.

The Phoenix EC was dated July 10, 2001, and was addressed to the Counterterrorism Division at FBI Headquarters and to the New York Division. The precedence line on the EC was marked "routine."



The EC stated that there was an inordinate number of individuals of investigative interest who were attending or had attended civil aviation universities and colleges in Arizona.

### 1.    Information on individuals

As the basis for his concerns, Williams summarized in the EC the results of four Phoenix intelligence investigations of four subjects who we will call "Subject No. 1," "Subject No. 2," "Subject No. 3," and "Subject No. 4."[59] The

---

[59] Williams was responsible for the Subject No. 1 investigation, which was summarized in the EC. The other three investigations were international terrorism intelligence cases (continued)

other persons of investigative interest were described as seven "associates" of Subject No. 1. The Phoenix Division had opened a "preliminary inquiry" for an intelligence investigation about each of these persons but had not yet developed sufficient information to open a full investigation.

Williams identified the connections of these individuals to aviation as follows: (1) Subject No. 1 was an aeronautical engineering student at Embry-Riddle Aeronautical University (ERAU) in Prescott, Arizona;[60] (2) Subject No. 2 took classes at Cochise College, located in Douglas, Arizona, in the late 1990s to obtain an FAA certificate in airframe and power plant operations;[61] and (3) Subject No. 3 and Subject No. 4 were known to associate with a person we will call Subject No. 5, whose telephone number was associated with a known supporter of an African Muslim terrorist organization and who reportedly left the United States in the late 1990s after graduating from Westwind Aviation in Phoenix, Arizona.[62]

---

(continued)

handled by other agents on Williams' squad and another squad in the Phoenix Division. Subject No. 2 also had been the subject of a separate investigation in an FBI field office in the western part of the United States before he moved to Arizona in the late 1990s. This field office's investigation of Subject No. 2 was closed at the time the Phoenix EC was written.

[60] Williams stated in the EC that Subject No. 1 was enrolled in aeronautical engineering. ERAU offers a degree in aerospace engineering with a concentration in aeronautical engineering. Aeronautical engineering is the study of aircraft design.

[61] A certificate in airframe and power plant operations allows an individual to become an aviation maintenance mechanic. The courses for this certificate deal largely with maintaining aircraft in airworthy condition.

[62] The Phoenix EC does not state what courses Subject No. 5 took at Westwind Aviation. The Phoenix EC also does not state whether the FBI had an investigation open on Subject No. 5 at the time; however, according to Williams, the FBI did not have any investigation open on Subject No. 5 at the time because he was not in the United States. Subject No. 5's name had surfaced in another FBI investigation involving the same African Muslim terrorist organization that Subject No. 5 was believed to be connected to. After September 11, Subject No. 5 was arrested on terrorism charges related to the September 11 attacks, but he was released when a court found that the prosecutors lacked any evidence connecting Subject No. 5 to the events of September 11.

With respect to the seven associates of Subject No. 1, Williams wrote that three were enrolled in pilot training at ERAU, and three were enrolled in an aeronautical engineering program at ERAU. For the seventh, Williams had no record of classes taken.[63]

Williams also reported in the EC the connections of Subject No. 1, Subject No. 2, Subject No. 3, and Subject No. 4 to Bin Laden and to each other, which we describe below.

**Subject No. 1:** The Subject No. 1 investigation was designated by Williams as a 199M or "IT-Other" matter.[64] Williams told the OIG that he had opened the Subject No. 1 case under this designation after obtaining material in Subject No. 1's garbage relating to Ibn Khattab, who Williams believed had a connection to Bin Laden. As discussed in more detail in Chapter Four, Ibn Khattab was a Jordanian-born, Islamic extremist who was the leader of a large group of Chechen rebels that had many successes in clashes with Russian forces.[65]

In summarizing his investigation of Subject No. 1, Williams wrote in the EC that Subject No. 1 came to the United States in the late 1990s, and that in April 2000 one of Williams' sources reported that Subject No. 1 was a supporter of Bin Laden. In addition, the EC stated that the source told Williams that Subject No. 1 was involved in the Al-Muhjiroun,[66] a Muslim fundamentalist organization that Williams described as "dedicated to the overthrow of Western society" and as "an ardent supporter of [Bin Laden]." As further support for a connection between these persons and civil aviation,

---

[63] We asked Williams to confirm the courses these individuals took. After reviewing their files, Williams told the OIG that only two of the individuals were enrolled in pilot training and the other four were enrolled in aeronautical engineering.

