Based on the electronic routing table in ACS, in New York the lead was initially routed to the Assistant Special Agent in Charge (ASAC) for the New York FBI's Counterterrorism Program. The ASAC's secretary was responsible for assigning leads routed to the ASAC. On July 30, 2001, she assigned the lead to a New York international terrorism squad based on the case number.

According to witnesses we interviewed in New York, the volume of read and clear leads received each day by the New York office was enormous.[78] Squad secretaries were usually responsible for assigning "read and clear" leads directed to their squads. Leads were assigned to specific agents based on the names listed in the "attention" section of the EC, the case number, or the content of the EC. The Phoenix EC lead, however, was never assigned in ACS to a particular agent. The secretary of the New York international terrorism squad that had been assigned the lead closed the lead in March 2002.[79]

The New York office's hard copy of the Phoenix EC was routed to the international terrorism squad that handled Bin Laden investigations, where it was provided to Jay, the first New York agent listed on the EC. Jay had been a special agent with the FBI since 1976 and had worked on international terrorism matters since 1984. Since 1996, he was assigned to the squad that handled Bin Laden-related investigations, working primarily criminal investigations.[80]

Jay told the OIG that the Phoenix EC was routed to his mail folder by the squad secretary. He said he recalled reading it in August 2001. He said that he did not know Williams and never spoke to him either before or after Williams wrote the EC. Jay said he assumed that Williams listed his name on the EC because he was one of the agents who worked on the Bin Laden squad in New York.

---

[78] We were told that in 2003 the squad that handled Bin Laden matters received approximately 3,300 leads.

[79] We were told that "read and clear" leads often were not closed in ACS for several months due to the lack of clerical support.

[80] The Phoenix EC addressed Jay as the SSA of the squad. He was one of two "relief" supervisors who filled in for the SSA when he was not in the office. At the time, the SSA was out of the office on extended medical leave.

Jay told the OIG that he did not believe that Williams' theory was based in fact. He asserted that a "glaring deficiency" was the implication that Bin Laden had a support network in Arizona. He asserted that there had been a terrorist cell that was active in Arizona, but that this was in the 1980s before al Qaeda existed. He said that based on what was written in the EC about Subject No. 1's connections to Bin Laden – that Williams was basing the connection on what Subject No. 1 had said in two interviews – Jay believed that Subject No. 1's connection to Bin Laden was "tenuous, at best." Jay stated that if it had been his responsibility to address the Phoenix EC, he would have "taken issue" with it and would have written back that he believed that the theory and conclusions were "faulty." He added that the FBI was well aware that ███ ███████████████████████████████████████████████ Middle Easterners commonly received flight training in the United States. He said he was not aware of anything that supported the theory espoused in the EC.

Jay said that he reviewed the recommendations and saw that the requested actions in the EC were for FBI Headquarters to address. He said that he believes he may have discussed the EC with some of his colleagues and that they agreed that the recommendations were something for FBI Headquarters to address. Jay told the OIG that he did not contact Williams or anyone else in Phoenix to discuss the EC.

Mark, the other agent listed on the attention line on the Phoenix EC, was assigned to the international terrorism squad that handled cases that were managed by the RFU. Mark told the OIG that he did not see the Phoenix EC until after September 11, 2001. ACS records confirm that he did not access the Phoenix EC until after September 11.

Except for an analyst and an auditor in New York who reviewed the Phoenix EC in connection with searches unrelated to the Phoenix EC, and the secretary who accessed the EC to assign the lead, we found no evidence that anyone else in New York read the Phoenix EC or did anything with regard to it.[81]

---

[81] ACS shows that an auditor and an IRS on a squad not related to Bin Laden cases accessed the Phoenix EC during this time period. They both said the EC did not relate to what they were researching, and they did not do anything with it.

### III. OIG analysis

This section analyzes the handling of the Phoenix EC by the FBI. We believe, and the FBI has acknowledged, that the Phoenix EC did not receive the sufficient or timely analysis that it deserved, and it was not disseminated, as it should have been, for consideration and input by others in the FBI and the Intelligence Community.

While the FBI analysts who reviewed the EC did not give it timely attention, we do not believe their individual failings were the main source of the problem with the handling of the EC. Rather, the deficiencies in its handling were caused in greater part by critical systemic failings in the way that intelligence information and requests for assistance were handled by the FBI prior to September 11. In this section, we discuss these systemic problems before evaluating the actions of the individual employees who came in contact with the EC.

#### A.   Systemic problems

Before discussing the systemic failings evidenced by the handling of the Phoenix EC, it is important to note what the Phoenix EC was not. It was not an immediate warning about a terrorist plot, and it did not reveal information about the September 11 attacks or those who committed the attacks.[82] The EC itself was worded to convey that Williams was proposing a theory rather than a warning or a threat. Williams designated it as "routine" because he did not have any information of a specific threat or pending attack. He said that he was putting forth "an investigative theory" or "hunch," and he was seeking an analytical product or feedback in response to his theory. He did not expect that to happen immediately.

