admitted into the United States on non-immigrant visas and authorized to remain until July 14, 2000.

### 8.    OIG findings regarding FBI's knowledge about Mihdhar and the Malaysia meetings

We discuss here our findings regarding the FBI's knowledge of information about Mihdhar and the January 2000 Malaysia meetings, including whether the intelligence information concerning Mihdhar's valid multiple entry U.S. visa and Hazmi's travel to the United States in January 2000 was passed to the FBI. Several witnesses told the OIG that Mihdhar's possession of a U.S. visa provided a clear domestic nexus that should have triggered the passing of this information from the CIA to the FBI.

At the outset, we note that the CIA has acknowledged that it obtained information that Mihdhar had a U.S. visa and that Hazmi had traveled to the United States, and that the CIA should have placed their names on U.S. watchlists, but that this did not occur.[174] The CIA OIG is reviewing this matter to determine why this failure occurred and who is responsible for it.

### a.    Formal passage of information from the CIA to the FBI

As noted above, the formal method of communicating intelligence information between the CIA and the FBI was an intelligence report called a CIR. CIA records show that between July 1999 and September 10, 2001, the Bin Laden Unit disseminated over 1,000 CIRs, most of which were sent to the FBI. CTC employees as well as FBI detailees to Bin Laden Unit had authority to draft CIRs, and the detailees collectively drafted over 150 CIRs to the FBI during this period. However, CIRs could only be disseminated by persons with authority to "release" the CIRs.[175] In the Bin Laden Unit, only supervisors,

---

[174] Mihdhar and Hazmi were placed on watchlists by other countries, including Thailand.

[175] Once a supervisor approved a CIR for release, it was electronically disseminated by a unit in the CIA known as the Policy Community Action Staff.

241

including John and Eric as the deputy chiefs of the station, had authority to release CIRs.[176]

Dwight drafted a CIR in which he summarized the information that had been disseminated by the NSA about Mihdhar. He also provided detailed information about Mihdhar's passport, visa, and visa application indicating that New York had been his intended destination. According to CIA records, this CIR never was disseminated to the FBI. A desk officer's note on the draft CIR indicated that the Deputy Chief of the Bin Laden Unit, John, had instructed the draft CIR be put on hold, and Dwight contacted him through an e-mail about the disposition of the CIR a week later. Despite this e-mail, the evidence clearly shows that the CIR never was disseminated to the FBI.

The evidence shows, however, that Dwight acted in accordance with the system that was in place at the time by drafting the CIR to formally pass the visa information to the FBI. In accordance with Bin Laden Unit policy, Dwight was not permitted to pass the CIR to the FBI without permission.

All of the witnesses stated, however, that they did not recall the CIR or any communications about it. Other than the note written by the desk officer, we found no documentary evidence about why the CIR was not disseminated. Thus, we were unable to determine why it was not sent.

The information in the CIR, which was documented in the appropriate format for passage to the FBI, was potentially significant to the FBI and should have been passed to the FBI. We believe it was a significant failure for the CIR not to be sent to the FBI.

### b.    Informal passage of information from CIA to FBI

We also considered what information that James, a CIA detailee to the FBI, informally passed to FBI Headquarters and whether he informed anyone of the visa information about Mihdhar. Based on the contemporaneous e-mails in which James documented in detail what he told FBI SSAs Bob and Ted, we concluded that he reported to the FBI the information regarding Mihdhar's

---

[176] CIA records show that Eric released five CIRs during his tenure at the Bin Laden Unit.

transit through Dubai, his arrival in Kuala Lumpur, his activities after his arrival, and his meeting with other suspected al Qaeda operatives. It is far less clear, however, whether he provided Mihdhar's passport and U.S. visa information to the FBI.

We do not believe that James briefed either Bob or Ted on Mihdhar's passport or U.S. visa information. First, nothing in Bob's contemporaneous notes or Ted's e-mail or briefing update referred to Mihdhar's passport or visa information.



Moreover, James wrote a detailed e-mail to document the contents of his conversations with Bob and Ted. Since the stated purpose of James' e-mail was to prevent the FBI from later claiming he had failed to brief them on some important details, he had every incentive to include all relevant details in that e-mail. At the time he wrote this e-mail, he had read three of the CIA cables indicating that Mihdhar had a U.S. visa, as well as the draft CIR. Yet, James' e-mail contained no mention of Mihdhar's passport or visa.

We found only one piece of evidence suggesting that the FBI was made aware in January 2000 of Mihdhar's U.S. visa – the early January cable by the desk officer who we call Michelle which stated that Mihdhar's travel documents, including a multiple entry U.S. visa, had been copied and passed "to the FBI for further investigation." We could not, however, find any evidence to corroborate that this information actually had been passed to the FBI.

This cable did not state by whom or to whom the documents were passed or make any other reference to the passage of the documents. The cable was an internal cable, which means it would not have been forwarded to or accessible to the FBI. In addition, Michelle, the CIA desk officer who wrote the cable, had no recollection of who told her that the documents had been passed or how they had been passed. She said that she would not have been responsible for passing the information but instead would have been told by someone else that the documents had been passed.

We were unable to locate any witness who said they remembered anything about the documents being passed to the FBI, as Michelle's cable

asserted. Even if her cable was accurate, and she had been told by someone that the documents had been passed to the FBI, there is no evidence that such information was correct. The CIA and FBI witnesses we interviewed described this period as very hectic and said they were flooded with information. Several witnesses suggested that these hectic circumstances could have created an environment where unintentional misunderstandings might have occurred about whether information was actually passed to other Intelligence Community agencies.

We also searched ACS for any FBI record of the travel documents having been provided to the FBI, since this cable indicated that a physical copy of the documents, not merely information about the documents, was passed. We found no reference to the documents.

Aside from this cable, we found no other evidence that the information or documents about Mihdhar's passport or visa information was in fact provided to the FBI during this time period.

### c.    FBI detailees' handling of information on Mihdhar

As discussed above, five FBI employees were detailed to the CTC to work on Bin Laden matters during 2000 and 2001, and all had access at their desks to CIA internal cable traffic. Four of those employees – the supervisor who we call Eric, the IOS who we call Mary, and the agents who we call Dwight and Malcolm – were at the Bin Laden Unit in January 2000 when the Malaysia meetings occurred.[177] We considered how each handled the intelligence information concerning Mihdhar during this period.

After reading two of the cables indicating that Mihdhar had a U.S. visa, Dwight prepared a draft CIR to officially notify the FBI about that information, since the U.S. visa presented a nexus between Mihdhar and the United States. But the CIR was not provided to the FBI. However, we also examined whether any of the detailees took any other action to notify FBI Headquarters or, in Malcolm's case, the New York Field Office, about the information concerning Mihdhar.

