specialist working on foreign counterintelligence matters. In November 1997, she became an Intelligence Research Specialist (IRS), and a year later was assigned to assist the RFU on the East African embassy bombings investigation. In 2000 she was permanently assigned as an IOS in the UBL Unit and was assigned to work on the Cole investigation in October 2000.

With regard to Donna's work on the Cole investigation, she stated that she and the other UBL Unit IOSs conducted the investigation as directed by the New York Field Office, sent out requests for information to other law enforcement and intelligence agencies, obtained budget enhancements to support the investigation, and performed other duties in support of the investigation. She and the other UBL IOSs often traveled to New York where they met with the Cole agents and worked on the investigation.

### b.    The wall and the caveat on NSA information

The information relevant to this section of the report includes NSA information disseminated about Mihdhar in late 1999 and early 2000. As noted in Chapter Two, by the summer of 2001 NSA counterterrorism intelligence information could not be disseminated within the FBI without adhering to certain procedures and protocols. At this time, the FBI was required by the Department and the FISA Court to keep criminal investigations separate from intelligence investigations, a policy which was commonly referred to as "the wall." Information obtained from FISA intercepts and search warrants had to be screened by someone not involved in the criminal investigation and then "passed over the wall" from the intelligence investigation to the criminal investigation. The FISA Court became the screening mechanism for FISA information obtained from al Qaeda intelligence investigations that the FBI wanted to pass to criminal investigators.

As described in Chapter Two, in response to notification that there had been many errors in FISA applications approved by the FISA Court, the Court imposed additional restrictions before information could be shared. First, based on the FISA Court's concerns about the errors in the FISA applications, the FBI directed that only intelligence agents were permitted to review FISA intercepts and materials seized pursuant to a FISA warrant (called "FISA-obtained material") or any CIA and NSA intelligence provided to the FBI based on information obtained through FISA search or intercept (called "FISA-derived" material) without further Court approval. The Court required anyone

who reviewed the FISA-obtained or FISA-derived intelligence to sign a certification acknowledging that the Court's approval was required for dissemination to criminal investigators.

Because FISA-obtained information often was passed from the FBI to the NSA and the CIA, the question was raised to the FISA Court whether the FBI was required to obtain certifications from all NSA or CIA employees who reviewed the FISA-obtained material. The Court exempted the NSA and CIA from the certification but required that the two agencies note on any intelligence shared with the FBI if it was FISA-derived. This was referred to as "a caveat."

When made aware of this requirement, the NSA reported to the Department of Justice that for the NSA to determine in real-time which counterterrorism intelligence that it had acquired was FISA-derived would delay dissemination of the information. As a result, the NSA decided to indicate on all its counterterrorism intelligence provided to the FBI as being FISA-derived so that it could not be disseminated to criminal agents or prosecutors without approval from the NSA.[212] Therefore, when the FBI wanted to pass this NSA intelligence to criminal investigators, it had to contact the NSA General Counsel's Office to determine whether the information was in fact FISA-derived before it could be passed.[213]

## 2. Discussions in May 2001

In May 2001, the potential connection of ████████████ ████ was again discussed by CIA personnel. FBI personnel also discussed Khallad in reference to his nexus to the Cole attack. There were also

---

[212] According to the NSA, its average response time to FBI requests for approval to pass information to criminal investigators was one to five business days.

[213] The NSA information concerning Hazmi and Mihdhar was from late 1999 and early 2000, and contained the initial caveat stating that information could not be disseminated to law enforcement officials without approval from OIPR. By the time FBI Headquarters was dealing with this information in the summer of 2001, the new caveat was being placed on NSA reporting, and FBI Headquarters was operating under the understanding that the NSA General Counsel had to approve dissemination of NSA counterterrorism information to criminal investigators.

273

discussions between the CIA and FBI in reference to the ███ ██ █
█████████████ But, as described below, the identification of ████████
█████████ ██ ██ ██ ███ ████ ██ ████ ████ █████ ██ ██ ██, such as
Hazmi and Mihdhar, were not addressed during these May discussions between
the FBI and the CIA.

### a.   John's inquiries about Khallad

Between the early January 2001 debriefing of the source and May 2001,
the CIA's focus on whether Khallad, the suspected mastermind behind the Cole
attack, had attended ████████████████ appears to have subsided.  In May
2001, John, a former Deputy Chief of the Bin Laden Unit, who by that time
was detailed to ITOS in FBI Headquarters, had continuing concerns about ██
██████████████, especially whether they had any nexus to the Cole
attack.[214]  John also noted to the OIG that during this period there were
heightened concerns in the Intelligence Community about the threat of an
imminent terrorist attack in Southeast Asia.

CIA records show that on May 15, 2001, John accessed the March 2000
cable stating that Mihdhar, Hazmi, and another person had traveled to Bangkok
from Malaysia on January 8, 2000.  The cable also stated that Hazmi had left
Bangkok on January 15, 2000, flying from Bangkok to Hong Kong and then to
Los Angeles.

Around this same time in May, John began inquiring about the Malaysia
meetings with a CTC analyst, who we call "Peter," at CIA Headquarters.  John
said he knew that Peter had been "down in the weeds" and knew the "nuts and
bolts" of the Cole investigation because Peter had been assigned to prepare a
CTC report on who was responsible for the Cole attack.

Peter told the OIG that his area of expertise and focus since August 1999
was the Arabian Peninsula.  He said that because the Cole attack took place in
Yemen, he was assigned to develop an intelligence report on who was

---

[214] John told the OIG that in this detail to the FBI he acted as the CIA's chief
intelligence representative to ITOS Section Chief Michael Rolince.  John stated that he did
not have line authority over anyone at the FBI and that his primary role was to assist the FBI
in exploiting information for intelligence purposes.

responsible for the Cole attack.  He completed his report in January 2001, finding that UBL/al Qaeda was circumstantially tied to the attack.[215]  Peter stated that while working on the Cole report he regularly interacted with the IOSs in the FBI's UBL Unit.  By the spring 2001, he was no longer working directly on the Cole attack, and had moved on to potential threats in Saudi Arabia and Yemen.  However, Peter said he had a continued interest in the Cole information and continued to gather information on an ad hoc basis.

