was the Marriott hotel in New York. Richard learned that Mihdhar had not registered as a guest at six New York City Marriotts.

Richard stated he also conducted Choicepoint™ searches on Hazmi and Mihdhar.[250] Richard said he recalled he had another JTTF officer assist him with the searches because he was not familiar with the system. Richard did not locate any records on either Hazmi or Mihdhar in Choicepoint™.[251] Richard told the OIG that it was not uncommon not to find a record because of variations in spelling of names or other identifying information.

Hazmi and Mihdhar had traveled to Los Angeles, California on January 1, 2000, via United Airlines, and INS records indicated that they claimed to be destined for a "Sheraton hotel" in Los Angeles. Therefore, on September 10, 2001, Richard drafted an investigative lead for the FBI Los Angeles Field Office. He asked that office to request a search of the Sheraton hotel records concerning any stays by Mihdhar and Hazmi in early 2000. He also requested that the Los Angeles office check United Airlines and Lufthansa Airlines records for any payment or other information concerning Mihdhar and Hazmi. However, the lead was not transmitted to Los Angeles until the next day, September 11, 2001.

By the morning of September 11, when the American Airlines flight 77 that Mihdhar and Hazmi hijacked and crashed into the Pentagon, Richard had not uncovered any information regarding Mihdhar's or Hazmi's location in the United States.

### 5. OIG conclusions on the intelligence investigation

Although FBI and CIA personnel had many discussions throughout July and August 2001 about the Cole attacks ███████████████, the CIA

---

[250] Choicepoint™ is a commercial service that mines information such as names, addresses, phone numbers, and other identifying information from public sources (such as telephone directories, local taxing authorities, and court records), as well as purchase information from merchants or other companies. The information is then consolidated into a large database and is accessible to law enforcement and other subscribers for a fee.

[251] After September 11, however, the FBI located records on Hazmi in this commercial database.

304

did not provide and the FBI did not become aware of the significant intelligence information about Mihdhar's U.S. visa, the Malaysian matter, and the ███████████████████████████████ until August 22, 2001. In May 2001, one detailee to the CTC was assigned to "get up to speed" on the Malaysian matter in her spare time but said she had been unable to focus on the matter until August 2001. On July 13, even after John had suggested in an e-mail to the CTC that the ████████████████████████████ ████████ be passed to the FBI via CIR, this was not done for several weeks. The CIR was not sent to the FBI until August 30, after the FBI learned of Mihdhar's presence in the United States.

The CIA also did not provide to the FBI the information about Hazmi's travel to the United States in January 2000 until August 22. Donna stated that she did not receive this information until August 22, and her actions upon receipt of the information clearly indicate that she understood the significance of this information when she received it. She took immediate steps to open an intelligence investigation when she learned of this information.

On August 22, once the FBI was aware of the intelligence information about Mihdhar and that he was in the United States, the FBI took steps to open an intelligence investigation to locate him. Yet, the FBI did not pursue this as an urgent matter or assign many resources to it. It was given to a single, inexperienced agent without any particular priority. Moreover, the dispute within the FBI about whether to allow a criminal investigation to be opened again demonstrated the problems with the wall between criminal and intelligence investigations. The FBI was not close to locating Mihdhar or Hazmi when they participated in the terrorist attacks on September 11, 2001. In the analysis section of this chapter, we address in more detail the FBI's decision to open the matter as an intelligence investigation instead of a criminal investigation, and the inadequacy of the FBI's efforts to investigate Mihdhar in late August and early September 2001.

### F. Summary of the five opportunities for the FBI to learn about Mihdhar and Hazmi

In summary, there were at least five opportunities for the FBI to have learned about Mihdhar and Hazmi, ████████████████████████████████ ████████████████████ and their presence in the United States, well before the September 11 attacks. First, in early 2000, the FBI received the

305

NSA information about Mihdhar's planned travel to Malaysia. Although the CIA informed the FBI of the Malaysia meetings in January 2000, the existence of Mihdhar's U.S. visa and the surveillance photographs was not disclosed to the FBI. FBI detailees at the CTC read the pertinent CIA cable traffic with this information and drafted a CIR to pass this information to the FBI. But the CIR was not released to the FBI, purportedly at the direction of a CIA supervisor, and the FBI did not learn of this critical information until August 2001. In addition, in March 2000 a CIA office discovered that Hazmi had traveled to the United States in January 2000, but no one from the CIA shared this information with the FBI.

