appropriate SCIF, the CIA employee co-located with the FBI's San Diego Field Office could not access CIA systems. To access CIA systems, he had to travel to a domestic CIA station.

### 5.    OIG conclusion on impediments to information sharing

In sum, significant and systemic problems that were evident in the FBI's handling of the Hazmi and Mihdhar case inhibited information sharing between the FBI and CIA. The FBI failed to define the roles and responsibilities of the FBI detailees to the CTC's Bin Laden Unit. The FBI failed to ensure effective oversight of the detailees at the CTC. The FBI and the CIA failed to develop a clear understanding of the function of detailees from each other's agencies. The FBI failed to understand the CIA's reporting process. The FBI lacked an adequate computer system and appropriate infrastructure for handling intelligence information not directly related to a specific investigation.

Although these systemic problems affected the flow of information between the FBI and CIA, we do not believe they fully explain the FBI's failure to obtain the critical information on Hazmi and Mihdhar. Employees at both the CIA and the FBI failed to provide or seek important information about Hazmi and Mihdhar, despite numerous interactions between them on issues related to Hazmi and Mihdhar from January 2000 through August 2001. We found these interactions were substantive and that much of the information about Mihdhar and Hazmi was exchanged through these ongoing efforts. Unfortunately, the critical pieces of information relating to Hazmi and Mihdhar did not become known to the FBI until shortly prior to September 11. As a former CTC Bin Laden Unit Deputy Chief aptly summarized it to us, "information that should have been shared was not, repeatedly."

### B.    The actions of the San Diego FBI

In addition to issues that affected information sharing between the FBI and the CIA, the FBI had other opportunities to find information about Hazmi and Mihdhar before the September 11 attacks. The time that Hazmi and Mihdhar spent in San Diego was an opportunity during which the FBI could have obtained information about them but did not. As discussed above, Hazmi and Mihdhar entered the United States in January 2000 and moved to San Diego in February 2000, where they resided unbeknownst to the FBI. While in San Diego, Hazmi and Mihdhar associated with Omar al-Bayoumi, a person

322

whom the FBI had previously investigated, and they also lived with an active, FBI informational asset. Yet, the FBI did not become aware of their presence in San Diego until after September 11, 2001.

Because Bayoumi spent a significant amount of time with Hazmi and Mihdhar in early 2000, it is possible that – had a full field investigation of Bayoumi been open at the time – the FBI could have discovered Mihdhar and Hazmi's presence in San Diego and also uncovered the CIA information about their attendance at the Malaysia meetings. Because Hazmi and Mihdhar lived with an FBI asset, it is also possible that if the FBI had documented their presence in San Diego, it would have provided additional investigative leads that could have aided the New York FBI in locating them in August 2001. We therefore evaluated the San Diego FBI's investigation of Bayoumi and the decision to close its preliminary inquiry on him in June 1999. We also examined the San Diego FBI control agent's decision not to obtain or document information from his information asset about Hazmi and Mihdhar, who were boarders in the asset's house.

In examining the San Diego Field Office's handling of the Bayoumi investigation and the informational asset, we also found that, despite the fact that FBI Headquarters had established counterterrorism as a top priority of the FBI in 1998, the San Diego Field Office was continuing to pursue drug trafficking as its top priority in 2001. While the FBI made counterterrorism its top priority on paper, the FBI took few steps to ensure that field offices complied with this directive. We discuss this issue at the end of this section.

### 1.    The San Diego FBI's preliminary investigation of Bayoumi

As discussed above, Bayoumi is a Saudi national who in January 2000 had been living in the United States for approximately six years, was well-paid by a Saudi company that contracted with the Saudi government, and was involved in setting up mosques in the San Diego area. Hazmi and Mihdhar met Bayoumi in Los Angeles approximately two weeks after entering the United States in January 2000. A few days later they moved to San Diego, where Bayoumi assisted them in obtaining an apartment in the complex where he lived. They lived in this complex for four months.

