This NSA intelligence about Mihdhar would have been important to the FBI agents conducting a criminal investigation ████████████. However, Donna did not share this information with the criminal agents at the June 11 meeting because of concerns about the wall. By this time, the FBI was operating under the requirement that all NSA counterterrorism information had to be reviewed by the NSA's General Counsel's Office for a determination of whether it was FISA-derived before it could be considered for dissemination to criminal agents. Because she had not yet asked the NSA whether the information could be passed, Donna did not provide the New York agents with any of the NSA information. That information would have been important to the New York agents who were working the Cole investigation because they specialized in al Qaeda operations and at the June 11 meeting showed great interest ████████████████████. That information may also have provided the criminal agents with additional leads and could have led to the information that Mihdhar and Hazmi had traveled to the United States in January 2000.

We recognize that the caveat on sharing any NSA counterterrorism information did not mean that the criminal agents were prohibited from ever obtaining access to the NSA information on Mihdhar. But if the information was FISA-derived, the caveat created a delay in the criminal agents receiving the information because of the lengthy procedures that had to be followed to share the information with them.

With respect to the information Donna had received from the CIA about the Malaysia meetings, Donna showed the photographs to New York agents and asked whether they could identify ████████████████████ ████████. After one of the agents made a tentative identification, the agents asked questions about Mihdhar and the photographs. The agents continued to ask Donna questions about Mihdhar, the Malaysia meetings, and the photographs on June 11 after the meeting. As we discussed above, it is unclear how much questioning occurred during the actual meeting and how much occurred after the meeting. Donna was unable to answer most of the agents' questions because she had not obtained the information from the CIA. This, in our view, was not because of the wall, but was because of Donna's failure to plan the meeting adequately or ask sufficient questions from the CIA in advance of the meeting.

338

First, we believe the planning for the June 11 meeting was flawed. Although Donna and other IOSs frequently traveled to New York to work on the Cole investigation, she told the OIG that this was the first time that she had arranged for a meeting involving CTC personnel in New York. Yet, according to what the meeting participants told the OIG, the purpose and the agenda of the meeting were not clear. The participants agreed that they knew there was going to be a discussion of the investigative results on the Cole attack. The New York agents believed that the CTC and FBI Headquarters had information to share with New York. Donna and the CTC participants, however, described the meeting as a "brainstorming" session to determine what new leads could be pursued and what FBI Headquarters could do to assist New York.

No agenda was prepared and no supervisors were consulted for their input about the meeting. Even though Donna said that she called the meeting to explore leads or avenues of investigation in the Cole case, she apparently did not ask the CTC participants to be prepared to present information or answer questions. Mary and Peter told the OIG they were not in a position to discuss the Cole investigation. Mary said she was not up to speed about the Cole investigation or the Malaysia meetings. Peter told the OIG that as an analyst at the CIA, he did not have authority to discuss CIA information at the meeting and he was merely "tagging along."

Donna told the OIG that she considered Mary to be another FBI employee at the meeting, and for this reason did not provide her with any specific instructions in preparation for the meeting. Donna also said that she had not invited Peter and because she was not in his chain of command, she did not ask him to be prepared. However, the New York agents we interviewed told the OIG that they believed that CTC personnel were coming to the meeting in part to share information with them. The fact that all the participants we interviewed described the meeting as unproductive and a "waste of time" highlighted that a more useful exchange of information could have occurred.

With respect to the ████████████████████, Donna had obtained only limited information from CIA employee John about the photos when she received them. She did not ask general background questions such as whether anyone else in the photographs had been identified, or what else was known from the Malaysia meetings. Donna told the OIG that because she believed the CIA provided her with everything she was entitled to know, she did not have

339

an in-depth discussion about the photographs. John said he did not recall anything about his discussions with Donna regarding the ███ ███ ███.

Donna told the OIG that when the New York agents asked her questions about Mihdhar, the Malaysia meetings, and the photographs, she thought that they were reasonable questions, but she did not know the answers. She stated that at the time she obtained the ████████████████ from the CIA, she believed that they were only potentially related to Quso and their significance to the Cole would hinge on whether Quso was in the photographs.

