UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
                                    :
AMERICAN AIRLINES, INC., ET AL.,    :    07 Civ. 7051 (AKH)
         Plaintiffs,                :
                                    :
     - against -                    :    THIS DOCUMENT RELATES TO:
                                    :
FEDERAL BUREAU OF INVESTIGATION,    :    21 MC 101 (AKH)
ET AL.,                             :
         Defendants                 :
                                    :
                                    :
------------------------------X

### REPLY MEMORANDUM OF LAW IN SUPPORT OF THE AVIATION PARTIES' MOTION FOR SUMMARY JUDGMENT SETTING ASIDE THE FEDERAL BUREAU OF INVESTIGATION'S REFUSAL TO ALLOW THE DEPOSITIONS OF CERTAIN WITNESSES AND IN OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
(212) 490-9100
dbarry@condonlaw.com

*Aviation Parties' Liaison Counsel*

*Of Counsel*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Wendy B. Reilly
Jacob W. Stahl

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT .............................................................................................................7

I.    THE REQUESTED TESTIMONY IS CRITICAL TO THIS
LITIGATION........................................................................................................8

    A.    The Aviation Security System as of September 11 ....................................8

    B.    The Relevance and Importance of the Requested Testimony to
Establishing Critical Facts ......................................................................16

    C.    The Relevance and Importance of the Requested Testimony to the
Applicable Legal Analysis......................................................................24

II.    THE AVIATION PARTIES ARE NOT SEEKING CLASSIFIED OR
PRIVILEGED INFORMATION AND ARE WILLING TO
ESTABLISH APPROPRIATE SAFEGUARDS. ...............................................31

    A.    Disclosure is Appropriate Under the *Touhy* Analysis Because the
Aviation Parties Seek Only Unclassified, Non-Privileged
Information. ............................................................................................31

    B.    The Government's Concerns About Protected Information Can Be
Resolved Through Appropriate Safeguards.............................................38

III.    THE REQUESTED WITNESS TESTIMONY HAS NO ADEQUATE
SUBSTITUTE....................................................................................................41

IV.    THE REQUESTED DEPOSITIONS ARE NOT UNDULY
BURDENSOME. ................................................................................................44

CONCLUSION............................................................................................................47

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abdullah v. American Airlines, Inc.,*
  181 F.3d 363 (3d Cir. 1999)....................................................................................................9

*Air Transp. Ass'n of Am. v. Cuomo,*
  520 F.3d 218 (2d Cir. 2008)...................................................................................................9

*Alexander v. F.B.I.,*
  186 F.R.D. 113 (D.D.C. 1998).............................................................................................42

*Cavanaugh v. Wainstein,*
  No. 05-123, 2007 U.S. Dist. LEXIS 40242 (D.D.C. June 4, 2007)..................................36, 41

*Clinton v. Jones,*
  520 U.S. 681 (1997)............................................................................................................36

*Comsat Corp. v. Nat'l Science Found.,*
  190 F.3d 269 (4th Cir. 1999) ...............................................................................................45

*Eiseman v. State,*
  70 N.Y.2d 175 (1987) ...........................................................................................................5

*Founding Church of Scientology v. Webster,*
  802 F.2d 1448 (D.C. Cir. 1986)...........................................................................................42

*Halpern v. FBI,*
  181 F.3d 279 (2d Cir. 1999)................................................................................................37

*In re Vioxx Products Liability Litigation,*
  235 F.R.D. 334 (E.D. La. 2006).....................................................................................32, 41

*In re World Trade Ctr. Disaster Site Litig.,*
  521 F.3d 169 (2d Cir. 2008)..........................................................................................30, 31

*Jones v. Goord,*
  No. 95 Civ. 8026, 2002 WL 1007614 (S.D.N.Y. May 16, 2002)...........................................45

*Leonardi v. Loyola Univ. of Chicago,*
  658 N.E.2d 450 (Ill. 1995)...................................................................................................25

*Med. Lab. Mgmt. Consultants v. Devaraj*,
  306 F.3d 806 (9th Cir. 2002) ........................................................................26

*Miller v. Mehltretter*,
  478 F. Supp. 2d 415 (W.D.N.Y. 2007) ...................................................... passim

*Nash v. Port Authority of New York & New Jersey*,
  856 N.Y.S.2d 583, 594 (1st Dep't 2008) .................................................21, 22

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003) .....................................................21, 25

*Rowe v. N. H. Motor Transp. Ass'n*,
  128 S. Ct. 989 (2008) ...................................................................................9

*Speadmark, Inc. v. Federated Dep't Stores, Inc.*,
  176 F.R.D. 116 (S.D.N.Y. 1997) ................................................................42

*United States v. Nixon*,
  418 U.S. 683 (1974) ...................................................................................36

### STATUTES

14 C.F.R. § 108 (2001) ...................................................................................8

28 C.F.R. § 16.22(c) .......................................................................................30

28 C.F.R. § 16.26 (2003) .......................................................................31, 32, 45

49 U.S.C. § 44903(b) (amended 2001) ..............................................................8

49 U.S.C. § 44904(a), (c) (amended 2001) .........................................................8

Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2008) ...............................7, 8, 35

Airline Deregulation Act of 1978 ......................................................................9

Federal Aviation Administration Authorization Act of 1994 .................................9

Fed. R. Civ. P. 26 and 45 .........................................................................3, 8, 31

Fed. R. Civ. P. 30(a) .................................................................................8, 42

N.Y. C.P.L.R. Art. 16 ...................................................................................................................26

Price-Anderson Amendments Act of 1988, Pub. L. No. 100-408, 102 Stat. 1066
   (1988).........................................................................................................................................9

## OTHER AUTHORITIES

Nat'l Comm'n on Terrorist Attacks Upon the U.S., *9/11 Commission Report*
   (2004)................................................................................................................... passim

Restatement (Second) of Torts (1965)..................................................................................21, 25

Nat'l Comm'n on Terrorist Attacks Upon the U.S., *Staff Monograph on the "Four
   Flights and Civil Aviation Security,"* (2005).............................................................13, 16, 17

## PRELIMINARY STATEMENT

The Aviation Parties[1] have requested limited deposition testimony from five Federal Bureau of Investigation ("FBI") witnesses. The requested testimony is narrowly tailored to cover only certain topics that have already been publicly disclosed and to elicit only those facts that are within each witness's personal knowledge. The Government has grossly misperceived the scope of the Aviation Parties' requested discovery. Forty-five pages of the Government's 73 page brief refer to the Government's concerns about preventing the disclosure of classified and privileged information based upon conclusory invocations of national security concerns. However, the Government's worst-case scenario hypotheticals have no connection to the discovery the Aviation Parties actually seek, and the Aviation Parties have no intention of delving into classified or privileged information. Indeed, the Aviation Parties gladly will work with the Government to establish safeguards to prevent the potential inadvertent disclosure of protected information.

---

[1] The Aviation Parties joining in this Motion as plaintiffs are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corporation; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corporation; Burns International Services Corporation; Burns International Security Services Corporation; Pinkerton's Inc.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; the Metropolitan Washington Airport Authority; and the Port Authority of New York and New Jersey. US Airways, Inc. and US Airways Group, Inc. join in this Motion and Reply Memorandum of Law solely with respect to the PI/WD, PD/BL and WTCP claimants who have signed the stipulation entered in their bankruptcy cases. The Plan Injunction remains in effect for all remaining claims. Continental Airlines, Inc. is a property defendant in the American Airlines Flight 11 Wrongful Death/Personal Injury Litigation only. Delta Air Lines, Inc. is participating in regard to those claims not stayed, enjoined or discharged pursuant to Delta Air Lines, Inc.'s bankruptcy proceedings.

For example, to resolve the Government's concerns, the Aviation Parties are willing to provide the Government with detailed written outlines containing the questions we intend to ask of each witness, and we are willing to provide these outlines well in advance of each deposition to allow the Government ample time to vet the questions, raise and resolve any objections, and prepare their witnesses. We are also willing to agree to any other reasonable measures that would help protect the Government's classified and privileged information, including conducting these depositions before a magistrate judge or special master. The Government's wholesale refusal to allow *any* questioning of these five witnesses, however, is not an acceptable or a fair resolution.

The Aviation Parties are defendants in multi-billion dollar litigation alleging that they were negligent by failing to prevent the terrorist attacks on September 11, 2001. Unless the Court grants dispositive motions resolving the September 11 Litigation, there will be a jury trial in this case. At trial, plaintiffs will attack the integrity and reputations of each defendant and of the airline industry as a whole. In developing their case for trial, plaintiffs have conducted videotaped depositions of more than 100 witnesses of their choosing. Much of the information elicited during these depositions was already available to plaintiffs through previously produced documents but they preferred to pursue witness testimony rather than rely exclusively on documents. When it comes to trial, in addition to the live witnesses they choose to call, plaintiffs will be able to present much of this videotaped deposition testimony to the jury.

The Aviation Parties ask for nothing more. We have requested depositions of a handful of FBI witnesses on important, discrete topics. All of the requested topics have

been publicly discussed by these witnesses before. None of the requests seeks access to classified or privileged information. The Aviation Parties are entitled to elicit information about these topics directly from witnesses who have personal knowledge about them. We are entitled to ask our own questions and should not be forced to rely on questions asked by others in separate proceedings. We are entitled to present the testimony of these witnesses to the jury. Witness testimony – live or videotaped – is more compelling to a jury than words on a piece of paper. We should be afforded the right to present the strongest defense possible. Denying these depositions would strike a severe blow to any chance of a fair trial.

Moreover, no extraordinary circumstances justify denying these five depositions. The requested discovery meets the applicable standards for disclosure contained in Federal Rules of Civil Procedure 26 and 45 and in the Department of Justice's ("DOJ") *Touhy* regulations.

*First*, as demonstrated in our *Touhy* requests, our Complaint, and our opening papers, and as discussed further below, the requested depositions seek information that is highly relevant and important to the Aviation Parties' defense. To highlight but one example, the Aviation Parties seek to depose FBI Special Agent Harry Samit concerning his extensive involvement in the pre-September 11 investigation of September 11 co-conspirator Zacarias Moussaoui. After receiving a tip from a Minnesota flight school that an unusual student (Moussaoui) was in training to fly commercial aircraft, Mr. Samit conducted an investigation and personally interviewed Moussaoui. He was also personally involved in arresting Moussaoui on August 16, 2001, and in uncovering two

small knives in Moussaoui's possession.    Based on his investigation, Mr. Samit concluded that Moussaoui was involved in "some sort of hijacking plan."  He urged the FBI to warn the Federal Aviation Administration ("FAA") about this, but his superiors at the FBI declined to do so.

