UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
IN RE SEPTEMBER 11 LITIGATION          :     **OPINION AND ORDER**
                                       :     **RESOLVING DISCOVERY**
                                       :     **AND EVIDENTIARY**
                                       :     **MOTIONS**
                                       :
                                       :     21 MC 101 (AKH)
                                       :     07 Civ. 7051 (AKH)
                                       :     08 Civ. 10646 (AKH)
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

   Three wrongful death cases and nineteen property damage cases arising

from the terrorist-related crashes into the World Trade Center remain to be tried against

the Aviation Defendants.[1]  All the cases are in pre-trial discovery, where they proceed in

coordinated fashion.  The parties dispute how close they are to being finished.  Citing the

billions of dollars in recovery that are claimed, the Aviation Defendants present a long

list of witnesses and issues still remaining to be discovered.  Plaintiffs press for early trial

dates, and contend that the extensive discovery proceedings already conducted are more

than sufficient.  My rulings today clarify the few tasks that remain, and schedule a

conference to fix dates for trial.

   In the pending motions, the Aviation Defendants request discovery and

evidentiary rulings.  They seek to depose Federal Bureau of Investigation ("FBI") agents

regarding the government's terrorist investigations of the September 11 attacks.  And, they

move for specific admissibility rulings regarding portions of the Zacarias Moussaoui trial

---

[1] The "Aviation Defendants" are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Argenbright Security, Inc.; Burns International Services Corp.; Burns International Security Services Corp.; Pinkerton's Inc.; Metropolitan Washington Airport Authority; the Port Authority of New York and New Jersey; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; and the Massachusetts Port Authority.  Not all of these defendants are parties to each of the motions addressed in this order.

1

record,[2] The 9/11 Commission Report ("The 9/11 Report") and related reports,[3] and a reporter's interview with Ramzi Binalshibh, one of the terrorist leaders.  The Aviation Defendants desire this discovery and evidence to show at trial that the government's failure to apprehend the terrorists and stop the attacks was so considerable that it mitigates and excuses any alleged faults of the Aviation Defendants, and that the terrorists likely would have succeeded even if the Aviation Defendants had exercised due care.

I grant the motions to the limited extent that these sources can (1) provide information for an agreed narrative summary that explains to the jury the events of September 11, 2001, see Conf. Tr. 18-25 (Dec. 15, 2008), and (2) reveal the hijackers' plans and preparations.  Otherwise, I deny the Aviation Defendants' motions.  The issues to be tried relate to the acts and omissions of the Aviation Defendants, not the government.  The government's failures to detect and abort the terrorists' plots would not affect the Aviation Defendants' potential liability.  Moreover, efforts to prove these propositions would cause confusion and prejudice, and burden court and jury with long delays and unduly lengthy trial proceedings.  See Fed. R. Civ. P. 26(b)(2)(c)(iii); Fed. R. Evid. 403.  Finally, the additional discovery sought by the Aviation Defendants would add little of relevance, threaten national security, cause major digressions at trial, and cause substantial unnecessary expense and delays concerning the progress of the cases before me.

The following pending motions are terminated by the rulings herein:

1.  Two motions to set aside the government's final administrative decisions denying the Aviation Defendants' requests to depose six FBI agents, and two motions by the government to uphold those decisions.

---

[2] United States v. Zacarias Moussaoui, 01 Cr. 455 (LMB) (E.D. Va.) (sentenced May 4, 2006).
[3] The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States (2004), available at http://www.9-11commission.gov/report/911Report.pdf.  The Staff Monographs and other staff statements are available at http://www.9-11commission.gov/staff_statements.

2.  A motion that The 9/11 Report and various statements by the
    Commission staff be determined relevant and admissible.
3.  A motion that prior statements by Khalid Sheikh Mohammed and
    Ramzi Binalshibh, regarding the preparation and execution of the
    September 11 attacks, be determined relevant and admissible.
4.  A motion that the testimony given by FBI agents at the criminal trial
    of Zacarias Moussaoui be determined relevant and admissible.

The table of contents that follows describes the issues addressed by this Opinion.

## Table of Contents

I.      The Prior Proceedings Leading to the Motions
II.     Whether the Government's Determinations, Refusing to Allow Depositions of
        FBI Agents, Were Arbitrary and Capricious
        A.  Factual Background
        B.  Standard for Deposing Nonparty Government Employees
        C.  Analysis of the Government's Determinations
III.    Whether the Government's Failures to Apprehend the Terrorists and Abort
        Their Plots Excuse the Aviation Defendants' Alleged Faults
IV.     Whether Evidence of the Terrorists' Preparation and Training Is Relevant
V.      Proving Undisputed Background Facts by Summary Narrative
VI.     Whether The 9/11 Report and Related Reports Are Admissible
        A.  History of The 9/11 Report
        B.  Rule 803(8)(C)—The Public Records Hearsay Exception
        C.  Analysis of the Staff Monographs and Staff Statements
        D.  Analysis of The 9/11 Report
        E.  Statements in The 9/11 Report Attributed to Khalid Sheikh
            Mohammed and Ramzi Binalshibh
        F.  Rule 403—Prejudice, Confusion, and Delay
VII.    The Admissibility of the Moussaoui Trial Record
        A.  "Substitute Testimony" of Khalid Sheikh Mohammed
        B.  FBI Agents' Testimony
VIII.   The Admissibility of Ramzi Binalshibh's Journalistic Interview
IX.     Conclusion

## I.      The Prior Proceedings Leading to the Motions

The discovery in these cases has been extensive and difficult.  The

Transportation Security Administration ("TSA") has acted as a filter, reviewing the

documentary production, seeking to regulate the conduct of depositions, and protecting

against disclosure of Sensitive Security Information ("SSI").  See generally In re

September 11 Litig., 236 F.R.D 164 (S.D.N.Y. 2006) (providing narrative of SSI

procedures in this case).  The TSA has reviewed over a million pages of documents and 121 deposition transcripts before allowing their release, in original or redacted form.  See Conf. Tr. 10 (Sept. 24, 2008), Conf. Tr. 28-32 (Dec. 15, 2008).  As a result, discovery has become extended, and a number of judicial interventions were necessary to avoid impasse.  See, e.g., Memorandum and Order Regulating Deposition Protocol and Supplementing Orders of March 31 and May 5, 2006 (May 16, 2006); Order (June 14, 2006) (discussing security clearances of attorneys, procedures at depositions, and rulings on objections).

The release of The 9/11 Report on July 22, 2004, and the trial of admitted September 11 terrorist Zacarias Moussaoui in the spring of 2006, considerably helped this litigation progress.  The 9/11 Report and the public Moussaoui prosecution revealed information previously considered sensitive and tended to undercut and make academic the TSA's confidentiality concerns.  Moreover, a chief motivation for many who chose a lawsuit in this court, rather than a settlement with the Victim Compensation Fund's Special Master, was to elicit such a public record of the events leading up to September 11.  Thus, these substantial disclosures, describing the terrorist investigations and detailing the events of September 11, facilitated settlements between the parties in many of the wrongful death and personal injury cases.

## II.      Whether the Government's Determinations, Refusing to Allow Depositions of FBI Agents, Were Arbitrary and Capricious

The Aviation Defendants seek to depose six former and current FBI agents.  They sought permission from the United States Attorney's Office to depose the agents, pursuant to 28 C.F.R. § 16.22(c) (2008).  See Unites States ex rel. Touhy v. Regan, 340 U.S. 462, 467-68 (1951).  Permission was denied in final determinations, and the Aviation Defendants filed two proceedings in this court to set them aside:  Am.

Airlines, Inc. v. Fed. Bureau of Investigation, 07 Civ. 7051 (AKH) and Am. Airlines, Inc. v. Fed. Bureau of Investigation, 08 Civ. 10646 (AKH).[4]  Both sides move for summary judgment.  I affirm the Department of Justice's final determinations, and deny the Aviation Defendants' motions to set them aside.  I hold that the depositions requested would be wasteful, cause undue delay, and raise national security concerns.

### A.  Factual Background

The Aviation Defendants claim that each of the six current or former FBI agents—Scott Billings, Coleen Rowley, Erik Rigler, Michael Rolince, Harry Samit, and Kenneth Williams—gained personal knowledge of the September 11 plot through their investigations of suspected terrorists.  Billings, Rigler, Rolince, and Samit testified at the Moussaoui trial; Rowley and Williams did not.  Brief summaries of their anticipated testimony follow.

Scott Billings was a special agent stationed in Oklahoma City.  He was a member of the Joint Terrorism Task Force on September 11, 2001 and searched Moussaoui's Oklahoma residence after the attacks.  Billings testified regarding written materials and other items recovered in that search which, the Aviation Defendants argue, could support an argument as to the extent of the terrorists' plans to penetrate aviation security and hijack airplanes.  The materials seized by Billings included research on American airports, flight simulator software, contact information for other terrorists, and Moussaoui's notes from flight training sessions.

Erik Rigler, a retired FBI agent, testified as a witness for the public defender in the Moussaoui trial.  Rigler discussed an investigative report issued by the Inspector General of the Department of Justice as to five missed opportunities to learn

---

[4] The parties agreed that the proceedings should come before this court.

about the plans of the two terrorists who hijacked the plane that was crashed into the

Pentagon, and about the lack of information sharing between the FBI and the Central

Intelligence Agency ("CIA").