[64] An EC requires a case number field to be completed. Williams used the Subject No. 1 case number in the case number field of the Phoenix EC.

[65] Chechnya is a republic of the former Soviet Union. Since the collapse of the Soviet Union in 1991, Chechen separatists – both Islamic and non-Islamic – have sought independence from Russia.

[66] We observed several spellings for this organization in FBI documents, including Al-Muhajiroun and Al-Mouhajiroun.

Williams noted that the spiritual leader of the Al-Muhjiroun had issued a religious degree (or "fatwa") in February 1998 in which he declared a "jihad" or "holy war" against the United States and British government, armies, interests, and **airports**." (Emphasis in original.)

Williams wrote in the EC that he had interviewed Subject No. 1 in the spring of 2000 and that during these interviews, which were conducted in Subject No. 1's apartment, Williams observed photographs on the walls of Bin Laden, Ibn Khattab, and wounded Muslim separatists from Chechnya. Williams wrote that Subject No. 1 admitted during these interviews to being involved in the Al-Muhjiroun, and that he considered the U.S. government and military forces to be "legitimate military targets of Islam." Williams noted in the EC that his investigation of Subject No. 1 was continuing.

**Subject No. 2:** Williams reported in the EC that Subject No. 2 was known to have contact with Bin Laden lieutenant Abu Zubaida. Williams wrote that Subject No. 2 had moved to Arizona in 1998, but had left the United States in October 1999.[67]

Williams also wrote that two persons arrested in June 2001 in Bahrain had admitted to being members of al Qaeda and had been planning an operation to bomb the U.S. embassy and military forces in Saudi Arabia. At the time of their arrest, they had in their possession a passport of a man who was believed to be a relative of Subject No. 2. Williams wrote that the man who was believed to be a relative of Subject No. 2 previously had entered the United States in 1998 with this passport and was associated with an address known to be that of Subject No. 2. Williams wrote that he had not been able to establish a connection between Subject No. 1 and Subject No. 2.[68]

**Subject No. 3 and Subject No. 4:** Williams reported in the EC that investigations of Subject No. 3 and Subject No. 4 had been opened based on

---

[67] The FBI field office that had been investigating Subject No. 2 had closed its investigation of Subject No. 2 at the time the Phoenix EC was written.

[68] Williams wrote in the EC that Subject No. 1 arrived in the United States in August 1999 and that Subject No. 2 left the United States in October 1999. Williams also wrote that "Subject No. 2 had departed the U.S. prior to Subject No. 1's arrival." Williams told the OIG that this last statement was in error.

information from foreign governments demonstrating that they were both involved with African Islamic extremist/terror activity and had associated with individuals who had associated with Ahmed Ressam. Ressam was arrested on December 14, 1999, attempting to cross the border from Canada into the United States with chemicals and detonator materials in his car.[69]

Williams wrote that Subject No, 3 and Subject No. 4 were friends with Subject No. 5, whose telephone number had been associated with a known supporter of an African Islamic terrorist organization. Williams noted that Subject No. 3, Subject No. 4, and Subject No. 5 had not been linked to Subject No. 1 or Subject No. 2. The EC did not state whether the FBI had an investigation open on Subject No. 5 or provide any further details on him. The EC reported that Subject No. 5 had left the country in November 1997 after graduating from Westwind Aviation. The EC did not describe the connections between the African Islamic terrorist organization and Bin Laden or al Qaeda.