Yet, even though it did not contain an immediate warning and was marked routine, Williams' information and theory warranted strategic analysis from the FBI, which it did not receive, and timely distribution, which it did not

---

[82] In prepared remarks for congressional testimony on May 8, 2002, former ITOS Section Chief Michael Rolince noted that "it should be stressed that none of the individuals identified by Phoenix were connected to the 9/11 attacks, nor did the leads stemming from that EC uncover the impending attacks." (Emphasis in original.)

receive. While we cannot say that better handling of the Phoenix EC would have uncovered the September 11 plot, the EC should have been handled differently.

### 1.   Ineffective system for assigning and managing work

The lead from the Phoenix EC was assigned by an administrative employee directly to an IOS in the RFU, Ellen, who discussed the matter with another IOS in the appropriate unit, Jane. They decided that Jane would handle the Phoenix EC. Thereafter, Ellen closed the lead in ACS and noted that she and Jane would discuss the matter further in the future. Although Jane briefly mentioned the Phoenix EC to her supervisor, the IOSs made independent judgments about what needed to be done to address the requests in the Phoenix EC and who to notify about it. Jane also decided when she would work on the Phoenix EC. We found that neither Ellen's direct supervisor (Chris) nor Jane's supervisor (Rob) ever received or reviewed the Phoenix EC. Nor did any other supervisor in FBI Headquarters. And as of September 11, Jane had not completed any work on the Phoenix EC.

We found that the assignment of the lead from the Phoenix EC, the handling of the Phoenix EC independently by an IOS, and even the closing of the lead did not violate any FBI policies or practices at the time. In instances where IOSs received leads or intelligence information directly, they were not required to seek any supervisory input on the information that they were handling. Witnesses stated that more significant threat information or leads related to important cases usually were discussed with the SSAs, but that this did not occur with every lead or assignment, and it was not required.

For example, Rob, the acting unit chief of the UBLU at the time, told the OIG that he often relied on the judgment of IOSs in how they handled their work. As a result, IOSs regularly handled most intelligence information and other assignments without supervisory input or knowledge.

Much also was left to the IOS's discretion in deciding what was a priority and which projects to focus on. Don, the unit chief of the RFU, said that at the time, managers relied on IOSs to exercise their judgment in how to prioritize their work. The IOSs we interviewed stated that the priorities were determined by the nature of the work. For example, they said they gave a threat of a terrorist attack or an emergency FISA request the highest priority. In addition,

if information was requested by higher level FBI officials or a Section Chief, that assignment was given priority. IOSs explained that, because of the crush of immediate projects, they were operating with a "triage" approach to their workload in which they dealt with crises or problems as they arose and thereafter dealt with routine matters. As with how they handled their leads and other assignments, we found that IOSs consulted with their supervisors about prioritizing their work only when they deemed it necessary.

We believe that although the assigning of the lead and handling of the Phoenix EC was in accord with UBLU and RFU practices at the time, these practices were significantly flawed. Assigning work directly to IOSs with no requirement of supervisory input or review resulted in a lack of accountability for addressing leads and intelligence information. Without supervisory involvement, IOSs were permitted to determine what was a priority, and even when and whether work would be completed. As a result, there often was no check on the decisions being made by IOSs and no way to ensure that work or intelligence that was deemed of a lesser priority – such as the Phoenix EC – was ever addressed. This system was one in which important information could easily "fall through the cracks," not receive timely attention, or not be brought to the attention of those inside and outside the FBI who had a reason and a need to know the information.

The lack of accountability and supervisory involvement was compounded by the fact that the FBI's computer system, ACS, was not set up to ensure that all addressees on an EC were even made aware of the EC. Only individuals assigned leads associated with the EC would be notified electronically of the document's existence. This meant that when the EC and leads were uploaded, the EC would not be seen by a supervisor, even if the supervisor was an addressee on the attention line, unless the supervisor searched ACS for the document. Nor was there any assurance that the persons listed on the attention line of the EC would ever receive notification about it. Since FBI employees did not search ACS on a regular basis for documents that might be addressed to them, they did not learn about leads or other intelligence information assigned to them.

As a result, we found that none of the supervisors listed on the Phoenix EC saw it before September 11. Important judgments were made about how to handle the Phoenix EC – which IOS would address the Phoenix EC, closing the lead instead of reassigning it, sending the EC to only one person for review, not

conducting any research on the recommendations suggested in the EC while other matters were being handled – none of which involved any supervisory input. This, in our view, is not an appropriate system for handling such important information.

The FBI recognized this problem after September 11 and changed the way it handled such information. Rolince told the OIG that once he became aware of the Phoenix EC after September 11 and learned how it had been handled, he instructed that leads in ITOS had to be assigned to supervisors and could not be assigned only to IOSs.

In addition to deficiencies in the supervisory process, we also believe that the FBI's practice and policies regarding closing of leads were faulty. As evidenced by the handling of the Phoenix EC, leads could be closed without any work being done on them, other than reassignment to someone else.