---

[177] The fifth detailee – the manager who we call Craig – did not arrive at the CTC until July 2000.

The evidence shows that each FBI detailee reviewed some of the cables about Mihdhar's U.S. visa. Dwight accessed several of the cables that indicated Mihdhar had a U.S. visa, such as the cables stating that Mihdhar had transited through Dubai and had a U.S. visa, the cable stating that Mihdhar's visa application listed New York as his intended destination in May 1999, and the cable stating that based on a review of Mihdhar's visa, it did not appear that he had actually traveled to the United States.

Malcolm also accessed the cable stating that Mihdhar's visa application listed New York as his intended destination in May 1999, and the cable stating that it did not appear that Mihdhar had actually traveled to the United States. Malcolm also accessed the two cables stating that Mihdhar had arrived in Kuala Lumpur and that surveillance photos showed him meeting with others in Malaysia. Malcolm also accessed Dwight's draft CIR indicating passage of the visa information to the FBI, including the New York Field Office.

Mary accessed the January cable stating that Mihdhar's travel documents, including a multiple-entry U.S. visa, had been passed to the FBI, but she did not access the previous cables reflecting the visa information or Dwight's CIR. She also accessed the two cables stating that Mihdhar had arrived in Kuala Lumpur and that surveillance photos showed him meeting with others in Malaysia.

Eric did not access these cables, but he accessed Dwight's draft CIR which detailed Mihdhar's visa information and which summarized the NSA information.

However, Dwight, Malcolm, Mary, and Eric all told the OIG that they did not recall anyone from the CIA bringing to their attention the fact that Mihdhar had a U.S. visa. In addition, despite the records of their access to the cable traffic or the CIR, they all told the OIG that they did not recall discovering at the time – such as by reading a cable – that Mihdhar had a U.S. visa.[178] As discussed above, Dwight told the OIG that he did not even recall

---

[178] The detailees also told the OIG that they did not necessarily read all of the cables they accessed. They explained that they often skimmed cables to determine if any action was required on their part or to find specific information in connection with a particular assignment or issue.

writing the CIR or even being aware of the Malaysia meetings or of the fact that Mihdhar had a U.S. visa. Eric told the OIG that his CIA counterpart – John, the CIA Bin Laden Unit Deputy Chief – mentioned the Malaysia meetings and that surveillance photos had been taken, but Eric did not recall ever hearing anything about Mihdhar having a U.S. visa. Mary told the OIG that she did not recall even being contemporaneously aware of the Malaysia meetings.[179] Mary explained that she did not have reason to be made aware of the Malaysia meetings at the time because the matter had been assigned to another CIA desk officer – Michelle (the one who wrote the cable indicating that Mihdhar's travel documents had been passed to the FBI).

Malcolm said he was not aware of the fact that Mihdhar had a U.S. visa until after September 11. He stated that he recalled being shown the Kuala Lumpur photos, but he could not remember whether that was before or after September 11. He said that it was not until he was shown the Kuala Lumpur photos that he became aware of the Malaysia meetings.

Yet, the evidence shows that all had accessed contemporaneously cables indicating that Mihdhar had a U.S. visa, which was important intelligence information that was never provided to FBI Headquarters. They did not violate any specific policy or procedure in their handling of the information, and they did not have the authority to unilaterally pass CTC information to the FBI without permission. This restriction included any informal passage of the information, such as by telephone call or in-person discussions. However, none of them, particularly Dwight, ensured that the information was provided to the FBI. Dwight drafted a CIR that would have provided the FBI with the important information about Mihdhar, but the CIR was not released by the CIA. Although Dwight followed up a few days later to ask whether the cable was going to be sent or whether he should remake it in some other way, there is no record of a response to his request, and no one could explain why the cable was not sent. We believe it was critical that the information be sent. We found no indication that this ever happened.

---

[179] When we showed Mary copies of an e-mail written by the CTC officer who had briefed SSA Bob and Ted, which indicated that she was copied on the e-mail, she said that she did not recall having read the e-mail.

This failure to send the information to the FBI, in our view, was also attributable to problems in how the detailees were instructed and supervised, and that these problems significantly impeded the flow of information between the CIA and the FBI. We discuss these systemic problems in detail in our analysis section later in this chapter.

### d.    OIG conclusion

In sum, the evidence shows that in January and March 2000, the CIA uncovered important intelligence information about Mihdhar and Hazmi:



- They traveled to Bangkok with a third person;
- Mihdhar had a valid, multiple-entry U.S. visa; and
- Hazmi had traveled to Los Angeles in January 2000.

Yet, we found that the CIA did not share significant pieces of this information with the FBI – that Mihdhar had a U.S. visa and that Hazmi had traveled to Los Angeles. An FBI detailee at the CIA drafted a CIR to share this information with the FBI, but that information was not released by the CIA to the FBI. We were unable to determine why this did not occur. No one we interviewed said they remembered the CIR or why it was not sent to the FBI. We consider it a significant failure for this CIR not to be sent to the FBI.

In addition, the evidence shows that the limited information that was provided to FBI Headquarters – that Mihdhar traveled ████████ ████ ████████████████████ was never documented by the FBI in any system that was retrievable or searchable, thus limiting the usefulness of the information that was shared. The FBI's only official record of having received this information was in the hard copies of the January 5 threat update, which was attached to the January 6 executive briefing, and Ted's e-mail summarizing information from his discussion with the CIA employee. We discuss this and other systemic problems in our analysis section below.

### B.  Hazmi and Mihdhar in San Diego

#### 1.  Introduction

The second set of events that may have led the FBI to discover Mihdhar and Hazmi's presence in the United States related to their stay in San Diego. As noted above, on January 15, 2000, Mihdhar and Hazmi boarded a flight in Bangkok, Thailand, for Los Angeles. They were admitted to the United States on non-immigrant visitor visas and authorized to remain in the U.S. until July 14, 2000. Shortly after arriving in Los Angeles, they traveled to San Diego, California, where they were aided in finding a place to stay by Omar al-Bayoumi. Bayoumi had been the subject of an FBI preliminary intelligence investigation that had been closed.

In late May 2000, Hazmi and Mihdhar rented a room in the residence of an FBI asset.[180] Mihdhar remained in San Diego until June 10, 2000, when he left the United States.[181] Hazmi remained in the San Diego area until approximately December 2000, when he moved to the Phoenix, Arizona area. In Phoenix, Hazmi lived for approximately three months with another September 11 hijacker, Hani Hanjour. In April 2001, Hazmi and Hanjour moved to New Jersey and remained on the East Coast until September 11.