According to John, he and Peter discussed ███████████████, and Peter provided him with a copy of the timeline of events related to the Cole investigation that Peter had compiled as part of his work on the Cole attack.█ In addition, John said they discussed ████████████████████



███████ John and Peter were aware that Quso had stated that he was supposed to take money to a person named "Khallad" ████████ but had met him in Bangkok instead in January 2000.  John told the OIG that Peter had posited that perhaps ████████████████████



In an e-mail to Peter in mid-May 2001, John noted that Mihdhar had arranged his travel to Malaysia and was associated with ████████████████████████████████████████████.[217]  In addition, John wrote that he was interested because Mihdhar was traveling with two "companions" who had left Malaysia and gone to Bangkok, Los Angeles, and Hong Kong and "also were couriers of a sort."  John noted in the e-mail

---

[215] The report did not mention Mihdhar's visa, Hazmi's travel to the United States ███ ████████████████████████████████████████████████████████

[217] As previously discussed, after Quso was detained in Yemen, he acknowledged that he had received $7,000 from someone named Ibrahim, which Quso asserted he took to Bangkok, Thailand on January 6, 2000, to deliver to "Khallad," a friend of Ibrahim's.  Mihdhar had traveled to Bangkok on January 8.

that "something bad was definitely up." Peter replied in an e-mail dated May 18, "My head is spinning over this East Asia travel. Do you know if anyone in [the CIA's Bin Laden Unit] or FBI mapped this?"

### b.  Discussions among FBI and CIA employees

Around this same time, FBI IOS Donna and other FBI IOSs working on the Cole investigation were focusing on Quso's connection to Bangkok and his trip to deliver money to Khallad. The FBI, like the CIA, was aware that in January 2000 ███████████████████████████████████████ ████████ According to an FBI document drafted by Donna in May 2001, Quso had claimed that on January 6, 2000, he and Ibrahim Al-Nibras went to Bangkok first but were unable to travel on to Kuala Lumpur because of problems with their travel documents, and Khallad had traveled to Bangkok to meet them there instead. The FBI began researching telephone numbers that appeared to be connected to Quso's trip and requested that several Legat Offices contact local law enforcement authorities to obtain subscriber information.

Donna told the OIG that she and others were tracking the information related to the telephone numbers associated with Quso in an attempt to determine the truth of his statements. In addition, she said that she was focused on the identity and whereabouts of Khallad, since he was the purported mastermind of the Cole attack.

At some point before the end of May 2001, John discussed with Donna the East Asian travel of Quso. In response to Peter's May 18 e-mail that asked whether anyone had "mapped" the East Asia travel, John replied in an undated e-mail that "key travel still needs to be mapped" and stated "[Donna] sounds really interested in comparing notes in a small forum expert to expert so both sides can shake this thing and see what gaps are common."

In addition to reviewing the East Asia travel of several Bin Laden operatives in January 2000, ███████████████████████████████████ ██████████████████████ John obtained three of them. John told the OIG that he had not read the cable stating that the joint source had identified Khallad in the photographs, but he was aware that an identification of Khallad in the photographs had been made. At the end of his e-mail to Peter, John stated that he had obtained three surveillance photographs of Mihdhar in

Malaysia, but he did not see "Khallad" in any of the photographs,



In response to John's e-mail, Peter wrote in an e-mail dated May 24 that he had thought one of the ▮▮▮▮▮▮▮▮▮▮▮. Peter added that Donna and another FBI IOS in the UBL Unit, who we call "Kathy," were meeting with Peter on May 29 to discuss the Cole investigation.

On May 24, Donna sent John an e-mail stating that a meeting with Peter and others was "tentatively scheduled" for May 29 for "an in depth discussion about the Cole."

We were unable to determine with certainty whether a meeting with Peter, Donna, and Kathy actually took place on May 29. None of the witnesses had notes of any such meeting, nor were there any e-mails discussing the meeting after it would have taken place. The witnesses told the OIG that they could not recall whether a meeting took place on May 29. For example, when asked whether she knew Peter, Kathy told the OIG that his name sounded familiar and that she may have met him, but she did not recall a meeting on May 29, 2001, about the Cole investigation. A May 29 e-mail from Peter to Mary indicates that he met with Mary earlier in the day, but it does not identify the other participants or what was discussed.

---

[218] As noted above, John was correct – Khallad was not in any of these three photographs. After September 11 it was learned that the person the source had identified as Khallad was actually Hazmi. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

However, it is clear that at some point before the end of May 2001, Donna became aware of the existence of the Kuala Lumpur photographs in January 2000. Donna told the OIG that she recalled John printing one of the CIA photographs on the printer in his office at FBI Headquarters, and Donna acknowledged that she obtained two other Kuala Lumpur photographs from him. According to Donna, Peter had raised the photographs in a discussion with her prior to her obtaining the photographs from John, although she said that she did not recall the details of their discussion about the photographs. Donna said she did recall that, at the time, Peter had posited that one of the photographs could relate to Quso, which if true would contradict Quso's statements about going only to Bangkok and not going to Malaysia. According to Donna, the FBI was attempting to determine the veracity of Quso's information, so the photographs potentially were connected to the Cole investigation. She stated, however, that outside of this potential connection, the photographs were "another piece of a thousand things coming in" at the time. She said that if Quso were determined to be in the photographs, then the photographs would have become significant to the Cole investigation.

Donna also told the OIG that she did not recall a "substantive conversation" with John about the photographs or the Malaysia meetings. Donna told the OIG that she wrote on the back of the photographs what John told her about the photographs, which included that "Khalid Al-Midar" traveled from Sana, Yemen, via Dubai, to Kuala Lumpur on January 5, 2000, and he was in Kuala Lumpur between January 6 and 8. She also wrote Khalid Mihdhar's name on the back of the photograph in which he had been identified.



Donna also said that no one told her that Mihdhar had a U.S. visa or that Hazmi had traveled to the United States.

John told the OIG that he did not recall anything about his discussion with Donna when he printed the Kuala Lumpur photographs for her. John said he recalled that at the time the FBI was trying to "nail down Quso's story."

John emphasized that the FBI was focused on the Cole investigation, not the Malaysia meetings.



Peter told the OIG that he recalled talking to FBI IOSs, including Donna, about mapping the telephone number information based on information provided by Quso.

### 3. June 11, 2001, meeting

#### a. Planning for the meeting

Around the same time that Donna was discussing Quso and the Cole investigation with Peter and John, she also was planning a meeting at the New York FBI Office to discuss the Cole investigation. The planned participants for the New York meeting included personnel from FBI Headquarters, the CIA's CTC, and the New York FBI agents working on the Cole investigation. FBI documents show that Donna began organizing the meeting as early as May 24.

There was no record of an agenda for the meeting, and no supervisors were involved in the preparation for this meeting or were consulted regarding what should be accomplished at the meeting. Donna told the OIG that she organized the meeting in an effort to consolidate information and determine what further action was warranted on the Cole investigation. She stated that the purpose of the meeting at the New York FBI Office was to address unresolved issues and produce additional leads or other activities focusing on

the Cole investigation. According to a May 24 e-mail by Donna, the meeting was "to discuss our direction, particularly as it relates to Nashiri."[219]

Donna stated that she planned to take the Kuala Lumpur photographs with her to New York to find out whether the New York FBI Cole agents, who had met and debriefed Quso, could identify him in the photographs. She said that if Quso was in the photographs, the FBI would have reason to question Quso's statement that he had not gone to Malaysia but had met Khallad in Bangkok instead.