Second, in February 2000, Mihdhar and Hazmi moved to San Diego, where they were aided in finding a place to live by the former subject of an FBI preliminary inquiry. In May 2000, Hazmi and Mihdhar moved in with an FBI asset in San Diego, California. However, the FBI did not learn of this information until after the September 11 attacks.

Third, in early January 2001, the CIA showed ▮▮▮▮ to a joint CIA/FBI source, and the source stated that ▮▮▮▮. This identification could have led the FBI to focus on who else was ▮▮▮▮, which could have led the FBI to identify and locate Mihdhar. However, we concluded that, despite the CIA's assertions, ▮▮▮▮ was not known by the FBI.

Fourth, in May and June 2001, due to concerns about possible terrorist activities, CIA employees were again examining the ▮▮▮▮, Hazmi's and Mihdhar's travel (including Hazmi's travel to Los Angeles), and ▮▮▮▮ At the same time, these CIA employees were discussing with FBI employees the Cole investigation and the ▮▮▮▮. Yet, despite these interactions between the two agencies on the telephone, in e-mails, and in a June 11 meeting in New York, the FBI never was informed of the critical intelligence information that ▮▮▮▮ with Mihdhar, and that Hazmi had traveled to the United States. Again, this information could have led the FBI to initiate a search for Hazmi and Mihdhar earlier than it eventually did.

306

Fifth, in July 2001 a former Bin Laden Unit Deputy Chief who was working in ITOS in FBI Headquarters confirmed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and wrote in an e-mail to CTC managers that this information needed to be sent in a CIR to the FBI. However, this information was not sent in a CIR to the FBI until several weeks later. On August 22, an FBI employee detailed to the CTC notified the FBI that Mihdhar had entered the United States on July 4, 2001. The FBI began an intelligence investigation to locate Mihdhar and Hazmi. However, the FBI assigned few resources to the investigation and little urgency was given to the investigation. The FBI was not close to locating Mihdhar and Hazmi before they participated in the September 11 attacks.

### IV. OIG's analysis of the FBI's handling of the intelligence information concerning Hazmi and Mihdhar

We found systemic and individual failings in the FBI's handling of the Hazmi and Mihdhar matter. As a result of these failings, there were at least five opportunities for the FBI to connect information that could have led to an earlier investigation of Hazmi and Mihdhar and their activities in the United States.

In this analysis section, we first discuss the systemic problems involving the breakdowns in the gathering or passing of information about Hazmi and Mihdhar between the FBI and CIA. We then turn to the problems in handling intelligence information within the FBI. Finally, we discuss the actions of individual FBI employees in handling information about Hazmi and Mihdhar information.

In this section, we do not make recommendations regarding the actions of the CIA and its employees. We believe the CIA shares a significant responsibility for the breakdowns in the Hazmi and Mihdhar case, and that several of its employees did not provide the intelligence information to the FBI as they should have. We leave it to the CIA OIG, the entity with oversight jurisdiction over the CIA and its employees, to reach conclusions and make recommendations on the actions of the CIA and its employees.

### A. Systemic impediments that hindered the sharing of information between the CIA and the FBI

The most critical breakdown in the Hazmi and Mihdhar case was the failure of the FBI to learn from the CIA critical information about them; their travel to the United States; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These breakdowns reflected serious problems in the process before the September 11 attacks for sharing information between the FBI and the CIA.

The FBI failed to receive from the CIA three critical pieces of intelligence about Mihdhar and Hazmi in a timely manner:

- Mihdhar's possession of a valid, multiple-entry U.S. visa;
- Hazmi's travel to the United States; and

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The CIA became aware of these three pieces of intelligence in January 2000, March 2000, and January 2001. Despite claims to the contrary, we found that none of this information was passed from the CIA to the FBI until August 2001. Although the CIA failed to timely pass this information to the FBI, there were several opportunities for the FBI to have obtained this information in other ways. But significant systemic problems, which we describe below, hindered the flow of information between the CIA and the FBI.