Bayoumi's name had first surfaced at the FBI in 1995 in connection with other investigations. Bayoumi's name resurfaced at the FBI on August 31,

323

1998, when his apartment manager contacted the FBI to report her suspicions regarding Bayoumi's activities. The manager reported that she had been notified by the U.S. Postal Inspection Service in March 1998 that Bayoumi had been sent a "suspicious" package from the Middle East. According to the manager, the package had broken open and had a number of wires protruding from it. She reported further that the apartment complex maintenance man had noticed a number of wires protruding beneath the bathroom sink in Bayoumi's master bedroom. She reported that there had been large meetings of men, who based upon their dress appeared to be Middle Eastern, gathering in Bayoumi's apartment on weekend evenings. She also complained that several parking spots were being illegally used by the people gathering at Bayoumi's apartment.

On September 8, 1998, the San Diego FBI opened a preliminary inquiry on Bayoumi.[260] The assigned agent checked FBI indices for further information regarding Bayoumi and conducted other investigative steps.

The agent contacted the U.S. Postal Inspection Service in reference to the alleged "suspicious" package sent to Bayoumi. A postal inspector advised the FBI agent that "suspicious" did not necessarily mean "nefarious," and the vast majority of suspicious packages were benign. The postal inspector reviewed the report relating to the Bayoumi package and told the agent that the package had been deemed "suspicious" because it had no customs papers or appropriate postage and originated in Saudi Arabia. According to the report, there was no record of any wires protruding from the package, Bayoumi had retrieved the package, and it was no longer called a "suspect parcel."

According to the FBI agent, the apartment manager agreed to record the license plate numbers of the meeting participants. However, the manager later advised the agent that meetings had dwindled to a few participants and then stopped all together.

---

[260] In accordance with the Attorney General's Foreign Counterintelligence Guidelines, a preliminary inquiry could be opened when there was information or allegations indicating that an individual is or may have been an international terrorist or a recruitment target of an international terrorist organization. Preliminary inquiries were permitted to remain open for 120 days and had to be closed unless the FBI obtained sufficient evidence to open a full field investigation.

The agent asked fellow FBI agents to ask their "logical sources" for information regarding Bayoumi. The sources related the following concerning Bayoumi:

- Bayoumi was married with small children and had recently completed a master's degree program and he was looking for a Ph. D. program, but his test scores were too low. He was approximately 30 years old and unemployed.

- Bayoumi was a Saudi who regularly attended the ICSD (Islamic Center of San Diego). He was married with children and was working on a master's or other advanced degree.

- Bayoumi reportedly delivered $400,000 to the Islamic Kurdish community in El Cajon, California in order to build a mosque. Source opined Bayoumi "must be an agent of a foreign power or an agent of Saudi Arabia."

- Bayoumi was in the U.S. on a student visa but was applying for a green card. Bayoumi claimed to have a master's degree and was working on a Ph. D. His father was sending him $3,000 a month for support while he was in school.

The FBI agent also contacted the INS in reference to Bayoumi's immigration status. An INS special agent advised that Bayoumi was in the U.S. on an F-1 student visa, but his work visa had expired. However, the INS reported that his visa could be renewed.

The FBI agent received no further substantive information in response to various information checks. According to the agent, the only remaining option was to conduct an interview of Bayoumi. After her supervisor consulted with fellow FBI agents who were working on a large, sensitive counterterrorism investigation involving an alleged terrorist organization, the supervisor instructed the agent not to conduct the subject interview of Bayoumi.[261] The agent told the OIG that she did not believe the decision was inappropriate

---

[261] The file indicates that the decision not to conduct an interview was due to an investigation that included a proposed proactive element. The FBI believed that the benefits of interviewing Bayoumi did not justify the risk to the proposed operation.

325

based on the potential effect of such an interview on the other sensitive investigation.

On June 7, 1999, the FBI closed its preliminary inquiry on Bayoumi, and he was no longer actively under investigation by the FBI.

The FBI case agent told the OIG that she had no concrete information linking Bayoumi to any terrorist activities. She stated that the allegations that gave rise to the preliminary investigation were not substantiated. With respect to the source reporting that Bayoumi had received large sums of money from overseas, the case agent explained it was not unusual for foreign students, especially from Saudi Arabia, to regularly receive money, even large sums of money. Therefore, the case agent did not consider this to be inherently suspicious. The agent's squad supervisor at the time and other agents on the squad also told the OIG that it was not unusual or suspicious for Saudi students to have received large sums of money from Saudi Arabia.