We believe Donna should have asked the CIA additional questions about the photographs. ███████████████████████████████████. Given her interest in ████████████████, she should have wanted to ascertain, and asked the CIA, what, if anything, was known about the purpose of the Malaysia meetings, who were the other participants at the meetings, what was known about the participants, and any other available information.

Donna also did not ask the CIA whether there were additional photos or documentation. Donna told the OIG she was unaware that there could have been additional photographs or other relevant information available. We believe that someone in her position should have known or at least asked for additional information about the subject of the photographs in preparation for the meeting.

We also were troubled by Donna's inadequate efforts to obtain additional information after the June 11 meeting, particularly information about the Malaysia meetings, since it had been the subject of a dispute between Donna and Scott. Although Donna told the New York agents that she would check with the CIA about additional information regarding the photographs and the Malaysia meetings, Donna made little effort to obtain this information until two months later, in August 2001. Donna told the OIG that she believes that she made some unsuccessful follow-up phone calls to Peter and John about the photographs. It is not clear from the documentary evidence how much Donna did before August to obtain the information, but she did not provide additional information to the New York agents about the photographs for at least two months. We recognize that FBI analysts were overwhelmed with assignments and had to juggle many responsibilities, however, given the possible

340

connections of this information to the Cole investigation, we believe Donna should have made more aggressive and timely efforts to obtain this information soon after the June 11 meeting and to keep the New York agents informed about what her follow-up efforts were.

By the same token, Scott, the New York Cole case agent, did little to follow up after the June 11 meeting to obtain information he requested ▌▌▌ ██████████████. Scott told the OIG he "often" asked Donna about the status of the information, but he was not provided any such information. Donna contended that Scott did not follow up on his June 11 requests. We found no evidence such as e-mails or other documents to support Scott's claim that he raised the issue often with Donna. We believe that neither Donna nor Scott made significant efforts after the meeting to obtain the information.

### 3. The FBI's investigation in August 2001 to find Mihdhar and Hazmi

As discussed above, on August 22, 2001, the FBI learned that Mihdhar and Hazmi had entered the United States in January 2000, that Mihdhar had again flown to New York on July 4, 2001, and that there was no record of either of them leaving the country. The FBI also learned that Khallad had been identified in the Kuala Lumpur photographs. Upon discovery of this information, the FBI opened an intelligence investigation in New York in an effort to locate Mihdhar.

Once again, however, the separation between intelligence and criminal information affected who could receive access to the information about Hazmi and Mihdhar. This interpretation of the wall also hampered the ability of the FBI New York agents working on the Cole investigation to participate in the search for Hazmi and Mihdhar. In addition, we found that the FBI's efforts to locate Hazmi and Mihdhar were not extensive. We do not fault the case agent assigned to locate them. He was new and not instructed to give the case any priority. Rather, we found that the FBI New York did not pursue this as an urgent matter or assign many resources to it.

341

### a.  The effect of the wall on the FBI's attempts to locate Mihdhar

As discussed above, Donna drafted an EC to the New York FBI requesting it open an investigation to locate Mihdhar. She also called Chad, the FBI New York agent who primarily handled intelligence investigations for the Bin Laden squad, to give him a "heads up" about the matter, and she subsequently sent the EC to him. She wrote in the e-mail that she wanted to get the intelligence investigation going and the EC could not be shared with any of the agents working the Cole criminal case. Chad forwarded the EC to his squad supervisor, Jason, who nevertheless disseminated the EC via e-mail within the Bin Laden squad, including to the criminal agents assigned to the Cole investigation.

Scott read the EC and contacted Donna regarding it. Donna informed Scott that he was not supposed to have read the EC because it contained NSA information that had not been cleared to be passed to criminal agents. Donna told Scott that he needed to destroy his copy. Scott responded that the effort to locate Mihdhar ███████████████████████████████, and he argued with Donna regarding the designation of the investigation as an intelligence matter. Donna asserted that, because of the wall, criminal agents were not yet entitled to the underlying intelligence provided by the NSA, and ████████ ████████████ the FBI could not establish any connection between Mihdhar and the Cole criminal investigation.