At his deposition, the Aviation Parties intend to ask Mr. Samit about the information he personally had about Moussaoui before September 11, what conclusions he drew from that information, and what he did with the information.  In particular, we want to ask what information, if any, was communicated to the FAA or to any of the Aviation Parties about Mr. Samit's findings or conclusions about Moussaoui.

This factual information is directly relevant to the legal issues of foreseeability and causation, which will be contested issues if this case goes to trial.  Again, to take but one example, Mr. Samit's testimony – particularly in combination with that of his superior, Michael Rolince, the Chief of the FBI's International Terrorism Operations Section – will provide compelling evidence for the jury on the issue of foreseeability. We expect that Mr. Samit and Mr. Rolince will testify that the FBI did not communicate the information they had about Moussaoui, including Mr. Samit's conclusion that Moussaoui was involved in a hijacking plan, to the FAA or the Aviation Parties.  We expect that they will testify that this information was not shared with the FAA or the Aviation Parties because Mr. Samit's supervisors at the FBI concluded that the information they had was insufficiently certain or specific to warrant sharing it with the FAA or the Aviation Parties.  This testimony could be crucial to the jury's assessment of foreseeability.

4

The jury could reasonably conclude that if the FBI, with its superior intelligence –
including the information that a suspected terrorist was training in the United States to fly
commercial airplanes and was arrested in possession of two small knives – did not
conclude that a domestic hijacking involving terrorists armed with small knives who were
able to pilot commercial airplanes was a significant enough concern to justify warning
the FAA or the Aviation Parties, then it was reasonable that the Aviation Parties did not
foresee such a threat either.

The Samit and Rolince testimony also goes directly to the reasonableness of the
Aviation Parties' conduct, which is a central issue here.  Reliable intelligence identifying
the appropriate countermeasures is essential if a sophisticated terrorist conspiracy is to be
thwarted.  At least in hindsight, the FBI had the necessary intelligence pre-September 11
but failed to communicate that intelligence to the FAA or to the Aviation Parties.  The
Aviation Parties can scarcely be found negligent for failing to deploy countermeasures
for which society's experts had not provided the requisite intelligence.[2]  Stated another
way, the significance (or lack of significance) of the intelligence information known to
the Aviation Parties as of September 11 can best be appreciated by the trier of fact in
light of the far more directly on point intelligence that the FBI had but did not
communicate.

**Second**, the Aviation Parties do *not* seek access to any classified or privileged
information.  The Aviation Parties made this point explicitly in our opening papers.  In

---

[2] *See Eiseman v. State*, 70 N.Y.2d 175, 191 (1987) (holding it improper to impose a higher
duty on a college to "screen out or detect potential danger signals" in parolee student than
that borne by "society's experts in making such predictions -- the correction and parole
officers").

fact, the Aviation Parties' opening brief contained an entire section on this point, entitled: "The Aviation Parties are not seeking protected information." Aviation Parties' Br. at 39-43. Nevertheless, the Government apparently mistakenly believes that we are seeking classified or privileged information or that we are arguing that there has been a subject matter waiver as to all information relating to the September 11 attacks. These fears are completely misplaced. The Aviation Parties are not seeking access to classified or privileged information and are more than willing to establish safeguards to protect against any disclosure, including providing the Government with our questions before the depositions and working with them to resolve any concerns. These protections should resolve all of the objections raised by the Government.

*Third*, no adequate substitute exists for the deposition testimony of these five FBI witnesses. Regarding Mr. Samit and Mr. Rolince, as well as Special Agents Scott Billings and Coleen Rowley, no other witnesses could provide comparable testimony.[3] Only they can testify about their personal knowledge of the Moussaoui investigation. For example, only Mr. Samit can adequately testify about his first-hand observations of Moussaoui and explain the conclusions he reached based on his investigation.

It is similarly not possible to establish the facts the Aviation Parties seek through documents alone. For many of the facts we seek to establish, no documents exist that we could use in lieu of testimony. Even where some documents might contain related facts, the admissibility of those documents is uncertain. Moreover, even assuming that certain facts could be established through admissible documents, it is simply more compelling to

---

[3] The requested testimony of former FBI agent Erik Rigler is somewhat differently situated and is discussed in Section I.B. below.

present those facts to a jury through a witness rather than through a document alone. Barring extraordinary circumstances – which do not exist here – the Aviation Parties have a right to present our evidence in the most persuasive way possible. Where, as here, fact witnesses possess relevant, non-privileged information, no legitimate justification exists for forcing the Aviation Parties to attempt to build their case through documents alone.

*Finally*, the requested depositions will not be unduly burdensome. The Government's burden argument is predicated on its mistaken belief that the Aviation Parties are requesting access to classified and privileged information. Since that is not the case, the burden will be only in preparing for and attending the five depositions, which is not a legitimate basis for refusing to allow the depositions to proceed.

Thus, the Government's refusal to authorize these five depositions should be reversed as arbitrary and capricious, and the Court should issue an order allowing the depositions to proceed according to whatever procedures are necessary to allow the Aviation Parties to seek the discovery we have requested while allowing the Government to protect its classified and privileged information from disclosure.

## ARGUMENT

The Court does not need to unravel dueling claims about material facts. Both sides agree that there is no genuine issue of material fact that would prevent resolution of this motion on summary judgment. Thus, the sole question for the Court is whether, in refusing to authorize any deposition testimony by any of the five requested FBI witnesses, the Government exceeded its authority under the Administrative Procedure

Act, 5 U.S.C. §§ 701-706 (2008) ("APA") and Federal Rules of Civil Procedure 26 and

45. The answer must be yes, because the requested discovery meets all of the criteria of

Rules 26 and 45 and because the Government has offered no legitimate basis under the

*Touhy* regulations for prohibiting the depositions. Because the requested testimony is

relevant, not classified or privileged, not able to be obtained through adequate alternative

means, and not unduly burdensome, the Government's refusal to authorize these

depositions was arbitrary and capricious and should be overturned.[4]

## I.    THE REQUESTED TESTIMONY IS CRITICAL TO THIS LITIGATION

### A.    *The Aviation Security System as of September 11*

To fully appreciate why the requested testimony of the FBI witnesses is so

relevant and important, the Court needs to understand the workings of the aviation

security system as it existed on September 11, 2001. As of September 11, the FAA and

the FBI were jointly responsible for assessing terrorist threat information relating to civil

aviation and designing countermeasures in response to that information. *See* 49 U.S.C. §

44904(a), (c) (amended 2001); 49 U.S.C. § 44903(b) (amended 2001). The FAA's

required aviation security procedures were set forth in each carrier's Air Carrier Standard

Security Program ("ACSSP").[5] *See* 14 C.F.R. § 108 (2001). As FAA Rule 30(b)(6)

witness Robert J. Cammaroto testified, the ACSSP had the force and effect of federal

---

[4]    As noted in our opening brief, the potential conflict over the appropriate standard of review is academic. The Government's refusal to authorize the requested testimony is unsustainable under either the "arbitrary and capricious" standard of Section 706 of the APA or the "undue burden" standard of Federal Rule of Civil Procedure 45.

[5]    As shown in the Aviation Defendants' prior memoranda of law concerning the applicable standard of care, the Federal Aviation Act and the related aviation security regulations established the exclusive standard of conduct for the Aviation Parties as of September 11,

regulations and compliance was mandatory.  *See* Ex. 38, Cammaroto Dep. Tr., at 35:8-

36:11;[6] *see also* Ex. 39, American ACSSP, at 10 ("This program is *required* by Title 14

Code of Federal Regulations (14 C.F.R.) part 108") (emphasis added).[7]

---

2001 and preempt any state common law standards that may have existed.  *See* Aviation
Defendants' Memorandum of Law in Support of Motion for a Determination of Applicable
Law Regarding the Standard of Care, (Doc. No. 1035 in 21 MC 97; Doc. No. 224 in 21 MC
101) (filed April 30, 2007) (citing numerous cases in support of this position); Aviation
Defendants' Reply Memorandum of Law in Support of Motion for a Determination of
Applicable Law Regarding the Standard of Care, (Doc. No. 1095 in 21 MC 97; (filed June 8,
2007) (same); Memorandum of Law in Support of United's Motion for Determination of
Applicable Law, for Dismissal of All Punitive Damage Claims and for Certain Government
Discovery (Doc. No. 1028 in 21 MC 97; Doc. No. 254 in 21 MC 101) (filed April 30, 2007)
(same); United's Reply Memorandum of Law in Support of Motions for the Determination of
the Applicable Law, for Dismissal of All Punitive Damage Claims and for the Need for
Certain Government Discovery (Doc. No. 1093 in 21 MC 97; Doc. No. 294 in 21 MC 101)
(filed June 8, 2007).  Moreover, since these briefs were filed, two new cases have been
decided that make clear that state common law standards are preempted not only by the Air
Transportation Safety and System Stabilization Act ("ATSSSA"), but also by the Airline
Deregulation Act.  *See Rowe v. N. H. Motor Transp. Ass'n*, 128 S. Ct. 989, 994-995 (2008);
*Air Transp. Ass'n of Am. v. Cuomo,* 520 F.3d 218-219, 223 (2d Cir. 2008).  In *Rowe*, the
Supreme Court held that because Congress, in deregulating trucking by passing the Federal
Aviation Administration Authorization Act of 1994, deliberately copied language regarding
preemption from the Airline Deregulation Act of 1978, the Court's pre-1994 case law
interpreting the Airline Deregulation Act would be applied to interpret the same preemption
language in the Federal Aviation Administration Authorization Act.  *See* 128 S. Ct. at 993-
95.  Similarly, since Congress, in passing ATSSSA, deliberately copied the "not inconsistent"
language from the Price-Anderson Amendments Act of 1988, Pub. L. No. 100-408, 102 Stat.
1066 (1988), a provision the courts have consistently held preempts state common law
standards, the "not inconsistent" language of ATSSSA should be given similar preemptive
effect.  *See* Aviation Defendants' Memorandum of Law in Support of a Motion for
Determination of Applicable Law, at 32.  In *Cuomo*, the Second Circuit held that the
Aviation Deregulation Act preempted New York's so-called Passenger Bill of Rights and
cited *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), with apparent
approval of the proposition that the Federal Aviation Act impliedly preempts state law safety
standards. *See Abdullah*, 520 F.3d at 223, 225.

[6]  All citations to "Ex. __" refer to the Exhibits to the Declaration of Desmond T. Barry, Jr.,
dated April 28, 2008 ("Barry Decl. I") (Exhibits 1-37) and the Declaration of Desmond T.
Barry, Jr., dated July 1, 2008 ("Barry Decl. II") (Exhibits 38-61).