Michael Rolince, the section chief of the FBI's International Terrorism

Operations Section on and before September 11, 2001, testified that the FBI had intelligence

before September 11 suggesting that an attack might occur and could target civil aviation in

the United States.  He also testified about the investigative techniques in use at the time.

Harry Samit, an FBI Special Agent, testified at length that he had been

assigned on August 15, 2001 to investigate Moussaoui's unusual activity as a trainee at a

Minnesota flight academy.  Samit conducted interviews and searches of Moussaoui and

Moussaoui's associate, Hussein al-Attas.[5]

Coleen Rowley, a former FBI Special Agent, has personal knowledge of

the items Moussaoui had in his possession at the time of his arrest, including short-bladed

knives.  She also observed other items found amidst his personal property, such as the

flight training materials.

Kenneth Williams was an FBI Special Agent assigned to the Phoenix

Field Office from 2000 to 2001.  The defendants' interest in deposing Williams arises

from a memorandum he wrote alerting superiors that a large number of Middle Eastern

students were training at civil aviation schools in Arizona.

### B.  Standard for Deposing Nonparty Government Employees

It is "'axiomatic' under the principle of sovereign immunity 'that the

United States may not be sued without its consent and that the existence of consent is a

prerequisite for jurisdiction.'"  <u>Adeleke v. United States</u>, 355 F.3d 144, 150 (2d Cir.

---

[5] A detailed description of Samit's testimony appears below.  <u>See</u> Section VII.B.

2004) (quoting United States v. Mitchell, 463 U.S. 206, 212 (1983)).  "[S]overeign immunity in the absence of a waiver" similarly bars actions seeking to compel a federal agency or federal employee to produce discovery.  EPA v. Gen. Elec. Co., 197 F.3d 593, 597 (2d Cir. 1999).  The Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-06, contains the sole waiver "that would permit a court to require a response to a subpoena in an action in which the government is not a party."  EPA, 197 F.3d at 597.

        Federal statutes impose special burdens on a party wishing to depose a Department of Justice employee when the United States is not a party, about information the employee obtained in the course of his official duty.  28 C.F.R. § 16.21.  First, the party must submit to the United States Attorney's Office an affidavit supporting the request outlining "the testimony sought and its relevance to the proceeding."  28 C.F.R. § 16.22(c); see Touhy, 340 U.S. at 468-69.  The United States Attorney's Office must then determine whether the "disclosure is appropriate under the rules of procedure . . . and the substantive law concerning privilege."  28 C.F.R. § 16.26(a).  Two categories of information that the United States Attorney may not disclose are "classified information, unless appropriately declassified," and "investigatory records compiled for law enforcement purposes, [that] would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."  Id. § 16.26(b).

        One "adversely affected or aggrieved by agency action . . . is entitled to judicial review."  5 U.S.C. § 702; see also id. § 704.  "[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A); see In re SEC v. Glotzer, 374 F.3d 184, 189-92 (2d Cir. 2004).  The analysis consists of determining whether the agency:

> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of
> the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); see

Long Island Head Start Child Dev. Servs. v. NLRB, 460 F.3d 254, 257-58 (2d Cir. 2006).

### C. Analysis of the Government's Determinations

The Aviation Defendants support their request by arguing that each

deposition would elicit testimony as to what intelligence the FBI, CIA, Federal Aviation

Administration ("FAA"), and airlines had before September 11 regarding the terrorists'

plans and capabilities, as well as how the entities shared and exploited this intelligence.

The United States Attorney for the Southern District of New York denied all six

deposition requests, five on May 7, 2007 and one on October 15, 2008.[6]

The Aviation Defendants move to set aside these Touhy determinations

for lack of substantial basis in fact, and as an arbitrary and capricious agency action.  5

U.S.C. §§ 701-06; Fed. R. Civ. P. 45.  The Aviation Defendants argue that the testimony

(1) is "vital for the jury to understand what took place on September 11, 2001," (2)

establishes that the government's negligence caused plaintiffs' damages, (3) demonstrates

that the Aviation Defendants could not have reasonably foreseen such terrorist acts, and

(4) reveals that the terrorists would have accomplished their mission despite any

negligence on the part of the Aviation Defendants.

The FBI represents that it remains engaged in a massive and sustained

investigation, PENTTBOM, and that subjecting FBI agents to depositions regarding matters

---

[6] The Aviation Defendants made the first five requests on March 6, 2007 and the sixth request, for Agent
Williams, on May 5, 2008.

related to an ongoing investigation raises security and privilege concerns. The Aviation Defendants dismiss government apprehension about security because much of the information already exists in the public record. They add that precautionary measures could be taken to prevent any classified information from being disclosed during the depositions.

The government's decision that the depositions requested are likely to interfere with its continuing investigation and compromise national security is reasonable and appropriate, not arbitrary and capricious. 28 C.F.R. § 16.26(b). The depositions sought necessarily will involve, or lead to disclosures of, pre- and post-September 11 intelligence, intra-agency communications, recommended countermeasures to anticipated threats, and other sensitive information. The precautions that the Aviation Defendants suggest are likely to impose substantial burdens on the government and on the court, and create unacceptable risks of inadvertent disclosures of protective information. As the government points out, "This risk is heightened in the context of a deposition, where open-ended inquiries may elicit responses in which classified or privileged material is intertwined and not readily segregable." Samit Touhy Response (May 7, 2007). The need to consult others, including senior agency members, would unduly prolong the proceedings, adding unjustified expense and delay, as well as threatening national security. See In re IBM Corp. Sec. Litig., 163 F.3d 102, 111 (2d Cir. 1998) (holding that a "'weak showing' of potential relevance in its extensive discovery request was insufficient to outweigh the burden and expense of" additional production).

Furthermore, "the government's interests outweigh" the Aviation Defendants' need for the testimony because the depositions would be of limited value. Abdou v. Gurrieri, 2006 WL 2729247 at *4 (E.D.N.Y. Sept. 25, 2006) (citing Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1342 (D.C. Cir. 1984) ("[W]hen the

existence of [the] privilege is established, there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.")).  Below, I hold that evidence of government acts or omissions are largely irrelevant to this litigation.  <u>See</u> Section III.  Since the Aviation Defendants seek depositions of Rowley, Rigler, Rolince, and Williams largely to elicit just such irrelevant evidence, the value of the depositions is small.  Moreover, I hold in this Opinion that the Moussaoui trial testimony of the remaining agents, Samit and Billings, may be admissible as relevant, thereby mitigating the need for these witnesses to testify again.  <u>See</u> Section VI.B.  There is no reason to believe that the agents would testify differently at a deposition then they did at the trial.  <u>See</u> Section VII.B.  Finally, the FBI and other agencies already have released extensive documents and testimony regarding the events surrounding the September 11 attacks to the Aviation Defendants, to governmental commissions, and to the public.  In their submissions the Aviation Defendants even concede that much of what they seek is already available.  In light of what is already available in the public record, and the limited admissibility, the value of these depositions is minimal.

Accordingly, the cost, delay, and threats to national security inherent in additional depositions far outweigh any marginal relevance.  <u>See</u> <u>In re IBM Corp. Sec. Litig.</u>, 163 F.3d at 111.  I hold that the government's determination, denying the Aviation Defendants' petitions seeking depositions, was not arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

### III.  Whether the Government's Failures to Apprehend the Terrorists and Abort Their Plots Excuse the Aviation Defendants' Alleged Faults

The trial against the Aviation Defendants will focus on what they knew and should have known about terrorist threats to civil aviation, and on what they did and

should have done to protect against such threats.  What the Aviation Defendants learned from governmental and agency sources is relevant.  What the government knew and failed to pass on is irrelevant.  What the government failed even to learn or fully apprehend also is irrelevant.

The Aviation Defendants seek to discover the irrelevant:  all that government agents knew and all that the government should have done to collect and synthesize intelligence of terrorist plots and plans.  Among other things, they propose to offer all The 9/11 Report, certain recommended findings of the 9/11 Commission staff, sections of the Moussaoui trial record, and an interview with Ramzi Binalshibh, in part to prove that the government's acts or omissions, and not the alleged negligence of the Aviation Defendants, proximately caused plaintiffs' damages.

The Aviation Defendants cannot sue the government, directly or by third-party claim or cross-claim, because no ground to do so exists under the Federal Tort Claims Act.[7]  Nor can they inject the government as a wrongdoer to excuse or mitigate their own alleged failures.  It is well-settled under New York law[8] that if one's negligence proximately causes a plaintiff's injury, the fault of another tortfeasor who acts independently in causing the same harm does not eradicate the fault of the first tortfeasor.

---

[7] See 28 U.S.C. §§ 1291 et seq.  Section 2680(a) exempts from the government's waiver of immunity a "claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation . . . , or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency . . . whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  See Schadel v. Iowa Interstate R.R., Ltd., 381 F.3d 671, 678 (7th Cir. 2004) (no federal common-law right of contribution based on joint and several tort liability) (citing Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981) (finding no federal common-law right to contribution in antitrust cases) and Northwest Airlines, Inc. v. Transp. Workers Union, 451 U.S. 77, 88-91, 97 (1981) (rejecting federal common-law right of contribution in Equal Pay Act case, and distinguishing admiralty precedents)).

[8] Under the Air Transportation Safety and System Stabilization Act, New York law will govern this action, except to the extent that the relevant state law is inconsistent with or preempted by Federal law, because it was in New York that the terrorist-hijacked planes crashed into the World Trade Center towers.  § 408, 49 U.S.C. § 40101.  Thus, the substantive law of New York will define the relevance of the proofs.