### 2.    Recommendations in the Phoenix EC

The Phoenix EC made four recommendations:



- "FBI field offices with these types of schools in their area should establish appropriate liaison" with the schools;

- "[FBI Headquarters] should discuss this matter with other elements of the U.S. intelligence community and task the community for any information that supports Phoenix's suspicions"; and

- "[FBI Headquarters] should consider seeking the necessary authority to obtain visa information from the [Department of State] on individuals obtaining visas to attend these types of schools and notify the appropriate FBI field office when these individuals are scheduled to arrive in their area of responsibility."

---

[69] The Phoenix EC did not state Ressam's affiliation with Bin Laden or al Qaeda.

64

In the lead section of the EC, Williams wrote that he was requesting that FBI Headquarters consider implementing the suggested actions. The New York Division lead was designated as a "read and clear" lead. At the end of the EC, Williams wrote that the information was "being provided to receiving offices for information, analysis and comments."

### 3.    Addressees on the Phoenix EC

The attention line of the EC contained the names the unit chief of the RFU, who we call "Don"; an IOS in the RFU who we call "Ellen"; the acting unit chief of the UBLU, who we call "Rob"; and UBLU IOSs who we call "Jane," "Matthew," and "Frank."[70] The RFU and the UBLU were the two units with program responsibility for the two primary organizations discussed in the EC: Al-Muhjiroun and Bin Laden/al Qaeda.

The attention line also contained the names of two Special Agents who worked on two different international terrorism squads in the New York Division: an agent who worked on the New York FBI's Bin Laden squad who we call "Jay", and an agent who we call "Mark" and who worked on a New York squad that handled investigations that fell under the RFU.

Williams told the OIG that his prior experience did not involve Bin Laden or Al Qaeda and instead centered on another terrorist organization which was managed by a unit other than the Bin Laden Unit at FBI Headquarters. He said that he was therefore not familiar with the personnel in the other units within ITOS, except for one long-time RFU IOS, who we call Frank. Williams said that he called Frank to obtain the names of the persons working in the RFU and the UBLU, and that he put in the attention line of the EC the names he had obtained by calling Frank.

Frank told the OIG that he recalled talking to Williams about the EC and recommending several potential points of contact. Frank said that based on his understanding of what Williams was writing about, several people needed to

---

[70] Williams mistakenly identified the IOSs as IRSs in the Phoenix EC. In addition, at that time Matthew and Frank worked in the RFU, not the UBLU. At the request of the FBI, we have omitted the true names of most of the agents and the analysts who are discussed in this report.

see the EC because more than one program was involved. He said that because the New York Field Office was the primary field office that handled the FBI's Bin Laden-related investigations, he likely recommended that Williams also address the EC to a point of contact in New York.

When asked why he did not recommend including any IRSs on the attention line, Frank told the OIG that the Investigative Services Division was "on its last legs" at the time and that there were very few IRSs in the ISD still working on analysis. He explained that any work of the IRSs would have to be coordinated through an IOS, so it made sense to route the EC through an IOS in the first instance.

Williams also told the OIG that at the time he was familiar by name with Ellen because, prior to writing the Phoenix EC, he had accessed in ACS an EC she had written on the Al-Muhjiroun in 1999. Ellen told the OIG that Williams called her on July 9, 2001, to tell her that he had used her paper in writing his EC and that he had included her name on the attention line. She said that he also asked her if she recommended anyone to include on the attention line and that she gave him the name of Mark, one of the New York Division agents who had been the case agent for the FBI's investigation of the Al-Muhjiroun.

## C.  Williams' theory



He said that he was basing the theory on his almost ten years of experience in international terrorism cases and his knowledge that al Qaeda had a presence in Arizona. He said that he had learned in squad meetings about Subject No. 2, and he thought it was "unusual" that Subject No. 2 would come across the world to study aircraft maintenance in the United States. Williams said that at the time, he also was working the investigation of Subject No. 1 and he began thinking that he should look to see how many other investigations were being handled in Arizona that involved individuals with Islamic militant viewpoints ████████████████████████ ████████. He said that after he did and learned about several others of interest to the FBI, he decided to put his thoughts and recommendations on paper.