A contributing factor to the ineffective management of the work assignments in ITOS was the FBI practice of rotating supervisors through FBI Headquarters on a relatively short basis. We found that supervisors typically stay in FBI Headquarters for two years or less, and SSA positions and unit chief positions often remain unfilled for months at a time. By contrast, IOSs remain in ITOS on a permanent basis and are therefore relied upon for their expertise and institutional knowledge about counterterrorism programs, intelligence on FBI targets, relationships with other intelligence agencies, and how FBI Headquarters works. As a result, IOSs sometimes manage themselves. While we believe that many IOSs are capable and dedicated FBI employees, the turnover of managers in FBI leaves a gap in IOSs' supervision, in addition to making it difficult for managers to be effective and knowledgeable about their subject areas before they are sent to a new assignment.

### 2.    Lack of adequate strategic analytical capabilities

We believe the Phoenix EC warranted strategic analysis. It never was subjected to any such analysis before September 11. Ellen and Jane agreed that Jane would handle the Phoenix EC, but Jane did not refer it to the entity at the FBI that was assigned to conduct strategic analysis, the ISD. She said she decided not to refer it to the ISD for analysis and instead keep it for herself to work on when she had time. She believed that the ISD did not have sufficient

capability to perform timely analysis. At the time, the FBI had no IRS in the ISD specifically assigned to handle matters involving Bin Laden, despite the importance of that assignment. As we discuss in more detail below, while the handful of analysts who worked in the ISD were supposed to perform strategic analytical functions, most of their time was spent assisting on case-related matters.

This was a significant failing. A critical component of the work of the FBI's Counterterrorism Division is analysis. Although case-related analysis – also called "tactical" or "operational" analysis – is crucial to bringing criminal cases to the point of arrest and prosecution and to determining through intelligence information whether a particular target or group may be planning an imminent terrorist act, strategic analysis is equally important to the FBI's counterterrorism mission. Strategic analysis involves drawing conclusions and predictions about terrorist organizations and likely methods of attack based on all sources of information. It is critical to the FBI's ability to be proactive instead of reactive as well as to set investigative priorities. It is also critical for identifying intelligence gaps in information about a terrorist group or target.

Since September 11, the FBI has acknowledged that it lacked an effective strategic analysis program for international terrorism prior to September 11. In congressional testimony, Director Mueller acknowledged the FBI's analytical capabilities prior to September 11 were "inadequate." He stated that the FBI's analytical capability "[was] not where it should be." Since then, the FBI has focused attention on improving its analytical functions.[83]

Prior to September 11, the FBI's strategic analytical capabilities were extremely limited. The FBI did not regularly prepare analytical products that predicted trends, explained patterns, or identified national security vulnerabilities with respect to international terrorism.[84]

---

[83] The OIG is in the process of completing a comprehensive review of FBI's analyst program and it is tentatively scheduled to be completed in September 2004.

[84] A striking example of the FBI's failing in this regard is documented in a September 2002 OIG audit report which found that the FBI had not performed a comprehensive national-level assessment of the threat and risk of terrorist attack, despite having promised Congress that it would do so following a September 1999 General Accounting Office (GAO) report. As of September 11, 2001, the FBI had developed a draft of a report that was (continued)

84

This lack of strategic analytical capability undoubtedly affected how the Phoenix EC was handled. Instead of being able to send the EC to a unit that had sufficient expertise and resources to assess the theory laid out by Williams, Jane kept it to herself, hoping to find the time to turn to it amid the crush of other duties. She was not able to do so before September 11.

Part of the problem was that, in the past, the FBI did not adequately value or support an analytical program. This problem was aptly described by one CIA official – one of several CIA managers enlisted by the FBI after September 11 to help turn around the FBI's analytical program – as "a lack of a culture of analysis." The FBI was composed predominantly of agents who performed criminal investigative work and who did not appreciate the value of strategic analysis. This was particularly acute in the FBI's Counterterrorism Program. As a result, FBI counterterrorism IOSs, SSAs, and managers had a tendency to rely on their own experience and professional judgment rather than seeking strategic analysis, and the Counterterrorism Program focused on immediate, short-term operational priorities rather than strategic analysis.

Strategic analysis was viewed as a support function rather than its own discipline. IOSs and agents employed IRSs primarily to conduct research and analysis projects in support of on-going investigations or prosecutions. While this research and analysis often involved complex and time-consuming work, such as reviewing information collected as a result of a FISA warrant or establishing the connections between targets in a case based on a review of telephone records, it was normally in furtherance of a specific investigation.