While residing in San Diego in 2000, Mihdhar and Hazmi did not act in an unusual manner that would draw attention, but they did not attempt to hide their identities. Using the same names contained in their travel documents and known to at least some in the Intelligence Community, they rented an apartment, obtained driver's licenses from the state of California Department of Motor Vehicles, opened bank accounts and received bank credit cards, purchased a used vehicle and automotive insurance, took flying lessons at a local flying school, and obtained local phone service that included Hazmi's listing in the local telephone directory.

---

[180] This kind of individual is often referred to as an "informant" - the common vernacular for an individual providing information to an investigative agency. Within the FBI's foreign intelligence program, they are known as assets.

[181] Mihdhar departed from Los Angeles on Lufthansa Airlines.

Although Hazmi and Mihdhar were in San Diego for a significant period of time, the FBI did not learn of their presence there until after September 11, 2001. After September 11, much would be learned about Hazmi and Mihdhar's time in San Diego and the Intelligence Community's missed opportunities to find and investigate them before the terrorist attacks in which they participated. In this section, we describe the facts surrounding Hazmi and Mihdhar's residence in San Diego, including their associations with two persons known to the FBI.

### 2.    Hazmi and Mihdhar's association with Bayoumi

Omar al-Bayoumi is a Saudi Arabian national who came to the United States in 1993. In early 2000 he had been living with his wife and four children in San Diego for at least four years. Although he described himself to others in San Diego as a graduate student in business administration, he took classes intermittently and was not enrolled in a program of study. He did not work in the United States and received a monthly stipend of $4,000 plus "other allowances," ranging from $465 to $3,800 each month, from Dallah/Avco, a Saudi contractor to the Presidency of Civil Aviation.[182] Bayoumi was active in the San Diego Muslim community and was involved in the establishment of several mosques in the United States.

In September 1998, the FBI's San Diego Field Office opened a preliminary inquiry on Bayoumi based on allegations raised by the manager in the apartment complex where he was living at the time. The manager alleged that Bayoumi had received a suspicious package from the Middle East, and the maintenance worker for the apartment complex had noted strange wires in Bayoumi's bathroom. In addition, the manager reported frequent gatherings of young Middle Eastern males at Bayoumi's apartment on weekend nights.

The FBI case agent conducted a limited investigation of Bayoumi, but the preliminary inquiry was closed in June 1999 and was not converted to a full

---

[182] Bayoumi was employed by the Saudi Presidency of Civil Aviation from 1975 until 1995 and became a contractor for the organization beginning in 1995.

field investigation.[183]   As a result, the FBI was no longer investigating Bayoumi at the time that Hazmi and Mihdhar met Bayoumi in February 2000.   However, the following paragraphs describe what was later learned about Bayoumi's interactions with Hazmi and Mihdhar.

On February 1, 2000, Bayoumi traveled by car from San Diego to Los Angeles, to resolve a visa issue at the Saudi consulate.   Bayoumi invited an associate, Isamu Dyson, to accompany him.[184]   Dyson provided the following account to the FBI of the trip with Bayoumi.[185]

Dyson said that at the time of the invitation, Bayoumi mentioned a Los Angeles restaurant serving halal food where they could eat lunch after Bayoumi's meeting at the consulate.[186]   After Bayoumi spent approximately one hour at the Saudi consulate, he and Dyson went to the restaurant but discovered it had been converted to a butcher shop.   The butcher shop employees recommended another nearby halal restaurant, the "Mediterranean Gourmet."   Bayoumi and Dyson walked to that restaurant.   While they were eating there, Hazmi and Mihdhar entered the restaurant and the four talked in Arabic.   Although Dyson had limited Arabic language skills, he said that Bayoumi kept him apprised of the content of the conversation.   Hazmi and Mihdhar told Bayoumi that they were in the United States to study English, but they did not like living in Los Angeles.   Bayoumi invited the men to visit San Diego and offered to assist them.   Bayoumi provided the men with his phone number.   Bayoumi and Dyson left the restaurant, and after stopping at a nearby mosque for sunset prayers, returned to San Diego.   Dyson asserted that the encounter with Hazmi and Mihdhar seemed to be a coincidental meeting.

Within several days of the meeting, Hazmi and Mihdhar accepted Bayoumi's invitation and traveled to San Diego.   In San Diego, Bayoumi

---

[183] In Section IV B 1 of this chapter, we examine the investigative steps taken by the FBI in this preliminary inquiry and assess the appropriateness of the decision to close the inquiry.

[184] Dyson is an American Caucasian who converted to Islam.   He has since changed his name to Caysan Bin Don.

[185] Dyson provided the information to the FBI in an interview after September 11.

[186] Halal is an Arabic word meaning "lawful" or "permitted."

arranged for Hazmi and Mihdhar to rent an apartment on Mount Ada road in the same apartment complex where Bayoumi lived. Bayoumi also co-signed their lease. Shortly after Hazmi and Mihdhar moved into the apartment, Bayoumi hosted a party to introduce them to the local Muslim community.

Within a few weeks of moving into the apartment, Hazmi and Mihdhar filed a 30-day notice to vacate the apartment, apparently to move to another apartment. However, they later rescinded the vacate notice and continued to lease the apartment until June 2, 2000.[187]

The apartment manager told the FBI that Bayoumi paid Hazmi and Mihdhar's first month's rent and security deposit because they had not yet established a local bank account and the apartment complex would not accept cash. A review of Bayoumi and Mihdhar's financial records after September 11, 2001, indicate that Bayoumi was reimbursed for this expense on the same day it was paid.[188]

### 3. Hazmi and Mihdhar's communications

On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's Mount Ada apartment to a suspected terrorist facility in the Middle East linked to al Qaeda activities. (See section III, A, 2 above.) A record of the call was captured in the toll records. After the September 11 attacks, the call was identified through a record check.

---

[187] Bayoumi left the United States for some of the time Hazmi and Mihdhar lived in the apartment. INS records do not indicate when Bayoumi left the country, but the records indicate that he obtained a United States visa in Jeddah on May 10, 2000, and returned to the United States on May 31, 2000. Bayoumi left the United States permanently in July 2001 and was living in England on September 11, 2001.

[188] Bayoumi's bank records show a cash deposit in the exact amount of the rent and security deposit ($1,558). Mihdhar's financial records also indicate that he opened an account with a deposit of $9,900 in cash within seven minutes of Bayoumi's cash deposit, which suggests that they were in the bank together.