Sometime after obtaining the Kuala Lumpur photographs from John, Donna queried CTLink for the name Khalid al-Midhar [sic], which John had provided to her and which she had noted on the back of one of the photographs.[220] In CTLink she discovered the NSA information from late 1999 and early 2000 referencing Mihdhar's planned travel to Malaysia and



. She also queried ACS about Mihdhar but did not obtain any additional information about him.

Mary, an FBI detailee to the Bin Laden Unit who worked as a CTC desk officer, also attended the June 11 meeting, as did Peter, the CTC analyst. According to Mary, Donna invited her to the meeting and told her the meeting was intended for information sharing and as a "brainstorming session" concerning the Cole investigation. Mary told the OIG she had recently been given the assignment by CTC management of "getting up to speed" in her spare time on the ███████████████████████████. Mary said that she had not yet begun reviewing the Malaysia meetings at the time of Donna's invitation.

---

[219] Abdul Rahim al-Nashiri was al Qaeda's chief of operations in the Persian Gulf and was suspected to have been involved in the attack on the Cole. According to Donna, at the time he was believed to be the "on-scene commander" for the Cole attack, and the IOSs had been assigned the task of trying to locate him based on the intelligence reporting on him. He has since been arrested outside the United States.

[220] CTLink is a database administered by the CIA and used to disseminate information within the Intelligence Community.

According to Peter, the meeting was also described to him as an "information sharing and brainstorming session" to determine whether any further leads should be pursued. Peter said that he heard about the meeting from Mary and contacted Donna about attending because he was interested in learning what the New York FBI agents had uncovered in their investigation of the Cole attack.

According to FBI personnel in New York, Donna told them that FBI Headquarters and CIA personnel had indicated they had "information to share" regarding the Cole investigation. The FBI New York personnel anticipated the meeting would be a mutual exchange of information. Scott, one of the New York case agents on the Cole investigation, said he was told that the CIA representatives who would be attending the meeting wanted a briefing on the Cole investigation. On his own initiative, Scott arranged for David Kelley, an AUSA from the SDNY who was assigned to the Cole matter, to discuss with the CIA representatives other issues related to the Cole investigation, one of which was the impact on the prosecution if some of the targets of the Cole investigation were captured or detained outside the United States.

### b.    The June 11 meeting

On June 11, the meeting was held in a conference room at the FBI's New York Field Office. We could not determine with certainty all the participants at the meeting. There was no list of attendees, and the witnesses could not recall exactly who was there. However, we confirmed that Donna, Mary, Peter, Scott, and another New York agent assigned to the Cole investigation who we call "Randall," attended. AUSA Kelley attended for part of the meeting. Although it was unclear exactly how long the meeting lasted, the witnesses said it lasted between two and four hours.

In interviews with the OIG, the attendees said they did not recall the specifics of what was discussed at the meeting. The only contemporaneous notes from the meeting that we were able to obtain were Donna's. Her notes indicate that the latest developments in the Cole investigation were discussed. The second page of the notes is labeled "to do" and referenced several items.

Randall said he recalled that at the beginning of the meeting, Scott gave an update of the results and status of the investigation. Mary said she recalled that the attendees "brainstormed" various issues, but she did not recall any

significant ideas being developed during the meeting. Peter said he recalled that the New York agents "railed" about the U.S. Ambassador to Yemen and the lack of cooperation they believed they were receiving from the Yemeni government. At some point during the meeting, AUSA Kelley discussed the feasibility of prosecution in the Cole case.

Toward the end of the meeting, Donna produced the three Kuala Lumpur surveillance photographs and asked the agents if they recognized Quso in any of the photographs. Donna said she told the agents that the photographs had been taken in Malaysia around the Millennium. Donna said she provided Khalid al Mihdhar's name to at least some of the agents present. ▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[221] The witnesses' accounts of what happened next differ.

Scott told the OIG that after reviewing the Kuala Lumpur photographs, the FBI agents began to ask questions, such as whether there were additional photographs or information concerning the background on the photographs, including questions about Mihdhar, who was in the photographs. According to Scott, he pressed Donna and Peter for details of the Malaysia meetings. ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Scott contended that Donna "refused" to provide any further information about the photographs or the Malaysia meetings due to "the wall." Scott told the OIG that he previously had numerous conversations about the wall with Donna, which had been an issue between them. He stated that during this June 11 meeting, he disputed that the wall was applicable to the information at hand because the photographs had not been obtained as the result of a FISA Court order, and he continued to press Donna for more information. Scott said the meeting degenerated into an argument about the wall.

---

[221] Only a limited number of New York agents had actually met Quso. The others had only seen photographs of him.

In his initial OIG interview, Scott described the meeting as very contentious and combative.[222] In a second OIG interview, although Scott did not characterize the meeting as having the same level of combativeness, he contended that he pressed Donna for more information but none was forthcoming. Scott stated he had heated telephone conversations and e-mail exchanges with Donna over this issue after the June 11 meeting.

Donna, Mary, and Peter described the showing of the Kuala Lumpur photographs as a sidebar to the main meeting and generally inconsequential. All three asserted that neither the display of the surveillance photographs nor the meeting overall was contentious. Although Donna agreed that the FBI agents asked further questions regarding the origin of the photographs and asked for additional information regarding the Malaysia meetings, she contended that she responded simply by saying she did not know anything further. She told the OIG that these questions made sense to her when they were asked, but she did not know the answers. She stated that someone asked what kind of passport Mihdhar was traveling on, and Peter responded that it was a Saudi passport.[223] According to Donna, she had not known this information prior to Peter stating it. Donna told us that this was the only information volunteered by Peter, and she believed he would have provided additional information if he knew it.

Peter told the OIG that he was not asked any questions at the June 11 meeting, he had no formal role, and he did not brief anyone on anything at the June 11 meeting. Peter explained that it is not within his purview or authority as an analyst to share CIA information. He said he did not recall the meeting becoming heated or contentious. He said he did not recall any time during the

---

[222] When we asked Scott whether an intelligence-designated agent could have been provided the information outside the presence of the criminal agents, Scott agreed that could have been done, but he did not think of it at the time and no one else suggested it. During his subsequent testimony before the Joint Intelligence Committee, however, Scott said that the wall must not have been at issue because the criminal agents could have just left the room and any information could have been related to an intelligence agent.

[223] Donna's contemporaneous notes reflect this information. It appears as the last entry on the notes, indicating that this was discussed at the end of the meeting.

meeting where Donna said, "I can't answer that question" or directly refused to answer a question.[224]

Mary stated that she had not been "up to speed" on the case at this time, so she was not in a position to provide information at the meeting. She stated that she and Peter were not asked any questions during the meeting. She said that she did not recall any serious disagreements arising during the meeting.