#### 1. Use of detailees

One of the most significant opportunities for the FBI to have obtained the intelligence information relating to Hazmi and Mihdhar was through the FBI detailees at the CTC. As discussed above, the FBI detailees to the CTC had access to CIA cable traffic and could read the cables that discussed Mihdhar's U.S. visa, the surveillance of the meetings  in Malaysia, Hazmi's subsequent travel to the United States, and the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Several of the FBI detailees accessed and read some of these cables. Significantly, in January 2000, one detailee, Dwight, prepared a draft CIR to pass to the FBI the information about Mihdhar's visa, ▮▮▮▮▮▮▮▮▮▮▮▮, and his travel to Malaysia. The FBI

should have been informed of this information because of its clear domestic nexus.

However, the CIR was never sent to the FBI. According to a note on the CIR, John, a Deputy Chief of the Bin Laden Unit, directed that the CIR be placed on hold, and FBI detailees did not have authority to disseminate CTC information without approval from the CIA. Eight days later, Dwight inquired about the disposition of the CIR through an e-mail to John asking whether anything needed to be changed on the cable. However, this e-mail failed to prompt further action on this CIR. The witnesses we interviewed had no recollection of the CIR and why it was not sent. We found no further record that anything was done with regard to the CIR.

In our view, the CIA should have sent the CIR to the FBI because of the important information it contained, and the FBI detailee should have followed up to ensure that it was sent. While we found evidence that Dwight inquired about its status at least once, there is no evidence that he took any other action to ensure that the information was sent to the FBI, including inquiring with other CTC supervisors about the need to send the cable to the FBI.

In reviewing the actions of the detailees, we found that the FBI lacked clear guidance on the role and responsibilities of FBI detailees to the CTC's Bin Laden Unit. This led to inconsistent expectations about what they were supposed to be doing at the CTC. Our review of the documents and interviews with the five FBI detailees to the CTC's Bin Laden Unit found that none of them had defined duties that were clearly understood, either by them or FBI managers. Nor were there any memoranda of understanding (MOU) between the FBI and the CIA setting out the job duties and responsibilities of any of the detailees.[252]

Moreover, we asked the FBI for the performance appraisals for all five of the detailees to the Bin Laden Unit during this period, and we received

---

[252] We asked both the FBI and the CIA for any memoranda of understanding between the agencies specifying the job duties of any of the detailees. The only MOUs we received, which were provided by the CIA, related to the administrative nature of the details, such as time and attendance reports, travel and training expenses, security clearances, and medical coverage. The MOUs did not address their substantive duties or responsibilities.

309

appraisals for three of them. They revealed that the FBI detailees were evaluated based on the elements for their positions at the FBI, not based on whatever they were supposed to be doing while working at the CTC.[253] The FBI was unable to provide any other documents defining or outlining the roles or responsibilities of these detailees.

We also interviewed the detailees about their understanding of their roles and responsibilities at the CTC. They stated that they were not given any specific instructions about their job duties. They described their details at the CTC as ill-defined and with little direction. As a result, each detailee defined the job at the CIA as he or she determined it to be, and there was significant variation in their conceptions of the job.

For example, Dwight told the OIG that he focused on leads that were related to financial components of terrorism, which he developed from various sources, such as from reviewing cable traffic, from his supervisors at the CTC, and from referrals from CIA officers at the CTC. By contrast, Malcolm told the OIG that he thought he was the "eyes and ears" of the New York Field Office, and that his role was "to monitor" cases being worked jointly by the CIA and the New York Field Office, such as the East African embassy bombings investigation. He said that he also would follow up on requests for information from the FBI to the CIA. Moreover, Mary said she was not given any specific instructions about her role at the CIA, but she was eventually trained to be a CTC desk officer and that was how she operated – like other CTC desk officers with specific assignments or "accounts."