As stated above, one source had provided unverified information that Bayoumi could potentially be a Saudi intelligence operative or source. According to the agent, Bayoumi was allegedly very involved and interested in Saudi affairs in San Diego, and this probably led to the suspicions about Bayoumi's connection to the Saudi government. However, the agent told the OIG that Saudi Arabia was not listed as a threat country and the Saudis were considered allies of the United States.[262] Therefore, Bayoumi's potential involvement with the Saudi Arabian government would not have affected the FBI's decision to close the preliminary inquiry.

The squad supervisor at the time of our investigation, who had been an agent on the squad for several years, told the OIG that before September 11, the Saudi Arabian government was considered an ally of the United States and that a report of an individual being an agent of the Saudi government would not have been considered a priority. Other agents on the squad also said that a source reporting that an individual was an agent of the Saudi government

---

[262] Country threats are defined by the FBI as foreign governments or entities whose intelligence activities are so hostile, or of such concern, to the national security of the United States that counterintelligence or monitoring activities directed against such countries are warranted.

326

would not have been cause for concern because the Saudi government was considered an ally of the United States.

In addition, the case agent explained that more intrusive investigative techniques could not be conducted because of the restrictions of the Attorney General FCI Guidelines in effect at the time. No meaningful surveillance could be conducted, no bank records or other financial records could be sought, and very little investigative activity beyond fully identifying the individual could be done.

In sum, we do not believe that the FBI's actions with regard to Bayoumi and its decision to close the preliminary inquiry were inappropriate. The agent conducted logical investigative steps that were permitted under the Attorney General Guidelines in effect at the time, such as checking FBI records for information, asking other intelligence agencies for information about the subject, and asking agents to query their sources about the subject, but the agent did not uncover any information to support the allegations. The Guidelines did not permit the case agent to engage in more intrusive investigative techniques, such as a clandestine search of Bayoumi's property, obtaining his telephone or financial records, or secretly recording his conversations.

Although the Attorney General Guidelines would have permitted a subject interview of Bayoumi prior to closing the preliminary inquiry, the decision not to conduct an interview appeared warranted, given its possible effect on an ongoing significant investigation.

### 2.    The FBI's handling of the informational asset

As described above, in May 2000 Hazmi and Mihdhar began renting a room in the home of an FBI informational asset. An FBI San Diego Special Agent who we call "Stan" was the asset's control agent since the asset was opened in 1994. The asset had provided the FBI with significant information over the years and was considered a reliable source. He was well known in the Muslim community. He often rented rooms in his house to Muslim men in the community who needed temporary housing. At the time that Hazmi and Mihdhar moved in with him, he had two other individuals renting rooms in his house. Mihdhar lived with the asset until June 10, 2000, when he left the

327

United States, and Hazmi remained as a boarder at the asset's home until December 2000.

According to Stan, the asset told Stan that two young Saudis who had recently come to the United States to visit and study had moved in as boarders. The asset described them as good Muslims who often went to the mosque and prayed. The asset provided Stan with their first names but little other identifying information. Stan did not obtain any additional information from the asset about the boarders, such as their last names, and he did not conduct any investigation of them.

Had Stan pursued information about Hazmi and Mihdhar, he might have uncovered the CIA information about them. In addition, he might have created a record in FBI computer systems about Hazmi and Mihdhar's presence in San Diego, which would have provided the FBI with additional information and avenues of investigation when it began to search for them in August 2001. For these reasons, we examined Stan's actions with regard to the asset.

In interviews with the JICI staff and in congressional testimony, Stan stated that the informational asset primarily provided information about the activities and identities of persons in the Muslim community in San Diego who were the subjects of FBI preliminary inquiries or full field investigations.[263] Stan said that the asset volunteered some information about other individuals as well. He said he thought that the asset had good judgment about which individuals might pose a threat and that his reporting had been "consistent" over the years. We reviewed the asset's file and noted the asset provided information on a regular basis on a variety of different individuals and topics. Although we could not evaluate the asset's judgment from the file, we consider Stan's description of the asset's reporting to be apt.