Scott, Donna, and acting UBL Unit Chief Rob then spoke via conference call. Scott argued that the investigation should be opened as a criminal investigation and that more resources and agents could be assigned to a criminal investigation by New York. He also argued that criminal investigative tools, such as grand jury subpoenas, were far quicker in obtaining information than the tools available in intelligence investigations.

Donna consulted with an NSLU attorney, Susan. According to Donna, Susan concurred that the matter should be handled as an intelligence investigation and that because of the wall, a criminal agent could not

342

participate in the search for or any interview of Mihdhar.[267]  When Donna advised Scott of Susan's opinion in an e-mail message, Scott responded by e-mail that he believed the wall was inapplicable.  Scott ended his message by suggesting that because of the NSLU's position, people were going to die and that he hoped that NSLU would stand by its position then.

The way that FBI Headquarters handled the Mihdhar information reflected its interpretation of the requirements of the wall prior to September 11.  First, because the predication for the search for Mihdhar originated from the NSA reports, this information could not be immediately shared with criminal agents.  Instead, it first had to be cleared for dissemination by the NSA, which would determine whether the intelligence was based on FISA information.  If so, the information had to be cleared for passage to the criminal agents – the information had to be provided to the NSLU, which then provided the information to OIPR, which then provided it to the FISA Court, which then had to approve the passage of this information to criminal agents.  In fact, the limited INS information concerning Mihdhar's and Hazmi's entries into the United States was the only unrestricted information in the EC immediately available to the criminal investigators.

█████████████, the decision to open an intelligence investigation resulted in certain restrictions.  FBI Headquarters employees understood that they needed to ensure that they avoided any activities that the FISA Court or OIPR could later deem "too criminal" and could use as a basis to deny a FISA application.  This included preventing a criminal agent from participating in a subject interview in an intelligence investigation.  While Scott was correct that the wall had been created to deal with the handling of only FISA information and that there was no legal barrier to a criminal agent being present for an interview with Mihdhar if it occurred in the intelligence investigation, FBI Headquarters and NSLU believed that the original wall had been extended by the FISA Court and OIPR to cover such an interview.

Scott's frustration over the wall was similar to Henry's ██████████ ████████ when Henry was told by Don that seeking prosecutor

---

[267] As discussed above, Susan told the OIG that she did not recall this discussion with Donna.

343

involvement prematurely could potentially harm any FISA request. Scott, like Henry, wanted to pursue a criminal investigation and became frustrated when he was advised by FBI Headquarters that he could not proceed in the manner he deemed appropriate. Scott's perception was that FBI Headquarters had misconstrued "the wall" and the wall had been inappropriately expanded. He told the OIG that he believed the wall should only relate to FISA or FISA-derived information. Like the Minneapolis FBI, Scott believed that he was being "handcuffed" in the performance of his job and that FBI Headquarters "erred on the side of caution" in its approach to intelligence information.

FBI Headquarters, on the other hand, acted in accordance with its experience with OIPR and the FISA Court. FBI Headquarters believed that OIPR and the FISA Court required strict adherence to the procedures for the passage of intelligence information to criminal investigations and required separating criminal and intelligence investigations. Donna explained that the FISA Court's mandates resulted in the need for the FBI to create a near complete separation between intelligence and criminal investigations in order to effectively use intelligence information. Rob also told the OIG that there were "land mines" in dealing with intelligence versus criminal information, and it was difficult to appropriately straddle the two sides.

Our review of this case showed that the wall had been expanded to create a system that was complex and had made it increasingly difficult to effectively use intelligence information within the FBI. The wall – or "maze of walls" as one witness described it – significantly slowed the flow of intelligence information to criminal investigations. The unintended consequence of the wall was to hamper the FBI's ability to conduct effective counterterrorism investigations because the FBI's efforts were sharply divided in two, and only one side had immediate and complete access to the available information.

The wall was not, however, the only impediment in the FBI's handling of the investigation to find Mihdhar and Hazmi. We found there were also other problems in how the search for Mihdhar and Hazmi was handled.