[7]  When the FAA determined, based upon intelligence information, that a new threat had
developed demanding immediate countermeasures, the FAA issued Security Directives to the

The required procedures for checkpoint security screening as of September 11 were set forth in Appendix III of the ACSSP. *See, e.g.,* Ex. 39, American ACSSP, Appendix III, at 1-4. This section included guidelines regarding screening for deadly and dangerous weapons. *See id.* at 1; *see also* American ACSSP, Appendix I. These guidelines were not minimum standards. To the contrary, the ACSSP specifically states that the screening procedures it establishes are "designed to effect uniform application, *optimum safety*, and the courteous and efficient treatment of all persons subject to preboard screening." Ex. 39, American ACSSP, Appendix III, at 1 (emphasis added). As of September 11, the ACSSP guidelines only prohibited the carriage of knives into the sterile area of an airport if their blades were four or more inches long or if they were prohibited by local law. *See* Ex. 39, American ACSSP, Appendix I.

The ACSSP was complemented by the Checkpoint Operations Guide ("COG"). *See* Ex. 40, Helliwell Dep. Tr., at 27:13-28:6; Ex. 38, Cammaroto Dep. Tr., at 276:5-9. The COG was developed by the airlines pursuant to Section XIII.C.2.d.(3) of the ACSSP as a "quick reference" for use at the screening checkpoints. *See* Ex. 41, Letter from Robert Dyer, August 10, 1994; Ex. 38, Cammaroto Dep. Tr., at 274:6-15, 275:16-276:4; Ex. 40, Helliwell Dep. Tr., at 33:11-34:8; *see also* Ex. 39, American ACSSP, at 135. The FAA reviewed and approved the COG. Ex. 40, Helliwell Dep. Tr., at 32:22-33:9. The COG did not have the force of a federal regulation. Ex. 38, Cammaroto Dep. Tr., at 271:15-19. The airlines were not subject to sanctions as a matter of federal law for

---

airlines that also had the force of federal regulations. *See, e.g.,* Cammaroto Dep. Tr., at 17:8-21.

10

failure to comply with the COG, as distinguished from the ACSSP. Ex. 38, Cammaroto
Dep. Tr., at 36:7-11, 271:20-25.

As of September 11, the COG permitted into the sterile area knives with blades
less than four inches long unless they were "menacing" or illegal under local law. *See*
Ex. 42, COG 5-7; *see also* Ex. 38, Cammaroto Dep. Tr., at 284:24-286:8. As of
September 11, Swiss army knives, scout knives, and pocket utility knives were expressly
listed as items that were *permitted* into the sterile area, as were other sharp metal
implements such as letter openers. *See* Ex. 42, COG 5-7, 5-11. In 1993, the FAA had
specifically considered and rejected the idea of banning all knives from entering the
sterile area. *See* Ex. 38, Cammaroto Dep. Tr., at 219:24-220:11; Nat'l Comm'n on
Terrorist Attacks Upon the U.S., *9/11 Commission Report*, 84 (2004) ("*9/11 Comm'n
Report*").[8]

While it is true, as Mr. Cammaroto testified, that the airlines and screening
companies were expected to exercise good judgment and common sense in carrying out
their responsibilities, this had to be done in the context of the regulations. Ex. 38,
Cammaroto Dep. Tr., at 621:17-623:3. The Aviation Parties were not permitted, under
the guise of good judgment, to simply fashion their own security screening procedures.
*See id.* For example, it would have been impermissible for the airlines or screening
companies to have implemented a policy that singled out all Arab-appearing males for

---

[8]    Mr. Cammaroto testified that among the reasons the FAA decided not to ban knives with
blades shorter than four inches from entering the sterile area were: (1) equally dangerous
weapons could be fashioned from materials available in the sterile area; (2) requiring
screeners to look for small-bladed knives would divert their attention from "high priority
threat items" such as explosives and guns; and (3) knives with short blades had not been used
in terrorist hijackings. *See* Ex. 38, Cammaroto Dep. Tr., at 228:12-231:5.

11

enhanced security screening. *See* Ex. 38, Cammaroto Dep. Tr., at 100:24- 104:7, 624:23-625:6 (FAA "didn't permit any discrimination of any sort"); Ex. 43, Department of Transportation Memorandum; *see also* Ex. 44, Security Directive 108-98-05, at 3 (1998); Ex. 45, Information Circular 99-13, at 1-2 (1999) ("It is essential that screeners treat all passengers – regardless of their race, ethnicity, color or gender – equally, both in terms of their being potential threats and in terms of their deserving courteous, professional treatment during the conduct of the security procedures."). Similarly, the Aviation Parties would not have been allowed to hand-wand or pat down individuals who did not alarm the walk-through metal detectors. *See* American ACSSP, Appendix III, at 1 ("If the person being screened does not alarm the detector, the person *is cleared* to proceed beyond the screening point.") (emphasis added); *see also* Ex. 38, Cammaroto Dep. Tr., at 103:17-25.

It is correct that common sense might have come into play concerning a judgment call on any particular knife. But despite the scores of depositions plaintiffs have taken, no evidence exists that on September 11 any screener found a knife with a blade under four inches long in the possession of any of the terrorists that required them to exercise their common sense to determine whether the knife should be permitted through the checkpoint.

The "Common Strategy," memorialized in Appendix XIII of the ACSSP, was another integral element of the aviation security system as of September 11. *See* Ex. 39, American ACSSP, Appendix XIII, at 2-9; *9/11 Comm'n Report*, at 85. The FAA developed the Common Strategy as a result of years of experience studying actual and

threatened hijackings. *See 9/11 Comm'n Report*, at 85; Nat'l Comm'n on Terrorist Attacks Upon the U.S., *Staff Monograph on the "Four Flights and Civil Aviation Security,"* 81 (2005) (the *"Aviation Monograph"*). The Government determined that hijackings historically most often had been safely resolved through negotiation. *See 9/11 Comm'n Report*, at 85; *Aviation Monograph*, at 81; *see also* Ex. 39, American ACSSP, Appendix XIII, at 6, 8. Thus, pursuant to the Common Strategy, flight crews were directed to cooperate with hijackers. *See 9/11 Comm'n Report*, at 85; *Aviation Monograph*, at 81; *see also* Ex. 39, American ACSSP, Appendix XIII, at 6, 8. They were directed not to use force against the hijackers. American ACSSP, Appendix XIII, at 6, 8; *see also 9/11 Comm'n Report*, at 85; *Aviation Monograph*, at 81. The Common Strategy also discouraged crews or passengers from trying to be heroes by overtaking the hijackers. *See* Ex. 39, American ACSSP, Appendix XIII, at 6, 8. And flight attendants were instructed to try to stay with the hijackers if they gained access to the cockpit. *See* Ex. 39, American ACSSP, Appendix XIII, at 6. Under the Common Strategy, the presence of reinforced cockpit doors on September 11 would have made no difference. *See 9/11 Comm'n Report*, at 85. As the Chairman of the Security Committee of the Air Line Pilots' Association has stated: "[e]ven if you make a vault out of the door, if they have a noose around my flight attendant's neck, I'm going to open the door." *Aviation Monograph*, at 81.

Further, as of September 11, the FAA perceived the primary threat against civil aviation to be bombings, particularly non-suicidal bombings. *See 9/11 Comm'n Report*, at 84; *Aviation Monograph*, at 2-3, 53 (according to former FAA Director Jane Garvey,

"based on intelligence reporting, [the FAA] saw explosive devices on aircraft as the most dangerous threat"); *see also* Ex. 38, Cammaroto Dep. Tr., at 21:19-22:17. The security system, therefore, was designed to emphasize the detection of bombs and other explosive devices. *See, e.g.*, Ex. 46, Security Directive 95-02H (2000) (warning that in January 1995, extremists associated with Ramzi Yousef conspired to place bombs aboard U.S. air carriers operating from East Asia and that "some of these [terrorists] were believed to have knowledge in fabricating explosive devices that are designed to bypass airline security"); Ex. 47, Information Circular 2000-10 (2000) ("Middle Eastern Group May be Planning to Bomb Aircraft"); Ex. 48, Information Circular 2001-01 (2001) (warning that Middle Eastern terrorist groups "have the capability to construct sophisticated IEDs concealed inside luggage and consumer products").

The Computer Assisted Passenger Prescreening System ("CAPPS"), for example, was specifically formulated as a countermeasure against the threat of explosives in checked baggage. *See* Ex. 38, Cammaroto Dep. Tr., at 21:19-22:2; *9/11 Comm'n Report*, at 84. Consistent with the objective of CAPPS, American Airlines and United Air Lines employed CTX machines to detect explosives in checked baggage. *See* Ex. 49, Bibbey Dep. Tr., at 41:23-42:4; Ex. 50, Curiel Dep. Tr., at 62:24-63:3; Ex. 51, Moona Nevulis Dep. Tr., at 114:8-115:14; Ex. 52, Tuero Dep. Tr., at 53:16-54:22; Ex. 53, Bolognese Dep. Tr., at 301:21-24; Ex. 54, Excerpt from United Air Lines Initial GSC Training, Trace and Explosive Detection Systems (United uses CTX-5500 to identify explosives in baggage); *see also* Ex. 55, Wansley Dep. Tr., at 441:21-442:2 (confirming that "the introduction of CTX machines enhance[d] the ability of the United States aviation

14

security system to detect explosives"). The ACSSP emphasized the priority of searching

for bombs. *See, e.g.,* Ex. 39, American ACSSP, at 28 ("Where available, an ETD

[explosive trace detection system] device *must* be used to inspect carry-on items that

cannot be cleared by the x-ray operator.") (emphasis added). Among other things, the

airlines and screening companies employed explosive trace detection systems and

random bag searches as of September 11 to further the goal of preventing and deterring

bombs from entering the sterile area. *Id.* at 28-29.

Nor was this focus on explosives unreasonable. Essentially all of the major actual

or attempted attacks on civil aviation and American interests inside or outside the United

States during the fifteen years before September 11 involved the use of explosives. For

example, the 1988 Pan Am Flight 103 bombing over Lockerbie, Scotland, the 1993

World Trade Center Attack, the 1995 Bojinka plot, the 1995 Oklahoma City bombing,

the 1996 Khobar Towers attack, the 1998 embassy bombings in Nairobi and Dar Es

Salaam, the Los Angeles International Airport millennium plot, and the 2000 attack on

the U.S.S. Cole all involved the actual or attempted use of explosives. *See 9/11 Comm'n*

*Report*, at 60, 70-71, 82, 147, 153, 177-79, 190. Accordingly, it was reasonable for the

FAA to have focused its attention on explosives.