Skinner v. Stone, Raskill & Israel, 724 F.2d 264, 266 (2d Cir. 1983) ("[W]hen there are several proximate or efficient causes of an injury, the injury may be attributed to any one or more of the causes."); Dunham v. Canisteo, 104 N.E.2d 872, 875 (N.Y. 1952).  Both tortfeasors would be jointly and severally liable for plaintiff's entire injury, and even an apportionment of fault between the tortfeasors "does not alter the joint and several liability" of each defendant for the entire "single indivisible injury."  Ravo v. Rogatnick, 514 N.E.2d 1104, 1108 (N.Y. 1987).  Only proof that the second tortfeasor was the superseding cause, that is to say, the sole proximate cause or cause-in-fact of the harm, could render a negligent party not liable.  Skinner, 724 F.2d at 266.

A superseding cause is "[a]n intervening act that the law considers sufficient to override the cause for which the original tortfeasor was responsible, thereby exonerating that tortfeasor from liability."  Higazy v. Templeton, 505 F.3d 161, 175, n.16 (2d Cir. 2007) (citing Black's Law Dictionary 213 (7th ed. 1999)); In re September 11 Litig., 280 F. Supp. 2d. 279, 301-02 (S.D.N.Y. 2003); see Gordon v. Eastern Ry. Supply, 626 N.E.2d 912, 916 (N.Y. 1993).  The superseding cause doctrine "was intended to relieve a party of responsibility for injuries which he could not have foreseen and ultimately did not cause— injuries arising from a force or actor wholly outside of the circumstances of the original negligence."  Rawl v. United States, 778 F.2d 1009, 1016 (4th Cir. 1985).  A negligent party that successfully demonstrates that a third party was a superseding cause has demonstrated, in essence, that the third party, not it, was the proximate cause of the damages.  See Johnson v. Johnson Chem., 588 N.Y.S.2d 607, 612-13 (App. Div. 1991); Ventricelli v. Kinney System Rent A Car, Inc., 399 N.Y.S.2d 237, 238 (App. Div. 1977).

In Ventricelli, plaintiff rented from defendant a car that had a defective trunk latch.  399 N.Y.S.2d at 238.  Plaintiff was standing by the parked car struggling to

close the trunk when a car struck him.  The jury found that the driver was 20% at fault and the rental company was 80% at fault.  The Appellate Division reversed, ruling that the rental company did not cause the injury, and that the driver's negligence in striking the plaintiff was the sole proximate cause of plaintiff's injury.  While the defective trunk latch on the rental car was the occasion for plaintiff's position on the roadway, it was not a contributing cause to the injury.

In Derdiarian v. Felix Contracting Corp., 414 N.E.2d 666 (N.Y. 1980), a driver who failed to take his seizure medication suffered an epileptic episode and crashed into a construction site injuring a worker.  The worker sued the contractor for failing to provide a safe workplace.  The court rejected the contractor's argument that the accident was "freakish" and unforeseeable, holding that even if "[t]he precise manner of the event [is] not . . . anticipated," it was entirely foreseeable "that a driver would negligently enter the work site and cause injury to a worker."  Id. at 671.  The court reasoned that a tortfeasor is excused only if the intervening act is "independent of or far removed from the defendant's conduct" and "breaks the causal nexus" created by the defendant's conduct.  Id. at 670.

> Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed.  In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence.  If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus.

Id. at 169-70.

Here, any government negligence did not "break[] the causal nexus" arising from the negligence of the Aviation Defendants; it preceded that negligence.  The

Aviation Defendants will be proved negligent to the extent their efforts to secure the airports and airplanes failed to conform to reasonable duties of care.  As in Ventricelli, the government's alleged negligence may have led to the terrorists being present at the airports and on the airplanes (in that it did not apprehend them prior), but any such government negligence does not reduce the Aviation Defendants' responsibility for the damages caused by their own negligence.  As in Derdiarian, the Aviation Defendants' duties to exercise due care exist regardless of any government negligence in failing to apprehend the terrorists earlier, for it was entirely foreseeable "that a [terrorist could] enter the . . . site and cause injury to a [passenger or others]."  Id. at 671.

As a leading treatise puts it, "a person is required to realize that there will be a certain amount of negligence in the world."  W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on The Law of Torts § 33, at 198 (5th ed. 1984) ("[W]hen the risk becomes a serious one, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated.") (quotation marks omitted).  Just as an employer should foresee that his employee may perform negligently, see, e.g., Connell v. Hayden, 443 N.Y.S.2d 383, 395 (App. Div. 1981), and a product designer should foresee that a user may misuse a designed product, see, e.g., Jurado v. W. Gear Works, 619 A.2d 1312, 1319 (N.J. 1993),[9] so the Aviation Defendants had to have

---

[9] As Professor Twerski wrote:

> "If a court determines that a design defect exists because the manufacturer has failed to include safety devices, there is no proximate cause question of any moment left to consider.  The very reason for declaring the design defective was to prevent this kind of foreseeable misuse.  Proximate cause could not, in such a case, present an obstacle

foreseen that government-supplied intelligence and warnings might have been incomplete, insufficient, or not heeded.  Moreover, the Aviation Defendants must have understood that they would not be able to excuse their own negligence by proving that the government, or some other agency, also negligently performed its role in the security process.

Generally, the fact-finder resolves "questions concerning what is foreseeable and what is normal."  Derdiarian, 414 N.E.2d at 671.  However, as there are no triable issues, or any "valid line of reasoning," concerning this question, there is nothing about it that requires a jury to decide.  Nallan v. Helmsley-Spear, Inc., 407 N.E.2d 451, 456 (N.Y. 1980) (quoting Cohen v. Hallmark Cards, Inc., 382 N.E.2d 1145, 1148 (N.Y. 1978)); see Gerbino v. Tinseltown USA, 788 N.Y.S.2d 538, 540-41 (App. Div. 2004) (holding that trial court properly dismissed comparative negligence and superseding cause defenses); Perales v. City of New York, 711 N.Y.S.2d 9, 10 (App. Div. 2000).

The Aviation Defendants add another argument to introduce evidence of government mistake.  They argue that if the government, with its much greater access to intelligence, could not foresee or thwart the September 11 attacks, the Aviation Defendants could not be expected reasonably to foresee what the government could not.  The argument falsely presumes a correlation between what the government ought to have known and done and what the Aviation Defendants ought to have known and done.  The Aviation Defendants will be judged by what they knew, or should have known, not by what the government knew or should have known.  The government's failures are not relevant.

---

on the grounds of misuse.  To do so would negate the very reason for declaring the design defective in the first instance."

Aaron D. Twerski, The Many Faces of Misuse: An Inquiry in to the Emerging Doctrine of Comparative Causation, 29 Mercer L. Rev. 403, 421 (1978).

The Aviation Defendants argue also that their defense of derivative immunity requires introducing evidence of government knowledge.  Just as government agents enjoy immunity from suit under the Federal Tort Claims Act for exercising "discretionary functions," 28 U.S.C. § 2680, the Aviation Defendants claim that they also should receive derivative immunity for acting under the direction of the FAA.  See In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 197-98 (2d Cir. 2008).  See generally Yearsley v. W.A. Ross. Constr. Co., 309 U.S. 18, 20-21 (1940); Boyle v. United Techs. Corp., 487 U.S. 500 passim (1988).

Even assuming, for the sake of argument, that this defense is properly pleaded, the criteria of derivative immunity are not satisfied.  The non-federal workers must have operated under "reasonably precise specifications," have been supervised and controlled by the federal agency, and have disclosed to the agency any dangers they knew of and that the agency did not.  In re World Trade Ctr. Disaster Site Litig., 521 F.3d at 197.

The Court of Appeals opinion arose in the context of an appeal from my decision that held that New York City's defense of immunity raised triable issues of fact and could not be decided in a motion for summary judgment.  Non-federal workers had been charged with overseeing construction site safety, allegedly under standards set forth by the Occupational Safety and Health Administration.  The Court of Appeals ruled that the following three-prong test must be met:

> (1) the agency, in its discretion, approved reasonably precise specifications regarding the management of a recovery site; (2) the agency supervised and controlled an entity charged with implementing those specifications; and (3) the entity warned the agency about any dangers known to it but not to the agency.

Id.  The Aviation Defendants contend that the third prong implicates evidence of what the government knew.

The Aviation Defendants do not need proof from government agents in order to show what the Aviation Defendants communicated to those agents.  Their proofs lie within their own files and the minds of their own employees.  I do not need to rule now on the speculative possibility that plaintiffs might impeach the Aviation Defendants' proofs or that the Aviation Defendants might show that the government already had been aware of information that the defendants failed to convey.

Finally, the evidence sought by the Aviation Defendants is inadmissible because of Federal Rule of Evidence 403.  If the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or delay [and] waste of time," the court may exclude the evidence.  Fed. R. Evid. 403.  Permitting an inquiry into what fragments of information the various government agents knew, or should have known, and at what time, but did not tell the defendants, threatens thoroughly to confuse and prejudice the jury, distract it from the major issues of the case, and add to the trial substantial expense and delay.  Id.

IV.    **Whether Evidence of the Terrorists' Preparation and Training Is Relevant**

The Aviation Defendants wish to argue at trial that the terrorists would have succeeded in their plans and caused the damage of which plaintiffs complain regardless of the Aviation Defendants' negligence.  They seek to show that the terrorists had trained to evade airport and airplane security and to accomplish their planned hijackings despite proper security procedures.