66

Williams explained that he was not focused on flight schools, but instead focused on colleges and universities where individuals could earn degrees in aviation-related subjects and then obtain jobs in the civil aviation industry in this country. ████████████████████████████████████████████████ ████████████████████████ Rather, he believed that there could be an effort under way to develop expertise about where to put an explosive device on an airplane or how to mechanically alter an airplane in order to cause it to crash. Williams told the OIG that he did not have information of a specific threat or pending attack, which is why he marked the EC's precedence as "routine."

Williams told the OIG that he did not know at the time whether Subject Nos. 3 and 4 discussed in the EC or the African Islamic terrorist organizations were connected to Bin Laden or al Qaeda. Williams said that he was trying to "paint a picture of people associated with radical Islam" who were also associated with aviation. Williams said he wanted FBI Headquarters to look at his EC and answer the question: ██████████████████████████████████ ████████████████████████ He stated that he did not expect an immediate response and believed that it would take at least a couple of months for FBI Headquarters to review the EC, because he knew that resources for this kind of analytical project at FBI Headquarters were limited. In addition, he said that he wanted FBI Headquarters to share his theory with other elements of the Intelligence Community to see if anybody else had any information to corroborate his theory.[71]

---

[71] In the summer of 2003, the OIG received new allegations from a former FBI confidential informant whose control agent had been Williams. The former informant alleged that he had informed Williams in October 1996 that he was concerned that a terrorist could use crop duster airplanes as weapons and that one of the subjects of the Phoenix EC and other Middle Easterners were attending flight schools in Arizona. The former informant also said that he believed Williams had written the Phoenix EC because in May 2001 the informant had raised complaints with the Phoenix FBI about how it handled him as an informant and why he was closed as an informant in 1999. The former informant also alleged that a reporter had called Williams in June or July 2001 about the former informant's information concerning Middle Eastern matters.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

(continued)

Williams stated that he also knew that there were some "inherent legal issues" with the recommendations in the EC because he believed that concerns about racial profiling would have to be addressed. Moreover, he said that he was not aware at the time whether the FBI had the authority to review the visa information of thousands of people applying to civil aviation universities and colleges in the United States, as he had recommended in the EC.

After the Phoenix EC was completed and sent, Williams did not contact anyone at FBI Headquarters or in New York to discuss its contents or check the status of the leads in ACS.

### D.    FBI Headquarters' handling of the Phoenix EC

Although the EC is dated July 10, the Phoenix Division did not upload the EC into ACS until the afternoon of Friday, July 27, 2001. The Phoenix FBI also mailed the paper copy to FBI Headquarters around July 27.

ACS records show that, because of the case designation listed on the Phoenix EC, the lead for FBI Headquarters was initially routed electronically through the ITOS electronic routing table to a general ITOS lead bucket that was handled by an ITOS administrative unit. The lead was not directly routed to the RFU or the UBLU.[72] An IA in the administrative unit in ITOS was responsible for checking the ITOS general lead bucket regularly and electronically assigning these kinds of leads to the appropriate person within ITOS.

---

(continued)



In addition, Williams said that he never spoke to the reporter who the former informant said had called Williams, and that he was not prompted to write the Phoenix EC because of a phone call from any such reporter.

[72] At the time, the electronic routing table in ACS for the Counterterrorism Division was set up to automatically route leads associated with cases with the type of case number designated on the Phoenix EC to an administrative unit in ITOS rather than to a particular operational unit.

### 1.    Assignment to the RFU

On the morning of Monday, July 30, 2001, the ITOS IA accessed in ACS the text of the Phoenix EC. ACS shows that on that same day the ITOS IA assigned the lead in ACS to Ellen, an IOS in the RFU who was listed second on the attention line of the EC.

The ITOS IA told the OIG that he did not recall the Phoenix EC or assigning the lead, but that his practice was to review the text of the lead and the person or persons listed on the attention line to determine to whom to assign the lead. The EC indicated that it related to an "IT-Other" matter and these cases fell under the RFU. The ITOS IA said that he sometimes consulted with his unit chief if he was unsure to whom to assign the lead, but he said he did not recall whether he did so in this case.