Furthermore, several IRS employees we interviewed told the OIG that IRSs often were used to perform the work that IOSs did not like to do, such as conducting name searches in ACS or performing research on the Internet. A

--------

(continued)
purportedly the threat assessment. The OIG reviewed a draft of the report in May 2002. We concluded that it was not a threat assessment because it did not describe the nature of the terrorist threat, identify critical intelligence requirements, or make recommendations to any level of FBI management. <u>See</u> "A Review of the Federal Bureau of Investigation's Counterterrorism Program: Threat Assessment, Strategic Planning, and Resource Management" (May 2002). In January 2003, the FBI issued an intelligence assessment entitled "The Terrorist Threat to the U.S. Homeland: An FBI Assessment," which responded to the recommendations in our September 2002 audit report.

CIA manager detailed to the FBI told the OIG that IRSs were considered "second class citizens" at the FBI. This view of analysts reduced the ability of the FBI to conduct the strategic analysis that was needed on projects such as the Phoenix EC.

Another example of how the strategic analytical function was subordinate to the operational function in the FBI's Counterterrorism Program is evident in the fact that 5 IRSs were absorbed into an operational unit in late 2000, when there were fewer than 20 IRSs devoted to international terrorism at the time. These IRSs were assigned in late 1998 to the UBLU to conduct research and complete other tasks in support of the investigation and prosecutions stemming from the embassy bombings in East Africa. These were important assignments that needed to be done, but they made it more unlikely that strategic analysis, such as the kind warranted by the Phoenix EC, would be accomplished.

In addition, the primacy of the operational units was further demonstrated by the fact that the judgments and conclusions of IRSs set forth in analytical products could be overruled or blocked from dissemination by the managers in the operational units or the ITOS section chief. Witnesses told the OIG that operational personnel were permitted to prevent dissemination of analytical products. For example, IRSs told the OIG that a proposal for an analytical report that would have discussed signs that al Qaeda was planning a terrorist attack was stopped by a New York Field Office supervisor because of concerns that the information could be subject to discovery in a prosecution.

Witnesses also told the OIG that operational units' ability to override the conclusions of the IRSs was demoralizing to the analytical component. CIA analysts detailed to the FBI after September 11 to revamp its analytical program asserted to the OIG that operational personnel, whose expertise is case-oriented and therefore tactically based, should be involved in checking the facts presented in the analytical product but should not be able to alter or block the dissemination of analytical results.

While there are legitimate tensions between operational and analytical personnel, the FBI had no process before September 11 for addressing conflicts that arose out of this tension.

86

### 3. Resources and training for analysts

The FBI's strategic analytical function also was under-resourced. This was demonstrated by the shortage of IRSs and the lack of training offered to them. We interviewed former IRS managers about the resources of the ISD prior to September 11. The FBI acknowledged that the number of IRSs working on counterterrorism matters had dwindled prior to September 11, and that the few remaining IRSs were not sufficient to address the analytical needs of the ISD.

In 1996, the FBI had hired 36 IRSs in an effort to bolster its international terrorism analytical program. According to witnesses, within a year approximately half of the IRSs had left the program. By mid-1999, there were only approximately 15 international terrorism IRSs, and by mid-2000 there were only 10 IRSs devoted to counterterrorism analysis.[85] Former IRS managers confirmed to us that only one IRS was assigned to UBL matters in 2001, but she transferred to another unit in July 2001. Thus, in the summer of 2001 when the Phoenix EC was received, no IRS was assigned to work on Bin Laden matters. Jane pointed to this void as one reason she did not seek analysis of the Phoenix EC.

In addition, we found that training for analysts at the FBI was ad hoc and untimely. While special agents were sent to Quantico to the FBI Training Academy for a 16-week course, IRSs did not receive equivalent training at Quantico or elsewhere. IRSs received mostly on-the-job training until they could attend a CIA or Defense Intelligence Agency course on international terrorism. For some IRSs, this did not occur until they had been working for a year or more. In addition, IRSs told us they had to seek training on their own, and if they changed program areas they also had to find appropriate training in the new subject matter.[86]

---

[85] Some IRSs left the FBI, while others transferred to other positions within the FBI. FBI documents show that 10 IRSs became IOSs in ITOS, 8 moved to other positions within the FBI, and 13 left the FBI. In addition, as discussed above five of the IRSs who became IOSs were administratively transferred to the UBLU after working on a task force in support of the embassy bombings case.

[86] While this section of the report primarily focuses on resource and training issues for IRSs, IOSs also were not provided with adequate resources and training.

Counterterrorism IRSs also lacked a clear career path. They usually were supervised and managed by agents, who were not trained about the IRS position, mission, or work product. Moreover, CIA managers detailed to the FBI to improve its strategic analytical capabilities told the OIG that in order for analysts to be taken seriously, they had to hold positions of authority. As an example, they stated that in the CIA one of the Deputy Directors was an analyst.[87] According to another CIA manager, the lack of a career path for IRSs was a clear indication that IRSs were not valued by the FBI.

The result of these deficiencies was a weak and underutilized analytical function, which in our view contributed to the lack of attention that the Phoenix EC received when it was sent to FBI Headquarters.