### 4.    Hazmi and Mihdhar's association with an FBI asset beginning in May 2000

Sometime in May 2000, Hazmi and Mihdhar moved out of the apartment Bayoumi had found for them on Mount Ada Road and moved as boarders into the home of an asset of the FBI's San Diego Field Office.[189] Hazmi and Mihdhar met the asset at the mosque they attended.[190] Mihdhar stayed at the asset's residence until June 10, 2000, when he left the United States. Hazmi resided in the asset's house until December 10, 2000, when he moved to Arizona.

#### a.    Background on the FBI asset

In 1994, the asset was recruited by San Diego FBI Special Agent who we call "Stan." The FBI had interviewed the asset in connection with a bombing investigation several years before. Stan remained the asset's handling agent – or "control agent" – until Stan retired in February 2002.[191]

The asset was opened as an asset on May 14, 1994.[192] He worked as an informational source, providing to the FBI information acquired in his normal daily routine. He normally was questioned about specific individuals who were under investigation by the FBI, although he occasionally volunteered information that he thought might be relevant. According to Stan, during some

---

[189] The OIG was not able to interview the asset. The Joint Intelligence Committee Inquiry had attempted to interview the asset without success. The Committee then submitted interrogatories that the asset declined to answer, asserting his Fifth Amendment privilege. The asset indicated through his attorney that if subpoenaed by the Committee, he would not testify without a grant of immunity.

[190] There is some dispute about whether Hazmi and Mihdhar actually responded to an advertisement for boarders posted by the asset or whether they were introduced to the asset. The OIG did not have access to the witnesses who could address this issue.

[191] Stan was interviewed twice by the JICI staff, and he testified before the Joint Intelligence Committee. After his retirement from the FBI, Stan declined repeated requests for an OIG interview. The OIG does not have authority to subpoena individuals and cannot compel former Department of Justice employees to submit to an interview.

[192] Initially the asset was not paid. In July 2003, the asset was given a $100,000 payment and closed as an asset.

periods, he would talk to the asset several times per day, but there were periods in which he did not talk to him for several weeks or months. Stan said that many of their conversations were about family matters, the informational asset's health, and other non-substantive issues.

In 1996, the asset began renting out rooms in his home. Prior to September 11, 2001, he had 14 different boarders in his house, including Hazmi and Mihdhar. When Hazmi and Mihdhar rented rooms from the asset in 2000, two other persons also were renting rooms there.

### b.    Information from asset on Hazmi and Mihdhar

It is not clear what information the asset provided to the FBI about Hazmi and Mihdhar before the September 11 attacks.

After the September 11 attacks, the FBI interviewed the asset and asked about the conduct and activities of Hazmi and Mihdhar while they were living with the asset. In those interviews, the asset described them as quiet tenants who paid their rent. He said they were good Muslims who regularly prayed at the mosque.    The asset said that Hazmi and Mihdhar often would go outside when using their cellular telephones. The asset insisted that he noted no indicators of nefarious activity by Hazmi or Mihdhar that should have resulted in his reporting their identities to the FBI.[193]

The asset was asked what information he provided to Stan about Hazmi and Mihdhar before September 11. In these interviews, the asset provided conflicting accounts regarding the information on Hazmi and Mihdhar that he had disclosed to Stan. The agent who interviewed the asset - this agent had taken over as the asset's control agent after Stan's retirement from the FBI - told us that the asset said he told Stan about his boarders in general terms, although he had not fully identified Hazmi and Mihdhar. The control agent said that the asset later said that he had not told Stan about the boarders at all.

---

[193] The FBI opened an investigation after September 11 to determine whether the asset was involved in the attack. The asset has consistently maintained after September 11 that he had no suspicions about Hazmi and Mihdhar. The results of a polygraph examination on his potential role were inconclusive. Based on its investigation, however, the San Diego FBI concluded that the informational asset had not been complicit in plotting the attacks.

Although Stan declined to be interviewed by the OIG, after September 11, his FBI supervisors had interviewed him about the asset. Stan also had discussed the asset with co-workers and was interviewed by, and subsequently testified in, a closed session before the Joint Intelligence Committee.[194] Stan reported that the asset had told him contemporaneously that two Saudi national visitors were residing in a room at his residence. Stan said that the asset merely provided the first names of the boarders, Nawaf and Khalid. Stan contended that he had asked the asset for the boarders' last names but never received them and did not follow up. He said that the asset told him that his boarders were in the U.S. on valid visitors' visas, and they planned to visit and to study while they were in the country. In addition, Stan said that the asset told him that he believed that the two boarders were good Muslims because of the amount of time that they spent at the mosque. Stan stated that he did not recall the asset ever telling him that either of the boarders had moved out. According to Stan, the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny. Stan reported that he never obtained Hazmi and Mihdhar's full identities from the asset and that he did not conduct any investigation of them.

### 5.    OIG conclusion

In sum, the FBI did not obtain information about Mihdhar's and Hazmi's time in San Diego, either as a result of the Bayoumi preliminary inquiry or from the asset. In the analysis section of this chapter, we evaluate Stan's actions with regard to Hazmi and Mihdhar and whether he should have pursued additional information about who was living with one of his assets.

### C.    Mihdhar's association with Khallad, the purported mastermind of the Cole attack

The third potential opportunity for the FBI to acquire information about Hazmi and Mihdhar occurred in January 2001 . However, the FBI has

---

[194] The OIG was permitted to review the transcripts of Stan's testimony before the Joint Intelligence Committee's Inquiry.

asserted that it did not learn of the source's identification of the al Qaeda operative at the Malaysia meetings until much later in 2001, just before the September 11 attacks. This section of the report describes the events surrounding this third opportunity for the FBI to focus on Hazmi and Mihdhar.

### 1. Background

In 2000, the CIA and the FBI began debriefing a source who provided significant information on operatives and operations related to Usama Bin Laden. The source gave the CIA and the FBI information about an al Qaeda operative known as "Khallad" and described him as being involved with the East African embassy bombings in August 1998. Shortly after the *U.S.S. Cole* was attacked in October 2000, the CIA and the FBI received a photograph and information that a man named "Khallad" was the purported mastermind behind the attack on the Cole. In December 2000, the CIA and the FBI showed the source the photograph of Khallad, and the source identified the person in the photograph as the same Khallad he had described as involved with the East African bombings. As part of the Cole investigation, the FBI sought to find Khallad.

In January 2001, the source was shown photographs from the Malaysia meetings in an effort to determine whether Khallad was in the photographs.