According to Donna, she remained in New York after the meeting, without Peter and Mary, and she continued the discussions with the New York agents regarding the photographs after the meeting. She said that these subsequent conversations became fairly "heated," as the agents pressed her with questions such as whether there were additional photographs and any documentation about the photographs.[225]

Donna told the OIG she had provided to the agents all the information she had received from the CIA regarding the photographs. She told us that all she knew was that these three photographs were taken in Malaysia around the Millennium, and one of the persons in the photographs was someone named Khalid al Mihdhar. Donna stated she advised the agents of this and told them that efforts would be made to obtain the requested information. She said she was not aware that there would have been additional information to provide. She added that she recalled having the impression that the agents did not believe her when she said that she did not have the information about the photographs that the agents were requesting.

As discussed earlier, however, Donna had additional NSA information about Mihdhar that she had discovered through her CTLink query.



Donna told us that she

---

[224] As described earlier, Peter and John had exchanged several e-mails about the Malaysia meetings and the photographs. However, it is unclear based upon the information available to us exactly what Peter knew at this point. He said he was unable to remember exactly what additional information he had on June 11, 2001.

[225] We believe it likely that the agents were confusing the post-meeting discussions with the showing of the photographs at the meeting.

could not provide this information directly to the agents working the Cole criminal investigation due to the caveat, which prevented all NSA counterterrorism-related intelligence information from being provided to FBI criminal agents without approval from the NSA.[226]

Donna told us that the New York FBI primarily worked criminal terrorism investigations and the sharing of intelligence information with the criminal agents was often an issue. She said that some of the New York agents had become "overly sensitive" about a perceived lack of information sharing. Donna emphasized that any information could be shared but often a process had to be followed before certain intelligence information could be shared with agents working criminal investigations. She added that it was not her job to keep information from the agents but instead to ensure they had the tools necessary to do their job.

According to Donna, the only issue regarding the ▮▮▮▮▮▮▮▮ photographs would have been obtaining permission from the CIA to allow individuals outside of the FBI to see the photographs in furtherance of the Cole investigation, such as in interviews conducted in Yemen.[227] Donna said at some point while she was in New York, she and the agents discussed providing the photographs to the agents working in Yemen in order to get a positive identification of Quso in the photographs and to conduct further investigation.[228] She stated that she told the agents that she would attempt to obtain the requisite permission to provide the photographs to the agents working the Cole investigation in Yemen.

---

[226] It is important to note, however, that this NSA information originally had been routed not only to FBI Headquarters but also to the New York FBI Office in late 1999 and early 2000.

[227] A policy in the Intelligence Community, which is designed to protect intelligence sources and methods, is that the originator of intelligence information controls the further dissemination of the information. This policy is described as originator controlled, or "ORCON." Dissemination of ORCON information requires permission from the originating agency to further disseminate the information outside the receiving agency.

[228] Apparently unbeknownst to the involved FBI and CIA personnel, the Yemeni authorities already had been given the photographs on January 3, 2001, six months before anyone at the FBI received the photographs.

285

Although she had no explicit discussion with John regarding the use of the photographs, Donna stated she understood that the photographs were "not formally passed" to the FBI when John gave them to her, but only provided for limited use in the meeting. Therefore, Donna said she did not believe that she could leave the photographs with the New York agents until the requisite permission to show the photographs outside of the FBI had been obtained.

However, John told the OIG that that since the photographs had been given to Donna, an FBI employee, they could be further distributed within the FBI. John agreed that the photographs could not be used by the FBI in any manner where they would be disclosed to a foreign government. For example, he said that without approval from the CIA, the FBI agents could not keep the photographs and show them to Quso, who was in Yemeni custody, because Yemeni officials also would see the photographs.

### c.    Follow-up after the June 11 meeting

We looked for evidence as to whether Donna or the New York agents conducted any follow-up efforts about the ███████ photographs or obtaining permission from the NSA to pass the intelligence information to the New York agents. Donna said that she "probably" had follow-up conversations with John, Peter, and Mary about the photographs, but she did not specifically recall the conversations or obtaining additional information. Mary told the OIG that she recalled conversations with Donna about obtaining permission for the FBI to use the photographs of the Malaysia meetings in their investigation.

Donna stated she was not contacted by Scott after the meeting, although she was working with another agent on the squad, who we call "Glenn," in connection with tracking telephone toll records. Those records related to the Cole participants, the travel of Quso to Bangkok, and Quso's potential travel to ████.

According to Scott, over the course of the summer, he had several more conversations with FBI Headquarters asking about any additional information on the ██████████, but he was not provided any additional information. He stated that he did not seek assistance from any supervisor in obtaining additional information. He told us that he and the rest of the New York Field Office had been fighting a battle with FBI Headquarters over

information sharing for months, and he was "dumbfounded" that he could not obtain the information about the ███████████████. He stated that in hindsight he probably should have sought the intervention of a supervisor.

Documentary evidence shows that, as a result of the June 11 meeting, Donna and the New York agents discussed the ████████████████ in several follow-up conversations. In an e-mail dated August 22 from Donna to Glenn, she wrote that there were additional photographs of the Malaysia meetings and that the reason that Mihdhar was of interest at the time was because of some threat information that led to the CIA looking at all persons named "Khalid." In addition, she wrote that she had received assurances that the FBI would be able to use the ███████████████ outside the FBI. We discuss this e-mail in further detail in the next section.

Documents also show that on August 27 Donna requested permission from the NSA to provide the intelligence information about Mihdhar to the New York Cole criminal agents. However, this request came after the FBI had discovered on August 22 that Mihdhar might be in the United States and had opened an investigation to determine whether he was in the country. We discuss the events that led to that investigation and the investigative efforts of the FBI in the next section of the report.

### 4.    OIG conclusions on May and June discussions



While there were several interactions between FBI and CIA personnel in May and June 2001 that could have resulted in the FBI learning more about the ████████████████ and Mihdhar, the FBI personnel did not become aware of significant intelligence information about Mihdhar and ████████ ████████████████. The fact that Mihdhar had possessed a United States visa was not disclosed at this time by the CIA to Donna or the FBI. The fact that Hazmi had been at the Malaysia meeting and then traveled to Los Angeles also was not disclosed by the CIA. In addition, the fact that the source had identified Khallad, the purported mastermind of the Cole bombing, from the ████████████████████████ was not disclosed during these interactions.

Although Donna knew about the ████████████████ █████████, we do not believe that she was informed that Mihdhar had a U.S. visa or that ████████████████████████████. Donna's

287

contemporaneous notes on the back of the ███████████████ reflect
the limited information that she had obtained about the photographs and the
Malaysia meetings. The notes do not mention anything about Mihdhar's
possession of a U.S. visa. In addition, Donna stated that she was aware of the
significance of Khallad to the Cole investigation, but the notes on the
photographs also do not mention Khallad. Moreover, John, who provided the
photographs to Donna, told the OIG he did not recall discussing the █████
████████████ with her, and he did not believe that he would have
discussed with Donna that █████████████████████████████████,
because at the time he was not sure that this was true and he thought the
information was "speculative." Although an e-mail message indicated that
Peter was planning to discuss the Khallad identification with Donna in a
meeting on May 29, we were unable to determine that this meeting actually
occurred.