Eric, who was a Bin Laden Unit Deputy Chief, said that he was told "to fix" the relationship between the Bin Laden Unit and the FBI, but he was not given any specific instructions about how to go about accomplishing this objective. He said that he assisted in the running of the Bin Laden Unit by directly overseeing CTC operations and that he also functioned in a liaison role between the CIA and the FBI. He supervised the FBI detailees like he did other Bin Laden Unit employees. He was not given any other supervisory

---

[253] For a fourth detailee, Mary, the FBI produced only a performance plan but no appraisal reports. The performance plan was related to her duties as an FBI IOS. Mary told the OIG that she was directed by CTC management based on her work as a CIA desk officer and was not evaluated by FBI personnel.

oversight particular to the detailees. He said that on his own initiative he tried to stay abreast of matters that might be of interest to the FBI by reading the CTC cable traffic. However, he explained that determining what might be of interest to the FBI was very subjective because there were no criteria defining what should be brought to the attention of the FBI.

We also interviewed the highest-ranking FBI employee detailed to the CTC, who was a Deputy Chief of the CTC from 1999 through 2002. We call him "Evan." Evan believed that one of the FBI detailees' functions would have been to review CIA cable traffic for information of potential relevance to the FBI. Yet, the detailees told the OIG that while reviewing CIA cable traffic was part of their jobs, it was not their function to review cable traffic for items of interest to the FBI, and they did not review all of the cable traffic on a daily basis. They said they did not think they were acting as backstops to ensure that anything that might be relevant to the FBI was brought to the FBI's attention.[254] The detailees asserted emphatically that their function did not entail scouring CIA cable traffic for the FBI, and their efficacy would be limited if they were perceived by CIA personnel merely as moles for the FBI.[255] They also explained that even if this had been their role, it would have been difficult to do because of the volume of cables, especially during the chaotic Millennium period.

The two FBI employees who held similar supervisory positions – one as a deputy chief in the Bin Laden Unit and the other as a deputy chief in another unit that later housed the Bin Laden Unit – also had differing views on their responsibility for reviewing cable traffic. Both agreed that their role was not merely to review cable traffic for items of interest to the FBI. Eric told the

---

[254] We also interviewed the first FBI employee detailed in March 1996 to Bin Laden Unit soon after it was created. This detailee was an agent from the FBI's New York Field Office, and he remained at the CTC until August 1998. He said that he did not attempt to review all of the cable traffic. He indicated, however, that when he did locate information of interest to the FBI, he did not encounter problems obtaining the CIA's permission to share this information with the FBI.

[255] Some CIA employees we interviewed stated that they, by contrast, believed that this was the function of the New York Field Office detailee. We discuss this further in the next section.

311

OIG that while he tried to review the traffic in order to stay abreast of the information in the CTC, it was too much for one person to manage effectively. By contrast, Craig, who followed Eric as a manager detailed to the CTC, told the OIG that he did not even attempt to review the cable traffic but only focused on those cables that required action on his part.

In addition to failing to clearly define the roles and responsibilities of the detailees, the FBI did not provide oversight of the detailees. Eric acted as one of two deputy chiefs within the Bin Laden Unit. After Eric left the CTC, Craig was a deputy chief in a much larger unit that included the Bin Laden Unit. Both said that they performed day-to-day supervision of the detailees in the same manner in which they supervised the other CTC employees assigned to their groups.[256] According to Eric and Craig, they did not focus specifically on the role of FBI detailees.

Evan told the OIG that he did not supervise any of the detailees, and he had no authority to oversee their duties or direct their activities, except by virtue of his position as a senior manager within the FBI. He said that they were evaluated by their chain of command in the FBI office from which they had been assigned, which is supported by the limited documents we reviewed. We found that there was no oversight by the FBI of the detailees based on their function as detailees.

The FBI's failure to adequately oversee the detailees is illustrated by the role of Mary, the only FBI analyst detailed to the Bin Laden Unit. She has been detailed to the CIA since 1998. Mary had the opportunity to learn valuable analyst skills by working alongside CTC personnel and then use those skills at the FBI. Additionally, the detail provided an opportunity to learn about the CIA infrastructure and establish liaison contacts at the CIA.