Stan also stated that he was aware that the asset had boarders in his house over the years, and the fact that two new boarders had moved in with the asset did not arouse suspicion. He noted that the asset volunteered that the two boarders were living with him soon after they moved in, but the asset provided the information about his boarders as part of a personal conversation and not

---

[263] As noted above, Stan has retired from the FBI and declined to be interviewed by the OIG.

because the asset believed that it had any significance.  Stan stated the information provided from the asset was that the two boarders were from Saudi Arabia, which, according to Stan, was not a country that the United States had placed on the list as a threat to national security.  Stan said that the asset did not describe his boarders as suspicious or otherwise worthy of further scrutiny.  He also asserted that he was prohibited from further pursuing the information about Hazmi and Mihdhar, including documenting the information that he had obtained, because of the Attorney General Guidelines in effect at the time.

In examining Stan's actions, we first considered whether the Attorney General's FCI Guidelines were applicable to the situation involving Hazmi and Mihdhar.  As suggested by Stan, the Attorney General's FCI Guidelines were designed to ensure that the FBI opened preliminary inquiries and conducted investigations only if the required predicating information was present.  Because there were no allegations or information provided to Stan that Hazmi and Mihdhar were terrorists or agents of a foreign power, we agree that Stan did not have sufficient information to open a preliminary inquiry and actively investigate Hazmi and Mihdhar.

We also considered whether, at a minimum, Stan could have attempted to obtain additional information about people who were living with his informational asset, such as their full names, and whether he was required to document the information on Hazmi and Mihdhar that he had received from his asset.  First, we reviewed FBI policies and procedures for handling assets.  Those policies did not require Stan to obtain information from an informational asset about people living in the asset's house or to conduct record checks to obtain this information.  In addition, the policies do not appear to require Stan to have documented information received from the asset about anyone living with him, or to even document their full identities if he had obtained that information.

We also interviewed several FBI agents who were on Stan's counterterrorism squad and asked them whether it would have been their practice to seek additional information about boarders living with an informational asset and what, if anything, they would have done with this information.  We found no consensus among them about whether information on boarders like Hazmi and Mihdhar who lived with an informational asset should have been obtained and documented.  Some agents stated that they would have pursued more information about boarders living with an

329

informational asset, while others stated that they would not have. Some of the agents stated that they would have noted the fact of the informational asset having boarders in his file. Some agents stated that they would have documented the identities of the roommates in an EC that would have been uploaded to ACS. However, former San Diego Division Special Agent in Charge William Gore told the OIG that he "did not believe anything had been done wrong" in the handling of the informational asset and he did not fault Stan for not obtaining the information.

While we recognize that no FBI policy addressed this issue and there was a lack of consensus on what should have been done in a situation like this, we believe that it would have been a better practice for Stan to have questioned the informational asset about his boarders and obtained their full identities. Stan was aware that Hazmi and Mihdhar were relative strangers to the informational asset, and that they were not friends, family, or long-time associates of the asset. Stan also was aware that the asset had no direct knowledge of Hazmi and Mihdhar's backgrounds and could not vouch for their character. Moreover, the boarders in the asset's home were in a position to put the asset and the information he supplied to the FBI in jeopardy. Therefore, prudence and operational security would suggest that information about persons living with the asset should have been sought, at least to the extent of learning and documenting their names, and perhaps running a records check on them.

If Stan had asked more questions about the asset's boarders, he also may have acquired enough information to pursue further inquiry. For example, the asset has stated after the September 11 attacks that Hazmi and Mihdhar did not make telephone calls from his house, and that in retrospect he found this behavior to be suspicious. The asset also stated after September 11 that he had told Hazmi to stay away from Bayoumi because of his alleged association with the Saudi government. Therefore, if Stan had asked the asset a few more questions about Hazmi and Mihdhar and acquired this kind of information, it may have led Stan to conduct further inquiries, particularly since Bayoumi had been the subject of an FBI investigation.

Moreover, while no specific FBI policy required agents to obtain information about persons living in a house with an informational asset, FBI policies required control agents to continuously evaluate the credibility of their informational assets. Before informational assets are approved, they are required to undergo a background investigation to assess their suitability,

credibility, and "bona fides."[264]  Certain minimum checks were required, such as a check of FBI indices, local criminal checks, and CIA traces.  The policy provided that additional checks "may be deemed necessary," such as querying other assets and running indices checks on immediate family members.  In addition, FBI policy provided that an asset's bona fides "should be continually addressed," even after the initial assessment was completed.