### b.   Allocation of investigative resources

We found that prior to the September 11 attacks, the New York Field Office focused its al Qaeda counterterrorism efforts on criminal investigations, but it did not expend a similar effort on intelligence investigations or the

344

development of intelligence information. New York agents told the OIG they believed that criminal prosecution was the most effective tool in combating terrorism. They asserted that criminal investigations are also a preventive activity and the FBI had always focused on preventing terrorism, even before September 11. They pointed to the TERRSTOP investigation in 1993, an investigation to uncover a terrorist plot to attack New York City landmarks, and the criminal investigation into the East African embassy bombings.

Prosecutors also argued that criminal investigations and prosecutions are an effective preventive measure against terrorism. Testifying before the Joint Intelligence Committee, Mary Jo White, the former U.S. Attorney for the Southern District of New York (SDNY), stated, "[W]e viewed the terrorist investigations and prosecutions we did from 1993-2002 as a prevention tool." Patrick Fitzgerald, currently the U.S. Attorney for the Northern District of Illinois and formerly an Assistant U.S. Attorney in the SDNY, told us that it is a misconception that there has to be a difference between prosecution and gathering intelligence. He added that the SDNY prosecutions produced a "treasure trove of [intelligence] information."

However, prosecutors also realized criminal investigation and prosecution were not the only means of countering terrorism. White stated, "the counterterrorism strategy of our country in the 1990s was not, as I have read in the media, criminal prosecutions." She further stated, "none of us considered prosecutions to be the country's counterterrorism strategy, or even a major part of it." As Fitzgerald told us, "in order to connect the dots, you need people to gather the dots."

Although we agree criminal investigations are a highly effective counterterrorism tool, intelligence investigations were not given nearly the same level of resources and attention in the FBI's New York Field Office before September 11, 2001. This criminal focus was clear in the assignment of personnel on the New York Bin Laden squad. From October 2000 to June 2001, only one agent on the Bin Laden squad was designated as the "intelligence" agent – the agent we call "Chad." The remainder were designated as "criminal" agents.[268] Chad told us that he was inundated with

---

[268] One criminal agent worked on intelligence matters on a part-time basis.

intelligence investigations and information, and he rarely had enough time even to review all the incoming Bin Laden intelligence information, let alone to digest, analyze, or initiate the procedures to pass the information to the criminal agents where applicable. Chad also told us that the "intelligence" agent designation was "not a desirable position" within the Bin Laden squad. He described himself as the "leper" on the squad due to "the wall." Furthermore, Chad stated that the intelligence side of the squad received far less and lower quality resources.

The handling of the investigation to locate Mihdhar provides a clear indication of the primacy of the criminal over intelligence investigations in the New York office. On August 28, 2001, the New York Field Office opened an intelligence investigation to locate Mihdhar based upon Donna's EC. Donna told the OIG that she believed there was some urgency to the Mihdhar investigation, not because of any evidence that he was operational, but because he could leave the United States at any time and the opportunity to find out as much as possible about him would be lost. She said she therefore called Chad about the EC in advance, which she did not normally do.

However, when she sent the EC to New York, she assigned the matter "routine" precedence, the lowest precedence level. When asked about this discrepancy, Donna told the OIG that the Mihdhar investigation was "no bigger" than any other intelligence investigation that the FBI was pursuing at the time.

The New York Bin Laden squad relief supervisors, who we call "Jay" and "David," told the OIG that they recognized that there was some urgency to the Mihdhar investigation. Yet, the FBI in New York did not treat it like an urgent matter. The investigation was given to an inexperienced agent – "Richard" – who had only recently been assigned to the Bin Laden squad. This was his first intelligence investigation. As one of the largest field offices in the FBI, with over 300 agents assigned to the JTTF, the New York Field Office could have assigned additional or more experienced agents who were not involved in the Cole criminal investigation to assist Richard. However, the New York Field Office Bin Laden Squad was focused on criminal investigations. As a result, the designation of the Mihdhar matter as an intelligence investigation, as opposed to a criminal investigation, undermined the priority of any effort to locate Mihdhar.