Given the information the FAA possessed before September 11, the FAA

concluded that the terrorist threat against civil aviation was primarily overseas. *See, e.g.*,

Ex. 29, slide presentation prepared by Pat McDonnell, Director of the Office of Civil

Aviation Security Intelligence of the Federal Aviation Administration, at slide 24. In this

pre-September 11 presentation, the FAA stated that it "considers a suicide bombing of a

15

U.S. airliner to be a low probability, [while] a non-suicide bombing continues to be a major concern." *Id.* The FAA's presentation acknowledged the possibility of a suicide bombing, but it dismissed such a possibility, noting: "Fortunately, we have no indication that any group is currently thinking in that direction." *Id.*

In sharp contrast, prior to September 11, the FAA had not provided the Aviation Parties with any information at all suggesting that terrorists had acquired or were seeking to acquire the ability to fly commercial aircraft. Nor did the FAA ever suggest to the airlines or security companies that small knives or other small sharp, cutting implements were likely terrorist weapons. The security directives and information circulars issued by the FAA during the five years prior to September 11 make only one or two passing references to knives.

**B.    *The Relevance and Importance of the Requested Testimony to Establishing Critical Facts***

With this background, we can now turn to why the requested testimony from these five FBI witnesses is so important to the Aviation Parties' defense. Two critical factors made the attacks of September 11 unique. First, the terrorists had acquired the capacity to pilot commercial airplanes. *Aviation Monograph* at 49; *see also 9/11 Comm'n Report*, at 156, 244. No previous hijacking involved a terrorist piloting a commercial jet to a particular location. But for the terrorists' ability to fly commercial jet aircraft into their chosen targets, the World Trade Center towers would still be standing.

The second critical factor that made the September 11 attacks unique is that they involved gangs of hijackers who were apparently armed with small knives or other small, sharp implements as their weapons. *See, e.g., 9/11 Comm'n Report*, at 84 ("Reportedly,

16

the 9/11 hijackers were instructed to use items that would be undetectable by airport checkpoints."); *Aviation Monograph*, at 48 ("Records of purchases by the hijackers, as well as evidence discovered at the crash sites . . . indicate that the primary weapon of choice were knives with a blade less than 4 inches long."). Based on the history of hijackings, however, the aviation security system was designed to prevent and deter guns and bombs from entering the sterile area, not small knives. *See, e.g.*, *9/11 Comm'n Report*, at 2, 82-84, 457 n.91; *see also, e.g.*, Ex. 56, Criminal Acts Against Civil Aviation – 1994 (describing commandeering of Air France Flight 8689 using automatic weapons, hand grenades and explosives); Ex. 57, Criminal Acts Against Civil Aviation – 1986 (describing attempted commandeering of Pan Am Flight 073 by hijackers with guns).

To be sure, some hijackings in the past involved small knives, but they were infrequent and none had occurred in the United States for more than ten years before September 11. *See 9/11 Comm'n Report,* at 457 n.91. Such hijackings typically involved a solitary hijacker and the outcomes were generally benign. *See* Ex. 38, Cammaroto Dep. Tr., at 230:13-231:5 (no pre-September 11 hijackings involving short knives could be "characterized as terrorist situations, but rather [were] more routine hijackings" such as Cubans wishing to return home). A single individual with a small knife was not historically considered to be a serious threat to the safety of a flight with scores of passengers and crew members aboard. *See* Ex. 38, Cammaroto Dep. Tr., at 231:2-5 (hijackers using short blade knives were "viewed to be far less threatening situations" than the deadly hijackings of the mid-1990s); *see also 9/11 Comm'n Report*, at 84 (FAA did not prohibit knives with blades under four inches from entering the sterile area

17

because it did not consider them menacing).  Moreover, the number of hijackings involving small knives was vastly outnumbered by those that were consummated *without the use of any weapons at all*.  *See* Ex. 58, FAA, Special Analysis – Civil Aviation Incidents in the United States, 1983-1992, at 1-2.

Against this background, the testimony of Mr. Samit, Ms. Rowley, and Mr. Rolince is crucial to the Aviation Parties' defense since they were involved in the pre-September 11 investigation of Moussaoui, who was a member of al Qaeda and a co-conspirator of the September 11 hijackers.  The Moussaoui investigation uncovered the first and only concrete pre-September 11 information showing that an Islamic terrorist was present in the United States and was attempting to learn how to fly a commercial airplane.[9]  *See* Ex. 14, Moussaoui Tr. (Samit), at 808-11.  Moussaoui's August 16, 2001 arrest also revealed that he had two knives with blades less than four inches long.  *See* Ex. 14, Moussaoui Tr. (Samit), at 844-50.[10]

Why is this relevant?  Because this information, if properly disseminated prior to September 11, could have made all the difference in the world.  If this information had been communicated to the FAA and to the Aviation Parties, the security procedures could

---

[9]    Indeed, Mr. Samit concluded that Moussaoui's activity "suggests some sort of hijacking plan."  Ex. 15, Email from Special Agent Samit to W. Jay Abbott, dated August 15, 2001.  One FBI agent even contemplated that Moussaoui might be planning on "taking a plane and crashing into the World Trade Center."  *9/11 Comm'n Report*, at 275.  At least one other FBI agent was also concerned about the potential that al Qaeda operatives might be trying to attend civil aviation schools in the United States.  *See 9/11 Comm'n Report*, at 272 (discussing the July 2001 so-called Phoenix Memo by FBI agent Kenneth Williams).

[10]    Khalid Sheikh Mohammed, the proclaimed "mastermind" of the September 11 attacks, has "explained that Moussaoui was preparing for a second wave attack which entailed the same steps as the 9/11 hijackers: getting flight lessons, purchasing knives, etc." Ex. 12, Substitution for the Testimony of Khalid Sheikh Mohammed, at ¶ 104.

have been adjusted to prevent the September 11 attacks.  If the FAA and the Aviation Parties had been told that terrorists were training to fly commercial airplanes, they could have taken additional steps to prevent passengers from gaining access to the cockpit.  For example, at the Moussaoui trial, Mr. Cammaroto testified that had the FAA known that the FBI suspected that terrorists might be plotting to hijack airplanes and pilot them into targeted buildings, the FAA could have altered or canceled the Common Strategy to ensure that the flight deck remained secure and that the airplane landed as soon as possible.  Ex. 28, Moussaoui Tr. (Cammaroto), at 1841, 1844.  The FAA also could have placed armed Air Marshals on major domestic flights.  *Id.* at 1842-43.

Similarly, if the FAA and the Aviation Parties had been told that a terrorist who was training to fly commercial aircraft had been arrested in possession of two small knives, they could have taken steps to prevent small knives from being brought on board aircraft.  For example, the FAA could have banned all small knives from entering the sterile area.  *Id.* at 1845-46.  The FAA also could have changed the sensitivity settings of the walk-through metal detectors to be able to better detect small knives.   As of September 11, the walk-through metal detectors were "calibrated to detect items with at least the metal content of a .22-caliber handgun."  *See 9/11 Comm'n Report*, at 2.  The evidence at trial will demonstrate that the types of items believed to have been possessed by the hijackers on September 11 would not have alarmed the walk-through metal detectors at the September 11 settings.[11]

---

[11]    This issue is one that the Court itself has identified as relevant to this litigation.  *See* October 1, 2003 Mem. and Order Denying Certification for Interlocutory Appeal, at 4 (raising question: "[c]ould certain materials pass through accepted methods of screening?").

Given the critical nature of the information about Moussaoui's flight training and possession of small knives, the Aviation Parties are entitled to ask Mr. Samit, Ms. Rowley, and Mr. Rolince whether the pre-September 11 information they had gathered through the Moussaoui investigation was communicated to the FAA or the Aviation Parties. Little, if any, of this information was communicated to the FAA and none of this information was communicated to the Aviation Parties. The Aviation Parties must be able to confirm these facts at trial.

The Aviation Parties also seek testimony from Mr. Samit and Mr. Billings about the weapons and other items discovered in Moussaoui's apartment and among his belongings on September 11 and 15, 2001, after the 9/11 attacks. Among other things, these items included a small knife with a blade less than four inches, two utility tools with blades less than four inches, an operating manual for a Boeing 747-400 aircraft and its cockpit, and flight simulator software. Ex. 14, Moussaoui Tr. (Samit), at 953-55, 958; Ex. 18, Moussaoui Tr. (Billings), at 1303. This testimony is relevant to the tactics employed by al Qaeda terrorist hijackers, including the types of weapons they may have used.

The testimony of Mr. Samit, Mr. Billings, Ms. Rowley, and Mr. Rolince also is relevant to other aspects of the Aviation Parties' defense. For example, Mr. Samit personally interviewed Moussaoui. Since the September 11 hijackers are dead and the Government will not allow the Aviation Parties to depose Moussaoui or the other September 11 co-conspirators who are in the Government's custody, one of the best ways we can present the jury with a meaningful sense of what the terrorist hijackers were like

is to obtain Mr. Samit's testimony. Mr. Samit can describe to the jury his impression of Moussaoui, the information he elicited, and the conclusions he drew from his interview. This testimony would become part of the totality of evidence the jury should consider in assessing the events of September 11.

For example, one of the Aviation Parties' arguments is that the September 11 hijackers were fanatical about their mission and were prepared to go forward with their plan even if whatever potential weapons they may have carried with them had been confiscated at the checkpoint. Mr. Samit's and Mr. Billings' testimony about the information they gathered regarding Moussaoui's physical training would be relevant to this argument. Such testimony tends to show that the hijackers were training to be able to take over the planes with their bare hands, if necessary. This testimony would complement Mr. Cammaroto's testimony that it would have been a relatively simple task for the hijackers to have fashioned a small cutting implement within the sterile area or on the plane, if necessary. *See* Ex. 38, Cammaroto Dep. Tr., at 234:9-239:13. Such an improvised weapon would have been sufficient to incapacitate a flight attendant – particularly when combined with the element of surprise. [12]

---

[12] It is incontrovertible that an "actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." Restatement (Second) of Torts § 432(1) (1965); *see also Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003) ("[N]o case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it" (quoting W. Prosser, *Handbook of the Law of Torts*, § 41, at 240 (4th ed. 1971)) (internal quotation marks omitted). Plaintiffs' suggestion that the decision in *Nash v. Port Authority of New York & New Jersey* undermines this basic proposition is simply incorrect. *See* Plaintiffs' Br. at 32-33; 856 N.Y.S.2d 583, 594 (1st Dep't 2008) (quoting a comment to Restatement (Second) of Torts § 432 as providing "simply, and unremarkably, that '[i]f, without the actor's negligent conduct, the other would have sustained harm, the