17

For example, the Aviation Defendants seek to introduce evidence that the terrorists had planned to use as weapons only implements that were then permitted on airplanes, and that they had trained in hand-to-hand combat so that they could accomplish their mission if airport security stripped them even of those weapons. The Boeing Company wishes to argue that the terrorists were planning to take over the cockpit early in the flight, when the cockpit door typically was open. Boeing claims that its alleged negligence in constructing a cockpit door that is impenetrable when locked did not matter; for the terrorists had planned to advance when the door was open.

The Aviation Defendants should be allowed to develop this defense. If the terrorists would have been able to pass through airport security with their weapons, overcome security procedures aboard airplanes, overcome resistance of passengers and crew, and fly jumbo jets into buildings even if the Aviation Defendants had acted meticulously, plaintiffs may be unable to prove proximate causation, or at least a jury might so decide. However, the evidence that the Aviation Defendants require to make this argument adequately already exists in The 9/11 Report and FBI agents' prior testimony, discussed later in this Opinion, see Sections VI and VII.B, and can be part of an agreed narrative of undisputed facts, see Section V. No further discovery is necessary to elicit evidence supporting this argument.

## V.    Proving Undisputed Background Facts by Summary Narrative

A trial is more than a set of dry proofs on disputed issues. The issues arise in context of history and circumstance, presented in the form of competing narratives. Rulings of relevance should allow the parties to develop their narratives, balanced against potential confusion of issues, undue delay, inefficiency, and expense.

The events of September 11, 2001 similarly have to be understood in their several contexts.  The jury should understand the chronology of the terrorists' movements, how they undertook to elude airport security, how they hijacked aircraft and flew them into populated buildings, and what damage resulted.  The jury also should understand the history and policies relating to the security protocols and practices used by the Aviation Defendants, the relevant government regulations that influenced and governed the protocols, and the tensions between public safety and public convenience in devising practical, economic, and effective screening protocols.  The parties will have their own ideas about the information they wish to present.

All of this has to be regulated, for the longer the parties take to present their proofs, the more difficult it will be to empanel a representative jury.  The court and the parties must cooperate to develop summaries and agreed statements of relevant facts, to shorten trial time without sacrificing fairness and comprehension of the relevant issues.

Fortunately, much of the information relevant to an understanding of the issues of September 11 has been authoritatively gathered by the 9/11 Commission and presented in The 9/11 Report.  Relevant portions of The 9/11 Report, and other information in the public record, can be used to develop an agreed upon narrative of the events and context of September 11, to minimize the length of trial and reduce the number of witnesses and experts that otherwise might be required.  The procedure is recommended by the Manual for Complex Litigation.

> When basic facts of the who-said-what-to-whom kind are agreed upon and only the inferences to be drawn from those facts are in dispute, the judge can streamline the trial by requiring the parties to stipulate to the undisputed facts and present the stipulations to the jury, rather than allowing the lawyers to bore everyone by eliciting uncontradicted facts by means of protracted direct examination and cross-

> examination of witnesses, as if they were dentists pulling
> teeth the old-fashioned way.

In re High Fructose Corn Syrup Anti-Trust Litig., 295 F.3d 651, 665 (7th Cir. 2002)

(citing Federal Judicial Center, Manual for Complex Litigation § 21.47 (3d ed. 1995)).

      The narrative may include, among other subjects, a basic description of

the hijackers and their plans, the manner in which the hijackers boarded the planes, the

events that took place in the planes, the crashes, the resulting collapse of the towers, and

a chronology of all these events.  This procedure will allow the witnesses, including

experts, to concentrate on disputed issues relating to the nature, purpose, and scope of

airport security on September 11, 2001, the government regulations and policies, and

how the terrorists managed to evade security and accomplish their objectives.

### VI.     Whether The 9/11 Report and Related Reports Are Admissible

      The Aviation Defendants ask the court to make preliminary rulings of

admissibility for The 9/11 Report, as well as a monograph and statements written by the

9/11 Commission Staff.[10]  The Aviation Defendants argue that these summary documents

reflect trustworthy and reliable government-authorized investigations that are admissible

pursuant to Fed. R. Evid. 803(8)(C).

      The 9/11 Report was the product of a federally-mandated, full-scale

investigation into the September 11 terrorist attacks.  Intelligence Authorization Act of

2003 §§ 601-11, 6 U.S.C. § 101 note (2002) ("IAA").  The Commission investigated and

documented nearly every aspect of government involvement in the events leading up to,

during, and following the hijackings.  The Commission was given access to non-public

information, the power to subpoena, and a budget of three million dollars to conduct the

---

[10] The Aviation Defendants seek rulings on The 9/11 Report, The Staff Monograph on the Four Flights and Civil Aviation Security, and Staff Statements Nos. 1-4, 9, 10, and 16.

investigation.  Id. at §§ 605(A)(2), 609, 611.  The Aviation Defendants ask that they be

able to present The 9/11 Report and related staff reports to help them prove their defenses

regarding causation, unforseeability, and derivative immunity.  They argue that these

documents pertain to the following relevant areas:

1. Screening and Security on September 11,
2. Events in Flight on the Hijacked Aircrafts on September 11,
3. Pre-September 11 Intelligence Regarding the Terrorist Threat,
4. Pre-September 11 Aviation Security Measures,
5. Terrorist Planning for the September 11 Attacks,
6. Terrorist Tactics for the September 11 Attacks, and
7. Terrorist Histories of the September 11 Hijackers.

The Aviation Defendants argue also that because the government has resisted granting

access to government witnesses and security-sensitive documents, virtually no

conventional alternatives exist to access such evidence.

The plaintiffs argue against admissibility.  They claim that the Commission

did not focus on the Aviation Defendants' conduct, and based conclusions on unreliable

statements by terrorist suspects made during "enhanced methods" of interrogations,

precluding admission under Rule 803(8)(C).  They claim that the staff reports are not final

reports and therefore are not admissible under Rule 803(8)(C).  In addition, plaintiffs

argue that proper efforts to impeach statements contained in The 9/11 Report would

distract the jury.  Plaintiffs maintain that a joint stipulation of a limited number of

background facts, which could be based on The 9/11 Report, would do away with any

need to introduce it directly and in bulk.

**A.  History of The 9/11 Report**

The 9/11 Report had its genesis in an Act of Congress passed on

November 27, 2002, establishing the National Commission on Terrorist Attacks upon the

United States.  IAA § 602.  The purpose of this commission was to:

> (1) examine and report upon the facts and causes relating to the terrorist attacks of September 11, 2001 . . . ;
> (2) ascertain, evaluate, and report on the evidence developed by all relevant governmental agencies regarding the facts and circumstances surrounding the attacks;
> (3) build upon the investigations of other entities, and avoid unnecessary duplication, by reviewing the findings, conclusions, and recommendations of [other government inquiries];
> (4) make a full and complete accounting of the circumstances surrounding the attacks, and the extent of the United States' preparedness for, and immediate response to, the attacks; and
> (5) investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that can be taken to prevent acts of terrorism.

Id. § 603(a).  The Commission was to be composed of ten "prominent United States citizens, with national recognition and significant depth of experience in such professions as governmental service, . . . intelligence gathering, commerce (including aviation matters), and foreign affairs."  Id. § 603(b).  No more than five Commission members could belong to a single political party.  Id. § 603(a), (b).  The Commission's charge was to "investigate[] relevant facts and circumstances relating to the terrorist attacks . . . , including any relevant legislation, Executive order, regulation, plan, policy, practice, or procedure . . . ."  Id. § 604(a).  The 9/11 Report, subtitled the "Final Report of the National Commission on Terrorist Attacks upon the United States," was the final submission to the President and Congress providing the Commission's findings.  See id. § 604(a)(3).

In making its report, the Commission "reviewed over 2.5 million pages of documents and interviewed more than 1,200 individuals."  The 9/11 Report, supra note 3, at xv.  It heard from nearly every senior official who had knowledge of the relevant events and topics, and many others.  Id.  The Commission's purpose was not "to assign blame," but rather "to provide the fullest possible account of the events surrounding 9/11 and to identify lessons learned."  Id.

22

The 9/11 Report provides narrative, background, and analytical treatment of the events of September 11, 2001, each chapter focusing on a different aspect of the terrorism, the nation's preparedness, and its response.  The 9/11 Report, divided into chapters and subchapters, smoothly integrates a vast history of terrorism and national security with detailed factual findings regarding the hijackers' plans and actions and the government's responses.  The first chapter explains the minute-by-minute events of September 11.  The second and third chapters describe early developments in terrorism and counterterrorism, and the fourth chapter outlines the United States response to Al Qaeda's initial assaults.  Chapters Five, Six, and Seven recount Al Qaeda's progress towards launching an attack on American soil.  The eighth chapter describes the counterterrorism efforts that took place in the weeks and months prior to the September 11 attacks.  Chapters Nine and Ten present the response to the attacks and the wars that followed.  Chapters Eleven, Twelve, and Thirteen identify lessons learned from September 11 to prevent future attacks.