Ellen told the OIG that she pulled the Phoenix EC up in ACS, printed a copy, and read it.[73] She said that, after reading it, she thought that the EC should be reviewed by the UBLU, not by her unit, because the EC discussed Bin Laden and al Qaeda, which were the responsibility of the UBLU.

Ellen therefore discussed the EC with one of the IOSs who worked in the UBLU, who we call Jane. Ellen said she recalled asking Jane if she should transfer the lead to Jane, and that Jane stated that she did not have time to look at it then. Ellen said that Jane asked if she could get back to Ellen in a week.

Ellen said that she therefore consulted with Jane about a week later. ACS records show that Jane downloaded the Phoenix EC from ACS on August 7, 2001. According to Ellen, she and Jane discussed the tremendous effort that they thought would be needed to implement the recommendations in the EC.



Ellen said that Jane agreed that Jane should handle the Phoenix EC. Ellen told the OIG that she remembered Jane saying she wanted to do more

---

[73] Ellen told the OIG that she never received a hard copy of the Phoenix EC.

research on FBI investigations to determine what other connections might exist between Bin Laden, al Qaeda, ▮▮▮▮▮▮, and then, depending upon the results of that research, perhaps disseminate it. Ellen said that Jane also told her that she also wanted to speak with her supervisor and decide what action to take on the Phoenix EC.

Ellen said that, after talking with Jane, she closed the lead in ACS on August 7, 2001, indicating in ACS that Jane was planning to conduct additional research before proceeding. ACS shows that Ellen wrote in the "disposition" field for the lead that the lead was "covered-consulted with UBLU, no action at this time, will reconvene on this issue." Ellen said that after she and Jane discussed the issue, they agreed to "revisit" the issue later once Jane had done some research and had a better idea of how to proceed. Ellen also said that she closed the lead rather than asking an IA to reassign the lead to Jane because she knew that it would take some time for the necessary research to be done, and that the RFU unit chief – Don – had instructed RFU employees that leads had to be closed in a timely manner.

Ellen told the OIG that she thought that the theory presented in the EC was "interesting," but that she, like Jane, believed that further research needed to be conducted before any action was taken on the Phoenix EC. Ellen also asserted, "It was a theory that certainly needed to be explored more fully before disseminating it to the [Intelligence Community] as fact or not." In addition, Ellen said that she believed that attorneys in the FBI's National Security Law Unit (NSLU) would have had to review the Phoenix EC before any action could be taken on it because the issue of racial profiling was "hot."

When we asked Ellen whether she considered referring the Phoenix EC to the ISD to research and analyze, she stated that the RFU did not have an ISD analyst assigned to it at the time. Ellen acknowledged that it would have been possible for the ISD to assign an IRS analyst to do strategic research regarding the EC, but she believed the EC should first be referred to the UBLU, since the EC's focus was al Qaeda and it was the UBLU's prerogative to decide how to proceed on it.

Ellen told the OIG that she did not recall consulting with her supervisor in the RFU, an SSA who we call "Chris," about how to handle the Phoenix EC, or showing it to him. She said that she might have mentioned it in passing to Chris, but it was common for IOSs to close leads without supervisory input.

70

Chris was an SSA assigned to the RFU from the summer of 2000 until September 10, 2001, when he left FBI Headquarters. Chris told the OIG that he never saw or discussed the Phoenix EC with anyone prior to September 11.

Don was the unit chief of the RFU at this time. He joined the FBI in 1987 and was assigned to the RFU in May 2001. Don said that he first learned of the Phoenix EC only after the September 11 attacks. He indicated that neither Ellen nor anyone else mentioned the EC to him before September 11. He said that on average he reviewed 30 to 45 ECs a day that were assigned to the RFU, and because of the vast amount of intelligence data that had to be analyzed by the seven IOSs in the RFU, the RFU had to rely on their judgment to accurately prioritize the information. Don stated that if he had seen the Phoenix EC before September 11, he would have discussed its recommendations with his UBL counterpart, then forwarded the EC to the ITOS Section Chief, Michael Rolince, for a decision on the course of action to take on the EC.