### 4.    Poor information flow and information sharing

The FBI also has acknowledged that the Phoenix EC contained information that should have been disseminated and reviewed by other parts of the FBI and the Intelligence Community. While the Phoenix EC did not contain information that constituted an imminent threat or warning of a terrorist attack, the FBI should have obtained input from within and outside the FBI to properly analyze Williams' theory. However, before September 11 the Phoenix EC was not disseminated widely within or outside of the FBI.

When Jane received the EC, she decided not to disseminate it immediately. She believed it lacked sufficient factual support to warrant immediate dissemination, and she said she decided to conduct some initial research before deciding whether to invest additional resources on the EC. Because of her other work, she did not begin the research prior to September 11.

Her actions were consistent with the FBI's policies and procedures at the time. As noted above, IOSs were permitted to exercise discretion in handling their assignments, including determining what information to share both within and outside the FBI, without supervisory approval. The FBI provided them no guidance or requirements on what type of information should be shared, either

---

[87] Within the Counterintelligence Program, the highest position held by an analyst was Section Chief.

inside or outside the FBI. This left to the discretion of the individual analyst decisions about what to do with intelligence information, such as the Phoenix EC.

We believe exercise of such significant discretion resulted in a failure to share important information such as the Phoenix EC. Fundamental to the effectiveness of an intelligence operation is its ability to collect and disseminate information within and outside the agency. Such information is needed by operational personnel to inform their investigations or other operational goals. Moreover, in the analytical process, the more information that is available about a terrorist organization or a target, the better informed conclusions and predictions about the likely actions of the person or organization. Information should be reviewed, among other things, to determine what would be useful in other FBI investigations, what other personnel or offices within the agency should be provided with the information, what would be useful for other government agencies, what would be useful and appropriate to disseminate to foreign governments, and what can be declassified for use in public alerts.

But information sharing within and outside the FBI's Counterterrorism Program prior to September 11 was piecemeal and ad hoc rather than systematic. Several of the CIA managers detailed to the FBI told the OIG that there was no "information flow" within the FBI. The FBI's process for disseminating information was to route information primarily to IOSs, who then used their own judgment and experience to decide what needed to be disseminated and to whom. As discussed above, IOSs were operating with a "triage" approach to their workload. They had to identify what information was the most significant and deal with the crises or problems as they arose. As a result, information that did not demand immediate attention or did not relate to a crisis took significant time to be addressed, if it was addressed at all.

The CIA managers we interviewed asserted that an intelligence agency must set priorities to identify what its information needs and intelligence gaps are. They said that once priorities and intelligence gaps are identified, decisions can be made about what information should be collected and who should receive the information. They explained that these decisions should then be communicated throughout the agency as "requirements."

89

Several of the CIA managers also noted that the FBI lacked any priorities or requirements for the dissemination of information once it was collected. For example, there was no guidance concerning what types of information were required to be disseminated or included in reports to other intelligence agencies. Moreover, there were no requirements that certain types of information be routed to analysts or that analysts be copied on particular kinds of communications. IOSs simply shared or disseminated the information they believed needed to be shared based primarily on their prior experience.[88]

IOSs we interviewed told the OIG that they spent a majority of their time preparing documentation for requests for FISA warrants. They also were responsible for providing advice and assistance to the field offices in connection with ongoing investigations and with responding to threats of terrorist acts. They also had to obtain resources to support investigations, such as arranging for translators or preparing documentation for re-allocation of money. They needed to respond to requests to check telephone numbers, names, and other identifying information about targets of investigations in FBI and CIA databases. While the IOSs acknowledged that collection and dissemination of intelligence information was one of their responsibilities, they stated that as a job function it was not a priority before September 11.

Several IOSs stated that it was impossible for IOSs to be aware of and disseminate every piece of information generated by every lead because of the demands of the other responsibilities of their jobs. As a result, they said that they had to focus on the most significant information that was generated from important cases or credible threats. Jane, other IOSs, and special agents told us that the type of intelligence information that received immediate attention was that generated from explicit threats of an attack or other terrorist act, information that a terrorist who was in custody was being brought to the United States, or intelligence intercepts by another agency that led to a name and phone number in the United States of a target. Other information was handled if there was time.

---

[88] We also discuss the FBI's lack of policies and procedures for information sharing in our December 2003 OIG audit report, "The Federal Bureau of Investigation's Efforts to Improve the sharing of Intelligence and Other Information" (December 2003) at 19-20.

90

By contrast, according to the CIA personnel, the dissemination of intelligence information requires full-time personnel trained solely for that purpose. In the CIA, dissemination of intelligence information is handled by "reports officers" who are professional employees trained in analysis and information collection and dissemination.

It also was clear in our review of the Phoenix EC that the FBI's procedures for disseminating information internally were cumbersome. At the FBI, many layers of review were required to distribute an EC to multiple field offices. Disseminating an EC to all FBI field offices required approval from several supervisors and managers, including the FBI Director. Several witnesses stated that the review and approval process normally took several weeks to complete. The CIA employees detailed to the FBI to improve the analytical program who we interviewed told the OIG that they found the process for completing an EC was "difficult" and "hard."