[195]



As a result, they said, they may have uncovered earlier the CIA's

---

[195] Information developed after September 11, 2001, revealed this was a misidentification, and the person identified as Khallad was actually Hazmi. We discuss this misidentification in detail below.

information about Mihdhar and Hazmi and found them in the United States well before the summer of 2001.



For example, on September 26, 2002, Cofer Black, who served as Director of the CIA's CTC from 1999 until May 2002, testified before the Joint Intelligence Committee:

> FBI agents and analysts had full access to information [the CIA] acquired about the Cole attack. For example, we ran a joint operation with the FBI to determine if a Cole suspect was in a ██████████ surveillance photo. I want to repeat – it was a joint operation. The FBI had access to that information from the beginning. More specifically, our records establish that the Special Agents from the FBI's New York Field Office who were investigating the USS Cole attack reviewed the information about the ████████ photo in late January 2001.

We therefore examine in detail the evidence relating to whether the FBI was aware of the identification of Khallad in the photographs of the Malaysia meetings.

### 2. Source's identification of Khallad

#### a. The source

In mid-2000, Drug Enforcement Administration (DEA) personnel arranged for FBI Legal Attaché (Legat) Office personnel overseas to meet a source who had substantial information on Bin Laden and his operatives and operations. This particular FBI Legat office was staffed by the Legal Attaché (the "Legat") and the Assistant Legal Attaché (the ALAT), who were FBI Special Agents.[196]

---

[196] The primary mission of FBI Legat Offices is to establish liaison with foreign law enforcement agencies to support the FBI's investigative activities overseas. While Legat staff may become involved in specific investigations, they have no law enforcement authority in foreign countries. For a description of the role and responsibilities of FBI (continued)

Because of the FBI Legat personnel's inability to converse in any of the source's languages, limits on the FBI's authority to conduct unilateral intelligence activities overseas, and the source's potential value as a source of intelligence information relevant to the CIA, the FBI contacted the CIA for assistance with the source. The source was subsequently handled as a joint FBI/CIA source. Even though the FBI ALAT – who we call "Max" – was unable to directly communicate with the source due to the lack of a common language, he was designated as the FBI control agent for the source.

Because the source had significant information about Bin Laden and his operatives and operations, the FBI New York Field Office – the office that was leading the investigations on the East African embassy bombings, the Cole attack, and other Bin Laden-related investigations – also became involved with the source. This joint handling of the source created concerns within the CIA. The CIA's most significant concern was the FBI's desire to use the source for the criminal investigations involving Bin Laden conducted by the FBI's New York Field Office. The CIA believed that the source should not face possible exposure in criminal proceedings.

CIA Headquarters was asked to work with FBI Headquarters to convert the source to purely an intelligence role, solely under CIA control. According to CIA documents, the CIA and the Legat had discussed the FBI's "wall" whereby separate but concurrent intelligence and criminal investigations were conducted within the FBI, but the CIA expressed concerns about the CIA's ability to continue clandestine handling of the source if the FBI was involved. Although the CIA acknowledged that the source had value to the FBI's criminal case, the CIA argued that the source's potential as an intelligence asset was more important then his potential assistance in the criminal case. Despite the CIA's concerns, the source remained a joint FBI/CIA asset.

### b.   Debriefings of the source

Beginning in 2000, the CIA and FBI began to debrief the source on a regular basis. Over the course of several months, the source frequently was

---

(continued)

Legats, see the OIG report entitled, "Federal Bureau of Investigation Legal Attaché Program" (March 2004).

shown photographs and asked to identify people in them. Although Max was the source's designated control agent, a CIA officer who spoke one of the source's languages conducted the debriefings. Max was present for some of these debriefings, but not all. Some of the debriefings were unilateral CIA interviews. The time spent with the source was kept short because of issues of travel and security.

According to Max, during the debriefings the CIA officer usually did not immediately translate the source's statements for the benefit of Max. He said that the CIA case officer would only immediately translate something when Max had specific questions for the CIA officer to ask the source. The CIA case officer told the OIG he recalled translating for Max things that the source said, but he did this only when he recognized the significance of the information to Max or an FBI operation.

In an effort not to duplicate the reporting of information received from the source, the CIA and the FBI agreed that the CIA would be responsible for reporting the information from the debriefings. However, in instances where the source was solely being shown FBI photographs or questioned based on an FBI lead, Max would document the source's information, either in an EC or an FBI FD-302 form, and the CIA would not document the same information.

After the debriefings, the CIA officer would write internal cables covering the debriefings and forward them to the CTC and other appropriate offices. These cables were internal CIA communications and were not provided to or shared with Max or other FBI personnel.[197] Instead, Max and FBI Headquarters would be informed of the debriefings when the information was reported by the CIA in a TD. As previously discussed, TDs were prepared by CIA reports officers who reviewed the internal cables and determined what information needed to be disseminated and to which agencies. Based on our review of internal cables reporting the source's debriefings and the TD reporting of the same interviews, it is clear the TDs often contained only a part of the information obtained during the source debriefings. As a result, either

---

[197] As discussed above, FBI detailees to the CTC had access to these CIA cables, but the review and dissemination of source information to the FBI was not considered their responsibility.

258

through direct knowledge or through the TDs, Max had access to only some of the information obtained from the source during the debriefings.

In addition to the debriefings of the source by the CIA case officer, FBI agents from the New York Field Office working Bin Laden-related criminal investigations also interviewed the source with the CIA case officer present. Max occasionally was present for these interviews. After each of these interviews, the New York agents documented the source's information in detail in an FD-302 that was entered into ACS and retrievable by all FBI personnel working on the Bin Laden cases.[198] These FD-302s were routinely shared with CIA personnel in the field and at the CTC.

### c.   Source identifies Khallad from Yemeni-provided photograph

Over a 3-month period in 2000, FBI New York Field Office personnel interviewed the source overseas four times. During one of these interviews, the source described an individual known as "Khallad" as a trusted senior Bin Laden operative with potential connections to the East African embassy bombings.

As noted above, on October 12, 2000, two terrorists in a boat laden with explosives committed a suicide attack on the *U.S.S. Cole*, a U.S. naval destroyer, during its brief refueling stop in the port in Aden, Yemen. The FBI's investigation into the attack was led by the FBI's New York Field Office.