It was impossible for us to determine exactly what happened at the
June 11 meeting with respect to the ███████████████████ because the
witnesses cannot recall the specifics of the discussions and there is little
documentary evidence. It is clear, however, that the information regarding
Mihdhar's U.S. visa and the fact that █████████████████████ █████
███████████████ was not discussed at the June 11 meeting.

Donna told the agents about the photographs and provided them limited
information that she had obtained from the CIA about the photographs. Most
of the questioning about the photographs took place after the meeting, when
Peter and Mary had left. We believe those interactions after the meeting
became very contentious, with the New York FBI wanting more information.
Donna did not provide the New York agents with the NSA intelligence
information about the Mihdhar's ███████████████████████████████
██████████████████████████████, which she obtained through
her research. She said she did not because of the restrictions placed on sharing
such NSA information. As we discuss further in the next section, Donna
subsequently contacted the NSA in reference to having the NSA information
passed to the agents, but this did not occur until much later, on August 27,
2001.

We found little attempt by either the FBI agents or Donna after June 11
to follow up on the information about the photographs that was discussed at the
meeting. There is little evidence of follow-up until some time in August 2001,

288

when, as we discuss in the next section, the FBI learned that Mihdhar had recently entered the United States, and the FBI opened an investigation to locate him.

The interaction between the CIA and the FBI in May and June 2001 was another failed opportunity for the FBI to obtain the critical information about Mihdhar and Khallad. The failure of the FBI to learn about Mihdhar, ██ ██████████████, and his travel to the United States at that time demonstrated significant problems in the flow of information between the CIA and the FBI. We discuss these deficiencies in the analysis section of this chapter.

### E.    The FBI's efforts to locate Mihdhar in August and September 2001

The fifth and final opportunity for the FBI to locate Mihdhar and Hazmi occurred in late August 2001, when it was informed that Mihdhar and Hazmi had traveled to the United States. The FBI learned in August 2001 that Mihdhar had entered the United States in July 2001 and that Mihdhar and Hazmi had previously traveled together to the United States in January 2000. On August 29, the FBI began an investigation to locate Mihdhar, but it did not assign great urgency or priority to the investigation. The New York FBI criminal agents who wanted to participate in the investigation were specifically prohibited from doing so because of concerns about the wall and the procedures to keep criminal and intelligence investigations separate. The FBI did not locate Mihdhar before the September 11 attacks.

We review the facts surrounding the FBI's discovery of this information about Mihdhar and Hazmi and what the FBI did with this information in August. We also examine the FBI's unsuccessful efforts to locate Mihdhar before the September 11 attacks.

### 1.    Continuing review of the Malaysia meetings in July and August 2001

As discussed above, John, the CIA Bin Laden Unit Deputy Chief, was detailed to the FBI's ITOS in May 2001. Shortly before assuming his duties at the FBI, John had asked CTC management to assign a CTC desk officer with "getting up to speed" on the Malaysia meetings and determining any potential

██████████████████████████████████████. This assignment was given to Mary. She told the OIG that "getting up to speed" meant she would have to research and read the pertinent cable traffic as her schedule permitted. She emphasized that her priority assignment during this period was the credible threats of an imminent attack on U.S. personnel in Yemen, and she said that she worked the Malaysia meetings connections to the Cole attack whenever she had an opportunity.

In early July 2001, based on recent intelligence information, the CIA had concerns about the possibility of a terrorist attack in Southeast Asia. On July 5, 2001, John sent an e-mail to managers at the CTC's Bin Laden Unit noting "how bad things look in Malaysia." He wrote that there was a potential connection between the recent threat information and information developed about the ████████████████. In addition, he noted that in January 2000 when Mihdhar was traveling to Malaysia, ██████████

████████████████████████████████
████████████████████████████████
████████████████████████████████.
Therefore, he recommended that the Cole and ████████ be re-examined for potential connections to the current threat information involving ████████. He wrote, "I know your resources are strained, but if we can prevent something in SE Asia, this would seem to be a productive place to start." He ended the e-mail by stating that "all the indicators are of a massively bad infrastructure being readily completed with just one purpose in mind."

On July 13, John wrote another e-mail to CTC managers stating that he had discovered the CIA cable relating to the source's identification of
████████████████████████████████████████
████ John began the e-mail by announcing "OK. This is important." He then described Khallad as a "major league killer who orchestrated the Cole attack and possibly the Africa bombings." The e-mail recommended revisiting the ████████████, especially in relation to any potential information on ████████. Significantly, John ended the e-mail asking, "can this [information] be sent via CIR to [the FBI]?"

Despite John's recommendation that this information be forwarded to the FBI in a CIR, we found no evidence indicating that the CIA provided this information to the FBI until August 30, 2001, which, as we describe below, was after the FBI learned about Mihdhar's presence in the United States.

290

In a response e-mail dated July 13, 2001, a CTC Bin Laden Unit supervisor stated that Mary had been assigned to handle the request for additional information on the Malaysia meetings.  In addition, the e-mail stated that another FBI detailee to the CTC, Dwight, who was out of the office at the time, would be assigned to assist Mary upon his return.

Later in July, Mary drafted a cable to another CIA office requesting follow-up information about the Malaysia meetings.



A week later, the CTC supervisor forwarded the cable to John for his review prior to release, and the cable was sent to the office to which it was addressed three days after that.

On the same day she drafted the cable referencing the source's identification of Khallad, Mary located one of the CIA cables referencing Mihdhar's possession of a U.S. visa.  On the same date, Mary also reviewed the CIA cable that stated this visa information had been passed to the FBI in January 2000.[229]

In early August, Mary and Donna continued to discuss the  In an e-mail on August 7 from Donna to Mary, Donna requested a copy of the flight manifest for Mihdhar's January 2000 trip to Malaysia in order to determine whether ██ had traveled with Mihdhar.  She also asked, "if we could get the pictures cleared to show ████."[230]  She continued, "the reasoning behind this would be that first, we do not have a concensus [sic] that the individual with Midhar [sic] is in fact ████ . . . [second] to determine if ████ can identify Midher by an other [sic] name."  Donna then discussed her continuing efforts to track telephone number information developed in the investigation.  At the close of the e-mail, Donna wrote, "I plan to write something up, but perhaps we should schedule another sit down to compare notes on both sides.  Let me know."

---

[229] As discussed above, we found no evidence that this information had, in fact, been provided to the FBI.

[230] Apparently the desk officer was unaware that clearance had been received and that the photographs had been shared with Yemeni officials.

291

In a response e-mail on the same date, Mary wrote, "okay, all sounds good." Mary also wrote that she thought Donna had Mihdhar's flight manifest because John had mentioned it, but Mary indicated she would find the manifest. She wrote, "I think we will be able to clear the pictures, they are for passage to Quso, right?" Mary also asked whether the FBI would be able to meet with Quso again. Mary ended the e-mail, "I think a sit down again would be great" and mentioned the potential logistics of arranging the meeting.