Mary told us that she operated as a full-fledged CIA desk officer, and that she has worked with FBI personnel during her detail but from the position of a CIA employee, not an FBI employee. We believe there needs to be a review of the duration of these details to ensure the value of these details is maximized.

---

[256] Eric left the CTC in mid-January 2000, and Craig did not arrive at the CTC until July 2000. Thus, between mid-January and July 2000 the FBI had no supervisory presence for the FBI employees detailed to work Bin Laden matters at the CTC.

At a time when the FBI is concerned about the shortage of qualified analysts to do the work it has, a 5-year detail of an FBI analyst working as a CTC employee warrants review by the FBI.[257]

The same lack of oversight and direction was evident regarding the work of Malcolm, the FBI New York Field office detailee to the CTC. He had been traveling to the CTC from New York on a weekly basis for four years, until January 2003. On Mondays he traveled from New York to the CTC, stopping by FBI Headquarters. On Fridays he stopped by FBI Headquarters on his way back to New York. After the bombing of the Cole, he spent at least half of his days in Washington, D.C. at FBI Headquarters. Thus, he was frequently away from the CTC and not in a position to maximize his potential for obtaining information at the CTC. This also left the perception with other CTC employees that he was not fully integrated into the CTC.

We found that that the FBI lacked a systematic approach to its use of detailees at CTC's Bin Laden Unit. The detailees could have functioned in one of three ways – as fully integrated members of the CTC working unilaterally on CTC matters, as backstops ensuring all pertinent CTC information was forwarded to the FBI, or in some combination thereof. While there are potential benefits to using the detailees in any of these functions, the potential benefits were not maximized because there was no clear understanding of the detailees' roles and no system to ensure that any objectives were met. The lack of oversight over FBI detailees to the CTC resulted in squandering critical opportunities for information sharing between the CIA and FBI.

We also found significant misunderstandings between employees of these two agencies regarding their respective responsibilities for information sharing. First, as noted above, we found that some CIA employees believed that FBI detailees had more responsibility for reviewing the CIA cable traffic than the FBI detailees believed that they had. One CIA Bin Laden Unit employee told the OIG that the CIA was not going to "spoon feed" information to the FBI and that the FBI personnel at the Bin Laden Unit had access to all of the CIA cable traffic. She stated that while the CTC provided to the FBI intelligence

---

[257] The OIG is in the process of completing a comprehensive review of FBI's analyst program.

information that contained a domestic nexus, she did not believe it was the CIA's responsibility to provide all of the predicating material, since the FBI detailees also had access to the same cables. In addition, CIA personnel described FBI detailee Malcolm as a "mole" for the FBI's New York Office, suggesting they thought he was reading CIA cables for the express purpose of reporting back to the New York Field Office on what he found.

In addition, we found that a similar misunderstanding existed among FBI employees in New York with respect to the role of the CIA employee detailed to the FBI's New York Field Office. A CIA employee assigned to the JTTF in the New York Field Office had a desk in that office's sensitive compartmented information facility (SCIF).[258] FBI agents in the New York Field Office asserted to the OIG that this individual was knowledgeable regarding their investigations and that he was responsible for reviewing CIA traffic, finding items of interest to the FBI, and bringing this information to the attention of appropriate New York agents.

The CIA employee, however, denied that this was his role. He told the OIG that he had been sent to the New York Office to "improve the relationship between the CIA and the FBI" and that he provided the FBI with CIA intelligence that was designated for the FBI New York Field Office's review. He stated, however, his job was not to "spoon feed" information but only to make it accessible to the agents in New York. This meant that he would print information obtained from CIA databases that was of potential interest to the FBI New York Field Office and make that information available for review in the SCIF if FBI agents decided to come and review it. But, apparently unknown to many New York FBI agents, he believed the onus was on FBI personnel to come into the SCIF and see if any new, relevant information had arrived, rather than to alert them to that information. He also said that while he generally knows what the various FBI squads are investigating, the New York JTTF has over 300 members and he could not reasonably be expected to have knowledge of all their investigative interests. He said that if he spent his time

---

[258] The FBI agents do not routinely work in a SCIF area. The computers on which they access ACS do not contain sensitive compartmented information or materials classified above Secret. Because a high percentage of CIA traffic contains this information, the CIA detailee must work in a separate area.