More specifically, the FBI field office is required to conduct a yearly evaluation of each informational asset and provide the evaluation report to FBI Headquarters.  This report is required to contain, among other things, the FBI's number of contacts with the informational asset during the reporting period, a summary of the most significant information furnished by the informational asset, the number of preliminary inquiries and full investigations that were opened based on information provided by the informational asset, and "steps that have been taken to establish asset bona fides since last evaluation."  Although Stan would not have been required to obtain additional information about his informational asset's boarders to complete this report, the FBI's policy of continually vetting the credibility of its assets permitted Stan to seek more information about Hazmi and Mihdhar and the other boarders from his asset and run indices checks on any persons living with his informational asset.

We reviewed the informational asset's file, Stan's yearly evaluation of the asset, and Stan's reporting on the bona fides checks conducted on the informational asset.  Based on our review, we were concerned by the lack of information included in the file in support of the bona fides checks conducted by Stan each year.  In each of the documents provided to FBI Headquarters about the informational asset that we reviewed, Stan wrote the following perfunctory paragraph:  "Asset bona fides have been established through independently received reliable asset reporting, [redacted] and physical surveillance."

Stan maintained no predicating information in the file on these bona fides checks.  The file did not disclose which checks or surveillance had been

---

[264] The FBI defines "bona fides" to mean that the asset or informational asset "is who he/she says he/she is;" that the asset "has the position or access the asset claims to have;" and that the asset "is not working for or reporting to a foreign intelligence service or international terrorist organization without the knowledge of the FBI."

conducted, by whom, when, or the results. Without that material, the informational asset's bona fides were merely verified through the attestation of Stan. It is possible that Stan conducted numerous indices checks and conducted an exhaustive bona fides check on the informational asset each year. It also is possible that he conducted minimal or no checks and merely attested to the informational asset's credibility based on their personal history and relationship. Because we were unable to interview Stan, we could not determine which was more likely.

However, no FBI policy described the level of detail to be contained in an asset file. We believe the policy should require an asset file to contain at least minimal information to allow a reviewer to independently verify that an adequate background check has been conducted. This information is necessary to allow FBI managers to determine whether the control agent is continuing to assess each informational asset's credibility. This information would also help ensure that the control agent has not become too comfortable with the informational asset and thus vulnerable to being misled or failing to obtain adequate information about the asset.

We also were concerned by the lack of policy or practice specifying what information from the asset must be documented. The Hazmi and Mihdhar case clearly demonstrates that information must be documented to be useful. Even if Stan had obtained the full names of Hazmi and Mihdhar from the informational asset, he would not have been required to document it in any retrievable format. Without the requirement to document such information, the information would not have been accessible to other FBI personnel. For information to be useful, it must be documented in a retrievable form and it must be available for consideration and analysis.

In sum, we believe that Hazmi and Mihdhar's presence in San Diego should have drawn some scrutiny from the FBI. Although unknown at the time, documenting their presence in San Diego in a searchable and retrievable manner would have provided an opportunity for the FBI to connect information in the future. If Hazmi and Mihdhar's presence in San Diego in 2000 had been documented, an FBI indices record check in August 2001, when the FBI received information from the CIA that Hazmi and Mihdhar had entered the

332

United States, might have led the FBI to the San Diego information. This connection would have provided substantive leads for the New York FBI's effort to locate Mihdhar in August 2001.[265]

### 3.    San Diego FBI's failure to prioritize counterterrorism investigations

As discussed in Chapter Two, in 1998 the FBI adopted a 5-year strategic plan that established the FBI investigative priorities in a 3-tier system. Tier I priorities were "foreign intelligence, terrorist, and criminal activities that directly threaten the National or Economic Security of the United States." Tier II priorities were "crimes that affect the public safety or undermine the integrity of American society: drugs, organized crime, civil rights, and public corruption." Tier III priorities were "crimes that affect individuals and property such as violent crime, car theft, and telemarketing scams…"

On March 15, 1999, shortly after Director of Central Intelligence George Tenet asserted the U.S. Intelligence Community was declaring war on Usama Bin Laden and al Qaeda, FBI Headquarters established national level priorities within its Counterterrorism Program. Bin Laden and al Qaeda, along with the Bin Laden-allied Egyptian Islamic Jihad (EIJ) and al Gama'at al Islamiyya (IG), were designated as "priority group one" for the FBI's counterterrorism efforts.