346

Finally, we also noted that there was a clear predicate for a criminal investigation that no one appeared to notice at the time. In her EC, Donna noted that Mihdhar had previously traveled to the United States, according to information she had obtained from the INS. After the FBI's intelligence investigation was opened, she obtained and forwarded to Richard a copy of Mihdhar's June 2001 visa application on which he stated that he had not previously been issued a visa and had never traveled to the United States. Thus, there was a clear basis to charge Mihdhar criminally with false statements or visa fraud. Significantly, this information had been provided to the FBI without the restrictive caveats placed on NSA reports and other intelligence information. As a result, if Mihdhar had been found, he could have been arrested and charged with a criminal violation based on the false statements on his visa application. However, the FBI did not seem to notice this when deciding whether to use criminal or intelligence resources to locate Mihdhar.

## D.    Individual performance

This section summarizes the performance of individual FBI employees in the Hazmi and Mihdhar matter. While none of them committed misconduct, we believe that several FBI employees did not perform their duties as well as they could have and should have. We address in turn the FBI employees involved in each of the five lost opportunities.

In this section, we do not discuss the performance of individual CIA employees. However, we believe that a significant cause of the failures in the sharing of information regarding the Hazmi and Mihdhar case is attributable to the actions of the CIA employees. It is the responsibility of the CIA OIG to assess the accountability of the actions of CIA employees.

### 1.    Dwight

In January 2000, intelligence information was developed about Hazmi, Mihdhar, and ███████████████████ meeting in Malaysia. Dwight, an FBI detailee to the CTC's Bin Laden Unit, read the CIA cables about the Malaysia meeting. The cables indicated that Mihdhar had a U.S. visa and that he listed New York on the visa application as his intended destination. Dwight recognized the significance of this information to the FBI and drafted a CIR to pass this information to the FBI.

347

Unfortunately, his draft CIR was never sent. A notation added to the CIR suggested that it was held at the request of the CIA's Deputy Chief of the Bin Laden Unit. Several FBI detailees accessed the CIR, and Dwight inquired about it again five days later, asking the Deputy Chief in an e-mail whether it was going to be sent or whether he needed to "remake" it in some way. We found no response to his e-mail, and none of the participants, including Dwight and the Deputy Chief, said they remembered this CIR at all.

We believe the primary responsibility for the failure to pass this information rests with the CIA. The evidence indicates that the CIA did not provide permission for the CIR to be sent.[269] However, we also believe that Dwight should have followed up as much as necessary to ensure that the information was sent to the FBI. Although we found evidence that he inquired once about the disposition of the CIR, we found no additional evidence that he continued to follow up to ensure that the information was sent. If Dwight was stymied in his attempt to learn about the disposition of the cable, or if the CIA gave no reasonable explanation for why the information was not being sent, he could have brought this issue to the attention of another supervisor in the CTC. In our view, Dwight took the commendable initiative to draft the CIR to share the information with the FBI, but did not follow through adequately to ensure that it was sent, and the information in the CIR was not provided to the FBI until shortly before the September 11 attacks.

## 2. Malcolm

Malcolm was a New York FBI agent detailed for several years to the CTC. He told the OIG that he understood his role at the CTC was, among other things, to be the "eyes and ears" of the New York Field Office. We do not believe that he performed this role sufficiently. He acknowledged to the OIG that one of his duties was "to monitor" New York Field Office cases, but he said he read only the cables that he thought were "interesting," generally

---

[269] The CIA has asserted that the information in the CIR was sent to the FBI through another cable, which may be why the CIR was not sent. A CIA cable stated that Mihdhar's travel documents, including a multiple entry U.S. visa, had been copied and passed "to the FBI for further investigation." As discussed above, however, we found no evidence that this cable was correct and that this information had actually been provided to the FBI.

based solely on his review of the cable subject line. In addition, while he said his role was to "facilitate inquiries of mutual interest," the only example he could provide was his acting as a liaison for FBI offices around the country by following up on tracing requests and reporting on their status. This was not very onerous or substantive. We believe that FBI management is primarily responsible for failing to provide the FBI detailees to the CTC, including Malcolm, with clear duties, direction, and supervision. But we believe Malcolm should have done more and taken more initiative in performing his duties at the CTC.