The testimony of former FBI Agent Erik Rigler falls into a somewhat different category.[13] The Aviation Parties have requested Mr. Rigler's deposition to give voice to the report issued by the DOJ on the FBI's missed opportunities to apprehend Nawaf al Hazmi and Khalid al Mihdhar. *See* Ex. 59, Report of the DOJ's Office of the Inspector General ("OIG"), Chapter 5; Ex. 20, Moussaoui Tr. (Rigler), at 2144 (stating that Rigler is testifying as a summary witness regarding Chapter 5 of the DOJ's OIG report). Among other things, Mr. Rigler will be able to testify that the FBI never asked the FAA to place Hazmi or Mihdhar on the FAA's "no-fly list." *Cf.* Ex. 60, FBI's Handling of

same in character and extent as that which he receives, the actor's conduct . . . is not a substantial factor in bringing it about'") (emphasis omitted). The Port Authority's argument in *Nash* was very different from the argument advanced by the Aviation Parties. In *Nash*, the Port Authority sought to argue that "even if the recommended precautions had been taken, the terrorists would have been undeterred from causing an explosion of similar character and extent, although perhaps at a different date, time and location." *Id.* at 592. The *Nash* court went out of its way to point out that "it is *not* defendant's position that it was prepared to prove that the World Trace Center bombing . . . would have occurred even if it had taken the precautions urged by plaintiff." *Id.* at 593 (emphasis added). In contrast, that is precisely the argument the Aviation Parties intend to make here. Our argument is that even if any prohibited weapons the hijackers were carrying with them on September 11 had been confiscated at the checkpoints, the September 11 hijackers would have gone through with the very same plot, on the very same day, and would have attacked the same airplanes, the same people, and the same buildings, with the same consequences, since the same result could have been achieved by the terrorists' use of items such as Swiss army knives or pocket utility knives that were permitted inside the sterile area, cutting implements obtained or improvised inside the sterile area, or their bare hands. In *Nash*, the Port Authority apparently did not put on any such evidence at trial, with the seemingly perverse result that the Port Authority was found to be 68% responsible for plaintiffs' damages, leaving the terrorists only 32% responsible. *See Nash*, 856 N.Y.S.2d at 594. The Aviation Parties should not be forced to repeat Port Authority's mistakes.

[13] The testimony sought from Mr. Rigler is not based on information that he learned in the course of his employment with the FBI. Thus, the Aviation Parties were not required to serve a *Touhy* request for his testimony. The fact that the Aviation Parties did, in an abundance of caution, serve a *Touhy* request for Mr. Rigler does not confer authority on the DOJ that they do not have under the *Touhy* regulations. The Government's additional assertion that Mr. Rigler is prohibited from revealing classified information pursuant to a Memorandum of Understanding Regarding Receipt of Classified Information is of no consequence because the Aviation Parties are not seeking access to classified information.

Intelligence Information Related to Khalid al-Mihdhar & Nawaf al-Hazmi, September 11 Attacks, at slide 51 (showing that FAA no-fly list was not among watchlists containing Hazmi's and Mihdhar's names); Ex. 20, Moussaoui Tr. (Rigler), at 2260-61 (confirming that FAA no-fly list was not among the watchlists containing Hazmi's and Mihdhar's names). This testimony will provide the factual predicate for the testimony of Larry Wansley, American's Managing Director of Corporate Security on September 11 and a former FBI agent, that if Hazmi and Mihdhar had been on the FAA's no-fly list, they would have been detained for questioning when they attempted to check in for American Flight 77 and prohibited from boarding. *See* Ex. 34, Wansley Dep. Tr., at 421:24-426:2.

Moreover, if Hazmi's and Mihdhar's names had been on the no-fly list, and if they had tried to fly *before* September 11, they would have been detained and likely arrested and the entire September 11 plot could have been stopped, not just the hijacking of American Flight 77. This is not mere conjecture. Documents reveal that Hazmi and Mihdhar took flights within the United States in the months leading up to September 11, 2001. *See* Ex. 61, Summary of PENTTBOM Investigation, at 45 (on June 19, 2001, Hazmi flew from Newark, New Jersey to Miami, Florida), 46 (on June 25, 2001, Hazmi flew from Miami, Florida to Newark, New Jersey), 45 (on August 13, 2001, Hazmi and hijacker Hani Hanjour traveled from Dulles, Virginia, to Las Vegas, Nevada, via Los Angeles, California), 52 (on August 14, 2001, Hazmi and Hanjour flew from Las Vegas, Nevada to BWI Airport, Maryland, via Minneapolis, Minnesota), 41 (on July 4, 2001, Mihdhar flew from Saudi Arabia to JFK Airport).

**C.    The Relevance and Importance of the Requested Testimony to the Applicable Legal Analysis**

The facts and theories discussed above go directly to the legal issues of foreseeability and causation. For example, a jury could reasonably conclude that given the information possessed by the Aviation Parties as of September 11, it was not reasonably foreseeable that gangs of terrorists armed with nothing more than small cutting implements, who were trained to pilot commercial airplanes, would launch a coordinated attack to hijack airplanes and crash them into specified buildings. It would be important to the jury's consideration of this issue for them to hear testimony from FBI witnesses that even with the FBI's significantly enhanced knowledge – including the facts about Moussaoui's flight training and possession of small knives – the FBI did not conclude that such an attack was likely enough to warrant warning the FAA or the Aviation Parties.[14] The jury could reasonably conclude that if the FBI did not foresee that a hijacking by knife wielding, pilot-trained terrorists was imminent within the United States, it was reasonable that the Aviation Parties did not foresee it either.[15] Having FBI

---

[14] To the contrary, the FBI presented only a watered-down version of its intelligence regarding Moussaoui to the FAA before September 11. *See* Aviation Defendants' Br., at 11; *9/11 Comm'n Report*, at 274 (noting that the FBI's communication to the FAA "did not report the case agent's personal assessment that Moussaoui planned to hijack an airplane" and contained a misleading comment that "it was not unusual for Middle Easterners to attend flight training schools in the United States").

[15] Plaintiffs' suggestion that historical information about terrorist bombings, generalized warnings of al Qaeda's or Usama Bin Ladin's desires to attack American interests, and hortatory cautions to remain on "high alert" should have caused the Aviation Parties to foresee that terrorists able to pilot commercial airplanes would hijack domestic airplanes using small knives misses the mark. Rather, the FBI's and FAA's emphasis on the threat of terrorist *bombings* – combined with the legal prohibitions against singling out Middle Eastern-appearing persons for heightened scrutiny – had the effect of increasing the Aviation Parties' focus on the detection of bombs and other explosive devices. For example, in the

24

witness testimony on the issue of foreseeability would be particularly useful to the jury, given the inevitable distorting effect of hindsight.

In addition, a jury could reasonably conclude that the terrorists' criminal actions, combined with the Government's intelligence failures and – in hindsight only – the insufficient countermeasures established by the FAA, so overshadowed any negligence by the Aviation Parties that any such negligence was not a substantial factor in causing any damages suffered by plaintiffs. *See* Restatement (Second) Torts § 433 cmt. d (1965) ("Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although no one of the contributing factors may have had such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor.").[16]    It would be important to a jury's

---

weeks and months prior to September 11, both American Airlines and United Air Lines installed CTX machines and Explosive Trace Detection devices in their facilities at Logan International Airport. *See supra* pp. 14-15.

[16]   Plaintiffs' attempt to distort the law of proximate cause is unpersuasive. *See* Plaintiffs' Br., at 14-17.  It is indisputable that "[i]n order to show proximate cause, a plaintiff must establish that the defendant's conduct was a substantial cause in bringing about the harm." *Pelman*, 237 F. Supp. 2d at 537-38.  The substantial factor determination is ordinarily a question of fact for the jury.  Defendants are always permitted to show that someone else's conduct or some impersonal force was the sole proximate cause of plaintiffs' injuries. *See, e.g., Leonardi v. Loyola Univ. of Chicago*, 658 N.E.2d 450, 459 (Ill. 1995).  Defendants are also permitted to point to all other potentially contributing factors and to argue that the individual or combined contribution of these other factors renders defendants' conduct less than a substantial factor in bringing about plaintiffs' injuries. *See* Restatement (Second) of Torts § 433(a) (1965) (explaining that "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it" is an "important [consideration] in determining whether the actor's conduct is a substantial factor in bringing about harm to another"); *Pelman*, 237 F. Supp. 2d at 538 (in assessing whether a defendant's conduct was a substantial cause of the harm, "[s]everal factors are considered,

consideration of this issue to hear testimony from FBI witnesses that despite the fact that

the FBI knew that a suspected terrorist was in the United States taking commercial flight

lessons, and that one of the FBI agents investigating Moussaoui had concluded in mid-

August 2001 that Moussaoui's conduct "obviously suggests some sort of hijacking plan,"

this information was not communicated to the Aviation Parties.[17]    It would also be

important to the jury's consideration of causation issues to hear FBI witness testimony

about the fact that the FBI did not ask the FAA to place Hazmi and Mihdhar on the

FAA's "no-fly" list.   This testimony could be particularly important given the evidence

that both hijackers flew within the United States before September 11 and would have

been detained for questioning had they checked in for their flights while their names were

on the no-fly list.

---

including the aggregate number of actors involved which contribute towards the harm and the
effect which each has in producing it, and whether the situation was acted upon by other
forces for which the defendant is not responsible") (internal quotation marks omitted); *Med.
Lab. Mgmt. Consultants v. Devaraj*, 306 F.3d 806, 820-21 (9th Cir. 2002) (finding that
alleged trespass by investigative reporter was not a substantial factor in the harm caused to
plaintiff by broadcast of investigative report because harm caused by video produced as a
result of trespass was "negligible by comparison" to harm caused by other portion of report
documenting laboratory's substandard practices).    These causation principles operate
independently of the rules concerning joint or several liability.   Consequently, plaintiffs'
arguments concerning the unavailability of apportionment of economic losses under Article
16 of the New York Civil Practice Law and Rules are beside the point.

[17]    The jury could also find it important to hear testimony from FBI witnesses about the fact
that Moussaoui's arrest was not publicly announced.   The jury could reasonably conclude
that if the FBI had announced in August 2001 that Moussaoui had been arrested and that the
FBI was in pursuit of his co-conspirators in a hijacking plot, the September 11 plot would
have been disrupted.   Other evidence would support this conclusion as well. *See, e.g.*, *9/11
Comm'n Report*, at 276 (noting that "publicity about Moussaoui's arrest and a possible
hijacking threat might have derailed the plot"), 247 ("According to Binalshibh, had Bin
Laden and KSM learned prior to September 11 that Moussaoui had been detained, they might
have cancelled the operation.").

The jury could reasonably conclude that the FBI's failure to share any of this information with the Aviation Parties was a causal factor in the September 11 attacks. Among other things, the jury could conclude that the FBI's failure to communicate this information to the Aviation Parties deprived them of the opportunity to consult with the FAA about imposing additional countermeasures to prevent an attempted attack on the aviation system by a terrorist with the capability of piloting an airplane. Combining the FBI's failure to communicate this information to the Aviation Parties with the criminal acts of the terrorists, the jury could conclude that any negligence on the part of the Aviation Parties was not a substantial cause of plaintiffs' damages.