The Staff Monographs and Statements were prepared by the staff appointed by each Commissioner.  IAA § 607(a)(1) (providing each commissioner with the right to appoint staff as "necessary to enable the commission to carry out its functions").  The two Staff Monographs total approximately 400 pages and cover issues related to terrorist financing and terrorist travel.  The Staff Statements consist of seventeen documents, each an in-depth report on an aspect of the Commission's investigation, such as "National Policy Consideration" and "The Performance of the Intelligence Community."  However, neither the Staff Monographs nor the released Statements are final reports.  Each was written by a handful of investigators on the Commission's staff and then read into the public record at the hearings.  They were not approved or endorsed by the Commissioners

and do "not necessarily reflect their views."  National Commission on Terrorist Attacks on

the United States, Monograph on Terrorist Financing at Preface.[11]

### B.  Rule 803(8)(C)—The Public Records Hearsay Exception

Generally, an out-of-court statement offered at trial for the truth of its

contents is considered hearsay and is inadmissible.  Fed. R. Evid. 801, 802.  But there are

many exceptions, including Rule 803(8)(C) which relates to factual findings of a

government agency's duly-authorized investigation.  The Rule deems admissible:

> Records, reports, statements, or data compilations, in any
> form, of public offices or agencies, setting forth . . . factual
> findings resulting from an investigation made pursuant to
> authority granted by law, unless the sources of information
> or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8)(C).  Opinions and conclusions of the agency on matters of fact that

flow from the investigative findings may also be admissible.  Beech Aircraft Corp. v.

Rainey, 488 U.S. 153, 170 (1988); Complaint of Nautilus Motor Tanker Co., Ltd., 85

F.3d 105, 112-23 (3rd Cir. 1996) (admitting conclusions and recommendations in a Coast

Guard Report, under 803(8)(C)).  Conclusions of law are likely inadmissible.  See Hines

v. Brandon Steel Decks, Inc., 866 F.2d 299, 302 (11th Cir. 1989).

If the circumstances indicate that the government agency has functioned

within its authorization and in a trustworthy and reliable manner, the law "assumes

admissibility . . . but with ample provision for escape if sufficient negative factors are

present."  Fed. R. Evid. 803(8) advisory committee's note; Bridgeway Corp. v. Citibank,

201 F.3d 134, 142 (2d Cir. 2000) (describing Rule's underlying "'assumption that public

officers will perform their duties, that they lack motive to falsify, and that public

inspection to which many such records are subject will disclose inaccuracies'" (quoting

---

[11] See supra note 3.

31 Michael H. Graham, Federal Practice and Procedure § 6759 at 663-64 (Interim ed.

1992))).  The Supreme Court explained:

> That "provision for escape" is contained in the final clause of the Rule: evaluative reports are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness."  This trustworthiness inquiry—and not an arbitrary distinction between "fact" and "opinion"—was the Committee's primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements of the report.  Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof—whether narrow "factual" statements or broader "conclusions"—that she determines to be untrustworthy.  Moreover, safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them.  And of course it goes without saying that the admission of a report containing "conclusions" is subject to the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions.  [See Fed. R. Evid. 106, 806.]

Beech Aircraft Corp., 488 U.S. at 167-68 (footnote omitted).

The Advisory Committee provides four non-exclusive factors upon which

to determine trustworthiness:  timeliness of report, skill and experience of investigators,

use of hearings, and signs of investigatory bias.  Fed. R. Evid. 803(8) advisory

committee's note.  Courts have also used finality as a factor.  City of New York v.

Pullman, Inc., 662 F.2d 910, 914 (2d Cir. 1981) (finding report inadmissible hearsay

because "by its own terms, . . . [it] was not the final report or finding of a government

agency within the meaning of the Rule, but was an 'interim' staff report in the form of a

recommendation to the Administrator").

If the report meets all of the preliminary requirements of Rule 803(8)(C),

then the inquiry turns to the report's trustworthiness.  The party opposing admission has

the burden to show untrustworthiness.  Gentile v. County of Suffolk, 926 F.2d 142, 148

(2d Cir. 1991); Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 805

F.2d 49, 54 (2d Cir. 1986) ("To exclude evidence which technically falls under 803(8)(C)

there must be an affirmative showing of untrustworthiness, beyond the obvious fact that

the declarant is not in court to testify.").  If the party does not satisfy the burden, the court

may admit the evidence, and the trier of fact may determine the report's "weight and

credibility."  Bradford Trust Co., 805 F.2d at 54; see Note, The Trustworthiness of

Government Evaluative Reports Under Federal Rule of Evidence 803(8)(C), 96 Harv. L.

Rev. 492, 493 (1982) ("[I]n civil cases[,] government evaluative reports should be treated

like expert testimony and thus should be excluded only when the agency or the official

who produced the report could not have independently qualified as an expert."), cited in

Beech Aircraft Corp., 488 U.S. at 168.

### C.  Analysis of the Staff Monographs and Staff Statements

The Staff Monographs and Staff Statements, as recommendations to the

9/11 Commissioners, were interim reports, not final reports.  The 9/11 Report constituted

the Commission's final report, containing the findings of a duly-constituted public agency

as required by Rule 803(8)(C).  The Staff Monographs and Staff Statements were findings

of the Commission staff, and not a public office or agency.  The Staff Statements refer to

the findings contained therein as "initial findings . . . [which] lead[] to some tentative

judgments," Staff Statement No. 1 at 1, "findings and judgments [that] may . . . inform the

development of [the Commission's] recommendations,"  Staff Statement No. 2 at 1.

Accordingly, they do not satisfy the criteria of Rule 803(8)(C), which permits only reports

that "set forth . . . factual findings" by "public agencies."  See Pullman, 662 F.2d at 914;

Figures v. Bd. of Pub. Utilities of City of Kansas City, Kansas, 967 F.2d 357, 360 (10th

Cir. 1992) (holding draft of proposed letter from federal official not admissible as a finding); Strobl v. New York Mercantile Exch., 590 F. Supp. 875, 879-89 (S.D.N.Y. 1984) (finding initial decision of default does not meet Rule 803(8)(C)).  Thus, I rule that the Staff Monographs and the Staff Statements are not admissible.[12]

### D.  Analysis of The 9/11 Report

Plaintiffs argue that, because the Commission focused on government conduct and not the aviation companies' conduct, The 9/11 Report as a whole is irrelevant to this litigation, would mislead the jury, and should not be admitted into evidence.  However, the Intelligence Authorization Act of 2003 indicates that commercial aviation was a relevant area of the Commission's investigation.  § 603(b)(3).  And, even if the issue in question were merely peripheral to The 9/11 Report's central purpose, the report's admissibility would not necessarily be affected.  Compare Bradford Trust Co., 805 F.2d at 54 (finding investigation made in a criminal context "especially reliable" given its tangential relation to the corresponding civil action), with Pullman, 662 F.2d at 915 (approving of trial judge's decision to exclude public records, under Fed. R. Evid. 403, in part, because "the report was prepared for very different purposes than those for which it was offered at trial").

Plaintiffs do not dispute that The 9/11 Report meets the Rule 803(8)(C) initial requirements.  There is no basis to distinguish The 9/11 Report from any other public office or agency report.  It is a report of a public commission, pursuant to an Act of Congress, written following an investigation by staff and Commissioners appointed

---

[12] In a recent opinion, setting out the minute-by-minute events of the morning of September 11, 2001, I adopted the chronology developed in the Staff Monograph.  In re September 11 Litig., 594 F. Supp. 2d 374, 378 (S.D.N.Y. 2009).  Both sides accepted the chronology as true, and the 9/11 Commission had adopted the Staff's finding.  The 9/11 Report, supra note 3, at 1-46.  The chronology satisfies the criteria of Rule 803(8)(C).

pursuant to that Act.  IAA §§ 601-11, 6 U.S.C. § 101 note (2002); see Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000) (finding presumptively admissible the U.S. State Department Country Reports for Liberia for the years 1994-97); In re Air Disaster at Lockerbie Scotland, 37 F.3d 804, 827-28 (2d Cir. 1994) (admitting Scottish investigator's report on aircraft bombing); Gentile v. County of Suffolk, 926 F.2d 142, 148 (2d Cir. 1991) (finding report by Temporary Commission of Investigations of the State of New York meets initial Rule 803(8)(C) criteria); United States v. American Tel. & Tel. Co., 498 F. Supp. 353, 359 (D.D.C. 1980) (same for FCC Report).

Plaintiffs do challenge the "trustworthiness" of many parts of the report.  Fed. R. Evid. 803(8)(C).  The trustworthiness of the relevant findings is measured by the investigation's timeliness, the investigating officials' skill and experience, and other appropriate criteria.  See Fed. R. Evid. 803(8) advisory committee's note; Beech Aircraft, 488 U.S. at 167 n.11.  The plaintiffs, as the parties opposing admission, have the burden to demonstrate that the portions of the report to which they object (and which are not otherwise objectionable) fail to satisfy Rule 803(8)(C)'s requirement of trustworthiness.  Bradford Trust Co., 805 F.2d at 54.

I hold that relevant and appropriate findings made by the Commission are potentially trustworthy and admissible.  The Commission's goal was to provide the government and the public with the "facts and circumstances surrounding the attacks." IAA § 603(a).  The Commission heard 160 witnesses, was free from bias, and conducted public hearings that were the adequate equivalent of cross-examination in protecting litigants' rights.  See Franklin v. Skelly Oil Co., 141 F.2d 568, 572 (10th Cir. 1944); Fed. R. Evid. 803(8) advisory committee's note.