### 2. Assignment to the UBLU

#### a. Jane's handling of the EC

As noted above, Ellen reassigned the Phoenix EC to Jane, an IOS in the UBLU. In addition, the hard copy version of the EC, which Phoenix had mailed to FBI Headquarters, also was assigned to Jane. According to Jane, on or about July 30, an IA in the RFU delivered the hard copy of the Phoenix EC to Jane. Jane provided the OIG with the copy that she received from the IA, which Jane had initialed to indicate receipt.

Jane told the OIG that she also recalled discussing the EC with Ellen. Jane said that after she read the EC, she told Ellen that she agreed that it made more sense for the UBLU, rather than RFU, to handle it because of the references to Bin Laden.

Jane told the OIG that she did not believe that there was a sufficient "factual predicate" to justify taking any immediate action on the EC, such as disseminating it to the Intelligence Community. Jane asserted that based on what was in the EC she did not believe that Subject No. 1 had a strong connection to Bin Laden. She said that the investigation of Subject No. 1 was opened as an Islamic Army of the Caucuses/Ibn Khattab matter, and, according

71

to Jane, "Ibn Khattab has never taken operational directions from Usama Bin Laden." She said that, according to the EC, the primary evidence of the connection was that Subject No. 1 was a member of Al-Muhjiroun and had a picture of Bin Laden on his wall. She stated that she confirmed with Ellen that while Al-Muhjiroun verbally supported Bin Laden, the FBI had not developed any evidence that Al-Muhjiroun had provided any operational support to Bin Laden.[74]

In addition, Jane told the OIG that she recalled concluding that the factual predicate was weak because many of the individuals who were listed in the EC as associated with Subject No. 1 were the subjects of only preliminary inquiries, not full investigations. Jane said that based on what she saw in the EC and knew about Bin Laden, she did not see the connection between Bin Laden and Subject No. 1 or the other subjects of the EC. She stated that she did not feel "comfortable at this stage going forward with the theory that we think these individuals from these countries are coming here sent by UBL, when the preponderance of evidence indicates that these people are aligned with Al-Muhajiroun and Ibn Khattab." She said that being associated with Ibn Khattab "did not equate" with being associated with Bin Laden.

Jane said that the fact that the Phoenix EC reported that a large number of Middle Eastern men were training in U.S. aviation-related schools did not strike her as significant because it was well known that Middle Eastern men have historically trained in U.S. flight schools because they are cheaper and better than other flight schools around the world. She suggested that before September 11, even someone of investigative interest training in a U.S. school in an aviation-related field did not necessarily raise a red flag.

Jane said that she told Ellen that she needed to do some research before she took any action on the EC. According to Jane, she initially thought of a handful of steps she wanted to take based on her knowledge of ongoing cases within the FBI. Jane said that she wrote a "to do" list on a yellow post-it note and attached it to her copy of the EC. She said she thought that there were at

---

[74] Mark, who had been the case agent in New York on the FBI's investigation of the Al-Muhjiroun, told the OIG that the New York Division had closed its case on Al-Muhjiroun long before September 11 because the FBI was not able to establish that Al-Muhjiron had engaged in terrorist activities or supported terrorist activities.

least four items on the list, but she could not specifically remember all of them.[75] However, she said she recalled that one of the items on the list was to review the FBI's information on Essam Al Ridi, a former personal pilot for Bin Laden who testified for the government in the trials against the persons responsible for bombing the U.S. embassies in East Africa in August 1998, to see if al Qaeda had undertaken any similar initiatives as those discussed in the Phoenix EC.

Because the EC included information about Subject No. 2, who had previously lived and studied in the United States and had ties to suspected terrorists arrested a few weeks prior, Jane said that she immediately thought of an issue being researched by an IRS in an FBI field office. We call the IRS "Lynn."[76] Lynn had been involved with the field office's intelligence investigation of Subject No. 2 when he lived in the area. As noted in the EC, two al-Qaeda operatives were arrested in Bahrain at the end of June 2001 who had been planning an operation to bomb the U.S. embassy and military forces in Saudi Arabia. At the time of their arrest, they were in possession of a passport containing the name of a person believed to be a relative of Subject No. 2.