We believe that the Phoenix EC should have been shared with the Intelligence Community or parts of the Intelligence Community for their input and analysis. While Williams had advanced only a theory, and there needed to be more analysis of the recommendations before they were adopted, the EC should have been presented to others in the FBI and the Intelligence Community for their information and analyses. The fact that it was not disseminated reflected the longstanding problem within the FBI of information sharing being ad hoc and piecemeal. Rather than relying on the judgment of IOSs about what information should be disseminated as they juggle their other job duties, the FBI should have a system in place to guide, identify, and prioritize the kinds of information that need to be shared.

### 5. General complaints about the difficulties of working in ITOS

We also heard consistently from witnesses in ITOS that working there before September 11 was extremely chaotic and difficult. They complained that all aspects of their jobs – from putting FISA packages together to disseminating intelligence to sending out ECs to the field – were hampered by the lack of resources and poor technology.

IOSs, agents, and managers uniformly told the OIG that IOSs did not have sufficient time to handle the workload in ITOS, and that because of the lack of resources in ITOS and the demands of operational matters in the

91

section, they worked extremely long hours on a regular basis, including nights and weekends. They described being overwhelmed with work, including intelligence information that needed to be disseminated. For example, they said that hundreds of leads could be generated by any one case. They stated that the demands of a particular case or a particular threat sometimes consumed all of their time and attention for several days or even weeks. As previously discussed, they were operating with a "triage" approach to their workload in which they dealt with crises or priority problems as they arose. We found that as a result, issues that they considered to be non-priority matters, such as the Phoenix EC, often were placed on the backburner.

FBI and CIA witnesses also uniformly complained that the FBI's computer system – ACS – impeded the flow of information. As we have discussed in several other OIG reports, ACS is a very cumbersome and non-user-friendly system that discourages its use.[89] To disseminate information within the FBI was not simply a matter of forwarding an electronic document in a point and click e-mail environment. Rather, an IOS would have to prepare an EC, which required accessing several different screens in ACS to complete and then upload the EC.[90] In addition, witnesses complained that ACS especially hampered the flow of information because it was not a system designed to "push" information out to the user. Instead, the user had to know that information existed in order to find it. As discussed above, this resulted in the Phoenix EC not being reviewed by the appropriate individuals, even when their names were on the attention line.

---

[89] See, e.g., OIG reports entitled, "The Federal Bureau of Investigation's Implementation of Information Technology Recommendations," (September 2003); "FBI's Management of Information Technology Investments" (December 2002); "An Investigation of the Belated Production of Documents in the Oklahoma City Bombing Case" (March 2002); and "The Handling of FBI Intelligence Information Related to the Justice Department's Campaign Finance Investigation" (July 1999).

[90] Also, as stated above, ECs that were addressed to all field offices required several layers of management approval, which also slowed down the process.

### B.  Individual performance

We now turn to the actions of the individuals who were involved with the Phoenix EC. While the systemic problems hampered FBI employees in handling information such as the Phoenix EC, and explained to some extent the reasons that FBI employees did not adequately respond to it, these systemic problems do not explain all the deficiencies we found in the handling of the Phoenix EC. While we do not believe that anyone involved with the Phoenix EC at FBI Headquarters committed misconduct, we believe that some of them made errors in judgment with respect to some of their actions on the Phoenix EC.

### 1.   Kenneth Williams

First, we believe that Williams should be commended for his initiative and for his attempts to apply broad analytical thinking to his casework. He prepared the Phoenix EC based on his experience, intuition, and expertise, and he sought assistance through the proper channels at FBI Headquarters in pursuing his theory. It was FBI Headquarters' responsibility – not a field office's responsibility – to decide what strategic analysis was needed to address the issues Williams raised and to ensure that appropriate attention was directed to the analysis of those issues. Williams deserves praise for, in the midst of handling cases in the field, discerning a pattern that he thought warranted review and seeking to bring that to the attention of others in the FBI.

### 2.   FBI Headquarters

#### a.   Jane

Jane's decision not to refer the Phoenix EC to the ISD and instead to conduct the necessary research herself did not violate any FBI policies and procedures at the time. Leads could be assigned and handled without supervisory input, and much was left to IOSs' discretion and judgment about how assignments were handled and prioritized.

However, we question Jane's decision not to refer the Phoenix EC to the ISD for analysis. While the FBI's strategic analytical capabilities were extremely limited, as we have described above in detail, and no IRS was specifically assigned to Bin Laden matters, Jane could have, and should have, referred the Phoenix EC to the ISD for analysis. By all accounts, Jane was

93

hard working and conscientious.  But the press of other work prevented her
from addressing the Phoenix EC sufficiently.  While she said that she did not
think that the ISD could do what was necessary to analyze the Phoenix EC
because no IRS was specifically assigned to Bin Laden matters, she could have
raised the problem to her supervisor's attention in an attempt to have resources
assigned to analyze the Phoenix EC.  Instead, she kept the Phoenix EC to
herself, hoping to get to it when time allowed.  But she did not have time for it.
We believe that, even if she intended to conduct research on it when time
permitted, she should have provided it to members of the Intelligence
Community for their input on the theories and recommendations it advanced.