After the attack on October 12, the Yemenis provided the FBI and the CIA with information on the Bin Laden operative known as "Khallad." According to this information, Khallad had been described as the purported mastermind of the Cole attack. U.S. intelligence agencies had already

---

[198] When a witness is interviewed as part of a criminal investigation, the FBI prepares an FD-302 to document what was said in the interview. When information is being obtained as part of an intelligence investigation, the FBI documents the information in an EC. There was often a significant lag time between the interview and the completion of the documentation due to a variety of factors, including the intensity of investigative activity, the agents' extensive travel, and the required review of the documentation by FBI supervisors before dissemination.

connected Khallad to the East African embassy bombings. The Yemenis also identified "Khallad" as Tawfiq Muhammad Salih Bin Rashid al Atash. On November 22, 2000, the Yeminis provided the FBI with a photograph of Khallad ("the Yemeni-provided photograph"). Around this same time, the Yemenis provided the FBI with several photographs of other Cole suspects.

The New York FBI agents investigating the Cole bombing wanted to determine whether the Khallad identified by the Yemenis was the same Khallad who had been previously described by the source. At the same time, a CIA internal cable to was sent to several CIA offices suggesting that the photographs of the Cole suspects that the FBI had obtained from the Yemenis, including the Khallad photograph, be shown to the source. Because the FBI did not have the technological capability to easily transmit the Khallad photograph from Yemen to the ALAT who was handling the source and who we call Max, the photograph was forwarded through CIA channels to the nearby CIA office in order to show the photograph to the source.[199]

CIA documents show that on December 16, 2000, the CIA officer conducted a debriefing of the source. Max was present for the debriefing.[200] During the debriefing, the CIA case officer showed the source many photos of Cole bombing suspects and other suspected Arab terrorists, including the Yemeni-provided photograph of Khallad. The source immediately identified the individual in the Yemeni-provided photograph as the same Khallad he had previously described as a trusted senior Bin Laden operative with potential connections to the East African embassy bombings.

The CIA officer prepared a cable documenting the debriefing, which was addressed to several CIA offices. The CIA officer wrote in the cable that the source was shown the many photographs and "quickly" identified Khallad in

---

[199] Max told the OIG that at the time he and the CIA case officer believed that this photograph had come from the FBI's New York Field Office. Max added that it was not uncommon for him not to know the source of photographs that were shown to the source and that the source was shown hundreds of photographs.

[200] Although FBI agents from New York had traveled overseas several times in 2000 to interview the source, in December 2000 the agents with the appropriate language abilities were tied up in Yemen after the Cole attack and were unable to travel to debrief the source. Therefore, the FBI relied on the CIA to conduct this debriefing.

the Yemeni-provided photograph. Notably, the CIA cable stated that the CIA officer had the source repeat the identification specifically for the benefit of Max. In addition, the cable stated that before the debriefing ended, the CIA officer again showed the photographs to the source and asked the source to verify the Khallad identification.

Max acknowledged to the OIG that he was contemporaneously aware of the identification of Khallad in the Yemeni-provided photograph by the source on December 16. Max stated that he recalled specific circumstances of the debriefing and recounted them to us. Max told us that he recalled the source immediately identifying Khallad in the photograph.

####   d.   CIA suspects that Khallad may be Mihdhar in Kuala Lumpur surveillance photographs

Around this same time, CIA personnel were beginning to connect Khallad with Mihdhar ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In a December 2000 cable, CIA personnel overseas asked for copies of the January 2000 Kuala Lumpur surveillance photographs of Mihdhar. The cable noted that further connections had been made between Mihdhar and Al Qaeda. As a result of these further connections, the CIA believed there might be a connection between Mihdhar and the Cole perpetrators.

The CIA office reported in the December 2000 cable that the it had learned that Fahd al Quso, who was in Yemeni custody for his participation in the Cole attack, had received $7,000 from someone named Ibrahim, which Quso had taken to Bangkok, Thailand, on January 6, 2000, to deliver to "Khallad," a friend of Ibrahim's. It was noted in the cable that because Mihdhar had departed Kuala Lumpur around that same time to travel to Bangkok, the CIA suspected that the "Khallad" mentioned by Quso could actually be Khalid al Mihdhar or one of his associates.[201] It was noted further that this information had "added significance" because Khallad had been

------

[201] As previously discussed, the CIA had reported previously in an internal March 2000 cable that Mihdhar, Hazmi, and another individual had left Malaysia on January 8, 2000, and traveled together to Bangkok.

identified as a "key operative likely serving as an intermediary between Usama Bin Laden and the [Cole] perpetrators."

In another December 2000, cable the CTC concurred with the overseas CIA office's theory and forwarded a Kuala Lumpur surveillance photo of Mihdhar to the CIA case officer to show to the source. According to the cable, the purpose was "to confirm/rule out this particular Khalid [Mihdhar] as a match for [Khallad]."[202] The next day, the CIA officer received permission to show the Kuala Lumpur surveillance photographs to the source.

Max told the OIG, however, that he was not aware of the CIA cables or the theory that Khallad was actually Mihdhar. We found no other evidence that Max knew about the information that Mihdhar was at the Malaysia meetings, or the CIA's theory that Khallad was actually Mihdhar.[203]

### e.    Source identifies Khallad from Kuala Lumpur photograph

The CIA case officer debriefed the source again in early January 2001. At some point, the CIA case officer showed the source photographs, including two of the surveillance photographs taken during the January 2000 Malaysia meetings. One of the photographs from the Malaysia meetings, which we call

---

[202] The CIA cable referred to its forwarding of only one Kuala Lumpur surveillance photograph, although subsequent cables showed that the receiving office received two Kuala Lumpur photographs to show the source. It is unclear why the sending office sent only two of the photographs instead of all three of the Kuala Lumpur photographs it had.

[203] In fact, CIA cables suggest this information was not shared with the FBI. We saw several CIA cables during this time that discussed working with the FBI in relation to the FBI's investigation of the Cole attack. For example, we saw a December 2000 cable stating that the FBI had provided an update on its investigation of the location associated with telephone numbers the CIA had provided to the FBI in connection with an investigation, and the office that drafted the cable asked to be advised of whether the two offices to whom the cable was addressed were aware of additional information that could assist the FBI. However, we saw another December 2000 cable, which discusses Khallad and other information not related to Khallad, which specifically instructed two CIA offices to share with the FBI the other information in the cable that was not related to Khallad, but it did not instruct the offices to share the information regarding the possible connection of the Malaysia meetings and Khallad.

"Photo No. 1" included an unknown subject.  According to a January 2001, cable written by the CIA case officer, the source was asked if he was sure, and he replied that he was "ninety percent" certain.[204]

The second photograph from the Malaysia meetings, which we call "Photo No. 2," contained a picture of the person the CIA knew to be Mihdhar. The source could not identify the person in the photograph.[205]

 First, the source previously provided information that Khallad was a Bin Laden operative who was connected to the Cole attack and the East African embassy bombings.