In another e-mail exchange on August 7, Donna thanked Mary and advised her that the FBI would again have access to Quso. Donna continued by stating that the ████████████████████ also would be passed to a foreign government because Quso was currently in its custody. She stated that John could call if he had any questions. Donna tentatively scheduled a meeting with Mary at FBI Headquarters on August 15, 2001. However, it appears that the meeting did not take place.[231]

## 2.    Discovery of Mihdhar's entry into the United States

On August 21, Mary located the CIA cables referencing Hazmi's travel to the United States on January 15, 2000.[232] Mary checked with a U.S. Customs Service representative to the CTC about Hazmi's and Mihdhar's travel. She discovered that Mihdhar had entered the United States on July 4, 2001, and had not departed. In addition, she confirmed that Hazmi had traveled to the United States in January 2000.

Mary immediately relayed to Donna in a voicemail message on August 21 that Mary had something important to discuss with her. Donna was on annual leave on August 21. Mary told the OIG she did not have an

---

[231] Mary told the OIG that she took a week of annual leave during August, which she thought was during that week, and she thought that the meeting therefore had not occurred. Although the e-mail references a meeting, Mary and Donna both told us that they had no recollection of any meeting on August 15 or any one prior to August 22.

[232] Mary was copied on an e-mail from John to Peter in mid-May, 2001, in which John discussed the travel of Mihdhar and others who appeared to be "couriers on a sort." In this e-mail John stated, among other things, that "Nawaf" [Hazmi] had traveled with someone from Bangkok to Los Angeles to Hong Kong. Mary stated to the OIG that she received this e-mail before she was "up to speed" on the Malaysia meetings.

opportunity to focus on the Malaysia meetings until August, but upon discovering on August 21 that Hazmi had traveled to the United States "it [the importance of the information] all clicks for me."

On August 22, Mary met with Donna at FBI Headquarters and informed her of Mihdhar's July 4 entry and Hazmi's travel to the United States in March 2000.[233] Donna verified in INS indices Mihdhar's recent entry. She also learned that both Mihdhar and Hazmi had entered the United States on January 15, 2000, and that they were allegedly destined for the Sheraton Hotel in Los Angeles, California. The INS records showed Mihdhar had departed the United States from Los Angeles on June 10, 2000, on Lufthansa Airlines. No departure record could be located for Hazmi. An INS representative advised Donna that departure information often was not captured in INS indices.[234] Therefore, she incorrectly surmised Hazmi had also departed on June 10, 2000.[235]

Further INS indices checks confirmed Mihdhar had re-entered the U.S. on July 4, 2001, at the JFK Airport in New York, allegedly destined for the "Marriott hotel" in New York City. By the terms of his entry, Mihdhar was authorized to remain in the United States until October 3, 2001. The INS had no record indicating Mihdhar had departed the United States as of August 22, 2001.

Mary and Donna met with John on August 22 in his office at FBI Headquarters to discuss their discovery that Mihdhar recently had entered the United States and there was no record of his departure. All of them said they could not recall the specifics of the conversation, but all agreed that they

---

[233] There is some discrepancy in witness statements on whether this meeting occurred on August 22 or August 23. Although it is unclear on which date this meeting occurred, we believe the meeting occurred on August 22, 2001.

[234] The problem of INS departure records not being complete or accurate is described in an August 2001 OIG report entitled "The Immigration and Naturalization Service's Automated I-94 System."

[235] Investigation conducted after September 11 found that Hazmi had remained in the United States.

realized it was important to initiate an investigation to determine whether Mihdhar was still in the United States and locate him if he was.

On August 22, 2001, Donna sent an e-mail to the New York FBI Special Agent who we call "Glenn." He was one of the agents assigned to the Cole investigation. In the e-mail, Donna advised Glenn that she had obtained Mihdhar's flight manifest. Donna also wrote, "the reason they [the intelligence community] were looking at Midhar [sic] is relatively general -- basically they were looking at all individuals using the name Khalid because of some threat information." Significantly, the e-mail also advised that the CIA had additional surveillance photographs beyond those she had taken to New York, and the source had identified one of the individuals in these additional photographs as Khallad. Donna said that she was "requesting the details on that [Khallad's identification]." Donna also stated in her e-mail that the clearance to show the ███████████████████████████████ should not be a problem.[236]

This e-mail was the first reference we identified that the FBI had been informed of additional 

After her meeting with Donna on August 22, 2001, Mary asked another CTC officer to draft a CIR to the State Department, INS, U.S. Customs Service, and FBI requesting the placement of Mihdhar and his travel companions, Hazmi and Salah Saeed Muhammed bin Yousaf, on U.S. watchlists.[237] The CIR briefly outlined Mihdhar's attendance at the Malaysia meetings and his subsequent travel to the U.S. in January 2000 and July 2001. On August 24, the State Department placed Mihdhar and his travel companions

---

[236] Donna was unable to recall how she first discovered the information on the Khallad identification. We were unable to find any documents or other evidence clarifying this issue.

[237] At this time, several agencies maintained separate watchlists. The State Department watchlist was the VISA/VIPER system. Within VISA/VIPER, the TIPOFF system focused on suspected terrorists. The INS maintained the LOOKOUT system, which was also available to the Customs Service through TECS.

on its terrorism watchlist. This is the first record of the placement of Mihdhar or Hazmi on any U.S. watchlist.

On August 23, 2001, Donna contacted the State Department and requested a copy of Mihdhar's most recent visa application from the U.S. Consulate in Jeddah, Saudi Arabia.

### 3.    The FBI's intelligence investigation on Mihdhar

#### a.    Steps to open the investigation

On August 23, Donna contacted her supervisor, an SSA who we call "Rob," regarding the information about Mihdhar's travel to the United States. As discussed in Chapter Three, Rob was the acting Unit Chief of the UBLU at the time.[238]

After reviewing the information, Rob concurred with Donna that the appropriate course of action would be to open an intelligence investigation in New York, Mihdhar's last known destination in the United States, to locate Mihdhar.

To expedite the investigative process and provide a "heads up [alert]" to the New York Field Office that the information was coming, on August 23 Donna telephoned an agent on the Bin Laden squad in the New York Field Office who we call "Chad." To comply with the wall, the New York Field Office had designated agents as either "criminal" or "intelligence," and Chad was an intelligence agent. Donna discussed with Chad Mihdhar's most recent entry into the United States and FBI Headquarters' request for the New York office to open a full field intelligence investigation to locate Mihdhar. Donna told the OIG that she did not normally telephonically contact the field on these types of issues, but there was some urgency to her request because the FBI did not want to lose the opportunity to locate Mihdhar before he left the United States.

---

[238] He was the acting Unit Chief of the UBL from June 28, 2001, until September 10, 2001.