314

solely looking for information of interest to the FBI, he would never get any work done.

As a result, FBI agents in New York believed they were receiving from this CIA employee assigned to the JTTF all of the CIA information of interest to the FBI, when in fact they were not. Therefore, the New York agents could have received information on Hazmi and Mihdhar directly through their own CIA employee, but they misunderstood the process.

### 2. FBI employees' lack of understanding of CIA reporting process

These gaps in the information sharing process were exacerbated by FBI personnel's lack of understanding of the CIA's reporting process. This problem is clearly illustrated by the failure of the FBI to obtain the information on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ by the joint FBI/CIA joint source.

As detailed above, we concluded that the FBI's ALAT was not made aware of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Although the ALAT attended the debriefing of the source, the ALAT did not immediately receive the information that the source had identified Khallad. We were unable to ascertain the reasons for this significant omission. However, our review found that there were later opportunities for the ALAT to have obtained information about the identification from CIA documents. In addition, we found that the New York FBI agents working the Cole attack investigation did not learn of this significant information, despite interviewing the source on several occasions. We believe this was due in part to the fact that the FBI personnel were not familiar with the CIA's process for reporting intelligence information.

As discussed previously, the CIA primarily relies on cable traffic to share intelligence among its personnel who are stationed around the world. None of these cables are available for FBI review, except by the limited number of FBI personnel with direct access to CIA computer systems, such as the detailees at the CTC.

The CIA uses a certain type of cable called a TD to disseminate CIA information outside of the CIA to other U.S. government agencies. These cables are created by CIA reports officers based on their review of the internal

315

CIA cable traffic. The reports officers were described to us as "editors" who remove references to sources and methods contained in the cables and determine what information should be further disseminated in the TDs. As a result, TDs did not necessarily include all the substantive information contained in the internal cable traffic.

Our review found the ALAT did not understand that the TDs did not necessarily contain all of the intelligence gathered by the CIA from a particular source or on a particular event. The ALAT had been keenly aware of the significance of Khallad to the FBI, and contemporaneous FBI documents outline his efforts in mid-January 2001 to try to ensure that all the information obtained from the joint source was provided to the UBL Unit at FBI Headquarters and the Bin Laden Squad in the New York Field Office. However, he relied on the TDs concerning the source's reporting to ensure the completeness of the information that he had provided to his FBI colleagues. The ALAT erroneously believed he had obtained all the source reporting through the TDs. This was not the case. ▮▮▮▮▮▮▮▮ was only reported in an internal CIA cable and was never included in a TD.

In addition to the ALAT, New York FBI agents working on the Cole investigation told us that when they read a TD regarding a particular subject (which they could access through CTLink), they mistakenly believed that it contained all relevant information from the source debriefings. The primary Cole case agent told us that he believed that the CIA operational cables dealt with techniques and methods, but he did not know that these cables also contained the details of debriefings. He said that he had "assumed" all the substantive reporting would be contained in the TDs, so he never asked the CIA to allow him to review the underlying cable traffic.

If these FBI employees had a more thorough knowledge of the information flow within the CIA, they could have ensured that they received all the relevant information from the joint source. This was especially significant in the case of Hazmi and Mihdhar because the CIA and FBI had decided the majority of the joint source's reporting would be handled through CIA channels, and the ALAT did not independently report in FBI documents most of the source's information. For example, in this case, the FBI could have requested to review the CIA's internal cables or asked the interviewing CIA officer to review the TDs and the FBI documentation to ensure all the

316

information had been captured. However, the lack of understanding by FBI personnel of the CIA reporting process and its procedures for sharing intelligence contributed to the FBI not learning of significant information in CIA cables about Khallad – [REDACTED]

### 3. Inadequate procedures for documenting receipt of CIA information

We also found that the FBI lacked consistent policies or procedures for the receipt and documentation of intelligence information received from the CIA. In addition, structural impediments within the FBI undermined the appropriate documentation of information received from the CIA.