Our review of the Hazmi/Mihdhar chronology revealed no appreciable shift in resources by the FBI's San Diego Field Office in response to these changed priorities. We found that prior to September 11, 2001, the actual investigative priority for the San Diego Field Office was drug trafficking. According to former San Diego Special Agent in Charge William Gore, the highest concentration of FBI agents and resources in San Diego was directed at combating drug trafficking based on the FBI's process and procedures used each year to set priorities in its field offices. He said that white-collar crime was the office's second priority, and violent crime was its third priority.

---

[265] As noted, Mihdhar and Hazmi used their own names to open bank accounts, conduct financial transactions, obtain state identification cards, purchase a vehicle, obtain telephone service, take flying lessons, and rent an apartment while residing in San Diego.

333

Counterterrorism was only the fourth priority for the San Diego FBI office. The counterterrorism efforts in San Diego were directed primarily at another terrorist organization and related groups not connected to Al Qaeda, and the majority of San Diego's counterterrorism investigations targeted activities related to the indirect support of terrorism conducted by those groups.

We found that the San Diego FBI focused little to no investigative activity on al Qaeda prior to September 11. San Diego FBI personnel stated to us that they had believed there was no significant al Qaeda activity in San Diego based on information from their sources and investigative activities. The former supervisor of the San Diego counterterrorism squad explained their job at the field office level was to "shake the tree and see what fell out" in relation to potential terrorism activities in their area. Although San Diego agents assigned to counterterrorism conceded they had received little to no specific training concerning Bin Laden or al Qaeda, they asserted that al Qaeda did not have a significant presence in San Diego prior to September 11.

Yet, al Qaeda was present in San Diego, unbeknownst to the FBI. Hazmi and Mihdhar resided in San Diego. Unfortunately, the San Diego agents were not focusing on al Qaeda. Even though FBI Headquarters had designated al Qaeda as the number one counterterrorism priority, the San Diego FBI was not attempting to identify individuals that were associated with al Qaeda.

Since September 11, many San Diego agents have been moved from other squads and assigned to counterterrorism. Significantly, the San Diego office opened a large number of intelligence investigations on potential al Qaeda subjects immediately after September 11. Obviously, the focus and priorities dramatically changed after September 11. But there is no reason to believe the al Qaeda presence in San Diego began only after September 11. If San Diego's focus on counterterrorism and al Qaeda had occurred earlier in San Diego, there would have been a greater possibility, though no guarantee, that Hazmi's and Mihdhar's presence in San Diego may have come to the attention of the FBI before September 11.

However, it is important to note that San Diego's allocation of resources before September 11 and the lower priority it gave to the Counterterrorism Program were not atypical of FBI field offices before September 11. In an OIG September 2002 audit report entitled "A Review of the Federal Bureau of Investigation's Counterterrorism Program: Threat Assessment, Strategic

Planning, and Resource Management," we found that "Although the FBI has developed an elaborate, multi-layered strategic planning system over the past decade, the system has not adequately established priorities or effectively allocated resources to the Counterterrorism Program."

Furthermore, the OIG report found that resources were not allocated consistent with the FBI's priorities – particularly at the field office level – because of the lack of "management controls" in the FBI's "complicated and paper-intensive strategic planning process." Instead of allocating resources based on FBI priorities, field offices allocated resources primarily based on previous caseloads in the field office. According to the report, prior to September 11, "the Bureau devoted significantly more special agent resources to traditional law enforcement activities such as white collar crime, organized crime, drug, and violent crime investigations than to domestic and international terrorism investigations." For example, in 2000 twice as many FBI agents were assigned to drug enforcement than to counterterrorism. Thus, the San Diego's office allocation of resources was not different from many other FBI field offices, despite the stated priorities of the FBI.