### 3. Stan

For several months in 2000, Hazmi and Mihdhar lived as boarders in the house of an FBI informational asset. The asset briefly mentioned the two boarders to his FBI control agent, who we call "Stan." Stan did not document this information, seek to learn the boarders' full identities, or conduct any checks on them.

No FBI policy required Stan to seek or document this type of information from the asset, and we found differences among the other FBI agents who we interviewed about whether they would have sought such information from an asset. While Stan did not violate any specific FBI policy, we believe it would have been a better and more prudent practice for him to have sought at least minimal information from his asset about the boarders living with him. The asset knew little about the boarders, and the boarders could have compromised information provided by the asset to the FBI.

Moreover, FBI policy required Stan to continually evaluate the asset's credibility and provide a yearly evaluation report on the asset. Stan's yearly report on this asset was minimal, with a bare attestation of the asset's bona fides. It contained no indication of what evidence Stan had used to make these attestations. While we do not suggest that Stan had to conduct extensive reviews of everyone living with the asset, Stan's actions in following up on this information were not particularly thorough or aggressive.

### 4. Max

In January 2001, a joint FBI/CIA source identified Khallad ███ ███████████████████████████████. Because the FBI ALAT who was

involved in the handling of the source, Max, was unable to speak any of the joint source's languages, a CIA employee conducted the debriefings of the source, including the debriefing in which the source identified Khallad. We concluded that Max was not informed of the source's identification of Khallad ███████ █ ██ ██ █ ██ █ ███ █ █ ███, either at the time of the identification or afterwards. Although CIA cables covering the debriefing described the identification of Khallad, these were not shared with Max. Instead, he saw CIA TDs that did not contain the information about the identification.

CIA documents do not indicate that the ALAT was informed of the identification, and no other evidence indicates that the ALAT knew. We found that the ALAT included detailed descriptions in his reports of other information from the source, which indicates he was not provided the information about the identification of Khallad. We also found that the New York FBI agents who interviewed the source in February 2001 were not informed of the identification of Khallad. In sum, we believe the ALAT did not learn about the source's identification, not that he knew about identification but failed to share this information with others.

We believe that, as the ALAT, Max should have been more familiar with the CIA's reporting process. He was not aware that the CIA's TDs contained only a part of the information obtained during the source debriefings. Although our review revealed that many FBI employees operated with misunderstandings about the ways the CIA recorded and reported intelligence information, a significant function of the ALAT position is to interact with the CIA. Had he recognized that he could not rely on TDs for full reporting about the source's information, he could have asked his CIA counterpart directly for any additional information from the source, and the ALAT may have learned about the identification of Khallad. In addition, given Max's concern that he provide FBI Headquarters with all of the information reported by the source, it would have been prudent for him to consult with the CIA case officer and ask sufficient questions to ensure that he had received all of the information. We found no indication that he did so.

### 5.  Donna

Donna, the FBI analyst who worked on the investigation of the Cole attacks, planned a June 11, 2001, meeting with the Cole investigators and CIA

employees to discuss information relating to the Cole investigation. She deserves credit for organizing this meeting and seeking to share intelligence information with the Cole investigators. However, we fault her performance in two respects. First, we found that the meeting was poorly planned, and Donna did not clearly communicate the purpose of the meeting to the participants. Donna also failed to obtain significant information prior to the meeting that could have been shared with the investigators ███ █ ██ ███ ██ █. After the meeting, although Donna devoted a significant amount of time to the Cole investigations, she did little specific follow-up to provide answers to the investigators about their logical questions regarding ██ █ █████ ██ █. We believe she did not do all she could have to acquire that information for the New York agents, even though she had said that she would as a result of their discussion at the June 11 meeting. As a result, the FBI missed another opportunity to focus on Mihdhar and Hazmi earlier than it did.