This type of evidence also is relevant more broadly to the issue of negligence. Plaintiffs are likely to argue that based on the information the FAA and the Aviation Parties had, they should have taken steps to forestall the September 11 attacks. Conceivably, viewed in isolation, the jury might view the information the Aviation Parties possessed to have been sufficient to have allowed us to prevent the attacks. The Aviation Parties are entitled to point out to the jury that the FBI had more information than they did, but were not able to prevent the attacks. Testimony from the five FBI witnesses would help to provide a context in which the jury can weigh its negligence determinations. The jury could reasonably conclude that the Aviation Parties' lack of knowledge about the two critical, unique factors to the September 11 plot – the hijackers' ability to pilot commercial aircraft and their decision to work within the FAA's mandated checkpoint security procedures by using only knives with blades less than four inches long or other small cutting implements – absolves the Aviation Parties of liability. The

27

jury's resolution of this issue could be outcome determinative. Evidence that the FBI had information about these two critical factors and did not share it with the Aviation Parties could greatly affect the jury's weighing of this evidence.

Testimony by the FBI witnesses would also be relevant to the question of whether the Aviation Parties were negligent in conducting checkpoint screening. Plaintiffs will undoubtedly argue – as they have attempted to do through their deposition questions – that the items used by the hijackers were both prohibited and detectable by the security screening systems in place on September 11. The Aviation Parties, on the other hand, will argue that any items used by the hijackers were permissible and/or not readily detectable. For example, the Aviation Parties will argue that whatever knives the hijackers may have possessed on September 11 would have had blades less than four inches long. Included in the mix of information presented to the jury on this issue should be videotaped deposition testimony by Mr. Samit about the types of knives he uncovered from Moussaoui, a co-conspirator of the September 11 hijackers. *See, e.g.*, Ex. 14, Moussaoui Tr. (Samit), at 844-50 (describing two knives found in Moussaoui's possession at time of his August 2001 arrest: one with a two-inch blade, the other with a three-inch blade).

A conclusion by the jury that any knives used by the hijackers likely had blades less than four inches long and were permissible to be brought into the sterile area or were not readily detectable by checkpoint screening equipment would almost certainly result in a finding of no liability concerning the checkpoint security screening process. If, for example, the jury concludes that the items most likely to have been used by the hijackers

were basic Swiss army knives, they should return a defense verdict for the airlines and the screening companies. Because Swiss army knives were expressly permitted into the sterile area according to the COG (Ex. 42, COG 5-7; *see also* Ex. 38, Cammaroto Dep. Tr., at 284:24-286:8) – and were unlikely to be detected by a walk-through metal detector – it is inconceivable that the airlines or screening companies could be found negligent for allowing Swiss army knives to pass through the checkpoint. It is also inconceivable that the Aviation Parties would be prohibited from presenting to the jury the FBI witnesses' testimony about the knives uncovered in Moussaoui's possession, given the relevance of the testimony to this critical issue.

The suggestion by the Government and plaintiffs that testimony from the FBI witnesses about the fact that the FBI had information before September 11 about an Islamic terrorist who was taking commercial flight lessons in the United States and was found in possession of multiple small knives is not relevant to the September 11 Litigation is unfathomable.[18] The untenability of that position is highlighted by the fact

---

[18]   Plaintiffs' opposition to the Aviation Parties' motion focuses almost exclusively on the issue of relevance. Plaintiffs seem to be arguing that because they have relevant evidence, the Aviation Parties' contrary evidence cannot also be relevant. This argument is absurd. Plaintiffs' possession of evidence they believe supportive of their case in no way precludes the Aviation Parties from obtaining and presenting evidence relevant to our defenses. Moreover, plaintiffs' repeated suggestions that the Court should defer to the FBI's supposed determinations of the relevance of the requested testimony reflects a novel misapprehension of the law. *See, e.g.*, Plaintiffs' Br., at 17, 24, 33, 35. The FBI is not a court, nor is it a party to this litigation. It is not up to the FBI or the DOJ to decide what information will be relevant to the Aviation Parties' defenses. Relevance determinations rest solely within this Court. Furthermore, any suggestion by plaintiffs that the requested testimony is irrelevant as a result of the Court's June 2007 Order on government discovery mischaracterizes the Court's ruling on that motion. *See* June 22, 2007 Summary Order (Doc. No. 1104 in 21 MC 97; Doc. No. 300 in 21 MC 101) (filed June 22, 2007) (denying motion without prejudice and concluding that the Court would not "resolve discovery questions in the abstract," but would

that the Government apparently believed this information to be so important that it sought to put Moussaoui to death for failing to adequately communicate it to the Government before September 11. The Government cannot pick and choose to disclose unclassified, non-privileged information only when it serves its own purposes. That is the very definition of arbitrary and capricious decision making.

In addition to the relevance of the requested testimony to the legal issues of foreseeability, negligence, and causation, the requested discovery is also relevant to determining whether the Aviation Parties have derivative immunity from liability. As discussed in the Aviation Parties' opening brief, the first two prongs of the test for establishing derivative immunity are not at issue on this motion. The third prong, however, requires a defendant to show that it was "not aware of dangers about which [the agency] was unaware." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 198 (2d Cir. 2008). The FBI witnesses' testimony is relevant to this prong of the test because they will be able to testify whether certain critical threat information was disclosed to the FAA and to the Aviation Parties. What better way to convince a jury that we satisfy this third prong than to show that (a) the Aviation Parties had no important threat information that they failed to disclose to the Government; and (b) the Government had important threat information that it failed to disclose to the Aviation Parties?[19]

---

"resolve disputes regarding requests for specific documents or items or information and objections thereto").

[19] The Government's argument that the Court should not consider "new arguments" contained in the Aviation Parties' opening brief, but not in their *Touhy* requests, should be rejected. *See* Government's Br., at 55. The DOJ's *Touhy* regulations emphasize that a party seeking oral testimony need only supply a statement "setting forth a *summary* of the testimony sought and its relevance to the proceeding." 28 C.F.R. § 16.22(c) (emphasis

## II.    THE AVIATION PARTIES ARE NOT SEEKING CLASSIFIED OR PRIVILEGED INFORMATION AND ARE WILLING TO ESTABLISH APPROPRIATE SAFEGUARDS.

### A.    *Disclosure is Appropriate Under the Touhy Analysis Because the Aviation Parties Seek Only Unclassified, Non-Privileged Information.*

The Government's purported concerns about preventing disclosure of classified and privileged information are exaggerated and easily overcome. The Government is not being fair or practical in its interpretation of the Aviation Parties' requests, which are limited and transparent. We have made clear in our *Touhy* requests, in our Complaint, in our opening brief, and again here, the information that we seek from these five FBI witnesses. We want to obtain in live and somewhat augmented form the same information that these witnesses have already testified about at the Moussaoui trial or have otherwise publicly disclosed. Having already publicly disclosed this information when it served its own purposes, the Government cannot now refuse to authorize the requested disclosures by hiding behind claimed concerns over national security.

The governing *Touhy* regulations guide the DOJ to authorize requested discovery where, as here, the discovery is appropriate under the applicable rules of procedure (in this instance, Federal Rules of Civil Procedure 26 and 45) and would not violate a statute or regulation or reveal privileged or classified information. *See* 28 C.F.R. § 16.26 (2003).

---

added). Nothing in the *Touhy* regulations requires the Aviation Parties to provide an exhaustive list of every way in which the requested discovery is relevant to the pending litigation or to cite case law in support of our positions. Moreover, the Second Circuit's derivative immunity decision in *In re World Trade Center Disaster Site Litigation* was not released until after the Aviation Parties made our *Touhy* requests, so we could not possibly have cited that decision in our requests. 521 F.3d at 169. In any event, the Government has had our opening brief for about two months. If some "new" argument about relevance would have made a difference to the Government's *Touhy* determination, it had ample opportunity to change its mind, but chose not to do so.

The regulations are not intended to block disclosure of information that does not run afoul of the criteria specified in the Code of Federal Regulation 28 section 16.26.

The circumstances here presented the DOJ with a decision that should have been easier than most because the requested topics have already been publicly disclosed and discussed.  By refusing to authorize the five requested depositions, the DOJ failed to follow the dictates of its own *Touhy* regulations.  If these circumstances do not warrant authorizing disclosure, then the DOJ is essentially saying that despite the *Touhy* regulations, the DOJ actually has *carte blanche* to refuse to authorize disclosure.  The Government could always cite national security to block requested discovery.  However, such an approach is arbitrary and capricious and exceeds the DOJ's authority.

The Court rejected this precise approach in *In re Vioxx Products Liability Litigation*, 235 F.R.D. 334 (E.D. La. 2006).  There, the Court rejected as arbitrary and capricious the FDA's refusal to authorize a requested deposition, noting that ruling in the FDA's favor would "in effect allow the FDA to implement a practice of denying all deposition requests under the guise of possible, although presently nonexistent consequences." *Id.* at 345.  The Court specifically stated: "[m]uch as this Court will not write litigants a blank check, it will not deal the FDA a trump card." *Id.*[20]

Moreover, it is unjustifiable for the DOJ to use its generalized concern about national security or the law enforcement privilege to avoid making individualized assessments about which facts are suitable for disclosure and which are not.  The analysis

---

[20]    The Government attempts to distinguish *Vioxx* and the other *Touhy* cases cited by the Aviation Parties by stating that they did not deal with classified information.  *See* Government's Br., at 44 n.12.  But the Aviation Parties are not seeking access to classified information, so this is not a distinguishing factor.

in *Miller v. Mehltretter*, 478 F. Supp. 2d 415 (W.D.N.Y. 2007), is instructive here. The plaintiff in *Miller*, a police officer who had brought a contempt proceeding against the chief of the police department, sought the testimony of an FBI agent in support of his case. *Id.* at 418-19. The plaintiff's requested testimony concerned thirteen specific topics. *Id.* at 421. The DOJ authorized the FBI agent to provide testimony on four of the topics, but refused to authorize testimony on the other nine, citing the grand jury secrecy rule, the Privacy Act, and the law enforcement and deliberative process privileges, as well as objections based on relevance and burden. *Id.* at 421-22. The court went through a detailed analysis of the DOJ's bases for refusing to authorize testimony on the nine topics, accepting some bases and rejecting others as arbitrary and capricious. *Id.* at 422-32.