Nevertheless, I deny the Aviation Defendants' evidentiary offers as to The 9/11 Report, without prejudice to resubmission consistent with my rulings herein. The Aviation Defendants have identified numerous paragraphs of The 9/11 Report which they seek to admit. Many of these paragraphs are inconsistent with my rulings in this Opinion. Others contain extraneous and descriptive information not suitable for evidentiary offers. Resubmissions shall be made in the form of a jointly-prepared, three-column document, listing: in the left column, numbered sequentially, the proposed finding or language and the page number of The 9/11 Report on which it can be found; in the center column, the plaintiffs' response and objections; and in the right column, a space for the court's rulings. The date upon which resubmissions should be made will be determined at the status conference discussed below. See Section IX.

The general comments that follow suggest that few parts of the report satisfy the rules of admissibility, although these parts, particularly as the bases for an agreed narrative, may be particularly useful and important.[13]

Several of the Commissioners' findings, as they themselves acknowledge, are based on sources that are not completely trustworthy or acceptable in American courts. For example, plaintiffs argue that "key sections" of The 9/11 Report are based on information derived from torture or other questionable investigative techniques and are unreliable. These sections focus on the terrorists' initial planning of the attack, their organization into terrorist cells, their recruitment activities, the assembly of their teams,

---

[13] The inadmissibility of any given section of The 9/11 Report does not affect that of other sections. See Beech Aircraft Corp., 488 U.S. at 167 (holding "a trial judge has the discretion, and indeed the obligation, to exclude an entire report, or portions thereof—whether narrow 'factual' statements or broader 'conclusions'—that she determines to be untrustworthy").

and the final preparations of the attack.  The 9/11 Report, supra note 3, at 146.[14]  The

Commissioners did not interview the terrorists, and did not make findings on the manner

of their interrogations.  The Commissioners asserted that their findings are reliable

because they were made carefully and based on substantial corroborative evidence.  See

id.  But, that determination, made for the purpose of general education, may not extend to

the evidentiary requirements of a trial.  Cf. Bridgeway, 201 F.3d at 143 (questioning

admissibility of State Department reports about fairness of Liberian Judicial System and

Liberian elections).  And, in any event, the sections in question have limited, if any,

relevance to the issues before me, and raise substantial dangers of bias, confusion, and

undue delay.  Fed. R. Evid. 402, 403.

> ### E.  Statements in The 9/11 Report Attributed to Khalid Sheikh Mohammed and Ramzi Binalshibh

The Aviation Defendants seek to introduce statements in The 9/11 Report

attributed to terrorists Khalid Sheikh Mohammed and Ramzi Binalshibh, contending that

the two men figured prominently in the planning and implementation of the September

11 attacks, are unavailable for depositions, and made statements contained in The 9/11

Report that are sufficiently trustworthy to be admitted into evidence.

The argument is without merit.  A statement recorded in a public record

made by an individual with no business duty to report is considered hearsay-within-

hearsay and is excluded, unless it satisfies some other hearsay exception.  Since no other

exception is offered, the statements are excluded.  See Parsons v. Honeywell, Inc., 929

---

[14] Plaintiffs submit news articles that allege that such conduct took place and quote unnamed government officials who corroborate that Khalid Sheikh Mohammed would have been precisely the type of prisoner to whom the government would have applied these techniques.  See, e.g., Jane Mayer, The Black Sites, A rare look inside the CIA's secret interrogation program, The New Yorker, Aug. 13, 2007.  Plaintiffs have submitted no direct proof that Mohammed was tortured while making these statements, or indicated which parts of the "submitted testimony" allegedly were derived from torture.

F.2d 901, 907 (2d Cir. 1991) (admitting one statement contained in a police report as an

excited utterance, but excluding another statement that failed to qualify as a hearsay

exception); United States v. Taylor, 462 F.3d 1023, 1026 (8th Cir. 2006) (finding

inadmissible a police report containing double hearsay).  The statements of the terrorists,

even though found in The 9/11 Report, also cannot qualify as factual findings of the

Commissioners.  The statements will be excluded.

### F.   Rule 403—Prejudice, Confusion, and Delay

The 9/11 Report, or large sections contained therein, cannot be admitted in

full.  Although specific statements may be relevant, useful, and admissible, admitting

longer sections of the report would cause the trial to digress into innumerable arguments

relating to myriad issues, causing undue prejudice, extensive delay, and confusion.  Fed.

R. Evid. 403.  The imprimatur of the 9/11 Commissioners would extend to findings that

were not fully tested and could not adequately be rebutted.  Objections would be difficult

to argue and resolve.  However valuable an account it is to government officials and the

public, The 9/11 Report, in contrast to its specific findings, cannot be permitted to

displace the time-tested search for truth by examination and cross-examination.  Cf.

United States v. Scheffer, 523 U.S. 303, 313-14 (1998) (holding polygraph evidence

inadmissible; "the aura of infallibility attending polygraph evidence can lead jurors to

abandon their duty to assess credibility and guilt"); Pullman, 662 F.2d at 915

(government report held inadmissible; presenting it to the jury "would not have been

commensurate with its actual reliability"); United States v. Duke, 242 Fed. App'x 37, 55

(4th Cir. 2007) ("It is . . . human nature to rely upon an opinion carrying the imprimatur

of an entire state.").  While careful jury instructions on this point might mitigate the

danger, see Scheffer, 523 U.S. at 335 (dissent), the danger would likely remain.

Admitting The 9/11 Report in bulk, rather than by evaluation of specific statements, would choke the proceedings.  Parties, if confronted by hearsay within a report admitted under Rule 803(8)(C), have the right to impeach the report.  Fed. R. Evid. 806; Beech Aircraft Corp., 488 U.S. at 167.  Inevitably, admitting any lengthy section of the report, a book brimming with findings and recommendations, and subjecting the many findings to impeaching arguments and evidence, would overwhelm the trial and affect its fairness.  Fed. R. Evid. 403.  The sheer volume of interviews and documents, the confidentiality that pervades the interviews, and the controversy that threatened the work of the Commission and refuses to be quieted surely will create scores of mini-trials as each finding of The 9/11 Report is asserted and challenged.  Challenging even a single finding could implicate a panoply of documents and interviews.  Without reasonable limitations regarding the statements presented from The 9/11 Report, a fair and efficient trial could not take place.  See Fed. R. Evid. 403.

The 9/11 Report, in relevant parts, provides a useful basis for an agreed narrative, or stipulated set of facts, to describe the events of September 11 and, to a limited extent, the run-up to those events.  See Section V.  In pressing the parties to create such an indisputable narrative, the court, directly or through the aid of Magistrate Judges or Special Masters, may use The 9/11 Report as an acceptable and neutral source for particular statements.  See Federal Judicial Center, Manual for Complex Litigation § 11.472 (4th ed. 2004) (providing that a court may urge a party who denied a requested admission for trivial reasons to respond in good faith or face sanctions under Fed R. Civ. P. 36(a)(4)).  But beyond that, as my discussion above makes clear, The 9/11 Report poses considerable dangers of confusion, prejudice, and undue delay.  See Fed. R. Evid. 403.

Accordingly, for the reasons stated, I hold that The 9/11 Report is not admissible as a whole. Specific findings may be admissible.

### VII.   The Admissibility of the Moussaoui Trial Record

### A.  "Substitute Testimony" of Khalid Sheikh Mohammed

The Aviation Defendants seek an admissibility ruling on a document containing statements attributed to, and describing the conduct of, Khalid Sheikh Mohammed. They argue that since the document, Mohammed's "substitute testimony," was admitted in the punishment phase of Zacarias Moussaoui's criminal trial, where a sentence of life or death was in issue, it should be admissible at the civil trial of the Aviation Defendants. The Aviation Defendants assert that Mohammed is unavailable, and that the statements are against his interest and are reliable. See Fed. R. Evid. 804(b)(3), 807.

Zacarias Moussaoui pleaded guilty to conspiracy to commit acts of terrorism, commit aircraft piracy, destroy aircrafts, use weapons of mass destruction, murder United States employees, and destroy property, as part of the September 11 attacks. See United States v. Zacarias Moussaoui, 01 Cr. 455 (LMB) (E.D. Va.) (plea accepted April 22, 2005) ("Moussaoui Trial"). Because the case was death-eligible, the court and jury heard evidence as to whether Moussaoui should be sentenced to death or to life without possibility of parole. On May 3, 2006, the jury issued its verdict, rejecting the death penalty and finding that Moussaoui should serve a life sentence with no possibility of parole. The court sentenced Moussaoui to six life sentences.

At trial, the defense presented a statement attributed to Khalid Sheikh Mohammed, his "substitute testimony."[15] The document was based on the intelligence

---

[15] Mohammed was not available to attorneys either for the prosecution or the defense because he was in custody, following his capture in March 2003, and any deposition or testimony threatened to expose

that the government gathered from Mohammed during his time spent in custody. As a prisoner in various locations, he was subjected to various conditions. At the time of the Moussaoui trial, Mohammed was being held in the United States Naval Base at Guantanamo Bay, Cuba. Mohammed's "substitute testimony" was a summary of his responses during his interrogations, written and compiled by his various interrogators. The district court admitted into evidence the "substitute testimony" as a stipulation by government and defense counsel, worded in the third person. 18 U.S.C. App'x § 6(c). Mohammed did not appear in court, and his statement was not sworn.