In June 2001, Jane had asked Lynn to review her field office's case file on Subject No. 2 to try to find connections between Subject No. 2 and his associates in the state where the field office was located and the two al Qaeda operatives arrested in Bahrain. Jane told the OIG that she was familiar with this field office's investigation of Subject No. 2 and several of his associates who were living in the area. ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

---

[75] In November 2001, Jane was interviewed about the EC by an OIG Special Agent who conducted a preliminary review regarding the Phoenix EC. Jane said that she gave the EC with the post-it note on it to the OIG Special Agent. The Special Agent confirmed that Jane gave him the EC along with the note, but he was not able to locate the post-it note when he retrieved the original EC several months later.

[76] Lynn had been an IRS with the FBI for approximately two years at the time of the Phoenix EC. She handled all counterterrorism-related analytical work for the FBI field office in which she was employed.

██████████████ She said that she thought that Lynn might be aware of something in what she was researching about Subject No. 2's contacts in the area of the field office that could support the theory in the Phoenix EC.

As a result of the arrest of the two al Qaeda operatives in Bahrain, Jane also was dealing with Williams' supervisor who we call "Bob," and with agents in the Phoenix Division other than Williams on Phoenix's Subject No. 2 investigation, which was closed at the time. She stated that the FBI Phoenix Division had been asked to follow up on matters in the Subject No. 2 investigation that had been left unfinished, such as documents that had been collected from several sources but never read or analyzed. In addition, Jane stated that she had been in contact with the Phoenix Division about locating a source who previously had been married to a woman who was married to a family member of Subject No. 2.

However, Jane told the OIG that she did not have any contact with Williams about the Phoenix EC and that her only contact with Bob about the EC was via e-mail. On August 6, 2001, Jane sent an e-mail to Bob asking if he had any objection to her sending the Phoenix EC to Lynn. Bob replied via e-mail the same day that he did not have any objection.

The next day, Jane sent the Phoenix EC to Lynn. In an e-mail message attached to the EC, Jane stated: "I thought it would be interesting to you considering some of the stuff you were coming up with in [your field office]. Let me know if anything strikes you." Jane told the OIG that she wanted to know if Lynn saw any similar patterns between the associates of Subject No. 2 that she was researching in her area and the individuals discussed in the Phoenix EC. However, Jane did not assign a lead to Lynn, nor did she call Lynn about the Phoenix EC either before or after she e-mailed it to her.

### b.    Lynn's response

Lynn told the OIG that she received the Phoenix EC and Jane's e-mail, and she read them. Lynn stated that she believed that Jane sent her the EC because Jane was aware of her field office's earlier investigation of Subject No. 2 and several of his associates. Lynn said that in these investigations, the FBI observed some trends, such as that all of the subjects were of Saudi descent, were employed by Saudi airlines, and were involved with aircraft maintenance or had pilots' licenses, and that the Saudi airline company was

74

paying for their training. Lynn said that the investigation also had revealed that the subjects were calling various gun dealers and gun shops. She said that the FBI personnel involved in the investigation questioned whether the subjects were using Saudi airlines to transport weapons, but that nothing further had developed in the investigations to support this theory and that the field office investigation was closed. According to Lynn, by the time the name of Subject No. 2 resurfaced in June 2001 based on the arrest of the two al Qaeda operatives in Bahrain, he had not been in her area for approximately three years.

Lynn said that, although she did not recall speaking with Jane about the EC, she believed that Jane was passing the EC to her for informational purposes. Lynn said that she was interested in whether there was any information in the EC that would inform the work that she was doing on Subject No. 2 at the time, but that after reading the EC, she concluded that it did not affect her investigation. She said she considered it good information to know and that it was a "piece of the puzzle."



She stated that it was "no big secret" that Arab nationals received aviation training in the United States. She said that for these reasons, she did not respond to Jane's e-mail.