### b.    Ellen

Ellen recognized that the Phoenix EC pertained more to the UBLU than
the RFU, and she appropriately discussed it with Jane and had the matter
reassigned to her.  She also noted in the disposition field of ACS how the lead
was being handled.  Ellen closed the lead, but rather than closing the lead, she
should have reassigned the lead to Jane.  While this was not inconsistent with
how leads were handled in ITOS, given the pressure to close leads in the
system, it misrepresented the status of the lead since the necessary research had
not yet been completed.

### c.    Rob

We believe that Jane's supervisor – Rob – should have recognized that
the requests in the Phoenix EC were not typical requests for operational
support in the field and should have directed the matter to the ISD.  Although
we recognize that the FBI left much to the discretion and judgment of IOSs
about how they handled their work, it was Rob's responsibility as a supervisor
to ensure that Jane was handling requests appropriately.  Jane briefly
mentioned the Phoenix EC to Rob, but said he did not review it, and we do not
believe he sought to ensure that it received adequate attention.  We believe that
Rob should have been more actively involved in Jane's handling of the
Phoenix EC.  If he had decided that resources did not exist to address the EC
for several months, we believe that he should have brought the matter to the
attention of his section chief.

### 3. Lynn

Jane sent the EC to Lynn, the IRS who works counterterrorism matters in a field office that had had an investigation of Subject No. 2, with a note that read, "I thought it would be interesting to you considering some of the stuff you were coming up with in [your field office]. Let me know if anything strikes you." Jane did not call Lynn to discuss the Phoenix EC prior to sending Lynn the e-mail, and Lynn was not assigned a lead with respect to the Phoenix EC. Lynn read the Phoenix EC, but did not respond to Jane's e-mail, and Jane did not otherwise contact her about the Phoenix EC.

As discussed above, Lynn had several years earlier worked on an investigation in which Subject No. 2 had been central, and Subject No. 2's name had resurfaced in June of 2001 when two individuals were detained in Bahrain who admitted to being al Qaeda operatives and possessed a passport containing the same last name as Subject No. 2 and a previous address of Subject No. 2. Lynn told the OIG that after Subject No. 2's name resurfaced, at the request of Jane she researched their associates from when they had lived nearby. Lynn told the OIG that she believed Jane had sent her the Phoenix EC because Subject No. 2 was mentioned in the EC. Lynn explained that because the information in the EC about Subject No. 2 did not impact what she was working on and because she was not aware of any information that supported Williams' theory, she did not respond to the e-mail.

Lynn was not required to respond to the e-mail by any formal FBI policy. Her actions were consistent with others in the FBI, who did not address an issue unless a lead was assigned to them. But we believe that Jane's request for Lynn to let her know if anything struck her warranted some response, even if the response was that Lynn had nothing to support the theory in the Phoenix EC. Instead, Lynn did nothing in response to the e-mail. A response from Lynn may have caused Jane to take some other step, to seek further input from someone else, or to alert Phoenix of the status. Instead, Lynn did not communicate with Jane, and the Phoenix EC languished.

### 4. Jay

Jay, an agent on the Bin Laden squad in the FBI's New York Field Office, received and read the Phoenix EC. He told the OIG that he was not aware of any information that supported the theory in the EC, and he therefore

95

did not respond to it, either in writing or by contacting anyone in the Phoenix office. He also stated that he would have "taken issue" with the conclusions if he had responded. Jay was not required to respond to the Phoenix EC, and he did not violate any FBI policies and procedures by not responding.

Yet, although Jay was not required to respond to the lead set for the New York Field Office in the Phoenix EC, Williams had asked for analysis and comments on his proposal in the text of the EC. Since Jay told us he felt strongly that the theory in the Phoenix EC was not supported by the facts, we believe he should have contacted Williams or someone in FBI Headquarters to discuss the EC to provide his view, given the expertise of the New York office on issues involving Bin Laden. But given the disorganization and convoluted way that leads were assigned, and the prevailing practice not to respond to leads that were not specifically assigned to an agent, it is not surprising that Jay did not respond.

### 5.    FBI management

Finally, we believe it important to state that the failings in this case go well beyond any failings of those individuals who came in contact with the Phoenix EC. In our view, the failings were caused in much larger part by the FBI's inadequate and inefficient system for analyzing intelligence information, and the lack of attention paid by many levels of FBI managers to strategic analysis. This was the responsibility of many FBI managers and employees, from the top down, over many years. We believe that the FBI's lack of focus on strategic analysis and its failure to provide sufficient resources and priority to analysis were problems attributable to the FBI and many FBI senior managers. While some of the individuals who handled the Phoenix EC did not do all they should have to address it in a timely way, the larger and more important failure was the way the FBI handled intelligence analysis for many years before the September 11 attacks.