Thus, the source's identification of Khallad at the Malaysia meetings raised the question whether Mihdhar and Hazmi also were linked to the Cole attack.

We tried to determine if the FBI's ALAT learned of the source's identification of Khallad in the photograph. Max told the OIG that he did not specifically recall the early January 2001 debriefing of the source.

The CIA case officer told the OIG that he had no independent recollection of any particular meeting with the source, including the meeting in early January 2001.

---

[204] As noted above, information developed after September 11, 2001, revealed this was a misidentification, and the person identified as Khallad was actually Hazmi.

[205] This failure to identify Khallad in the photograph known to be of Mihdhar should have ended the theory that Mihdhar and Khallad were the same person.

### f.    Documentation regarding the source's identification of Khallad in the early January 2001 debriefing

#### (1)   CIA cables

To examine whether the FBI learned of the source's identification of ███████████████████████, we reviewed the CIA documentation concerning the meeting with the source in early January 2001. In an internal cable written the day after the debriefing, the CIA case officer reported that the source had identified ████████████████████ ████████ with a "ninety percent" certainty. However, unlike in the December 2000 CIA cable, which stated that the CIA officer had the source repeat the identification of Khallad in the Yemeni-provided photograph to Max, the January 2001 cable did not suggest the identification was repeated for Max or was brought to the attention of Max. The January 2001 cable did not provide any other details about the debriefing, such as where the meeting took place, when exactly during the debriefing the photographs were shown to the source, who was present when the photographs were shown to the source, or what other topics were discussed with the source.

We also reviewed a detailed January 2001 CIA TD to the Intelligence Community regarding the early January 2001 debriefing. The TD reported specifics about what the source discussed and that he had provided a stack of documents to his CIA and FBI handlers. The TD made no mention of any photographs being shown to the source ███████████████████.[206]

A few days later, the CIA case officer wrote another cable describing the logistics of the early January 2001 meeting with the source. In addition, the cable summarized what was discussed during the meeting. This cable also did not mention the photographs being shown to or discussed with the source, but the CIA case officer told the OIG that these kinds of cables were not always comprehensive with respect to the information obtained from the source.

---

[206]  Although no witness can recall the details of this particular debriefing, it is possible that Max, who lacked the appropriate language skills for a debriefing, either photocopied or hand wrote the information from the documents thus explaining his absence at the time that the photographs were shown to the source.

### (2)  FBI documents

We also reviewed FBI documents from this period relating to the source. On January 9, 2001, a New York FBI agent who was the FBI's lead case agent on the Cole investigation sent Max an e-mail stating that he and his co-case agent wanted to meet with the source to talk about some of the Cole suspects, including Khallad.   The New York agent wrote that he was "specially [sic] interested in all [the source] knows about Khallad and his associates." The agent noted that the source previously had given the agents important information regarding Khallad and the Cole attack.

In a January 10 e-mail response, Max referred to the December 16 meeting with the source in which the source had been shown many photographs and had immediately identified the Yemeni-provided photograph as Khallad.  Max also mentioned the early January 2001 meeting, summarizing specific information provided by the source in the debriefing.  Max wrote that, due to the lack of technological capabilities in the Legat Office, he promised to make the CIA TD numbers relating to the source available to the case agent within a few days so the agent could read them before his trip to interview the source.  However, Max made no mention of any identification of photographs by the source in the early January 2001 debriefing.

Around the same time as this e-mail exchange, Max was criticized by the head of the FBI's UBL Unit at Headquarters for insufficient reporting regarding the source's information.  The UBL Unit chief wanted to know from Max what information the source was providing.  She also was concerned because Max was not producing any reports regarding the source.

In response, on January 16, 2001, Max wrote a 34-page EC summarizing the source's debriefings and other information obtained from the source since mid-2000, most of which was based on the information that had been disseminated in the TDs by the CIA.  Max explained in the EC that he merely was repeating what the CIA had previously reported in TDs, which had already been forwarded to FBI Headquarters.  He noted the agreement with the CIA that there would not be duplicative reporting on the source's information.  He explained the CIA was doing the primary reporting on the source debriefings Max noted that the interview was conducted in the foreign language, and he would read the CIA's report of the interview (the TD) once it was completed.

265

Max then listed all of the CIA's TDs that summarized what the source had said.

On page 29 of this January 16 EC, Max summarized the CIA's reporting of what had occurred at the December 16, 2000, meeting with the source. The EC stated the source was handed a stack of many photographs and immediately identified the top photograph as a photograph of Khallad, the person the source had previously implicated in the attack on the Cole. The EC stated, "At that time it was the clear impression of [the Legat] and [the CIA officer] that both FBIHQ CTD and NYO were receiving all of the reporting above from CIA liaison in the U.S., as soon as it was being filed."

In the next paragraph of the EC, Max summarized what the CIA had reported in the TD about the early January 2001 debriefing of the source. This summary is contained on pages 29 through 33 of the EC. Max reported at length about the source's information, and the EC provided a lengthy description of the documents provided by the source. ████████████████████████████████████████████████████████

Max discussed with the CIA case officer the complaint from FBI Headquarters about Max's reporting on the source. As a result, the CIA case officer provided Max with a report of the next debriefing of the source in late January 2001. The day after this debriefing, Max prepared a lengthy EC summarizing this debriefing. He noted in the EC that the report was based on the CIA's report of an interview conducted by a CIA officer and, although Max was present for the debriefing, he only became aware of what was said after the CIA officer provided the report.[207]

---

[207] Around the same time, the CIA officer sent a cable to CIA Headquarters that described the FBI's need for reporting directly through FBI channels, as opposed to CIA channels. The CIA office then asked permission to provide electronic copies of TDs to Max so that Max could send the same reporting through FBI channels.

266

### g. New York FBI agents' interview of source on February 1, 2001

Around the same time, Max was preparing for the arrival of the Cole case agent from the FBI's New York Field Office. The Cole case agent was traveling to interview the source about Khallad, along with another FBI agent who spoke one of the languages of the source and was going to assist in the preparation of the FD-302 for the criminal investigation. Max had received a January 17 e-mail from one of the Cole agents stating that the information being provided by the source was very important to the FBI's criminal investigation of the Cole attack and discussing the arrangements for the upcoming interview of the source by the Cole agents.

The New York Cole agents also asked Max to prepare an FD-302 documenting Max's personal knowledge of the source's identification of Khallad from the Yemeni-provided photograph on December 16. On January 24, 2001, Max sent an EC to the New York Field Office and FBI Headquarters with an attached FD-302 regarding the source's December 16, 2000, identification of Khallad.