295

Chad told the OIG that although he routinely worked with Donna, this was the first time that Donna had relayed a need for urgency in an intelligence investigation. Chad told us, however, that he questioned both the urgency and the need for a separate intelligence investigation. Chad explained that the attempt to locate Mihdhar seemed to relate to the criminal investigation of the Cole attack, and efforts to locate an individual normally would be handled through a sub-file to the main investigation and not as a separate full field investigation. Nevertheless, he told Donna that New York would open an intelligence investigation.

On August 23, Donna sent an e-mail to John concerning her telephone conversation with Chad. She advised in the e-mail that "[Chad] will open an intel[ligence] case."



She wrote, "I am still looking at intel, but I think we have more of a definitive connection to the Cole here than we thought." She ended by stating that she was working on the EC requesting a full field investigation, but doubted that it would be completed that day.

On August 27, Donna requested permission through the NSA representative to the FBI to pass to the FBI agents working on the Cole investigation the information ███████████████████. Donna told the OIG that she thought that the NSA information on Mihdhar could be useful to the Cole criminal investigators, even if the Mihdhar search remained an intelligence investigation.

On the morning of August 28, Donna sent Chad a draft copy of an EC requesting the intelligence investigation to locate Mihdhar. In the cover e-mail, Donna stated, "here is a draft" and that the EC had not been uploaded due to some tear line information that was not yet approved for passage.[239] She concluded, "I do want to get this going as soon as possible."

The EC, entitled "Khalid M. Al-Mihdhar" with various aliases, stated in the synopsis, "Request to open an intelligence investigation." The EC outlined Mihdhar's travel to the United States in July 2001, his previous travel to the

---

[239] According to the NSA, the request was approved later that same day.

United States with Hazmi in January 2000, the background on and his attendance at the Malaysia meetings,



As to the identification of Khallad in the by the source, Donna told the OIG that she did not include this information because it had not yet been officially passed to the FBI, although she had requested the passage from a CTC Representative to the FBI.[240]

While Donna had relayed urgency to opening the investigation in her telephone conversation with Chad and in her cover e-mail, she designated the EC precedence as "routine," the lowest precedence level.[241] She explained this by saying this case was "no bigger" than any other intelligence case. She also told us, however, that there was a time consideration because Mihdhar could be leaving the United States at any time and that is why she had personally contacted Chad.

### b.    The FBI opens the intelligence investigation

On August 28, Chad forwarded Donna's draft EC to his immediate supervisor, a Supervisory Special Agent who we call "Jason." Jason became a supervisor on the JTTF in the New York Field Office in 1996. He had been on the New York JTTF since 1985.

At approximately 2:00 p.m. on August 28, Jason forwarded the EC to various agents on the Bin Laden squad, including the Cole criminal case agent who we call "Scott." In the cover e-mail, Jason directed the Relief Supervisor, who we call "Jay," to open an intelligence investigation and assign it to a Special Agent who we call "Richard." Jason also directed another agent to

---

[240] This information officially was passed to the FBI in a CIR on August 30, 2001.

[241] As discussed in Chapter Three, ECs are marked with a precedence level based on an escalating scale beginning at "routine;" "priority," connoting some urgency; and "immediate," connoting the highest level of urgency.

check on an investigative lead related to Mihdhar while the agent was in Malaysia.[242]

Scott received the EC on August 28. Scott, who had been at the June 11 meeting and had discussions with Donna about the ███████████ ██ ███, contacted Donna to discuss the appropriateness of opening an intelligence investigation as opposed to a criminal investigation. Donna told the OIG that when she realized that the EC had been disseminated to Scott, she asked Scott to delete it because it contained NSA information and therefore required approval for review by criminal agents. Scott told the OIG that he deleted the EC as she requested.

Shortly thereafter, Scott, Donna, and Rob engaged in a conference call to discuss whether the case should be opened as a criminal instead of an intelligence investigation. Scott told the OIG that he argued that the investigation should be opened as a criminal investigation due to the nexus to the Cole investigation and the greater investigative resources that could be brought to bear in a criminal investigation. Scott explained that more agents could be assigned to a criminal investigation due to the squad designations. He also asserted that criminal investigation tools, such as grand jury subpoenas, were far quicker and easier to obtain than the tools available in an intelligence investigation, such as a national security letter.

Donna told the OIG that the information on Mihdhar was received through intelligence channels and, because of restrictions on using intelligence information, could not be provided directly to the criminal agents working the Cole investigation. The only information that could be provided directly to them was the limited INS information. She stated that without the intelligence information on Mihdhar, there would have been no potential nexus to the Cole investigation and no basis for a criminal investigation. Rob told the OIG he had concurred with Donna's assessment that the matter should be an intelligence investigation. He added that there was also a process through

---

[242] Jason told the OIG that he did not specifically recall this e-mail. He said he was out of the office the majority of the time from June until September 11, 2001, due to a serious medical condition, and he did not return to work full-time until September 11, 2001.

which the information could potentially be shared with the criminal agents in the future.[243]

Scott was not satisfied with that response, and he asked for a legal opinion from the FBI's National Security Law Unit (NSLU) whether the investigation should be opened as a criminal matter relating to the Cole criminal investigation. Additionally, Scott wanted a legal opinion on whether a criminal agent could accompany an intelligence agent to interview Mihdhar if he was located.

According to Donna, she subsequently contacted the NSLU attorney who we call "Susan" on August 28, and she and Rob discussed the issue with Susan. It is unclear how she presented the matter to Susan because there were no documents about the conversation and she and Susan had little or no recollection of the specific conversation. Donna told the OIG that she provided the EC to Susan. According to Donna, Susan agreed with her that the matter should be opened as an intelligence investigation. Donna said Susan also advised that a criminal agent should not be present for an interview of Mihdhar if he was located. During an OIG interview, Susan said she could not specifically recall this matter or the advice she gave. Rob told the OIG that he did not recall the specifics of this consultation, but he stated that the NSLU opinion was supportive of FBI Headquarters' determination that the case should be opened as an intelligence investigation.