As we detailed above, the information concerning the surveillance of [REDACTED], was verbally conveyed in January 2000 by a CIA officer to two FBI employees who were working in the FBI's Strategic Information Operations Center (SIOC). But this important information was not documented in any retrievable form at the FBI.

The FBI was able to provide only three documents regarding the briefing on this information. First, one FBI e-mail message was recovered through a painstaking review of messages on an FBI server that the FBI searched in connection with a request from the JICI. Although this written record survived from that time, no analyst or agent would have had access to the information, learned of its existence, or been able to conduct the type of search that led to the discovery of this document. Second, information regarding the briefing was also located in one of the FBI Director's daily briefing documents prepared in response to the Millennium threats. These briefing documents, however, were not electronically archived in a searchable database that analysts or agents in the field could access. Third, a brief handwritten note about the information he received from the CIA was contained in the personal daily calendar of one of the FBI employees briefed by the CIA officer in the SIOC.

We found there were no clear procedures for documenting intelligence communicated by the CIA to the FBI in an informal manner, such as the verbal

317

briefings on Mihdhar in the SIOC. Although the SIOC had been activated during the Millennium for the express purpose of handling threat information from various sources, FBI personnel assigned to the SIOC during this period told us that there were no procedures for the receipt and handling of interagency information communicated informally unless it related to an ongoing FBI investigation. Although one witness suggested that some type of log might have existed to record incoming physical information, such as documents, the FBI found no such log. Moreover, FBI witnesses told us that the log would not have been used to document verbal briefings. Therefore, any documentation of information received informally would have been at the discretion of the recipient.

We are not suggesting that every informal communication from the CIA to the FBI should be documented. We also recognize it is difficult to know the significance of any individual piece of information when it is received. Yet, we believe that the FBI should attempt to establish criteria or guidance for determining what information from informal briefings should be documented, and how it should be documented. The information received in the SIOC on Mihdhar was recorded only in a briefing provided to the Director and executive staff, which is not available to others throughout the FBI. Clearly, the authors of the Director's daily briefing believed there was some import to this information. Because the Mihdhar information was never documented in an accessible format, only those individuals personally informed about the CIA's information on the Malaysia meetings or those present for the Director's briefings were made aware of the Mihdhar information. In effect, it was lost to everyone else because no analysts or field agents would be able to search for or locate this information. An effective analytical program requires that analysts have access to all available information, and that pertinent information is not contained solely in the personal memories of selected individuals.

This was particularly significant because the information on Mihdhar initially did not appear to be important. But it subsequently became very significant. ████████████████████████████████ At this time, the e-mail and the information from the Director's briefing in January 2000 were not available to the FBI personnel. Without mechanisms to maintain information in which the significance is not immediately apparent, the FBI will not be able to fully connect and analyze disparate pieces of information for their significance.

In addition, even if the agents who received the information in the SIOC had wanted to document it in a form that was available throughout the FBI, the FBI lacks an information technology system capable of adequately handling this type of information. As discussed previously, the FBI's primary electronic information storage system is the Automated Case Support (ACS) System. ACS is a case management system designed to capture information related to specific investigations and not for this type of general intelligence information. There was no FBI system that would allow this type of information to have been maintained so that it would be available for directed searches or other subsequent data mining. It is also important to note that ACS is not approved for storage of information classified above the Secret level and is not approved for storage of any sensitive compartmented information. Thus, it is not available for storage of the majority of the relevant Intelligence Community information, including the information on Hazmi and Mihdhar.

In the absence of effective methods for recording and retrieving information obtained from other intelligence agencies, the benefits of increased information sharing among the agencies will remain of limited use. Based on the system in effect during this period, the value of the information was minimal, unless the information was relayed to an individual who could immediately use the information or the information related to an ongoing FBI investigation. When, as here, subsequent additional information increases the significance of the prior information, the absence of an effective information retrieval system effectively precludes any meaningful effort by the FBI to analyze the disparate pieces of information over time.