### C.    Events in the spring and summer of 2001

As described in the factual chronology, the FBI had several opportunities in the spring and summer of 2001 to obtain critical intelligence about Mihdhar and Hazmi. Although the FBI and the CIA were discussing Mihdhar, Khallad, and the Cole investigation throughout the spring and summer of 2001, the FBI did not become aware of the critical intelligence involving Mihdhar's U.S. visa and subsequent travel to the U.S. until late August 2001. As we discussed above, we believe that systemic problems regarding information sharing between the two agencies contributed to the FBI's failure to obtain this information earlier. But restrictions within the FBI also contributed to the FBI's failure to acquire critical information about Hazmi and Mihdhar before September 11. In this section, we discuss those problems.

### 1.    Restrictions on the flow of information within the FBI

By the summer of 2001, the effect of the various restrictions within the FBI on information sharing – commonly referred to as "the wall" – had resulted in a nearly complete separation of intelligence and criminal investigations within the FBI. This separation greatly hampered the flow of

335

information between FBI personnel working criminal and intelligence investigations, including information concerning Hazmi and Mihdhar in the summer of 2001.

As discussed in Chapter Two, in late 1999 the FISA Court had become the "wall" for purposes of passing FISA information on targets of a particular terrorist organization from FBI intelligence investigations to criminal investigations. Any information that intelligence agents wanted to give to criminal agents had to be provided to the FBI's NSLU, which then provided it to OIPR, which then provided it to the FISA Court, which then had to approve the passage of the information to criminal agents. In addition, after the FISA Court was notified in the fall 2000 about errors in approximately 100 FISA applications, a significant portion of which related to the FBI's representations about the "wall" procedures in al Qaeda cases, the FISA Court imposed new restrictions on the FBI's handling of FISA information. The FISA Court required a certification from all individuals who received FISA information stating that they understood this requirement.

The FISA Court exempted CIA and NSA personnel, who often received FISA information from the FBI, from this certification requirement. But the FISA Court required that the CIA and NSA indicate on the information they provided to the FBI whether the information had been obtained based on FISA information previously provided to them by the FBI (called "FISA-derived information"). In response, the NSA decided that it was more efficient not to delay dissemination of intelligence while checking to see if it was derived from FISA, and it therefore placed a caveat on all NSA counterterrorism reports to the FBI stating that before information could be considered for dissemination to criminal personnel, the FBI had to check with the NSA General Counsel about whether the intelligence was FISA-derived. Once the NSA determined whether the information was FISA-derived, the FBI had to comply with the wall procedures for passing FISA-derived information to criminal agents or prosecutors. If the information was not FISA-derived, it could be passed directly.

FBI Headquarters personnel became wary that any involvement of criminal agents in intelligence investigations could present problems for the FBI with the FISA Court. A former ITOS unit chief described the FISA Court's certification requirement as a "contempt letter" and said that it "shut down" the flow of information in the FBI. He further stated that FBI

336

Headquarters employees became worried that any misstep in handling FISA information could result in harm to their careers because an FBI agent was banned from appearing before the FISA Court and OPR began an investigation on him. These three factors – the Court had become the screener in al Qaeda cases, the certification requirement imposed by the FISA Court, and concerns about violating the Court's rules – combined to stifle the flow of intelligence information within the FBI. FBI employees described this to the OIG as the walls within the FBI becoming "higher" over time. New York FBI agents told the OIG that the walls were viewed as a "maze" that no one really understood or could easily navigate.

As we discuss below, these walls affected the FBI personnel's discussions about the Mihdhar information at the June 11, 2001, meeting in New York and the FBI's decision to open an investigation to locate Mihdhar in August 2001.

### 2.    Problems at the June 11 meeting

At the June 11, 2001, meeting, FBI Headquarters and CIA CTC personnel discussed with New York FBI investigators issues relating to the Cole investigation. At the time of this meeting, the FBI analyst who we call Donna had received information from the CIA concerning travel in January 2000 of an al Qaeda operative named Khalid al-Mihdhar to Malaysia through Dubai. ██████████████████████████████████████
██████ [266]

After receiving the information from the CIA, Donna had conducted her own record check on Mihdhar in CTLink and discovered the NSA information from late 1999 and early 2000 associating ███████████████████
████████████████████████████████████████

---

[266] Although not shared with Donna or known to anyone else in the FBI, the CIA also knew in June 2001 that Mihdhar had a U.S. visa, that Mihdhar's associate -- Hazmi -- had traveled to the United States in January 2000, ██████████████████
███████████████████████████████████