When Donna finally learned from Mary on August 22, 2001, that Hazmi and Mihdhar were in the United States, Donna quickly and appropriately took steps to have the FBI open an investigation to locate them. She personally called the New York Bin Laden intelligence agent and told him about the matter. This was an unusual step to call the agent directly, and it suggested that the investigation should be given some priority. However, when she sent the EC to New York, she designated the EC as having a routine precedence. Donna's actions indicated some urgency in the need for the investigation yet the subsequent EC did not convey any urgency. The New York Field Office assigned the case immediately, and the agent began working on the case within two business days of the assignment. If the EC had conveyed urgency, the FBI New York Field Office might have assigned additional or more experienced agents to locate Mihdhar and Hazmi and initiated the search sooner.

### 6.    Rob

We believe that Rob, as Donna's supervisor, is also responsible for Donna's failures. While the FBI at the time permitted IOSs to make significant decisions, often with little supervisory input, we believe that as a supervisor, he should have ensured that she was handling the June 11 meeting appropriately and, if necessary, become involved with the planning or execution of the meeting. Although Donna often traveled to New York to work on the Cole investigation, the June 11 meeting involved the CIA and an AUSA, which

351

should have led to more supervisory involvement in the purpose, agenda, and outcome of the meeting. But Rob had little supervisory involvement with it, either before or after the meeting. In addition, although Donna drafted the EC requesting the investigation of Mihdhar, the EC was ultimately approved and sent by Rob. Therefore, we believe he also bears some responsibility for failing to ensure that the appropriate precedence level was used on the EC.

### 7.    Richard

We do not fault Richard for his limited investigation, which was still in the nascent stages by the time of the September 11 attacks. As we described above, Richard took logical steps to try to locate Mihdhar and Hazmi, such as completing a lookout for Mihdhar with the INS, requesting local criminal history checks, checking with New York hotels about Hazmi and Mihdhar, and conducting commercial database checks on them. However, there were many more investigative steps that could have been pursued, in New York and elsewhere, had the investigation been assigned greater priority and had the FBI provided more resources to this investigation. The FBI was not close to locating Hazmi and Mihdhar when they participated in the September 11 attacks. We believe that the FBI in New York should have assigned the matter more priority than it did.

### 8.    Mary

Mary was assigned by her CIA managers in May 2001 with finding and reviewing the CIA cables relating to the Malaysia meetings and their potential connection to the Cole attack. Mary did not find the relevant CIA cable traffic until late July and mid-August 2001. She told the OIG that she did not have time to focus on this assignment until then. Upon discovering on August 21 that Hazmi and Mihdhar had traveled to the United States, she immediately passed this information to the FBI.

We recognize that the disparate pieces of information about the Malaysia meetings were not easy to connect and that the task of developing patterns from seemingly unrelated information was complex. Yet we question the amount of time that elapsed between Mary's assignment and her discovery of the important information. As we discussed previously, however, Mary's assignments were directed and controlled by her managers in the CTC. We, therefore, leave this issue to the CIA OIG for its consideration.

## V.   OIG conclusions

In sum, we found individual and systemic failings in the FBI's handling of information regarding the Hazmi and Mihdhar matter.  The FBI had at least five opportunities to learn about their presence in the United States and to seek to find them before September 11, 2001.  Much of the cause for these lost opportunities involved systemic problems.  We found information sharing problems between the CIA and the FBI and systemic problems within the FBI related to counterterrorism investigations.  The systemic problems included inadequate oversight and guidance provided to FBI detailees at the CIA, the FBI employees' lack of understanding of CIA procedures, the inconsistent documentation of intelligence information received informally by the FBI, the lack of priority given to counterterrorism investigations by the FBI before September 11, and the effect of the wall on FBI criminal investigations.

Our review also found that the CIA did not provide information to the FBI about Hazmi and Mihdhar when it should have and we believe the CIA shares significant responsibility for the breakdown in the Hazmi and Mihdhar case.  However, the FBI also failed to fully exploit the information that was made available to them.  In addition, the FBI did not assign sufficient priority to the investigation when it learned in August 2001 that Hazmi and Mihdhar were in the in the United States.  While we do not know what would have happened had the FBI learned sooner or pursued its investigation more aggressively, the FBI lost several important opportunities to find Hazmi and Mihdhar before the September 11 attacks.

353