In reviewing the DOJ's decision, the court in *Miller* observed that its task was to "ascertain whether [the DOJ] made a clear error in judgment in refusing to allow [the FBI agent] to testify or to produce documents" in response to the disputed requests. *Id.* at 422 (internal quotation marks). The court explained that "[a]ccording to the Second Circuit, this determination turns on whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

Of particular note is the *Miller* court's analysis of the DOJ's objection based on the law enforcement privilege and the DOJ's claim that allowing certain testimony would

"undermine law enforcement efforts." *Id.* at 424. The court rejected that rationale, finding, among other things, that:

- the DOJ had made "only 'vague and conclusory statements without any specific or particularized facts' to support [its] claim that the testimony . . . would be privileged";

- the DOJ "did not explain 'how disclosure will undermine law enforcement efforts and reveal law enforcement techniques'"; and

- the DOJ did not "offer a satisfactory explanation for how such testimony would 'disclose investigative techniques and procedures the effectiveness of which would thereby be impaired.'"

*Id.* at 425 (quoting *Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. Mar. 16, 2006) and 28 C.F.R. § 16.26(b)(5)).

The DOJ's conclusory statements here about protecting its "law enforcement sensitive information" are similarly deficient. *See, e.g.*, Heimbach Decl., at ¶ 23 (claiming, without substantiation, that "attempts to elicit the foundation of prior public statements, inquire into background facts or circumstances, or otherwise amplify the prior public statements likely would implicate classified or law enforcement sensitive information that has not previously been disclosed").

In the case of Moussaoui, for example, the Aviation Parties seek specific information about a specific investigation of a specific individual. The specific information we seek relates to events that occurred nearly seven years ago. Moussaoui was arrested in August 2001. He has already pleaded guilty and been sentenced to life in prison. Four of the requested FBI witnesses testified live at the Moussaoui trial. Under these circumstances, the DOJ's unsubstantiated claim that some of the questions asked by

34

the Aviation Parties might implicate law enforcement sensitive information about the Moussaoui investigation are unavailing.

Moreover, the DOJ's statement that some information regarding the PENTTBOM investigation remains protected is beside the point because the Aviation Parties will not be asking questions about that investigation. *See, e.g.*, Heimbach Decl., at ¶ 12. For example, the DOJ's reference to the "ongoing enforcement proceedings" against the five September 11 co-conspirators who were recently arraigned has no relevance to the requested discovery. *See id.* at ¶ 11. The Aviation Parties are not seeking to ask the FBI witnesses any questions about these five individuals.

The DOJ also notes that some information relating to PENTTBOM "remains classified and/or law enforcement sensitive because it implicates specific intelligence sources." *Id.* at ¶ 12. While this may be true regarding some information, it has no application to the FBI's source for the initial tip about Moussaoui. The FBI has already publicly disclosed that this tip came from the Pan Am flight school where Moussaoui was training and it has disclosed the name of the source who provided the initial tip, as well as the names of additional sources who provided information about Moussaoui. *See, e.g.*, Ex. 14, Moussaoui Tr. (Samit), at 808, 821-25. This position is a perfect illustration of the DOJ inappropriately relying on sweeping statements about national security to block disclosure rather than engaging in the fact-specific analysis required by the APA. *Cf. Miller*, 478 F. Supp. 2d at 425 (rejecting DOJ's reliance on "conclusory statements without any specific or particularized facts to support [its] claim") (internal quotation marks omitted).

The fact that the specific information sought by the Aviation Parties already has been disclosed publicly further demonstrates that DOJ's refusal is inappropriate. *See id.* (concluding that "much of the 'techniques and procedures' . . . already have been disclosed" in prior court proceedings and "[t]he need for continued secrecy of these matters, therefore, has been diminished"). The *Miller* court also noted that the contempt litigation was "an important proceeding" and found that "the need for continued secrecy" was not "paramount to the interests advanced by the disclosure of the information in the contempt proceeding." *Id.* at 426.

Thus, even in *Miller*, which involved claims of privilege and other governmental protections, the court rejected the DOJ's failure to adhere to the *Touhy* regulations and compelled the testimony of the FBI agent. *Id.* at 422-32; *see also Cavanaugh v. Wainstein*, No. 05-123, 2007 U.S. Dist. LEXIS 40242, at *31 n.11 (D.D.C. June 4, 2007) (holding that DOJ's "across-the-board denial of Plaintiff's demand for deposition testimony regarding the DOJ Attorneys' internal communications or their communications with the Board's outside counsel was . . . arbitrary and capricious").[21]

---

[21]   Even sitting Presidents of the United States have provided deposition and trial testimony in appropriate circumstances. *See Clinton v. Jones*, 520 U.S. 681, 704-05 (1997) (noting that while in office, President Monroe responded to interrogatories, Presidents Grant and Ford gave depositions in criminal cases, and Presidents Carter and Clinton (twice) testified via videotape in criminal trials); *cf. United States v. Nixon*, 418 U.S. 683, 686, 708-14 (1974) (concluding that "the public . . . has a right to every man's evidence" and ordering President Nixon to submit to subpoena and turn over tape recordings and other documents in criminal proceeding despite his claims of executive privilege and confidentiality) (internal quotation marks omitted). In *Clinton v. Jones*, the Supreme Court refused to stay a lawsuit against President Clinton and assumed that the plaintiff could take the President's testimony "both for discovery and for use at trial." 520 U.S. at 691. President Clinton was, in fact, later deposed in connection with that litigation. *See* Francis X. Clines, *Clinton, in First for a President, Testifies in Sex Harassment Suit*, N.Y. Times, Jan. 18, 1998, at A1.

The Government can take solace here because the Aviation Parties are not seeking access to any classified, privileged, or law enforcement sensitive information. *See* Barry Decl. II, at ¶ 3. Indeed, no real dispute exists concerning the information the Aviation Parties are actually seeking. In its brief, the Government acknowledges that "the Aviation Defendants are correct that ***the specific information revealed during the [Moussaoui] trial is not classified or privileged***." Government's Br., at 38 (emphasis added). Similarly, in his declaration, the FBI's Michael Heimbach acknowledges that "much PENTTBOM-related information has already been publicly disclosed in such contexts as *The 9/11 Commission Report* and related hearings or the criminal trial of Zacarias Moussaoui." Heimbach Decl., at ¶ 13. Thus, the Government does not claim that information already made public is somehow classified or privileged.[22] The Aviation Parties seek discovery of such information here.

The Government has presumably read the Aviation Parties' *Touhy* submissions, Complaint, opening brief, and Statement of Material Facts in support of our motion for summary judgment. These documents disclose the topics about which the Aviation Parties intend to question the five FBI witnesses. The Aviation Parties seek the right to ask the five FBI witnesses about the very same topics that have already been publicly disclosed, including at the Moussaoui trial and in the *9/11 Commission Report.* The Aviation Parties want the right to ask live witnesses some of the same questions that have

---

[22] Nor could it. The Government's own citations to cases involving classified national security information in the Freedom of Information Act ("FOIA") context, for example, emphasize that disclosure is warranted where the information requested has already been publicly disclosed. *See* Government's Br., at 29; *see also, e.g., Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999) (noting "exception is permitted only where the government has officially disclosed the specific information the requester seeks").

already been asked and answered in other public contexts. The Aviation Parties also want the right to ask some of their own questions, which are more focused on the issues presented by this litigation. In all instances, however, the information we seek will be directly related to the topics that already have been publicly disclosed.

### B.    *The Government's Concerns About Protected Information Can Be Resolved Through Appropriate Safeguards.*

While the parties appear to be in agreement that any information that was revealed during the Moussaoui trial or in the *9/11 Commission Report* is appropriate for disclosure, the Government has expressed concern that "any amplification of [the Moussaoui trial] testimony, including attempts to elicit the foundation of prior public statements or elicit background facts and circumstances, is likely to implicate classified and privileged matters." Government's Br., at 38. The Government's brief also argues that the risk of disclosure "'is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privilege[d] material is intertwined and not readily segregable.'" Government's Br., at 46 (quoting Garcia Ltr.-Rolince at 2); Heimbach Decl., at ¶ 23. These concerns can be resolved through the use of appropriate safeguards.

The Government explains that one of the reasons it was able to permit the testimony of four of the five FBI witnesses at the Moussaoui trial was because the parties followed the protocols of the Classified Information Procedures Act, "including provisions to ensure against the unauthorized release of classified information during testimony" and additional "precautionary measures were employed to protect against the inadvertent disclosure of classified information during live court testimony."

Government's Br., at 36-38. Comparable safeguards can be employed here, particularly given that – unlike in the Moussaoui trial – the FBI witnesses do not need to review classified information in preparation for their deposition testimony because the Aviation Parties do not seek disclosure of any classified information. The procedural protections required should also be far less onerous than those needed at the Moussaoui trial because a deposition is inherently a more protected environment than testifying live at a public trial.

The Aviation Parties are willing to work with the Government to establish whatever reasonable safeguards are necessary to protect against the disclosure of classified or privileged information. *See* Barry Decl. II, at ¶ 3. For example, we are prepared to submit our intended questions in writing to the Government well in advance of the depositions to afford the Government the opportunity to review each question in advance and advise if any of the questions are problematic from the perspective of national security or privilege. The parties can then work together to resolve any such concerns before the depositions. Similarly, having the questions in advance will allow the Government to identify what information would be appropriate for disclosure and what information might be protected. The Government would then be able to sort these issues out with the FBI witnesses before the depositions. It would also eliminate the Government's concern that unexpected questions or answers might inadvertently call for or intrude upon classified or privileged information.

In conjunction with this procedure, any counsel asking questions at the depositions would agree to stick to the agreed-upon outline of questions as closely as

possible. To the extent certain follow-up questions are deemed necessary, they would be limited to the specific topics authorized for disclosure. To the extent any such follow-up questions raise a concern about classified or privileged information, the parties would resolve such a concern before the witness provided his or her answer to the question. This approach would ensure that the Aviation Parties would be able to ask clarifying questions that might arise during the deposition as a result of a witness' answer, while preserving the Government's need to protect against inadvertent disclosure of protected information. *Cf. Miller*, 478 F. Supp. 2d at 431 (holding that the DOJ's "determination not to allow [an FBI agent] to testify to any follow-up questions related to the approved subject areas was arbitrary and capricious" and noting that "by definition, a 'follow-up' question would only be related to previously-approved areas of inquiry").

The Aviation Parties are willing to agree to other reasonable precautions as well. For example, the following additional protections would be acceptable to the Aviation Parties, if the Government deemed any of them necessary or prudent to protect national security or the inadvertent disclosure of classified or privileged information:

- conduct the depositions before a Magistrate Judge or Special Master;
- limit the attendance at the depositions to only those persons who have Sensitive Security Information ("SSI") clearance;
- prohibit telephonic participation at the depositions;
- allow the Government to confer (including with the witness) over issues of potentially classified or privileged information, even if a question is pending;
- allow the Government to review the transcripts before they are released to any party to ensure that they do not contain any classified or privileged information; and

- agree that there will be no waiver should any classified or privileged information inadvertently be disclosed during the deposition.