The "substitute testimony" is over fifty pages long, contains 114 numbered paragraphs, and is written in a neutral tone. The document describes the planning of the September 11 attacks, including planning for an additional "second wave" of attacks that did not materialize. It also identifies the hijackers and their accomplices and discloses how money was sent to them in the United States, how they learned to live and train as pilots here, and how they argued among themselves and with other Al Qaeda leaders. The Aviation Defendants seek to admit the "substitute testimony," in part, to support the argument that the terrorists' plot would have succeeded despite the Aviation Defendants' alleged negligence. See Section IV.

A hearsay statement of a declarant who is unavailable to testify at trial may be admissible if the statement "so far tended to subject the declarant to civil or criminal liability . . . , that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). Mohammed is unavailable to testify, and likely to remain so, because of the strictness and secrecy that

---

information that would jeopardize national security. Pursuant to 18 U.S.C. App'x § 6(c), a provision in the Classified Information Procedure Act, 18 U.S.C. App'x III, the district court admitted a summary of the relevant information elicited from Mohammed in a form approved by the intelligence agencies.

surrounds his detention.  Fed. R. Evid. 804(a)(5).  However, the other criteria of Rule

804(b)(3) are not satisfied.

First, Mohammed's "substitute testimony" is not, in form and most likely

in substance, his "oral or written assertion."  Fed. R. Evid. 801(a).  The statement is at

least two steps removed:  a stipulation, extracted from various summaries and memoranda

written and edited by his interrogators and their supervisors over an appreciable period of

time.  Moussaoui Trial Tr. 2418.  Segregable portions of the "substitute testimony" might

possibly qualify, but Mohammed's "substitute testimony," as a whole, is not his statement

for the purposes of Rule 804(b)(3).  See Ramsameachire v. Ashcroft, 357 F.3d 169, 180

(2d Cir. 2004) (finding "a record of the interview that merely summarizes or paraphrases

the alien's statements is inherently less reliable than a verbatim account or transcript").

Cf. United States v. SKW Metals & Alloys Inc., 195 F.3d 83, 88 (2d Cir. 1999) (summary

prepared by declarant may be admissible as his "statement").

Second, Mohammed's interrogators allegedly subjected him to pressures

that may have caused him to exaggerate, or otherwise fabricate, his responses, aiming to

satisfy his interrogators rather than to accurately recount events that had occurred.[16]  A

court should examine the specific circumstances of the declarant, noting any motivations

that may have influenced a reasonable person in the situation to make a statement against

his interest.  See, e.g., United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978) (remarking

that declarant was in custody, of below average intelligence, facing a long sentence, and

cognizant of the implications of cooperating with authorities).  The issue raises the

concern that a reasonable person in Mohammed's circumstances might have made the

statements attributable to him, even if they were not entirely true.  See United States v.

---

[16] See supra note 14.

Oliver, 626 F.2d 254, 260 (2d Cir. 1980).  A reasonable person in Mohammed's place,

intent on winning favor from his jailers or causing them to stop harsh interrogation

methods, might well have been motivated to tell his jailers what he thought they would

want to hear, regardless of its truth.  If he had a substantial motive not to tell the truth

when he made his statement, his statement is not admissible under Rule 804(b)(3).  See

United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006) (excluding statement against

criminal interest where declarant had motive to accept guilt to protect his son from

culpability).  Compare Lang, 589 F.2d at 97 ("We conclude that there was no motive here

for [declarant] to lie. . . ."); with Oliver, 626 F.2d at 261 (finding that a reasonable person

might have made untrue, self-inculpatory statements while in FBI custody, in order to

mitigate a long prison sentence for himself and avoid criminal prosecution of his son).

       Furthermore, Mohammed may not have acted as a reasonable person.  The

rule is premised on the notion that the declarant has acted reasonably—the declarant's

rational compunctions are the foundation for his statement's presumed reliability.  See

Kenneth S. Broun, McCormick on Evidence § 319(g) (6th ed. 2006); 5 Weinstein's

Federal Evidence § 804.06[4][c] (2d ed. 2005).  Mohammed is a terrorist, willing to give

his life, and assist others in giving theirs, so as to murder innocents.  I will not base my

ruling here on the presumption that he is a reasonable man.

       Third, only self-inculpatory statements are admissible under Rule 804(b)(3).

Williamson v. United States, 512 U.S. 594, 599-600 (1994) ("We see no reason why

collateral statements, even ones that are neutral as to interest . . . should be treated any

differently from other hearsay statements that are generally excluded."); United States v.

Williams, 506 F.3d 151, 155 (2d Cir. 2007).  Given the form of the "substitute testimony," it

is not possible to determine which of Mohammed's statements were against his interest.  No

showing is made as to when each of the underlying statements were made, or what information Mohammed had been given at those times as to what crimes he was suspected of, what evidence against him the authorities possessed, what cooperation agreements were available to him, or any other such details that would shed light on whether each underlying statement was "sufficiently inculpatory" to render it reliable.  <u>Williamson</u>, 512 U.S. at 606.

Because of these and other difficulties, the "substitute testimony" of Khalid Sheikh Mohammed, as a whole, is not admissible under Rules 804(b)(3), 402, and 403.  Possibly, however, particular statements by Mohammed could be relevant and qualify for a hearsay exception, for example, under Rule 807.  <u>See</u> Section VII.B (discussion of Rule 807).  The parties are not prevented by my holding from offering such statements for later evaluation.  Indeed, I encourage them to base portions of the agreed narrative of events on Mohammed's account of how the terrorists planned to enter and hijack the airplanes.

### B.  FBI Agents' Testimony

The Aviation Defendants seek to admit, under Rule 807, the prior testimony given at the Moussaoui trial of four FBI agents who investigated terrorists linked to the September 11 attacks.  Rule 807, the Residual Hearsay Exception, includes especially reliable and indispensable hearsay that is otherwise inadmissible.  Fed. R. Evid. 807.  Agents Scott Billings and Harry Samit, as explained in Section II.A of this Opinion, gained first-hand knowledge of aspects of the hijackers' plans and tactics.  Agent Erik Rigler and Section Chief Michael Rolince testified about how the FBI and other agencies processed the intelligence the government had received.  <u>See</u> Section II.A.

The testimony of Billings and Samit should be incorporated, as appropriate, into the agreed narrative that the attorneys are preparing.  If necessary, I will consider it for admissibility at trial as well.  Billings's and Samit's testimony may support the Aviation

Defendants' argument that the terrorists' preparations were sufficiently sophisticated as to be able to overcome airport screening and safety measures, regardless of the Aviation Defendants' alleged negligence.  The testimony of Rigler and Rolince is inadmissible because it relates only to the irrelevant argument of government mistake.  See Section III.

Samit was a special agent in the FBI's Minneapolis Field Office who worked in counterterrorism.  On August 15, 2001, he received a report from a Minnesota flight training school concerning an atypical student.  School personnel told Samit that the student, Zacarias Moussaoui, had no affiliation with any airline and very little experience flying planes.  Nevertheless, he was studying to fly commercial jets, a relatively expensive and time-consuming endeavor, he was focusing on planes with a particular type of cockpit that would be easier than others to hijack, and he lived and was born abroad.  Samit opened an investigation immediately.

The next day, Samit interviewed Moussaoui and arrested him for immigration violations.  Samit questioned Moussaoui's roommate, Hussein al-Attas, who related comments Moussaoui had made about his Muslim convictions, disapproval of Israel/American policy, belief in Fatwas,[17] and approval of harming citizens in a Jihad.[18] During the post-arrest interrogation, Moussaoui answered questions about his background, friends, and family, giving extremely vague and incomplete answers.  For example, Moussaoui stated that he could not remember the name of the company at which he had worked the previous year, his salary, or his job description.  Samit recounts pressing Moussaoui unsuccessfully for details about his finances, including how he secured funding to travel and attend flight school.

---

[17] A Fatwa is a religious pronouncement from a Muslim scholar.
[18] A Jihad is a holy war.

On August 17, Samit notified headquarters, passing the information he had obtained to a centralized intelligence office at the FBI, the International Terrorism Operations Section ("ITOS").  ITOS is composed of several units, each of which focuses on a particular area of international terrorism.  Moussaoui had given up so little information that Samit did not know of his association with Osama Bin Laden. Moussaoui's Sunni faith led Samit to report his findings to the Radical Fundamentalist Unit at ITOS, rather than the ITOS unit focused specifically on Bin Laden.  By August 24, Samit had received additional information linking Moussaoui to Bin Laden, which prompted him to report his findings to the Bin Laden Unit.  Samit did not receive a response from that unit prior to the attacks.

Samit also requested permission to approach the federal prosecutor's office and pursue criminal charges, in part to permit a lawful search of Moussaoui's possessions seized from his Minneapolis residence.  Samit's superiors denied the request because they believed that there was insufficient evidence that a crime existed.  The FBI was also concerned that if they failed to convince a judge to issue a criminal warrant, the rejection would have made it difficult to successfully obtain a similar warrant from the special court established under the Foreign Intelligence Surveillance Act ("FISA"). Nevertheless, the FISA request was denied.

Then the FBI made arrangements to deport Moussaoui to France, where he claimed to reside, recognizing that French law would permit a search of his possessions upon arrival.  But the FBI did not receive authority to pursue deportation until the afternoon of September 10.  On September 11, 2001, Moussaoui was still in FBI custody at Sherburn County Jail in Minnesota.