### c.    UBLU

Jane said that, in addition to sending the EC to Lynn, she talked to the SSA with whom she worked in the UBLU who we call Rob, and told him briefly about the EC. Jane told the OIG that she could not recall whether she provided a copy of the EC to him.[77] She said that she explained to Rob that she believed that she should do some research before deciding to act on the EC. According to Jane, Rob concurred with her course of action.

---

[77] Jane later informed the OIG that she handed the Phoenix EC to Rob, that he skimmed the synopsis, and that he listened to her summary of the document and proposed course of action.

Rob was Jane's SSA and also the Acting Unit Chief of the UBLU at the time. Rob, an FBI agent since 1990, had been assigned to the UBLU since 1999. He was the Acting Unit Chief of the UBLU from June 28, 2001, until September 10, 2001. He told the OIG that he routinely reviewed dozens of ECs on any given day, and he often relied on the judgment of Jane and other IOSs concerning intelligence decisions.

Rob said that he remembered Jane coming to him in the second week of August 2001 and telling him briefly about the Phoenix EC. He said that he also recalled her saying that she believed some preliminary research needed to be done before proceeding. He said that he did not see a copy of the EC, but based on Jane's description, concurred with her decision to conduct some initial research before taking any other steps. Rob said he did not discuss the Phoenix EC with anyone else.

According to Jane, she intended to address the Phoenix EC as time permitted. However, she said that she believed it would take a significant amount of time to do the research necessary to determine an appropriate response to the EC. She said that she was not able to return to the EC between August 7 and September 11 because of her heavy workload at the time. In addition to the work generated by the al Qaeda operatives arrested in earlier in the summer in Bahrain, she said that other matters at the time were of a higher priority than the Phoenix EC, such as another would-be al Qaeda "bomber" who was arrested in a foreign country, analysis of information received from a number of sources on the brother of a key Bin Laden lieutenant, and several al Qaeda-related threats of imminent attack. She stated that the entire UBLU was flooded with leads and requests concerning Bin Laden and also was handling "dozens" of leads on a daily basis associated with the attack on the *U.S.S. Cole* that had occurred in Yemen in October 2000.

When we asked Jane why she did not refer the Phoenix EC to the ISD for analysis, she said she did not recall ever thinking that she should refer the EC to the analytical unit within the ISD. Jane noted that at the time the Phoenix EC was sent to FBI Headquarters, no IRS was assigned to the UBLU from the ISD. The last IRS assigned to the UBLU had arrived in February 2001, but had transferred in early July 2001 to another unit. The ISD had not replaced her.

Jane, who had been an IRS for approximately six months before becoming an IOS, told the OIG that she had planned to conduct the necessary analysis with respect to the theory presented by Williams because she did not believe there was anyone in the ISD to do this kind of research and analysis. When asked if she could have made a request of the ISD for assistance despite no one being specifically assigned to UBL matters, Jane responded that in other instances where her unit had asked for research from the ISD, it was not able to provide the support requested because it lacked adequate personnel to do so.

Jane said that she did not recall seeing the Phoenix EC again until after September 11.

The two other individuals in the UBLU who were listed on the attention line of the EC – Frank and Matthew – told the OIG that they did not see the Phoenix EC before September 11. ACS records also show that they did not access the Phoenix EC before September 11. ACS records also show that no other FBI Headquarters employees accessed the Phoenix EC before September 11.

### E.    The New York Division's handling of the EC

The Phoenix EC also was routed by hard copy and through ACS to the FBI's New York Division. Williams told the OIG that he sent the EC to the New York Division because it was the focal point for Bin Laden matters in the FBI. At the time, the New York Division was working several criminal and intelligence cases related to Bin Laden's terrorist activities.

Williams told the OIG that, by sending the EC to the New York office, he was seeking the expertise and knowledge of the office, not simply informing it of his theory. Williams said that he was anticipating an analysis of his theory from those in the FBI with more expertise and experience with Bin Laden matters, including the New York Division.

The "attention" field of the EC contained the names of two New York FBI agents, who we call Jay and Mark, and the lead was designated as "read and clear." As discussed above, within the FBI read and clear leads are considered for informational purposes and do not require any specific action.

77