### C.    Other pieces of intelligence concerning airplanes as weapons

 The FBI
conducted searches in its computer systems for references to "flight schools,"
"airplanes," "hijackings" and other related terms in an attempt to collect
information that the Joint Inquiry Committee Staff had indicated it was
interested in reviewing but had not specifically requested. The FBI collected
the documents retrieved in its electronic searches and provided them to the
Joint Inquiry Committee Staff and also to the OIG.

We reviewed the information provided by the FBI that referenced a
connection between airplanes or flight schools and persons of interest to the
FBI. The information was from as early as 1983, although most of it was from
1998 and 1999. Below we briefly describe four of the pieces of information
that are representative of the kinds of information contained in FBI files about
airplanes and flight schools at the time the Phoenix EC was received at FBI
Headquarters:

- The FBI received an intelligence report in mid-1999 stating that the
leadership of a terrorist organization other than Al Qaeda had met and
planned to use students in the United States to gather intelligence on
infrastructure facilities and public places frequented by Jews. It was
also reported that students also would be selected to participate in
terrorist training camps
It was reported further that the
leadership of the terrorist organization viewed this requirement as
being "particularly important" and were believed to have approved an
open-ended amount of funding to ensure its success.[91]

- In August 1998, an intelligence agency advised the FBI's New York
Division of an alleged plan by unidentified Arabs to fly an explosive

---

[91] The FBI later said that in 2002, in connection with the JICI Review, it researched this
issue and concluded that the information reported was likely a fabrication.

97

laden aircraft from Libya into the World Trade Center. The New York Division sent out leads in an attempt to obtain more information about the source of the reporting.

- On May 18, 1998, a Special Agent on the FBI's Oklahoma City Division's counterterrorism squad prepared an EC documenting his contact with an agent from that Division's surveillance squad, who also was the Division's chief pilot. In the EC, the agent noted that the Division pilot had observed "large numbers of Middle Eastern males receiving flight training at Oklahoma airports in recent months." The agent also reported that the pilot speculated that light planes would be an ideal means of spreading chemical or biological agents.

- In January 1995, Philippine authorities responded to a small fire and several explosions in an apartment in Manila. Inside the apartment, authorities discovered bomb-making equipment and terrorist literature. The resulting investigation revealed a plot to place explosive devices in 12 American passenger aircraft. As a result of the FBI's investigation into this matter, Abdul Murad, Wali Shah, and Ramzi Yousef were subsequently indicted and convicted in the United States for their involvement in the conspiracy. Yousef later was convicted on November 13, 1997, for his involvement in the bombing of the World Trade Center on February 23, 1993.

  During investigative interviews, Murad described general conversations with Yousef in which they discussed the potential use of aircraft to commit terrorist acts. According to Murad, he discussed with Yousef the ease with which a pilot could conduct a suicide attack by crashing an explosive-laden aircraft into a building. Murad mentioned CIA Headquarters as a potential target. Murad contended in investigative interviews that there was no specific planning in relation to any of these acts. Murad also described other general conversations with Yousef concerning potential non-aircraft related terrorist acts, such as bombing a nuclear facility, utilizing poison gas, and bombing the World Trade Center a second time.

As discussed above, the FBI conducted little strategic analysis before September 11, and it never attempted to connect any of these disparate pieces of information. For this reason, these pieces of information and all of the other

information in the FBI's possession that might have been used to analyze the use of airplanes and civil aviation for terrorist purposes was never considered systematically or analytically.

### D.  Conclusion

In sum, our examination of the FBI's handling of the Phoenix EC found that the individuals who handled it did not violate FBI policies and practices at the time, but they did not do all they could have, and should have, to respond to it or the recommendations in it. They should have sought input from others in the FBI, assured that the EC received the necessary analysis, and also sought input from the Intelligence Community about the theories and suggestions contained in it.

But we believe that their actions were not surprising, given that the policies and practices under which they operated were extremely flawed. We found that IOSs were not properly managed and that supervisors should have been more actively involved in the work assigned to IOSs. In addition, as an institution, the FBI was focused on its operational priorities at the expense of conducting strategic analysis. Furthermore, the FBI lacked a systematic approach to information sharing and lacked adequate tools to facilitate such information sharing both within and outside the FBI. As a result of these systemic failures, the FBI did not give the Phoenix EC the consideration that it deserved.

We cannot know for certain what the FBI would have concluded prior to September 11 if the FBI had applied strategic analysis to the theory posed by the Phoenix EC or what information may have been uncovered in support of the theory if the Phoenix EC had been shared with the Intelligence Community or within the FBI. We also cannot know what role, if any, the pieces of other information described above would have played in the analysis of this question. What we do know is that the FBI was not adequately analyzing information for the purpose of drawing conclusions and making predictions. This was a significant intelligence failure, which hindered the chances of the FBI being able to detect and prevent the September 11 attacks.

99