On February 1, 2001, the New York Cole case agent and another agent who spoke one of the source's languages interviewed the source overseas.[208] The CIA case officer who had shown the Kuala Lumpur photographs to the source in early January was also present at the interview. During the interview, they showed the source the Yemeni-provided photograph of Khallad, which previously had been shown to the source by the CIA officer on December 16, 2000. The source again identified Khallad in the photograph.

As discussed above, the agents had received information indicating that Quso, who was in custody for his participation in the Cole attack, had traveled to Bangkok and met Khallad in January 2000. The New York agents were investigating the circumstances of that trip. The agents knew that Quso previously had claimed that he had intended to meet Khallad in Malaysia. The

---

[208] In anticipation of the Cole agents' interview of the source, the CIA case officer had sent a cable asking the Bin Laden Unit to touch base with FBI Headquarters regarding the case status and the planned trip of the New York FBI agents. The CIA case officer noted that the source was "currently of very high interest to our [FBI] colleagues."

agents were concerned about Quso's veracity and 

### 3. OIG conclusions regarding whether the FBI was aware of the source's identification of Khallad in the Kuala Lumpur photograph

 Neither Max nor the CIA case officer specifically recalled the early January debriefing, but the documentary evidence supports this conclusion. In numerous CIA and FBI documents discussing the source and the early January debriefing, other important information from the source is described, Given the importance of that identification and the other details reported in the

------



268

documents, we believe such information would have been included had the FBI been made aware of the identification.

For example, as described above, in the CIA case officer's cable reporting the December 16 debriefing of the source during which the source had identified Khallad in the Yemeni photograph, the CIA officer specifically noted that ALAT heard the identification and that the identification was repeated for the benefit of him. Max said he recalled this debriefing and the identification of Khallad being brought to his attention by the CIA case officer.

By contrast, in his cable reporting the early January source debriefing, the CIA case officer did not state that he brought to the attention of Max the identification of ████████████████████████. Likewise in his cable describing the logistics of the debriefing, the CIA case officer provided a description of what was discussed with the source and stated that Max was present for a significant portion of the meeting with the source, ████████ ████████████████████████████████████████████ ████████████████████████████████████████████

The documents prepared at the time by Max about the early January debriefing also suggest that Max was not aware of the identification of Khallad in the Kuala Lumpur photographs. For example, in response to the Cole case agent's January 9 e-mail specifically requesting "all [the source] knows about Khallad," Max did not include any information about the Khallad identification from the Kuala Lumpur photographs. This was shortly after the early January debriefing, and the case agent had specifically indicated his interest in any information about Khallad.

Max's January 16 EC to FBI Headquarters in which he described at length what the source had reported in the early January meeting also did not mention the identification of Khallad or that any ████████████████ were shown to the source. In addition, Max prepared an FD-302 to document the source's identification of Khallad from the Yemeni photograph to provide documentation for the criminal investigation. We believe that if Max had known of the source's identification of ████████████████████████, he likely would have prepared a similar FD-302 of that identification as well.

We also found that the New York Field Office agents who interviewed the source overseas in February 2001 were not made aware of the early January identification of Khallad. The agents insisted that they were completely

269



other than the Yemeni-provided photograph. In addition, we found no documentary evidence that the New York FBI agents were even aware ████ ██ ███ Because the agents were keenly interested in Khallad and had asked the source to confirm his identification of Khallad from the Yemeni photograph, we believe the agents would have noted, remembered, and acted upon any information regarding another Khallad identification. We also believe that had the FBI known about the identification of ████ ███ ██████████████████████████████████, which could have increased the FBI's chances of locating them before the September 11 attacks.

Due to the OIG's lack of complete access to CIA employees and documents, we were unable to fully examine why the CIA did not inform Max or the New York agents that the source had identified ██████████ ██████████████████████ We believe the FBI should have been made aware that the joint FBI/CIA source had provided such significant information about the person purported to be the mastermind behind the Cole attack. This failure demonstrated significant problems in communication between the FBI and the CIA. However, the FBI employees' inaccurate belief that CIA reporting in TDs was comprehensive contributed to the FBI's failure to obtain this critical piece of information. We discuss this and other systemic problems that this case revealed in the analysis section of this chapter.

**D.    FBI and CIA discussions about the Cole investigation in May and June 2001**

The fourth opportunity for the FBI to have acquired intelligence information about Hazmi and Mihdhar – including Mihdhar's possession of a U.S. visa, Hazmi's travel to the United States, and the source's identification of ████████████████████████████ – occurred in May and June 2001 when the CIA and FBI Headquarters discussed the status of their information concerning the Cole attack. Once again, these discussions could have caused the FBI and the CIA to focus on the other persons attending ████ ███████

███████████, and thereby led the FBI to search for Mihdhar and Hazmi earlier than it did.  But, as we describe below, the FBI did not obtain the critical information about the identification of ██████████████ ███████ despite several interactions in May and June 2001 between the FBI and the CIA about Khallad.

### 1.    Background

#### a.    The Cole investigation

As discussed above, the FBI's investigation on the Cole attack was led by the FBI's New York Field Office.[210]  One of the case agents investigating the Cole attack was an agent who we call "Scott," and who was assigned to the New York FBI's counterterrorism squad that handled only al Qaeda investigations (the "Bin Laden squad").[211]  After serving eight years in the U.S. Navy as a fighter pilot, in April 1996 Scott became a special agent in the FBI's New York Office.  In July 1996 he was assigned to the TWA Flight 800 investigation because of his experience as a military pilot.  Shortly after the East African embassy bombings in August 1998, he was transferred to the New York's Bin Laden squad to assist with the embassy bombings investigation, and then was assigned as one of the case agents on the investigation the Cole attack.

The New York FBI was assisted on the Cole investigation by several Intelligence Operations Specialists (IOS) assigned to the UBL Unit and the Radical Fundamentalist Unit (RFU) at FBI Headquarters.

One of the primary IOSs who worked on the Cole investigation was an IOS who we call "Donna."  She had joined the FBI in 1988 as a clerk while she completed her college education.  After graduating from college in 1995, she entered the FBI's language training program and became a Russian language

---

[210] Through their work on the 1993 attack on the World Trade Center and the subsequent discovery of the terrorist plot to attack New York landmarks, the New York FBI became the primary office for the investigation of al Qaeda, eventually leading to the indictment of Bin Laden in the Southern District of New York in November 1998.

[211] The other primary case agent on the Cole investigation was out of the country during the events discussed in this section of the report.