At approximately 7:30 a.m. on August 29, Donna sent an e-mail to Jason, which stated:

> I think I might have caused some unnecessary confusion. I sent the EC on Al-Midhar [sic] to [Chad] via email marking it as DRAFT so he could read it before he went on vacation. There is material in the EC...which is not cleared for criminal investigators. [Scott] called and [Rob] and I spoke with him and tried to explain why this case had to stay on the intel. side of the house...In order to be confident...for this case to be a 199,

---

[243] Rob told the OIG that the squad's Supervisory Special Agent acted as "the wall" between intelligence and criminal investigations during this period, and Jason could subsequently open a criminal investigation if warranted.

and to answer some questions that [Scott] had, [Rob] and I spoke with the NSLU yesterday afternoon[244]...The opinion is as follows: Al-Mihdar [sic] can be opened directly as a FFI [Full Field Investigation]...The EC is still not cleared for criminal investigators...Per NSLU, if Al-Mihdar [sic] is located the interview must be conducted by an intel agent. A criminal agent CAN NOT be present at the interview. This case, in its entirety, is based on intel. If...information is developed indicating the existence of a substantial federal crime, that information will be passed over the wall according to the proper procedures and turned over for follow-up criminal investigation.[245]

Approximately 15 minutes after sending the e-mail to Jason, Donna sent an e-mail to Scott with the same language advising that the NSLU agreed the investigation should be an intelligence investigation and a criminal agent could not attend the interview if Mihdhar was located. That same morning, Scott responded in an e-mail to Donna stating:

...where is the wall defined? Isn't it dealing with FISA information? I think everyone is still confusing this issue...someday someone will die – and wall or not – the public will not understand why we were not more effective and throwing every resource we had at certain 'problems.' Let's hope the National Security Law Unit will stand by their decisions then, especially since the biggest threat to us now, UBL, is getting the most 'protection'.

Later that morning, Donna replied in an e-mail:

I don't think you understand that we (FBIHQ) are all frustrated with this issue. I don't know what to tell you. I don't know how many other ways I can tell this to you. These are the rules.

---

[244] Rob told the OIG that he could not recall whether he had talked to anyone from the NSLU about this issue.

[245] Rob told the OIG that the New York Field Office technically could have ignored Headquarters' recommendation and opened a criminal investigation. However as a practical matter, the field would not normally ignore Headquarters' decision.

NSLU does not make them up and neither does UBLU. They are in the MIOG[246] and ordered by the [FISA] Court and every office of the FBI is required to follow them including FBINY...

### 4.    The New York Field Office's investigation

On August 29, 2001, the FBI's New York Field Office opened a full field intelligence investigation to locate Mihdhar. The investigation was assigned to a Special Agent who we call "Richard." Richard was a relatively inexperienced agent, who had recently been transferred to the Bin Laden squad.[247] This was Richard's first intelligence investigation.

On August 29, Donna received Mihdhar's visa application from the U.S. Consulate in Jeddah. The application indicated that Mihdhar planned to travel as a tourist to the United States on July 1, 2001, for a purported month long stay. On the application, Mihdhar falsely claimed that he had not previously applied for a U.S. non-immigrant visa or been in the United States.[248]

On August 30, 2001, Donna sent an e-mail to Richard. After a paragraph introducing herself, Donna advised she was attaching Mihdhar's visa application form, which included Mihdhar's photograph, and that she would be faxing the remaining documents. Donna stated she would send a couple of pages from the Attorney General Guidelines "which apply to your case" and then she would mail the documents.

Richard told the OIG that on August 30, he received a telephone call from Donna in reference to the investigation. He said that Donna said the goal of the intelligence investigation was to locate and identify Mihdhar for a

---

[246] The MIOG is the FBI operational manual - Manual of Investigative Operations and Guidelines. Donna asserted this reference actually related to the Attorney General's FCI Guidelines that are contained in the MIOG.

[247] Richard began working in the New York Field Office after graduating from the FBI Academy in June 2000. After serving briefly on an applicant squad, a drug squad, and a surveillance squad, Richard was assigned to the UBL squad in July 2001.

[248] Donna said she did not notice this discrepancy. As we discuss below, neither did the New York FBI.

potential interview. According to Richard, Donna did not indicate the investigation was an emergency or identify any other exigent circumstance.

On August 30, 2001, the CIA sent a CIR to the FBI outlining the identification of "Khallad" from one of the ███ █ █ █ █ ██ ███ █ █ █ in January 2001 by the source. The first line of the text stated the information should be passed to Rob. The CIA cable stated the FBI should advise the CIA if the FBI did not have the ███ █ █ █ █ ██ ██ so they may be provided. This is the first record documenting that the source's identification of Khallad in the ███ █ █ ██ ██ ██ █ █ was provided by the CIA to the FBI.

Richard told the OIG that he began to work on locating Mihdhar on September 4. He stated that he had received the assignment on Thursday, August 30, but he worked all weekend and Monday on another exigent investigative matter involving a Canadian hijacking. As a result, he said he did not have the opportunity to begin work on the Mihdhar investigation until Tuesday, September 4.

On September 4, Richard completed a lookout request for the INS, identifying Mihdhar as a potential witness in a terrorist investigation. Due to his unfamiliarity with completing the lookout form, Richard contacted an INS Special Agent who was assigned to the FBI's JTTF in New York. We call this Special Agent "Patrick." The INS lookout form has a box indicating whether the individual was wanted for "security/terrorism" reasons. Richard did not check this box. He said that he thought Patrick told him to identify the subject on the form as a witness, not a potential terrorist, to prevent overzealous immigration officials from overreacting. By contrast, Patrick, who was assigned to the JTTF since September 1996, told us that he did not provide this advice to Richard and he always checked the security/terrorism box whenever he completed the lookout form for a potential witness in a terrorism investigation.

However, Richard asked Patrick to review the lookout request form for completeness, and Patrick sent the form to INS Inspections for inclusion in the

302

INS lookout system, without making any changes.[249]  During his initial interview with the OIG, Richard asserted that he also asked Patrick to review and explain Mihdhar's travel documents, including the INS indices printouts and the visa application.  In a follow-up interview, Richard said he could not definitively recall whether he had actually provided the predicating materials to Patrick or whether he merely had Patrick review the INS lookout request form.

Patrick told the OIG that he recalled this request because it was the first one from Richard and because of Mihdhar's subsequent involvement in the September 11 attacks.  Patrick stated that he had not reviewed the predicating materials, but had only checked the request form for completeness.  He added that if he had been shown any of the predicating materials on Mihdhar's travel, the review would only have been cursory.  Patrick and Richard both acknowledged that they did not notice the false statements on Mihdhar's visa application.

Richard also contacted a U.S. Customs Service representative assigned to the JTTF and verified that a TECS lookout was in place for Mihdhar.  Richard conducted other administrative tasks such as uploading the initial information about Mihdhar into ACS.

On September 4, Richard requested a local criminal history check on Mihdhar through the New York City Police Department.  Richard told the OIG that he initially focused on Mihdhar, since he was captioned as the subject of the investigation in the predicating EC.  After reviewing the EC several times, Richard noted the connection to Hazmi, so he conducted the same record checks on Hazmi as he had on Mihdhar.  On September 5, Richard requested an NCIC criminal history check, credit checks, and motor vehicle records be searched in reference to Mihdhar and Hazmi.

On September 5, Richard and another JTTF agent contacted the loss prevention personnel for the New York area Marriott hotels, since Mihdhar had indicated when he entered the United States in July 2001 that his destination

---

[249] Patrick explained that agents often provided just the information and he completed the lookout form, but "new" agents often completed the form themselves.  Patrick estimated he received approximately 10 lookout requests each month.