In sum, despite the fact that some personnel at the FBI were aware in January 2000 that Mihdhar ████████████████████████████████████████, this information was unavailable for further analysis or use once the SIOC closed down in late January or early February 2000. Because no one was assigned to document, follow up, or track the information on Mihdhar, the FBI's opportunity to discover Mihdhar's valid U.S. visa during this period and therefore try to locate him was lost.

### 4. Lack of appropriate infrastructure in FBI field offices

Information sharing with the FBI also was impeded by the inadequate facilities for the handling of intelligence information in the two field offices

319

…

most directly involved in the Hazmi/Mihdhar matter. Intelligence information from the CIA is often classified at a high level. As a result, safeguards must be taken in handling the information, while still allowing appropriate FBI employees the ability to access and use the information. Unfortunately, the FBI's field offices generally lacked both the necessary physical infrastructure and information technology to readily use this type of information. Without the appropriate physical infrastructure, the FBI will not be able to handle sensitive information in an effective manner.

To handle SCI classified material, employees must store and review such information in a SCIF. Access to the SCIF is limited to individuals with the appropriate clearance level and the need to know the information in the SCIF. Adequate security measures must be implemented to prevent unauthorized individuals from gaining access to the spaces containing such materials. The type of equipment that may be brought into the space is also strictly limited. For example, cellular telephones, two-way pagers, and other unsecured communication devices are prohibited. Telephones in SCIFs must be designated for secure transmissions. Computer networks also must be secured for transmission of information.

During our review, we observed the workspaces in the FBI New York and San Diego Field Offices and found that they were not set up to adequately handle the type of information involved in the Hazmi and Mihdhar cases. These workspaces were not adequately secured to permit FBI personnel to handle CIA and NSA information at their own desks, even if they had been given the information. Nor were the SCIFs suitable to permit agents to regularly access or handle such information. In the New York Field Office, for example, the SCIF we were shown was extremely small. The CIA detailee to the JTTF worked in this SCIF, but there was little room for any other personnel to enter, let alone use it as a workspace. In the San Diego Field Office, a small SCIF was used as a secure communications center for the entire office. The San Diego office lacked a separate SCIF for the JTTF,[259] including the CIA

---

[259] We were informed that a separate SCIF for the JTTF is under construction in the San Diego Field Office. However, this SCIF will only be large enough to accommodate three or four employees at any one time.

representative assigned to the task force. As a result, the San Diego agents were hampered in their ability to access CIA information.

We also found that New York and San Diego FBI agents did not have sufficient access to secure telephones, known as Secure Telephone Unit third generation or STU III telephones. The limited STU III phones available had to be shared among numerous agents. Again, this made communications involving classified material within the FBI or with other members of the Intelligence Community more difficult. An entire squad comprising as many as 25 individuals shared one or two STU III phones.

In addition, as noted above, the FBI agents did not have access to computer systems that could store much of the information received from the CIA. The computers at each agent's desk in the New York and San Diego Field Offices only provided access to ACS. This system does not permit storage or access to any information classified above the Secret level or any information deemed sensitive compartmented information. Therefore, even if the FBI recipients of the CIA information regarding Hazmi and Mihdhar had wanted to document and store such information in a retrievable fashion, they could not have stored it on the system that FBI agents use. The FBI had no internal system in New York and San Diego that allowed them to use the type of information involved in the Hazmi and Mihdhar case.

In addition, most FBI agents in the field did not have direct access to CTLink, the shared Intelligence Community database that did contain some of the information on Hazmi and Mihdhar, such as the NSA information. Field agents could not access, let alone conduct research, on this system. As a result, even if the New York and San Diego agents wanted to search for relevant information about Hazmi and Mihdhar, any sensitive or highly classified information obtained from the NSA and CIA could not be stored in the one system that they used.

In contrast, we observed that the CIA's workspaces permitted their employees to access highly classified information on computers in their personal workstations. Each CIA employee had their own secure computer on which they could receive and research highly classified material. They had several secure telephones that could be used to discuss Top Secret information with others. The difference in CIA and FBI workspaces was particularly stark in the FBI's San Diego Field Office where, due to the lack of access to an