Proceeding with these or other similar precautions should eliminate any lingering concerns about the inadvertent disclosure of protected information.[23]

## III.    THE REQUESTED WITNESS TESTIMONY HAS NO ADEQUATE SUBSTITUTE

The five FBI witnesses undoubtedly possess relevant and important information to the Aviation Parties' defense and no other witnesses can provide the testimony that we seek. Given that the Aviation Parties are not seeking any classified or privileged information, and that we are willing to establish safeguards against the inadvertent disclosure of such information, no legitimate basis exists for suggesting that the Aviation Parties should forgo taking these five depositions and rely exclusively on documents.

The law recognizes that there is no adequate substitute for live witness testimony. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 235 F.R.D. at 346 ("None of the documents provided by the FDA can express the [witness's] opinion with the clarity and tone as he personally can in his deposition."); *Cavanaugh*, 2007 U.S. Dist. LEXIS 40242, at *33

---

[23] The Government's concerns about inadvertent disclosures of SSI during prior depositions conducted in the September 11 Litigation, *see, e.g.,* Normand Decl., at ¶¶ 16-20, are exaggerated. The Government acknowledges that "[o]nly a very limited amount of SSI has been implicated in the depositions that have taken place to date." *Id.* at ¶ 18. Where SSI has arisen, the established process has been working smoothly. In any event, such concerns are resolved by the use of appropriate safeguards here. *Cf. id.* at ¶ 18 (noting that "TSA's security expert rarely has been called upon during the course of a deposition to make on-the-spot determinations as to what constitutes SSI"); *id.* at ¶ 19 (noting that where SSI has been inadvertently disclosed, it was in part because "the TSA security expert or counsel fail[ed] to anticipate that the question call[ed] for SSI"). Since the Aviation Parties will supply our questions to the Government in advance of the depositions, the Government and the witnesses will be fully familiar with the specifics of each question that will be asked, thus eliminating the burden of needing to make "on-the-spot determinations" about disclosure.

("A declaration is simply not an adequate substitute for live testimony, such as a deposition.") (internal quotation marks omitted); *see also Founding Church of Scientology v. Webster,* 802 F.2d 1448, 1451 (D.C. Cir. 1986) ("Depositions thus rank high in the hierarchy of pretrial, truth-finding mechanisms . . . [and] are a critical component of the tools of justice in civil litigation. Fed. R. Civ. P. 30(a) thus broadly provides that any party may take the testimony of any person, including a party, by deposition upon oral examination.") (internal quotation marks omitted); *Alexander v. F.B.I.,* 186 F.R.D. 113, 121 (D.D.C. 1998) ("Answering questions by declaration or affidavit . . . is simply not an adequate substitute for live testimony."). Not surprisingly, "[a]n order barring a litigant from taking a deposition is most extraordinary relief." *Speadmark, Inc. v. Federated Dep't Stores, Inc.,* 176 F.R.D. 116, 118 (S.D.N.Y. 1997).

If this litigation is not resolved through dispositive motions, there will be a jury trial of this case. If the Aviation Parties had our first choice, we would be able to call these five FBI witnesses to testify live at trial. But we are not asking for that relief. We have agreed with the Government that we would not seek to call witnesses such as these to testify live at trial but we should be able to question these witnesses at deposition and present their videotaped testimony to the jury.

The Government argues that the DOJ rejected the requested depositions in part based on the assumption that the Moussaoui testimony of four of the FBI witnesses would be admissible at trial and that the other sources of publicly disclosed information, such as the *9/11 Commission Report,* also would be admissible at trial. *See, e.g.,* Government's Br., at 64 (claiming that the information the Aviation Parties seek is

available in "documents already produced by the FBI in the September 11 Litigation, [The] *9/11 Commission Report*, the OIG Report, and exhibits and testimony admitted in the Moussaoui trial, including the testimony of these same witnesses"). In fact, "[t]he Government urges the Court to grant the Aviation Defendants' motion in connection with the FBI agents' prior testimony, at least with respect to their factual assertions, which are incontrovertible." Government's Br., at 68. Perhaps the Government did not anticipate the extent to which plaintiffs would attempt to block the admissibility of the Moussaoui trial testimony and statements contained in the *9/11 Commission Report*.

Plaintiffs object to the Aviation Parties being able to take these five depositions because they want to consign the Aviation Parties to the use of documentary exhibits wherever possible. As amply illustrated by the cases above, the use of documents alone is simply not an adequate substitute for witness testimony. For a jury to understand a document, a witness needs to explain it to them and provide context. It is also indisputable that witness testimony is nearly always more persuasive than documentary evidence. Moreover, plaintiffs appear to be trying to restrict our use of documentary evidence as well. They have not only opposed our motion to take the depositions of these five FBI witnesses, but they also have opposed our motion for a ruling that these witnesses' prior statements from the Moussaoui trial and the *9/11 Commission Report* would not be subject to hearsay objections if the witnesses are not permitted to testify. Were plaintiffs to get their way, the Aviation Parties would be deprived of *any* of the evidence we seek on the requested topics and a fair trial would not be possible.

## IV.    THE REQUESTED DEPOSITIONS ARE NOT UNDULY BURDENSOME

The Government's sole legitimate concern is the protection of its classified and privileged information.  This concern was motivated primarily by the Government's mistaken belief that the Aviation Parties were seeking access to classified and privileged information.  Since the Aviation Parties have made clear that we are not seeking any protected information, and that we are willing to establish safeguards against the inadvertent disclosure of such information, the Government has no basis for preventing the five requested depositions on the basis of burden.

At issue are five depositions:  four witnesses regarding Moussaoui and one regarding Mihdhar and Hazmi.  Most of the Government's preparation has already been done in connection with the witnesses' prior testimony in the Moussaoui trial and/or before the 9/11 Commission.  The difficult issues regarding the confines of what information is authorized for disclosure have mainly already been resolved.  What remains is some preparation for these particular depositions and attendance of the witnesses and Government counsel at the depositions themselves.  The Government's argument that even these minor burdens are too much for them to bear should be rejected out of hand.

First, the Government's suggestion that the Aviation Parties should rely on documentary evidence rather than depositions because that would create less burden on the Government is baseless.  Documentary evidence simply is not an adequate substitute

for witness testimony.[24]  Second, the Government's suggestion that preparation for these

depositions would divert resources that could better be used elsewhere is disingenuous.

*See, e.g.*, Government's Br., at 19 (quoting Fourth Circuit case noting the need "to

conserve agency resources and to prevent the agency from becoming embroiled in private

litigation") (internal quotation marks omitted).[25]  For example, the DOJ and TSA have

seen fit to divert their resources to attend more than 100 depositions noticed by plaintiffs.

Moreover, the Government has voluntarily embroiled itself by intervening in this

litigation.  The Government has attended almost every Court conference and substantive

hearing in the case.  In light of the magnitude and importance of the issues involved in

---

[24]  The Government's reliance on *Jones v. Goord*, No. 95 Civ. 8026, 2002 WL 1007614 (S.D.N.Y. May 16, 2002), is misplaced.  Among other reasons, *Jones* involved a decision whether the State would need to produce six electronic databases or 700,000 pages of written material, which apparently contained the same facts as the databases, but without the confidential information. *See id.* at *14.  That situation is readily distinguishable from this one, where the Government is suggesting the Aviation Parties should be satisfied with documents in lieu of witness testimony.  Moreover, unlike in *Jones*, it is not clear that the Aviation Parties will have any admissible evidence to rely on concerning the requested topics in the absence of these five depositions.

[25]  The Government's reliance on *Comsat Corp. v. Nat'l Science Found.*, 190 F.3d 269 (4th Cir. 1999), is particularly inappropriate. *See* Government's Br., at 19, 43, 69.  Among other reasons, the National Science Foundation's ("NSF") *Touhy* regulations at issue in *Comsat* are notably different from the DOJ's *Touhy* regulations at issue here.  The NSF's *Touhy* regulations, for example, expressly provided that the agency's disclosure decisions should be based in part on "[w]hether allowing testimony and document production would serve the stated purposes of . . . promoting efficient NSF operations [and] avoiding the involvement of NSF in tangential and controversial issues." *Comsat*, 190 F.3d at 273.  No such considerations are part of the DOJ's *Touhy* regulations. *See* 28 C.F.R. § 16.26.  The facts in *Comsat* were also distinct.  For example, in that case the party seeking documents from the NSF had already sought and received most of the same documents from the NSF pursuant to a prior FOIA request. *Comsat*, 190 F.3d at 272-73, 277-78.  In addition, many of the requested documents could be discovered directly from one of the parties to the underlying litigation. *Id.*  The *Comsat* court was thus presented with a document request calling for production of the *identical* documents that had already been produced by the governmental agency and/or that could have been obtained from a party to the litigation.  Neither of those circumstances exists here.

the September 11 Litigation, the Aviation Parties' need for these five depositions far outweighs the minimal burden they will place on the Government.

In sum, none of the concerns raised by the Government is sufficient to justify depriving the Aviation Parties of this critical testimony.    The Government has summarized its rationale for refusing to authorize the five requested depositions as follows: "Given that the Aviation Defendants could obtain the requested information through less burdensome means, and that these high-risk depositions would yield little, if any, relevant information, the Government properly denied the Aviation Parties' *Touhy* requests."  Government's Br., at 4.  This statement is plainly incorrect.  The requested testimony is of great importance to the September 11 Litigation; the Aviation Defendants cannot obtain the information through other means; and the depositions will not be high-risk or unduly burdensome because appropriate procedures can be put into place to safeguard the Government's protected information.    Accordingly, the Government's denial of the requested discovery has no legitimate basis and should be set aside.[26]

---

[26]  Plaintiffs' additional arguments add nothing to those advanced by the Government and require no separate response.

46

## CONCLUSION

For the foregoing reasons, the Aviation Parties respectfully request that this Court reverse the DOJ's arbitrary and capricious refusal to authorize the requested deposition testimony of FBI witnesses Scott Billings, Erik Rigler, Michael Rolince, Coleen Rowley, and Harry Samit in the September 11 Litigation and enter an Order granting summary judgment in favor of the Aviation Parties.

Dated:        July 1, 2008
              New York, New York

                              Respectfully submitted,

                              CONDON & FORSYTH LLP

                              By: _____
                                   Desmond T. Barry, Jr. (DB-8066)

                              7 Times Square
                              New York, NY 10036
                              (212) 490-9100
                              dbarry@condonlaw.com

                              *Aviation Parties' Liaison Counsel*

*Of Counsel*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Wendy B. Reilly
Jacob W. Stahl