Based on the attacks and the information Samit had already obtained from the interrogations, a magistrate judge granted a search warrant for Moussaoui's possessions on September 11.  The FBI completed the search immediately and found the following:  a small knife, two utility tools containing small blades, boxing gloves, shin guards, field binoculars, operating manuals for a 747 aircraft, new hiking boots, a laptop, a notebook, rent and utility bills for an Oklahoma address, identification documents and papers regarding the loss of identification documents, and a wire transfer receipt.  Samit ordered a search of the Oklahoma address as well and transported Moussaoui to the Southern District of New York.  Billings was the FBI agent stationed in Oklahoma City who carried out the search of Moussaoui's residence pursuant to Samit's recommendation. Billings's testimony relates to the items he found in that search.  See Section II.A.

During Samit's cross-examination, defense counsel sought to draw out mistakes or oversights that Samit, and others in the FBI, made during the pre-September 11 investigation, regarding investigative decisions and intra-agency communication.  Samit discussed his subsequent accusations against FBI personnel for negligently handling pre-September 11 intelligence.  Samit accused one senior FBI official of intentionally frustrating the investigation by refusing to submit a worthy application to search Moussaoui's apartment for fear that a rejection would hurt that official's prospects for career advancement.  Samit accused the senior official of modifying language and removing facts to weaken the application, then refusing to submit it to the FISA court.  Samit recounted how another FBI official, arguing in favor of applying for a warrant to the FISA court, urged the senior official that Samit was simply trying to make sure that Moussaoui did not get control of a plane and crash it into the World Trade Center—a "metaphor," the official later explained, that he had "pulled . . . out of the air."  Moussaoui Trial Tr. 1207.

The portions of testimony by Samit and Billings regarding how the terrorists planned to overcome airport and airplane security are admissible under Rule 807, preferably as bases for an agreed narrative and, potentially, in their own rights if the agreed narrative is shown to be insufficient.  All testimony of the government's intramural discussions and alleged shortcomings is not relevant or admissible.  See Section III.

Rule 807 provides a residual exception to the hearsay rule for statements not "specifically covered" by the hearsay exceptions described in Rules 803 and 804, but which have "equivalent circumstantial guarantees of trustworthiness."  Fed. R. Evid. 807; see United States v. Morgan, 385 F.3d 186, 208 (2d Cir. 2004).  Rule 807 requires advance notice in order to give the respondent fair opportunity to prepare to meet the hearsay statement, and sets out three additional conditions:  that the statement is about "a material point," that the statement is "more probative" than any other reasonably available evidence, and that admitting the statement is consistent with "the general purposes of these rules and the interests of justice."  Fed. R. Evid. 807.

In general, the prior testimony of Billings and Samit is trustworthy, to the extent that it reports their observations in carrying out the investigations.  Billings and Samit were experienced FBI agents.  Their testimony described their observations during authorized investigations, as well as their reports to superior officers of those observations.  They testified in court, before a jury, under oath and penalty of perjury, in a highly-scrutinized, public proceeding, regarding matters they were trained to perform.

The agents' testimony about their investigations' results is material and more probative than other available evidence.  As discussed in Section IV, evidence of the terrorists' plans is relevant to the element of causation.  Billings and Samit both discovered evidence that makes more likely the Aviation Defendants argument that the

41

terrorists intended to skirt aviation security.  The testimony is the most probative of such evidence that is available because it is based on direct observations of government officials during property searches and interviews of an admitted would-be hijacker.  The evidence is not synthesized, either by 9/11 Commissioners, see Section VI.E., or multiple anonymous government agents, see Section VII.A.  Also, for these reasons, admitting this reliable and relevant evidence serves the interests of justice and is consistent with the general principles underlying the federal evidentiary rules.

Accordingly, I hold that Samit's and Billings's prior testimony regarding their investigations is trustworthy and, to the extent I indicated, potentially admissible under Rule 807.  See In re Slatkin, 525 F.3d 805, 812 (9th Cir. 2008); Annunziata v. City of New York, 2008 WL 2229903 (S.D.N.Y. May 28, 2008).  I reserve my specific rulings for specific offers of proof.

### VIII.  The Admissibility of Ramzi Binalshibh's Journalistic Interview

The Aviation Defendants seek a ruling that the translation of an interview with Ramzi Binalshibh ("Translation") should not be excluded on hearsay grounds.  They argue that Federal Rules of Evidence 801(d)(2)(b) and 804(b)(3) permit the Translation's admission.  Plaintiffs disagree.  I hold that the Translation is not admissible.

Prior to his capture, Ramzi Binalshibh, a member of Al Qaeda and a co-conspirator in the September 11 attacks, requested an interview with Yosri Fouda, a journalist for Al Jazeera.  In April 2002, Fouda was brought to an apartment near Karachi where he met Binalshibh and Khalid Sheikh Mohammed.  Over two days, Fouda interviewed the men and recorded his interviews on videotape.  Al Qaeda members then kept the video recording and apparently edited selections of the Binalshibh interview onto an audio tape which they sent to Fouda.  Alaa Shahine, Al Qaeda Is Said To Have

Weighed Nuclear Targets, The Washington Post, Sept. 9, 2002, at A13; Yosri Fouda &

Nick Felding, Masterminds of Terror 118-19 (2003).  This recording was then translated

into the document the Aviation Defendants offer.  The underlying video and audio

recordings were not made available, nor were the non-translated version of the document

or the identity of the translator.

    The Aviation Defendants argue, on the basis of a sentence in plaintiffs'

letter of February 9, 2005 to opposing counsel and the court, that plaintiffs accepted the

Translation's truth, and that such acceptance qualifies as an adoptive admission by a

party-opponent pursuant to Fed. R. Evid. 801(d)(2)(b); Schering Corp. v. Pfizer, Inc., 189

F.3d 218, 238-39 (2d Cir. 1999).

    The argument is without merit.  The authors of the letter, the law firm of

Motley Rice, wrote on behalf of their clients only, not on behalf of the larger Plaintiffs'

Executive Committee.  Also, Motley Rice wrote in the context of settlement negotiations,

to discuss the merits of various contentions in the lawsuit.  The privilege provided in Rule

408 applies, barring admission of statements made during settlement discussions.  Fed. R.

Evid. 408.  The exceptions listed in Rule 408 do not apply.  Penguin Books U.S.A., Inc. v.

New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2d 251, 262 (S.D.N.Y. 2003);

see 5 Weinstein's Federal Evidence § 408.05[2] (2d ed. 2005) ("To promote settlement of

disputes, there must be full and frank disclosure by each party of his or her position, and

the facts on which he or she relies to sustain that position.").

    The Aviation Defendants argue that Motley Rice quoted the Translation

on its web page to rebut a certain finding of The 9/11 Report, thus waiving privilege

under Rule 408.  But, whether privileged or not, the use of one set of arguments to rebut

another set of arguments does not meet the tests of reliability and trustworthiness.  I hold

that the Translation is not admissible under Rule 801(d)(2)(B).

   The Aviation Defendants argue also that the Translation is a statement

against interest pursuant to Fed. R. Evid. 804(b)(3).  However, as I discussed in the

analysis of Khalid Sheikh Mohammed's "substitute testimony," such a statement has to

be "trustworthy."  <u>See</u> Section VII.A.  The boasts of terrorists given in an uncorroborated

interview with a sympathetic reporter as part of a controlled public relations campaign to

enhance Al Qaeda do not merit such a finding.  The Translation is not admissible.

### IX. Conclusion

   For the reasons given, I grant and deny the motions of the Aviation

Defendants and the government, as follows:

   (a)  I deny the Aviation Defendants' two summary judgment motions to

set aside the government's refusals to allow depositions of current and former FBI agents.

I grant the government's summary judgment motions to uphold the Department of

Justice's final determinations.

   (b)  I deny the Aviation Defendants' motion for an order that The 9/11

Report as a whole, a Staff Monograph, and Selected Staff Statements are relevant and not

excluded by the hearsay rule.  I hold that the Monograph and Staff Statements are not

admissible under Rule 803(8)(C).  I hold that the statements contained in The 9/11 Report

attributed to Mohammed and Binalshibh, as well as parts based on what the Commissioners

describe as insufficient access to witnesses, are not admissible under Rule 803(8)(C).  I hold

also that The 9/11 Report as a whole is inadmissible under Rule 403.  Specific portions of

The 9/11 Report may be admissible under Rules 803(8)(C), particularly as bases for an

agreed narrative of the history, context, and chronology of events, as discussed in Section V.

The chronology provided in The 9/11 Report is admissible under Rule 803(8)(C). See supra note 12. I hold that other specific statements contained in The 9/11 Report are inadmissible, under 803(8)(C), pending resubmissions in light of this Opinion.

(c) I deny the Aviation Defendants' motion for a determination that Mohammed's "substitute testimony" and Binalshibh's interview will survive hearsay-related objections. I hold that both are inadmissible hearsay.

(d) As to the Aviation Defendants' motion that testimony given by FBI agents during the Moussaoui trial be considered relevant and admissible, I grant the motion only as to the testimony of Samit and Billings in which they recount what they learned in their investigations. I deny the balance of the motion. Testimony as to what their superiors did or did not do is not relevant, and is not admissible.

The parties shall appear for a status conference on July 28, 2009 at 4 p.m. At this conference, I will discuss the status of the remaining discovery and schedule a final pre-trial conference and a trial date.

The Clerk shall mark the following motions terminated: Docs. 419, 423, 428, 439, 496, and 713.

SO ORDERED.
Dated:      July 16, 2009
            New York, New York

                              ALVIN K. HELLERSTEIN
                              United States District Judge